IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREATER YELLOWSTONE COALITION<br>13 South Willson, Suite 2<br>Bozeman, MT 59715;<br><br>THE WILDERNESS SOCIETY<br>1615 M St. NW<br>Washington, DC 20036;<br><br>NATURAL RESOURCES DEFENSE COUNCIL<br>40 West 20th Street<br>New York, NY 10011;<br><br>WINTER WILDLANDS ALLIANCE<br>910 Main St., Suite 235<br>Boise, ID 83702;<br><br>SIERRA CLUB<br>85 Second Street, 2nd Floor<br>San Francisco, CA 94105;<br><br>    Plaintiffs,<br><br>    vs.<br><br>DIRK KEMPTHORNE, in his official capacity as Secretary of Interior; MARY BOMAR, in her official capacity as Director of the National Park Service; and MIKE SNYDER, in his official capacity as Director of the Intermountain Region of the U.S. National Park Service,<br><br>    Defendants. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.  Plaintiffs Greater Yellowstone Coalition, et al. challenge the National Park Service's decision to allow continued snowmobile use in Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway (collectively "Yellowstone" or "Parks"). Despite

a bevy of laws, regulations, and policies that should prevent this result, the Park Service has authorized recreational snowmobiling in Yellowstone at a level that will impair or unacceptably impact park resources. The environmental analysis used to justify this result fails to assess accurately how this result and a range of other studied alternatives comport with the governing law, and frustrates the purposes of full environmental disclosure and analysis. Rather than preserving the Parks as a sanctuary for wildlife, natural processes, and humans alike, the decision contravenes the Park Service's affirmative responsibility to protect wildlife and natural soundscapes, and to secure the best possible air quality. By granting damaging snowmobile use priority over other, less injurious forms of public access, the Park Service has impaired the park experience for all winter visitors.

## PARTIES

2.  Plaintiff Greater Yellowstone Coalition ("GYC") is a conservation organization dedicated to protecting and restoring the Greater Yellowstone Ecosystem and the unique quality of life it sustains. Central to GYC's mission is maintaining the integrity of the national parks that are the core of the larger ecosystem. Formed in 1983, GYC is a non-profit corporation and has approximately 9,000 members, many of whom regularly use and enjoy Yellowstone and Grand Teton National Parks.

3.  Plaintiff The Wilderness Society ("TWS") is a non-profit organization dedicated to protecting a national network of wild lands and fostering an American land ethic. TWS works to ensure wise management and protection of America's public lands, including Yellowstone. Founded in 1935, TWS has approximately 200,000 members, many of whom regularly use and enjoy Yellowstone and Grand Teton National Parks.

4.      Plaintiff Natural Resources Defense Council ("NRDC") is a non-profit organization that uses law, science, and the support of more than 400,000 members to protect the planet's wildlife and wild places, and to ensure a safe and healthy environment. NRDC and its members have a longstanding interest in preserving Yellowstone's unique natural resources, including the integrity of visitor experience.

5.      Plaintiff Winter Wildlands Alliance is a non-profit organization that advocates nationally for non-motorized backcountry winter recreation. Representing more than 1,100 individual members and 28 grassroots groups to promote human-powered snowsports activities, Winter Wildlands Alliance works with federal, regional, and local land managers to resolve user conflicts on public lands and to promote a quality backcountry winter recreation experience on those lands.

6.      Plaintiff Sierra Club is a national conservation organization with more than 700,000 members. Founded in 1892, its mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist humanity to protect and to restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

7.      Members of each of the Plaintiff organizations visit the Parks in winter to observe wildlife, ski and snowshoe, and to enjoy the spectacular scenery and natural quiet. Even from afar, members of each of the Plaintiff groups take an active interest in maintaining the integrity of the National Park System. The Park Service's authorization of snowmobile use and inadequate environmental analysis causes direct injury to the recreational, aesthetic, and conservation interests of members of the Plaintiff organizations. These injuries are fairly

traceable to the challenged Record of Decision and EIS, and are redressable through this action to invalidate the Record of Decision and EIS.

8. Defendant Dirk Kempthorne is the Secretary of the U.S. Department of Interior and, in that capacity, has oversight authority over all actions of the National Park Service. Mr. Kempthorne is sued in his official capacity.

9. Defendant Mary Bomar is the Director of the National Park Service and, in that capacity, has management responsibility for all actions of the National Park Service. Ms. Bomar is sued in her official capacity.

10. Defendant Mike Snyder is Director of the Intermountain Region of the National Park Service and, in that capacity, has management responsibility for Yellowstone and Grand Teton National Parks, and the John D. Rockefeller, Jr. Memorial Parkway. Mr. Snyder signed the Record of Decision challenged in this action. Mr. Snyder is sued in his official capacity.

## JURISDICTION AND VENUE

11. This action arises under the National Park Service Organic Act, 16 U.S.C. §§ 1, et seq.; the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq. ("NEPA"); and the Administrative Procedure Act, 5 U.S.C. §§ 551, et seq. ("APA"), which waives Defendants' sovereign immunity.

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331(federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

13. Venue lies in the District of the District of Columbia pursuant to 28 U.S.C. § 1391(e) because Defendants Kempthorne and Bomar and Plaintiff The Wilderness Society reside in this

District, and because a substantial part of the events and omissions giving rise to Plaintiffs' legal claims transpired in this District.

## The Legal Framework

14. The Park Service has a conservation mandate under the National Park Service Organic Act and other federal statutes, regulations, Executive Orders, and Management Policies to afford Yellowstone's natural resources, including clean air and quiet, the very highest level of protection.

15. Congress established Yellowstone National Park in 1872 as America's first National Park. Its enabling legislation expressly requires the "preservation, from injury or spoliation, of … natural curiosities, or wonders, within the park, and their retention in their natural condition." 16 U.S.C. § 22. Yellowstone and the other Parks have been set aside and are to be "preserved and managed for the benefit and inspiration of all the people of the United States[.]" 16 U.S.C. § 1a-1.

16. The designation of Yellowstone National Park and the subsequent creation of the National Park System is a signal achievement of American society. Following the creation of Yellowstone and the National Park System, "[s]cores of nations have preserved areas of natural beauty and historical worth so that all people will have the opportunity to reflect on their natural and cultural heritage and to return to nature and be spiritually reborn. Of all the benefits resulting from the establishment of Yellowstone National Park, this may be the greatest." See Yellowstone: A Brief History of the Park, available at http://www.nps.gov/yell/planyourvisit/upload/Yell257.pdf.

17. With Yellowstone as a template, the National Park Service Organic Act of 1916 provides for the establishment of a national parks system, setting forth the Park Service's central mission "to conserve the scenery and the natural and historic objects and the wild life [within

5

national parks] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.

18. With the General Authorities Act, Congress "reaffirm[ed], declare[d], and direct[ed] that the promotion and regulation of the various areas of the National Park System … shall be consistent with and founded in the purpose established by [the Organic Act], to the common benefit of all the people of the United States." Id. § 1a-1. Congress further provided that "[t]he authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established[.]" Id.

19. This conservation mandate is further elaborated in the National Park Service Management Policies, which provide that the Park Service "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values." NPS Management Policies 2006 § 1.4.3. Specifically, the Park Service must "seek to perpetuate the best possible air quality in parks[,]" id. § 4.7.1, and "take action to prevent or minimize all noise that through frequency, magnitude, or duration adversely affects the natural soundscape or other park resources or values," id. § 4.9.

20. With regard to snowmobile use in particular, Park Service regulations prohibit snowmobiling in the Parks except in designated areas where "their use is consistent with the [Parks'] natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources." 36 C.F.R. § 2.18(c). As stated in the Park Service's Management Policies, where the use of motorized vehicles, such as snowmobiles, "is necessary and appropriate, the least impacting equipment, vehicles, and

6

transportation systems should be used, consistent with public and employee safety." NPS Management Policies 2006 § 8.2.3.

21. Similarly, Executive Orders mandate that off-road vehicle use, including snowmobile use, "shall be located in areas of the National Park system … only if the respective agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values." Exec. Order No. 11,644, 37 Fed. Reg. 2,877 (Feb. 8, 1972), as amended by Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 24, 1977). If off-road vehicle use "will cause or is causing considerable adverse effects on … wildlife, wildlife habitat or cultural or historic resources[,]" park managers must "immediately close such areas or trails to the type of off-road vehicle causing such effects[.]" Exec. Order No. 11,989, 42 Fed. Reg. at 26,959.

## FACTUAL BACKGROUND

22. The suite of laws, regulations, and policies governing management of the National Parks clearly prohibits snowmobile use that degrades the natural integrity of the Parks. Yet, for years now, the Park Service has accommodated snowmobiles at the expense of clean air, quiet, and wildlife.

### Snowmobile Use In Yellowstone

23. In 1971, eight years after snowmobiles first entered the park, the National Park Service began grooming Yellowstone's snow-covered roads for use by snowmobiles and other oversnow vehicles. Snowmobile usage steadily increased through the 1970s and 1980s, leading to complaints—from both visitors and Park Service personnel—regarding the noise, air pollution, and wildlife harassment caused by the machines. By the early 1990s, snowmobile numbers were exceeding all agency projections, and the Park Service recognized that

7

development of a new policy was necessary to address the adverse impacts caused by increasing snowmobile traffic in Yellowstone.

24.   In 1994, the Park Service initiated a formal study of the impacts of winter recreation on the Parks.  Three years later, as part of the settlement of a lawsuit brought by The Fund for Animals, the Park Service agreed to prepare a comprehensive Environmental Impact Statement ("EIS") addressing winter use.

25.   The resulting 2000 EIS confirmed longstanding concerns about snowmobile use in Yellowstone.  The EIS documented serious health hazards from snowmobile emissions; impaired visibility from the haze of snowmobile exhaust; persistent noise from snowmobile engines; and routine harassment of wildlife, especially bison already stressed by Yellowstone's harsh winter conditions.  In light of these unacceptable adverse impacts, the Park Service "acknowledge[d] that [it had] not complied with the applicable legal requirements" of the National Park Service Organic Act, governing Executive Orders, regulations, and Management Policies.  Final Rule, 66 Fed. Reg. 7,260 (Jan. 22, 2001).

### The 2001 Decision To Phase Out Snowmobile Use

26.   The Park Service considered several regulatory approaches to bringing snowmobile use into compliance with the law.  To this end, the Park Service analyzed the extent to which "best available technology" requirements could reduce air pollution and noise, and whether guided tour requirements could prevent wildlife harassment.  Ultimately, however, the Park Service concluded and the U.S. Environmental Protection Agency ("EPA") independently confirmed that best available technology and guiding requirements would not prevent impairment from continued snowmobile use in Yellowstone.

27. As the Park Service explained, "[s]ome newer snowmobiles have promise for reducing some impacts, but not enough for the use of large numbers of those machines to be consistent with the applicable legal requirements." Id. at 7,260. For instance, "[q]uieter snowmobiles are still noisy, and are audible at a greater distance than 4-track conversion snowcoaches." Id. Thus, "[a]chieving compliance with the applicable legal requirements while still allowing snowmobile use would require very strict limits on the numbers of both snowmobiles and snowcoaches[,]" which "would sharply limit overall winter use of the parks[.]" Id. at 7,262.

28. Faced with the task of maintaining historic levels of winter access without compromising air quality, quiet, and wildlife protection in the Parks, the Park Service developed a mass-transit plan that would phase out snowmobiles in favor of multi-passenger snowcoaches. On December 22, 2000, the Park Service issued a Record of Decision mandating a three-year transition to exclusive snowcoach access, see 65 Fed. Reg. 80,908 (Dec. 22, 2000), and on January 22, 2001, the Park Service published regulations implementing the new winter access plan in the Federal Register, see 66 Fed. Reg. at 7,260.

### The Subsequent SEIS Process

29. Six months later, following a change in presidential administrations, the Park Service agreed to prepare a supplemental EIS ("SEIS") to reconsider new technology as a fix for the Yellowstone snowmobile problem. However, in keeping with the Park Service's previous assessment, the SEIS disclosed that continued snowmobile use would continue to threaten human health, impair visibility, disrupt the natural quiet, and unnecessarily disturb wildlife notwithstanding advances in snowmobile technology, caps on daily snowmobile entries, and guided tour requirements. Once again, the Park Service concluded that a transition to

snowcoaches would "best attain[] the widest range of beneficial uses of the environment without degradation, [and] risk of health or safety by ensuring visitors to the park have appropriate opportunities to experience and enjoy the parks in a safe manner that causes the least amount of damage to the environment." National Park Service, Winter Use Plans, Final Supplemental Environmental Impact Statement, at 72 (Feb. 21, 2003) (internal quotations omitted).

30. Despite its endorsement of the original plan to phase out snowmobiles, the Park Service issued a March 25, 2003 Record of Decision ("ROD") to allow 1,140 daily snowmobile entries into the Parks. On December 11, 2003, the Park Service published regulations implementing its new winter access plan in the Federal Register. Final Rule, 68 Fed. Reg. 69,268 (Dec. 11, 2003).

### Litigation Over The 2003 Snowmobile Plan

31. GYC and others challenged the 2003 ROD on grounds that the Park Service had failed to explain adequately its decision in light of its previous conclusions that snowmobiles in substantial numbers impair park resources and values. Based on the adverse environmental impacts disclosed in the SEIS, GYC further argued that the new plan violated the Organic Act and other applicable legal requirements.

32. On December 16, 2003, this Court granted GYC's motion for summary judgment, holding that the Park Service had violated the Administrative Procedure Act, 5 U.S.C. § 706, in failing to explain its decision to allow continued snowmobile use "[i]n light of its clear conservation mandate, and the previous conclusion that snowmobile use amounted to unlawful impairment[.]" The Fund For Animals v. Norton, 294 F.Supp. 2d. 92, 108 (D.D.C. 2003). Having invalidated the 2003 ROD, rule, and SEIS on APA grounds, the Court declined to reach

GYC's substantive claims under the Organic Act and governing Executive Orders, regulations, and Management Policies.

33. At the request of the Park Service, this Court ordered the agency to implement its previously planned snowmobile phase-out pending compliance with the Court's order on remand.

### Litigation Over The Original 2001 Snowmobile Phase-Out

34. After the D.C. Circuit Court of Appeals declined to grant an emergency stay of this Court's December 16, 2003 Order, two intervenor-defendants in the litigation before this Court, the International Snowmobile Manufacturers Association ("ISMA") and the State of Wyoming, reopened a case challenging the 2001 phase-out rule in Wyoming District Court. On February 10, 2004, the Wyoming District Court preliminarily enjoined further implementation of the phase-out and ordered the Park Service to promulgate new rules governing the remainder of the 2003-2004 winter season. See Int'l Snowmobile Mfrs. Ass'n v. Norton, 304 F.Supp. 2d 1,278, 1,294 (D. Wy. 2004).

35. The Park Service then adopted a temporary rule applicable for three winter seasons, beginning 2004-2005 (the "2004 Rule"). See Final Rule, 69 Fed. Reg. 65,348 (Nov. 10, 2004). The 2004 Rule permitted 720 snowmobiles per day in Yellowstone. The Rule also required that all snowmobile users be accompanied by a commercial guide and that all recreational snowmobiles meet "best available technology" requirements. Several litigants challenged the 2004 Rule in both the Wyoming District Court and the D.C. District Court, but neither Court invalidated the 2004 Rule.

36. At the time that it adopted the 2004 Rule, the Park Service stated that it planned to conduct further studies concerning the impact of snowmobiles on Yellowstone while the

11

temporary rule was in effect, with the goal of enacting a permanent rule based on the findings of those further studies.

37. While the 2004 Rule authorized up to 720 snowmobiles per day in Yellowstone, actual use during the past three winter seasons has only been approximately 250 snowmobiles per day. This significantly reduced number of snowmobiles has resulted in markedly improved park health, with cleaner air, less impact on wildlife, quieter soundscapes, sharper views, and a more positive park experience for visitors. Even at these levels, however, Park Service monitoring identifies continued adverse impacts to Yellowstone's soundscapes and wildlife.

**The 2007 Snowmobile Decision**

38. In March 2007, the Park Service released a draft environmental impact statement (the "DEIS") regarding a new, permanent management plan for winter access in the Parks. See National Park Service, Winter Use Plans, Draft Environmental Impact Statement (Mar. 2007). The DEIS described the further studies that the Park Service had conducted since adopting the 2004 Rule and evaluated six alternative approaches to winter access in Yellowstone. See id. One of those alternatives was to eliminate the use of snowmobiles in favor of continued public access through a system of multi-passenger, best-available-technology snowcoaches. See id. at 40.

39. Despite the fact that the snowcoach alternative preserved park resources in ways that continued snowmobile operations could not, the Park Service's preferred alternative in its September 2007 final EIS ("FEIS") was a 540 snowmobiles per day in Yellowstone alternative.

40. After completion and release of the FEIS, the Park Service signed a Record of Decision authorizing continued recreational snowmobiling in the Parks and, on this date, released that decision to the public.

## FIRST CAUSE OF ACTION
## Violation of NEPA

41. All preceding paragraphs are incorporated as if fully set forth herein.

42. Under NEPA, federal agencies must prepare an EIS for major Federal actions that they undertake that will significantly affect the human environment. 42 U.S.C. § 4332(2)(C). NEPA's implementing regulations provide that an EIS must "state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of [NEPA] and other environmental laws and policies[,]" 40 C.F.R. § 1502.2(d), and that federal agencies "shall concentrate effort and attention on important issues," id. § 1502.15. Ultimately, an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," thereby "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." Id. § 1502.14.

43. The Snowmobile EIS fails to disclose the true environmental impacts of the various alternatives because its environmental analysis is structured around an assessment of whether each alternative is an improvement over deplorable historic conditions. By structuring its environmental analysis in this fashion, the Park Service obscured the assessment of whether any given alternative was consistent with the Service's obligation to prevent unacceptable impacts and impairment of park resources. Under this analytical framework, instead of evaluating whether an alternative violated the laws, regulations, and policies governing snowmobiling in a national park, the Park Service evaluated only whether each alternative was better than the deplorable historic conditions that have not been seen for four years.

44. Nowhere in the EIS did the Park Service demonstrate why or how it determined that any improvement over a violation of multiple environmental laws and policies would itself

13

comply with those same laws and policies.  The EIS and ROD are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

### SECOND CAUSE OF ACTION
### Violation of NEPA

45. All preceding paragraphs are incorporated as if fully set forth herein.

46. In its Snowmobile EIS, the Park Service failed to evaluate meaningfully the degradation of the Parks' natural soundscapes that would be caused by each of the various alternatives.  As stated in the EIS, the National Park Service Organic Act "was written and enacted in an environment in which it was clear that the American people wanted places to go that were undisturbed and natural and which offered a retreat from the rigors and stresses of everyday life."  National Park Service, Winter Use Plans, Final Environmental Impact Statement, at 137 (Sep. 2007).  Thus, "inappropriate sound or noise is clearly an issue to be addressed when considering a proposal for use and enjoyment of the national parks.  Natural quiet, or natural sound conditions that would prevail without human presence, is an appropriate baseline from which to gauge the impacts of human use."  Id.

47. In spite of this language, the Park Service's final EIS—which concludes that none of the discussed alternatives would impair the Parks' natural soundscapes—largely relies on an "overall park perspective" incapable of assessing the impact of the alternatives on the natural soundscape in those areas frequented by winter visitors. Under the Park Service's standard, an alternative has a "major impact" on a park's natural soundscape when snowmobile noise is audible in more than twenty percent of the "total park."  Id. at 304, 342.  This standard fails to distinguish between those areas in which visitors are generally present during the winter season (areas that are, in fact, frequented by snowmobiles) and those areas in which visitors are rarely present during the winter season.  The standard is accordingly unable to assess the impact it was

14

designed to measure, and the EIS thereby fails to determine and disclose whether the Park Service's selected alternative will comply with the environmental laws and policies governing the National Park System, including the Organic Act. The EIS and ROD are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law. See 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
### Violation of NEPA

48. All preceding paragraphs are incorporated as if fully set forth herein.

49. Under the Park Service's own regulations, snowmobile use may be allowed within the Parks only "where designated and only when their use … will not *disturb* wildlife[.]" 36 C.F.R. § 2.18(c) (emphasis added). Thus, as the Park Service acknowledged in its February 2003 Final SEIS, "park policies, regulations, and EOs clearly state that disturbance to wildlife, regardless of population-level effects, is unacceptable in the national parks." National Park Service, Winter Use Plans, Final Supplemental Environmental Impact Statement, at 206. The Park Service's EIS, however, disregards this requirement in attempting to assess the various alternatives, no more than "acknowledg[ing] that adverse impacts to individual animals should be minimized[.]" Final EIS, at 251. As stated in the EIS, "the focus of [the Service's] analysis is predominantly the impact [of each alternative] on wildlife populations[.]" Id. Accordingly, under the standards applied by the Park Service, an alternative is considered to have a "major" impact on wildlife only where its "effect will be measurable and have a substantial and possibly permanent consequence to the population." Id. at 257. By excluding from its analysis any genuine consideration of the individual disturbances of wildlife that would result under each of the assessed alternatives, the Park Service failed to address how the alternatives would or would not "achieve the requirements" of Section 2.18(c) and other laws and policies. See 40 C.F.R. §

15

1502.2(d). The EIS and ROD are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law. See 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION
### Unexplained Departure

50. All preceding paragraphs are incorporated as if fully set forth herein.

51. Only seven years ago, the Park Service issued a Record of Decision concluding that every alternative providing for snowmobile use would result in the impairment of park resources and values. In 2003, this Court vacated a subsequent Park Service supplemental EIS and Record of Decision authorizing snowmobile use within the Parks, concluding that the Service had failed to explain adequately its change in position and thus acted arbitrary and capriciously. See The Fund for Animals, 294 F.Supp. 2d at 108. Now, the Park Service has again issued an EIS and ROD at odds with its first considered view on the impacts of snowmobile use on park resources and values. Having again failed to explain adequately its reversal, the Park Service has neglected to determine and disclose whether its selected alternative will comply with the environmental laws and policies governing the National Park System, and deprived decisionmakers of a clear basis for decision. The EIS and ROD are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law. See 5 U.S.C. § 706(2)(A).

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

    1) Declare that the snowmobile ROD and FEIS are unlawful and set them aside;

    2) Enjoin implementation of the ROD following the 2007-2008 winter season;

    3) Remand the matter to the National Park Service;

    4) Award Plaintiffs their attorneys' fees and costs; and

5) Grant Plaintiffs such other and further relief as the Court may deem proper.

Respectfully submitted this __th day of November, 2007,

_____
Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
Greater Yellowstone Coalition, et al.

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Greater Yellowstone Coalition, The Wilderness Society, Natural Resources Defense Council, Winter Wildlands Alliance, and Sierra Club

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

Dirk Kempthorne, Mary Bomar, and Mike Snyder, in their official capacities

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Douglas Honnold, Sean Helle
Earthjustice
209 South Willson Avenue
Bozeman, MT 59715
(406) 586-9699

David Baron
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

Case: 1:07-cv-02111
Assigned To : Sullivan, Emmet G.
Assign. Date : 11/20/2007
Description: ADMN AGENCY REVIEW

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
⦿ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**
☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

⦿ **C. Administrative Agency Review**
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☒ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**   OR   ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Challenge to National Park Service EIS and ROD violative of the National Environmental Policy Act

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐  DEMAND $ _____  Check YES only if demanded in complaint  JURY DEMAND: YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☒  NO ☐  If yes, please complete related case form.

DATE 11/20/07   SIGNATURE OF ATTORNEY OF RECORD _[signature]_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.