IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

GREATER YELLOWSTONE COALITION, *et al*.,    )
                                                                      )
        Plaintiffs,                                                  )
                                                                      )
        Vs.                                                           )    Case No. 07-cv-2111 (EGS)
                                                                      )
DIRK KEMPTHORNE, in his official capacity as          )
Secretary of Interior, *et al*.,                                )
                                                                      )
        Defendants.                                               )
_____)

**PLAINTIFFS' MOTION FOR LEAVE TO FILE AN
AMENDED AND SUPPLEMENTED COMPLAINT**

On December 13, 2007, the National Park Service published a final rule implementing

the Record of Decision challenged in Plaintiffs' November 20, 2007 Complaint.  See 72 Fed.

Reg. 70,781 (Dec. 13, 2007).  Pursuant to Federal Rule of Civil Procedure 15, Plaintiffs hereby

move for leave to file the accompanying First Amended and Supplemented Complaint, which

amends Plaintiffs' NEPA claims and challenges the agency's final rule as inconsistent with the

Park Service's Organic Act and other federal mandates.  Plaintiffs' counsel has conferred with

Defendants' counsel pursuant to Local Civil Rule 7(m).  The government has not yet taken a

position on this motion, and will file a response if it determines that one is needed.

Under Federal Rule of Civil Procedure 15(a), parties are permitted to file an amended

pleading "once as a matter of course … before being served with a responsive pleading[.]"  Fed.

R. Civ. P. 15(a)(1)(A).  Under Rule 15(d), the filing of a supplemental pleading "setting out any

transaction, occurrence, or event that happened after the date of the pleading to be

supplemented" requires leave of court.  Fed. R. Civ. P. 15(d).  "Motions to supplement pleadings

'are to be freely granted when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to the action.'" <u>Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus</u>, 246 F.R.D. 39, 43 (D.D.C. 2007) (quoting <u>Hall v. CIA</u>, 437 F.3d 94, 101 (D.C. Cir. 2006)) (internal quotations omitted).

Plaintiffs' First Amended and Supplemented Complaint should be readily permitted under these standards.  First, as Defendants have yet to answer Plaintiffs' initial complaint, Plaintiffs' amendments should be allowed as a matter of course.  <u>See</u> Fed. R. Civ. P. 15(a)(1)(A). Second, in light of the early stage of these proceedings, no prejudice or delay would result from the supplementation of Plaintiffs' November 20, 2007 complaint with challenges to the Park Service's December 13, 2007 final rule.  Like the claims in Plaintiffs' initial complaint, Plaintiffs' new challenges concern the Park Service's authorization of recreational snowmobiling within Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway; supplementation will only promote the efficient resolution of this controversy in a single suit.

For the foregoing reasons, Plaintiffs respectfully ask that the Court grant them leave to file the accompanying First Amended and Supplemented Complaint.

Respectfully submitted this 9th day of January, 2008,


    /s/     Sean M. Helle
Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
Greater Yellowstone Coalition, et al.

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of January, 2008, I caused copies of the foregoing

Plaintiffs' Motion for Leave to File an Amended and Supplemented Complaint, Plaintiffs' First

Amended and Supplemented Complaint, and Plaintiffs' Proposed Order, to be served by United

States first-class mail, postage prepaid, upon the following:

Michael B. Mukasey Esq.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Jeffrey A. Taylor, Esq.
U.S. Attorney for the District of Columbia
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530

Barry Weiner, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Law and Policy Section
P.O. Box 4390
Ben Franklin Station
Washington, DC 20044-4390


        /s/        Sean M. Helle
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                          )
GREATER YELLOWSTONE COALITION, *et al*.,   )
                                                          )
    Plaintiffs,                                      )
                                                          )
      vs.                                            )     Case No. 07-cv-2111 (EGS)
                                                          )
DIRK KEMPTHORNE, in his official capacity as   )
Secretary of Interior, *et al*.,                     )
                                                          )
    Defendants.                                   )
_____)

**[PROPOSED] ORDER**

Upon consideration of Plaintiffs' Motion for Leave to File an Amended and

Supplemented Complaint, the Court hereby GRANTS the motion.

SO ORDERED this ___ day of _____, 2008.

_____
EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                                   )

GREATER YELLOWSTONE COALITION       )
13 South Willson Avenue, Suite 2           )
Bozeman, MT  59715;                          )
                                                   )

THE WILDERNESS SOCIETY               )
1615 M Street NW                              )
Washington, DC 20036;                       )
                                                   )

NATURAL RESOURCES DEFENSE COUNCIL   )
40 West 20th Street                            )
New York, NY 10011;                      )    Case No. 07-cv-2111 (EGS)
                                                   )

WINTER WILDLANDS ALLIANCE          )
910 Main Street, Suite 235                   )
Boise, ID 83702;                               )
                                                   )

SIERRA CLUB                                 )
85 Second Street, 2nd Floor                 )
San Francisco, CA  94105;                )
                                                   )

    Plaintiffs,                        )
                                                   )

       vs.                             )
                                                   )

DIRK KEMPTHORNE, in his official capacity as    )
Secretary of Interior; MARY BOMAR, in her official )
capacity as Director of the National Park Service; and )
MIKE SNYDER, in his official capacity as Director  )
of the Intermountain Region of the U.S. National Park )
Service,                                        )
                                                   )

    Defendants.                       )
_____ )

## FIRST AMENDED AND SUPPLEMENTED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

    1.    Plaintiffs Greater Yellowstone Coalition, et al. challenge the National Park Service's

decision to allow continued snowmobile use in Yellowstone and Grand Teton National Parks and

the John D. Rockefeller, Jr. Memorial Parkway (collectively "Yellowstone" or "the Parks").

Despite a bevy of laws, regulations, and policies that should prevent this result, the Park Service

has authorized recreational snowmobiling in Yellowstone at a level that will impair or

unacceptably impact park resources.  The environmental analysis used to justify the Park

Service's action fails to assess accurately how such levels of recreational snowmobile use and a

range of other studied alternatives comport with the governing law, and frustrates the purposes of

full environmental disclosure and analysis.  Rather than preserving the Parks as a sanctuary for

wildlife, natural processes, and humans alike, the action contravenes the Park Service's

affirmative responsibility to protect wildlife and natural soundscapes, and to secure the best

possible air quality.  By granting damaging snowmobile use priority over other, less injurious

forms of public access, the Park Service has impaired the park experience for all winter visitors.

The Park Service's environmental analysis, decision, and rule, therefore, cannot be allowed to

stand.

## PARTIES

2.    Plaintiff Greater Yellowstone Coalition ("GYC") is a conservation organization

dedicated to protecting and restoring the Greater Yellowstone Ecosystem and the unique quality

of life it sustains.  Central to GYC's mission is maintaining the integrity of the national parks

that are the core of the larger ecosystem.  Formed in 1983, GYC is a non-profit corporation and

has approximately 9,000 members, many of whom regularly use and enjoy Yellowstone and

Grand Teton National Parks.

3.    Plaintiff The Wilderness Society ("TWS") is a non-profit organization dedicated to

protecting a national network of wild lands and fostering an American land ethic.  TWS works to

ensure wise management and protection of America's public lands, including Yellowstone.

Founded in 1935, TWS has approximately 200,000 members, many of whom regularly use and enjoy Yellowstone and Grand Teton National Parks.

4.    Plaintiff Natural Resources Defense Council ("NRDC") is a non-profit organization that uses law, science, and the support of more than 1.2 million members and online activists to protect the planet's wildlife and wild places, and to ensure a safe and healthy environment. NRDC and its members have a longstanding interest in preserving Yellowstone's unique natural resources, including the integrity of visitor experience.

5.    Plaintiff Winter Wildlands Alliance is a non-profit organization that advocates nationally for non-motorized backcountry winter recreation.  Representing more than 1,100 individual members and 28 grassroots groups to promote human-powered snowsports activities, Winter Wildlands Alliance works with federal, regional, and local land managers to resolve user conflicts on public lands and to promote a quality backcountry winter recreation experience on those lands.

6.    Plaintiff Sierra Club is a national conservation organization with more than 700,000 members.  Founded in 1892, its mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist humanity to protect and to restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

7.    Members of each of the Plaintiff organizations visit the Parks in winter to observe wildlife, ski and snowshoe, and to enjoy the spectacular scenery and natural quiet.  Even from afar, members of each of the Plaintiff groups take an active interest in maintaining the integrity of the National Park System.  The Park Service's authorization of snowmobile use and inadequate environmental analysis cause direct, irreparable injury to the recreational, aesthetic,

and conservation interests of members of the Plaintiff organizations. These injuries are fairly traceable to the challenged EIS, Record of Decision, and Final Rule, and are redressable through this action to invalidate the EIS, Record of Decision, and Final Rule. Plaintiffs have no adequate remedy at law.

8.    Defendant Dirk Kempthorne is the Secretary of the U.S. Department of Interior and, in that capacity, has oversight authority over all actions of the National Park Service. Mr. Kempthorne is sued in his official capacity.

9.    Defendant Mary Bomar is the Director of the National Park Service and, in that capacity, has management responsibility for all actions of the National Park Service. Ms. Bomar is sued in her official capacity.

10.    Defendant Mike Snyder is Director of the Intermountain Region of the National Park Service and, in that capacity, has management responsibility for Yellowstone and Grand Teton National Parks, and the John D. Rockefeller, Jr. Memorial Parkway. Mr. Snyder signed the Record of Decision challenged in this action. Mr. Snyder is sued in his official capacity.

## JURISDICTION AND VENUE

11.    This action arises under the National Park Service Organic Act, 16 U.S.C. §§ 1, et seq.; the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq. ("NEPA"); and the Administrative Procedure Act, 5 U.S.C. §§ 551, et seq. ("APA"), which waives Defendants' sovereign immunity.

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

13.   Venue lies in the District of the District of Columbia pursuant to 28 U.S.C. § 1391(e) because Defendants Kempthorne and Bomar and Plaintiff The Wilderness Society reside in this District, and because a substantial part of the events and omissions giving rise to Plaintiffs' legal claims transpired in this District.

### THE LEGAL FRAMEWORK

14.   The Park Service has a conservation mandate under the National Park Service Organic Act and other federal statutes, regulations, Executive Orders, and NPS Management Policies to afford Yellowstone's natural resources, including wildlife, clean air, and quiet, the very highest level of protection.

15.   Congress established Yellowstone National Park in 1872 as America's first national park.  Its enabling legislation expressly requires the "preservation, from injury or spoliation, of … natural curiosities, or wonders, within the park, and their retention in their natural condition." 16 U.S.C. § 22.  Yellowstone and the other national parks have been set aside and are to be "preserved and managed for the benefit and inspiration of all the people of the United States[.]" 16 U.S.C. § 1a-1.

16.   The designation of Yellowstone National Park and the subsequent creation of the National Park System is a signal achievement of American society.  Following the creation of Yellowstone and the National Park System, "[s]cores of nations have preserved areas of natural beauty and historical worth so that all people will have the opportunity to reflect on their natural and cultural heritage and to return to nature and be spiritually reborn.  Of all the benefits resulting from the establishment of Yellowstone National Park, this may be the greatest." See Yellowstone: A Brief History of the Park, available at http://www.nps.gov/yell/planyourvisit/upload/Yell257.pdf.

17.    With Yellowstone as a template, the National Park Service Organic Act of 1916 provides for the establishment of a National Park System, setting forth the Park Service's central mission "to conserve the scenery and the natural and historic objects and the wild life [within national parks] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.

18.    With the General Authorities Act, Congress "reaffirm[ed], declare[d], and direct[ed] that the promotion and regulation of the various areas of the National Park System … shall be consistent with and founded in the purpose established by [the Organic Act], to the common benefit of all the people of the United States."  Id. § 1a-1.   Congress further provided that "[t]he authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established[.]"  Id.   Congress, in short, "recogniz[ed] that the enjoyment by future generations of the national parks can be ensured only if the superb quality of park resources and values is left unimpaired," and "provided that when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant."  NPS Management Policies 2006 § 1.4.3.

19.    This conservation mandate is further elaborated in the National Park Service Management Policies, which provide that "[t]he fundamental purpose of the national park system … begins with a mandate to conserve park resources and values" and, thus, the Park Service "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values."  Id. § 1.4.3.   Specifically, the Park Service must "minimize[e] human impacts on native plants, animals, populations, communities, and

ecosystems," id. § 4.4.1, "seek to perpetuate the best possible air quality in parks[,]" id. § 4.7.1, and "take action to prevent or minimize all noise that through frequency, magnitude, or duration adversely affects the natural soundscape or other park resources or values," id. § 4.9.

20.    With regard to snowmobile use in particular, Park Service regulations prohibit snowmobiling in the Parks except in designated areas where "their use is consistent with the [Parks'] natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources."  36 C.F.R. § 2.18(c); see also NPS Management Policies 2006 § 8.2.3.2.  As stated in the Park Service's Management Policies, where the use of motorized vehicles, such as snowmobiles, "is necessary and appropriate, the least impacting equipment, vehicles, and transportation systems should be used, consistent with public and employee safety."  NPS Management Policies 2006 § 8.2.3.

21.    Similarly, Executive Orders mandate that off-road vehicle use, including snowmobile use, "be located in areas of the National Park system … only if the respective agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values."  Exec. Order No. 11,644, 37 Fed. Reg. 2,877 (Feb. 8, 1972), as amended by Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 24, 1977); see also NPS Management Policies 2006 § 8.2.3.2.  If off-road vehicle use "will cause or is causing considerable adverse effects on … wildlife, wildlife habitat or cultural or historic resources[,]" park managers must "immediately close such areas or trails to the type of off-road vehicle causing such effects[.]"  Exec. Order No. 11,989, 42 Fed. Reg. at 26,959.

## FACTUAL BACKGROUND

22.    The suite of laws, regulations, and policies governing management of the national parks clearly prohibits snowmobile use that degrades the natural integrity of the Parks.  Yet, for

years now, the Park Service has accommodated snowmobiles at the expense of clean air, quiet, and wildlife.

## Snowmobile Use In Yellowstone

23.  In 1971, eight years after snowmobiles first entered the park, the National Park Service began grooming Yellowstone's snow-covered roads for use by snowmobiles and other oversnow vehicles.  Snowmobile usage steadily increased through the 1970s and 1980s, leading to complaints—from both visitors and Park Service personnel—regarding the noise, air pollution, and wildlife harassment caused by the machines.  By the early 1990s, snowmobile numbers were exceeding all agency projections, and the Park Service recognized that development of a new policy was necessary to address the adverse impacts caused by increasing snowmobile traffic in Yellowstone.

24.  In 1994, the Park Service initiated a formal study of the impacts of winter recreation on the Parks.  Three years later, as part of the settlement of a lawsuit brought in this Court by The Fund for Animals, the Park Service agreed to prepare a comprehensive Environmental Impact Statement ("EIS") addressing winter use.

25.  The resulting 2000 EIS confirmed longstanding concerns about snowmobile use in Yellowstone.  The EIS documented serious health hazards from snowmobile emissions; impaired visibility from the haze of snowmobile exhaust; persistent noise from snowmobile engines; and routine harassment of wildlife already stressed by Yellowstone's harsh winter conditions.  In light of the impairment that had resulted from recreational snowmobiling within the Parks, the Park Service "acknowledge[d] that [it had] not complied with the applicable legal requirements" of the National Park Service Organic Act, governing Executive Orders, regulations, and the agency's Management Policies.  Final Rule, 66 Fed. Reg. 7,260 (Jan. 22, 2001).

**The 2001 Decision To Phase Out Snowmobile Use**

26.  The Park Service considered several regulatory approaches to bringing snowmobile use into compliance with the law.  To this end, the Park Service analyzed the extent to which "best available technology" requirements could reduce air pollution and noise, and whether guided tour requirements could prevent wildlife harassment.  Ultimately, however, the Park Service concluded—and the U.S. Environmental Protection Agency independently confirmed—that "best available technology" and guiding requirements would not prevent impairment from continued snowmobile use in Yellowstone.

27.  As the Park Service explained, "[s]ome newer snowmobiles have promise for reducing some impacts, but not enough for the use of large numbers of those machines to be consistent with the applicable legal requirements."  Id. at 7,260.  For instance, "[q]uieter snowmobiles are still noisy, and are audible at a greater distance than 4-track conversion snowcoaches."  Id.  Thus, "[a]chieving compliance with the applicable legal requirements while still allowing snowmobile use would require very strict limits on the numbers of both snowmobiles and snowcoaches[,]" which "would sharply limit overall winter use of the parks[.]" Id. at 7,262.

28.  Faced with the task of maintaining historic levels of winter access without compromising air quality, quiet, and wildlife protection in the Parks, the Park Service developed an access plan that would phase out snowmobiles in favor of multi-passenger snowcoaches.  On December 22, 2000, the Park Service issued a Record of Decision mandating a three-year transition to snowcoach access, see 65 Fed. Reg. 80,908 (Dec. 22, 2000), and on January 22, 2001, the Park Service published regulations implementing the new winter access plan, see 66 Fed. Reg. at 7,260.

**The Subsequent SEIS Process**

29.   Six months later, following a change in presidential administrations, the Park Service agreed to prepare a supplemental EIS ("SEIS") to reconsider new technology as a fix for the Yellowstone snowmobile problem.  However, in keeping with the Park Service's previous assessment, the resulting SEIS disclosed that continued snowmobile use would continue to threaten human health, impair visibility, disrupt the natural quiet, and unnecessarily disturb wildlife notwithstanding advances in snowmobile technology, caps on daily snowmobile entries, and guided tour requirements.  Once again, the Park Service concluded that a transition to snowcoaches would "best attain[] the widest range of beneficial uses of the environment without degradation, [and] risk of health or safety by ensuring visitors to the park have appropriate opportunities to experience and enjoy the parks in a safe manner that causes the least amount of damage to the environment."  National Park Service, Winter Use Plans, Final Supplemental Environmental Impact Statement, at 72 (Feb. 21, 2003) (internal quotations omitted).

30.   Despite its endorsement of the original plan to phase out snowmobiles, the Park Service issued a March 25, 2003 Record of Decision ("ROD") to allow 950 daily snowmobile entries into Yellowstone.  On December 11, 2003, the Park Service published regulations implementing its new winter use plan.  Final Rule, 68 Fed. Reg. 69,268 (Dec. 11, 2003).

**Litigation Over The 2003 Snowmobile Plan**

31.   GYC and others challenged the 2003 ROD on grounds that the Park Service had failed to explain adequately its decision in light of its previous conclusion that snowmobiles in substantial numbers impair park resources and values.  Based on the adverse environmental impacts disclosed in the SEIS, GYC further argued that the new plan violated the Organic Act and other applicable legal requirements.

32.   On December 16, 2003, this Court granted GYC's motion for summary judgment, holding that the Park Service had acted arbitrarily and capriciously in failing to explain its decision to allow continued snowmobile use "[i]n light of its clear conservation mandate, and the previous conclusion that snowmobile use amounted to unlawful impairment[.]"  The Fund For Animals v. Norton, 294 F.Supp. 2d. 92, 108 (D.D.C. 2003).  Having invalidated the 2003 SEIS, ROD, and rule, the Court declined to reach GYC's substantive claims under the Organic Act and governing Executive Orders, regulations, and NPS Management Policies.

33.   At the request of the Park Service, this Court ordered the agency to implement its previously planned snowmobile phase-out pending compliance with the Court's order on remand.

**Litigation Over The Original 2001 Snowmobile Phase-Out**

34.   After the D.C. Circuit Court of Appeals declined to grant an emergency stay of this Court's December 16, 2003 Order, two intervenor-defendants in the litigation before this Court—the International Snowmobile Manufacturers Association ("ISMA") and the State of Wyoming—reopened a case challenging the 2001 phase-out rule in Wyoming District Court.  On February 10, 2004, the Wyoming District Court preliminarily enjoined further implementation of the phase-out and ordered the Park Service to promulgate new rules governing the remainder of the 2003-2004 winter season.  See Int'l Snowmobile Mfrs. Ass'n v. Norton, 304 F.Supp. 2d 1,278, 1,294 (D. Wy. 2004).

35.   The Park Service then adopted a temporary rule applicable for three winter seasons, beginning 2004-2005 (the "2004 Rule").  See Final Rule, 69 Fed. Reg. 65,348 (Nov. 10, 2004). The 2004 Rule permitted 720 snowmobiles per day in Yellowstone.  The rule also required that all snowmobile users be accompanied by a commercial guide and that all recreational

snowmobiles meet "best available technology" requirements.  Several litigants challenged the 2004 Rule in the Wyoming District Court and the D.C. District Court, but neither Court invalidated the regulation.

36.  At the time that it adopted the 2004 Rule, the Park Service stated that it planned to conduct further studies concerning the impact of snowmobiles on Yellowstone while the temporary rule was in effect, with the goal of enacting a permanent rule based on the findings of those further studies.

37.  While the 2004 Rule authorized up to 720 snowmobiles per day in Yellowstone, actual use during the three winter seasons governed by the 2004 Rule was approximately 260 snowmobiles per day.  This significantly reduced number of snowmobiles has resulted in markedly improved park health, with cleaner air, less impact on wildlife, quieter soundscapes, sharper views, and a more positive park experience for visitors.  Even at these levels, however, Park Service monitoring has identified continued adverse impacts to Yellowstone.

### The 2007 Snowmobile Decision

38.  In March 2007, the Park Service released a draft environmental impact statement ("DEIS") regarding a new, permanent management plan for winter access in the Parks. See National Park Service, Winter Use Plans, Draft Environmental Impact Statement (Mar. 2007). The DEIS described the further studies that the Park Service had conducted since adopting the 2004 Rule and evaluated six alternative approaches to winter access in Yellowstone.  See id. One of those alternatives was to eliminate the use of snowmobiles in favor of continued public access through a system of multi-passenger, best-available-technology snowcoaches.  See id. at 40.

39. Citing the documented adverse impacts of recreational snowmobiling on the Parks and the improvements that had followed from the reduced snowmobile numbers of recent seasons, a vast majority of those who commented on the DEIS favored the snowcoach alternative. The Park Service, however, did not. Though having determined only seven years before that recreational snowmobiling had impaired park resources and values, the Park Service concluded in its September 2007 final EIS ("FEIS") that none of the considered alternatives— even an "expanded recreational use" option providing for an increase in recreational snowmobiling over historic numbers—would result in impairment. National Park Service, Winter Use Plans, Final Environmental Impact Statement (Sep. 2007), at 365-73. As its preferred alternative in the FEIS, the Park Service selected a plan providing for 540 snowmobiles each day in Yellowstone, subject to guiding and "best available technology" requirements. Id. at 60-65.

40. On November 20, 2007, National Park Service Intermountain Regional Director Michael D. Snyder signed a Record of Decision adopting the agency's preferred alternative. See National Park Service, Winter Use Plans, Record of Decision (Nov. 2007). In its decision, the Park Service acknowledged that recreational snowmobiling within the Parks had long resulted in the impairment of natural soundscapes, wildlife, air quality, visitor experience, and the health and safety of both the public and Park employees. Id. at 3, 19, 30. The Park Service further admitted that safety and management thresholds for air quality and noise had been approached or exceeded in recent winter seasons, during which snowmobile numbers were significantly below "historic" averages and the public demand to use snowmobiles was significantly below the level authorized in the 2004 Rule. Id. at 20-21. The benefits of reduced recreational snowmobiling were, in a word, obvious. In terms of air quality alone, the Park Service conceded that,

"[c]learly, reducing the daily snowmobile numbers will better protect park air quality." Id. at 21. Nonetheless, the Park Service concluded that neither impairment nor unacceptable impacts would result from a doubling of recent levels of recreational snowmobiling within the Parks—an expansion of use that would, among other things, increase vehicle emissions over present levels. Id. at 21, 39. In reaching this conclusion, the Park Service largely relied on the reduced impacts of its preferred alternative relative to "historical conditions," thereby discounting the increase in adverse impacts that would result from an expansion in recreational snowmobiling within the Parks. See id. at 30-34. As "not all visitors enjoy the group travel experience provided by snowcoach tours, or the fact that snowcoach travel is slower than snowmobile travel[,]" the Park Service declined to give the snowcoach alternative serious consideration. Id. at 23.

41.  The Park Service published its Final Rule on December 13, 2007—six days prior to the opening of the Parks' 2007-2008 winter season. See Final Rule, 72 Fed. Reg. 70,781 (Dec. 13, 2007). With the regulation, the Park Service authorized the recreational use of 540 snowmobiles in Yellowstone each day, approximately twice the number present on park roads in recent seasons. See id. The Park Service declined, however, to cast the regulation as one authorizing an expansion of recreational snowmobiling within the Parks. Instead, after acknowledging that recent reductions in snowmobile use had "resulted in quieter conditions, cleaner air, fewer wildlife impacts, and much improved visitor and employee safety and experiences[,]" the Park Service declared that its regulation "reduce[d] the daily number of snowmobiles allowed to enter the Parks in order to better protect park soundscapes and other resources[.]" Id. at 70,782. In making this declaration, the Park Service even suggested that the "reduction" it implemented would somehow alleviate the adverse soundscape impacts documented during recent seasons, stating that "the lower number of snowmobiles [authorized]

will reduce the impacts on the natural soundscapes of the park, which [had been] found to be somewhat greater than expected even with the reduced number of snowmobiles that used the park over the last several winters." Id. at 70,783. The Park Service's discussion of the snowcoach alternative was similarly strained. While conceding that snowcoaches "can be substantially cleaner" than four-stroke snowmobiles, id. at 70,785, the Park Service concluded that snowmobile use was simply "part of an appropriate range of winter activities[,]" id. at 70,791. "Snowcoaches and snowmobiles[,]" for one, "provide two very different types of experiences for park visitors seeking to enjoy Yellowstone during the winter." Id. at 70,787. "The use of both types of travel[,]" moreover, was "well-established in the Parks, extending back more than 4 decades." Id. On these grounds, the Park Service concluded that an effective expansion of recreational snowmobiling within the Parks was consistent with the conservation mandate imposed by federal statutes, regulations, Executive Orders and policies.

## FIRST CAUSE OF ACTION
### Violation of the National Park Service Organic Act

42. All preceding paragraphs are hereby incorporated as if fully set forth herein.

43. Under the National Park Service Organic Act, 16 U.S.C. § 1, et seq., the Park Service cannot authorize activities that would result in the impairment of park resources or values. 16 U.S.C. § 1. Similarly, 16 U.S.C. § 22 requires the Secretary of Interior to preserve the natural wonders of Yellowstone in their natural condition, free from injury or spoliation. National Park Service Management Policies accordingly provide that the agency "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values." NPS Management Policies 2006 § 1.4.3. Specifically, the Park Service must "minimize[e] human impacts on native plants, animals, populations, communities, and ecosystems," id. § 4.4.1, "seek to perpetuate the best possible air quality in parks[,]" id. § 4.7.1,

and "take action to prevent or minimize all noise that through frequency, magnitude, or duration adversely affects the natural soundscape or other park resources or values," id. § 4.9.

44.   Only seven years ago, the Park Service acknowledged that substantial numbers of snowmobiles could not be permitted in the Parks without impairing park resources and values—even with "best available technology" and guiding requirements.  Subsequent studies have confirmed this conclusion, resulting in recommendations from the agency's own scientists that snowmobile numbers be maintained at or reduced from those seen in recent seasons.  In its 2007 FEIS, ROD, and rule, the Park Service nonetheless declares that wildlife, air quality, natural soundscapes, and other resources will not be impaired as the result of a doubling of recreational snowmobile use within Yellowstone.  The Park Service's non-impairment finding is at odds with the agency's own determination that recreational snowmobile use at approved levels will, among other things, increase noise and air pollution throughout Yellowstone, disturb wildlife, and pose health risks to visitors and park employees.  Moreover, as daily snowmobile entries into the Parks have been well below those authorized under the 2004 Rule, the Park Service's authorization of expanded recreational snowmobiling cannot be squared with the limited public demand for so damaging a means of access to the Parks.  The Park Service, in short, has authorized recreational snowmobile use that will result in the impairment of park resources and values, in contravention of the Service's own Organic Act, the General Authorities Act, and the statute establishing Yellowstone National Park.  The Park Service's ROD and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION
### Violation of Governing Executive Orders

45.   All preceding paragraphs are hereby incorporated as if fully set forth herein.

46.   Under Executive Orders 11,644 and 11,989, the Park Service may authorize snowmobiling in the Parks only when it "will not adversely affect their natural, aesthetic, or scenic values."  Exec. Order No. 11,644, 37 Fed. Reg. at 2,877.  Further, the Park Service must "immediately close" areas and trails to snowmobiling if use "will cause or is causing considerable adverse effects on … wildlife, wildlife habitat or cultural or historic resources[.]"  Exec. Order 11,989, 52 Fed. Reg. at 34,617.

47.   Recreational snowmobile use in the Parks pursuant to the Park Service's ROD and rule will adversely affect wildlife, public health, air quality, and natural quiet in the Parks.  Authorizing snowmobile use in the face of these adverse impacts to Yellowstone's natural, aesthetic, and scenic values violates the mandates set forth in Executive Orders 11,644 and 11,989.  The Park Service's ROD and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
### Violation of Park Service Regulations

48.   All preceding paragraphs are hereby incorporated as if fully set forth herein.

49.   In keeping with the governing federal statutes and Executive Orders, Park Service regulations prohibit snowmobiling in the Parks except in designated areas where "their use is consistent with the [Parks'] natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources."  36 C.F.R. § 2.18(c).

50.   In authorizing snowmobile use that will adversely affect wildlife, public health, air quality, and natural quiet in the Parks, the Park Service violated its own snowmobile regulations.  The Park Service's ROD and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION
## Violation of NEPA

51. All preceding paragraphs are incorporated as if fully set forth herein.

52. Under NEPA, federal agencies must prepare an EIS for major actions that they undertake that will significantly affect the human environment. 42 U.S.C. § 4332(2)(C). NEPA's implementing regulations provide that an EIS must "state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of [NEPA] and other environmental laws and policies[,]" 40 C.F.R. § 1502.2(d), and that federal agencies "shall concentrate effort and attention on important issues," id. § 1502.15. Ultimately, an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," thereby "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." Id. § 1502.14.

53. The Park Service's FEIS fails to disclose the true environmental impacts of the various alternatives because its environmental analysis is structured around an assessment of whether each alternative is an improvement over deplorable historic conditions. By structuring its environmental analysis in this fashion, the Park Service obscured the assessment of whether any given alternative was consistent with the Service's obligation to prevent unacceptable impacts on and impairment of park resources and values. Under this analytical framework, instead of evaluating whether an alternative violated the laws, regulations, and policies governing snowmobiling in a national park, the Park Service evaluated only whether each alternative was better than the "historic conditions" that have not been seen for four years.

54. Nowhere in the FEIS did the Park Service demonstrate why or how it determined that any improvement over a violation of multiple environmental laws and policies would itself

18

comply with those same laws and policies. The FEIS, ROD, and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law. See 5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION
### Violation of NEPA

55. All preceding paragraphs are incorporated as if fully set forth herein.

56. In its FEIS, the Park Service failed to evaluate meaningfully the degradation of the Parks' natural soundscapes that would be caused by each of the various alternatives. As stated in the FEIS, the National Park Service Organic Act "was written and enacted in an environment in which it was clear that the American people wanted places to go that were undisturbed and natural and which offered a retreat from the rigors and stresses of everyday life." National Park Service, Winter Use Plans, Final Environmental Impact Statement, at 137 (Sep. 2007). Thus, "inappropriate sound or noise is clearly an issue to be addressed when considering a proposal for use and enjoyment of the national parks. Natural quiet, or natural sound conditions that would prevail without human presence, is an appropriate baseline from which to gauge the impacts of human use." Id.

57. In spite of this language, the Park Service's FEIS—which concludes that none of the discussed alternatives would impair the Parks' natural soundscapes—largely relies on an "overall park perspective" incapable of assessing the impact of the alternatives on the natural soundscape in those areas frequented by winter visitors. Under the Park Service's standard, an alternative has a "major impact" on a park's natural soundscape when snowmobile noise is audible in more than twenty percent of the "total park." Id. at 304, 342. This standard fails to distinguish between those areas in which visitors are generally present during the winter season (areas that are, in fact, frequented by snowmobiles) and those areas in which visitors are rarely present during the winter season. Under the standard, moreover, the adverse impacts of historic

snowmobile use—recognized by the Park Service as having resulted in the impairment of Yellowstone's natural soundscapes—is categorized as "moderate." Id. at 304, 306. The Park Service's "total park" standard is accordingly unable to assess the impact it was designed to measure, and the FEIS thereby fails to determine and disclose whether the Park Service's selected alternative will comply with the environmental laws and policies governing the National Park System, including the Organic Act.

58. The FEIS's soundscape analysis also fails to address adequately the results of the agency's own studies, thereby compromising the integrity and clarity of the document. In concluding that approximately twice the number of snowmobiles presently used in the Parks should be authorized, the Park Service largely disregarded an internal monitoring report stating that current usage levels had already exceed established noise thresholds and recommending, as a result, that oversnow vehicle noise be reduced. Moreover, in relying on its "total park" standard as the primary measure of impairment, the Park Service's FEIS discounted, without sufficient explanation, the "major" adverse soundscape impacts identified by the agency's own studies. Finally, as acknowledged by the agency, the model relied upon by the Park Service underestimated the actual sound impacts of oversnow vehicle use at numerous monitored sites within the Parks.

59. The Park Service's FEIS, ROD, and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law. See 5 U.S.C. § 706(2)(A).

## SIXTH CAUSE OF ACTION
### Violation of NEPA

60. All preceding paragraphs are incorporated as if fully set forth herein.

61. Under the Park Service's own regulations, snowmobile use may be allowed within the Parks only "where designated and only when their use … will not *disturb* wildlife[.]" 36

C.F.R. § 2.18(c) (emphasis added).  Thus, as the Park Service acknowledged in its February

2003 Final SEIS, "park policies, regulations, and EOs clearly state that disturbance to wildlife,

regardless of population-level effects, is unacceptable in the national parks."  National Park

Service, Winter Use Plans, Final Supplemental Environmental Impact Statement, at 206.  The

Park Service's FEIS, however, disregards this requirement in attempting to assess the various

alternatives, no more than "acknowledg[ing] that adverse impacts to individual animals should

be minimized[.]"  FEIS, at 251.  As stated in the FEIS, "the focus of [the Service's] analysis is

predominantly the impact [of each alternative] on wildlife populations[.]"  Id.  Accordingly,

under the standards applied by the Park Service, an alternative is considered to have a "major"

impact on wildlife only where its "effect will be measurable and have a substantial and possibly

permanent consequence to the population."  Id. at 257.

62.   By excluding from its analysis any genuine consideration of the individual

disturbances of wildlife that would result under each of the assessed alternatives, the Park

Service failed to address how the alternatives would or would not "achieve the requirements" of

Section 2.18(c) and other laws and policies.  See 40 C.F.R. § 1502.2(d).  Furthermore, the

Service failed to address its own scientists' recommendation that oversnow vehicle numbers be

maintained at or below recent levels in order to limit wildlife disturbances.  The Park Service's

FEIS, ROD, and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in

accordance with law.  See 5 U.S.C. § 706(2)(A).

## SEVENTH CAUSE OF ACTION
### Violation of NEPA

63.   All preceding paragraphs are incorporated as if fully set forth herein.

64.   In addressing the effects of snowmobile use on air quality within the Parks, the

Service's FEIS acknowledged that "[t]o predict ambient concentrations of pollutants generated

by vehicular traffic, emissions from vehicle exhaust systems must be estimated accurately."
FEIS, at 217.  Nevertheless, the agency's analysis relied on "snowmobile laboratory test data"
that failed to reflect the actual, performance-reducing conditions within the Parks, disregarding
the results of a cooperative study concerning the true emissions of snowmobiles operated on
Yellowstone's roads.  Id.  The FEIS, moreover, did not afford snowcoaches the same advantage,
calculating their impact based on actual, in-use measurements.  Id. at 219.  Finally, the agency's
assessment relied on a model that underestimated the actual concentration of pollutants resulting
from vehicle emissions at multiple locations.  Id. at 220.  The Park Service's analysis thus
obscured meaningful comparison between the various alternatives and an assessment of the
alternatives' consistency with the mandates governing the National Park System.

65.  In largely resting its assessment of the alternatives' air quality impacts on national
and state ambient air quality standards, the Park Service's analysis further failed to disclose how
the alternatives would or would not "achieve the requirements" of controlling laws and policies.
See 40 C.F.R. § 1502.2(d).  Under the Organic Act and the agency's own Management Policies,
the Park Service is required to "seek to perpetuate the best possible air quality in parks[.]"  See
NPS Management Policies 2006 § 4.7.1; see also, e.g., id. § 8.2.3.  The Park Service focused its
analysis, however, on the question of whether any of the considered alternatives would further
diminish Park air quality beyond the degree allowed under state and federal air quality standards.
See FEIS, at 234.

66.  The Service's FEIS, ROD, and rule are accordingly arbitrary, capricious, an abuse of
discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

## EIGHTH CAUSE OF ACTION
### Unexplained Departure

67.  All preceding paragraphs are incorporated as if fully set forth herein.

68.  Only seven years ago, the Park Service issued an FEIS, ROD and rule, concluding that every alternative providing for snowmobile use within Yellowstone would result in the impairment of park resources and values.  In 2003, this Court vacated a subsequent Park Service SEIS, ROD, and rule authorizing snowmobile use within the Parks, concluding that the Service had failed to explain adequately its change in position and thus acted arbitrary and capriciously. See The Fund for Animals, 294 F.Supp. 2d at 108.  Now, the Park Service has again issued a conclusory FEIS, ROD, and rule at odds with its first considered view on the impacts of snowmobile use on park resources and values, declaring that none of the alternatives providing for substantial levels of recreational snowmobiling would result in impairment.  Having again failed to explain adequately its reversal, the Park Service has neglected to determine and disclose whether its selected alternative will comply with the environmental laws and policies governing the National Park System, and deprived decisionmakers of a clear basis for decision.  The Park Service's FEIS, ROD, and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1) Declare that the snowmobile FEIS, ROD, and Final Rule are unlawful and set them aside;

2) Enjoin implementation of the ROD and Final Rule following the 2007-2008 winter season;

3) Remand the matter to the National Park Service;

4) Award Plaintiffs their attorneys' fees and costs; and

5) Grant Plaintiffs such other and further relief as the Court may deem proper.

Respectfully submitted this ____th day of January, 2008,


_____
Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695


David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
Greater Yellowstone Coalition, et al.