IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————— )
GREATER YELLOWSTONE COALITION,    )
et al.,    )
　　　　　　　　　　　　　　 )
　　　　　　　Plaintiffs,    )
　　　　　　　　　　　　　　 )　　Case No. 07-cv-2111 (EGS)
　　　v.    )
　　　　　　　　　　　　　　 )　　[Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,    )　　Judgment on August 27, 2008]
　　　　　　　　　　　　　　 )
　　　　　　　Defendants.    )
———————————————————— )


———————————————————— )
NATIONAL PARKS CONSERVATION    )
ASSOCIATION,    )
　　　　　　　　　　　　　　 )
　　　　　　　Plaintiff,    )
　　　　　　　　　　　　　　 )　　Case No. 07-cv-2112 (EGS)
　　　v.    )
　　　　　　　　　　　　　　 )　　[Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE    )　　Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE    )
　　　　　　　　　　　　　　 )
　　　　　　　Defendants.    )
———————————————————— )


**FEDERAL DEFENDANTS' COMBINED MOTION TO TRANSFER
AND MEMORANDUM OF POINTS AND AUTHORITIES**

　　　The above-captioned cases constitute two of the four contemporaneous challenges to the

National Park Service's latest winter use decision for Yellowstone and Grand Teton National

Parks and the John D. Rockefeller, Jr. Memorial Parkway ("the Parks").  The four challenges are

proceeding in parallel in this Court and in the United States District Court for the District of

Wyoming.  The Wyoming Court cases, which have been consolidated, are docketed as <u>State of</u>

- 1 -

<u>Wyoming v. U.S. Dep't of the Interior</u>, Case No. 07-cv-319-CAB (D. Wyo.) and <u>Park County Comm'r, Hall, et al. v. U.S. Dep't of the Interior et al.</u>, 08-cv-00004-CAB (D. Wyo.).

Earlier winter use litigation that proceeded concurrently in these two courts produced conflicting orders – a situation which ultimately led this Court to order Federal Defendants to show cause why they should not be held in contempt of court. <u>See</u> Ex. P.[1] The present cases poses an even greater risk of conflicting outcomes because, while the previous litigation focused on two separate rulemaking actions, the current set of parallel proceedings target the same Final Rule, Record of Decision, and Environmental Impact Statement. Should the two district courts disagree concerning the validity of those agency actions, the National Park Service could once again face the untenable dilemma of being forced to comply with two irreconcilable court orders. To avoid this risk, the United States Department of the Interior and the National Park Service (Collectively "Federal Defendants"), by and through their undersigned counsel, hereby move this court to transfer the above-captioned cases to the District of Wyoming.

Given the interrelationship between the parallel proceedings, Federal Defendants are concurrently filing a similar motion in Case Nos. 07-cv-319 (D. Wyo.) and 08-cv-00004-CAB (D.Wyo.) (hereinafter "the Wyoming Cases"). That motion requests that the Wyoming Court consolidate the above-captioned cases with the Wyoming Cases upon the issuance of an order by this Court granting the instant motion to transfer. That motion, however, also recognizes that this Court may decline to transfer the above-captioned cases to the Wyoming Court. Thus, in the event this Court does not issue an order transferring the above-captioned cases to the Wyoming Court by April 25, 2008, that motion requests that the Wyoming Court transfer the Wyoming

---

[1] Citations to "Ex. ___" refer to exhibits to the Declaration of Guillermo A. Montero, which is filed concurrently herewith.

Cases to <u>this</u> Court upon which Federal Defendants will move <u>this</u> Court to consolidate the four winter use cases. A copy of the motion being filed with the Wyoming Court is submitted herewith for the Court's convenience. <u>See</u> Ex. Z.

The undersigned counsel has conferred with counsel for the Plaintiffs in compliance with L.R. 7(m). Plaintiffs' counsel has indicated that the Plaintiffs will oppose the instant motion.

## I.     BACKGROUND

Federal Defendants' concern about facing potentially conflicting orders from two federal courts in different Circuits is based on their experience in past litigation involving winter use plans in the Parks leading up to and continuing through the 2003-2004 winter season. The first relevant action involved a challenge to a 2000 Record of Decision and 2001 Rule in the Wyoming Court while the second relevant action involved a challenge to a 2003 Record of Decision and 2003 Rule in the D.C. Court. Although the two lawsuits involved separate agency actions, the interplay between the two cases, and ultimately the relief ordered by the two courts, left the Federal Defendants in the untenable position of ceasing to implement one court's order in order to satisfy the other court's order. Ultimately, Federal Defendants were required to respond to an order to show cause why they should not be held in contempt for failing to comply with one of the two orders. The current set of parallel proceedings presents an even greater risk of conflicting opinions because, unlike the previous cases which challenged different agency actions, the current cases target the same Final Rule, Record of Decision, and Environmental Impact Statement.

### A.     The 2000/2001 Wyoming Litigation

In October 2000, the National Park Service ("Service") issued an Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§

4321-4370f, in which the Service addressed the impacts of snowmobiles on the Parks.  The preferred alternative discussed in the EIS proposed using a mass transit snowcoach system, and contemplated the eventual phase-out of recreational snowmobiling.  Fund For Animals v. Norton ("FFA v. Norton I"), 294 F. Supp.2d 92, 100 (D.D.C. 2003).  The Service subsequently issued a final rule in January 2001 (the "2001 Rule") that contained a schedule for a gradual, complete phase-out of snowmobiles in the Parks.  Id.; 66 Fed. Reg. 7,260 (Jan. 22, 2001).

On December 6, 2000, the International Snowmobile Manufacturers Association ("ISMA") and other parties ("ISMA plaintiffs") opposing the phase-out of recreational snowmobile use in the Parks filed a lawsuit against the Federal Defendants in the Wyoming Court (Hon. Clarence A. Brimmer), alleging that the issuance of the 2001 Rule violated NEPA, the Administrative Procedure Act ("APA"), and the National Park Service Organic Act, 16 U.S.C. § 1 et seq. (the "Organic Act").  Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F. Supp. 2d 1249, 1254 (D. Wyo. 2004).  The State of Wyoming moved to intervene in the litigation, which the Wyoming Court granted on March 21, 2001.  The ISMA plaintiffs and the State of Wyoming thereafter reached a settlement with the Federal Defendants ("2001 Wyoming Settlement").  Pursuant to the terms of the settlement, the Federal Defendants agree to prepare a Supplemental Environmental Impact Statement ("SEIS") to evaluate information about new snowmobile technology, solicit more public comments, and, if warranted, issue further regulations.  In exchange, the ISMA plaintiffs agreed to a stay of the Wyoming litigation pending the Service's issuance of the SEIS and ROD.  Id. at 1254-55.

Pursuant to this settlement, the Service published and circulated a Draft SEIS ("DSEIS") on March 29, 2002.  67 Fed. Reg. 15,145 (March 29, 2002).  In addition, on November 18, 2002, the Service published a regulation generally deferring for one year the phase-out of snowmobiles

- 4 -

under the 2001 regulations, thereby providing the additional time necessary to complete a Final

SEIS.  <u>See</u> 67 Fed. Reg. 69,473 (November 18, 2002) (hereinafter the "2002 Rule").

> **B.     The 2002/2003 D.C. Litigation: The D.C. Court's Order Vacating the 2003 Rule and Reinstating the 2001 Rule**

In early 2003, the Service completed the SEIS required by the 2001 Wyoming

Settlement.  The preferred alternative adopted in the Final SEIS allowed snowmobiling in the

Parks to continue subject to new numerical, technological, and guided passage restrictions.  <u>FFA</u>

<u>v. Norton I</u>, 294 F. Supp. 2d at 101.  On March 25, 2003, the Service issued a record of decision

("2003 ROD") adopting the preferred alternative with certain modifications, and, on December

11, 2003, issued a regulation implementing the 2003 ROD ("2003 Rule").  <u>Id.</u>; 68 Fed. Reg.

69,268 (Dec. 11, 2003).

On March 25, 2003, the Fund for Animals, which was at the time litigating a challenge to

the 2002 Rule in the D.C. Court, filed a supplemental complaint to challenge the 2003 ROD.

<u>See</u> Ex. E.  In addition, a group of plaintiffs represented by Greater Yellowstone Coalition

("GYC plaintiffs") filed a separate action that same day challenging the 2003 ROD, also in the

D.C. Court.  <u>See</u> Ex. F.  These complaints were subsequently consolidated.

On December 16, 2003, the D.C. Court vacated and remanded the 2003 ROD, the SEIS,

and 2003 Rule.  <u>FFA v. Norton I</u>, 294 F. Supp. 2d at 97.  The Court held that the Service had

failed to adequately explain its change in position from the 2001 Rule, citing <u>Motor Vehicle</u>

<u>Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29 (1983), and

that the Service had failed, under NEPA, to adequately assess the impacts of road grooming on

wildlife.  In that same order, the D.C. Court reinstated the prior 2001 Rule "until further order of

the Court."  <u>Id.</u>  As discussed earlier, the 2001 Rule imposed limits on the number of

snowmobiles in the Parks in the first year and a total ban thereafter.

**C.    The 2003/2004 Wyoming Litigation: The Wyoming Court's Order Enjoining Enforcement of the 2001 Rule**

The decision in FFA v. Norton I, combined with the Service's inability to complete its new rulemaking by the November 1, 2003 deadline, led the State of Wyoming to successfully move to reopen the case against the 2001 Rule in the Wyoming Court.  On February 10, 2004, the Wyoming Court entered a preliminary injunction temporarily restraining the Service from enforcing the 2001 Rule – the same rule that the D.C. Court had earlier reinstated.  Int'l Snowmobile Mfrs. Ass'n v. Norton, 304 F. Supp. 2d 1278, 1286-89 (D. Wyo. 2004).  In place of the now-enjoined 2001 Rule, the Wyoming Court directed the Service to "implement winter use rules for the remainder of the 2003-2004 season . . . which will be fair to all parties."  Id. at 1294.  In compliance with this order, on February 11, 2004, the Service issued "Compendium Amendments" to provide emergency snowmobile restrictions for the Parks.[2]

**D.    'A Rock and a Hard Place'**

The Service's issuance of Compendium Amendments in compliance with the Wyoming Court's February 10, 2004 preliminary injunction prompted the plaintiffs in the D.C. litigation to file a series of motions in both the Tenth Circuit Court of Appeals and in the D.C. District Court in February and March 2004.  Of relevance here, the Fund for Animals plaintiffs moved the D.C. Court on February 12, 2004 for an order to show cause why the Federal Defendants should not be held in contempt.  On February 17, 2004, the D.C. Court granted Fund for Animals' motion and ordered the defendants to show cause "why they should not be held in contempt of this Court's Order of December 16, 2003."  Ex. P.

---

[2]    On October 14, 2004, the Wyoming Court entered an order vacating the 2001 Rule and supporting documents and remanding them to NPS for "further proceedings."    Int'l Snowmobile Mfrs. Ass'n  v. Norton, 340 F. Supp. 2d at 1266.

On February 24, 2004, Federal Defendants filed their Response to the Court's Order to show cause. In their response, Federal Defendants argued, among other things, that it was impossible to comply with the D.C. Court's Order without violating a conflicting injunction issued by the District of Wyoming. Along with their response, Federal Defendants filed two alternative motions seeking to extricate the Government from the predicament of parallel proceedings: a Conditional Renewed Motion to Transfer the D.C. litigation to the District of Wyoming; and a Conditional Motion for Partial Relief from Judgment.

On June 30, 2004, the D.C. Court granted the Federal Defendants' Conditional Motion for Partial Relief, thereby relieving the Service from enforcing the 2001 Rule. See Ex. Q. The Court recognized that its December 16, 2003 Order required the Service to "implement a rule that another court has mandated cannot be enforced." Id. at 6. Second, the Court modified its December 16, 2003 Order to require that the Service promulgate a new rule for the 2004-05 winter season "by a minimum of 30 days prior to the commencement of operations — that is, trail grooming — for the 2004-2005 winter season." Id. at 7-8. Finally, on August 6, 2004, the D.C. Court vacated its show cause order "in light of" its granting of the Federal Defendants' Conditional Motion for Partial Relief. See Ex. R at 1.

### E.     New Litigation in Both Districts Concerning the 2007 Environmental Impact Statement, Record of Decision, and Final Rule

On December 13, 2007, the Service published in the Federal Register a Final Rule governing winter use in the Parks (hereinafter "2007 Final Rule"). The 2007 Final Rule, which became effective on December 19, 2007, implemented the Service's Record of Decision ("2007 ROD") for the "Winter Use Plans Final Environmental Impact Statement" ("2007 EIS"), and amended the Special Regulations governing the use and management of all three Parks with respect to winter use. See 36 C.F.R. §§ 7.13, 7.21, 7.22.

The 2007 ROD, implemented by the 2007 Final Rule, allows 540 snowmobiles and 83 snowcoaches per day in Yellowstone National Park, subject to the requirements that all snowmobiles meet the Service's Best Available Technology ("BAT") requirements for air and sound emissions and that all snowmobiles travel with a commercial guide.  See Ex. T at 5.  The 2007 ROD also addresses snowmobile use in the Grand Teton National Park, the John D. Rockefeller, Jr. Memorial Parkway, and the Continental Divide Snowmobile Trail, and imposes a full avalanche forecasting system to manage oversnow travel on Sylvan Pass beginning after the winter of 2007-2008.  Id. at 6.  Finally, the 2007 ROD imposes an extensive monitoring and adaptive management program, through which the Service will continue to monitor park resources and values including air quality, natural landscapes, wildlife, employee health and safety, and visitor experience.  Based on the information it receives as a result of this monitoring, the Service would make adjustments, as appropriate, to ensure that the objectives of the winter use plans are being achieved.  Id. at 5.

A number of plaintiff groups – composed of both interest groups and local government bodies – quickly filed suit challenging the above actions in the Wyoming and D.C. districts.  On November 20, 2007, the Greater Yellowstone Coalition, The Wilderness Society, the Natural Resources Defense Council, the Winter Wildlands Alliance, and the Sierra Club (collectively, "GYC") filed a complaint in the D.C. Court (Case No. 07-cv-2111-EGS) alleging that the Service's 2007 EIS and 2007 ROD violate NEPA and the APA.  See Ex. G.  GYC filed a first amended and supplemented complaint in that same case on January 11, 2008, further alleging that the 2007 Final Rule, which issued on December 13, 2007, violates several federal laws including the Organic Act, Executive Order 11644 ("EO 11644"), and 36 C.F.R. § 2.18(c).  See Ex. H.

Similarly, on November 21, 2007, the National Parks Conservation Association ("NPCA") filed a complaint in the D.C. Court (Case No. 07-cv-2112) challenging the Service's 2007 EIS and 2007 ROD on NEPA and APA grounds. Ex. I. As in the GYC case, NPCA filed an amended complaint quickly thereafter describing additional violations allegedly caused by the Service's issuance of the 2007 Final Rule. See Ex. J. The GYC and NPCA cases were consolidated by order dated March 19, 2008.

Similar challenges have been filed in the District of Wyoming. On December 13, 2007, the State of Wyoming filed a petition for review of agency action challenging the 2007 EIS, ROD, and Final Rule, and alleging that those actions violate NEPA, the APA, the Organic Act, the Yellowstone National Park Act, and the United States Constitution insofar as they (1) impose daily limits on snowmobile access to Yellowstone National Park ("Yellowstone"); (2) impose a commercial guide requirement; and (3) impose a new management scheme for Sylvan Pass. See Ex. K. On January 2, 2008, the Board of County Commissioners of the County of Park filed a nearly identical petition. Ex. L. The two Wyoming Cases were consolidated by Order dated February 19, 2008. See Ex. D.

Finally, on February 22, 2008, the International Snowmobile Manufacturers Association, the American Council of Snowmobile Associations, the Blue Ribbon Coalition, and Terri Manning (collectively "ISMA") filed a motion to intervene as plaintiffs in the consolidated Wyoming Cases, challenging the 2007 Final Rule's reduced limited of 540 snowmobiles per day in Yellowstone and the commercial guide requirement. See Ex. C. ISMA's motion for intervention was granted on February 22, 2008.

The Wyoming Cases differ from the cases before this Court in that the Wyoming plaintiffs argue that the limitations and restrictions on snowmobile use in the Winter Use Plan

are too stringent, whereas the original plaintiffs in the cases before this Court argue that those limitations and restrictions are not stringent enough.  Otherwise, however, the cases are virtually identical in that they challenge the same agency actions and allege similar claims under many of the same federal statutes.[3]

## II.    ARGUMENT

### A.    Standard of Review

The Court's authority to transfer the above-captioned cases is governed by 28 U.S.C. § 1404(a), which states that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  Under the statute, the Court is afforded broad discretion to determine whether transfer from one jurisdiction to another is proper.  SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1154 (D.C. Cir. 1978).[4]

In determining whether to transfer the above-captioned cases to another venue, this Court balances both considerations of convenience and the interest of justice.  See Stewart Org. v.

---

[3]    In addition, ISMA has recently filed a second motion to intervene, this time as a defendant in the above-captioned cases.  See Ex. B (Dkt. #15).  As part of its intervention, ISMA proposes cross-claims against the Federal Defendants which mirror the claims ISMA has raised in the Wyoming litigation.  Compare Ex. M with Ex. N.

[4]    The only limitation on the Court's discretion to grant a transfer motion is the statutory requirement that a case be transferred to another "district or division where [the case] might have been brought."  28 U.S.C. § 1404(a).  See, e.g., Kafack v. Primerica Life Ins. Co., 934 F. Supp. 3, 5 (D.D.C. 1996).  The issue of where the case might have been brought is addressed by 28 U.S.C. § 1391(e), which provides that, in an action where an agency of the United States is a defendants, venue is proper in "the judicial district in which . . . a substantial part of the events or omissions giving rise to the claim occurred," or in which "the plaintiff resides . . . ."  28 U.S.C. § 1391(e)(2), (3).  Here, the Parks are located primarily in Wyoming.  Therefore, as this Court has previously found, the District of Wyoming is a proper venue and available forum for the above-captioned cases.  See Ex. O at 7 ("Given that the Parks that are the subject of this litigation are located in the State of Wyoming, there is no question that this action could have been brought before the U.S. District Court for the District of Wyoming.").

Ricoh Corp., 487 U.S. 22, 29 (1988); Envtl. Def. v. U.S. Dep't of Transp., Civil Action No. 06-2176 (GK), 2007 WL 1490478, *4 (May 18, 2007, D.D.C.).  In practice, however, the statutory factors of convenience and the interest of justice are "best viewed as placeholders for a broader set of considerations, the contours of which turn upon the particular facts of each case."  Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220 n.3 (7th Cir. 1986).

Thus, in this District, the "convenience" factor typically requires that a court consider a number of *private* interests, including "(1) the plaintiffs' choice of forum . . . ; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof." Nat'l Wildlife Fed'n v. Harvey, 437 F. Supp.2d 42, 46 (D.D.C. 2006).  By contrast, the "interest of justice" factor requires the consideration of several *public* interests including (1) the desire to avoid multiple litigation from a single transaction; (2) the desire to try related litigation together; (3) the public interest in conserving judicial resources; (4) the local interest in deciding local controversies at home; (5) the degree to which both venues are familiar with the governing laws; and (6) the relative congestions of the calendars of the transferee and transferor courts.  See Nat'l Wildlife Fed'n, 437 F. Supp.2d at 46 (discussing fourth, fifth, and sixth considerations); Hawksbill Sea Turtle v. Fed'l Emergency Mgmt. Agency, 939 F. Supp. 1, 4 (D.D.C. 1996) (discussing first, second, third, and fourth considerations); Holland v. A.T. Massey Coal, 360 F. Supp.2d 72, 76 (D.D.C. 2004) (same).

Of the two statutory factors, the more important is the interest of justice.  See Wright et al., Federal Practice and Procedure, § 3854 (2008) ("Indeed, a number of federal courts have considered this factor decisive – outweighing the other statutory factors – in ruling on a change of venue motion even though the convenience of the parties and witnesses pointed in a different

direction."); <u>Coffey v. Van Dorn Iron Works</u>, 796 F.2d 217, 220-221 (7th Cir. 1986) (interest of

justice may be determinative); <u>Chrysler Capital Corp. v. Woehling</u>, 663 F. Supp. 478, 483

(D.Del. 1987) (recognizing that interest of justice is the most important criterion).

**B.     The Interest of Justice Weighs Heavily in Favor of Transfer**

This Court has compelling reasons to transfer the above-captioned cases to the District of

Wyoming because, as previously stated, the cases before both districts challenge the very same

agency actions.  The plaintiffs in all four cases filed complaints within six weeks of each other.

<u>See</u> Exs. A, B, C, D.  In each complaint, the plaintiffs allege and seek findings that the 2007 EIS,

ROD, and Final Rule violate NEPA, the APA, the Yellowstone National Park Act, and the

National Park Service Organic Act.  <u>See</u> Exs. H, J, K, L.  Given the relationship between the two

actions, the interests of justice necessitate that they be heard by the same court, primarily to

avoid the risk of subjecting the Federal Defendants to conflicting judgments.

Winter use litigation before this Court and the Wyoming Court during the winter of

2003/2004 produced conflicting orders and ultimately led this court to order Federal Defendants

to show cause why they should not be held in contempt of court.  <u>See</u> Ex. P; <u>see also</u> <u>Fund for</u>

<u>Animals</u>, 323 F. Supp. 2d at 10 (". . . defendants are required by this Court's Order to implement

a Rule that another court has mandated cannot be enforced").  The current state of parallel

proceedings presents an even greater risk that this Court and the Wyoming Court could reach

inconsistent judgments on the merits of Plaintiffs' claims and the requirements of law concerning

winter recreational use of the Parks.  Unlike the 2003/2004 litigation, where the two courts were

asked to consider the merits of different rules with different administrative records, the plaintiffs

in the cases currently before this Court and the Wyoming Court challenge exactly the same

federal documents and decisions on the same administrative record.  Thus, the risk of

inconsistent judgments has undoubtedly increased.[5]

       In these circumstances, the interest of justice strongly favors a single court adjudicating

the claims to avoid the risk of conflicting judgments.  See Feller v. Brock, 802 F.2d 722, 727-

728 (4th Cir. 1986) ("Prudence requires that whenever possible, coordinate courts should avoid

issuing conflicting orders."); see also Church of Scientology of California v. U.S. Dep't of the

Army, 611 F.2d 738, 750 (9th Cir. 1979) (recognizing the need to "avoid the embarrassment of

conflicting judgments").  This is because the imposition of conflicting orders require the subject

party "to choose between coordinate courts and to knowingly violate an outstanding court

order," thus "forc[ing] the [subject party] to run a serious risk of contempt sanctions," creating

"morale and credibility problems," and imposing a "hardship" on the subject party that

"implicates basic principles of judicial obedience . . . ."  Feller, 802 F.2d at 727 (citations

omitted).  Accordingly, this Circuit has cautioned that "[c]onsiderations of comity and orderly

administration of justice dictate that two courts of equal authority should not hear the same case

simultaneously."  WMATA v. Ragonese, 617 F.2d 828, 830 (D.C. Cir. 1980) (emphasis added).

       Thus, faced with these circumstances, courts in this District have routinely granted

motions to transfer so that related cases can be adjudicated by the same court.  See e.g., Envtl.

Def. v. U.S. Dep't of Transp., Civil Action No. 06-2176 (GK), 2007 WL 1490478, *4 (May 18,

2007, D.D.C.) (granting transfer and recognizing that allowing two related cases "to proceed

unconsolidated in separate districts would lead to . . . a significant risk that this court and the

_____

[5]       This is further underscored by ISMA's motion for intervention, which was filed in the
above-captioned cases on March 12, 2008.  See Ex. B.  ISMA's proposed answer incorporates a
number of cross-claims against the Federal Defendants which mirror the claims ISMA has
already raised via their intervention in the consolidated Wyoming cases.  Compare Ex. M with
Ex. N.

[transferee] court would issue inconsistent orders subjecting Defendants to inconsistent obligations") (quotations omitted); <u>Reiffin v. Microsoft Corp.</u>, 104 F. Supp.2d 48, 55 (D.D.C. 2000) ("[L]itigating this matter here would . . . run the risk of inconsistent judgments on the validity and infringement of Mr. Reiffin's 603 and 604 patents."); <u>Prof'l Ass'n Travel Serv. v Arrow Air, Inc.</u>, 597 F. Supp. 475, 477 (D.D.C. 1984) (transferring case to district where related case was also pending because a consolidation the cases would "avoid inconsistent findings" and would "provide for a single, coherent, consistent judgment"). Similarly here, this Court should ensure that the current winter use litigation produces a single, coherent, consistent judgment by transferring the above-captioned cases to the Wyoming Court so that they may be consolidated with the two related cases currently pending in that district.

The public interest in judicial economy also weighs heavily in favor of transfer. In an age of increasingly congested federal dockets, it makes little sense to have two separate districts duplicate their efforts when a single court could hear both cases and adjudicate the claims more efficiently. As the Supreme Court has instructed, "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy, and money that section 1404(a) was designed to prevent." <u>Cont'l Grain Co. v. The Barge FBL-585</u>, 364 U.S. 19, 26 (1960).

This District has consistently heeded the Supreme Court's instruction, noting that "the fact that there is an ongoing case dealing with similar issues in another jurisdiction weighs very heavily in favor of a transfer under § 1404(a)." <u>Holland v. A.T. Massey Coal</u>, 360 F. Supp.2d 72, 77 (D.D.C. 2004). The same is true here. The current winter use litigation involves four cases, all of which target the same Federal Defendants, and all of which petition this Court and the Wyoming Court to set aside the Services' 2007 EIS, ROD, and Final Rule. Each of these

cases will require that the reviewing court become familiar with the exact same legal issues as well as the administrative record underlying the challenged agency actions, which at present exceeds 45,000 pages. Under these circumstances, judicial economy would clearly be served by a consolidation of the four winter use cases before a single court, which, as explained below, should be the Wyoming Court.

The interests of justice are promoted when a localized controversy such as this one is resolved in the region that it impacts. See Oil, Chem. & Atomic Workers Local Union No. 6-418 v. Nat'l Labor Review Bd., 694 F.2d 1289, 1300 (D.C. Cir. 1982). As the Supreme Court has noted, "In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509 (1947) (emphasis added); accord Sierra Club v. Flowers, 276 F. Supp. 2d 62, 67 (D.D.C. 2003).

Here, Defendants do not deny that the management of the national parks implicates issues of interest to both the local residents of Wyoming and the Nation as a whole. Moreover, it is clear that both courts are equally capable of fairly and adequately considering these interests consistent with the fair administration of justice. Notwithstanding this, the implications of a decision resolving the current winter use litigation will be felt more acutely in Wyoming, where its citizens are affected more proximately not only by the conservation and preservation concerns of the plaintiffs in the above-captioned cases, but also by the local business, livelihood, and recreational concerns implicated by the Park Services winter use regulations challenged here. Under the circumstances, this Court should recognize the compelling interest of the State of Wyoming in having this localized controversy decided at home. See Nat'l Wildlife Fed'n, 437

F. Supp. 2d at 49; <u>Trout Unlimited v. U.S. Dep't of Agriculture</u>, 944 F. Supp. 13, 19 (D.D.C. 1996); <u>Hawksbill Sea Turtle</u>, 939 F. Supp. at 3 n.5.  In sum, the interest of justice weighs heavily in favor of having the winter use cases decided in the district where the agency actions underlying the various cases took place and where the Park land affected by those actions lies.[6]

> ### C.    Factors Concerning the Convenience of the Parties Do Not Offset the Strong Public Interests That Would Be Served by Transferring The Above-Captioned Cases to the Wyoming Court

The private interest considerations which reflect the "convenience" factor in section 1404(a) either favor transfer of the above-captioned cases to the Wyoming Court or are neutral and therefore do not counterbalance the strong public interests described above.

First, each of the winter use cases arises under the Administrative Procedure Act and, therefore, will be decided solely on the basis of an administrative record.  Accordingly, live testimony involving local witnesses in either district is unlikely, and the parties' ease of access to "sources of proof" would remain constant regardless of the district.

Second, the plaintiffs in the above-captioned cases would not be prejudiced by a transfer to Wyoming.  While this Court must afford some deference to the Plaintiffs' choice of forum, that deference is diminished where the forum has "no meaningful ties to the controversy and no particular interest in the parties or subject matter."  <u>Trout Unlimited</u>, 944 F. Supp. at 17 (internal

---

[6]    The last remaining public interest factor – the degree to which both venues are familiar with governing laws – is neutral and therefore does not counterbalance the compelling interest in avoiding conflicting judgments and preserving judicial resources.  While it is in the public interest to have a dispute heard by a court that is more familiar with the governing laws, this factor is of little relevance where, as here, the Court is required to decide between two federal district courts in a case that involves exclusively federal law.  In cases based on environmental federal law, courts in this District have routinely followed "the principle that the transferee federal court is competent to decide federal issues correctly."  <u>Nat'l Wildlife Fed'n</u>, 437 F. Supp.2d at 49; <u>In re Korean Air Lines Disaster of Sept. 1, 1983</u>, 829 F.2d 1171, 1175 (D.C. Cir. 1987).

quotations omitted); <u>accord</u> <u>Nat'l Wildlife Fed'n</u>, 437 F. Supp.2d at 47; <u>Sierra Club v. Flowers</u>, 276 F. Supp. 2d at 67.  As discussed above, the Park lands at issue lie primarily in the District of Wyoming, and decisions concerning their management will be felt most acutely by the citizens of that State.

By contrast, there is no evidence that the Service's management of the Parks impacts the District of Columbia in any way other than to affect a generalized interest in use and enjoyment of the National Park System that is equally shared by citizens in each of this Country's fifty states.  Indeed, the only apparent relationship between the above-captioned cases and this District is the fact that NPCA and the Wilderness Society have their headquarters in this District. NPCA, however, has field offices in both Jackson Hole, Wyoming and Livingston, Montana, the latter of which is devoted primarily to advocating a phasing out of snowmobile use in Yellowstone National Park.  <u>See</u> Exs. U, V.  The Wilderness Society also has a field office near the northern border of the Parks, in Bozeman, Montana.  <u>See</u> Ex. W.  None of the remaining plaintiffs are headquartered in Washington, DC.  Indeed, the Greater Yellowstone Coalition is headquartered in Bozeman, Montana and has a field office in Cody, Wyoming; The Wilderness Society has a field office in Bozeman, Montana; and the Sierra Club has field offices in both Bozeman, Montana and Sheridan, Wyoming.  <u>See</u> Exs. W, X, Y.  Therefore, none of the plaintiffs could claim prejudice as a result of being made to litigate in Wyoming.

Finally, the procedural posture in all of the cases is identical.  Accordingly, a transfer to the Wyoming Court would not in any way jeopardize the plaintiffs' ability or desire to have their claims resolved in advance of the 2008/2009 winter season.  By contrast, a transfer would significantly benefit the Defendants by allowing them to avoid any unnecessary expense

stemming from simultaneous litigation in two different districts and, as we explained earlier, by avoiding the risk of inconsistent judgments by the two district courts.

## III.     CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the above-captioned cases be transferred to the District of Wyoming so that they may be consolidated with the ongoing winter use litigation in that district.

Respectfully submitted this 25th day of March, 2008.

RONALD J. TENPAS
Assistant Attorney General

 /s/ Guillermo A. Montero
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469 / Fax: (202) 305-0274
Email: Barry.Weiner@usdoj.gov
           Luke.Hajek@usdoj.gov
           Guillermo.Montero@usdoj.gov

OF COUNSEL:                              Attorneys for the Defendants

JASON WAANDERS
U.S. Department of the Interior
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————— )
GREATER YELLOWSTONE COALITION,   )
et al.,                          )
                                 )
            Plaintiffs,          )
                                 )          Case No. 07-cv-2111 (EGS)
        v.                       )
                                 )
DIRK KEMPTHORNE, et al.,         )
                                 )
            Defendants.          )
————————————————————)


———————————————————— )
NATIONAL PARKS CONSERVATION      )
ASSOCIATION,                     )
                                 )
            Plaintiff,           )
                                 )          Case No. 07-cv-2112 (EGS)
        v.                       )
                                 )
UNITED STATES DEPARTMENT OF THE  )
INTERIOR; NATIONAL PARK SERVICE  )
                                 )
            Defendants.          )
————————————————————)


**DECLARATION OF GUILLERMO A. MONTERO**
**IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO TRANSFER**

I, Guillermo A. Montero, declare as follows pursuant to 28 U.S.C. §1746:

1.      I am an attorney in good standing of the bar of Massachusetts, and I am employed as a trial attorney with the United States Department of Justice, Environment and Natural Resources Division, Natural Resources Section.  I am one of the attorneys of record assigned to represent the Federal Defendants in this action.  I have personal knowledge of the facts stated herein and, if called upon to testify, I would testify that the facts set forth below are true and correct.

2.      Attached as **Exhibit A** is a true and correct copy of the Civil Docket for Case Number 1:07-cv-02111-EGS, in the U.S. District Court for the District of Columbia.

3.      Attached as **Exhibit B** is a true and correct copy of the Civil Docket for Case Number 1:07-cv-02112-EGS, in the U.S. District Court for the District of Columbia.

4.      Attached as **Exhibit C** is a true and correct copy of the Civil Docket for Case Number 2:07-cv-00319-CAB, in the U.S. District Court for the District of Wyoming.

5.      Attached as **Exhibit D** is a true and correct copy of the Civil Docket for Case Number 2:08-cv-00004-CAB, in the U.S. District Court for the District of Wyoming.

6.      Attached as **Exhibit E** is a true and correct copy of the Civil Docket for Case Number 1:02-cv-02367-EGS, in the U.S. District Court for the District of Columbia.

7.      Attached as **Exhibit F** is a true and correct copy of the Civil Docket for Case Number 1:03-cv-00752-EGS, in the U.S. District Court for the District of Columbia.

8.      Attached as **Exhibit G** is a true and correct copy of the Complaint for Declaratory and Injunctive Relief filed by Greater Yellowstone Coalition et al. in Case No. 07-cv-2111-EGS on November 20, 2007.

- 1 -

9.      Attached as **Exhibit H** is a true and correct copy of the First Amended and Supplemented Complaint for Declaratory and Injunctive Relief filed by Greater Yellowstone Coalition et al. in Case No. 07-cv-2111-EGS on January 11, 2008.

10.     Attached as **Exhibit I** is a true and correct copy of the Petition for Review of Agency Action filed by the National Parks Conservation Association in Case No. 07-cv-2112-EGS on November 21, 2007.

11.     Attached as **Exhibit J** is a true and correct copy of the First Amended Petition for Review of Agency Action filed by the National Parks Conservation Association in Case No. 07-cv-2112-EGS on December 18, 2007.

12.     Attached as **Exhibit K** is a true and correct copy of the Petition for Review of Final Agency Action filed by the State of Wyoming in Case No. 07-cv-319B on December 13, 2007.

13.     Attached as **Exhibit L** is a true and correct copy of the Petition for Review of Agency Action filed by the Board of County Park Commissioners of the County of Park in Case No. 07-cv-00004B on January 2, 2008.

14.     Attached as **Exhibit M** is a true and correct copy of the Petition for Review of Final Agency Action filed by the International Snowmobile Manufacturer's Association, et al. in Case No. 07-cv-319B on February 26, 2008.

15.     Attached as **Exhibit N** is a true and correct copy of the Proposed Answer and Cross-Claims lodged by the International Snowmobile Manufacturer's Association, et al. in Case No. 07-cv-2112-EGS on March 12, 2008.

16.     Attached as **Exhibit O** is a true and correct copy of the Order issued on September 15, 2003 in Case Nos. 02-cv-2367-EGS and 03-cv-762-EGS.

17.     Attached as **Exhibit P** is a true and correct copy of the Order issued on February 17, 2004 in Case No. 02-cv-2367-EGS.

18.     Attached as **Exhibit Q** is a true and correct copy of the Memorandum Opinion and Order issued on June 20, 2004 in Case No. 02-cv-2367-EGS.

19.     Attached as **Exhibit R** is a true and correct copy of the Order issued on August 6, 2004 in Case No. 02-cv-2367-EGS.

20.     Attached as **Exhibit S** is a true and correct copy of the Order Consolidating Docket No. 08-CV-04-B With Docket No. 07-CV-319-B issued on February 14, 2008 in Case Nos. 08-cv-0004B and 07-cv-319B.

21.     Attached as **Exhibit T** is a true and correct copy of the Winter Use Plans Record of Decision, executed on November 20, 2007.

22.     Attached as **Exhibit U** is a true and correct copy of the portion of the National Parks Conservation Association's official web page which describes the mission and recent work of the National Parks Conservation Association's Yellowstone Field Office.

23.     Attached as **Exhibit V** is a true and correct copy of the portion of the National Parks Conservation Association's official web page which depicts the geographic location of the National Parks Conservation Association's Yellowstone Field Office and Grand Teton Field Office.

24.     Attached as **Exhibit W** is a true and correct copy of the portion of The Wilderness Society's web page which identifies the location of The Wilderness Society's headquarters and regional offices, including the Bozeman, Montana Regional Office.

25.     Attached as **Exhibit X** is a true and correct copy of the portion of the Sierra Club's web site which identifies the location of the Sierra Club's field offices, including the Bozeman, Montana Field Office.

26.     Attached as **Exhibit Y** is a true and correct copy of the portion of the Greater Yellowstone Coalition's web site which identifies the location of the Greater Yellowstone Coalition's headquarters in Bozeman, Montana and field office in Cody, Wyoming.

27.     Attached as **Exhibit Z** is a true and correct copy of the motion to transfer without attachments that is being filed in the District of Wyoming concurrently with the motion before this Court.


Executed this 25th day of March, 2008 in Washington, D.C.


 Guillermo A. Montero
Guillermo A. Montero

TYPE-C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:07-cv-02111-EGS

GREATER YELLOWSTONE COALITION et al v. KEMPTHORNE et al
Assigned to: Judge Emmet G. Sullivan
Cases: 1:02-cv-02367-EGS
　　　　 1:03-cv-00752-EGS
　　　　 1:04-cv-01913-EGS
Cause: 33:1365 Environmental Matters

Date Filed: 11/20/2007
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 11/20/2007 | 1 | COMPLAINT against DIRK KEMPTHORNE, MARY BOMAR, MIKE SNYDER ( Filing fee $ 350, receipt number 4616008489) filed by WILDERNESS SOCIETY, NATURAL RESOURCES DEFENSE COUNCIL, WINTER WILDLANDS ALLIANCE, SIERRA CLUB, GREATER YELLOWSTONE COALITION. (Attachments: # 1 Civil Cover Sheet)(jf, ) (Entered: 11/23/2007) |
| 11/20/2007 | | SUMMONS (5) Issued as to DIRK KEMPTHORNE, MARY BOMAR, MIKE SNYDER, U.S. Attorney and U.S. Attorney General. (jf, ) (Entered: 11/23/2007) |
| 11/20/2007 | 2 | NOTICE OF RELATED CASE by WILDERNESS SOCIETY, NATURAL RESOURCES DEFENSE COUNCIL, WINTER WILDLANDS ALLIANCE, SIERRA CLUB, GREATER YELLOWSTONE COALITION. Case related to Case No. 02-2367, 03-0752 & 04-1913. (jf, ) (Entered: 11/23/2007) |
| 11/20/2007 | 3 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by WILDERNESS SOCIETY, NATURAL RESOURCES DEFENSE COUNCIL, WINTER WILDLANDS ALLIANCE, SIERRA CLUB, GREATER YELLOWSTONE COALITION (jf, ) (Entered: 11/23/2007) |
| 11/28/2007 | 4 | NOTICE of Appearance by Sean M. Helle on behalf of all plaintiffs (Helle, Sean) (Entered: 11/28/2007) |
| 11/28/2007 | 5 | NOTICE of Appearance by Douglas L. Honnold on behalf of all plaintiffs (Honnold, Douglas) (Entered: 11/28/2007) |
| 01/09/2008 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to MARY BOMAR served on 12/10/2007, answer due 2/8/2008. (Baron, David) (Entered: 01/09/2008) |

EXHIBIT A

| Date | Doc # | Description |
|---|---|---|
| 01/09/2008 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to DIRK KEMPTHORNE served on 12/10/2007, answer due 2/8/2008. (Baron, David) (Entered: 01/09/2008) |
| 01/09/2008 | 8 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to MIKE SNYDER served on 12/10/2007, answer due 2/8/2008. (Baron, David) (Entered: 01/09/2008) |
| 01/09/2008 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on Attorney General. Date of Service Upon Attorney General 12/10/07. (Baron, David) (Entered: 01/09/2008) |
| 01/09/2008 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the US Attorney. (Baron, David) (Entered: 01/09/2008) |
| 01/09/2008 | 11 | MOTION for Leave to File *Amended and Supplemented Complaint* by WILDERNESS SOCIETY, NATURAL RESOURCES DEFENSE COUNCIL, WINTER WILDLANDS ALLIANCE, SIERRA CLUB, GREATER YELLOWSTONE COALITION (Attachments: # 1 Text of Proposed Order Proposed Order# 2 Exhibit First Amended and Supplemented Complaint)(Helle, Sean) Modified file date on 1/10/2008 (nmw, ). (Entered: 01/10/2008) |
| 01/11/2008 | 12 | NOTICE of Appearance by Barry Alan Weiner on behalf of DIRK KEMPTHORNE, MARY BOMAR, MIKE SNYDER (Weiner, Barry) (Entered: 01/11/2008) |
| 01/11/2008 |  | Minute Order granting 11 Plaintiffs' Motion for Leave to File an Amended and Supplemented Complaint. A motion was not required within the strict meaning of Federal Rules of Civil Procedure 15(a), because defendants have not filed a responsive pleading. Signed by Judge Emmet G. Sullivan on January 11, 2008. (lcegs1) (Entered: 01/11/2008) |
| 01/11/2008 | 13 | FIRST AMENDED COMPLAINT against DIRK KEMPTHORNE, MARY BOMAR, MIKE SNYDER filed by WILDERNESS SOCIETY, NATURAL RESOURCES DEFENSE COUNCIL, WINTER WILDLANDS ALLIANCE, SIERRA CLUB, GREATER YELLOWSTONE COALITION.(nmw, ) (Entered: 01/14/2008) |
| 01/14/2008 | 14 | NOTICE of Appearance by Luther L. Hajek on behalf of DIRK KEMPTHORNE, MARY BOMAR, MIKE SNYDER (Hajek, Luther) (Entered: 01/14/2008) |
| 02/05/2008 | 15 | NOTICE of Appearance by Guillermo A. Montero on behalf of DIRK KEMPTHORNE, MARY BOMAR, MIKE SNYDER (Montero, Guillermo) (Entered: 02/05/2008) |
| 02/08/2008 | 16 | *Federal Defendant's* ANSWER to 13 Amended Complaint by DIRK KEMPTHORNE, MARY BOMAR, MIKE SNYDER. Related document: 13 Amended Complaint filed by SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, WINTER WILDLANDS ALLIANCE, GREATER YELLOWSTONE COALITION, WILDERNESS SOCIETY.(Montero, Guillermo) (Entered: 02/08/2008) |

EXHIBIT A

| 02/08/2008 | 17 | ORDER; Attorney Meet and Confer Conference due by 3/7/2008., Meet & Confer Statement due by 3/14/2008. Setting forth further instruction to counsel.. Signed by Judge Emmet G. Sullivan on 2/8/08. (clv, ) (Entered: 02/08/2008) |
| --- | --- | --- |
| 03/10/2008 | 18 | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order)(Helle, Sean) (Entered: 03/10/2008) |
| 03/13/2008 | 19 | MOTION to Consolidate Cases by DIRK KEMPTHORNE, MARY BOMAR, MIKE SNYDER (Attachments: # 1 Text of Proposed Order) (Montero, Guillermo) (Entered: 03/13/2008) |
| 03/13/2008 | 20 | Memorandum in opposition to re 19 MOTION to Consolidate Cases *(Response)* filed by WILDERNESS SOCIETY, NATURAL RESOURCES DEFENSE COUNCIL, WINTER WILDLANDS ALLIANCE, SIERRA CLUB, GREATER YELLOWSTONE COALITION. (Helle, Sean) (Entered: 03/13/2008) |
| 03/14/2008 | 21 | REPLY to opposition to motion re 19 MOTION to Consolidate Cases , *Notice of Completion of Briefing on Motion,* filed by DIRK KEMPTHORNE, MARY BOMAR, MIKE SNYDER. (Montero, Guillermo) (Entered: 03/14/2008) |
| 03/18/2008 | 22 | MEET AND CONFER STATEMENT. (Hajek, Luther) (Entered: 03/18/2008) |
| 03/19/2008 |  | MINUTE ORDER granting Motion to Consolidate Cases. It is hereby ORDERED that the Defendants' Motion to Consolidate with Civil Action No. 07-2112 (EGS), National Parks Conservation Association v. National Park Service is GRANTED. However, to accommodate the plaintiffs' concerns in both cases, and consistent with the movants' request, it is FURTHER ORDERED (1) that the plaintiffs in both cases retain the right to file separate pleadings, motions, and briefs; and (2) that in the event Defendants file a motion to transfer venue, such motion shall be addressed and resolved separately for each of the two cases without regard to their having been consolidated. Signed by Judge Emmet G. Sullivan on March 19, 2008. (lcegs2) (Entered: 03/19/2008) |
| 03/19/2008 | 23 | SCHEDULING ORDER setting forth further instruction to counsel. Parties are directed to read this Order in its entirety upon receipt. Signed by Judge Emmet G. Sullivan on March 19, 2008. (lcegs2) (Entered: 03/19/2008) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 03/19/2008 21:25:43 | | |
| **PACER Login:** | us3079 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-02111-EGS |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

EXHIBIT A

TYPE-C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:07-cv-02112-EGS

NATIONAL PARKS CONSERVATION ASSOCIATON v.     Date Filed: 11/21/2007
UNITED STATES DEPARTMENT OF THE INTERIOR et     Jury Demand: None
al                                              Nature of Suit: 890 Other Statutory
Assigned to: Judge Emmet G. Sullivan            Actions
Cause: 05:551 Administrative Procedure Act      Jurisdiction: U.S. Government
                                                Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 11/21/2007 | 1 | COMPLAINT against UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE ( Filing fee $ 350, receipt number 4616008499) filed by NATIONAL PARKS CONSERVATION ASSOCIATION. (Attachments: # 1 Civil Cover Sheet)(jf, ) Modified on 11/27/2007 (lc, ). (Entered: 11/26/2007) |
| 11/21/2007 | | SUMMONS (4) Issued as to UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, U.S. Attorney and U.S. Attorney General (jf, ) (Entered: 11/26/2007) |
| 11/21/2007 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL PARKS CONSERVATION ASSOCIAITON (jf, ) (Entered: 11/26/2007) |
| 12/13/2007 | 3 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on Attorney General. Date of Service Upon Attorney General 11/21/07. (Rosenbaum, Robert) (Entered: 12/13/2007) |
| 12/13/2007 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the US Attorney,served on 11/21/2007. (Rosenbaum, Robert) Modified on 12/14/2007 (lc, ). (Entered: 12/13/2007) |
| 12/13/2007 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to UNITED STATES DEPARTMENT OF THE INTERIOR served on 11/21/2007, answer due 1/22/2008. (Rosenbaum, Robert) (Entered: 12/13/2007) |
| 12/13/2007 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to NATIONAL PARK SERVICE served on 11/21/2007, answer due 1/22/2008. (Rosenbaum, Robert) (Entered: 12/13/2007) |
| 12/18/2007 | 7 | FIRST AMENDED COMPLAINT (PETITION FOR REVIEW OF AGENCY ACTION) against UNITED STATES DEPARTMENT OF |

EXHIBIT B

| | | |
|---|---|---|
| | | THE INTERIOR, NATIONAL PARK SERVICE filed by NATIONAL PARKS CONSERVATION ASSOCIATON.(nmw, ) (Entered: 12/18/2007) |
| 01/09/2008 | 10 | Case Reassigned to Judge Emmet G. Sullivan. Judge James Robertson no longer assigned to the case. (lc, ) (Entered: 01/15/2008) |
| 01/11/2008 | 8 | NOTICE of Appearance by Barry Alan Weiner on behalf of UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE (Weiner, Barry) (Entered: 01/11/2008) |
| 01/14/2008 | 9 | NOTICE of Appearance by Luther L. Hajek on behalf of UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE (Hajek, Luther) (Entered: 01/14/2008) |
| 01/22/2008 | 11 | ANSWER to 7 Amended Complaint by UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE. Related document: 7 Amended Complaint filed by NATIONAL PARKS CONSERVATION ASSOCIATON, 1 Complaint,.(Weiner, Barry) (Entered: 01/22/2008) |
| 01/24/2008 | 12 | ORDER, Attorney Meet and Confer Conference due by 2/29/2008., Meet & Confer Statement due by 3/7/2008. Setting forth further instruction to counsel.. Signed by Judge Emmet G. Sullivan on 1/24/08. (clv, ) (Entered: 01/24/2008) |
| 02/05/2008 | 13 | NOTICE of Appearance by Guillermo A. Montero on behalf of UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE (Montero, Guillermo) (Entered: 02/05/2008) |
| 03/07/2008 | 14 | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order)(Rosenbaum, Robert) (Entered: 03/07/2008) |
| 03/12/2008 | 15 | MOTION to Intervene as Defendants by INTERNATIONAL SNOWMOBILE MANUFACTURERS ASSOCIATION, AMERICAN COUNCIL OF SNOWMOBILE ASSOCIATIONS, BLUE RIBBON COALITION, TERRI MANNING (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Proposed Answer and Crossclaims, # 7 Corporate Disclosure-Blue Ribbon Coalition, # 8 Corporate Disclosure-Intl. Snowmobile Manuf. Assoc., # 9 Corporate Disclosure-American Council of Snowmobile Assoc., # 10 Certificate of Service, # 11 Text of Proposed Order)(nmw, ) (Entered: 03/13/2008) |
| 03/13/2008 | 16 | MOTION to Consolidate Cases by UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE (Attachments: # 1 Text of Proposed Order)(Montero, Guillermo) (Entered: 03/13/2008) |
| 03/14/2008 | 17 | SUPPLEMENTAL MEMORANDUM to re 16 MOTION to Consolidate Cases filed by NATIONAL PARKS CONSERVATION ASSOCIATON. (Rosenbaum, Robert) (Entered: 03/14/2008) |
| 03/14/2008 | 18 | REPLY to opposition to motion re 16 MOTION to Consolidate Cases , *Notice of Completion of Briefing on Motion,* filed by UNITED STATES |

EXHIBIT B

| | | DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE. (Montero, Guillermo) (Entered: 03/14/2008) |
|---|---|---|
| 03/18/2008 | 19 | MEET AND CONFER STATEMENT. (Hajek, Luther) (Entered: 03/18/2008) |
| 03/19/2008 | | MINUTE ORDER granting Motion to Consolidate Cases. It is hereby ORDERED that the Parties' Joint Motion to Consolidate with Civil Action No. 07-211 (EGS), Greater Yellowstone Coalition et al v. Dirk Kempthorne et al is GRANTED. However, to accommodate the plaintiffs' concerns in both cases, and consistent with the movant's request, it is FURTHER ORDERED (1) that the plaintiffs in both cases retain the right to file separate pleadings, motions, and briefs; and (2) that in the event Defendants file a motion to transfer venue, such motion shall be addressed and resolved separately for each of the two cases without regard to their having been consolidated. Signed by Judge Emmet G. Sullivan on March 19, 2008. (lcegs2) (Entered: 03/19/2008) |
| 03/19/2008 | 20 | SCHEDULING ORDER setting forth further instruction to counsel. Parties are directed to read this Order in its entirety upon receipt. Signed by Judge Emmet G. Sullivan on March 19, 2008. (lcegs2) (Entered: 03/19/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/19/2008 21:28:45 | | |
| **PACER Login:** us3079 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 1:07-cv-02112-EGS |
| **Billable Pages:** 2 | **Cost:** | 0.16 |

EXHIBIT B

## U.S. District Court
## District of Wyoming (Cheyenne)
## CIVIL DOCKET FOR CASE #: 2:07–cv–00319–CAB

State of Wyoming v. United States Department of Interior et al
Assigned to: Judge Clarence A Brimmer
Referred to: Judge William C Beaman
Member case: (View Member Case)
  Cases: 1:08–cv–00032–CAB
         2:08–cv–00004–CAB
Case in other court:  USDC – WY, 00–CV–229; 04–CV–315
Cause: 05:702 Administrative Procedure Act

Date Filed: 12/13/2007
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 12/13/2007 | 1 | Petition for Review of Final Agency Action ( Filing fee $350 receipt #CHY003421), filed by State of Wyoming. (Attachments: # 1 Civil Cover Sheet)(sjlg, ) (Entered: 12/14/2007) |
| 12/13/2007 | 2 | NOTICE of Attorney Appearance by Bruce A Salzburg on behalf of State of Wyoming (sjlg, ) (Entered: 12/14/2007) |
| 12/13/2007 | 3 | NOTICE of Attorney Appearance by Jay A Jerde on behalf of State of Wyoming (sjlg, ) (Entered: 12/14/2007) |
| 12/13/2007 | 4 | NOTICE of Attorney Appearance by Teresa R Nelson on behalf of State of Wyoming (sjlg, ) (Entered: 12/14/2007) |
| 12/13/2007 | 5 | NOTICE of complexity by Petitioner State of Wyoming ; this case is non–complex. (sjlg, ) (Entered: 12/14/2007) |
| 12/13/2007 | 6 | Praecipe for summons filed by Petitioner State of Wyoming. (sjlg, ) (Entered: 12/14/2007) |
| 01/17/2008 | 7 | NOTICE of Attorney Appearance by Nicholas Vassallo on behalf of National Park Service Director, National Park Service Regional Director Intermountain Region, United States Department of Interior, National Park Service, United States Department of Interior Secretary (szf, ) (Entered: 01/17/2008) |
| 01/17/2008 | 8 | REFERRED TO MAGISTRATE JUDGE. MOTION for Luther L. Hajek to appear pro hac vice; Check not tendered; filed by Respondents National Park Service Director, National Park Service Regional Director Intermountain Region, United States Department of Interior, National Park Service, United States Department of Interior Secretary. (Attachments: # 1 Proposed Order)(szf, ) (Entered: 01/17/2008) |
| 01/17/2008 | 9 | REFERRED TO MAGISTRATE JUDGE. MOTION for Barry A. Weiner to appear pro hac vice; Check not tendered; filed by Respondents National Park Service Director, National Park Service Regional Director Intermountain Region, United States Department of Interior, National Park Service, United States Department of Interior Secretary. (Attachments: # 1 Proposed Order)(szf, ) (Entered: 01/17/2008) |
| 01/22/2008 | 10 | ORDER by the Honorable William C Beaman granting 8 Motion to appear pro hac vice admitting Luther L Hajek for National Park Service Director and National Park Service Regional Director Intermountain Region (szf, ) (Entered: 01/23/2008) |
| 01/22/2008 | 11 | ORDER by the Honorable William C Beaman granting 9 Motion to appear pro hac vice admitting Barry A Weiner for National Park Service Director and National Park Service Regional Director Intermountain Region (szf, ) (Entered: 01/23/2008) |

EXHIBIT C

| 02/11/2008 | 12 | PROOF OF SERVICE by Petitioner State of Wyoming (szf, ) (Entered: 02/11/2008) |
|---|---|---|
| 02/11/2008 | 13 | REFERRED TO MAGISTRATE JUDGE. MOTION for Guillermo A. Montero to appear pro hac vice; filed by Respondents National Park Service Director, National Park Service Regional Director Intermountain Region, United States Department of Interior, National Park Service, United States Department of Interior Secretary. (Attachments: # 1 Declaration of Guillermo A. Montero# 2 Proposed Order)(Vassallo, Nicholas) (Entered: 02/11/2008) |
| 02/13/2008 | 14 | ORDER by the Honorable William C Beaman granting 13 Motion to appear pro hac vice admitting Guillermo A Montero for National Park Service Director and National Park Service Regional Director Intermountain Region (szf, ) (Entered: 02/13/2008) |
| 02/14/2008 | 15 | REFERRED TO MAGISTRATE JUDGE. MOTION for Extension of Time *to File Administrative Record and Response* filed by Respondents National Park Service Director, National Park Service Regional Director Intermountain Region, United States Department of Interior, National Park Service, United States Department of Interior Secretary. (Attachments: # 1 Proposed Order)(Vassallo, Nicholas) (Entered: 02/14/2008) |
| 02/19/2008 | 16 | ORDER Consolidating Docket No 08–CV–4–B with Docket No 07–CV–319by the Honorable Judge Clarence A Brimmer. All future pleadings should be filed in 07–CV–319–B(sjlg, ) (Entered: 02/20/2008) |
| 02/20/2008 | 17 | ORDER by the Honorable Judge William C Beaman granting 15 Motion for Extension of Time. (szf, ) (Entered: 02/20/2008) |
| 02/21/2008 | 18 | REQUEST for hearing on Scheduling Conference by Petitioner State of Wyoming. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(Jerde, Jay) (Entered: 02/21/2008) |
| 02/22/2008 | 19 | REFERRED TO MAGISTRATE JUDGE. MOTION to Intervene filed by International Snowmobile Manufacturer's Association, American Council of Snowmobile Associations, Blue Ribbon Coalition, Inc., Teri Manning (Attachments: # 1 Proposed Order)Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/22/2008) |
| 02/22/2008 | 20 | REFERRED TO MAGISTRATE JUDGE. MOTION for William P. Horn and David E. Lampp to appear pro hac vice; Check tendered; filed by Intervenor Parties International Snowmobile Manufacturers Associaton Inc, American Council of Snowmobile Associations, Blue Ribbon Coalition Inc, Terri Manning. (Attachments: # 1 Proposed Order)Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/22/2008) |
| 02/22/2008 | 21 | MEMORANDUM in Support of (19 in 2:07–cv–00319–CAB, 19 in 2:07–cv–00319–CAB) Motion to Intervene,,, filed by Intervenor Parties International Snowmobile Manufacturers Associaton Inc, American Council of Snowmobile Associations, Blue Ribbon Coalition Inc, Terri Manning. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/22/2008) |
| 02/22/2008 | 23 | ORDER by the Honorable Judge Clarence A Brimmer granting (19) Motion to Intervene in case 2:07–cv–00319–CAB and (18) Motion to Intervene in case 2:08–cv–00004–CAB Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/26/2008) |
| 02/25/2008 | 22 | NOTICE of Initial Pretrial Conference: Initial Pretrial Conference set for 3/11/2008 09:00 AM in Cheyenne before Judge William C Beaman. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB (sdb, ) (Entered: 02/25/2008) |
| 02/25/2008 | 24 | ORDER by the Honorable Judge William C Beaman granting (20) in case 07–cv–00319–CAB and (19) in case 08–cv–00004–CAB Motion to appear pro hac vice admitting William P. Horn and David E. Lampp for International Snowmobile Manufacturers Associaton Inc, American Council of Snowmobile Associations, Blue Ribbon Coalition Inc and Terri Manning Associated Cases: |

EXHIBIT C

| | | 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/26/2008) |
|---|---|---|
| 02/26/2008 | 25 | PETITION for Review of Final Agency Action, filed by Intervenors International Snowmobile Manufacturers Associaton Inc, American Council of Snowmobile Associations, Blue Ribbon Coalition Inc, Terri Manning.(szf, ) (Entered: 02/26/2008) |
| 02/26/2008 | 26 | CORPORATE DISCLOSURE filed by International Snowmobile Manufacturers Associaton Inc. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/26/2008) |
| 02/26/2008 | 27 | CORPORATE DISCLOSURE filed by American Council of Snowmobile Associations. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/26/2008) |
| 02/26/2008 | 28 | CORPORATE DISCLOSURE filed by Blue Ribbon Coalition Inc. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/26/2008) |
| 03/12/2008 | 29 | REFERRED TO MAGISTRATE JUDGE. Unopposed MOTION to Amend Caption, filed by Petitioner State of Wyoming. (Attachments: # 1 Proposed Order)Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 03/12/2008) |
| 03/13/2008 | 30 | INITIAL PRETRIAL ORDER by the Honorable Judge William C Beaman: The administrative record shall be filed with the Court on or before March 21, 2008. The petitioners and intervenors shall have 30 days to inspect and copy the contents of record. Second Scheduling Conference set for 4/30/2008 10:00 AM in Cheyenne before Judge William C Beaman. (sdb, ) (Entered: 03/13/2008) |
| 03/13/2008 | 31 | ORDER by the Honorable Judge William C Beaman granting Unopposed MOTION to Amend Caption, filed by Petitioner State of Wyoming. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(sjs, ) (Entered: 03/13/2008) |
| 03/17/2008 | 32 | REFERRED TO MAGISTRATE JUDGE. Emergency MOTION for Extension of Time *to File the Administrative Record* filed by Respondent United States Department of Interior. (Attachments: # 1 Proposed Order)Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(Vassallo, Nicholas) (Entered: 03/17/2008) |
| 03/17/2008 | 33 | NOTICE of Hearing on (32 in 2:07–cv–00319–CAB) Emergency MOTION for Extension of Time *to File the Administrative Record* Motion Hearing set for 3/18/2008 08:30 AM in Cheyenne before Judge William C Beaman. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(sdb, ) (Entered: 03/17/2008) |
| 03/18/2008 | 34 | Minutes for proceedings held before Judge William C Beaman: Motion Hearing held on 3/18/2008. (Court Reporter Julie Hedelson.)Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(sdl, ) (Entered: 03/18/2008) |
| 03/18/2008 | 35 | ORDER Granting Federal Respondents' Emergency Motion for an Enlargement of Time to File the Administrative Record by the Honorable Judge William C Beaman granting Motion for Extension of Time (32) in case 2:07–cv–00319–CAB; (29) in case 2:08–cv–00004–CAB Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 03/19/2008) |

EXHIBIT C

CONSTR

## U.S. District Court
## District of Wyoming (Cheyenne)
## CIVIL DOCKET FOR CASE #: 2:08−cv−00004−CAB

Park County Commissioner, Hall et al v. United States
Department of the Interior et al
Assigned to: Judge Clarence A Brimmer
Referred to: Judge William C Beaman
Lead case: 2:07−cv−00319−CAB
Member case: (View Member Case)
 Case:  2:07−cv−00319−CAB
Cause: 42:4321 Review of Agency Action−Environment

Date Filed: 01/02/2008
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 01/02/2008 | 1 | Petition for Review of Agency Action ( Filing fee $350 receipt #CHY003525.), filed by Park County Board of County Commissioners, Brewer, Fontaine, Park County Board of County Commissioners, Park County Board of County Commissioners, Hall, French, Park County Board of County Commissioners, Park County Board of County Commissioners, Siggins.(sdl, ) Additional attachment(s) added on 1/3/2008 (sdl, ). (Entered: 01/03/2008) |
| 01/17/2008 | 2 | NOTICE of Attorney Appearance by Nicholas Vassallo on behalf of United States Department of Interior, United States Department of Interior Secretary, National Park Service Director, National Park Service Regional Director Intermountain Region (szf, ) (Entered: 01/17/2008) |
| 01/17/2008 | 3 | REFERRED TO MAGISTRATE JUDGE. MOTION for Luther Hajek to appear pro hac vice; Check not tendered; filed by Respondents United States Department of Interior, United States Department of Interior Secretary, National Park Service Director, National Park Service Regional Director Intermountain Region. (Attachments: # 1 Proposed Order)(szf, ) (Entered: 01/17/2008) |
| 01/17/2008 | 4 | REFERRED TO MAGISTRATE JUDGE. MOTION for Barry A. Weiner to appear pro hac vice; Check not tendered; filed by Respondents United States Department of Interior, United States Department of Interior Secretary, National Park Service Director, National Park Service Regional Director Intermountain Region. (Attachments: # 1 Proposed Order)(szf, ) (Entered: 01/17/2008) |
| 01/22/2008 | 5 | ORDER by the Honorable William C Beaman granting 3 Motion to appear pro hac vice admitting Luther L Hajek for United States Department of Interior and United States Department of Interior Secretary (szf, ) (Entered: 01/23/2008) |
| 01/22/2008 | 6 | ORDER by the Honorable William C Beaman granting 4 Motion to appear pro hac vice admitting Barry A Weiner for United States Department of Interior and United States Department of Interior Secretary (szf, ) (Entered: 01/23/2008) |
| 01/30/2008 | 7 | NOTICE of Hearing: Hearing on Petition for Review set for 9/15/2008 10:00 AM in Cheyenne before Honorable Clarence A Brimmer. (szf, ) (Entered: 01/30/2008) |
| 02/04/2008 | 8 | CERTIFICATE OF SERVICE re 1 Complaint, by Petitioner Park County Board of County Commissioners, Hall (Davis, James) (Entered: 02/04/2008) |
| 02/11/2008 | 9 | REFERRED TO MAGISTRATE JUDGE. MOTION for Guillermo A. Montero to appear pro hac vice; filed by Respondents United States Department of Interior, United States Department of Interior Secretary, National Park Service Director, National Park Service Regional Director Intermountain Region. (Attachments: # 1 Declaration of Guillermo A. Montero# 2 Proposed Order)(Vassallo, Nicholas) (Entered: 02/11/2008) |
| 02/13/2008 | 10 | ORDER by the Honorable William C Beaman granting 9 Motion to appear pro hac vice admitting Guillermo A Montero for United States Department of Interior and United States Department of Interior Secretary EXHIBIT E: |

| | | 02/13/2008) |
|---|---|---|
| 02/14/2008 | 11 | MOTION to Consolidate Cases for Trial *Judicial Review* filed by Petitioners Park County Commissioner, Brewer, Park County Commissioner, Fontaine, Park County Commissioner, Hall, Park County Commissioner, French, Park County Commissioner, Siggins. (Davis, James) Document filed in error. (szf, ). (Entered: 02/14/2008) |
| 02/14/2008 | 12 | REFERRED TO MAGISTRATE JUDGE. MOTION for Order *Proposed Order* filed by Petitioners Park County Commissioner, Brewer, Park County Commissioner, Fontaine, Park County Commissioner, Hall, Park County Commissioner, French, Park County Commissioner, Siggins. (Davis, James) Document filed in error, should have been attached to Document 13 as proposed order(szf, ). (Entered: 02/14/2008) |
| 02/14/2008 | 13 | MOTION to Consolidate Cases for Trial *Jdicial Review* filed by Petitioners Park County Commissioner, Brewer, Park County Commissioner, Fontaine, Park County Commissioner, Hall, Park County Commissioner, French, Park County Commissioner, Siggins. (Davis, James) (Entered: 02/14/2008) |
| 02/14/2008 | 14 | REFERRED TO MAGISTRATE JUDGE. MOTION for Extension of Time *to File Administrative Record and Response* filed by Respondents United States Department of Interior, United States Department of Interior Secretary, National Park Service Director, National Park Service Regional Director Intermountain Region. (Attachments: # 1 Proposed Order)(Vassallo, Nicholas) (Entered: 02/14/2008) |
| 02/19/2008 | 15 | ORDER by the Honorable Judge Clarence A Brimmer granting 13 Motion to Consolidate Cases for Trial (sjlg, ) (Entered: 02/20/2008) |
| 02/20/2008 | 16 | ORDER by the Honorable Judge William C Beaman granting 14 Motion for Extension of Time (szf, ) (Entered: 02/20/2008) |
| 02/21/2008 | 17 | REQUEST for hearing on Scheduling Conference by Petitioner State of Wyoming. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(Jerde, Jay) (Entered: 02/21/2008) |
| 02/22/2008 | 18 | REFERRED TO MAGISTRATE JUDGE. MOTION to Intervene filed by International Snowmobile Manufacturer's Association, American Council of Snowmobile Associations, Blue Ribbon Coalition, Inc., Teri Manning (Attachments: # 1 Proposed Order)Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/22/2008) |
| 02/22/2008 | 19 | REFERRED TO MAGISTRATE JUDGE. MOTION for William P. Horn and David E. Lampp to appear pro hac vice; Check tendered; filed by Intervenor Parties International Snowmobile Manufacturers Associaton Inc, American Council of Snowmobile Associations, Blue Ribbon Coalition Inc, Terri Manning. (Attachments: # 1 Proposed Order)Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/22/2008) |
| 02/22/2008 | 20 | MEMORANDUM in Support of (19 in 2:07–cv–00319–CAB, 19 in 2:07–cv–00319–CAB) Motion to Intervene,,, filed by Intervenor Parties International Snowmobile Manufacturers Associaton Inc, American Council of Snowmobile Associations, Blue Ribbon Coalition Inc, Terri Manning. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/22/2008) |
| 02/22/2008 | 22 | ORDER by the Honorable Judge Clarence A Brimmer granting (19) Motion to Intervene in case 2:07–cv–00319–CAB and (18) Motion to Intervene in case 2:08–cv–00004–CAB Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/26/2008) |
| 02/25/2008 | 21 | NOTICE of Initial Pretrial Conference: Initial Pretrial Conference set for 3/11/2008 09:00 AM in Cheyenne before Judge William C Beaman. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB (sdb, ) (Entered: 02/25/2008) |

EXHIBIT D

| 02/25/2008 | 23 | ORDER by the Honorable Judge William C Beaman granting (20) in case 07–cv–00319–CAB and (19) in case 08–cv–00004–CAB Motion to appear pro hac vice admitting William P. Horn and David E. Lampp for International Snowmobile Manufacturers Associaton Inc, American Council of Snowmobile Associations, Blue Ribbon Coalition Inc and Terri ManningAssociated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/26/2008) |
|---|---|---|
| 02/26/2008 | 24 | CORPORATE DISCLOSURE filed by International Snowmobile Manufacturers Associaton Inc. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/26/2008) |
| 02/26/2008 | 25 | CORPORATE DISCLOSURE filed by American Council of Snowmobile Associations. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/26/2008) |
| 02/26/2008 | 26 | CORPORATE DISCLOSURE filed by Blue Ribbon Coalition Inc. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 02/26/2008) |
| 03/12/2008 | 27 | REFERRED TO MAGISTRATE JUDGE. Unopposed MOTION to Amend Caption, filed by Petitioner State of Wyoming. (Attachments: # 1 Proposed Order)Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 03/12/2008) |
| 03/13/2008 | 28 | ORDER by the Honorable Judge William C Beaman granting Unopposed MOTION to Amend Caption, filed by Petitioner State of Wyoming. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(sjs, ) (Entered: 03/13/2008) |
| 03/17/2008 | 29 | REFERRED TO MAGISTRATE JUDGE. Emergency MOTION for Extension of Time *to File the Administrative Record* filed by Respondent United States Department of Interior. (Attachments: # 1 Proposed Order)Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(Vassallo, Nicholas) (Entered: 03/17/2008) |
| 03/17/2008 | 30 | NOTICE of Hearing on (32 in 2:07–cv–00319–CAB) Emergency MOTION for Extension of Time *to File the Administrative Record* Motion Hearing set for 3/18/2008 08:30 AM in Cheyenne before Judge William C Beaman. Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(sdb, ) (Entered: 03/17/2008) |
| 03/18/2008 | 31 | Minutes for proceedings held before Judge William C Beaman: Motion Hearing held on 3/18/2008. (Court Reporter Julie Hedelson.)Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(sdl, ) (Entered: 03/18/2008) |
| 03/18/2008 | 32 | ORDER Granting Federal Respondents' Emergency Motion for an Enlargement of Time to File the Administrative Record by the Honorable Judge William C Beaman granting Motion for Extension of Time (32) in case 2:07–cv–00319–CAB; (29) in case 2:08–cv–00004–CAB Associated Cases: 2:07–cv–00319–CAB, 2:08–cv–00004–CAB(szf, ) (Entered: 03/19/2008) |

EXHIBIT D

APPEAL, TYPE-C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:02-cv-02367-EGS

THE FUND FOR ANIMALS et al v. NORTON

Assigned to: Judge Emmet G. Sullivan

Member case: (View Member Case)

  Case: 1:07-cv-02111-EGS

Case in other court: U.S. Court of Appeals, 02-02367

                  USCA for the District of Columbia, 03-05365

                  USCA, 04-05037

Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 12/03/2002

Date Terminated: 12/16/2003

Jury Demand: None

Nature of Suit: 893 Environmental Matters

Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 12/03/2002 |  | SUMMONS (4) Issued as to FRAN MAINELLA ; GALE NORTON , U.S. Attorney and U.S. Attorney General (td, ) (Entered: 12/04/2002) |
| 12/03/2002 | 1 | COMPLAINT against FRAN MAINELLA , GALE NORTON (Filing fee $ 150.) , filed by BLUEWATER NETWORK , ECOLOGY CENTER , WALT FARMER , PHILLIP KNIGHT , RICHARD MEIS , PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY , THE FUND FOR ANIMALS , GEORGE WUERTHNER .(td, ) (Entered: 12/04/2002) |
| 12/03/2002 | 2 | NOTICE OF RELATED CASE by all plaintiffs . Case related to Case No. 97-1126 EGS. (td, ) (Entered: 12/06/2002) |
| 12/03/2002 | 3 | LCvR 26.1 - CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests (td, ) (Entered: 12/06/2002) |
| 12/09/2002 | 4 | First MOTION to Compel *Production of the Administrative Record* by THE FUND FOR ANIMALS. (Attachments: # 1 Exhibit Attachment 1# 2 Exhibit Attachment 2# 3 Exhibit Attachment 3)(Crystal, Howard) (Entered: 12/09/2002) |
| 12/10/2002 |  | ORDER granting 4 Motion to Compel. Signed by Judge Emmet G. Sullivan on December 10, 2002. It is ORDERED that by no later than January 2, 2003, the federal defendants shall produce to plaintiffs and the Court the Administrative Record for the November 18, 2002 regulations concerning winter use in Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway, see 67 Fed. Reg. 69,473 (2002); and it isFURTHER ORDERED that by no later than February 1, 2003 the federal defendants shall produce to plaintiffs and |

EXHIBIT E

| | | |
|---|---|---|
| | | the Court the Administrative Record for all of plaintiffs' claims in this case. (Sullivan, Emmet) (Entered: 12/10/2002) |
| 12/18/2002 | 5 | ATTORNEY APPEARANCE. (Fischer, Lauren) (Entered: 12/18/2002) |
| 12/19/2002 | 6 | MOTION to Intervene by THE BLUERIBBON COALITION INC , THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC . (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Exhibit # 10 Exhibit # 11 EXHIBIT Intervenors' proposed Answer to plaintiff's complaint)(td, ) (Entered: 12/27/2002) |
| 12/30/2002 | 7 | ORDER regarding filing of Administrative Record. Signed by Judge Emmet G. Sullivan on December 30, 2002. (lcegs1) (Entered: 12/30/2002) |
| 12/31/2002 | 8 | MOTION for Leave to File *Motion to Transfer or in the Alternative Dismiss* by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Horn, William) (Entered: 12/31/2002) |
| 12/31/2002 | 9 | MOTION to Transfer Case *or in the Alternative Dismiss* by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Attachments: # 1 Exhibit 1-Motion to Transfer# 2 Exhibit 2 - Motion to Transfer# 3 Exhibit 3 - Motion to Transfer# 4 Exhibit 4 - Motion to Transfer# 5 Exhibit 5 - Motion to Transfer# 6 Exhibit 6 - Motion to Transfer# 7 Exhibit 7 - Motion to Transfer# 8 Exhibit 8 - Motion to Transfer# 9 Exhibit 9 - Motion to Transfer# 10 Exhibit 10 - Motion to Transfer)(Horn, William) (Entered: 12/31/2002) |
| 01/02/2003 | 10 | ADMINISTRATIVE RECORD *for the Nov. 18, 2002 final rule* by FRAN MAINELLA, GALE NORTON. (Attachments: # 1 Exhibit Index, Bates 1 to 40,000# 2 Exhibit Index, Bates 50,000 to 55,000)(Fischer, Lauren) (Entered: 01/02/2003) |
| 01/02/2003 | 11 | Memorandum in opposition to motion re 6 *to Intervene by the International Snowmobile Manufacturers Association and the BlueRibbon Coalition* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Crystal, Howard) (Entered: 01/02/2003) |
| 01/06/2003 | 12 | MOTION to Transfer Case by FRAN MAINELLA, GALE NORTON. (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Exhibit # 10 # 11 Exhibit # 12 Exhibit # 13 Exhibit)(Fischer, Lauren) (Entered: 01/06/2003) |
| 01/07/2003 | 13 | ENTERED IN ERROR. . . .REPLY to opposition to motion re 6 *Intervention* filed by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Horn, William) Modified on 1/8/2003 (td, ). |

EXHIBIT E

| | | |
|---|---|---|
| | | (Entered: 01/07/2003) |
| 01/07/2003 | 14 | REPLY to opposition to motion re 6 *Intervention* filed by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Horn, William) (Entered: 01/07/2003) |
| 01/13/2003 | 15 | Memorandum in opposition to motion re 8 *for Leave To File a Motion To Transfer Or In The Alternative Dismiss* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Crystal, Howard) (Entered: 01/13/2003) |
| 01/17/2003 | 16 | Memorandum in opposition to motion re 12 *by Federal Defendants to Transfer* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1 Exhibit Plaintiffs' Exhibit 1# 2 Exhibit Plaintiffs' Exhibit 2# 3 Exhibit Plaintiffs' Exhibit 3# 4 Exhibit Plaintiffs' Exhibit 4# 5 Exhibit Plaintiffs' Exhibit 5# 6 Exhibit Plaintiffs' Exhibit 6# 7 Exhibit Plaintiffs' Exhibit 7# 8 Exhibit Plaintiffs' Exhibit 8# 9 Exhibit Plaintiffs' Exhibit# 10 Exhibit Plaintiffs' Exhibit 10# 11 Exhibit Plaintiffs' Exhibit 11# 12 Exhibit Plaintiffs' Exhibit 12# 13 Exhibit Plaintiffs' Exhibit 13# 14 Exhibit Plaintiffs' Exhibit 14# 15 Exhibit Plaintiffs' Exhibit 15# 16 Exhibit Plaintiffs' Exhibit 16# 17 Exhibit Plaintiffs' Exhibit 17)(Crystal, Howard) (Entered: 01/17/2003) |
| 01/21/2003 | 17 | REPLY to opposition to motion re 8 *Motion for Leave to File Motion to Transfer* filed by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Horn, William) (Entered: 01/21/2003) |
| 01/27/2003 | 18 | REPLY in support of motion re 12 *Transfer of Venue* filed by FRAN MAINELLA, GALE NORTON. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2)(Fischer, Lauren) (Entered: 01/27/2003) |
| 01/31/2003 | 19 | AMENDED COMPLAINT against all defendants, filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, THE FUND FOR ANIMALS, GEORGE WUERTHNER.(td, ) (Entered: 02/03/2003) |
| 02/03/2003 | 20 | ADMINISTRATIVE RECORD *for Plaintiff Bluewater Network's Rulemaking Petition* by FRAN MAINELLA, GALE NORTON. (Attachments: # 1 Exhibit)(Fischer, Lauren) (Entered: 02/03/2003) |
| 02/07/2003 | 21 | *Proposed* ANSWER to Amended Complaint by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC.(Horn, William) (Entered: 02/07/2003) |

EXHIBIT E

| | | |
|---|---|---|
| 02/14/2003 | 22 | MOTION to Dismiss for Lack of Jurisdiction *on the ESA Claim* by FRAN MAINELLA, GALE NORTON. (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4Exhibit # 5 Exhibit # 6 Exhibit)(Fischer, Lauren) Modified on 2/14/2003 (jeb, ). (Entered: 02/14/2003) |
| 02/14/2003 | 23 | ANSWER to Amended Complaint by FRAN MAINELLA, GALE NORTON.(Fischer, Lauren) (Entered: 02/14/2003) |
| 02/28/2003 | 24 | Memorandum in opposition to motion re 22 *to dismiss* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1 Exhibit Attachment 1# 2 Exhibit Attachment 2)(Crystal, Howard) (Entered: 02/28/2003) |
| 03/03/2003 | 25 | AFFIDAVIT *of Service* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1 Exhibit Proof of Service)(Crystal, Howard) (Entered: 03/03/2003) |
| 03/06/2003 | 26 | NOTICE by FRAN MAINELLA, GALE NORTON re 20 Administrative Record, *Supplement* (Attachments: # 1 Supplement)(Fischer, Lauren) (Entered: 03/06/2003) |
| 03/07/2003 | 27 | REPLY in support of motion re 22 *Partial Motion to Dismiss* filed by FRAN MAINELLA, GALE NORTON. (Fischer, Lauren) (Entered: 03/07/2003) |
| 03/25/2003 | 28 | Consent MOTION for Leave to File *to File Supplemental Complaint* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1)(Crystal, Howard) (Entered: 03/25/2003) |
| 03/31/2003 | 29 | MOTION for Leave to File *Opposition to Plaintiffs' Unopposed, Expedited Motion for Leave to File Supplemental Complaint* by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Horn, William) (Entered: 03/31/2003) |
| 03/31/2003 | 30 | Memorandum in opposition to motion re 28 *Leave to File Supplemental Complaint* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Horn, William) (Entered: 03/31/2003) |
| 04/01/2003 | 31 | Memorandum in opposition to motion re 29 *For Leave to File an Opposition to Plaintiffs' Motion to File Supplemental Complaint* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Crystal, Howard) (Entered: 04/01/2003) |

EXHIBIT E

| 04/21/2003 | | ORDER granting 29 Motion for Leave to File. Signed by Judge Emmet G. Sullivan on April 21, 2003.(lcegs2) (Entered: 04/21/2003) |
|---|---|---|
| 04/21/2003 | | ORDER. Upon consideration of plaintiff's response to applicant defendant-intervenor's motion for leave to file an opposition to plaintiff's motion to file a supplemental complaint, it is by the Court hereby ORDERED that plaintiff shall file a reply in support of the motion to file a supplemental complaint by no later than April 30, 2003. Signed by Judge Emmet G. Sullivan on April 21, 2003. (lcegs2) (Entered: 04/21/2003) |
| 04/28/2003 | 32 | REPLY in support of motion re 28 *For Leave To File Supplemental Complaint* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Crystal, Howard) (Entered: 04/28/2003) |
| 05/05/2003 | 36 | MOTION to intervene and transfer, or in the alternative, dismiss because of substantially the same issues presented in this case are already before the District of Wyoming by STATE OF WYOMING. (td, ) (Entered: 05/25/2003) |
| 05/12/2003 | 33 | RESPONSE to *State of Wyoming's Motion to Intervene* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1 Exhibit Attachment 1# 2 Exhibit Attachment 2)(Crystal, Howard) (Entered: 05/12/2003) |
| 05/22/2003 | 34 | MOTION to Dismiss *all claims asserted in Plaintiffs' supplemental complaint* by FRAN MAINELLA, GALE NORTON. (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit)(Fischer, Lauren) (Entered: 05/22/2003) |
| 05/23/2003 | 35 | RESPONSE to *Plaintiffs' Response to the State of Wyoming's Motion to Intervene* filed by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Miller, Barbara) (Entered: 05/23/2003) |
| 06/05/2003 | 37 | Memorandum in opposition to motion re 34 *to dismiss plaintiffs' supplemental complaint* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Crystal, Howard) (Entered: 06/05/2003) |
| 06/13/2003 | 38 | REPLY in support of motion re 34 *Partial Motion to Dismiss* filed by FRAN MAINELLA, GALE NORTON. (Fischer, Lauren) (Entered: 06/13/2003) |
| 07/16/2003 | 39 | NOTICE by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER re 34 MOTION to Dismiss *all* |

EXHIBIT E

|  |  |  |
|---|---|---|
|  |  | *claims asserted in Plaintiffs' supplemental complaint* (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2)(Crystal, Howard) (Entered: 07/16/2003) |
| 07/16/2003 | 40 | NOTICE by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, THE FUND FOR ANIMALS, GEORGE WUERTHNER re 12 MOTION to Transfer Case (Attachments: # 1 Exhibit Attachment 1)(Crystal, Howard) (Entered: 07/16/2003) |
| 07/22/2003 | 41 | SCHEDULING ORDER: Motion Hearing set for 8/6/2003 10:00 AM in Courtroom 1 before Emmet G. Sullivan. See attached Order setting forth instructions to counsel. Signed by Judge Emmet G. Sullivan on July 22, 2003. (lcegs2) (Entered: 07/22/2003) |
| 07/28/2003 | 42 | SCHEDULING ORDER: Motion Hearing scheduled for August 6, 2003 at 10:00 a.m. CONTINUED to 9/4/2003 at 10:00 AM in Courtroom 1 before Emmet G. Sullivan. Signed by Judge Emmet G. Sullivan on July 28, 2003.(lcegs2) (Entered: 07/28/2003) |
| 08/01/2003 | 43 | MEMORANDUM *ON CONSOLIDATION PURSUANT TO THE COURT'S JULY 22, 2003 ORDER* from Plaintiffs Fund for Animals et al. (Glitzenstein, Eric) (Entered: 08/01/2003) |
| 08/01/2003 | 44 | MEMORANDUM *ON CONSOLIDATION PURSUANT TO THE COURT'S JULY 22, 2003 ORDER* from Federal Defendants. (Fischer, Lauren) (Entered: 08/01/2003) |
| 08/01/2003 | 45 | MEMORANDUM *on Consolidation Pursuant to Court's July 22, 2003, Order* from International Snowmobile Manufacturers Association, Inc., et al.. (Miller, Barbara) (Entered: 08/01/2003) |
| 08/01/2003 | 48 | NOTICE of Appearance by Jay A. Jerde on behalf of STATE OF WYOMING (td, ) (Entered: 08/14/2003) |
| 08/06/2003 | 47 | MOTION to Withdraw Lynda G. Cook as Attorney . (td, ) (Entered: 08/14/2003) |
| 08/12/2003 | 46 | ORDER granting the withdrawal of Lynda Cook from this litigation. Signed by Judge Emmet G. Sullivan on 8/11/03. (clv, ) (Entered: 08/12/2003) |
| 08/28/2003 | 49 | NOTICE by FRAN MAINELLA, GALE NORTON re 34 MOTION to Dismiss *all claims asserted in Plaintiffs' supplemental complaint* (Attachments: # 1 Exhibit)(Fischer, Lauren) (Entered: 08/28/2003) |
| 08/28/2003 | 50 | ERRATA *re: Notice of Federal Register Publication of Proposed Rule* by FRAN MAINELLA, GALE NORTON. (Fischer, Lauren) (Entered: 08/28/2003) |
| 09/03/2003 | 51 | NOTICE by FRAN MAINELLA, GALE NORTON *of Appearance of Counsel* (Fischer, Lauren) (Entered: 09/03/2003) |

EXHIBIT E

| | | |
|---|---|---|
| 09/08/2003 | 64 | AMENDED COMPLAINT against all defendants, filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER.Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 09/29/2003) |
| 09/10/2003 | 52 | NOTICE by FRAN MAINELLA, GALE NORTON *of Lodging the Administrative Record on the 2003 Record of Decision* (Fischer, Lauren) (Entered: 09/10/2003) |
| 09/10/2003 | 53 | NOTICE by FRAN MAINELLA, GALE NORTON *of Lodging the Administrative Record on Plaintiff Bluewaters' Petition for Rulemaking* (Fischer, Lauren) (Entered: 09/10/2003) |
| 09/10/2003 | 54 | MOTION to Accept Administrative Record Entries for Filing by FRAN MAINELLA, GALE NORTON. (Fischer, Lauren) (Entered: 09/10/2003) |
| 09/10/2003 | 55 | SCHEDULING ORDER setting forth briefing schedule. Motion Hearing set for 11/20/2003 10:00 AM in Courtroom 1 before Emmet G. Sullivan. Signed by Judge Emmet G. Sullivan on September 10, 2003. (lcegs2) (Entered: 09/10/2003) |
| 09/10/2003 | 56 | ADMINISTRATIVE RECORD by FRAN MAINELLA, GALE NORTON; (16 boxes) (td, ) (Entered: 09/11/2003) |
| 09/11/2003 | | ORDER granting 54 Motion for leave to file. Signed by Judge Emmet G. Sullivan on September 11, 2003. (lcegs2) (Entered: 09/11/2003) |
| 09/12/2003 | 57 | NOTICE by FRAN MAINELLA, GALE NORTON re Order on Motion for Miscellaneous Relief *of Filing Administrative Record Entries* (Fischer, Lauren) (Entered: 09/12/2003) |
| 09/15/2003 | 58 | NOTICE by FRAN MAINELLA, GALE NORTON re 56 Administrative Record, *Additional Documents* (Fischer, Lauren) (Entered: 09/15/2003) |
| 09/15/2003 | 59 | ORDER denying 22 Motion to Dismiss for Lack of Jurisdiction, denying 34 , 36 Motions to Dismiss, granting 6 , 36 Motions to Intervene, granting 8 , 28 Motions for Leave to File, denying Motions to Transfer Case 9 , 12 , 36 . Signed by Judge Emmet G. Sullivan on September 15, 2003.(lcegs2) (Entered: 09/15/2003) |
| 09/15/2003 | | Cases consolidated pursuant to order filed 9/15/03. All filings will be docketed in lead case number 02-2367. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 09/26/2003) |
| 09/19/2003 | 60 | ENTERED IN ERROR. . . .NOTICE by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER *of Filing of Consolidated Amended Complaint* (Attachments: # 1)(Crystal, Howard) Modified on 9/29/2003 (td, ). (Entered: 09/19/2003) |
| 09/19/2003 | 65 | CONSOLIDATED AMENDED COMPLAINT against all defendants, filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT |

EXHIBIT E

| | | |
|---|---|---|
| | | FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS.Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (td, ) (Entered: 09/29/2003) |
| 09/24/2003 | 61 | ADMINISTRATIVE RECORD *on ESA Claim* by FRAN MAINELLA, GALE NORTON. (Attachments: # 1 Exhibit A)(Fischer, Lauren) (Entered: 09/24/2003) |
| 09/26/2003 | 62 | *Answer to Consolidated Amended Complaint for Declaratory and Injunctive Relief* ANSWER to Amended Complaint by STATE OF WYOMING.Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Jerde, Jay) (Entered: 09/26/2003) |
| 09/26/2003 | 63 | RESPONSE *to Consolidated Amended Complaint* by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 09/26/2003) |
| 09/26/2003 | 69 | ANSWER to (consolidated) Amended Complaint by FRAN MAINELLA, GALE NORTON, KAREN WADE.Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 10/05/2003) |
| 09/29/2003 | | Plaintiff's initial amended complaint filed as a "Notice" 9/19/03 has been correctly entered on the docket as number 65. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) Modified on 9/29/2003 (td, ). (Entered: 09/29/2003) |
| 10/01/2003 | 66 | MOTION for Summary Judgment *and Supporting Memorandum and Statement of Material Facts and Proposed Order* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2# 3 Exhibit Exhibit 3# 4 Exhibit Exhibit 4# 5 Exhibit Exhibit 5# 6 Exhibit Exhibit 6# 7 Exhibit Exhibit 7# 8 Exhibit Exhibit 8# 9 Exhibit Exhibit 9# 10 Exhibit Exhibit 10# 11 Exhibit Exhibit 11# 12 Exhibit Exhibit 12# 13 Exhibit Exhibit 13# 14 Exhibit Exhibit 14# 15 Exhibit Exhibit 15# 16 Exhibit Exhibit 16# 17 Exhibit Exhibit 17# 18 Exhibit Exhibit 18# 19 Exhibit Exhibit 19# 20 Exhibit Exhibit 20# 21 Exhibit Exhibit 21# 22 Exhibit Exhibit 22# 23 Exhibit Exhibit 23# 24 Exhibit Exhibit 24# 25 Exhibit Exhibit 25# 26 Exhibit Exhibit 26)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 10/01/2003) |
| 10/01/2003 | 67 | MOTION leave to file composite videotape exhibit in support of summary judgment *and supporting Memorandum* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 10/01/2003) |
| 10/01/2003 | 68 | MOTION for Summary Judgment by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Memorandum In Support of Summary Judgment# 2 Exhibit 1# 3 Exhibit 2# 4 Exhibit 3# 5 Exhibit 4# 6 Exhibit |

EXHIBIT E

| | | |
|---|---|---|
| | | 5# 7 Affidavit of Michael Scott# 8 Affidavit of Tony Jewett# 9 Affidavit Robert Ekey# 10 Affidavit of Charles Clusen# 11 Affidavit Kenneth Miller# 12 Affidavit Steve Thomas# 13 Statement of Material Facts# 14 Proposed Order)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 10/02/2003) |
| 10/07/2003 | 70 | MOTION for Leave to File Excess Pages by FRAN MAINELLA, GALE NORTON, KAREN WADE. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 10/07/2003) |
| 10/07/2003 | 71 | ERRATA *Notice* by FRAN MAINELLA, GALE NORTON, KAREN WADE. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Fischer, Lauren) (Entered: 10/07/2003) |
| 10/08/2003 | | ORDER granting 70 Motion for Leave to File Excess Pages. Signed by Judge Emmet G. Sullivan on October 8, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 10/08/2003) |
| 10/24/2003 | 77 | Cross MOTION for Summary Judgment by STATE OF WYOMING. (Attachments: # 1 Memorandum in Support# 2 Statement of Material Facts# 3 Text of Proposed Order)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(nmw, ) (Entered: 10/28/2003) |
| 10/24/2003 | 78 | Combined Memorandum in opposition to motions re 66 68 for Summary Judgment filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(nmw, ) (Entered: 10/28/2003) |
| 10/27/2003 | 72 | Cross MOTION for Summary Judgment by FRAN MAINELLA, GALE NORTON, KAREN WADE. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 10/27/2003) |
| 10/27/2003 | 73 | Cross MOTION for Summary Judgment *Memorandum in Support of Cross Motion and In Opposition to Plaintiffs' Motions for Summary Judgment* by FRAN MAINELLA, GALE NORTON, KAREN WADE. (Attachments: # 1 Exhibit Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 10/27/2003) |
| 10/27/2003 | | MINUTE ORDER granting 67 Motion to File Videotape. Signed by Judge Emmet G. Sullivan on October 27, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS.(lcegs2) (Entered: 10/27/2003) |
| 10/27/2003 | 74 | Cross MOTION for Summary Judgment by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 10/27/2003) |
| 10/27/2003 | 75 | Memorandum in opposition to motion re 68 *for Summary Judgment and Memorandum in Support of Cross-Motion for Summary Judgment* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 10/27/2003) |
| 10/27/2003 | 76 | MOTION to Strike *Plaintiffs' Exhibits to Motions for Summary Judgment* by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS |

EXHIBIT E

| | | |
|---|---|---|
| | | ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 10/27/2003) |
| 10/28/2003 | 79 | NOTICE of filing of 2 videotapes pursuant to minute order of 10/27/03 by All Plaintiffs Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 10/31/2003) |
| 11/05/2003 | 80 | Memorandum in opposition to motion re 72 *for Summary Judgment of Federal Defendants and Intervenors and Reply In Support of Fund Plaintiffs' Motion For Summary Judgment, and Fund Plaintiffs' Responses To Federal Defendants and Intervenors' Statements of Material Facts* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1 Exhibit FFA Exhibit 27# 2 Exhibit FFA Exhibit 28# 3 Exhibit FFA Exhibit 29# 4 Exhibit FFA Exhibit 30# 5 Exhibit FFA Exhibit 31# 6 Exhibit FFA Exhibit 32# 7 Exhibit FFA Exhibit 33# 8 Exhibit FFA Exhibit 34# 9 Exhibit FFA Exhibit 35# 10 Exhibit FFA Exhibit 36) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 11/05/2003) |
| 11/05/2003 | 81 | Memorandum in opposition to motion re 77 *for Summary Judgment and Reply in Support of Summary Judgment* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 11/05/2003) |
| 11/10/2003 | 82 | Memorandum in opposition to motion re 76 *to Strike by Intervenors* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 11/10/2003) |
| 11/10/2003 | 83 | Memorandum in opposition to motion re 76 *Strike* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 11/10/2003) |
| 11/12/2003 | 84 | RESPONSE to *Defendants' Statements Of Material Facts As To Which There Is No Genuine Issue* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 11/12/2003) |
| 11/12/2003 | 85 | REPLY in support of motion re 74 *for Summary Judgment* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 11/12/2003) |
| 11/12/2003 | 86 | REPLY in support of motion re 72 filed by FRAN MAINELLA, GALE NORTON. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Fischer, Lauren) (Entered: 11/12/2003) |
| 11/12/2003 | 87 | RESPONSE to plaintiff's oppositions to defendants cross motions for summary judgment filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 11/14/2003) |

EXHIBIT E

| | | |
|---|---|---|
| 11/13/2003 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan: Per the Telephone Conference held on November 13, 2003, the Court requests that the parties submit two copies of the cited to portions of the administrative record. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/13/2003) |
| 11/17/2003 | 88 | REPLY to opposition to motion re 76 to Strike Plaintiffs' Exhibits to Motions for Summary Judgment filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 11/17/2003) |
| 11/18/2003 | 89 | ORDER setting forth instructions to counsel.Signed by Judge Emmet G. Sullivan on November 18, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/18/2003) |
| 11/18/2003 | | NOTICE to the Parties: As of 7:00 p.m. on November 18, 2003, the Court has not received copies of the cited portions of the administrative record. Signed by Judge Emmet G. Sullivan on November 18, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/18/2003) |
| 11/19/2003 | 90 | APPLICATION for Admission Pro Hac Vice by THE BLUERIBBON COALITION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 11/19/2003) |
| 11/19/2003 | | NOTICE to parties: the Court has received copies of the cited to portions of the Administrative Record.Signed by Judge Emmet G. Sullivan on October 19, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/19/2003) |
| 11/19/2003 | | ORDER granting 90 Application for admission pro hac vice of Susan E. Buxton.Signed by Judge Emmet G. Sullivan on November 19, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/19/2003) |
| 11/20/2003 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan : Motion Hearing held on 11/20/2003; motions taken under advisement Status Conference set for 12/17/2003 10:00 AM in Courtroom 1 before Judge Emmet G. Sullivan. (Court Reporter F. Rangus/E. Hawkins.)(clv, ) (Entered: 11/20/2003) |
| 11/21/2003 | 91 | ORDER setting forth instructions to counsel and setting status hearing for December 17, 2003, at 10:00 a.m. Signed by Judge Emmet G. Sullivan on November 21, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/21/2003) |
| 11/21/2003 | | Set/Reset Hearings: Status Conference set for 12/17/2003 at 10:00 AM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/21/2003) |
| 11/24/2003 | 92 | NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE Responding to Judicial Inquiry (Attachments: # 1 Exhibit Jones |

EXHIBIT E

| | | |
|---|---|---|
| | | Declaration)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Fischer, Lauren) (Entered: 11/24/2003) |
| 11/26/2003 | 94 | NOTICE OF TRANSCRIPT FILED for Motion Hearing held on dates November 20, 2003 ; Court Reporter: Edward N. Hawkins. (jf, ) (Entered: 12/05/2003) |
| 11/28/2003 | 93 | TRANSCRIPT of Proceedings held on November 20, 2003 before Judge Emmet G. Sullivan. Court Reporter: Frank J. Rangus. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(ks, ) (Entered: 12/01/2003) |
| 12/04/2003 | | MINUTE ORDER. The Court sua sponte reschedules the status hearing scheduled in both cases from December 17, 2003, to December 16, 2003, at 3:30 p.m. in Courtroom One. Signed by Judge Emmet G. Sullivan on December 4, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/04/2003) |
| 12/04/2003 | | Set/Reset Hearings: Status Conference set for 12/16/2003 at 3:30 PM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/04/2003) |
| 12/09/2003 | 95 | NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE *of Final Regulation and Motion to Reschedule Status Conference* (Attachments: # 1 Exhibit Final Regulation)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 12/09/2003) |
| 12/09/2003 | 96 | ORDER rescheduling status hearing for December 15, 2003, at 9:30 a.m. and setting forth further instructions to counsel.Signed by Judge Emmet G. Sullivan on December 9, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/09/2003) |
| 12/09/2003 | | Set/Reset Hearings: Status Conference set for 12/15/2003 at 09:30 AM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/09/2003) |
| 12/11/2003 | | Minute Entry. Notice to parties: On December 11, 2003, chambers contacted the Fund for Animals counsel for the sole purpose of requesting a copy of the 1999 Rulemaking Petition. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/11/2003) |
| 12/11/2003 | 97 | NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE *Supplemental Brief* (Attachments: # 1 Exhibit Final Regulation# 2 Exhibit Notice of Final Regulation)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 12/11/2003) |
| 12/11/2003 | 98 | MEMORANDUM from GYC Plaintiffs Re: Final Rule. (Attachments: # 1 Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Honnold, Donald) (Entered: 12/11/2003) |
| 12/11/2003 | 99 | MEMORANDUM from The Fund Plaintiffs Supplemental Brief. (Attachments: # 1 Exhibit Final Regulations)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Glitzenstein, Eric) (Entered: 12/11/2003) |
| | | |

EXHIBIT E

| | | |
|---|---|---|
| 12/11/2003 | 100 | First MOTION For The Court To Consider Supplemental Brief *of The Fund Plaintiffs* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Glitzenstein, Eric) (Entered: 12/11/2003) |
| 12/12/2003 | 101 | RESPONSE to *Federal Defendants' Supplemental Brief By The Fund Plaintiffs* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 12/12/2003) |
| 12/12/2003 | 102 | RESPONSE to *Plaintiffs' Supplemental Briefs* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 12/12/2003) |
| 12/12/2003 | 103 | RESPONSE to *Greater Yellowstone Coalition and Fund For Animal Plaintiffs' Supplemental Briefs* filed by FRAN MAINELLA, GALE NORTON, KAREN WADE. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 12/12/2003) |
| 12/12/2003 | 104 | RESPONSE to *Plaintiffs' Supplemental Briefs* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Jerde, Jay) (Entered: 12/12/2003) |
| 12/12/2003 | 105 | MEMORANDUM from GYC re: Response To Supplemental Briefing. (Attachments: # 1 Exhibit 1# 2 # 3 Exhibit 3# 4 Exhibit 4)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 12/12/2003) |
| 12/12/2003 | | MINUTE ORDER: Notice the the parties: Pursuant to the parties' December 12, 2003, phone inquiry, the parties need not submit Word Perfect versions of their supplemental filings. Signed by Judge Emmet G. Sullivan on December 12, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/12/2003) |
| 12/15/2003 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan : Status Conference held on 12/15/2003. chambers to issue order;(Court Reporter Jon Hundley, Miller.) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(clv, ) (Entered: 12/15/2003) |
| 12/16/2003 | 106 | MEMORANDUM AND OPINION.Signed by Judge Emmet G. Sullivan on December 16, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/16/2003) |
| 12/16/2003 | 107 | JUDGMENT. Signed by Judge Emmet G. Sullivan on December 16, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (lcegs2) (Entered: 12/16/2003) |
| 12/17/2003 | 108 | Emergency MOTION to Stay *Judgment and Request for Expedited Consideration* by THE INTERNATIONAL SNOMOBILE |

EXHIBIT E

| | | |
|---|---|---|
| | | MANUFACUTRERS ASSOCIATION INC. (Attachments: # 1 Exhibit s) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 12/17/2003) |
| 12/17/2003 | | MINUTE ORDER. Upon consideration of Defendant Intervenors' Emergency Motion for a Stay of Judgment, the Court sua sponte directs that any responses shall be filed by no later than December 18, 2003 at noon (E.S.T); any replies shall be filed by no later than December 18, 2003, at 4:00 p.m. (E.S.T.) Signed by Judge Emmet G. Sullivan on December 17, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/17/2003) |
| 12/17/2003 | 109 | First MOTION to Amend/Correct 106 Memorandum & Opinion, 107 Judgment *and Supporting Memorandum* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 12/17/2003) |
| 12/18/2003 | 110 | ENTERED IN ERROR.....NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE re 108 Emergency MOTION to Stay *Judgment and Request for Expedited Consideration Federal Defendants' Response* Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Fischer, Lauren) Modified on 12/19/2003 (jf, ). (Entered: 12/18/2003) |
| 12/18/2003 | 111 | First MOTION to Stay *filed* by STATE OF WYOMING. (Attachments: # 1 # 2 Text of Proposed Order # 3 Affidavit # 4 # 5 # 6 # 7 # 8 # 9) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 12/18/2003) |
| 12/18/2003 | 112 | Memorandum in opposition to motion re 108 *to Stay By ISMA and BlueRibbon Coalition* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 12/18/2003) |
| 12/18/2003 | 113 | RESPONSE to *ISMA's Request For Stay Of Judgment* filed by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 1,2,3)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Honnold, Donald) (Entered: 12/18/2003) |
| 12/18/2003 | 114 | First MOTION to Amend/Correct *Affidavit filed* by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Jerde, Jay) (Entered: 12/18/2003) |
| 12/18/2003 | 115 | REPLY to opposition to motion re 108 *Emergency Stay* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 12/18/2003) |
| 12/18/2003 | | NOTICE OF CORRECTED DOCKET ENTRY. Document Numbers 110 & 63(03-752) were entered in error and counsel was instructed to re- |

EXHIBIT E

| | | file said pleading as a motion instead of A notice. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(jf, ) (Entered: 12/19/2003) |
|---|---|---|
| 12/18/2003 | 122 | NOTICE OF APPEAL as to 107 Judgment by STATE OF WYOMING. Filing fee $ 255, receipt number 119930. (cp, ) (Entered: 12/22/2003) |
| 12/19/2003 | 116 | Memorandum in opposition to motion re 111 *for Stay of Judgment By State of Wyoming* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 12/19/2003) |
| 12/19/2003 | 117 | RESPONSE to *Wyoming's Motion For Stay Of Judgment* filed by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Transcript# 2 Affidavit of Michael Scott)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 12/19/2003) |
| 12/19/2003 | 118 | RESPONSE to *ISMA's Request For Stay of Judgment* filed by FRAN MAINELLA, GALE NORTON, KAREN WADE. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 12/19/2003) |
| 12/19/2003 | 119 | Memorandum in opposition to motion re 109 *Amend the Court's December 16, 2003 Opinion and Judgment* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 12/19/2003) |
| 12/19/2003 | 120 | ENTERED IN ERROR..... MOTION to Expedite Consideration (See Document No. 118 for the Image of the pleading) by FRAN MAINELLA, GALE NORTON, KAREN WADE. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(rje, ) Modified on 12/22/2003 (rje, ). (Entered: 12/22/2003) |
| 12/19/2003 | 124 | MOTION for Leave to File affidavit by STATE OF WYOMING. (Attachments: # 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 12/23/2003) |
| 12/22/2003 | | "NOTICE OF CORRECTED DOCKET ENTRY. Document No. 120 was entered in error and the said pleading will not be refiled." Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(rje, ) (Entered: 12/22/2003) |
| 12/22/2003 | | MINUTE ORDER. The Court sua sponte orders Defendant Intervenor State of Wyoming to file a reply, if any, to Plaintiffs' Responses to the State of Wyoming's Motion for a Stay of Judgment, by no later than 2:00 p.m. (E.S.T.) on Monday, December 22, 2003.Signed by Judge Emmet G. Sullivan on December 22, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/22/2003) |
| 12/22/2003 | 121 | REPLY to opposition to motion re 111 filed by STATE OF WYOMING. |

EXHIBIT E

| | | |
|---|---|---|
| | | Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 12/22/2003) |
| 12/22/2003 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 122 Notice of Appeal (cp, ) (Entered: 12/22/2003) |
| 12/22/2003 | 123 | RESPONSE to *Fund for Animals Plaintiffs' Motion to Amend Judgment* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 12/22/2003) |
| 12/23/2003 | | MINUTE ORDER granting 124 Motion for Leave to File. Signed by Judge Emmet G. Sullivan on December 23, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/23/2003) |
| 12/23/2003 | 125 | ORDER denying 108 Motion to Stay and denying 111 Motion to Stay. Signed by Judge Emmet G. Sullivan on December 23, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/23/2003) |
| 12/23/2003 | 126 | Memorandum in opposition to motion re 109 filed by FRAN MAINELLA, GALE NORTON, KAREN WADE. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 12/23/2003) |
| 12/23/2003 | 127 | NOTICE OF TRANSCRIPT FILED for status hearing held on dates December 15, 2003.Court Reporter: Jon Hundley (MILLER) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(jf, ) (Entered: 12/30/2003) |
| 12/29/2003 | 128 | USCA Case Number 03-5365 for 122 Notice of Appeal filed by STATE OF WYOMING. (bcs, ) (Entered: 12/31/2003) |
| 01/02/2004 | 129 | REPLY in support of motion re 109 *to Amend the Court's December 16, 2003 Opinion and Judgment* filed by THE FUND FOR ANIMALS. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Glitzenstein, Eric) (Entered: 01/02/2004) |
| 01/02/2004 | 130 | NOTICE OF APPEAL re 107 judgment and re 125 order denying motion to stay by BLUERIBBON COALITION, INC., THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Filing fee $ 255, receipt number 120189. (Attachments: # 1 Exhibit 1 (2) Exhibit 2 (cp, ) Modified on 1/12/2004 (cp, ). (Entered: 01/05/2004) |
| 01/06/2004 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 130 Notice of Appeal, (cp, ) (Entered: 01/06/2004) |
| 01/08/2004 | | Transmission of Corrected Docket Sheet to US Court of Appeals re 130 Notice of Appeal, (ks, ) (Entered: 01/08/2004) |
| 01/08/2004 | 131 | ENTERED IN ERROR. . . .NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE *of Appeal* Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) Modified on 2/9/2004 (td, ). (Entered: 01/08/2004) |
| | | |

EXHIBIT E

| 01/08/2004 | 132 | USCA Case Number 04-5001 for 130 Notice of Appeal, filed by BLUERIBBON COALITION, INC., THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (cp, ) Modified on 1/9/2004 (cp, ). Modified on 1/12/2004 (cp, ). (Entered: 01/09/2004) |
| 01/08/2004 | 135 | NOTICE OF APPEAL as to 107 Judgment by STEVEN WILLIAMS, STEVE MARTIN, FRAN MAINELLA. (td, ) (Entered: 02/09/2004) |
| 01/12/2004 |  | Transmission of Corrected Notice of Appeal and Docket Sheet to US Court of Appeals re 130 Notice of Appeal, (cp, ) (Entered: 01/12/2004) |
| 01/15/2004 | 133 | CERTIFIED COPY of Order filed in USCA dated 1/13/2004, referencing appeal 122 , denying motions for stay and injunctive relief. USCA # 03-5365 (lnw, ) (Entered: 01/16/2004) |
| 01/29/2004 | 134 | NOTICE by Judge Emmet G. Sullivan copy of the attached letter from Congressman Denny Rehberg and the Court's response (Attachment # 1 Letter and Attachment #2 Letter Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(adc) (Entered: 01/29/2004) |
| 02/06/2004 | 140 | TRANSCRIPT REQUEST by STATE OF WYOMING for proceedings held on 9/4/04; 11/20/03; 12/17/03. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 02/13/2004) |
| 02/09/2004 |  | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 135 Notice of Appeal and Notice of Appeal in 03cv752 number 81. (td, ) (Entered: 02/09/2004) |
| 02/11/2004 | 136 | NOTICE by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 02/11/2004) |
| 02/12/2004 | 137 | NOTICE by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER re 136 Notice (Other), Notice (Other) *Of Violation Of Court Order And Request For A Status Hearing* (Attachments: # 1 Exhibit Attachment 1# 2 Exhibit Attachment 2# 3 Exhibit Attachment 3# 4 Exhibit Attachment)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 02/12/2004) |
| 02/12/2004 | 138 | RESPONSE to *Federal Defendants' Notice* filed by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 3# 2 Exhibit 4# 3 Exhibit 1# 4 Exhibit 2)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 02/12/2004) |
| 02/12/2004 | 139 | ORDER scheduling Status Conference for February 17, 2004 at 11:00 a.m. and setting forth instructions to counsel. Signed by Judge Emmet G. Sullivanon February 12, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2 ) (Entered: 02/12/2004) |
| 02/12/2004 |  | Set/Reset Hearings: Status Conference set for 2/17/2004 11:00 AM in |

EXHIBIT E

| | | |
|---|---|---|
| | | Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 02/12/2004) |
| 02/12/2004 | | USCA Case Number 04-5037 for 135 Notice of Appeal filed by FRAN MAINELLA, STEVEN WILLIAMS, STEVE MARTIN. (bm) (Entered: 02/13/2004) |
| 02/13/2004 | 141 | RESPONSE to *Fund For Animals' Notice Of Violation Of Court Order* filed by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 02/13/2004) |
| 02/13/2004 | 142 | RESPONSE to *FFA Notice of Violation* filed by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 02/13/2004) |
| 02/13/2004 | 143 | NOTICE by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC re 137 Notice (Other), Notice (Other) *of Violation of Court Order and Request for a Status Hearing* Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 02/13/2004) |
| 02/13/2004 | 144 | RESPONSE to *Notice of Violation* filed by STATE OF WYOMING. (Attachments: # 1 Exhibit Attachment 1# 2 Exhibit Attachment 2# 3 Exhibit Attachment 3# 4 Exhibit Attachment 4# 5 Exhibit Attachment 5) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 02/13/2004) |
| 02/13/2004 | 145 | NOTICE by STATE OF WYOMING *Notice to Appear by Telephone* Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 02/13/2004) |
| 02/13/2004 | 146 | RESPONSE to *Defendants' Responses To This Court's February 12, 2004 Order* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 02/13/2004) |
| 02/13/2004 | 147 | RESPONSE to *Defendants' Responses To Notice of Violation Of Court Order* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 02/13/2004) |
| 02/13/2004 | 148 | MOTION for Leave to File *Corrected Response* by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. (Attachments: # 1 Errata)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 02/13/2004) |
| 02/17/2004 | | MINUTE ORDER granting 148 Motion for Leave to File Corrected |

EXHIBIT E

| | | |
|---|---|---|
| | | Response.Signed by Judge Emmet G. Sullivan on February 17, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 02/17/2004) |
| 02/17/2004 | | Set/Reset Hearings: Status Conference set for 2/17/04 at 11:00 am is continued until 2/17/2004 at 02:00 PM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 02/17/2004) |
| 02/17/2004 | 149 | THIS ORDER IS VACATED PURSUANT TO THE COURT'S ORDER DATED 8/6/04 ORDER directing defendants/interveners to show cause why they should not be heldin contempt of this Court's December 16, 2003 Order; setting forth further instructions to counsel; and scheduling a hearing for March 9, 2004 at 10:30 a.m. in Courtroom One. Signed by Judge Emmet G. Sullivan on February 17, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2, ) Modified on 8/10/2004 (clv, ). (Entered: 02/17/2004) |
| 02/17/2004 | | Set/Reset Hearings: Motions Hearing set for 3/9/2004 at 10:30 AM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 02/17/2004) |
| 02/17/2004 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan : Status Conference held on 2/17/2004. Motion Hearing set for 3/9/2004 10:30 AM in Courtroom 1 before Judge Judge Emmet G. Sullivan. (Court Reporter Beth Wasserman.) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(clv, ) (Entered: 02/18/2004) |
| 02/17/2004 | 192 | ORDER of USCA consolidating USCA #03-5365, USCA #04-5001, and USCA #04-5002; and holding USCA #03-5365 in abeyance pending further order of the court as to 122 Notice of Appeal filed by STATE OF WYOMING (cp, ) Modified on 5/18/2004 (cp, ). Additional attachment (s) added on 7/12/2004 (adc, ). (Entered: 05/18/2004) |
| 02/18/2004 | 150 | MOTION Clarification of Order *Dated February 17, 2004* by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 02/18/2004) |
| 02/19/2004 | 151 | RESPONSE to *the State of Wyoming's Motion for Clarification* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 02/19/2004) |
| 02/20/2004 | | MINUTE ORDER denying 150 Motion for Clarification. The February 17, 2004, Order was unambiguous and requires no clarification. Accordingly, upon consideration of the State of Wyoming's Motion for Clarification and the Fund for Animals' Response, the motion is denied. Signed by Judge Emmet G. Sullivan on February 20, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 02/20/2004) |
| 02/23/2004 | 157 | NOTICE OF TRANSCRIPT FILED for dates 2/17/04; Court Reporter: |

EXHIBIT E

| | | Elizabeth L. Wasserman Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 03/02/2004) |
|---|---|---|
| 02/24/2004 | 152 | RESPONSE TO ORDER TO SHOW CAUSE by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Jerde, Jay) (Entered: 02/24/2004) |
| 02/24/2004 | 153 | RESPONSE TO ORDER TO SHOW CAUSE by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Attachments: # 1 Exhibit 1 and Exhibit 2)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 02/24/2004) |
| 02/24/2004 | 154 | RESPONSE to *ORDER TO SHOW CAUSE* filed by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2# 3 Exhibit Exhibit 3# 4 Exhibit Exhibit 4# 5 Exhibit Exhibit 5# 6 Exhibit Exhibit 6# 7 Exhibit Exhibit 7# 8 Exhibit Exhibit 8# 9 Exhibit Exhibit 9# 10 Exhibit Exhibit 10)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 02/24/2004) |
| 02/24/2004 | 155 | MOTION For Partial Relief From Judgment *filed as an alternative to Federal Defendants' Response to the Court's Order to Show Cause* by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 02/24/2004) |
| 02/24/2004 | 156 | MOTION to Transfer Case *filed in the alternative to Federal Defendants' Response to the Court's Order to Show Cause* by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2# 3 Exhibit Exhibit 3# 4 Exhibit Exhibit 4)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 02/24/2004) |
| 03/02/2004 | 158 | NOTICE by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS (Attachments: # 1 Exhibit Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Fischer, Lauren) (Entered: 03/02/2004) |
| 03/02/2004 | 159 | RESPONSE to *Defendants' Responses To This Court's Show Cause Order* filed by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 03/02/2004) |
| 03/02/2004 | 160 | RESPONSE to *The Court's Order To Show Cause* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2# 3 Exhibit FFA Exhibit 3)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 03/02/2004) |
| 03/02/2004 | 161 | Memorandum in opposition to motion re 156 *Transfer* filed by |

EXHIBIT E

|  |  |  |
|---|---|---|
|  |  | GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 03/02/2004) |
| 03/02/2004 | 162 | Memorandum in opposition to motion re 155 *Federal Defendants' "Conditional" Motion For Partial Relief From Judgment* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 03/02/2004) |
| 03/02/2004 | 163 | Memorandum in opposition to motion re 156 *Federal Defendants' "Conditional" Renewed Motion to Transfer* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 03/02/2004) |
| 03/05/2004 | 164 | RESPONSE to *Federal Defendants' Conditional Motions for Partial Relief From Judgment and To Transfer and Reply to Plaintiffs' Responses to Order to Show Cause* filed by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 03/05/2004) |
| 03/05/2004 | 165 | NOTICE by STATE OF WYOMING *Notice to Appear by Telephone* Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 03/05/2004) |
| 03/05/2004 | 166 | RESPONSE to *Federal Defendants' Conditional Motion to Transfer Venue* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 03/05/2004) |
| 03/05/2004 | 167 | REPLY *to Plaintiffs' Responses to this Court's Show Cause Order* by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 03/05/2004) |
| 03/05/2004 | 168 | RESPONSE to *Plaintiffs' Response To The Court's Order to Show Cause* filed by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 03/05/2004) |
| 03/05/2004 | 169 | REPLY in support of motion re 155 *For Partial Relief* filed by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 03/05/2004) |
| 03/05/2004 | 170 | REPLY in support of motion re 156 *Conditional Renewed Transfer* filed by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 03/05/2004) |
|  |  |  |

EXHIBIT E

| 03/08/2004 | 171 | ENTERED IN ERROR. . . .REPLY to opposition to motion re 155 *Plaintiffs' Opposition to Federal Defendants' Conditional Motion for Partial Relief from Judgment* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) Modified on 3/9/2004 (td, ). (Entered: 03/08/2004) |
|---|---|---|
| 03/09/2004 | | DOCUMENT NO. 171 in 02cv2367 and DOCUMENT NO. 107 in 03cv752 have been Entered In Error and counsel has been advised to refile said document as a memorandum in opposition. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) Modified on 3/9/2004 (td, ). (Entered: 03/09/2004) |
| 03/09/2004 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan : Motion Hearing held on 3/9/2004; the order to show cause is stayed; motion to transfer is senied. Status Conference set for 4/14/2004 11:00 AM in Courtroom 1 before Judge Emmet G. Sullivan. chambers to issue an order(Court Reporter Elaine Merchant.) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(clv, ) (Entered: 03/09/2004) |
| 03/09/2004 | 172 | Memorandum in opposition to motion re 156 *Opposition to Conditional Motion for Partial Relief from Judgment* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 03/09/2004) |
| 03/09/2004 | 173 | ORDER denying Motion to Transfer Case 156 , staying contempt proceedings until further order of the Court, and scheduling Status Hearing for April 14, 2004 at 11:00 a.m. Signed by Judge Emmet G. Sullivan on March 9, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2, ) Modified on 3/9/2004 (lcegs2, ). (Entered: 03/09/2004) |
| 03/09/2004 | | Set/Reset Hearings: Status Conference set for 4/14/2004 11:00 AM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2, ) (Entered: 03/09/2004) |
| 03/11/2004 | 174 | NOTICE by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS *Of Order Denying Stay* (Attachments: # 1 Exhibit Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 03/11/2004) |
| 03/16/2004 | 175 | RESPONSE to *Defendants' March 11, 2004 Notice* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 03/16/2004) |
| 03/18/2004 | 176 | RESPONSE to 175 *The Fund for Animals' Response to the Federal Defendants' March 11, 2004 Notice* by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 03/18/2004) |

EXHIBIT E

| 03/18/2004 | 177 | MOTION for Permanent Injunction by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Text of Proposed Order)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 03/18/2004) |
|---|---|---|
| 03/24/2004 | 178 | REPLY *to the Fund for Animals Plaintiffs' Response to Federal Defendnats' March 11, 2004 Notice* by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 03/24/2004) |
| 03/29/2004 | 179 | RESPONSE to *Greater Yellowstone Coalition Plaintiffs' Motion for an Injunction* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 03/29/2004) |
| 03/30/2004 | 180 | MOTION To Modify Relief *And Memorandum In Support* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 03/30/2004) |
| 04/01/2004 | 181 | Memorandum in opposition to motion re 177 filed by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 04/01/2004) |
| 04/01/2004 | 182 | Memorandum in opposition to motion re 177 *Permanent Injunction* filed by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 04/01/2004) |
| 04/07/2004 |  | MINUTE ORDER finding as moot 114 Motion to Amend/Correct Affidavit. Signed by Judge Emmet G. Sullivan on April 7, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 04/07/2004) |
| 04/07/2004 |  | MINUTE ORDER finding as moot 120 Motion to Expedite. Signed by Judge Emmet G. Sullivan on April 7, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 04/07/2004) |
| 04/08/2004 | 183 | ORDER cancelling April 14, 2004 Status Hearing.Signed by Judge Emmet G. Sullivan on April 8, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 04/08/2004) |
| 04/09/2004 | 184 | REPLY in support of motion re 177 *for Injunction* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 04/09/2004) |
| 04/12/2004 | 185 | RESPONSE to *the Fund for Animals Plaintiffs' Motion to Modify Relief* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 04/12/2004) |
| 04/13/2004 | 186 | Memorandum in opposition to motion re 180 filed by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, |

EXHIBIT E

| | | STEVEN WILLIAMS. (Attachments: # 1 Exhibit Lewis Declaration) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 04/13/2004) |
|---|---|---|
| 04/13/2004 | 187 | Memorandum in opposition to motion re 180 *to Modify* filed by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 04/13/2004) |
| 04/20/2004 | 188 | NOTICE OF TRANSCRIPT FILED for dates 3/9/04; Court Reporter: Elaine A. Merchant. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 04/22/2004) |
| 04/22/2004 | 189 | REPLY to opposition to motion re 180 *To Modify Relief* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 04/22/2004) |
| 05/11/2004 | 190 | NOTICE by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS (Attachments: # 1 Exhibit Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Fischer, Lauren) (Entered: 05/11/2004) |
| 05/11/2004 | 191 | NOTICE by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER *of Filing of Status Report in Court of Appeals* (Attachments: # 1 Attachment)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 05/11/2004) |
| 05/25/2004 | 193 | MOTION to Withdraw as Attorney by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 05/25/2004) |
| 05/26/2004 | | MINUTE ORDER granting 193 Motion to Withdraw as Attorney. Attorney Barbara A. Miller terminated. Signed by Judge Emmet G. Sullivan on May 25, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 05/26/2004) |
| 05/28/2004 | 194 | NOTICE by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS (Attachments: # 1 Exhibit) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 05/28/2004) |
| 06/30/2004 | 195 | NOTICE by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER *of Filing* (Attachments: # 1 Attachment 1# 2 Attachment 2# 3 Attachment 3)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 06/30/2004) |

EXHIBIT E

| | | |
|---|---|---|
| 06/30/2004 | 196 | ORDER granting 155 Motion for Partial Relief From Judgment, denying without prejudice 177 Motion for Permanent Injunction, denying without prejudice 180 Motion to Modify Relief, and setting forth further instructions to counsel.Signed by Judge Emmet G. Sullivan on June 30, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (lcegs2, ) (Entered: 06/30/2004) |
| 07/23/2004 | 197 | ORDER denying 109 Motion to Amend the December 16, 2003, Opinion and Judgment.Signed by Judge Emmet G. Sullivan on July 23, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) Additional attachment(s) added on 7/23/2004 (lcegs2, ). (Entered: 07/23/2004) |
| 08/06/2004 | 198 | ORDER vacating February 17, 2004, Order directing defendants/interveners to show cause why they should not be held in contempt of this Court's December 16, 2003, Order. Signed by Judge Emmet G. Sullivan on August 6, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 08/06/2004) |
| 08/09/2004 | 199 | NOTICE by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS (Attachments: # 1 Exhibit Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Fischer, Lauren) (Entered: 08/09/2004) |
| 08/10/2004 | 200 | NOTICE by GREATER YELLOWSTONE COALITION *of Filing of 90-Day Status Report* (Attachments: # 1 Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 08/10/2004) |
| 08/20/2004 | 201 | NOTICE by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS (Attachments: # 1 Exhibit Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Fischer, Lauren) (Entered: 08/20/2004) |
| 09/08/2004 | 202 | NOTICE by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS *of Filing Proposed Special Regulations* (Attachments: # 1 Exhibit Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 09/08/2004) |
| 09/15/2004 | 203 | NOTICE OF APPEAL as to 107 Judgment by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Filing fee $ 255, receipt number 127792. (td, ) (Entered: 09/21/2004) |
| 09/21/2004 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 203 Notice of Appeal (td, ) (Entered: 09/21/2004) |
| 09/23/2004 | 204 | NOTICE by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS *Of Upcoming Winter Season* (Attachments: # 1 Exhibit Declaration)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 09/23/2004) |

EXHIBIT E

| | | |
|---|---|---|
| 10/04/2004 | | USCA Case Number 04-5356 for 203 Notice of Appeal filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC, THE BLUERIBBON COALITION INC. (td, ) (Entered: 10/14/2004) |
| 10/26/2004 | 205 | NOTICE by GALE NORTON (Attachments: # 1 Exhibit Suzanne Lewis Declaration)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Emrich, Andrew) (Entered: 10/26/2004) |
| 11/12/2004 | 206 | MOTION to Enforce *Court's December 16, 2003 Opinion and Order* by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Text of Proposed Order Proposed Order) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 11/12/2004) |
| 11/19/2004 | | MINUTE ORDER. The Court, sua sponte, schedules a Status Conference in this matter for 11/23/2004 at 09:30 AM in Courtroom 1. Signed by Judge Emmet G. Sullivan on November 19, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS, 1:04-cv-01913(lcegs2) (Entered: 11/19/2004) |
| 11/23/2004 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan : Status Conference held on 11/23/2004. (Court Reporter Elaine Merchant.) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (zclv, ) (Entered: 11/23/2004) |
| 11/24/2004 | 207 | Memorandum in opposition to motion re 206 filed by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 11/24/2004) |
| 11/24/2004 | 208 | RESPONSE to 206 *Greater Yellowstone Coalition's Motion to Enforce Order* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) Modified on 11/26/2004 (lc, ). (Entered: 11/24/2004) |
| 11/24/2004 | 209 | Memorandum in opposition to motion re 206 *enforcement of judgment* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Gaston, Gretchen) (Entered: 11/24/2004) |
| 12/03/2004 | 210 | REPLY to opposition to motion re 206 *Enforcement Of This Court's December 16, 2003 Order* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 12/03/2004) |
| 12/17/2004 | 211 | MOTION for Leave to File *Sur-Reply* by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. (Attachments: # 1 Exhibit Proposed Sur-Reply)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 12/17/2004) |
| 12/17/2004 | | MINUTE ORDER granting 211 Defendants' Motion for Leave to File a |

EXHIBIT E

|  |  |  |
|---|---|---|
|  |  | Surreply. Signed by Judge Emmet G. Sullivan on December 17, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs1) (Entered: 12/17/2004) |
| 04/15/2005 | 212 | MANDATE of USCA (certified copy)It is hereby ordered that these consolidated appeals be dismissed; It is further ordered that the motions to govern future proceedings be dismissed as moot; USCA#03-5365 (jsc) (Entered: 04/22/2005) |
| 05/16/2005 | 213 | STIPULATION *Concerning Fees and Costs* by THE FUND FOR ANIMALS. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Crystal, Howard) (Entered: 05/16/2005) |
| 06/09/2005 | 214 | STIPULATED PARTIAL FINAL CONSENT JUDGMENT. Signed by Judge Emmet G. Sullivan on 6/8/05. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(clv, ) (Entered: 06/09/2005) |
| 07/01/2005 | 215 | TRANSCRIPT of Proceedings held on 6/3/05 before Judge Emmet G. Sullivan. Court Reporter: Elaine A. Merchant. The public may view the document in the Clerk's Office between the hours of 9:00 a.m. and 4:00 p.m, Monday through Friday. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 07/05/2005) |
| 07/26/2005 |  | MINUTE ORDER. The Court, sua sponte, schedules a motions hearing re. 206 , the GYC plaintiff's pending Motion to Enforce the Court's 12/16/03 Opinion, for September 8, 2005 at 10:00 a.m. in Courtroom 1. This hearing will be consolidated with the currently scheduled hearing on pending motions in related case No. 04-1913. Signed by Judge Emmet G. Sullivan on July 26, 2005. (lcegs2) (Entered: 07/26/2005) |
| 07/26/2005 |  | Set/Reset Hearings: Motion Hearing set for 9/8/2005 10:00 AM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(clv, ) (Entered: 07/27/2005) |
| 08/25/2005 |  | MINUTE ORDER. The Court, sua sponte, vacates the motion hearing scheduled for September 8, 2005. The Court will resolve GYC plaintiff's pending Motion to Enforce Judgment on the basis of the previously filed pleadings. Signed by Judge Emmet G. Sullivan on August 25, 2005. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 08/25/2005) |
| 09/28/2005 | 216 | ORDER denying 206 Motion to Enforce. Signed by Judge Emmet G. Sullivan on September 28, 2005. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 09/28/2005) |
| 10/03/2006 |  | Chambers is holding a copy of the Administrative Record regarding this action. Please call Carol Votteler at (202) 354-3152 to make arrangements to have these copies removed by October 6, 2006. If counsel does not contact Carol the copies will be discarded. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(clv, ) (Entered: 10/03/2006) |
| 10/06/2006 |  | Counsel retrieved copies of the Administrative Record being held in |

EXHIBIT E

| | | chambers this date. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(clv, ) (Entered: 10/06/2006) |
|---|---|---|

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/19/2008 21:08:49 | | |
| **PACER Login:** | us3079 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:02-cv-02367-EGS |
| **Billable Pages:** | 19 | **Cost:** | 1.52 |

EXHIBIT E

APPEAL, TYPE-C

## U.S. District Court
### District of Columbia (Washington, DC)
### CIVIL DOCKET FOR CASE #: 1:03-cv-00752-EGS

GREATER YELLOWSTONE COALITION et al v.
NORTON et al
Assigned to: Judge Emmet G. Sullivan
Lead case: 1:02-cv-02367-EGS
Member case: (View Member Case)
 Case: 1:07-cv-02111-EGS
Case in other court: U.S. Court of Appeals, 04-05002
        USCA, 04-05038
        04-05356
        04-05357
Cause: 42:4321 Review of Agency Action-Environment

Date Filed: 03/25/2003
Date Terminated: 09/23/2003
Jury Demand: None
Nature of Suit: 893 Environmental
Matters
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 03/25/2003 | 1 | COMPLAINT against FRAN MAINELLA, GALE NORTON, KAREN WADE (Filing fee $ 150.) , filed by GREATER YELLOWSTONE COALITION, NATIONAL PARKS CONSERVATION ASSOCIATION, NATIONAL RESOUSRCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, WINTER WILDLANDS ALLIANCE.(td, ) (Entered: 03/31/2003) |
| 03/25/2003 | | SUMMONS (5) Issued as to FRAN MAINELLA ; GALE NORTON ; KAREN WADE, U.S. Attorney and U.S. Attorney General (td, ) (Entered: 03/31/2003) |
| 03/25/2003 | 2 | NOTICE OF RELATED CASE by GREATER YELLOWSTONE COALITION, NATIONAL PARKS CONSERVATION ASSOCIATION, NATIONAL RESOUSRCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, WINTER WILDLANDS ALLIANCE. Case related to Case No. 02-2367 EGS. (td, ) (Entered: 03/31/2003) |
| 03/25/2003 | 3 | LCvR 26.1 - CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests (td, ) (Entered: 03/31/2003) |
| 05/27/2003 | 4 | MOTION to Dismiss by FRAN MAINELLA, GALE NORTON, KAREN WADE. (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Exhibit) (Fischer, Lauren) (Entered: 05/27/2003) |
| 06/06/2003 | 5 | First MOTION for Extension of Time to *File Response* by GREATER |

EXHIBIT F

| | | |
|---|---|---|
| | | YELLOWSTONE COALITION. (Honnold, Donald) (Entered: 06/06/2003) |
| 06/06/2003 | 6 | Proposed Pretrial Order *Granting Plaintiffs' Unopposed Motion For Extension* by GREATER YELLOWSTONE COALITION. (Honnold, Donald) (Entered: 06/06/2003) |
| 06/13/2003 | | ORDER granting 5 Plaintiffs' Unopposed Motion for Extension of Time to file response to motion to dismiss. Plaintiffs shall file their response by no later than June 16, 2003. Signed by Judge Emmet G. Sullivan on June 13, 2003.(lcegs2) (Entered: 06/13/2003) |
| 06/16/2003 | 7 | Memorandum in opposition to motion re 4 *to dismiss* filed by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Exhibit 9)(Honnold, Donald) (Entered: 06/16/2003) |
| 06/26/2003 | 8 | REPLY in support of motion re 4 *Motion to Dismiss* filed by FRAN MAINELLA, GALE NORTON, KAREN WADE. (Fischer, Lauren) (Entered: 06/26/2003) |
| 07/25/2003 | 9 | ORDER scheduling hearing on pending motions on August 6, 2003 and setting forth instructions to counsel. Signed by Judge Emmet G. Sullivan on July 22, 2003. (lcegs2) (Entered: 07/25/2003) |
| 07/28/2003 | 10 | SCHEDULING ORDER: Motion Hearing scheduled for August 6, 2003 CONTINUED to September 4, 2003 at 10:00 AM in Courtroom 1 before Emmet G. Sullivan. Signed by Judge Emmet G. Sullivan on July 28, 2003. (lcegs2) (Entered: 07/28/2003) |
| 08/01/2003 | 11 | MEMORANDUM *ON CONSOLIDATION PURSUANT TO THE COURT'S JULY 22, 2003 ORDER* from Federal Defendants. (Fischer, Lauren) (Entered: 08/01/2003) |
| 08/01/2003 | 12 | MOTION to Consolidate Cases *Submission Re: Consolidation* by GREATER YELLOWSTONE COALITION. (Honnold, Donald) (Entered: 08/01/2003) |
| 08/26/2003 | 13 | MOTION for Leave to Appear Pro Hac Vice by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Affidavit In Support of Motion for Admission Pro Hac Vice)(Honnold, Donald) (Entered: 08/26/2003) |
| 08/26/2003 | 14 | ENTERED IN ERROR.....Proposed Pretrial Order *Granting Motion For Adminssion Pro Hac Vice* by GREATER YELLOWSTONE COALITION. (Honnold, Donald) Modified on 8/27/2003 (bcs, ). (Entered: 08/26/2003) |
| 08/27/2003 | | ORDER granting 13 Motion for Leave to Appear pro hac vice. Signed by Judge Emmet G. Sullivan on August 27, 2003.(lcegs2) (Entered: 08/27/2003) |
| 08/27/2003 | | "NOTICE OF CORRECTED DOCKET ENTRY. Document No. 14 was entered in error and counsel was instructed not to refile said |

EXHIBIT F

| | | |
|---|---|---|
| | | pleading" (bcs, ) (Entered: 08/27/2003) |
| 08/28/2003 | 15 | NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE re 4 MOTION to Dismiss (Attachments: # 1 Exhibit)(Fischer, Lauren) (Entered: 08/28/2003) |
| 09/03/2003 | 16 | NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE *of Appearance of Counsel* (Fischer, Lauren) (Entered: 09/03/2003) |
| 09/10/2003 | 17 | NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE *of Lodging the Administrative Record on the 2003 Record of Decision* (Fischer, Lauren) (Entered: 09/10/2003) |
| 09/10/2003 | 18 | MOTION to Accept Administrative Record Entries for Filing by FRAN MAINELLA, GALE NORTON, KAREN WADE. (Fischer, Lauren) (Entered: 09/10/2003) |
| 09/10/2003 | 19 | SCHEDULING ORDER setting forth briefing schedule. Summary Judgment Hearing set for 11/20/2003 10:00 AM in Courtroom 1. Signed by Judge Emmet G. Sullivan on September 10, 2003. (lcegs2) (Entered: 09/10/2003) |
| 09/10/2003 | 20 | ADMINISTRATIVE RECORD by FRAN MAINELLA, GALE NORTON, KAREN WADE; (16 boxes) (td, ) (Entered: 09/11/2003) |
| 09/11/2003 | | ORDER granting 18 Motion for leave to file. Signed by Judge Emmet G. Sullivan on September 11, 2003. (lcegs2) (Entered: 09/11/2003) |
| 09/12/2003 | 21 | NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE re Order on Motion for Miscellaneous Relief *of Filing Administrative Record Entries* (Fischer, Lauren) (Entered: 09/12/2003) |
| 09/15/2003 | 22 | NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE re 20 Administrative Record, *Additional Documents* (Fischer, Lauren) (Entered: 09/15/2003) |
| 09/15/2003 | | Cases consolidated pursuant to order of 9/15/03. All filings will be docketed n lead case number 02-2367. (td, ) (Entered: 09/26/2003) |
| 09/16/2003 | 23 | ORDER denying 4 Motion to Dismiss, directing 12 that cases be consolidated, closing case. Signed by Judge Emmet G. Sullivan on September 15, 2003.(lcegs2) (Entered: 09/16/2003) |
| 09/16/2003 | | Cases consolidated pursuant to order filed 9/16/03. ALL FILINGS SHALL BE MADE IN LEAD CASE NUMBER 02-CV-2367. (td, ) (Entered: 09/16/2003) |
| 09/19/2003 | 25 | AMENDED COMPLAINT against all defendants, filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER.Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 09/29/2003) |
| 09/19/2003 | 26 | CONSOLIDATED AMENDED COMPLAINT against all defendants, filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT |

EXHIBIT F

| | | |
|---|---|---|
| | | FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS.Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (td, ) (Entered: 09/29/2003) |
| 09/26/2003 | 24 | *Answer to Consolidated Amended Complaint for Declaratory and Injunctive Relief* ANSWER to Amended Complaint by STATE OF WYOMING.Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Jerde, Jay) (Entered: 09/26/2003) |
| 09/29/2003 | | Plaintiff's initial amended complaint filed as a "Notice" 9/19/03 has been correctly entered on the docket. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 09/29/2003) |
| 10/01/2003 | 27 | MOTION for Summary Judgment *and Supporting Memorandum and Statement of Material Facts and Proposed Order* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2# 3 Exhibit Exhibit 3# 4 Exhibit Exhibit 4# 5 Exhibit Exhibit 5# 6 Exhibit Exhibit 6# 7 Exhibit Exhibit 7# 8 Exhibit Exhibit 8# 9 Exhibit Exhibit 9# 10 Exhibit Exhibit 10# 11 Exhibit Exhibit 11# 12 Exhibit Exhibit 12# 13 Exhibit Exhibit 13# 14 Exhibit Exhibit 14# 15 Exhibit Exhibit 15# 16 Exhibit Exhibit 16# 17 Exhibit Exhibit 17# 18 Exhibit Exhibit 18# 19 Exhibit Exhibit 19# 20 Exhibit Exhibit 20# 21 Exhibit Exhibit 21# 22 Exhibit Exhibit 22# 23 Exhibit Exhibit 23# 24 Exhibit Exhibit 24# 25 Exhibit Exhibit 25# 26 Exhibit Exhibit 26)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 10/01/2003) |
| 10/01/2003 | 28 | MOTION leave to file composite videotape exhibit in support of summary judgment *and supporting Memorandum* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 10/01/2003) |
| 10/01/2003 | 29 | MOTION for Summary Judgment by GREATER YELLOWSTONE COALITION. (Honnold, Donald) (Entered: 10/02/2003) |
| 10/02/2003 | 30 | ENTERED IN ERROR. . . .MOTION for Summary Judgment by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Memorandum In Support of Summary Judgment# 2 Proposed Order# 3 Exhibit 4# 4 Affidavit of Robert Ekey# 5 Affidavit Charles Clusen# 6 Affidavit Tony Jewett# 7 Affidavit of Michael Scott# 8 Affidavit Steve Thomas# 9 Affidavit Kenneth Miller)(Honnold, Donald) Modified on 10/3/2003 (td, ). (Entered: 10/02/2003) |
| 10/02/2003 | 31 | PRETRIAL STATEMENT by GREATER YELLOWSTONE COALITION. (Honnold, Donald) (Entered: 10/02/2003) |
| 10/02/2003 | 32 | MOTION for Summary Judgment by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Memorandum In Support of Summary Judgment# 2 Exhibit 1# 3 Exhibit 2# 4 Exhibit 3# 5 Exhibit 4# 6 Exhibit |

EXHIBIT F

| | | |
|---|---|---|
| | | 5# 7 Affidavit of Michael Scott# 8 Affidavit of Tony Jewett# 9 Affidavit Robert Ekey# 10 Affidavit of Charles Clusen# 11 Affidavit Kenneth Miller# 12 Affidavit Steve Thomas# 13 Statement of Material Facts# 14 Proposed Order)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 10/02/2003) |
| 10/08/2003 | 33 | ALL FILINGS SHALL BE MADE IN LEAD CASE NUMBER 02-CV-2367. Cases consolidated pursuant to order filed 9/16/03. REMINDER - this case was closed on 9/23/03. (GK, ) (Entered: 10/08/2003) |
| 10/24/2003 | 37 | Cross MOTION for Summary Judgment by STATE OF WYOMING. (Attachments: # 1 Memorandum in Support# 2 Statement of Material Facts# 3 Text of Proposed Order)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(nmw, ) (Entered: 10/28/2003) |
| 10/24/2003 | 38 | Combined Memorandum in opposition to motions re 66 68 for Summary Judgment filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(nmw, ) (Entered: 10/28/2003) |
| 10/27/2003 | | MINUTE ORDER granting 67 Motion to File Videotape. Signed by Judge Emmet G. Sullivan on October 27, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS.(lcegs2) (Entered: 10/27/2003) |
| 10/27/2003 | 34 | Cross MOTION for Summary Judgment by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 10/27/2003) |
| 10/27/2003 | 35 | Memorandum in opposition to motion re 68 for Summary Judgment and Memorandum in Support of Cross-Motion for Summary Judgment filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 10/27/2003) |
| 10/27/2003 | 36 | MOTION to Strike Plaintiffs' Exhibits to Motions for Summary Judgment by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 10/27/2003) |
| 10/28/2003 | 39 | NOTICE of filing of 2 videotapes pursuant to minute order of 10/27/03 by All Plaintiffs Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 10/31/2003) |
| 11/05/2003 | 40 | Memorandum in opposition to motion re 72 for Summary Judgment of Federal Defendants and Intervenors and Reply In Support of Fund Plaintiffs' Motion For Summary Judgment, and Fund Plaintiffs' Responses To Federal Defendants and Intervenors' Statements of Material Facts filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1 Exhibit FFA Exhibit 27# 2 Exhibit FFA Exhibit 28# 3 Exhibit FFA Exhibit 29# 4 Exhibit FFA Exhibit 30# 5 Exhibit FFA Exhibit 31# 6 Exhibit FFA Exhibit 32# 7 Exhibit FFA Exhibit 33# 8 Exhibit FFA |

EXHIBIT F

| | | |
|---|---|---|
| | | Exhibit 34# 9 Exhibit FFA Exhibit 35# 10 Exhibit FFA Exhibit 36) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 11/05/2003) |
| 11/05/2003 | 41 | Memorandum in opposition to motion re 77 for Summary Judgment and Reply in Support of Summary Judgment filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 11/05/2003) |
| 11/10/2003 | 42 | Memorandum in opposition to motion re 76 to Strike by Intervenors filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 11/10/2003) |
| 11/10/2003 | 43 | Memorandum in opposition to motion re 76 Strike filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 11/10/2003) |
| 11/12/2003 | 44 | RESPONSE to Defendants' Statements Of Material Facts As To Which There Is No Genuine Issue filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 11/12/2003) |
| 11/12/2003 | 45 | REPLY in support of motion re 74 for Summary Judgment filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 11/12/2003) |
| 11/12/2003 | 46 | RESPONSE to plaintiff's oppositions to defendants cross motions for summary judgment filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 11/14/2003) |
| 11/13/2003 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan: Per the Telephone Conference held on November 13, 2003, the Court requests that the parties submit two copies of the cited to portions of the administrative record. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/13/2003) |
| 11/17/2003 | 47 | REPLY to opposition to motion re 76 to Strike Plaintiffs' Exhibits to Motions for Summary Judgment filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 11/17/2003) |
| 11/18/2003 | 48 | ORDER setting forth instructions to counsel.Signed by Judge Emmet G. Sullivan on November 18, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/18/2003) |
| 11/18/2003 | | NOTICE to the Parties: As of 7:00 p.m. on November 18, 2003, the Court has not received copies of the cited portions of the administrative record. Signed by Judge Emmet G. Sullivan on November 18, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) |

EXHIBIT F

| | | |
|---|---|---|
| | | (Entered: 11/18/2003) |
| 11/19/2003 | 49 | APPLICATION for *Admission Pro Hac Vice* by THE BLUERIBBON COALITION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 11/19/2003) |
| 11/19/2003 | | NOTICE to parties: the Court has received copies of the cited to portions of the Administrative Record.Signed by Judge Emmet G. Sullivan on October 19, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/19/2003) |
| 11/19/2003 | | ORDER granting 90 Application for admission pro hac vice of Susan E. Buxton.Signed by Judge Emmet G. Sullivan on November 19, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/19/2003) |
| 11/21/2003 | 50 | ORDER setting forth instructions to counsel and setting status hearing for December 17, 2003, at 10:00 a.m. Signed by Judge Emmet G. Sullivan on November 21, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/21/2003) |
| 11/21/2003 | | Set/Reset Hearings: Status Conference set for 12/17/2003 at 10:00 AM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 11/21/2003) |
| 12/04/2003 | | MINUTE ORDER. The Court sua sponte reschedules the status hearing scheduled in both cases from December 17, 2003, to December 16, 2003, at 3:30 p.m. in Courtroom One. Signed by Judge Emmet G. Sullivan on December 4, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/04/2003) |
| 12/04/2003 | | Set/Reset Hearings: Status Conference set for 12/16/2003 at 3:30 PM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/04/2003) |
| 12/09/2003 | 51 | ORDER rescheduling status hearing for December 15, 2003, at 9:30 a.m. and setting forth further instructions to counsel.Signed by Judge Emmet G. Sullivan on December 9, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/09/2003) |
| 12/09/2003 | | Set/Reset Hearings: Status Conference set for 12/15/2003 at 09:30 AM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/09/2003) |
| 12/11/2003 | | Minute Entry. Notice to parties: On December 11, 2003, chambers contacted the Fund for Animals counsel for the sole purpose of requesting a copy of the 1999 Rulemaking Petition. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/11/2003) |
| 12/11/2003 | 52 | MEMORANDUM from GYC Plaintiffs Re: Final Rule. (Attachments: # 1 Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Honnold, Donald) (Entered: 12/11/2003) |
| 12/11/2003 | 53 | MEMORANDUM from The Fund Plaintiffs Supplemental Brief. |

**EXHIBIT F**

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit Final Regulations)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Glitzenstein, Eric) (Entered: 12/11/2003) |
| 12/11/2003 | 54 | First MOTION For The Court To Consider Supplemental Brief *of The Fund Plaintiffs* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Glitzenstein, Eric) (Entered: 12/11/2003) |
| 12/11/2003 | | ORDER granting 54 Motion for the Court to Consider Plaintiffs' Supplemental Brief. Signed by Judge Emmet G. Sullivan on December 11, 2003. (lcegs2) (Entered: 12/11/2003) |
| 12/12/2003 | 55 | RESPONSE to *Federal Defendants' Supplemental Brief By The Fund Plaintiffs* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 12/12/2003) |
| 12/12/2003 | 56 | RESPONSE to *Plaintiffs' Supplemental Briefs* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 12/12/2003) |
| 12/12/2003 | 57 | RESPONSE to *Plaintiffs' Supplemental Briefs* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Jerde, Jay) (Entered: 12/12/2003) |
| 12/12/2003 | 58 | MEMORANDUM from GYC re: Response To Supplemental Briefing. (Attachments: # 1 Exhibit 1# 2 # 3 Exhibit 3# 4 Exhibit 4)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 12/12/2003) |
| 12/12/2003 | | MINUTE ORDER: Notice the the parties: Pursuant to the parties' December 12, 2003, phone inquiry, the parties need not submit Word Perfect versions of their supplemental filings. Signed by Judge Emmet G. Sullivan on December 12, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/12/2003) |
| 12/16/2003 | 59 | MEMORANDUM AND OPINION.Signed by Judge Emmet G. Sullivan on December 16, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/16/2003) |
| 12/16/2003 | 60 | JUDGMENT. Signed by Judge Emmet G. Sullivan on December 16, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (lcegs2) (Entered: 12/16/2003) |
| 12/17/2003 | 61 | Emergency MOTION to Stay *Judgment and Request for Expedited Consideration* by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Attachments: # 1 Exhibit s) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, |

EXHIBIT F

| | | |
|---|---|---|
| | | Barbara) (Entered: 12/17/2003) |
| 12/17/2003 | | MINUTE ORDER. Upon consideration of Defendant Intervenors' Emergency Motion for a Stay of Judgment, the Court sua sponte directs that any responses shall be filed by no later than December 18, 2003 at noon (E.S.T); any replies shall be filed by no later than December 18, 2003, at 4:00 p.m. (E.S.T.) Signed by Judge Emmet G. Sullivan on December 17, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/17/2003) |
| 12/17/2003 | 62 | First MOTION to Amend/Correct 106 Memorandum & Opinion, 107 Judgment *and Supporting Memorandum* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 12/17/2003) |
| 12/18/2003 | 63 | ENTERED IN ERROR.....NOTICE by FRAN MAINELLA, GALE NORTON, KAREN WADE re 108 Emergency MOTION to Stay *Judgment and Request for Expedited Consideration Federal Defendants' Response* Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Fischer, Lauren) Modified on 12/19/2003 (jf, ). (Entered: 12/18/2003) |
| 12/18/2003 | 64 | First MOTION to Stay *filed* by STATE OF WYOMING. (Attachments: # 1 # 2 Text of Proposed Order # 3 Affidavit # 4 # 5 # 6 # 7 # 8 # 9) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 12/18/2003) |
| 12/18/2003 | 65 | Memorandum in opposition to motion re 108 *to Stay By ISMA and BlueRibbon Coalition* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 12/18/2003) |
| 12/18/2003 | 66 | RESPONSE to *ISMA's Request For Stay Of Judgment* filed by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 1,2,3)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Honnold, Donald) (Entered: 12/18/2003) |
| 12/18/2003 | 67 | First MOTION to Amend/Correct *Affidavit filed* by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Jerde, Jay) (Entered: 12/18/2003) |
| 12/18/2003 | 68 | REPLY to opposition to motion re 108 *Emergency Stay* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 12/18/2003) |
| 12/18/2003 | | NOTICE OF CORRECTED DOCKET ENTRY. Document Numbers 110 & 63(03-752) were entered in error and counsel was instructed to re-file said pleading as a motion instead of A notice. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(jf, ) (Entered: 12/19/2003) |

EXHIBIT F

| 12/19/2003 | 69 | Memorandum in opposition to motion re 111 *for Stay of Judgment By State of Wyoming* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 12/19/2003) |
| 12/19/2003 | 70 | RESPONSE to *Wyoming's Motion For Stay Of Judgment* filed by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Transcript# 2 Affidavit of Michael Scott)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Donald) (Entered: 12/19/2003) |
| 12/19/2003 | 71 | Memorandum in opposition to motion re 109 *Amend the Court's December 16, 2003 Opinion and Judgment* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 12/19/2003) |
| 12/19/2003 | 74 | MOTION for Leave to File affidavit by STATE OF WYOMING. (Attachments: # 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 12/23/2003) |
| 12/22/2003 | | MINUTE ORDER. The Court sua sponte orders Defendant Intervenor State of Wyoming to file a reply, if any, to Plaintiffs' Responses to the State of Wyoming's Motion for a Stay of Judgment, by no later than 2:00 p.m. (E.S.T.) on Monday, December 22, 2003.Signed by Judge Emmet G. Sullivan on December 22, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/22/2003) |
| 12/22/2003 | 72 | REPLY to opposition to motion re 111 filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 12/22/2003) |
| 12/22/2003 | 73 | RESPONSE to *Fund for Animals Plaintiffs' Motion to Amend Judgment* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 12/22/2003) |
| 12/23/2003 | | MINUTE ORDER granting 124 Motion for Leave to File. Signed by Judge Emmet G. Sullivan on December 23, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/23/2003) |
| 12/23/2003 | 75 | ORDER denying 108 Motion to Stay and denying 111 Motion to Stay. Signed by Judge Emmet G. Sullivan on December 23, 2003. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 12/23/2003) |
| 01/02/2004 | 76 | REPLY in support of motion re 109 *to Amend the Court's December 16, 2003 Opinion and Judgment* filed by THE FUND FOR ANIMALS. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Glitzenstein, Eric) (Entered: 01/02/2004) |
| 01/02/2004 | 77 | NOTICE OF APPEAL as to 60 Judgment, 75 Order on Motion to Stay, |

EXHIBIT F

| | | |
|---|---|---|
| | | by BLUERIBBON COALITION, INC., INTERNATIONAL SNOWMOBILE MANUFACTURERS ASSOCIATION, INC.. Filing fee not paid. (Attachments: # 1 Exhibit order# 2 Exhibit judgment)(cp, ) (Entered: 01/06/2004) |
| 01/06/2004 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 77 Notice of Appeal (cp, ) (Entered: 01/06/2004) |
| 01/08/2004 | 81 | NOTICE OF APPEAL as to 107 Judgment by STEVEN WILLIAMS, STEVE MARTIN, FRAN MAINELLA. (td, ) (Entered: 02/09/2004) |
| 01/09/2004 | 78 | USCA Case Number 04-5002 for 77 Notice of Appeal filed by INTERNATIONAL SNOWMOBILE MANUFACTURERS ASSOCIATION, INC., BLUERIBBON COALITION, INC. (cp, ) (Entered: 01/09/2004) |
| 01/15/2004 | 79 | CERTIFIED COPY of Order filed in USCA dated 1/13/2004, referencing appeal 77 , denying motions for stay and injuctive relief. USCA # 03-5365 (lnw, ) (Entered: 01/16/2004) |
| 01/29/2004 | 80 | NOTICE by Judge Emmet G. Sullivan copy of the attached letter from Congressman Denny Rehberg and the Court's response (Attachment # 1 Letter and Attachment #2 Letter Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(adc) (Entered: 01/29/2004) |
| 02/06/2004 | 85 | TRANSCRIPT REQUEST by STATE OF WYOMING for proceedings held on 9/4/04; 11/20/03; 12/17/03. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 02/13/2004) |
| 02/09/2004 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 135 Notice of Appeal and Notice of Appeal in 03cv752 number 81. (td, ) (Entered: 02/09/2004) |
| 02/12/2004 | 82 | NOTICE by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER re 136 Notice (Other), Notice (Other) *Of Violation Of Court Order And Request For A Status Hearing* (Attachments: # 1 Exhibit Attachment 1# 2 Exhibit Attachment 2# 3 Exhibit Attachment 3# 4 Exhibit Attachment)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 02/12/2004) |
| 02/12/2004 | 83 | RESPONSE to *Federal Defendants' Notice* filed by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 3# 2 Exhibit 4# 3 Exhibit 1# 4 Exhibit 2)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 02/12/2004) |
| 02/12/2004 | 84 | ORDER scheduling Status Conference for February 17, 2004 at 11:00 a.m. and setting forth instructions to counsel. Signed by Judge Emmet G. Sullivanon February 12, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2 ) (Entered: 02/12/2004) |
| 02/12/2004 | | Set/Reset Hearings: Status Conference set for 2/17/2004 11:00 AM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 02/12/2004) |

EXHIBIT F

| 02/12/2004 | | USCA Case Number 04-5038 for 81 Notice of Appeal filed by FRAN MAINELLA. (bm) (Entered: 02/13/2004) |
|---|---|---|
| 02/13/2004 | 86 | RESPONSE to *Fund For Animals' Notice Of Violation Of Court Order* filed by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 02/13/2004) |
| 02/13/2004 | 87 | NOTICE by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC re 137 Notice (Other), Notice (Other) *of Violation of Court Order and Request for a Status Hearing* Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 02/13/2004) |
| 02/13/2004 | 88 | RESPONSE to *Notice of Violation* filed by STATE OF WYOMING. (Attachments: # 1 Exhibit Attachment 1# 2 Exhibit Attachment 2# 3 Exhibit Attachment 3# 4 Exhibit Attachment 4# 5 Exhibit Attachment 5) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 02/13/2004) |
| 02/13/2004 | 89 | NOTICE by STATE OF WYOMING *Notice to Appear by Telephone* Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 02/13/2004) |
| 02/13/2004 | 90 | RESPONSE to *Defendants' Responses To This Court's February 12, 2004 Order* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 02/13/2004) |
| 02/13/2004 | 91 | RESPONSE to *Defendants' Responses To Notice of Violation Of Court Order* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 02/13/2004) |
| 02/17/2004 | | MINUTE ORDER granting 148 Motion for Leave to File Corrected Response.Signed by Judge Emmet G. Sullivan on February 17, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 02/17/2004) |
| 02/17/2004 | | Set/Reset Hearings: Status Conference set for 2/17/04 at 11:00 am is continued until 2/17/2004 at 02:00 PM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 02/17/2004) |
| 02/17/2004 | 92 | THIS ORDER IS VACATEAD PURSUANT TO THE COURT'S ORDER FILED 8/6/04 ORDER directing defendants/interveners to show cause why they should not be heldin contempt of this Court's December 16, 2003 Order; setting forth further instructions to counsel; and scheduling a hearing for March 9, 2004 at 10:30 a.m. in Courtroom One. Signed by Judge Emmet G. Sullivan on February 17, 2004. Associated |

EXHIBIT F

| | | |
|---|---|---|
| | | Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2, ) Modified on 8/10/2004 (clv, ). (Entered: 02/17/2004) |
| 02/17/2004 | | Set/Reset Hearings: Motions Hearing set for 3/9/2004 at 10:30 AM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 02/17/2004) |
| 02/17/2004 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan : Status Conference held on 2/17/2004. Motion Hearing set for 3/9/2004 10:30 AM in Courtroom 1 before Judge Judge Emmet G. Sullivan. (Court Reporter Beth Wasserman.) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(clv, ) (Entered: 02/18/2004) |
| 02/17/2004 | 125 | ORDER of USCA consolidating USCA #03-5365, USCA #04-5001, and USCA #04-5002; and holding USCA #03-5365 in abeyance pending further order of the court as to 122 Notice of Appeal filed by STATE OF WYOMING (cp, ) Modified on 5/18/2004 (cp, ). Additional attachment (s) added on 7/12/2004 (adc, ). (Entered: 05/18/2004) |
| 02/18/2004 | 93 | MOTION Clarification of Order *Dated February 17, 2004* by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 02/18/2004) |
| 02/19/2004 | 94 | RESPONSE to *the State of Wyoming's Motion for Clarification* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 02/19/2004) |
| 02/20/2004 | | MINUTE ORDER denying 150 Motion for Clarification. The February 17, 2004, Order was unambiguous and requires no clarification. Accordingly, upon consideration of the State of Wyoming's Motion for Clarification and the Fund for Animals' Response, the motion is denied. Signed by Judge Emmet G. Sullivan on February 20, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 02/20/2004) |
| 02/23/2004 | 97 | NOTICE OF TRANSCRIPT FILED for dates 2/17/04; Court Reporter: Elizabeth L. Wasserman Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 03/02/2004) |
| 02/24/2004 | 95 | RESPONSE TO ORDER TO SHOW CAUSE by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (Jerde, Jay) (Entered: 02/24/2004) |
| 02/24/2004 | 96 | RESPONSE TO ORDER TO SHOW CAUSE by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. (Attachments: # 1 Exhibit 1 and Exhibit 2)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 02/24/2004) |
| 03/02/2004 | 98 | RESPONSE to *Defendants' Responses To This Court's Show Cause Order* filed by GREATER YELLOWSTONE COALITION. |

EXHIBIT F

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit 1# 2 Exhibit 2)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 03/02/2004) |
| 03/02/2004 | 99 | RESPONSE to *The Court's Order To Show Cause* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2# 3 Exhibit FFA Exhibit 3)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 03/02/2004) |
| 03/02/2004 | 100 | Memorandum in opposition to motion re 156 *Transfer* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 03/02/2004) |
| 03/02/2004 | 101 | Memorandum in opposition to motion re 155 *Federal Defendants' "Conditional" Motion For Partial Relief From Judgment* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 03/02/2004) |
| 03/02/2004 | 102 | Memorandum in opposition to motion re 156 *Federal Defendants' "Conditional" Renewed Motion to Transfer* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 03/02/2004) |
| 03/05/2004 | 103 | RESPONSE to *Federal Defendants' Conditional Motions for Partial Relief From Judgment and To Transfer and Reply to Plaintiffs' Responses to Order to Show Cause* filed by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 03/05/2004) |
| 03/05/2004 | 104 | NOTICE by STATE OF WYOMING *Notice to Appear by Telephone* Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 03/05/2004) |
| 03/05/2004 | 105 | RESPONSE to *Federal Defendants' Conditional Motion to Transfer Venue* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 03/05/2004) |
| 03/05/2004 | 106 | REPLY *to Plaintiffs' Responses to this Court's Show Cause Order* by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 03/05/2004) |
| 03/08/2004 | 107 | ENTERED IN ERROR. . . .REPLY to opposition to motion re 155 *Plaintiffs' Opposition to Federal Defendants' Conditional Motion for Partial Relief from Judgment* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752- |

EXHIBIT F

| | | |
|---|---|---|
| | | EGS(Honnold, Douglas) Modified on 3/9/2004 (td, ). (Entered: 03/08/2004) |
| 03/09/2004 | | DOCUMENT NO. 171 has been Entered In Error and counsel has been advised to refile said document as a memorandum in opposition. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 03/09/2004) |
| 03/09/2004 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan : Motion Hearing held on 3/9/2004; the order to show cause is stayed; motion to transfer is senied. Status Conference set for 4/14/2004 11:00 AM in Courtroom 1 before Judge Emmet G. Sullivan. chambers to issue an order(Court Reporter Elaine Merchant.) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(clv, ) (Entered: 03/09/2004) |
| 03/09/2004 | 108 | Memorandum in opposition to motion re 156 *Opposition to Conditional Motion for Partial Relief from Judgment* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 03/09/2004) |
| 03/09/2004 | 109 | ORDER denying Motion to Transfer Case 156 , staying contempt proceedings until further order of the Court, and scheduling Status Hearing for April 11, 2004 at 11:00 a.m. Signed by Judge Emmet G. Sullivan on March 9, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2, ) (Entered: 03/09/2004) |
| 03/09/2004 | | Set/Reset Hearings: Status Conference set for 4/14/2004 11:00 AM in Courtroom 1 before Judge Emmet G. Sullivan. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2, ) (Entered: 03/09/2004) |
| 03/16/2004 | 110 | RESPONSE to *Defendants' March 11, 2004 Notice* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 03/16/2004) |
| 03/18/2004 | | Set/Reset Hearings: Status Conference set for 4/14/2004 11:00 AM in Courtroom 1 before Judge Emmet G. Sullivan. (zclv, ) (Entered: 03/18/2004) |
| 03/18/2004 | 111 | RESPONSE to 175 *The Fund for Animals' Response to the Federal Defendants' March 11, 2004 Notice* by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-2367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 03/18/2004) |
| 03/18/2004 | 112 | MOTION for Permanent Injunction by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Text of Proposed Order)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 03/18/2004) |
| 03/24/2004 | 113 | REPLY *to the Fund for Animals Plaintiffs' Response to Federal Defendnats' March 11, 2004 Notice* by STATE OF WYOMING. |

EXHIBIT F

| | | |
|---|---|---|
| | | Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 03/24/2004) |
| 03/29/2004 | 114 | RESPONSE to *Greater Yellowstone Coalition Plaintiffs' Motion for an Injunction* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 03/29/2004) |
| 03/30/2004 | 115 | MOTION To Modify Relief *And Memorandum In Support* by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 03/30/2004) |
| 04/01/2004 | 116 | Memorandum in opposition to motion re 177 filed by FRAN MAINELLA, STEVE MARTIN, GALE NORTON, KAREN WADE, STEVEN WILLIAMS. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Fischer, Lauren) (Entered: 04/01/2004) |
| 04/01/2004 | 117 | Memorandum in opposition to motion re 177 *Permanent Injunction* filed by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 04/01/2004) |
| 04/07/2004 | | MINUTE ORDER finding as moot 114 Motion to Amend/Correct Affidavit. Signed by Judge Emmet G. Sullivan on April 7, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 04/07/2004) |
| 04/07/2004 | | MINUTE ORDER finding as moot 120 Motion to Expedite. Signed by Judge Emmet G. Sullivan on April 7, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 04/07/2004) |
| 04/08/2004 | 118 | ORDER cancelling April 14, 2004 Status Hearing.Signed by Judge Emmet G. Sullivan on April 8, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 04/08/2004) |
| 04/09/2004 | 119 | REPLY in support of motion re 177 *for Injunction* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 04/09/2004) |
| 04/12/2004 | 120 | RESPONSE to *the Fund for Animals Plaintiffs' Motion to Modify Relief* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) (Entered: 04/12/2004) |
| 04/13/2004 | 121 | Memorandum in opposition to motion re 180 *to Modify* filed by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 04/13/2004) |
| 04/20/2004 | 122 | NOTICE OF TRANSCRIPT FILED for dates 3/9/04; Court Reporter: Elaine A. Merchant. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 04/22/2004) |

EXHIBIT F

| | | |
|---|---|---|
| 04/22/2004 | 123 | REPLY to opposition to motion re 180 *To Modify Relief* filed by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 04/22/2004) |
| 05/11/2004 | 124 | NOTICE by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER *of Filing of Status Report in Court of Appeals* (Attachments: # 1 Attachment)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 05/11/2004) |
| 05/25/2004 | 126 | MOTION to Withdraw as Attorney by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Miller, Barbara) (Entered: 05/25/2004) |
| 05/26/2004 | | MINUTE ORDER granting 193 Motion to Withdraw as Attorney. Attorney Barbara A. Miller terminated. Signed by Judge Emmet G. Sullivan on May 25, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 05/26/2004) |
| 06/30/2004 | 127 | NOTICE by BLUEWATER NETWORK, ECOLOGY CENTER, WALT FARMER, PHILLIP KNIGHT, RICHARD MEIS, THE FUND FOR ANIMALS, GEORGE WUERTHNER *of Filing* (Attachments: # 1 Attachment 1# 2 Attachment 2# 3 Attachment 3)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Crystal, Howard) (Entered: 06/30/2004) |
| 06/30/2004 | 128 | ORDER granting 155 Motion for Partial Relief From Judgment, denying without prejudice 177 Motion for Permanent Injunction, denying without prejudice 180 Motion to Modify Relief, and setting forth further instructions to counsel.Signed by Judge Emmet G. Sullivan on June 30, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (lcegs2, ) (Entered: 06/30/2004) |
| 07/23/2004 | 129 | ORDER denying 109 Motion to Amend the December 16, 2003, Opinion and Judgment.Signed by Judge Emmet G. Sullivan on July 23, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 07/23/2004) |
| 08/06/2004 | 130 | ORDER vacating February 17, 2004, Order directing defendants/interveners to show cause why they should not be held in contempt of this Court's December 16, 2003, Order. Signed by Judge Emmet G. Sullivan on August 6, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 08/06/2004) |
| 08/10/2004 | 131 | NOTICE by GREATER YELLOWSTONE COALITION *of Filing of 90-Day Status Report* (Attachments: # 1 Exhibit 1)Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 08/10/2004) |

**EXHIBIT F**

| | | |
|---|---|---|
| 09/15/2004 | 132 | NOTICE OF APPEAL as to 107 Judgment by THE BLUERIBBON COALITION INC, THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Filing fee $ 255, receipt number 127792. (td, ) (Entered: 09/21/2004) |
| 09/21/2004 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 203 Notice of Appeal (td, ) (Entered: 09/21/2004) |
| 10/04/2004 | | USCA Case Number 04-5356 for 203 Notice of Appeal filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC, THE BLUERIBBON COALITION INC. (td, ) (Entered: 10/14/2004) |
| 10/05/2004 | | USCA Case Number 04-5357 for 132 Notice of Appeal. (td, ) (Entered: 10/14/2004) |
| 11/12/2004 | 133 | MOTION to Enforce *Court's December 16, 2003 Opinion and Order* by GREATER YELLOWSTONE COALITION. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Text of Proposed Order Proposed Order) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 11/12/2004) |
| 11/19/2004 | | MINUTE ORDER. The Court, sua sponte, schedules a Status Conference in this matter for 11/23/2004 at 09:30 AM in Courtroom 1. Signed by Judge Emmet G. Sullivan on November 19, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS, 1:04-cv-01913(lcegs2) (Entered: 11/19/2004) |
| 11/23/2004 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan : Status Conference held on 11/23/2004. (Court Reporter Elaine Merchant.) Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS (zclv, ) (Entered: 11/23/2004) |
| 11/24/2004 | 134 | RESPONSE to 133 *Greater Yellowstone Coalition's Motion to Enforce Order* filed by STATE OF WYOMING. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Jerde, Jay) Modified on 11/26/2004 (lc, ). (Entered: 11/24/2004) |
| 11/24/2004 | 135 | Memorandum in opposition to motion re 206 *enforcement of judgment* filed by THE INTERNATIONAL SNOMOBILE MANUFACUTRERS ASSOCIATION INC. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Gaston, Gretchen) (Entered: 11/24/2004) |
| 12/03/2004 | 136 | REPLY to opposition to motion re 206 *Enforcement Of This Court's December 16, 2003 Order* filed by GREATER YELLOWSTONE COALITION. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(Honnold, Douglas) (Entered: 12/03/2004) |
| 12/17/2004 | | MINUTE ORDER granting 211 Defendants' Motion for Leave to File a Surreply. Signed by Judge Emmet G. Sullivan on December 17, 2004. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs1) (Entered: 12/17/2004) |
| 04/15/2005 | 137 | MANDATE of USCA (certified copy)It is hereby ordered that these |

EXHIBIT F

| | | |
|---|---|---|
| | | consolidated appeals be dismissed; It is further ordered that the motions to govern future proceedings be dismissed as moot; USCA#03-5365 (jsc) (Entered: 04/22/2005) |
| 07/01/2005 | 138 | TRANSCRIPT of Proceedings held on 6/3/05 before Judge Emmet G. Sullivan. Court Reporter: Elaine A. Merchant. The public may view the document in the Clerk's Office between the hours of 9:00 a.m. and 4:00 p.m, Monday through Friday. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(td, ) (Entered: 07/05/2005) |
| 09/28/2005 | 139 | ORDER denying 206 Motion to Enforce. Signed by Judge Emmet G. Sullivan on September 28, 2005. Associated Cases: 1:02-cv-02367-EGS,1:03-cv-00752-EGS(lcegs2) (Entered: 09/28/2005) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 03/19/2008 21:17:59 | | |
| **PACER Login:** | us3079 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:03-cv-00752-EGS |
| **Billable Pages:** | 13 | **Cost:** | 1.04 |

EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREATER YELLOWSTONE COALITION<br>13 South Willson, Suite 2<br>Bozeman, MT 59715;<br><br>THE WILDERNESS SOCIETY<br>1615 M St. NW<br>Washington, DC 20036;<br><br>NATURAL RESOURCES DEFENSE COUNCIL<br>40 West 20th Street<br>New York, NY 10011;<br><br>WINTER WILDLANDS ALLIANCE<br>910 Main St., Suite 235<br>Boise, ID 83702;<br><br>SIERRA CLUB<br>85 Second Street, 2nd Floor<br>San Francisco, CA 94105;<br><br>   Plaintiffs,<br><br>    vs.<br><br>DIRK KEMPTHORNE, in his official capacity as<br>Secretary of Interior; MARY BOMAR, in her official<br>capacity as Director of the National Park Service; and<br>MIKE SNYDER, in his official capacity as Director<br>of the Intermountain Region of the U.S. National Park<br>Service,<br><br>   Defendants. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Plaintiffs Greater Yellowstone Coalition, et al. challenge the National Park Service's

decision to allow continued snowmobile use in Yellowstone and Grand Teton National Parks and

the John D. Rockefeller, Jr. Memorial Parkway (collectively "Yellowstone" or "Parks").  Despite

EXHIBIT G

a bevy of laws, regulations, and policies that should prevent this result, the Park Service has authorized recreational snowmobiling in Yellowstone at a level that will impair or unacceptably impact park resources. The environmental analysis used to justify this result fails to assess accurately how this result and a range of other studied alternatives comport with the governing law, and frustrates the purposes of full environmental disclosure and analysis. Rather than preserving the Parks as a sanctuary for wildlife, natural processes, and humans alike, the decision contravenes the Park Service's affirmative responsibility to protect wildlife and natural soundscapes, and to secure the best possible air quality. By granting damaging snowmobile use priority over other, less injurious forms of public access, the Park Service has impaired the park experience for all winter visitors.

### PARTIES

2.  Plaintiff Greater Yellowstone Coalition ("GYC") is a conservation organization dedicated to protecting and restoring the Greater Yellowstone Ecosystem and the unique quality of life it sustains. Central to GYC's mission is maintaining the integrity of the national parks that are the core of the larger ecosystem. Formed in 1983, GYC is a non-profit corporation and has approximately 9,000 members, many of whom regularly use and enjoy Yellowstone and Grand Teton National Parks.

3.  Plaintiff The Wilderness Society ("TWS") is a non-profit organization dedicated to protecting a national network of wild lands and fostering an American land ethic. TWS works to ensure wise management and protection of America's public lands, including Yellowstone. Founded in 1935, TWS has approximately 200,000 members, many of whom regularly use and enjoy Yellowstone and Grand Teton National Parks.

EXHIBIT G

4.    Plaintiff Natural Resources Defense Council ("NRDC") is a non-profit organization that uses law, science, and the support of more than 400,000 members to protect the planet's wildlife and wild places, and to ensure a safe and healthy environment.  NRDC and its members have a longstanding interest in preserving Yellowstone's unique natural resources, including the integrity of visitor experience.

5.    Plaintiff Winter Wildlands Alliance is a non-profit organization that advocates nationally for non-motorized backcountry winter recreation.  Representing more than 1,100 individual members and 28 grassroots groups to promote human-powered snowsports activities, Winter Wildlands Alliance works with federal, regional, and local land managers to resolve user conflicts on public lands and to promote a quality backcountry winter recreation experience on those lands.

6.    Plaintiff Sierra Club is a national conservation organization with more than 700,000 members.  Founded in 1892, its mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist humanity to protect and to restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

7.    Members of each of the Plaintiff organizations visit the Parks in winter to observe wildlife, ski and snowshoe, and to enjoy the spectacular scenery and natural quiet.  Even from afar, members of each of the Plaintiff groups take an active interest in maintaining the integrity of the National Park System.  The Park Service's authorization of snowmobile use and inadequate environmental analysis causes direct injury to the recreational, aesthetic, and conservation interests of members of the Plaintiff organizations.  These injuries are fairly

EXHIBIT G

traceable to the challenged Record of Decision and EIS, and are redressable through this action

to invalidate the Record of Decision and EIS.

8.    Defendant Dirk Kempthorne is the Secretary of the U.S. Department of Interior and,

in that capacity, has oversight authority over all actions of the National Park Service.  Mr.

Kempthorne is sued in his official capacity.

9.    Defendant Mary Bomar is the Director of the National Park Service and, in that

capacity, has management responsibility for all actions of the National Park Service.  Ms. Bomar

is sued in her official capacity.

10.    Defendant Mike Snyder is Director of the Intermountain Region of the National Park

Service and, in that capacity, has management responsibility for Yellowstone and Grand Teton

National Parks, and the John D. Rockefeller, Jr. Memorial Parkway.  Mr. Snyder signed the

Record of Decision challenged in this action.  Mr. Snyder is sued in his official capacity.

## JURISDICTION AND VENUE

11.    This action arises under the National Park Service Organic Act, 16 U.S.C. §§ 1, et

seq.; the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq. ("NEPA"); and the

Administrative Procedure Act, 5 U.S.C. §§ 551, et seq. ("APA"), which waives Defendants'

sovereign immunity.

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331(federal

question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§

2201-2202.

13.    Venue lies in the District of the District of Columbia pursuant to 28 U.S.C. § 1391(e)

because Defendants Kempthorne and Bomar and Plaintiff The Wilderness Society reside in this

EXHIBIT G

District, and because a substantial part of the events and omissions giving rise to Plaintiffs' legal claims transpired in this District.

### The Legal Framework

14.  The Park Service has a conservation mandate under the National Park Service Organic Act and other federal statutes, regulations, Executive Orders, and Management Policies to afford Yellowstone's natural resources, including clean air and quiet, the very highest level of protection.

15.  Congress established Yellowstone National Park in 1872 as America's first National Park.  Its enabling legislation expressly requires the "preservation, from injury or spoliation, of … natural curiosities, or wonders, within the park, and their retention in their natural condition." 16 U.S.C. § 22.  Yellowstone and the other Parks have been set aside and are to be "preserved and managed for the benefit and inspiration of all the people of the United States[.]"  16 U.S.C. § 1a-1.

16.  The designation of Yellowstone National Park and the subsequent creation of the National Park System is a signal achievement of American society.  Following the creation of Yellowstone and the National Park System, "[s]cores of nations have preserved areas of natural beauty and historical worth so that all people will have the opportunity to reflect on their natural and cultural heritage and to return to nature and be spiritually reborn.  Of all the benefits resulting from the establishment of Yellowstone National Park, this may be the greatest."  See Yellowstone: A Brief History of the Park, available at http://www.nps.gov/yell/planyourvisit/upload/Yell257.pdf.

17.  With Yellowstone as a template, the National Park Service Organic Act of 1916 provides for the establishment of a national parks system, setting forth the Park Service's central mission "to conserve the scenery and the natural and historic objects and the wild life [within

EXHIBIT G

national parks] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.

18.   With the General Authorities Act, Congress "reaffirm[ed], declare[d], and direct[ed] that the promotion and regulation of the various areas of the National Park System … shall be consistent with and founded in the purpose established by [the Organic Act], to the common benefit of all the people of the United States."  Id. § 1a-1.   Congress further provided that "[t]he authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established[.]"  Id.

19.   This conservation mandate is further elaborated in the National Park Service Management Policies, which provide that the Park Service "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values."  NPS Management Policies 2006 § 1.4.3.  Specifically, the Park Service must "seek to perpetuate the best possible air quality in parks[,]" id. § 4.7.1, and "take action to prevent or minimize all noise that through frequency, magnitude, or duration adversely affects the natural soundscape or other park resources or values," id. § 4.9.

20.   With regard to snowmobile use in particular, Park Service regulations prohibit snowmobiling in the Parks except in designated areas where "their use is consistent with the [Parks'] natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources."  36 C.F.R. § 2.18(c).  As stated in the Park Service's Management Policies, where the use of motorized vehicles, such as snowmobiles, "is necessary and appropriate, the least impacting equipment, vehicles, and

6

EXHIBIT G

transportation systems should be used, consistent with public and employee safety."  NPS Management Policies 2006 § 8.2.3.

21.  Similarly, Executive Orders mandate that off-road vehicle use, including snowmobile use, "shall be located in areas of the National Park system … only if the respective agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values."  Exec. Order No. 11,644, 37 Fed. Reg. 2,877 (Feb. 8, 1972), as amended by Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 24, 1977).  If off-road vehicle use "will cause or is causing considerable adverse effects on … wildlife, wildlife habitat or cultural or historic resources[,]" park managers must "immediately close such areas or trails to the type of off-road vehicle causing such effects[.]"  Exec. Order No. 11,989, 42 Fed. Reg. at 26,959.

## FACTUAL BACKGROUND

22.  The suite of laws, regulations, and policies governing management of the National Parks clearly prohibits snowmobile use that degrades the natural integrity of the Parks.  Yet, for years now, the Park Service has accommodated snowmobiles at the expense of clean air, quiet, and wildlife.

### Snowmobile Use In Yellowstone

23.  In 1971, eight years after snowmobiles first entered the park, the National Park Service began grooming Yellowstone's snow-covered roads for use by snowmobiles and other oversnow vehicles.  Snowmobile usage steadily increased through the 1970s and 1980s, leading to complaints—from both visitors and Park Service personnel—regarding the noise, air pollution, and wildlife harassment caused by the machines.  By the early 1990s, snowmobile numbers were exceeding all agency projections, and the Park Service recognized that

EXHIBIT G

development of a new policy was necessary to address the adverse impacts caused by increasing snowmobile traffic in Yellowstone.

24. In 1994, the Park Service initiated a formal study of the impacts of winter recreation on the Parks. Three years later, as part of the settlement of a lawsuit brought by The Fund for Animals, the Park Service agreed to prepare a comprehensive Environmental Impact Statement ("EIS") addressing winter use.

25. The resulting 2000 EIS confirmed longstanding concerns about snowmobile use in Yellowstone. The EIS documented serious health hazards from snowmobile emissions; impaired visibility from the haze of snowmobile exhaust; persistent noise from snowmobile engines; and routine harassment of wildlife, especially bison already stressed by Yellowstone's harsh winter conditions. In light of these unacceptable adverse impacts, the Park Service "acknowledge[d] that [it had] not complied with the applicable legal requirements" of the National Park Service Organic Act, governing Executive Orders, regulations, and Management Policies. Final Rule, 66 Fed. Reg. 7,260 (Jan. 22, 2001).

### The 2001 Decision To Phase Out Snowmobile Use

26. The Park Service considered several regulatory approaches to bringing snowmobile use into compliance with the law. To this end, the Park Service analyzed the extent to which "best available technology" requirements could reduce air pollution and noise, and whether guided tour requirements could prevent wildlife harassment. Ultimately, however, the Park Service concluded and the U.S. Environmental Protection Agency ("EPA") independently confirmed that best available technology and guiding requirements would not prevent impairment from continued snowmobile use in Yellowstone.

EXHIBIT G

27.  As the Park Service explained, "[s]ome newer snowmobiles have promise for reducing some impacts, but not enough for the use of large numbers of those machines to be consistent with the applicable legal requirements." Id. at 7,260.  For instance, "[q]uieter snowmobiles are still noisy, and are audible at a greater distance than 4-track conversion snowcoaches." Id.  Thus, "[a]chieving compliance with the applicable legal requirements while still allowing snowmobile use would require very strict limits on the numbers of both snowmobiles and snowcoaches[,]" which "would sharply limit overall winter use of the parks[.]" Id. at 7,262.

28.  Faced with the task of maintaining historic levels of winter access without compromising air quality, quiet, and wildlife protection in the Parks, the Park Service developed a mass-transit plan that would phase out snowmobiles in favor of multi-passenger snowcoaches. On December 22, 2000, the Park Service issued a Record of Decision mandating a three-year transition to exclusive snowcoach access, see 65 Fed. Reg. 80,908 (Dec. 22, 2000), and on January 22, 2001, the Park Service published regulations implementing the new winter access plan in the Federal Register, see 66 Fed. Reg. at 7,260.

**The Subsequent SEIS Process**

29.  Six months later, following a change in presidential administrations, the Park Service agreed to prepare a supplemental EIS ("SEIS") to reconsider new technology as a fix for the Yellowstone snowmobile problem.  However, in keeping with the Park Service's previous assessment, the SEIS disclosed that continued snowmobile use would continue to threaten human health, impair visibility, disrupt the natural quiet, and unnecessarily disturb wildlife notwithstanding advances in snowmobile technology, caps on daily snowmobile entries, and guided tour requirements.  Once again, the Park Service concluded that a transition to

EXHIBIT G

snowcoaches would "best attain[] the widest range of beneficial uses of the environment without

degradation, [and] risk of health or safety by ensuring visitors to the park have appropriate

opportunities to experience and enjoy the parks in a safe manner that causes the least amount of

damage to the environment."  National Park Service, Winter Use Plans, Final Supplemental

Environmental Impact Statement, at 72 (Feb. 21, 2003) (internal quotations omitted).

30.  Despite its endorsement of the original plan to phase out snowmobiles, the Park

Service issued a March 25, 2003 Record of Decision ("ROD") to allow 1,140 daily snowmobile

entries into the Parks.  On December 11, 2003, the Park Service published regulations

implementing its new winter access plan in the Federal Register.  Final Rule, 68 Fed. Reg.

69,268 (Dec. 11, 2003).

### Litigation Over The 2003 Snowmobile Plan

31.  GYC and others challenged the 2003 ROD on grounds that the Park Service had

failed to explain adequately its decision in light of its previous conclusions that snowmobiles in

substantial numbers impair park resources and values.  Based on the adverse environmental

impacts disclosed in the SEIS, GYC further argued that the new plan violated the Organic Act

and other applicable legal requirements.

32.  On December 16, 2003, this Court granted GYC's motion for summary judgment,

holding that the Park Service had violated the Administrative Procedure Act, 5 U.S.C. § 706, in

failing to explain its decision to allow continued snowmobile use "[i]n light of its clear

conservation mandate, and the previous conclusion that snowmobile use amounted to unlawful

impairment[.]"  The Fund For Animals v. Norton, 294 F.Supp. 2d. 92, 108 (D.D.C. 2003).

Having invalidated the 2003 ROD, rule, and SEIS on APA grounds, the Court declined to reach

EXHIBIT G

GYC's substantive claims under the Organic Act and governing Executive Orders, regulations, and Management Policies.

33.   At the request of the Park Service, this Court ordered the agency to implement its previously planned snowmobile phase-out pending compliance with the Court's order on remand.

### Litigation Over The Original 2001 Snowmobile Phase-Out

34.   After the D.C. Circuit Court of Appeals declined to grant an emergency stay of this Court's December 16, 2003 Order, two intervenor-defendants in the litigation before this Court, the International Snowmobile Manufacturers Association ("ISMA") and the State of Wyoming, reopened a case challenging the 2001 phase-out rule in Wyoming District Court.  On February 10, 2004, the Wyoming District Court preliminarily enjoined further implementation of the phase-out and ordered the Park Service to promulgate new rules governing the remainder of the 2003-2004 winter season.  See Int'l Snowmobile Mfrs. Ass'n v. Norton, 304 F.Supp. 2d 1,278, 1,294 (D. Wy. 2004).

35.   The Park Service then adopted a temporary rule applicable for three winter seasons, beginning 2004-2005 (the "2004 Rule").  See Final Rule, 69 Fed. Reg. 65,348 (Nov. 10, 2004). The 2004 Rule permitted 720 snowmobiles per day in Yellowstone.  The Rule also required that all snowmobile users be accompanied by a commercial guide and that all recreational snowmobiles meet "best available technology" requirements.  Several litigants challenged the 2004 Rule in both the Wyoming District Court and the D.C. District Court, but neither Court invalidated the 2004 Rule.

36.   At the time that it adopted the 2004 Rule, the Park Service stated that it planned to conduct further studies concerning the impact of snowmobiles on Yellowstone while the

EXHIBIT G

temporary rule was in effect, with the goal of enacting a permanent rule based on the findings of those further studies.

37. While the 2004 Rule authorized up to 720 snowmobiles per day in Yellowstone, actual use during the past three winter seasons has only been approximately 250 snowmobiles per day. This significantly reduced number of snowmobiles has resulted in markedly improved park health, with cleaner air, less impact on wildlife, quieter soundscapes, sharper views, and a more positive park experience for visitors. Even at these levels, however, Park Service monitoring identifies continued adverse impacts to Yellowstone's soundscapes and wildlife.

### The 2007 Snowmobile Decision

38. In March 2007, the Park Service released a draft environmental impact statement (the "DEIS") regarding a new, permanent management plan for winter access in the Parks. See National Park Service, Winter Use Plans, Draft Environmental Impact Statement (Mar. 2007). The DEIS described the further studies that the Park Service had conducted since adopting the 2004 Rule and evaluated six alternative approaches to winter access in Yellowstone. See id. One of those alternatives was to eliminate the use of snowmobiles in favor of continued public access through a system of multi-passenger, best-available-technology snowcoaches. See id. at 40.

39. Despite the fact that the snowcoach alternative preserved park resources in ways that continued snowmobile operations could not, the Park Service's preferred alternative in its September 2007 final EIS ("FEIS") was a 540 snowmobiles per day in Yellowstone alternative.

40. After completion and release of the FEIS, the Park Service signed a Record of Decision authorizing continued recreational snowmobiling in the Parks and, on this date, released that decision to the public.

EXHIBIT G

## FIRST CAUSE OF ACTION
### Violation of NEPA

41.  All preceding paragraphs are incorporated as if fully set forth herein.

42.  Under NEPA, federal agencies must prepare an EIS for major Federal actions that they undertake that will significantly affect the human environment.  42 U.S.C. § 4332(2)(C). NEPA's implementing regulations provide that an EIS must "state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of [NEPA] and other environmental laws and policies[,]" 40 C.F.R. § 1502.2(d), and that federal agencies "shall concentrate effort and attention on important issues," id. § 1502.15.  Ultimately, an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," thereby "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  Id. § 1502.14.

43.  The Snowmobile EIS fails to disclose the true environmental impacts of the various alternatives because its environmental analysis is structured around an assessment of whether each alternative is an improvement over deplorable historic conditions.  By structuring its environmental analysis in this fashion, the Park Service obscured the assessment of whether any given alternative was consistent with the Service's obligation to prevent unacceptable impacts and impairment of park resources.  Under this analytical framework, instead of evaluating whether an alternative violated the laws, regulations, and policies governing snowmobiling in a national park, the Park Service evaluated only whether each alternative was better than the deplorable historic conditions that have not been seen for four years.

44.  Nowhere in the EIS did the Park Service demonstrate why or how it determined that any improvement over a violation of multiple environmental laws and policies would itself

13

EXHIBIT G

comply with those same laws and policies. The EIS and ROD are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law. See 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION
### Violation of NEPA

45. All preceding paragraphs are incorporated as if fully set forth herein.

46. In its Snowmobile EIS, the Park Service failed to evaluate meaningfully the degradation of the Parks' natural soundscapes that would be caused by each of the various alternatives. As stated in the EIS, the National Park Service Organic Act "was written and enacted in an environment in which it was clear that the American people wanted places to go that were undisturbed and natural and which offered a retreat from the rigors and stresses of everyday life." National Park Service, Winter Use Plans, Final Environmental Impact Statement, at 137 (Sep. 2007). Thus, "inappropriate sound or noise is clearly an issue to be addressed when considering a proposal for use and enjoyment of the national parks. Natural quiet, or natural sound conditions that would prevail without human presence, is an appropriate baseline from which to gauge the impacts of human use." Id.

47. In spite of this language, the Park Service's final EIS—which concludes that none of the discussed alternatives would impair the Parks' natural soundscapes—largely relies on an "overall park perspective" incapable of assessing the impact of the alternatives on the natural soundscape in those areas frequented by winter visitors. Under the Park Service's standard, an alternative has a "major impact" on a park's natural soundscape when snowmobile noise is audible in more than twenty percent of the "total park." Id. at 304, 342. This standard fails to distinguish between those areas in which visitors are generally present during the winter season (areas that are, in fact, frequented by snowmobiles) and those areas in which visitors are rarely present during the winter season. The standard is accordingly unable to assess the impact it was

EXHIBIT G

designed to measure, and the EIS thereby fails to determine and disclose whether the Park

Service's selected alternative will comply with the environmental laws and policies governing

the National Park System, including the Organic Act. The EIS and ROD are accordingly

arbitrary, capricious, an abuse of discretion, and not in accordance with law. See 5 U.S.C. §

706(2)(A).

### THIRD CAUSE OF ACTION
### Violation of NEPA

48. All preceding paragraphs are incorporated as if fully set forth herein.

49. Under the Park Service's own regulations, snowmobile use may be allowed within

the Parks only "where designated and only when their use … will not *disturb* wildlife[.]" 36

C.F.R. § 2.18(c) (emphasis added). Thus, as the Park Service acknowledged in its February

2003 Final SEIS, "park policies, regulations, and EOs clearly state that disturbance to wildlife,

regardless of population-level effects, is unacceptable in the national parks." National Park

Service, Winter Use Plans, Final Supplemental Environmental Impact Statement, at 206. The

Park Service's EIS, however, disregards this requirement in attempting to assess the various

alternatives, no more than "acknowledg[ing] that adverse impacts to individual animals should

be minimized[.]" Final EIS, at 251. As stated in the EIS, "the focus of [the Service's] analysis is

predominantly the impact [of each alternative] on wildlife populations[.]" Id. Accordingly,

under the standards applied by the Park Service, an alternative is considered to have a "major"

impact on wildlife only where its "effect will be measurable and have a substantial and possibly

permanent consequence to the population." Id. at 257. By excluding from its analysis any

genuine consideration of the individual disturbances of wildlife that would result under each of

the assessed alternatives, the Park Service failed to address how the alternatives would or would

not "achieve the requirements" of Section 2.18(c) and other laws and policies. See 40 C.F.R. §

15

EXHIBIT G

1502.2(d).  The EIS and ROD are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

**FOURTH CAUSE OF ACTION**
**Unexplained Departure**

50.  All preceding paragraphs are incorporated as if fully set forth herein.

51.  Only seven years ago, the Park Service issued a Record of Decision concluding that every alternative providing for snowmobile use would result in the impairment of park resources and values.  In 2003, this Court vacated a subsequent Park Service supplemental EIS and Record of Decision authorizing snowmobile use within the Parks, concluding that the Service had failed to explain adequately its change in position and thus acted arbitrary and capriciously.  See The Fund for Animals, 294 F.Supp. 2d at 108.  Now, the Park Service has again issued an EIS and ROD at odds with its first considered view on the impacts of snowmobile use on park resources and values.  Having again failed to explain adequately its reversal, the Park Service has neglected to determine and disclose whether its selected alternative will comply with the environmental laws and policies governing the National Park System, and deprived decisionmakers of a clear basis for decision.  The EIS and ROD are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

    1) Declare that the snowmobile ROD and FEIS are unlawful and set them aside;

    2) Enjoin implementation of the ROD following the 2007-2008 winter season;

    3) Remand the matter to the National Park Service;

    4) Award Plaintiffs their attorneys' fees and costs; and

EXHIBIT G

5) Grant Plaintiffs such other and further relief as the Court may deem proper.

Respectfully submitted this __th day of November, 2007,

_____
Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
Greater Yellowstone Coalition, et al.

EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                              )
GREATER YELLOWSTONE COALITION                  )
13 South Willson Avenue, Suite 2                        )
Bozeman, MT  59715;                                       )
                                                              )
THE WILDERNESS SOCIETY                            )
1615 M Street NW                                           )
Washington, DC 20036;                                    )
                                                              )
NATURAL RESOURCES DEFENSE COUNCIL       )
40 West 20th Street                                         )
New York, NY 10011;                                      )          Case No. 07-cv-2111 (EGS)
                                                              )
WINTER WILDLANDS ALLIANCE                       )
910 Main Street, Suite 235                                )
Boise, ID 83702;                                            )
                                                              )
SIERRA CLUB                                               )
85 Second Street, 2nd Floor                             )
San Francisco, CA  94105;                               )
                                                              )
        Plaintiffs,                                            )
                                                              )
            vs.                                                )
                                                              )
DIRK KEMPTHORNE, in his official capacity as     )
Secretary of Interior; MARY BOMAR, in her official )
capacity as Director of the National Park Service; and )
MIKE SNYDER, in his official capacity as Director  )
of the Intermountain Region of the U.S. National Park )
Service,                                                       )
                                                              )
        Defendants.                                         )
_____ )

**FIRST AMENDED AND SUPPLEMENTED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     Plaintiffs Greater Yellowstone Coalition, et al. challenge the National Park Service's

decision to allow continued snowmobile use in Yellowstone and Grand Teton National Parks and

EXHIBIT H

the John D. Rockefeller, Jr. Memorial Parkway (collectively "Yellowstone" or "the Parks").

Despite a bevy of laws, regulations, and policies that should prevent this result, the Park Service

has authorized recreational snowmobiling in Yellowstone at a level that will impair or

unacceptably impact park resources.  The environmental analysis used to justify the Park

Service's action fails to assess accurately how such levels of recreational snowmobile use and a

range of other studied alternatives comport with the governing law, and frustrates the purposes of

full environmental disclosure and analysis.  Rather than preserving the Parks as a sanctuary for

wildlife, natural processes, and humans alike, the action contravenes the Park Service's

affirmative responsibility to protect wildlife and natural soundscapes, and to secure the best

possible air quality.  By granting damaging snowmobile use priority over other, less injurious

forms of public access, the Park Service has impaired the park experience for all winter visitors.

The Park Service's environmental analysis, decision, and rule, therefore, cannot be allowed to

stand.

## PARTIES

2.     Plaintiff Greater Yellowstone Coalition ("GYC") is a conservation organization

dedicated to protecting and restoring the Greater Yellowstone Ecosystem and the unique quality

of life it sustains.  Central to GYC's mission is maintaining the integrity of the national parks

that are the core of the larger ecosystem.  Formed in 1983, GYC is a non-profit corporation and

has approximately 9,000 members, many of whom regularly use and enjoy Yellowstone and

Grand Teton National Parks.

3.     Plaintiff The Wilderness Society ("TWS") is a non-profit organization dedicated to

protecting a national network of wild lands and fostering an American land ethic.  TWS works to

ensure wise management and protection of America's public lands, including Yellowstone.

EXHIBIT H

Founded in 1935, TWS has approximately 200,000 members, many of whom regularly use and enjoy Yellowstone and Grand Teton National Parks.

4.   Plaintiff Natural Resources Defense Council ("NRDC") is a non-profit organization that uses law, science, and the support of more than 1.2 million members and online activists to protect the planet's wildlife and wild places, and to ensure a safe and healthy environment. NRDC and its members have a longstanding interest in preserving Yellowstone's unique natural resources, including the integrity of visitor experience.

5.   Plaintiff Winter Wildlands Alliance is a non-profit organization that advocates nationally for non-motorized backcountry winter recreation.  Representing more than 1,100 individual members and 28 grassroots groups to promote human-powered snowsports activities, Winter Wildlands Alliance works with federal, regional, and local land managers to resolve user conflicts on public lands and to promote a quality backcountry winter recreation experience on those lands.

6.   Plaintiff Sierra Club is a national conservation organization with more than 700,000 members.  Founded in 1892, its mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist humanity to protect and to restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

7.   Members of each of the Plaintiff organizations visit the Parks in winter to observe wildlife, ski and snowshoe, and to enjoy the spectacular scenery and natural quiet.  Even from afar, members of each of the Plaintiff groups take an active interest in maintaining the integrity of the National Park System.  The Park Service's authorization of snowmobile use and inadequate environmental analysis cause direct, irreparable injury to the recreational, aesthetic,

EXHIBIT H

and conservation interests of members of the Plaintiff organizations.  These injuries are fairly

traceable to the challenged EIS, Record of Decision, and Final Rule, and are redressable through

this action to invalidate the EIS, Record of Decision, and Final Rule.  Plaintiffs have no adequate

remedy at law.

8.    Defendant Dirk Kempthorne is the Secretary of the U.S. Department of Interior and,

in that capacity, has oversight authority over all actions of the National Park Service.  Mr.

Kempthorne is sued in his official capacity.

9.    Defendant Mary Bomar is the Director of the National Park Service and, in that

capacity, has management responsibility for all actions of the National Park Service.  Ms. Bomar

is sued in her official capacity.

10.   Defendant Mike Snyder is Director of the Intermountain Region of the National Park

Service and, in that capacity, has management responsibility for Yellowstone and Grand Teton

National Parks, and the John D. Rockefeller, Jr. Memorial Parkway.  Mr. Snyder signed the

Record of Decision challenged in this action.  Mr. Snyder is sued in his official capacity.

### JURISDICTION AND VENUE

11.   This action arises under the National Park Service Organic Act, 16 U.S.C. §§ 1, et

seq.; the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq. ("NEPA"); and the

Administrative Procedure Act, 5 U.S.C. §§ 551, et seq. ("APA"), which waives Defendants'

sovereign immunity.

12.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§

2201-2202.

EXHIBIT H

13.   Venue lies in the District of the District of Columbia pursuant to 28 U.S.C. § 1391(e) because Defendants Kempthorne and Bomar and Plaintiff The Wilderness Society reside in this District, and because a substantial part of the events and omissions giving rise to Plaintiffs' legal claims transpired in this District.

## THE LEGAL FRAMEWORK

14.   The Park Service has a conservation mandate under the National Park Service Organic Act and other federal statutes, regulations, Executive Orders, and NPS Management Policies to afford Yellowstone's natural resources, including wildlife, clean air, and quiet, the very highest level of protection.

15.   Congress established Yellowstone National Park in 1872 as America's first national park.  Its enabling legislation expressly requires the "preservation, from injury or spoliation, of … natural curiosities, or wonders, within the park, and their retention in their natural condition." 16 U.S.C. § 22.  Yellowstone and the other national parks have been set aside and are to be "preserved and managed for the benefit and inspiration of all the people of the United States[.]" 16 U.S.C. § 1a-1.

16.   The designation of Yellowstone National Park and the subsequent creation of the National Park System is a signal achievement of American society.  Following the creation of Yellowstone and the National Park System, "[s]cores of nations have preserved areas of natural beauty and historical worth so that all people will have the opportunity to reflect on their natural and cultural heritage and to return to nature and be spiritually reborn.  Of all the benefits resulting from the establishment of Yellowstone National Park, this may be the greatest." See Yellowstone: A Brief History of the Park, available at http://www.nps.gov/yell/planyourvisit/upload/Yell257.pdf.

EXHIBIT H

17.   With Yellowstone as a template, the National Park Service Organic Act of 1916 provides for the establishment of a National Park System, setting forth the Park Service's central mission "to conserve the scenery and the natural and historic objects and the wild life [within national parks] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.

18.   With the General Authorities Act, Congress "reaffirm[ed], declare[d], and direct[ed] that the promotion and regulation of the various areas of the National Park System … shall be consistent with and founded in the purpose established by [the Organic Act], to the common benefit of all the people of the United States."  Id. § 1a-1.  Congress further provided that "[t]he authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established[.]"  Id.  Congress, in short, "recogniz[ed] that the enjoyment by future generations of the national parks can be ensured only if the superb quality of park resources and values is left unimpaired," and "provided that when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant."  NPS Management Policies 2006 § 1.4.3.

19.   This conservation mandate is further elaborated in the National Park Service Management Policies, which provide that "[t]he fundamental purpose of the national park system … begins with a mandate to conserve park resources and values" and, thus, the Park Service "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values."  Id. § 1.4.3.  Specifically, the Park Service must "minimize[e] human impacts on native plants, animals, populations, communities, and

EXHIBIT H

ecosystems," id. § 4.4.1, "seek to perpetuate the best possible air quality in parks[,]" id. § 4.7.1, and "take action to prevent or minimize all noise that through frequency, magnitude, or duration adversely affects the natural soundscape or other park resources or values," id. § 4.9.

20.   With regard to snowmobile use in particular, Park Service regulations prohibit snowmobiling in the Parks except in designated areas where "their use is consistent with the [Parks'] natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources."  36 C.F.R. § 2.18(c); see also NPS Management Policies 2006 § 8.2.3.2.  As stated in the Park Service's Management Policies, where the use of motorized vehicles, such as snowmobiles, "is necessary and appropriate, the least impacting equipment, vehicles, and transportation systems should be used, consistent with public and employee safety."  NPS Management Policies 2006 § 8.2.3.

21.   Similarly, Executive Orders mandate that off-road vehicle use, including snowmobile use, "be located in areas of the National Park system … only if the respective agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values."  Exec. Order No. 11,644, 37 Fed. Reg. 2,877 (Feb. 8, 1972), as amended by Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 24, 1977); see also NPS Management Policies 2006 § 8.2.3.2.  If off-road vehicle use "will cause or is causing considerable adverse effects on … wildlife, wildlife habitat or cultural or historic resources[,]" park managers must "immediately close such areas or trails to the type of off-road vehicle causing such effects[.]"  Exec. Order No. 11,989, 42 Fed. Reg. at 26,959.

## FACTUAL BACKGROUND

22.   The suite of laws, regulations, and policies governing management of the national parks clearly prohibits snowmobile use that degrades the natural integrity of the Parks.  Yet, for

EXHIBIT H

years now, the Park Service has accommodated snowmobiles at the expense of clean air, quiet, and wildlife.

### Snowmobile Use In Yellowstone

23.  In 1971, eight years after snowmobiles first entered the park, the National Park Service began grooming Yellowstone's snow-covered roads for use by snowmobiles and other oversnow vehicles.  Snowmobile usage steadily increased through the 1970s and 1980s, leading to complaints—from both visitors and Park Service personnel—regarding the noise, air pollution, and wildlife harassment caused by the machines.  By the early 1990s, snowmobile numbers were exceeding all agency projections, and the Park Service recognized that development of a new policy was necessary to address the adverse impacts caused by increasing snowmobile traffic in Yellowstone.

24.  In 1994, the Park Service initiated a formal study of the impacts of winter recreation on the Parks.  Three years later, as part of the settlement of a lawsuit brought in this Court by The Fund for Animals, the Park Service agreed to prepare a comprehensive Environmental Impact Statement ("EIS") addressing winter use.

25.  The resulting 2000 EIS confirmed longstanding concerns about snowmobile use in Yellowstone.  The EIS documented serious health hazards from snowmobile emissions; impaired visibility from the haze of snowmobile exhaust; persistent noise from snowmobile engines; and routine harassment of wildlife already stressed by Yellowstone's harsh winter conditions.  In light of the impairment that had resulted from recreational snowmobiling within the Parks, the Park Service "acknowledge[d] that [it had] not complied with the applicable legal requirements" of the National Park Service Organic Act, governing Executive Orders, regulations, and the agency's Management Policies.  Final Rule, 66 Fed. Reg. 7,260 (Jan. 22, 2001).

EXHIBIT H

## The 2001 Decision To Phase Out Snowmobile Use

26.   The Park Service considered several regulatory approaches to bringing snowmobile use into compliance with the law.  To this end, the Park Service analyzed the extent to which "best available technology" requirements could reduce air pollution and noise, and whether guided tour requirements could prevent wildlife harassment.  Ultimately, however, the Park Service concluded—and the U.S. Environmental Protection Agency independently confirmed— that "best available technology" and guiding requirements would not prevent impairment from continued snowmobile use in Yellowstone.

27.   As the Park Service explained, "[s]ome newer snowmobiles have promise for reducing some impacts, but not enough for the use of large numbers of those machines to be consistent with the applicable legal requirements."  Id. at 7,260.  For instance, "[q]uieter snowmobiles are still noisy, and are audible at a greater distance than 4-track conversion snowcoaches."  Id.  Thus, "[a]chieving compliance with the applicable legal requirements while still allowing snowmobile use would require very strict limits on the numbers of both snowmobiles and snowcoaches[,]" which "would sharply limit overall winter use of the parks[.]" Id. at 7,262.

28.   Faced with the task of maintaining historic levels of winter access without compromising air quality, quiet, and wildlife protection in the Parks, the Park Service developed an access plan that would phase out snowmobiles in favor of multi-passenger snowcoaches.  On December 22, 2000, the Park Service issued a Record of Decision mandating a three-year transition to snowcoach access, see 65 Fed. Reg. 80,908 (Dec. 22, 2000), and on January 22, 2001, the Park Service published regulations implementing the new winter access plan, see 66 Fed. Reg. at 7,260.

9

EXHIBIT H

**The Subsequent SEIS Process**

29.  Six months later, following a change in presidential administrations, the Park Service agreed to prepare a supplemental EIS ("SEIS") to reconsider new technology as a fix for the Yellowstone snowmobile problem.  However, in keeping with the Park Service's previous assessment, the resulting SEIS disclosed that continued snowmobile use would continue to threaten human health, impair visibility, disrupt the natural quiet, and unnecessarily disturb wildlife notwithstanding advances in snowmobile technology, caps on daily snowmobile entries, and guided tour requirements.  Once again, the Park Service concluded that a transition to snowcoaches would "best attain[] the widest range of beneficial uses of the environment without degradation, [and] risk of health or safety by ensuring visitors to the park have appropriate opportunities to experience and enjoy the parks in a safe manner that causes the least amount of damage to the environment."  National Park Service, Winter Use Plans, Final Supplemental Environmental Impact Statement, at 72 (Feb. 21, 2003) (internal quotations omitted).

30.  Despite its endorsement of the original plan to phase out snowmobiles, the Park Service issued a March 25, 2003 Record of Decision ("ROD") to allow 950 daily snowmobile entries into Yellowstone.  On December 11, 2003, the Park Service published regulations implementing its new winter use plan.  Final Rule, 68 Fed. Reg. 69,268 (Dec. 11, 2003).

**Litigation Over The 2003 Snowmobile Plan**

31.  GYC and others challenged the 2003 ROD on grounds that the Park Service had failed to explain adequately its decision in light of its previous conclusion that snowmobiles in substantial numbers impair park resources and values.  Based on the adverse environmental impacts disclosed in the SEIS, GYC further argued that the new plan violated the Organic Act and other applicable legal requirements.

EXHIBIT H

32.   On December 16, 2003, this Court granted GYC's motion for summary judgment, holding that the Park Service had acted arbitrarily and capriciously in failing to explain its decision to allow continued snowmobile use "[i]n light of its clear conservation mandate, and the previous conclusion that snowmobile use amounted to unlawful impairment[.]"  The Fund For Animals v. Norton, 294 F.Supp. 2d. 92, 108 (D.D.C. 2003).  Having invalidated the 2003 SEIS, ROD, and rule, the Court declined to reach GYC's substantive claims under the Organic Act and governing Executive Orders, regulations, and NPS Management Policies.

33.   At the request of the Park Service, this Court ordered the agency to implement its previously planned snowmobile phase-out pending compliance with the Court's order on remand.

### Litigation Over The Original 2001 Snowmobile Phase-Out

34.   After the D.C. Circuit Court of Appeals declined to grant an emergency stay of this Court's December 16, 2003 Order, two intervenor-defendants in the litigation before this Court—the International Snowmobile Manufacturers Association ("ISMA") and the State of Wyoming—reopened a case challenging the 2001 phase-out rule in Wyoming District Court.  On February 10, 2004, the Wyoming District Court preliminarily enjoined further implementation of the phase-out and ordered the Park Service to promulgate new rules governing the remainder of the 2003-2004 winter season.  See Int'l Snowmobile Mfrs. Ass'n v. Norton, 304 F.Supp. 2d 1,278, 1,294 (D. Wy. 2004).

35.   The Park Service then adopted a temporary rule applicable for three winter seasons, beginning 2004-2005 (the "2004 Rule").  See Final Rule, 69 Fed. Reg. 65,348 (Nov. 10, 2004). The 2004 Rule permitted 720 snowmobiles per day in Yellowstone.  The rule also required that all snowmobile users be accompanied by a commercial guide and that all recreational

EXHIBIT H

snowmobiles meet "best available technology" requirements. Several litigants challenged the 2004 Rule in the Wyoming District Court and the D.C. District Court, but neither Court invalidated the regulation.

36. At the time that it adopted the 2004 Rule, the Park Service stated that it planned to conduct further studies concerning the impact of snowmobiles on Yellowstone while the temporary rule was in effect, with the goal of enacting a permanent rule based on the findings of those further studies.

37. While the 2004 Rule authorized up to 720 snowmobiles per day in Yellowstone, actual use during the three winter seasons governed by the 2004 Rule was approximately 260 snowmobiles per day. This significantly reduced number of snowmobiles has resulted in markedly improved park health, with cleaner air, less impact on wildlife, quieter soundscapes, sharper views, and a more positive park experience for visitors. Even at these levels, however, Park Service monitoring has identified continued adverse impacts to Yellowstone.

### The 2007 Snowmobile Decision

38. In March 2007, the Park Service released a draft environmental impact statement ("DEIS") regarding a new, permanent management plan for winter access in the Parks. See National Park Service, Winter Use Plans, Draft Environmental Impact Statement (Mar. 2007). The DEIS described the further studies that the Park Service had conducted since adopting the 2004 Rule and evaluated six alternative approaches to winter access in Yellowstone. See id. One of those alternatives was to eliminate the use of snowmobiles in favor of continued public access through a system of multi-passenger, best-available-technology snowcoaches. See id. at 40.

EXHIBIT H

39. Citing the documented adverse impacts of recreational snowmobiling on the Parks and the improvements that had followed from the reduced snowmobile numbers of recent seasons, a vast majority of those who commented on the DEIS favored the snowcoach alternative.  The Park Service, however, did not.  Though having determined only seven years before that recreational snowmobiling had impaired park resources and values, the Park Service concluded in its September 2007 final EIS ("FEIS") that none of the considered alternatives— even an "expanded recreational use" option providing for an increase in recreational snowmobiling over historic numbers—would result in impairment.  National Park Service, Winter Use Plans, Final Environmental Impact Statement (Sep. 2007), at 365-73.  As its preferred alternative in the FEIS, the Park Service selected a plan providing for 540 snowmobiles each day in Yellowstone, subject to guiding and "best available technology" requirements.  Id. at 60-65.

40.  On November 20, 2007, National Park Service Intermountain Regional Director Michael D. Snyder signed a Record of Decision adopting the agency's preferred alternative.  See National Park Service, Winter Use Plans, Record of Decision (Nov. 2007).  In its decision, the Park Service acknowledged that recreational snowmobiling within the Parks had long resulted in the impairment of natural soundscapes, wildlife, air quality, visitor experience, and the health and safety of both the public and Park employees.  Id. at 3, 19, 30.  The Park Service further admitted that safety and management thresholds for air quality and noise had been approached or exceeded in recent winter seasons, during which snowmobile numbers were significantly below "historic" averages and the public demand to use snowmobiles was significantly below the level authorized in the 2004 Rule.  Id. at 20-21.  The benefits of reduced recreational snowmobiling were, in a word, obvious.  In terms of air quality alone, the Park Service conceded that,

EXHIBIT H

"[c]learly, reducing the daily snowmobile numbers will better protect park air quality."  Id. at 21.

Nonetheless, the Park Service concluded that neither impairment nor unacceptable impacts

would result from a doubling of recent levels of recreational snowmobiling within the Parks—an

expansion of use that would, among other things, increase vehicle emissions over present levels.

Id. at 21, 39.  In reaching this conclusion, the Park Service largely relied on the reduced impacts

of its preferred alternative relative to "historical conditions," thereby discounting the increase in

adverse impacts that would result from an expansion in recreational snowmobiling within the

Parks.  See id. at 30-34.  As "not all visitors enjoy the group travel experience provided by

snowcoach tours, or the fact that snowcoach travel is slower than snowmobile travel[,]" the Park

Service declined to give the snowcoach alternative serious consideration.  Id. at 23.

41.  The Park Service published its Final Rule on December 13, 2007—six days prior to

the opening of the Parks' 2007-2008 winter season.  See Final Rule, 72 Fed. Reg. 70,781 (Dec.

13, 2007).  With the regulation, the Park Service authorized the recreational use of 540

snowmobiles in Yellowstone each day, approximately twice the number present on park roads in

recent seasons.  See id.  The Park Service declined, however, to cast the regulation as one

authorizing an expansion of recreational snowmobiling within the Parks.  Instead, after

acknowledging that recent reductions in snowmobile use had "resulted in quieter conditions,

cleaner air, fewer wildlife impacts, and much improved visitor and employee safety and

experiences[,]" the Park Service declared that its regulation "reduce[d] the daily number of

snowmobiles allowed to enter the Parks in order to better protect park soundscapes and other

resources[.]"  Id. at 70,782.  In making this declaration, the Park Service even suggested that the

"reduction" it implemented would somehow alleviate the adverse soundscape impacts

documented during recent seasons, stating that "the lower number of snowmobiles [authorized]

EXHIBIT H

will reduce the impacts on the natural soundscapes of the park, which [had been] found to be somewhat greater than expected even with the reduced number of snowmobiles that used the park over the last several winters."  Id. at 70,783.  The Park Service's discussion of the snowcoach alternative was similarly strained.  While conceding that snowcoaches "can be substantially cleaner" than four-stroke snowmobiles, id. at 70,785, the Park Service concluded that snowmobile use was simply "part of an appropriate range of winter activities[,]" id. at 70,791.  "Snowcoaches and snowmobiles[,]" for one, "provide two very different types of experiences for park visitors seeking to enjoy Yellowstone during the winter."  Id. at 70,787.  "The use of both types of travel[,]" moreover, was "well-established in the Parks, extending back more than 4 decades."  Id.  On these grounds, the Park Service concluded that an effective expansion of recreational snowmobiling within the Parks was consistent with the conservation mandate imposed by federal statutes, regulations, Executive Orders and policies.

**FIRST CAUSE OF ACTION**
**Violation of the National Park Service Organic Act**

42.   All preceding paragraphs are hereby incorporated as if fully set forth herein.

43.   Under the National Park Service Organic Act, 16 U.S.C. § 1, et seq., the Park Service cannot authorize activities that would result in the impairment of park resources or values.  16 U.S.C. § 1.  Similarly, 16 U.S.C. § 22 requires the Secretary of Interior to preserve the natural wonders of Yellowstone in their natural condition, free from injury or spoliation.  National Park Service Management Policies accordingly provide that the agency "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values."  NPS Management Policies 2006 § 1.4.3.  Specifically, the Park Service must "minimize[e] human impacts on native plants, animals, populations, communities, and ecosystems," id. § 4.4.1, "seek to perpetuate the best possible air quality in parks[,]" id. § 4.7.1,

15

EXHIBIT H

and "take action to prevent or minimize all noise that through frequency, magnitude, or duration adversely affects the natural soundscape or other park resources or values," id. § 4.9.

44.   Only seven years ago, the Park Service acknowledged that substantial numbers of snowmobiles could not be permitted in the Parks without impairing park resources and values—even with "best available technology" and guiding requirements.  Subsequent studies have confirmed this conclusion, resulting in recommendations from the agency's own scientists that snowmobile numbers be maintained at or reduced from those seen in recent seasons.  In its 2007 FEIS, ROD, and rule, the Park Service nonetheless declares that wildlife, air quality, natural soundscapes, and other resources will not be impaired as the result of a doubling of recreational snowmobile use within Yellowstone.  The Park Service's non-impairment finding is at odds with the agency's own determination that recreational snowmobile use at approved levels will, among other things, increase noise and air pollution throughout Yellowstone, disturb wildlife, and pose health risks to visitors and park employees.  Moreover, as daily snowmobile entries into the Parks have been well below those authorized under the 2004 Rule, the Park Service's authorization of expanded recreational snowmobiling cannot be squared with the limited public demand for so damaging a means of access to the Parks.  The Park Service, in short, has authorized recreational snowmobile use that will result in the impairment of park resources and values, in contravention of the Service's own Organic Act, the General Authorities Act, and the statute establishing Yellowstone National Park.  The Park Service's ROD and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

### SECOND CAUSE OF ACTION
### Violation of Governing Executive Orders

45.   All preceding paragraphs are hereby incorporated as if fully set forth herein.

EXHIBIT H

46.  Under Executive Orders 11,644 and 11,989, the Park Service may authorize snowmobiling in the Parks only when it "will not adversely affect their natural, aesthetic, or scenic values."  Exec. Order No. 11,644, 37 Fed. Reg. at 2,877.  Further, the Park Service must "immediately close" areas and trails to snowmobiling if use "will cause or is causing considerable adverse effects on … wildlife, wildlife habitat or cultural or historic resources[.]"  Exec. Order 11,989, 52 Fed. Reg. at 34,617.

47.  Recreational snowmobile use in the Parks pursuant to the Park Service's ROD and rule will adversely affect wildlife, public health, air quality, and natural quiet in the Parks.  Authorizing snowmobile use in the face of these adverse impacts to Yellowstone's natural, aesthetic, and scenic values violates the mandates set forth in Executive Orders 11,644 and 11,989.  The Park Service's ROD and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
### Violation of Park Service Regulations

48.  All preceding paragraphs are hereby incorporated as if fully set forth herein.

49.  In keeping with the governing federal statutes and Executive Orders, Park Service regulations prohibit snowmobiling in the Parks except in designated areas where "their use is consistent with the [Parks'] natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources."  36 C.F.R. § 2.18(c).

50.  In authorizing snowmobile use that will adversely affect wildlife, public health, air quality, and natural quiet in the Parks, the Park Service violated its own snowmobile regulations.  The Park Service's ROD and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

17

EXHIBIT H

## FOURTH CAUSE OF ACTION
### Violation of NEPA

51.  All preceding paragraphs are incorporated as if fully set forth herein.

52.  Under NEPA, federal agencies must prepare an EIS for major actions that they undertake that will significantly affect the human environment.  42 U.S.C. § 4332(2)(C).  NEPA's implementing regulations provide that an EIS must "state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of [NEPA] and other environmental laws and policies[,]" 40 C.F.R. § 1502.2(d), and that federal agencies "shall concentrate effort and attention on important issues," id. § 1502.15.  Ultimately, an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," thereby "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  Id. § 1502.14.

53.  The Park Service's FEIS fails to disclose the true environmental impacts of the various alternatives because its environmental analysis is structured around an assessment of whether each alternative is an improvement over deplorable historic conditions.  By structuring its environmental analysis in this fashion, the Park Service obscured the assessment of whether any given alternative was consistent with the Service's obligation to prevent unacceptable impacts on and impairment of park resources and values.  Under this analytical framework, instead of evaluating whether an alternative violated the laws, regulations, and policies governing snowmobiling in a national park, the Park Service evaluated only whether each alternative was better than the "historic conditions" that have not been seen for four years.

54.  Nowhere in the FEIS did the Park Service demonstrate why or how it determined that any improvement over a violation of multiple environmental laws and policies would itself

18

comply with those same laws and policies.  The FEIS, ROD, and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION
### Violation of NEPA

55.  All preceding paragraphs are incorporated as if fully set forth herein.

56.  In its FEIS, the Park Service failed to evaluate meaningfully the degradation of the Parks' natural soundscapes that would be caused by each of the various alternatives.  As stated in the FEIS, the National Park Service Organic Act "was written and enacted in an environment in which it was clear that the American people wanted places to go that were undisturbed and natural and which offered a retreat from the rigors and stresses of everyday life."  National Park Service, Winter Use Plans, Final Environmental Impact Statement, at 137 (Sep. 2007).  Thus, "inappropriate sound or noise is clearly an issue to be addressed when considering a proposal for use and enjoyment of the national parks.  Natural quiet, or natural sound conditions that would prevail without human presence, is an appropriate baseline from which to gauge the impacts of human use."  Id.

57.  In spite of this language, the Park Service's FEIS—which concludes that none of the discussed alternatives would impair the Parks' natural soundscapes—largely relies on an "overall park perspective" incapable of assessing the impact of the alternatives on the natural soundscape in those areas frequented by winter visitors.  Under the Park Service's standard, an alternative has a "major impact" on a park's natural soundscape when snowmobile noise is audible in more than twenty percent of the "total park."  Id. at 304, 342.  This standard fails to distinguish between those areas in which visitors are generally present during the winter season (areas that are, in fact, frequented by snowmobiles) and those areas in which visitors are rarely present during the winter season.  Under the standard, moreover, the adverse impacts of historic

EXHIBIT H

snowmobile use—recognized by the Park Service as having resulted in the impairment of Yellowstone's natural soundscapes—is categorized as "moderate."  Id. at 304, 306.  The Park Service's "total park" standard is accordingly unable to assess the impact it was designed to measure, and the FEIS thereby fails to determine and disclose whether the Park Service's selected alternative will comply with the environmental laws and policies governing the National Park System, including the Organic Act.

58.  The FEIS's soundscape analysis also fails to address adequately the results of the agency's own studies, thereby compromising the integrity and clarity of the document.  In concluding that approximately twice the number of snowmobiles presently used in the Parks should be authorized, the Park Service largely disregarded an internal monitoring report stating that current usage levels had already exceed established noise thresholds and recommending, as a result, that oversnow vehicle noise be reduced.  Moreover, in relying on its "total park" standard as the primary measure of impairment, the Park Service's FEIS discounted, without sufficient explanation, the "major" adverse soundscape impacts identified by the agency's own studies.  Finally, as acknowledged by the agency, the model relied upon by the Park Service underestimated the actual sound impacts of oversnow vehicle use at numerous monitored sites within the Parks.

59.  The Park Service's FEIS, ROD, and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

### SIXTH CAUSE OF ACTION
### Violation of NEPA

60.  All preceding paragraphs are incorporated as if fully set forth herein.

61.  Under the Park Service's own regulations, snowmobile use may be allowed within the Parks only "where designated and only when their use … will not *disturb* wildlife[.]"  36

EXHIBIT H

C.F.R. § 2.18(c) (emphasis added).  Thus, as the Park Service acknowledged in its February

2003 Final SEIS, "park policies, regulations, and EOs clearly state that disturbance to wildlife,

regardless of population-level effects, is unacceptable in the national parks."  National Park

Service, Winter Use Plans, Final Supplemental Environmental Impact Statement, at 206.  The

Park Service's FEIS, however, disregards this requirement in attempting to assess the various

alternatives, no more than "acknowledg[ing] that adverse impacts to individual animals should

be minimized[.]"  FEIS, at 251.  As stated in the FEIS, "the focus of [the Service's] analysis is

predominantly the impact [of each alternative] on wildlife populations[.]"  Id.  Accordingly,

under the standards applied by the Park Service, an alternative is considered to have a "major"

impact on wildlife only where its "effect will be measurable and have a substantial and possibly

permanent consequence to the population."  Id. at 257.

62.   By excluding from its analysis any genuine consideration of the individual

disturbances of wildlife that would result under each of the assessed alternatives, the Park

Service failed to address how the alternatives would or would not "achieve the requirements" of

Section 2.18(c) and other laws and policies.  See 40 C.F.R. § 1502.2(d).  Furthermore, the

Service failed to address its own scientists' recommendation that oversnow vehicle numbers be

maintained at or below recent levels in order to limit wildlife disturbances.  The Park Service's

FEIS, ROD, and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in

accordance with law.  See 5 U.S.C. § 706(2)(A).

### SEVENTH CAUSE OF ACTION
### Violation of NEPA

63.   All preceding paragraphs are incorporated as if fully set forth herein.

64.   In addressing the effects of snowmobile use on air quality within the Parks, the

Service's FEIS acknowledged that "[t]o predict ambient concentrations of pollutants generated

EXHIBIT H

by vehicular traffic, emissions from vehicle exhaust systems must be estimated accurately."
FEIS, at 217. Nevertheless, the agency's analysis relied on "snowmobile laboratory test data"
that failed to reflect the actual, performance-reducing conditions within the Parks, disregarding
the results of a cooperative study concerning the true emissions of snowmobiles operated on
Yellowstone's roads. Id. The FEIS, moreover, did not afford snowcoaches the same advantage,
calculating their impact based on actual, in-use measurements. Id. at 219. Finally, the agency's
assessment relied on a model that underestimated the actual concentration of pollutants resulting
from vehicle emissions at multiple locations. Id. at 220. The Park Service's analysis thus
obscured meaningful comparison between the various alternatives and an assessment of the
alternatives' consistency with the mandates governing the National Park System.

65. In largely resting its assessment of the alternatives' air quality impacts on national
and state ambient air quality standards, the Park Service's analysis further failed to disclose how
the alternatives would or would not "achieve the requirements" of controlling laws and policies.
See 40 C.F.R. § 1502.2(d). Under the Organic Act and the agency's own Management Policies,
the Park Service is required to "seek to perpetuate the best possible air quality in parks[.]" See
NPS Management Policies 2006 § 4.7.1; see also, e.g., id. § 8.2.3. The Park Service focused its
analysis, however, on the question of whether any of the considered alternatives would further
diminish Park air quality beyond the degree allowed under state and federal air quality standards.
See FEIS, at 234.

66. The Service's FEIS, ROD, and rule are accordingly arbitrary, capricious, an abuse of
discretion, and not in accordance with law. See 5 U.S.C. § 706(2)(A).

### EIGHTH CAUSE OF ACTION
### Unexplained Departure

67. All preceding paragraphs are incorporated as if fully set forth herein.

EXHIBIT H

68.  Only seven years ago, the Park Service issued an FEIS, ROD and rule, concluding that every alternative providing for snowmobile use within Yellowstone would result in the impairment of park resources and values.  In 2003, this Court vacated a subsequent Park Service SEIS, ROD, and rule authorizing snowmobile use within the Parks, concluding that the Service had failed to explain adequately its change in position and thus acted arbitrary and capriciously.  See The Fund for Animals, 294 F.Supp. 2d at 108.  Now, the Park Service has again issued a conclusory FEIS, ROD, and rule at odds with its first considered view on the impacts of snowmobile use on park resources and values, declaring that none of the alternatives providing for substantial levels of recreational snowmobiling would result in impairment.  Having again failed to explain adequately its reversal, the Park Service has neglected to determine and disclose whether its selected alternative will comply with the environmental laws and policies governing the National Park System, and deprived decisionmakers of a clear basis for decision.  The Park Service's FEIS, ROD, and rule are accordingly arbitrary, capricious, an abuse of discretion, and not in accordance with law.  See 5 U.S.C. § 706(2)(A).

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1) Declare that the snowmobile FEIS, ROD, and Final Rule are unlawful and set them aside;

2) Enjoin implementation of the ROD and Final Rule following the 2007-2008 winter season;

3) Remand the matter to the National Park Service;

4) Award Plaintiffs their attorneys' fees and costs; and

5) Grant Plaintiffs such other and further relief as the Court may deem proper.

EXHIBIT H

Respectfully submitted this ____th day of January, 2008,


_____
Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT 59715
(406) 586-9699
Fax: (406) 586-9695


David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
Greater Yellowstone Coalition, et al.

EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL PARKS CONSERVATION                )
ASSOCIATION                                )
1300 19th Street, NW – Suite 300           )
Washington, DC  20036                      )
(800) 628-7275                             )
                                           )
              Plaintiff,                   )

          v.                               **Case: 1:07-cv-02112**
                                           **Assigned To : Robertson, James**
UNITED STATES DEPARTMENT                   **Assign. Date : 11/21/2007**
OF THE INTERIOR                            **Description: ADMN AGENCY REVIEW**
1849 C Street, NW                          )
Washington, DC  20240                      )
(202) 208-3100                             )
                                           )
NATIONAL PARK SERVICE                      )
1849 C Street, NW                          )
Washington, DC  20240                      )
(202) 208-3100                             )
                                           )
              Defendants.                  )
_____           )

## PETITION FOR REVIEW OF AGENCY ACTION

1.      Plaintiffs bring this action under the Administrative Procedure Act, 5

U.S.C. § 551 *et seq.*, and the National Environmental Policy Act, 42 U.S.C. § 4321 *et*

*seq.*, to seek review of and to challenge Defendants' final environmental impact

statement (the "FEIS") and resulting decision (the "Record of Decision," or "ROD")

concerning their proposal to permit snowmobiles in Yellowstone National Park

("Yellowstone"), Grand Teton National Park ("Grand Teton") and the John D.

Rockefeller, Jr. Memorial Parkway (together, the "Parks").  The alternative chosen by

Defendants (the "Winter Use Plan") would, among other things, allow 540 snowmobiles

EXHIBIT I

per day in Yellowstone. Despite the fact that the Winter Use Plan would cause serious harm to Yellowstone's natural soundscape, wildlife and air quality, Defendants decided it was nevertheless permissible.

2.     The FEIS and the ROD are the latest in a series of efforts by Defendants to permit snowmobiles in Yellowstone, and this action accordingly represents the third legal challenge to those efforts. But this action should be the last because it is now clear, after Defendants have spent $10 million on studies of this issue, that permitting recreational snowmobiles in Yellowstone and the other Parks is inconsistent with the governing statutes and rules. Those statutes and rules preclude Defendants from permitting snowmobiles in any of these Parks because, among other things, snowmobiles disturb wildlife, damage park resources and are inconsistent with Congress' requirement that Defendants provide for the preservation of Yellowstone's natural wonders against injury or spoliation.

3.     These Defendants reaffirmed only last year that the statute which governs their administration of the National Park System must be interpreted as prohibiting recreational opportunities when those activities conflict with the predominant statutory requirement that Defendants conserve the resources and values of the parks in the National Park System. The Winter Use Plan, based on Defendants' own evaluations and studies, would indeed be inconsistent with the conservation of park resources and values.

4.     In order to permit a conclusion in the FEIS and the ROD that the proposed Winter Use Plan would not cause impermissible adverse impacts, Defendants manipulated the analytical process; ignored their own scientists' conclusions about the adverse impacts the proposed use would cause; ignored those scientists' recommendation

2

EXHIBIT I

against adopting the proposed Winter Use Plan; and changed — without explanation or justification — important NPS policies and interpretations concerning the protection of wildlife, among other things.

5.      For these and other reasons set forth below, this Court should find the FEIS and the ROD to be unlawful and should invalidate them.

## JURISDICTION AND VENUE

6.      This actions arises under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* This Court accordingly has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7.      Venue is proper in this Court as defendants are located in this District.

## PARTIES AND STANDING

8.      Plaintiff National Parks Conservation Association ("NPCA") is a nonprofit membership organization headquartered in Washington, D.C. The NPCA is the largest national organization in the United States dedicated to the protection and enhancement of the National Park System. The NPCA was founded in 1919 by, among others, Frederick Laws Olmstead, Jr., who was instrumental in crafting the legislation that created the National Park System in 1916. Today, the NPCA has approximately 330,000 members. More than 3,800 of those members reside in the states bordering on Yellowstone: Wyoming, Idaho and Montana. Many members of the NPCA have visited, and will continue to visit, the Parks to enjoy, observe and photograph the wildlife, flora and scenery of the Parks. During the winter months, NPCA members frequently snowshoe or cross-country ski in Yellowstone to enjoy the peace, solitude, quiet and

EXHIBIT I

serenity of the park and its wildlife, and to enjoy Yellowstone's fresh air, and they plan to continue doing so in the future. The use of snowmobiles by others in Yellowstone has adversely impacted the ability of these members to enjoy that park in the winter, due to the noise and emissions created by the vehicles, as well as the substantial adverse impacts of snowmobiles on wildlife. The Winter Use Plan would adversely affect the ability of NPCA members to observe, study, photograph and otherwise enjoy Yellowstone's wildlife and scenery and to enjoy its natural soundscapes and fresh air.

9. Defendants are a department and an agency of the United States and are charged by Congress with administering and conserving the lands within the National Park System. The Defendants are the federal agencies that took the actions challenged herein.

## FACTUAL BACKGROUND

10. Yellowstone is this nation's oldest and first national park, established by Congress in 1872. A majestic symbol of this country and arguably the crown jewel of the national park system, this treasure, as with all national parks, has "been set aside by the American people to preserve, protect, and share, the legacies" of this country. (National Park Service, http://www.nps.gov/aboutus/index.htm.)

11. The legacy of Yellowstone "is far greater than [the preservation] of a unique landscape" and encompasses the birth of a national park system. "This idea conceived wilderness to be the inheritance of all people, who gain more from an experience in nature than from private exploitation of the land." (National Park Service, *Yellowstone, A Brief History of the Park,* http://www.nps.gov/yell/planyourvisit/ upload/Yell257.pdf.) As a result of the creation of Yellowstone, "[s]cores of nations

EXHIBIT I

have preserved areas of natural beauty and historical worth so that all people will have the opportunity to reflect on their natural and cultural heritage and to return to nature and be spiritually reborn. Of all the benefits resulting from the establishment of Yellowstone National Park, this may be the greatest." (*Id.*)

### *The Legal Framework*

12.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare environmental impact statements regarding "proposals for ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As interpreted by the courts, NEPA requires that, when federal agencies prepare such an environmental impact statement, the agency must reasonably define its objective so as to carry out the purpose and requirements of the underlying legislation and that the agency must use reasonable tests and methods for evaluating the degree to which the considered alternatives meet that objective. The agency may not define the objective unreasonably so as to permit a favored result.

13.     Yellowstone and the other Parks, like the whole National Park System, have been set aside and are to be "preserved and managed for the benefit and inspiration of all the people of the United States." 16 U.S.C. § 1a-1. Regardless of whether this enjoyment is derived from appreciating the park from afar or by directly visiting the park, Yellowstone belongs to all the American people.

14.     Congress created the NPS in 1916 to "promote and regulate" the public use of our national parks, "by such means and measures" as necessary to conform to the "fundamental purpose" of the parks, which is to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same

EXHIBIT I

[so as to] leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1 (the "Organic Act"). Congress reaffirmed this commitment in 1970, instructing that the NPS shall not administer the parks "in derogation of the values and purposes for which these various areas have been established ...." 16 U.S.C. § 1a-1 (the "General Authorities Act, as amended").

15.     In 2005, the NPS published for public comment a revision, among other things, of its interpretation of the Organic Act, proposing that that interpretation should henceforth be that recreational opportunities and conservation stand on an equal footing and that the NPS should balance those conflicting purposes supposedly found in the Organic Act. After a massive outcry from the American public against such a change, the Secretary of the Defendant Department of the Interior and the Director of the Defendant NPS jointly announced that they were rejecting such a change in interpretation. Instead, on August 31, 2006, the NPS adopted the 2006 Management Policies, which stated unequivocally that "when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant." 2006 Management Policies § 1.4.3. Furthermore, the "fundamental purpose of the national park system, established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve park resources and values. This mandate is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired." *Id.*

16.     Congress has further limited the NPS's authority to regulate Yellowstone, recognizing its special place in the National Park System as the first national park. While

6

EXHIBIT I

16 U.S.C. § 3 generally authorizes the NPS to regulate the National Park System consistent with the Organic Act and the General Authorities Act, as amended, Section 22 of that Title expressly limits the NPS's authority further as it relates to Yellowstone. Section 22 provides that, as to Yellowstone, the NPS may adopt regulations under its more general regulatory authority only to the extent "not inconsistent with" Section 22. Section 22 instructs the Secretary of the Interior to "make regulations providing for the preservation, from injury or spoliation, of all … natural curiosities, or wonders, within the park, and their retention and their natural condition." 16 U.S.C. § 22. Consistent with Section 22, therefore, the NPS may not adopt regulations inconsistent with its obligation to provide for the preservation of the natural wonders in Yellowstone against injury or spoliation.

17.     In 1972, President Nixon signed Executive Order ("EO") 11644, which provided for the regulation of off-road vehicles, including snowmobiles, on public lands. EO 11644 (Feb. 8, 1972). The EO instructs the public lands agencies to promulgate regulations for that purpose to "protect[] the resources of the public lands." *Id.* § 3. Executive Order 11644 expressly provides that the Defendants may not authorize the use of off-road vehicles in the National Park System unless the Secretary of the Interior "determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic or scenic values."

18.     In 1974, the NPS promulgated the predecessor to what is now 36 C.F.R. § 2.18 to implement the requirements of Executive Order 11644. That predecessor rule and currently Section 2.18(c) have established a long-standing prohibition on

EXHIBIT I

snowmobile use in the National Park System, subject to narrow exceptions. Among other things, the rule provides:

> Snowmobiles are prohibited except where designated and only when their use is consistent with the park's natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources.

### *The History of Snowmobile Regulation in Yellowstone*

19.     In 1997, a number of plaintiffs brought suit in the U.S. District Court for the District of Columbia, challenging the use of snowmobiles in these Parks. In settling that suit, the NPS agreed to prepare an environmental impact statement for new winter use plans for these Parks. The resulting studies concluded that snowmobile use should be phased out in these Parks by the winter of 2003-2004 and that visitor access should be provided instead only by an NPS-managed mass-transit snowcoach system. The NPS adopted such a rule in January 2001 (the "2001 Rule"). That rule was based upon the NPS's finding that snowmobile use at that time — approximately 795 snowmobiles per day — **"harms the integrity of the resources and values of [Yellowstone] and so constitutes an impairment of resources and values, which is not permissible under the NPS Organic Act**. In [Yellowstone] the impairment is the result of impacts from snowmobile use on air quality, wildlife, the natural soundscape, and opportunities for enjoyment of the park by visitors." (emphasis added)

20.     The snowmobile industry and other plaintiffs challenged the 2001 Rule in the U.S. District Court for the District of Wyoming. In a settlement of that suit, the NPS, now under a new Administration, agreed to prepare a Supplemental Environmental Impact Statement. The NPS then stayed implementation of the 2001 Rule. In 2003, the

EXHIBIT I

NPS adopted a rule that instead authorized the use of up to 950 snowmobiles per day in Yellowstone, among other things (the "2003 Rule").

21.     In December 2003, in a suit by the 1997 plaintiffs and others, the United States District Court for the District of Columbia vacated the 2003 Rule, in part on the ground that the NPS had failed adequately to explain why the 2003 Rule would not create the same impairment and adverse impacts on Yellowstone that the NPS had found to be caused by the conditions existing at the time the 2001 Rule was enacted. That ruling left the 2001 Rule in effect.

22.     In December 2003, the Wyoming plaintiffs then reopened their settled action and sought and obtained a preliminary injunction from the United States District Court for the District of Wyoming setting aside the 2001 Rule on the ground that the NPS had provided an inadequate period for public comment and had inadequately explained the basis for the 2001 Rule.

23.     The NPS then adopted a temporary rule applicable for the three winter seasons beginning 2004-2005 (the "2004 Rule"). The 2004 Rule permitted 720 snowmobiles per day in Yellowstone. That Rule also required that all snowmobile users be accompanied by a commercial guide and that all recreational snowmobiles must meet what were referred to as "best available technology" ("BAT"). The 2004 Rule also permitted the continued use of snowcoaches in Yellowstone.

24.     Several litigants challenged the 2004 Rule in both the Wyoming District Court and the D.C. District Court, but neither Court struck down the 2004 Rule.

25.     At the time that it adopted the 2004 Rule, the NPS stated that it planned to conduct further studies concerning the impact of snowmobiles on Yellowstone while the

EXHIBIT I

temporary rule was in effect, with the goal of then enacting a permanent rule based on the findings of those further studies.

26.     While the 2004 Rule allowed 720 snowmobiles per day in Yellowstone, the number of snowmobiles there over the past four winter seasons has only been approximately 250 snowmobiles per day for various reasons. This significantly reduced number of snowmobiles has resulted in markedly improved park health, with cleaner air, less impact on wildlife, quieter soundscapes, sharper views and an all-around more positive park experience for visitors.

### *The 2007 Environmental Impact Statement*

27.     In March 2007, the NPS issued for public comment a draft environmental impact statement (the "DEIS") relating to a permanent winter use plan for the Parks. The DEIS described the further studies that the NPS had conducted since adopting the 2004 Rule. The DEIS evaluated six alternative approaches to allowing oversnow vehicles in Yellowstone and the other Parks. One of those alternatives was to eliminate the use of snowmobiles and snowcoaches in Yellowstone. The NPS acknowledged that this was the "environmentally preferred alternative" and that this alternative "best preserves the unique historic, cultural, and natural resources associated with the parks." The NPS further acknowledged that this alternative "yields the least impacts to air quality, wildlife, and natural soundscapes."

28.     Nonetheless, the NPS identified as its preferred alternative one under which 720 snowmobiles per day would be allowed in Yellowstone. The NPS recognized that its preferred alternative "increases the adverse impacts to air quality, natural soundscapes and wildlife."

EXHIBIT I

29.     The NPS received comments on the DEIS from more than 122,000 commentors, including individuals, organizations, government agencies and businesses. More than 89,000 of these commentors — in excess of 70% — urged the NPS to eliminate recreational snowmobiling in Yellowstone.  More than 115,000 of the commentors stated that snowmobiles in the parks destroy Yellowstone's natural winter soundscape.  More than 96,000 of the commentors stated that snowmobiles have a negative impact on air quality.

30.     In September 2007, the NPS issued a Final Environmental Impact Statement (the "FEIS").  The FEIS stated that rather than permitting 720 snowmobiles per day in Yellowstone, the NPS now preferred a revised alternative permitting 540 snowmobiles per day there.

31.     The FEIS, like the DEIS, acknowledged that eliminating snowmobile use was the "environmentally preferred alternative" which best "promotes the national environmental policy as expressed by ... the National Environmental Policy Act."  The NPS acknowledged that eliminating snowmobiles would provide a "clear benefit to the natural environment, relative to all other alternatives" and would best "preserve[] the unique historic, cultural, and natural resources in the parks."  The NPS recognized that allowing 540 snowmobiles per day at Yellowstone would "increase[] impacts to air quality, natural soundscapes, and wildlife as compared to [the no-snowmobile alternative]."  The NPS chose the 540 snowmobile alternative, however, because it "achieves a balance of resources use and sharing life's amenities."  That statement is consistent with the very first statement in the FEIS:  "the purpose of this project or planning effort is to ensure park visitors have a range of winter recreation opportunities

11

EXHIBIT I

that are appropriate to the national park setting, and that these activities do not impair or irreparably harm park resources or values."

### *The Adverse Effects of the Winter Use Plan Identified in the FEIS and the NPS's Studies*

32.     The FEIS and the studies conducted by the NPS establish that the Winter Use Plan will have severe adverse effects on Yellowstone.  The adverse effects include harm to Yellowstone's natural soundscapes, wildlife and air quality.

### ADVERSE IMPACT ON NATURAL SOUNDSCAPES

33.     The FEIS recognizes that one of the reasons for the adoption of the Organic Act was a recognition that the American people "wanted places to go that were undisturbed and natural and which offered a retreat from the signs and stresses of everyday life."  The NPS therefore recognizes the natural winter soundscapes of Yellowstone as a "key resource" to be protected.

34.     The FEIS concludes, however, that the Winter Use Plan would not create any impairment of the natural soundscapes and finds that that plan would have only a "moderate adverse impact" on natural soundscapes.  But the facts set forth in the FEIS demonstrate instead that the Winter Use Plan will have a significant adverse impact on Yellowstone's natural winter soundscapes.

35.     The NPS's principal test for evaluating the impact of snowmobile noise is based on a flawed, outcome-determinative analysis — one that measures the percentage of the **entire park area** in which the 540 snowmobiles could be heard.  In order to be considered as having a "major" impact on natural soundscapes at Yellowstone, that test requires that noise be audible in more than 20% of Yellowstone's entire area.  But no

EXHIBIT I

amount of noise created by snowmobiles could ever meet that test because Yellowstone occupies more than 2.2 million acres, an enormous area the size of Delaware and Rhode Island combined. Thus NPS's choice of the "entire park area" test predetermined — before any data were collected and before any alternatives were purportedly considered — that no alternative involving the use of snowmobiles, regardless of how many snowmobiles it involved, would be found to generate a major noise impact. The "entire park area" test was therefore an unreasonable basis for concluding that the Winter Use Plan would cause no undue harm to park resources.

36.     The FEIS also analyzes the audibility of snowmobile noise in a number of specific locations in Yellowstone. That FEIS concedes, based on hypothetical models, that the Winter Use Plan would result in noise that could be heard more than 69% of the time in those areas. Indeed, actual monitoring conducted over the last several years — when an average of 250 snowmobiles per day were present — found that oversnow vehicles could be heard at the popular Old Faithful geyser 67% of the time. That number is 100% of the time on busy weekends with higher snowmobile traffic. These figures are comparable to those previously found to constitute impairment. Not surprisingly therefore, the FEIS concludes that the adverse impacts due to percent time audible would be "major" at Yellowstone.

37.     Nevertheless, the NPS views this intrusion into the natural soundscapes as acceptable, perhaps because the NPS concludes that the loudness of the sounds would be "minor." But that conclusion is based on a hypothetical model, which grossly understates how loud the sound of 540 snowmobiles per day would be.

EXHIBIT I

38.     The NPS's own monitoring of actual conditions, rather than supporting the NPS's conclusions, demonstrates instead that the modeling study is erroneous.  The NPS monitoring studies report that the loudest daily sound for oversnow vehicles during the last three winter seasons at Old Faithful, along popular travel corridors and at the West Yellowstone entrance exceeded the sound of a vacuum cleaner in an indoor room.  Burson *et al.*, "Natural Soundscape Monitoring in Yellowstone National Park" at 2.  The NPS's own studies define that level of noise as having "an easily recognizable adverse effect on the natural soundscape and potential for its enjoyment."  Burson at 12.  Since the Winter Use Plan would <u>double</u> the number of snowmobiles at Yellowstone from the level experienced during this monitoring — which already showed adverse impacts on scoundscapes — the NPS's own monitoring studies demonstrate that the Winter Use Plan would have a significant adverse effect on Yellowstone's winter soundscapes.

39.     The FEIS claims that 540 snowmobiles in Yellowstone would not unduly impact natural soundscapes and visitor experiences in part because the Winter Use Plan would require the use of snowmobiles using "best available technology," or "BAT" and because all snowmobilers would be required to use commercial guides.  But the 2004 Rule in effect during the NPS's monitoring studies already required snowmobiles to use BAT and required commercial guides.  Imposing those requirements under the new Winter Use Plan would therefore not reduce the noise experienced under the 2004 Rule.  Doubling the number of snowmobiles from the average of 250 per day during the study period would therefore double the adverse impact demonstrated by the NPS's own monitoring studies.

EXHIBIT I

40. The FEIS itself makes clear that modern snowmobiles using BAT, including "4-stroke" instead of "2-stroke" engines, would continue to be extremely noisy. The NPS states that **each** of these BAT snowmobiles produces noise one-third louder than listening to a vacuum cleaner in an indoor room. The FEIS also acknowledges that the noises resulting from snowmobiles are "concentrated to a large degree around travel corridors and park attractions and affect the areas most accessible by the vast majority of park visitors." Such a concentration of snowmobiles can be expected to have a significant impact on natural soundscapes in those travel corridors and park attractions and other areas most accessible by the vast majority of park visitors.

### ADVERSE IMPACT ON WILDLIFE

41. The Winter Use Plan would have significant detrimental effects on wildlife in Yellowstone.

42. The FEIS acknowledges that the increases in winter traffic levels proposed to be permitted would "cause increases in vehicle-caused mortality, wildlife displacement, behavior- or physiology-related energy costs" in bison, elk, wolves, lynx, wolverines, bald eagles and swans.

43. The NPS's own scientists conducted a study of oversnow vehicle impacts on wildlife during the last several winter seasons while the 2004 Rule was in effect. They concluded that the reduced number of snowmobiles during those seasons to 250 per day was "effective at reducing disturbances to wildlife below a level that would cause measurable fitness effects." However, they acknowledged "the potential for fitness effects to develop if [oversnow vehicles] or other stressors become more severe or prolonged. Thus we recommend park managers consider maintaining [oversnow vehicle]

15

EXHIBIT I

traffic levels at or below those observed during our monitoring." Yet the NPS's Winter Use Plan would permit a doubling of the number of snowmobiles permitted in Yellowstone from that experienced during the observation period. The NPS has failed even to explain its departure from its own scientists' recommendation.

44. The NPS considers the acknowledged adverse impacts on wildlife to be acceptable because the NPS measures the wildlife impact of snowmobiles only to the extent the population of each species **as a whole** is threatened. An adverse impact on an individual animal — regardless of the seriousness of the impact, even resulting in death — is not considered important so long as the effect "would not be of any measurable or perceptible consequence to the population." This approach represents a radical departure from decades of NPS policy. The environmental impact statement performed before the 2003 Rule was adopted, for example, states that "park policies, regulations, and [executive orders] clearly state that disturbance to wildlife, regardless of population-level effects, is unacceptable in the national parks." The NPS's Management Policies make clear that it views impacts on animals or communities of animals just as much to be avoided as impacts on whole population of animals. *See* 2006 NPS Management Policies § 4.4.1 (requiring the NPS to "minimiz[e] human impacts on native plants, animals, populations, communities and ecosystems ...."). Yet the NPS has provided no explanation for the radical change in policy toward wildlife reflected in the FEIS.

### ADVERSE IMPACT ON AIR QUALITY

45. The Winter Use Plan would create a significant increase in hydrocarbon emissions that would have a severe adverse impact on air quality in Yellowstone.

EXHIBIT I

46.     The FEIS acknowledges that "air quality is a key resource, in itself, as
well as a highly prized (and expected) element of the park visitor experience." The FEIS
acknowledges that "an overall reduction in snowmobiles from previous years" has, along
with BAT and other factors, led to a "marked reduction in ambient pollution levels" at
Yellowstone. Yet the NPS's Winter Use Plan would double the number of snowmobiles
from the number experienced during the last several seasons, which have averaged
approximately 250 per day. Compared to the conditions under the 2004 Rule, the FEIS
acknowledges that emissions impact would be more adverse. The FEIS acknowledges
that the impact of emissions under the Winter Use Plan would be "moderate, adverse,
long-term … direct [and] park-wide."

47.     According to the FEIS, carbon monoxide is a "colorless, odorless, and
poisonous gas produced by incomplete burning of carbon in fuels. When [carbon
monoxide] enters the bloodstream, it reduces the delivery of oxygen to the body's organs
and tissues. Health effects may include impairment of visual perception, manual
dexterity, learning ability, and performance of complete tasks; headaches and fatigue; or
respiratory failure and death." Based on hypothetical modeling, the NPS estimates in the
FEIS that adoption of the Winter Use Plan would more than double the amount of carbon
monoxide in some areas of Yellowstone from that experienced with only 250
snowmobiles per day.

48.     Particulate matter ("PM") includes, according to the FEIS, "dust, dirt,
soot, smoke, and liquid droplets from sources such as … vehicles …. Health effects from
PM emissions include reduced lung function, long-term risk of increased cancer rates,

EXHIBIT I

and the development or aggravation of respiratory problems." Yet the Winter Use Plan would increase the amount of fine particulate matter by up to 40% in some areas.

49.     Moreover, the NPS concedes that the modeling on which it relied was based on assumptions that cause the modeling to **understate** the actual adverse impact of the Winter Use Plan on air quality. For example, the FEIS admits that "snowmobile laboratory test data utilized [in the model] may not reflect actual operating conditions in Yellowstone … as high altitude and low winter temperatures in the parks are likely to decrease overall snowmobile engine performance and increase relative emissions." The FEIS concedes that, at least at one site, monitored actual conditions reflected more than 50% more particulate matter than predicted under the model relied on by the FEIS.

50.     In addition, the NPS's model assumes that snowmobiles will meet the BAT criteria, but an NPS study issued in January 2007 found that actual emissions are likely to produce more pollution than the maximum under those criteria. That study makes clear that actual emissions depend on factors not considered when testing snowmobiles against those BAT criteria. Those factors include the amount of time the driver spends idling (for example, while taking photographs) or accelerating or decelerating. The study found that, during time spent idling, accelerating or decelerating, some models certified as meeting BAT criteria actually created emissions higher than those criteria. Because it is certain that many drivers will in fact spend time idling, accelerating and decelerating, the NPS's models clearly understate the actual pollution likely to result from 540 snowmobiles per day.

51.     Nevertheless, the FEIS set the "desired conditions," which are the objective of its analysis, at an unreasonably low threshold in order to permit the NPS to

EXHIBIT I

find that the Winter Use Plan's impact on air quality would be acceptable. The FEIS

merely states that its "desired condition" relating to air quality is that "reduced oversnow

vehicle … emission levels protect air quality," referring to a reduction from emission

levels in the late 1990's. But the NPS's Winter Use Plan will permit an increase in

emission levels when compared with air quality during the last several seasons.

### *The Record of Decision*

52.     On November 20, 2007, Defendants decided, based on the FEIS, that the

proposed Winter Use Plan would be consistent with the underlying statues and other legal

requirements. But the FEIS was flawed, as discussed above.

### FIRST CLAIM FOR RELIEF
**(Section 10(e)(2) of the Administrative Procedure Act for Agency Action, Findings
and Conclusions that Are Arbitrary, Capricious and an Abuse of Discretion)**

53.     Section 10(e)(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2),

authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and

conclusions found to be arbitrary, capricious and an abuse of discretion …." The ROD

and the FEIS are arbitrary, capricious and an abuse of discretion, because, among other

things, there is no rational connection between the facts and the NPS's conclusions. For

example:

(a)     Defendants set a standard for evaluating impact on natural winter

soundscapes at Yellowstone which was unreasonable but which permitted Defendants'

desired conclusion, that permitting 540 snowmobiles per day would not cause prohibited

adverse effects. That impact standard was based on the percentage of the "total park

area" in which sounds could be heard. Because of the enormous size of Yellowstone,

19

EXHIBIT I

that standard would permit a finding of little or no impact even when the sounds being evaluated are extremely loud and carry for long distances, interfering with the enjoyment of Yellowstone by visitors not using snowmobiles. The unreasonableness of that analytical method is further heightened by the fact that the same areas of the park in which snowmobiles would be used are those areas in which other visitors and wildlife tend to congregate, according to the NPS's own analysis.

(b)     Defendants set a standard for evaluating the impact of snowmobiles on wildlife which was unreasonable but which permitted Defendants' desired conclusion, that permitting 540 snowmobiles per day at Yellowstone would not cause prohibited adverse effects. That standard was based on the impact on the "total population" of a species, regardless of the significance of impacts on individual animals or smaller groups of them. That "total population" standard permitted Defendants to conclude that 540 snowmobiles per day would have little or no impact on wildlife.

(c)     Defendants set unreasonably low the "desired conditions" for evaluating impacts on air quality in order to permit a finding that the Winter Use Plan's impact on air quality would be acceptable. The FEIS's "desired condition" relating to air quality is merely that there be "reduced oversnow vehicle ... emission levels [that] protect air quality," referring to a reduction from emission levels prior to the adoption of the 2001 Rule.

(d)     Defendants unreasonably chose not to follow the recommendations of its own scientists concerning the effects of snowmobiles on wildlife in Yellowstone and provided no rational explanation of why that recommendation was being disregarded. The NPS's own scientists recommended that oversnow vehicle use not be permitted to an

20

EXHIBIT I

extent greater than that experienced during the winter seasons in which the 2004 Rule was in effect. Yet the ROD would permit double that number of oversnow vehicles.

(e)     Defendants unreasonably based the conclusion that 540 snowmobiles would have limited impact on natural soundscapes, wildlife and air quality by relying on hypothetical modeling, despite Defendants' recognition that that modeling understates those impacts and relies on inaccurate assumptions and despite the fact that that modeling is contrary to the NPS's own monitoring of actual conditions.

(f)     The NPS departed in several critical respects from prior agency policies or interpretations in order to permit a finding of little or no adverse impact arising from the proposed Winter Use Plan, yet Defendants provided no justification for those departures, including the following:

> (i)     The NPS's long-standing interpretation that applicable statutes and regulations preclude adverse impacts to individual wildlife or groups of wildlife, replacing that interpretation with one that only considers the impact upon a total population of a species of animal.

> (ii)    The NPS's long-standing interpretation of the applicable statutory and regulatory requirements relating to soundscapes which take into account the impact on natural soundscapes in areas likely to be visited by visitors and/or wildlife and replacing that interpretation with one that only considers impacts on natural soundscapes which affect the entire area of a park unit.

(g)     Defendants failed to articulate a rational basis for the determination that none of the seven alternatives examined would impair park resources, relying on the same repetitive, boilerplate and nearly identical conclusory statements in each impairment analysis.

EXHIBIT I

## SECOND CLAIM FOR RELIEF
### (Section 10(e)(2) of the Administrative Procedure Act for
### Violation of the National Environmental Policy Act)

54.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare environmental impact statements regarding "proposals for … major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As interpreted by the courts, NEPA requires that, when federal agencies prepare such an environmental impact statement, the agency must reasonably define its objective so as to carry out the purpose and requirements of the underlying legislation and that the agency must use reasonable tests and methods for evaluating the degree to which the considered alternatives meet that objective. The agency may not define the objective unreasonably so as to permit a favored result.

55.     Defendants acted contrary to these requirements in preparing the FEIS and in reaching their conclusions as set forth in the ROD. Among other things:

(a)     The NPS's definition of its objective, "to ensure park visitors have a range of winter recreation opportunities that are appropriate to the national park setting, and that these activities do not impair or irreparably harm park resources or values," does not reasonably reflect the purpose or requirements of the Organic Act, the General Authorities Act, as amended, the act establishing Yellowstone, the NPS's own snowmobile regulation or the Executive Order on which it was based. *See* 16 U.S.C. §§ 1, 1a-1 and 22; 36 C.F.R. § 2.18(c); EO 11644. "Impairment" is not the only requirement established by these statutes or other authorities, nor must harm to park resources or values be "irreparable" in order to be prohibited by these authorities.

EXHIBIT I

(b)     Defendants' statements of its "desired conditions" fail reasonably to reflect the requirements of the authorities cited in the preceding subparagraph. For example, Defendants set unreasonably low the "desired conditions" for evaluating impacts on air quality in order to permit a finding that the Winter Use Plan's impact on air quality would be acceptable. The FEIS's "desired condition" relating to air quality is merely that there be "reduced oversnow vehicle … emission levels [that] protect air quality," referring to a reduction from emission levels in the late 1990's. But "protect air quality" is too lacking in substantive content to serve as a meaningful desired condition.

(c)     Defendants set a standard for evaluating impact on natural winter soundscapes at Yellowstone which was not a reasonable means of evaluating whether those impacts violated the requirements of the underlying legislative and other authorities. That test of impact was based on the percentage of the "total park area" in which sounds could be heard. Because of the enormous size of Yellowstone, that test would permit a finding of little or no impact even when sounds being evaluated are extremely loud and carry for long distances, interfering with the enjoyment of the park by other visitors. The unreasonableness of that analytical method is further heightened by the fact that the same areas of the park in which snowmobiles would be used are those areas in which other visitors and wildlife tend to congregate, according to the NPS's own analysis.

(d)     Defendants used an analytical method for evaluating the impact of snowmobiles on wildlife which was not a reasonable means of evaluating whether those impacts violated the requirements of the underlying legislative and other authorities. That method was to examine the impact on the total population of each species, despite

23

EXHIBIT I

the recognition that the Winter Use Plan would in fact have significant impact on individual animals or groups of animals.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

(1)     Find that the ROD and the FEIS are unlawful and set them aside; and

(2)     Grant Plaintiffs such other and further relief as the Court may deem proper.

Respectfully submitted,

Robert D. Rosenbaum (D.C. Bar No. 090498)
Donna E. Patterson (D.C. Bar No. 358701)
Ingo W. Sprie
Kwame A. Clement (D.C. Bar No. 467377)
Meetu Kaul (D.C. Bar No. 468146)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
Phone:     (202) 942-5862
Fax:        (202) 942-5999

Attorneys for Plaintiff

Dated:  November 21, 2007

EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION<br>1300 19th Street, NW – Suite 300<br>Washington, DC  20036<br>(800) 628-7275<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR<br>1849 C Street, NW<br>Washington, DC  20240<br>(202) 208-3100<br><br>NATIONAL PARK SERVICE<br>1849 C Street, NW<br>Washington, DC  20240<br>(202) 208-3100<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. 1:07-cv-02112 (JR) |

**FIRST AMENDED PETITION FOR REVIEW OF AGENCY ACTION**

1.      Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, to seek review of and to challenge (i) Defendants' amendment of 36 C.F.R. §§ 7.13, 7.21 and 7.22 to permit recreational snowmobiles in Yellowstone National Park ("Yellowstone"), Grand Teton National Park ("Grand Teton") and the John D. Rockefeller, Jr. Memorial Parkway (together, the "Parks") and (ii) the final environmental impact statement (the "FEIS") and resulting decision (the "Record of Decision," or "ROD") on which those amended regulations are based.  Those regulations,

EXHIBIT J

as amended, (the "Winter Use Plan"), allow 540 snowmobiles per day in Yellowstone, among other things. Despite the fact that the Winter Use Plan would cause serious harm to Yellowstone's natural soundscape, wildlife and air quality, Defendants decided it was nevertheless permissible.

2.     The Winter Use Plan is the latest in a series of efforts by Defendants to permit snowmobiles in Yellowstone, and this action accordingly represents the third legal challenge to those efforts. But this action should be the last because it is now clear, after Defendants have spent $10 million on studies of this issue, that permitting recreational snowmobiles in Yellowstone and the other Parks is inconsistent with the governing statutes and rules. Those statutes and rules preclude Defendants from permitting snowmobiles in any of these Parks because, among other things, snowmobiles disturb wildlife, damage park resources and are inconsistent with Congress' requirement that Defendants provide for the preservation of Yellowstone's natural wonders against injury or spoliation.

3.     These Defendants reaffirmed only last year that the statute which governs their administration of the National Park System must be interpreted as prohibiting recreational opportunities when those activities conflict with the predominant statutory requirement that Defendants conserve the resources and values of the parks in the National Park System. The Winter Use Plan, based on Defendants' own evaluations and studies, would indeed be inconsistent with the conservation of park resources and values.

4.     In order to permit a conclusion in the FEIS and the ROD that the Winter Use Plan would not cause impermissible adverse impacts, Defendants manipulated the analytical process; ignored their own scientists' conclusions about the adverse impacts

EXHIBIT J

the proposed use would cause; ignored those scientists' recommendation against adopting

the proposed Winter Use Plan; and changed — without explanation or justification —

important NPS policies and interpretations concerning the protection of wildlife, among

other things.

     5.     For these and other reasons set forth below, this Court should find the

Winter Use Plan, the FEIS and the ROD to be unlawful and should invalidate them.

## JURISDICTION AND VENUE

     6.     This actions arises under the National Environmental Policy Act, 42

U.S.C. § 4321 *et seq.* and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*  This

Court accordingly has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

     7.     Venue is proper in this Court as defendants are located in this District.

## PARTIES AND STANDING

     8.     Plaintiff National Parks Conservation Association ("NPCA") is a

nonprofit membership organization headquartered in Washington, D.C.  The NPCA is the

largest national organization in the United States dedicated to the protection and

enhancement of the National Park System.  The NPCA was founded in 1919 by, among

others, Frederick Laws Olmstead, Jr., who was instrumental in crafting the legislation

that created the National Park System in 1916.  Today, the NPCA has approximately

330,000 members.  More than 3,800 of those members reside in the states bordering on

Yellowstone:  Wyoming, Idaho and Montana.  Many members of the NPCA have visited,

and will continue to visit, the Parks to enjoy, observe and photograph the wildlife, flora

and scenery of the Parks.  During the winter months, NPCA members frequently

EXHIBIT J

snowshoe or cross-country ski in Yellowstone to enjoy the peace, solitude, quiet and serenity of the park and its wildlife, and to enjoy Yellowstone's fresh air, and they plan to continue doing so in the future. The use of snowmobiles by others in Yellowstone has adversely impacted the ability of these members to enjoy that park in the winter, due to the noise and emissions created by the vehicles, as well as the substantial adverse impacts of snowmobiles on wildlife. The Winter Use Plan will adversely affect the ability of NPCA members to observe, study, photograph and otherwise enjoy Yellowstone's wildlife and scenery and to enjoy its natural soundscapes and fresh air.

9. Defendants are a department and an agency of the United States and are charged by Congress with administering and conserving the lands within the National Park System. The Defendants are the federal agencies that took the actions challenged herein.

**FACTUAL BACKGROUND**

10. Yellowstone is this nation's oldest and first national park, established by Congress in 1872. A majestic symbol of this country and arguably the crown jewel of the national park system, this treasure, as with all national parks, has "been set aside by the American people to preserve, protect, and share, the legacies" of this country. (National Park Service, http://www.nps.gov/aboutus/index.htm.)

11. The legacy of Yellowstone "is far greater than [the preservation] of a unique landscape" and encompasses the birth of a national park system. "This idea conceived wilderness to be the inheritance of all people, who gain more from an experience in nature than from private exploitation of the land." (National Park Service, *Yellowstone, A Brief History of the Park,* http://www.nps.gov/yell/planyourvisit/

EXHIBIT J

upload/Yell257.pdf.) As a result of the creation of Yellowstone, "[s]cores of nations have preserved areas of natural beauty and historical worth so that all people will have the opportunity to reflect on their natural and cultural heritage and to return to nature and be spiritually reborn. Of all the benefits resulting from the establishment of Yellowstone National Park, this may be the greatest." (*Id.*)

### *The Legal Framework*

12. The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare environmental impact statements regarding "proposals for … major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As interpreted by the courts, NEPA requires that, when federal agencies prepare such an environmental impact statement, the agency must reasonably define its objective so as to carry out the purpose and requirements of the underlying legislation and that the agency must use reasonable tests and methods for evaluating the degree to which the considered alternatives meet that objective. The agency may not define the objective unreasonably so as to permit a favored result.

13. Yellowstone and the other Parks, like the whole National Park System, have been set aside and are to be "preserved and managed for the benefit and inspiration of all the people of the United States." 16 U.S.C. § 1a-1. Regardless of whether this enjoyment is derived from appreciating the park from afar or by directly visiting the park, Yellowstone belongs to all the American people.

14. Congress created the NPS in 1916 to "promote and regulate" the public use of our national parks, "by such means and measures" as necessary to conform to the "fundamental purpose" of the parks, which is to "conserve the scenery and the natural

5

EXHIBIT J

and historic objects and the wild life therein and to provide for the enjoyment of the same [so as to] leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1 (the "Organic Act"). Congress reaffirmed this commitment in 1970, instructing that the NPS shall not administer the parks "in derogation of the values and purposes for which these various areas have been established …." 16 U.S.C. § 1a-1 (the "General Authorities Act, as amended").

15.    In 2005, the NPS published for public comment a revision, among other things, of its interpretation of the Organic Act, proposing that that interpretation should henceforth be that recreational opportunities and conservation stand on an equal footing and that the NPS should balance those conflicting purposes supposedly found in the Organic Act. After a massive outcry from the American public against such a change, the Secretary of the Defendant Department of the Interior and the Director of the Defendant NPS jointly announced that they were rejecting such a change in interpretation. Instead, on August 31, 2006, the NPS adopted the 2006 Management Policies, which stated unequivocally that "when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant." 2006 Management Policies § 1.4.3. Furthermore, the "fundamental purpose of the national park system, established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve park resources and values. This mandate is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired." *Id.*

EXHIBIT J

16.     Congress has further limited the NPS's authority to regulate Yellowstone,
recognizing its special place in the National Park System as the first national park.  While
16 U.S.C. § 3 generally authorizes the NPS to regulate the National Park System
consistent with the Organic Act and the General Authorities Act, as amended, Section 22
of that Title expressly limits the NPS's authority further as it relates to Yellowstone.
Section 22 provides that, as to Yellowstone, the NPS may adopt regulations under its
more general regulatory authority only to the extent "not inconsistent with" Section 22.
Section 22 instructs the Secretary of the Interior to "make regulations providing for the
preservation, from injury or spoliation, of all … natural curiosities, or wonders, within
the park, and their retention and their natural condition."  16 U.S.C. § 22.  Consistent
with Section 22, therefore, the NPS may not adopt regulations inconsistent with its
obligation to provide for the preservation of the natural wonders in Yellowstone against
injury or spoliation.

17.     In 1972, President Nixon signed Executive Order ("EO") 11644, which
provided for the regulation of off-road vehicles, including snowmobiles, on public lands.
EO 11644 (Feb. 8, 1972).  The EO instructs the public lands agencies to promulgate
regulations for that purpose to "protect[] the resources of the public lands."  *Id.* § 3.
Executive Order 11644 expressly provides that the Defendants may not authorize the use
of off-road vehicles in the National Park System unless the Secretary of the Interior
"determines that off-road vehicle use in such locations will not adversely affect their
natural, aesthetic or scenic values."

18.     In 1974, the NPS promulgated the predecessor to what is now 36 C.F.R.
§ 2.18 to implement the requirements of Executive Order 11644.  That predecessor rule

7

EXHIBIT J

and currently Section 2.18(c) have established a long-standing prohibition on snowmobile use in the National Park System, subject to narrow exceptions. Among other things, the rule provides:

> Snowmobiles are prohibited except where designated and only when their use is consistent with the park's natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources.

### *The History of Snowmobile Regulation in Yellowstone*

19.     In 1997, a number of plaintiffs brought suit in the U.S. District Court for the District of Columbia, challenging the use of snowmobiles in these Parks. In settling that suit, the NPS agreed to prepare an environmental impact statement for new winter use plans for these Parks. The resulting studies concluded that snowmobile use should be phased out in these Parks by the winter of 2003-2004 and that visitor access should be provided instead only by an NPS-managed mass-transit snowcoach system. The NPS adopted such a rule in January 2001 (the "2001 Rule"). That rule was based upon the NPS's finding that snowmobile use at that time — approximately 795 snowmobiles per day — **"harms the integrity of the resources and values of [Yellowstone] and so constitutes an impairment of resources and values, which is not permissible under the NPS Organic Act**. In [Yellowstone] the impairment is the result of impacts from snowmobile use on air quality, wildlife, the natural soundscape, and opportunities for enjoyment of the park by visitors." (emphasis added)

20.     The snowmobile industry and other plaintiffs challenged the 2001 Rule in the U.S. District Court for the District of Wyoming. In a settlement of that suit, the NPS, now under a new Administration, agreed to prepare a Supplemental Environmental

EXHIBIT J

Impact Statement. The NPS then stayed implementation of the 2001 Rule. In 2003, the NPS adopted a rule that instead authorized the use of up to 950 snowmobiles per day in Yellowstone, among other things (the "2003 Rule").

21.  In December 2003, in a suit by the 1997 plaintiffs and others, the United States District Court for the District of Columbia vacated the 2003 Rule, in part on the ground that the NPS had failed adequately to explain why the 2003 Rule would not create the same impairment and adverse impacts on Yellowstone that the NPS had found to be caused by the conditions existing at the time the 2001 Rule was enacted. That ruling left the 2001 Rule in effect.

22.  In December 2003, the Wyoming plaintiffs then reopened their settled action and sought and obtained a preliminary injunction from the United States District Court for the District of Wyoming setting aside the 2001 Rule on the ground that the NPS had provided an inadequate period for public comment and had inadequately explained the basis for the 2001 Rule.

23.  The NPS then adopted a temporary rule applicable for the three winter seasons beginning 2004-2005 (the "2004 Rule"). The 2004 Rule permitted 720 snowmobiles per day in Yellowstone. That Rule also required that all snowmobile users be accompanied by a commercial guide and that all recreational snowmobiles must meet what were referred to as "best available technology" ("BAT"). The 2004 Rule also permitted the continued use of snowcoaches in Yellowstone.

24.  Several litigants challenged the 2004 Rule in both the Wyoming District Court and the D.C. District Court, but neither Court struck down the 2004 Rule.

EXHIBIT J

25.     At the time that it adopted the 2004 Rule, the NPS stated that it planned to conduct further studies concerning the impact of snowmobiles on Yellowstone while the temporary rule was in effect, with the goal of then enacting a permanent rule based on the findings of those further studies.

26.     While the 2004 Rule allowed 720 snowmobiles per day in Yellowstone, the number of snowmobiles there over the past four winter seasons has only been approximately 250 snowmobiles per day for various reasons.  This significantly reduced number of snowmobiles has resulted in markedly improved park health, with cleaner air, less impact on wildlife, quieter soundscapes, sharper views and an all-around more positive park experience for visitors.

### *The 2007 Environmental Impact Statement*

27.     In March 2007, the NPS issued for public comment a draft environmental impact statement (the "DEIS") relating to a permanent winter use plan for the Parks.  The DEIS described the further studies that the NPS had conducted since adopting the 2004 Rule.  The DEIS evaluated six alternative approaches to allowing oversnow vehicles in Yellowstone and the other Parks.  One of those alternatives was to eliminate the use of snowmobiles and snowcoaches in Yellowstone.  The NPS acknowledged that this was the "environmentally preferred alternative" and that this alternative "best preserves the unique historic, cultural, and natural resources associated with the parks."  The NPS further acknowledged that this alternative "yields the least impacts to air quality, wildlife, and natural soundscapes."

28.     Nonetheless, the NPS identified as its preferred alternative one under which 720 snowmobiles per day would be allowed in Yellowstone.  The NPS recognized

EXHIBIT J

that its preferred alternative "increases the adverse impacts to air quality, natural soundscapes and wildlife."

29.     The NPS received comments on the DEIS from more than 122,000 commentors, including individuals, organizations, government agencies and businesses. More than 89,000 of these commentors — in excess of 70% — urged the NPS to eliminate recreational snowmobiling in Yellowstone. More than 115,000 of the commentors stated that snowmobiles in the parks destroy Yellowstone's natural winter soundscape. More than 96,000 of the commentors stated that snowmobiles have a negative impact on air quality.

30.     In September 2007, the NPS issued a Final Environmental Impact Statement (the "FEIS"). The FEIS stated that rather than permitting 720 snowmobiles per day in Yellowstone, the NPS now preferred a revised alternative permitting 540 snowmobiles per day there.

31.     The FEIS, like the DEIS, acknowledged that eliminating snowmobile use was the "environmentally preferred alternative" which best "promotes the national environmental policy as expressed by … the National Environmental Policy Act." The NPS acknowledged that eliminating snowmobiles would provide a "clear benefit to the natural environment, relative to all other alternatives" and would best "preserve[] the unique historic, cultural, and natural resources in the parks." The NPS recognized that allowing 540 snowmobiles per day at Yellowstone would "increase[] impacts to air quality, natural soundscapes, and wildlife as compared to [the no-snowmobile alternative]." The NPS chose the 540 snowmobile alternative, however, because it "achieves a balance of resources use and sharing life's amenities." That statement is

EXHIBIT J

consistent with the very first statement in the FEIS: "the purpose of this project or planning effort is to ensure park visitors have a range of winter recreation opportunities that are appropriate to the national park setting, and that these activities do not impair or irreparably harm park resources or values."

### *The Adverse Effects of the Winter Use Plan*
### *Identified in the FEIS and the NPS's Studies*

32.     The FEIS and the studies conducted by the NPS establish that the Winter Use Plan will have severe adverse effects on Yellowstone. The adverse effects include harm to Yellowstone's natural soundscapes, wildlife and air quality.

#### ADVERSE IMPACT ON NATURAL SOUNDSCAPES

33.     The FEIS recognizes that one of the reasons for the adoption of the Organic Act was a recognition that the American people "wanted places to go that were undisturbed and natural and which offered a retreat from the signs and stresses of everyday life." The NPS therefore recognizes the natural winter soundscapes of Yellowstone as a "key resource" to be protected.

34.     The FEIS concludes, however, that 540 snowmobiles per day in Yellowstone would not create any impairment of the natural soundscapes and finds that that plan would have only a "moderate adverse impact" on natural soundscapes. But the facts set forth in the FEIS demonstrate instead that 540 snowmobiles per day will have a significant adverse impact on Yellowstone's natural winter soundscapes.

35.     The NPS's principal test for evaluating the impact of snowmobile noise is based on a flawed, outcome-determinative analysis — one that measures the percentage of the **entire park area** in which the 540 snowmobiles could be heard. In order to be

EXHIBIT J

considered as having a "major" impact on natural soundscapes at Yellowstone, that test requires that noise be audible in more than 20% of Yellowstone's entire area. But no amount of noise created by snowmobiles could ever meet that test because Yellowstone occupies more than 2.2 million acres, an enormous area the size of Delaware and Rhode Island combined. Thus NPS's choice of the "entire park area" test predetermined — before any data were collected and before any alternatives were purportedly considered — that no alternative involving the use of snowmobiles, regardless of how many snowmobiles it involved, would be found to generate a major noise impact. The "entire park area" test was therefore an unreasonable basis for concluding that the Winter Use Plan would cause no undue harm to park resources.

36.     The FEIS also analyzes the audibility of snowmobile noise in a number of specific locations in Yellowstone. That FEIS concedes, based on hypothetical models, that the Winter Use Plan would result in noise that could be heard more than 69% of the time in those areas. Indeed, actual monitoring conducted over the last several years — when an average of 250 snowmobiles per day were present — found that oversnow vehicles could be heard at the popular Old Faithful geyser 67% of the time. That number is 100% of the time on busy weekends with higher snowmobile traffic. These figures are comparable to those previously found to constitute impairment. Not surprisingly therefore, the FEIS concludes that the adverse impacts due to percent time audible would be "major" at Yellowstone.

37.     Nevertheless, the NPS views this intrusion into the natural soundscapes as acceptable, perhaps because the NPS concludes that the loudness of the sounds would be

EXHIBIT J

"minor." But that conclusion is based on a hypothetical model, which grossly understates how loud the sound of 540 snowmobiles per day would be.

38.    The NPS's own monitoring of actual conditions, rather than supporting the NPS's conclusions, demonstrates instead that the modeling study is erroneous. The NPS monitoring studies report that the loudest daily sound for oversnow vehicles during the last three winter seasons at Old Faithful, along popular travel corridors and at the West Yellowstone entrance exceeded the sound of a vacuum cleaner in an indoor room. Burson *et al.*, "Natural Soundscape Monitoring in Yellowstone National Park" at 2. The NPS's own studies define that level of noise as having "an easily recognizable adverse effect on the natural soundscape and potential for its enjoyment." Burson at 12. Since the Winter Use Plan would <u>double</u> the number of snowmobiles at Yellowstone from the level experienced during this monitoring — which already showed adverse impacts on scoundscapes — the NPS's own monitoring studies demonstrate that the Winter Use Plan will have a significant adverse effect on Yellowstone's winter soundscapes.

39.    The FEIS claims that 540 snowmobiles in Yellowstone would not unduly impact natural soundscapes and visitor experiences in part because the Winter Use Plan would require the use of snowmobiles using "best available technology," or "BAT" and because all snowmobilers would be required to use commercial guides. But the 2004 Rule in effect during the NPS's monitoring studies already required snowmobiles to use BAT and required commercial guides. Imposing those requirements under the new Winter Use Plan would therefore not reduce the noise experienced under the 2004 Rule. Doubling the number of snowmobiles from the average of 250 per day during the study

14

EXHIBIT J

period would therefore double the adverse impact demonstrated by the NPS's own monitoring studies.

40.    The FEIS itself makes clear that modern snowmobiles using BAT, including "4-stroke" instead of "2-stroke" engines, would continue to be extremely noisy. The NPS states that **each** of these BAT snowmobiles produces noise one-third louder than listening to a vacuum cleaner in an indoor room.  The FEIS also acknowledges that the noises resulting from snowmobiles are "concentrated to a large degree around travel corridors and park attractions and affect the areas most accessible by the vast majority of park visitors."  Such a concentration of snowmobiles can be expected to have a significant impact on natural soundscapes in those travel corridors and park attractions and other areas most accessible by the vast majority of park visitors.

### ADVERSE IMPACT ON WILDLIFE

41.    The Winter Use Plan will have significant detrimental effects on wildlife in Yellowstone.

42.    The FEIS acknowledges that the increases in winter traffic levels proposed to be permitted would "cause increases in vehicle-caused mortality, wildlife displacement, behavior- or physiology-related energy costs" in bison, elk, wolves, lynx, wolverines, bald eagles and swans.

43.    The NPS's own scientists conducted a study of oversnow vehicle impacts on wildlife during the last several winter seasons while the 2004 Rule was in effect. They concluded that the reduced number of snowmobiles during those seasons to 250 per day was "effective at reducing disturbances to wildlife below a level that would cause measurable fitness effects."  However, they acknowledged "the potential for fitness

EXHIBIT J

effects to develop if [oversnow vehicles] or other stressors become more severe or prolonged. Thus we recommend park managers consider maintaining [oversnow vehicle] traffic levels at or below those observed during our monitoring." Yet the NPS's Winter Use Plan will permit a doubling of the number of snowmobiles permitted in Yellowstone from that experienced during the observation period. The NPS has failed even to explain its departure from its own scientists' recommendation.

44.     The NPS considers the acknowledged adverse impacts on wildlife to be acceptable because the NPS measures the wildlife impact of snowmobiles only to the extent the population of each species **as a whole** is threatened. An adverse impact on an individual animal — regardless of the seriousness of the impact, even resulting in death — is not considered important so long as the effect "would not be of any measurable or perceptible consequence to the population." This approach represents a radical departure from decades of NPS policy. The environmental impact statement performed before the 2003 Rule was adopted, for example, states that "park policies, regulations, and [executive orders] clearly state that disturbance to wildlife, regardless of population-level effects, is unacceptable in the national parks." The NPS's Management Policies make clear that it views impacts on animals or communities of animals just as much to be avoided as impacts on whole population of animals. *See* 2006 NPS Management Policies § 4.4.1 (requiring the NPS to "minimiz[e] human impacts on native plants, animals, populations, communities and ecosystems ...."). Yet the NPS has provided no explanation for the radical change in policy toward wildlife reflected in the FEIS.

EXHIBIT J

### ADVERSE IMPACT ON AIR QUALITY

45. The Winter Use Plan will create a significant increase in hydrocarbon emissions that would have a severe adverse impact on air quality in Yellowstone.

46. The FEIS acknowledges that "air quality is a key resource, in itself, as well as a highly prized (and expected) element of the park visitor experience." The FEIS acknowledges that "an overall reduction in snowmobiles from previous years" has, along with BAT and other factors, led to a "marked reduction in ambient pollution levels" at Yellowstone. Yet the NPS's Winter Use Plan will double the number of snowmobiles from the number experienced during the last several seasons, which have averaged approximately 250 per day. Compared to the conditions under the 2004 Rule, the FEIS acknowledges that emissions impact would be more adverse. The FEIS acknowledges that the impact of emissions from 540 snowmobiles per day would be "moderate, adverse, long-term … direct [and] park-wide."

47. According to the FEIS, carbon monoxide is a "colorless, odorless, and poisonous gas produced by incomplete burning of carbon in fuels. When [carbon monoxide] enters the bloodstream, it reduces the delivery of oxygen to the body's organs and tissues. Health effects may include impairment of visual perception, manual dexterity, learning ability, and performance of complete tasks; headaches and fatigue; or respiratory failure and death." Based on hypothetical modeling, the NPS estimates in the FEIS that adoption of the Winter Use Plan will more than double the amount of carbon monoxide in some areas of Yellowstone from that experienced with only 250 snowmobiles per day.

48. Particulate matter ("PM") includes, according to the FEIS, "dust, dirt, soot, smoke, and liquid droplets from sources such as … vehicles …. Health effects from

EXHIBIT J

PM emissions include reduced lung function, long-term risk of increased cancer rates, and the development or aggravation of respiratory problems." Yet the Winter Use Plan will increase the amount of fine particulate matter by up to 40% in some areas.

49.     Moreover, the NPS concedes that the modeling on which it relied was based on assumptions that cause the modeling to **understate** the actual adverse impact of the Winter Use Plan on air quality. For example, the FEIS admits that "snowmobile laboratory test data utilized [in the model] may not reflect actual operating conditions in Yellowstone ... as high altitude and low winter temperatures in the parks are likely to decrease overall snowmobile engine performance and increase relative emissions." The FEIS concedes that, at least at one site, monitored actual conditions reflected more than 50% more particulate matter than predicted under the model relied on by the FEIS.

50.     In addition, the NPS's model assumes that snowmobiles will meet the BAT criteria, but an NPS study issued in January 2007 found that actual emissions are likely to produce more pollution than the maximum under those criteria. That study makes clear that actual emissions depend on factors not considered when testing snowmobiles against those BAT criteria. Those factors include the amount of time the driver spends idling (for example, while taking photographs) or accelerating or decelerating. The study found that, during time spent idling, accelerating or decelerating, some models certified as meeting BAT criteria actually created emissions higher than those criteria. Because it is certain that many drivers will in fact spend time idling, accelerating and decelerating, the NPS's models clearly understate the actual pollution likely to result from 540 snowmobiles per day.

EXHIBIT J

51.     Nevertheless, the FEIS set the "desired conditions," which are the objective of its analysis, at an unreasonably low threshold in order to permit the NPS to find that the Winter Use Plan's impact on air quality would be acceptable.  The FEIS merely states that its "desired condition" relating to air quality is that "reduced oversnow vehicle … emission levels protect air quality," referring to a reduction from emission levels in the late 1990's.  But the NPS's Winter Use Plan will permit an increase in emission levels when compared with air quality during the last several seasons.

## *The Record of Decision*

52.     On November 20, 2007, Defendants decided, based on the FEIS, that the proposed Winter Use Plan would be consistent with the underlying statues and other legal requirements.  But the FEIS was flawed, as discussed above.

## *Adoption of the Regulation*

53.     On December 10, 2007, Defendants adopted the Winter Use Plan by amending 36 C.F.R. §§ 7.13, 7.21 and 7.22.

## FIRST CLAIM FOR RELIEF
### (Section 10(e)(2) of the Administrative Procedure Act for Agency Action Not in Accordance with Law)

54.     Section 10(e)(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2) authorizes a reviewing court to "hold unlawful and set aside agency action, findings and conclusions found to be … not in accordance with law."

55.     Defendants' Winter Use Plan for the Parks is not in accordance with law, including the following legal prohibitions and requirements:

19                                    EXHIBIT J

(a)     The Winter Use Plan is prohibited by 16 U.S.C. § 22 because the Winter Use Plan is inconsistent with the requirements of that section mandating that Defendants make regulations to preserve the natural wonders of Yellowstone against injury or spoliation and to preserve them in their natural condition.  The Winter Use Plan would, according to the NPS's own evaluation, permit injury and spoliation of Yellowstone's wildlife, natural soundscapes and air quality, all of which are among Yellowstone's natural curiosities or wonders.

(b)     Defendants acted contrary to Executive Order 11644 in adopting the Winter Use Plan.  That Executive Order prohibits Defendants from authorizing the use of snowmobiles in the Parks unless the Secretary of the Interior "determines that off-road vehicle use in such locations will not adversely affect the natural, aesthetic or scenic values."  EO 11644 § 3.  Yet, based on the NPS's own FEIS, the Winter Use Plan will adversely affect the natural, aesthetic and scenic values within the Parks.

(c)     The Winter Use Plan is contrary to the prohibition on snowmobile authorization under the NPS's own regulation, 36 C.F.R. § 2.18(c).  That regulation prohibits snowmobile use to be designated when their use is not consistent with the park's natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources.  Yet the NPS's own evaluation demonstrates that the Winter Use Plan will in fact disturb wildlife and damage park resources, and that the Winter Use Plan is inconsistent at least with Yellowstone's natural, cultural, scenic and aesthetic values.

(d)     The Winter Use Plan is contrary to the Organic Act and the General Authorities Act, as amended.  16 U.S.C. §§ 1, 1a-1.  Among other things, those

EXHIBIT J

statutes prohibit the NPS from permitting an "impairment" of the scenery, natural and historic objects and wild life within the National Park System, and prohibit the NPS from administering the parks within that System "in derogation of the values and purposes for which these various areas have been established." The NPS has itself interpreted these requirements as mandating that conservation predominate over recreation whenever there is a conflict between conserving resources and values and providing for their enjoyment. 2006 Management Policies § 1.4.3. The Defendants recognize that conflict at Yellowstone yet, by adopting the Winter Use Plan, are permitting snowmobile recreation there at the expense of conservation.

### SECOND CLAIM FOR RELIEF
**(Section 10(e)(2) of the Administrative Procedure Act for Agency Action, Findings and Conclusions that Are Arbitrary, Capricious and an Abuse of Discretion)**

56.     Section 10(e)(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2), authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious and an abuse of discretion ...." The ROD and the FEIS are arbitrary, capricious and an abuse of discretion, because, among other things, there is no rational connection between the facts and the NPS's conclusions. For example:

(a)     Defendants set a standard for evaluating impact on natural winter soundscapes at Yellowstone which was unreasonable but which permitted Defendants' desired conclusion, that permitting 540 snowmobiles per day would not cause prohibited adverse effects. That impact standard was based on the percentage of the "total park area" in which sounds could be heard. Because of the enormous size of Yellowstone, that standard would permit a finding of little or no impact even when the sounds being

21                                          EXHIBIT J

evaluated are extremely loud and carry for long distances, interfering with the enjoyment of Yellowstone by visitors not using snowmobiles. The unreasonableness of that analytical method is further heightened by the fact that the same areas of the park in which snowmobiles would be used are those areas in which other visitors and wildlife tend to congregate, according to the NPS's own analysis.

(b)     Defendants set a standard for evaluating the impact of snowmobiles on wildlife which was unreasonable but which permitted Defendants' desired conclusion, that permitting 540 snowmobiles per day at Yellowstone would not cause prohibited adverse effects. That standard was based on the impact on the "total population" of a species, regardless of the significance of impacts on individual animals or smaller groups of them. That "total population" standard permitted Defendants to conclude that 540 snowmobiles per day would have little or no impact on wildlife.

(c)     Defendants set unreasonably low the "desired conditions" for evaluating impacts on air quality in order to permit a finding that the Winter Use Plan's impact on air quality would be acceptable. The FEIS's "desired condition" relating to air quality is merely that there be "reduced oversnow vehicle … emission levels [that] protect air quality," referring to a reduction from emission levels prior to the adoption of the 2001 Rule.

(d)     Defendants unreasonably chose not to follow the recommendations of its own scientists concerning the effects of snowmobiles on wildlife in Yellowstone and provided no rational explanation of why that recommendation was being disregarded. The NPS's own scientists recommended that oversnow vehicle use not be permitted to an

EXHIBIT J

extent greater than that experienced during the winter seasons in which the 2004 Rule

was in effect. Yet the ROD would permit double that number of oversnow vehicles.

   (e) Defendants unreasonably based the conclusion that 540

snowmobiles would have limited impact on natural soundscapes, wildlife and air quality

by relying on hypothetical modeling, despite Defendants' recognition that that modeling

understates those impacts and relies on inaccurate assumptions and despite the fact that

that modeling is contrary to the NPS's own monitoring of actual conditions.

   (f) The NPS departed in several critical respects from prior agency

policies or interpretations in order to permit a finding of little or no adverse impact

arising from the proposed Winter Use Plan, yet Defendants provided no justification for

those departures, including the following:

> (i) The NPS's long-standing interpretation that applicable statutes and regulations preclude adverse impacts to individual wildlife or groups of wildlife, replacing that interpretation with one that only considers the impact upon a total population of a species of animal.

> (ii) The NPS's long-standing interpretation of the applicable statutory and regulatory requirements relating to soundscapes which take into account the impact on natural soundscapes in areas likely to be visited by visitors and/or wildlife and replacing that interpretation with one that only considers impacts on natural soundscapes which affect the entire area of a park unit.

   (g) Defendants failed to articulate a rational basis for the

determination that none of the seven alternatives examined would impair park resources,

relying on the same repetitive, boilerplate and nearly identical conclusory statements in

each impairment analysis.

EXHIBIT J

## THIRD CLAIM FOR RELIEF

### (Section 10(e)(2) of the Administrative Procedure Act for Violation of the National Environmental Policy Act)

57.    The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare environmental impact statements regarding "proposals for ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As interpreted by the courts, NEPA requires that, when federal agencies prepare such an environmental impact statement, the agency must reasonably define its objective so as to carry out the purpose and requirements of the underlying legislation and that the agency must use reasonable tests and methods for evaluating the degree to which the considered alternatives meet that objective. The agency may not define the objective unreasonably so as to permit a favored result.

58.    Defendants acted contrary to these requirements in preparing the FEIS and in reaching their conclusions as set forth in the ROD. Among other things:

(a)    The NPS's definition of its objective, "to ensure park visitors have a range of winter recreation opportunities that are appropriate to the national park setting, and that these activities do not impair or irreparably harm park resources or values," does not reasonably reflect the purpose or requirements of the Organic Act, the General Authorities Act, as amended, the act establishing Yellowstone, the NPS's own snowmobile regulation or the Executive Order on which it was based. *See* 16 U.S.C. §§ 1, 1a-1 and 22; 36 C.F.R. § 2.18(c); EO 11644. "Impairment" is not the only requirement established by these statutes or other authorities, nor must harm to park resources or values be "irreparable" in order to be prohibited by these authorities.

EXHIBIT J

(b)     Defendants' statements of its "desired conditions" fail reasonably to reflect the requirements of the authorities cited in the preceding subparagraph.  For example, Defendants set unreasonably low the "desired conditions" for evaluating impacts on air quality in order to permit a finding that the Winter Use Plan's impact on air quality would be acceptable.  The FEIS's "desired condition" relating to air quality is merely that there be "reduced oversnow vehicle … emission levels [that] protect air quality," referring to a reduction from emission levels in the late 1990's.  But "protect air quality" is too lacking in substantive content to serve as a meaningful desired condition.

(c)     Defendants set a standard for evaluating impact on natural winter soundscapes at Yellowstone which was not a reasonable means of evaluating whether those impacts violated the requirements of the underlying legislative and other authorities.  That test of impact was based on the percentage of the "total park area" in which sounds could be heard.  Because of the enormous size of Yellowstone, that test would permit a finding of little or no impact even when sounds being evaluated are extremely loud and carry for long distances, interfering with the enjoyment of the park by other visitors.  The unreasonableness of that analytical method is further heightened by the fact that the same areas of the park in which snowmobiles would be used are those areas in which other visitors and wildlife tend to congregate, according to the NPS's own analysis.

(d)     Defendants used an analytical method for evaluating the impact of snowmobiles on wildlife which was not a reasonable means of evaluating whether those impacts violated the requirements of the underlying legislative and other authorities.  That method was to examine the impact on the total population of each species, despite

EXHIBIT J

the recognition that the Winter Use Plan would in fact have significant impact on individual animals or groups of animals.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

(1)     Find that the Winter Use Plan, the ROD and the FEIS are unlawful and set them aside; and

(2)     Grant Plaintiffs such other and further relief as the Court may deem proper.

Respectfully submitted,

Robert D. Rosenbaum (D.C. Bar No. 090498)
Donna E. Patterson (D.C. Bar No. 358701)
Ingo W. Sprie
Kwame A. Clement (D.C. Bar No. 467377)
Meetu Kaul (D.C. Bar No. 468146)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Phone:    (202) 942-5862
Fax:      (202) 942-5999

Attorneys for Plaintiff

Dated: December 18, 2007

EXHIBIT J

## CERTIFICATE OF SERVICE

I hereby certify that, on this 18th day of December 2007, I served on the

following a copy of the Plaintiff's First Amended Petition for Review of Agency Action

in the case captioned *National Parks Conservation Association v. U.S. Department of the*

*Interior and National Park Service*, 1:07-cv-02112 (JR) pending in the U.S. District

Court for the District of Columbia, by sending a copy of that document by Certified Mail,

Return Receipt Requested.

The Hon. Michael B. Mukasey
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530

Jeffrey A. Taylor, Esq.
United States Attorney for the
  District of Columbia
555 Fourth Street, NW
Washington, DC  20530

The Honorable Dirk Kempthorne
Secretary
United States Department of the Interior
1849 C Street, NW
Washington, DC  20240

The Honorable Mary Bomar
Director
National Park Service
1849 C Street NW
Washington, DC  20240


Robert D. Rosenbaum

EXHIBIT J

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

DEC 1 3 2007

Stephan Harris, Clerk
Cheyenne

Bruce Salzburg
Attorney General

Jay Jerde
Deputy Attorney General

Teresa Nelson
Assistant Attorney General
123 Capitol Building
Cheyenne, WY 82002
(307) 777-6946
(307) 777-3542 facsimile
email: jjerde@state.wy.us

Attorneys for Petitioner State of Wyoming

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, )<br><br>Petitioner, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF )<br>THE INTERIOR; THE NATIONAL PARK )<br>SERVICE; DIRK KEMPTHORNE, in his official )<br>capacity as Secretary of the Interior; MARY )<br>BOMAR, in her official capacity as Director )<br>of the National Park Service; and MICHAEL )<br>SNYDER, in his official capacity as Intermountain )<br>Region Director for the National Park Service, )<br><br>Respondents. ) | Case No. **07 C V   3 1 9 ß**<br><br>**PETITION FOR REVIEW OF**<br>**FINAL AGENCY ACTION** |

Petitioner State of Wyoming ("State"), by and through the Wyoming Attorney General's

Office, hereby petitions this Court for review of the final agency action taken by the United

States Department of the Interior, the National Park Service, Secretary of the Interior Dirk

Receipt #CHVQ03421
Summons:_____ issued
_____not issued

EXHIBIT K

Kempthorne, National Park Service (NPS) Director Mary Bomar, and NPS Intermountain Region Director Michael Snyder (collectively "Respondents") in promulgating the final rule governing winter use activities in Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway (collectively "the Parks"). This final rule was published in the Federal Register on December 13, 2007. *See* 72 Fed. Reg. 70781-70804 (Dec. 13, 2007).

1. In June 2005, the NPS began preparing an environmental impact statement (EIS), a record of decision (ROD), and a final rule to govern winter use activities in the Parks. The NPS released the final EIS on September 24, 2007. The ROD was signed on November 20, 2007. The final rule was published in the Federal Register on December 13, 2007.

2. The Respondents' actions in developing the EIS and the ROD and in adopting the final rule violated numerous federal laws, including, but not limited to: the National Environmental Policy Act (and its implementing regulations), the Administrative Procedure Act, the Yellowstone National Park Act, the National Park Service Organic Act, and the United States Constitution. These violations include, but are not limited to, the following:

(a)     The Respondents violated the NEPA by failing to take a "hard look" at the environmental consequences of:

(i)     allowing a reasonable percentage of snowmobiles to enter Yellowstone National Park ("YNP") each day while accompanied by a non-commercial guide;

(ii)     the management plan for Sylvan Pass;

2

EXHIBIT K

(iii)    the revised preferred alternative as a whole; and

(iv)    allocating snowmobile entries into YNP on a total entries per season basis rather than a maximum number of entries per day basis.

(b)    The Respondents violated 40 C.F.R. §§ 1501.6 and 1508.5 by not allowing the State, in its role as a cooperating agency in the NEPA process, to meaningfully participate in the development of the revised preferred alternative in the final EIS.  Specifically, the Park Service did not confer with, or seek input from, the State when making the decision to decrease the number of daily snowmobile entries into YNP from 720 sleds per day (as required in the preferred alternative in the draft EIS) to 540 sleds per day (as required in the revised preferred alternative in the final EIS);

(c)    The Respondents violated 5 U.S.C. § 553 by not critically reviewing and giving meaningful consideration to all of the comments submitted by the State;

(d)    The Respondents acted arbitrarily and capriciously in violation of 5 U.S.C. § 706(2)(A) by failing to provide a "reasoned analysis" of its change in policy regarding the management plan for Sylvan Pass beginning with the 2008-2009 winter season. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983);

(e)    The Respondents violated 5 U.S.C. § 706(2)(A) by arbitrarily and capriciously reducing the number of daily snowmobile entries into YNP from 720 sleds per day (as required

3

EXHIBIT K

in the preferred alternative in the draft EIS) to 540 sleds per day (as required in the revised preferred alternative in the final EIS);

(f)    The Respondents acted in excess of statutory authority in violation of 5 U.S.C. § 706(C). Specifically, the Respondents violated the Yellowstone National Park Act, 16 U.S.C. § 21, and the National Park Service Organic Act, 16 U.S.C. §§ 1-4, by arbitrarily limiting the number of daily snowmobiles entries into YNP at a maximum of 540 sleds per day; and

(g)    The Respondents acted in excess of statutory or constitutional right in violation of 5 U.S.C. § 706(2)(B). Specifically, the 100% commercial guide requirement for snowmobiles entering Yellowstone National Park is a *de facto* levy of a tax or an unauthorized fee.

4. This Court has jurisdiction over the claims in this Petition pursuant to 5 U.S.C. §§ 701-706, 28 U.S.C. § 1331, FED. R. APP. P. 15, and U.S.D.C.L.R. 83.7.2.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e). Each of the above-named respondents is either an agency of the United States or an officer or employee of the United States acting in his or her official capacity, and a substantial part of the events giving rise to the claims occurred in this judicial district. Additionally, the State "resides" in this judicial district for purposes of this suit.

6. The adoption of the final rule is final agency action subject to appellate review in this Court. *See* 5 U.S.C. §§ 701-706; *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580

4

EXHIBIT K

(10th Cir. 1994) (stating that federal district courts in the Tenth Circuit must review agency action as an appellate court).

WHEREFORE, the State respectfully requests that this Court:

1.      Declare that the Respondents violated the NEPA, the APA, the Yellowstone National Park Act, the National Park Service Organic Act, and the United States Constitution in developing the EIS and the ROD and in adopting the final rule;

2.      Set aside and vacate those portions of the EIS, the ROD, and the final rule which address the daily limits on snowmobiles entering Yellowstone National Park, the commercial guide requirement for Yellowstone National Park, and the management plan for Sylvan Pass;

3.      Remand those portions of the EIS, the ROD, and the final rule which address the daily limits on snowmobiles entering Yellowstone National Park, the commercial guide requirement for Yellowstone National Park, and the management plan for Sylvan Pass to the NPS;

4.      Order that:

a.      on remand, the NPS shall remedy the foregoing violations of federal law and publish a revised EIS, a revised ROD, and a revised final rule;

b.      the revised final rule shall take effect no later than September 1, 2008; and

EXHIBIT K

    c.     this Court shall retain jurisdiction over this matter during the remand process so that, upon timely application by any of the parties to this action, this Court may review the results of the remand to ensure that the Respondents have remedied the foregoing violations of federal law, or provide other appropriate relief as necessary during the remand process; and

    5.     Grant the State such further and additional relief as the Court may deem just and proper.

    Submitted this 15 day of December, 2007.


_____
Bruce Salzburg
Attorney General


_____
Jay Jerde
Deputy Attorney General


_____
Teresa Nelson
Assistant Attorney General
123 Capitol Building
Cheyenne, WY 82002
(307) 777-6946
(307) 777-3542 facsimile

Attorneys for the Petitioner State of Wyoming

6

EXHIBIT K

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the _34th_ day of December, 2007, a true and correct copy of the foregoing **PETITION FOR REVIEW OF FINAL AGENCY ACTION** was served upon the following via United States mail, first class, certified, return receipt requested:

United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

National Park Service
1849 C Street, NW
Washington, DC 20240

Honorable Dirk Kempthorne
Secretary
United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

Mary Bomar
Director
National Park Service
1849 C Street, NW
Washington, DC 20240

Michael Snyder
Intermountain Region Director
National Park Service
12795 W. Alameda Parkway
P.O. Box 25287
Denver, CO  80225

United States Attorney's Office
Attn:  Civil Process Clerk
P.O. Box 668
Cheyenne, WY 82003-0668

Honorable Michael B. Mukasey
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530-0001

_Connie Schepp_
Wyoming Attorney General's Office

7

EXHIBIT K

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

JAN - 2 2008

Stephan Harris, Clerk
Cheyenne

Bryan A. Skoric
James F. Davis
1002 Sheridan Ave.
Cody, Park County 82414
(307) 527-8660 (phone)
(307) 527-8668 (facsimile)

Attorneys for Park County, Wyoming – Petitioners

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| BUCKY HALL, TIM A. FRENCH, JILL SHOCKLEY SIGGINS, BILL BREWER, and MARIE FONTAINE, in their official capacity as the Board of County Commissioners of the County of Park, State of Wyoming, <br><br> Petitioner, <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior; MARY BOMAR, in her official capacity as the Director of the National Park Service, and MICHAEL SNYDER, in his official capacity as Intermountain Regional Director, National Park Service, <br><br> Respondents. | Civil No. | 08 C V  0 0 4-0 |

## PETITION FOR REVIEW OF AGENCY ACTION

1.      Petitioner, Board of County Commissioners of the County of Park, Wyoming

("Park County"), by and through the office of the Park County Attorney, hereby petitions

EXHIBIT L

the Court for review of the National Park Service's final rule regarding winter use in Yellowstone National Park, Grand Teton National Park and the John D. Rockefeller, Jr., Memorial Parkway, as submitted December 13, 2007 by the above-named respondents, Dirk Kempthorne, United States Secretary of the Interior, Mary Bomar, Director of the National Park Service, and Michael Snyder, Intermountain Regional Director of the National Park Service on. The final rule followed respondents' publication of an Environmental Impact Statement and Record of Decision regarding winter use and is published at 72 Fed. Reg. 70781-70804 (Dec. 13, 2007).

2.      This petition is filed pursuant to 5 U.S.C. § 706(2)(A)(B) and (C). The final rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, is contrary to constitutional right, power or privilege and/or in excess of statutory jurisdiction, authority or limitation or short of statutory right. By way of example, the final rule:

    a. Allows only commercially-guided snowmobile access and fails to properly analyze an alternative for non-commercially guided access in accordance with the National Environmental Protection Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*;

    b. Fails to provide sufficient analysis and justification for the long-term management plan related to winter use over Sylvan Pass in Yellowstone National Park in violation of NEPA. Petitioner recognizes a need to preserve this issue despite continuing efforts between the parties to negotiate aspects of future use;

EXHIBIT L

c.  Fails to adequately analyze the allocation of snowmobile entries into Yellowstone National Park on a per season basis or flexible daily basis as compared to a strict per day basis as it relates to maximum numbers in violation of NEPA;

d.  Fails to properly analyze the preferred alternative as a whole in violation of NEPA;

e.  Fails to give observance and critical review of Park County's public comments, particularly in the context of Park County's status as a cooperating agency;

f.  Arbitrarily and capriciously reduces the number of snowmobile entries into Yellowstone National Park from 720 per day (draft environmental impact statement preferred alternative) to 540 per day (final rule), which final number is additionally violative of the Yellowstone National Park Act, 16 U.S.C. § 21, the National Park Service Organic Act, 16 U.S.C. §§ 1, 2-4, and 40 C.F.R. §§ 1501.6 and 1501.8;

g.  Establishes a *de facto* tax or unauthorized fee with the requirement that all snowmobiles be accompanied by a commercial guide;

h.  Is based in part on a regulation, 36 C.F.R. § 2.18(c), that regulates activity in a manner beyond the authority granted in the executive order upon which it is based, and therefore the final rule, to the extent it relies on said regulation, is contrary to law.

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, 5 U.S.C. §§ 701-706, Fed. R. App. P. 15 and U.S.D.C.L.R. 83.7.2.

EXHIBIT L

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) & (e).

**WHEREFORE**, Petitioner respectfully prays that this Court:

1.      Find that the Final Rule and the environmental impact statement and record of decision preceding the Final rule are unlawful and set them aside;

2.      Remand this matter to the National Park Service to remedy the violations set forth herein;

3.      Grant Petitioners such other and further relief this Court may deem just and proper.

Respectfully submitted this ____ day of December, 2007.

Bryan A. Skoric
Park County Attorney

James F. Davis
Deputy Park County Attorney
1002 Sheridan Ave.
Cody, Wyoming 82414
(307) 527-8660
(307) 527-8668 facsimile

4

EXHIBIT L

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing PETITION FOR REVIEW OF AGENCY ACTION by Petitioner was served upon the following by placing same in the United States mail, first-class, certified, return receipt requested, on the _____ day of December, 2007, addressed as follows:

Honorable Dirk Kempthorne
Secretary
United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

Michael Snyder
Intermountain Regional Director
National Park Service
12795 W. Alameda Parkway
P.O. Box 25287
Denver, CO 80225

Honorable Michael B. Mukasey
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

United States Attorney
c/o Civil Process Clerk
P.O. Box 668
Cheyenne, Wyoming 82003-0668

Mary Bomar
Director
National Park Service
1849 C Street, NW
Washington, D.C. 20240

Bryan A. Skoric
Park County Attorney
1002 Sheridan Avenue
Cody, Wyoming 82414
(307) 527-8660
(307) 527-8668  Facsimile

5

EXHIBIT L

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

FEB 2 6 2008

Stephan Harris, Clerk
Cheyenne

Harriet M. Hageman (Wyo Bar No. 5-2656)
Hageman & Brighton, PC
222 E. 21st St.
Cheyenne, WY 82001
Telephone: (307) 635-4888
Facsimile: (307) 635-7581
hhageman@hblawoffice.com

William P. Horn (*pro hac vice* application pending)
David E. Lampp (*pro hac vice* application pending)
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave. NW, Suite 1200
Washington, DC 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
whorn@dc.bhb.com; dlampp@dc.bhb.com

*Attorneys for Petitioner-Intervenors International Snowmobile Manufacturer's Association, American Council of Snowmobile Associations, BlueRibbon Coaltion, Inc., and Teri Manning*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE INTERNATIONAL SNOWMOBILE | ) | Case No. 2:07-cv-00319-CAB |
| MANUFACTURER'S | ) | |
| ASSOCIATION, INC., et al. | ) | PETITION FOR REVIEW |
| | ) | OF FINAL AGENCY ACTION |
| Petitioner Intervenor-Applicants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| | ) | |

1

EXHIBIT M

Petitioner Intervenors The International Snowmobile Manufacturer's Association, the American Council of Snowmobile Associations, BlueRibbon Coalition, Inc., and Teri Manning, by and through counsel, hereby petition this Court for review of final agency action by Respondents United States Department of the Interior ("DOI"), the National Park Service ("NPS"), Secretary of the Interior Dirk Kempthorne, NPS Director Mary Bomar, and NPS Intermountain Region Director Michael Snyder (collectively "Respondents" or "Federal Respondents"). Petitioner Intervenors intervene on the side of the State of Wyoming, which filed its Petition for Review on December 13, 2007. The final agency action for which the Petitioner Intervenors seek review consists of the Federal Respondents' promulgation of a final rule regarding winter use of Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Highway (collectively, the "Parks"). See 72 Fed. Reg. 70781 et seq. (the "2007 Final Rule"). The 2007 Final Rule is arbitrary and capricious, contrary to law, and exceeds the NPS's statutory authority to the extent that it limits snowmobile entries into Yellowstone National Park to 540 vehicles per day, reduced from the previous limit of 720 vehicles per day, and requires all recreational snowmobiles entering Yellowstone National Park to be accompanied by a commercial guide.

### Parties, Jurisdiction, and Venue

1.     The International Snowmobile Manufacturers' Association ("ISMA"), based in Michigan, is an organization of snowmobile manufacturers dedicated to, *inter alia*, promoting snowmobiling and snowmobile-friendly policies, preparing and disseminating information regarding snowmobiling opportunities, and fostering growth in the sport of snowmobiling.

EXHIBIT M

ISMA members manufacture many of the snowmobiles and snowmobile parts that are used

throughout the National Park System, including in Yellowstone National Park, Grand Teton

National Park, and the Rockefeller Parkway. ISMA previously challenged, as a Petitioner in this

Court, the NPS's promulgation of a 2001 winter use plan prohibiting all recreational

snowmobiling in Yellowstone National Park. See Int'l Snowmobile Mfrs. Ass'n. v. Norton, 304

F. Supp. 2d 1278 (D. Wyo. 2004). In addition, ISMA was previously a Defendant Intervenor on

the side of the NPS in a case in the U.S. District Court for the District of Columbia brought to

challenge the NPS's 2004 temporary winter use plan regulating snowmobile usage in

Yellowstone National Park. See Fund for Animals v. Norton, Civ. No. 04-1913 (EGS), 512 F.

Supp. 2d 49 (D.D.C. 2007).

    2.    The American Council of Snowmobile Associations ("ACSA"), based in

Michigan, is an organization made up of snowmobilers and snowmobiling-related businesses and

associations dedicated to providing a strong national voice to promote the interests of the

snowmobiling community and the millions of snowmobilers throughout the United States.

Among other things, ACSA promotes snowmobile access to public lands across the United

States, including the Parks.

    3.    The BlueRibbon Coalition, Inc. ("BRC"), based in Idaho, is an Idaho non-profit

organization representing over 1,000 businesses and organizations with approximately 600,000

members nationwide. BRC is dedicated to promoting public access to federal lands like those at

issue in this case for both motorized and non-motorized use, including for snowmobiling in the

Parks. BRC has participated in past litigation and rulemaking proceedings in connection with its

EXHIBIT M

mission of preserving motorized and non-motorized access to public lands for recreational purposes. BRC previously challenged, as a Petitioner in this Court, the NPS's promulgation of a 2001 winter use plan prohibiting all recreational snowmobiling in Yellowstone National Park. See Int'l Snowmobile Mfrs. Ass'n. v. Norton, 304 F. Supp. 2d 1278 (D. Wyo. 2004). In addition, BRC was previously a Defendant Intervenor on the side of the NPS in a case in the U.S. District Court for the District of Columbia brought to challenge the NPS's 2004 temporary winter use plan regulating snowmobile usage in Yellowstone National Park. See Fund for Animals v. Norton, Civ. No. 04-1913 (EGS), 512 F. Supp. 2d 49 (D.D.C. 2007).

　　　　4.　　Teri Manning is an individual residing in Wyoming who has, for many years, enjoyed snowmobiling in the Parks. Ms. Manning is a past president of the Wyoming State Snowmobile Association and ACSA, and in those capacities has dedicated significant amounts of time and effort to protecting and promoting the interests of snowmobilers, including access to public lands specifically including the Parks at issue here.

　　　　5.　　This action arises under the Administrative Procedure Act, codified 5 U.S.C. §§ 551 et seq. ("APA"), the Yellowstone National Park Act, codified at 16 U.S.C. §§ 21 et seq., and the National Park Service Organic Act, codified at 16 U.S.C. §§ 1 et seq.

　　　　6.　　This Court has jurisdiction over Petitioner Intervenors' claims under 5 U.S.C. §§ 701-706, 28 U.S.C. § 1331, and Local Civil Rule 83.7.2.

　　　　7.　　Venue is proper in this Court under 28 U.S.C. § 1391(e). Respondents are all federal agencies or federal officers acting in their official capacities, and a substantial part of the events and omissions giving rise to the 2007 Final Rule, State Petitioners' challenge, and

EXHIBIT M

Petitioner Intervenors' challenge occurred in this judicial district. In addition, State Petitioner resides in this judicial district for purposes of this litigation.

### Challenged Action

8.      During the winter use seasons of 2004-2005, 2005-2006, and 2006-2007, recreational snowmobile use in the Parks was governed by an NPS Interim Rule that provided, *inter alia*, for 720 snowmobiles per day to enter Yellowstone National Park. See 69 Fed. Reg. 65348, 65349 (Nov. 10, 2004).

9.      The NPS Interim Rule also required all snowmobiles entering Yellowstone National Park for recreational purposes to be accompanied by a commercial guide. See id.

10.      On May 16, 2007, the NPS published a proposed permanent rule regarding winter use for the Parks. See 72 Fed. Reg. 27500 et seq. The proposed rule, like the Interim Rule previously in place, included a limit of 720 snowmobiles per day in Yellowstone National Park (aside from at Cave Falls, which, as an isolated area where snowmobile use is incidental to snowmobile use outside the Park, has its own independent daily limit). Id. at 27505. The proposed rule, like the Interim Rule, also required all recreational snowmobiles entering Yellowstone National Park to be accompanied by a commercial guide.

11.      The NPS published its 2007 Final Rule on a permanent winter use plan for the Parks in on December 13, 2007. See 72 Fed. Reg. 70781 et seq. The 2007 Final Rule includes a limit of 540 snowmobiles per day in Yellowstone National Park (aside from Cave Falls). See id. at 70798. The 2007 Final Rules also includes a requirement that all recreational snowmobiles entering Yellowstone National Park be accompanied by a commercial guide.

EXHIBIT M

12.    The 2007 Final Rule was preceded by a draft environmental impact statement on April 2, 2007, see 72 Fed. Reg. 15720 et seq. (Apr. 2, 2007), and a final environmental impact statement ("FEIS") issued on September 25, 2007. See 72 Fed. Reg. 54456 (Sept. 25, 2007).

13.    The NPS's limit in its 2007 Final Rule of 540 snowmobiles per day is arbitrary and capricious and contrary to law and exceeds the NPS's statutory authorization.

**Petioner Intervenors' Claims**

14.    The NPS's promulgation of the 2007 Final Rule is final agency action subject to review in this Court. See 5 U.S.C. § 704; Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994); Int'l Snowmobile, 304 F. Supp. 2d at 1290 (2001 winter use rules constituted "final agency action" for purposes of judicial review).

15.    The NPS's reduction in snowmobile entries into Yellowstone National Park from 720 to 540 snowmobiles per day and its requirement that all snowmobiles entering the Park for recreational purposes be accompanied by commercial guides are not supported by the record, are arbitrary and capricious and not in accordance with law in violation of the APA, and exceed the NPS's statutory authority under the National Park Service Organic Act and the Yellowstone National Park Act.

16.    The NPS acted arbitrarily and capriciously, in violation of the APA, 5 U.S.C. § 706(2)(A), by decreasing the daily snowmobile limit from 720 vehicles (the interim rule limit in place for three winter use seasons, the preferred alternative in the draft EIS, and the proposed limit in the May 2007 proposed rule) to 540 vehicles (the "revised preferred alternative" in the final EIS and the limit in the 2007 Final Rule). The decrease in snowmobile access is not

6

EXHIBIT M

supported by the record and the NPS has failed to provide a "reasoned analysis" for that decision. <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 42 (1983).

17.     The NPS acted arbitrarily and capriciously, in violation of the APA, 5 U.S.C. § 706(2)(A), by requiring all recreational snowmobiles entering Yellowstone National Park to be accompanied by a commercial guide. This requirement is not supported by the record and the NPS has failed to provide a "reasoned analysis" for that decision. <u>Motor Vehicle</u>, 463 U.S. at 42.

18.     The NPS exceeded its statutory authority under the Yellowstone National Park Act, codified at 16 U.S.C. §§ 21 <u>et seq.</u>, and the National Park Service Organic Act, codified at 16 U.S.C. §§ 1 <u>et seq</u>. Because the daily snowmobile limit in the 2007 Final Rule violates these provisions of federal law, it is also contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(c).

19.     Accordingly, Petitioner Intervenors ask the Court to:

    a.  Set aside that portion of the 2007 Final Rule imposing a 540-snowmobile limit on daily snowmobile entries into Yellowstone National Park; and

    b.  Order that Federal Respondents impose a daily snowmobile limit that is not arbitrary and capricious, that is supported by the record, and that complies with federal law; and

    c.  Order that the previous 720-snowmobile limit remain in effect until such time as Federal Respondents promulgate a limit that complies in all respects with their legal obligations; and

    d.  Grant Petitioner Intervenors such further and additional relief as the Court may

EXHIBIT M

deem proper.

Submitted this 26th day of February, 2008.

HAGEMAN & BRIGHTON, P.C.

Respectfully submitted,

Harriet M. Hageman (Wyo. Bar No. 5-2656)
HAGEMAN & BRIGHTON, PC
222 E. 21st St.
Cheyenne, WY 82001
Telephone: (307) 635-4888
Facsimile: (307) 635-7581
hhageman@hblawoffice.com

William P. Horn (pro hac vice application pending)
David E. Lampp (pro hac vice application pending)
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave. NW, Suite 1200
Washington, DC 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
whorn@dc.bhb.com; dlampp@dc.bhb.com

*Attorneys for Applicant Defendant Intervenors
International Snowmobile Manufacturers
Association, American Council of Snowmobile
Associations, Blue Ribbon Coalition, and Teri
Manning*

EXHIBIT M

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of February, 2008, I filed the foregoing Petition electronically through the CM/ECF system, which caused the following counsel to be served by electronic means. I further certify that I caused correct copies of the foregoing to be served by placing the same in the U.S. first class mail, postage prepaid, addressed as follows:

Bruce Salzburg, Attorney General
Jay Jerde, Deputy Attorney General
Teresa Nelson, Assistant Attorney General
123 Capitol Building
Cheyenne, WY 82002

Barry A. Weiner
Luther L. Hajek
Guillermo Montero
U.S. Department of Justice
Environmental & Natural Resources Division
601 D Street, NW, Room 3528
P.O. Box 663
Washington, DC 20044-0663

Nicholas Vassallo
U.S. Attorney's Office
P.O. Box 668
Cheyenne, WY 82003-0668

9

EXHIBIT M

William P. Horn (DC Bar No. 375666)
David E. Lampp (DC Bar No. 480215)
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave. NW, Suite 1200
Washington, DC 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027

*Attorneys for Applicant Defendant and Cross-Claim Plaintiff*
*Intervenors International Snowmobile Manufacturer's Association,*
*American Council of Snowmobile Associations,*
*BlueRibbon Coalition, Inc., and Teri Manning*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PARKS CONSERVATION, ASSOCIATION )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al. )<br><br>Defendants, )<br><br>and )<br><br>THE INTERNATIONAL SNOWMOBILE MANUFACTURER'S ASSOCIATION, 1640 Haslett Road, Suite 170 Haslett, Michigan 48840 )<br><br>THE AMERICAN COUNCIL OF SNOWMOBILE ASSOCIATIONS, 271 Woodland Pass, Suite 216 East Lansing, Michigan 48823 )<br><br>THE BLUE RIBBON COALITION, 4555 Burley Drive, Suite A Pocatello, Idaho 83202 )<br><br>TERRI MANNING, an individual, 5450 Shoshone P.O. Box 1524 ) | Case No. 1:07-cv-02112 (EGS)<br><br><br><br><br><br>LODGED: ANSWER AND CROSS-CLAIMS |

{G:\101238\13\00000312.DOCX}                    1

EXHIBIT N

Jackson, Wyoming  83001                    )
                                           )
Applicant Defendant and Cross-Claim        )
Plaintiff Intervenors                      )
_____)
                                           )
THE INTERNATIONAL SNOWMOBILE               )
    MANUFACTURER'S ASSOCIATION,            )
    et al.                                 )
                                           )
    Applicant Defendant and Cross-Claim    )
    Plaintiff Intervenors,                 )
                                           )
v.                                         )
                                           )
UNITED STATES DEPARTMENT OF THE            )
    INTERIOR, et al.                       )
                                           )
    Cross-Claim Defendants.                )
_____)

Defendant and Cross-Claim Plaintiff Intervenors the International Snowmobile Manufacturer's Association ("ISMA"), American Council of Snowmobile Associations ("ACSA"), BlueRibbon Coalition, Inc. ("BRC"), and individual Teri Manning (collectively, the "Intervenors"), by and through counsel hereby answer Plaintiffs' First Amended Petition for Review of Agency Action, dated December 18, 2007, and submit their cross-claims against Federal Defendants. Unless specifically stated otherwise, the numbered paragraphs in Intervenors' Answer correspond to the numbered paragraphs in Plaintiffs' First Amended Petition for Review.

**INTERVENORS' ANSWER**

1. Admit that the 2007 Final Rule, which amends 36 C.F.R. §§ 7.13, 7.21, and 7.22, establishes a limit of 540 snowmobiles per day allowed into Yellowstone National Park. The rest of Plaintiffs' ¶ 1 is denied or constitutes Plaintiffs' characterization of their claims, to which no response is required.

EXHIBIT N

2.    Admit that the 2007 Final Rule is the most recent regulatory provision governing snowmobile use in Yellowstone National Park.  The rest of Plaintiffs' ¶ 2 is denied.

3.    Intervenors have insufficient information to either admit or deny Plaintiffs' vague allegations in ¶ 3.  To the extent a response is required, Plaintiffs' allegations in ¶ 3 are denied.

4.    Deny.

5.    Plaintiffs' ¶ 5 asserts a legal conclusion to which no response is necessary.  To the extent a response is necessary, Plaintiffs' ¶ 5 is denied.

### Jurisdiction and Venue

6.    Plaintiffs' ¶ 6 contains assertions of legal conclusions to which no response is required.

7.    Admit that Federal Defendants are located in this District.  The remainder off Plaintiffs' ¶ 7 contains assertions of legal conclusions to which no response is required.

### Parties and Standing

8.    Deny that snowmobile use significantly impairs Yellowstone visitors' enjoyment of Yellowstone National Park in the winter, or that snowmobiles have "substantial adverse impacts" on wildlife.  Further deny that the 2007 Final Rule will have any significant adverse impact on Plaintiffs' members' use or enjoyment of Yellowstone National Park or its wildlife, scenery, natural soundscapes, or fresh air.  Intervenors have insufficient information to either admit or deny the remaining allegations in Plaintiffs' ¶ 8, and on information and belief, admit them.

9.    Admit as to Plaintiffs' description of Federal Defendants.

### Factual Background

10.   Admit that Yellowstone National Park is the nation's first national park and was

EXHIBIT N

established by act of Congress in 1872.  The remainder of Plaintiffs' ¶ 10 requires no response.

11.    Plaintiffs' ¶ 10 contains allegations of opinion rather than fact, not requiring a response.  Furthermore, as to Plaintiffs' allegation in ¶ 10 that the creation of Yellowstone National Park led other nations to establish similar parks, Intervenors have insufficient knowledge to admit or deny, but on information and belief admit that allegation.

**The Legal Framework**

12.    Plaintiffs' ¶ 12 contains Plaintiffs' legal conclusions to which no response is required.

13.    Plaintiffs' ¶ 13 contains Plaintiffs' legal conclusions to which no response is required.

14.    Admit that Congress created the National Park Service in 1916.  The remainder of ¶ 14 contains recitations of language from statutes that speak for themselves, and legal conclusions to which no response is required.

15.    Intervenors have insufficient information to either admit or deny the first two sentences of Plaintiffs' ¶ 15, but, on information and belief, deny them.  The remainder of ¶ 15 contains Plaintiffs' recitation of documents that speak for themselves and/or legal conclusions that require no response.

16.    Plaintiffs' ¶ 16 contains Plaintiffs' recitation of documents that speak for themselves, and legal conclusions to which no response is required.  To the extent a response is required, the allegations in ¶ 16 are denied.

17.    Plaintiffs' ¶ 17 contains its characterization of documents that speak for themselves, and no response is required.

18.    Plaintiffs' ¶ 18 contains characterizations of documents that speak for themselves,

EXHIBIT N

and legal conclusions for which no response is required.

### *The History of Snowmobile Regulation in Yellowstone*

19.     Admit that a lawsuit was filed in 1997 in this Court regarding use of snowmobiles in the Parks.  The remainder of ¶ 19 contains characterizations of documents that speak for themselves and legal conclusions to which no response is required.  To the extent any response is required, the remaining allegations in ¶ 19 are denied.

20.     Admit.

21.     Plaintiffs' ¶ 21 contains Plaintiffs' characterization of documents that speak for themselves.  No response is required.

22.     Admit that the Wyoming Plaintiffs sought and obtained a preliminary injunction from the U.S. District Court for the District of Wyoming.  Deny that that preliminary injunction was issued in December 2003; it was issued in February 2004.  The remainder of Plaintiffs' ¶ 22 constitutes Plaintiffs' characterization of that court's holding, which speaks for itself.

23.     Admit that NPS adopted an interim rule applicable during winter 2004-2005, winter 2005-2006, and winter 2006-2007, providing for limits on snowmobile entries of up to 720 per day.  The remainder of Plaintiffs' ¶ 23 is Plaintiffs' characterization of a document that speaks for itself.

24.     Admit.

25.     Admit that NPS stated its intention, at the time it passed the November 2005 interim rule to govern winter usage from winter 2004-2005 through winter 2006-2007, to collect additional monitoring data snowmobile and snowcoach use.  The remainder of Plaintiffs' ¶ 25 is denied.

26.     Admit that the 2004 interim rule allowed for 720 snowmobiles per day in

EXHIBIT N

Yellowstone National Park. Intervenors have insufficient information to either admit or deny Plaintiffs' allegation of the number of snowmobiles entering Yellowstone per day for the past four winter seasons, and therefore that allegation is denied. The remainder of Plaintiffs' ¶ 26 is denied.

### The 2007 Environmental Impact Statement

27. Admit that, in March 2007, the NPS issued for public comment a draft environmental impact statement ("DEIS") relating to a winter use plan for the Parks. The remainder of Plaintiffs' ¶ 27 characterizes a document that speaks for itself.

28. Admit that the "preferred alternative" in the March 2007 DEIS allowed 720 snowmobiles per day into Yellowstone National Park. The remainder of Plaintiffs' ¶ 28 characterizes a document that speaks for itself.

29. Intervenors have insufficient information to either admit or deny that the NPS received comments on the March 2007 DEIS from more than 122,000 commenters, and on information and belief, Intervenors admit that allegation. The remainder of Plaintiffs' ¶ 29 characterizes documents that speak for themselves.

30. Admit that the NPS, in September 2007, issued a final environmental impact statement ("FEIS"), and that the "revised preferred alternative" in the September 2007 FEIS allowed 540 snowmobiles per day to enter Yellowstone National Park. The remainder of Plaintiffs' ¶ 30 is denied.

31. Plaintiffs' ¶ 31 characterizes a document that speaks for itself.

### The Adverse Effects of the Winter Use Plan Identified in the FEIS and the NPS's Studies

32. Deny.

33. Plaintiffs' ¶ 33 characterizes a document that speaks for itself.

EXHIBIT N

34.     Deny that that the facts in the FEIS demonstrate any particular level of adverse impact from a 540-snowmobile per day limit.  The remainder of Plaintiffs' ¶ 34 characterizes a document that speaks for itself.

35.     Deny.

36.     Admit that the FEIS analyzes audibility of snowmobile noise in a number of locations in Yellowstone National Park.  The remainder of Plaintiffs' ¶ 36 characterizes a document that speaks for itself.

37.     Deny, except to the extent Plaintiffs' ¶ 37 characterizes the FEIS, which speaks for itself.

38.     Intervenors have insufficient information to either admit or deny the first sentence in Plaintiffs' ¶ 38, and on information and belief, deny it.  The second and third sentences of Plaintiffs' ¶ 38 characterize NPS studies that speak for themselves.  The fourth sentence of Plaintiffs' ¶ 38 is denied.

39.     The first sentence in Plaintiffs' ¶ 39 characterizes the 2007 FEIS which speaks for itself.  The second sentence in Plaintiffs' ¶ 39 is admitted, although the 2004 interim rule speaks for itself.  The remainder of Plaintiffs' ¶ 39 is denied.

40.     The first three sentences in Plaintiffs' ¶ 40 characterize a document that speaks for itself.  The fourth sentence in Plaintiffs' ¶ 40 is denied.

***Adverse Impact on Wildlife***

41.     Deny.

42.     Plaintiffs' ¶ 42 characterizes a document that speaks for itself.

43.     The first sentence of Plaintiffs' ¶ 43 is admitted.  The second, third, and fourth sentences of Plaintiffs' ¶ 43 characterize a document that speaks for itself.  The last two

EXHIBIT N

sentences of Plaintiffs' ¶ 43 are denied.

44. Intervenors have insufficient knowledge to either admit or deny the first three sentences of Plaintiffs' ¶ 44, and on information and belief, deny them. The fourth and fifth sentences of Plaintiffs' ¶ 44 characterize documents that speak for themselves. The remainder of Plaintiffs' ¶ 44 is denied.

### *Adverse Impact on Air Quality*

45. Deny.

46. Plaintiffs' ¶ 46 characterizes documents that speak for themselves.

47. Plaintiffs' ¶ 47 characterizes documents that speak for themselves.

48. Plaintiffs' ¶ 48 characterizes documents that speak for themselves.

49. Intervenors deny the allegations in the first sentence of Plaintiffs' ¶ 49. The remainder of Plaintiffs' ¶ 49 characterizes a document that speaks for itself.

50. Plaintiffs' ¶ 50 characterizes documents, models, and studies that speak for themselves. To the extent a response is required, Intervenors deny the allegations in Plaintiffs' ¶ 50.

51. Intervenors deny the allegations in the first and third sentences of Plaintiffs' ¶ 51. The remainder of Plaintiffs' ¶ 51 characterizes a document that speaks for itself.

### *The Record of Decision*

52. Intervenors admit the allegations in the first sentence of Plaintiffs' ¶ 52. The remainder of Plaintiffs' ¶ 52 is denied.

### *Adoption of the Regulation*

53. Deny.

**First Claim for Relief**

EXHIBIT N

54.     Plaintiffs' ¶ 54 characterizes the Administrative Procedure Act, which speaks for itself.

55.     Admit that two limited features of the Winter Use Plan for the Parks, identified below in Intervenors' cross-claims, are not in accordance with law.  The remainder of Plaintiffs' ¶ 55 is denied.  Furthermore, Plaintiffs' ¶ 55 characterizes documents, statutes, and regulations that speak for themselves.

### Second Claim for Relief

56.     The first sentence of Plaintiffs' ¶ 56 characterizes the Administrative Procedure Act, which speaks for itself.  Furthermore, Plaintiffs' ¶ 56 characterizes documents, statutes, and regulations that speak for themselves.  The remainder of Plaintiffs' ¶ 56 is denied.

### Third Claim for Relief

57.     The first sentence of Plaintiffs' ¶ 57 characterizes the National Environmental Policy Act, which speaks for itself.  The remainder of Plaintiffs' ¶ 56 contains legal conclusions to which no response is required.

58.     Plaintiffs' ¶ 58 contains a number of characterizations of documents, statutes, and regulations that speak for themselves.  Intervenors deny Plaintiffs' remaining allegations in ¶ 58.

### Prayer for Relief

No response is required to Plaintiffs' Prayer for Relief ¶¶ 1 and 2.  To the extent a response is required, Intervenors deny that Plaintiffs are entitled to the relief they request.

EXHIBIT N

## INTERVENORS' CROSS-CLAIMS

1.     Defendant and Cross-Claim Plaintiff-Intervenors ISMA, ACSA, BRC, and Teri Manning ("Intervenors") bring their cross-claims under the Administrative Procedure Act, codified at 5 U.S.C. §§ 551 et seq. (the "APA"); the Yellowstone National Park Act, codified at 16 U.S.C. §§ 21 et seq. (the "YNPA"), and the National Park Service Organic Act, codified at 16 U.S.C. §§ 1 et seq (the "Organic Act").

### Parties, Jurisdiction, and Venue

2.     Intervenor International Snowmobile Manufacturers' Association ("ISMA"), based in Michigan, is an organization of snowmobile manufacturers dedicated to, *inter alia*, promoting snowmobiling and snowmobile-friendly policies, preparing and disseminating information regarding snowmobiling opportunities, and fostering growth in the sport of snowmobiling. ISMA members manufacture many of the snowmobiles and snowmobile parts that are used throughout the National Park System, including in Yellowstone National Park, Grand Teton National Park, and the Rockefeller Parkway. ISMA previously challenged, in the U.S. District Court for the District of Wyoming, the NPS's promulgation of a 2001 winter use plan prohibiting all regulated recreational snowmobile use on portions of the Yellowstone National Park road system. See Int'l Snowmobile Mfrs. Ass'n. v. Norton, 304 F. Supp. 2d 1278 (D. Wy. 2004). In addition, ISMA was previously a Defendant Intervenor with the NPS in a case in this Court brought to challenge the NPS's 2004 Temporary Winter Use Plan regulating and allowing snowmobile use on portions of the Yellowstone National Park road system. See Fund for Animals v. Norton, Civ. No. 04-1913 (EGS), 512 F. Supp. 2d 49 (D.D.C. 2007).

3.     The American Council of Snowmobile Associations ("ACSA"), based in Michigan, is an organization made up of snowmobilers and snowmobiling-related businesses and

EXHIBIT N

associations dedicated to providing a strong national voice to promote the interests of the snowmobiling community and the millions of snowmobilers throughout the United States. Among other things, ACSA promotes snowmobile access to public lands across the United States, including the Parks.    ACSA members have ridden snowmobiles recreationally in Yellowstone National Park for many years and intend to ride there in the future.  In addition, ACSA members have, in the past, ridden snowmobiles in Yellowstone National Park without guides and would ride there again without guides if allowed to do so.

4.    The BlueRibbon Coalition, Inc. ("BRC"), based in Idaho, is an Idaho non-profit organization representing over 1,000 businesses and organizations with approximately 600,000 members nationwide.  BRC is dedicated to promoting public access to federal lands like those at issue in this case for both motorized and non-motorized use, including for snowmobiling in the Parks.  BRC has participated in past litigation and rulemaking proceedings in connection with its mission of preserving motorized and non-motorized access to public lands for recreational purposes.  BRC previously challenged, in the U.S. District Court for the District of Wyoming, the NPS's promulgation of a 2001 winter use plan prohibiting all regulated recreational snowmobile use on portions of the Yellowstone National Park road system.    See Int'l Snowmobile Mfrs. Ass'n. v. Norton, 304 F. Supp. 2d 1278 (D. Wy. 2004).  In addition, BRC was previously a Defendant Intervenor with the NPS in a case in this Court brought to challenge the NPS's 2004 Temporary Winter Use Plan regulating and allowing snowmobile use on portions of the Yellowstone National Park road system.  See Fund for Animals v. Norton, Civ. No. 04-1913 (EGS), 512 F. Supp. 2d 49 (D.D.C. 2007).    BRC members have ridden snowmobiles recreationally in Yellowstone National Park for many years and intend to ride there in the future.  In addition, BRC members have, in the past, ridden snowmobiles in Yellowstone

EXHIBIT N

National Park without guides and would ride there again without guides if allowed to do so.

5.      Teri Manning is an individual residing in Wyoming who has, for many years, enjoyed snowmobiling in the Parks. Ms. Manning is a past president of the Wyoming State Snowmobile Association and ACSA, and in those capacities has dedicated significant amounts of time and effort to protecting and promoting the interests of snowmobilers, including access to public lands specifically including the Parks at issue here. Ms. Manning has ridden snowmobiles recreationally in Yellowstone National Park for many years and intends to ride there in the future. In addition, Ms. Manning has, in the past, ridden snowmobiles in Yellowstone National Park without a guide and would ride there again without guides if allowed to do so.

6.      This Court has jurisdiction over Petitioner Intervenors' claims under 5 U.S.C. §§ 701-706, 28 U.S.C. § 1331, and Local Civil Rule 83.7.2.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(e). Respondents are all federal agencies or federal officers acting in their official capacities and located in this district. In addition, a substantial part of the events and omissions giving rise to the 2007 Final Rule occurred in this judicial district.

### Challenged Action

8.      During the winter use seasons of 2004-2005, 2005-2006, and 2006-2007, recreational snowmobile use in the Parks was governed by an NPS Interim Rule that provided, *inter alia*, for 720 snowmobiles per day to enter Yellowstone National Park. See 69 Fed. Reg. 65348, 65349 (Nov. 10, 2004).

9.      The NPS Interim Rule also required all snowmobiles entering Yellowstone National Park for recreational purposes to be accompanied by a commercial guide. See id.

10.     On May 16, 2007, the NPS published a proposed permanent rule regarding winter

EXHIBIT N

use for the Parks.  See 72 Fed. Reg. 27500 et seq. (May 16, 2007).  The proposed rule, like the Interim Rule previously in place, included a limit of 720 snowmobiles per day in Yellowstone National Park (aside from at Cave Falls, which, as an isolated area where snowmobile use is incidental to snowmobile use outside the Park, has its own independent daily limit).  Id. at 27505.  The proposed rule, like the Interim Rule, also required all recreational snowmobiles entering Yellowstone National Park to be accompanied by a commercial guide.  Id.

11.     The NPS published its 2007 Final Rule on December 13, 2007.  See 72 Fed. Reg. 70781 et seq.  The 2007 Final Rule includes a new, previously never proposed limit of 540 snowmobiles per day in Yellowstone National Park (aside from Cave Falls).  See id. at 70798. The 2007 Final Rule also includes a requirement that all recreational snowmobiles entering Yellowstone National Park be accompanied by a commercial guide.

12.     Yellowstone National Park has never been subject to a limit as low as the 2007 Final Rule's 540 snowmobile-per-day limit.  While the NPS sought to impose a complete ban on recreational snowmobiling in Yellowstone National Park in 2001, that ban was never implemented and was enjoined by the U.S. District Court for the District of Wyoming.  See International Snowmobile Mfrs. Ass'n. v. Norton, 304 F. Supp. 2d 1278 (D. Wyo. 2004).

13.     Consequently, the impacts of a 540 snowmobile-per-day limit, as opposed to a 720 snowmobile-per-day limit, are largely conjectural and not based on an actual comparison of real world impacts of the two alternative limits.

14.     Cars, buses, trucks, and other motorized vehicles are permitted to drive into and through Yellowstone National Park without a commercial guide.

15.     The 2007 Final Rule was preceded by a draft environmental impact statement on April 2, 2007, see 72 Fed. Reg. 15720 et seq. (Apr. 2, 2007), and a final environmental impact

EXHIBIT N

statement ("FEIS") issued on September 25, 2007. See 72 Fed. Reg. 54456 (Sept. 25, 2007).

16.     The NPS's limit in its 2007 Final Rule of 540 snowmobiles per day is arbitrary and capricious and contrary to law and exceeds the NPS's statutory authorization.

### Petitioner Intervenors' Claims

17.     The NPS's promulgation of the 2007 Final Rule is final agency action subject to review in this Court. See 5 U.S.C. § 704; Int'l Snowmobile, 304 F. Supp. 2d at 1290 (2001 winter use rules constituted "final agency action" for purposes of judicial review).

18.     The 2007 Final Rule's 540 snowmobile-per-day limit on entries into Yellowstone National Park and requirement that all snowmobiles entering the Park to be accompanied by a commercial violate the Organic Act and the YNPA.  Furthermore, the reduced daily limit and commercial guide requirements are not supported by the record and contradict the NPS's own published management policies.  As such, the reduced daily snowmobile limit and commercial guide requirement are arbitrary and capricious and not in accordance with law, in violation of the APA.

### Count I:  The 2007 Final Rule Violates the Organic Act

19.     Intervenors expressly incorporate all allegations previously set forth herein.

20.     The Organic Act provides:

> The [National Park Service] shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified, except such as are under the jurisdiction of the Secretary of the Army, as provided by law, by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and ***to provide for the enjoyment of the same*** in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1 (emphasis added).  One of the "fundamental purposes" of the NPS is to provide for

EXHIBIT N

the enjoyment of National Parks including Yellowstone National Park.

21.     The 2007 Final Rule's imposition of a daily 540 snowmobile limit and a commercial guide requirement are significant obstacles to many park visitors' enjoyment of Yellowstone National Park.

22.     As such, the 2007 Final Rule violates the Organic Act's statutory mandate that NPS provide for the enjoyment of National Parks.

<u>Count II:  The 2007 Final Rule Violates the YNPA</u>

23.     Intervenors expressly incorporate all allegations previously set forth herein.

24.     The YNPA provides that Yellowstone National Park is:

> [R]eserved and withdrawn from settlement, occupancy, or sale under the laws of the United States, and dedicated and set apart as a public park or pleasuring ground for the benefit and enjoyment of the people[.]

16 U.S.C. § 21.

25.     The NPS's reduction in snowmobile entries into Yellowstone National Park and its commercial guides requirement impair Yellowstone National Park's statutorily-mandated purpose as a "public park or pleasuring ground for the benefit and enjoyment of the people[.]"

26.     As such, the 2007 Final Rule violates the YNPA.

<b>Count III:  The 2007 Final Rule Violates the APA Because It Is<br><u>"Not in Accordance With Law" and Exceeds the NPS's Statutory Authority</u></b>

27.     Intervenors expressly incorporate all allegations previously set forth herein.

28.     The APA requires a reviewing court to hold unlawful any final agency action that is, *inter alia*, "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2).

29.     Because the 2007 Final Rule's daily snowmobile limits and commercial guide requirements exceed the NPS's authority under and violate the terms of the Organic Act and the

EXHIBIT N

YNPA, as discussed above, the APA requires that the reviewing court hold those provisions unlawful.

**Count IV: The 2007 Final Rule's Reduced Daily Snowmobile Entry Limit Into Yellowstone National Park Violates the APA Because It Is Arbitrary, Capricious, Not in Accordance With Law, Lacks a Reasoned Analysis by the NPS, and Violates the NPS's Own Published Management Policies**

30.     Intervenors expressly incorporate all allegations previously set forth herein.

31.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion[.]" 5 U.S.C. § 706(2)(A).

32.     There is no observed evidence in the record that reducing the daily snowmobile entry limit from 720 to 540 snowmobiles will have any significant impact on natural soundscapes or other natural conditions, as no limit below 720 snowmobiles per day has ever been implemented at Yellowstone National Park.

33.     The NPS's reduction in the daily snowmobile limit, therefore, is based entirely on conjecture and untested predictions about conditions under 540 snowmobile daily limit.  As such, the reduction from 720 to 540 snowmobiles per day is unsupported by the record and is arbitrary and capricious, in violation of the APA.

34.     The reduced daily snowmobile limit also contradicts published NPS Management PoliciesThe NPS Management Policies published by the NPS in 2006 direct NPS decision makers, in crafting new policies, to:

> [E]mploy a tone that leaves no room for misunderstanding the Park Service's commitment to *the public's appropriate use and enjoyment*, including education and interpretation, of park resources, while preventing unacceptable impacts[.]

National Park Service, Management Policies: The Guide to Managing the National Park System

EXHIBIT N

at p. 4 (Aug. 31, 2006) (emphasis added).

35.    The 2007 Final Rule violates the Park Service's statement of policy.  It impairs the "appropriate use and enjoyment" of Yellowstone National Park by a portion of the public (snowmobile users).  Furthermore, that impairment is based entirely on untested conjecture about the impacts 540 snowmobile per day limit that has never been implemented in reality and that is significantly lower than the lowest daily limit previously implemented.

36.    The reduced daily snowmobile limit is arbitrary and capricious in violation of the APA.

### Count V:  The 2007 Final Rule's Commercial Guide Requirement Violates the APA Because It Is Arbitrary, Capricious, Not in Accordance With Law, Lacks a Reasoned Analysis by the NPS, and Violates the NPS's Own Published Management Policies

37.    Intervenors expressly incorporate all allegations previously set forth herein.

38.    The 2007 Final Rule's commercial guide requirement is not supported by the record.  It rests on conjecture and assumptions about the behavior of snowmobilers in Yellowstone National Park with and without commercial guides.  It also makes numerous assumptions about commercial guide capabilities and behavior that are not supported by any evidence in the record.

39.    The commercial guide requirement also contradicts the NPS's published management policies because it impairs the "appropriate use and enjoyment" of Yellowstone National park by a portion of the public (snowmobile users).  That impairment is based entirely on untested conjecture about the impact of the commercial guide requirement on park resources, with no actual evidence that it will have any significant positive impact on Park resources.

### Prayer For Relief

40.    Accordingly, Defendant and Cross Claim Plaintiff Intervenors ask the Court to:

EXHIBIT N

a. Set aside that portion of the 2007 Final Rule imposing a 540-snowmobile limit on daily snowmobile entries into Yellowstone National Park; and

b. Set aside that portion of the 2007 Final Rule requiring all snowmobiles entering Yellowstone National Park to be accompanied by a commercial guide; and

c. Order that Federal Defendants impose a daily snowmobile limit that is not arbitrary and capricious, that is supported by the record, and that complies with federal law; and

d. Order that Federal Defendants impose only those conditions on entry into Yellowstone National Park that are consistent with federal law; and

e. Order that the previous 720-snowmobile limit remain in effect until such time as Federal Respondents promulgate a limit that complies in all respects with their legal obligations; and

f. Grant Intervenors such further and additional relief as the Court may deem proper.

Submitted this 11th day of March, 2008.

EXHIBIT N

BIRCH HORTON BITTNER & CHEROT, P.C.

Respectfully submitted,

 /s/ William P. Horn
William P. Horn (D.C. Bar No. 375666)
David E. Lampp (D.C. Bar No. 480215)
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave. NW, Suite 1200
Washington, DC  20036
Telephone:  (202) 659-5800
Facsimile:  (202) 659-1027
whorn@dc.bhb.com; dlampp@dc.bhb.com

*Attorneys for Defendant and Cross-Claim Plaintiff Intervenors International Snowmobile Manufacturers Association, American Council of Snowmobile Associations, Blue Ribbon Coalition, Inc., and Teri Manning*

19

EXHIBIT N

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 11th day of March, 2008, I filed the foregoing electronically through the CM/ECF system, which caused the following counsel to be served by electronic means. I further certify that I caused correct copies of the foregoing to be served by placing the same in the U.S. first class mail, postage prepaid, addressed as follows:

The Hon. Michael B. Mukasey
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Guillermo A. Montero
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 663
Washington, DC 20044

Jeffrey A. Taylor, Esq.
United States Attorney for the District of Columbia
555 Fourth Street, NW
Washington, DC 20530

The Honorable Dirk Kempthorne
Secretary, United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

The Honorable Mary Bomar
Director, National Park Service
1849 C Street NW
Washington, DC 20240

Robert D. Rosenbaum
Donna E. Patterson
Ingo W. Sprie
Kwame Clement
Meetu Kaul
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004

__/s/ David E. Lampp_____
David E. Lampp

20

EXHIBIT N

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )
THE FUND FOR ANIMALS, *et al*    )
                                 )
          Plaintiffs,            )   Civil Action No. 02-2367
                                 )   (EGS)
     v.                          )
                                 )
GALE NORTON, *et al*,            )
                                 )
                                 )
          Defendants,            )
_____)


_____
                                )
GREATER YELLOWSTONE              )
  COALITION, *et al*             )
                                 )
          Plaintiffs,            )   Civil Action No. 03-762
                                 )   (EGS)
     v.                          )
                                 )
GALE NORTON, *et al*,            )
                                 )
          Defendants,            )
_____)

**ORDER**

Both of the above-captioned cases raise challenges, pursuant
to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 *et
seq*. (2003), to several agency actions on the part of the
National Parks' Service ("NPS") addressing the use of snowmobiles
in Yellowstone National Park, Grand Teuton National Park, and the
John D. Rockefeller Parkway ("the Parks"), on the grounds that
they violate the National Parks Service Organic Act, 16 U.S.C. §

EXHIBIT O

1, *et seq.* (2003)("Organic Act"), the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4332 *et seq.* (2003), Executive Orders governing the use of snowmobiles in the Parks, NPS regulations, and NPS management policies.

## I.  Background

In 1997, plaintiff Fund for Animals, along with several other organizations, filed an action before this Court challenging NPS' existing winter-use program for the Parks. *Fund for Animals v. Babbitt*, Civil Action No. 97-1126. That suit culminated in a settlement agreement ("1997 Settlement Agreement") which required NPS to prepare an Environmental Impact Statement ("EIS") pursuant to NEPA before the year 2000, and obtain a biological assessment ("BA") from and request formal consultation with the Department of the Interior's Fish and Wildlife Service ("FWS") regarding the impacts of existing winter use of the Parks on grizzly bears and gray wolves. A final EIS was published in October 2000, and in December 2000 NPS published proposed regulations consistent with the EIS.

In late 2000, Congress enacted legislation prohibiting NPS from promulgating or enforcing any regulation that would reduce the use of snowmobiles in the Parks during the 2000-2001 and 2001-2002 seasons. Pub. L. No. 106-554 (2000). Accordingly, the final regulation promulgated by NPS in January 2001 did not

2

EXHIBIT O

contemplate a reduction in snowmobile use in the Parks until the winter of 2002-2003, at which time snowplane use would be eliminated. 66 Fed. Reg. 7,260 (Jan. 22, 2001). Snowmobile use was to be eliminated by the winter of 2003-2004. *Id*.

The International Snowmobile Manufacturers' Association, which seeks to intervene in this case, subsequently filed suit against the NPS in the U.S. District Court for the District of Wyoming, on the grounds that the final regulations contemplating the phase-out of snowmobiling in the Parks violated NEPA, the APA, and the Organic Act. *Int'l Snowmobile Mfrs Assoc. v. Norton*, Civil Action No. 00-229-B (D. Wyo.). A settlement agreement was reached in that case ("2001 Settlement Agreement") which required the NPS to prepare a Supplemental Environmental Impact Statement ("SEIS") considering new information, and issue a Record of Decision ("ROD") and final regulations consistent with the SEIS.

Plaintiffs in both of the cases now before this Court raise APA challenges to the SEIS produced as a result the 2001 settlement agreement in the Wyoming case, as well as the March 25, 2003 Record of Decision memorializing the policy adopted by the NPS in reliance on the SEIS.[1] The *Fund for Animals* plaintiffs assert several additional claims, challenging the NPS' November

---

[1] The *Fund for Animals* plaintiffs recently moved for leave to file a supplemental complaint in Civ. A. No. 02-2367 adding claims relating to the February 2003 Supplemental EIS ("SEIS") performed by the National Park Service, as well as the March 25, 2003 Record of Decision (ROD) issued pursuant to the SEIS. Federal defendants do not oppose the motion.

EXHIBIT O

18, 2002 "Further Delay Rule," which has the effect of further delaying the phase-out of snowmobiling in the Parks beyond the 2002-2003 winter, and defendants' failure to act on plaintiffs' APA petition for rulemaking in the four years since it was filed, on the grounds that these actions violate the APA, Organic Act, Endangered Species Act ("ESA"), NEPA, and the 1997 Settlement Agreement.

Plaintiffs in both cases seek declaratory relief holding the March 25, 2003 ROD to be contrary to applicable laws, Executive Orders, regulations, and policies, as well as injunctive relief precluding its implementation, and attorneys' fees. *Fund for Animals v. Norton* plaintiffs also seek a declaration that NPS' conduct violates the 1997 Settlement Agreement, as well as injunctive relief directing defendants to respond to their 1999 petition for rulemaking and setting aside the "Further Delay Rule."

## II.  Motions to Intervene

The International Snowmobile Manufacturers' Association ("ISMA"), the BlueRibbon Coalition, Inc. ("BRC"), and the State of Wyoming have moved to intervene in this case. The ISMA is an organization of snowmobile manufacturers whose purpose is the promotion of the snowmobile industry, and whose members include manufacturers of snowmobiles and parts purchased by users of the National Park System, including the Parks. The ISMA contends that

EXHIBIT O

closure of the Parks to snowmobiling will lead to a decreased
need for its members' products, thereby directly harming its
members. The BRC is an Idaho non-profit organization representing
over 1,000 businesses and 600,000 members nationwide who use
snowmobiles and other off-road vehicles on federal park lands,
including the Parks. Some member organizations also have
commercial interests in snowmobile-related tourism in the parks.
The State of Wyoming seeks to intervene on the grounds that it
was granted cooperating agency status in the preparation of the
2000 EIS, is a party to the action before the Wyoming District
Court challenging the final 2000 EIS, has concurrent
environmental regulatory jurisdiction both within and outside the
Parks, and has socioeconomic, recreational and tourism interests
in the subject matter of this action. Because plaintiffs seek to
challenge the decisions flowing from the SEIS issued pursuant to
the settlement agreement in the Wyoming case, the State of
Wyoming seeks to intervene to protect its interests in the
settlement agreement it negotiated as one of the plaintiffs in
that case.

The Court finds that all three applicant-intervenors have
met the minimal burden under Fed. R. Civ. P. 24(a) of
demonstrating that their interests "may be inadequately
represented" by existing parties. Although plaintiffs contend
that applicant-intervenors interests will adequately be
represented by the government, as both the government and the

EXHIBIT O

applicant-intervenors will seek to defend the administrative actions challenged by the plaintiffs, the Court is persuaded that the interests of affected private industries and of the State of Wyoming are sufficiently distinct from those of the federal government and the general public that grant of intervention as of right is appropriate.

## III.    Motions to Transfer

Both federal defendants and intervenor-defendants move to transfer the case to the District of Wyoming pursuant to 28 U.S.C. § 1404(a), on the grounds that plaintiffs' claims arise from the same subject matter as the earlier-filed case before that Court, and that the interests of fairness and judicial economy counsel against litigating the same issues against the same government agencies simultaneously in two different *fora*. Federal defendants principally rely on the possibility of conflicting outcomes in the two cases, leading to conflicting orders from two federal courts, as the basis for their motion.

Transfer of venue is governed by 28 U.S.C. § 1404, which provides in relevant part:

> (a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404. "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case- by-case

EXHIBIT O

consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S. Ct. 2239 (1988) (internal citations and quotations omitted). "The moving party bears the burden of establishing that the transfer of this action is proper." *Trout Unlimited v. U.S. Dept. of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996).

Given that the Parks that are the subject of this litigation are located in the State of Wyoming, there is no question that this action could have been brought before the U.S. District Court for the District of Wyoming. *See* 28 U.S.C. § 1391. Therefore, the Court need only consider whether "the convenience of the parties, the convenience of the witnesses, and the interests of justice" counsel in favor of transferring the case to the District of Wyoming. *See* 28 U.S.C. § 1404 (a). "In ruling on Section 1404(a) motions, courts have not, however, limited their consideration to these three enumerated factors." *Trout Unlimited v. U.S. Dept. of Agric.*, 944 F. Supp. at 16 (internal citations and footnotes omitted).

> Courts have considered various other factors, including the private interests of the parties and the public interests of the court, which are protected by the language of Section 1404(a). The private interest considerations include: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof."

7

EXHIBIT O

*Id.* (internal citations and footnotes omitted).

All of these factors weigh in favor of vindicating plaintiffs' choice of forum. "It is plaintiffs' privilege to chose the forum and their preference must be given substantial weight in the transfer analysis." *Adams v. Bell*, 711 F.2d 161, 194 n. 115 (D.C. Cir. 1983) (*en banc*). Defendants have not persuaded the Court that it would be any more convenient for the parties to litigate in the District of Wyoming, and this being a suit brought pursuant to the APA, there are no witnesses whose convenience is at issue. Accordingly, all that remains for the Court to address is defendants' contention that transfer is required in order to protect the federal government from being subject to potentially conflicting orders from different federal courts.

In a recent case involving the U.S. Army Corps of Engineers' management of the Missouri River, the U.S. District Court for the District of Columbia denied a motion to transfer in which federal defendants made similar arguments in favor of transfer to the U.S. District Court for Nebraska, which had issued a preliminary injunction in a related case. *American Rivers v. United States Army Corps of Engineers*, Civil Action No. 03-241, May 21, 2003 Order (D.D.C.). In that case, the court rejected defendants' arguments regarding the possibility of conflicting opinions issuing from two separate federal courts by first noting that the

8

EXHIBIT O

"mere existence of a related case in another forum is insufficient grounds for transfer." *American Rivers v. United States Army Corps of Engineers*, Civil Action No. 03-241, May 21, 2003 Order at 11 (citing *Shan Sharshott v. Feld Entertainment, Inc.*, 89 F. Supp. 2d 1, 4 (D.D.C. 2000)). The court went on to opine that defendants could never eliminate the possibility of conflicting opinions, as it was likely that, in a matter of interest to the 10 states and one province through which the Missouri river runs, future law suits challenging defendants' management of the river would likely be filed in any number of venues, and defendants could not be certain that any motions to transfer to Nebraska or any other court in the Eighth Circuit would be granted by independent federal district courts. *Id*. Finally, the *American Rivers* court concluded that the cases presently before the Nebraska District Court and the Eighth Circuit focused on issues relating to the management of the river, namely the allocation of water, whereas the case before her focused on the defendants' compliance with the ESA, an issue which neither the Nebraska District Court nor the Eighth Circuit had addressed prior to granting and affirming the preliminary injunction defendants contended could result in conflicting orders.

Similarly, the issues presented in this case are different from those raised by the case still pending before the U.S.

EXHIBIT O

District Court for the District of Wyoming. Different agency documents and decisions are being challenged in each case, each of which must be reviewed with reference to its particular administrative record. The Wyoming case involves a challenge to the 2000 EIS, the November 2000 ROD, and the January 2001 final implementing regulations. These documents, and their attendant administrative records, are entirely distinct from those challenged in these actions, which are the November 20, 2003 "Further Delay Rule," the 2003 SEIS, and the March 2003 ROD, each of which was based on a discrete administrative record. Because APA review is limited to review of the administrative record to determine if the agency's action was arbitrary, capricious, or contrary to law, the judicial review of the administrative record underlying the documents and decisions challenged here will likely have no effect on the review of the administrative record underlying the documents and decisions challenged in the Wyoming action.

Defendants rely on a case from the Ninth Circuit, in which that Court of Appeals discussed the doctrine of "federal comity."[2]  *Church of Scientology of California v. U.S. Dept. of*

---

[2]  The Ninth Circuit described the doctrine as follows:

the doctrine of federal comity [is] a discretionary doctrine which permits one district to decline judgment on an issue which is properly before another district. In its classic formulation, the comity doctrine permits a district court to decline jurisdiction over a matter if a complaint has

EXHIBIT O

*Army*, 611 F.2d 738, 749 (9th Cir. 1980). However, as noted by the Ninth Circuit itself, this doctrine has no application unless an identical complaint is filed in two different federal courts, which no one contends is the case here. *Id.*; *see also Barapind v. Reno*, 72 F. Supp. 2d 1132, 1145 (E.D. Cal. 1999) ("The first to file doctrine of federal comity permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district."). Furthermore, as the Ninth Circuit highlighted, the federal comity rule is a discretionary doctrine.

Finally, defendants' arguments regarding duplication of effort and waste of judicial resources are unpersuasive. Although they contend that there is significant overlap between the administrative records relevant to the two cases, and that they will be relying on the 2000 Settlement Agreement as justification for promulgating the November 22, 2002 "Further Delay Rule" challenged here, it would appear that the Wyoming court has not yet had the opportunity to develop a familiarity with the

---

already been filed in another district. . . . [T]he Eighth Circuit observed . . . that '(t)here is no rigid or inflexible rule for determining priority of cases pending in federal courts involving the same subject matter.' The purpose of the comity principle is of paramount importance. The doctrine is designed to avoid placing an unnecessary burden on the federal judiciary, and to avoid the embarrassment of conflicting judgments.

*Church of Scientology of California v. U.S. Dept. of Army*, 611 F.2d at 749 (citations omitted).

EXHIBIT O

administrative record underlying the decisions challenged in the
case before it, as the Wyoming case was settled before any
proceedings on the merits took place in that court. The Wyoming
court only went so far as holding an initial pre-trial conference
and setting a briefing schedule for potentially dispositive
motions before the parties moved to stay the litigation pursuant
to the 2000 Settlement Agreement. Accordingly, defendants can
simply re-file that administrative record with this Court to the
extent they wish to rely on it in this case, and no duplication
of effort will ensue. Similarly, defendants' claim that the
parties will be subjected to the burden of litigating claims in
two different courts is without merit, given that the Wyoming
case is currently stayed, and is scheduled to be dismissed once
federal defendants have met all of their obligations under the
2000 Settlement Agreement.

## IV.  Consolidation

Consolidation is provided for by Fed. R. Civ. P. 42(a),
which states:

> When actions involving a common question of law or fact are
> pending before the court, it may order a joint hearing or
> trial of any or all the matters in issue in the actions; it
> may order all the actions consolidated; and it may make such
> orders concerning proceedings therein as may tend to avoid
> unnecessary costs or delay.

The Court finds that, as to all claims, and particularly
those involving the 2003 SEIS and the March 25, 2003 ROD, the
above-captioned cases raise common questions of law and fact.

EXHIBIT O

Accordingly, the Court, with the consent of the parties, will *sua sponte* consolidate the above-captioned cases for all purposes. The parties are hereby directed to file an amended consolidated complaint within the time frame set forth in the Scheduling Order entered by this Court on September 10, 2003. In light of the imminent filing of a consolidated amended complaint, all remaining pending motions will be denied without prejudice.

## V.    Conclusion

Upon careful consideration of the pending motions, the responses and replies thereto, the governing case law and statutes, and the entire record before the Court, for the reasons set forth herein, it is by the Court hereby

**ORDERED** that plaintiff's motion to amend the Complaint filed in Civil Action No. 02-2367 is hereby **GRANTED**; and it is

**FURTHER ORDERED** that the State of Wyoming, the International Snowmobile Manufacturers' Association, and the Blue Ribbon Coalition are hereby **GRANTED** permission to intervene in these cases; and it is

**FURTHER ORDERED** that pending motions to transfer to the United States District Court for the District of Wyoming are hereby **DENIED**; and it is

**FURTHER ORDERED** that all pending motions to dismiss are hereby **DENIED** without prejudice to refiling upon consideration of the amended consolidated Complaint; and it is

13

EXHIBIT O

FURTHER ORDERED that the above-captioned cases are hereby **CONSOLIDATED** under Case No. 02-2367; and it is

FURTHER ORDERED that, upon the filing of this Order in Civil Action No. 03-762, that case shall be closed and removed from the active calendar of the Court.

This matter shall otherwise proceed in all respects as set forth in the Court's September 10, 2003 Scheduling Order.

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**September 15, 2003**

EXHIBIT O

Notice to:

Laura Beth Fisher, Esquire
U.S. Department of Justice
601 D Street, NW
Washington, DC 20530

Howard M. Crystal, Esquire
Eric R. Glitzenstein, Esquire
Meyer & Glitzenstein
1601 Connecticut Avenue, NW
Suite 700
Washington, DC 20009

Donald L. Honnold, Esquire
Abigail Dylan, Esquire
Earthjustice
209 South Willison Avenue
Bozeman, MT 59715

William P. Horn, Esquire
Barbara A. Miller, Esquire
Birch, Horton, Blittern and Cherot
1155 Connecticut Avenue, NW
Washington, DC 20036

Jay Jerde, Esquire
Senior Assistant Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, Wyoming 82002

15

EXHIBIT O

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                        )
THE FUND FOR ANIMALS, et al             )
                                        )
          Plaintiffs,                   )   Civil Action No. 02-2367
                                        )   (EGS)
     v.                                 )
                                        )
GALE NORTON, et al,                     )
                                        )
          Defendants,                   )
_____)

_____
                                        )
GREATER YELLOWSTONE                     )
  COALITION, et al                      )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )
                                        )
GALE NORTON, et al,                     )
          Defendants,                   )
_____)
```

<u>ORDER</u>

Pursuant to the Federal Defendants' February 11, 2004, Notice to the Court, as well as Plaintiff The Fund for Animals' Notice of Violation of this Court's December 16, 2003, Order, and the responses and replies thereto, and for the reasons stated in open court on February 17, 2004, it is hereby

**ORDERED** that all defendants/interveners, including Secretary of the Interior Gale Norton and the other individually named and

EXHIBIT P

agency defendants shall, by no later than **February 24, 2004, SHOW CAUSE** why they should not be held in contempt of this Court's Order of December 16, 2003; and it is

   **FURTHER ORDERED** that plaintiffs shall file any responses by no later than **March 2, 2004;** and it is

   **FURTHER ORDERED** that defendants/interveners shall file any replies by no later **March 5, 2004;** and it is

   **FURTHER ORDERED** that a hearing on the show cause order, and any pending motions, is scheduled for **March 9, 2004, at 10:30 a.m. in Courtroom One.**


Signed:   **Emmet G. Sullivan**
          **United States District Judge**
          **February 17, 2004**

EXHIBIT P

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
THE FUND FOR ANIMALS, *et al*           )
                                        )
          Plaintiffs,                   )   Civil Action No. 02-2367
                                        )   (EGS)
     v.                                 )
                                        )
GALE NORTON, *et al*,                   )
                                        )
          Defendants.                   )
_____)
_____)
                                        )
GREATER YELLOWSTONE                     )
   COALITION, *et al*                   )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )
                                        )
GALE NORTON, *et al*,                   )
          Defendants.                   )
_____)

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Federal Defendants' Conditional Motion for Partial Relief from Judgment, the Fund for Animals Plaintiffs' Motion to Modify Relief, and the Greater Yellowstone Coalition Plaintiffs' Motion for an Injunction.[1] Upon careful consideration of the motions, the responses and replies thereto, the entire record herein, as well as the governing statutory and case law, and for the following reasons, it is by the Court

---

[1] The Fund for Animals Plaintiffs' pending Motion to Amend Judgment, filed at Docket Entry # 109, is not addressed in this Order.

EXHIBIT Q

hereby **ORDERED** that the Federal Defendants' Conditional Motion for Partial Relief from Judgment is **GRANTED,** and the Fund for Animals Plaintiffs' Motion to Modify Relief and the Greater Yellowstone Coalition Plaintiffs' Motion for an Injunction are **DENIED WITHOUT PREJUDICE** to refiling, if appropriate, upon the National Park Service's promulgation of a Rule governing winter use in the Yellowstone Parks.

## I. <u>PERTINENT HISTORY</u>

This case originally came before the Court on the Fund for Animals' ("Fund") and the Greater Yellowstone Coalition's ("Yellowstone Coalition") challenge to the National Park Service's ("Service" or "NPS") administrative decision, codified in a 2003 Supplemental Environmental Impact Statement ("SEIS") and Record of Decision ("2003 ROD"), to allow continued snowmobiling and trail grooming in Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller, Jr. Memorial Parkway (collectively "Yellowstone" or "Parks").  During the course of this litigation, and a mere six days before the snowmobiling season was scheduled to begin, the NPS issued a Final Rule governing winter use in the Yellowstone Parks.  *See* Winter Use Plan Final Rule, 68 Fed. Reg. 69,268 (Dec. 11, 2003)("2003 Rule").  On December 16, 2003, this Court, finding

2

EXHIBIT Q

both Administrative Procedure Act ("APA") and National
Environmental Policy Act ("NEPA") violations, vacated and
remanded the 2003 Record of Decision, the 2003 Supplemental
Environmental Impact Statement, and the 2003 Final Rule to the
National Park Service, U.S. Department of the Interior, for
further proceedings not inconsistent with the Opinion.  Taking
notice that the NPS's published 2003 Final Rule stated that,
absent promulgation of the new regulations, the existing 2001
regulations would go into effect, the Court further ordered that
"the prior January 22, 2001, Final Rule, as modified by the
November 18, 2002, Final Rule, shall remain in effect until
further Order of the Court."  *See The Fund for Animals v. Norton*
294 F. Supp. 2d 92, 115 (D.D.C. 2003); *see also* 2003 Final Rule,
68 Fed. Reg. at 69,269 ("Absent the promulgation of these new
regulations, the existing regulations which reduce the numbers of
snowmobiles that may be used in the parks during the winter of
2003-2004, but without air and sound emissions requirements, will
continue to apply.").  Defendants' subsequent Motion for a Stay
was denied by the United States Court of Appeals for the District
of Columbia.  *The Fund for Animals v. Norton*, 2004 WL 98700 (D.C.
Cir. Jan. 13, 2004).

After unsuccessfully seeking a stay of this Court's decision
in this Circuit, the State of Wyoming and the International
Snowmobile Manufacturers Association, both intervenors in the
case before this Court, moved for injunctive relief in the U.S.

EXHIBIT Q

District Court for Wyoming, specifically seeking to enjoin implementation of the 2001 Rule.[2]  *See Int'l Snowmobile Mfrs. Ass'n. v. Norton*, 304 F. Supp. 2d 1278, 1285 (D. Wyo. 2004).  The Wyoming court granted the relief sought, ordered that the NPS was "temporarily restrained from enforcing the 2001 Snowcoach Rule," and further ordered the NPS to

> promulgate temporary rules for this 2004 snowmobile season that will be fair and equitable to snowmobile owners and users, to the business community, and to the environmental interests, such as the Greater Yellowstone Coalition, by limiting snowmobile use to four-stroke machines, and to all other interests public and private, of which the NPS is aware.

*Id.* at 1294.


## II. ANALYSIS

### A. Federal Defendants' Motion for Relief from Judgment

Federal Defendants now seek relief from this Court's Order enjoining the 2003 Rule and implementing the 2001 Rule.  They argue that the NPS "is left in the impossible position of having to satisfy two irreconcilable court orders," and aver that

---

[2] Litigation surrounding the 2001 Rule commenced in the Wyoming District Court in December of 2000.  In June 2001, the parties entered into a settlement agreement, and the Wyoming court stayed the litigation.  Per the State of Wyoming's request, the Wyoming court reopened the case.  *Int'l Snowmobile Mfrs. Ass'n.*, 304 F. Supp. 2d at 1285.

4

EXHIBIT Q

"coordinate courts should avoid issuing conflicting orders."[3]
Fed. Defs.' Mot. at 4-5 (quoting *Feller v. Brock*, 802 F.2d 722,
728-729 (4 th Cir. 1986)).  Intervenors International Snowmobile
Manufacturers Association, *et al.,* support the federal
defendants' motion, arguing "it is simply inequitable to require
the Federal Defendants to implement such a seriously flawed
decision [the 2001 Rule] . . . the change in circumstances in the
form of a judicial review of the 2001/2002 regulations [the
Wyoming court Order enjoining the 2001 Rule] necessitates
modifying this portion of the Court's Order."  Intervenors' March
5, 2004, Response at 7.

     While Federal Defendants are correct that they are faced
with conflicting orders from sister courts, this "impossible
situation" is not of this Court's making.   This Court's December
2003 Opinion and Order was issued several months *prior* to the
Wyoming court's decision; the Intervenors, having failed to
achieve the result they wanted in this Court, chose to seek
relief from another court in another Circuit.  That confusion
resulted should come as no surprise to any defendant or
intervenor.  Moreover, this Court's implementation of the 2001
Rule was also no surprise; the Court, as noted above, followed
the course of action set out in the 2003 Final Rule, and the

---

     [3] Interestingly, it is the Court's understanding that
defendants have not sought to be relieved from the Wyoming
court's order.

EXHIBIT Q

course of action defendants articulated and agreed to in open court. *See, e.g.,* Transcript of Motions Hearing at 7 (Morning Session) (Nov. 20, 2003) ("Tr.") (Federal Defendants' counsel stating that if the 2003 Final Rule did not go into effect, the parks would "operate under the 2001 Regulation . . . the Park Service is ready with a backup . . . they are prepared to operate under the fifty percent mandate." ).

That said, the fact remains that this Court remanded and vacated the 2003 Rule, put in place the prior 2001 Rule, and the Wyoming court subsequently enjoined the implementation of the 2001 Rule.  In effect, defendants are required by this Court's Order to implement a Rule that another court has mandated cannot be enforced.  Moreover, it is the Court's understanding that a rule governing the 2004-2005 Winter season does not currently exist: the 2003 Rule was enjoined, the 2001 Rule was subsequently enjoined, and the temporary Rule put in place by order of the Wyoming court was an interim rule only in place "for *this* 2004 snowmobile season." *Int'l Snowmobile Mfrs. Ass'n.,* 304 F. Supp. 2d at 1294 (emphasis added).

Accordingly, the most prudent course of action, and the action most likely to lend some clarity to increasingly unclear agency proceedings, is to relieve Federal Defendants from an obligation to enforce the 2001 Rule.  However, lest there be any doubt by anyone, the Court sharply emphasizes that the remainder

EXHIBIT Q

of the Court's December 16, 2003, Opinion and Order remains in full force and effect; Federal Defendants still have an obligation to conduct the new rule-making process in a manner consistent with, and addressing the concerns delineated in, the Court's December 2003 Opinion and Order.

The government is admonished that its enactment of rules literally hours prior to the commencement of the winter season does little, if anything, to properly inform the public of agency decisions, erodes the public's confidence in the rule-making process, and casts innumerable aspersions on the legitimacy of that process.  Accordingly, in an attempt to avoid a repeat of last year's scenario--where the Court was put in the awkward position of rendering a complex decision in a matter of days due to the government's failure to issue a Final Rule, despite the Court's repeated warnings,[4] until a *mere six days* prior to the start of the winter season--the Court will modify its December 16, 2003, Opinion and Order as follows: Federal Defendants shall promulgate a new Rule governing the 2004-2005 winter use season,

---

[4] The Court repeatedly questioned the NPS's delay in promulgating the Final Rule, and the implications for the 2003-2004 winter season.  *See, e.g.,* Transcript of Motions Hearing (Morning Session) (Nov. 20, 2003) at 5-7 (Judge Sullivan asking: "Why has it taken so long for the government to issue a Final Ruling?  The ROD has been out there for quite some time . . . You recognize that legitimate arguments can be made by some that the government's intentionally delaying publication of a final rule to coincide with the opening of the winter season, do you not?").

EXHIBIT Q

not inconsistent with this Court's December 16, 2003, Opinion and
Order, by a minimum of 30 days prior to the commencement of
preparations--that is, trail grooming--for the 2004-2005 winter
season.

### B. The Fund for Animals Plaintiffs' Motion to Modify Relief and the Greater Yellowstone Coalition Plaintiffs' Motion for an Injunction

Also pending before the Court are the Fund for Animals
Plaintiffs' Motion to Modify Relief, which requests that the
Court enjoin trail-grooming, and the Greater Yellowstone
Coalition Plaintiffs' Motion for an Injunction, which requests
that the Court enjoin snowmobiling.

Quite simply, the Court finds the motions to be premature.
The 2003-2004 snowmobile season is over, and indeed concluded
before either of these motions were filed.  Thus, the complained
of activities are not currently occurring;  accordingly, the two
motions can only be construed as seeking to prevent these
activities from occurring upon the start of the 2004-2005 winter
season.  *See, e.g.,* Greater Yellowstone Coalition Plaintiffs'
Motion for an Injunction at 9 ("Issuance of an injunction is
necessary now in order to facilitate planning for *next* winter.")
(emphasis added); Federal Defendants' Opposition to Fund for
Animals' Motion to Modify Relief at 7 (noting that the 2003-2004
winter season has ended and "road grooming will not commence
again until December 2004").

EXHIBIT Q

The Court would be acting prematurely if it enjoined trail grooming or snowmobiling before the NPS has a full opportunity to comply with both today's Order and the December 2003 decision. Indeed, until a new Rule is promulgated, there is no guarantee that the NPS, heeding this Court's December 2003 decision when promulgating the new Rule, will permit trail grooming or snowmobiling in Yellowstone during the upcoming winter season. It is well settled that in order to warrant injunctive relief, the injury predicted "must be both certain and great; it must be actual and not theoretical. Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time.'" *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985)(quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)). Here, the harm asserted, while admittedly informed by past experience with NPS rule-making regarding Yellowstone winter use, is too speculative to warrant injunctive relief.[5]

---

[5] While the Fund for Animals styles its motion as one to "Modify Relief" pursuant to Fed. R. Civ. P. 60 (b), they are actually (again) seeking injunctive relief prohibiting trail grooming in certain areas of the Parks. *See, e.g.,* Fund for Animals Plaintiffs' Motion to Modify Relief at 11 (stating that "[s]uch an *injunction* would protect Park resources") (emphasis added); *id.* at 12 ("[s]uch an *injunction* would not preclude any other of the myriad winter use activities") (emphasis added); *id.* at 13 ("the *injunction* would obviously only last until NPS can demonstrate that it has considered the impacts of trail grooming in the manner required by federal law.") (emphasis added).

EXHIBIT Q

Accordingly, it is by the Court hereby

**ORDERED** that Federal Defendants' Conditional Motion for Partial Relief from Judgment is **GRANTED**; and it is

**FURTHER ORDERED** that the Federal Defendants shall promulgate a new Rule governing the 2004-2005 winter use season, not inconsistent with this Court's December 16, 2003 Opinion and Order, by a minimum of 30 days prior to the commencement of preparations--that is, trail grooming--for the 2004-2005 winter use season; and it is

**FURTHER ORDERED** that the Fund for Animals Plaintiffs' Motion to Modify Relief and the Greater Yellowstone Coalition Plaintiffs' Motion for an Injunction are **DENIED WITHOUT PREJUDICE** to refiling, if necessary, upon the promulgation of a Rule governing the 2004-2005 winter season.

**Signed:**    **Emmet G. Sullivan**
        **United States District Judge**
        **June 30, 2004**

10

EXHIBIT Q

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
THE FUND FOR ANIMALS, *et al*           )
                                        )
        Plaintiffs,              )   Civil Action No. 02-2367
                                        )   (EGS)
   v.                               )
                                        )
GALE NORTON, *et al*,                   )
                                        )
        Defendants.              )
_____)
_____)
                                        )
GREATER YELLOWSTONE                      )
  COALITION, *et al*                    )
                                        )
        Plaintiffs,              )
                                        )
   v.                               )
                                        )
GALE NORTON, *et al*,                   )
        Defendants.              )
_____)

## ORDER

In light of the Court's June 30, 2004, Order granting defendant's Motion for Partial Relief from Judgment, and for the reasons stated therein, the Court's February 17, 2004, Order directing defendants/interveners to show cause why they should not be held in contempt of this Court's December 16, 2003, Order is **VACATED.**


Signed:    **Emmet G. Sullivan**
             **United States District Judge**
             **August 6, 2004**

EXHIBIT R

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

BUCKY HALL, TIM A. FRENCH,    )
JILL SHOCKLEY SIGGINS, BILL    )
BREWER, and MARIE FONTAINE, in their    )
official capacity as the Board of County    )    Civil No. 08-CV-04B
Commissioners of the County of Park,    )
State of Wyoming,    )
    )
        Petitioner,    )
    )
    v.    )
    )
UNITED STATES DEPARTMENT    )
OF THE INTERIOR; DIRK KEMPTHORNE,    )
 in his official capacity as the Secretary of    )
the United States Department of the Interior;    )
MARY BOMAR, in her official    )
capacity as the Director of the National Park    )
Service, and MICHAEL SNYDER, in his official    )
capacity as Intermountain Regional Director,    )
National Park Service,    )
    )
        Respondents.    )
    )
    and    )
    )
STATE OF WYOMING,    )
    )
        Petitioner,    )    Civil No. 07-CV-319B
    )
    v.    )
    )
UNITED STATES DEPARTMENT    )
OF THE INTERIOR; NATIONAL PARK    )
SERVICE; DIRK KEMPTHORNE, in his official    )
capacity as the Secretary of the Interior;    )
MARY BOMAR, in her official capacity as the    )
Director of the National Park Service, and    )

EXHIBIT S

MICHAEL SNYDER, in his official capacity as   )
Intermountain Region Director for the           )
National Park Service,                           )
                                            )
                 Respondents.              )

### ORDER CONSOLIDATING DOCKET NO. 08-CV-04-B WITH DOCKET NO. 07-CV-319-B

The above-entitled matter comes before the Court on Petitioner, Board of County Commissioners of the County of Park, State of Wyoming's (Park County), Motion to Consolidate this case with Civil No. 07-CV-319B, *State of Wyoming v. United States, Department of the Interior, National Park Service, Dirk Kempthorne, et al.* The Court, having reviewed the motion and being otherwise fully advised in the premises, **FINDS** and **ORDERS** as follows:

#### Factual Background

As set forth in Petitioner's Motion, the National Park Service on December 13, 2007, published in the Federal Register a final rule governing winter use in Yellowstone National Park, Grand Teton National Park and the John D. Rockefeller, Jr., Memorial Parkway (Parks). The final rule followed the Parks' release of a final Environmental Impact Statement on September 4, 2007 and a Record of Decision dated November 20, 2007 relating to winter use in the Parks. Following release of the final rule, the State of Wyoming on December 13, 2007, filed in the United States District Court for the District of Wyoming a Petition for Review of Final Agency Action relating to the release of the final rule asserting the decision violated various federal laws including the National

2

EXHIBIT S

Environmental Protection Act, the Administrative Procedure Act, the Yellowstone National Park Act, the National Park Service Organic Act and the United States Constitution. (*See* Civil No. 07-CV-319B at 2). That case is pending in the United States District Court and is captioned Civil No. 07-CV-319B. Thereafter, on January 2, 2008, Park County filed its Petition for Review of Agency Action in the above-captioned case relating to the same final rule and alleging violations of the same laws as set forth in the State of Wyoming's Petition.

**Standard of Review**

Consolidation of actions is proper under Fed.R.Civ.P. 42(a) as follows:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Consolidation is discretionary with the trial court. *Shump v. Balko,* 574 1341, 1344 (10th Cir. 1978). In deciding whether to consolidate the court considers whether consolidation promotes judicial efficiency without unduly prejudicing a party. *Johnson v. Unified Gov't of Wyandotte County,* 1999 U.S. Dist. LEXIS 18769, 1999 WL 1096038 at *1 (D. Kan. Nov. 16, 1999). Once the court determines that common questions of law or fact exist, it then weighs "the interests of judicial convenience in consolidating the cases against the delay, confusion and prejudice consolidation might cause." *Nieto v. Kapoor,* 210 F.R.D. 244, 248 (D.N.M. 2002), *quoting Servants of the Paraclete, Inc. v. Great Am. Ins. Company,* 866 F. Supp. 1560, 1572 (D.N.M. 1994).

3

EXHIBIT S

**Discussion**

As set forth in Park County's Motion, Petitioners in both docket numbers raise the same issues and the same legal principles. The final rule, according to both petitions:

a. Allows only commercially-guided snowmobile access and fails to properly analyze an alternative for non-commercially guided access in accordance with the National Environmental Protection Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*;

b. Fails to provide sufficient analysis and justification for the long-term management plan related to winter use over Sylvan Pass in Yellowstone National Park in violation of NEPA;

c. Fails to adequately analyze the allocation of snowmobile entries into Yellowstone National Park on a per season basis or flexible daily basis as compared to a strict per day basis as it relates to maximum numbers in violation of NEPA;

d. Fails to properly analyze the preferred alternative as a whole in violation of NEPA;

e. Fails to give observance and critical review of Petitioners' public comments, particularly in the context of their status as cooperating agencies;

f. Arbitrarily and capriciously reduces the number of snowmobile entries into Yellowstone National Park from 720 per day (draft environmental impact statement preferred alternative) to 540 per day (final rule), which final number is additionally violative of the Yellowstone National Park Act, 16 U.S.C. § 21, the National Park Service Organic Act, 16 U.S.C. §§ 1, 2-4, and 40 C.F.R. §§ 1501.6 and 1501.8;

4

EXHIBIT S

g. Establishes a *de facto* tax or unauthorized fee with the requirement that all snowmobiles be accompanied by a commercial guide.

Park County's petition adds that the final rule is based in part on a regulation, 36 C.F.R. § 2.18(c), that regulates activity in a manner beyond the authority granted in the executive order upon which it is based, and therefore the final rule, to the extent it relies on said regulation, is contrary to law. Otherwise, the petitions propose the same factual and legal issues. No confusion or prejudice should result from consolidating these cases; to the contrary, consolidation will result in significant judicial economy.

The proceedings at this stage also argue in favor of consolidation. The Respondents are in the process of assembling the administrative record. The deadline for submitting the record is still at least one month away. The administrative record in both cases will likely be identical. Further, no scheduling conference has been set in either case although a hearing has been set for September 15, 2008 on the above-captioned case. Thus, granting a motion to consolidate at this time will not result in any delay of the proceedings. In short, consolidation makes much sense under the circumstances and is appropriate in balancing the factors set forth above.

### Conclusion

Therefore, given the common questions of law and fact, the two cases, *Bucky Hall, Tim A. French, Jill Shockley Siggins, Bill Brewer and Marie Fontaine, in their official capacity as the Board of County Commissioners of the County of Park, State of Wyoming, v. United States Department of the Interior; Dirk Kempthorne, in his official capacity as*

5

EXHIBIT S

the Secretary of the United States Department of the Interior; Mary Bomar, in her official

capacity as the Director of the National Park Service; and Michael Snyder, in his official

capacity as Intermountain Regional Director, National Park Service, Docket No. 08-CV-

04B and *State of Wyoming v. United States Department of the Interior; National Park*

*Service; Dirk Kempthorne, in his official capacity as the Secretary of the Interior; Mary*

*Bomar, in her official capacity as the Director of the National Park Service; and Michael*

*Snyder, in his official capacity as Intermountain Region Director for the National Park*

*Service,* Docket No. 07-CV-319B, should be consolidated, and all filings made under

Docket No. 07-CV-319B.

Therefore, and for the foregoing reasons, its

**ORDERED** that *Bucky Hall, Tim A. French, Jill Shockley Siggins, Bill Brewer*

*and Marie Fontaine, in their official capacity as the Board of County Commissioners of*

*the County of Park, State of Wyoming, v. United States Department of the Interior; Dirk*

*Kempthorne, in his official capacity as the Secretary of the United States Department of*

*the Interior; Mary Bomar, in her official capacity as the Director of the National Park*

*Service; and Michael Snyder, in his official capacity as Intermountain Regional Director,*

*National Park Service,* Docket No. 08-CV-04B be consolidated with *State of Wyoming v.*

*United States Department of the Interior; National Park Service; Dirk Kempthorne, in his*

*official capacity as the Secretary of the Interior; Mary Bomar, in her official capacity as*

*the Director of the National Park Service; and Michael Snyder, in his official capacity as*

6

EXHIBIT S

*Intermountain Region Director for the National Park Service,* Docket No. 07-CV-319B. It is further

      **ORDERED** that all further pleadings and motions be filed under *State of Wyoming v. United States Department of the Interior; National Park Service; Dirk Kempthorne, in his official capacity as the Secretary of the Interior; Mary Bomar, in her official capacity as the Director of the National Park Service; and Michael Snyder, in his official capacity as Intermountain Region Director for the National Park Service,* Docket No. 07-CV-319B.

Dated this 19th day of February, 2008.

 

                           CLARENCE A. BRIMMER
                           UNITED STATES DISTRICT JUDGE

EXHIBIT S



**National Park Service**
**U.S. Department of the Interior**

**Yellowstone National Park**
**Grand Teton National Park**
**John D. Rockefeller, Jr. Memorial Parkway**
**Wyoming, Montana, Idaho**

# Winter Use Plans
# Record of Decision

Recommended:

*[signature]*

Suzanne Lewis

Superintendent

Yellowstone National Park

Approved:

*[signature]*

Michael D. Snyder

Intermountain Regional Director

National Park Service

Effective on:

November 20, 2007          2:30 p.m. MST

Date                                Time

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

This page intentionally left blank.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

## UNITED STATES DEPARTMENT OF THE INTERIOR

## NATIONAL PARK SERVICE

## RECORD OF DECISION

## WINTER USE PLANS
## ENVIRONMENTAL IMPACT STATEMENT

## Yellowstone National Park
## Grand Teton National Park
## John D. Rockefeller, Jr. Memorial Parkway

## Wyoming, Montana, Idaho

The Department of the Interior, National Park Service has prepared this Record of Decision on the Winter Use Plans/Final Environmental Impact Statement (FEIS) for Yellowstone and Grand Teton national parks and the John D. Rockefeller, Jr. Memorial Parkway. This Record of Decision (ROD) includes a description of the background of the project, a statement of the decision made, a listing of measures to minimize environmental harm, synopses of other alternatives considered, the basis for the decision, findings on impairment of park resources and values, a description of the environmentally preferable alternative, and an overview of public and agency involvement in the decision-making process.

## BACKGROUND OF THE PROJECT

The purpose of the winter use plans is to provide a framework for managing winter use activities in Yellowstone and Grand Teton national parks and the John D. Rockefeller, Jr. Memorial Parkway (Parkway; collectively Parks). The goal of the plans is to provide park visitors with a range of appropriate winter recreational opportunities, while ensuring that these activities do not lead to unacceptable impacts or the impairment of park resources and values. This purpose is underpinned by laws, regulations and policies that establish the basis for managing units of the National Park System.

The intent of a plan is to achieve, as well as practicable, a set of desired conditions or goals. The existing conditions, for purposes of this planning effort, are the historical conditions that existed prior to the last four winters of managed use. Because those conditions led to impairment of park soundscapes, wildlife, air quality, and visitor experience, they clearly indicated a need for change. Thus, the term "historical conditions" is used to describe the conditions that existed during the 1990s. Between 1963 and 2003, snowmobile use was largely unmanaged. Use during those decades peaked in the 1990s. The historical conditions, compared to the desired conditions, illustrate the need for action, or the need for a winter use plan.

Desired and historical conditions are juxtaposed in Table 1. Throughout the several winter use planning efforts undertaken by the NPS since 1990, the planning goals and existing conditions have remained essentially the same. They are restated here in a way that articulates each condition as a discrete topic, for ease in analysis. The desired conditions have been updated in light of the *Management Policies 2006*.

Also, consistent with the decisions of the United States District Court for the District of Columbia, the FEIS addresses various concerns regarding the winter use 2003 Supplemental EIS. These include road grooming and bison movement, compliance with NPS mandates,

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

and the effectiveness of mitigation measures. Consistent with the decisions of the United States District Court for the District of Wyoming, the FEIS addresses various concerns regarding the 2000 EIS. These include snowcoaches, public and cooperating agency involvement, and guiding requirements.

This decision will provide a long-term framework for managing winter use in the Parks, and provides the basis for promulgation of the special regulations that are necessary to implement many key elements of the winter use plans. The regulations governing winter use in the Parks that have been in effect since 2004 include specific provisions that provide the authority to allow the operation of both snowmobiles and snowcoaches in the Parks. Since those regulations were intended to implement a temporary winter use plan, the specific provisions that actually authorize the recreational use of snowmobiles and snowcoaches provide that authority only through the winter of 2006-2007. Thus, without a revision to those regulations, or promulgation of new regulations, the NPS lacks the authority to allow the use of either recreational snowmobiles or snowcoaches in the Parks beginning with the 2007-2008 winter season. This ROD will provide the basis for the decisions reflected in the promulgation of new regulations for winter use management in the Parks.

This Record of Decision is not the final agency action for those elements of the plans that require promulgation of regulations to be effective. Promulgation of such regulations will constitute the final agency action for such elements of the Winter Use Plans.

Table 1:  Desired Versus Historical Conditions for Winter Use Planning

| Desired Conditions | Historical Conditions |
|---|---|
| *Visitor Access* | |
| Visitors have access to a range of appropriate activities for enjoyment of the park resources and values during the winter. Appropriate winter recreation is that which does not cause unacceptable impacts on unique characteristics of winter settings within the parks, while permitting their enjoyment and protection. Appropriate activities are those which promote understanding of the purposes for which the parks' resources are being preserved, and those which promote the health and personal fitness of the general public. | Access for personal motorized use via snowmobile increased greatly since the beginnings of the winter program, while access for "quiet" winter use decreased in relation to it. Snowmobile use, in historical numbers, is inconsistent with winter park landscapes that uniquely embody solitude, quiet, undisturbed wildlife, clean air vistas and the enjoyment of these resources by those engaged in non-motorized activities. |
| *Visitor Experience* | |
| Visitors experience high quality winter activities with a sense of appreciation and enjoyment that is consistent with the condition for visitor access. Recreation experiences enhance the enjoyment of park resources and values, while protecting the experiences of other park visitors. Conflicts among user groups are minimal. Reduced oversnow vehicle sound and emission levels enhance the visitor experience. Visitors participate in winter use activities without damaging resources. | A variety of winter use conflicts have been identified involving the relationship between users and among different user groups. Each of these conflicts affects how people experience the parks. At destination facilities and trails open to both motorized and non-motorized users, the latter express dissatisfaction with the sound, odor, and number of snowmobiles as affecting the solitude, quiet, and clean air that people expect to enjoy in the parks. |

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| Desired Conditions | Historical Conditions |
|---|---|
| *Health and Safety* | |
| High quality facilities, programs and operations provide a safe and healthful environment for visitors and employees. The safety and health of persons will be ensured by identifying and preventing potential injuries from recognizable threats. Known hazards are reduced or eliminated. Visitors know how to participate safely in winter use activities, and they equip themselves for doing so. Reduced oversnow vehicle sound and emission levels protect the health and welfare of employees and visitors. | The level of snowmobile accidents, unsafe users, inherent winter risks, and conflicts between users is a public safety concern. The parks have documented health hazards from oversnow vehicle emissions and noise for both employees and visitors. |
| *Park Resources and Values* | |
| Park resources and values are protected from impairment by preventing unacceptable impacts. Reduced oversnow vehicle sound and emission levels protect air quality, natural soundscapes, and other resources that are dependent on those qualities. Impacts to wildlife are mitigated, and effective wildlife habitat is protected. | Sound and exhaust emissions from oversnow vehicles affect air quality, visibility, and natural soundscapes. Oversnow vehicle travel causes harassment and other unintended impacts on wildlife, especially at times when wildlife species are highly vulnerable to natural stressors. |

## DECISION (SELECTED ACTION)

### Description of the Selected Action

This decision is primarily based upon Alternative 7 in the FEIS and strikes a balance between snowmobile and snowcoach use to provide an appropriate range of winter access while protecting park resources.  Implementation of certain aspects of the decision will occur once the rulemaking is completed.  Rulemaking is anticipated to be completed by late-November 2007.

As shown in Table 2 for Yellowstone National Park, 540 snowmobiles per day will be allowed, with the requirements that all snowmobiles meet NPS Best Available Technology (BAT) requirements for air and sound emissions and all snowmobilers travel with a commercial guide. In addition, 83 snowcoaches will be allowed per day. This decision will also manage several side-roads with temporal and spatial zoning to facilitate a variety of uses.

This decision includes an intensive monitoring and adaptive management program, which is outlined in Appendix A. The NPS will continue monitoring of park resources and values, including air quality, natural soundscapes, wildlife, employee health and safety, and visitor experience. This will provide the NPS with the ongoing information necessary to assess the impacts resulting from implementation of this decision on park resources and values, and visitor access, and to make adjustments, as appropriate, in winter use management.  The thresholds within the adaptive management framework are a tool for managers to help them determine if the goals and objectives of the winter use plans are being achieved. Managers will use monitoring results, along with changes in technology and other new information, to help inform future actions. Managers have at their disposal a wide variety of tools. Some of the management techniques available include adjustments in snowmobile or snowcoach use levels (up or down), adjustment in Best Available Technology requirements, visitor and guide education, timing of entries, and group sizes. Through adaptive management, if monitoring

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

of use levels of snowmobiles and snowcoaches allowed under this Record of Decision indicates acceptable conditions, the NPS will increase use levels to the extent acceptable conditions can be maintained. Conversely, if monitoring of use levels of snowmobiles and snowcoaches allowed under this Record of Decision indicates unacceptable conditions, the NPS will reduce use levels to the extent acceptable conditions can be maintained.

This decision addresses Sylvan Pass in Yellowstone. For the winter season of 2007-2008 the pass will be managed continuing the combined program outlined in the 2004 Temporary Plan. After the winter of 2007-2008, in order to maximize risk reduction, the pass would be open and managed using full avalanche forecasting (as defined in the Sylvan Pass Operational Risk Management Assessment). When full forecasting indicates the pass is safe, the pass would be open to oversnow travel (both motorized and non-motorized access).

The National Park Service will, in good faith, work cooperatively with the State of Wyoming, Park County, Wyoming and the town of Cody to determine how to provide continued snowmobile and snowcoach motorized oversnow access to Yellowstone National Park through the East Gate via Sylvan Pass in the winter use seasons beyond 2007-2008.

The National Park Service will meet with representatives of the State of Wyoming, Park County, Wyoming and the town of Cody to further explore reasonable avalanche and access mitigation safety measures and costs. In order to provide adequate time to amend this Record of Decision reflecting a potential consensus of the parties and to promulgate a new regulation reflecting the amended decision for the 2008-2009 winter use season and beyond, consensus should be reached by June 1, 2008.

In future years, when Sylvan Pass is not open due to safety, the NPS will maintain the road segment from the East Entrance to a point approximately four miles west of the entrance station to provide for opportunities for cross-country skiing and snowshoeing. Limited snowmobile and snowcoach use will be allowed in order to provide drop-offs for such purposes. In addition, when the pass is not open due to safety, oversnow vehicle travel will be allowed on the road segment between Fishing Bridge and Lake Butte Overlook.

In Grand Teton National Park, 40 snowmobiles will be allowed on Jackson Lake each day in order to provide access for ice fishing, subject to the condition that they meet BAT requirements for air and sound emissions. In addition, the use of snowmobiles not meeting BAT requirements will continue to be allowed on certain designated routes in order to access inholdings or adjacent public and private lands.

Within the John D. Rockefeller, Jr. Memorial Parkway, 25 snowmobiles will be allowed to access the Grassy Lake Road at Flagg Ranch each day. The BAT requirement will not apply to snowmobiles using the Grassy Lake Road, and the daily entry limit will apply to snowmobiles originating a trip at Flagg Ranch.

The Continental Divide Snowmobile Trail (CDST) within both Grand Teton and the Parkway is a portion of a much longer trail that extends through northwest Wyoming to the Pinedale and Lander areas. Except for the segment of the CDST between the east boundary of Grand Teton and the vicinity of Moran Junction, this route will no longer be designated for snowmobile use, in essence converting it to a trailered segment of the CDST. Snowmobiles could be hauled between Moran Junction and Flagg Ranch, at that point connecting with the Grassy Lake Road and oversnow access to points in the Caribou-Targhee National Forest and beyond.

This decision also keeps in place for the 2007-2008 winter season a number of elements of the temporary winter use plan that has guided use of the Parks for the past three winters. This will provide for continuity of operations over a one-season period, thereby avoiding

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

disruptions to park visitors, snowmobile and snowcoach operators, and local communities. Specifically, for the winter of 2007-2008, 720 BAT snowmobiles and 78 snowcoaches will continue to be allowed into Yellowstone, and Sylvan Pass will remain open for motorized oversnow vehicle travel (using a combination of helicopter and howitzer dispensed explosives to mitigate avalanche danger). In Grand Teton and the Parkway, a combined total of 140 snowmobiles will be allowed on Jackson Lake, the CDST, and the Grassy Lake Road, subject to the same BAT requirements that have been in effect the past three winters.

This decision addresses the purpose and need identified in the FEIS. Previous impairment to air quality and wildlife will be mitigated and the visitor experience, employee and visitor health and safety, and natural soundscape conditions will be improved. Visitor access will be facilitated through managed snowmobile and snowcoach use.

## Key Actions

### Actions Specific to Yellowstone

#### *Routes Open to Snowmobile Use*

The superintendent may open or close these routes, or portions thereof, for snowmobile travel after taking into consideration the location of wintering wildlife, adequate snowpack, public safety, and other factors. Notice of such opening or closing will be provided by one or more of the methods listed in 36 CFR 1.7(a).

The following routes are designated for snowmobile use:

- Grand Loop Road, from its junction with Upper Terrace Drive to Norris Junction
- Norris Junction to Canyon Junction
- Grand Loop Road, from Norris Junction to Madison Junction
- West Entrance Road, from the park boundary at West Yellowstone to Madison Junction
- Grand Loop Road, from Madison Junction to West Thumb
- South Entrance Road, from the South Entrance to West Thumb
- Grand Loop Road, from West Thumb to its junction with the East Entrance Road
- East Entrance Road, from the East Entrance to its junction with the Grand Loop Road
- Grand Loop Road, from its junction with the East Entrance Road to Canyon Junction
- South Canyon Rim Drive
- Lake Butte Road
- Firehole Canyon Drive, from noon to 9 p.m. only
- North Canyon Rim Drive, from noon to 9 p.m. only
- Riverside Drive, from noon to 9 p.m. only
- Cave Falls Road, with no BAT or guiding requirement, and a daily entry limit of 50 snowmobiles (which does not count against the 540 total in Yellowstone)
- Roads in the developed areas of Madison Junction, Old Faithful, Grant Village, West Thumb, Lake, East Entrance, Fishing Bridge, Canyon, Indian Creek, and Norris.

#### *Routes Open to Snowcoach Use*

The superintendent may open or close the following oversnow routes, or portions thereof, or designate new routes for snowcoach travel after taking into consideration the location of

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

wintering wildlife, adequate snowpack, public safety, and other factors. Notice of such opening or closing will be provided by one or more of the methods listed in 36 CFR 1.7(a).

All routes designated for snowmobile use are also open to snowcoach use. In addition, the following routes are open to snowcoaches:

- Firehole Canyon Drive, all day (7 a.m. to 9 p.m.)
- Fountain Flat Road
- North Canyon Rim Drive, all day (7 a.m. to 9 p.m.)
- Riverside Drive, all day (7 a.m. to 9 p.m.)
- Grand Loop Road, from its junction with Mammoth Terrace Drive to its junction with North Entrance Road
- Roads in the developed area of Mammoth Hot Springs
- Grand Loop Road, from Canyon Junction to the Washburn Hot Springs overlook.

### Guiding Requirements

- All snowmobilers in Yellowstone, except those on the Cave Falls Road, will be required to travel with a commercial guide who is affiliated with a commercial guiding service that is authorized by contract to operate in the park.
- No more than eleven snowmobiles will be permitted in a group including at least one commercial guide. That is, group numbers include the commercial guide sled(s).
- All snowcoaches operating in the park will have to operate in accordance with a concessions contract. Private snowcoaches will not be allowed, beginning with the winter of 2008-2009.
- All businesses providing commercial guiding services and other commercial services in the park are required to have contracts authorizing their operation.

### Snowmobile and Snowcoach Limits

Table 2: Yellowstone Daily Snowmobile and Snowcoach Entry Limits*

| Entrance** | Commercially Guided Snowmobiles | Commercially Guided Snowcoaches |
|---|---|---|
| West Entrance | 300 | 37 |
| South Entrance | 170 | 10 |
| East Entrance | 30 | 2 |
| North Entrance | 20 | 15 |
| Old Faithful | 20 | 19 |
| Total | 540 | 83 |

* The numbers of snowmobiles and snowcoaches allocated to a particular entrance may be adjusted (with the parkwide totals not to exceed 540 and 83, respectively), depending on the results of analysis for concession contracts. A change in the number of snowcoaches permitted might not be implemented until new snowcoach contracts are issued (in approximately 2013), depending on the need. Snowmobiles on the Cave Falls Road do not count against the 540 limit.
** For the winter of 2007-2008 only, the following snowmobile allocations will be in effect: West Entrance, 400; South Entrance, 220; East Entrance, 40; North Entrance, 30; and Old Faithful, 30 (total 720). The following snowcoach allocations will apply in 2007-2008 only: West Entrance, 34; South Entrance, 10; East Entrance, 3; North Entrance, 13; and Old Faithful, 18 (total 78).

### Non-Motorized Access

- Backcountry non-motorized use will continue to be allowed throughout the park (see the "sensitive areas" exception below), subject to the Winter Severity Index program. The

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

program restricts backcountry use of the park when winter snowpack and weather conditions become severe and appear to be adversely affecting wildlife.

- Snow road edges may continue to have track set for skiing where feasible.

- About 35 miles of roads will continue to be groomed for cross country skiing in Yellowstone. These are mainly roads used by summer vehicles, but which are closed to oversnow vehicle travel. These roads may continue to be machine groomed for skiing. Existing and new routes could be evaluated in the future, and changes announced through one or more of the methods listed in 36 CFR 1.7(a). The Virginia Cascades Road in Yellowstone may be groomed for skiing.

- Ski and snowshoe use of the South Entrance Road and East Entrance Road will be allowed to continue after the balance of roads close to winter operations (during spring plowing). When spring plowing operations approach the entrances, the roads will then be closed to skiing and snowshoeing for safety concerns. Bear management closures of the park's backcountry will continue as in previous years.

- Sensitive areas within the inner gorge of the Grand Canyon of the Yellowstone and the McMinn Bench bighorn sheep area will continue to be closed to recreational winter use.

### East Entrance Road

- This decision addresses Sylvan Pass in Yellowstone. For the winter season of 2007-2008 the pass will be managed continuing the combined program outlined in the 2004 Temporary Plan. After the winter of 2007-2008, in order to maximize risk reduction, the pass would be open and managed using full avalanche forecasting (as defined in the Sylvan Pass Operational Risk Management Assessment). When full forecasting indicates the pass is safe, the pass would be open to oversnow travel (both motorized and non-motorized access).

- The National Park Service will, in good faith, work cooperatively with the State of Wyoming, Park County, Wyoming and the town of Cody to determine how to provide continued snowmobile and snowcoach motorized oversnow access to Yellowstone National Park through the East Gate via Sylvan Pass in the winter use seasons beyond 2007-2008.

- The National Park Service will meet with representatives of the State of Wyoming, Park County, Wyoming and the town of Cody to further explore reasonable avalanche and access mitigation safety measures and costs. In order to provide adequate time to amend this Record of Decision reflecting a potential consensus of the parties and to promulgate a new regulation reflecting the amended decision for the 2008-2009 winter use season and beyond, consensus should be reached by June 1, 2008.

- In future years, when Sylvan Pass is not open due to safety, the NPS will maintain the road segment from the East Entrance to a point approximately four miles west of the entrance station to provide for opportunities for cross-country skiing and snowshoeing. Limited snowmobile and snowcoach use will be allowed in order to provide drop-offs for such purposes. In addition, when the pass is not open due to safety the road segment between Fishing Bridge and Lake Butte Overlook will be maintained for oversnow vehicle travel.

### Speed Limits

The speed limit from the West Entrance to Madison to Old Faithful will remain at 35 mph except where posted at 25 mph in designated segments to protect wildlife and natural soundscapes, and to enhance visitor safety.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

### *Winter Oversnow Vehicle Season*

- Beginning in 2008-2009, Yellowstone's winter season will begin December 15 and close March 15 each year. Actual opening or closing dates for oversnow travel will be determined by adequate snowpack or snow water equivalency. Early closures of the Grand Loop Road from its junction with Upper Terrace Drive to Madison Junction, and from Norris Junction to Canyon and Fishing Bridge Junction will occur to facilitate spring plowing. To protect road surfaces, the NPS will continue to implement temporary vehicle type restrictions (for example, rubber-tracked vehicles only), as necessary.

- In Yellowstone, the NPS will continue to plow the roads from Gardiner to Mammoth, Mammoth to Tower, and Tower to the Northeast Entrance (Cooke City) throughout the winter. U.S. Highway 191 will continue to be plowed in Yellowstone. Rubber tracked vehicles will not be allowed on these roads.

### *Facilities*

Warming huts may be available for visitor use at Old Faithful, Norris, Madison, Canyon, Fishing Bridge, Indian Creek, Mammoth Terraces, and other appropriate sites.

### **Actions Specific to Grand Teton and the Parkway**

### *Routes Open to Snowmobile Use*

The superintendent may open or close these routes, or portions thereof, for snowmobile travel and may establish separate zones for motorized and non-motorized use on Jackson Lake, after taking into consideration the location of wintering wildlife, adequate snowpack, public safety and other factors. Notice of such opening or closing will be provided by one or more of the methods listed in 36 CFR 1.7(a).

The following routes are designated for snowmobile use:

- The CDST along U.S. 26/287, from the east boundary of GTNP to the vicinity of Moran Junction.
- The CDST along U.S. 89/191/287 from the Moran Junction vicinity to the north boundary of GTNP and from there to Flagg Ranch, through the winter of 2007-2008 only.
- In the developed area of Flagg Ranch.
- U.S. 89/191/287 from Flagg Ranch to the north boundary of the Parkway.
- Grassy Lake Road (Flagg-Ashton Road), from Flagg Ranch to the west boundary of the Parkway.
- The frozen surface of Jackson Lake for purposes of ice fishing by persons possessing a valid Wyoming state fishing license and the proper fishing gear. Jackson Lake will be open generally from the time that the ice reaches sufficient thickness to make the lake safe for snowmobile use. The season will extend until late March or early April, depending on lake conditions, public safety, and resource concerns.

### *Routes Open to Snowcoach Use*

The superintendent may open or close these oversnow routes, or portions thereof, or designate new routes for snowcoach travel after taking into consideration the location of wintering wildlife, adequate snowpack, public safety, and other factors. Notice of such opening or closing will be provided by one or more of the methods listed in 36 CFR 1.7(a).

- U.S. Highway 89/191/287, from the Snake River Bridge to the north boundary of the Parkway.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- In the developed area of Flagg Ranch.

### Guiding Requirements

- Snowmobile use on Jackson Lake and the Grassy Lake Road will not require the use of commercial guides; however, requests to provide commercial guiding services will be considered by the NPS.  Snowmobiles being operated between Flagg Ranch and the South Entrance of Yellowstone must be accompanied by a guide.
- All snowcoaches operating in the Parkway will have to be operated in accordance with a concessions contract, or other NPS-issued permit.

### Snowmobile Limits

Table 3: Grand Teton and the Parkway Daily Snowmobile Entry Limits

| Entrance | Snowmobiles |
|---|---|
| Grassy Lake Road (Flagg-Ashton Road) | 25* |
| CDST | 0** |
| Jackson Lake | 40 |
| Total | 65 |

* As measured by counting snowmobiles originating a westbound trip at Flagg Ranch. For the winter of 2007-2008 only, the daily entry limit will be 50 snowmobiles.
**For the winter of 2007-2008 only, the daily snowmobile limit on the CDST will be 50 snowmobiles.

### Non-Motorized Access

- Non-motorized winter use will continue to be managed consistent with prior decisions and rules.
- Snow road edges may continue to have track set for skiing where feasible.
- About 15 miles of the Teton Park Road are currently groomed for cross country skiing in Grand Teton.  This road may continue to be machine groomed for skiing.

### Plowed Roads

- In GTNP and the Parkway, the following roads will continue to be plowed:
  o Highway 26/89/191, from the south boundary of GTNP to Moran
  o Highway 89/191/287, from Moran to Flagg Ranch
  o Highway 26/287, from Moran to the east boundary of GTNP
  o Teton Park Road, from Moose Junction to Taggart Lake Trailhead
  o Teton Park Road, from Jackson Lake Junction to Signal Mountain Lodge
  o Pacific Creek Road, from Highway 89/191/287 to the GTNP boundary
  o Gros Ventre Road, from Gros Ventre Junction to east boundary, via Kelly and Kelly Warm Springs
  o The road from Kelly to end of pavement, approximately two miles north of Mailbox Corner
  o Teton Science School Road to the east boundary
  o The Moose–Wilson Road, from the Granite Canyon Entrance to the Granite Canyon Trailhead
- Current winter closures will remain in effect on the Snake River floodplain, the Buffalo Fork River floodplain, and the Uhl Hill area, Willow Flats, Kelly Hill, Static Peak, Prospectors Mountain, and Mount Hunt.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- Motorized access to inholdings and adjacent public and private lands will continue to be available through a combination of plowed roads for wheeled vehicles and staging areas for snowmobiles traveling to immediately adjacent lands.
- Reasonable and direct access to adjacent public and private lands, or to privately owned lands within the park with permitted or historical motorized access, will continue via paved and plowed routes or via oversnow routes from GTNP.
- Snowmobiles that meet the best available technology requirements will be phased in for administrative use, subject to the availability of funding, by 2011-2012. The NPS, and other parties authorized by the NPS, may continue to use non-BAT snowmobiles where necessary for specialized purposes, such as search and rescue, law enforcement, facility repair and maintenance, and other emergency operations.
- Destination and support facilities may continue to be provided at Moose, Triangle X, Colter Bay, and Flagg Ranch, and warming hut facilities may be available along the Teton Park Road to provide visitor services and interpretive opportunities.

### Winter Season

The winter use season will generally coincide with the season established for Yellowstone, from December 15 to March 15 each year. Actual opening or closing dates for oversnow travel will be determined by adequate snowpack, snow water equivalency, or the condition of the frozen surface of Jackson Lake, as applicable.

### Grassy Lake Road

The approximately 6 mile portion of the Grassy Lake (Flagg - Ashton) Road within the Parkway is currently, and historically has been, groomed by the Fremont County, Idaho, Department of Parks and Recreation. The grooming of this route is performed in conjunction with grooming of the snowmobile route through the Caribou-Targhee National Forest. In the event that Fremont County ever chooses not to, or is unable to continue grooming the road, the National Park Service does not intend to undertake that responsibility. Therefore, unless another other entity were available to provide that service, that portion of the Grassy Lake (Flagg – Ashton) Road within the Parkway will no longer be designated as being open to oversnow vehicle use.

## Actions and Assumptions Common to all Park Units

None of the actions in this decision preclude closures for safety, resource protection, or other reasons as identified in 36 CFR 1.5 or 2.18.

### Definitions

- In this ROD, the following definitions apply:
  - **Commercial guide:** A guide who operates for a fee or compensation and is authorized to operate in the park(s) under a concession contract or commercial use authorization, or is affiliated with a commercial guiding service or commercial tour.
  - **Commercial tour:** One or more persons traveling on an itinerary that has been packaged, priced, or sold for leisure/recreational purposes by an organization that realizes financial gain through the provision of the service.
  - **Designated "non-motorized recreation" route**: A marked or otherwise indicated oversnow travel route.
  - **Gateway communities:** The towns of Jackson and Cody, Wyoming, and Gardiner, Cooke City, and West Yellowstone, Montana.
  - **Historical snowcoach:** A Bombardier snowcoach manufactured in 1983 or earlier. Any other snowcoach is considered a non-historical snowcoach.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- o **Oversnow vehicles (OSVs):** Self-propelled vehicles intended for travel on snow, driven by a track or tracks in contact with the snow, and which may be steered by skis or tracks in contact with the snow.  This term includes both snowmobiles and snowcoaches.
- o **Oversnow route:**  That groomed portion of the unplowed roadway located between the road shoulders and designated by snow poles or other poles, ropes, fencing, or signs erected to regulate over-snow activity.  Oversnow routes include pullouts or parking areas that are groomed or marked similarly to roadways and are adjacent to designated oversnow routes.
- o **Snowcoaches:** Self-propelled, mass transit vehicles intended for travel on snow, with a curb weight of over 1,000 pounds (450 kg), driven by a track or tracks, steered by skis or tracks, and which have a capacity of at least eight passengers.  A snowcoach has a maximum size of 102 inches wide, plus tracks (not to exceed 110 inches wide with tracks); a maximum length of 35 feet; and a Gross Vehicle Weight Rating (GVWR) not to exceed 25,000 pounds.
- o **Snowmobiles:** Self-propelled vehicles intended for travel on snow, with a curb weight of not more than 1,000 pounds (450 kg), driven by a track or tracks in contact with the snow, and which may be steered by a ski or skis in contact with the snow.

## Mitigating Measures/Monitoring

A variety of mitigating measures are included in the action items listed for each park, above. These include restricting snowmobile and snowcoach use to designated routes, requiring 100% commercial guiding in Yellowstone, placing a daily numerical limit on the number of snowmobiles and snowcoaches that may enter the parks, speed limits and studying bison use of roads.  In addition, the following mitigating measures will be implemented as well as an extensive monitoring and adaptive management program, as described in Appendix A of this decision.

### *Best Available Technology (BAT)*

- If the EPA adopts standards for any class of oversnow vehicle that are more stringent than the requirements resulting from this NEPA process and decision, the EPA standards will replace the NPS standard.
- The NPS recommends the use of environmentally preferred fuels and lubricants for all motorized winter vehicle use for all alternatives.  For example, this could include lubricants meeting the EPA "highly biodegradable" classification, and fuels like biodiesel and ethanol blends.  Additionally, the NPS encourages the use of fuel-efficient winter vehicles in the parks.
- Revisions to testing procedures may be described and implemented per NPS procedures used to certify a snowmobile or snowcoach as BAT.
- Individual snowcoaches or snowmobiles may be subject to periodic inspections to determine compliance with the emission and sound requirements.

### Snowmobile BAT

- All recreational snowmobiles operating in the parks must meet BAT requirements, except:
  - o Snowmobiles traveling on the Grassy Lake Road to and from Flagg Ranch will be exempt from BAT requirements, beginning the winter of 2008-2009. In order to be consistent in implementing all aspects of the winter use plans in 2008-2009, and to avoid the confusion that could result by implementing individual elements prior to that time, the NPS is retaining the BAT requirement on the Grassy Lake Road until the winter season of 2008-2009. Eastbound snowmobiles may not travel beyond

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

Flagg Ranch unless they meet BAT requirements and any other applicable requirements.

o Snowmobiles using the Cave Falls Road in Yellowstone will not be required to be BAT.

o Snowmobiles using routes within Grand Teton established to allow access to inholdings or adjacent public or private lands will be exempt from BAT requirements. This also applies to the portion of the CDST between the east park boundary and Moran Junction.

o The superintendents will maintain a list of approved snowmobile makes, models, and years of manufacture that meet the BAT requirements and a procedure to certify a snowmobile as BAT. The list will be posted on the park website, and notice will be provided by one or more of the methods listed in 36 CFR 1.7(a).

• The NPS anticipates that snowmobile manufacturers will conduct research to continually improve sound and emissions in available machines. Information on the full spectrum of pollutant criteria is critical to prevent an inadvertent increase in some pollutants.

• Once approved, a snowmobile will be certified as BAT for a period of six years. In the absence of new emissions and sound information, after six years a snowmobile make and model will no longer be BAT-certified and its use will not be allowed in the parks. In recognition of the possibility that some privately owned snowmobiles used for ice fishing on Jackson Lake may have relatively low mileage after a period of 6 years, the certification for these snowmobiles may be extended up to a total of 10 years, as long as the mileage of the individual machine does not exceed 6,000 miles.

• Snowmobiles that have been modified in a manner that may affect air or sound emissions may be prohibited by the superintendent.

• In addition, all critical snowmobile emission, sound and odometer-related components that were originally installed by the manufacturer must be in place and functioning properly. Such components may only be replaced with the original equipment manufacturer (OEM) component or its equivalent. If OEM parts are not available, aftermarket parts may be used if they do not worsen sound or emission characteristics.

• The following snowmobile BAT standards apply:

o Snowmobile BAT Air Emissions Requirements

▪ All snowmobiles must achieve a 90% reduction in hydrocarbons and a 70% reduction in carbon monoxide emissions, relative to EPA's baseline emissions assumptions for conventional two-stroke snowmobiles. Specifically, beginning with the 2005 model year, all snowmobiles must be certified under 40 CFR 1051and 1065 to a Family Emission Limit no greater than 15 g/kW-hr for hydrocarbons and 120 g/kW-hr for carbon monoxide. If the existing procedures or requirements of 40 CFR 1051 and 1065 and the Family Emission Limit are superseded, all snowmobiles must be certified by their manufacturer to meet the above emission requirements.

▪ For 2004 model year snowmobiles, measured emissions levels (official emission results with no deterioration factors applied) must comply with the emission limits specified above.

▪ Pre-2004 model year snowmobiles may be operated only if they have been shown to have emissions that do not exceed the limits specified above.

▪ Snowmobiles must be tested on a five-mode engine dynamometer, consistent with the existing test procedures specified by EPA (40 CFR 1051 and 1065).

o Snowmobile BAT Sound Requirements

▪ Snowmobiles must operate at or below 73dBA as measured at full throttle

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

according to Society of Automotive Engineers (SAE) J192 test procedures (revised 1985).

- ▪ Snowmobiles may be tested at any barometric pressure equal to or above 23.4 inches Hg uncorrected (as measured at or near the test site).
- ▪ The NPS recognizes that the SAE procedures changed in 2003 and are continuing to change; thus the 2003 procedures may be supplanted. The NPS intends to continue to work with industry to update the BAT sound measurement procedures. NPS will consider such new protocols or procedures as they are modified by SAE.

## Snowcoach BAT

- All non-historical snowcoaches must meet NPS air emissions requirements, which are the applicable EPA emission standards for the vehicle at the time it was manufactured.

- By the beginning of the 2011-2012 season, all snowcoaches authorized to operate in the Parks must meet BAT air emission requirements, which will be the functional equivalent of having EPA Tier I emissions control equipment incorporated into the engine and drive train for the vehicle class (size and weight) as a wheeled vehicle.  The NPS will encourage, in part through contract and permit, snowcoaches to have EPA Tier II emissions control equipment for the vehicle class.

- In addition, all critical emission and sound-related exhaust components that were originally installed by the manufacturer must be in place and functioning properly. Such components may only be replaced with the original equipment manufacturer (OEM) component or their equivalent.  If OEM parts are not available, aftermarket parts may be used if they do not worsen emission and sound characteristics.  In general, catalysts that have exceeded their manufacturer-recommended useful life must be replaced unless the operator can demonstrate the catalyst is functioning properly.

- Modifying or disabling a snowcoach's original pollution control equipment is prohibited except for maintenance purposes.

- Beginning in the 2011-2012 season, all snowcoaches must meet a sound emissions requirement of no greater than 73 dBA (testing procedures to be determined). The NPS will encourage, in part through contract and permit, snowcoaches with quieter sound levels.

## *Bison and Roads*

- The NPS will implement the research proposal by Robert A. Garrott and P.J. White entitled "Evaluating Key Uncertainties Regarding Road Grooming and Bison Movements" (at http://www.nps.gov/yell/parkmgmt/winterusetechnicaldocuments.htm). This proposal specifically addresses the uncertainty recognized in the EIS as to whether grooming of the Madison to Norris road segment (Gibbon Canyon) has led to alterations of bison movements and distribution in Yellowstone, a question identified in the report by Cormack Gates et al., "The Ecology of Bison Movements and Distribution In and Beyond Yellowstone National Park" (2005, posted at above site).

- Garrott and White propose to analyze existing data on GPS-collared bison, track additional GPS-collared bison for 5 years, and deploy cameras along travel routes to gain information on the relationship between road grooming and bison travel, without closing the Gibbon Canyon Road to public motorized oversnow vehicle travel (during this five-year period).

- During the five year period, other roads or routes may be investigated to help describe the relationship between snow depth, grooming, and bison movement. For example, the

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

Firehole Canyon Drive may be closed to oversnow travel, forcing bison to travel cross country or along the ungroomed Firehole Canyon Road. Similarly, the Madison to Norris Road may be fenced or gated in the vicinity of the new bridge over the Gibbon River to restrict bison movement on the groomed roadway and force bison to travel cross country (while permitting snowmobile and snowcoach travel). Thus bison movement and snow depth and roads may be tested without closing a main road.

- After five years of such data gathering and analysis, the NPS will consider closing the main road between Madison and Norris in its entirety to observe bison response. It is uncertain until the five-year period of data gathering and analysis has finished whether such closure will yield informative data or conclusions. Such a closure, if determined to be appropriate, would likely be a multi-year closure. The NPS does not intend to perform further NEPA analysis on this closure because the concept of closing the Gibbon Canyon road was specifically analyzed during modeling for the FEIS as an option within alternatives 1 and 7. For those alternatives, the impacts have been analyzed assuming that the road segment between Madison and Norris would be closed to all motorized oversnow travel. The agency will announce the closure using the monitoring program procedures described below.

- Other recommendations of the Gates report will be evaluated as part of Yellowstone's bison management program.

### Administrative Use

- Non-recreational, administrative use of snowmobiles will be allowed by park personnel or parties duly permitted under the provisions of 36 CFR 1.5 and 1.6. Permitted parties must meet BAT requirements unless specifically authorized otherwise by the park superintendent. Such use will not count against daily recreational entry limits and will not be subject to guiding requirements.

- Administrative use of snowmobiles may be supplemented with administrative snowcoaches. When administrative snowmobiles are necessary, the NPS will generally use BAT snowmobiles. Some non-BAT snowmobiles will be permitted for law enforcement, search and rescue, and other administrative purposes on a limited basis.

- Contractors, researchers, and other partners working in the parks will be encouraged to use snowcoaches and they will be required to use BAT snowmobiles unless non-BAT machines are necessary for a particular project and are approved in advance of use by the NPS. The need for non-BAT machines outside the parks does not constitute a reason to use the non-BAT snowmobile in the park when a BAT snowmobile or snowcoach will suffice.

- NPS employees and their families living in the interior of Yellowstone (and their visitors) may continue to use snowmobiles. Subject to available funding, the NPS will provide BAT snowcoaches and snowmobiles for employee use. Beginning in the 2011-2012 season, all employee-owned snowmobiles operated in the parks must meet BAT requirements, and visitors to these employees must also use BAT snowmobiles or snowcoaches.

- Concessioners and their employees and families living in the interior of Yellowstone (and their visitors) may continue to use snowmobiles. To the extent practicable (through permits and contracts), concessioners, their employees and families will be required to use BAT snowmobiles and encouraged to use snowcoaches. Beginning in the 2011-2012 season, all concession employee-owned snowmobiles operated in the parks must meet BAT requirements, and visitors to these concessioner employees must also use BAT snowmobiles or snowcoaches.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

### Hours of Operation

Motorized travel from 9 p.m. to 7 a.m. will be prohibited except for emergency purposes or when approved by the superintendent for administrative use or by special permit for necessary travel. Yellowstone's East Entrance will open to recreational snowmobile and snowcoach travel no earlier than 8 a.m.

### Plowed Roads

Sand, or an equally environmentally neutral substance, may be used for traction on all plowed winter roads. No salts will be used, and sand will be generally spread only in the shaded, icy, or hilly areas of plowed roads. Before spring opening, sand removal operations will be conducted on all plowed park roads.

### Accessibility

- This decision continues implementation of transition and action plans for accessibility and support the philosophy of universal access in the parks. The NPS will make reasonable efforts to ensure accessibility to buildings, facilities, programs, and services.
- The NPS will develop strategies to ensure that new and renovated facilities, programs, and services (including those provided by concessioners) are designed, constructed, or offered in conformance with applicable policies, rules, regulations, and standards, including but not limited to the Architectural Barriers Act of 1968, the Americans with Disabilities Act of 1990, the Uniform Federal Accessibility Standards of 1984, and the Guidelines for Outdoor Developed Areas of 1999. The NPS will evaluate existing buildings and existing and new programs, activities, and services, including telecommunications and media, to determine current accessibility and usability by disabled winter visitors. Action plans to remove barriers will be developed.

### Personal Protective Equipment

Personal protective equipment is recommended for snowmobilers, including helmet, snowmobile suit and gloves, proper footwear, and hearing protection. Persons traveling by snowcoach should also wear or have access to appropriate personal protective equipment including winter clothing, footwear, and hearing protection. Non-motorized users are also recommended to wear and carry personal protective equipment as appropriate for their winter travel. For all user groups, personal protective equipment should include avalanche rescue gear (shovel, probe, and transceiver) as appropriate.

## MEASURES TO MINIMIZE ENVIRONMENTAL HARM

### Monitoring of Winter Visitor Use and Park Resources

In addition to the mitigating measures above, scientific studies and monitoring of winter visitor use and park resources (including air quality, natural soundscapes, wildlife, employee health and safety, water quality, and visitor experience) will continue. Selected areas of the parks, including sections of roads, may be closed to visitor use if studies indicate that human presence or activities have unacceptable effects on wildlife or other park resources that could not otherwise be mitigated. The appropriate level of environmental analysis under NEPA will be completed for all actions as required by the Council on Environmental Quality regulations (40 CFR 1500–1508).

- A one-year notice will be provided before any such closure will be implemented unless immediate closure is deemed necessary to avoid impairment of park resources.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- A Monitoring and Adaptive Management Program is a key element of this decision (see Appendix A). Generally non-emergency changes in park management implemented under the adaptive management program will be implemented only after at least one or two years of monitoring, followed by a 6- to 12-month notification and waiting period. The superintendents will continue to have the authority under 36 CFR 1.5 to take emergency actions to protect park resources or values.

## Wildlife, Including Federally Protected Species and Species of Special Concern

- At periodic intervals when snow depth warrants, routine plowing operations will include laying back roadside snow banks that could be a barrier to wildlife exiting the road corridor.
- NPS personnel will patrol sensitive resource areas to ensure compliance with area closures.
- The parks will continue to support the objectives of the Greater Yellowstone Bald Eagle Management Plan, and the eagle population will continue to be monitored to identify and protect nests.
- Monitoring of wolves will continue.
- Monitoring of grizzly bear populations will continue in accordance with the Interagency Grizzly Bear Management Guidelines and the parks' bear management plans.
- Wildlife-proof garbage holding facilities for interior locations (including Old Faithful Snowlodge) will be provided as part of regularly-occurring park operations.
- Use of groomed, ungroomed, and plowed surfaces by bison and other ungulates will continue to be monitored.
- Monitoring and protection of trumpeter swan habitats and nests will continue, including the closure of nest sites to public access when warranted.
- Monitoring potential or known winter use conflicts will result in area closures if necessary to protect wildlife and their habitat.
- If monitoring indicates that undesirable impacts are occurring, further measures including avoiding, minimizing, rectifying, reducing, or compensating for those impacts will be identified and taken.

## Cultural Resources

If human remains, funerary objects, sacred objects, or objects of cultural patrimony are discovered, applicable provisions of the Native American Graves Protection and Repatriation Act of 1990 (25 USC 3001) will be followed.

## Water Resources

- Best management practices will be used during the construction, reconstruction, or winter plowing of trails and roads to prevent unnecessary vegetation removal, erosion, and sedimentation.
- Water resource monitoring, which has not indicated a problem in recent years, will continue on an as-needed basis. If necessary, best management practices will be implemented.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

## OTHER ALTERNATIVES CONSIDERED

Six other alternative winter use management plans were evaluated in the FEIS. Alternative 1 resembled the temporary winter use plan of August 2004, with some modifications. Alternative 2 would prohibit recreational snowmobiling in the parks in favor of snowcoach access. Alternative 3A would close much of Yellowstone to oversnow travel, leaving only the South Entrance to Old Faithful route open. A variation of alternative 3 (3B) is the no action alternative, which would close all routes to motorized oversnow recreation. This would be the result of the expiration of the uses allowed under the temporary plan, should no new decision be made. Three other alternatives (4, 5, and 6) would allow varying levels of snowmobile and snowcoach access to continue in the parks. Alternative 6 calls for plowing some roads in Yellowstone to allow wheeled-vehicle access from West Yellowstone and Mammoth to Old Faithful. All alternatives met the purpose and need for the FEIS. However, alternatives 2 and 3 would offer a more limited range of visitor experiences in the winter as compared to the other alternatives. Alternatives 1, 4, and 5 would offer a greater range of opportunities for visitors while alternative 6 would offer the most varied ways to access the interior of Yellowstone National Park. Use levels and means of access in some alternatives may discourage some winter visitors. This decision would largely implement Alternative 7, as explained on page 4 of this ROD.

## BASIS FOR DECISION

Unmanaged, unlimited and unrestricted winter use created impairment of park resources and values historically (including air quality, wildlife, soundscapes, visitor experience, and visitor and employee health and safety), and the solutions to these concerns have been, and remain multi-faceted. That is why this decision includes a daily limit on snowmobile and snowcoach use as well as other reasonable and prudent management tools, such as 100% commercial guiding in Yellowstone, BAT for the vast majority of oversnow vehicles, continued research and monitoring, and adaptive management.

Four winters of experience and monitoring have shown that a program of managed snowmobile and snowcoach access to the Parks works. Many of the historical issues related to past numbers and types of snowmobiles have been successfully addressed. Past issues related to air quality, wildlife concerns, soundscapes, employee and visitor health and safety have been substantially addressed so that impairment and unacceptable impacts are not occurring. Additionally, a program of monitoring and adaptive management will be in place to help the National Park Service understand if the decision is effective and provides a framework for the agency to respond accordingly, with a variety of management tools available (see Appendix A).

The past four years have also shown that certain adjustments to the managed winter access program are necessary; this decision will implement those changes.

### Yellowstone National Park

The NPS has addressed many of the historical issues through air and sound requirements for oversnow vehicles (Best Available Technology, or BAT), mandatory commercial guiding for snowmobiles (and most snowcoaches), limits on the numbers of snowmobiles allowed into the parks, continued research and monitoring, and through temporal and spatial zoning and/or road closures. This decision will continue most of these requirements while making adjustments in some and extending others.

Best available technology has substantially reduced the air emissions from the typical snowmobile and somewhat reduced noise emissions. Air emissions are 70-90% less than

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

those of the historical two-stroke snowmobile and noise levels are 5 decibels less (about a 25% reduction). These reductions have greatly improved Yellowstone's air quality, to the point that some measures of air pollution are close to background level (that is, those pollution levels that would exist without oversnow vehicle traffic). Noise levels have also dropped. The successes in reducing the environmental impacts of snowmobile use that have been brought about by the BAT requirement, along with public support for this management tool, affirm this decision to continue BAT requirements for snowmobiles in Yellowstone. This decision will also implement similar BAT requirements for snowcoaches in the park.

Snowcoaches, especially some older models, are significant contributors to soundscapes concerns. Some older snowcoaches also have been contributing higher levels of air pollutants than their cleaner counterparts. That is why this decision calls for best available technology to be put in place for snowcoaches, with technology requirements that will substantially lower both air and sound emissions. This decision also calls for a reasonable implementation schedule for requiring this BAT requirement to be met, recognizing the relatively large investment that each snowcoach represents.

Commercial guiding under the temporary plan also helped to address many of the concerns regarding the unacceptable impacts and impairment resulting from historical, unregulated snowmobile use. Guides better ensured that only BAT snowmobiles were used, which helped to address noise and air quality issues. Requiring all visitors to travel in groups and enforcing proper visitor behavior also made the parks cleaner and quieter. Safety has been greatly enhanced, with more orderly visitor behavior and fewer intoxicated drivers, less speeding, and fewer underage operators. Oversnow moving violations decreased by 78% from 2002-2003 to 2006-2007 and arrests dropped from 21 to 3 per winter in the same period, due to commercial guiding (after accounting for changing visitation numbers). Because guides know the park rules, the need for closures and signage has been reduced, saving ranger time and reducing visitor frustration. Finally, guides helped reduce the occurrence of adverse wildlife encounters and habituated wildlife problems.

These substantial improvements in visitor experience, employee and visitor health and safety, park operations, and soundscapes, wildlife, and air quality protections are all due, at least in part and in some cases almost entirely, to the 100% commercial guide requirement for snowmobilers. Mandatory commercial guiding has worked, and this decision calls for continuation of this requirement in these new winter use plans. This decision also eliminates the option for private snowcoach travel, effectively implementing the same 100% commercial guide requirement for those traveling by snowcoach.

Limits on the numbers of snowmobiles and snowcoaches allowed into the park have been one element of the largely successful solution to the historical problems associated with unmanaged use of oversnow vehicles in Yellowstone. In order to prevent impairment and unacceptable impacts to park resources and ensure that the experience of visiting Yellowstone in the winter is of high quality, this decision limits the number of snowmobiles to 540 per day, in comparison to the historical average of 795 per day. As a point of comparison, the winter of 2006-2007 saw an average of 290 snowmobiles per day and a single peak day of 542, slightly higher than each of the previous two winters.

Monitoring data also indicates that at the lower levels of use experienced over the past three years, oversnow vehicles could be heard more than expected. During the winter of 2006-2007, oversnow vehicle sounds were audible 59% of the time along the busy West Yellowstone to Madison Road corridor between the hours of 8:00 a.m. and 4:00 p.m. Snowmobiles account for 72% of time audible while snowcoaches account for 22%. The balance is attributable to groomers or unidentifiable vehicles. The 59% time audible exceeded the 50% monitoring threshold that was established to help park managers evaluate

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

the effectiveness of winter use management. In addition, the monitoring thresholds for sound level (loudness) were also exceeded more often than expected, but these exceedances were primarily attributable to snowcoaches and road grooming equipment.

Audibility of oversnow vehicles in Yellowstone's backcountry also exceeded the backcountry soundscapes threshold. The Mary Mountain site is in a backcountry area acoustical zone, but oversnow vehicles on the groomed Old Faithful-Madison Junction Road 8000 feet away were audible at least 10% of the time on all 18 days analyzed. The average percent time audible for all days analyzed was 26% (9 of 18 days exceeded 20%). The audibility threshold was 20% in backcountry areas.

Although the numbers of snowmobiles permitted to enter Yellowstone each day under this decision are greater (with the exception of a single day) than those that actually experienced during the previous three winters, the impacts of this use are manageable, and the use of snowmobiles at this level, combined with the other elements of this decision, is an appropriate use of the park. As noted, the majority of times that monitoring thresholds for sound levels were exceeded were attributable to sources other than recreational snowmobiles. Most of these exceedances were attributable to snowcoaches, particularly the older model Bombardiers. The BAT requirement for snowcoaches will help reduce their noise impacts, which contribute disproportionately to both sound level impacts and percent time audible. Other elements of this decision, such as requiring employee-owned and administratively–used (concessioners, contractors, etc.) snowmobiles (which also contribute disproportionately to soundscapes impacts) to meet BAT requirements, will also reduce noise impacts on the park. Soundscape monitoring activities will continue under this decision, and will help to inform adaptive management actions should they be necessary to ensure that impacts on the park remain acceptable. If audibility remains a concern, this decision enables park managers to utilize the adaptive management program to reduce audibility further, such as by adjusting snowmobile or snowcoach numbers or mandating that all groups enter the park at certain times. Although not part of this decision, future development of even quieter snowmobiles could further reduce impacts on the natural soundscapes of the parks. Because of the actions called for in this decision, the NPS expects to be fully within the soundscapes thresholds identified in the monitoring and adaptive management program.

A second key issue is air quality. Although BAT snowmobiles are far cleaner than snowmobiles historically used in the parks, neither they nor snowcoaches are pollution-free. In addition to BAT requirements, air quality concerns are addressed by limiting use. Modeling indicates that while there would be a small increase in emissions if the number of snowmobiles increased from current use levels to 540, no alternative would result in an impairment of park air quality. In fact, under all the alternatives, all measures of air quality for pollutants, particulates and visibility are predicted to meet Federal, Montana and Wyoming ambient air quality standards, at levels well below those standards. The Federal Class I air quality standards would not be violated or even approached. Clearly, reducing the daily snowmobile numbers will better protect park air quality.

However, at higher use levels, some monitoring indicated a potential problem with benzene and formaldehyde exposure for employees. Safe exposure levels for neither contaminant were exceeded, although measured levels have occasionally come close. As with soundscapes, the NPS will continue air quality and health and safety monitoring, which will ensure that if there is a problem with benzene or formaldehyde exposure, the adaptive management program will be used to reduce the exposure to acceptable levels. Also, air quality is affected by weather: inversions can exacerbate pollution levels, even with BAT requirements. These contaminant concerns reinforce the decision to set Yellowstone's daily

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

snowmobile limit at 540 and to implement the adaptive management program, which is described in Appendix A of this decision; both will better ensure that air quality and personal exposure desired conditions are met.

A third key issue is wildlife. The wildlife impact analyses in the FEIS indicate that the preferred alternative would result in negligible to moderate adverse effects. The same impact range would occur with other alternatives, such as snowcoaches only (Alternative 2), 720 snowmobiles per day (Alternative 1), or 1,025 snowmobiles per day (Alternative 4). Monitoring shows that winter use did not contribute to wildlife effects at the population level under a wide range of snowmobile numbers (between 324 and 1,400 per day at the West Entrance). Setting the snowmobile limit lower, at 540 per day, ensures that there will continue to be no population level effects, and will also help limit any impacts to individual wildlife. Mandatory commercial guiding also helps reduce any such effects. As with air quality and soundscapes, monitoring of wildlife impacts will continue, and the adaptive management program will be used to mitigate any unacceptable impacts. The NPS does recognize a strong perception or concern, expressed in the public comments, continues to exist that snowmobiles are hurting wildlife, despite scientific evidence to the contrary.

Wildlife monitoring indicated that 80% of the time bison displayed no visible response to human recreationists, 12.5% of the time they displayed a "vigilance response," (looked at the recreationist, but did not otherwise move), and 7% of the time they actively responded (the animal walked or ran away or charged the human or vehicle). Elk had no visible response 49% of the time, displayed a vigilance response 44% of the time, and displayed an active response 8% of the time.

Specifically as regards bison in Yellowstone, debate continues as to whether groomed roads allow bison to alter their movements and distribution, relative to what would occur in the absence of groomed roads. Recently, this debate has focused on the road from Madison to Norris Junctions; bison experts are unable to discern whether bison would utilize this corridor in the absence of road grooming.  Because this uncertainty has contributed to the ongoing nature of Yellowstone's winter use debate and because the NPS strives to preserve wildlife in its natural state as best as possible, this decision includes the implementation of the research proposal by Robert A. Garrott and P.J. White entitled "Evaluating Key Uncertainties Regarding Road Grooming and Bison Movements" (at http://www.nps.gov/yell/parkmgmt/winterusetechnicaldocuments.htm). This proposal specifically addresses the uncertainty recognized in the EIS as to whether grooming of the Madison to Norris road segment (Gibbon Canyon) has led to alterations of bison movements and distribution in Yellowstone, a question identified in the report by Cormack Gates et al., "The Ecology of Bison Movements and Distribution In and Beyond Yellowstone National Park" (2005, posted at above site).

Garrott and White propose to analyze existing data on GPS-collared bison, track additional GPS-collared bison for 5 years, and deploy cameras along travel routes to gain information on the relationship between road grooming and bison travel, without closing the Gibbon Canyon Road to public motorized oversnow vehicle travel (during this five-year period).

During the five year period, other roads or routes may be investigated to help describe the relationship between snow depth, grooming, and bison movement. For example, the Firehole Canyon Drive may be closed to oversnow travel, forcing bison to travel cross country or along the ungroomed Firehole Canyon Road. Similarly, the Madison to Norris Road may be fenced or gated in the vicinity of the new bridge over the Gibbon River to restrict bison movement on the groomed roadway and force bison to travel cross country (while permitting snowmobile and snowcoach travel).  Thus bison movement and snow depth and roads may be tested without closing a main road.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

After five years of such data gathering and analysis, the NPS will consider closing the main road between Madison and Norris in its entirety to observe bison response. It is uncertain until the five-year period of data gathering and analysis has finished whether such closure will yield informative data or conclusions. Such a closure, if determined to be appropriate, would likely be a multi-year closure. The NPS does not intend to perform further NEPA analysis on this closure because the concept of closing the Gibbon Canyon road was specifically analyzed during modeling for the FEIS as an option within alternatives 1 and 7. For those alternatives, the impacts have been analyzed assuming that the road segment between Madison and Norris would be closed to all motorized oversnow travel. The agency will announce the closure using the monitoring program procedures described below.

A fourth key issue has been visitor experience. As explained above, mandatory commercial guiding has improved the visitor experience for many, although it has eliminated the freedom of touring Yellowstone on one's own. For most visitors, though, it has restored order and safety to visiting Yellowstone, and has virtually eliminated the wildlife harassment that occurred when visitors were unguided. Additionally, many visitors enjoy the interpretation they receive from their guides. BAT has certainly also improved the visitor experience, substantially reducing noise and air emissions. These changes again affirm the decision to retain 100% commercial guiding and BAT requirements for snowmobiles.

The decision to continue allowing snowmobiles into Yellowstone may adversely affect the visitor experience of those who do not wish to see snowmobiles in the parks. However, not all visitors enjoy the group travel experience provided by snowcoach tours, or the fact that snowcoach travel is slower than snowmobile travel. Providing both snowmobile and snowcoach transportation options gives visitors a choice of modes of travel. This decision affirms that choice.

This decision also calls for continued temporal and spatial zoning. The Firehole Canyon Drive, North Rim Drive and Riverside Drive will continue to be restricted to snowcoaches only in the mornings, but each will be open to both snowcoaches and snowmobiles from Noon to 9:00 p.m. daily. This temporal separation will provide snowcoach users the opportunity to select periods of snowcoach-only travel. Additionally, the road from Canyon Junction to Washburn Hot Springs Overlook and the Fountain Freight Road will continue to be snowcoach-only access.

This decision addresses Sylvan Pass in Yellowstone. For the winter season of 2007-2008 the pass will be managed continuing the combined program outlined in the 2004 Temporary Plan. After the winter of 2007-2008, in order to maximize risk reduction, the pass would be open and managed using full avalanche forecasting (as defined in the Sylvan Pass Operational Risk Management Assessment). When full forecasting indicates the pass is safe, the pass would be open to oversnow travel (both motorized and non-motorized access).

The National Park Service will, in good faith, work cooperatively with the State of Wyoming, Park County, Wyoming and the town of Cody to determine how to provide continued snowmobile and snowcoach motorized oversnow access to Yellowstone National Park through the East Gate via Sylvan Pass in the winter use seasons beyond 2007-2008.

The National Park Service will meet with representatives of the State of Wyoming, Park County, Wyoming and the town of Cody to further explore reasonable avalanche and access mitigation safety measures and costs. In order to provide adequate time to amend this Record of Decision reflecting a potential consensus of the parties and to promulgate a new regulation reflecting the amended decision for the 2008-2009 winter use season and beyond, consensus should be reached by June 1, 2008.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

This approach both addresses the concerns of the communities and the National Park Service. The City of Cody, Wyoming, as well as Park County, Wyoming, and the State of Wyoming have clearly articulated the importance of this route to the community and the historical relationship between Cody and Yellowstone's East Entrance. They have spoken for the businesses near Yellowstone's East Entrance and how those businesses have been hurt in recent years by the changing patterns of winter visitation. They have stated how those businesses will continue to be harmed if the pass is closed to oversnow vehicle travel in the winter. The community and businesses have also stated the value they place on the certainty of the road being open in the winter and the importance of that certainty to their businesses and guests. NPS acknowledges that those values and concerns are real and has carefully weighed those considerations.

Avalanche control at Sylvan Pass has long represented a safety concern to the National Park Service. It is evident in reviewing the original winter use plan EIS, the Supplemental Environmental Impact Statement, and the Temporary Winter Use Plan EA, that the avalanche danger on Sylvan Pass is significant and has been well-known for many years. It is also evident from reviewing those documents and other files related to Sylvan Pass that the historical way of doing avalanche control cannot continue indefinitely. There are approximately 20 avalanche paths that cross the road at Sylvan Pass. They average over 600 feet of vertical drop, and the East Entrance Road crosses the middle of several of the paths, putting travelers at risk of being hit by an avalanche and swept down the slope, almost certainly to their deaths. NPS employees must cross several uncontrolled avalanche paths to reach the howitzer used for discharging those avalanches, which is itself at the base of a cliff prone to both rock-fall and additional avalanche activity (the howitzer cannot be moved without compromising its ability to reach all avalanche zones). Duds (artillery shells that do not explode on impact) occur and exist on the slopes, presenting year-round hazards to both employees and visitors, both in Yellowstone and the Shoshone National Forest. Natural avalanches can and do occur, both before and after howitzer use. Using a helicopter instead of a howitzer also is a high risk activity because of other risks a contractor would have to incur, as identified in the Operational Risk Management Report completed by the NPS in October 2007. Using full forecasting will ensure that visitors and personnel are not exposed to avalanche risk because the pass will be open only when forecasting indicates it is safe.

Some in the community of Cody, Wyoming and elsewhere do not believe there is a safety issue at Sylvan Pass, because there has not been a serious incident at the pass in the 30+ years of avalanche control activity. Yet an employee lost his life traveling to the pass to check on conditions to determine if the pass was safe to open, and several close calls have occurred. Further, safety and safety management in the National Park Service is no longer about past records and good fortune, but rather taking a hard look at what we do, why we do it, and continually asking ourselves, "Are we accomplishing this work in the safest manner possible?" It is unacceptable to knowingly continue a dangerous practice when report after report and analysis after analysis says that an operation has inherent safety risks.

During this FEIS process, the additional, independent work by avalanche expert Bob Comey and the Operational Risk Management Assessment (into which several avalanche experts, including Mr. Comey, had direct input) reinforced that the past ways of doing avalanche control (through howitzer or helicopter) pose an unacceptably high risk to NPS employees. These reports also identified options describing how avalanche mitigation could be conducted in safer ways. NPS has reviewed those options, including the cost information and the additional planning, geotechnical investigations, compliance, design, contracting, construction, and testing that would be required to implement some of these options. A significant one-time investment would apparently be needed, along with additional operating

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

monies, in order to implement any of these options. It could take three or four years before a new system could be in place and functional.  That is why it is important to resolve the issues regarding avalanche management early in 2008 to provide the summer to begin implementation if necessary.

During the winter of 2007-2008 NPS will use a combination of techniques that have been used in the past (howitzer and helicopter). Local staff may use whichever tool is the safest and most appropriate that winter, with the full understanding that safety of employees and visitors comes first. The NPS will not take unacceptable risks. When the pass is safe, it will be open; when it is not, the pass will remain closed. As with past winters, extended closures of the pass may occur in 2007-2008.

Use levels have always been relatively low on Yellowstone's East Entrance. Even during the highest winter use years in the 1990s, total use for the season rarely exceeded 5,000 people, less than 5% of Yellowstone's total winter visitation. The winter season at the East Entrance averages about 82 days, while the summer season there averages about 180 days, from the first Friday in May until the first Friday in November. Historically, Sylvan Pass has been closed for several days during the winter to allow safe avalanche management to occur. That is, the pass has almost never been open for the entire 82-day season. Most reasonable avalanche mitigation techniques would result in the pass being closed for at least some days in the winter to conduct avalanche mitigation.

Historically the East Entrance has been closed for a total of about 98 days from mid-March to early May (for spring plowing) and from early November to mid-December (to allow for snow accumulation). During the peak summer season in July and August, use on a single busy day exceeds that of the entire winter season.

Visitor access over Sylvan Pass is purely for recreational purposes. The East Entrance Road is not a major highway nor a railroad. Other avalanche mitigation programs in this country are focused on routes with far higher traffic volume and economic value, often including high value interstate commerce. For example, Glacier National Park is addressing avalanche issues on a major trans-continental railroad. In contrast, the NPS believes Sylvan Pass is the only route of its kind where active avalanche mitigation is occurring for a discretionary, recreational activity.

It is the intent of this decision and the subsequent discussions that occur between now and June 1, 2008 to see if there are ways to address the concerns of the community and the NPS outlined above regarding Sylvan Pass.

No matter what the outcome of the discussion with the community, for some uses, the East Entrance will remain open.  People will still be able to travel through this entrance to enjoy several miles of cross country skiing or snowshoeing in Yellowstone's East Entrance and the Middle Fork area. The trails in Yellowstone's East Entrance area connect to the 25 km of groomed ski trails on adjacent forest and private lands. The park will work with its neighbors and the local Nordic ski association to help ensure that these opportunities remain whether the pass is open to motorized travel or not.

### Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway

This decision makes modifications to the management of snowmobile use in Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway.  A daily entry limit of 25 snowmobiles per day will be established for the Grassy Lake Road, as measured in terms of snowmobiles originating a westbound trip at Flagg Ranch. Snowmobiles using the Grassy Lake Road will not be required to meet BAT requirements. In this manner, the Grassy Lake road will function primarily as an access route to snowmobile areas on the Caribou-Targhee

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

National Forest to the west. A number of other roads in Grand Teton serve as access routes to private or public lands; the six miles of Grassy Lake Road within the Parkway will serve much the same purpose.  Such a conversion will also help continue the Continental Divide Snowmobile Trail long-distance trail concept by providing a way for snowmobilers with non-BAT machines to continue west into Idaho and Montana.

The Continental Divide Snowmobile Trail (CDST) was created in the mid 1990's as a long-distance touring opportunity, allowing snowmobile travel between Lander, Wyoming and West Yellowstone. While historical use of the CDST within Grand Teton and the Parkway averaged between 25 and 35 snowmobiles per day over about a 60-day season, use of the trail has declined dramatically, averaging only 14 snowmobiles *per season* for the last three winters. While the requirement that snowmobiles using the CDST must meet BAT requirements may partially explain the decline, it is also clear much of the attraction of this portion of the trail historically was to continue into Yellowstone. The guiding and BAT requirements for Yellowstone have contributed to the substantial reduction in use of the CDST since most users would not have been able to continue into Yellowstone. In view of the continued guiding and BAT requirements for Yellowstone contained in this decision, it is highly unlikely that use of the CDST would recover to levels that support its continued operation at a cost of about $100,000 per season. Therefore, this decision discontinues designation of the CDST as a snowmobile route effective with the winter of 2008-2009.

This decision recognizes that some snowmobilers using the CDST in the Bridger-Teton National Forest east of Grand Teton wish to connect via the Grassy Lake Road to the snowmobiling opportunities in the Caribou-Targhee National Forest, west of the Parkway. These users will have the opportunity to transport their snowmobiles between Moran and Flagg Ranch by trailer, and then continue westbound by snowmobile on the Grassy Lake Road. Since the BAT requirement for the Grassy Lake Road has likely been the primary factor in limiting its use, the removal of this requirement beginning in the winter if 2008-2009 will facilitate access to the recreational opportunities on the national forest lands to the west of the Parkway. The NPS considers this to be a reasonable exception to the BAT requirements that are generally needed to properly manage oversnow vehicle use in the parks. The impacts of this limited exception are minor.

Jackson Lake will remain open for snowmobile use to provide access for ice fishing, subject to BAT requirements and the provision that these users must also possess a Wyoming Fishing license and fishing gear. This mode of access has worked well to address both the historical soundscapes issues as well as provide a reasonable level of access for those who do wish to ice fish. The BAT requirement is an important element of managing snowmobile use on Jackson Lake due to the large expanse of open space across which noise can propagate unimpeded.

The FEIS did not re-evaluate the issue of whether the use of snowplanes should be allowed on Jackson Lake. The reasons and analysis that supported the closure of the lake to snowplanes remain unchanged. The NPS decision to prohibit snowplanes was upheld by the U.S. District Court for the District of Wyoming in June 2007.

## Management Policies

This decision fully complies with the *Management Policies 2006*.  In particular, some of the sections that were reviewed in making this decision include:

Section 1.4.3, the NPS Obligation to Conserve and Provide for Enjoyment of Park Resources and Values, which states:

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

"NPS managers must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values.  However, the laws do give the Service the management discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values."

This decision will reduce impacts, especially to soundscapes. The decision will also keep impacts upon air quality, wildlife, visitor access and experience, and employee and visitor health and safety, to acceptable levels, by utilizing 100% guiding in Yellowstone, BAT requirements for both snowmobiles and snowcoaches, and strict daily limits on both snowmobiles and snowcoaches, and by addressing Sylvan Pass and the CDST. Although some impacts will continue to occur, they will not result in impairment.

Section 4.7.1, Air Quality:

"The Service will seek to perpetuate the best possible air quality in parks to (1) preserve natural resources and systems; (2) preserve cultural resources; and (3) sustain visitor enjoyment, human health, and scenic vistas."

This decision will assure that clean air is preserved in the parks and will ensure that levels of formaldehyde and benzene remain low enough to protect human health. At present, with oversnow vehicle use levels similar to what would likely be experienced under this decision (including the air quality on the busiest days, with oversnow vehicle numbers at or near the maximum that will be allowed under this decision), air quality in the parks is in full compliance with the requirements of the Clean Air Act and NPS Management Policies. Both carbon monoxide and particulate levels were well below national standards; carbon monoxide levels were a tenth of the national standard and particulate levels were less than one-fourth of the standard, as documented in the FEIS. No visibility impairment currently occurs in the parks due to oversnow vehicles.

Section 4.9, Soundscapes:

"The National Park Service will preserve, to the greatest extent possible, the natural soundscapes of parks…. The Service will restore to the natural condition wherever possible those park soundscapes that have become degraded by unnatural sounds (noise)…"

The decision will preserve natural soundscapes and will, in combination with the implementation of a snowcoach BAT requirement and adaptive management procedures to take further actions if impacts continue, make consistent progress toward protecting the parks' winter soundscape. Additionally, requiring park employees, contractors, and permittees to use BAT snowmobiles will help reduce oversnow vehicle audibility.

Section 8.2, Visitor Use:

"The Service is committed to providing appropriate, high quality opportunities for visitors to enjoy the parks, and the Service will maintain within the parks an atmosphere that is open, inviting, and accessible to every segment of American society. …

To provide for enjoyment of the parks, the National Park Service will encourage visitor activities that:

- are appropriate to the purpose for which the park was established; and
- are inspirational, educational, or healthful, and otherwise appropriate to the park environment; and
- will foster an understanding of and appreciation for park resources and values, or will

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- promote enjoyment through a direct association with, interaction with, or relation to park resources; and
- can be sustained without causing unacceptable impacts to park resources or values."

The decision to allow a limited number of snowmobiles and snowcoaches will provide a variety of ways to enjoy the parks. The requirement for guided experiences will promote educational, inspirational experiences that promote an understanding of, and appreciation for, park resources and values, because guides are trained in Yellowstone's natural and cultural history and convey that knowledge to their clients. Through their familiarity with park resources and where wildlife tends to be found, guides also promote direct associations and appropriate interactions with park resources. Guiding greatly reduces wildlife harassment, eliminating unacceptable wildlife impacts of the past. Guiding also helps enforce BAT requirements, clusters visitors together (thereby helping protect park soundscapes), and enforces park regulations better—all of which maintain an inviting and accessible park while preventing unacceptable wildlife impacts.

Section 8.2.3.2, Snowmobiles:

"Snowmobile use is a form of off -road vehicle use governed by Executive Order 11644 (Use of Off -road Vehicles on Public Lands, as amended by Executive Order 11989)… Outside Alaska, routes and areas may be designated for snowmobile and oversnow vehicle use only by special regulation after it has first been determined through park planning to be an appropriate use that will meet the requirements of 36 CFR 2.18 and not otherwise result in unacceptable impacts. Such designations can occur only on routes and water surfaces that are used by motor vehicles or motorboats during other seasons."

The decision to allow a limited number of snowmobiles and snowcoaches per day, when combined with other reasonable restrictions (BAT, 100% commercial guiding, nighttime use limits, and reduced speed limits) will not create unacceptable impacts to the parks' resources or values as supported by the analysis in the FEIS. Further, consistent with 36 CFR 2.18, all oversnow vehicle use would occur on snow-covered roads or, in the case of Jackson Lake in Grand Teton National Park, on the frozen surface of a lake that is used by motorboats in the summer.

## FINDINGS ON IMPAIRMENT OF PARK RESOURCES AND VALUES

### Policy

The fundamental purpose of the NPS, established by the Organic Act and reaffirmed by the General Authorities Act (as amended), begins with a mandate to conserve park resources and values. Congress has given the NPS the management discretion to allow impacts within parks, although that discretion is limited by the statutory requirement (generally enforceable by the federal courts) that the Park Service must leave park resources and values unimpaired unless a particular law directly and specifically provides otherwise. This, the cornerstone of the NPS Organic Act, establishes the primary responsibility of the National Park Service. It ensures that park resources and values will continue to exist in a condition that will allow the American people to have present and future opportunities for enjoyment of them.

The impairment that is prohibited by the Organic Act and the NPS General Authorities Act, as amended, is an impact that in the professional judgment of the responsible NPS manager would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Whether an impact meets this definition depends on the particular resources and values that would be

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question, and other impacts.

An impact to any park resource or value may, but does not necessarily, constitute impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is:

- necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or
- key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or
- identified in the park's general management plan or other relevant NPS planning documents as being of significance.

An impact would be less likely to constitute impairment if it is an unavoidable result of an action necessary to preserve or restore the integrity of park resources or values and it can not be further mitigated. An impact that may, but would not necessarily, lead to impairment may result from visitor activities; NPS administrative activities; or activities undertaken by concessioners, contractors, and others operating in the park. Impairment may also result from sources or activities outside the park.

An analysis of impacts and determinations with respect to impairment were included within the FEIS. Impairment analysis and determinations are not required for visitor use and experience (unless the impact is resource-based), park operations, or socioeconomic environment (including economics, employment, housing, and land use). Adverse impacts determined to have minor or below (that is, no impact or negligible) intensities are not analyzed further (relative to the impairment standard) because of their relatively low magnitude.

### Unacceptable Impacts

The impact threshold at which impairment occurs is not always readily apparent. Therefore, the NPS will also avoid impacts that it determines to be "unacceptable" (NPS Management Policies 2006). These are impacts that fall short of impairment but are still not acceptable within a particular park's environment. Virtually every form of human activity that takes place within a park has some degree of effect on park resources or values; however, that does not mean the impact is unacceptable or that a particular use must be disallowed. The direction to park managers that they should strive to insure that unacceptable impacts do not harm park resources rests with the NPS Management Policies (1.4.7.1), 36 CFR 1.5, Closures and Public Use Limits and Interim Guidance on Appropriate Use and Unacceptable Impacts, *Management Policies* 2006 as presented in a memorandum from NPS Regional Director Mike Snyder to Intermountain Region Superintendents, September 20, 2007.

Unacceptable impacts are impacts that, individually or cumulatively, would:

- Be inconsistent with a park's purposes or values.
- Impede the attainment of a park's desired future conditions for natural and cultural resources as identified through the Park's planning process.
- Create an unsafe or unhealthy environment for visitors or employees.
- Diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values.
- Unreasonably interfere with park programs or activities; an appropriate use of the Park; the atmosphere of peace and tranquility; or the natural soundscape maintained in wilderness and natural, historical, or commemorative locations within the Park.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

In its role as steward of park resources, the NPS must ensure that acceptable park uses would not cause impairment of, or unacceptable impacts on, park resources and values. When proposed park uses and the protection of park resources and values come into conflict, the protection of resources and values must be predominant. A new form of park use would be allowed within a park only after a determination has been made in the professional judgment of the park manager that it will not result in unacceptable impacts. The NPS will always consider allowing activities that are appropriate to the park, although conditions could preclude certain activities or require that limitations be placed on them.

### *Previous Winter Use Decisions*

A previous winter use planning effort concluded (in a Record of Decision dated November 22, 2000) that of the seven alternatives evaluated in the 2000 FEIS, the only alternative that did not exceed a level of impairment of park resources and values was the one that phased out the use of snowmobiles (Alternative G).  This was the primary basis for selecting that alternative, as explained in the 2000 ROD.  In all other 2000 FEIS alternatives, snowmobile use in Yellowstone was found to impair air quality, wildlife, the natural soundscape, and opportunities for enjoyment of the park by visitors. In Grand Teton, impairment was found to result from snowmobile and snowplane use on the natural soundscape and opportunities for enjoyment of the park. In the Parkway, impairment was found to result from snowmobile use on air quality, the natural soundscape, and opportunities for enjoyment of the park. There is no new evidence contradicting the finding that historically unlimited snowmobile and snowplane use impaired park resources and values.

The 2000 FEIS and ROD, based on the information available at the time, found impairment for all alternatives with snowmobile use, including those that would have required phased-in use of cleaner and quieter snowmobiles in accordance with objectives set for sound and air emissions. It was determined that there was no way to mitigate the impairment short of reducing the amount of use as determined by an effective carrying capacity analysis, or by imposing a limit unsupported by such an analysis (2000 ROD, pages 18-19).

The rule implementing the 2000 ROD, published in the Federal Register on January 22, 2001, recognized that "achieving compliance with the applicable legal requirements while still allowing snowmobile use would require very strict limits on the numbers of both snowmobiles and snowcoaches" (66 Fed. Reg. 7260, 7262). The 2000 ROD and the 2001 Rule thus recognized that if snowmobile and snowcoach were managed with strict limits, they could be accommodated in the Parks without constituting impairment to park resources and values.  At that time, the NPS had not studied the feasibility or potential impacts of such strictly limited use in its NEPA and planning processes.

Following a settlement agreement resulting from a lawsuit over the 2000 FEIS and ROD, the NPS prepared a Supplemental Environmental Impact Statement and Record of Decision (2003 SEIS and ROD).  The SEIS and the March 25, 2003 ROD reinforced these earlier conclusions, but also studied new alternatives. The SEIS found that alternatives with strict limitations on snowmobile numbers, combined with other restrictions (technology and guiding) and intensive monitoring and adaptive management would not constitute impairment. The Temporary EA and Finding of No Significant Impact (2004) came to similar conclusions as the 2000 FEIS and SEIS regarding impairment resulting from historical conditions.

The analysis for the 2007 FEIS and this decision supports the previous documents' conclusions. New modeling for this FEIS also looked at historical (circa 1999) conditions when unlimited and virtually unregulated two-stroke snowmobile use was allowed. At that time, snowmobiles were the dominant mode of access to the parks. In Yellowstone, an

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

average of 795 snowmobiles and 15 snowcoaches entered the park each day. Modeling and analysis were conducted to help decision makers understand and compare the alternatives with historical conditions. For example, the air quality analysis indicates that historical snowmobile use generated 3,045 tons of carbon monoxide per winter, almost 12 times the quantity that is generated by any of the alternatives considered in the 2007 FEIS. In addition, the air quality analysis took into consideration EPA regulations regarding snowmobile emissions and looked forward to the year 2010 to help the decision maker understand how those regulations might affect air quality under historical conditions. This additional analysis was conducted with the recognition that technological changes are underway with snowmobiles and a strict return to historical conditions could not occur. After taking into consideration implementation of the EPA regulations, the air quality analysis of "historical conditions circa 2010" indicated that 1,124 tons per year of carbon monoxide would be produced (over four times more than the most polluting alternative considered in the 2007 FEIS).

For wildlife, historical conditions created considerable negative interactions between visitors and wildlife, conditions that were found to constitute impairment of park resources in the 2000 ROD.  Much of the conflict occurred when wildlife were on or near the groomed roadways and groups of snowmobilers attempted to pass them. Especially with bison, this resulted in situations where animals were trapped between groups of snowmobiles traveling in opposite directions, occasional stampeding bison, and excess energy expenditure by bison to avoid snowmobiles. This situation has markedly changed in the last three years, largely due to the implementation of mandatory guiding. Guides are trained in how to pass wildlife on the groomed roadways with as little stress to the animal as possible. Field rangers in Yellowstone have noticed a pronounced drop in adverse interactions between visitors and wildlife that are on the roadways.

For visitor experience, historical conditions created unpleasant touring situations for visitors. Many complained about the noise of snowmobiles, with many others complaining about air pollution and inappropriate encounters with wildlife.  Conditions under the Temporary Plan were markedly different. Complaints from visitors about unpleasant touring situations virtually ceased. While some visitors do not like mandatory guiding, others enjoyed learning from their guides and touring the park with them. Opportunities to enjoy scenery and wildlife are as good as or better than before, in part because guides are familiar with common wildlife locations. Opportunities to enjoy quiet and solitude have improved, as four-stroke snowmobiles are quieter than two-strokes and all snowmobilers travel with guides, leaving long windows of time free of any OSV noise. Traveling with guides dramatically improved the safety of touring, as guides enforce proper touring behavior such as driving within speed limits. BAT snowmobiles also produce fewer hazardous emissions, greatly reducing the exposure to such pollutants.

For soundscapes, new analysis indicates that historical conditions created unacceptable percent time audibility in the parks. Historically, developed areas and travel corridors typically had OSV sounds audible at or near 100% of the time. Transition zones and some backcountry areas experienced more than double the percent time audible under current conditions. As noted under visitor experience, it was difficult to escape the sound of OSV travel.

This decision will not impair park resources or values or create unacceptable impacts. The actions described in this decision do not severely affect a resource or value whose conservation is 1) necessary to fulfill specific legislative purposes; 2) key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park; or 3) identified as a goal in the parks' general management plan or other relevant NPS planning documents.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

Similarly, the actions in this decision also will not 1) be inconsistent with a park's purposes or values; 2) impede the attainment of a park's desired future conditions for natural and cultural resources as identified through the parks' planning processes; 3) create an unsafe or unhealthy environment for visitors or employees; 4) diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values; or 5) unreasonably interfere with park programs or activities; an appropriate use of the parks; the atmosphere of peace and tranquility; or the natural soundscape maintained in wilderness and natural, historical, or commemorative locations within the parks.

### Resource Impacts

Although adverse impacts could occur under this decision to wildlife, air quality, soundscapes, and visitor experience, impacts are at acceptable levels and may be mitigated through management actions.

Wildlife

Elk and Bison:

The qualitative assumptions, grounded in the available literature on bison and elk, made in this analysis are that increases in winter traffic levels and associated human recreational activity cause increases in vehicle-caused mortality, wildlife displacement, behavior- or physiology-related energy costs, and the potential for adverse demographic impacts. However, the mitigations (limited number of visitors, continued wildlife monitoring) discussed above, and adaptive management, will limit impacts to acceptable levels. Guided oversnow vehicle users will be less likely to interact improperly with wildlife, causing less mortality, less displacement, and fewer negative behavioral and physiological responses. According to the best available information, impacts under this decision are predicted to be negligible to moderate, adverse, short-term, and direct. The impacts associated with the decision will not be of sufficient magnitude to constitute unacceptable impacts or impairment of elk and bison populations.

Wolves:

The qualitative assumptions, grounded in the available literature on wolves, made in this analysis are that increases in winter traffic levels and associated human recreational activity cause increases in vehicle-caused mortality, wildlife displacement, and behavior- or physiology-related energy costs; wolf populations will not be affected. However, the mitigations (limited number of visitors, continued wildlife monitoring, use of commercial guides for park visitors, and seasonal wolf den closures) discussed above, and adaptive management, will limit any wildlife impacts to acceptable levels. According to the best available information, impacts under this decision are predicted to be negligible to moderate, adverse, short-term, and direct. The impacts associated with the decision will not be of sufficient magnitude to constitute unacceptable impacts or impairment of wolf populations.

Lynx and Wolverine:

The qualitative assumptions, grounded in the available literature on lynx and wolverines, made in this analysis are that increases in winter traffic levels and associated human recreational activity cause increases in vehicle-caused mortality, wildlife displacement, behavior- or physiology-related energy costs, and the potential for adverse demographic impacts. Sylvan Pass is the area most likely to yield motorized activity and human interactions (and associated impacts) with wolverines or lynx, but the overall risk to wolverines and lynx is believed to be generally very low when the pass is open. Additionally, the mitigations (limited number of visitors, completion of existing research, continued

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

wildlife monitoring, use of guides for most visitors, and potential closures around their dens) discussed above and adaptive management will limit any impacts to acceptable levels. According to the best available information,  impacts on lynx and wolverines from the decision are predicted to be negligible, adverse, short-term, and direct. The impacts associated with the decision are not predicted to be of sufficient magnitude to constitute unacceptable impacts or impairment of lynx or wolverine populations.

Coyotes and Ravens:

According to the best available information, impacts on coyotes and ravens from the decision are predicted to be negligible, adverse, short-term, and direct. In terms of cumulative effects, the negligible, adverse, short-term impacts resulting from direct and indirect actions described in the decision will contribute no impact to past, present, and foreseeable actions on coyotes or ravens. The impacts associated with the decision are not predicted to be of sufficient magnitude to constitute unacceptable impacts or impairment of coyote or raven populations.

Eagles and Swans:

The qualitative assumptions, grounded in the available literature on eagles and swans, made in this analysis are that increases in winter traffic levels and associated human recreational activity cause increases in vehicle-caused mortality, wildlife displacement, behavior- or physiology-related energy costs, and the potential for adverse demographic impacts. However, the mitigations (limited number of visitors, continued research and monitoring efforts, use of guides for most visitors, and potential closures around their nests) discussed above, and adaptive management, will limit any impacts to acceptable levels. According to the best available information, impacts on eagles and swans from the decision are predicted to be negligible to moderate, adverse, short-term, and direct. The impacts associated with the decision are not predicted to be of sufficient magnitude to constitute unacceptable impacts or impairment of eagle or swan populations.

Air Quality

Emissions at the maximum use levels permitted in this decision will be a moderate, adverse, long-term (but occurring only in winter), direct, park-wide impact, more adverse compared to current use levels, and greatly beneficial compared to historical conditions. For carbon monoxide, the decision will result in 134 tons per year as compared to 114 under current conditions (as defined in the FEIS), and 3,045 under historical conditions.   Hydrocarbon emissions will be 12 tons per year under the decision, 8 tons under current conditions, and 905 tons under historical conditions. No perceptible visibility impacts will be likely. If the Madison-Norris road is closed for bison-road research or if the East Entrance remains open, impacts will be the same (moderate, adverse, long-term, direct, and park-wide). Impairment of park resources will not occur; the level of air pollution under the decision will not harm the integrity of park resources and values and not constitute unacceptable impacts or impairment.

Natural Soundscapes

As modeled for Yellowstone, in about 13.8% of the park over the average day, oversnow vehicles will be audible at some level. From the overall park perspective, this will constitute a moderate, adverse, short-term, and direct impact. In Grand Teton, in about 17.7% of the park over the average day, oversnow vehicles will be audible at some level according to the modeling. From the overall park perspective, this will constitute a moderate, adverse, short-term, and direct impact. Impacts due to percent time audible will be major in Yellowstone to moderate in Grand Teton and the Parkway, adverse, and short-term impacts. Impacts due to

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

maximum sound levels will be minor, adverse, and short-term in the parks. This decision will be beneficial in Yellowstone and adverse in Grand Teton compared to current use and beneficial in both parks compared to the historical condition. Under current conditions, analysis indicates oversnow vehicles would be audible in about 14.4% of Yellowstone and 11.0% of Grand Teton.  Under historical conditions, oversnow vehicles would be audible in 16.8% of Yellowstone and 23.3% in Grand Teton. While the comparison to current conditions in Yellowstone may seem counterintuitive, the comparison is accurate because the implementation of snowcoach sound requirements substantially reduces overall oversnow vehicle audibility. Potential closure of the Madison to Norris road segment also removes oversnow vehicle operations that will otherwise contribute to sound impacts. Impairment of park resources will not occur; the level of oversnow vehicle sound under the decision will not harm the integrity of park resources and values.

Visitor Experience

Under this decision, visitors will continue to be able to view and experience the Parks in a natural setting, enjoying high quality access to information through guides and snowcoach drivers and visitor centers. Opportunities to view wildlife and scenery will abound and access to quiet, solitude, and clean air will be abundant, mainly due to the reduced snowmobile numbers. No unacceptable impacts will occur to the visitor experience.

## Summary of Findings

In addition, to ensure that impairment does not occur, the NPS will continue intensive monitoring of park resources and values, including air quality, natural soundscapes, wildlife, employee health and safety, and visitor experience. This will provide the NPS with the ongoing information necessary to assess the impacts of the decision to park resources and values and to make adjustments, as appropriate, in winter use management.  Appendix A contains a discussion and table on the monitoring and adaptive management framework. The thresholds within the adaptive management framework are a tool for managers to help them determine if the goals and objectives of the winter use plans are being achieved. They will continue to be employed and evaluated throughout the duration of the regulation ensuing from this decision. Through adaptive management, if monitoring of use levels of snowmobiles and snowcoaches allowed under this Record of Decision indicates acceptable conditions, the NPS will increase use levels to the extent acceptable conditions can be maintained. Conversely, if monitoring of use levels of snowmobiles and snowcoaches allowed under this Record of Decision indicates unacceptable conditions, the NPS will reduce use levels to the extent acceptable conditions can be maintained. The superintendents of the parks may take emergency actions to protect park resources and values if necessary.

In summary, the analysis in the FEIS supports the conclusion that this decision does not constitute impairment.  Significant mitigation is part of the decision, and the monitoring and adaptive management program will assure that impairment does not occur.


## ENVIRONMENTALLY PREFERRED ALTERNATIVE

The environmentally preferred alternative is that alternative which promotes the national environmental policy as expressed by §101 of the National Environmental Policy Act. That section states that it is the responsibility of the federal government to improve and coordinate federal plans, functions, programs, and resources "to the end that the Nation may:

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
- Ensure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;
- Attain the widest range of beneficial uses of the environment without degradation, risk of health or safety, or other undesirable and unintended consequences;
- Preserve important historical, cultural, and natural aspects of our national heritage and maintain, wherever possible, an environment that supports diversity and variety of individual choice;
- Achieve a balance between population and resource use that will permit high standards of living and a wide sharing of life's amenities; and
- Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources."

Previous winter use planning documents did not include alternatives for completely closing the parks to OSV use; that option was never fully considered (although alternative F in the 2000 FEIS did consider closure of the west side roads to OSV use, similar to alternative 3A in the 2007 FEIS). Designation of the snowcoach-only alternative as environmentally preferred in previous documents, given the range of alternatives considered, effectively optimized resource protection and human use. The snowcoach-only alternative impacted park resources and values the least overall while accommodating human recreational access at then-current levels.

In the 2007 FEIS, the range of alternatives is different from previous planning documents. The no action alternative, as a consequence of continued management without a new decision, would eliminate the impact-inducing activities associated with motorized over-snow recreation. The clear benefit to the natural environment, relative to all other alternatives as described below, provides the rationale for choosing alternative 3B as environmentally preferred.

Though visitor use by OSVs during the winter in Yellowstone and Grand Teton has been established over time, and local economies have come to depend on it, other snow-dominated park units do not allow large winter motorized recreation programs. For example, significant portions of Isle Royale, Glacier, Yosemite, Mount Rainier, Lassen Volcanic, and Sequoia-Kings Canyon national parks have limited winter vehicle use. Management has chosen to close major portions of these parks in the winter as the most protective measure for these parks to maintain, uninterrupted, natural physical and ecological processes and because of the cost and challenges of keeping roads open.

Given this background and these selection criteria, alternative 3B is the environmentally preferred alternative in the 2007 FEIS. Alternative 3B best preserves the unique historical, cultural, and natural resources in the parks. This alternative yields the least impacts to air quality, wildlife, and natural soundscapes because oversnow recreational vehicle travel would not occur in the parks. This alternative is not as effective in sharing life's amenities as the other alternatives because of the lack of oversnow vehicle access, but the level of resource protection achieved exceeds all other alternatives.

Alternative 1 increases the adverse impacts to air quality, natural soundscapes, and wildlife as compared to 3B, but it also allows for a large number of visitors to enjoy the parks in the winter via several modes of transportation. Thus, alternative 1 achieves a balance of resources use and sharing life's amenities; however, it does not achieve the level of protection that alternative 3B would be able to reach.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

Alternative 2 also increases the adverse impacts to air quality, natural soundscapes, and wildlife as compared to 3B (but less than the impacts of alternative 1), and allows visitors to enjoy the oversnow areas of the park with access via one mode of transportation, snowcoaches. Thus, alternative 2 also achieves a balance of resources use and sharing life's amenities, but less so than alternative 1 because choices of access modes and numbers of visitors are more limited. Additionally, as described in FEIS Chapters III and IV, snowcoaches do create impacts on wildlife, soundscapes, and air quality, and utilize more fuel than other modes of transportation. Alternative 2 also does not achieve the level of protection of alternative 3B.

Alternative 3A increases the adverse impacts to air quality, natural soundscapes, and wildlife as compared to alternative 3B, and visitors would be allowed to enjoy oversnow vehicle access to small portions of the parks. Thus, alternative 3A achieves a balance of resource use and sharing life's amenities, but less so than alternative 1 because access to the parks is much more limited. Also, alternative 3A does not achieve the level of protection of alternative 3B.

Alternative 4 has the most adverse effects to the parks' resources, but it also allows for the most use of the parks. Thus, alternative 4 achieves a balance of resources use and sharing life's amenities; however, it does not achieve the level of protection afforded by the other alternatives.

Alternative 5 increases impacts to air quality, natural soundscapes, and wildlife as compared to 3B, and visitors would be able to enjoy oversnow vehicle access in the parks. Thus, alternative 5 achieves a balance of resources use and sharing life's amenities, but less so than alternative 1 because of the more limited number of entries that are allowed. Also, alternative 5 does not achieve the level of protection of alternative 3B, primarily because of the unguided component.

Alternative 6 increases impacts to air quality, natural soundscapes, and wildlife as compared to alternative 3B, and visitors would be able to utilize the most varied modes of travel to enjoy the park. Thus, alternative 6 achieves a balance of resources use and sharing life's amenities, but does not afford the same level of protection as alternative 3B.

Alternative 7 increases impacts to air quality, natural soundscapes, and wildlife as compared to 3B, and an ample number of visitors would be able to enjoy oversnow vehicle access in the parks. Thus, alternative 7 achieves a balance of resources use and sharing life's amenities, but less so than alternative 1 because of the more limited number of entries that are allowed. Although alternative 7 does not achieve the level of protection of alternative 3B, it is likely to achieve greater protection than alternative 5 because all use is commercially guided.

## PUBLIC AND AGENCY INVOLVEMENT

### *Scoping*

The public scoping period for this EIS was June 24 – September 1, 2005. The NPS received 33,365 documents commenting on the scope of the EIS. Of these, about 90% were form letters of various kinds, and about 1% contained unique or substantive comments rather than, or in addition to, opinion statements. Comments were received from persons in all U.S. states and territories, as well as from persons and organizations in other countries.

Although this public scoping period was primarily intended to garner comments about the scope of this EIS, many people simply expressed their opinions regarding winter use management in the parks. A detailed report of the public scoping comments is available for public review on the NPS winter use website:

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

http://www.nps.gov/yell/parkmgmt/planyourvisit/winteruse.htm

### Public Meetings and Outreach

Recognizing that the winter use issue continues to generate intense interest, the NPS explored a variety of public involvement process options. The NPS utilized the Rocky Mountain Cooperative Ecosystems Study Unit (RM-CESU) to implement an agreement between the NPS, Montana State University Department of Political Science, and Cadence, Inc. Cadence provided meeting facilitation with cooperating agencies and other stakeholders and provided continual advice on the public involvement elements of the EIS and rulemaking processes.

Through this agreement, the NPS has:

- Developed and implemented a Public and Agency Participation Plan with a commitment to open information sharing. This Plan is posted on the winter use website shown above.
- Employed a variety of outreach methods to keep cooperating agencies and other interested parties informed. These methods attempt to meaningfully involve the public through: roving team meetings, selected larger meetings, newsletters, and web site postings (Yellowstone site and NPS Planning, Environment, and Public Comment (PEPC) system).
- Finalized a Memorandum of Understanding with each Cooperating Agency. The States of Wyoming, Montana, and Idaho; the counties of Park and Teton in Wyoming, Park and Gallatin in Montana, and Fremont in Idaho along with the USFS and EPA were cooperating agencies, as they were in the previous EIS and SEIS processes.
- Held more than 50 meetings with cooperating agencies and other stakeholders since finalizing the Public and Agency Participation Plan. These 'Roving Team' meetings have been a valuable tool for sharing information and receiving input to the planning process. Early meetings were held to discuss the history and background of winter use planning and the need for a new planning effort; beginning in November 2005 the range of modeling scenarios were introduced. In April 2006, draft alternatives were presented. In late November 2006, the NPS posted the cooperating agency review draft on its website. While the primary purpose of this posting was to make the review draft available to cooperating agencies for their review, any member of the public was able to download the draft as well. Although the formal public comment period was not open until spring 2007, the NPS accepted any comments that either the cooperating agencies or members of the public provided before that period.
- Held three different information fairs during the process and four public hearings on the DEIS. At the information fairs both Yellowstone personnel and various resource experts were available to answer questions, the NPS provided overviews of the status of winter use planning, and NPS personnel accepted verbal comments. At the hearings, NPS personnel accepted verbal comments through a formal public comment period while others were available to answer questions.
- Submitted draft reports of monitoring and scientific work (soundscapes, air quality, wildlife, avalanche, etc.) for review by cooperating agencies and stakeholders with relevant expertise.
- Submitted draft modeling and study plans, as well as draft modeling reports, for technical review by cooperating agencies and stakeholders with relevant expertise:
  - Soundscapes Modeling Plan and Draft Report
  - Air Quality Modeling Plan and Draft Report
  - Wildlife Study Plan
  - Economic Analysis Memorandum and Draft Modeling Report

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- o Research proposal evaluating key uncertainties regarding road grooming and bison movements
- Consulted with the U.S. Fish and Wildlife Service under Section 7 of the Endangered Species Act, and the U.S.F.W.S. concurred that the FEIS preferred alternative may affect, but will not likely adversely affect either the lynx or the grey wolf (letter dated October 23, 2007). The consultation assumed that Sylvan Pass would be open in the winter of 2007-2008 and closed to motorized travel in subsequent winters. Additional consultation with the U.S. Fish and Wildlife Service will occur, if necessary, prior to the winter of 2008-2009 regarding Sylvan Pass.
- Consultation and public and agency review of the DEIS did not identify any impacts on archeological or historical resources, ethnographic resources, cultural landscapes, sacred sites or Indian Trust resources from the range of alternatives considered. Scoping for this EIS did not identify any new issues relative to these resources. As part of government-to-government relationships, consultation with affiliated tribes has and will occur on ongoing winter use and other planning and management topics.

### Public Comment on the DEIS

The Draft EIS was on public review from March 27 – June 5, 2007. The NPS received approximately 120,000 documents commenting on the DEIS. A summary of comments and responses is found in Appendix I of the FEIS. Four public meetings were held during the DEIS comment period: Cody, Wyoming; West Yellowstone, Montana; St. Paul, Minnesota; and Lakewood, Colorado. A detailed report is available at the above web site.

Table 4: Summary of Public Comment on the DEIS

| Issues | Users | Conservation Interests | State of Wyoming and Park County, Wyoming |
|---|---|---|---|
| Air Quality | Generally support BAT to reduce pollution | Believe snowcoaches only best reduces pollution | Generally disagree there is a concern |
| Wildlife | Generally support guiding | Believe snowcoaches only best addresses wildlife concerns | Generally disagree there is a concern |
| Guiding | Desire some unguided access (about 20% unguided) | If small number of snowmobiles allowed, 100% commercially guided | Generally desire unguided access |
| Sound | Generally support BAT to reduce noise | Believe snowcoaches only best addresses noise | Generally disagree there is a concern |
| Sylvan Pass (East Entrance) | Desire to see pass kept open | Generally support closing pass | Believe howitzer program was safe; keep pass open |
| Management Policies | Believe Management Policies call for balanced use of parks | Believe Management Policies call for snowcoaches only | Believe Management Policies require that park be open for access |
| Continental Divide Snowmobile Trail (CDST) | Keep open and allow EPA-compliant snowmobiles to use trail | Close | Keep open and allow EPA-compliant snowmobiles to use trail |

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

**CONCLUSION**

As described in the Decision and Mitigation sections, all practical means to avoid or minimize environmental harm from the selected alternative have been adopted. Because there would be no major adverse impacts to resources whose conservation is (1) necessary to fulfill specific purposes in the establishing legislation or proclamation for Yellowstone National Park, Grand Teton National Park, or the John D. Rockefeller, Jr. Memorial Parkway; (2) key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park; or (3) identified as a goal in relevant National Park Service planning documents, there would be no impairment of the parks' resources or values. After a review of these effects, I find that the alternative selected for implementation will not lead to unacceptable impacts, impair park resources or values, or violate the NPS Organic Act. I further find that this decision represents an appropriate balance of the various potential uses of the parks in the winter, and is in accord with the discretion provided to the National Park Service in managing the National Park System.

**APPENDIX A. MONITORING AND ADAPTIVE MANAGEMENT PROGRAM**

Adaptive management helps science managers maintain flexibility in their decisions, knowing that uncertainties exist and provides managers the latitude to change direction. Adaptive management will improve understanding of ecological systems to achieve management objectives and is about taking action to improve progress towards desired outcomes.

The emphasis in an adaptive approach is first and foremost on resource management. The value of understanding, and the monitoring and analysis that produce understanding, is inherited from their contributions to the objectives of resource management. Although the focus is on learning, the ultimate goal of the effort is smart management. It is important to recognize that adaptive management is a complex endeavor that includes much more than simply following a sequence of steps. Properly executed, the process involves ongoing, real-time learning, both in a technical sense and in terms of process itself. Stakeholders need to be engaged at the stage of initial problem formulation and remain engaged throughout implementation. Williams, et al, identifies nine steps in adaptive management (Williams, Byron K., Robert C. Szaro, and Carl D. Shapiro. 2007. "Adaptive Management: Department of the Interior Technical Guide" and associated secretarial order. Adaptive Management Working Group, U.S. Department of the Interior, Washington, DC):

1. Stakeholder involvement
2. Objectives
3. Management actions
4. Models
5. Monitoring Plans
6. Decision making
7. Follow-up monitoring
8. Assessment, and
9. Iteration.



Through this and previous winter planning processes, steps 1-5 have been completed. This Record of Decision is step 6.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

An adaptive management plan is different from a monitoring plan in that it allows park managers to act when some information exists about a specific resource but conclusive data is currently unavailable. A key step in adaptive management is to develop and implement a management scenario based on the best available information. For example, in the FEIS, several alternatives propose a specific limit on the number of winter visitors that can enter the park daily via snowmobile. The next step is to implement an evaluation program to assess the success of the management scenario relative to defined resource thresholds. This evaluation is critical within the framework of adaptive management because of the uncertain results of the initial predictions. Through adaptive management, if monitoring of use levels of snowmobiles and snowcoaches allowed under this Record of Decision indicates acceptable conditions, the NPS will increase use levels to the extent acceptable conditions can be maintained. Conversely, if monitoring of use levels of snowmobiles and snowcoaches allowed under this Record of Decision indicates unacceptable conditions, the NPS will reduce use levels to the extent acceptable conditions can be maintained.

Monitoring is also a component of this decision. General resource monitoring applies when adequate information exists to make informed management decisions based on discrete and accepted thresholds. It is the process of collecting information to evaluate if the objectives of a management plan are being realized. Appropriate monitoring techniques will be used to assess impacts to air quality, natural soundscapes, public and employee health and safety; water quality and snowpack, geothermal features; wildlife; and some aspects of the visitor experience. The table in this appendix describes monitoring and adaptive management indicators, locations/zones, preliminary thresholds, methods, and monitoring intensity. The table also identifies possible management actions that will be implemented if thresholds are violated. Some non-emergency actions, such as the construction of a new facility, may require additional site-specific NEPA analysis, which includes public involvement. Other actions might be administrative in nature or could be implemented through application of a categorical exclusion under NEPA.

The preliminary thresholds are established to help a manager understand the results of monitoring programs and be one of many guides for possibly taking action if a problem is perceived. Exceeding a threshold indicates that conditions could be moving away from those that are desirable, and in some cases exceeding a threshold may indicate that impacts are unacceptable or are causing impairment. Monitoring and adaptive management, and management action if these thresholds are violated, will ensure the parks' obligation to preserve resources and values in an unimpaired and acceptable condition is achieved, while allowing for winter use of the parks. Many of these thresholds were derived partly from the results of computational models, and they are preliminary in nature. If monitoring detects undesirable impacts in the Parks, thresholds could be adjusted to resolve these unanticipated impacts.

Changes have been made in the table as compared to earlier winter use planning documents. In particular, soundscapes thresholds have been updated with new information gleaned from four winters of monitoring. When the initial indicators and thresholds for soundscapes adaptive management were developed for the 2000 EIS and 2003 SEIS, only a limited data set was available. At that time, the data set represented the best available and most current information on soundscapes in the parks, but four additional winters of monitoring information were available along with modeling analysis for this FEIS. In addition, other NPS units and offices have and are collecting sound information and using that data in planning. The natural soundscapes thresholds were adjusted in this decision to reflect the additional knowledge that has been gained over the past years.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

**Monitoring and Adaptive Management Indicators, Thresholds, and Methods**

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity[1] | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Air Quality | Park employees and visitors exposure to CO, particulate matter, and volatile organic compounds. For comparison purposes, monitoring data for air quality may be found in section 3.4 of | Developed Area | 1-hr maximum CO (w/bkgd): 8 ppm 8-hr maximum CO (w/bkgd): 3 ppm 24-hr maximum $PM_{10}$ (w/bkgd): 23 $\mu g/m^3$ No observed employee health problems due to air quality ATSDR (Agency for Toxic Substances and Disease Registry) Minimal Risk Levels | Fixed site monitoring or personal sampling for PM and CO Personal samples, cartridges, or canisters for VOCs (air toxics) | High | Require new technologies Adjust number of daily vehicle entries permitted Establish timed-entry requirements Medically monitor employees if necessary |
|  |  | Road corridor | 1-hr maximum CO (w/bkgd): 1 ppm 8-hr maximum CO (w/bkgd): 1 ppm 24-hr maximum $PM_{10}$ (w/bkgd): 6 $\mu g/m^3$ No observed employee health problems due to air quality ATSDR (Agency for Toxic Substances and Disease Registry) Minimal Risk Levels | Fixed site monitoring or personal sampling for PM and CO Personal samples, cartridges, or canisters for VOCs (air toxics) | Moderate |  |

---

[1] High = daily to weekly or in accordance with standard protocol for parameter in question; Moderate = monthly to seasonally and during peak days or use periods; Low = annually during peak use periods or at the end of the season.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity[1] | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| | the FEIS. Modeled air quality impacts for alternatives may be found in section 4.2.3 of the FEIS. | Transition and Backcountry | 1-hr maximum CO (w/bkgd): 1 ppm 8-hr maximum CO (w/bkgd): 1 ppm 24-hr maximum $PM_{10}$: 5 µg/m$^3$ | Fixed site monitoring or personal sampling for PM and CO | Low | |
| | Visibility | Development Area and Road corridor | No perceptible localized visibility impacts | Photo Survey, time lapse video and nephelometer | High | |
| | | Transition and Backcountry | No perceptible localized visibility impacts | | Low | |
| | Odor | Developed Area and Road Corridor | Area free of any noticeable odor resulting from motorized recreation at least 90% of the daytime hours of park operation (8 A.M. – 4 P.M.) | Park visitor survey | High | |
| | | Transition and Backcountry | Area free of any noticeable odor resulting from motorized recreation | | Low | |

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| Resource or Value | Indicator(s) | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity[1] | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Natural Soundscapes | Distance and time OSV sound is audible; maximum sound level (dBA)<br><br>Note: A rare event that exceeds these thresholds may not trigger management action.  For comparison purposes, monitoring data for sound may be found in FEIS section 3.7.4.  Modeled sound impacts for alternatives may be found in section 4.2.6. | Developed Area | Measured during daytime hours of park operation (8 A.M.– 4 P.M.) and 100 feet from sound sources: Audibility[2]: not to exceed (NTE) 75% OSV sound: NTE 70 dB(A) | Audibility logging, digital recordings, and sound pressure level measurement | High | Require new technologies<br><br>Adjust number of daily vehicle entries permitted<br><br>Establish timed-entry requirements |
|  |  | Road Corridor | Measured during daytime hours of park operation (8 A.M.– 4 P.M.) and 100 feet from sound sources: Audibility: NTE 50% OSV sound: NTE 70 dB(A) |  | High |  |
|  |  | Transition Zone | Measured during daytime hours of park operation (8 A.M. – 4 P.M.) at selected index sites for the zone. Audibility: NTE 25% OSV sound: NTE 65 dB(A) |  | Moderate |  |

---

[2]Audibility is the percent of time OSV are audible to a person with normal hearing.  A NTE 50% threshold means that OSV will not be audible more than 50% of the time during daytime hours of park operation.

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| Resource or Value | Indicator(s) | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity[1] | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| | | Backcountry | Measured during daytime hours of park operation (8 A.M. – 4 P.M.) at selected index sites for the zone. Audibility: NTE 10% OSV sound: NTE Lnat (natural ambient sound levels)<br><br>Note: Vehicle noise, even at 6 dB(A) less than natural ambient, is usually audible due to the lower frequencies of OSV sound. Additionally, since natural and non-natural sounds tend to be in different frequencies, both can be audible at the same time, even at very low levels. | | Moderate | |

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| Resource or Value | Indicator(s) | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity[1] | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Public and Employee Health and Safety | Motor vehicle accidents<br><br>Exposure to noise<br><br>For comparison purposes, monitoring data for noise exposure may be found in section 3.7.4 of the FEIS. | Developed Area and Road Corridor | Continual improvement of three-year moving average<br><br>8-hour time-weighted noise levels exceed 80 dBA and peak noise levels exceed 90 dBA.<br><br>[See Air Quality for other health and safety thresholds.] | Incident descriptions and GIS mapping<br><br>Personal exposure monitoring | High | Alter or implement commercial guiding requirements and/or ratio Increase signage and reduce speed limits in areas of recurring incidents Increase law enforcement and educational information Adjust number of daily vehicle entries permitted Require use of personal protection equipment; issue PPE; improve PPE |

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity[1] | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Water/Snowpack | Water quality: VOCs, pH, hydrogen, ammonium, calcium, sulfate, nitrate, and NOx | Developed Area and Road Corridor | Ref: Ingersoll (1999) compared his water quality findings for snowmelt runoff to drinking water standards. Benzene: EPA maximum limit for drinking water 0.005 mg/L. OSHA permissible exposure in workplace (8-hour day, 40-hour weeks) 1 ppm Toluene: EPA maximum limit for drinking water 1 mg/L. OSHA permissible exposure in workplace 200 ppm Ethylbenzene: EPA maximum limit for drinking water .7 mg/L. OSHA permissible exposure in workplace 100 ppm Xylene: EPA maximum limit for drinking water 10 ppm. OSHA permissible exposure in workplace 100 ppm | Snowpack sampling, snowmelt runoff, stream runoff, snowmelt/rain event | Low or as needed by changing conditions | Require new technologies Determination and application of best management practices Adjust number of daily vehicle entries permitted |
| | | Backcountry | Benzene: EPA maximum limit for drinking water 0.005 mg/L. OSHA permissible exposure in workplace (8-hour day, 40-hour weeks) 1 ppm Toluene: EPA maximum limit for drinking water 1 mg/L. OSHA permissible exposure in workplace 200 ppm Ethylbenzene: EPA maximum limit for drinking water .7 mg/L. OSHA permissible exposure in workplace 100 ppm Xylene: EPA maximum limit for drinking water 10 ppm. OSHA permissible exposure in workplace 100 ppm | Snowpack sampling, snowmelt runoff, stream runoff, snowmelt/rain event | Low | |

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity[1] | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Geothermal Features | Human-caused damage to geothermal areas | Developed Area | No degradation of geothermal resources | Remote sensing and visual observation | High | Increase law enforcement and educational information Restrict travel |
| Visitor Experience | Smoothness of the groomed surface | Travel Corridor | No worse than fair 20% of the daytime hours of park operation (8 A.M. – 4 P.M.) | Visual observation | High | Increase grooming Adjust vehicle numbers when threshold temperature and/or snow conditions are forecasted or reached |
| | Visitor satisfaction levels with opportunities to experience and view wildlife, scenery, and clean air and solitude. | Developed Area, Road Corridor, Transition, and Backcountry | Visitors are highly satisfied (+90%) with their park experience | Visitor Survey | High | Establish carrying capacity/adjust visitor numbers Determine unsatisfactory conditions and rectify |
| | Visitor perception and assessment of important park resources and values | Developed Area, Road Corridor, Transition, and Backcountry | Visitors are able to see, smell, and hear the natural environment at roadside pullouts and interpretive trails 90% of daytime hours during park operation (8 A.M. – 4 P.M.) | Visitor survey Encounter rates Time lapse photos Travel simulation models Observations | High | Establish carrying capacity/adjust visitor numbers Require new technologies |

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity[1] | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Wildlife | Bird and mammal habituation and effectiveness of garbage facilities | Developed Area | Garbage, human food and other attractants unavailable to wildlife | Observations and monitoring | High | Improve or redesign facilities<br>Alter or implement commercial guiding requirements and allocations |
| | Ungulate (e.g., bison and elk) movements on plowed roads | Travel Corridor | No unacceptable adverse effects. Unacceptable effects are those considered greater than "adverse moderate." | Continue bison monitoring and flights | High | Evaluate alternative transportation systems<br>Close roads (by road segment or seasonally)<br>Lower speed limits and increase enforcement |
| | Vehicle caused wildlife mortality | Travel Corridor | No unacceptable adverse effects | Incident reports, roadside surveys, GIS, and visual observations | High | Alter or implement commercial guiding requirements and allocations<br>Evaluate alternative transportation systems<br>Increase law enforcement and educational information<br>Reduce speed limits |

EXHIBIT T

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity[1] | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| | Wildlife harassment or displacement due to vehicle sounds or movements | Travel Corridor | No unacceptable adverse effects | Incident reports and visual observations | High | Increase law enforcement and educational information<br>Require new technologies<br>Adjust number of daily vehicle entries permitted<br>Alter or implement commercial guiding requirements and allocations<br>Establish additional no-stopping zones<br>Adjust group size requirements<br>Establish timed-entry requirements<br>Close roads (by road segment or seasonally) |
| | Wildlife trapped by snow berms in road corridor | Travel Corridor | No unacceptable adverse effects | Incident reports, roadside surveys, and visual observations | High | Increase number of exit berms and re-evaluate location of existing exits<br>Evaluate alternative transportation systems |
| | Ungulate (e.g., bison and elk) use of groomed surfaces | Travel Corridor | No unacceptable adverse effects | Visual observations, air surveys, and telemetry. Continue bison monitoring | High | Close roads or eliminate grooming operations (by road segment or seasonally)<br>Adjust grooming intensity |

EXHIBIT T

## WINTER USE PLANS RECORD OF DECISION
### Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity[1] | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| | Carnivore (e.g., wolves and lynx) displacement and habitat effectiveness | Transition and Backcountry | Insignificant, discountable, or beneficial effects only | Monitoring and air surveys | High | Mitigate effects or close area<br>Increase law enforcement and educational information<br>Require new technologies<br>Adjust number of daily vehicle entries permitted<br>Alter or implement commercial guiding requirements and allocations<br>Establish additional no-stopping zones<br>Adjust group size requirements<br>Establish timed-entry requirements<br>Consult with USFWS for appropriate mitigation strategies |
| | Wildlife harassment or displacement as a result of visitor activities | Transition and Backcountry | No unacceptable adverse effects | Incident reports and visual observations | High | Increase law enforcement and educational information<br>Require use of designated trails only<br>Close areas to use seasonally |
| | Human-bear conflicts during pre- and post-denning periods | Transition and Backcountry | No unacceptable adverse effects | Mapping of denning areas and visitor use patterns and trends. Incident Reports | Moderate | |

EXHIBIT T



| se |

**Who We Are**  **What We Do**  **Where We Work**  **Explore the Parks**  **Donate Now**  **Take Action**  Ne

## Northern Rockies

Home > Northern Rockies

Te

### Northern Rockies Home

Who We Are

Contact Us

Field Offices

Bison Belong

Field Report

Gateway Reports

World Class Assets Report

## WHERE WE WORK

Alaska

Mid-Atlantic

Midwest

Northeast

Northern Rockies

Northwest

Pacific

Southeast

Southwest

Sun Coast

Texas

## SIGN UP FOR NEWS + ALERTS

enter email     **GO**

RSS Feeds

**DONATE NOW >**

## Winter Use In Yellowstone

The Yellowstone Field office is working to protect Yellowstone's wildlife and restore the Park's unique winter quiet and pristine air quality by phasing out noisy and polluting snowmobiles and moving toward a park-friendly snowcoach-only winter transportation system.



© Jon Catton

RE
HI

F
P

R
R

C
o
R

M

**EXHIBIT U**



Your Online Purchases Can Help Our National Parks

iGive.com®

LEARN MORE ›

**Snowcoaches in the News**

Yellowstone sees busy February
*Gazette News Services*, March 6, 2008

Nearly 100,000 Americans (and over 15,000 NPCA members and activ
the National Park Service's plan for winter access into Yellowstone Nat
would allow for three times the past four year's average number of sno
Yellowstone's fragile winter environment, and instead called for park-fr
snowcoach access into our nation's first national park.

In doing so, these Americans have joined a growing chorus of influenti
voices across the country, including:

- Seven former National Park Service Directors, with a tenure that
  40 years, who urged the Park Service to apply its scientific findin
  to the public's call for winter access that provides the highest prc
  Yellowstone's resources and natural conditions.
- The Environmental Protection Agency, which revealed that when
  the snowcoach only alternative, the Park Service's latest preferre
  plan: "...would result in five times more carbon monoxide emissic

EXHIBIT U

more hydrocarbon emissions…" And, "…would double the acres i
impacted by oversnow vehicle noise for more than 50 percent of

- The Outdoor Alliance, representing the interests of more than 10
  Americans who paddle, climb, mountain bike, hike, showshoe an
  nation's public lands, which recently asked NPS Director Mary Bo
  transition to cleaner, quieter snowcoaches, which "would continu
  the trend toward a healthier Yellowstone".
- A coalition of organizations (including NPCA) that represents ove
  Americans, voiced its support for ending the winter use acrimony
  the Park Service to phase out snowmobiles and move towards sn
  Yellowstone. Read NPCA and our coalition partner comments (PD

NPCA remains hopeful that the National Park Service will correct its pro
and implement the expansion of snowcoach access and phaseout of sn
that the National Park Service and the Environmental Protection Agenc
determined independently, four times in eight years, provides the best
protection of Yellowstone while continuing motorized public access to t
attractions.

Thank you again for voicing your support for Yellowstone.

Print this page 🖶 | Email to a friend ✉

Home | Contact Us | Privacy Policy | Media Center | Magazine | Work at NPCA | Shop Online | S

NPCA | 1300 19th Street, NW | Suite 300 | Washington, DC 20036 | 800.NAT.PARK |



EXHIBIT U



National Parks Conservation Association®
*Protecting Our National Parks for Future Generations®*

se

Who We Are | What We Do | Where We Work | Explore the Parks | Donate Now | Take Action | Ne

Ne

Home > Northern Rockies

# Northern Rockies

**Northern Rockies**

Northern Rockies Home

Who We Are

Contact Us

Field Offices

Bison Belong

Field Report

Gateway Reports

World Class Assets Report

**WHERE WE WORK**

Alaska

Mid-Atlantic

Midwest

Northeast

Northern Rockies

Northwest

Pacific

Southeast

Southwest

Sun Coast

Texas

**SIGN UP FOR NEWS + ALERTS**

enter email    GO

RSS Feeds

DONATE NOW >

The Northern Rockies Region contains some of America's most awe-inspiring wilderness and is home to several of the nation's crown jewel parks. From the Earth's greatest geyser area found in Yellowstone to the rugged awe-inspiring mountain range found in the Grand Tetons to the history of the Battle of Little Bighorn, America's rich natural beauty and cultural heritage are at the heart of our national parks.

GLACIER FIELD OFFICE
Whitefish, MT

NORTHERN ROCKIES REGIONAL OFFICE
Helena, MT

YELLOWSTONE FIELD OFFICE
Livingston, MT

GRAND TETON FIELD OFFICE
Jackson, WY

## Pathways Funding Paves the Way for Alternate Transportation system in Grand Teton Park

Pathways funding included in the 2008 Omnibus Appropriations bill will pave the way for a state-of-the-art multi-model pathways system in Grand Teton National Park. Thanks to the efforts of Senator John Barrasso (R-WY). $1.75 million secured through the spending bill will fund initial construction phases and ultimately enhance safety for bikers and pedestrians in the park.

**Read More >>**

Photo by Sarah Zenner/NPS

## Mountaintop Removal Coal Mine Threatens Glacier

The Flathead River is one of the most wild, biologically rich places in the world, but an open-pit coal mine has been proposed for its headwaters just 25 miles upstream of Glacier National Park.

**Read More >>**

© Harvey Locke

## Winter Use In Yellowstone

The Yellowstone Field office is working to protect Yellowstone's wildlife and restore the Park's unique winter

Te

RE
HI

F
P

R
R

C
o
R

M

EXHIBIT V



quiet and pristine air quality by phasing out noisy and polluting snowmobiles and moving toward a park-friendly snowcoach-only winter transportation system. **Read More >>**

## Regional Offices

- **The Glacier Field Office** is located in Whitefish, Montana
- **The Grand Teton Field Office** is based in Jackson Hole, Wyoming
- **The Yellowstone Field Office** is located in Livingston, Montana

## Featured Regional Parks

- **Yellowstone National Park** is America's first national park. It is often referred to as the Serengeti of the West as it protects some of the greatest biodiversity in the nation.
- **Glacier National Park** is also known as Waterton-Glacier International Peace Park and is a World Heritage Site. Glacier shelters nearly 50 glaciers, a wide variety of wildflowers, mountain goats, grizzly bears, and gray wolves.
- **Grand Teton National Park** rises over 13,000 feet above sea le of America's most recognizable mountain ranges.
- **Craters of the Moon National Monument and Preserve** is an landscape of ancient volcanic activities.  This harsh environment diverse wildlife capable of survival in its high desert habitat.
- **Devil's Tower National Monument** is the nation's first nationa stands as a remnant of an ancient volcanic feature and is a sacre worship to over 24 tribes of the Northern Plains.
- **Little Bighorn Battlefield National Monument** commemorate America's most significant battles, the Battle of Little Bighorn.

## Threats:

- Snowmobiles ravage the landscape and harass wildlife in Yellows Teton national parks each winter.
- Bison Belong in Yellowstone, but each year more bison are slaug and federal agencies.
- Air Pollution is damaging to the region's parks, including Yellows
- Invasive Species threaten the region's famed biodiversity.

EXHIBIT V

- A <u>Proposed coal mine</u> threatens Glacier National Park.
- A <u>Hydropower Project</u> proposed for the Jackson Lake Dam threat
  resources and promotes an inappropriate industrial use within Gr
  National Park.

<u>Print this page</u> 🖶 | <u>Email to a friend</u> ✉

Home | Contact Us | Privacy Policy | Media Center | Magazine | Work at NPCA | Shop Online | !

NPCA | 1300 19th Street, NW | Suite 300 | Washington, DC 20036 | 800.NAT.PARK |



EXHIBIT V





Home    Contact Us    Site Map

Search [_____] GO

About Us | Join and Donate | News Room | Library | Our Issues | Where We Work | Ta

About U

- About Us
- What We Do
- **Who We Are**
  - Staff & Experts
  - Governing Council
- Our Partners
- Careers
- Merchandise
- Annual Report

Subscribe to WildAlerts

[Enter email address] GO

Support Our Work

Click here to Donate Now

# Who We Are

 Email Page          🖶 Print Page

We are advocates for the land. At the heart of the work we do is the land ethic, which defines a set of principles in how humans should relate to the land:

*"A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic community. It is wrong when it tends otherwise."* - Aldo Leopold

Our work is steeped in science and infused with a passion that has lasted for generations, just as the work that we do must last for generations. Since 1935, we have helped protect more than 105 million acres of America's wildest places.

Our goal is to ensure that future generations will enjoy, as we do today, the clean air and water, wildlife, beauty and opportunities for recreation and renewal that pristine forests, rivers, deserts and mountains provide.

## Headquarters
1615 M St, NW
Washington, DC 20036
1-800-THE-WILD

## Regional Offices

- **Alaska** - Anchorage, AK
- **California/Nevada** - San Francisco, CA
- **Central Rockies** - Denver, CO
- **Idaho** - Boise, ID
- **Mid Atlantic** - Washington, DC
- **Northeast** - Hallowell, ME
- **Northern Rockies** - Bozeman, MT

EXHIBIT W

- Pacific Northwest - Seattle, WA
- Southeast - Atlanta, GA
- Southwest - Albuquerque, NM
- Wilderness Support Center - Durango, CO

**Alaska**

705 Christensen Drive

Anchorage, AK 99501

(907) 272-9453

Eleanor Huffines

**California/Nevada**

655 Montgomery St Ste 1000

San Francisco, CA 94111

(415) 398-1111

Sara Barth

**Central Rockies**

1660 Wynkoop St Ste 850

Denver, CO 80202

(303) 650-5818

Suzanne Jones

**Idaho**

350 N 9th St Ste 302

Boise, ID 83702

(208) 343-8153

Craig Gehrke

**Mid-Atlantic Region**

1615 M St NW

Washington DC 20036

(202) 429-2657

Fran Hunt

**Northeast**

9 Union Street, 3rd floor

Hallowell, ME 04347

(207) 626-5553

Jeremy Sheaffer

**Northern Rockies**

503 W Mendenhall

Bozeman, MT 59715

(406) 586-1600

(406) 586-4700 fax

Bob Ekey

EXHIBIT W

**Pacific Northwest**

720 3rd Ave Ste 1800

Seattle, WA 98104

(206) 624-6430

Michelle Ackermann

**Southeast**

112 Krog St Ste 26

Atlanta, GA 30307

(404) 872-9453

Frank Peterman

**Southwest**

(505) 917-4226

Deanna Archuleta

**Wilderness Support Center**

835 East 2nd Ave Ste 440

PO Box 1620

Durango, CO 81302-1620

(970) 247-8788

Bart Koehler

Our Privacy Policy

1615 M St, NW     Washington, DC 20036     1.800.THE.WILD

EXHIBIT W



**environmental update**
find out about issues that
matter to you

Our Conservation Initiatives 

**my backyard**
stay in touch with events,
issues and chapters in your area

Select a Place


my chapter
select another cha

MEMBER CENTER

sea

Explore, enjoy and protect the planet

**in this section:**
- Field Offices
- Chapters
- RCCs
- Sierra Student Coalition

# field offices

Choose a place from the drop-down menu below to find your
nearest field office, or use our clickable map.

Select a Place

take a
get ou
join c
inside si
press
politics
sierra m
sierra cl
online
conta


Join the S
Why become



## Appalachia
(DC, DE, GA, MD, NC, SC, TN, VA, WV)

**Appalachian Regional Office,**
422 E Franklin St, Suite 302 Richmond, VA 23219 Phone: 804-
565-4950 (phone) Fax: 804-225-9114 (fax)
app.field@sierraclub.org
www.sierraclub.org/field/appalachia/

**Richmond Office**
6 N 6th St, Ste 101
Richmond, VA 23219-2419
Phone: 804-565-4950
Fax: 804-255-9114

**Southern Appalachian Highlands Ecoregion**
RR 2 Box 118
Bland, VA 24315-9612
Phone: 276-688-2190
Fax: 276-688-2179

## California/Nevada/Hawaii

**Sacramento Field Office/Sierra Club California**
1116 9th Street
Sacramento, CA 95814-3603
Phone: 916-557-1100
FAX 916-557-9669
ca.field@sierraclub.org
www.sierraclub.org/field/ca_nv_hi

**Southern California/Nevada Office**
3435 Wilshire Blvd., Suite 660
Los Angeles, CA 90010
Phone: 213-387-6528
FAX: 213-387-8348
ca.field@sierraclub.org

EXHIBIT X

www.sierraclub.org/field/southerncal

## Canada

**Sierra Club Canada**
1 Nicholas St. Ste. 620
Ottawa, Ontario, Canada K1N 7B7
Phone: 613-241-4611
FAX: 613-233-2292
sierra.club.canada@sierraclub.org
www.sierraclub.ca/

## Great Plains
AR, KS, MT, NE, ND, OK, SD, TX, WY

**Northern Plains Office**
45 E. Loucks #109
Sheridan, WY 82801
Phone: 307-672-0425
FAX: 307-674-6187
np.field@sierraclub.org

**Bozeman, Montana Office**
PO Box 1290
Bozeman, MT 59771-1290
phone 406-582-8365
fax 406-582-9417
np.field@sierraclub.org

## Midwest
IA, IL, IN, KY, MI, MN, MO, OH, WI

**Traverse City, Michigan Office**
229 Lake Avenue, Suite 4
Traverse City, Michigan 49684
Phone: 231-922-2201
Fax: 231-922-2909
mw.field@sierraclub.org

**Madison, Wisconsin Office**
122 West Washington Ave., Suite 830
Madison, WI 53703
Phone: 608-257-4994
Fax: 608-257-3513
mw.field@sierraclub.org

**Milwaukee, Wisconsin Office**
8112 W. Blue Mound Rd. Suite 108

EXHIBIT X

Milwaukee, WI 53208
Phone: 414-453-3127
Fax: 414-476-3970
joyce.harms@sierraclub.org

**Cincinnati, Ohio Office**
515 Wyoming Ave.
Cincinnati, OH 45215
Phone: (513) 761-4001
mw.field@sierraclub.org

**Chicago Office**
200 N. Michigan Avenue, Suite 401
Chicago, IL 60601
Phone: 312-251-1511
Fax: 312-251-1780
mw.field@sierraclub.org

**Northeast**
CT, MA, ME NH, NJ, NY, PA, RI, VT

**Northeast Office**
85 Washington St.
Saratoga Springs, NY 12866-4105
Phone:518-587-9166
FAX: 518-583-9062
ne.field@sierraclub.org
www.sierraclub.org/field/northeast

**Maine Office**
44 Oak St. Suite 301
Portland, ME 04101
Phone: (207) 761-5616
Fax: (207) 773-6690
Email: maine.chapter@sierraclub.org
Web: maine.sierraclub.org

**New Hampshire Office**
40 North Main St., 2nd Floor
Concord, NH 03301
Phone: 603-224-8222
FAX: 603-224-4719
ne.field@sierraclub.org

**New York City Office**
116 John St. STE 3100
New York, NY 10038
Phone: 212-791- 3600
FAX: 212-791-0839

**Rhode Island Field Office**
298 West Exchange Street
Providence, RI 02903
Phone: 401-521-4734
Fax: 401-521-4001

EXHIBIT X

**Northwest/Alaska**
AK, ID, OR, WA

**Northwest/Alaska Office**
180 Nickerson St. Ste. 202
Seattle, WA 98109
Phone: 206-378-0114
FAX: 206-378-0034
nw-wa.field@sierraclub.org

**Alaska Office**
201 Barrow Street, Suite 101
Anchorage, AK 99501
Phone: 907-276-4048
Fax: 907-258-6807
nw-ak.field@sierraclub.org

**Portland Office**
2950 Stark Suite 100
Portland, OR 97241
(503) 243-6656
(503) 2438-6281

**Idaho Office**
503 W Franklin
Boise, ID 83701
(208) 384-1023

**Southeast**
AL, FL, LA, MS,

**Southeast Regional Office**
1330 21st Way South #100
Birmingham, AL 35205-3904
Phone: 205-933-9111
FAX 205-939-1020

**Florida Office**
475 Central Avenue Ste. M-1
St.Petersburg, FL 33701
Phone: 727-824-8813
FAX: 727-824-0936
se.field@sierraclub.org

**South Florida/Everglades Office**
2700 SW 3rd Ave, Ste. 2F
Miami, FL 33129
Phone: 305-860-9888
FAX: 305-860-9862
se.field@sierraclub.org

EXHIBIT X

**Southwest**
AZ, CO, NM, UT

**Southwest Regional Office**
202 E. McDowell Rd. #277 Phoenix, AZ 85004
Phone: 602-254-9330
FAX 602-258-6533
sw.field@sierraclub.org

**Colorado Office**
2260 Baseline Rd. Ste. 105
Boulder, CO 80302
Phone 303-449-5595
FAX 303-449-6520
sw.field@sierraclub.org
rmc.sierraclub.org/field/

**Utah Office**
2120 South 1300 East
Salt Lake City, UT
84106-3785
Phone: 801-467-9294
FAX: 801-467-9296
sw.field@sierraclub.org

**National Field Director: Bob Bingaman**
Sierra Club DC Office 202-675-7904
408 C Street, NE F: 202-547-6009
Washington, DC 20002-5818
bob.bingaman@sierraclub.org

Up to Top

HOME | Email Signup | About Us | Contact Us | Terms of Use

EXHIBIT X



**Home**

**Join GYC**

**Greater Yellowstone**

**Our Work**

**Get Involved**

**Events**

**Press Room**

**About Us**

Contact Us
Mission/Vision
Accomplishments
Member Lists
Financials
Jobs/Internships
Site Map



**Search our website:**

[ Search ]

# About the Greater Yellowstone Coalition

**Our mission:** *People protecting the lands, waters, and wildlife of the Greater Yellowstone Ecosystem, now and for future generations.*

GYC was founded in 1983 on a simple premise: An ecosystem will remain healthy and wild ecosystem only if it is kept whole.

Since that time GYC has emerged as a nationally known advocate for the idea that ecosystem level sustainability should guide the management of the region's public and private lands.

Perhaps the best measure of GYC's leadership and influence is its base of more than 13,000 members, 80 conservation and outdoor organizations, and 230 businesses. These constituents have come together to fulfill GYC's goal of preserving and protecting the Greater Yellowstone Ecosystem and the unique quality of life it sustains.

The region of Greater Yellowstone is centered in the two national parks and six national forests which form the ecosystem's core, surrounded by private lands in 20 counties that include parts of Montana, Idaho and Wyoming. GYC works to ensure that a thoughtful and holistic approach is taken to managing the national and wildlife resources in harmony with people and modern development. The Greater Yellowstone Coalition holds steadfast to its mission "to protect and conserve the Greater Yellowstone Ecosystem and its full range of life, now and for future generations." GYC works to shape a future where wildlife populations maintain their full diversity and vitality, where ecological processes function on public lands with minimal intervention, where exceptional recreational opportunities abound for visitors and residents alike, and where

**Who We Are** > Contact Us | Mission/Vision | Accomplishments | Member Lists | Financials | Jobs/Internships | Site Map

**Overview** > Parks & Lands | Waters | Wildlife | Communities | FAQ

**Overview** > Parks & Lands Work | Waters Work | Wildlife Work | Community Work

**Current News** > News Articles | Press Releases | Opinions - Editorials/Letters to the Editor | Newsletters | Publications |

EXHIBIT Y

**People protecting the lands, waters, and wildlife of the Greater Yellow-stone Ecosystem, now and for future generations.**

communities can enjoy a healthy and diversified economy.

The organization has an annual operating budget of approximately $2.4 million, with revenues coming primarily from members and private foundations. It does not accept governmental funds. The organization is governed by a national board of 24 members and has a staff of 25 professionals. GYC is based in Bozeman, Montana and has field offices in Idaho Falls, Idaho, as well as Cody and Jackson, Wyoming. GYC publishes an annual report, a newsletter four times a year, and authors special reports on key issues within the region. It emphasizes the involvement of its many organizational and individual members in these efforts.

The Greater Yellowstone Ecosystem's unique concentration of large expanses of wild public lands puts it at the national center of many wildlife and public land controversies. These controversies include the recovery of grizzlies; the ongoing issues around successful reintroduction of gray wolves; the extent to which energy development on public lands affects species and communities; the protection of over 4.5 million acres of roadless lands; and the management of national parks.

In addition, growing human population numbers in the surrounding private lands have put new pressures upon the region, challenging the long-term viability of the ecosystem. Increasingly, GYC has shifted its resources to deal with issues regarding rural sprawl and population growth within the region. These efforts have produced a broad-based array of programmatic activities that are unique for a rural region in the west.

The Greater Yellowstone Coalition has been a pioneer in defining and promoting the concept of ecosystem management. The Coalition engages in a wide variety of efforts to improve land management in the region so the area's forests, streams, wildlife and other natural features will flourish for the enjoyment of future generations.

Search Archives | Web Sites of Interest

**How to Get Involved** >
Current Alerts | e-News Signup | Volunteer | Contact Decision Makers | Yellowstone e-Cards | Join / Donate

**Support our work** > Join GYC | Donate | Give a Gift Membership | Planned Giving | Donations in Honor / Memoriam

**Calendar** > GYE Summer Hikes | Annual Meeting

© 2006 Greater Yellowstone Coalition. All rights reserved. Contact Us | Take Action! | Site Map

EXHIBIT Y

RONALD J. TENPAS
Assistant Attorney General
LUTHER L. HAJEK
BARRY A. WEINER
GUILLERMO A. MONTERO
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0469/(202) 305-0492
Fax: (202) 305-0274

JOHN R. GREEN
Interim United States Attorney
NICHOLAS VASSALLO
Assistant United States Attorney
2120 Capital Avenue, Room 4002
Cheyenne, WY 82001
Tel: (307) 772-2124

Attorneys for Federal Respondents

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

_____

|  |  |
|---|---|
| STATE OF WYOMING, | ) |
|  | ) |
| Petitioner, | ) |
|  | ) |
| and | ) Civ. No. 2:07-cv-00319-CAB |
|  | ) Civ. No. 2:08-cv-00004-CAB |
| BOARD OF COUNTY COMMISSIONERS | ) |
| OF THE COUNTY OF PARK, et al., | ) |
|  | ) |
| Petitioner, | ) |
|  | ) |
| and | ) |
|  | ) |
| THE INTERNATIONAL SNOWMOBILE | ) |
| MANUFACTURER'S ASSOCIATION, INC. et al | ) |
|  | ) |

Petitioner-Intervenors,            )
                                   )
v.                                 )
                                   )
UNITED STATES DEPARTMENT OF THE    )
INTERIOR et al.                    )
                                   )
Respondents.                       )
_____)

**FEDERAL RESPONDENTS' CONTINGENT MOTION TO TRANSFER**

Federal Respondents, UNITED STATES DEPARTMENT OF THE INTERIOR; DIRK KEMPTHORNE, in his official capacity as the Secretary of the Interior; MARY BOMAR, in her official capacity as the Director of the National Park Service; and MICHAEL SNYDER, in his official capacity as Intermountain Regional Director for the National Park Service (collectively "Federal Respondents"), through undersigned counsel, respectfully contingently move this Court for a transfer of the above-captioned cases to the U.S. District Court for the District of Columbia.

The above-captioned cases constitute two of the four contemporaneous challenges to the National Park Service's latest winter use decision for Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway ("the Parks"). The four challenges are proceeding in parallel in this Court and in the United States District Court for the District of Columbia (hereinafter "D.C. Court"). The D.C. Court cases, which have been consolidated, are docketed as Greater Yellowstone Coalition et al. v. Dirk Kempthorne, et al, Case No. 07-cv-2111-EGS (D.D.C.) and National Parks Conservation Association v. U.S. Dep't of the Interior et al., Case No. 07-cv-2112-EGS (D.D.C.).

Earlier winter use litigation that proceeded concurrently in these two courts produced conflicting orders – a situation which ultimately led the D.C. Court to order Federal Respondents to show cause why they should not be held in contempt of court. The present cases pose an even greater risk of conflicting outcomes because, while the previous litigation focused on two separate rulemaking actions, the current set of parallel proceedings target the same Final Rule, Record of Decision, and Environmental Impact Statement. Should the two district courts

- 1 -

disagree concerning the validity of those agency actions, the National Park Service ("Service") could once again face the untenable dilemma of being forced to comply with two irreconcilable court orders.

To avoid this risk, Federal Respondents have moved the D.C. Court to transfer Case Nos. 07-cv-2111-EGS (D.D.C.) and 07-cv-2112-EGS (D.D.C.) (hereinafter "the D.C. Cases") to the District of Wyoming. That motion indicates that, upon transfer, Federal Respondents would move in this Court to consolidate all of the winter use cases. That motion, however, also recognizes that the D.C. Court may decline to transfer the above-captioned cases to this Court. Federal Respondents, therefore, concurrently move this Court to transfer the above-captioned cases to the D.C. Court. Specifically, Respondents have requested that the D.C. Court issue an order granting or denying its motion no later than April 25, 2008. If the D.C. Court has not transferred the D.C. Cases to this District as of that date, Respondents respectfully request that this Court instead transfer the above-captioned cases to the D.C. Court, so that all four winter use cases may be consolidated in that district. A copy of the motion filed with the D.C. Court is submitted herewith for the Court's convenience. See Ex. O.[1]

---

[1]     Citations to "Ex. __" refer to exhibits to the Declaration of Guillermo A. Montero, which is filed concurrently herewith.

The undersigned counsel has conferred with counsel for the Plaintiffs in compliance with Local Rule 7.1(b)(1)(A).  Plaintiffs' counsel has indicated that the Plaintiffs will oppose the instant motion.

Respectfully submitted this 25th day of March, 2008.

RONALD J. TENPAS
Assistant Attorney General
BARRY A. WEINER

 /s/ Guillermo A. Montero
LUTHER L. HAJEK
GUILLERMO A. MONTERO
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469; (202) 305-0492
Fax: (202) 305-0274
Email: Barry.Weiner@usdoj.gov
        Luke.Hajek@usdoj.gov
        Guillermo.Montero@usdoj.gov


JOHN R. GREEN
Interim United States Attorney

 /s/  Nicholas Vassallo
NICHOLAS VASSALLO
Assistant United States Attorney
2120 Capitol Avenue, Room 4002
Cheyenne, WY 82001
Tel: (307) 772-2124

Attorneys for the Federal Respondents

OF COUNSEL:

JASON WAANDERS
U.S. Department of the Interior
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March 2008, a copy of the Federal Respondents' Contingent Motion to Transfer and Proposed Order were filed electronically.  Notice of this filing will be sent to the following counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's electronic case filing (ECF) system.  Hard copies of the filing also were mailed to the following counsel:

Bruce Salzburg, Attorney General
Jay Jerde, Deputy Attorney General
Teresa Nelson, Assistant Attorney General
123 Capitol Building
Cheyenne, WY 82002
Telephone:     (307) 777-6946
Fax:     (307) 777-3542
Email:     jjerde@state.wy.us

Attorneys for Petitioner, State of Wyoming

Harriet M. Hageman
Hageman & Brighton, PC
222 E. 21st St.
Cheyenne, WY 82001
Telephone:     (307) 635-4888
Facsimile     (307) 635-7581
E-mail:     hhageman@bhlawoffice.com

Attorneys for Petitioner-Intervenors

Bryan A. Skoric
James A. Davis
1002 Sheridan Ave.
Cody, Park County 82414
Telephone: (307) 527-8660
Fax:     (307) 527-8668
E-mail:     jdavis@parkcounty.us

Attorneys for Petitioner Park County, Wyoming

William P. Horn
David E. Lampp
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave., NW, Suite 1200
Telephone:     (202) 659-5800
Facsimile:     (202) 659-1027
E-mail:     whorn@dc.bhh.com
                dlampp@dc.bhh.com

 /s/ Luther L. Hajek
LUTHER L. HAJEK

RONALD J. TENPAS
Assistant Attorney General
LUTHER L. HAJEK
BARRY A. WEINER
GUILLERMO A. MONTERO
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0469/(202) 305-0492
Fax: (202) 305-0274

JOHN R. GREEN
Interim United States Attorney
NICHOLAS VASSALLO
Assistant United States Attorney
2120 Capital Avenue, Room 4002
Cheyenne, WY 82001
Tel: (307) 772-2124

Attorneys for Federal Respondents

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

_____
                                          )
STATE OF WYOMING,                         )
                                          )
              Petitioner,                 )
                                          )
              and                         )      Civ. No. 2:07-cv-00319-CAB
                                          )      Civ. No. 2:08-cv-00004-CAB
BOARD OF COUNTY COMMISSIONERS             )
OF THE COUNTY OF PARK, et al.,            )
                                          )
              Petitioner,                 )
                                          )
              and                         )
                                          )
THE INTERNATIONAL SNOWMOBILE              )
MANUFACTURER'S ASSOCIATION, INC. et al    )
                                          )

Petitioner-Intervenors,    )
                           )
v.                         )
                           )
UNITED STATES DEPARTMENT OF THE    )
INTERIOR et al.            )
                           )
Respondents.               )
_____)

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
FEDERAL RESPONDENTS' CONTINGENT MOTION TO TRANSFER**

---

Federal Respondents, UNITED STATES DEPARTMENT OF THE INTERIOR; DIRK KEMPTHORNE, in his official capacity as the Secretary of the Interior; MARY BOMAR, in her official capacity as the Director of the National Park Service; and MICHAEL SNYDER, in his official capacity as Intermountain Regional Director for the National Park Service (collectively "Federal Respondents"), through undersigned counsel, respectfully contingently move this Court for a transfer of the above-captioned cases to the U.S. District Court for the District of Columbia ("D.C. Court") so as to ensure that the various winter use cases do not produce irreconcilable orders by this Court and the D.C. Court.  As explained below, this motion is contingent upon the disposition of another motion the Federal Defendants are filing this date in the D.C. Court.  By that motion, the Federal Respondents are requesting the D.C. Court transfer the litigation pending in that Court to this Court.  If the D.C. Court by April 25, 2008 grants that relief, Federal Respondents intend to withdraw this motion as moot.  If, on the other hand, the D.C. Court by April 25, 2008 does not grant that relief, the Federal Respondents respectfully request this Court to transfer the above-captioned cases to the D.C. Court.

I.    **BACKGROUND**

A.    **Historical Winter Use Litigation**[1/]

Federal Respondents' concern about facing potentially conflicting orders from two federal courts in different Circuits is based on their experience in past litigation involving winter use plans in the Parks leading up to and continuing through the 2003-2004 winter season.  The

---

[1/]    A more thorough discussion of the history of winter use litigation in this Court and in the U.S. District Court for the District of Columbia is provided in Ex. O (at 4-7) to the Declaration of Guillermo A. Montero, which is filed concurrently herewith.

first relevant action involved a challenge to a 2000 Record of Decision and 2001 Rule before this

Court, while the second relevant action involved a challenge to a 2003 Record of Decision and

2003 Rule in the D.C. Court.  Although the two lawsuits involved separate agency actions, the

interplay between the two cases, and ultimately the relief ordered by the two courts, left the

Federal Respondents in the untenable position of unavoidably violating one court's order in

order to comply with the other court's order.  Ultimately, Federal Respondents were required to

respond to an order by the D.C. court to show cause why they should not be held in contempt for

failing to comply with its order that conflicted with this Court's orders.  The current set of

parallel proceedings presents an even greater risk of conflicting opinions because, unlike the

previous cases which challenged different agency actions, the current cases target the same Final

Rule, Record of Decision, and Environmental Impact Statement.

> **B.    New Litigation in Both Districts Concerning the 2007 Environmental Impact Statement, Record of Decision, and Final Rule**

On December 13, 2007, the Service published in the Federal Register a Final Rule

governing winter use in the Parks (hereinafter "2007 Final Rule").  The 2007 Final Rule, which

became effective on December 19, 2007, implemented the Service's Record of Decision ("2007

ROD") for the "Winter Use Plans Final Environmental Impact Statement" ("2007 EIS"), and

amended the Special Regulations governing the use and management of all three Parks with

respect to winter use.  See 36 C.F.R. §§ 7.13, 7.21, 7.22.

The 2007 ROD, implemented by the 2007 Final Rule, allows 540 snowmobiles and 83

snowcoaches per day in Yellowstone National Park, subject to the requirements that all

snowmobiles meet the Service's Best Available Technology ("BAT") requirements for air and

- 2 -

sound emissions and that all snowmobiles travel with a commercial guide.  See Ex. N at 5.[2/]  The

2007 ROD also addresses snowmobile use in the Grand Teton National Park, the John D.

Rockefeller, Jr. Memorial Parkway, and the Continental Divide Snowmobile Trail, and imposes

a full avalanche forecasting system to manage oversnow travel on Sylvan Pass beginning after

the winter of 2007-2008.  Id. at 6.  Finally, the 2007 ROD imposes an extensive monitoring and

adaptive management program, through which the Service will continue to monitor park

resources and values including air quality, natural landscapes, wildlife, employee health and

safety, and visitor experience.  Based on the information it receives as a result of this monitoring,

the Service would make adjustments, as appropriate, to ensure that the objectives of the winter

use plans are being achieved.  Id. at 5.

A number of plaintiff groups – composed of both interest groups and local government

bodies – quickly filed suit challenging the above actions in the Wyoming and D.C. districts.  On

November 20, 2007, the Greater Yellowstone Coalition, The Wilderness Society, the Natural

Resources Defense Council, the Winter Wildlands Alliance, and the Sierra Club (collectively the

"GYC") filed a complaint in the D.C. Court (Case No. 07-cv-2111-EGS) alleging that the

Service's 2007 EIS and 2007 ROD violate the National Environmental Policy Act ("NEPA"), 42

U.S.C. § 4321 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.

See Ex. E.  GYC filed a first amended and supplemented complaint in that same case on January

11, 2008, further alleging that the 2007 Final Rule, which issued on December 13, 2007, violates

---

[2/]      Citations to "Ex. ___" refer to exhibits to the Declaration of Guillermo A. Montero,
which is filed concurrently herewith.

several federal laws including the National Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1 et seq., Executive Order 11644 ("EO 11644"), and 36 C.F.R. § 2.18(c). See Ex. F.

Similarly, on November 21, 2007, the National Parks Conservation Association ("NPCA") filed a complaint in the D.C. Court (Case No. 07-cv-2112) challenging the Service's 2007 EIS and 2007 ROD on NEPA and APA grounds. Ex. G. As in the GYC case, NPCA filed an amended complaint quickly thereafter describing additional violations allegedly caused by the Service's issuance of the 2007 Final Rule. See Ex. H. The GYC and NPCA cases were consolidated by order dated March 19, 2008.

Similar challenges have been filed in this District. On December 13, 2007, the State of Wyoming filed a petition for review of agency action challenging the 2007 EIS, ROD, and Final Rule, and alleging that those actions violate NEPA, the APA, the Organic Act, the Yellowstone National Park Act, and the United States Constitution insofar as they (1) impose daily limits on snowmobile access to Yellowstone National Park ("Yellowstone"); (2) impose a commercial guide requirement; and (3) impose a new management scheme for Sylvan Pass. See Ex. I. On January 2, 2008, the Board of County Commissioners of the County of Park filed a nearly identical petition. Ex. J. The two Wyoming Cases were consolidated by Order dated February 19, 2008. See Ex. D.

Finally, on February 22, 2008, the International Snowmobile Manufacturers Association, the American Council of Snowmobile Associations, the Blue Ribbon Coalition, and Terri Manning (collectively "ISMA") filed a motion to intervene as plaintiffs in the consolidated Wyoming Cases, challenging the 2007 Final Rule's reduced limited of 540 snowmobiles per day

in Yellowstone and the commercial guide requirement.  <u>See</u> Ex. C.  ISMA's motion for

intervention was granted on February 22, 2008.

The D.C. Cases differ from the Wyoming Cases in that the plaintiffs before this Court

believe that the restrictions on snowmobile use in the Winter Use Plan are too stringent, whereas

the plaintiffs in the D.C. Cases argue that those same restrictions are not stringent enough.

Otherwise, however, the cases are virtually identical in that they challenge the same agency

actions and allege similar claims under many of the same federal statutes.[3/]

## II.     ARGUMENT

### A.     Standard of Review

The Court's authority to transfer the above-captioned cases is governed by 28 U.S.C. §

1404(a), which states that "[f]or the convenience of the parties and witnesses, in the interest of

justice, a district court may transfer any civil action to any other district or division where it

might have been brought."  Under the statute, the Court is afforded broad discretion to determine

---

[3/]     In addition, ISMA has recently filed a second motion to intervene, this time as a defendant in the D.C. Cases.  <u>See</u> Ex. B (Dkt. #15).  As part of its intervention, ISMA proposes cross-claims against the Federal Respondents which mirror the claims ISMA has raised in the Wyoming litigation.  <u>Compare</u> Ex. K <u>with</u> Ex. L.

whether transfer from one jurisdiction to another is proper.[4/]  Texas Eastern Transmission Corp. v. Marine Office-Appleton & Cox Corp., 579 F.2d 561, 567 (10th Cir. 1978).

Although Section 1404(a) provides only three factors – i.e., convenience of the parties, convenience of the witnesses, and the interest of justice – "these [three] factors are best viewed as placeholders for a broader set of considerations, the contours of which turn upon the particular facts of each case."  Coffey v. Van Dorn Iron Works, 796 F.2d 217, 219 n.3 (7th Cir. 1986). Thus, in Chrysler Credit Corp. v. County Chrysler, Inc., 928 F.2d 1509 (10th Cir. 1991), the Tenth Circuit instructed that considerations such as the accessibility of witnesses, the cost of making the necessary proof, and "all other considerations of a practical nature that make a trial easy, expeditious and economical" should form part of a district court's analysis in deciding a motion for transfer.  Id. at 1515.  Of the three statutory factors, however, the most important is the interest of justice.  See Wright et al., Federal Practice and Procedure, § 3854 (2008) ("Indeed, a number of federal courts have considered this factor decisive – outweighing the other statutory factors – in ruling on a change of venue motion even though the convenience of the parties and witnesses pointed in a different direction.");  Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220-221 (7th Cir. 1986) (interest of justice may be determinative);  Chrysler Capital

---

[4/]    The only limitation on the Court's discretion to grant a transfer motion is the statutory requirement that a case be transferred to another "district or division where [the case] might have been brought."  28 U.S.C. § 1404(a).  See Van Dusen v. Barrack, 376 U.S. 612, 622 (1964).  The issue of where the case might have been brought is addressed by 28 U.S.C. § 1391(e), which provides that, in an action where an agency of the United States is a defendants, venue is proper in "the judicial district in which . . . a substantial part of the events or omissions giving rise to the claim occurred," or in which "the plaintiff resides . . . ."  28 U.S.C. § 1391(e)(2), (3).  Here, both the Department of the Interior and the National Park Service are headquartered in the District of Columbia, as are the National Parks Conservation Association and The Wilderness Society. Accordingly, the District of Columbia is an available forum for the above-captioned cases.

<u>Corp. v. Woehling</u>, 663 F. Supp. 478, 483 (D.Del. 1987) (recognizing that interest of justice is the most important criterion).

**B.      The Interest of Justice Weighs Heavily in Favor of Transfer**

In the event the D.C. Court does not, by April 25, 2008,  grant Federal Respondents' request, by separate motion filed this date in the D.C. Court, to transfer to this Court the cases pending in the D.C. Court, Respondents alternatively request this Court to transfer the above-captioned cases to the D.C. Court.  Although Federal Respondents' motion to transfer filed with the D.C. Court explains why there are more compelling legal reasons to transfer the D.C. Cases to this Court, if the D.C. Court nonetheless declines to grant Federal Respondents' request, then the overriding interests of justice and judicial economy would support the transfer of the above-captioned cases to the D.C. Court rather than continuing down the road of parallel, duplicative litigation, which could squander judicial resources, party resources, and expose Federal Respondents to conflicting orders.

As previously stated, the cases before both districts challenge the very same agency actions.  The plaintiffs in all four cases filed complaints within six weeks of each other.  <u>See</u> Exs. A, B, C, D.  In each complaint, the plaintiffs allege and seek findings that the 2007 EIS, ROD, and Final Rule violate NEPA, the APA, the Yellowstone National Park Act, and the National Park Service Organic Act.  <u>See</u> Exs. F, H, I, J.  Given the relationship between the two actions, the interests of justice necessitate that they be heard by the same court, primarily to avoid exposing the Federal Respondents to the risk of conflicting judgments.

Winter use litigation before this Court and the D.C. Court during the winter of 2003/2004 produced conflicting orders and ultimately led the D.C. Court to order Federal Respondents to

show cause why they should not be held in contempt of court.  See Ex. M; see also Fund for Animals v. Norton, 323 F. Supp. 2d 7, 10 (D.D.C. 2004) (". . . defendants are required by this Court's Order to implement a Rule that another court has mandated cannot be enforced").  The current state of parallel proceedings presents an even greater risk that this Court and the D.C. Court could reach inconsistent judgments on the merits of Plaintiffs' claims and the requirements of law concerning winter recreational use of the Parks.  Unlike the 2003/2004 litigation, where the two courts were asked to consider the merits of different rules with different administrative records, the plaintiffs in the cases currently before this Court and the D.C. Court challenge the exact same federal documents and decisions on the same administrative record.  Thus, the risk of inconsistent judgments has undoubtedly increased.[5/]

In these circumstances, the interest of justice strongly favors a single court adjudicating the claims to avoid the risk of conflicting judgments.  See Feller v. Brock, 802 F.2d 722, 727-728 (4th Cir. 1986) ("Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders."); see also Church of Scientology of California v. U.S. Dep't of the Army, 611 F.2d 738, 750 (9th Cir. 1979) (recognizing the need to "avoid the embarrassment of conflicting judgments").  This is because the imposition of conflicting orders require the subject party "to choose between coordinate courts and to knowingly violate an outstanding court order," thus "forc[ing] the [subject party] to run a serious risk of contempt sanctions," creating "morale and credibility problems," and imposing a "hardship" on the subject party that

---

[5/]    This is further underscored by ISMA's motion for intervention, which was filed in the D.C. Cases on March 12, 2008.  See Ex. B.  ISMA's proposed answer incorporates a number of cross-claims against the Federal Respondents which mirror the claims ISMA has already raised via their intervention in the cases before this Court.  Compare Ex. K with Ex. L.

"implicates basic principles of judicial obedience . . . ."  Feller, 802 F.2d at 727 (citations

omitted).  The serious implications described in Feller have already occurred once in the course

of previous winter use litigation.  They can be avoided in the future by ensuring that all of the

winter use cases are heard by a single district court.  Thus, in the event the D.C. Court does not

by April 25, 2008 grant the Federal Respondents' motion for transfer, Federal Respondents

respectfully request this Court to grant the instant motion so as to ensure that the current winter

use litigation produces a judgment that resolves all the parties' claims and defenses in a manner

less susceptible to collateral challenge.

The public interest in judicial economy also weighs heavily in favor of transfer.  In an

age of increasingly congested federal dockets, it makes little sense to have two separate districts

duplicate their efforts when a single court could hear both cases and adjudicate the claims more

efficiently.  As the Supreme Court has instructed, "[t]o permit a situation in which two cases

involving precisely the same issues are simultaneously pending in different District Courts leads

to the wastefulness of time, energy, and money that section 1404(a) was designed to prevent."

Cont'l Grain Co. v. The Barge FBL-585, 364 U.S. 19, 26 (1960); see also Jacobs v. Lancaster,

526 F.Supp. 767, 769 (W.D. Okla. 1981) ("The purpose of § 1404(a) is to prevent the waste of

time, energy and money and to protect litigants, witnesses and the public against unnecessary

inconvenience and expense.")

The current winter use litigation involves four cases, all of which target the same Federal

Respondents, and all of which petition this Court and the D.C. Court to set aside the Services'

2007 EIS, ROD, and Final Rule.  Each of these cases will require that the reviewing court

become familiar with exactly the same legal issues as well as the relevant portions of the

administrative record underlying the challenged agency actions, which at present exceeds 45,000

pages.  Under these circumstances, judicial economy would clearly be served by a consolidation

of the four winter use cases before a single court.

## III.    CONCLUSION

For the foregoing reasons, Federal Respondents respectfully request that this Court defer

ruling on this motion until April 25, 2008 and if, by that date, the District Court for the District

of Columbia has not issued an order transferring the D.C. Cases to this Court, then this Court

should as soon as practicable after April 25, 2008 transfer the above-captioned cases to the D.C.

Court.


Respectfully submitted this 25th day of March, 2008.

> RONALD J. TENPAS
> Assistant Attorney General
> BARRY A. WEINER
>
> /s/ Guillermo A. Montero
> LUTHER L. HAJEK
> GUILLERMO A. MONTERO
> United States Department of Justice
> Environment and Natural Resources Division
> Post Office Box 663
> Washington, D.C. 20044-0663
> Telephone: (202) 305-0469; (202) 305-0492
> Fax: (202) 305-0274
> Email: Barry.Weiner@usdoj.gov
>              Luke.Hajek@usdoj.gov
>              Guillermo.Montero@usdoj.gov

JOHN R. GREEN
Interim United States Attorney

 /s/  Nicholas Vassallo
NICHOLAS VASSALLO
Assistant United States Attorney
2120 Capitol Avenue, Room 4002
Cheyenne, WY 82001
Tel: (307) 772-2124

Attorneys for the Federal Respondents

OF COUNSEL:

JASON WAANDERS
U.S. Department of the Interior
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of March 2008, a copy of the Memorandum of Points and Authorities in Support of Federal Respondents' Contingent Motion to Transfer was filed electronically. Notice of this filing will be sent to the following counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic case filing (ECF) system. Hard copies of the filing also were served via U.S. Mail upon the following counsel:

Bruce Salzburg, Attorney General
Jay Jerde, Deputy Attorney General
Teresa Nelson, Assistant Attorney General
123 Capitol Building
Cheyenne, WY 82002
Telephone:    (307) 777-6946
Fax:              (307) 777-3542
Email:           jjerde@state.wy.us

Attorneys for Petitioner, State of Wyoming

Harriet M. Hageman
Hageman & Brighton, PC
222 E. 21st St.
Cheyenne, WY 82001
Telephone:    (307) 635-4888
Facsimile      (307) 635-7581
E-mail:          hhageman@bhlawoffice.com

Attorneys for Petitioner-Intervenors

Bryan A. Skoric
James A. Davis
1002 Sheridan Ave.
Cody, Park County 82414
Telephone: (307) 527-8660
Fax:            (307) 527-8668
E-mail:        jdavis@parkcounty.us

Attorneys for Petitioner Park County, Wyoming

William P. Horn
David E. Lampp
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave., NW, Suite 1200
Telephone:    (202) 659-5800
Facsimile:     (202) 659-1027
E-mail:          whorn@dc.bhb.com
                   dlampp@dc.bhb.com

 /s/ Luther L. Hajek
LUTHER L. HAJEK

RONALD J. TENPAS
Assistant Attorney General
LUTHER L. HAJEK
BARRY A. WEINER
GUILLERMO A. MONTERO
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0469/(202) 305-0492
Fax: (202) 305-0274

JOHN R. GREEN
Interim United States Attorney
NICHOLAS VASSALLO
Assistant United States Attorney
2120 Capital Avenue, Room 4002
Cheyenne, WY 82001
Tel: (307) 772-2124

Attorneys for Federal Respondents

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

_____

| | | |
|---|---|---|
| STATE OF WYOMING, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| and | ) | Civ. No. 2:07-cv-00319-CAB |
| | ) | Civ. No. 2:08-cv-00004-CAB |
| BOARD OF COUNTY COMMISSIONERS | ) | |
| OF THE COUNTY OF PARK, et al., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE INTERNATIONAL SNOWMOBILE | ) | |
| MANUFACTURER'S ASSOCIATION, INC. et al | ) | |
| | ) | |

Petitioner-Intervenors,                )
                                       )
v.                                     )
                                       )
UNITED STATES DEPARTMENT OF THE        )
INTERIOR et al.                        )
                                       )
Respondents.                           )
_____)

---

**DECLARATION OF GUILLERMO A. MONTERO IN SUPPORT OF
FEDERAL RESPONDENTS' CONTINGENT MOTION TO TRANSFER**

---

I, Guillermo A. Montero, declare as follows pursuant to 28 U.S.C. §1746:

  1.  I am an attorney in good standing of the bar of Massachusetts, and I am employed as a trial attorney with the United States Department of Justice, Environment and Natural Resources Division, Natural Resources Section.  I am one of the attorneys of record assigned to represent the Federal Defendants in this action.  I have personal knowledge of the facts stated herein and, if called upon to testify, I would testify that the facts set forth below are true and correct.

  2.  Attached as **Exhibit A** is a true and correct copy of the Civil Docket for Case Number 1:07-cv-02111-EGS, in the U.S. District Court for the District of Columbia.

  3.  Attached as **Exhibit B** is a true and correct copy of the Civil Docket for Case Number 1:07-cv-02112-EGS, in the U.S. District Court for the District of Columbia.

  4.  Attached as **Exhibit C** is a true and correct copy of the Civil Docket for Case Number 2:07-cv-00319-CAB, in the U.S. District Court for the District of Wyoming.

  5.  Attached as **Exhibit D** is a true and correct copy of the Civil Docket for Case Number 2:08-cv-00004-CAB, in the U.S. District Court for the District of Wyoming.

  6.  Attached as **Exhibit E** is a true and correct copy of the Complaint for Declaratory and Injunctive Relief filed by Greater Yellowstone Coalition et al. in Case No. 07-cv-2111-EGS on November 20, 2007.

7.    Attached as **Exhibit F** is a true and correct copy of the First Amended and Supplemented Complaint for Declaratory and Injunctive Relief filed by Greater Yellowstone Coalition <u>et al.</u> in Case No. 07-cv-2111-EGS on January 11, 2008.

8.    Attached as **Exhibit G** is a true and correct copy of the Petition for Review of Agency Action filed by the National Parks Conservation Association in Case No. 07-cv-2112-EGS on November 21, 2007.

9.    Attached as **Exhibit H** is a true and correct copy of the First Amended Petition for Review of Agency Action filed by the National Parks Conservation Association in Case No. 07-cv-2112-EGS on December 18, 2007.

10.    Attached as **Exhibit I** is a true and correct copy of the Petition for Review of Final Agency Action filed by the State of Wyoming in Case No. 07-cv-319B on December 13, 2007.

11.    Attached as **Exhibit J** is a true and correct copy of the Petition for Review of Agency Action filed by the Board of County Park Commissioners of the County of Park in Case No. 07-cv-00004B on January 2, 2008.

12.    Attached as **Exhibit K** is a true and correct copy of the Petition for Review of Final Agency Action filed by the International Snowmobile Manufacturer's Association, <u>et al.</u> in Case No. 07-cv-319B on February 26, 2008.

13.     Attached as **Exhibit L** is a true and correct copy of the Proposed Answer and Cross-Claims lodged by the International Snowmobile Manufacturer's Association, et al. in Case No. 07-cv-2112-EGS on March 12, 2008.

14.     Attached as **Exhibit M** is a true and correct copy of the Order issued on February 17, 2004 in Case No. 02-cv-2367-EGS.

15.     Attached as **Exhibit N** is a true and correct copy of the Winter Use Plans Record of Decision, executed on November 20, 2007.

16.     Attached as **Exhibit O** is a true and correct copy of the motion to transfer that is being filed in the District of the Columbia concurrently with the motion before this Court.

Executed this 25th day of March, 2008 in Washington, D.C.

 /s/ Guillermo A. Montero

Guillermo A. Montero

- 3 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of March 2008, a copy of the Declaration of Guillermo A. Montero in Support of Federal Respondents' Contingent Motion to Transfer was filed electronically. Notice of this filing will be sent to the following counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic case filing (ECF) system. Hard copies of the filing also were served via U.S. Mail upon the following counsel:

Bruce Salzburg, Attorney General
Jay Jerde, Deputy Attorney General
Teresa Nelson, Assistant Attorney General
123 Capitol Building
Cheyenne, WY 82002
Telephone:    (307) 777-6946
Fax:            (307) 777-3542
Email:          jjerde@state.wy.us

Attorneys for Petitioner, State of Wyoming

Bryan A. Skoric
James A. Davis
1002 Sheridan Ave.
Cody, Park County 82414
Telephone: (307) 527-8660
Fax:            (307) 527-8668
E-mail:        jdavis@parkcounty.us

Attorneys for Petitioner Park County, Wyoming

Harriet M. Hageman
Hageman & Brighton, PC
222 E. 21st St.
Cheyenne, WY 82001
Telephone:    (307) 635-4888
Facsimile      (307) 635-7581
E-mail:          hhageman@bhlawoffice.com

Attorneys for Petitioner-Intervenors

William P. Horn
David E. Lampp
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave., NW, Suite 1200
Telephone:    (202) 659-5800
Facsimile      (202) 659-1027
E-mail:          whorn@dc.bhb.com
                    dlampp@dc.bhb.com

 /s/ Luther L. Hajek
LUTHER L. HAJEK