**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
GREATER YELLOWSTONE                       )
COALITION, *et al*.,                      )
                                          )
        Plaintiffs,                       )    Civ. No. 07-2111 (EGS)
                                          )
        v.                                )    [Hearing on Motion for Summary
                                          )     Judgment on August 27, 2008]
DIRK KEMPTHORNE, *et al*.,                )
                                          )
        Defendants.                       )
_____)
                                          )
NATIONAL PARKS CONSERVATION               )
ASSOCIATION,                              )
                                          )
        Plaintiff,                        )    Civ. No. 07-2112 (EGS)
                                          )
        v.                                )    [Hearing on Motion for Summary
                                          )     Judgment on August 27, 2008]
UNITED STATES DEPARTMENT                  )
OF THE INTERIOR, *et al*.,                )
                                          )
        Defendants.                       )
_____)

**GREATER YELLOWSTONE COALITION PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER**

In late 2007, the National Park Service issued a final environmental impact statement,

record of decision, and regulation purporting to address "various concerns" this Court raised in

vacating and remanding a 2003 supplemental environmental impact statement, record of

decision, and regulation authorizing continued recreational snowmobiling within Yellowstone

National Park.  See Defs.' Ex. T at 3-4 (2007 decision); see also Fund for Animals v. Norton,

294 F. Supp. 2d 92, 115 (D.D.C. 2003) (vacating and remanding the 2003 environmental

analysis, decision, and rule).[1]  The administration's new winter use plan maintains the

deficiencies of its predecessor, authorizing substantial levels of recreational snowmobile use

subject only to the same inadequate mitigation measures criticized in this Court's prior Opinion.

See id.  Accordingly, the Greater Yellowstone Coalition plaintiffs filed the present suit,

challenging the administration's environmental analysis, decision, and rule under the

Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA"), the

National Park Service's Organic Act ("Organic Act"), and other federal mandates.  See Defs.'

Exs. G, H.  In seeking to transfer this case to the District of Wyoming—the forum of two later-

filed cases challenging as excessive the winter use plan's limitations on recreational

snowmobiling, see Defs.' Exs. K, L—the government repeats a tactic previously tried and

appropriately rejected by this Court.  See Fund for Animals v. Norton, 352 F. Supp. 2d 1, 1-2

(D.D.C. 2005).  For the reasons articulated by the Court in denying the government's prior

motions to transfer related Yellowstone winter use litigation to the District of Wyoming, the

Court should deny federal defendants' present motion.

## BACKGROUND

**I.      The 1997 Litigation and the Park Service's 2001 Phase-Out Rule**

This Court's involvement in the ongoing series of cases regarding Yellowstone's winter

management began in 1997, with a suit filed by The Fund for Animals and other organizations.

See Fund for Animals v. Babbitt, 97-cv-1126 (EGS) (filed May 20, 1997).  In a Court-approved

---

[1] Citations to "Defs.' Ex. __" refer to the exhibits accompanying the Declaration of Guillermo A. Montero, which was filed with federal defendants' motion to transfer.  Citations to "Pls.' Ex. __" refer to the exhibits accompanying the Declaration of Sean M. Helle, which is filed with this opposition.

settlement of that lawsuit,[2] the National Park Service agreed to prepare a comprehensive

environmental impact statement ("EIS") "addressing a full range of all alternatives for all types

of visitor winter use, including snowmobiling and trail grooming ... and considering the effects

of those alternatives on the … environments" of Yellowstone, Grand Teton National Park, and

the John D. Rockefeller, Jr. Memorial Parkway.  See Fund for Animals, 294 F. Supp. 2d at 99

(internal quotations omitted).  Following three years of study, the Park Service issued an EIS and

record of decision ("ROD") confirming that "[t]he use of snowmobiles … at present levels

harm[ed] the integrity of the resources and values of the[] three parks, and so constitute[d] an

impairment of [park] resources and values, which is not permissible under the NPS Organic

Act."  Record of Decision, Winter Use Plans for the Yellowstone and Grand Teton National

Parks and John D. Rockefeller Jr., Memorial Parkway ("2000 ROD"), 65 Fed. Reg. 80,908,

80,916 (Dec. 22, 2000).

With its 2000 EIS, the Service considered seven alternative means of allowing continued

and substantial access to the Parks without impairing park resources and values, all but one of

which provided for continued recreational snowmobile use.  See 65 Fed. Reg. at 80,922-23.

Despite the availability of snowmobile alternatives including significant technological and use

limitations, the Park Service concluded that continued snowmobile use within the Parks would

"adversely impact[] and impair[] park resources and values."  Id. at 80,917.  The Service

determined, however, that these impacts would be largely mitigated under the environmentally

preferred alternative—one providing for continued public access to Yellowstone in winter

through a mass transportation snowcoach system.  Id. at 80,917, 80,926.  The Service noted that

---

[2] In its Order approving the parties' settlement agreement, the Court denied a motion to transfer
the case to the District of Montana.  See Pls.' Ex. A (docket sheet reflecting Court's Oct. 29,
1997 Order).

the contrast between the snowcoach alternative and the six options allowing for continued snowmobile use within the Parks was stark, there being "a clear magnitude of difference between the impacts of snowmobiles and the impacts of snowcoaches on natural resource values and the opportunities to enjoy them." Id. at 80,917. The Park Service implemented the snowcoach alternative with a January 22, 2001 final rule requiring a gradual phase-out of recreational snowmobiling in the Parks. Special Regulations, Areas of the National Park System ("2001 Rule"), 66 Fed. Reg. 7,260 (Jan. 22, 2001).

## II.    The Reversal of the 2001 Phase-Out Rule

"The 2001 Rule, promulgated by the Clinton administration, was published the day after President George W. Bush took office, and was immediately stayed pending a review of the Rule by the new administration." Fund for Animals, 294 F. Supp. 2d at 100 (citing Final Rule, Delay of Effective Date, 66 Fed. Reg. 8,366 (Jan. 31, 2001)). Six months later, as part of the settlement of a lawsuit filed by the International Snowmobile Manufacturers Association ("ISMA") and others, the administration agreed to prepare a supplemental environmental impact statement ("SEIS") addressing snowmobile technology and additional public comment. See id. at 100-01. In the course of this supplemental analysis, the administration made clear its intention to reverse the Park Service's earlier phase-out rule. On November 8, 2002, Deputy Secretary of the Interior J. Steven Griles signed a regulation "postponing" the phase-out rule's implementation in order to avoid the substantial reduction in recreational snowmobiling the rule would have required with the arrival of the 2002-2003 winter season. See Special Regulations, Areas of the National Park System, 67 Fed. Reg. 69,473, 69,478 (Nov. 18, 2002). According to the Department, the delay "w[ould] enable [the agency] to complete the [SEIS] process without implementing the 50%

reduction that [wa]s due to go into effect during the winter use season 2002–2003 under the current regulations." Id. at 69,474.

On December 11, 2003, the administration published a final regulation authorizing the continued recreational use of 950 snowmobiles in Yellowstone each day—subject to technological limitations, a guiding requirement, and the possibility of adaptive management measures should "desired resource conditions" not be met under the plan. See Special Regulations, Areas of the National Park System, 68 Fed. Reg. 69,268 (Dec. 11, 2003).

### III.    The 2003 Litigation

The Greater Yellowstone Coalition plaintiffs, among others, immediately challenged the administration's 2003 environmental analysis and decision as, among other things, an arbitrary and capricious departure from the Park Service's prior regulation eliminating all recreational snowmobiling from the Parks. See Fund for Animals, 294 F. Supp. 2d at 96-97. After denying federal defendants' motion to transfer the case to the District of Wyoming, where a challenge to the Park Service's 2001 regulation had been filed, see Defs.' Ex. O at 13 (Court's Sep. 15, 2003 Order), this Court vacated the administration's SEIS, ROD, and regulation on December 16, 2003. Fund for Animals, 294 F. Supp. 2d at 115. In the Court's words, the 2003 regulation—a "dramatic change in course, in a relatively short period of time and conspicuously timed with the change in administrations"—"represent[ed] precisely the 'reversal of the agency's views' that triggers an agency's responsibility to supply a reasoned explanation for the change." Id. at 105. This responsibility, the Court noted, was especially pronounced in light of the "statutory mandate" governing the Park Service's actions—"a conservation mandate … that … trumps all other considerations." Id. As the administration had failed to offer an adequate explanation for its "180 degree reversal" of the Park Service's 2001 determination, the Court concluded that the

2003 decision was of a "quintessentially arbitrary and capricious" sort that could not be allowed

to stand.  Id. at 108 (internal quotations omitted).

The Court rejected the administration's argument that its reversal of the 2001 rule was

sufficiently explained by the technology and guided group requirements incorporated into the

2003 rule.  See Fund for Animals, 294 F. Supp. 2d at 106.  "The possibility of improved

technology was explicitly considered in the 2000 ROD," the Court noted, "and just as explicitly

rejected as an inadequate solution for reducing the negative impacts of snowmobiling."  Id. at

106.  As to the rule's guided group requirement and limitation on the number of daily

snowmobile entries, the Court concluded that such measures were "significantly flawed"—the

prescribed entry limits did "not actually appear to reduce snowmobile use[;]" the regulation

defined a "group" as "'1-11 snowmobiles'" and "thereby eliminat[ed] the benefit of 'group'

travel" to wildlife; and guides were almost certain to have difficulties communicating with the

line of snowmobilers they guided.  Id. at 107.

In short, the Court concluded,

> [t]he gap between the decision made in 2001, and the decision
> made in 2003 [wa]s stark.  In 2001, the rulemaking process
> culminated in a finding that snowmobiling so adversely impacted
> the wildlife and resources of the Parks that all snowmobile use
> must be halted.  A scant three years later, the rulemaking process
> culminated in the conclusion that nearly one thousand
> snowmobiles w[ould] be allowed to enter the park each day.  In
> 2001, the NPS selected the 'environmentally preferred alternative.'
> In 2003, the NPS rejected the environmentally preferred
> alternative, and instead chose an alternative whose 'primary
> beneficiaries' are the 'park visitors who ride snowmobiles in the
> parks and the businesses that serve them.'

Fund for Animals, 294 F. Supp. 2d at 107-08 (quoting the 2003 final rule).  As the administration

had failed to explain this reversal—indeed, as evidence in the record suggested that there was no

legitimate explanation for the change as the 2003 SEIS "was completely politically driven and

result oriented"—the Court vacated the 2003 rule and remanded it, with the underlying SEIS and

ROD, to the Park Service for "further proceedings not inconsistent with [its] Opinion[.]"  Id. at

115.  Consistent with the language of the administration's 2003 rule, the Court ordered that the

2001 phase-out regulation be implemented by the National Park Service.  Id.

## IV.    The 2004 Litigation

After failing to obtain a stay of this Court's Order in the D.C. Circuit Court of Appeals,

the State of Wyoming moved to reopen the District of Wyoming lawsuit that had challenged the

2001 phase-out rule.  See Fund for Animals v. Norton, 323 F. Supp. 2d 7, 9 (D.D.C. 2004).  On

February 10, 2004, the Wyoming Court entered a preliminary injunction prohibiting the Park

Service "from enforcing the 2001 Snowcoach Rule" and requiring the agency to "promulgate

temporary rules for th[e] 2004 snowmobile season that w[ould] be fair and equitable to

snowmobile owners and users, to the business community, and to the environmental interests,

such as the Greater Yellowstone Coalition, by limiting snowmobile use to four-stroke machines,

and to all other interests public and private, of which the NPS is aware."  See Int'l Snowmobile

Mfrs. Ass'n v. Norton, 304 F. Supp. 2d 1,278, 1,294 (D. Wyo. 2004).

Rather than seeking relief from the later Wyoming Order, federal defendants filed a

motion seeking relief from the portion of this Court's Order requiring implementation of the

2001 phase-out regulation.[3]  See Fund for Animals, 323 F. Supp. 2d at 10 n.3 ("Interestingly, it

is the Court's understanding that defendants have not sought to be relieved from the Wyoming

court's order.").  After concluding that "the most prudent course of action, and the action most

likely to lend some clarity to increasingly unclear agency proceedings" was to relieve federal

---

[3] Federal defendants also filed a conditional motion seeking the transfer of the District of
Columbia litigation to Wyoming—a motion the Court denied on March 9, 2004.  See Pls.' Ex. B
(Mar. 9, 2004 Order).

defendants of their obligation to implement the phase-out rule, the Court "sharply emphasize[d] that the remainder of the Court's December 16, 2003, Opinion and Order remains in full force and effect" and "Federal Defendants still have an obligation to conduct the new rule-making process in a manner consistent with, and addressing the concerns delineated in, the Court's December 2003 Opinion and Order." Id. at 10.

In the wake of these decisions, the Park Service developed a 2004 "temporary plan" authorizing—for three winter seasons—the recreational use of 720 snowmobiles in Yellowstone each day, subject to "best available technology" and commercial guiding requirements. See Special Regulations, Areas of the National Park System, 69 Fed. Reg. 65,348 (Nov. 10, 2004). On November 4, 2004, a number of conservation groups and individual plaintiffs filed a lawsuit in this Court challenging the finding of no significant impact underlying the administration's 2004 decision, see Pls.' Ex. C (Complaint, Fund for Animals v. Norton, Case No. 04-cv-1913 (EGS)); on November 10, 2004, The Wyoming Lodging and Restaurant Association filed a lawsuit in the District of Wyoming challenging the same action, see Pls.' Ex. D (Complaint, Wy. Lodging and Rest. Ass'n v. U.S. Dep't of the Interior, Case No. 04-cv-315 (CAB)).  Concerned about the potential for another set of conflicting orders, the government sought to consolidate the cases before a single court.  See Fund for Animals, 352 F. Supp. 2d at 2.  Rather than first seeking the transfer of the later-filed District of Wyoming case to this Court, however, the government asked that this Court transfer its case to the District of Wyoming—filing in the District of Wyoming a motion to transfer the Wyoming Lodging and Restaurant Association case to the District of Columbia only if this Court had not granted the government's transfer motion by January 5, 2005.  See Pls.' Ex. E (Federal Defendants' Consolidated Motion to Transfer,

Consolidate, and Stay Proceedings, <u>The Fund for Animals v. Norton</u>, 04-cv-1913 (EGS) (filed

Nov. 23, 2004)).

    In a January 5, 2005 Opinion, this Court denied the government's transfer motion,[4]

concluding that federal defendants had "failed to persuade the Court that the interests of justice

weigh[ed] in favor of the transfer." <u>Fund for Animals</u>, 352 F. Supp. 2d at 1. "First, and most

importantly," the Court stated,

> this Court has a long history with the facts and law surrounding
> this case and the prior litigation involving winter use at
> Yellowstone National Park. Plaintiffs' most recent complaint calls
> for the interpretation and application of a series of extensive
> opinions and orders stretching back to this Court's approval of a
> Settlement Agreement in 1997. <u>See, e.g.</u>, <u>The Fund for Animals v.</u>
> <u>Norton</u>, 294 F. Supp. 2d 92 (D.D.C. 2003); <u>The Fund for Animals</u>
> <u>v. Norton</u>, 323 F. Supp. 2d 7 (D.D.C. 2004). Clearly, this Court is
> best suited to perform the task of applying its own Orders.

<u>Id.</u> at 2. As "the convenience of parties and witnesses d[id] not clearly favor a transfer in th[e]

case"—federal defendants and their counsel were located within the District of Columbia, and

the plaintiffs' APA challenge would be "limited to the administrative record"—the Court

concluded that it would not "disturb plaintiffs' choice of forum." <u>Id.</u>

---

[4] On June 16, 2005, the Judicial Panel on Multidistrict Litigation denied the government's
motion for an "order centralizing [the District of Columbia and Wyoming] litigation in a district
court within the jurisdiction of the Court of Appeals for the <u>Tenth Circuit</u>." <u>See</u> Pls.' Ex. F at 1
(Jun. 16, 2005 Judicial Panel on Multidistrict Litigation Order Denying Transfer) (emphasis
added). The Panel concluded that "centralization would neither serve the convenience of the
parties and witnesses nor further the just and efficient conduct of this litigation" as

> [e]ach of the two … actions [wa]s a successor action to litigation
> that ha[d] already been proceeding on a parallel basis in the
> Wyoming and District of Columbia courts for over four years, and
> alternatives to transfer exist[ed] that c[ould] continue to minimize
> whatever possibilities there might [have been] of duplicative
> discovery and/or inconsistent pretrial rulings.

<u>Id.</u> at 1-2.

In reaching this conclusion, the Court gave thorough consideration to federal defendants' arguments regarding the risk of conflicting orders and the interests of Wyoming residents in Yellowstone's winter use plan.  See Fund for Animals, 352 F. Supp. 2d at 2.  While noting that the government's concerns with respect to the possibility of conflicting orders was "understandable," the Court determined that the risk was "unlikely" due, first, to the possibility that the District of Wyoming would subsequently transfer its case to the District of Columbia; second, to the possibility that federal defendants would prevail in both suits, absent consolidation; and, third, "because the two cases involve[d] challenges to different aspects of the Park Service's 2004 Winter Use Plan, there w[ould] likely be opportunities for both courts to tailor any eventual remedies to avoid conflicts."  Id.  As to the interests of Wyoming residents in the case—interests joined, the Court noted, by those of "the nation as a whole"—the Court stated that they "w[ould] be fairly and adequately considered consistent with the fair administration of justice."  Id.

## V.    The 2007 Litigation

Sustained by a series of congressional appropriations riders, the temporary plan remained in effect for three winter seasons, during which the administration developed a new, long-term winter use plan for the Parks.  See Fund for Animals, 512 F. Supp. 2d 49, 51 (D.D.C. 2007); Fund for Animals v. Norton, 390 F. Supp. 2d 12, 14 (D.D.C. 2005).  Following the September 24, 2007 publication of a Winter Use Plans Final Environmental Impact Statement, the administration's plan emerged in a November 20, 2007 record of decision.  See Defs.' Ex. T. While claiming to address this Court's "various concerns regarding the winter use 2003 Supplemental EIS"—including "road grooming and bison movement, compliance with NPS mandates, and the effectiveness of mitigation measures[,]" id. at 3-4—the decision perpetuates

deficiencies identified in this Court's December 16, 2003 Opinion.  Under the new rule, 540 recreational snowmobiles are to be allowed in Yellowstone each day—subject, again, to "best available technology" standards, commercial guiding, and a requirement that all snowmobilers travel in "group[s]" of eleven or less, with no minimum.  See id. at 8, 13-15.

On November 20, 2007, the Greater Yellowstone Coalition plaintiffs filed the present lawsuit challenging the administration's FEIS and ROD as inadequate under NEPA and, again, as an unexplained departure from the Park Service's 2000 impairment determination—claims later supplemented by plaintiffs' challenges to the administration's subsequently adopted final rule.  See Defs.' Ex. G (Complaint); Defs.' Ex. H (First Amended and Supplemented Complaint).  Nearly a month after the filing of plaintiffs' suit and National Parks Conservation Association v. U.S. Department of the Interior, Case No. 07-cv-2112 (EGS), a second action challenging the 2007 winter use plan, the State of Wyoming initiated its own challenge in the District of Wyoming.  See Defs.' Ex. K (Petition).  The claims raised in State of Wyoming v. U.S. Department of the Interior, Case No. 07-cv-CAB (D. Wyo.), and the later-filed Board of County Commissioners of the County of Park, Wyoming v. U.S. Department of the Interior, Case No. 08-cv-004-CAB (D. Wyo.), are different from those pending in the litigation before this Court, arguing that the administration has gone too far in restricting recreational snowmobile use in Yellowstone.  See Defs.' Ex. K (Wyoming Petition); Defs.' Ex. L (Park County Petition).

Nonetheless, federal defendants have asked this Court, again, to transfer its cases to the District of Wyoming, and have declined, again, to seek the transfer of Wyoming's later-filed litigation to this Court before confirming that this Court does intend to "apply[] its own Orders." See Fund for Animals, 352 F. Supp. 2d at 2.  For the same reasons that this Court denied the

governments' prior motions to transfer Yellowstone winter use litigation to the District of Wyoming, this Court should deny the government's present motion.

**ARGUMENT**

The government offers little in defense of its contention that this Court should transfer its earlier-filed cases to the District of Wyoming, dwelling instead on the inefficiency and risk of inconsistent judgments that would arise should all four challenges to the winter use plan not be resolved by the same court—be it this Court or the District of Wyoming. See Defs.' Combined Mot. to Transfer and Mem. of P. & A. ("Defs.' Mem."). Federal defendants' arguments in support of the Wyoming forum are inadequate to justify transfer.[5] According to the government, Greater Yellowstone Coalition and National Parks Conservation Association should be transferred to the District of Wyoming because, first, plaintiffs' challenges present a "localized controversy" uniquely impacting the conservation and economic concerns of the State of Wyoming; second, plaintiffs would not be prejudiced by a transfer to Wyoming as "the only apparent relationship between the above-captioned cases and this District is the fact that NPCA and the Wilderness Society have their headquarters in this District[;]" and, finally, "the procedural posture in all of the cases is identical." Defs. Mem. at 15-18. Each of these arguments is incorrect. More critically, however, defendants' arguments disregard both this Court's interest in ensuring compliance with its Orders and this Court's prior denials of government motions seeking to transfer related litigation to the District of Wyoming.

---

[5] Federal defendants make no effort to argue that the District of Wyoming would prove the more convenient forum. See Defs.' Mem. at 16. Nor could they. The administrative record is present in the District of Columbia and, as this litigation arises under the APA, there is little chance that witnesses will be required in resolving plaintiffs' claims. See Fund for Animals, 352 F. Supp. 2d at 2. Moreover, federal defendants' counsel are located within this forum. See id. Because defendants have failed to demonstrate any inconvenience with this forum, plaintiffs' decision to litigate here should not be disturbed. See id.

12

I.    **Legal Standard**

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  In exercising their broad discretion under this provision, courts are to "balance case-specific factors which include the private interests of the parties and public interests such as efficiency and fairness."  Greater Yellowstone Coalition v. Bosworth, 180 F. Supp. 2d 124, 127 (D.D.C. 2001).  A party dissatisfied with the plaintiffs' chosen forum has the burden of demonstrating the appropriateness of transfer.  Fund for Animals, 352 F. Supp. 2d at 1-2.  Ultimately, in all but those cases in which the plaintiffs' chosen forum has "'no meaningful ties to the controversy and no particular interest in the parties or subject matter[,]'" courts "must afford substantial deference to the plaintiffs' choice of forum."  Greater Yellowstone Coalition, 180 F. Supp. 2d at 128 (quoting Islamic Republic of Iran v. Boeing Co., 477 F. Supp. 142, 144 (D.D.C. 1979)); see also Fund for Animals, 352 F. Supp. 2d at 2; Wilderness Soc'y v. Babbitt, 104 F. Supp. 2d 10, 12 (D.D.C. 2000) ("Absent specific facts that would cause a district court to question plaintiffs' choice of forum, plaintiffs' choice is afforded substantial deference.").

II.    **This Court Has a Significant Interest in Ensuring Compliance with its Orders**

While arguing at length that the "interest of justice" requires that each of the winter use cases now pending in either this Court or the District of Wyoming be resolved by a single Court—that in Wyoming—the government ignores this Court's significant interest in ensuring compliance with its own Orders.  On December 16, 2003, this Court vacated the present administration's previous attempt to promulgate a long-term rule authorizing recreational snowmobiling within Yellowstone, holding that the administration had failed to explain

13

adequately its reversal of the Clinton administration's phase-out rule and remanding the decision "for further proceedings not inconsistent with [the Court's] Opinion[.]" <u>Fund for Animals</u>, 294 F. Supp. 2d at 115. In later amending its Order to relieve federal defendants of their obligation to implement the phase-out rule, the Court "sharply emphasize[d] that the remainder of the Court's December 16, 2003, Opinion and Order remains in full force and effect" and "Federal Defendants still have an obligation to conduct the new rule-making process in a manner consistent with, and addressing the concerns delineated in, the Court's December 2003 Opinion and Order." <u>Fund for Animals</u>, 323 F. Supp. 2d at 10. The administration's new FEIS, ROD, and regulation—developed during the Parks' three years under a temporary plan sustained by congressional appropriations riders—purport to address the deficiencies identified by the Court. <u>See</u> Defs.' Ex. T at 3-4. They do not, however, because they rely again on the flawed mitigation measures deemed inadequate by the Court in 2003. <u>See id.</u> at 5; 294 F. Supp. 2d at 107. Plaintiffs have accordingly challenged, again, the administration's failure to explain its departure from the Park Service's prior determination that all recreational snowmobiling must be eliminated from the Parks in order to avoid the impairment of park resources and values. Because "this Court is best suited to perform the task of applying its own Orders[,]" <u>Fund for Animals</u>, 352 F. Supp. 2d at 2, the interests of justice would be furthered by this Court's resolution of the present controversy.

## III.     This Court Has Previously Addressed, and Rejected, Federal Defendants' Arguments In Favor of Transfer

In each of the lawsuits following the present administration's reversal of the 2001 phase-out rule, the government has moved—at least once—to transfer this Court's Yellowstone cases to the District of Wyoming. <u>See</u> <u>Fund for Animals</u>, 352 F. Supp. 2d at 2 (Court's Jan. 5, 2005 Opinion and Order denying federal defendants' motion to transfer); Pls.' Ex. B (Court's Mar. 9,

2004 Order denying federal defendants' motion to transfer); Defs.' Ex. O at 6, 13 (Court's Sep.

15, 2003 Order denying federal defendants' motion to transfer); see also Pls.' Ex. F (Jun. 16,

2005 Judicial Panel on Multidistrict Litigation Order denying federal defendants' motion to

centralize the 2004 "temporary plan" litigation within the Tenth Circuit).  The government's

present transfer motion is largely identical, in fact, to that denied by the Court in Fund for

Animals v. Norton, Case No. 04-cv-1913 (EGS), on January 5, 2005.  See Fund for Animals, 352

F. Supp. 2d at 1-2; Pls.' Ex. E (federal defendants' 2004 motion).  Federal defendants have

declined to cite the Court's January 5, 2005 Opinion and have made no effort to explain why the

arguments there rejected now justify disturbing plaintiffs' chosen forum.  As a result, the

government has again failed to meet its burden in demonstrating the appropriateness of transfer

in this case.

## IV.     Plaintiffs' Challenges Present Federal Legal Questions of National Concern, Not a "Localized Controversy" Most Suitable for Resolution in Wyoming

In advocating the transfer of the present litigation to the District of Wyoming, federal

defendants attempt to cast it as a "localized controversy" that should be resolved within

Wyoming.  See Defs.' Mem. at 15-16.  This contention fails.  First, in characterizing the present

dispute regarding the National Park Service's obligation to conserve Yellowstone National Park

as fundamentally "localized[,]" the government diminishes the national character of the

controversy.  See id. at 15 (contending that this litigation presents a "localized" dispute

"[n]otwithstanding" the national interest in the management of the national parks).  As Congress

underscored with the enactment of the General Authorities Act, Yellowstone stands as the first

park of a "national park system preserved and managed for the benefit and inspiration of all the

people of the United States[.]"  See 16 U.S.C. § 1a-1 (stating, more fully, that each of the areas

managed by the National Park Service "are united through their inter-related purposes and

resources into one national park system as cumulative expressions of a single national heritage"
and that "individually and collectively, these areas derive increased national dignity and
recognition of their superb environmental quality through their inclusion jointly with each other
in one national park system preserved and managed for the benefit and inspiration of all the
people of the United States"); id. § 21 ("dedicat[ing] and set[ting] apart" Yellowstone "as a
public park or pleasuring ground for the benefit and enjoyment of the people").  The
management of Yellowstone National Park and, more broadly, the interpretation of the various
federal mandates governing the National Park Service thus present questions of fundamental
import to those fortunate enough to live along the Park's borders, to those who visit the Park
"once or twice in a lifetime[,]" see 65 Fed. Reg. at 80,915 (2000 ROD), and to the "future
generations" who are to inherit the National Parks "unimpaired[,]" 16 U.S.C. § 1.  See also Pls.'
Ex. G (2006 Department of the Interior schedule noting that "[e]xtensive national and regional
media coverage and editorials [were] anticipated" upon the publication of the draft EIS).  For this
reason, this is not a "localized controversy" in which the State of Wyoming has a uniquely
"compelling" interest.  See Fund for Animals, 352 F. Supp. 2d at 2 ("The Court is mindful that
this case raises issues of profound interest to local residents of Wyoming as well as the nation as
a whole[.]"); Greater Yellowstone Coalition, 180 F. Supp. 2d at 128-29 (noting the "national
significance" of a case involving the interpretation of federal statutes, and no state laws, affecting
the management of Yellowstone buffalo); Wilderness Soc'y, 104 F. Supp. 2d at 13 (concluding
that the Department of the Interior's decision to begin oil and gas leasing on Alaska's National
Petroleum Reserve was a "national policy decision" concerning a "national resource"—not "an
isolated, local environmental issue").

The substantial national concern regarding Yellowstone's winter management is reflected in the history of both this litigation and the challenged winter use plan.  In the past decade, a number of national conservation organizations have repeatedly challenged, in this Court, the government's failure to adhere to the requirements of the Organic Act, NEPA, and other federal mandates in its management of the Park—including, in this lawsuit, Natural Resources Defense Council, Sierra Club, and The Wilderness Society, itself a District of Columbia–based organization.  See Defs.' Exs. W, X (The Wilderness Society and Sierra Club internet pages reflecting the organizations' national operations); see also Wilderness Soc'y, 104 F. Supp. 2d at 17 (denying the government's motion to transfer where "[t]he future of one of the nation's National Petroleum Reserves 'touche[d]' more than the local citizens of Alaska"—"[t]he 1.4 million members of the environmental groups [that brought] th[e] suit view[ed] [Interior's decision to authorize oil and gas development in Alaska] as a national issue, and ha[d] chosen to litigate th[e] dispute in the District of Columbia").  Moreover, public involvement in the administration's current winter use plan has included comments from across the country and the world.  With respect to both the draft EIS and the proposed rule, comments came from every state in the United States and a number of other countries; a small fraction of the letters received came from the State of Wyoming.  See Pls.' Ex. H at 5-6 (public comment report stating that 3,497 of the 122,190 letters on the draft EIS came from Wyoming); Pls.' Ex. I at 4-5 (public comment report stating that 26 of the 1,481 letters on the proposed rule came from Wyoming); see also Wilderness Soc'y, 104 F. Supp. 2d at 14 (noting that comments on the relevant draft EIS were received "from all fifty states[,]" underscoring the national interest in the decision).

While acknowledging the national interest in "the management of the national parks[,]" the government contends that this dispute is nonetheless "localized" due to the winter use plan's

unique impact on the State of Wyoming. Defs.' Mem. at 15. This argument is difficult to reconcile with the provisions of the winter use plan and the cases cited in support of the contention. Under the administration's newest regulation, a majority of the authorized recreational snowmobiles and snowcoaches are to enter Yellowstone from Montana—specifically, from the towns of West Yellowstone in the west, and Gardiner in the north. See 72 Fed. Reg. at 70,798. Accordingly, the "local business, livelihood, and recreational concerns" cited by federal defendants, see Defs.' Mem. at 15, are by no means dominated by the State of Wyoming. In light of this and the other "national" elements elsewhere discussed in this brief, the present litigation is readily distinguishable from the "localized controversy" cases referenced by the government. See id. In each of those cases, the Court concluded that transfer (or, in the forum non conveniens context of Gulf Oil, dismissal) was appropriate, in part, due to the centralization of the challenged action and its impacts within a single state or territory. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509-11 (1947) (Virginia); Nat'l Wildlife Fed'n v. Harvey, 437 F. Supp. 2d 42, 49 (D.D.C. 2006) (Florida); Sierra Club v. Flowers, 276 F. Supp. 2d 62, 71 (D.D.C 2003) (Florida); Trout Unlimited v. U.S. Dep't of Agric., 944 F. Supp. 13, 17-20 (D.D.C. 1996) (Colorado); Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency, 939 F. Supp. 1, 3 (Virgin Islands); cf. Oil, Chem. & Atomic Workers Local Union No. 6-418, AFL-CIO v. Nat'l Labor Relations Bd., 694 F.2d 1,289, 1,300 (D.C. Cir. 1982) (denying a motion to transfer a case from the District of Columbia where "the impact of the litigation [went] far beyond the interests of one region"). Federal defendants' contention that "this Court should recognize the compelling interest of the State of Wyoming in having this localized controversy decided at home[,]" Defs.' Mem. at 15, is thus misplaced.[6]

---

[6] Federal defendants make no effort to demonstrate that the decisionmaking process underlying

As this Court previously stated in denying the government's similar transfer motion in

Fund for Animals v. Norton, 04-cv-1913 (EGS), while "this case raises issues of profound

interest to local residents of Wyoming as well as the nation as a whole[,] these interests w[ould]

be fairly and adequately considered consistent with the fair administration of justice" in this

forum.  See Fund for Animals, 352 F. Supp. 2d at 2.  Federal defendants' arguments in favor of

Wyoming are inadequate to justify the disturbance of plaintiffs' chosen forum.  See id.

## V.    This Litigation Has a Substantial Nexus to the District of Columbia

According to the government, while Wyoming has a "compelling" interest in seeing this

litigation "decided at home[,]" this forum lacks "'meaningful ties to the controversy'" and has

"'no particular interest in the parties or subject matter[,]'" thus draining from plaintiffs' decision

to litigate here the substantial deference it would otherwise be owed.  Defs.' Mem. at 16-17

(quoting Trout Unlimited, 944 F. Supp. at 17).  In federal defendants' words, "the only apparent

relationship between the above-captioned cases and this District is the fact that NPCA and the

Wilderness Society have their headquarters in this District."  Id. at 17.

At the outset, this argument disregards the significance of a plaintiff's residence within a

challenged forum.  See Greater Yellowstone Coalition, 180 F. Supp. 2d at 129 (holding that the

---

the challenged winter use plan took place entirely—or even predominantly—within Yellowstone
National Park.  See Defs.' Mem. at 16 (stating, without citation or explanation, that "the interest
of justice weighs heavily in favor of having the winter use cases decided in the district where the
agency actions underlying the various cases took place and where the Park land affected by those
actions lies").  As the government carries the burden of demonstrating the appropriateness of
transfer, such an assertion is inadequate to deprive plaintiffs of their chosen forum.  See Greater
Yellowstone Coalition, 180 F. Supp. 2d at 128 (noting the government's burden and failure to
present evidence that District of Columbia officials were not involved in the relevant decision);
cf. Sierra Club, 276 F. Supp. 2d at 68 (concluding that federal officials in the District of
Columbia "did not play an active role" in the relevant decision where the government had
submitted an affidavit stating so, where the relevant decision had been signed in the transferee
forum, and where the plaintiffs had failed to offer "any evidence of consultation between the
federal officials in Florida and their counterparts in the District of Columbia").

case had a "nexus to the District of Columbia" due, in part, to the fact that some of the environmental organization plaintiffs "ha[d] offices in the District of Columbia"); Wilderness Soc'y, 104 F. Supp. 2d at 14 (same).  The participation of a resident environmental organization in this lawsuit forges a substantial connection between the present case and the District of Columbia.

The government's argument, moreover, disregards the history of the actions challenged in this case.  Since the Bush administration's immediate stay of the phase-out rule in 2001, see Fund for Animals, 294 F. Supp. 2d at 100, the administration's efforts to perpetuate recreational snowmobiling within Yellowstone have involved numerous federal officials in the District of Columbia.  Regarding the specific actions challenged here, internal Department of the Interior documents (obtained by plaintiffs through two FOIA requests) reflect continued and substantial involvement in the winter use planning process by a number of federal officials working in the District of Columbia including, among others, defendant Mary A. Bomar, Director of the National Park Service, see Pls.' Ex. J; Lynn Scarlett, Deputy Secretary of the Interior, see Pls.' Ex. K; defendant Dirk Kempthorne, Secretary of the Interior, see Pls.' Ex. L; and officials within the Council on Environmental Quality, see Pls.' Ex. M.  See also Pls.' Ex. N (Interior document identifying Yellowstone's snowmobile regulations as a "major administrative action[]" potentially deserving of White House involvement).  Further, the December 13, 2007 regulation challenged here was signed by defendant Assistant Secretary for Fish and Wildlife and Parks Lyle Laverty, an official located in the District of Columbia.  See 72 Fed. Reg. at 70,804.

In light of the involvement of District of Columbia–based officials in the challenged actions and the participation of a District of Columbia–based organization in this suit, the District of Columbia has both "'meaningful ties'" to the present controversy and a pronounced

"'interest in the parties [and] subject matter'" it concerns.  See Greater Yellowstone Coalition, 180 F. Supp. 2d at 128-29.  Contrary to the government's argument, therefore, plaintiffs would be significantly prejudiced were their legitimate choice of forum disturbed and this case transferred to the District of Wyoming.

**VI.    In Electing to First Seek the Transfer of this Court's Cases to Wyoming, Federal Defendants Disregard the Preference Owed to First-Filed Cases**

In describing the "procedural posture" of the District of Columbia and Wyoming cases as "identical[,]" see Defs.' Mem. at 17, federal defendants disregard a principle inherent in many of the cases upon which they rely in arguing that the risk of inconsistent judgments requires that this Court transfer its cases to Wyoming: when related cases are pending in separate fora, the cases should generally be consolidated in that Court in which the first of the cases was filed.  See Wash. Metro. Area Transit Auth. v. Ragonese, 617 F.2d 828, 830 (D.C. Cir. 1980) ("[W]here two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first[.]" (internal quotations omitted)); Church of Scientology of Ca. v. U.S. Dep't of the Army, 611 F.2d 738, 749 (9th Cir. 1979) ("In its classic formulation, the comity doctrine permits a district court to decline jurisdiction over a matter if a complaint has already been filed in another district."); Reiffin v. Microsoft Corp., 104 F. Supp. 2d 48, 56 (D.D.C. 2000) (transferring case to the forum of an earlier-filed proceeding in the interest of justice); Holland v. A.T. Massey Coal, 360 F. Supp. 2d 72, 77 (D.D.C. 2004) (same).[7]

---

[7] In another of the cases cited by defendants, Environmental Defense v. United States Department of Transportation, 2007 WL 1490478 (D.D.C. 2007), the Court gave the "first-filed" rule "little weight" where "both cases were filed on the same day within hours of each other." Id. *5 n.13.  This reasoning does not hold here, as this case was filed nearly a month before the first of the Wyoming cases.

Under this "first-filed" principle, the government should have first sought the transfer of the two cases pending in the District of Wyoming to this Court, as the first of those cases was filed almost a month after the litigation pending before this Court.  See Defs.' Exs. G, I, K, L (complaints and petitions).  The government's failure to honor this principle—indeed, the government's insistence throughout the history of the winter use litigation to first burden this Court with transfer motions—is further reason to deny the requested transfer.

## VII.    Federal Defendants Overstate the Risk of Conflicting Court Orders

Finally, the government's argument that transfer is required due to the risk of conflicting judgments that might arise absent transfer is overstated.  As this Court earlier concluded under nearly identical circumstances, the risk of such conflict is mitigated by the prospect that the District of Wyoming may transfer its cases to this district.  See Fund for Animals, 352 F. Supp. 2d at 2.  Should the cases proceed in both Courts, moreover, it is possible that the government will prevail on both fronts.  See id.  Regardless, as the government acknowledged in opposing ISMA's request to assert cross-claims as an intervenor in this action, the plaintiffs in the Wyoming and District of Columbia cases are presently pursuing distinct claims, reducing the likelihood of inconsistent judgments.  See Fed. Defs.' Mem. in Opp. to ISMA's Mot. to Intervene at 3 (Dkt. No. 26) ("ISMA's motion … seeks leave to intervene to assert against Federal Defendants identical affirmative claims in two distinct district courts.  This tactic presents an increased risk that the two courts will issue conflicting judgments because, if granted, both district courts will be called upon to address precisely the same legal claims and arguments.").  Ultimately, "there will likely be opportunities for both courts to tailor any eventual remedies to avoid conflicts."  Fund for Animals, 352 F. Supp. 2d at 2.  In short, defendants' concern regarding the risk of conflicting orders is inadequate to justify the

disturbance of plaintiffs' chosen forum.  See id.; Sparshott v. Feld Entertainment, Inc., 89 F.

Supp. 2d 1, 4 (D.D.C. 2000) ("[T]he mere existence of a related case in another forum is

insufficient grounds for transfer").

## CONCLUSION

Where venue is proper in plaintiffs' chosen forum, "[t]ransfer … under Section 1404(a)

must … be justified by particular circumstances that render the transferor forum inappropriate by

reference to the considerations specified in that statute.  Absent such circumstances, transfer in

derogation of properly laid venue is unwarranted."  Starnes v. McGuire, 512 F.2d 918, 925-26

(D.C. Cir. 1974) (en banc).  Because federal defendants have failed to meet their burden of

demonstrating the inappropriateness of this forum, their motion should be denied.

Respectfully submitted this 8th day of April, 2008.


_____/s/_____Sean M. Helle_____
Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
*Greater Yellowstone Coalition et al.*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                     )
GREATER YELLOWSTONE       )
COALITION, *et al*.,              )
                     )
       Plaintiffs,        )   Civ. No. 07-2111 (EGS)
                     )
      v.               )
                     )
DIRK KEMPTHORNE, *et al*.,    )
                     )
       Defendants.     )
_____)
                     )
NATIONAL PARKS CONSERVATION )
ASSOCIATION,             )
                     )
       Plaintiff,         )   Civ. No. 07-2112 (EGS)
                     )
      v.               )
                     )
UNITED STATES DEPARTMENT   )
OF THE INTERIOR, *et al*.,     )
                     )
       Defendants.     )
_____)

## [PROPOSED] ORDER

Having reviewed federal defendants' Motion to Transfer and plaintiffs' oppositions thereto, it is hereby ORDERED that federal defendants' motion is DENIED.

SO ORDERED this _____ day of _____, _____.


_____
EMMET G. SULLIVAN
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                    )
GREATER YELLOWSTONE      )
COALITION, *et al*.,          )
                    )
      Plaintiffs,      )     Civ. No. 07-2111 (EGS)
                    )
     v.            )
                    )
DIRK KEMPTHORNE, *et al*.,   )
                    )
      Defendants.    )
_____)
                    )
NATIONAL PARKS CONSERVATION  )
ASSOCIATION,          )
                    )
      Plaintiff,       )     Civ. No. 07-2112 (EGS)
                    )
     v.            )
                    )
UNITED STATES DEPARTMENT   )
OF THE INTERIOR, *et al*.,    )
                    )
      Defendants.    )
_____)

**DECLARATION OF SEAN M. HELLE IN SUPPORT OF THE**
**GREATER YELLOWSTONE COALITION PLAINTIFFS'**
**OPPOSITION TO TRANSFER**

I, Sean M. Helle, declare pursuant to 28 U.S.C. § 1746:

      1.     I am an attorney in good standing of the bar of the District of Columbia, and I am

employed as an associate attorney with Earthjustice.  I am one of the attorneys representing the

Greater Yellowstone Coalition plaintiffs in this action.  I have personal knowledge of the facts

stated in this declaration and, if called to testify, I would testify that the facts set forth here are true and correct.

2.     Attached as **Exhibit A** is a true and correct copy of the docket sheet for <u>Fund for Animals v. Babbitt</u>, Case No. 97-cv-1126 (EGS), obtained through the Court's electronic case filing system.

3.     Attached as **Exhibit B** is a true and correct copy of this Court's March 9, 2004 Order in <u>Fund for Animals v. Norton</u>, Case Nos. 02-2367 and 03-752 (EGS), obtained through the Court's electronic case filing system.

4.     Attached as **Exhibit C** is a true and correct copy of the November 4, 2004 Complaint in <u>Fund for Animals v. Norton</u>, Case No. 04-cv-1913 (EGS), obtained through the Court's electronic case filing system.

5.     Attached as **Exhibit D** is a true and correct copy of the November 10, 2004 Complaint in <u>Wyoming Lodging and Restaurant Association v. United States Department of the Interior</u>, Case No. 04-cv-315 (CAB) (D. Wyo.), obtained through the Court's electronic case filing system.

6.     Attached as **Exhibit E** is a true and correct copy of federal defendants' November 23, 2004 Consolidated Motion to Transfer, Consolidate, and Stay Proceedings in <u>Fund for Animals v. Norton</u>, 04-cv-1913 (EGS), obtained through the Court's electronic case filing system.

7.     Attached as **Exhibit F** is a true and correct copy of the Judicial Panel on Multidistrict Litigation's June 16, 2005 Order in <u>In re National Park Service Winter Use Management Litigation</u>, Docket No. 1681, obtained through the District of Wyoming's electronic case filing system.

8.      Attached as **Exhibit G** is a true and correct copy of a Department of the Interior, Fish and Wildlife and Parks November 19-25, 2006 internal schedule, obtained by plaintiffs through a December 2007 Freedom of Information Act request.

9.      Attached as **Exhibit H** is a true and correct copy of the public comment report on the National Park Service's 2007 Winter Use Plans Draft Environmental Impact Statement, available at http://www.nps.gov/yell/parkmgmt/upload/deis_results_draft2.pdf.

10.      Attached as **Exhibit I** is a true and correct copy of the public comment report on the National Park Service's 2007 proposed winter use rule, available at http://www.nps.gov/yell/parkmgmt/upload/comment_report_proposed_rule.pdf.

11.      Attached as **Exhibit J** are true and correct copies of internal Department of the Interior documents concerning the involvement of National Park Service Director Mary Bomar in the preparation of the winter use plan, obtained by plaintiffs through a December 2007 Freedom of Information Act request.

12.      Attached as **Exhibit K** are true and correct copies of internal Department of the Interior documents concerning the involvement of Deputy Secretary of the Interior Lynn Scarlett in the preparation of the winter use plan, obtained by plaintiffs through a December 2007 Freedom of Information Act request.

13.      Attached as **Exhibit L** are true and correct copies of internal Department of the Interior documents concerning the involvement of Secretary of the Interior Dirk Kempthorne in the preparation of the winter use plan, obtained by plaintiffs through a December 2007 Freedom of Information Act request.  Suzanne Lewis, referenced in the documents, is Superintendent of Yellowstone National Park.

14.     Attached as **Exhibit M** are true and correct copies of internal Department of the Interior documents concerning the involvement of the Council on Environmental Quality in the preparation of the winter use plan, obtained by plaintiffs through a December 2007 Freedom of Information Act request.

15.     Attached as **Exhibit N** is a true and correct copy of an internal Department of the Interior document concerning the possibility of White House involvement in the winter use plan, obtained by plaintiffs through a December 2007 Freedom of Information Act request.

I declare under penalty of perjury that the foregoing is true and correct.  Executed April 8, 2008 in Bozeman, Montana.

_/s/    Sean M. Helle_____

CLOSED, TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:97-cv-01126-EGS

| | |
|---|---|
| THE FUND FOR ANIMALS, et al v. BABBITT, et al | Date Filed: 05/20/1997 |
| Assigned to: Judge Emmet G. Sullivan | Date Terminated: 11/15/2001 |
| Demand: $0 | Jury Demand: None |
| Cause: 42:4321 Review of Agency Action-Environment | Nature of Suit: 893 Environmental Matters |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**FUND FOR ANIMALS, INC.**          represented by **Eric Robert Glitzenstein**
MEYER GLITZENSTEIN &
CRYSTAL
1601 Connecticut Avenue, NW
Washington, DC 20009
(202) 588-5206
Fax: (202) 588-5049
Email: eric@meyerglitz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Howard M. Crystal**
MEYER GLITZENSTEIN &
CRYSTAL
1601 Connecticut Avenue, NW
Suite 700
Washington, DC 20009
(202) 588-5206
Fax: (202) 588-5049
Email: howardcrystal@meyerglitz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BIODIVERSITY LEGAL
FOUNDATION**          represented by **Eric Robert Glitzenstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Howard M. Crystal**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PREDATOR PROJECT**                    represented by   **Eric Robert Glitzenstein**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Howard M. Crystal**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ECOLOGY CENTER**                      represented by   **Eric Robert Glitzenstein**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Howard M. Crystal**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**BILL WILLARS**                        represented by   **Eric Robert Glitzenstein**
*DR.*                                                    (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Howard M. Crystal**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**WALT FARMER**                         represented by   **Eric Robert Glitzenstein**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Howard M. Crystal**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEORGE WUERTHNER**                    represented by   **Eric Robert Glitzenstein**
                                                         (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Howard M. Crystal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PHILLIP KNIGHT**                    represented by  **Eric Robert Glitzenstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Howard M. Crystal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RICHARD MEIS**                      represented by  **Eric Robert Glitzenstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Howard M. Crystal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BRUCE BABBITT**                     represented by  **Geoffrey Garver**
*Secretary, U.S. Department of the*                   UNITED STATES DEPARTMENT OF
*Interior*                                            JUSTICE
                                                      Environment and Natural Resources
                                                      P.O. Box 663
                                                      Washington, DC 20044
                                                      (202) 305-0481
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Martin J. Lalonde**
                                                      UNITED STATES DEPARTMENT OF
                                                      JUSTICE
                                                      Environment and Natural Resources
                                                      Natural Resources Section
                                                      P.O. Box 663

Washington, DC 20044
(202) 305-0247
Fax: 202-305-8271
Email: martin.lalonde@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DENIS GALVIN**
*Acting Deputy Director, National Park
Service*

represented by **Geoffrey Garver**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martin J. Lalonde**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JACK NECKELS**
*Superintendent, Grand Tenton National
Park*

represented by **Geoffrey Garver**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martin J. Lalonde**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL FINLEY**
*Superintendents, Yellowstone National
Park*

represented by **Geoffrey Garver**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martin J. Lalonde**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN ROGERS**
*Acting Director, U.S. Fish and Wildlife
Service*

represented by **Geoffrey Garver**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martin J. Lalonde**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**MONTANA SNOWMOBILE
ASSOCIATION**

**Intervenor Defendant**

| | | |
|---|---|---|
| **EDWARD P. DOUGHERTY** | represented by | **Douglas Scott Burdin**
Safari Club International
501 2nd Street, NE
Washington, DC 20002
(202) 543-8733
Fax: 202-543-1205
Email: dburdin@sci-dc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Turcke**
MOORE & MCFADDEN
999 Main Street
Suite 910
Roise, ID 83703
*ATTORNEY TO BE NOTICED*

**Susan E. Buxton**
2225 North 9th Street
Suite 420
Boise, ID 83702
(208) 331-1800
*ATTORNEY TO BE NOTICED*

**William P. Horn**
BIRCH, HORTON, BITTNER AND
CHEROT
1155 Connecticut Avenue, NW
Suite 1200
Washington, DC 20036
(202) 659-5800
Fax: (202) 659-1027
Email: whorn@dc.bhb.com |

**Intervenor Defendant**

| | | |
|---|---|---|
| **YELLOWSTONE TOUR &
TRAVEL** | represented by | **Douglas Scott Burdin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Turcke**
(See above for address) |

*ATTORNEY TO BE NOTICED*

**Susan E. Buxton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**THE TOWN OF WEST YELLOWSTONE**                    represented by    **Douglas Scott Burdin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Turcke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Susan E. Buxton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**THE WEST YELLOWSTONE CHAMBER OF COMMERCE**                    represented by    **Douglas Scott Burdin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Turcke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Susan E. Buxton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**AMERICAN COUNCIL OF SNOWMOBILE ASSOCIATIONS**                    represented by    **Douglas Scott Burdin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Turcke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Susan E. Buxton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**BLUE RIBBON COALITION, INC.**                    represented by    **Douglas Scott Burdin**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Turcke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Susan E. Buxton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**ROY N. BROWN**                    represented by    **Douglas Scott Burdin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Turcke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Susan E. Buxton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**THE MONTANA SNOWMOBILE**          represented by    **Douglas Scott Burdin**
**ASSOCIATION**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Turcke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Susan E. Buxton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**YELLOWSTONE OUTDOOR**             represented by    **Michael J. Brennan**
**RECREATION SOLUTIONS**
*A Wyoming non-profit corporation*                   HOLLAND & HART
175 South King Street
P.O. Box 68
Suite 2
Jackson, WY 83001
(307) 739-9741
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula A. Fleck**
HOLLAND & HART
175 South King Street
P.O. Box 68
Suite 2
Jackson, WY 83001
(307) 739-9741
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**JIM HULSEY**                    represented by   **Michael J. Brennan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula A. Fleck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**BEN WEEKS**                     represented by   **Michael J. Brennan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula A. Fleck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**JAMES ZIMMERMAN**               represented by   **Michael J. Brennan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula A. Fleck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**JOSEPHINE WAGNER**              represented by   **Michael J. Brennan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Paula A. Fleck
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**DAN BESS**                    represented by    **Michael J. Brennan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Paula A. Fleck
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**WILLIAM MCCANDLESS**          represented by    **Michael J. Brennan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Paula A. Fleck
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/20/1997 | 1 | COMPLAINT filed by plaintiff THE FUND FOR ANIMALS, plaintiff BIODIVERSITY LEGAL, plaintiff PREDATOR PROJECT, plaintiff ECOLOGY CENTER, plaintiff BILL WILLARS, plaintiff WALT FARMER, plaintiff GEORGE WUERTHNER, plaintiff PHILLIP KNIGHT, plaintiff RICHARD MEIS (tw) (Entered: 05/27/1997) |
| 05/20/1997 | | SUMMONS (7) issued to federal party(s) federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS , and non-parties: U.S. Attorney and U.S. Attorney General. (tw) (Entered: 05/27/1997) |
| 05/20/1997 | 2 | RULE 109 Certificate of disclosure of corporate affiliations and financial interests by plaintiffs (tw) (Entered: 05/27/1997) |
| 07/14/1997 | 3 | (UNOPPOSED) MOTION filed by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS to extend time to 8/8/9 to answer complaint [1-1] (bjsp) Modified on 07/15/1997 (Entered: 07/15/1997) |
| 07/16/1997 | 4 | ORDER by Judge Emmet G. Sullivan : granting motion to extend time to |

| | | |
|---|---|---|
| | | 8/8/9 to answer complaint [1-1] [3-1] by federal defendantssss ; Answer extended to 8/8/97 for JOHN ROGERS, for MICHAEL FINLEY, for JACK NECKELS, for DENIS GALVIN, for BRUCE BABBITT (N) (clv) (Entered: 07/16/1997) |
| 07/16/1997 | | SCHEDULING NOTICE: Initial Status Conference set for 10:00 9/10/97 . Meet Confer Statement due 9/8/97 . before Judge Emmet G. Sullivan . (clv) (Entered: 07/16/1997) |
| 08/05/1997 | 5 | (SECOND) (UNOPPOSED) MOTION filed by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS to extend time to 8/22/97 to answer complaint [1-1] (bjsp) (Entered: 08/06/1997) |
| 08/05/1997 | 6 | ATTORNEY APPEARANCE for federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS by (bjsp) (Entered: 08/06/1997) |
| 08/05/1997 | 7 | MOTION filed for EDWARD P. DOUGHERTY, ROY N. BROWN, YELLOWSTONE TOUR, TOWN OF YELLOWSTONE, YELLOWSTONE COMMERCE, AMER. COUNCIL ASSOC., MONTANA ASSOC., BLUE RIBBON COAL. to intervene in this case as defendant-intervenor EXHIBIT (motions to be admitted pro hav vice) (bjsp) (Entered: 08/07/1997) |
| 08/05/1997 | 8 | MOTION (UNOPPOSED) filed by movant for Susan E. Buxton to appear pro hac vice ( 999 Main Street, Suite 910, Boise, ID 83702, (208) 331-1800) ( filed per chambers) (cjp) Modified on 08/19/1997 (Entered: 08/19/1997) |
| 08/05/1997 | 9 | MOTION (UNOPPOSED) filed by movant EDWARD P. DOUGHERTY, movant ROY N. BROWN, movant YELLOWSTONE TOUR, movant TOWN OF YELLOWSTONE, movant YELLOWSTONE COMMERCE, movant AMER. COUNCIL ASSOC., movant MONTANA ASSOC., movant BLUE RIBBON COAL. for Paul A. Turcke to appear pro hac vice ( 999 Main Street, Suite 910, Boise, ID 83702, (208) 331-1800) (file per chambers) (cjp) Modified on 08/19/1997 (Entered: 08/19/1997) |
| 08/08/1997 | 10 | ORDER James Robertsons for Emmet G. Sullivan : granting motion to extend time to 8/22/97 to answer complaint [1-1] [5-1] by JOHN ROGERS, MICHAEL FINLEY, JACK NECKELS, DENIS GALVIN, BRUCE BABBITT ; Answer extended to 8/8/97; parties shall file their meet and confer statement pursuant to Local Rule 206 by no laterthan 9/8/97; scheduling initial scheduling conference for 9/12/97 at 10:00 a.m. in Courtroom #11 (N) (jwd) Modified on 08/26/1997 (Entered: 08/08/1997) |
| 08/12/1997 | 11 | RETURN OF SERVICE/AFFIDAVIT of summons and complaint executed on 5/22/97 upon federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal |

| | | |
|---|---|---|
| | | defendant MICHAEL FINLEY, federal defendant JOHN ROGERS ; green cards received dated and signed (bjsp) Modified on 08/19/1997 (Entered: 08/13/1997) |
| 08/12/1997 | 12 | RETURN OF SERVICE/AFFIDAVIT of summons and complaint executed upon U.S. Attorney on 5/20/97 (bjsp) Modified on 08/19/1997 (Entered: 08/13/1997) |
| 08/12/1997 | 13 | RETURN OF SERVICE/AFFIDAVIT of summons and complaint executed upon U.S. Attorney General on 5/22/97 (bjsp) Modified on 08/19/1997 (Entered: 08/13/1997) |
| 08/15/1997 | 14 | RESPONSE by federal defendants' to motion for EDWARD P. DOUGHERTY, ROY N. BROWN, YELLOWSTONE TOUR, TOWN OF YELLOWSTONE, YELLOWSTONE COMMERCE, AMER. COUNCIL ASSOC., MONTANA ASSOC., BLUE RIBBON COAL. to intervene in this case as defendant-intervenor [7-1] (JMF) Modified on 08/19/1997 (Entered: 08/18/1997) |
| 08/15/1997 | 15 | ORDER by Judge Emmet G. Sullivan : granting motion for Susan E. Buxton to appear pro hac vice ( 999 Main Street, Suite 910, Boise, ID 83702, (208) 331-1800) [15-1] by movants (N) (cjp) Modified on 08/19/1997 (Entered: 08/19/1997) |
| 08/15/1997 | 16 | ORDER by Judge Emmet G. Sullivan : granting motion for Paul A. Turcke to appear pro hac vice ( 999 Main Street, Suite 910, Boise, ID 83702, (208) 331-1800) [16-1] by movants (N) (cjp) Modified on 08/19/1997 (Entered: 08/19/1997) |
| 08/18/1997 | 17 | RESPONSE by plaintiff in opposition to motion for EDWARD P. DOUGHERTY, ROY N. BROWN, YELLOWSTONE TOUR, TOWN OF YELLOWSTONE, YELLOWSTONE COMMERCE, AMER. COUNCIL ASSOC., MONTANA ASSOC., BLUE RIBBON COAL. to intervene in this case as defendant-intervenor [7-1] . (JMF) (Entered: 08/19/1997) |
| 08/20/1997 | 18 | NOTICE OF FILING by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS to the Court RE: the filing of a transcript of the NEbbia hearing referred to in memorandum in support of defendant's futher motion to dismiss ; attachments (bjsp) (Entered: 08/21/1997) |
| 08/22/1997 | 19 | ANSWER TO COMPLAINT [1-1] by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS . (bjsp) (Entered: 08/25/1997) |
| 08/28/1997 | 20 | REPLY by movant EDWARD P. DOUGHERTY to defendants opposition to motion for EDWARD P. DOUGHERTY, ROY N. BROWN, YELLOWSTONE TOUR, TOWN OF YELLOWSTONE, YELLOWSTONE COMMERCE, AMER. COUNCIL ASSOC., MONTANA ASSOC., BLUE RIBBON COAL. to intervene in this case |

|  |  | as defendant-intervenor [7-1] (bjsp) (Entered: 08/29/1997) |
|---|---|---|
| 08/28/1997 | 21 | ORDER by Judge Emmet G. Sullivan : granting motion for EDWARD P. DOUGHERTY, ROY N. BROWN, YELLOWSTONE TOUR, TOWN OF YELLOWSTONE, YELLOWSTONE COMMERCE, AMER. COUNCIL ASSOC., MONTANA ASSOC., BLUE RIBBON COAL. to intervene in this case as defendant-intervenor [7-1] (N) (jwd) (Entered: 08/29/1997) |
| 08/28/1997 | 23 | MOTION filed for YELLOWSTONE REC., JIM HULSEY, BEN WEEKS, JAMES ZIMMERMAN, JOSEPHINE WAGNER, DAN BESS, WILLAM MCCANDLESS to intervene in this case as defendants exhibits (6); EXHIBIT ANSWER (fiat) SULLIVAN, J. (bjsp) Modified on 09/02/1997 (Entered: 09/02/1997) |
| 08/31/1997 | 22 | ORDER by Judge Emmet G. Sullivan : vacating the Court's order of 8/28/97 (N) (jaw) (Entered: 09/02/1997) |
| 09/02/1997 | 24 | ERRATA by movant DAN BESS to the Court of a copy of Concession Permit No. LP JODR009-88 which was inadvertently omitted to attach as Exhibit A to the affidavit of Dan Bess which was appended as exhibit F to the recently filed motion to intervene as defendants in this case ; attachments (bjsp) (Entered: 09/03/1997) |
| 09/04/1997 |  | SCHEDULING NOTICE: rescheduling status hearing set for 10:00 to 2:00 9/12/97 ; before Judge Emmet G. Sullivan Courtroom #11, Fourth Floor. (jwd) (Entered: 09/04/1997) |
| 09/08/1997 | 25 | RESPONSE by plaintiff THE FUND FOR ANIMALS, plaintiff BIODIVERSITY LEGAL, plaintiff PREDATOR PROJECT, plaintiff ECOLOGY CENTER, plaintiff BILL WILLARS, plaintiff WALT FARMER, plaintiff GEORGE WUERTHNER, plaintiff PHILLIP KNIGHT, plaintiff RICHARD MEIS in opposition to motion for YELLOWSTONE REC., JIM HULSEY, BEN WEEKS, JAMES ZIMMERMAN, JOSEPHINE WAGNER, DAN BESS, WILLAM MCCANDLESS to intervene in this case as defendants [23-1] . (bjsp) (Entered: 09/09/1997) |
| 09/08/1997 | 26 | JOINT MEET AND CONFER STATEMENT/REPORT PURSUANT TO L.R. 206(d) filed by plaintiff THE FUND FOR ANIMALS, plaintiff BIODIVERSITY LEGAL, plaintiff PREDATOR PROJECT, plaintiff ECOLOGY CENTER, plaintiff BILL WILLARS, plaintiff WALT FARMER, plaintiff GEORGE WUERTHNER, plaintiff PHILLIP KNIGHT, plaintiff RICHARD MEIS, federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS . (bjsp) (Entered: 09/09/1997) |
| 09/09/1997 | 27 | MOTION filed by movant YELLOWSTONE REC., movant JIM HULSEY, movant BEN WEEKS, movant JAMES ZIMMERMAN, movant JOSEPHINE WAGNER, movant DAN BESS, movant WILLAM MCCANDLESS for a Court's order allowing defenants (mov) and their attorney to appear at the scheduling conference set for 9/12/97 (bjsp) |

| | | (Entered: 09/10/1997) |
|---|---|---|
| 09/09/1997 | 28 | MOTION filed by movant YELLOWSTONE REC., movant JIM HULSEY, movant BEN WEEKS, movant JAMES ZIMMERMAN, movant JOSEPHINE WAGNER, movant DAN BESS, movant WILLAM MCCANDLESS for a Court's order permitting movants in this case to correct the intervention pleadings filed on behalf of applicants specifically applicants' motion for intervention as defendants, applicants' point and authorities in support of motion to intervene as defendants and applicants answer EXHIBITS (motion to intervene and answer) (bjsp) (Entered: 09/10/1997) |
| 09/12/1997 | | STATUS HEARING before Judge Emmet G. Sullivan : Tele-conference set for 12:00 9/24/97 Reporter: Wm. McAllister (clv) (Entered: 09/12/1997) |
| 09/15/1997 | 29 | ORDER by Judge Emmet G. Sullivan : granting motion for a Court's order permitting movants in this case to correct the intervention pleadings filed on behalf of applicants specifically applicants' motion for intervention as defendants, applicants' point and authorities in support of motion to intervene as defendants and applicants answer [28-1] by movantssssss (N) (clv) (Entered: 09/15/1997) |
| 09/15/1997 | 30 | ORDER by Judge Emmet G. Sullivan : granting applicant's motion by Paula A. Fleck to appear on behalf of the applicants at the scheduling conferenc eto be held on 9/12/97; (N) (clv) (Entered: 09/15/1997) |
| 09/18/1997 | 31 | MOTION filed by movant YELLOWSTONE REC., movant JIM HULSEY, movant BEN WEEKS, movant JAMES ZIMMERMAN, movant JOSEPHINE WAGNER, movant DAN BESS, movant WILLAM MCCANDLESS for Michael J. Brennan, to appear pro hac vice ( 555 17th St, Suite 3200, Denver, CO, (303) 295 8000 , ) (bjsp) (Entered: 09/19/1997) |
| 09/18/1997 | 32 | MOTION filed by movant YELLOWSTONE REC., movant JIM HULSEY, movant BEN WEEKS, movant JAMES ZIMMERMAN, movant JOSEPHINE WAGNER, movant DAN BESS, movant WILLAM MCCANDLESS for Paula A. Fleck, to appear pro hac vice ( HOLLAND & HART, 555 17th, Suite 3200, Denver, CO, 80202, (303) 295-8000) (bjsp) (Entered: 09/19/1997) |
| 09/23/1997 | 36 | JOINT MOTION by plaintiff THE FUND FOR ANIMALS, plaintiff BIODIVERSITY LEGAL, plaintiff PREDATOR PROJECT, plaintiff ECOLOGY CENTER, plaintiff BILL WILLARS, plaintiff WALT FARMER, plaintiff GEORGE WUERTHNER, plaintiff PHILLIP KNIGHT, plaintiff RICHARD MEIS, federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS, movant EDWARD P. DOUGHERTY, movant ROY N. BROWN, movant YELLOWSTONE TOUR, movant TOWN OF YELLOWSTONE, movant YELLOWSTONE COMMERCE, movant AMER. COUNCIL ASSOC., movant MONTANA ASSOC., movant |

| | | |
|---|---|---|
| | | BLUE RIBBON COAL., movant YELLOWSTONE REC., movant JIM HULSEY, movant BEN WEEKS, movant JAMES ZIMMERMAN, movant JOSEPHINE WAGNER, movant DAN BESS, movant WILLAM MCCANDLESS to dismiss complaint [1-1] , and for approval of settlement agreement (bjsp) (Entered: 09/24/1997) |
| 09/24/1997 | 33 | ORDER by Judge Emmet G. Sullivan : granting motion for Paula A. Fleck, to appear pro hac vice ( HOLLAND & HART, 555 17th, Suite 3200, Denver, CO, 80202, (303) 295-8000) [32-1] by movant (N) (clv) (Entered: 09/24/1997) |
| 09/24/1997 | 34 | ORDER by Judge Emmet G. Sullivan : granting motion for Michael J. Brennan, to appear pro hac vice ( 555 17th St, Suite 3200, Denver, CO, (303) 295 8000 , ) [31-1] by movant (N) (clv) (Entered: 09/24/1997) |
| 09/24/1997 | 35 | ORDER by Judge Emmet G. Sullivan : directing that the motions of both applicant-intervenors for intervention as of right in this matter are taken under advisement pending further notification of the progress of settlement negotiations; telephonic status conference will be held on 9/24/97 12:00 noon; (N) (clv) (Entered: 09/24/1997) |
| 09/25/1997 | | SCHEDULING NOTICE: motion hearing set for 11:00 10/27/97 ; before Judge Emmet G. Sullivan . (clv) (Entered: 09/25/1997) |
| 09/25/1997 | 37 | REPLY by movant YELLOWSTONE REC., movant JIM HULSEY, movant BEN WEEKS, movant JAMES ZIMMERMAN, movant JOSEPHINE WAGNER, movant DAN BESS, movant WILLAM MCCANDLESS to plaintiffs' response to motion for YELLOWSTONE REC., JIM HULSEY, BEN WEEKS, JAMES ZIMMERMAN, JOSEPHINE WAGNER, DAN BESS, WILLAM MCCANDLESS to intervene in this case as defendants [23-1] (bjsp) (Entered: 09/26/1997) |
| 10/01/1997 | 38 | ORDER by Judge Emmet G. Sullivan : applicant-intervenors comments on plaintiffs and defendants proposed settlement agreement due by 10/6/97; responses due by 10/10/97; replies due by 10/14/97; status hearing set for 11:00 10/27/97 ; (N) (clv) (Entered: 10/01/1997) |
| 10/06/1997 | 39 | COMMENTS AND OBJECTIONS by movant EDWARD P. DOUGHERTY, movant ROY N. BROWN, movant YELLOWSTONE TOUR, movant TOWN OF YELLOWSTONE, movant YELLOWSTONE CHAMBER, movant AMER. COUN. ASSOC. to the Court RE: proposed settlement agreement and motion to approve settlement and to dismiss this action ; exhibits 14 [38-1], order [38-2] (bjsp) (Entered: 10/07/1997) |
| 10/06/1997 | 40 | MEMORANDUM by movant EDWARD P. DOUGHERTY, movant ROY N. BROWN, movant YELLOWSTONE TOUR, movant TOWN OF YELLOWSTONE, movant YELLOWSTONE CHAMBER, movant AMER. COUN. ASSOC. to the Court addressing procedural and legal issues raised by the joint motion for dismissal and approval of settlement agreement (bjsp) (Entered: 10/07/1997) |
| 10/06/1997 | 41 | MOTION filed by movant EDWARD P. DOUGHERTY, movant ROY |

| | | |
|---|---|---|
| | | N. BROWN, movant YELLOWSTONE TOUR, movant TOWN OF YELLOWSTONE, movant YELLOWSTONE CHAMBER, movant AMER. COUN. ASSOC., movant MT SNOWMOBILE ASSOC. to transfer case to District of Montana ; exhibits 2 (bjsp) (Entered: 10/07/1997) |
| 10/06/1997 | 42 | NOTICE OF FILING by movant YELLOWSTONE REC., movant JIM HULSEY, movant BEN WEEKS, movant JAMES ZIMMERMAN, movant JOSEPHINE WAGNER, movant DAN BESS, movant WILLAM MCCANDLESS to the Court RE: comments on parties proposed settlement agreement ; exhibits 5 (bjsp) (Entered: 10/07/1997) |
| 10/07/1997 | 43 | ERRATA by movant YELLOWSTONE REC., movant JIM HULSEY, movant BEN WEEKS, movant JAMES ZIMMERMAN, movant JOSEPHINE WAGNER, movant DAN BESS, movant WILLAM MCCANDLESS to the Court of the filing of an original affidavit of Robert Coe, a copy of which was filed last week as exhibit E in applicant intervenors movants proposed settlement agreement ; affidavits (1)_ (bjsp) (Entered: 10/08/1997) |
| 10/08/1997 | | SCHEDULING NOTICE: motion hearing set for 10:00 10/27/97 ; before Judge Emmet G. Sullivan . (clv) (Entered: 10/08/1997) |
| 10/10/1997 | 44 | RESPONSE by plaintiff THE FUND FOR ANIMALS, plaintiff BIODIVERSITY LEGAL, plaintiff PREDATOR PROJECT, plaintiff ECOLOGY CENTER, plaintiff BILL WILLARS, plaintiff WALT FARMER, plaintiff GEORGE WUERTHNER, plaintiff PHILLIP KNIGHT, plaintiff RICHARD MEIS to the comments of proposed intervenors Yellowstone ex al, and objections and legal memorandum of proposed intervenors Edward Dougherty, et al [42-1] by movant, notice [40-1] by movant, objection [39-1] by movant ; attachments 1 (bjsp) (Entered: 10/14/1997) |
| 10/10/1997 | 45 | RESPONSE by plaintiff THE FUND FOR ANIMALS, plaintiff BIODIVERSITY LEGAL, plaintiff PREDATOR PROJECT, plaintiff ECOLOGY CENTER, plaintiff BILL WILLARS, plaintiff WALT FARMER, plaintiff GEORGE WUERTHNER, plaintiff PHILLIP KNIGHT, plaintiff RICHARD MEIS, federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS to to file notice [42-1] by movant, notice [40-1] by movant, objection [39-1] by movant to intervenor applicants' comments and objections regarding the parties' proposed settlement and joint motion for dismissal and for approval of settlement agreement (bjsp) (Entered: 10/14/1997) |
| 10/14/1997 | 46 | REPLY by movant YELLOWSTONE REC., movant JIM HULSEY, movant BEN WEEKS, movant JAMES ZIMMERMAN, movant JOSEPHINE WAGNER, movant DAN BESS, movant WILLAM MCCANDLESS to parties' response to YOR's comments on proposed settlement agreement RE: joint motion for approval of settlement agreement [36-2] by movant, federal defendant, plaintiff (bjsp) (Entered: |

| | | 10/14/1997) |
|---|---|---|
| 10/14/1997 | 47 | REPLY COMMENTS by movant EDWARD P. DOUGHERTY, movant ROY N. BROWN, movant YELLOWSTONE TOUR, movant TOWN OF YELLOWSTONE, movant YELLOWSTONE CHAMBER, movant AMER. COUN. ASSOC., movant MT SNOWMOBILE ASSOC., movant BLUE RIBBON COAL. to the Court RE: federal defendants and plaintiffs responses to movants proposed settlement agreement and joint motion to dismiss of plaintiffs and defendants [40-1]; objection comments to proposed settlement agreement [39-1] by movants' (bjsp) (Entered: 10/15/1997) |
| 10/15/1997 | 48 | NOTICE OF FILING by movant EDWARD P. DOUGHERTY to the Court RE: the filing of a declaration of Edward P. Dougherty and a affidavit of Clyde G. Seely (bjsp) (Entered: 10/15/1997) |
| 10/27/1997 | | MOTION HEARING before Judge Emmet G. Sullivan by movant motion to transfer case to District of Montana [41-1] heard, by movant, federal defendant, plaintiff joint motion to dismiss complaint [1-1] [36-1] heard, by movant, federal defendant, plaintiff joint motion for approval of settlement agreement [36-2] heard, motion for YELLOWSTONE REC., JIM HULSEY, BEN WEEKS, JAMES ZIMMERMAN, JOSEPHINE WAGNER, DAN BESS, WILLAM MCCANDLESS to intervene in this case as defendants [23-1] heard; chambers to issue order; Reporter: Harry Deutsch (clv) (Entered: 10/27/1997) |
| 10/27/1997 | 49 | NOTICE OF FILING by movant EDWARD P. DOUGHERTY to the Court RE: the filing of supplemetal exhibits to DOUGHERTY intervenors' comments exhibits (2) labled exhibit C and exhibit D (bjsp) (Entered: 10/28/1997) |
| 10/29/1997 | 50 | ORDER by Judge Emmet G. Sullivan : denying motion to transfer case to District of Montana [41-1] by movant, denying joint motion to dismiss complaint [1-1] [36-1] by movant, federal defendant, plaintiff, denying motion for YELLOWSTONE REC., JIM HULSEY, BEN WEEKS, JAMES ZIMMERMAN, JOSEPHINE WAGNER, DAN BESS, WILLAM MCCANDLESS to intervene in this case as defendants [23-1] granting joint motion for approval of settlement agreement [36-2] by movant, federal defendant, plaintiff; the Federal Defendants shall pay plaintiffs $11,000.00 payable to plaintifs' counsel, in full settlement; (N) (clv) (Entered: 10/29/1997) |
| 10/29/1997 | 51 | NOTICE OF FILING (ADDENDUM TO SETTLEMENT AGREEMENT) by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS to the Court RE: applicants for intervention expressed desire to be informed of certain future developments that could occur under the parties 9/23/97 settlement agreement (fiat) SULLIVAN, J. (bjsp) (Entered: 10/30/1997) |
| 11/08/1997 | 52 | TRANSCRIPT filed for date(s) of 9/12/97. Reporter: William McAllister (bjsp) (Entered: 11/10/1997) |

| 12/01/1997 | 53 | TRANSCRIPT filed for date(s) of 10/27/97. Reporter: Harry Deutsch (bjsp) (Entered: 12/02/1997) |
|---|---|---|
| 12/29/1997 | 54 | ORDER by Judge Emmet G. Sullivan : approving the modification to settlement agreement; (N) (clv) (Entered: 12/29/1997) |
| 01/08/1998 | 55 | ORDER by Judge Emmet G. Sullivan :directing that copies of letters received in chambers be forwarded to counsel for the parties; (N) (clv) (Entered: 01/08/1998) |
| 01/20/1998 | 56 | NOTICE OF FILING by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS to the Court RE: the filing of a 12/17/97 Court order in District of Montana case and Severe Winter Road Closure and Bison Feeding Contingency Plan Report (fiat) SULLIVAN, J. ; attachments (bjsp) Modified on 01/21/1998 (Entered: 01/21/1998) |
| 03/27/1998 | 57 | (REQUEST)`MOTION filed by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS for the Court to modify the schedule under settlement agreement ; declarations (1) (bjsp) (Entered: 03/30/1998) |
| 03/30/1998 | 58 | ERRATA by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS to the Court RE: the filing on an original declaration of Marvin O. Jensen ; attachment (bjsp) (Entered: 03/31/1998) |
| 03/31/1998 | 59 | RESPONSE by plaintiff THE FUND FOR ANIMALS, plaintiff BIODIVERSITY LEGAL, plaintiff PREDATOR PROJECT, plaintiff ECOLOGY CENTER, plaintiff BILL WILLARS, plaintiff WALT FARMER, plaintiff GEORGE WUERTHNER, plaintiff PHILLIP KNIGHT, plaintiff RICHARD MEIS in opposition to motion for the Court to modify the schedule under settlement agreement [57-1] by JOHN ROGERS, MICHAEL FINLEY, JACK NECKELS, DENIS GALVIN, BRUCE BABBITT . ; exhibits (2) (bjsp) (Entered: 04/01/1998) |
| 04/02/1998 | 60 | ORDER by Judge Emmet G. Sullivan : granting in part, denying in part motion for the Court to modify the schedule under settlement agreement [57-1] (N) (clv) (Entered: 04/02/1998) |
| 06/03/1998 | 61 | STIPULATED ORDER by Judge Emmet G. Sullivan : dismissing 98-428, this case is reinstated; the complaint filed in C.A. 98-428 is hereby deemed to be re-filed, nunc pro tunc, as plaintiff's supplemental complaint in this case; defendant's answer in C.A. 98-428 is hereby deemed to be refiled, nunc pro tunc, as defendant's supplemental answer in this case; defendant's motion for summary judgment, statement of material facts, memorandum of points and authorities in support of defendant's motion for summary judgment, proposed order and administrative record in C.A. 98-428 are hereby deemed as re-filed, nunc |

| | | |
|---|---|---|
| | | pro tunc in this case; motion of intervenor-applicants Edward Dougherty, et al to intervene in C.A. 98-428 is denied; they are granted leave to file a renewed motion to intervene in this case; plaintiff's consolidated motion for summary judgment is due by 6/24/98; defendants response to motion for summary judgement and reply to plaintiffs' response to defendants' motion for summary judgment shall be filed by 7/22/98; plaintiff's reply to defendants' response to plaintiff's consolidated motion for summary judgment and for enforcement of the settlement agreement shall be filed no later than 8/12/98; motion hearing set for 10/16/98 at 10:00 a.m. (N) (clv) Modified on 07/24/1998 (Entered: 06/03/1998) |
| 06/03/1998 | | Case Reopened (clv) (Entered: 06/03/1998) |
| 06/03/1998 | 76 | ANSWER TO COMPLAINT [75-1] by federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS .; (previously filed in CA 98-428, filed in this case pursuant to the Court's order dated 6/3/98; nunc pro tunc to 4/20/98) (clv) (Entered: 07/24/1998) |
| 06/08/1998 | 62 | MOTION filed by movant EDWARD P. DOUGHERTY, movant ROY N. BROWN, movant YELLOWSTONE TOUR, movant TOWN OF YELLOWSTONE, movant YELLOWSTONE CHAMBER, movant AMER. COUN. ASSOC., movant MT SNOWMOBILE ASSOC., movant BLUE RIBBON COAL. for the Court to let them intervene in this case presently they are movants in this case EXHIBIT (answer) ; EXHIBIT (motion for summary judgment) ; exhibits (1) (bjsp) Modified on 07/17/1998 (Entered: 06/09/1998) |
| 06/23/1998 | 63 | MOTION (UNOPPOSED) filed by plaintiff THE FUND FOR ANIMALS, plaintiff BIODIVERSITY LEGAL, plaintiff PREDATOR PROJECT, plaintiff ECOLOGY CENTER, plaintiff BILL WILLARS, plaintiff WALT FARMER, plaintiff GEORGE WUERTHNER, plaintiff PHILLIP KNIGHT, plaintiff RICHARD MEIS for an order to incorporate previously filed opposition to motion to inervene into this proceeding (bjsp) (Entered: 06/24/1998) |
| 06/24/1998 | 69 | MOTION filed by plaintiff THE FUND FOR ANIMALS, plaintiff BIODIVERSITY LEGAL, plaintiff PREDATOR PROJECT, plaintiff ECOLOGY CENTER, plaintiff BILL WILLARS, plaintiff WALT FARMER, plaintiff GEORGE WUERTHNER, plaintiff PHILLIP KNIGHT, plaintiff RICHARD MEIS, federal defendant BRUCE BABBITT for summary judgment , and for a Court's order to enforce settlement agreement (bjsp) (Entered: 07/15/1998) |
| 06/26/1998 | 64 | MOTION (UNOPPOSED) filed by plaintiff to reschedule the 10/16/98 argument date to 10/1,2,6-9,14 (st) (Entered: 06/29/1998) |
| 06/29/1998 | 65 | ORDER by Judge Emmet G. Sullivan : granting motion for an order to incorporate previously filed opposition to motion to inervene into this proceeding [63-1] by plaintiff; and directing that pltfs' 5/8/98 opposition to motion to interven in Fund for Animals v. Babbitt CA 98-428 shall be deemed re-filed in this case (N) (jaw) (Entered: 06/29/1998) |
| | | |

| 06/30/1998 | 66 | ORDER by Judge Emmet G. Sullivan : granting motion to reschedule the 10/16/98 argument date to 10/9/98 at 10:00 [64-1] by plaintiff (N) (clv) (Entered: 07/01/1998) |
|---|---|---|
| 07/01/1998 | 67 | REPLY by movant EDWARD P. DOUGHERTY to plaintiffs' opposition to motion to intervene [62-1]; exhibit (1) (tw) (Entered: 07/02/1998) |
| 07/08/1998 | 68 | ORDER by Judge Emmet G. Sullivan : granting motion for the Couirt to let them intervene in this case presently they movants in this case [62-1] by movant (N) (jaw) (Entered: 07/10/1998) |
| 07/08/1998 | 70 | ANSWER TO COMPLAINT [1-1] by intervenor-defendant EDWARD P. DOUGHERTY, intervenor-defendant YELLOWSTONE TOUR, intervenor-defendant TOWN OF YELLOWSTONE, intervenor-defendant YELLOWSTONE CHAMBER, intervenor-defendant AMER. COUN. ASSOC., intervenor-defendant BLUE RIBBON COAL., intervenor-defendant MONTANA SNOW ASSOC. . (bjsp) (Entered: 07/20/1998) |
| 07/08/1998 | 71 | MOTION filed by intervenor-defendant EDWARD P. DOUGHERTY, movant ROY N. BROWN, intervenor-defendant YELLOWSTONE TOUR, intervenor-defendant TOWN OF YELLOWSTONE, intervenor-defendant YELLOWSTONE CHAMBER, intervenor-defendant AMER. COUN. ASSOC. for summary judgment ; attachments (bjsp) (Entered: 07/20/1998) |
| 07/22/1998 | 72 | RESPONSE (MEMORANDUM) by intervenor-defendant to motion for summary judgment [69-1] by plaintiffs (st) (Entered: 07/23/1998) |
| 07/22/1998 | 73 | REPLY by intervenor-defendant to response to motion for summary judgment [71-1] (st) (Entered: 07/23/1998) |
| 07/22/1998 | 74 | MEMORANDUM by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS in opposition to motion for summary judgment [69-1] motion for a Court's order to enforce settlement agreement [69-2] by plaintiffs (st) (Entered: 07/23/1998) |
| 07/24/1998 | 75 | COMPLAINT filed by plaintiff THE FUND FOR ANIMALS; (filed in this case pursuant to an order dated 6/2/98; was previously filed in CA 98-428; nunc pro tunc to 2/18/98 (clv) (Entered: 07/24/1998) |
| 07/24/1998 | 77 | ADMINISTRATIVE RECORD by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS ; exhibits (31) (bjsp) (Entered: 07/24/1998) |
| 08/12/1998 | 78 | MOTION filed by plaintiff to supplement the record (st) (Entered: 08/13/1998) |
| 08/12/1998 | 79 | REPLY by plaintiff to response to motion for summary judgment [69-1] by federal defendant, plaintiff, motion for a Court's order to enforce settlement agreement [69-2] by federal defendant, plaintiff (st) (Entered: |

| | | 08/13/1998) |
|---|---|---|
| 08/26/1998 | 80 | RESPONSE by intervenor-defendant EDWARD P. DOUGHERTY, intervenor-defendant YELLOWSTONE TOUR, intervenor-defendant TOWN OF YELLOWSTONE, intervenor-defendant YELLOWSTONE CHAMBER, intervenor-defendant AMER. COUN. ASSOC., intervenor-defendant BLUE RIBBON COAL., intervenor-defendant MONTANA SNOW ASSOC. to plaintiffs' motion to supplement the record [78-1] by plaintiff (tw) (Entered: 08/27/1998) |
| 08/26/1998 | 81 | RESPONSE by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS to motion to supplement the record [78-1] by plaintiff (tw) (Entered: 08/27/1998) |
| 09/02/1998 | 82 | REPLY by plaintiff to response to motion to supplement the record [78-1] by plaintiff (st) (Entered: 09/03/1998) |
| 10/09/1998 | | MOTION HEARING before Judge Emmet G. Sullivan; heard and taken under advisement; Reporter: Frank Rangus (clv) (Entered: 10/09/1998) |
| 10/15/1998 | 83 | TRANSCRIPT filed for date(s) of 10/09/98. Reporter: Frank J. Rangus (lkn) (Entered: 10/16/1998) |
| 03/31/1999 | 84 | MEMORANDUM OPINION AND ORDER by Judge Emmet G. Sullivan : granting motion to supplement the record [78-1] by plaintiffssssssss granting motion for summary judgment [71-1] by intervenor-defendsss, movant, intervenor-defend granting motion for summary judgment [69-1] by federal defendant, plaintiff denying motion for a Court's order to enforce settlement agreement [69-2] by federal defendant, plaintiff (N) (clv) Modified on 04/01/1999 (Entered: 04/01/1999) |
| 07/26/1999 | 85 | NOTICE by plaintiffs, federal defendants modification to settlement agreement. (tw) (Entered: 07/27/1999) |
| 12/01/1999 | 86 | NOTICE OF FILING by plaintiffs and federal defendants to the Court Re; the filing of a modification to settlement agreement (bjsp) (Entered: 12/06/1999) |
| 12/06/1999 | 87 | STIPULATION filed and fiated by Judge Emmet G. Sullivan regarding modification to settlement agreement. (N) (clv) (Entered: 12/06/1999) |
| 09/29/2000 | 88 | ERRATA by plaintiffs, federal defendants modification to settlement agreement. (td) (Entered: 10/02/2000) |
| 02/12/2002 | | ADMINISTRATIVE RECORD [77-1] filed by federal defendant BRUCE BABBITT, federal defendant DENIS GALVIN, federal defendant JACK NECKELS, federal defendant MICHAEL FINLEY, federal defendant JOHN ROGERS destroyed by Clerk. (cjp) (Entered: 02/13/2002) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 04/03/2008 12:46:17 | | | |
| PACER Login: | sc0214 | Client Code: | 1704 |
| Description: | Docket Report | Search Criteria: | 1:97-cv-01126-EGS |
| Billable Pages: | 12 | Cost: | 0.96 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
THE FUND FOR ANIMALS, *et al*       )
                                    )
          Plaintiffs,               )   Civil Action No. 02-2367
                                    )   (EGS)
     v.                             )
                                    )
GALE NORTON, *et al*,               )
                                    )
          Defendants,               )
_____)

_____
                                    )
GREATER YELLOWSTONE                 )
  COALITION, *et al*                )
                                    )
          Plaintiffs,               )   Civil Action No. 03-752
                                    )   (EGS)
     v.                             )
                                    )
GALE NORTON, *et al*,               )
          Defendants,               )
_____)

<u>ORDER</u>

Pursuant to the hearing held on March 9, 2004, and for the reasons stated in open court, it is by the Court hereby

**ORDERED** that the Federal Defendants' Conditional Motion to Transfer is **DENIED**; and it is

**FURTHER ORDERED** that further contempt proceedings are stayed until further order of this Court; and it is

**FURTHER ORDERED** that a status hearing is scheduled for **April 14, 2004, at 11:00 a.m.** in Courtroom One.

**Signed:**     **Emmet G. Sullivan**
           **United States District Judge**
           **March 9, 2004**

FILED

NOV - 4 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE FUND FOR ANIMALS )
8121 Georgia Avenue, Suite 301 )
Silver Spring, MD 20910, )
)
BLUEWATER NETWORK )
311 California St, Suite 510 )
San Francisco, CA 94104, )
)
WALT FARMER )
P.O. Box 1821 )
Jackson, WY 83001, )
)
GEORGE WUERTHNER )
P.O. Box 3156 )
Eugene, Oregon 97403, )
)
RICHARD MEIS )
P.O. Box 5086 )
Bozeman, MT 59717, )
)
      Plaintiffs, )
)
      v. )
)
GALE NORTON )
Secretary, U.S. Department of the Interior )
1849 C Street, N.W. )
Washington, D.C. 20240, )
)
and )
)
FRAN MAINELLA )
Director, National Park Service )
1849 C Street, N.W. )
Washington, D.C. 20240, )
)
      Defendants. )
)

CASE NUMBER 1:04CV01913

JUDGE: Emmet G. Sullivan

DECK TYPE: Administrative Agency Review

DATE STAMP: 11/04/2004

## COMPLAINT

1

1.     This case challenges the National Park Service's ("Park Service") November 4,

2004 Finding of No Significant Impact ("2004 FONSI") concerning winter use in Yellowstone

National Park.  On December 16, 2003, this Court issued a Memorandum Opinion setting aside

the Park Service's 2003 Regulations on winter use, explaining that "the administrative record is

ripe with studies indicating that winter park use, and especially trail grooming" – i.e., 25 foot-

wide snowpacked roads created each winter –  "has lead to major changes in bison migration

patterns," and that, in light of this evidence, it is "particularly damning that the NPS has *failed to*

*close a single road to trail grooming*" to collect data on these impacts, or to explain the basis for

its decision to continue to pack the entire Yellowstone winter road system.  The Court then

instructed the Park Service to issue new winter use rules that are consistent with, and address the

concerns delineated in, the Court's Opinion.  However, the Park Service's 2004 FONSI

continues to ignore these concerns, deciding – with no further explanation – that, for at least

three more winters, the Park Service will continue to maintain the entire Yellowstone groomed

road system.  The FONSI violates this Court's Orders, the Park Service Organic and Yellowstone

Acts, 16 U.S.C. §§ 1, 22, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et

seq., the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, the Park Service's own

regulations and binding management policies, and a 1997 Settlement Agreement with the Fund

for Animals approved by this Court ("the 1997 Settlement").

## JURISDICTION

2.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

2

## PARTIES

3.      Plaintiff The Fund for Animals ("The Fund") is a national nonprofit membership organization headquartered in New York City and Silver Spring, Maryland.  The Fund is committed to preserving animal and plant species in their natural habitats, and to preventing the abuse and exploitation of both wild and domestic animals.

4.      Many of The Fund's over 200,000 members and supporters joined the organization to obtain adequate representation of their interests in safeguarding wild animal and plant species, including species found in units of the National Park System, such as Yellowstone National Park.  Members of The Fund devote substantial recreational and professional time to enjoying the flora and fauna in the Park during the winter, and have traveled and will continue to travel to these areas to observe, photograph, protect and otherwise enjoy plants and animals in their natural habitat.  The Fund brings this action on behalf of its members, and to safeguard its own organizational interest in protecting the wildlife in these areas.  The interests of the Fund and its members in protecting the wildlife in units of the Park System, including Yellowstone, and in using the Park as an enjoyable place to recreate and observe, study, and photograph wildlife are harmed by the defendants' failure to comply with NEPA, the APA, the 1997 Settlement, and other federal laws and regulations, because groomed trails -- trails of packed snow -- have numerous adverse impacts on the wildlife, environment, and winter visitor experience in these areas.

5.      Plaintiff Bluewater Network ("Bluewater") is a national environmental organization protecting public waters, lands, and ecosystems.  Bluewater campaigns against

3

damage caused by motorized recreation, including snowmobiles, jetskis and off-road vehicles, oil and shipping industry practices, and other types of marine pollution.

6. Members and donors of Bluewater spend recreational and professional time enjoying the flora and fauna in Yellowstone National Park, and have traveled and will continue to travel to the Park to observe, photograph, protect and otherwise enjoy plants and animals in their natural habitat in the Park. The interests of Bluewater and its members in protecting and enjoying the wildlife and environment in Yellowstone, and in using the Park as an enjoyable place to recreate and observe, study, and photograph wildlife are harmed by the defendants' failure to comply with NEPA, the APA, the 1997 Settlement, and other federal laws and regulations, because groomed trails have numerous adverse impacts on the wildlife, environment, and winter visitor experience in these areas.

7. Plaintiff Walt Farmer is a resident of Jackson, Wyoming. Mr. Farmer, a member of The Fund for Animals, has been an outspoken advocate for wildlife and wildlands in the Greater Yellowstone Ecosystem for many years. He has attended, and continues to attend, public meetings, and has submitted public comments on a variety of environmental and wildlife issues, including winter use in Yellowstone National Park, and the surrounding public lands. He also receives considerable pleasure and enjoyment from his personal time spent in Yellowstone. He often hikes in the Park in order to enjoy and observe the wildlife, wildlands, and serenity of these areas, and he intends to continue to participate in these activities in the future. In the winter months, Mr. Farmer snowshoes in the Yellowstone. However, the groomed trails have adversely impacted his ability to enjoy the Park in the winter, due to the substantial adverse impacts of groomed trails on wildlife, including bison, Park lands, other Park users, hydrology, and

4

vegetation, all of which offend his aesthetic enjoyment of the region. Mr. Farmer's interests in

protecting wildlands and wildlife in these areas, and in using them as an enjoyable place to

recreate and observe, study, and photograph wildlife, are harmed by the defendants' failure to

comply with NEPA, the APA, the 1997 Settlement, and other federal laws and regulations,

because groomed trails have numerous adverse impacts on the wildlife, environment, and winter

visitor experience in these areas.

8.      Plaintiff George Wuerthner, a naturalist and writer with a strong background in

biology, resides in Eugene, Oregon. Mr. Wuerthner has lectured and taught courses concerning a

variety of issues related to Yellowstone, including a course on winter ecology for Prescott

College. He guides natural history tours in Yellowstone, and has authored two books about

Yellowstone, Yellowstone: A Visitor's Companion and Yellowstone: The Fires of Change. He

also completed a two year study on the biological attributes of the Greater Yellowstone

Ecosystem with a focus on Yellowstone.

9.      Mr. Wuerthner has spent many hours hiking, climbing, cross-country skiing, and

observing and photographing wildlife in Yellowstone, and he intends to continue these activities

in the future. Mr. Wuerthner's enjoyment of the Park in the winter has been adversely affected by

groomed trails and their impact on Park wildlife and Park ecology. He is concerned about the

impacts of groomed trails on bison, elk, deer, grizzly bears, wolves, and other species in the

Parks. Mr. Wuerthner's interest in protecting wildlands and wildlife in these areas and in using

them as an enjoyable place to recreate and observe, study, and photograph wildlife are harmed by

the defendants' failure to comply with NEPA, the APA, the 1997 Settlement, and other federal

5

laws and regulations, because groomed trails have numerous adverse impacts on the wildlife, environment, and winter visitor experience in these areas.

10.     Plaintiff Richard Meis, a resident of Bozeman, Montana, is an ardent conservationist who has enjoyed cross-country skiing, boating, hiking and wildlife observation in Yellowstone and surrounding Park areas in the past, and intends to continue these activities in the future. His winter experiences in these areas have been adversely impacted by groomed trails. His interest in protecting wildlands and wildlife in these areas and in using them as an enjoyable place to recreate and observe wildlife are harmed by the defendants' failure to comply with NEPA, the APA, and other federal laws and regulations, because groomed trails have numerous adverse impacts on the wildlife, environment, and winter visitor experience in these areas.

11.     Defendant Gale Norton is the Secretary of the Interior and is the official ultimately responsible for all activities in units of the National Park System.

12.     Defendant Fran Mainella is the Director of the National Park Service and is the official directly responsible for the supervision, management and control of the units of the National Park System.

## STATUTORY FRAMEWORK

### A.     Park Service Acts And Regulations

13.     The Park Service Organic Act, passed in 1916, created the National Park Service to "promote and regulate" the public use of our national parks, "by such means and measures" as necessary to conform to the "fundamental purpose" of the parks to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same [so as to] leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.

6

Congress reaffirmed this commitment in 1970, instructing that the Park Service shall not administer the parks "in derogation of the values and purposes for which these various areas have been established . . . ." 16 U.S.C. § 1-a-1.

14.     The Yellowstone Act of 1872 states that the Park Service must provide for "the preservation, from injury or spoilation, of all timber, mineral deposits, natural curiosities, or wonders, within the park, and their retention in their natural condition." 16 U.S.C. § 22 (emphasis added).

15.     In furtherance of these mandates, Park Service regulations prohibit "disturbing" wildlife from its "natural state." 36 C.F.R. § 2.1(a)(1)(I). The regulations also prohibit snowmobile use unless such use is "consistent with the parks' natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources." 36 C.F.R. § 2.18(c).

16.     Similarly, the Park Service's binding Management Policies provide that "[t]he impairment of park resources and values may not be allowed," and that such an impairment exists where the impact of a particular activity "would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." Park Service Management Policies 2001 ("Park Service Policies"), at § 1.4.4 and 1.4.5. Furthermore, the Policies provide that, among the "park resources or values" which must not be impaired are "[t]he park's scenery, natural, and historical objects, and wildlife, and the processes and conditions that sustain them . . . ." Id. § 1.4.6.

7

## B.   The National Environmental Policy Act

17.     NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  Its purpose is to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  Id. at § 1500.1(c).  Under NEPA, federal agencies are required to prepare an environmental impact statement ("EIS") regarding all "major Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. § 4332(C).  This EIS must describe (1) the "environmental impact of the proposed action," (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented," (3) any "alternatives to the proposed action," (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."  Id.

18.     Under NEPA's implementing regulations -- promulgated by the Council for Environmental Quality ("CEQ"), an agency within the Executive Office of the President --  in order to determine whether to prepare an EIS federal agencies must ordinarily at least prepare an Environmental Assessment ("EA").  40 C.F.R. § 1501.4.  The EA is a public document that analyzes the agency's determination whether an EIS is necessary, and includes a brief discussion of "the need for the proposal, of alternatives . . ., [and] of the environmental impacts of the proposed action and such alternatives . . . ."  Id. at §§ 1501.4(c), 1508.9.  If, as a result of an EA, an agency determines an EIS is not necessary, it must issue a Finding of No Significant Impact

8

("FONSI") explaining the decision it has made, and detailing the reasons the action will not have significant impacts on the environment. Id. at §§ 1501.3(e); 1508.13.

19.     Among the factors an agency must consider to determine whether a project may have "significant" impacts, and therefore whether an EIS is required, are the "context" and "intensity" of the action. 40 C.F.R. § 1508.27. Regarding context, the CEQ regulations provide that, for a "site-specific action," an agency must determine whether the "effects on the locale" are significant. Id. § 1508.27(a).

20.     As for intensity, the regulations provide that, among other relevant factors, the severity of the impact must be judged based on whether "the proposed action affects public health and safety"; "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial"; "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks"; "[t]he degree to which the action may adversely affect an endangered species"; and "[w]hether the action threatens a violation of Federal [law] imposed for the protection of the environment." Id. § 1508.27(b).

## **RELEVANT FACTS**

**A.     The Adverse Impacts Of Groomed Trails in Yellowstone National Park**

21.     Yellowstone National Park, part of a forested plateau near the headwaters of the Yellowstone and Snake Rivers, is the nation's first national park, established in 1872. Famous for its wildlife, geyser basins and canyons, Yellowstone lies mostly in northwestern Wyoming, but also occupies parts of Montana and Idaho.

22.     Although as recently as thirty-five years ago there were virtually no winter visitors to Yellowstone, winter use has increased dramatically in recent decades, and more than one

hundred thousand visitors now visit the Park each winter, by car, on foot, on skis and snowshoes, and on snowmobiles. Largely to facilitate snowmobile access, from approximately December to March each year, the Park Service and its contractors regularly groom – e.g., pack – a 25-foot wide path for more than 180 miles over areas of paved roads in Yellowstone.

23.     As documented by numerous experts – including Dr. Mary Meagher, who was a Park Service biologist for decades – these groomed trails are having serious adverse impacts on Yellowstone's wildlife, such as bison, who use the trails as energy efficient winter travel routes. Bison use of the groomed trails directly and indirectly facilitates their emigration from Yellowstone into Montana and Wyoming where they are often killed by federal and state officials, due to unsubstantiated fears of potential health risks to neighboring livestock. Over the past decade, more than 2,700 bison have been killed in this manner.

24.     In addition to this direct impact, the groomed trails have an indirect effect on bison population dynamics, movements, distribution, and habitat use. Other species, such as elk, moose, coyotes, and deer also use the groomed trails, and, their population dynamics, movements, distribution, and habitat use patterns may also be adversely affected.

25.     Groomed trails also have negative impacts on species protected under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq. In Yellowstone, groomed trails have adverse impacts on grizzly bears, gray wolves, Canada lynx, and bald eagles, which are all federally protected species. For example, grizzly bears, which are listed as a threatened species in the contiguous United States, inhabit Yellowstone National Park. The availability of carrion and the bears' ability to access and eat carrion when they emerge from winter dens has been disrupted by groomed trails, due to the use of the trails by bison, elk, and other ungulates, as well

10

as the bears' avoidance of carcasses near the trails. Groomed trails also adversely impact the Canada lynx because they allow other animals, such as coyotes and bobcats, access to lynx habitat that they otherwise would not be able to reach, and therefore increase competition for the lynx's primary prey -- snowshoe hares.

**B.      The Fund For Animals' Original Lawsuit Concerning Yellowstone Winter Use And Original Challenge to the Park Service's Refusal To Address Trail Grooming**

26.      During the winter of 1996-97, the Park Service, in cooperation with other federal and state officials, slaughtered more than 1,100 bison who left Yellowstone during the winter. In response to this slaughter, in May 1997, The Fund for Animals and several other groups and individuals ("The Fund Plaintiffs") filed suit in this Court challenging the Park Service's failure to comply with federal law in connection with winter use. Plaintiffs asked the Court to enjoin the Park Service from permitting certain road packing activities until the agency prepared an Environmental Impact Statement ("EIS") under NEPA and took other steps to come into compliance with federal law.

27.      In response to this suit, the Park Service offered to, for the first time, prepare an EIS on winter use. The Park Service also proposed to conduct an experimental winter closure of a road segment in the park, in order to conduct research on the impacts of groomed trails on the environment and wildlife in Yellowstone, including the impact of the groomed roads on the movements of bison during the winter.

28.      In September 1997, the parties submitted a Settlement Agreement to the Court ("the 1997 Settlement"), which provided that the Park Service "will prepare a comprehensive environmental impact statement ("EIS"), pursuant to NEPA, addressing a full range of

11

alternatives for all types of winter visitor use, including snowmobiling and trail grooming, in the Parks and considering the effects of those alternatives on the Parks' environment."  The Agreement further provided a schedule by which the agency would complete the EIS, and issue a Record of Decision ("ROD") determining how the winter use management of Yellowstone and nearby Parks would be altered in light of the EIS, before the 2000-01 winter use season.

29.     The Agreement also provided that, "[t]o obtain information for various planning efforts in the Parks," the Park Service is "studying the effects of groomed snowmobile trails on bison," and that, "to further these studies," the agency would propose – through the issuance of an EA – the closure of one or more segments of the Yellowstone trail system to trail grooming and other winter use.  The Agreement further provided that the "proposed alternative" in the EA would provide for a 14 mile closure during the winter of 1997-98, and closing at least 14 additional miles of the trail system during the winters of 1998-99 and 1999-2000.

30.     In October 1997, the Court issued an Order approving the 1997 Settlement, but declining to dismiss the case in order to insure that the Settlement Agreement could be enforced, if necessary.

31.     Although, as provided in the Settlement Agreement, the Park Service issued an EA proposing the closure of a groomed road segment in Yellowstone, in January 1998, the Service reversed course and decided that it would continue to groom the entire trail system at least until the EIS was completed.  In light of this decision, The Fund Plaintiffs argued that the agency was violating the 1997 Settlement because, by refusing to close any trails, it would be impossible to complete an EIS that properly evaluated the impact of these trails, and that, in any

12

event, the Park Service had failed to provide any coherent rationale for its refusal to follow through with its proposal.

32. The Court resolved those claims in favor of the Park Service, finding that it was premature to determine whether the Park Service's refusal to conduct any trail closures would result in "an EIS not in compliance with the settlement agreement and with NEPA."

## C. The Park Service's Subsequent Decisions To Continue To Permit Trail Grooming in Yellowstone.

33. In 2000, the Park Service issued a final EIS on winter use. Despite plaintiffs' and others' comments, neither the Draft, nor the Final, EIS considered in detail any alternative that included significant changes in the winter groomed trail system in Yellowstone. Instead, the EIS considered several alternatives concerning changes in the level of use of snowmobiles, and, in its Record of Decision ("2001 ROD"), the Park Service chose an alternative that would phase-out snowmobile use over several years, while permitting snowcoach use of the entire groomed trail system to continue. Subsequently, the Park Service issued regulations providing for a snowmobile phase-out to begin during the winter of 2003-04, and for the complete elimination of snowmobiles beginning this winter season of 2004-05.

34. In 2001, the Park Service announced that the agency would prepare a Supplemental EIS ("SEIS") to reconsider the snowmobile phase-out that had just recently been finalized, explaining that the SEIS was necessary to "solicit[ ] more public comment on the earlier decision and alternatives to it which will maintain protection of park resources."

35. In March 2003, the Park Service issued a final SEIS and Supplemental ROD ("2003 ROD") on winter use. Once again, despite plaintiffs' and others' comments, neither the

Draft, nor the Final, SEIS considered any alternative that included changes in the winter groomed

trail system in Yellowstone. Instead, once again, the SEIS considered several alternatives

concerning changes in the level of use of snowmobiles. In the 2003 ROD, the Park Service

chose an alternative that would permit more than 900 snowmobiles into Yellowstone each day.

The agency subsequently issued regulations ("the 2003 Regulations") – on December 11, 2003 –

implementing this chosen alternative.

**D.     This Court's December 2003 Ruling And Events
        Leading Up To The Current Rulemaking**

36.     In March 2003, The Fund Plaintiffs and another coalition of plaintiffs – the

Greater Yellowstone Coalition Plaintiffs ("GYC Plaintiffs") – challenged the Park Service's

2003 ROD. Among other arguments, The Fund Plaintiffs claimed that the Park Service had still

failed to address trail grooming in the manner required by NEPA, the 1997 Settlement, and other

federal laws. As a remedy for these legal violations, The Fund Plaintiffs asked the Court to

enjoin the Park Service from grooming the Yellowstone winter packed road system, with the

exception of the approximately 40 miles from Yellowstone's South Entrance to Old Faithful,

Yellowstone's premier winter destination. The GYC Plaintiffs raised other concerns, and

ultimately asked the Court to put back into place the snowmobile phase-out which had been

planned until those plans were superceded by the 2003 ROD, and later, the 2003 Regulations.

37.     On December 16, 2003, this Court set aside the 2003 ROD, and the 2003

Regulations implementing that ROD, on several grounds, including that, despite an EIS, and now

an SEIS, the Park Service had never adequately addressed impacts of the winter-packed road

system on Yellowstone's bison and other wildlife. Noting that the "administrative record is ripe

14

with studies indicating that winter park use, and especially trail grooming, has lead to major changes in bison migration patterns," the Court found that NPS has failed to ever explain, in light of these studies, why the agency had concluded that it is consistent with the agency's mandates to continue to engage in this activity. The Court also found that NPS had violated NEPA by failing to meaningfully consider any alternatives that would address these impacts, or to even take the steps to collect the information -- such as comparative data -- that the agency itself claimed would be necessary to better understand these impacts.

38.     In addition to remanding the 2003 ROD and Regulations to the Park Service, the Court also ruled that the prior regulations providing for a phase-out of snowmobiles "shall remain in effect until further Order of the Court."

39.     Although the Park Service began implementing those prior regulations, in February 2004, in response to another Court's ruling, the agency issued new Compendia for Yellowstone and nearby Parks providing for increased daily snowmobile limits for the remainder of the winter season.

40.     In response to this development, the parties before this Court each asked the Court to modify the relief it had provided in its December 16, 2003 Opinion. The Fund for Animals Plaintiffs once again asked the Court to impose its proposed remedy concerning trail grooming, while the GYC Plaintiffs requested a ban on snowmobiling altogether beginning the winter of 2004-05. The federal defendants asked the Court simply to relieve the NPS of the obligation to implement the snowmobile phase-out regulations that this Court had Ordered the Park Service to leave "in effect until further Order of the Court."

41.     In June 2004, this Court issued an Order denying without prejudice both The Fund

Plaintiffs' and the GYC Plaintiffs' modification requests, on the grounds that they were

premature in light of the need for the Park Service to make a new decision concerning winter use

for future winter seasons.  The Court also granted the Park Service's request, relieving the agency

of the obligation to implement the snowmobile ban.

42.     At the same time, in order to avoid a "repeat of last year's scenario – where the

Court was put in the awkward position of rendering a complex decision in a matter of days due to

the government's failure to issue a Final Rule, despite the Court's repeated warnings, until a

*mere six days* prior to the start of the winter season" –  the Court Ordered that the Park Service

must undertake a new rulemaking and issue Final Regulations that are "not inconsistent with this

Court's December 16, 2003 Opinion and Order, by a minimum of 30 days prior to the

commencement of preparations – that is, trail grooming – for the 2004-2005 winter season."

43.     In relieving the Park Service of the obligation to ban snowmobiles this winter, and

in establishing a schedule for a new decision-making process, the Court also "sharply

emphasize[d] that the remainder of the Court's December 16, 2003 Opinion and Order remains

in full force and effect [and thus] Federal Defendants still have an obligation to conduct the new

rule-making process in a manner consistent with, and addressing the concerns delineated in, the

Court's December 2003 Opinion and Order."

**E.     The Park Service's Temporary Winter Use FONSI For 2004-2007**

44.     In August 2004, the Park Service issued a Draft Temporary Winter Use Plan

Environmental Assessment that considered several alternatives for the management of winter use

in Yellowstone and nearby Parks for the next three winter seasons, 2004-05, 2005-06, and 2006-

07. In the Draft EA, the Park Service once again considered several alternatives concerning the number of snowmobiles that would be permitted into Yellowstone each day, from zero to 950 snowmobiles per day. The preferred alternative in the Draft EA provides a daily limit of 720 snowmobiles per day.

45.     Once again, the Draft EA did not consider any alternatives that proposed any changes to the groomed trail system in Yellowstone, or any experimental trail closures to collect additional data or for any other reason. Instead, in the Draft EA the Park Service stated that it has contracted with an independent researcher to produce a Report concerning "what is known about bison movements and dispersal," "link[ing] science, within the context of movement ecology, to the management of road grooming." According to the Draft EA, this Report will not be completed until March 2005.

46.     The Park Service also issued a Draft FONSI with the Draft EA. The Draft FONSI provides that the Park Service will choose the preferred alternative in the Draft EA, permitting 720 snowmobiles to enter Yellowstone each day for the next three winter seasons.

47.     On September 7, 2004 the Park Service published a Proposed Rule that would implement the preferred alternative in the Draft EA and Draft FONSI. 69 Fed. Reg. 54,072 (2004).

48.     As before, the Fund For Animals and others submitted extensive comments on the Draft EA, and Proposed Regulations, once again emphasizing that, to comply with federal law, the Park Service may not continue to ignore the adverse impacts of trail grooming in Yellowstone on bison and other wildlife, and insisting that the Park Service finally consider a meaningful alternative that addresses these issues.

17

49.     On November 4, 2004, the Park Service issued its 2004 FONSI, in which the agency made its "decision" to continue to groom the entire winter trails system, and to implement the alternative proposed in the Draft EA and Draft FONSI, with minor modifications. Pursuant to the FONSI, the Park Service will groom the entire Yellowstone winter trail system for at least the next three winter seasons, regardless of the outcome of the road grooming Report due in March 2005. In addition, the Park Service has decided to permit 720 snowmobiles in Yellowstone to use these groomed trails each day.

50.     In the FONSI, the Park Service fails to provide a coherent explanation for its decision to continue to groom the entire winter trails system for the next three winter seasons.

51.     In the FONSI, the Park Service also announced that it will not be preparing an Environmental Impact Statement on the Temporary Winter Use Plan for the next three winter seasons. Although in the FONSI the agency designated EA Alternative One – the ban on snowmobiles – as the "environmentally preferred" alternative, in the FONSI the agency also "determined that implementation of this decision" – i.e., the decision to implement Alternative 4 – "will not constitute impairment of Yellowstone or Grand Teton National Park or the John. D. Rockefeller, Jr. Parkway's resources or values. . . ."

52.     In the FONSI, the Park Service states that it will shortly publish in the Federal Register Final Regulations ("2004 Regulations") further implementing the decision contained in the FONSI.

18

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim One

### (Violations of this Court's Orders, the Organic Act, Yellowstone Act, And The APA)

53.     By issuing the 2004 FONSI for winter use in Yellowstone National Park, which announces the Park Service's decision to permit trail grooming to continue unabated in Yellowstone for at least three more winter seasons, and failing to explain how such an approach can be reconciled with the data concerning the adverse impacts of the groomed trails on bison and other aspects of Yellowstone's ecology, the Park Service is violating this Court's December 2003 Opinion in this case, the Organic and Yellowstone Acts, and the Park Service's own regulations and binding management policies, and is unlawfully withholding and unreasonably delaying agency action in violation of the APA, 5 U.S.C. § 706(1), in addition to acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA.  5 U.S.C. § 706(2)(a).

54.     These violations are injuring plaintiffs in the manner described in ¶¶ 3-10 above.

### Claim Two

### (Violations of this Court's Orders, NEPA and the APA)

55.     By issuing the 2004 FONSI for winter use in Yellowstone National Park, which announces the Park Service's decision to permit trail grooming to continue unabated in Yellowstone for at least three more winter seasons, without considering any alternatives that would include a cessation to any trail grooming in Yellowstone, even on an experimental basis, and without adequately considering the environmental impacts of the groomed trail system, the Park Service is violating NEPA and its implementing regulations, as well as this Court's

19

December 2003 Opinion in this case, and is acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. 5 U.S.C. § 706(2)(a). This failure also violates the 1997 Settlement, which required the Park Service to consider a full range of alternatives for all types of winter visitor use, including snowmobiling and trail grooming, and also constitutes agency action unlawfully withheld and unreasonably delayed in violation of the APA, 5 U.S.C. § 706(1).

56. By refusing to prepare an Environmental Impact Statement ("EIS") on the manner in which winter use in Yellowstone will be managed over the next three winter seasons, despite the significant and uncertain impacts of trail grooming, and the scientific controversy concerning this issue, the Park Service is violating NEPA and its implementing regulations, and is acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. 5 U.S.C. § 706(2)(a). This failure also violates the 1997 Settlement, which required the Park Service to consider a full range of alternatives for all types of winter visitor use, including snowmobiling and trail grooming, and also constitutes agency action unlawfully withheld and unreasonably delayed in violation of the APA, 5 U.S.C. § 706(1).

57. These violations are injuring plaintiffs in the manner described in ¶¶ 3-10 above.

WHEREFORE, plaintiffs respectfully request that this Court:

(1) declare that by issuing the 2004 FONSI the defendants are violating NEPA, the APA, the Organic Act, the Yellowstone Act, the Park Service's own regulations and binding management policies, the 1997 Settlement Agreement, and this Court's December 16, 2003 Opinion;

20

(2)     set aside, and preliminarily and permanently enjoin implementation of the 2004

FONSI;

(3)     preliminarily and permanently enjoin trail grooming in some or all of Yellowstone

National Park, pending defendants' compliance with NEPA, the Organic and Yellowstone Acts,

and Park Service regulations and policies, this Court's Orders and the 1997 Settlement;

(4)     retain jurisdiction of this matter until defendants have fulfilled all of their

statutory, regulatory, and Court-Ordered obligations;

(5)     award plaintiffs their costs, attorneys' fees, and other disbursements for this

action, including any expert witness fees; and

(6)     grant plaintiffs such other and further relief as this Court may deem just and

proper.

Respectfully submitted,

Howard M. Crystal (D.C. Bar No. 446189)

Eric R. Glitzenstein (D.C. Bar. No. 358287)

Meyer & Glitzenstein
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

November 4, 2004                    Attorney for Plaintiffs

Steven F. Freudenthal
Monique J. Ojeda
Freudenthal, Salzburg & Bonds, P.C.
123 East 17th Street
P.O. Box 387
Cheyenne, WY 82003
(307) 634-2240

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

NOV -10 2004   11:45am

Betty A. Griess, Clerk
Cheyenne

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| THE WYOMING LODGING AND RESTAURANT ASSOCIATION, a Wyoming nonprofit corporation, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>UNITED STATES DEPARTMENT OF THE INTERIOR, THE NATIONAL PARK SERVICE, GALE NORTON IN HER OFFICIAL CAPACITY AS THE SECRETARY OF THE DEPARTMENT OF THE INTERIOR, AND FRAN MAINELLA IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE NATIONAL PARK SERVICE, )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>Defendants. )<br>) | Case No. **04CV 315B** |

## COMPLAINT

Plaintiff, The Wyoming Lodging and Restaurant Association ("WLRA") for itself and its members, by and through its attorneys Steven F. Freudenthal and Monique J. Ojeda of Freudenthal, Salzburg & Bonds, P.C., brings this complaint pursuant to the National

Receipt # 30-1845
Summons: ___ issued
         ___ not issued

Environmental Policy Act ("NEPA") and the Administrative Procedure
Act ("APA") seeking declaratory and injunctive relief against
Defendants United States Department of the Interior, the National
Park Service, Gale Norton in her official capacity as the Secretary
of the Department of the  Interior, and Fran Mainella in her
official capacity as Director of the National Park Service
(collectively referred to as "Federal Defendants").

### INTRODUCTION

1.    In this action, Plaintiff WLRA challenges the legal
validity of an environmental assessment ("2004 EA") and a finding
of no significant impact ("2004 FONSI"), and a final temporary rule
("2004 Temporary Rule") to govern winter use in the National Parks
for the next two to three winter seasons.  In developing the 2004
EA and the 2004 FONSI, the Federal Defendants did not comply with
the requirements of the National Environmental Policy Act ("NEPA")
and its implementing regulations.  The Federal Defendants failed to
include a "no action" alternative in the 2004 EA, failed to take a
"hard look" at the environmental impacts of allowing some
snowmobiles to enter Yellowstone without being accompanied by a
commercial guide, and failed to consider an alternative that would
have allocated entry permits into Yellowstone National Park
("Yellowstone") on a per season basis instead of per day basis.  In
adopting the 2004 Temporary Rule, the Federal Defendants acted
arbitrarily and capriciously and violated the APA by failing to

provide a reasoned explanation for its decision to require that all snowmobiles entering Yellowstone be accompanied by a commercial guide, by failing to provide a reasoned explanation for limiting the number of daily snowmobile entries into Yellowstone to no more than 720 snowmobiles per day, and by adopting the commercial guide requirement and the 720 snowmobiles per day limit in the 2004 Temporary Rule despite the lack of substantial evidence in the administrative record to support these decisions.

### JURISDICTION

2.    This action arises under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. § 1346(a)(2) (United States as a defendant), and 5 U.S.C. §§ 702-706 (APA right of review).

### VENUE

3.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(2), as a substantial part of the events or omissions giving rise to this civil action occurred in this judicial district.  Venue also is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(3), as Plaintiff WLRA is a Wyoming non-profit corporation with its principal place of business and

residence in this judicial district, and no real property is involved in the action.

**PARTIES**

4.    The Wyoming Lodging and Restaurant Association ("WLRA") is a Wyoming nonprofit corporation whose members consist of Wyoming businesses involved in the lodging and/or restaurant businesses within the state of Wyoming.    WLRA's 400 members maintain 450 business locations throughout the state of Wyoming.

   a.    Members of the Wyoming Lodging and Restaurant Association are significant participants in Wyoming's tourism industry which in 2000 accounted for:    (1) one billion six hundred and fifty-seven million dollars of direct expenditures by 4,700,000 travelers; (2) 42,650 direct full-time and part-time jobs; (3) $459 million in direct personal income and $1,019,000,000 in total personal income; and (4) $76,629,000 in state and local tax revenues.

   b.    Sixty-seven of WLRA's members operate solely or primarily in Teton County, Wyoming.    The negative impact of the 2004 Temporary Rule on these members is estimated to be $14.4 million in lost restaurant, lodging and snowmobile rental revenues for the 2004-05 season.

   c.    While the number of members in Park County, Wyoming are fewer and tourism is a slightly smaller component of the overall economy, the negative impact of the 2004 Temporary

Rule on members located in Park County, Wyoming is equally severe. One member has reduced its operations from seven days a week to four days a week.

      d.    The limitations on the daily number of snowmobiles, commercial guide requirements and continued uncertainty for future seasons discourages and reduces the number of persons seeking access to the National Parks via snowmobiles, all to the direct and immediate economic injury to the Teton and Park County members of WLRA.

      e.    Other members of WRLA are also adversely affected, but as their distance from the National Parks increases, it become more difficult to precisely quantify the economic impact.

      5.    Defendant United States Department of the Interior is an executive branch agency of the United States of America. The Department of the Interior is the federal agency responsible for managing national parks in the United States, including Yellowstone, Grand Teton National Park ("Grand Teton") and the John D. Rockefeller, Jr., Memorial Parkway ("Parkway").

      6.    Defendant National Park Service ("NPS") is a bureau of the United States Department of the Interior. The NPS promotes and regulates the use of national parks in the United States, including the management of winter use activities in Yellowstone, Grand Teton and the Parkway (collectively referred to as "the National Parks").

7.    Defendant Gale Norton is the Secretary of the United States Department of the Interior.   Secretary Norton has legal responsibility for the actions of the NPS (including its decisions relating to the 2004 EA, the 2004 FONSI, and the 2004 Temporary Rule challenged in this case) and for ensuring that the NPS complies with NEPA and its implementing regulations, the APA, and other laws.   Secretary Norton is sued in her official capacity.

8.    Defendant Fran Mainella is the Director of the NPS. Director Mainella is responsible for the actions of the NPS (including its decisions relating to the 2004 EA, the 2004 FONSI, and the 2004 Temporary Rule challenged in this case) and for ensuring that the NPS complies with NEPA and its implementing regulations, the APA, and other laws.  Director Mainella is sued in her official capacity.

## FACTS COMMON TO ALL CAUSES OF ACTION

9.    The Federal Defendants first permitted the use of snowmobiles in the National Parks in 1963.  In the late 1960's, the Federal Defendants implemented the first winter use plans for the National Parks.  From 1963 through the end of the 2002-2003 winter season, the Federal Defendants permitted snowmobiles to enter the National Parks in unlimited numbers and without being accompanied by a guide.

10.   In October 2000, the Federal Defendants issued a final environmental impact statement ("2000 FEIS") and record of decision

("2000 ROD") relating to the winter use plans for the National Parks. In the 2000 FEIS and the 2000 ROD, the Federal Defendants determined that all recreational snowmobiling should be banned in the National Parks and that access to the National Parks should be by snowcoach only.

11. In late December 2000, the International Snowmobile Manufacturers Association ("ISMA") and other parties filed suit ("2000 Wyoming suit") in this Court seeking to have the 2000 FEIS, the 2000 ROD and the 2001 Snowcoach Rule vacated. The State of Wyoming intervened as a plaintiff in the 2000 Wyoming suit.

12. In January 2001, the Federal Defendants issued a final rule ("2001 Snowmobile Ban Rule") which would have banned the use of snowmobiles in the National Parks.

13. In June 2001, Plaintiffs, the Federal Defendants, and the State of Wyoming entered into a settlement agreement. Under the terms of the settlement agreement, the Federal Defendants agreed to prepare a supplemental environmental impact statement ("2003 SEIS") pursuant to NEPA to consider, *inter alia*, new information and data submitted regarding new snowmobile technologies.

14. In November 2002, the Federal Defendants issued a rule ("November 2002 Rule") postponing implementation of the Snowmobile Ban Rule until the Federal Defendants completed the 2003 SEIS. The November 2002 Rule limited daily entry of snowmobiles during the 2003-2004 snowmobile season to 493 snowmobiles per day into

Yellowstone and a total of 50 snowmobiles daily into Grand Teton and the Parkway combined.  The November 2002 Rule required that all snowmobiles entering Yellowstone be accompanied by a commercial guide.

15.  In March 2003, the Federal Defendants completed the 2003 SEIS and issued the a record of decision ("2003 ROD") in which it determined that snowmobiles could be used in the National Parks subject to limits on the number of snowmobiles entering the National Parks daily and specified restrictions on emissions and sound.

16.  In early 2003, the Fund for Animals and other parties ("Fund") and the Greater Yellowstone Coalition and other parties ("GYC") challenged the 2003 SEIS and the 2003 ROD in the United States District Court for the District of Columbia ("D.C. District Court").  The Fund and the GYC requested numerous types of relief, including an order setting aside and permanently enjoining implementation of the 2003 SEIS and the 2003 ROD.

17.  In early December 2003, and after having missed three agreed upon deadlines, the Federal Defendants still had not published a final rule as contemplated by the parties in the settlement agreement in the 2000 Wyoming suit and, as a result, the State of Wyoming moved to reopen the 2000 Wyoming suit.  This Court granted the motion and ordered the case reopened on December 31, 2003.

18.   On December 11, 2003, the Federal Defendants issued a final rule ("2003 Final Rule") based upon the 2003 SEIS and the 2003 ROD.   The 2003 Final Rule authorized 950 snowmobile entries per day in Yellowstone and 190 snowmobile entries daily into Grand Teton and the Parkway combined.   The 2003 Final Rule also required that 80 percent of the snowmobiles entering the National Parks to be accompanied by a commercial guide, while the remaining 20 percent could enter the National Parks with a non-commercial guide.

19.   On December 16, 2003, the day before the beginning of the 2003-2004 snowmobile season in the National Parks, the D.C. District Court vacated and remanded the March 2003 SEIS, the 2003 ROD, and the 2003 Final Rule.   The D.C. District Court then ordered that the 2001 Snowmobile Ban Rule, as modified by the November 2002 Rule, shall remain in effect.   As a result of the D.C. District Court's order, the Federal Defendants did not implement the 2003 Final Rule and instead implemented the November 2002 Rule for the 2003-2004 winter season.

20.   From December 17, 2003, through February 10, 2004, the November 2002 Rule governed winter use in the National Parks.   The Federal Defendants thus permitted  493 snowmobiles to enter Yellowstone each day and 50 snowmobiles per day  to enter Grand Teton and the Parkway combined.   All snowmobiles entering Yellowstone were required to be accompanied by a commercial guide.

21.   In early January 2004, the State of Wyoming and ISMA both moved for a preliminary injunction to enjoin the Federal Defendants from enforcing the 2001 Snowmobile Ban Rule (as modified by the November 2002 Rule) during the pendency of the action challenging the legal validity of the 2001 Snowmobile Ban Rule.  On February 10, 2004, this Court enjoined enforcement of the 2001 Snowmobile Ban Rule (as modified by the November 2002 Rule) and ordered the Federal Defendants to promulgate temporary rules for the remainder of the 2003-2004 winter season.

22.   On February 11, 2004, the Federal Defendants issued two compendia ("February 2004 compendia") to govern winter use in the National Parks for the remainder of the 2003-2004 winter season. The February 2004 compendia authorized up to 780 snowmobiles entries per day into Yellowstone and up to 140 snowmobile entries into Grand Teton and the Parkway combined.   All snowmobiles entering Yellowstone were required to be accompanied by a commercial guide.   The February 2004 compendia remained in effect throughout the remainder of the 2003-2004 winter season.

23.   In mid-June 2004, the Federal Defendants began the process of promulgating new temporary winter use plans for the National Parks.  During the effective period of the proposed rule, the Federal Defendants intend to complete an EIS on winter use in the National Parks and, based on the findings in the EIS and

associated ROD, adopt new long-term winter use rules for the
National Parks.

24.   On June 14, 2004, the Federal Defendants began public
scoping in anticipation of preparing an environmental assessment
("EA") to support the new temporary winter use plans.

25.   The State of Wyoming submitted written comments to the
Federal Defendants during the scoping period.  In these comments,
the State of Wyoming asked the Federal Defendants to authorize 950
snowmobiles per day into Yellowstone, 25 percent of which could
enter with a non-commercial guide.  The State of Wyoming also asked
the Federal Defendants to allocate entry permits on a per season
basis rather than a per day basis.

26.   In late June 2004, the Federal Defendants released a
schedule of key events in the development of the 2004 EA for the
temporary winter use plans.    In this schedule, the Federal
Defendants indicated that the 2004 EA would be released for public
comment on August 20, 2004 and that a finding of no significant
impact ("FONSI") would be prepared and released after the public
comments on the 2004 EA had been reviewed and summarized.

27.   In late August 2004, the Federal Defendants released the
2004 EA for the temporary winter use plans.  The Federal Defendants
accepted public comment on the 2004 EA until midnight on September
20, 2004.

28. The 2004 EA analyzed five alternatives with regard to winter use. Four of the five alternatives permitted snowmobile access to the National Parks and required that the snowmobiles meet best available technology requirements for emissions and sound. Two of the five alternatives permitted a specified percentage of snowmobiles to enter Yellowstone without being accompanied by a commercial guide. The 2004 EA does not include a "no action" alternative.

29. Alternative 1 authorized access to the National Parks only by snowcoach and banned recreational snowmobiling in the National Parks. Alternative 1 mirrored the 2001 Snowmobile Ban Rule which this Court vacated on October 14, 2004.

30. Alternative 2 authorized 318 daily snowmobile entries into Yellowstone and 50 daily snowmobile entries into Grand Teton and the Parkway combined. Alternative 2 required that all snowmobiles entering Yellowstone be commercially guided.

31. Alternative 3 authorized 540 daily snowmobile entries into Yellowstone and 75 daily snowmobile entries into Grand Teton and the Parkway combined. Alternative 3 dictated that approximately 80 percent of the snowmobiles entering Yellowstone be commercially guided and the remaining 20 percent be unguided.

32. Alternative 4 authorized 720 daily snowmobile entries into Yellowstone and 140 daily snowmobile entries into Grand Teton and the Parkway combined. Alternative 4 required that all

snowmobiles entering Yellowstone be commercially guided. The Federal Defendants designated Alternative 4 as the "preferred alternative" in the 2004 EA. The Federal Defendants provided no substantive analysis to explain why all snowmobiles entering Yellowstone were required to be accompanied by a commercial guide or to explain why the number of snowmobiles entries into Yellowstone was capped at 720 snowmobiles.

33.   Alternative 5 authorized 950 daily snowmobile entries into Yellowstone and 190 daily snowmobile entries into Grand Teton and the Parkway combined. Under Alternative 5, approximately 80 percent of the snowmobiles entering Yellowstone were required to be commercially guided and the remaining 20 percent were required to be accompanied by a non-commercial guide. Alternative 5 mirrored the 2003 Final Rule which the D.C. District Court vacated on December 16, 2003.

34.   On September 7, 2004, the Federal Defendants published a proposed rule to govern winter use in the National Parks for the 2004-2005 winter season, the 2005-2006 winter season and, if necessary, the 2006-2007 winter season. Under the proposed rule, Alternative 4 from the 2004 EA would be implemented as the winter use rules for the National Parks for the next two to three winter seasons.

35.   In the proposed rule, the Federal Defendants relied upon law enforcement statistics from the 2003-2004 winter season to

justify the decision to require commercial guides for all snowmobiles entering Yellowstone. The Federal Defendants provided no explanation for the decision to limit the number of daily entries into Yellowstone to no more than 720 snowmobiles.

36. On November 4, 2004, the Federal Defendants issued the 2004 FONSI in connection with the 2004 EA. In the 2004 FONSI, the Federal Defendants adopted Alternative 4 from the 2004 EA, with slight modifications. The decision in the 2004 FONSI limits the number of daily snowmobile entries into Yellowstone to no more than 720 snowmobiles. All recreational snowmobiles in Yellowstone must travel with a commercial guide. The decision in the 2004 FONSI authorizes recreational snowmobile use in the National Parks through the winter of 2006-2007.

37. On November 10, 2004, the Federal Defendants issued the 2004 Temporary Rule to govern winter use in the National Parks for the next two to three winter seasons. The 2004 Temporary Rule limits the number of daily snowmobile entries into Yellowstone to no more than 720 snowmobiles. All recreational snowmobiles in Yellowstone must travel with a commercial guide. The 2004 Temporary Rule authorizes recreational snowmobile use in the National Parks through the winter of 2006-2007.

## FIRST CAUSE OF ACTION

### Violations of the National Environmental Policy Act and Its Implementing Regulations

38.  Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 37, as if fully set forth herein.

39.  NEPA requires federal agencies to consider every significant aspect of the environmental impact of any proposed action.  The requirements in NEPA are intended to ensure that federal agencies will foster informed public comment and engage in informed decision making with respect to the environmental impact of a proposed action.

40.  In accordance with NEPA and its implementing regulations, the Federal Defendants were required to complete an EA to determine whether the proposed winter use plans required them to complete an EIS.

41.  An EA is a concise public document that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI; to aid the federal agency's compliance with NEPA when no EIS is necessary; and to facilitate the preparation of an EIS when one is necessary.

42.  An EA shall include brief discussions of: (a) the need for the proposal; (b) alternatives to the proposed action; (c) the environmental impacts of the proposed action and the alternatives; and (d) a listing of agencies and persons consulted.  In identifying alternatives to the proposed action, the federal agency

must consider a reasonable range of alternatives and must include and evaluate a "no action" alternative in its analysis. In evaluating the environmental impacts in the EA, the federal agency must take a "hard look" at the environmental consequences of the proposed action and the alternatives. If the agency finds that the proposed action will not significantly affect the environment, the agency makes a FONSI.

43.   The 2004 EA does not include a "no action" alternative. The failure to include a "no action" alternative in the 2004 EA violates NEPA and its implementing regulations.

44.   In evaluating the alternatives in the 2004 EA, the Federal Defendants did not take a "hard look" at the environmental impacts of allowing some snowmobiles to enter Yellowstone without being accompanied by a commercial guide. The failure to take a "hard look" violates NEPA and its implementing regulations.

45.   The Federal Defendants did not consider a reasonable range of alternatives in the 2004 EA. Alternatives 2 through 5 each limit the number of daily snowmobile entries into the National Parks. The Federal Defendants did not consider an alternative that would have limited the number of snowmobiles based upon a seasonal allocation of entry permits to snowmobile outfitters. The failure to consider such an alternative violates NEPA and its implementing regulations.

46. The Federal Defendants impermissibly predetermined the outcome of the 2004 EA. They made the decision to issue a FONSI before it had released the 2004 EA for public comment. Given the predetermined outcome for the 2004 EA, this Court owes the Federal Defendants no deference in reviewing the decisions made in connection with the 2004 EA.

### SECOND CAUSE OF ACTION

### Violations of the Administrative Procedure Act

47. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 46 as if fully set forth herein.

48. The APA dictates that a reviewing court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. An agency decision is arbitrary or capricious if: (a) the agency entirely failed to consider an important aspect of the issue; (b) the agency's explanation for the decision was counter to the evidence before it; (c) the agency relied on factors that Congress did not intend for it to consider; or (d) the agency's decision is so implausible that it could not be attributed to the product of agency expertise.

49. The APA "arbitrary and capricious" standard requires an agency to provide a reasoned explanation for its action. The agency's action must be upheld, if at all, on the basis articulated by the agency itself. To satisfy the "reasoned explanation"

requirement, the agency must clearly articulate its course of inquiry, its analysis, and its reasoning.

50. The "arbitrary and capricious" standard also requires that the agency's action be supported by substantial evidence in the administrative record. "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

51. The Federal Defendants failed to provide a reasoned explanation for its decision to require that all snowmobiles entering Yellowstone be accompanied by a commercial guide. The failure to provide such a reasoned explanation makes the decision to adopt the commercial guide requirement in the Temporary Rule arbitrary and capricious.

52. The commercial guide requirement and the 720 snowmobiles per day limit on snowmobiles entering into Yellowstone is not supported by substantial evidence in the administrative record and, as a result, the decision to adopt the commercial guide requirement and the 720 snowmobiles per day limit in the Temporary Rule was arbitrary and capricious.

53. The Federal Defendants failed to provide a reasoned explanation for limiting the number of daily snowmobile entries into Yellowstone to no more than 720 snowmobiles per day. The failure to provide such a reasoned explanation makes the decision

in the Temporary Rule to place such limits on snowmobile entries into Yellowstone arbitrary and capricious.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff WLRA prays for this Court to enter judgment in its favor and against Defendants as follows:

1.   Declare that the Federal Defendants have violated NEPA and its implementing regulations by failing to include a "no action" alternative in the 2004 EA, by failing to take a "hard look" at the environmental impacts of allowing some snowmobiles to enter Yellowstone without being accompanied by a commercial guide, and by failing to consider an alternative that would have allocated entry permits into Yellowstone on a per season basis instead of per day basis;

2.   Declare that the Federal Defendants acted arbitrarily and capriciously by adopting the temporary rule and violated the APA by failing to provide a reasoned explanation for its decision to require that all snowmobiles entering Yellowstone National Park be accompanied by a commercial guide, by failing to provide a reasoned explanation for limiting the number of daily snowmobile entries into Yellowstone National Park to no more than 720 snowmobiles per day, and by adopting the commercial guide requirement and the 720 snowmobiles per day limit in the Temporary Rule despite the lack of substantial evidence in the administrative record to support these decisions;

3.    Set aside the 2004 EA, the 2004 FONSI, and the 2004 Temporary Rule and remand the 2004 EA, the 2004 FONSI, and the 2004 Temporary Rule to the NPS;

4.    Order that the 2004 Temporary Rule shall remain in effect during the remand process;

5.    Order that this Court shall retain jurisdiction over this matter during the remand process so that, upon completion of the remand process and upon timely application by any of the parties to this action, this Court may review the results of the remand to ensure that the Federal Defendants have complied with NEPA and the APA; and

6.    Award such other relief as this Court may find just and appropriate.

Dated this 10th day of November, 2004.

THE WYOMING LODGING AND RESTAURANT ASSOCIATION

By: _____
Steven F. Freudenthal
Monique J. Ojeda
Freudenthal, Salzburg & Bonds, P.C.
123 East 17th Street
P.O. Box 387
Cheyenne, WY 82003
(307) 634-2240
(307) 634-0336 fax

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE FUND FOR ANIMALS, et al. )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>GALE NORTON, et al. )<br>)<br>Defendants. )<br>) | Civ. No. 04-1913 (EGS) |

**FEDERAL DEFENDANTS' CONSOLIDATED MOTION TO TRANSFER,
CONSOLIDATE, AND STAY PROCEEDINGS**

This action is one of two contemporaneous challenges to the National Park Service's latest

winter use decision for Yellowstone and Grand Teton National Parks and the John D. Rockefeller,

Jr., Memorial Parkway ("the Parks") and to documentation supporting that decision. The two

challenges are proceeding in parallel in this Court and in the United States District Court for the

District of Wyoming. See Wyoming Lodging and Rest. Ass'n. v. Dept. of Interior, Civ. No. 04-

315B (D. Wyo.). Earlier winter use litigation that proceeded concurrently in these two courts

produced conflicting orders that ultimately led this Court to order Federal Defendants to show cause

why they should not be held in contempt of court. See February 17, 2004 Order to Show Cause.

With the current set of parallel proceedings, there is an even greater risk of conflicting

outcomes than there was earlier. To avoid this risk – and the Hobson's choice it could entail for the

Federal Defendants – Federal Defendants, Gale A. Norton, Secretary of the Interior, and Fran

Mainella, Director of the National Park Service (collectively "Federal Defendants"), by and through

undersigned counsel, hereby move this Court to transfer this case to the District of Wyoming. In

the meantime, Federal Defendants also move the Wyoming Court to stay the Wyoming proceedings

until January 5, 2005 pending this Court's consideration of this motion.

If this Court grants Federal Defendants' motion to transfer by January 5, 2005, Federal Defendants move the Wyoming Court to consolidate the instant case with Wyoming Lodging and Rest. Ass'n., Civ. No. 04-315B. If this Court has not granted Federal Defendants' motion to transfer by January 5, 2005, Federal Defendants move the Wyoming Court to transfer Wyoming Lodging and Rest. Ass'n., Civ. No. 04-315B to the District of the District of Columbia by January 19, 2005, and further move this Court to consolidate Wyoming Lodging and Rest. Ass'n., Civ. No. 04-315B with the instant case.

Because of the interrelationship between these parallel proceedings, Federal Defendants are filing a substantially identical motion in Wyoming Lodging and Rest. Ass'n., Civ. No. 04-315B, see Exhibit A. Undersigned counsel conferred with plaintiff's counsel and plaintiff's counsel opposed granting the relief requested herein.

Respectfully submitted: November 23, 2004

THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division

ANDREW C. EMRICH
Counsel to the Assistant Attorney General
Environment and Natural Resources Division
950 Pennsylvania Avenue, N.W., Room 2143
Washington, D.C. 20530
Tel: (202) 514-0624; Fax: (202) 514-0557

LAUREN FISCHER
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0240; Fax: (202) 305-0506

Attorneys for Defendants.

OF COUNSEL:

BARRY N. ROTH
U.S. Department of the Interior
Office of the Solicitor
Deputy Associate Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3210
Washington, D.C. 20240
Tel: (202) 208-7957

JASON WAANDERS
U.S. Department of the Interior
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3210
Washington, D.C. 20240
Tel: (202) 208-7957

A CERTIFIED TRUE COPY

JUN 1 6 2005

ATTEST
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 1 6 2005

FILED
CLERK'S OFFICE

*RELEASED FOR PUBLICATION*

*DOCKET NO. 1681*

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE NATIONAL PARK SERVICE WINTER USE MANAGEMENT LITIGATION

*The Fund for Animals, et al. v. Gale Norton, et al.*, D. District of Columbia, C.A. No. 1:04-1913

*Wyoming Lodging & Restaurant Association, et al. v. United States Department of Interior, et al.*, D. Wyoming, C.A. No. 2:04-315

## BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR., KATHRYN H. VRATIL* AND DAVID R. HANSEN, JUDGES OF THE PANEL

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

### ORDER DENYING TRANSFER

JUN 2 0 2005

This litigation currently consists of one action pending in the District of District of Columbia and one action pending in the District of Wyoming. Three federal defendants in the two actions (the United States Department of Interior, the Secretary of the Department, and the Director of the National Park Service) move the Panel, pursuant to 28 U.S.C. § 1407, for an order centralizing this litigation in a district court within the jurisdiction of the Court of Appeals for the Tenth Circuit. Joining the movants in support of this position are two defendant-intervenors in the District of District of Columbia action, Blue Ribbon Coalition, Inc., and International Snowmobile Manufacturers Assn. The State of Wyoming, which is a plaintiff-intervenor in the District of Wyoming action, supports centralization in the District of Wyoming. The seven plaintiffs in the District of District of Columbia action (The Fund for Animals, BlueWater Network, Ecology Center, and four individual plaintiffs) oppose transfer. If the Panel orders centralization over their objections, then these plaintiffs would support selection of District of District of Columbia as transferee forum.

On the basis of the papers filed and hearing session held, the Panel finds that Section 1407 centralization would neither serve the convenience of the parties and witnesses nor further the just and efficient conduct of this litigation. Movants have failed to persuade us that any remaining, unresolved common questions of fact and law are sufficiently complex and/or numerous to justify Section 1407 transfer in this two action docket. Each of the two MDL-1681 actions is a successor action to litigation that has already been proceeding on a parallel basis in the Wyoming and District of Columbia courts for over four years, and alternatives to transfer exist that can continue to

---

*Judge Vratil took no part in the disposition of this matter.

- 2 -

minimize whatever possibilities there might be of duplicative discovery and/or inconsistent pretrial rulings. *See, e.g., In re Eli Lilly and Company (Cephalexin Monohydrate) Patent Litigation,* 446 F.Supp. 242, 244 (J.P.M.L. 1978). *See also Manual for Complex Litigation, Fourth,* § 20.14 (2004).

IT IS THEREFORE ORDERED that the motion, pursuant to 28 U.S.C. § 1407, for centralization of these two actions is denied.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

**FISH AND WILDLIFE AND PARKS**
NOVEMBER 19 – 25, 2006

# NON RESPONSIVE

and Threatened Species. In the absence of ESA listing, bald eagles would receive protection under the Bald and Golden Eagle Protection Act, which prohibits the disturbance of eagles. The draft EA had been surnamed by the Director and is in the Assistant Secretary's Office for signature.

- *New:* **NPS - Yellowstone and Grand Teton National Parks (WY) – Cooperating Agencies to Conduct Technical Review of Draft Winter Use EIS:** The National Park Service will provide a preliminary version of the Draft Winter Use Environmental Impact Statement (DEIS) for technical review by the ten Cooperating Agencies involved in the planning effort on Monday, November 20th. Alternatives contained in the Cooperating Agency review document are a refinement of the preliminary draft alternatives which were made available for public review and comment in March 2006. The technical review draft identifies an agency preferred alternative, which would generally continue the current managed snowmobile and snowcoach program. Briefings with DOI, OMB, NPS and Congressional staff members are taking place prior to Monday's release. Extensive national and regional media coverage and editorials are anticipated.

- *New:* **NPS - Grand Canyon National Park (AZ) – Bright Angel Non-native Fish Reduction Project:** The National Park Service has prepared a Finding of No Significant Impact (FONSI) for the removal of non-native fish from Bright Angel creek. Eighteen comments from the Federation of Fly Fishers, members of Northern Arizona Fly Casters, and the unaffiliated public were received. The Arizona Game and Fish Department, U.S. Fish and Wildlife Service and the Arizona State Historic Preservation Office were the agencies responding. The FONSI includes a provision that the NPS will ensure that it has complied with 43 CFR § 24.4 regarding consultation with the state and application for any required state permits before implementing the preferred alternative. The action will remove non-native fish, primarily trout, from the creek for five years. The dual purposes of the action are to benefit endangered humback chub and other native fish species in the mainstem Colorado River, and to restore and enhance, to the extent possible, the native fish community that once flourished in Bright Angel Creek.

- *New:* **NPS – Glen Canyon National Recreation Area (AZ) - Blank Petition to Annex Over 21,000 Acres Filed by Page, AZ:** The city of Page, AZ filed a blank petition, map and description with Coconino County to annex over 21,000 acres of land within Glen Canyon National Recreation Area. The filing starts the 30-day public review period, after which the City can begin collecting signatures for the petition. The City will hold a public hearing, as required by AZ statute, on November 21, 2006. The regional Solicitor's Office in Salt Lake City has begun discussions with the U.S. Attorney's Office in Phoenix about possible legal actions.

**8 Pages**

**NON RESPONSIVE**



**PUBLIC COMMENT REPORT**
**Winter Use Plans, Draft Environmental Impact Statement**
**Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway**

**NATIONAL PARK SERVICE**

This report summarizes public comments received by the National Park Service (NPS) for the Draft Winter Use Plans Environmental Impact Statement (DEIS), to plan winter visitation and recreation management in Yellowstone National Park, Grand Teton National Park (GTNP), and the John D. Rockefeller, Jr., Memorial Parkway. This long-term plan will guide the management of winter use in the parks, including snowmobiles, snowcoaches and possibly buses. It is intended to ensure that park visitors have a range of winter recreational opportunities in an appropriate setting, and that these do not impair or irreparably harm park resources or values.

**BACKGROUND**

Winter use management of Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway has been the subject of intensive study and public involvement for over a decade, comprising planning efforts, litigation, and National Environment Policy Act (NEPA) documentation. The following summarizes events that have occurred to date:

| | |
|---|---|
| 1990 | The NPS completed an Environmental Assessment and Winter Use Plan for the parks. The Greater Yellowstone Coordinating Committee (including the NPS and U.S. Forest Service) subsequently began work on an interagency assessment of winter use issues (published in 1999 as *Winter Visitor Use Management: a Multi-agency Assessment*). |
| 1997 | The Fund for Animals filed suit against the NPS, resulting in a settlement that required the NPS to produce a Final Environmental Impact Statement (FEIS) and make a new decision on winter use. |
| November 22, 2000 | The NPS signed a Record of Decision on the FEIS. The decision eliminated recreational snowmobile and snowplane use from the parks by the winter of 2003-2004. |
| December 6, 2000 | The International Snowmobile Manufacturers Association sued the NPS asking that the decision eliminating snowmobile and snowmobile use be set aside based on NEPA process infractions. |
| June 29, 2001 | A procedural settlement negotiated by the Office of the Secretary of Interior became final. As provided in that settlement agreement, the NPS acted as lead agency to prepare a Supplemental Environmental Impact Statement (SEIS), with the State of Wyoming and nine others acting as cooperating agencies. |
| March 2002 | The NPS published the draft SEIS, and a 60-day public comment period followed during which the NPS received over 300,000 comment documents. |
| March 25, 2003 | The NPS issued a Record of Decision for the SEIS. |
| August 27, 2003 | The Proposed Rule based on the March 2003 Record of Decision was published in the *Federal Register*; the public comment period closed on October 14, 2003. |

August 2007                                                                                    North Wind, Inc.

| December 2003 | The NPS published the new regulation based on the Record of Decision, but these actions were subsequently vacated and remanded to the NPS by the Washington, D.C., District Court. |
|---|---|
| February 2004 | A federal court in Wyoming issued a preliminary injunction preventing the NPS from implementing the January 2001 regulation phasing out snowmobile use in the three parks. As a result, the parks issued emergency orders to comply with the court's order. |
| June 2004 | The NPS began work on an Environmental Assessment (EA) for a Temporary Winter Use Plan for the parks, to guide management of winter use for the interim period (2004-2005, 2005-2006, and 2006-2007). |
| August 20, 2004 | The NPS issued the EA for a 30-day public review and comment and received 95,006 comment documents. |
| September 7, 2004 | The NPS published a Proposed Rule in conjunction with the EA, followed by a 30-day comment period that ended on October 7, 2004. |
| November 10, 2004 | Implementing regulations for the temporary use plan, which remained in effect through the 2006–2007 winter season, were published in the *Federal Register*. |
| June 24, 2005 | NPS published a Notice of Intent to prepare the Winter Use Plans Environmental Impact Statement and began a 60-day public scoping period beginning on July 24, 2005. |
| September 1, 2005 | The scoping comment period ended, with stakeholders submitting a total of 33,365 comment documents. |
| Fall 2005 | The Wyoming District Court upheld the validity of the 2004 temporary winter use plan, ruling on challenges filed by several litigants. The D.C. District Court denied the Fund for Animals and Federal defendants' motions for summary judgment, as well as a motion by the Greater Yellowstone Coalition enforcing the adaptive management standards of the 2003 decision. |
| September 2006 | The Fund for Animals filed a motion renewing a previous request for summary judgment. That suit is still pending. |
| June 2007 | The Wyoming District Court ruled on a suit from Save Our Snowplanes, upholding the validity of the temporary winter use plan and final regulation and their provisions prohibiting snowplane use on Jackson Lake. |

## CONTRACTOR ACTIVITIES and RESULTS

The comment period for the DEIS began on 03/27/2007 and ended on 06/05/2007. The NPS contracted with North Wind, Inc. (North Wind) to analyze public comments on the DEIS using the NPS Planning, Environment, and Public Comment (PEPC) system, a World Wide Web-based interface through which stakeholders submitted correspondence electronically. Stakeholders also sent paper documents directly to the NPS and provided oral and written comments at public meetings; these were forwarded to North Wind for hand processing (either scanning or data entry into the system).

North Wind received and analyzed 122,190 documents and considered the content of each through a coding process. North Wind reviewed and analyzed each document for concern statements; each concern statement was assigned a code. Codes represent text statements that, taken together, summarize the content of all similar comments received. The result is a profile for each comment document that reflects the content.

August 2007                                                                                              North Wind, Inc.

**SUMMARY TABLES**

The following queries based on data from PEPC summarize the results:

- Total number of documents and comments received
- Number of comment documents favoring each alternative
- Number of documents from each state/province/country
- Number of documents containing comments on each summary code
- Number of documents from gateway communities
- Number of form letters and non-form letters
- Total number for each form letter, and number responding via the web, email or U.S. mail, for form letters (for both form and non-form letters)

Also included is an appendix (Correspondence Text from DEIS Form Letters) of form letters received during the public comment period.

## Number of Documents and Comments Received

| | |
|---|---|
| Total correspondence documents | 122,190 |
| Total number of comments | 1,276,393 |

## Number of Documents Favoring Each Alternative

| Alternative | Number * |
|---|---|
| Alternative 1: Continue Current Plan (Preferred Alternative) | 193 |
| Alternative 2: Snowcoaches only | 88,934 |
| Alternative 3a: Eliminate Most Oversnow Roads/Road Grooming | 31 |
| Alternative 3b: Close Oversnow Roads - No Action | 69 |
| Alternative 4: Expand Recreational Use | 3,244 |
| Alternative 5: Provide for Unguided Access | 52 |
| Alternative 6: Mixed Use | 10 |

\*   Total expressing a preference for a particular alternative does not equal the total number of correspondence documents because not all commentors expressed a preference.

## Number of Letters from Each State/Province/Country *

| Number of Letters from Each State/Province | |
|---|---|
| **USA** | |
| AK | 359 |
| AL | 512 |
| AR | 452 |
| AZ | 2797 |
| CA | 21246 |
| CO | 4774 |
| CT | 1695 |
| DC | 214 |
| DE | 239 |
| FL | 6333 |
| GA | 1778 |
| GU (Guam) | 6 |
| HI | 602 |
| IA | 847 |
| ID | 639 |
| IL | 4680 |
| IN | 1421 |
| KS | 716 |
| KY | 713 |
| LA | 442 |
| MA | 3503 |
| MD | 1984 |
| ME | 891 |
| MI | 3059 |
| MN | 2824 |
| MO | 1468 |
| MS | 204 |
| MT | 863 |
| NC | 2543 |
| ND | 82 |
| NE | 389 |
| NH | 843 |
| NJ | 3095 |
| NM | 1392 |
| NV | 771 |
| NY | 8435 |
| OH | 3406 |
| OK | 434 |

| Number of Letters from Each State/Province | |
|---|---|
| OR | 3641 |
| PA | 4352 |
| PR | 60 |
| RI | 427 |
| SC | 679 |
| SD | 156 |
| TN | 1381 |
| TX | 4519 |
| UT | 802 |
| VA | 2442 |
| VI | 18 |
| VT | 614 |
| WA | 5078 |
| WI | 2179 |
| WV | 261 |
| WY | 3497 |
| AA (Armed Forces Americas) | 5 |
| AE (Armed Forces Europe) | 68 |
| AP (Armed Forces Pacific) | 15 |
| AS (American Samoa) | 7 |
| FM Federated States of Micronesia | 1 |
| MH (Marshall Islands) | 1 |
| UM (U.S. Minor Outlying Islands) | 7 |
| USA (other) | 57 |
| **Canada** | |
| AB (Alberta) | 49 |
| BC (British Columbia) | 122 |
| MB (Manitoba) | 18 |
| NB (New Brunswick) | 9 |
| NL (Newfoundland and Labrador) | 7 |
| NS (Nova Scotia) | 12 |
| NT (Northwest Territories) | 3 |
| NU (Nunavut) | 4 |
| ON (Ontario) | 211 |
| PE (Prince Edward Island) | 2 |
| QC (Quebec) | 55 |
| SK (Saskatchewan) | 9 |
| YT (Yukon Territory) | 6 |
| Canada (other) | 1 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                                  North Wind, Inc.

| Number of Letters from Each State/Province | |
|---|---|
| Other countries | |
| Baranya (Hungary) | 1 |
| Finland | 1 |
| Japan | 2 |
| Maharashtra (India) | 1 |
| Mendoza (Argentina) | 1 |
| North Holland (Netherlands) | 1 |
| NSW Australia | 1 |

| Number of Letters from Each State/Province | |
|---|---|
| PW Palau | 1 |
| Serbia | 1 |
| Songkhla (Thailand) | 1 |
| Spain | 1 |
| Sweden | 9 |
| United Kingdom | 7 |
| No or Incomplete Address | 4,736 |
| **Total** | **122,190** |

\*    Data extracted from NPS PEPC system. Commentors enter their own information, so breakout is not restricted to 50
     states. Some address corrections (Zip Codes, etc.) were incorporated before totals were calculated.

## Comment Totals per Code

| Code | Code Description | Total Comments |
|---|---|---|
| **D-AE3.0** | **AFFECTED ENVIRONMENT** | |
| D-AE3.4.1 | Commentors state that summer visitors have greater impacts to resources than do winter visitors. Some state: * The large number of automobiles entering the park during summer months contributes more pollutants than do snowmobiles. * Summer visitors have negative impacts to wildlife and can travel without guides. | 103 |
| **D-AE3.5** | **Public and Employee Health and Safety** | |
| D-AE3.5.1 | Commentors state NPS should continue avalanche control on Sylvan Pass. Some add: * The howitzer is safe and should continue. * Risk of injury is low. * Controlled slides prevent road closures/repairs. * Other areas are hazardous, too. * The park needs avalanche control capability. * Closure is really a budget, not a safety, issue. * DEIS overstates health and safety issues related to this concern. * Cody needs consistent avalanche management, not a hit-and-miss program. | 562 |
| D-AE3.5.1.1 | Commentors state that there are alternative ways to manage the avalanche issue and/or other viable explosive delivery methods for Sylvan Pass, such as sound wave guns or fixed propane detonation devices on the mountain. Some commentors support: * Multiple delivery methods of avalanche control identified in the DEIS. * Future best available technologies. * Contracting avalanche control to private companies that are more willing to take risks. | 15 |
| D-AE3.5.1.2 | Commentors make statements about continuing avalanche control. * Based on the Comey report NPS can't claim the risk on Sylvan Pass is unacceptable or can't be managed. * A specialized remote weather station should be put in place to provide real time data. * Helicopters increase costs yet make avalanche mitigation unpredictable and inconsistent and should only be used as a supplement to a primary artillery program. * NPS should act on mitigations recommended by NoHow, Inc. and Comey. | 8 |
| D-AE3.5.2 | Commentors oppose continued avalanche control operations on Sylvan Pass because: * It is dangerous to staff. * It is unique in NPS - no other discretionary oversnow road in the US uses active avalanche control measures. * No other national parks use artillery for controlled avalanches. * It sets a dangerous precedent for other parks. | 13,628 |
| D-AE3.9.1 | Commentors state that NPS needs to educate the public about the need for and process of protecting an environmentally sensitive park. Some state they should use partnerships with the surrounding communities, counties and states to expand educational opportunities regarding rules, user ethics, visitor safety and appreciation of the resources. Some commentors add that allowing too many off-road vehicles in national parks sends the wrong message about park protection. | 911 |
| **D-AL2.0** | **ALTERNATIVES** | |
| **D-AL2.1** | **Alternative Management Techniques** | |
| D-AL2.1.1.1 | Commentors support Best Available Technology (BAT) requirements for snowmobiles used in the parks. Some commentors add that: * The snowmobile industry opposed the introduction of BAT machines, but they have reduced the negative impacts of snowmobiling. | 18,835 |
| D-AL2.1.1.2 | Commentors oppose snowmobiles BAT requirements in the parks, or in certain areas. Some add: * Associated costs are too high. * Areas in GTNP, JDR, Flagg Ranch west on Grassy Lake Rd., Jackson Lake and/or CDST should be BAT exempt. * EPA Compliant (2007 or newer) models should be allowed on CDST and/or Jackson Lake. * A percentage of daily entries from Grand Junction to Flagg Ranch/Grassy Lake Road should be allowed to be 2006 or newer model. | 1,226 |
| D-AL2.1.1.2.1 | Commentors state that 25 non-BAT EPA compliant and 25 BAT snowmobiles per day should be allowed on the CDST, with a group size limit of 10. | 5 |
| D-AL2.1.1.3 | Commentors support Best Available Technology (BAT) requirements for snowcoaches used in the parks. | 75 |
| D-AL2.1.1.4 | Commentors state concerns about the cost of purchasing BAT machines for winter fishing in Grand Teton Park without some guarantee that they can be used for multiple years. They suggest that NPS guarantee that approved BAT snowmobiles can be used for 5 to 10 years. | 3 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                    North Wind, Inc.

| Code | Code Description | Total Comments |
|------|-----------------|----------------|
| D-AL2.1.1.5 | Commentors state various reasons that NPS should not rely on BAT to reduce air pollution from mobile sources: *It does not establish progressive emission standards that snowmobile makers must meet. * Predicted BAT emissions are likely to be lower than actual levels during typical operation. | 10 |
| D-AL2.1.2.1 | Commentors support guide requirements for snowmobiles used in the parks. Some make suggestions for modifying the program, such as allowing guides to train in the park prior to opening. | 85,933 |
| D-AL2.1.2.1.1 | Commentors state that previous NEPA analyses and three-years of required guiding have clearly established that guided access is essential to control inappropriate behavior and protect resources; allowing unguided access would be illegal. | 2 |
| D-AL2.1.2.2 | Commentors object to guide requirements for snowmobiles in the parks. Some commentors add that: * High guide fees reduce winter visitation. * Guide requirements eliminate many potential visitors to accommodate a few who prefer solitude, at taxpayer expense. * The requirements displace local "real snowmobilers" in favor of tourists. | 144 |
| D-AL2.1.2.3 | Commentors support limiting guided groups to 11: 10 snowmachines plus one guide. Some add that lower numbers increase costs, reduce flexibility, harm wildlife, increase congestion at attractions thus affecting visitor experience, and/or increase negative sound impacts. Some commentors add that larger groups are unproven and could cause negative impacts. | 1,031 |
| D-AL2.1.2.4 | Commentors support some level of unguided access with trained/certified leaders. Some add: * Visitors could qualify to snowmobile without a commercial guide using their own machines * Trained visitors could lead their own groups * Unguided snowmobilers can use the park w/o impacts to others * Unguided access should be available through the East Entrance * Unguided groups should be smaller * All groups should be maximized in size * This addresses need for affordable access. | 1,222 |
| D-AL2.1.2.4.1 | Commentors suggest requirements for certified guides: snowmobile experience, safety certificate, annual renewal, advance park reservations, BAT equipment, advance communication with park staff on current hazards and conditions, FRS radios for intragroup communication. | 10 |
| D-AL2.1.2.4.2 | Commentors recommend requirements for snowmobile operators who are part of groups led by certified leaders: a valid drivers license and a certificate of completion of a safety course. Those who do not meet these requirements would need to be riders or go with a guided group. | 5 |
| D-AL2.1.2.5 | Commentors request that NPS allow up to 50% of daily snowmobiles entries on the CDST and Grassy Lake Road to be used by commercial snowmobile outfitters. | 83 |
| D-AL2.1.3.1 | Commentors support route restrictions for snowmobiles and/or snowcoaches used in the parks. Some commentors add that they favor closure of the CDST. | 95 |
| D-AL2.1.3.2 | Commentors object to various snowmobile route restrictions and/or management of route restrictions. Some commentors add: * They object to closure of Sylvan Pass (East Entrance of the Park). Some state this restricts public access to the Park, impairs a cultural resource, and may diminish future opportunities. * If routes are closed, post notice signs in gateway communities. * NPS should provide better notice of grooming schedules for routes in the park so they will know what to expect. | 4,561 |
| D-AL2.1.3.2.1 | Commentors state Sylvan Pass should stay open to oversnow motorized vehicles in the winter and be named the Craig Thomas Memorial Trail. | 1 |
| D-AL2.1.3.3 | Commentors state support for closing Sylvan Pass/East Entrance in the winter. Some commentors add that: * Closure is consistent with NPS law and policy. * The costs of plowing do not justify the small visitor numbers. * Funds spent on plowing could be put to better use (hiring additional winter staff for enforcement and services). * The East Entrance has always had low visitor numbers. | 13,658 |
| D-AL2.1.3.4 | Commentors request that the road from West Yellowstone to Seven-mile Bridge be opened to snowcoach operators only for preseason testing of vehicles. | 5 |
| D-AL2.1.3.5 | Commentors state that the winter use decision should include continued and reliable grooming of the first 6 miles of the East Entrance Road for cross-country skiing and they request that NPS coordinate with Park County Nordic Ski Association to connect skiing opportunities available on the East Entrance Road with those available on Shoshone National Forest. | 1 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                                    North Wind, Inc.

| Code | Code Description | Total Comments |
|------|------------------|----------------|
| D-AL2.1.4.1 | Commentors support limits and/or low limits on snowmobiles allowed daily in the parks. Some commentors add that: * They favor daily over seasonal limits to manage winter use. * They object to flexible daily limits. * Low limits enable the park to recover from visitors during the winter. * Snowcoaches provide full access. * Some state the focus should be on monitoring the number of visitors not on the number of machines. | 46,927 |
| D-AL2.1.4.2 | Commentors object to limits on the number of snowmobiles allowed in the parks daily and/or low limits for specific park entrances, routes, or features. | 52 |
| D-AL2.1.4.2.1 | Commentors state that limits on the number of snowmobiles allowed in the parks are responsible for low visitor numbers through the East Entrance; thus, it is not fair to use low visitor use to justify closing this entrance. Some add that justifying the closure of Sylvan Pass because there is not enough traffic to justify the expense of grooming is a self inflicted and premeditated situation. | 3,249 |
| D-AL2.1.4.2.2 | Commentors state that snowmobiles operating on the CDST between the east boundary of GTNP and Moran Junction should be exempt from daily limits, or a percentage should be allowed for through snowmobilers on the CDST or those headed west on Grassy Lake Rd. Some recommend setting a daily limit of 15 BAT and 25 non-BAT EPA compliant snowmobiles on the Grassy Lake Rd.-CDST corridor and allowing those snowmobiles to travel either east or west. | 888 |
| D-AL2.1.4.2.3 | Commentors state that the lower numbers of snowmobiles in the parks over the last four years have resulted in improvements in park air quality, soundscapes and/or visitor experience. Some commentors commend the Park Service for these improvements. | 81,204 |
| D-AL2.1.5.1 | Commentors state that rules relating to oversnow travel should be strictly enforced if snowmobiles are allowed in the parks. Some state that NPS law enforcement, rather than guides, be used to enforce rules. Some suggest those who break the rules should not be allowed to return to the park. | 69 |
| D-AL2.1.5.2 | Commentors suggest that NPS take advantage of "fast pass," GPS speed tracking, and other new technologies to reduce staff requirements and/or improve enforcement. | 5 |
| D-AL2.1.5.3 | Commentors discuss various potential snowcoach improvements, including small group size, less polluting vehicles operated only when full, more comfort, better handicap access, better reliability, and larger windows. Some commentors recommend scheduled shuttle service to accommodate longer stays or custom, nonmotorized recreation once inside the park. | 18 |
| D-AL2.1.6 | Commentors make general statements in favor of snowmobile access to the parks, such as: * NPS should continue to allow snowmobiles in the parks (or, should not close the parks to snowmobiles). * NPS should not place any restrictions on snowmobiles. * Individual snowmobile travel provides the best way to experience the parks in winter. | 1,194 |
| D-AL2.1.6.1 | Commentors state reasons for eliminating snowmobiles from the parks. * Legal and policy mandates including Interior Secretary Kempthorne's management direction and strategic plan. * Scientific findings. * The will of the people. * Philosophical considerations including that YNP was the first national park established in the world and the nation and the world look to Yellowstone for guidance in stewardship of resources. | 2 |
| D-AL2.1.7 | Commentors express concern about one contractor having control of oversnow access to the park and state that NPS should consider issuing more than one concessions contract. | 2 |
| D-AL2.1.8 | Commentors recommend that YNP, as the oldest national park, should be a leader in ecological management and/or sustainable recreation. Some state that given the scope of its responsibility for the resources and values entrusted to its care, NPS has an obligation to demonstrate and work with others to promote leadership in environmental stewardship. | 36 |
| D-AL2.1.9 | Commentors support setting winter usage fees to offset the costs of keeping the park accessible to winter visitors | 8 |
| **D-AL2.3** | **Alternatives Dismissed from Further Consideration** | |
| D-AL2.3.1 | Commentors state that NPS should designate an area inside or outside Yellowstone for snowmobiling, including off-trail or extreme snowmobiling. | 32 |
| D-AL2.3.2 | Commentors ask NPS to reconsider the issue of snowplane operation on Jackson Lake. | 3 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                North Wind, Inc.

| Code | Code Description | Total Comments |
|---|---|---|
| D-AL2.3.3 | Commentors ask NPS to consider these management techniques: * Percentage of commercially guided snowmobiles does not exceed 70% of daily total. * Percentage of noncommercially guided snowmobiles ranges from 25% to 50% of daily total; leader must complete certification course. * Increase percentage of noncommercially guided snowmobiles in exchange for lower daily limits. * Manage CDST as a through trail with group and group size limits. * Manage snowmobile use by daily group limit. | 4 |
| D-AL2.3.4 | Commentors recommend allowing snowmobile access during alternative periods (days or weeks), and/or varying periods of motorized/nonmotorized use. | 2 |
| **D-AL2.5** | **Description of Alternatives** | |
| **D-AL2.5.3** | **Monitoring and Mitigation** | |
| D-AL2.5.3.1 | Commentors recommend that NPS work with and or subsidize local concessioners regarding replacement of older snowmobiles or snowcoaches, and inform them about updated emissions requirements and/or newer models. | 6 |
| D-AL2.5.3.2 | Commentors ask NPS to communicate clearly with gateway communities and the public regarding its decision, any changes required by adaptive management strategies, and the transition. NPS should also provide adequate lead-time to adjust to new actions. | 23 |
| D-AL2.5.3.3 | Commentors state that ongoing NPS monitoring and evaluation is vital for managing parks to achieve the NPS mission. Some add that superintendents must continually monitor and examine all park uses to ensure that unanticipated and unacceptable impacts do not occur. Some suggest NPS re-evaluate the impact of snowmobile use every 3-5 years. | 10 |
| D-AL2.5.3.4 | Commentors state that NPS should continue to analyze the costs of keeping the East Entrance open during the winter. Some state NPS should continue to consider safe and cost-effective mitigative measures to keep the pass open, as well as alternatives that meet the criteria presented by the community and commercial operations that access this entrance. | 36 |
| D-AL2.5.3.5 | Commentors state that NPS should convert oversnow vehicles to biodegradable lubricants that are better for the environment. | 2 |
| D-AL2.5.3.6 | Commentors state that NPS should have constant opening and closing dates. | 16 |
| D-AL2.5.3.7 | Commentors suggest that adaptive management be used to manage winter use. Some state that adaptive management thresholds for oversnow vehicles be flexible within plus or minus 20%. Some who support flexible daily entry limits state adaptive management could be used to address unwanted outcomes. Some add that keeping the East Gate open will provide greater flexibility if daily entries need to be redistributed among entrances. | 11 |
| D-AL2.5.3.8 | Commentors state that suggested mitigation measures in the PDEIS should be implemented to reverse recent declines in visitation at the East Entrance. They cite the requirement for 100% commercial guides as the cause. | 6 |
| D-AL2.5.3.9 | Commentors state that NPS is inappropriately applying the adaptive management concept, using monitoring data to increase oversnow travel levels but not to provide greater resource protection. | 1 |
| **D-AL2.6** | **Action Alternatives** | |
| **D-AL2.6.1** | **Alternative 1: Continue Current Plan (Preferred Alternative)** | |
| D-AL2.6.1.1 | Commentors express support for Alternative 1 and/or continuing the current Temporary Plan with some modifications. Some commentors add that this provides a balance and public choice with respect to transportation. | 206 |
| D-AL2.6.1.2 | Commentors state that they oppose Alternative 1, the Preferred Alternative. Some commentors add reasons for opposing it, such as: * It will reduce winter visitation as it has under the Temporary Rule * Snowmobile limits are too low to sustain winter visitation. * A group size of 17 snowmobiles is too large. * It favors the south and west gates, where the wealthy are. | 999 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                North Wind, Inc.

| Code | Code Description | Total Comments |
|---|---|---|
| D-AL2.6.1.3 | Commentors object to allowing 720 snowmobiles per day (Alternative 1/ Preferred Alternative). Some commentors add that this would: * Equate to an increase in the daily limit over current levels. * Adversely impact visitor enjoyment of peace and quiet. * Conflict with recommendations of park biologists. * Reverse progress made to air quality and increase emissions. * Adversely impact wildlife, such as bison, who use groomed trails to leave the protection of the park. | 96,122 |
| D-AL2.6.1.4 | Commentors object to the Preferred Alternative because it: * Disregards aspects of the Comey report and impacts on NHRP structures. * Manipulates cost/visitor data. * Lacks an alternative based on the current management plan. * Would concentrate traffic where most animals live. * Would close a federal highway. * Would deprive individuals of motorized access. * Violates the Americans with Disability Act by restricting East Gate access. | 3,160 |
| D-AL2.6.1.5 | Commentors object to the Preferred Alternative because there has been no new information to persuasively reject the 2000 EIS and its impairment finding, or the 2001 rulemaking, to ban all recreational snowmobiling in the park. They state the DEIS contains no new information that warrants selection of any alternative other than Alternative 2. | 10 |
| **D-AL2.6.2** | **Alternative 2: Snowcoaches Only** | |
| D-AL2.6.2.1 | Commentors support Alternative 2 and/or eliminating recreational snowmobiling; some add: * Fewer snowmobiles have improved park conditions. * Seven former NPS directors support it. * Snowcoaches are practical, efficient, safer, environmentally responsible, adaptable to low snow levels, and they benefit gateway communities and provide the best air quality of all alternatives. * Some snowmobilers violate rules. * Only handicapped individuals should be able to use them. | 88,962 |
| D-AL2.6.2.1.1 | Commentors state that NPS should expedite implementation of Alternative 2. Some commentors add that: * Alternative 2 balances public access with resource preservation. * Strict limits on snowmobiles should remain in place during transition. | 72,312 |
| D-AL2.6.2.1.2 | Commentors state NPS should eliminate recreational snowmobiling in the parks because it takes the focus away from the parks and puts it on high-performance machines. Some commentors add that managing snowmobile operations with tight budgets takes staff away from important visitor education and park operations. | 289 |
| D-AL2.6.2.1.3 | Commentors support Alternative 2 because: * It upholds laws and policies providing the basis for a sustainable decision. * It meets the agency's responsibility to protect and perpetuate clean air in the parks to the greatest degree possible. * It provides motorized access with less noise and ensures visitors an opportunity to experience YNP's winter sounds and quiet. * It addresses NPS's legal responsibilities toward wildlife and its scientists' recommendations. | 1 |
| D-AL2.6.2.2 | Commentors oppose Alternative 2 for a variety of reasons: * It does not provide an adequate winter experience for the visitor. * Snowcoaches are not reliable and cannot provide access to the whole park. * Snowcoaches negatively impact groomed roads. * Snowcoaches alone cannot sustain winter visitation. | 305 |
| D-AL2.6.3.1 | Commentors oppose Alternative 3 for a variety of reasons: * It does not provide an adequate winter experience for the visitor. * Grooming is essential for park management and protection. | 275 |
| **D-AL2.6.3A** | **Alternative 3a: Eliminate Most Oversnow Roads / Road Grooming** | |
| D-AL2.6.3A.1 | Commentors express support for Alternative 3a and/or eliminating most oversnow roads in the parks. | 30 |
| D-AL2.6.3A.2 | Commentors state that they oppose Alternative 3A; some add that: * It is too restrictive. | 2 |
| **D-AL2.6.3B** | **Alternative 3b: Close Oversnow Roads - No Action** | |
| D-AL2.6.3B.1 | Commentors express support for Alternative 3b and/or banning of recreational snowmobiles and snowcoaches in the parks. Some commentors add that: * This is the only alternative that would treat all visitors fairly, not just those who can afford the high cost of snowmobile, snowcoach, or commercial transport. * Continuing to allow snowmobile use in the parks inhibits the development of snowmobiling alternatives elsewhere. | 68 |

8

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                          North Wind, Inc.

| Code | Code Description | Total Comments |
|---|---|---|
| D-AL2.6.3B.2 | Commentors state that they oppose Alternative 3B. Some commentors add that: * It is too restrictive. * It should not be the environmentally Preferred Alternative because it does not provide access without resource degradation. | 10 |
| D-AL2.6.3B.3 | Commentors object to Alternative 3B as the Environmentally Preferred Alternative. They state the DEIS acknowledges Alternative 3B "is not as effective in sharing life's amenities as the other alternatives because of the lack of oversnow vehicle access..." They state Alternative 2 would yield lower impacts to YNP's air quality, soundscapes and wildlife than continued snowmobile use while providing motorized public access. | 1 |
| D-AL2.6.4 | **Alternative 4: Expand Recreational Use** | |
| D-AL2.6.4.1 | Commentors express support for Alternative 4 and/or elements of it, including some or all of the following: * Expanding recreational use by raising daily snowmobile limits. * Allowing 25 percent unguided or noncommercial entries. * Reopening all Yellowstone side roads to snowmobile visitors. * Allowing 100 snowmobiles per day on Jackson Lake, which is consistent with past use levels. Some commentors add that it balances resource protection with sufficient access. | 3,239 |
| D-AL2.6.4.2 | Commentors recommend unlimited snowmobile operation in the parks, reducing impacts by asking the snowmobile industry to produce a battery-powered machine. | 4 |
| D-AL2.6.4.3 | Commentors state that they oppose Alternative 4. Some commentors state reasons why they oppose it: * It does not balance park protection with visitor access. * It includes an option for private snowcoaches. * There should be no preferential treatment for those who own their own snowcoaches. | 3 |
| D-AL2.6.5 | **Alternative 5: Provide for Unguided Access** | |
| D-AL2.6.5.1 | Commentors express support for Alternative 5 and/or allowing 20 percent of daily snowmobile entries to be unguided. | 52 |
| D-AL2.6.5.2 | Commentors state that they oppose Alternative 5. Some commentors add that the limits are too low. | 1 |
| D-AL2.6.6 | **Alternative 6: Mixed Use** | |
| D-AL2.6.6.1 | Commentors express support for Alternative 6 and/or allowing wheeled vehicle access to Yellowstone's interior in addition to snowmobiles and snowcoaches. | 10 |
| D-AL2.6.6.2 | Commentors oppose Alternative 6 for a variety of reasons: * It does not provide an adequate winter experience for the visitor. * It would be detrimental to effective management of the park interior. * It is too expensive. * It would be logistically unrealistic because visitors could not cross the park in one type of vehicle. * It would cause air quality impairment at West Yellowstone. * No plowing of roads should occur in the park. | 271 |
| D-AL2.6.6.3 | Commentors state that they support use of alternative fuels on commercial wheeled vehicles to reduce air impacts in the parks. | 7 |
| D-EC4 | **ENVIRONMENTAL CONSEQUENCES** | |
| D-EC4AQ | **Effects on Air Quality and Air Quality-Related Values** | |
| D-EC4AQ.1 | Commentors state that snowmobiles have negative impacts on air quality, and/or object to their negative impacts. Some commentors add that snowmobiles pollute because they lack the emission controls that automobiles have. Other commentors state that the DEIS omits the fact that BAT snowmobiles have lower emissions per person than snowcoaches. | 96,698 |
| D-EC4AQ.2 | Commentors state that snowcoaches have negative impacts on air quality, and/or object to their negative impacts. Some commentors add that snowcoach tailpipe emissions are unregulated. | 30 |
| D-EC4AQ.3 | Commentors state that Section 3.4 of the DEIS shows that NAAQS standards were not violated even by older snowmobiles, and that BAT has reduced pollution even more. | 2 |
| D-EC4G | **General Impacts** | |
| D-EC4G.1 | Commentors state that snowmobile use has negative impacts on park resources. | 19,679 |
| D-EC4G.2 | Commentors state that snowmobile use contributes to global warming and worldwide climate change due to carbon emissions. | 198 |
| D-EC4G.3 | Commentors state that snowmobiling does not result in negative environmental impacts. Some commentors state that there is no proof that regulated winter activity harms anything in the parks. | 78 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                                     North Wind, Inc.

| Code | Code Description | Total Comments |
|---|---|---|
| D-EC4G.4 | Commentors state that snowcoach use has negative impacts on protected park values. | 7 |
| **D-EC4SE** | **Effects on the Socioeconomic Environment** | |
| D-EC4SE.1 | Commentors state that closure of the East Entrance in winter as described in the Preferred Alternative would have negative socioeconomic impacts on east side gateway communities and/or: * Eventually end visitor use through this entrance * Threaten winter businesses and uses on the North Fork of the Shoshone River * Impede growth in the Cody area. | 3,319 |
| D-EC4SE.3 | Commentors state that keeping the park open to snowmobiles could make it lose its natural appeal and/or have negative socioeconomic impacts (i.e., decreased tourist dollars) through decreased visitation while positive socioeconomic impacts could result from snowmobile restrictions (less pollution will attract more visitors). Some commentors add that gateway communities have already or will benefit from snowcoach operations and/or diversifying winter use. | 119 |
| D-EC4SE.4 | Commentors state that managing snowmobile use is extremely costly on a per capita basis and is a waste of tax dollars. | 35 |
| D-EC4SE.5 | Commentors state that the parks are important economically to surrounding counties, and citizens expect reasonable access to the parks. | 94 |
| D-EC4SE.6 | Commentors state that negative socioeconomic impacts on gateway communities, concessioners and guided snowmobile outfitters/users have resulted from snowmobile restrictions and/or Park Service/Federal Government misinformation and other actions. Some commentors add that these actions have given a false impression that visitors do not want to use the East Gate in winter. | 123 |
| D-EC4SE.7 | Commentors state that there has been a decline in snowmobile use under the temporary rule, reducing entrance revenues by at least $500,000 annually. | 4 |
| D-EC4SE.8 | Commentors state that revenue from snowmobilers provides capital required to maintain the park so that it may be enjoyed by all users in all seasons. | 12 |
| D-EC4SE.9 | Commentors state that despite the drop in East Gate visitors, the Cody economy continues to grow; Sylvan Pass closure would not have serious negative impacts. | 2 |
| D-EC4SE.10 | Commentors state that evidence contradicts the claim that banning snowmobiles will have negative socioeconomic impacts on gateway communities. They state recent tax data indicates snowmobile use and overall winter use have declined but it has not detectably impacted economies of surrounding counties. | 3 |
| D-EC4SE.11 | Commentors state that snowmobile use has increased for the past few years, even faster than snowcoach use has. | 2 |
| **D-EC4SS** | **Effects on the Natural Soundscape** | |
| D-EC4SS1 | Commentors state that snowmobiles in the parks destroy the natural winter soundscape. | 115,049 |
| D-EC4SS2 | Commentors state that snowcoaches in the parks have negative impacts on the natural winter soundscape. | 18 |
| D-EC4SS2.1 | Commentors state that with snowcoaches only (Alternative 2) the natural soundscape will be present over more acres a greater percentage of the time, thereby removing this impairment to park resources in the shortest possible time. | 1 |
| D-EC4SS3 | Commentors state that the DEIS conclusively demonstrates that continued snowmobile use with BAT has no adverse impacts on soundscapes; with BAT machines, sounds are not intrusive, and the backcountry offers a natural soundscape. | 7 |
| D-EC4SS3.1 | Commentors state that most visitors traveling along park roads or visiting developed areas expect to hear oversnow vehicle noise and so that noise won't be a significant deterrent to their visit. They state NPS should include Management Policy 8.2.2 in Section 3.7.1 which states park visitors expect to hear "sounds associated with people visiting their parks....." | 5 |
| **D-EC4VE** | **Effects on Visitor Experience** | |
| D-EC4VE.1 | Commentors state that snowmobile use has negative impacts on visitor experience. | 47,466 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                      North Wind, Inc.

| Code | Code Description | Total Comments |
|------|------------------|----------------|
| D-EC4VE.2 | Commentors state that closure of the East Entrance would have negative impacts on visitor experience because it provides the widest range of winter use options. Some add that closure would not provide park visitors, local communities, and others an assurance that winter use management will remain fairly stable and predictable over the long-term and would not facilitate an environment in which visitors can make informed decisions about visiting the parks. | 126 |
| D-EC4VE.3 | Commentors state that requiring snowcoach travel has negative impacts on visitor experience, and visitors do not like them. Some commentors add that improvements such as providing more wildlife stops could help. Some state they do not provide access to same areas of the park that snowmobiles do. | 7 |
| D-EC4VE.4 | Commentors state that snowcoaches enhance visitor experience and/or are consistent with tour industry reports that groups prefer interpretive services and low environmental impacts. Some question the basis for stating in the DEIS that under Alternative 2, "... opportunities to view wildlife and scenery may decrease." | 19 |
| **D-EC4VS** | **Effects on Public and Employee Health and Safety** | |
| D-EC4VS.1 | Commentors state that snowmobile use has negative impacts on safe working conditions for park employees and/or the health and safety of employees and visitors. | 72,840 |
| D-EC4VS.1.1 | Commentors state that safety is one of the arguments NPS uses in favor of requiring commercial guides for all snowmobiles, but there is no directly comparable basis to conclude unguided access will be unsafe because it hasn't been allowed or tried on an experimental basis since implementation of managed winter use in 2003. | 5 |
| D-EC4VS.2 | Commentors state that it would be irresponsible to allow skiers and snowshoers to use Sylvan Pass if it is closed and not groomed for winter use, due to the health and safety risks and liability to the park. | 265 |
| D-ECVS.3 | Commentors state that snowmobile use does not have negative impacts on safe working conditions for park employees and/or the health and safety of employees and visitors. | 7 |
| **D-EC4WH** | **Effects on Wildlife** | |
| D-EC4WH1 | Commentors state that snowmobiles have negative impacts on park wildlife. Some commentors add that animals are already under stress trying to survive the harsh winter. | 43,080 |
| D-EC4WH1.1 | Commentors state that snowmobiles do not have negative impacts on park wildlife, including bison. Some state that possible adverse effects from oversnow vehicle use will always be insignificant compared to other variables. | 87 |
| **D-ED** | **EDITORIAL COMMENTS** | |
| D-ED1 | Commentors recommend a change in Chapter 11, Section 2.5.4, p. 30, by replacing bullet 1 with the following text: "Beginning in the 2011-2012 season, all snowcoaches must meet ... having EPA Tier 11 emissions control equipment." | 1 |
| D-ED2 | Commentors ask NPS to clarify the process used to determine the overall seasonal entry limit for commercial snowmobiles (p. 51 of the DEIS). | 1 |
| D-ED3 | Commentors ask NPS to clarify why snowmobiles would still be allowed "from the east boundary of GTNP to Buffalo Fork River" in the alternatives whereby the CDST is eliminated (2 and 5). It is unclear what the purpose for this continued access would be in the absence of the balance of the CDST. | 1 |
| D-ED4 | Commentors question data on pp. 79-81 of the DEIS that, they say, gives the false impression that visitation at some locations is up over the years depicted by the table. They add that the NPS manipulated these data to reach a misleading conclusion. Commentors also request that Sec. 3.8.5 be clarified to state that there has been a net decrease of over 47 percent in Yellowstone's visitation. | 1 |
| D-ED5 | Commentors request the following change on p. 191: Revise "new standards will begin to take effect with the 2006 model year" to clarify that EPA- regulated snowmobiles have already been in the marketplace for two full years, and are now entering their third year of sales. | 1 |
| D-ED6 | Commentors, representing the International Snowmobile Association, submit a list of 65 editorial comments on specific pages in the DEIS. | 1 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                North Wind, Inc.

| Code | Code Description | Total Comments |
|------|-----------------|----------------|
| D-ED7 | Commentors request that NPS do a better job of explaining park budgets and priorities to help the public understand the reasons for identifying Alternative 1 as the Preferred Alternative. | 1 |
| D-ED8 | Commentors state that the 2006 NPS Policy on Air Quality is omitted from the "Regulatory and Policy Overview" on air in the DEIS (p. 82) and NPS should ensure that the Final EIS includes the policy. | 2 |
| D-ED9 | Commentors recommend that the desired condition for Health and Safety in the DEIS p. S-4, Table S-1, that states, "The safety and health of persons, and protection of property, are ensured by identifying and preventing potential injuries from recognizable threats" be rewritten to state something like, "The safety and health of persons will be provided to the extent possible by...." | 5 |
| D-ED10 | Commentors state that NPS needs to do a better job of describing the significance of the park's fundamental resources and what is at stake with respect to potential impacts. | 2 |
| D-ED11 | Commentors ask NPS to clarify if an "episode" is an avalanche control mission in the discussion of avalanche hazard mitigation on p. 97, and if the average includes spring avalanche control missions. | 5 |
| D-ED12 | Commentors ask NPS to provide definitions of terms in Table 4-40, p. 207, to explain what they mean in relation to avalanche hazards. | 5 |
| D-ED14 | Commentors state that the Final EIS should disclose that of the six alternatives analyzed, Alternative 2 would "perpetuate the best possible air quality" in Yellowstone. The Final EIS should also disclose in non-technical language readily understandable by decision makers and the public that Alternative 1, because of its emphasis on continued snowmobile use, would result in five times greater carbon monoxide emissions and 17 times greater hydrocarbon emissions than Alternative 2. | 1 |
| D-ED15 | Commentors state that NPS needs to do a better job of describing the significance of the park's fundamental resources and what is at stake with respect to potential impacts. | 1 |
| **D-PN1** | **PURPOSE AND NEED** | |
| D-PN1.1 | Commentors describe what they consider to be NEPA process violations during preparation of the EIS: * It did not follow federal NEPA guidelines because all reasonable alternatives were not explored and objectively evaluated. * The Preferred Alternative fails to consider multiple factors. * NPS did not adequately consider the impacts to the Cody community during scoping. | 3,142 |
| D-PN1.1.1 | Commentors state that selection of the Preferred Alternative violates NEPA because it will result in unacceptable impacts and significant impairment of the parks' resources. They add that allowing 720 snowmobiles into the park per day is arbitrary and capricious. | 3 |
| D-PN1.1.1.1 | Commentors state that there are NEPA deficiencies and flaws that do not support selection of the Preferred Alternative, including: * The Preferred Alternative appears to be predetermined. * A lack of decision criteria. * A cumulative effects analysis that provides inadequate treatment of climate change. | 5 |
| D-PN1.1.1.2 | Commentors state that implementation of the proposed Preferred Alternative would be in violation of laws and policies. They state these violations apply to potential impacts, inadequately acknowledged and considered in the Preferred Alternative, to 3 primary and critical resources in the parks - air quality, natural soundscapes or natural quiet, and wildlife. | 1 |
| D-PN1.1.2 | Commentors state that NPS has no choice but to complete the DEIS and previous NEPA actions because they are ordered by the courts as the result of litigation by parties on all sides. | 1 |
| D-PN1.1.3 | Commentors point out concerns with the way NPS has proceeded with the NEPA process since 1997. * They have not followed an informed process, nor considered all factual data provided, nor properly included cooperating agencies in the process. * Many of the decisions and pending decisions have not followed law. | 1 |
| **D-PN1.2** | **Purpose and Need for Action** | |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                   North Wind, Inc.

| Code | Code Description | Total Comments |
|------|------------------|----------------|
| D-PN1.2.1 | Commentors state that previous studies have already evaluated the impacts of snowmobiles and/or the public has previously expressed their opinion against snowmobiles and for a transition to snowcoaches. Some commentors add that: * A snowmobile phaseout is consistent with federal law and NPS policy. * The EIS is unneeded and/or wastes money. | 114,619 |
| D-PN1.2.2 | Commentors state that visitors have already given up their cars to ride in coaches in some Western parks such as Yosemite, and should be willing to give up some level of access to protect Yellowstone in the winter. | 34 |
| **D-PN1.4** | **Scope of Analysis: Range of Alternatives Considered** | |
| D-PN1.4.1 | Off scope/no comments: Commentors make statements that are off scope relating to topics such as: * The NPS Newsletter. * Areas outside the park jurisdiction or boundary. * Concessioner breach-of-contract issues. * Surreptitious planning to plow Cooke Pass to Cooke City. | 134 |
| D-PN1.5.2 | Commentors make statements about impact topics dismissed from detailed analysis, including soils and vegetation. | 11 |
| D-PN1.5.2.1 | Commentors state that snowmobiling wastes scarce petroleum resources. Some commentors add that eliminating recreational snowmobiling would set an example of how to conserve nonrenewable energy. | 142 |
| **D-PN1.6** | **Public Involvement** | |
| D-PN1.6.1 | Commentors request that their names not be added to NPS mailing lists. | 18,748 |
| D-PN1.6.2 | Commentors state that NPS should consider the comments of all park stakeholders, not just the vocal minority or commercial interests. Some commentors add that: * NPS should not take actions that benefit the few to the detriment of others. * Snowmobiles impact the ability of the majority to enjoy the park without pollution, noise, and other associated negative impacts. | 14,100 |
| D-PN1.6.3 | Commentors state that NPS should consider the comments of all park stakeholders, including those who support snowmobiles access to Yellowstone. Some commentors add that the debate is not about preservation, but about an elitist group that wants to eliminate a behavior they do not like. | 99 |
| D-PN1.6.4 | Commentors, who object to closure of Sylvan Pass, state that they support a confrontational approach to influence decision-making if NPS does not honor their request. This would include actions such as a local picket or camp out on the East Entrance with complete media involved, with participants risking jail time if needed. | 1 |
| D-PN1.6.5 | Commentors make statements about the public comment process and/or NPS messages. * Stakeholders appreciate the process. * The initial decision to limit public meetings to Cody and West was flawed; it diminished the value of comments from other meetings. * NPS says NEPA is not a vote, but the message is that public preferences don't count. * NPS statements convey form letters aren't as important as non-forms. * The DEIS did not adequately address agency comments on the PDEIS. | 11 |
| **D-PN1.7** | **Major Issues** | |
| D-PN1.7.1 | Commentors state that Yellowstone and Grand Teton are unique and therefore people should snowmobile on other public lands. Some state that snowmobile use is not "uniquely suited and appropriate" to the parks and given that there are thousands of miles of trails and acres on public lands adjacent to the parks, snowmobilers can use these lands, consistent with the 2006 Management Policies. | 685 |
| D-PN1.7.2 | Commentors recommend that NPS promote or groom more trails for nonmotorized activities. Some commentors add that they: * Have fewer negative impacts on the experiences of other visitors * Promote fitness in accordance with compliance with Executive Order 13266 * Are better for the environment * Can also generate revenue for area communities. | 53,696 |
| D-PN1.7.3 | Commentors state that the DEIS needs to consider the closure of Sylvan Pass as a major issue. Some commentors add that NPS: * Depends on its concessioners and surrounding communities for visitor support and access. * Should ensure that its policy actions consider the interests of these parties and should do a better job of communicating with concessioners about research and new technologies. | 48 |
| D-PN1.7.4 | Commentors state that it is not the responsibility of the National Park Service to maintain the economies of gateway communities. | 76 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                          North Wind, Inc.

| Code | Code Description | Total Comments |
|------|----------------|----------------|
| D-PN1.7.5 | Commentors state that NPS should manage visitor use and access in a way that is fair to all parties and/or meets the needs of local stakeholders as well as visitors from other areas. | 54 |
| **D-PN1.8** | **NPS Mandates** | |
| D-PN1.8.1 | Commentors state that the mission of NPS is to conserve the parks and their associated values (e.g., wilderness, wildlife, pristine nature, peace and quiet, solitude) and leave them unimpaired for future generations. Some commentors add that * Snowmobile use in national parks conflicts with this mission. * Multiple mandates require NPS to fulfill this mission: public laws, executive orders and directives. | 69,331 |
| D-PN1.8.1.1 | Commentors state that NPS has no responsibility to provide access to a range of appropriate activities. Some commentors add that the statement in Table S-1 (Desired Conditions/Visitor Access) is without legal or policy basis and/or is a false assumption upon which to base the DEIS. | 13 |
| D-PN1.8.1.2 | Commentors state that the decision on winter use is especially important because it will establish a precedent for how the 2006 NPS Management Policies will be implemented throughout the Park Service system. | 17 |
| D-PN1.8.2 | Commentors state that the mission of NPS is to provide opportunities for the public to enjoy the parks. Some commentors add that: * The parks belong to the public. * It is a public park, not a pristine wilderness and should not be treated as such (i.e., snowmobile access should continue). * Visitors should have access without using commercial businesses. | 257 |
| D-PN1.8.3 | Commentors state that a balance between all users should be the goal and/or is needed to protect the resources. Some state that snowcoaches represent the best compromise because they allow motorized access while protecting the park's resources. | 28,301 |
| D-PN1.8.3.1 | Commentors state that conservation is to be predominant when the choice is to be made between use and protection of the resources. | 32 |
| D-PN1.8.4 | Commentors state objections to perceived efforts by the Administration and/or the NPS to rewrite basic park policy to promote recreation over park protection. They cite examples such as: * Defining impact levels in ways that depart from decades of NPS policy. * Disregarding the YNP enabling act and existing NPS snowmobile regulations. | 834 |
| D-PN1.8.5 | Commentors state that NPS guidelines on resource protection require park managers to select forms of transportation that have the fewest impacts. | 684 |
| D-PN1.8.6 | Commentors note that new Clean Air Act Management Policies require the National Park Service to maintain the best possible air quality in the parks. | 27,521 |
| D-PN1.8.7 | Commentors state that historical use of snowmobiles has indicated this use was acceptable because park managers must not allow uses that would cause unacceptable impacts; therefore Alternative 1 will not result in unacceptable impacts or impairment of park's resources. | 1 |
| D-PN1.8.7.1 | Commentors state that the unacceptable impacts standard is a misstatement of law and recreational uses can only be prohibited if the use causes impairment of park resources. | 1 |
| D-PN1.8.8 | Commentors state that the 2001 ban on snowmobiles was forced through by political considerations without studies or information to justify the change from previous policy. | 2 |
| D-PN1.8.9 | Commentors state allowing limited unguided and/or non-commercially guided access will better meet the NPS Policy for Visitor Use that states, the Service will, to the extent practicable, afford visitors ample opportunity for inspiration, appreciation, and enjoyment through their own personalized experiences... They add that under the Preferred Alternative there is no opportunity for snowmobile visitors to enjoy YNP through their own personalized experience. | 5 |
| D-PN1.9.1 | Commentors recommend that NPS coordinate the EIS with the Grand Teton Transportation Plan EIS and consider both together. | 2 |
| D-RVC4.4 | Commentors state that the DEIS failed to evaluate the cumulative impacts of all federal actions on the economy of the Cody community and other surrounding areas and on visitor access and circulation if the East Entrance is closed. | 6 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                North Wind, Inc.

| Code | Code Description | Total Comments |
|------|-----------------|----------------|
| D-RVC4.4.1 | Commentors state the cumulative analysis section is insufficient because: * Scoping did not properly cover concerns about the Cody gateway community. * Admissions from Section 4.5 note the futility of visitation trend data. * There are outstanding criticisms of the economic data. * There is no analysis of future scenarios for Cody and Park County. * It neglects to specifically discuss cumulative effects from ongoing changes in NPS policy including the temporary ruling in 2003. | 5 |
| **D-SC1** | **NEW INFORMATION THAT COULD CHANGE THE PROPOSAL** | |
| D-SC1.1 | Commentors state that NPS should use the data from Dr. Bishop's 2006 "In Use Emissions" for modeling in the Final EIS. | 1 |
| **D-SC2** | **ADEQUACY OF ENVIRONMENTAL ANALYSIS** | |
| D-SC2.1 | Commentors state that the EIS analysis does not consider sustainability of the alternatives/plan in terms of factors such as increasing population and energy consumption. One commentor states that NPS needs to complete a supplement to the DEIS to comply with 40 CFR 1502.16 (e)(f), which requires an energy evaluation for the proposed action. | 5 |
| D-SC2.2 | Commentors state the soundscape analysis is flawed. It calculates impacts based on total park area rather than the area to which visitors have access, moving the emphasis on noise impacts away from the most visited areas, where snowmobile noise has exceeded the previous definition of major adverse impacts even with an average of 250/day, where noise problems would increase with 720 snowmobiles and where NPS models show, attractions would be quieter with a greater emphasis on snowcoaches. | 10 |
| D-SC2.3 | Commentors state that the analysis of air quality in the EIS is incomplete because it is based on modeling rather than the real-time data NPS collected over the three-year period of the Temporary Winter Use Plan. This data collection was a cited reason for adopting the Temporary Plan. Commentors add that the EIS failed to disclose conflicting scientific data. | 10 |
| D-SC2.4 | Commentors commend NPS for producing a document that is well written and based to a much greater degree on facts than previous documents. They add that NPS now has the best information available and should use it to proceed with a decision. | 10 |
| D-SC2.4.1 | Commentors state that analysis in the DEIS is flawed because it fails to use the best available science to drive the development of the Preferred Alternative. | 10 |
| D-SC2.5 | Commentors state that the DEIS fails to consider the danger of avalanches on Talus Slope, which demonstrates an inconsistent, park-wide analysis. | 6 |
| D-SC2.5.1 | Commentors question whether the DEIS meets its legal mandate to disclose cumulative impacts by not including discussions on either the Talus Slope avalanche hazard or possible avalanche mitigation operations or both as "past, present, or reasonably foreseeable future actions...." | 5 |
| D-SC2.6 | Commentors state that the DEIS fails to analyze properly the impacts of snowmobile restrictions on the sustainability of winter visitation. | 8 |
| D-SC2.7 | Commentors state that the analysis in the DEIS fails to fully consider Big Sky as a gateway community. | 1 |
| D-SC2.8 | Commentors suggest that the DEIS lacks a discussion of the parks' weather reporting capability and how it could be improved to reduce operating and maintenance costs. | 1 |
| D-SC2.9 | Commentors state that no clear and significant data was provided to justify the decision to close the East Entrance. | 9 |
| D-SC2.9.1 | Commentors state closure of East Entrance is a major action and warrants a more focused look at the communities/counties that will be directly impacted. Some add that the DEIS does not fully capture economic impacts to Park County and Wyoming and the NPS did not sufficiently modify the economic analysis by Duffield and Neher (2006) or consider new economic analyses using unbiased data in the DEIS. | 5 |
| D-SC2.10 | Commentors state that the analysis of cumulative impacts in the DEIS is inadequate because it fails to clarify the disparity of cumulative effects among alternatives. | 9 |
| D-SC2.11 | Commentors state that the Final EIS needs to consider nonimpairment to park wildlife, especially with respect to avalanche control on Sylvan Pass. | 2 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                    North Wind, Inc.

| Code | Code Description | Total Comments |
|---|---|---|
| D-SC2.12 | Commentors express concern about inconsistencies in the health and safety analysis for alternatives that would allow non-motorized travel over Sylvan Pass. They question the lack of safety analysis and cumulative effects analysis for alternatives that continue to allow ski and snowshoe use of the South Entrance and East Entrance Road after the balance of the park's roads close to winter operations. | 5 |
| D-SC2.13 | Commentors state that the DEIS fails to provide data to substantiate the statement that there is "less idling by guided groups." They state that it is a rationalization to justify requiring commercial guides for all snowmobiles and add that if NPS has quantifiable scientific data to justify the statement they should include it in the Final EIS. | 5 |
| D-SC2.14 | Commentors question how NPS can frame law enforcement statistics on p. 95, specifically decreases in the number of citations issued to snowmobiles, as supportive of guided vs. unguided snowmobilers. | 5 |
| D-SC2.15 | Commentors state that the cumulative impact of each parameter of health and safety (listed on p. 207) should be assessed separately for employees versus the public (as was done in the 2000 FEIS). | 5 |
| D-SC2.16 | Commentors state the lack of analysis concerning climate change is a serious flaw in the NEPA document. They add that: * In dismissing climate change from the detailed analysis, NPS contradicts thinking of leadership within its own agency. * Without an assessment of global climate change and its related reduced snowfall and accumulation, the DEIS falls short of taking a hard look at one of the foundation environmental impacts. | 5 |
| **D-SC3** | **ACCURACY OF INFORMATION IN THE EIS** | |
| D-SC3.1 | Commentors state that the EIS figures for historic snowmobile use on Jackson Lake should consider past use of snowplanes, and that combining snowplane and snowmobile numbers into a general motorized use category would be more accurate. | 3 |
| D-SC3.2 | Commentors question adequacy of technical analysis related to population dynamics models of the Yellowstone bison (Borowski 2006, Borowski et al. 2006, Bruggeman 2006, Fuller 2006, Wagner et al. 2006, Gates et al. 2005). | 1 |
| D-SC3.3 | Commentors state that information in the DEIS about CDST visitation (Table 2-15) conflicts with data provided by the NPS Public Use Statistics Office. | 2 |
| D-SC3.4 | Commentors question the accuracy of the sound analysis in the DEIS: * The sound analysis needs to be updated to use the procedure revised in 2003 by the Society of Automotive Engineering. * The noise impact differences between Alternatives 1 and 2 appear to be underestimated. * There is no compelling data to support the contention that 100% commercial guiding decreases percent time audible. | 16 |
| D-SC3.5 | Commentors state that the DEIS underestimates the effect of snowmobile emissions on air quality because it assumes that all snowmobiles in the parks will be four-stroke. | 1 |
| D-SC3.6 | Commentors question the analysis of impacts on wildlife because it appears they are the same for Alternatives 1 and 2. | 1 |
| D-SC3.7 | Commentors question the analysis of socioeconomic impacts. * They state that NPS uses recent winter visitation data to result in smaller socioeconomic impacts but they should be using historic levels before management reduced visitation. * They state the use of IMPLAN is inappropriate. | 6 |
| D-SC3.8 | Commentors state that considering Sylvan Pass as backcountry in these alternatives is inconsistent with NPS policy. | 5 |
| D-SC3.9 | Commentors state that the description of oversnow vehicle visitation trends for the South Entrance is incorrect. In the last 3 winters, snowmobile use has increased from 70% to 74%, not declined from 87% to 72.3% as stated in the DEIS, p. 143. They state that the Winter Visitation Data section clearly shows that snowmobiles remain the most popular means among the visiting public to access YNP. | 5 |
| D-SC3.10 | Commentors state the DEIS purposely overstates the safety effects for Alternatives 4 and 5 compared to previous analyses to justify closing Sylvan Pass in the Preferred Alternative. They question what conditions have changed since 2004 to warrant avalanche hazards being considered a "major, adverse" impact, especially to visitors. In the previous analysis they were described as "moderate, adverse." | 5 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                          North Wind, Inc.

| Code | Code Description | Total Comments |
|------|-----------------|----------------|
| D-SC3.11 | Commentors question the inclusion of wildlife as a selection criterion and suggest NPS not consider wildlife effects in its determination of appropriate oversnow vehicle effects. They state that the DEIS assumes since the protection of wildlife is an emotional public issue, it automatically warrants inclusion as a selection criteria. They add that they find no logical connection to wildlife effects and oversnow vehicle use. | 5 |
| D-SC3.12 | Commentors express concern about the wildlife analysis. * They object to the statement that there is no difference in wildlife impacts between Alternative 1 and allowing 120 snowcoaches per day even though the latter would involve 1/6 as much traffic. * They state NPS modified the wildlife Desired Condition and Definition of Impacts to Wildlife and now link the desired condition to whole population consequences although the 2003 SEIS stated NPS' responsibility to minimize adverse impacts to individuals. | 1 |
| D-SC3.13 | Commentors disagree with the accuracy of NPS assertions in the "Summary and Comparison of Impacts by Resource" that there is no difference in impacts to YNP's soundscapes between 720 snowmobiles/day and the snowcoach alternative. They add these statements are misleading because in reality the former would result in 40 additional square miles in the park's most visited areas where visitors would hear engine noise more than half of each day. | 1 |
| **D-SC4** | **OTHER REASONABLE ALTERNATIVES** | |
| D-SC4.1 | Commentors ask NPS to consider an alternative that combines elements of Alternatives 1, 4 and 5: * 20% of daily entries led by trained, non-commercial guides. * EPA compliant snowmobiles allowed on the CDST. * All entrances remain open. * Daily, rather than seasonal limits. * Reduce daily limits if needed to meet planning goals while allowing more visitor flexibility. | 258 |
| D-SC4.2 | Commentors ask NPS to consider an alternative that would eliminate all snowmobiles and provide access by commercial wheeled vehicles only. | 6 |
| D-SC4.3 | Commentors ask NPS to consider an alternative that would plow most roads in Yellowstone and allow visitors to tour the park in privately owned vehicles, with reduced winter speed limits and requirements for tires with winter treads. | 7 |
| D-SC4.4 | Commentors suggest expanding groomed trails for nonmotorized activity in certain areas including Canyon, Lake, and Old Faithful in YNP; the road from Cottonwood to Signal Mt. in GTNP; and future multi-purpose pathways to be constructed in Grand Teton. | 25 |
| D-SC4.5 | Commentors ask NPS to consider an alternative that includes the following components: * Allow non-BAT snowmobiles on the CDST, Jackson Lake (for Wyoming Game and Fish Department and fishing access), and from Flagg Ranch west to provide access to national forest trails. * Allow up to 50% of daily snowmobiles entries on the CDST and Grassy Lake Road to be used by commercial snowmobile outfitters. | 92 |
| D-SC4.6 | Commentors ask NPS to consider an alternative that would transport winter visitors via horse-drawn sleds. | 7 |
| D-SC4.7 | Commentors suggest cycling be included as an acceptable form on non-motorized winter travel. They state * Just like cross-country skiing, cycling is an appropriate, low-impact, muscle-powered activity that provides visitors a safe, healthy way to enjoy the parks. * Winter cycling, or snow biking, using 4"-wide tires is a growing aspect of cycling that is suited to groomed snow surfaces. | 10 |
| D-SC4.8 | Commentors state that the DEIS fails to analyze a four-year snowmobile average of 250 as a component of any alternative and recommend that NPS do so. This would illustrate how impacts under the current status quo compare to the proposed alternatives. | 10 |
| D-SC4.9 | Commentors state that the Final EIS should analyze an alternative that includes phasing in a fleet of updated, multi-season yellow bus/snowcoaches as part of a regional transportation plan. | 9 |
| D-SC4.10 | Commentors recommend the final alternative should: * Keep all 4 entrances open. * Allow snowcoach and snowmobile access with daily entry limits of 60 snowmobiles through East and flexible daily limits for special occasions. * Accommodate unguided/noncommercially guided access. * Allow limited non-BAT (EPA compliant) on CDST and non-BAT on Jackson Lake. They state this would better meet the dual mandate of providing for public enjoyment of the parks while conserving resources and values. | 5 |

August 2007                                                                                        North Wind, Inc.

| Code | Code Description | Total Comments |
|------|-----------------|----------------|
| **D-VN100** | **STAKEHOLDER VALUES** | |
| D-VN101 | Commentors describe positive personal experiences in the national parks and/or out of doors. | 700 |
| D-VN102 | Commentors describe negative personal experiences in the national parks or out of doors. Some commentors state that most park employees did not make them welcome, but gave the impression that YNP belonged to them instead of the visitors. | 212 |
| D-VN103 | Commentors state objections to the values of society, the current Administration and/or federal government. Some commentors add that: * The Administration values money and/or business interests more than conservation and/or environmental protection. * We should encourage reasonable and considerate public use of the wild country. | 404 |
| D-VN104 | Commentors state that they value motorized access to Yellowstone and/or that limits on use of federal parks and lands infringe on their right to access them. Some commentors add that their values are as legitimate as those who choose nonmotorized activities. | 69 |
| D-VN105 | Commentors state that national parks are one of the last great legacies to the public. Some commentors add that: * The government should provide more funding for national parks. * It is an inexcusable dereliction of duty and honor to limit access, to limit funding and to allow the park system to deteriorate. | 35 |
| D-VN106 | Commentors state that the residents of Cody value winter access through the East Entrance so deeply that they are willing to work with the NPS to keep it open. | 8 |
| D-VN107 | Commentors remind NPS that visitors are opposed to management options that reduce access (Freimund and Borrie 2001). They state that closing Gibbon Canyon Road would adversely impact visitor access and circulation and that closing both Gibbon Canyon Road and East gate would decrease opportunities for oversnow travel in the park and concentrate use into smaller areas, which is contrary to the desired condition for visitor access and experience. | 5 |
| D-WQ4001 | Commentors state that snowmobiles adversely impact water quality and/or express concerns about spills of gasoline and other toxic substances that may cause negative impacts on water quality. | 47 |
| | Total number of comments | 1,276,393 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                North Wind, Inc.

## Number of Documents from Gateway Communities

| | | |
|---|---|---|
| Driggs | ID | 14 |
| Island Park | ID | 4 |
| Tetonia | ID | 4 |
| Victor | ID | 17 |
| Absarokee | MT | 0 |
| Big Sky | MT | 5 |
| Cooke City | MT | 4 |
| Gardiner | MT | 5 |
| Gateway | MT | 0 |
| West Yellowstone | MT | 58 |
| Alpine | WY | 9 |
| Alta | WY | 4 |
| Cody | WY | 462 |
| Jackson | WY | 167 |
| Moran | WY | 5 |
| Teton Village | WY | 4 |
| Thayne | WY | 5 |
| Wapiti | WY | 63 |
| Wilson | WY | 23 |
| Yellowstone NP | WY | 4 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                North Wind, Inc.

## Number of Form and Non-Form Letters

| Letter Type | Number of Documents |
|---|---|
| Form Letters | 116,910 |
| Non-form Letters | 5,280 |
| **Totals** | **122,190** |

Note:

\*   Some commentors sent more than one kind of form letter as well as one or more non-form letters; count may not match count of letters by state.

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                              North Wind, Inc.

## Number of Letters for Each Form Letter *

| Form Letter ID | Total | Letter | Web | Park Form | Email |
|---:|---:|---:|---:|---:|---:|
| 34 | 9 | 3 | 6 | | |
| 46 | 238 | 202 | 36 | 1 | |
| 50 | 17,673 | 1 | 17,672 | | |
| 17023 | 13,148 | 2 | 13,146 | | |
| 26259 | 69 | | 69 | | |
| 29230 | 697 | 690 | 6 | | 1 |
| 29231 | 82 | 80 | 1 | | 1 |
| 29233 | 3,087 | 605 | | | 2,482 |
| 33633 | 8 | 1 | 7 | | |
| 33634 | 27,160 | 1 | 27,159 | | |
| 52866 | 53,274 | | 40,328 | | 12,946 |
| 53231 | 81 | 5 | 76 | | |
| 55765 | 17 | | 17 | | |
| 83205 | 71 | | 71 | | |
| 101692 | 2 | | 2 | | |
| 104137 | 83 | 83 | | | |
| 118338 | 586 | | 1 | | 585 |
| 118999 | 625 | | | | 625 |
| | 116,910 | 1,673 | 98,597 | 1 | 16,640 |

Note:

Some commentors sent more than one kind of form letter as well as one or more non-form letters, so count will not match count of letters by state or overall total. Also, several form letters are similar or identical in content, with differences only in the inside address or date.

**APPENDIX**

**CORRESPONDENCE TEXT FROM FORM LETTERS**

## Correspondence Text from DEIS Form Letters

### 1.   Form Letter 34

**Correspondence Text**

Testing

### 2.   Form Letter 46

**Correspondence Text**

Dear Planning Team:

I am writing in support of continued snowmobiling access to Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway. I am opposed to Alternatives 2, 3 and 6 since they would not provide adequate access for the winter experience I desire. I ask that you consider a final management plan that blends several pieces of Alternatives 1, 4 and 5 to reflect the following:

Requiring that 100 percent of snowmobile visitors in Yellowstone be led by a commercial guide is undesirable and has proven to be detrimental to providing an adequate level of winter visitor use in the park. Please consider allowing up to 20 percent of daily entries to be led by non-commercial Certified Group Leaders who have taken a short certification course and would be responsible for managing their groups. Reducing group size and overall daily snowmobile limits in Yellowstone to 500 to 600 per day is acceptable, and better than having 720 entries per day allocated exclusively to commercial use. Certified Groups would still be heavily regulated and be very different than historic unguided access. Yellowstone is a public park and access should not be relegated to being only through commercial businesses.

Winter use in Grand Teton and the Parkway deserves to be considered on its own merits rather than being grouped with Yellowstone issues. In particular, allowing only BAT snowmobiles to be used in these parks is an overbearing, pointless limitation. Please consider allowing EPA compliant snowmobiles to be operated on the Continental Divide Snowmobile Trail, since this trail is immediately adjacent to plowed highways used by other motor vehicles, as well as for fishing access on Jackson Lake and operation in both directions on the Grassy Lake Road. If it is necessary to reduce group size and overall daily snowmobile limits or to limit the number of daily groups to accomplish this - that is acceptable and better than having only 140 entries per day .that are essentially useless since BAT snowmobiles are generally unavailable for use in this area by the general public who desire to connect to adjacent national forest trails.

I do not support seasonal entry limits and believe that winter use is best managed by daily entry limits.

The east entrance to Yellowstone is important and should be kept open to all winter visitors, including snowmobilers and snowcoach riders. Park managers should continue to provide avalanche control by the use of improved modern technology and practices. Additionally, it would be irresponsible to allow skiers and snowshoers to continue using Sylvan Pass if it is closed and not groomed for motor vehicles since, unmanaged, it would create an extreme liability to recreationists and the park.

Thank you for this opportunity to comment.

### 3.   Form Letter 50

**Correspondence Text**

National Park Service PEPC
Dear National Park Service PEPC,

The National Park Service has now determined in three separate analyses--in November 2000, February 2003, and August 2004—that continued snowmobile use is harmful to park resources, healthy enjoyment of the parks by visitors, and safe working conditions for employees. Each of these studies concluded that Yellowstone would be significantly cleaner, quieter, less hectic, and healthier if snowmobile use is ended and visitor access on snowcoaches is expanded.

It's time for the Park Service to implement what its own studies have concluded: "that snowcoach access would provide public motorized access to Yellowstone while having the lowest impact on air quality, water quality, natural soundscapes and wildlife - while presenting the lowest risk of visitor and Park Service staff health and safety."

If you must conduct another study, please look at ways to speed up a transition to the best available protection provided by snowcoach access which has been delayed for too long. Do NOT accept snowmobile use at levels above those which have caused documented problems the past several winters. And do NOT consider backtracking on the commercial guiding requirement or other "strict limitations" that you and top Administration officials have asserted repeatedly are fundamental to protecting the Parks.

With respect and appreciation for everyone who has worked hard to keep our national parks on the best possible path, I urge you not to weaken standards in Yellowstone and Grand Teton. Instead, please implement the transition to snowcoaches--which your studies have consistently identified as the best way to balance public access with preserving these magnificent places for future visitors to enjoy.

Thanks for allowing me to submit my views. Please do NOT add my name to your mailing list. I will learn about future developments on this issue from other sources.

### 4.   Form Letter 17023

**Correspondence Text**

Yellowstone National Park deserves the highest level of protection. I urge you to heed the recent call of seven former National Park Service Directors to uphold the 2006 Management Policies, the Park Service's own science, and overwhelming public opinion and select Alternative 2, the snowcoach-only alternative.

The Park Service's preferred alternative to lock in the current limits of 720 entries per day, nearly triple the current daily average of 250, will degrade the park's pristine air quality, bring unacceptable noise impacts upon park visitors, and disturb wildlife already stressed by the pressures of winter survival.

I also request that during the snowmobile phase-out period, you continue to maintain the requirement that professional guides accompany all snowmobilers in the park.

Finally, I support the Park Service's proposal to close the Park's east entrance, Sylvan Pass, during the 90-day winter season, based on the considerable risk to Park Service employees in keeping the pass free of avalanche danger and the excessive $200,000 annual cost to keep the pass open for just 13 winter visitors per day.

America's national parks have been called, 'the best idea America ever had.' Let's preserve the resources, natural quiet, and beauty of Yellowstone for future generations. Thank you for considering my views.

### 5.   Form Letter 26259

**Correspondence Text**

Both the EPA and National Park Service have independently confirmed, several times that visitors would enjoy Yellowstone with much less risk to their health, far less impact on park resources, and greater opportunities to enjoy the park's natural ambiance if snowmobile use is ended and snowcoach access expanded. Yet the new winter use plan proposes almost tripling the number of snowmobiles allowed in the park each day -- over 700 snowmobiles. We need to act now to preserve the ambiance of our first national park for our children and grandchildren.

### 6.   Form Letter 29230

**Correspondence Text**

I support the concept of continued snowmobile access to Yellowstone and Grand Teton National Parks. Individual travel by snowmobile provides the best way to experience the magnificent natural features of the Parks in the winter. Please include the following points in developing the final EIS on Winter Use in the Yellowstone and Grand Teton National Parks.

1. Please allow a small percentage of daily entrances into Yellowstone Park by none commercially guided, small groups

of snowmobiles. A person who has taken a special Internet based training course on snowmobiling for Yellowstone could lead these small groups.

2. In addition, I support continued access to Yellowstone National Park through the East entrance. Cody, Wyoming needs this access to the Park in the winter for both motorized and no motorized park visitors.

3. I support maintaining the current group size of eleven snowmobiles in a group with one commercial guide. Reducing the number to eight as proposed will drive up the cost per person and reduce flexibility.

4. In Grand Teton National Park there should be some percentage of the daily entrances for through snowmobiles that travel from Moran Junction to Flagg Ranch and onto the Grassy Lake Road and the National Forest. These snowmobiles would not have to meet BAT standards. This change would allow for more use of the Continental Divide Snowmobile Trail and the purpose it was created for!

I also encourage you to use partnerships with the surrounding communities, counties and states to expand educational opportunities that inform winter visitors regarding Park rules, user ethics, visitor safety and appreciation of the Park resources.

### 7.    Form Letter 29231

#### Correspondence Text

I am writing to support the concept of continued snowmobile access to Yellowstone National Park. After experiencing first-hand, a snowmobile trip into Yellowstone National Park, I feel this is the best way to experience the magnificent natural features the Park has to offer in the winter. I have reviewed the draft environmental impact statement and wish to offer the following points to consider in developing the final EIS on Winter Use in Yellowstone.

1. I support continued snowmobile access to Yellowstone.

2. I support maintaining the current group size of eleven snowmobiles in a group with one commercial guide (10 guests +1 guide). Reducing the number to eight, as proposed, will reduce flexibility and drive up the cost per person.

3. I support continued snowmobile access to Yellowstone National Park via the East Entrance. The East Entrance is important to Yellowstone and should be kept open to all winter visitors, including snowmobiles and snowcoaches. Park managers should continue to provide avalanche control by the use of improved modern technology and practices.

I appreciate your time and attention to my comments.

### 8.    Form Letter 29233

#### Correspondence Text

I support continued winter access through the East Gate into Yellowstone National Park for multi-purpose recreational uses as defined in Alternative #4 of the DEIS.

The DEIS winter use plan generally fails to follow federal (NEPA) guidelines and does not "rigorously explore and objectively evaluate all reasonable alternatives." Specifically, the Park's preferred alternative:

--ignores the significant adverse impact of park policies on Park County, Wyoming's economy as detailed in the Dr. David Taylor report of March 2007;
--disregards the avalanche report commissioned by the Park itself (the Bob Comey report of February 2007) identifying the howitzer as the preferred avalanche mitigation technique for Sylvan Pass;
--attempts to justify a decision that is being incrementally implemented or that has already been made, i.e. to reduce visitor access through the East Gate in order to justify closure;
--ignores the significant adverse impact park policies have on structures listed in the National Register of Historic Places;
--would set the undesirable public policy precedent of restricting public access to a national park based on the manipulation of cost per visitor data;
--fails to provide a baseline alternative that accurately reflects the current management plan;
--would concentrate more traffic in the most heavily congested parts of the Park where there is a significant

August 2007                                                                                      North Wind, Inc.

concentration of animals;
--would seasonally close a newly reconstructed federal highway that is an important route for victims of domestic violence;
--would deprive annual pass holders of their purchased right to annual access; and
--violates the Americans with Disability Act by restricting recreational access through the East Gate.

We respectfully request that you take these matters into consideration, Superintendent Lewis, as you develop your final winter use plan.

### 9.  Form Letter 118999

#### Correspondence Text

The National Park Service has now determined in three separate analyses--in November 2000, February 2003, and August 2004--that continued snowmobile use is harmful to park resources, healthy enjoyment of the parks by visitors, and safe working conditions for employees. Each of these studies concluded that Yellowstone would be significantly cleaner, quieter, less hectic, and healthier if snowmobile use is ended and visitor access on snowcoaches is expanded.

It's time for the Park Service to implement what its own studies have concluded: "that snowcoach access would provide public motorized access to Yellowstone while having the lowest impact on air quality, natural soundscapes and wildlife - while presenting the lowest risk of visitor and Park Service staff health and safety."

If you must conduct another study, please look at ways to speed up a transition to the best available protection provided by snowcoach access which has been delayed for too long. Do NOT accept snowmobile use at levels above those which have caused documented problems the past several winters.

And do NOT consider backtracking on the commercial guiding requirement or other "strict limitations" that you and top Administration officials have asserted repeatedly are fundamental to protecting the Parks.

With respect and appreciation for everyone who has worked hard to keep our national parks on the best possible path, I urge you not to weaken standards in Yellowstone and Grand Teton. Instead, please implement the transition to snowcoaches--which your studies have consistently identified as the best way to balance public access with preserving these magnificent places for future visitors to enjoy.

Thanks for allowing me to submit my views. Please do NOT add my name to your mailing list. I will learn about future developments on this issue from other sources.

### 10.  Form Letter 33633

#### Correspondence Text

There is no good reason to allow more snowmobiles in Yellowstone National Park during the winter. According to the National Park Service's own studies, increasing snowmobile use will damage park air and disturb more wildlife. They also create noise pollution that spoils the park experience for visitors and employees.

The current proposal to allow 720 snowmobiles a day in Yellowstone would undo all the progress that's been made since snowmobile use decreased to 250 a day several years ago. In that time, the use of park-friendly snowcoaches has increased - making the park environment healthier while providing full winter access to visitors.

Since snowmobile use in Yellowstone declined, the park's air quality has been improved. The Clean Air Act and its newly affirmed Management Policies give the National Park Service clear direction: to provide "the best possible air quality." Yet if snowmobile numbers expand from 250 to 720, we'll see a doubling of hydrocarbon emissions and a tripling of particulate and nitrogen oxide emissions. That's not "the best possible air quality" - it's actually a big step backwards from where we are now.

I urge you not to weaken the environmental standards in Yellowstone. Please reconsider the proposal to increase snowmobiles in the park, and please continue to work toward transitioning to snowcoaches. That's the best way to balance public access and the need for clean air, safe wildlife, and a peaceful park.

August 2007                                                                                       North Wind, Inc.

### 11. Form Letter 33634

**Correspondence Text**

There is no good reason to allow more snowmobiles in Yellowstone National Park during the winter. According to the National Park Service's own studies, increasing snowmobile use will damage park air and disturb more wildlife. They also create noise pollution that spoils the park experience for visitors and employees.

The current proposal to allow 720 snowmobiles a day in Yellowstone would undo all the progress that's been made since snowmobile use decreased to 250 a day several years ago. In that time, the use of park-friendly snowcoaches has increased - making the park environment healthier while providing full winter access to visitors.

Since snowmobile use in Yellowstone declined, the park's air quality has been improved. The Clean Air Act and its newly affirmed Management Policies give the National Park Service clear direction: to provide "the best possible air quality." Yet if snowmobile numbers expand from 250 to 720, we'll see a doubling of hydrocarbon emissions and a tripling of particulate and nitrogen oxide emissions. That's not "the best possible air quality" - it's actually a big step backwards from where we are now.

I urge you not to weaken the environmental standards in Yellowstone. Please reconsider the proposal to increase snowmobiles in the park, and please continue to work toward transitioning to snowcoaches. That's the best way to balance public access and the need for clean air, safe wildlife, and a peaceful park.

### 12. Form Letter 52866

**Correspondence Text**

I oppose your proposal to allow 720 snowmobiles per day in Yellowstone National Park. Instead, you should protect the park's natural values, promote the healthy enjoyment of the park by visitors, and provide safe working conditions for employees by lowering the current limit of 250 snowmobiles per day down to zero.

Four Park Service studies -- at a cost of $10 million – have shown that Yellowstone would be significantly cleaner, quieter, less hectic and healthier if snowmobile use was phased out. Please heed your own management policies, the conclusions of your scientists, the advice of your former directors and the wishes of the vast majority of American citizens and adopt Alternative 2, which calls for providing winter access on modern snowcoaches and phasing out snowmobile use in the park.

During this phase-out, the commercial guiding requirement and other "strict limitations" you have implemented should be retained, while public access to the park aboard modern snowcoaches is expanded. Snowcoaches provide an environmentally friendly way for visitors to access the park for skiing, snowshoeing and other winter adventures.

I commend the Park Service for the improved conditions -- including fresher air, more vibrant natural sounds and less human conflicts with wildlife -- in Yellowstone and Grand Teton national parks over the past four winters. As we all know, those conditions are a direct result of fewer snowmobiles in the parks.

For the sake of present and future generations of visitors, the Park Service must maintain this positive trend in America's flagship national park by phasing out snowmobiles in favor of Alternative 2 (snowcoach-only access).

### 13. Form Letter 53231

**Correspondence Text**

I support the concept of continued snowmobile access to Yellowstone and Grand Teton National Parks. Individual travel by snowmobile provides the best way to experience the magnificent natural features of the Parks in the winter. Please include the following points in developing the final EIS on Winter Use in the Yellowstone and Grand Teton National Parks.

 1. Please allow a small percentage of daily entrances into Yellowstone Park by non-commercially guided small groups of snowmobilers. These small groups could be led by a person who had taken a special internet based training course on snowmobiling in Yellowstone.

August 2007                                                                                              North Wind, Inc.

2. In addition, I support continued access to Yellowstone National Park through the East entrance. Cody, Wyoming needs this access to the Park in the winter for both motorized and non-motorized park Visitors.

3. I support maintaining the current group size of eleven snowmobiles in aroup with one commercial guide. Reducing the number to eight asroposed will drive up the cost per person and reduce flexibility.
4. In Grand Teton National Park there should be some percentage of the daily entrances for through snowmobilers who travel from Moran Junction to Flagg Ranch and onto the Grassy Lakes Road and the National Forest. These snowmobiles would not have to meet BAT standards. This change would allow for more use of the Continental Divide Snowmobile Trail and the purpose it was created for!

I also encourage you to use partnerships with the surrounding communities, counties and states to expand educational opportunities that inform winter visitors regarding Park rules, user ethics, visitor safety and appreciation of the Park resources.

### 14. Form Letter 55765

#### Correspondence Text

I oppose your proposal to allow 720 snowmobiles per day in Yellowstone National Park. Instead, you should protect the park's natural values, promote the healthy enjoyment of the park by visitors, and provide safe working conditions for employees by lowering the current limit of 250 snowmobiles per day down to zero.

### 15. Form Letter 83205

#### Correspondence Text

I oppose your proposal to allow 720 snowmobiles per day in Yellowstone National Park. Instead, you should protect the park's natural values, promote the healthy enjoyment of the park by visitors, and provide safe working conditions for employees by lowering the current limit of 250 snowmobiles per day down to zero.

Four Park Service studies -- at a cost of $10 million -- have shown that Yellowstone would be significantly cleaner, quieter, less hectic and healthier if snowmobile use was phased out. Please heed your own management policies, the conclusions of your scientists, the advice of your former directors and the wishes of the vast majority of American citizens and adopt Alternative 2, which calls for providing winter access on modern snowcoaches and phasing out snowmobile use in the park.

### 16. Form Letter 104137

#### Correspondence Text

I am writing to request that you include the following potential management components in the range of alternatives that are currently being developed for the Winter Use EIS for Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway.

Winter use in Grand Teton and the Parkway should be considered on its own merits rather than being drug along solely on the basis of Yellowstone winter use issues. Please include the following components in the range of alternatives and ensure that they receive meaningful consideration during the analysis of alternatives:

   Allow non-BAT snowmobiles to be operated on the Continental Divide Snowmobile Trail (CDST) since 100% of this trail is immediately adjacent to plowed highways used by other motor vehicles.
   Allow non-BAT snowmobiles to be operated on Jackson Lake for fishing access since BAT snowmobiles cannot safely pass through unpacked and drifted snow.
   Allow non-BAT snowmobiles to depart from Flagg Ranch on the Grassy Lake Road in order to provide access to national forest trails located on the Targhee National Forest.
   Allow up to 50% of daily snowmobiles entries on the CDST and Grassy Lake Road to be used by commercial snowmobile outfitters.

Thank you for your consideration.

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                          North Wind, Inc.

### 17. Form Letter 101692

**Correspondence Text**

I support Alternative 2, which calls for providing winter access on modern snow coaches and phasing out snowmobile use in the park. Alternative 2 has been recommended by Yellowstone's own scientists in order to avoid adverse impacts on the park's wildlife, and to provide better air quality. Thank you.

### 18. Form Letter 118338

**Correspondence Text**

Over the last four winters, visitors to Yellowstone and Grand Teton experienced parks that were cleaner and quieter than they had been in decades. These four winters have proven out what your previous three studies predicted - that transitioning to snowcoach-only access would result in lower levels of air and noise pollution and less disturbance of wildlife.

Given that snowcoaches are more affordable, comfortable and provide great educational opportunities for individuals touring Yellowstone, it is not surprising that their use increased 67 percent since 2003. The purpose of the winter use plan is to provide public recreation opportunities that do not impair park resources and values. Your preferred alternative, which recommends 720 snowmobiles per day, fails to do this. Over the last four winters, 250 snowmobiles on average have entered Yellowstone per day. However, even with the decrease to 250 snowmobiles in the Park, natural sounds are obscured by noise and wildlife continue to be disturbed. Your management policies, newly reaffirmed, requires the best possible air quality in parks, protection of natural soundscapes and avoidance or minimization of adverse impacts to park resources and values.

If snowmobile use increases as you propose, the resurgent natural conditions in the Park will be lost and the Park Service will be failing to uphold the management policies in the following ways:

*The Park Service is supporting an alternative that will result in a decline in Yellowstone's air quality. The preferred alternative will allow nearly five times the carbon monoxide and 17 times the hydrocarbons as the snowcoach-only alternative.
* Noise is already a problem with only 250 snowmobiles in the Park per day, and the DEIS concludes that this problem would grow significantly worse under the preferred alternative of 720 snowmobiles per day.
* Yellowstone's own scientists have recommended that winter traffic remain "at or below" 250 snowmobiles per day. The proposal to increase snowmobile use is at odds with the recommendation of scientists and is wrong for Yellowstone.

After nearly a decade of studies the government has spent 10 million tax dollars. All of the studies, including this DEIS, have demonstrated that Yellowstone's air quality, peace and quiet and wildlife would be protected best if snowmobile use is replaced with expanded public access on modern snowcoaches.

In March, seven former NPS directors said that making the right decision is vitally important to keeping, not just Yellowstone, but the entire National Park System on the right path. If the transition to snowcoaches is reversed, the directors concluded it would "undercut the park's resurgent natural conditions" and would represent a departure from the conservation-first ethic that has governed management of America's national parks from the beginning. It is time to end this debate and do what the Park Service and the Environmental Protection Agency have both concluded is best for Yellowstone – a full transition to snowcoach-only access.



# PUBLIC COMMENTS ON THE PROPOSED RULE
## 36 CFR Part 7: Special Regulations, Areas of the National Park System
### Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

## NATIONAL PARK SERVICE

This report presents the results of the public comment period for the National Park Service (NPS) Proposed Rule to manage winter visitation and recreational use in Yellowstone National Park and Grand Teton National Park (GTNP) and the John D. Rockefeller, Jr., Memorial Parkway. The text of the Proposed Rule appeared in the *Federal Register* on Wednesday, May 16, 2007 (Vol. 72, No. 94, 27499 - 27519).

## BACKGROUND

The National Park Service has been considering winter use management of Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway for over a decade. This effort has included planning, public participation, litigation, and National Environment Policy Act (NEPA) documentation. The following is a short summary of events to date:

| | |
|---|---|
| 1990 | The NPS completed an Environmental Assessment and Winter Use Plan for the parks. The Greater Yellowstone Coordinating Committee (including the NPS and U.S. Forest Service) subsequently began work on an interagency assessment of winter use issues (published in 1999 as *Winter Visitor Use Management: a Multi-agency Assessment*). |
| 1997 | The Fund for Animals filed suit against the NPS, resulting in a settlement that required the NPS to produce a Final Environmental Impact Statement (FEIS) and make a new decision on winter use. |
| November 22, 2000 | The NPS signed a Record of Decision on the FEIS. The decision eliminated recreational snowmobile and snowplane use from the parks by the winter of 2003-2004. |
| December 6, 2000 | The International Snowmobile Manufacturers Association sued the NPS asking that the decision eliminating snowmobile and snowplane use be set aside based on NEPA process infractions. |
| June 29, 2001 | A procedural settlement negotiated by the Office of the Secretary of Interior became final. As provided in that settlement agreement, the NPS acted as lead agency to prepare a Supplemental Environmental Impact Statement (SEIS), with the State of Wyoming and nine others acting as cooperating agencies. |
| March 2002 | The NPS published the draft SEIS and a 60-day public comment period followed during which the NPS received over 300,000 comment documents. |
| March 25, 2003 | The NPS issued a Record of Decision for the SEIS. |
| August 27, 2003 | The Proposed Rule based on the March 2003 Record of Decision appeared in the *Federal Register*; the public comment period closed on October 14, 2003. |
| December 2003 | The NPS published the new regulation based on the Record of Decision, but these actions were subsequently vacated and remanded to the NPS by the Washington, D.C., District Court. |
| February 2004 | A federal court in Wyoming issued a preliminary injunction preventing the NPS from implementing the January 2001 regulation phasing out snowmobile use in |

Case 1:07-cv-02111-EGS    Document 32-12    Filed 04/08/2008    Page 2 of 21

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                North Wind, Inc.

|  |  |
|---|---|
|  | the three parks. As a result, the parks issued emergency orders to comply with the court's order. |
| June 2004 | The NPS began work on an Environmental Assessment (EA) for a Temporary Winter Use Plan for the parks, to guide management of winter use for the interim period (2004-2005, 2005-2006, and 2006-2007). |
| August 20, 2004 | The NPS issued the EA for a 30-day public review and comment and received 95,006 comment documents. |
| September 7, 2004 | The NPS published a Proposed Rule in conjunction with the EA, followed by a 30-day comment period that ended on October 7, 2004. |
| November 10, 2004 | Implementing regulations for the temporary use plan, which remained in effect through the 2006–2007 winter season, appeared in the *Federal Register*. |
| June 24, 2005 | NPS published a Notice of Intent to prepare the Winter Use Plans Environmental Impact Statement and began a 60-day public scoping period beginning on July 24, 2005. |
| September 1, 2005 | The scoping comment period ended, with stakeholders submitting 33,365 comment documents. |
| Fall 2005 | The Wyoming District Court upheld the validity of the 2004 temporary winter use plan, ruling on challenges filed by several litigants. The D.C. District Court denied the Fund for Animals and Federal defendants' motions for summary judgment, as well as a motion by the Greater Yellowstone Coalition enforcing the adaptive management standards of the 2003 decision. |
| September 2006 | The Fund for Animals filed a motion renewing a previous request for summary judgment. That suit is still pending. |
| April 2, 2007 | The NPS issued the Winter Use Plans Draft Environmental Impact Statement (DEIS) for review, with the comment period extending through June 5, 2007. NPS received 122,190 documents containing comments on the DEIS. |
| May 16, 2007 | The Proposed Rule based on the DEIS appeared in the *Federal Register*, announcing a public comment period that extended through July 16, 2007. |
| June 2007 | The Wyoming District Court ruled on a suit from Save Our Snowplanes, upholding the validity of the temporary winter use plan and final regulation and their provisions prohibiting snowplane use on Jackson Lake. |

## CONTRACTOR ACTIVITIES and RESULTS

The NPS contracted with North Wind, Inc. (North Wind) to collect and analyze the comments on the Proposed Rule. Stakeholders sent paper comment letters directly to the NPS, and these were forwarded to North Wind for processing. Additional comments came through *Regulations.gov*, an electronic Internet-based system, or were hand-delivered to park headquarters.

North Wind received 1,481 documents including 1,444 in hard copy and 37 in electronic form. Staff considered all documents, analyzing each document and associating the content with one or more text statements that summarized the content of all comments received. The result is a profile for each comment document that reflects its content.

## SUMMARY TABLES

August 31, 2007                                                                North Wind, Inc.

The following database queries developed by North Wind provide tabular summaries of the content analysis:

- Number of Commentors and Letters from Each State
- Number of Commentors Who Expressed Each Comment
- Number of Commentors and Letters from "Gateway Communities"
- Number of Form Letter and Non-form Letter Commentors
- Number of Commentors for each type of Form Letter
- Number of Commentors that Responded via the Web or US Mail, for Form Letters and non-Form Letters
- Number of Commentors - By State and Position on Rule

These tables are provided on the following pages.

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                      North Wind, Inc.

## Number of Commentors and Letters from Each State

| State | Number of Letters | Number of Commentors | % of Total Commentors |
|-------|-------------------|----------------------|-----------------------|
| AK | 4 | 4 | 0.28 |
| AL | 3 | 3 | 0.21 |
| AR | 2 | 2 | 0.14 |
| AZ | 20 | 20 | 1.38 |
| CA | 155 | 155 | 10.69 |
| CO | 81 | 81 | 5.59 |
| CT | 13 | 13 | 0.90 |
| DC | 7 | 7 | 0.48 |
| DE | 2 | 2 | 0.14 |
| FL | 42 | 42 | 2.90 |
| GA | 12 | 12 | 0.83 |
| HI | 7 | 7 | 0.48 |
| IA | 33 | 30 | 2.07 |
| ID | 17 | 17 | 1.17 |
| IL | 49 | 49 | 3.38 |
| IN | 14 | 14 | 0.97 |
| KS | 7 | 7 | 0.48 |
| KY | 7 | 7 | 0.48 |
| LA | 1 | 1 | 0.07 |
| MA | 41 | 41 | 2.83 |
| MD | 17 | 17 | 1.17 |
| ME | 6 | 6 | 0.41 |
| MI | 69 | 65 | 4.48 |
| MN | 138 | 132 | 9.10 |
| MO | 16 | 16 | 1.10 |
| MS | 2 | 2 | 0.14 |
| MT | 34 | 32 | 2.21 |
| NC | 28 | 28 | 1.93 |
| ND | 29 | 28 | 1.93 |
| NE | 11 | 9 | 0.62 |
| NH | 18 | 17 | 1.17 |
| NJ | 18 | 18 | 1.24 |
| NM | 15 | 14 | 0.97 |
| NV | 12 | 12 | 0.83 |
| NY | 69 | 68 | 4.69 |
| OH | 27 | 26 | 1.79 |
| OK | 4 | 4 | 0.28 |
| OR | 38 | 38 | 2.62 |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                North Wind, Inc.

| State | Number of Letters | Number of Commentors | %Total Commentors |
|-------|-------------------|----------------------|-------------------|
| PA | 37 | 37 | 2.55 |
| PR | 3 | 3 | 0.21 |
| RI | 4 | 4 | 0.28 |
| SC | 7 | 7 | 0.48 |
| SD | 13 | 13 | 0.90 |
| TN | 16 | 16 | 1.10 |
| TX | 39 | 39 | 2.69 |
| UT | 21 | 21 | 1.45 |
| VA | 19 | 19 | 1.31 |
| VI | 2 | 2 | 0.14 |
| VT | 19 | 18 | 1.24 |
| WA | 69 | 69 | 4.76 |
| WI | 76 | 71 | 4.90 |
| WV | 2 | 2 | 0.14 |
| WY | 26 | 25 | 1.72 |
| OTHER * | 60 | 58 | 4.00 |
| **Totals \*\*** | **1,481** | **1,450** | **100.00** |

\*    "OTHER" includes letters with missing, incomplete, or overseas addresses.
\*\*   Some commentors submitted multiple letters, and some letters had multiple signatures. Therefore, totals for letters and commentors may differ.

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                    North Wind, Inc.

## Number of Commentors Who Expressed Each Comment

| ID | Comment Text | Number of Commentors |
|---|---|---|
| **3.1** | **Air Quality and Air Quality-Related Values** | |
| 3.1.1 | Commentors state that snowmobiles adversely impact air quality. | 198 |
| 3.1.1.1 | Commentors state that reductions in the number of snowmobiles in the park along with BAT requirements have led to improved air quality. Some add that the temporary plan and interim regulations have not been responsible for the improvements as stated in the Proposed Rule. | 3 |
| 3.1.1.2 | Commentors suggest that NPS sell entrance tickets in gateway communities to reduce congestion and air quality impacts at entrances. | 1 |
| 3.1.2 | Commentors state that new requirements for snowmobiles accessing the parks have reduced emissions and met air quality concerns. | 2 |
| 3.1.3 | Commentors state that snowcoaches have negative impacts on air quality, and/or object to their negative impacts. | 3 |
| **3.2** | **Health and Safety** | |
| 3.2.1 | Commentors state that snowmobiles adversely impact health and safety. | 35 |
| 3.2.2 | Commentors state that allowing nonmotorized users to continue to access Sylvan Pass without avalanche control is irresponsible. | 4 |
| **3.3** | **Natural Soundscapes** | |
| 3.3.1 | Commentors state that snowmobiles adversely impact natural soundscapes. | 184 |
| 3.3.2 | Commentors state that visitors should not reasonably expect to enjoy natural quiet in a National Park with hundreds of other visitors traveling along the same transportation infrastructure. Some add that the parks have vast backcountry opportunities for experiencing natural quiet. | 4 |
| 3.3.3 | Commentors state that snowcoaches adversely impact natural soundscapes. | 1 |
| 3.3.4 | Commentors state that sounds from snowmobiles with BAT are not intrusive and have no adverse impacts on soundscapes. | 1 |
| **3.4** | **Socioeconomics** | |
| 3.4.1 | Commentors state that closing Sylvan Pass and the East Entrance in winter would have negative socioeconomic effects on communities who depend on winter tourism. | 15 |
| 3.4.2 | Commentors state that the requirement that 100% of snowmobile visitors be led by a commercial guide has led to negative socioeconomic impacts. | 271 |
| 3.4.3 | Commentors state that continuing to allow snowmobiles in the park will have negative socioeconomic impacts because visitors will boycott the parks. | 8 |
| 3.4.4 | Commentors state that banning snowmobiles will not have negative socioeconomic impacts on gateway communities. Some state these communities will benefit from snowcoach operations and/or diversifying winter use. | 2 |
| 3.4.5 | Commentors state that the parks are important economically to surrounding counties, and citizens expect reasonable access to the parks. | 4 |
| 3.4.6 | Commentors state that negative socioeconomic impacts on gateway communities, concessioners, and guided snowmobile outfitters/users have resulted from snowmobile restrictions and/or Park Service/federal government misinformation and other actions. Some commentors add that these actions have given a false impression that visitors do not want to use the East Entrance in winter. | 2 |
| 3.4.7 | Commentors state that revenue from snowmobilers provides capital required to maintain the parks so they may be enjoyed by all users in all seasons. | 1 |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                      North Wind, Inc.

| 3.5 | **Visitor Access and Circulation** | |
|------|----------------------------------------------------------------------------------------------------------------------------------------------|------|
| 3.5.1 | Commentors state that snowcoaches provide adequate access to the parks. | 23 |
| 3.5.2 | Commentors state that the Proposed Rule denies access by individual snowmobilers, which they have enjoyed responsibly for decades. Some commentors add that reduction of access to the park is also a cumulative impact to some stakeholders because of restrictions on access to other federal lands. | 4 |
| 3.5.3 | Commentors state that they value motorized oversnow access to various park features such as Jackson Lake and/or that limits on use of federal parks and lands infringe on their right to access them. | 2 |
| 3.5.4 | Commentors state that visitors are opposed to management options that reduce access according to NPS visitor surveys (Freimund and Borrie 2001). | 1 |
| **3.6** | **Visitor Experience** | |
| 3.6.1 | Commentors state that snowmobiles in the park adversely impact visitor experience. Some commentors add that they disturb peace and quiet in the parks. | 94 |
| 3.6.2 | Commentors state that closing the East Entrance would diminish visitor experience by depriving visitors of that area's unique qualities. | 2 |
| 3.6.3 | Commentors state that requiring snowcoach travel has negative impacts on visitor experience. | 1 |
| 3.6.4 | Commentors state that under the Preferred Alternative there is no opportunity for snowmobile visitors to enjoy YNP through their own personalized experience. They add that allowing limited unguided and/or noncommercially guided access will better meet the NPS Policy for Visitor Use that states, the Service will, to the extent practicable, afford visitors ample opportunity for inspiration, appreciation, and enjoyment through their own personalized experiences... | 1 |
| **3.7** | **Wildlife, including Bison and Elk** | |
| 3.7.1 | Commentors state that snowmobiles adversely impact wildlife. | 114 |
| 3.7.2 | Commentors state that snowmobiles do not adversely impact wildlife. | 5 |
| **3.8** | **General Impacts** | |
| 3.8.1 | Commentors state that snowmobiles waste resources and/or contribute to global warming. | 52 |
| 3.8.2 | Commentors state that snowmobile use has negative impacts on park resources and/or values. Some add it is irresponsible to allow snowmobiles to continue to use the public lands in light of their negative impacts. | 147 |
| 3.8.3 | Commentors state that snowmobile use has negative impacts on water quality. | 5 |
| 3.8.4 | Commentors state that the lower numbers of snowmobiles in the parks over the last four years have reduced impacts to park resources. | 1 |
| 3.8.5 | Commentors state that snowmobiles adversely impact vegetation. | 1 |
| 3.8.6 | Commentors state that snowmobiling does not result in negative environmental impacts. | 1 |
| **4** | **DESCRIPTION OF THE PROPOSED RULE/MANAGEMENT TECHNIQUES** | |
| **4.1** | **Monitoring of Park Resources and Values** | |
| 4.1.1 | Commentors state they support adaptive management to guide management of noncommercially guided groups and/or use of non-BAT snowmachines on the CDST. Some express concern about the potential for misuse of adaptive management strategies. | 4 |
| **4.2** | **Daily Entry Limits** | |
| 4.2.1 | Commentors state that no more than 50 snowcoaches should be admitted to the parks per day to maximize per coach occupancy. | 322 |
| 4.2.2 | Commentors state they support limits or low limits on the number of snowmobiles allowed in the parks. | 30 |
| 4.2.3 | Commentors suggest using a lottery to determine who would be able to enter the parks on | 1 |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

| | | |
|---|---|---|
| August 31, 2007 | | North Wind, Inc. |

| | | |
|---|---|---|
| | snowmobiles. | |
| **4.3** | **Commercial Guide Requirements** | |
| 4.3.1 | Commentors state they support guided snowmobile access to the parks. | 5 |
| 4.3.1.1 | Commentors state they support the 10 plus 1 group size because it has been tested and has proven to work; changing it would have significant long-term, adverse effects on businesses and winter visitation. | 563 |
| 4.3.1.2 | Commentors state specific objections to larger group sizes because they would:<br>* Affect visitor safety<br>* Increase the sound level and duration<br>* Diminish visitor experience. | 6 |
| 4.3.1.3 | Commentors object to smaller group sizes for one or more of the following reasons:<br>* They would increase the number of groups, thus increasing the percentage of audible noise times<br>* They would increase the costs for visitors<br>* Transportation for smaller groups wastes gas because vehicles would not be operated at full capacity<br>* Small group size will not accommodate large families.<br>* They detract from visitor experience.<br>Some commentors provide examples of their concerns from operations in the park. | 259 |
| 4.3.1.4 | Commentors state that the final rule should specify a minimum group size larger than 2, and management of snowmobiles in the three parks by a daily limit on snowmobile groups. | 266 |
| 4.3.2 | Commentors state objections to the 100% commercial guiding requirements. Some state the requirement has led to negative socioeconomic effects on local communities. Some feel that the requirement discriminates against the individual snowmobile user. Some state the 100% commercial guide requirement constitutes an unlawful tax levy. | 329 |
| 4.3.2.1 | Commentors support allowing varying percentages of the daily entrances into the parks to be noncommercially guided by a trained or certified guide. Some suggest a group size of 5 plus 1 for these noncommercially guided groups. | 564 |
| 4.3.2.1.1 | Commentors recommend requirements for snowmobile operators who are part of groups led by certified leaders: a valid driver's license and a certificate of completion of a safety course. Those who do not meet these requirements would need to be riders or go with a guided group. | 2 |
| 4.3.2.2 | Commentors state that NPS has not provided data to support statements that commercial guides mitigate impacts to soundscapes, wildlife, and safety. They state the analysis is flawed because noncommercially guided groups have not been tried since implementation of managed winter use in 2003. | 1 |
| 4.3.3 | Commentors request that the rule clarify the group size restrictions that would be in effect this winter; this will ensure that concessionaires who have scheduled groups of 10 do not have to reduce the group size at the last minute to seven visitors. | 1 |
| 4.3.4 | Commentors object to guides for snowmobile groups. Some add that summer visitors are not required to have guides. | 5 |
| **4.4** | **Best Available Technology (BAT)** | |
| 4.4.1 | Commentors support BAT and/or state that snowmobiles should be cleaner and more efficient. Some commentors express their support for the Family Emissions methodology for demonstrating compliance and use of the Snowmobile Safety and Certification Committee form as well as private testing and certification. | 17 |
| 4.4.2 | Commentors state that EPA compliant or other non-BAT snowmobiles should be allowed on CDST, Grassy Lake Road, and Jackson Lake in Grand Teton and the Parkway. | 509 |
| 4.4.3 | Commentors state that they support BAT for snowcoaches. Some commentors add that these improvements should be phased in earlier than 2011-2012. | 327 |
| **4.5** | **Route Restrictions** | |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                      North Wind, Inc.

| | | |
|---|---|---|
| 4.5.1 | Commentors support route restrictions for snowmobiles and/or snowcoaches used in the parks. | 4 |
| 4.5.2 | Commentors object to various route restrictions on snowmobile use in the parks, including closure of Sylvan Pass (East Entrance of the park) and/or various side roads. Some add that NPS should continue to look at options to keep these routes open, including increased recreation use fees to help defray costs, resuming use of the howitzer as the primary method for avalanche control, or contracting this work out so employee safety would not be an issue. | 567 |
| 4.5.3 | Commentors state there is no clear argument for closing Sylvan Pass and/or no substantial data to support closure based on safety concerns. Some state that the decision to close the pass is unfair. | 7 |
| 4.5.3.1 | Commentors state that limits on the number of snowmobiles allowed in the parks are responsible for low visitor numbers through the East Entrance; thus, it is not fair to use low visitor use to justify closing this entrance. Some add that visitation through this entrance would increase to historic levels if NPS were to allow limited noncommercially guided access. | 3 |
| 4.5.4 | Commentors state they support closure of Sylvan Pass (East Entrance of the park) during the winter season. Some cite costs and safety as reasons for their support. | 2 |
| 4.5.5 | Commentors request that NPS reconsider allowing access to Firehole Canyon Drive, North Canyon Rim Drive, and Riverside Drive for snowmobile visitors. | 1 |
| 4.5.6 | Commentors state that NPS should continue to analyze the costs of keeping the East Entrance open during the winter. | 3 |
| **4.9** | **Enforcement** | |
| 4.9.1 | Commentors state that NPS should strictly enforce existing rules and punish violators. | 3 |
| **4.10** | **General Statements about Snowmobile Management** | |
| 4.10.1 | Commentors make statements criticizing the current administration and/or federal government. Some state politics or greed is driving the decision on winter use. | 73 |
| 4.10.2 | Commentors state that the snowmobile lobby is influencing the decision on winter use. | 38 |
| 4.10.3 | Commentors state that snowmobiles should be banned from Yellowstone and/or all National Parks. Some commentors state that legal and policy mandates support eliminating snowmobiles from the parks, including Interior Secretary Kempthorne's management direction and strategic plan. | 197 |
| 4.10.4 | Commentors support a diversity of oversnow transportation including both snowmobiles and snowcoaches. | 62 |
| 4.10.5 | Commentors state support for continued access to the parks by snowmobile. Some commentors add that snowmobilers' entrance fees should support studies of potential adverse environmental impacts and how to mitigate them. | 512 |
| 4.10.6 | Commentors recommend that the final rule specify managing CDST and the Grassy Lake Road as one unit focused on through trips associated with adjacent national forests. | 271 |
| 4.10.7 | Commentors suggest expanding groomed trails for nonmotorized activity in certain areas including Canyon, Lake, and Old Faithful in YNP; the road from Cottonwood to Signal Mt. in GTNP; and future multi-purpose pathways to be constructed in GTNP. | 1 |
| **5** | **COMPLIANCE WITH OTHER LAWS AND MANDATES** | |
| 5.1 | National Environmental Policy Act: Commentors make one or more statements regarding NPS compliance with NEPA. | 4 |
| 5.2 | Organic Act: Commentors state that implementation of the Proposed Rule will cause NPS to violate the Organic Act, other NPS mandates, and/or its mission to preserve unimpaired the natural and cultural resources and values of the National Park System (such as its pristine nature, peace and quiet, wilderness, etc.) for this and future generations. | 310 |
| 5.2.1 | Commentors state that NPS is not responsible for the profits of industry and corporations. | 10 |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                   North Wind, Inc.

| | | |
|---|---|---|
| 5.2.2 | Commentors state there is not a valid need to provide all types of opportunities for recreational activities in the national parks. | 22 |
| 5.2.3 | Commentors state that conservation must be the priority when there is a choice between visitor access and protection of park resources and values. | 33 |
| 5.3 | Commentors emphasize that the NPS mission is to provide park access for the enjoyment, education, and inspiration of this and future generations. | 14 |
| 5.4 | Commentors state objections to perceived efforts by the Administration and/or the NPS to rewrite basic park policy to promote recreation over park protection. | 36 |
| 5.5 | Commentors state that NPS guidelines on resource protection require park managers to select forms of transportation that have the fewest impacts. | 4 |
| 5.6 | Commentors note that new Clean Air Act Management Policies require the National Park Service to maintain the best possible air quality in the parks. | 2 |
| 5.7 | Commentors express concern that publishing a list of vehicles that meet park requirements affects interstate commerce and impairs contract abilities. | 2 |
| **6** | **PUBLIC PARTICIPATION** | |
| 6.1 | Commentors state that NPS should consider the comments of all park stakeholders, not just the vocal minority or commercial interests. | 43 |
| 6.2 | Commentors state that previous studies, former NPS directors, and the majority of the American public agree that snowmobiles adversely impact the parks' resources and values. | 863 |
| 6.3 | Commentors recommend that NPS partner with surrounding communities, counties and states to provide public information to winter visitors regarding park rules, user ethics, safety, and appreciation of the park resources. | 256 |
| 6.4 | Commentors state that ignoring widespread public opposition to a use that degrades the national parks and other places is undemocratic. | 13 |
| 6.5 | Commentors express appreciation to the Park Service for providing multiple opportunities for the public to participate in the decision making process. | 9 |
| 6.6 | Commentors (including cooperating agencies) feel their input and efforts in resolving winter use issues have been largely ignored by Park Service planners. | 2 |
| 6.7 | Commentors state they appreciate efforts by NPS to work with snowmobile manufacturers on appropriate documentation for BAT sound requirements and compliance. | 1 |
| 6.8 | Commentors state that NPS should manage visitor use and access in a way that is fair to all parties and/or meets the needs of local stakeholders as well as visitors from other areas. | 1 |
| **7** | **REGULATIONS RELATING TO SPECIFIC PARK UNITS** | |
| **7.1** | **Yellowstone National Park** | |
| 7.1.1 | Commentors request that NPS set fixed opening and closing dates for winter access to Yellowstone Park of December 15 and March 15. Some commentors add that this would provide for consistency in planning. | 2 |
| 7.1.2 | Commentors recommend extended hours for access to Firehole Canyon, North Canyon Rim, and Riverside Drive in Yellowstone to provide more flexibility for guided tours. | 2 |
| **8** | **PRO-RULE** | |
| 8.1 | Commentors generally support a Proposed Rule based on Alternative 1 in the DEIS. | 10 |
| **9** | **ANTI-RULE** | |
| 9.1 | Commentors object to the Proposed Rule. Some commentors add that the rule contradicts the 2001 final rule that required sharp reductions in winter visitation. Some state there has been no new information to persuasively reject that rule. Some commentors add that the Proposed Rule would: * Adversely impact visitor enjoyment of peace and quiet. * Conflict with recommendations of park biologists and adversely impact wildlife. * Reverse progress made to air quality . | 865 |
| **9.2** | **Commentors make statements about other alternatives in the EIS as a basis for the** | |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                          North Wind, Inc.

|  |  |  |
|---|---|---|
| | **Proposed Rule** | |
| 9.2.1 | Commentors state they support Alternative 2. | 861 |
| 9.2.1.1 | Commentors state they support Alternative 2 because it impacts park resources and values the least while accommodating human recreational access. | 10 |
| 9.2.1.2 | Commentors object to Alternative 2 for various reasons. Some state it does not provide balanced use between snowmobiles and snowcoaches. Some state snowcoaches are not reliable and/or cannot provide access to all areas of the park. | 4 |
| 9.2.1.2.1 | Commentors discuss various potential snowcoach improvements. | 1 |
| 9.2.2.1 | Commentors state they oppose Alternative 3 and/or 250 snowmobiles per day proposed in Alternative 3. | 5 |
| 9.2.3 | Commentors state they support Alternative 4 and/or elements of it. Some recommend modifications to the alternative. | 7 |
| 9.2.4 | Commentors state they support Alternative 5 and/or elements of it. | 4 |
| 9.2.6 | Commentors state they support an alternative that blends several pieces of Alternatives 1, 4, and 5. | 271 |
| 9.2.7 | Commentors state they support a final alternative that keeps all four entrances open, requires BAT-only snowmobiles and snowcoaches in YNP, allows daily entry limits of 60 snowmobiles through the East Entrance and flexible daily limits for special occasions, and that accommodates noncommercially guided access. | 2 |
| 9.2.8 | Commentors ask NPS to consider these management techniques: * Percentage of commercially guided snowmobiles does not exceed 70% of daily total. * Percentage of noncommercially guided snowmobiles ranges from 25% to 50% of daily total; leader must complete certification course. * Increase percentage of noncommercially guided snowmobiles in exchange for lower daily limits. * Manage CDST as a through trail with group and group size limits. * Manage snowmobile use by daily group limit. | 2 |
| **10** | **MAJOR ISSUES** **Commentors identify other issues and/or concerns related to the Proposed Rule.** | |
| 10.1 | Commentors state that there are plenty of other lands on which to snowmobile; therefore, snowmobiles should not be allowed in the parks. | 54 |
| 10.2 | Commentors support continuation of the preferential right of renewal of long-time, small concessioners. They state that without the preferential right of renewal and the certainty that a long-term concession contract provides, small businesses would suffer and it would be a detriment to rural communities and visitor experience. Some commentors add that the final rule should recognize this right. | 4 |
| 10.3 | Commentors state that NPS should promote nonmotorized winter activities. | 19 |
| **11** | **OFF-SCOPE ISSUES** | |
| 11.1 | Commentors submit various comments on the DEIS for Winter Use. | 6 |
| 11.2 | Commentors make various off-scope statements such as: * Visitors degrade park resources by littering and disobeying laws within park boundaries. | 30 |
| **12** | **PERSONAL OBSERVATIONS** | |
| 12.1 | Commentors make observations based on personal experiences in the national parks and/or out of doors. | 102 |
| 12.2 | Commentors commend NPS for various actions including: · Efforts to protect the national parks. | 3 |
| **13** | **QUESTIONS REGARDING THE DATA OR ANALYSES SUPPORTING THE PROPOSED RULE** | |
| 13.1 | Commentors question the analyses of sound and emissions impacts supporting the Proposed Rule. | 5 |
| 13.2 | Commentors question the lack of analysis in the DEIS of the existing exclusively | 1 |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                      North Wind, Inc.

|  |  |  |
|---|---|---|
|  | nonmotorized activities available in the park compared to the limited opportunities for the motorized community. They state that it is imperative that the Proposed Rule properly analyzes the opportunities available to all users to show the balances in the types of winter recreational opportunities. |  |
| 13.3 | Commentors state they do not believe that the analysis supporting the Proposed Rule properly considered the long-term socioeconomic impacts to gateway communities and/or cumulative environmental impacts to forest system lands. | 2 |
| 13.4 | Commentors object to references in the Proposed Rule to the 2000 FEIS and subsequent Record of Decision because they were invalidated by the Wyoming District Court. | 1 |
| 13.5 | Commentors state they do not believe that the analysis supporting the Proposed Rule properly considered the long-term impacts from climate change on winter activities in the parks; they recommend that plans be reevaluated every few years so routes with insufficient snow could be closed to visitors. Commentors request that NPS publish the cost per winter user of maintaining oversnow routes and how the plan will adapt as the climate warms. | 3 |
| 13.6 | Commentors state that the following statement on page 27510 of the Proposed Rule is not true for communities and businesses in Park County:<br>"The preferred alternative also supports the communities and businesses both near and far from the park and will encourage them to have an economically sustainable winter recreation program that relies on a variety of modes and access to the parks in the winter." | 2 |
| 13.7 | Commentors state the Proposed Rule is incomplete because the analysis did not properly consider recent studies showing that snowcoaches and snowmobiles can have the same extremes in emissions - both high and low. Some add that the Proposed Rule cites studies not cited in the DEIS. | 1 |
| 13.8 | Commentors state the analysis is inconsistent because it uses historic snowmobile use levels as the baseline for some resources but does not use that baseline for the economic analysis. | 1 |
| 13.9 | Commentors express concern about inconsistencies in the health and safety analysis for alternatives that would allow nonmotorized travel over Sylvan Pass. They question the lack of safety analysis and cumulative effects analysis for alternatives that continue to allow ski and snowshoe use of the South Entrance and East Entrance Road after the balance of the park's roads close to winter operations. | 1 |
|  | **Total Number of Comments Generated:** | **10,054** |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                North Wind, Inc.

## Number of Commentors from "Gateway Communities"

| State | City | Number of Commentors | Number of Letters |
|-------|------|---------------------:|------------------:|
| ID | Island Park | 1 | 1 |
| MT | West Yellowstone | 7 | 9 |
| WY | Cody | 2 | 2 |
| WY | Jackson | 12 | 13 |
| | **Totals *** | **22** | **25** |

\*    Some commentors submitted multiple letters, and some letters had multiple signatures. Therefore, totals for letters and commentors may differ.

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                    North Wind, Inc.

## Number of Form Letter and non-Form Letter Commentors

| Letter Type | Number of Commentors |
|---|---|
| Form Letters | 605 |
| non-Form Letters | 845 |
| **Totals \*** | **1,450** |

\*    Some commentors sent more than one kind of form letter as well as one or more non-form letters; count will not match count of letters by state.

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                     North Wind, Inc.

## Number of Commentors for Each Form Letter

| Letter Type | Number of Commentors |
|---|---|
| FL-1 | 70 |
| FL-2 | 57 |
| FL-3 | 236 |
| FL-4 | 264 |
| Total: | 627 |

\*    Some commentors sent more than one kind of form letter as well as one or more non-form letters; count will not match count of letters by state.

August 31, 2007                                                                                    North Wind, Inc.

## Number of Commentors that Responded via the Web or US Mail, for Form Letters and Nonform Letters

| Letter Type | US Mail | Web | Number of Commentors |
|---|---|---|---|
| Non Form | 827 | 18 | 845 |
| FL-1 | 70 | 0 | 70 |
| FL-2 | 56 | 1 | 57 |
| FL-3 | 235 | 1 | 236 |
| FL-4 | 252 | 13 | 265 |
| Total * | **1,440** | **33** | **1,473** |

\*    Some commentors sent in a hardcopy letter AND submitted a web letter. Therefore, they are counted twice in this report.

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                    North Wind, Inc.

## Number of Commentors - By State, Position

| State | Form Letters | | |
|-------|---------|---------|-----------|
|       | Pro Rule | Unclear | Anti-Rule |
| AK | 0 | 1 | 0 |
| AL | 0 | 1 | 0 |
| AZ | 0 | 2 | 3 |
| CA | 0 | 16 | 16 |
| CO | 0 | 48 | 2 |
| CT | 0 | 2 | 0 |
| FL | 0 | 1 | 1 |
| GA | 0 | 0 | 3 |
| IA | 0 | 26 | 1 |
| ID | 0 | 8 | 1 |
| IL | 0 | 21 | 3 |
| IN | 0 | 4 | 1 |
| KS | 0 | 0 | 1 |
| KY | 0 | 1 | 1 |
| LA | 0 | 0 | 1 |
| MA | 0 | 17 | 1 |
| MD | 0 | 0 | 1 |
| ME | 0 | 0 | 1 |
| MI | 0 | 47 | 0 |
| MN | 0 | 111 | 1 |
| MO | 0 | 2 | 1 |
| MT | 0 | 15 | 0 |
| NC | 0 | 0 | 2 |
| ND | 0 | 28 | 0 |
| NE | 0 | 7 | 0 |
| NH | 0 | 10 | 1 |
| NJ | 0 | 1 | 2 |
| NM | 0 | 2 | 0 |
| NV | 0 | 6 | 0 |
| NY | 0 | 8 | 3 |
| OH | 0 | 6 | 1 |
| OR | 0 | 5 | 3 |
| PA | 0 | 6 | 2 |
| PR | 0 | 0 | 1 |
| SC | 0 | 0 | 1 |
| SD | 0 | 11 | 0 |
| TN | 0 | 2 | 0 |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                           North Wind, Inc.

| Form Letters | | | |
|---|---|---|---|
| **State** | **Pro Rule** | **Unclear** | **Anti-Rule** |
| **TX** | 0 | 0 | 4 |
| **UT** | 0 | 13 | 1 |
| **VA** | 0 | 0 | 1 |
| **VT** | 0 | 12 | 0 |
| **WA** | 0 | 8 | 2 |
| **WI** | 0 | 52 | 0 |
| **WV** | 0 | 0 | 0 |
| **WY** | 0 | 14 | 0 |
| **OTHER** | 0 | 21 | 7 |
| **Totals \*** | 0 | 535 | 70 |

| Nonform Letters | | | |
|---|---|---|---|
| **State** | **Pro-Rule** | **Unclear** | **Anti-Rule** |
| **AK** | 0 | 0 | 3 |
| **AL** | 0 | 0 | 2 |
| **AR** | 0 | 0 | 2 |
| **AZ** | 0 | 0 | 15 |
| **CA** | 0 | 1 | 122 |
| **CO** | 0 | 1 | 30 |
| **CT** | 0 | 0 | 11 |
| **DC** | 1 | 0 | 6 |
| **DE** | 0 | 0 | 2 |
| **FL** | 0 | 0 | 40 |
| **GA** | 0 | 0 | 9 |
| **HI** | 0 | 0 | 7 |
| **IA** | 0 | 1 | 2 |
| **ID** | 0 | 2 | 6 |
| **IL** | 0 | 0 | 24 |
| **IN** | 0 | 0 | 9 |
| **KS** | 0 | 0 | 6 |
| **KY** | 0 | 0 | 5 |
| **MA** | 0 | 0 | 23 |
| **MD** | 0 | 0 | 16 |
| **ME** | 0 | 0 | 5 |
| **MI** | 0 | 2 | 16 |
| **MN** | 2 | 0 | 18 |
| **MO** | 0 | 0 | 13 |
| **MS** | 0 | 0 | 2 |
| **MT** | 4 | 6 | 7 |
| **NC** | 0 | 0 | 26 |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                     North Wind, Inc.

| Nonform Letters | | | |
|---|---|---|---|
| **State** | **Pro Rule** | **Anti-rule** | **Unclear** |
| **NE** | 0 | 0 | 2 |
| **NH** | 0 | 0 | 6 |
| **NJ** | 0 | 1 | 13 |
| **NM** | 0 | 1 | 11 |
| **NV** | 0 | 0 | 6 |
| **NY** | 0 | 0 | 56 |
| **OH** | 0 | 0 | 19 |
| **OK** | 0 | 0 | 4 |
| **OR** | 0 | 1 | 29 |
| **PA** | 0 | 0 | 29 |
| **PR** | 0 | 0 | 2 |
| **RI** | 0 | 0 | 4 |
| **SC** | 0 | 0 | 6 |
| **SD** | 0 | 0 | 2 |
| **TN** | 0 | 0 | 13 |
| **TX** | 0 | 1 | 34 |
| **UT** | 0 | 0 | 6 |
| **VA** | 0 | 1 | 17 |
| **VI** | 0 | 0 | 2 |
| **VT** | 0 | 0 | 5 |
| **WA** | 0 | 4 | 55 |
| **WI** | 0 | 3 | 16 |
| **WV** | 0 | 0 | 2 |
| **WY** | 0 | 6 | 6 |
| **OTHER** | 0 | 5 | 24 |
| **Totals *** | 7 | 36 | 796 |

* Some commentors sent more than one kind of form letter as well as one or more non-form letters; count will not match count of letters by state.

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                            North Wind, Inc.

## Form Letters

| Letter ID | Correspondence Text |
|---|---|
| FL-1 | I am writing in regard to the National Park Service's plans to change the regulation of snowmobile use in Yellowstone National Park.<br><br>Despite three Park Service studies finding that current snowmobile use is damaging Yellowstone -- and despite protests from nearly all former NPS directors -- I understand that the National Park Service's preferred plan is to allow a threefold increase in snowmobile use in the park.<br><br>I urge the National Park Service to reject this "preferred alternative" and to instead adopt "Alternative 2," which would phase out the use of snowmobiles in favor of snowcoaches.<br><br>Thank you for your time. |
| FL-2 | Dear Rule Makers:<br>I am writing in regard to the Winter Use Proposed Rule for Grand Teton and Yellowstone National Parks and the John D. Rockefeller, Jr., Memorial Parkway. I support the continued use of snowmobiles for winter transportation in these parks.<br><br>1. The rule should be amended to allow at least 20% of Yellowstone's daily snowmobiles entries to be led by a non-commercial guide who has taken a short training course.<br>2. The daily snowcoach limit of 78 per day proposed is too high and should be reduced to fewer than 50 per day. This should better utilize empty seats in existing snowcoaches, currently averaging just 29 per day entering the park with an average of only 7.5 riders per coach.<br>3. I support the section of the rule which will finally require snowcoaches to meet emissions and sound requirements. However, "beginning in the 2011-2012 season" is too long of a phase-in period. Two years advance notice should be more than sufficient.<br>4. The maximum commercial snowmobile group size should remain at 11 (10 plus 1 guide) versus being decreased to 8 as proposed by this rule.<br>5. Sylvan Pass provides important access to Yellowstone through the East Entrance. Therefore I would request Sylvan Pass be kept open to snowmobile and snowcoach traffic.<br>6. The Yellowstone side-roads provide opportunities for visitors to view the beauty of the park. I support re-opening these road segments to snowmobiles in the afternoons.<br><br>Thank you for this opportunity to comment. |
| FL-3 | I support the concept of continued snowmobile access to Yellowstone and Grand Teton National Parks. Individual travel by snowmobile provides the best way to experience the magnificent natural features of the Parks in the winter. Please include the following points in developing the Final Rule on Winter Use in the Yellowstone and Grand Teton National Parks.<br><br>1. Please allow a small percentage of daily entrances into Yellowstone Park by noncommercially guided small groups of snowmobilers. These small groups could be led by a person who had taken a special internet based training course on snowmobiling in Yellowstone.<br><br>2. In addition, I support continued access to Yellowstone National Park through the East Entrance. Cody, Wyoming needs this access to the Park in the winter for both motorized and non-motorized park visitors.<br><br>3. I support maintaining the current group size of eleven snowmobiles in a group with one commercial guide. Reducing the number to eight as proposed will drive up the cost per person and reduce flexibility.<br><br>4. In Grand Teton National Park, there should be some percentage of the daily entrances for through snowmobilers who travel from Moran Junction to Flagg Ranch and onto the Grassy Lake Road and the National Forest. These snowmobiles would not have to meet BAT standards. This change would allow for more use of the Continental Divide Snowmobile Trail and the purpose it was created for.<br><br>I also encourage you to use partnerships with the surrounding communities, counties and states to expand educational opportunities that inform winter visitors regarding Park rules, user ethics, visitor safety and appreciation of the Park resources. |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                  North Wind, Inc.

| Letter ID | Correspondence Text |
|-----------|---------------------|
| FL-4 | I am writing in regard to the Winter Use Proposed Rule (Regulatory Information Number 1024-AD55) for Grand Teton and Yellowstone National Parks and the John D. Rockefeller, Jr., Memorial Parkway. I support the continued use of snowmobiles for winter transportation in these parks and urge that you blend several pieces of Alternatives 1, 4 and 5 of the associated DEIS to create a revised final rule that will provide a better long-term management plan for the parks that considers the following:<br><br>The rule should be amended to allow at least 20% of Yellowstone's daily snowmobile entries to be led by a non-commercial guide (Certified Group Leader) who has taken a short training course to prepare them for taking private snowmobile groups into Yellowstone. The requirement that 100% of snowmobile groups be led by commercial guides remains objectionable and has been harmful since it has resulted in a 50% decline in winter visitation.<br><br>The daily snowcoach limit of 78 per day proposed for Yellowstone in Table 1 to Section 7.13 is too high and should be reduced to fewer than 50 per day. This will help to better utilize empty seats in existing snowcoaches which currently average just 29 per day entering the park, with an average of only 7.5 riders per coach. Snowcoaches are extremely heavy and their operation can adversely impact the quality of the groomed snow roads in the park. Therefore, minimizing empty or half-full coaches will help improve the quality of the visitor's experience while better protecting the investment in the park's groomed roads.<br><br>I support the section of the rule which will finally require snowcoaches to meet emissions and sound requirements for operation in the parks. However, "beginning in the 2011-2012 season" is too long of a phase-in-period which will result in unnecessary impacts from snowcoaches to the park's resources. Two years advance notice (versus four years as proposed by this rule) should be more than sufficient for snowcoach operators to conform to these new requirements. Therefore, I request that you consider implementation of snowcoach BAT requirements beginning with the 2009-2010 season.<br><br>The maximum snowmobile group size should remain at 11 (10 plus 1 guide) versus being decreased to 8 as proposed by this rule. The final rule should also consider a minimum group size that is larger than 2, as well as consider managing snowmobiles in the three parks by a daily limit on snowmobile groups.<br><br>The rule should be revised to allow any 2007 and newer model year snowmobile (defined by the DEIS as "EPA Compliant Snowmobile") on the Grassy Lake Road, the Continental Divide Snowmobile Trail (CDST), and Jackson Lake in Grand Teton and the Parkway. The final rule should also consider managing the CDST and the Grassy Lake Road as one unit with the primary focus being for CDST through-trips associated with adjacent national forest trails.<br><br>The final rule should be revised to keep Sylvan Pass open to snowmobile and snowcoach traffic.<br><br>I support re-opening the Yellowstone side-roads to snowmobiles as proposed by this draft rule. |

| Ashley Carrigan/OEA/OS/DOI | To | Mary_Bomar@nps.gov |
|---|---|---|
| 12/01/2006 05:15 PM | cc | Deb Smith/WASO/NPS@NPS, Steve_Martin@nps.gov Brian Waidmann/SIO/OS/DOI@DOI, Donna Deen/SIO/OS/DOI@DOI |
| | bcc | |
| | Subject | Winter Use |

All - Please see attached memo.

Thank you!

Ashley Carrigan
Associate Director
Office of External & Intergovernmental Affairs
U.S. Department of the Interior
(202) 208.1923 phone
(202) 208.1821 fax

# Exemption 6

Winter Use Feedback.doc

# **MEMORANDUM**

TO:         Mary Bomar

FROM:       Ashley Carrigan
            Associate Director, Office of External and Intergovernmental Affairs

CC:         Steve Martin
            Brian Waidman

DATE:       November 30, 2006

RE:         Winter Use

---

I was asked to follow up with you on any feedback our office received from external groups regarding the recent release of the draft EIS for cooperative agency review. Since Gary Smith is recused, I was asked to take over the issue for this office.

Prior to the release of the draft EIS, it is my understanding that most external groups and stakeholders were given a head's up by our office and offices within Yellowstone and Grand Teton National Park. Groups included the American Council of Snowmobile Associations, the International Snowmobile Association, the Blue Ribbon Coalition, Arctic Cat, Yamaha, the American Recreation Coalition, the delegations from Idaho, Montana, and Wyoming, and various other stakeholders.

This office has not heard anything further from external groups regarding the draft EIS that was released on November 20, 2006. Should we hear anything in the near future, I will be sure to reach out to your office and inform you of the feedback.

**FISH AND WILDLIFE AND PARKS**
**FEBRUARY 18 – 24, 2007**

# NON RESPONSIVE

**3 PAGES**

**NON RESPONSIVE**

- **FWS – Revision of CITES Regulations Final Rule:** Regulations that implement the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) in the U.S. have not been significantly updated in nearly 30 years. The Secretary of the Interior, through FWS, implements CITES in the U.S. FWS published a proposed rule to revise the CITES regulations in April 2006 and plans to have a final rule published by June 2007. The draft final rule is being circulated for internal FWS review and is subject to review by the Office of Management and Budget prior to publication.

- **FWS –Proposed Critical Habitat and a Draft Economic Analysis For Three Comal Springs Invertebrates (TX):** FWS has prepared a draft economic analysis to accompany a proposed critical habitat designation for the Comal Springs dryopid beetle, Comal Springs riffle beetle, and Peck's cave amphipod that occur in Comal and Hays Counties, Texas. Costs of conservation efforts in the proposed areas are estimated to be between $11.9 and $77.3 million over the next 20 years. The proposal is expected to publish in the *Federal Register* in mid-to-late February.

- **FWS – Printing of Appended National Recreational Survey:** FWS is anticipating printing the report *Fishing and Hunting Recruitment and Retention in the U.S. from 1990 to 2005* the week of February 18. The report is the 11th Addendum to the *2001 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation.* The detailed data collection for the 2006 Survey will be completed February 28. Preliminary information on the 2006 number of anglers, hunters, and wildlife watchers will be available in June.


**SENIOR OFFICIALS ACTIVITIES THIS WEEK**

**David Verhey, Acting Assistant Secretary – FWP**

**Focus:**    Working on management systems for FWP and other Administration priorities for the National Park Service and U.S. Fish and Wildlife Service.

**Mary Bomar, Director – NPS**

**Focus:** NPS Issues -
     National Park Centennial
     Yellowstone Winter Use (2/20/07)
     Ford's Theatre (2/21/07)
     Advisory Council on Historic Preservation Meeting and Reception
     Preparation for Oversight Hearing

**H. Dale Hall, Director – FWS**

**Focus:**   Travel to Anchorage, Alaska, to attend the Climate Change Forum

**12 PAGES**

**NON RESPONSIVE**

6



**Mary**
**Bomar/WASO/NPS@NPS**
05/28/2007 09:59 PM

To  Brian Waidmann/SIO/OS/DOI@DOI

cc

bcc

Subject  How are you this lovely evening?

| History: | ⤷ This message has been forwarded. |
|---|---|

Brian...hope you enjoyed your weekend.  I have just finalized my remarks with Phil for the press conference on Thursday also other documents that are in draft--see attached... we can finalize at our 10:00 am meeting tomorrow.  I have reviewed other documents as forwarded last Friday by the DOI, Sue and the Centennial staff: Fact Sheet; Report Press: Talking points; Secretary's Press Conference Speech plus Briefing statements for DK with the NLC, NPF and the Friends Alliance....minor tweaking needed but they look good...thanks so much for your leadership last Friday....My three late night functions and meetings caught up with me on Friday.

    

Centennial report rollout all employee memo May 07.doc   Centennial report copies cover note from Director.doc



Centennial Report Media Event Comments May 07.doc   Centennial Report memo to Superintendents May 07.doc



Centennial Report Message points.doc

Brian I had also sent an email to Bill Wade requesting agenda items he wished to address at our meeting--I finally heard back from him yesterday afternoon....see items noted below:

- Background and current status of the Coalition
  - 501(c)(3) application
  - Hartzog Institute update
- Issues we are involved with or are concerned about:
  - Centennial Initiatives
  - NPS Budget and Staffing - erosion of visitor services
  - Fee surge
  - Yellowstone winter use EIS (NPS Management Policies)
  - Status of outsourcing initiatives

It is possible that Maureen Finnerty will be accompanying Bill, but he has not received confirmation on that yet - if she isn't available, he'll be alone.

I have asked Dan to prepare a briefing statement regarding competitive sourcing as Lynn has been working with us and OMB on this issue.  Hopefully I will have it in your hands by 10:00 tomorrow.

Also Sue is getting an updated briefing statement on the fee program for us too.  You and I may want to address some of these issues with Bill THEN invite the Secretary to come in and join us...your call Brian.

Look forward to seeing you tomorrow....Mary

Mary A. Bomar
Director
National Park Service
Phone: (202) 208-3818

EXPERIENCE YOUR AMERICA

From: Sue Masica
Sent: 11/28/2007 08:10 PM EST
To: Suzanne Lewis; John Sacklin; Jerry Case; Mitchell Butler
Subject: Yellowstone Winter Use Rule


All:

The Director signed the transmittal for the winter use rule tonight.  It
will get logged out of NPS first thing in the morning, and then will be
hand-carried to the FWP hallway.  It has already been surnamed by SOL.

Mitch, this needs to turn around quickly, so anything you can do to
expedite the review and get a FWP signature, so that the rule can go to it
next stop, would be very much appreciated.  It is set up for Lyle's
signature (as are most rules), but I understand he's on travel through the
end of next week, this really can't sit, given the need for it to be
published prior to the anticipated 12/19 start of the 2007-08 season.

My understanding is that after FWP signs, the rules goes to Exec Sec, who
delivers it to OMB/OIRA for review, then comes back to NPS to make any
changes, then back to Exec Sec for final OK to proceed.  Lynn has already
provided direction to Exec Sec to have it sig-mac'd as soon as received if
she is out on travel.  Once that happens, the rule goes to the Federal
Register and it takes 2-3 business days to publish once received.

Please let me know if there are any questions.  Thanks for all your help.

Sue

_____
Sue Masica
National Park Service
Chief of Staff
phone:  202.208.3818
fax:       202.273.0896

# OFFICE OF THE SECRETARY
## July 8 – 14, 2007

### Secretary Kempthorne's Schedule
- Conduct a media interview regarding national parks as oases of quiet
- Meet with White House Fellows
- Meet with PMB to receive direction on 2009 budget, and in a separate meeting, to receive 2009 budget recommendations from PMB
- Meet with the Inspector General to discuss 2009 budget and to conduct the regular monthly meeting
- Participate in the Preserve America grants rollout
- Meet with Congressman Bill Sali
- Meet with former Senator Breaux

## OFFICE OF THE DEPUTY SECRETARY

### Lynn Scarlett

Key Meetings/Events:
- Update from Nina Hatfield and Doug Bourgeois on status of real estate appraisal reform. (July 10)
- Meeting with Suzanne Lewis to discuss Yellowstone Winter Use issues. (July 11)
- Preserve America grants roll-out on Capitol Hill with the Secretary and First Lady. (July 12)
- Meeting with Carl Artman on Fee to Trust. (July 12)

Current Issues/Projects:
- FY 2009 budget briefings throughout the week.
- Coordinating Hill strategy for cooperative conservation legislation
- Revised grants coordination options paper under review—options proposed to the Secretary by mid-July
- The Task Force subcommittees, each with 15 to 25 participants from multiple bureaus, met June 25-26 to refine and prioritize options for Secretarial consideration. **Suggest Secretarial update/briefing in mid-July.**
- Reviewed draft Healthy Lands Initiative policy options. **Action plan under preparation with goals, actions and timelines. When ready, this will warrant a secretarial briefing.**
- Ongoing coordination of bureau regulatory timelines and ongoing major, site-specific decisions.
- Partnership facilitation options for Centennial Challenge and departmental policy developed and implementation actions are underway. These include changes to the Department Manual, legislative language on cooperative agreements, completion of fundraising templates, revision of construction partnership process, and other

# 2 PAGES

# NON RESPONSIVE

# OFFICE OF THE SECRETARY
## September 16 – 22, 2007

### Secretary Kempthorne's Schedule
- Provide remarks to a meeting of the Abraham Lincoln Bicentennial Commission
- Participate in ceremonial swearing-in of Brent Wahlquist
- Provide the keynote speech to the Field and Stream Heroes of Conservation Award dinner

## OFFICE OF THE DEPUTY SECRETARY

Lynn Scarlett
Key Meetings/Events:
- White House meeting on Preserve America with the First Lady (September 17)
- Meeting with Michael Jackson, Deputy Secretary, DHS (September 17)
- Ocean legislation meeting with Kameran Onley and Chris Kearney (September 18)
- Attend International Conservation Caucus Foundation Reception (September 18)
- Meeting with Suzanne Lewis, John Sacklin (Yellowstone NP), and Gary Pollack (Grand Teton) regarding Final EIS for Winter Use (September 19)
- Preserve America monthly meeting (September 19)
- USGS Briefing for Deputy Secretary with Office of Biological Informatics (September 19)
- Meeting Kevin Skenandore on Bureau of Education Program Improvement Plan (September 19)
- Meeting with Deschutes River Basin partners (September 19)
- Attend BLM National Executive Assistant Team Meeting (September 20)
- Meeting with Congressman Michael Turner on Preserve America (September 20)
- Meeting with Bill Snape and others regarding ESA (September 20)

Current Issues/Projects:
- Budget follow up with OMB
- Meeting with senior leadership at OMB, DPC, CEQ, National Economic Council, others at White House on strategic issues of interest to DOI/Secretary Kempthorne.
- The Climate Change Task Force subcommittees met August 20-23. **Suggest Secretarial update/briefing in October.**
- Partnership facilitation options for Centennial Challenge and departmental policy developed and implementation actions are underway.
    - Bureau comments received on Department Manual on donations; discussions with IG, Ethics, SOL ongoing
    - Department Manual chapter on cooperative agreements has been reviewed by SOL & IG; informal OMB completed; issues resolution underway
    - Completion of fundraising templates & revision of construction partnership process in progress.
- Coordination of ESA policy strategy. Discussions ongoing to address final issues.

# 2 PAGES

# NON RESPONSIVE

Lynn Scarlett /PMB/OS/DOI          To   Brian Waidmann/SIO/OS/DOI@DOI
11/01/2007 07:29 PM                cc
                                   bcc
                              Subject

Here is a summary of the communications on the winter use rule:

1) Listed in the Federal Register, DOI Semiannual Regulatory Agenda issued April 30, 2007 (and provided to OMB for review before publication)

2) Given an entire page of discussion in our 2007 Regulatory Plan: Statement of Priorities submitted to OMB/OIRA in Sept. 2007

3) Listed as a top priority item, with review dates, in each of the three past "90-day" lists of upcoming rules and proposed rules provided to OMB dating back to April 2007 (and in prior 90-day lists before that)

4) Briefings with OMB starting in April, 2005, continuing through numerous meetings, calls, and emails in 2006 (with OMB and OIRA), and then continuing throughout 2007 with OMB, OIRA (and one recent meeting with CEQ staff).

Bottom line: many notifications occurred in writing in documents that go to OMB and OIRA, including to the political leadership and many more calls, meetings, and emails with staff

Presumably the staff have an obligation to brief up line and flag important rules to their supervisors.

Calendar Entry
# Appointment

[ ] Notify me      [ ] Pencil In
[ ] Mark Private

| Subject | SECRETARY'S SCHEDULE - Winter Use Meeting w/Suzanne Lewis, Mary Gibson Scott, Steve Martin, Gary Smith and Matt Eames |
|---|---|

| Where | Location | Secretary's Office |
|---|---|---|
| Categorize | | |

| When | Starts | Fri 11/17/2006 | 09:30 AM | 1 hour |
|---|---|---|---|---|
| | Ends | Fri 11/17/2006 | 10:30 AM | |
| | Specify a different time zone | | | |

| Description | |
|---|---|

# BRIAN WAIDMANN'S CALENDAR    NOVEMBER 17, 2006

### FRIDAY, NOVEMBER 17

| | | |
|---|---|---|
| 09:00 AM | 09:30 AM | **Planning Meeting** |
| 09:30 AM | 10:30 AM | SECRETARY'S SCHEDULE - Winter Use Meeting w/Suzanne Lewis, Mary Gibson Scott, Steve Martin, Gary Smith and Matt Eames |
| 11:00 AM | 11:30 AM | SECRETARY'S SCHEDULE - Meeting w/Jim Cason, David Bernhardt, Carl Artman, George Skibine re: Indian Gaming |
| 11:30 AM | 12:00 PM | **Exec. Sec. and Pat Connally** |
| 11:30 AM | 12:30 PM | SECRETARY'S SCHEDULE - Phone call with Governor Sebelius |
| 12:00 PM | 01:00 PM | **LUNCH** |
| 12:30 PM | 01:30 PM | SECRETARY'S SCHEDULE - Lunch w/Spencer Abraham |
| 01:00 PM | 01:30 PM | **Admin Time** |
| 01:30 PM | 02:00 PM | **Meeting w/Gary Smith re: 2006 SES Performance Review and approve 2007 plan** |
| 02:00 PM | 03:00 PM | **SECRETARY'S SCHEDULE - Scheduling Meeting with Lori Yates and Brian Waidmann** |
| 03:00 PM | 03:30 PM | SECRETARY'S SCHEDULE - Admin Time |
| 03:00 PM | 03:30 PM | **Doug Domenech re Secretary's Briefing Book** |
| 03:30 PM | 04:00 PM | **Meeting w/Matt Eames re: 2006 Performance Rating and approval of 2007 Plan** |
| 03:30 PM | 04:00 PM | SECRETARY'S SCHEDULE - Call Senator Sununu |
| 04:15 PM | 04:30 PM | SECRETARY'S SCHEDULE - Phone call with Steve Case 202-776-1406 |
| 04:30 PM | 05:30 PM | **SECRETARY'S SCHEDULE - NPS PowerPoint presentation - 3121** |

Calendar Entry
# Meeting

☐ Notify me
☐ Mark Private    ☐ Pencil In

| Subject | Winter Use Meeting with Suzanne Lewis, Mary Gibson Scott, Steve Martin, Gary Smith and Matt Eames |
| --- | --- |

| Chair | Secretary Kempthorne's Calendar |
| --- | --- |
| | Sent By    Margaret Bradley |

| When | Starts  Fri 11/17/2006      09:30 AM     1 hour |
| --- | --- |
| | Ends   Fri 11/17/2006      10:30 AM |
| | ☐ Specify a different time zone |

| Where | Location     Secretary's Office |
| --- | --- |
| | Reserved    No rooms or resource reserved |

| Invitees | Invited | The following invitees have been invited |
| --- | --- | --- |
| | Required (to) | Gary L Smith/OEA/OS/DOI@DOI, Mary Gibson Scott/GRTE/NPS@NPS, matt_eames@ios.doi.gov, Steve P |
| | FYI (bcc) | Caroline Merritt/OEA/OS/DOI@DOI, D'Andrea Jackson/OEA/OS/DOI@DOI, Lori_Yates@ios.doi.gov, Sharon |
| | Additional | Select additional invitees below |
| | Required (to) | |
| | Optional (cc) | |
| | FYI (bcc) | |

Categorize

| Scheduler    ▶▶▶    <u>Click to see invitee status</u> |
| --- |

| Description |
| --- |

Contact:  Steve Martin (o) 202-208-4621

| | | |
|---|---|---|
| Ashley Carrigan/OEA/OS/DOI | To | Mary_Bomar@nps.gov |
| | cc | Deb Smith/WASO/NPS@NPS, Steve_Martin@nps.gov |
| 12/01/2006 05:15 PM | | Brian Waidmann/SIO/OS/DOI@DOI, Donna |
| | | Deer/SIO/OS/DOI@DOI |
| | bcc | |
| | Subject | Winter Use |

All - Please see attached memo.

Thank you!

Ashley Carrigan
Associate Director
Office of External & Intergovernmental Affairs
U.S. Department of the Interior
(202) 208.1923 phone
(202) 208.1821 fax

# Exemption 6

Winter Use Feedback.doc

# **MEMORANDUM**

TO:       Mary Bomar

FROM:   Ashley Carrigan
             Associate Director, Office of External and Intergovernmental Affairs

CC:       Steve Martin
             Brian Waidman

DATE:    November 30, 2006

RE:      Winter Use

---

I was asked to follow up with you on any feedback our office received from external groups regarding the recent release of the draft EIS for cooperative agency review. Since Gary Smith is recused, I was asked to take over the issue for this office.

Prior to the release of the draft EIS, it is my understanding that most external groups and stakeholders were given a head's up by our office and offices within Yellowstone and Grand Teton National Park. Groups included the American Council of Snowmobile Associations, the International Snowmobile Association, the Blue Ribbon Coalition, Arctic Cat, Yamaha, the American Recreation Coalition, the delegations from Idaho, Montana, and Wyoming, and various other stakeholders.

This office has not heard anything further from external groups regarding the draft EIS that was released on November 20, 2006. Should we hear anything in the near future, I will be sure to reach out to your office and inform you of the feedback.



**Mary Bomar/WASO/NPS@NPS**
05/28/2007 09:59 PM

To   Brian Waidmann/SIO/OS/DOI@DOI
cc
bcc
Subject   How are you this lovely evening?

| History: | 🔁 This message has been forwarded. |
|---|---|

Brian...hope you enjoyed your weekend.  I have just finalized my remarks with Phil for the press conference on Thursday also other documents that are in draft--see attached... we can finalize at our 10:00 am meeting tomorrow.  I have reviewed other documents as forwarded last Friday by the DOI, Sue and the Centennial staff: Fact Sheet; Report Press: Talking points; Secretary's Press Conference Speech plus Briefing statements for DK with the NLC, NPF and the Friends Alliance....minor tweaking needed but they look good...thanks so much for your leadership last Friday....My three late night functions and meetings caught up with me on Friday.

          

Centennial report rollout all employee memo May 07.doc  Centennial report copies cover note from Director.doc

          

Centennial Report Media Event Comments May 07.doc  Centennial Report memo to Superintendents May 07.doc



Centennial Report Message points.doc

Brian I had also sent an email to Bill Wade requesting agenda items he wished to address at our meeting--I finally heard back from him yesterday afternoon....see items noted below:

- Background and current status of the Coalition
  - 501(c)(3) application
  - Hartzog Institute update
- Issues we are involved with or are concerned about:
  - Centennial Initiatives
  - NPS Budget and Staffing - erosion of visitor services
  - Fee surge
  - Yellowstone winter use EIS (NPS Management Policies)
  - Status of outsourcing initiatives

It is possible that Maureen Finnerty will be accompanying Bill, but he has not received confirmation on that yet - if she isn't available, he'll be alone.

I have asked Dan to prepare a briefing statement regarding competitive sourcing as Lynn has been working with us and OMB on this issue.  Hopefully I will have it in your hands by 10:00 tomorrow.

Also Sue is getting an updated briefing statement on the fee program for us too.  You and I may want to address some of these issues with Bill THEN invite the Secretary to come in and join us...your call Brian.

Look forward to seeing you tomorrow....Mary

Mary A. Bomar
Director
National Park Service
Phone: (202) 208-3818

EXPERIENCE YOUR AMERICA

Jim Mosher/ASFW/OS/DOI
09/14/2007 06:27 AM

To    Brian Waidmann/SIO/OS/DOI@DOI

cc    Tina Kreisher/OCO/OS/DOI@DOI, Gary L
      Smith/OEA/OS/DOI@DOI, Mitchell J
      Butler/ASFW/OS/DOI@DOI

bcc

Subject   Followup information

Brian - In followup to your questions:

    1) Superintendent Bill Laitner, Olympic NP will represent the NPS/DOI at the water treatment plant groundbreaking event with Rep. Norm Dicks next week
    2) The Yelowstone NP Winter use FEIS will be ready to go to the Fed Reg early PM on  9/20 for publication on 9/24.

Dr. James A. Mosher
Deputy Assistant Secretary for Fish, Wildlife & Parks
United States Department of Interior
1849 C Street, NW, Room 3144
Washington, DC 20240
(202) 208-3928
(202) 208-4684 fax

Mitchell J                          To  Ashley Carrigan/OEA/OS/DOI@DOI
Butler/ASFW/OS/DOI                  cc
10/09/2007 03:06 PM
                                    bcc

                               Subject  Fw: Winter Use Yellowstone EIS meeting


----- Original Message -----
From: Sue Masica
Sent: 10/09/2007 02:50 PM AST
To: Mitchell Butler; Tasha Robbins
Cc: Dan Wenk; John Sacklin; Suzanne Lewis
Subject: RE:  Winter Use Yellowstone EIS meeting


Mitch:

For the 4pm with CEQ, can we plan to use a dial-in conference call number
... the park folks are in Denver, and I need to remain here in the
building.

We can use my conference call number --        **Exemption 2**

Dan still intends to accompany you to CEQ.  Does he need to be cleared into
the building?  Are you walking over, or do you have a ride pre-arranged?
Thanks.

Sue Masica
National Park Service
Chief of Staff
phone:  202.208.3818
fax:       202.273.0896



            Sue
            Masica/WASO/NPS
                                                                    To
            10/05/2007 03:42       Mitchell_Butler@ios.doi.gov
            PM EDT                                                  cc
                                   Dan_Wenk@nps.gov, Suzanne Lewis,
                                   John Sacklin/YELL/NPS@NPS
                                                               Subject
                                   RE:  Winter Use Yellowstone EIS
                                   meeting(Document link: Sue Masica)

See note I just sent ... they're available, but due to flight schedules, would prefer 4pm to 3:30pm, our time.

I'd recommend Dan and I from here, Jason Waanders from SOL, and perhaps Molly or Barry ... but really defer to SOL who they'd like to send.  I haven't invited anyone from that hallway, nor mentioned meeting to them, figuring it wasn't my place to do so.  But if I need to play catch up, let me know.  Thanks.
_____
Sue Masica
National Park Service
Chief of Staff
phone:  202.208.3818
fax:       202.273.0896


                    Mitchell_Butler@i
                    os.doi.gov
                                                                    To
                    10/05/2007 12:55        Sue_Masica@nps.gov,
                    PM AST                  Dan_Wenk@nps.gov
                                                                    cc

                                                                    Subject
                                            RE:  Winter Use Yellowstone EIS
                                            meeting



Any luck finding out if the Super and RD are available to be on the call Tuesday? Also, would appreciate your thoughts on who should attend from Solicitor's office. I'm happy to reach out to invite them, just need to know who the lead has been. thanks

Mitch Butler
Deputy Assistant Secretary for Fish and Wildlife and Parks
United States Department of the Interior
202-208-4416-main
202-208-4684-fax

| Mitchell J<br>Butler/ASFW/OS/DOI<br>10/05/2007 05:50 PM | To | "Bear, Dinah" <Dinah_Bear@ceq.eop.gov> |
|---|---|---|
| | cc | Dan_Wenk@nps.gov, "Greczmiel, Horst"<br><Horst_Greczmiel@ceq.eop.gov>, Janet R<br>Naughton/ASFW/OS/DOI@DOI, Michelle |
| | bcc | |
| | Subject | RE: Winter Use Yellowstone EIS meeting |

FYI, spoke to our Solicitor's office. Barry Roth and/or Jason Waanders will be attending on their behalf.
Have a nice weekend.

Mitch Butler
Deputy Assistant Secretary for Fish and Wildlife and Parks
United States Department of the Interior
202-208-4416-main
202-208-4684-fax
"Bear, Dinah" <Dinah_Bear@ceq.eop.gov>



| "Bear, Dinah"<br><Dinah_Bear@ceq.eop.gov><br>10/05/2007 04:27 PM | To | Mitchell J Butler/ASFW/OS/DOI@DOI |
|---|---|---|
| | cc | <Dan_Wenk@nps.gov>, "Greczmiel, Horst"<br><Horst_Greczmiel@ceq.eop.gov>, Janet R<br>Naughton/ASFW/OS/DOI@DOI, Michelle<br>McBryde/ASFW/OS/DOI@DOI, <Sue_Masica@nps.gov> |
| | Subject | RE: Winter Use Yellowstone EIS meeting |

Yes, that will work for both of us.  See you then; appreciate the fast work on organizing this.  And if there is
a hard copy of the FEIS, feel free to bring it along :)
Again, thanks, Dinah

**From:** Mitchell_Butler@ios.doi.gov [mailto:Mitchell_Butler@ios.doi.gov]
**Sent:** Friday, October 05, 2007 4:15 PM
**To:** Bear, Dinah
**Cc:** Dan_Wenk@nps.gov; Greczmiel, Horst; Janet_R_Naughton@ios.doi.gov;
Michelle_McBryde@ios.doi.gov; Sue_Masica@nps.gov
**Subject:** RE: Winter Use Yellowstone EIS meeting

Dinah, any chance we could move the meeting back to 4:00? Sorry for the late change.

Mitch Butler
Deputy Assistant Secretary for Fish and Wildlife and Parks
United States Department of the Interior
202-208-4416-main
202-208-4684-fax

"Bear, Dinah"
<Dinah_Bear@ceq.eop.gov>

10/04/2007 02:18 PM

To Mitchell J Butler/ASFW/OS/DOI@DOI, "Greczmiel, Horst"
<Horst_Greczmiel@ceq.eop.gov>
cc <Dan_Wenk@nps.gov>, <Sue_Masica@nps.gov>, Janet R
Naughton/ASFW/OS/DOI@DOI, Michelle McBryde/ASFW/OS/DOI@DOI
Subject RE:  Winter Use Yellowstone EIS meeting

Mitch, that's works well for both of us.  I've reserved the conference room here for 3:30!

Would it be possible to get a hard copy of the final EIS before then?  Our copy from EPA hasn't been delivered yet and reading it online - while we've done quite a bit of it - is not optimal.

**From:** Mitchell_Butler@ios.doi.gov [mailto:Mitchell_Butler@ios.doi.gov]
**Sent:** Thursday, October 04, 2007 1:37 PM
**To:** Bear, Dinah; Greczmiel, Horst
**Cc:** Dan_Wenk@nps.gov; Sue_Masica@nps.gov; Janet_R_Naughton@ios.doi.gov;
Michelle_McBryde@ios.doi.gov
**Subject:** Winter Use Yellowstone EIS meeting

Dinah/Horst, I spoke with Dan Wenk and Sue Masica (cc'd) regarding the meeting. It turns out that the Park Super and NPS Regional Director will be meeting next Tuesday and would likely be able to join us by phone around 3:30pm. How does that look for you? Note, we are still trying to identify the best person to attend from our solicitor's office but will build them in as soon as we have a tentative time. Also, we are planning to come to CEQ. Let us know if you would prefer to have it here. Thanks

"Bear, Dinah" <Dinah_Bear@ceq.eop.gov>

10/03/2007 09:57 AM

To Mitchell J Butler/ASFW/OS/DOI@DOI
cc "Greczmiel, Horst" <Horst_Greczmiel@ceq.eop.gov>
Subject Winter Use Yellowstone EIS

Mitch, this is a follow-up from the voicemail I just left for you.  We would like to schedule a meeting w/you and NPS on the final Yellowstone Winter Use EIS, and, in particular, on the issue of alternatives related to

the proposed closure of Sylvan Pass.

Would it be possible to pull together something the first part of next week (I forgot, however, when I left my voice mail that Monday is a holiday - that's why there were no meetings booked in the conference room :)!)

Besides yourself, it would be good to have a representative from the Solicitor's office, as well as, obviously, NPS staff.  Thanks, Dinah

**Janet R**
**Naughton/ASFW/OS/DOI**
09/26/2007 02:15 PM

To Todd Willens/ASFW/OS/DOI@DOI, Jim Mosher/ASFW/OS/DOI@DOI, Mitchell J Butler/ASFW/OS/DOI@DOI

cc

bcc

Subject Fw: need for Secretary's meeting at the white House

This is what we are being asked to produce for this step of the fire drill on goals and initiatives. I hope the message below is helpful.

Janet
-
----- Forwarded by Mark Davis/POB/OS/DOI on 09/26/2007 01:01 PM -----



**Mark Davis/POB/OS/DOI**
09/26/2007 12:56 PM

To  Amy L Holley/ASWS/OS/DOI@DOI

cc

Subject  need for Secretary's meeting at the white House

A-

As per our discussion, by 2:00 today I need your best effort on the following two items for USGS and Reclamation. The President is looking to determine what he can accomplish between now and Jan of 2009. Next week the Secretary has a meeting with White House Deputy Chief of staff to go over these items

The lists under each of these items is going to be reviewed by Jim Cason this afternoon and then with Brian Waidman tomorrow morning - hence the 2:00 deadline is firm. For the current drill we just need the item or bullet - If Brian agrees with them there are some more detail that we will have to fill in on Thursday and Friday.

1. Between now and Jan 2009, what items warrant Presidential involvement to showcase current accomplishments or to roll-out planned accomplishments, i.e., what press events do you have planned or foresee planning that can/or could involve the President??

2. What major administrative actions do you see the bureaus putting forth between now and Jan of 2009 i.e rule making, regulation changes. Things that come to mind from other parts of Interior include revised NEPA regs, changes to ESA, AML rule making, rules for snowmobiles in Yellowstone. etc etc.

Thanx
M

**********************************
**Mark H. Davis**
**Division Chief**
**Budget and Program Review**
**Office of Budget**
**OS - Dept. of the Interior**

202.208.4480 (office)  **Please note my new phone #**
202.208.3911 (fax)

**Ex. 2  and exemption 6**