**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
GREATER YELLOWSTONE                   )
COALITION, *et al*.,                        )
)
      Plaintiffs,                    )      Civ. No. 07-2111 (EGS)
)
      v.                             )      [Hearing on Motion for Summary
)       Judgment on August 27, 2008]
DIRK KEMPTHORNE, *et al*.,                 )
)
      Defendants.                   )
_____)
)
NATIONAL PARKS CONSERVATION          )
ASSOCIATION,                          )
)
      Plaintiff,                     )      Civ. No. 07-2112 (EGS)
)
      v.                             )      [Hearing on Motion for Summary
)       Judgment on August 27, 2008]
UNITED STATES DEPARTMENT             )
OF THE INTERIOR, *et al*.,                 )
)
      Defendants.                   )
_____)


**GREATER YELLOWSTONE COALITION PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

     Plaintiffs Greater Yellowstone Coalition, The Wilderness Society, Natural Resources

Defense Council, Winter Wildlands Alliance, and Sierra Club hereby move for summary

judgment pursuant to Federal Rule of Civil Procedure 56(a).  As set forth in the accompanying

Memorandum, federal defendants violated the National Park Service Organic Act, Yellowstone's

enabling legislation, the National Environmental Policy Act, the Administrative Procedure Act,

Executive Orders 11,644 and 11,989, and 36 C.F.R. § 2.18(c) in issuing a 2007 Final

Environmental Impact Statement, Record of Decision, and Final Rule authorizing recreational snowmobiling within Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller, Jr. Memorial Parkway.

This motion is supported by the accompanying Memorandum and Statement of Material Facts as to which There Is No Genuine Issue.  Plaintiffs' standing to bring this case is demonstrated by the accompanying declarations of Charles Clusen, Robert Ekey, Amy McNamara, Michael Scott, Steve Thomas, and Charles Woodruff.  As there are no genuine issues of material fact and plaintiffs are entitled to judgment as a matter of law, the Court should enter summary judgment for plaintiffs.  <u>See</u> Fed. R. Civ. P. 56(c).

Respectfully submitted this 9th day of May, 2008.


_____<u>/s/  Sean M. Helle</u>_____
 Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
*Greater Yellowstone Coalition et al.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
GREATER YELLOWSTONE                       )
COALITION, *et al*.,                      )
                                          )
      Plaintiffs,                  )       Civ. No. 07-2111 (EGS)
                                          )
      v.                           )       [Hearing on Motion for Summary
                                          )        Judgment on August 27, 2008]
DIRK KEMPTHORNE, *et al*.,                 )
                                          )
      Defendants.                  )
_____)
                                          )
NATIONAL PARKS CONSERVATION               )
ASSOCIATION,                              )
                                          )
      Plaintiff,                   )       Civ. No. 07-2112 (EGS)
                                          )
      v.                           )       [Hearing on Motion for Summary
                                          )        Judgment on August 27, 2008]
UNITED STATES DEPARTMENT                   )
OF THE INTERIOR, *et al*.,                 )
                                          )
      Defendants.                  )
_____)

**GREATER YELLOWSTONE COALITION PLAINTIFFS'
MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................1

    I.      The History of Snowmobile Use in Yellowstone ...................................4

    II.     The Park Service's 2001 Snowcoach Rule ........................................5

    III.    The Political Reversal of the Snowcoach Rule ....................................8

    IV.    Vacation of the 2003 SEIS, ROD, and Rule ...........................................10

    V.     Winter Use under the 2004 "Temporary Plan" ....................................12

    VI.    The 2007 Rule .......................................................................15

ARGUMENT ...................................................................................................................17

    I.      Standard of Review ..............................................................17

    II.     The Administration's Authorization of Expanded Snowmobile Use
          within the Parks is Arbitrary and Irreconcilable with the Park Service's
          Overriding Conservation Mandate ..................................................18

          A.    The Administration's New Snowmobile Plan Violates
                the Organic Act ............................................................18

          B.    The Administration's New Snowmobile Plan Violates
                Park Service Regulations ..................................................26

          C.    The Administration's New Snowmobile Plan Violates
                Governing Executive Orders ..............................................26

          D.    In Again Authorizing Significant Levels of Recreational
                Snowmobiling within Yellowstone, the Administration
                Again Failed to Explain Its Reversal of the Park
                Service's Snowcoach Rule ................................................27

    III.    The Administration's FEIS Obscures the Impacts of Snowmobile Use
          and Its Incompatibility with National Park Service Mandates, in
          Violation of NEPA ................................................................31

A.      In Measuring the Considered Alternatives Against Deplorable "Historic Conditions," the FEIS Obscures Their Environmental Impacts and Their Consistency with the Park Service's Conservation Mandate ............................................33

B.      In Assessing the Alternatives' Soundscape Impacts, the FEIS Improperly Relies on a Metric that Disregards the Alternatives' Effects on Winter Visitors........................................36

C.      In Assessing the Alternatives' Air Quality Impacts, the FEIS Improperly Relies upon Inapposite Air Quality Standards and a Park-Wide Impact Metric ...................................39

D.      In Assessing the Alternatives' Wildlife Impacts, the FEIS Improperly Relies on a Population-Based Metric Indifferent to Impacts on Individual Animals and Disregards the Recommendations of Park Service Biologists .............................40

E.      The FEIS Deprives Decisionmakers and the Public of an Understanding of the Alternatives' Environmental Impacts and the Extent to which They Conform with Park Service Mandates ......................................................................................41

IV.    The Court Should Order the Park Service to Promulgate a Winter Use Plan Consistent with the Court's Orders................................................41

CONCLUSION......................................................................................................42

# TABLE OF AUTHORITIES

## FEDERAL CASES

Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n,
    449 F.2d 1109 (D.C. Cir. 1971) ........................................................................32

Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402 (1971)...........................................................................................17

*Daingerfield Island Protective Soc'y v. Babbitt,
    40 F.3d 442 (D.C. Cir. 1995) .............................................................17, 19, 22

Edmonds Inst. v. Babbitt,
    42 F. Supp. 2d 1 (D.D.C. 1999) ......................................................................19

*Fund for Animals v. Norton,
    294 F. Supp. 2d 92 (D.D.C. 2003) ........................................................... *passim*

Fund for Animals v. Norton,
    512 F. Supp. 2d 51 (D.D.C. 2007) ................................................................. 13

Int'l Snowmobile Mfrs. Ass'n v. Norton,
    304 F. Supp. 2d 1,278 (D. Wyo. 2004)............................................................12

Int'l Snowmobile Mfrs. Ass'n v. Norton,
    340 F. Supp. 2d 1,249 (D. Wyo. 2004)............................................................13

La. Pub. Serv. Comm'n v. FERC,
    184 F.3d 892 (D.C. Cir. 1999) ................................................................. 17-18

Mausolf v. Babbitt,
    125 F.3d 661 (8th Cir. 1997) .....................................................................19, 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,
    463 U.S. 29 (1983)................................................................................. *passim*

*Nat'l Rifle Ass'n of Am. v. Potter,
    628 F. Supp. 903 (D.D.C. 1986) ...............................................................3, 19

Robertson v. Methow Valley Citizens Council,
    490 U.S. 332 (1989)...........................................................................................31

Sierra Club v. Andrus,
    487 F. Supp. 443 (D.D.C. 1980) ....................................................................20

*Sierra Club v. Mainella,
    459 F. Supp. 2d 76 (D.D.C. 2006) ........................................................... *passim*

*U.S. Air Tour Ass'n v. FAA,
    298 F.3d 997 (D.C. Cir. 2002) .................................................................37, 39

## STATUTES AND LEGISLATIVE MATERIALS

Administrative Procedure Act,
    5 U.S.C. § 706(2)(A)............................................................................... *passim*

National Environmental Policy Act,
    42 U.S.C. § 4332 ....................................................................................31

16 U.S.C. § 1 ...............................................................................3, 19, 23, 33
    § 1a-1 .................................................................................3, 19
    § 21 .........................................................................................1
    § 22 .................................................................................18, 25
    § 406d-1 .................................................................................3

## REGULATIONS AND ADMINISTRATIVE MATERIALS

36 C.F.R. § 1.5(a)......................................................................................19
    § 2.18(c)............................................................................26, 40

40 C.F.R. § 1500.1(a).................................................................................31
    § 1502.1 ...............................................................................32
    § 1502.2(d) ..................................................................... *passim*
    § 1502.14 ........................................................................ *passim*
    § 1502.16(c)..................................................................... *passim*

37 Fed. Reg. 2,877 (Feb. 8, 1972) .............................................................4, 27

42 Fed. Reg. 26,959 (May 24, 1977) ..........................................................4, 27

65 Fed. Reg. 80,908 (Dec. 22, 2000) ....................................................... *passim*

66 Fed. Reg. 7,260 (Jan. 22, 2001) ............................................................7, 8

67 Fed. Reg. 69,473 (Nov. 18, 2002)..........................................................9, 10

68 Fed. Reg. 69,268 (Dec. 11, 2003)............................................................10

69 Fed. Reg. 65,348 (Nov. 10, 2004)............................................................13

72 Fed. Reg. 70,781 (Dec. 13, 2007) ....................................................................... *passim*

## MISCELLANEOUS

NPS Management Policies,
     § 1.4.3....................................................................................................20, 33
     § 1.4.3.1...........................................................................................................33
     § 4.4.1.............................................................................................................20
     § 4.7.1....................................................................................................20, 40
     § 4.9...............................................................................................................20
     § 8.2.3....................................................................................................20, 23

Pub. L. No. 92-404, 86 Stat. 619 (1972)........................................................................3

## INTRODUCTION

Five years ago, this Court set aside a National Park Service regulation authorizing recreational snowmobiling within Yellowstone National Park, holding that the present administration had failed to offer a meaningful explanation for its "180 degree reversal" of the Park Service's prior determination that significant snowmobile use was inconsistent with the conservation mandate governing the Park.  Fund for Animals v. Norton, 294 F. Supp. 2d 92, 105 (D.D.C. 2003).  In this case, the Court is again presented with a regulation compromising the integrity of Yellowstone's air, wildlife, and natural quiet—and with them, the experience of all those who come to Yellowstone in search of clean air, undisturbed wildlife, and silence—in order to allow expanded recreational snowmobiling on the Park's snow-covered roads.  Because the administration's new regulation stems from an obfuscated environmental analysis, is at odds with the Park Service's prior determination on the issue, and is irreconcilable with the conservation mandate securing Yellowstone for this and future generations, it too should be set aside.

## BACKGROUND

Yellowstone National Park is the embodiment of a transformative American idea.  On March 1, 1872, spurred by "the beautiful and astonishing features of a region unlike any other in the world[,]" The Yellowstone Park Bill, N.Y. Times, Feb. 29, 1872, Congress established Yellowstone as the world's first National Park.  See 16 U.S.C. § 21 ("dedicat[ing] and set[ting] apart" Yellowstone "as a public park or pleasuring ground for the benefit and enjoyment of the people").  The notion was simple.  As steward of Yellowstone's land and wildlife, the Secretary of the Interior would be required to "provid[e] for the preservation, from injury or spoliation, of all … natural curiosities, or wonders, within the park, and their retention in their natural

condition." Id. § 22; see also National Park Service, Winter Use Plans, Record of Decision (Nov. 20, 2007) (AR 126499) ("2007 ROD"), at 30 ("In its role as steward of park resources, the NPS must ensure that acceptable park uses would not cause impairment of, or unacceptable impacts on, park resources and values. When proposed park uses and the protection of park resources and values come into conflict, the protection of resources and values must be predominant.").[1]  With this mandate, Congress secured Yellowstone as a sanctuary for plants, wildlife, and humans alike.

It is of little surprise that Yellowstone's landscape inspired Congress to ensure its preservation.  Within the Park's more than two-million acres lie half of the world's geothermal features—a diverse and surreal population of geysers, steam vents, mudpots, and hotsprings. Together, these structures punctuate Yellowstone's winter quiet—a quiet built from some of the lowest natural sound levels ever documented—with the "intermittent gurgling, hissing, rushing, and eruptive sounds" of geothermal activity.  National Park Service, Winter Use Plans, Final Environmental Impact Statement (Sep. 2007) (AR 117160) ("FEIS"), at 138.  Warmed by this activity, the Firehole, Gibbon, and Madison Rivers flow throughout Yellowstone's deep winters, nourishing plants and wildlife within the Park.  See id. at 127.  Today, the wildlife that gather during Yellowstone's winter months include critical populations of wolves, wolverines, lynx, bald eagles, trumpeter swans, and the largest remaining genetically pure bison herd in the nation. See id. at 129-136.  As the result of an unprecedented notion more than a century ago, Yellowstone anchors one of the best-preserved ecosystems in the world.

---

[1] "AR" citations refer to the Administrative Record.  Record citations are to Bates numbers and, where applicable, to page numbers within documents that have not been internally Bates stamped.  Because the challenged FEIS (AR 117160) and ROD (AR 126499) are not internally Bates stamped within the record, citations to those documents will be to page number only.  The FEIS, ROD, and other record documents are available at http://www.nps.gov/yell/parkmgmt/ winterusetechnicaldocuments.htm.

Yellowstone's significance extends well beyond the Park's physical boundaries.  In the decades following the establishment of Yellowstone National Park, Congress set aside additional lands to be "preserved and managed for the benefit and inspiration of all the people of the United States"—the rugged expanses of Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway among them.  See 16 U.S.C. § 1a-1; id. § 406d-1 (establishing Grand Teton National Park); Pub. L. No. 92-404, 86 Stat. 619 (1972) (establishing the John D. Rockefeller, Jr. Memorial Parkway).  In 1916, Yellowstone's enabling legislation in hand, Congress enacted the National Park Service Organic Act, with it creating an agency wholly dedicated to "conserv[ing] the scenery and the natural and historic objects and the wild life [within the National Parks] and to provid[ing] for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1; see also Nat'l Rifle Ass'n of Am. v. Potter, 628 F. Supp. 903, 905 (D.D.C. 1986).  Congress "reaffirm[ed]" the Park Service's conservation mandate with the Redwoods Act in 1978, "declar[ing] … and direct[ing] that the promotion and regulation of the various areas of the National Park System … shall be consistent with and founded in the purpose established by [the Organic Act], to the common benefit of all the people of the United States."  Id. § 1a-1.  Under the terms of the Act, the Park Service's "authorization of activities shall be construed and the protection, management, and administration of [the National Park System's lands] shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established[.]"  Id.

All told, in the words of the National Park Service,

> [t]he years have shown that the legacy of those who worked to establish Yellowstone National Park in 1872 was far greater than simply preserving a unique landscape. This one act has led to a lasting concept—the national park idea. This idea conceived

wilderness to be the inheritance of all people, who gain more from an experience in nature than from private exploitation of the land. Scores of nations have preserved areas of natural beauty and historical worth so that all people will have the opportunity to reflect on their natural and cultural heritage and to return to nature and be spiritually reborn. Of all the benefits resulting from the establishment of Yellowstone National Park, this may be the greatest.

Yellowstone: A Brief History of the Park, available at http://www.nps.gov/yell/planyourvisit/ upload/Yell257.pdf.

The administration's renewed attempt to authorize recreational snowmobiling within Yellowstone National Park at the expense of the Park's air, wildlife, and natural quiet cannot be reconciled with this "national park idea"—an idea contained in the mandates governing the National Park Service.

**I.      The History of Snowmobile Use in Yellowstone**

In 1971, eight years after snowmobiles were first allowed in the Park, the National Park Service began grooming Yellowstone's snow-covered roads for use by snowmobiles and other oversnow vehicles.  Fund for Animals, 294 F. Supp. 2d at 98.  Snowmobile usage increased dramatically through the 1970s and 1980s, and with it mounted concerns regarding the effects of the machines on park resources. Id. at 98.  In response to the impacts of snowmobiling and other off-road vehicle use on public lands, Presidents Nixon and Carter issued executive orders mandating that the Park Service allow such machines on park land only when their operation would "not adversely affect [the lands'] natural, aesthetic, or scenic values."  Exec. Order No. 11,644, 37 Fed. Reg. 2,877 (Feb. 8, 1972), as amended by Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 24, 1977).  Recreational snowmobiling within Yellowstone increased nonetheless. See Fund for Animals, 294 F. Supp. 2d at 98.  By the early 1990s, snowmobile numbers were exceeding all agency projections, and the Park Service recognized that development of a new

policy was necessary to address the adverse impacts caused by increasing snowmobile traffic within the Park.  Pls.' First Am. and Supp. Compl. ¶ 23; Fed. Defs.' Answer ¶ 23; Def. Intervenors' Answer ¶ 23; see also Fund for Animals, 294 F. Supp. 2d at 99.

## II.    The Park Service's 2001 Snowcoach Rule

In 1997, in settling a lawsuit brought in this Court by the Fund for Animals and others, the Park Service agreed to prepare an environmental impact statement ("EIS") "addressing a full range of all alternatives for all types of visitor winter use, including snowmobiling and trail grooming ... and considering the effects of those alternatives on the … environments" of Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller, Jr. Memorial Parkway.  See Fund for Animals, 294 F. Supp. 2d at 99 (internal quotations omitted). After three years of study, the Park Service confirmed what had long been obvious to the Parks' visitors and personnel:  recreational snowmobiling at existing levels "harm[ed] the integrity of the resources and values of the[] three parks, and so constitute[d] an impairment of [park] resources and values, which is not permissible under the NPS Organic Act."  Record of Decision, Winter Use Plans for the Yellowstone and Grand Teton National Parks and John D. Rockefeller Jr., Memorial Parkway ("2000 ROD"), 65 Fed. Reg. 80,908, 80,916 (Dec. 22, 2000).  In Yellowstone, this impairment was widespread, affecting the Park's "air quality, wildlife, the natural soundscape, and opportunities for enjoyment of the park by visitors."  Id.  The experience of those "who … visit the … parks once or twice in a lifetime, and who seek the resources and values for which the parks were created," the Service observed, could be "adversely and irretrievably affected" by the adverse impacts of snowmobile use within the Parks.  Id. at 80,915.

In its 2000 EIS, the Park Service considered various means of avoiding unlawful impairment of park resources and values while allowing continued access to the Parks by

increasing numbers of winter visitors.  See 65 Fed. Reg. at 80,922-23.  All but one of the EIS's

alternatives provided for continued recreational snowmobile use.  See id.  Five alternatives

provided for strict standards governing snowmobile noise and emissions, a substantial reduction

in the area open to recreational snowmobiling, a so-called "adaptive planning approach," or

some combination of such measures.  See id. at 80,922.  Nonetheless, the Park Service concluded

that continued recreational snowmobiling within the Parks—even under significant technological

and use restrictions—would "adversely impact[] and impair[] park resources and values."  Id. at

80,917.  As the Park Service explained,

> Clean, quiet and odorless snowmobiles are not available at present.
> Even with technical advances in snowmobiles, the impacts of
> snowmobile use on wildlife, especially ungulates [such as bison
> and elk] using groomed routes, constitutes disturbance and
> harassment at a time when individual animals are particularly
> challenged for survival.  The continued use of snowmobiles as
> provided in the alternatives studied … is found to be inconsistent
> with the health and integrity of resources existing in the three park
> units.  Continued use hinders the enjoyment of resources and
> values for which the parks were created, most notably natural
> soundscapes, clean and clear air, and undisturbed wildlife in a
> natural setting.

Id. at 80,916-17.  Accordingly, the Park Service concluded that such snowmobile use "must be

discontinued in order to meet [the agency's] primary mandates, regulations and policies[.]"  Id.

at 80,917.

In reaching this conclusion, the Park Service was fully aware of the potential "social and

economic impacts" of the determination.  See 65 Fed. Reg. at 80,917.  The Service determined

that these impacts would be mitigated, however, under the last and environmentally preferred of

the alternatives—one providing for unlimited access to Yellowstone by snowcoach.  Id. at

80,917, 80,926.  The disparity between snowmobile and snowcoach access was striking, there

being "a clear magnitude of difference between the impacts of snowmobiles and the impacts of

snowcoaches on natural resource values and the opportunities to enjoy them." Id. at 80,917.

With the snowcoach alternative came "greatly decreased volumes of traffic and consequent decreases in odor, noise, and pollutants." Id. Moreover, "[t]he area within the three park units that would be available for use without audible motorized sound [was] maximized using snowcoach access." Id. "Additionally, because operators of snowcoaches [would] be familiar with park roadways and trained in appropriate techniques for mitigating the effects of vehicle-wildlife encounters the potential for wildlife harassment [would] be minimized." Id. Safety was also found to be improved to the "highest degree" under the snowcoach alternative, as the alternative imposed "greater controls over speed, time of operation, driver training and experience, and the volume of traffic" than any snowmobile alternative. Id. All told, snowcoaches "offer[ed] access to the public that [was] equivalent in numbers to current use" and additionally made the Park "accessible to a larger population of young, elderly, and disabled visitors." Id. With a November 22, 2000 Record of Decision, the Park Service announced that an unimpaired Yellowstone would be accessible by snowcoach. Id. at 80,909.

Two months later, the Park Service promulgated a regulation providing for the elimination of recreational snowmobiling from Yellowstone in order "to come into compliance with the legal requirements that apply to snowmobile use in national parks." Special Regulations, Areas of the National Park System, 66 Fed. Reg. 7,260 (Jan. 22, 2001) ("2001 Rule"). In responding to public comments regarding the regulation, the Service rejected the suggestion that snowmobiles be allowed in limited numbers or guided groups. As the agency explained, "[a]chieving compliance with the applicable legal requirements while still allowing snowmobile use would require very strict limits on the numbers of both snowmobiles and snowcoaches"—restrictions that would "sharply limit overall winter use of the parks, reducing

the opportunities for public enjoyment of the parks and causing even greater adverse impacts on affected gateway communities and businesses." Id. at 7,262. As snowcoaches had "far fewer and less extensive adverse impacts than snowmobiles," they could "be … accommodated … without numerical limits[.]" Id. The Service's regulation accordingly required significant reductions in snowmobile numbers during the 2002-2003 winter season, followed by a complete transition to snowcoaches in Yellowstone National Park by the 2003-2004 winter season. Id. at 7,265.

**III.    The Political Reversal of the Snowcoach Rule**

The Park Service's 2001 snowcoach rule, promulgated by the Clinton administration after three years of study and extensive public comment, was "immediately stayed" by the incoming administration of President George W. Bush. Fund for Animals, 294 F. Supp. 2d at 100 (citing Final Rule, Delay of Effective Date, 66 Fed. Reg. 8,366 (Jan. 31, 2001)). Six months later, the new administration agreed to prepare a supplemental environmental impact statement ("SEIS") as part of the settlement of a Wyoming lawsuit filed by the International Snowmobile Manufacturers Association and others to challenge the 2001 rule. See id. at 100-01. The stated purpose of the SEIS was two-fold:  to address additional manufacturer information regarding snowmobile technology and to consider public comment beyond the "more than 59,000 comments" that had been received during the prior environmental analysis and rulemaking process. See id.; see also 66 Fed. Reg. 39,197 (Jul. 27, 2001) (notice of intent to prepare an SEIS); 2001 Rule, 66 Fed. Reg. at 7,261 (summarizing public involvement in the 2001 Rule). By many accounts, however, the underlying objective of the action was the development of a rule perpetuating recreational snowmobiling within the Parks—whatever the requirements of the Organic Act. See Fund for Animals, 294 F. Supp. 2d at 108 n.11 (noting the presence of

"evidence in the Record that there <u>isn't</u> an explanation for [the administration's reversal of the phase-out rule], and that the SEIS was completely politically driven and result oriented") (emphasis in original).

In conducting its supplemental analysis, the administration made little effort to disguise the fate of the Park Service's phase-out rule.  On November 8, 2002, then–Deputy Secretary of the Interior J. Steven Griles signed a regulation "postponing" implementation of the snowmobile phase-out—an action that "enable[d]" the agency "to complete the [SEIS] process without implementing the 50% reduction that [wa]s due to go into effect during the winter use season 2002-2003 under the current regulations."  <u>See</u> Special Regulations, Areas of the National Park System, 67 Fed. Reg. 69,473-75, 69,478 (Nov. 18, 2002); <u>see also</u> <u>id.</u> at 69,475 ("The NPS is not making any changes to snowmobile use requirements as a method of reducing noise impacts during the winter use season 2002-2003.").  While most of those commenting on the postponement opposed the idea, the Department concluded that "implementing the 50% reduction in the winter of 2002–2003, as originally scheduled," would be "undesirable."  <u>Id.</u> "[U]nder the ongoing SEIS process," the Department explained, "the NPS [was] considering whether new snowmobile technology and some travel restrictions (such as guided trips and operator training) would allow recreational snowmobile use to continue in the park units."  <u>Id.</u> The Department dismissed comments suggesting that the Park Service could authorize continued recreational snowmobiling only by disregarding the purposes for which Yellowstone had been set aside.  <u>Id.</u> at 69,475-76.  According to the Department:

> Within the final SEIS, the NPS [was] considering how to provide various use areas throughout the parks in order to allow for motorized and nonmotorized activities.  Each person characterizes his or her "refuge" and expectations of the ideal park visit in a different way.  What one person values in the park experience may be contrary to another's.  The NPS hopes to provide a wide

> spectrum of experiences to visitors from around the country and
> around the world.

Id. at 69,476.

The administration published a new regulation authorizing expanded recreational snowmobiling within Yellowstone National Park on December 11, 2003—nearly ten months after publishing a final SEIS that presented "analysis and … alternatives … not vastly different than those in the [2000] Final EIS[,]" and that selected as "environmentally preferred" the alternative providing for snowcoach access to the Park.  See Special Regulations, Areas of the National Park System, 68 Fed. Reg. 69,268, 69,274 (Dec. 11, 2003); National Park Service, Winter Use Plans Record of Decision (Mar. 25, 2003) ("2003 ROD") (attached as Ex. A), at 6-7. Under the rule, 950 snowmobiles were allowed within Yellowstone each day—subject to technology limitations, a guided group requirement, and the possibility of adaptive management measures should "desired resource conditions" not be met.  68 Fed. Reg. at 69,277, 69,282-85. These restrictions, the administration declared, would "substantially improve air quality conditions relative to the current situation of unregulated snowmobile use."  Id. at 69,276.

## IV.    Vacation of the 2003 SEIS, ROD, and Rule

The Greater Yellowstone Coalition plaintiffs challenged the administration's 2003 winter use plan as an arbitrary and capricious departure from the Park Service's prior determination that recreational snowmobiling was incompatible with the conservation mandates governing Yellowstone.  See Fund for Animals, 294 F. Supp. 2d at 96-97.  In a December 16, 2003 opinion, this Court vacated the regulation, concluding that the administration's decision—a "dramatic change in course, in a relatively short period of time and conspicuously timed with the change in administrations"—"represent[ed] precisely the 'reversal of the agency's views' that triggers an agency's responsibility to supply a reasoned explanation for the change."  Id. at 105.  Having

failed to explain its reversal of the Park Service's prior determination, the Court concluded, the administration's decision was "quintessentially arbitrary and capricious" and could not be allowed to stand.  Id. at 108 (internal quotations omitted).

The administration had argued otherwise, contending that its reversal of the phase-out rule was well explained by the technology and guiding requirements included within the new regulation.  See Fund for Animals, 294 F. Supp. 2d at 106-07.  The Court was not persuaded. "The possibility of improved technology was explicitly considered in the 2000 ROD," the Court noted, "and just as explicitly rejected as an inadequate solution for reducing the negative impacts of snowmobiling."  Id. at 106; see also id. at 107 (noting the Environmental Protection Agency's 2003 comment that the 2000 EIS had been "'remarkably accurate'" in predicting the environmental benefits of new technologies and, thus, a phase-out remained necessary). Moreover, the administration had not abandoned the Park Service's prior determination that "'[c]leaner, quieter snowmobiles would do little, if anything, to reduce the most serious impacts on wildlife[,]'" further undermining its contention that technology justified the 2003 rule.  Id. at 106-07 (emphasis in original).  Finally, the Court noted that the administration's reliance on the promise of continued technological improvements within the snowmobile industry appeared misplaced, as the 2003 rule itself admitted that some of 2004's snowmobiles were emitting more pollutants than their 2002 counterparts.  Id. at 107 n.9.

With respect to the rule's entry restrictions and guided group requirements, the Court concluded that such measures were "significantly flawed[.]"  Fund for Animals, 294 F. Supp. 2d at 107.  The entry limits, for one, did "not actually appear to reduce snowmobile use[.]"  Id.  The requirement of group travel was deemed little more effective, as the administration's rule defined a group as "'1-11 snowmobiles'" and thereby "eliminat[ed]" the benefits of group travel to

11

wildlife.  Id.  With respect to guides, the Court noted the documented difficulties in

communication between persons riding on the same snowmobile—difficulties that would be

even more pronounced among a group of riders spread up to one-third of a mile apart.  Id.

The disparity between the 2001 and 2003 decisions, the Court concluded, was "stark."

Fund for Animals, 294 F. Supp. 2d at 107.

> In 2001, the rulemaking process culminated in a finding that
> snowmobiling so adversely impacted the wildlife and resources of
> the Parks that all snowmobile use must be halted.  A scant three
> years later, the rulemaking process culminated in the conclusion
> that nearly one thousand snowmobiles w[ould] be allowed to enter
> the park each day.  In 2001, the NPS selected the 'environmentally
> preferred alternative.'    In 2003, the NPS rejected the
> environmentally preferred alternative, and instead chose an
> alternative whose 'primary beneficiaries' are the 'park visitors who
> ride snowmobiles in the parks and the businesses that serve them.'

Id. at 107-08 (quoting the 2003 final rule).  Despite the "clear conservation mandate" governing

the Parks, the Court concluded, the administration had failed to explain this reversal.  Id. at 108.

Indeed, evidence in the record suggested that there was no explanation, the administration's

supplemental analysis having been "completely politically driven and result oriented."  Id. at 108

n.11.  Accordingly, the Court vacated the 2003 rule and remanded it, with the underlying

environmental analysis and decision, to the Park Service for reconsideration in light of the

Court's opinion.  Id.  Consistent with the language of the administration's 2003 rule, the Court

ordered that the 2001 snowcoach regulation be implemented by the National Park Service.  Id. at

115.

**V.       Winter Use under the 2004 "Temporary Plan"**

In the wake of this Court's ruling, the State of Wyoming reopened a prior challenge to

the 2001 rule in the District of Wyoming.  See Int'l Snowmobile Mfrs. Ass'n v. Norton, 304 F.

Supp. 2d 1,278, 1,285 (D. Wyo. 2004).  On February 10, 2004, the Wyoming Court entered a

preliminary injunction prohibiting the Park Service from implementing the phase-out rule and

requiring the agency to "promulgate temporary rules for th[e] 2004 snowmobile season that

w[ould] be fair and equitable" to the various interests involved.  Id. at 1,294.  The Court later

made its injunction permanent.  Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F. Supp. 2d 1,249

(D. Wyo. 2004).  Left without a regulation governing winter use in the Parks pending the

completion of a new environmental impact statement, decision, and long-term rule, the Park

Service developed a three-year "temporary plan" authorizing the recreational use of 720

snowmobiles in Yellowstone each day—subject to "best available technology" and commercial

guiding requirements.  See Special Regulations, Areas of the National Park System, 69 Fed. Reg.

65,348 (Nov. 10, 2004).  Sustained by a series of congressional appropriation riders, the

temporary plan remained in effect for three seasons.  See Fund for Animals, 512 F. Supp. 2d 49,

51 (D.D.C. 2007).

     In each of Yellowstone's three winter seasons under the temporary plan, recreational

snowmobile use fell far short of authorized levels.  Between 2003 and 2007, average snowmobile

numbers ranged from 250 to 300 per day, FEIS at 153; during the 2006-2007 winter season,

snowmobile entries averaged 290 per day, 2007 ROD at 20.  Even at these levels, however, the

adverse environmental impacts of the temporary plan exceeded Park Service expectations and

the administration's own "adaptive management" thresholds.  See 2007 ROD at 19-25; Special

Regulations, Areas of the National Park System, 72 Fed. Reg. 70,781, 70,782-83 (Dec. 13, 2007)

("2007 Rule").

     With respect to noise, oversnow vehicles were generally audible in the much-visited Old

Faithful and West Entrance travel corridor areas for more than half the day, often exceeding the

temporary plan's "50%" threshold by a significant margin.  See FEIS at 143-146; 2007 ROD at

20-21.  The backcountry soundscapes threshold was also exceeded on numerous occasions, 2007

ROD at 21—"even with 4-stroke machines and reduced [snowmobile] numbers[,]" as one

Yellowstone employee complained, AR 124898-99 (2006 emails from Yellowstone employee

complaining of "snowmobile noise" at a geyser basin more than five miles from the nearest

road).

      With respect to air quality, the administration has acknowledged that "some monitoring

indicated a potential problem with benzene and formaldehyde exposure for employees."  Id. at

21.  In a series of studies between 2004 and 2006, benzene levels at the Park's West Entrance

were found to exceed the Agency for Toxic Substances and Disease Registry's "minimum risk

level" for chronic exposure to benzene on days when only 180 to 220 "best available

technology" snowmobiles entered the Park through the West Entrance.  FEIS at 99, 100 (Table

3-11).  Four-stroke snowmobiles, the administration explains, "produce more benzene (and some

other hazardous air pollutants) than the two-stroke engines used historically[.]"  Id. at 99.

Moreover, with an average of only 180 daily snowmobile entries, the National Institute for

Occupational Safety and Health's recommended exposure limit for formaldehyde was itself

approached.  Id. at 100.  Though the administration attempts to minimize the relevance of these

pollutant levels, see id. at 99 ("[E]mployees would have to be exposed to these levels every day

of the year (which they are not) for a concern to be present."), it admits that "[c]learly, reducing

the daily snowmobile numbers [would] better protect park air quality[,]" 2007 ROD at 21; see

also AR 113572 at 20 (internal Park Service document acknowledging the "potential problem

with benzene and formaldehyde" that will "need[] further investigation").

      Finally, with respect to wildlife, the Park Service's own biologists recommended that

oversnow vehicle numbers be maintained "at or below" the reduced levels of recent seasons in

order to minimize animal disturbance and thereby avoid adverse fitness effects during

Yellowstone's harsh winters.  AR 125701 (P.J. White et al., Behavioral Responses of Wildlife to

Snowmobiles and Coaches in Yellowstone (Oct. 17, 2006)), at 1, 20.

## VI.    The 2007 Rule

The administration was unmoved by the harms documented during Yellowstone's years

under the temporary plan.  In late 2007, ignoring the evidence of existing, unacceptable impacts

to park resources and values, the recommendations of Park Service biologists, and a letter from

seven former directors of the National Park Service noting the incompatibility of snowmobiling

with Park Service mandates, see AR 120940 (Mar. 26, 2007 letter), the administration adopted a

new snowmobile plan providing for the recreational use of 540 snowmobiles each day within the

Park—twice the average of recent seasons.  See 2007 Rule, 72 Fed. Reg. at 70,783; FEIS at 153.

By the administration's own calculations, the new regulation will triple the area in which

oversnow vehicles are audible during half or more of the day while, at a minimum,[2] increasing

carbon monoxide emissions by 18 percent, benzene emissions by 33 percent, hydrocarbon

emissions by 50 percent, formaldehyde emissions by 60 percent, and particulate matter emissions

by 100 percent over current winter levels.  See FEIS at 229, 231, 307.

Rather than dwelling on these figures, the administration declares that its new

snowmobile plan places "strict limits on the number of snowmobiles allowed to enter the Park[]

each day."  72 Fed. Reg. at 70,783.  Pushing aside the fact that the new regulation authorizes a

---

[2] These numbers are based on the assumption that Yellowstone's East Entrance and Gibbon Canyon roads will be closed throughout the winter season.  See FEIS at 229.  Under the administration's decision, however, closure of the Gibbon Canyon road is nothing more than a possibility the Park Service will "consider" after five years, and the East Entrance road will remain open when "safe[.]"  2007 ROD at 6, 15-16.  Moreover, the administration's air quality models have underestimated pollutant concentrations within the Park.  See FEIS at 220-21.  As a result, emissions increases under the challenged plan are likely to exceed these figures.  See id. at 229.

doubling of recent snowmobile numbers within Yellowstone—numbers that have resulted in violations of multiple resource thresholds—the administration attempts to characterize the plan's 540-snowmobile cap as "a <u>reduction</u>[,]" noting that 720 snowmobiles could have entered the Park each day under the provisions of the temporary plan.  <u>Id.</u> (emphasis added).  This "reduction," the administration contends, will somehow improve conditions within Yellowstone, as the "lower number of snowmobiles" allowed under the new plan "will reduce the impacts on the natural soundscapes of the park, which the NPS found to be somewhat greater than expected even with the reduced number of snowmobiles that used the park over the last several winters." <u>Id.</u>  Moreover, the administration again argues that the adverse impacts of recreational snowmobile use will be mitigated by "best available technology" standards, a requirement that snowmobiles travel in commercially guided groups of one to eleven, and uncertain "adaptive management" actions that might address future impacts to park resources.  <u>See</u> 2007 ROD at 5-6, 8; 2007 Rule, 72 Fed. Reg. at 70,782-83.

In explaining its decision to allow an expansion of recreational snowmobile use within Yellowstone National Park, the administration is dismissive of the snowcoach alternative previously adopted by the Park Service.  While acknowledging that new snowcoaches can be "substantially cleaner" than "four-stroke snowmobiles …, especially given that snowcoaches currently carry an average of 7 times more passengers than snowmobiles[,]" the administration declares that "[s]nowcoaches and snowmobiles provide two very different types of experiences for park visitors seeking to enjoy Yellowstone during the winter."  2007 Rule, 72 Fed. Reg. at 70,785, 70,787.  Moreover, the administration notes, "[t]he use of both [snowmobiles and snowcoaches] is well-established in the Parks, extending back more than 4 decades."  <u>Id.</u> at 70,787.  With this statement, the administration ignores the better part of Yellowstone's

16

history—that which preserved the Park's resources and values.

## ARGUMENT

In authorizing an expansion of recreational snowmobile use within Yellowstone National Park, the administration violated the National Park Service's Organic Act, Yellowstone's enabling legislation, governing executive orders, Park Service regulations, the National Environmental Policy Act, and the Administrative Procedure Act. Each is addressed in turn.

## I.    Standard of Review

Under the Administrative Procedure Act, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  While this standard does "not empower[] [courts] to substitute [their] judgment for that of the agency[,]" it requires "a thorough, probing, in-depth review" of challenged decisions.  Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16 (1971).  Accordingly, an administrative action must be vacated where the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); see also Daingerfield Island Protective Soc'y v. Babbitt, 40 F.3d 442, 446 (D.C. Cir. 1995) (deference only to "reasoned, permissible construction[s] of … relevant statute[s]") (internal quotations omitted).

Review of an agency action is more demanding where the challenged decision stems from an administrative about-face.  "For [an] agency to reverse its position in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious."  La.

<u>Pub. Serv. Comm'n v. FERC</u>, 184 F.3d 892, 897 (D.C. Cir. 1999).  Thus, when reversing itself, "[an] agency is 'obligated to supply a reasoned analysis for the change <u>beyond that which may be required when an agency does not act in the first instance.</u>'"  <u>Fund for Animals</u>, 294 F. Supp. 2d at 104 (quoting <u>State Farm</u>, 463 U.S. at 41-42) (emphasis in original).  This obligation is all the more pronounced where the agency's reversal is at odds with a clear statutory mandate governing the agency's actions—such as the conservation mandate of the National Park Service. <u>See</u> <u>id.</u> at 105, 108.

## II.  The Administration's Authorization of Expanded Snowmobile Use within the Parks is Arbitrary and Irreconcilable with the Park Service's Overriding Conservation Mandate

In recent winter seasons, with snowmobile numbers averaging between 250 and 300, numerous resource thresholds have been exceeded within Yellowstone National Park. Nonetheless, with its new winter use plan, the administration has decided to allow 540 snowmobiles into the Park each day—a doubling of recreational snowmobile use that, the administration admits, will worsen conditions within the Park.  In electing to authorize an expansion of recreational snowmobiling at the expense of Yellowstone's air, wildlife, and natural quiet, the administration disregarded the Park Service's conservation mandate.  Accordingly, the administration's new snowmobile plan should be set aside.

### A.    *The  Administration's New Snowmobile Plan Violates the Organic Act*

More than a century ago, Congress set aside Yellowstone "for the preservation, from injury or spoliation, of all … natural curiosities, or wonders, within the park, and their retention in their natural condition."  16 U.S.C. § 22.  In managing Yellowstone and all other Parks, the National Park Service is accordingly required to "promote and regulate [the Parks'] use … by such means and measures as conform to [their] fundamental purpose …, which purpose is to

conserve the scenery and the natural and historic objects and the wild life therein and to provide

for the enjoyment of the same in such manner and by such means as will leave them unimpaired

for the enjoyment of future generations." <u>Id.</u> § 1.  As Congress "reaffirm[ed], declare[d], and

direct[ed]" in 1978,

> the promotion and regulation of the various areas of the National
> Park System … shall be consistent with and founded in the
> purpose established by [the Organic Act], to the common benefit
> of all the people of the United States.  The authorization of
> activities shall be construed and the protection, management, and
> administration of these areas shall be conducted in light of the high
> public value and integrity of the National Park System and shall
> not be exercised in derogation of the values and purposes for
> which these various areas have been established, except as may
> have been or shall be directly and specifically provided by
> Congress.

<u>Id.</u> § 1a-1.  As the administration acknowledges in its challenged Record of Decision, the Park

Service's discretion in managing the National Parks is accordingly limited.  "In its role as

steward of park resources, the NPS must ensure that acceptable park uses would not cause

impairment of, or unacceptable impacts on, park resources and values.  When proposed park uses

and the protection of park resources and values come into conflict, the protection of resources

and values must be predominant."  2007 ROD at 30.[3]

---

[3] <u>See also</u> <u>Mausolf v. Babbitt</u>, 125 F.3d 661, 669 (8th Cir. 1997) ("[T]he Superintendent's
discretion to order Park closures … must be exercised with an eye toward promoting specific
regulatory objectives such as 'protection of environmental or scenic values' or 'protection of
natural or cultural resources[.]'") (quoting 36 C.F.R. § 1.5(a)); <u>Fund for Animals</u>, 294 F. Supp.
2d at 105 ("NPS is bound by a conservation mandate and that mandate trumps all other
considerations."); <u>id.</u> at 113 ("[T]he NPS' conservation command could not be more clear:  the
NPS is absolutely charged with preserving the natural wonders of the Parks."); <u>Edmonds Inst. v.
Babbitt</u>, 42 F. Supp. 2d. 1, 15 (D.D.C. 1999) (the Organic Act "gives the Park Service 'broad,
but not unlimited discretion in <u>determining what actions are best calculated to protect Park
resources</u>'") (quoting <u>Daingerfield Island Protective Soc'y</u>, 40 F.3d at 446) (emphasis added);
<u>Potter</u>, 628 F. Supp. at 909 (holding that the Organic Act "speaks of but a single purpose,
namely, conservation" and thus, in omitting express hunting or trapping authorizations from the
enabling legislation of specific Park System units, Congress expected that hunting or trapping

The predominance of the Park Service's conservation duty is reflected in the agency's own Management Policies, which were promulgated by the present administration in 2006.  As the Policies acknowledge, "[t]he fundamental purpose of the national park system … begins with a mandate to conserve park resources and values"—a mandate that "is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired."  NPS Management Policies ("NPS Policies") § 1.4.3; see also 2007 ROD at 26-30 (reiterating Management Policies); FEIS at 169 (same).  Consistent with this mandate, the Policies require that the Park Service "always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values."  NPS Policies § 1.4.3; see also 2007 ROD at 26-27 (same); FEIS at 169 (same).  Specifically, the Park Service must "minimiz[e] human impacts on native plants, animals, populations, communities, and ecosystems," NPS Policies § 4.4.1; see also FEIS at 111 (same); "seek to perpetuate the best possible air quality in parks[,]" NPS Policies § 4.7.1; see also 2007 ROD at 27 (same); and "preserve, to the greatest extent possible, the natural soundscapes of parks," NPS Policies § 4.9; see also 2007 ROD at 27 (same).  "Where motorized use is appropriate and necessary," therefore, "the least impacting equipment, vehicles, and transportation systems should be used, consistent with public and employee safety."  FEIS at 148; see also NPS Policies § 8.2.3.

In authorizing an expansion of recreational snowmobiling and its environmental impacts, the administration turned its back upon the requirements of the Organic Act.  In the past four years, with snowmobile numbers averaging between 250 and 300—approximately half the  540

would not be allowed in those units); Sierra Club v. Andrus, 487 F. Supp. 443, 448-49 (D.D.C. 1980) (the Park Service has "broad" but "not unlimited" discretion in "determining what actions are best calculated to protect Park resources," consistent with its "'absolute duty … to take whatever actions … as will safeguard the units of the National Park System'") (emphasis added).

authorized under the challenged regulation—multiple resource thresholds have been exceeded within Yellowstone.  With respect to air quality, health thresholds for formaldehyde and benzene were approached or exceeded with only 180 to 250 snowmobiles entering the Park's West Entrance.  See FEIS at 99-100; 2007 ROD at 21-22; see also FEIS at J-1 (June 13, 2007 letter from EPA Deputy Regional Administrator Kerrigan Clough to Superintendents Suzanne Lewis and Mary Gibson Scott, at 6) ("NPS may want to consider medically monitoring the workers at Yellowstone National Park for formaldehyde and benzene exposure if the number of vehicles were to significantly increase.").  With respect to noise, the Park Service's own "adaptive management" thresholds were exceeded numerous times in multiple locations.  See FEIS at 143-47; 2007 ROD at 20-21.[4]  And with respect to wildlife, the Park Service's own biologists recommended that oversnow vehicles be maintained "at or below" the reduced levels of recent seasons in order to avoid adverse fitness affects during the Park's severe winter conditions.  See AR 125701, at 1, 20.  In the face of such existing impacts and recommendations, the

---

[4] Under the administration's "adaptive management" framework, three "management options" are presented as "possible" responses to an exceedance of a soundscape threshold:  new technological requirements, "[a]djust[ed]" daily entry limits, and "timed-entry requirements[.]"  FEIS at E-5; see also National Park Service, Temporary Winter Use Plans, Environmental Assessment (Aug. 2004) ("2004 EA"), at B-3 (attached as Ex. B); 2003 ROD at A-2.  In responding to the exceedances documented under the temporary plan, however, the administration elected to take a fourth route:  changing the threshold.  With the new snowmobile plan, the administration weakened the "audibility" threshold for "developed" areas from 50 percent to 75 percent.  See 2007 ROD at 40, 43; 2004 EA at B-3 (Ex. B); 2003 ROD at A-2 (Ex. A).  The administration makes no effort to explain this change in light of the Park Service's Organic Act mandate, stating only that the "soundscapes thresholds [were] updated with new information gleaned from four winters of monitoring."  2007 ROD at 40.  Moreover, the administration fails to reconcile its 75 percent "adaptive management" threshold with the FEIS's more stringent 40 percent threshold for "major" noise impacts.  See FEIS at 304.  This is arbitrary.  As the EPA noted in its comments on the administration's Draft EIS, "[i]f monitoring shows that [adaptive management] thresholds are being exceeded, … such results should lead to changes in management rather than modifications to the thresholds."  FEIS at J-1 (June 13, 2007 letter from Kerrigan Clough to Superintendents Suzanne Lewis and Mary Gibson Scott, at 4).

administration's decision to allow a doubling of snowmobile use within the Park—and, with it, at least an 18 percent increase in carbon monoxide emissions, a 33 percent increase in benzene emissions, a 50 percent increase in hydrocarbon emissions, a 60 percent increase in formaldehyde emissions, a 100 percent increase in particulate matter emissions, a tripling of the area in which oversnow vehicles are audible during half or more of the day, and an increase in wildlife mortality, displacement, and energy expenditure, see FEIS at 229, 231, 270, 307— cannot be reconciled with the Organic Act's overriding conservation mandate.[5]  While the Park Service has "discretion in determining what actions are best calculated to protect Park resources[,]" Daingerfield Island Protective Soc'y, 40 F.3d at 446 (internal quotations omitted), the administration made no such determination in electing to authorize an expansion of snowmobiling and its adverse impacts within Yellowstone National Park.

The contrast between the challenged winter use plan and the rejected snowcoach alternative is stark.  In the words of the challenged regulation, modern snowcoaches are "substantially cleaner" than "four-stroke snowmobiles[.]"  2007 Rule, 72 Fed. Reg. at 70,785. According to the administration's own figures, the snowcoach alternative considered in the FEIS and rejected in the ROD would have resulted in approximately one-forth the carbon monoxide and particulate matter, one-tenth the benzene, one-twelfth the hydrocarbons, and one-seventeenth the formaldehyde produced under the challenged winter use plan.  See FEIS at 229, 231; see also id. at 234 (the snowcoach alternative would result in emissions "greater only than [those] that

---

[5]  This conclusion is evident in the ROD's own, reluctant statements regarding the consistency of the administration's plan with the Organic Act.  The "best possible air quality" will somehow be perpetuated, the ROD declares, as the plan "will ensure that levels of formaldehyde and benzene remain low enough to protect human health."  2007 ROD at 27 (emphasis added).  The Parks' natural quiet will somehow be preserved, the ROD states, as the plan "will … make consistent progress toward protecting the parks' winter soundscape."  2007 ROD at 27 (emphasis added). And the Parks' wildlife will fare well enough, the ROD concludes, as wildlife impacts will be kept to "acceptable levels."  2007 ROD at 32.

would be produced under the … alternative [eliminating motorized vehicles from the Park]" and thus the snowcoach alternative's "negligible" impact on air quality "would be beneficial compared to all the other alternatives, as well as current and historic levels of use"); 2007 Rule, 72 Fed. Reg. at 70,788 ("[T]he cleanest of snowcoaches would produce emissions well below that of four-stroke snowmobiles, on a per capita basis.").  Moreover, the snowcoach alternative would have reduced traffic-related adverse impacts to Yellowstone's wildlife, consistent with the recommendations of Park Service biologists, and otherwise minimized the noise impacts of motorized access to the Park.  See, e.g., FEIS at 251, 260-61 (wildlife); id. at 339 ("[The snowcoach alternative] showed relatively low modeled audibility due to the exclusion of snowmobiles and the use of only BAT snowcoaches."); 2006 AR 125701, at 1, 20 (2006 wildlife study).  In short, the snowcoach alternative rejected by the administration offered the "least impacting" means of affording motorized access to Yellowstone—the means required under the firm conservation mandate of the Organic Act.  See, e.g., 16 U.S.C. § 1; NPS Policies § 8.2.3; FEIS at 148.

In attempting to justify its rejection of snowcoach access in favor of a plan doubling recreational snowmobile use and associated environmental harms, the administration reached beyond the confines of the Organic Act, utilizing "factors which Congress ha[d] not intended [the Park Service] to consider" in overriding the Act's conservation mandate.  See State Farm, 463 U.S. at 43.  According to the administration, though both types of vehicles provide access to the "curiosities" and "wonders" of the Park, "[s]nowcoaches and snowmobiles provide two very different types of experiences for park visitors seeking to enjoy Yellowstone during the winter." 2007 Rule, 72 Fed. Reg. at 70,787.  As explained in the FEIS, snowcoaches purportedly offer a slower and less autonomous sort of travel.  See, e.g., FEIS at 74, 151, 346, 355-56 (discussing

impact of "snowcoach slowness" and group touring on visitor experience); <u>see also, e.g.</u>, <u>id.</u> at 163 (contending that "one may value nature, which gives rise to the attitude that parks should preserve nature in an unimpaired form, which engenders the opinion that motorized vehicle access to parks should be curtailed or even eliminated" or "one may value freedom more highly, which produces the attitude that social policies should allow the maximum expression of individual liberties, and the opinion that one should be able to travel through national parks at his/her will"). Accordingly, "[i]n seeking to provide a range of opportunities and means to enjoy the Parks," 72 Fed. Reg. at 70,787, the administration adopted a plan for expanded recreational snowmobiling that will exacerbate the already significant adverse impacts documented in the Park during recent winter seasons, <u>see, e.g.</u>, FEIS at 236 (plan's air quality impact "more adverse compared to current use levels"); <u>id.</u> at 270 (noting that increased traffic levels cause increased wildlife mortality, displacement, and winter energy expenditure); <u>id.</u> at 307, 334, 338 (documenting plan's increased audibility impacts over current conditions).

The administration's decision to compromise park resources and values in order to conserve, unimpaired, "the different type[] of experience" afforded by snowmobiles[6] cannot be

---

[6] The administration fails to demonstrate, even, that the recreational snowmobiling authorized under its new plan will further the administration's non-park values better than snowcoaches. Though declaring that "the pace of a typical Yellowstone visit [by snowcoach] would be slower and visitors may not be able to tour as much of the park in a single day as is possible by snowmobile[,]" the FEIS acknowledges that "snowcoach operators offer full-day tours that are nearly identical to the most popular snowmobile tours[.]" FEIS at 346; <u>see also id.</u> at J-1 (June 13, 2007 letter from EPA Deputy Regional Administrator Kerrigan Clough to Superintendents Suzanne Lewis and Mary Gibson Scott, at 7) (noting that draft EIS cited "no studies or visitor surveys" in support of its assertion that "snowcoach visitors are adversely affected by snowcoach speed"). While snowmobiles are characterized as offering a more autonomous means of accessing Yellowstone, the selected alternative provides only for guided snowmobile tours, obviating the independence said to define snowmobile travel. <u>See</u> 72 Fed. Reg. at 70,788 (Cmt. 13). Finally, the FEIS concludes that the "fewer number of [vehicles] on the roads" under the snowcoach alternative "would mean generally safer and smoother travel conditions" for Park visitors. FEIS at 355.

reconciled with the mandates of the Organic Act.  Snowcoaches and snowmobiles, the FEIS admits, provide "nearly identical" access to the "curiosities" and "wonders" Yellowstone was set aside to preserve.  See FEIS at 346; 16 U.S.C. § 22.  As a result, the FEIS concedes, a system of exclusive snowcoach access to the Park would satisfy the "purpose and need" underlying the administration's own plan—that is, "provid[ing] park visitors with a range of appropriate winter recreational opportunities, while ensuring that these activities do not lead to unacceptable impacts or the impairment of park resources and values."  See FEIS at 4, 44; see also id. at 5 ("Appropriate winter recreation is that which does not cause unacceptable impacts on unique characteristics of winter settings within the parks, while permitting their enjoyment and protection.  Appropriate activities are those which promote understanding of the purposes for which the parks' resources are being preserved, and those which promote the health and personal fitness of the general public.").  Indeed, the FEIS suggests, snowcoaches offer the best means of experiencing Yellowstone's winters, as "[o]pportunities to view wildlife and scenery w[ould] abound" under the snowcoach alternative and, "because snowmobiles would be banned from the parks, there would be increased opportunities for quiet and solitude and clean air."  Id. at 355-56.

In opting to expand recreational snowmobile use and its environmental impacts within Yellowstone National Park, the administration disregarded all of this, declaring that the Park's wildlife, quiet, solitude, and clean air would be compromised in order to allow further snowmobiling on the Park's snow-covered roads.  By allowing a particular "use[]" to trump "the protection of [park] resources and values[,]" the administration turned the national park idea on its head.  See 2007 ROD at 30.  As the challenged snowmobile plan is accordingly irreconcilable with the Organic Act, it should be set aside.  See 5 U.S.C. § 706(2)(A).

B.     *The Administration's New Snowmobile Plan Violates Park Service Regulations*

The administration's decision to compromise Yellowstone's resources and values in order to allow expanded recreational snowmobiling within the Park is similarly irreconcilable with Park Service regulations.  Under 36 C.F.R. § 2.18(c), snowmobiles are "prohibited" within the National Park System unless "their use is consistent with the park's natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources."  36 C.F.R. § 2.18(c); see also Mausolf, 125 F.3d at 663-64, 668-70 (noting that "snowmobiling generally is prohibited in national parks" and upholding snowmobiling restrictions within Voyageurs National Park despite a provision within the Park's enabling legislation allowing snowmobile use).  In authorizing an expansion of recreational snowmobiling within Yellowstone, the administration violated this provision.  At authorized levels, snowmobiles are inconsistent with Yellowstone's "natural, cultural, scenic and aesthetic values," see 36 C.F.R. § 2.18(c), damaging the Park's air and soundscapes.  See supra Sec. II(A).  Moreover, rather than leaving Yellowstone's wildlife undisturbed, the administration's expansion of recreational snowmobiling within the Park promises to increase traffic-related adverse impacts on the Park's animals.  See id.  In disregarding the requirements of Section 2.18(c), see 2007 ROD at 28, the administration acted arbitrarily and unlawfully.  The challenged regulation should, therefore, be set aside.  See 5 U.S.C. § 706(2)(A).

C.     *The Administration's New Snowmobile Plan Violates Governing Executive Orders*

The administration's new snowmobile plan is similarly at odds with governing Executive Orders.  With Executive Orders 11,644 and 11,989, Presidents Nixon and Carter recognized that the operation of off-road vehicles on public land, including snowmobiles, had resulted "in frequent conflict with wise land and resource management practices, environmental values, and

other types of recreational activity[.]"  Exec. Order No. 11,644, 37 Fed. Reg. 2,877 (1972), <u>as</u> <u>amended by</u> Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (1977).  The Orders therefore require that "the designation of … [off-road vehicle] areas and trails … be based upon the protection of the resources of the public lands, promotion of the safety of all users of those lands, and minimization of conflicts among the various uses of those lands."  <u>Id.</u> § 3(a); <u>see also</u> <u>id.</u> § 9 (when "the use of off-road vehicles will cause or is causing considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources of particular areas or trails of the public lands," they shall be "immediately close[d] … to the type of off-road vehicle causing such effects, until such time as … such adverse effects have been eliminated and … measures have been implemented to prevent future recurrence").  Within the National Parks in particular, the Orders prohibit the use of snowmobiles and other off-road vehicles unless the Park Service first "determines that off-road vehicle use … will not adversely affect [a Park's] natural, aesthetic, or scenic values."  <u>Id.</u> § 3(a)(4).  Here, the administration has elected to authorize recreational snowmobiling within Yellowstone that will "adversely affect" the Park's "natural, aesthetic, [and] scenic" values.  <u>See</u> <u>supra</u> Sec. II(A).  Having done so, the administration cannot demonstrate a "rational connection" between the adverse impacts of the snowmobiling it has allowed and its conclusion that such use is allowable under Executive Orders 11,644 and 11,989. <u>See</u> <u>State Farm</u>, 463 U.S. at 43; <u>see also</u> 2007 ROD at 28.  Being both arbitrary and unlawful, the administration's new snowmobile plan should be set aside.  <u>See</u> 5 U.S.C. § 706(2)(A).

> **D.**    ***In Again Authorizing Significant Levels of Recreational Snowmobiling within Yellowstone, the Administration Again Failed to Explain Its Reversal of the Park Service's Snowcoach Rule***

In addition to disregarding the substantive mandates that secure the Nationals Parks for present and future generations, the administration has again failed to explain its departure from

the Park Service's earlier snowcoach rule—a failure at odds with the Administrative Procedure

Act's basic requirement of reasoned agency decisionmaking.

Five years ago, in attempting to explain its reversal of the Park Service's prior

determination that significant levels of snowmobile use impair Yellowstone's air, natural quiet,

and wildlife, the administration pointed to a set of mitigation measures said to alleviate

snowmobiles' inherent problems—namely, a "best available technology" standard imposing

hydrocarbon, carbon monoxide, and noise limits on the machines; a 950-snowmobile cap on the

number of daily entries into Yellowstone; a requirement that all snowmobiles enter the Park in

guided groups of eleven or less; and "adaptive management" provisions allowing adjustments

should things not go well.  See 2003 ROD at 12-17 (Ex. A); see also Fund for Animals, 294 F.

Supp. 2d at 106-08.  In vacating the 2003 snowmobile rule, this Court concluded that the

administration's justification for its reversal of the Park Service's snowcoach rule was "weak at

best[,]" having failed to provide the "cogent, supported explanation" required to ensure reasoned

agency action and compliance with the Park Service's conservation mandate.  Id. at 108.

Technology, the Court noted, had been "explicitly considered[,]" accurately projected, and

"explicitly rejected as … inadequate" during the Park Service's prior rulemaking process;

snowmobile numbers were not actually reduced under the 2003 plan; and the purported benefits

of guided group travel were undercut by a "group" definition that included even one snowmobile

and the substantial difficulties in communication between guides and the guided.  Id. at 106-08.

With its new plan, one authorizing a significant expansion of recreational snowmobile

use beyond current levels, the administration has again failed to offer a reasonable explanation

for its departure from the Park Service's prior regulation.  The administration contends that

impairment will not result under the new plan due to an identical "best available technology"

requirement; a 540-snowmobile cap on the number of daily entries into Yellowstone; a requirement that all snowmobiles enter the Park in guided groups of eleven or less; and "adaptive management" provisions allowing adjustments should things get worse.  See 2007 ROD at 5-6; 72 Fed. Reg. at 70,788-89 (Cmts. 5, 15, 31).  Of these measures, only one differs from those deemed inadequate by this Court to justify a reversal of the Park Service's snowcoach rule: under the administration's new regulation, the number of authorized daily snowmobile entries has been reduced.  See 72 Fed. Reg. at 70,781, 70,783.  While the administration contends, as it did five years ago, that its new plan is accordingly consistent with the Park Service's prior impairment determination due to the "strict" numerical limits the plan imposes on snowmobiles, see 72 Fed. Reg. at 70,783, this contention fails, again, to explain the administration's reversal of the snowcoach rule.

First, the so-called "strict" numerical limit on snowmobiles does not avoid adverse impacts to key park resources.  The administration's new snowmobile plan provides for recreational snowmobile use within Yellowstone at twice the levels of recent seasons—levels at which numerous resource thresholds have been exceeded.  See supra Sec. II(A).  In allowing a doubling of snowmobile use within the Park, moreover, the administration disregarded the recommendation of Park Service biologists that oversnow vehicles be kept "at or below" recent levels in order to avoid imposing adverse fitness impacts on the Park's winter-stressed wildlife.  See 2006 AR 125701, at 1, 20 (2006 wildlife study).  The administration's assertion that it has imposed "strict limits" on snowmobile numbers is, as a result, both implausible and irreconcilable with the evidence in the record.  See State Farm, 463 U.S. at 43 (an agency explanation that "runs counter to the evidence" or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise" must be set aside).

Second, the challenged regulation itself diminishes the significance of the numerical limit it imposes. In an attempt to minimize the environmental impacts stemming from its decision to allow an expansion of snowmobile use within Yellowstone, the administration discounts the importance of the entry limits put into place by the new regulation. In a discussion accompanying the final rule, the administration rejects the suggestion that the environmental improvements seen during recent seasons have largely been the product of "the lower numbers of snowmobiles that have been present" in Yellowstone. See 72 Fed. Reg. at 70,788 (Cmt. 7). According to the administration, while reductions in recreational snowmobiling "contributed" to the improvements of recent years, "these improvements are also attributable to the air and sound emissions requirements, guiding, and other elements of the temporary plan that has been in effect for the past several winters." Id. In other words, aware that it was authorizing a doubling of already unacceptable levels of recreational snowmobiling within Yellowstone, the administration sought to diminish the significance of snowmobile numbers and instead rest its decision on the same mitigation measures "explicitly considered" and "explicitly rejected" by the Park Service in adopting the snowcoach rule. See Fund for Animals, 294 F. Supp. 2d at 106-08. As this Court has already concluded, reliance on such measures is insufficient to justify a departure from the snowcoach rule. See id.

Finally, in declaring that 540 snowmobiles will be allowed in Yellowstone each winter day, the administration failed to offer any meaningful explanation as to how this number was derived. Nearly eight years ago, in promulgating the snowcoach rule, the Park Service rejected suggestions that a reduced-snowmobiling alternative be implemented, noting that "carrying capacity studies" had yet to be conducted and, as a result, there was no means of knowing what level of recreational snowmobiling, if any, could be permitted within the Park without

impairment or unacceptable impacts.  See 65 Fed. Reg. at 80,915-16.  No such studies are cited in support of the administration's determination that 540 snowmobiles can be allowed into Yellowstone without impermissible consequences.  To the contrary, the experience of recent seasons demonstrates that unacceptable impacts result from half that number of machines.  See supra Sec. II(A).

As the administration has yet to offer a "cogent, supported explanation" for its reversal of the Park Service's snowcoach rule, its decision is of the "quintessentially arbitrary and capricious" sort that must be set aside.  See Fund for Animals, 294 F. Supp. 2d at 108 (internal quotations omitted); see also Sierra Club v. Mainella, 459 F. Supp. 76, 98-103 (D.D.C. 2006) (remanding a Park Service "nonimpairment" determination where the Service had offered "little or no explanation" as to how the determination had been reached, having relied instead upon repeated, conclusory declarations that there would be no impairment).

III.    **The Administration's FEIS Obscures the Impacts of Snowmobile Use and Its Incompatibility with National Park Service Mandates, in Violation of NEPA**

In attempting to justify its decision to authorize an expansion of recreational snowmobile use within Yellowstone National Park, the administration crafted an environmental impact statement that obscures the substantial differences among the alternative winter use plans it considers and their consistency with Park Service mandates.  Because the administration's FEIS offers more obfuscation than analysis, it cannot be reconciled with the requirements of NEPA.

"The National Environmental Policy Act … is our basic national charter for protection of the environment[,]" 40 C.F.R. § 1500.1(a)—a statute that "prohibits uninformed … agency action" by requiring federal agencies "to take a hard look at [the] environmental consequences" of their conduct, Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989) (internal quotations omitted).  Under NEPA, federal agencies must prepare an EIS for every

31

major action that will significantly affect the quality of the human environment.  42 U.S.C. §

4332(2)(C).  Environmental impact statements are "more than … disclosure document[s,]" their

"primary purpose" being to "serve as an action-forcing device to insure that the policies and

goals defined in the Act are infused into the ongoing programs and actions of the Federal

Government."  40 C.F.R. § 1502.1; see also Calvert Cliffs' Coordinating Comm. v. Atomic

Energy Comm'n, 449 F.2d 1109, 1113 (D.C. Cir. 1971) (noting "'action-forcing'" nature of

NEPA).  Accordingly, environmental impact statements are to be "concise, clear, and to the

point," providing "full and fair discussion of significant environmental impacts and …

inform[ing] decisionmakers and the public of the reasonable alternatives which would avoid or

minimize adverse impacts or enhance the quality of the human environment."  Id.  In doing this,

an EIS must "state how alternatives considered in it and decisions based on it will or will not

achieve the requirements of … [NEPA] and other environmental laws and policies[,]" id. §

1502.2(d), and discuss "[p]ossible conflicts between the proposed action and the objectives of

Federal … policies and controls for the area concerned[,]" id. 1502.16(c).  Ultimately, an EIS

must "[r]igorously explore and objectively evaluate all reasonable alternatives," thereby "sharply

defining the issues and providing a clear basis for choice among options by the decisionmaker

and the public."  Id. § 1502.14; see also FEIS at 167 (same).  "Read together, the provisions of

NEPA and the National Park Service Organic Act are consonant and jointly commit the Service

to make informed decisions that perpetuate the conservation and protection of park resources

unimpaired for the benefit and enjoyment of future generations."  National Park Service,

Director's Order 12 ("DO 12") § 1 (attached as Ex. C).[7]

---

[7] While Director's Order 12 originally included a "sunset date" of January 8, 2005, the
challenged FEIS was purportedly prepared "in accordance with" the Order, which has not been

A.   *In Measuring the Considered Alternatives Against Deplorable "Historic Conditions," the FEIS Obscures Their Environmental Impacts and Their Consistency with the Park Service's Conservation Mandate*

By centering its environmental analysis upon the merits of the considered alternatives relative to the Parks' deplorable "historic conditions," the administration obscured the adverse impacts that would result under each of the alternative plans, rendering the FEIS incapable of insuring an informed agency decision.  In assessing the environmental impacts of the seven winter use alternatives set forth in its FEIS, the administration had one fundamental obligation: determining and discussing which of the potential winter use plans could be implemented consistent with the substantive mandates governing Yellowstone.  See, e.g., 16 U.S.C. § 1; NPS Policies §§ 1.4.3, 1.4.3.1; 40 C.F.R. §§ 1502.2(d), 1502.16(c); see also FEIS at 4 ("The goal of the plan is to provide park visitors with a range of appropriate winter recreational opportunities, while ensuring that these activities do not lead to unacceptable impacts or the impairment of park resources and values."); DO 12 § 4.7 (Ex. C) ("Impacts that may constitute an impairment of park resources or values will be evaluated and described in impact analysis contained within environmental documents produced by the Service.").  While the FEIS is punctuated by a refrain declaring that none of the considered alternatives would result in impairment or unacceptable impacts—even one providing for snowmobile use in excess of historic levels, see, e.g., FEIS at 364-374—it fails to justify this conclusion.  Instead, the FEIS rests its nonimpairment determination upon the notion that no alternative would prove as bad as "historic conditions" within Yellowstone.  Missing from the FEIS, however, is any explanation as to why impairment would be avoided so long as the Park is left somewhat less degraded than it was during the years of unmanaged snowmobile use.  The FEIS, in other words, fails to identify the threshold beyond

revised.  See FEIS at 1; see also Director's Orders and Related Documents, at
http://home.nps.gov/applications/npspolicy/DOrders.cfm (listing standing Director's Orders).

which impairment or unacceptable impacts would occur.  As a result, the FEIS does not

meaningfully assess the adverse impacts of the considered alternatives, depriving both

decisionmakers and the public of an understanding of the extent to which each alternative is

consistent with Park Service mandates.  See Sierra Club, 459 F. Supp. 2d at 100, 106 (rejecting a

NEPA analysis that "simply describ[ed] the impact followed by a conclusion that the impact was

not impairment"); see also 40 C.F.R. §§ 1502.2(d), 1502.16(c).

 The FEIS's reliance on the foil of "historic conditions" is pervasive.  Having been

designed to "address[] … historic conditions by developing a winter use plan[,]" the FEIS begins

by "juxtapos[ing]" historic conditions with those "desired" in the Parks.  See FEIS at 4-5; see

also id. ("Part of the function of this FEIS is to determine, as well as possible, whether recent

conditions … have improved or not, relative to the historic condition.").  In subsequent chapters,

the FEIS resorts again and again to such juxtaposition, using the deplorable conditions of the

"largely unmanaged" past as a means of diminishing the impact of alternatives that inevitably

look better when compared to unlimited levels of unregulated, highly polluting two-stroke

snowmobile use.  See id. at 4; see also, e.g., id. §§ 2.6, 4.2, 4.3; see also AR 125262 at 2  (NPS

Natural Sounds Program comments noting the inadequacy of impact discussions centered upon

improvements over historic conditions).

 The FEIS's reliance upon deplorable "historic conditions" is most pronounced in its

persistent use of the metric as a basis for its "impairment" assessments.  With respect to air

quality, the FEIS's "conclusions" table announces that each of the considered alternatives would

be "beneficial" relative to historic conditions and therefore, it seems, non-impairing—an analysis

that obscures the fact that three of the alternatives, including the snowmobile plan selected by the

administration, would be "adverse" relative to the Park's current, unacceptable conditions.  See

FEIS at 236 (Table 4-45); see also, e.g., id. at 99 (arguing that while there were fewer than 250

snowmobiles in Yellowstone on days when benzene standards were exceeded, "recent benzene

exposure[] levels are an order of magnitude lower than they were when two-strokes were

allowed in the parks—a decrease possibly attributable to fewer numbers of snowmobiles"); id. at

235 ("Th[e] [1,025-snowmobile, expanded-use] alternative would result in an adverse impact

compared to current conditions but would be a beneficial impact relative to historic use

conditions.  Overall, this alternative's impact on air quality would be major [and] adverse….

Impairment of park resources would not occur[.]").[8]  With respect to soundscapes, the FEIS's

"conclusions" table again pairs a column announcing that each of the alternatives would be an

improvement over historic conditions with a column declaring that none of the alternatives

would result in impairment.  Id. at 342 (Table 4-66).  Finally, with respect to wildlife, the FEIS

notes simply that the guiding requirement common to all alternatives has resulted in a

"pronounced drop" in the "considerable negative interactions between visitors and wildlife" seen

during the period of unregulated snowmobile use.  Id. at 365.

This environmental "analysis" cannot be sustained.  The purpose of the FEIS was not to

assess whether and how a new set of alternatives varied from "historic conditions," but rather to

develop and discuss alternatives providing access to Yellowstone in a manner consistent with

Park Service mandates.  See FEIS at 4.  The FEIS's "historic conditions" assessment is almost

useless in this regard, inviting decisionmakers and the public to believe that any improvement

---

[8] The FEIS goes so far, in fact, as to project the emissions that would have been seen in
Yellowstone in 2010 had unmanaged snowmobile use been allowed to continue within the Park,
factoring into this analysis the emissions reductions that would have been achieved under the
EPA's general snowmobile emissions requirements.  FEIS at 218, 365.  The FEIS concludes that
this "'historic conditions circa 2010'" scenario would have been "over four times" worse than
the "most polluting" of the considered alternatives, id.—a meaningless statistic that no more than
obscures the document's assessment of the alternatives' environmental impacts.

over historic conditions would not impair or unacceptably impact the Parks. The FEIS offers

nothing in support of this notion, thereby obscuring the substantial differences among the

alternatives and the extent to which each satisfies—or does not satisfy—the requirements of the

Organic Act. See Sierra Club, 459 F. Supp. 2d at 106. Having failed to articulate why each of

the considered alternatives would not result in impairment or unacceptable impacts, the FEIS

does not satisfy the purposes and demands of NEPA. See 40 C.F.R. §§ 1502.2(d); 1502.14;

1502.16(c); see also 2000 ROD, 65 Fed. Reg. at 80,915 ("carrying capacity studies" required to

determine whether snowmobiles could be allowed at reduced levels).

### B.    *In Assessing the Alternatives' Soundscape Impacts, the FEIS Improperly Relies on a Metric that Disregards the Alternatives' Effects on Winter Visitors*

The FEIS's assessment of the considered alternatives is further obscured by its reliance

upon a noise metric indifferent to the location of Yellowstone's winter visitors. Though the

Organic Act was promulgated before snowmobiles and other recreational vehicles offered the

possibility of motorized access to the National Parks, the statute—in the words of the FEIS—

"was written and enacted in an environment in which it was clear that the American people

wanted places to go that were undisturbed and natural and which offered a retreat from the rigors

and stresses of everyday life." FEIS at 137. Accordingly, as the FEIS declares, "inappropriate

sound or noise is clearly an issue to be addressed when considering a proposal for use and

enjoyment of the national parks"—and "[n]atural quiet, or natural sound conditions that would

prevail without human presence, is an appropriate baseline from which to gauge the impacts of

human use."[9] Id.

---

[9] The FEIS's emphasis of the alternatives' reduced noise impacts relative to "historic conditions," see, e.g., FEIS at 342 (Table 4-66), is difficult to reconcile with its acknowledgment that "[n]atural quiet" should serve as the "baseline" for analysis, see id. at 137, further underscoring the inadequacies of the document's "historic conditions" analysis.

While recognizing these principles at the outset of its soundscapes analysis, the FEIS ultimately applies a metric that disregards them by design.[10]  Within the FEIS, the noise impacts of the various alternatives are measured against a "total park" audibility standard under which an alternative is deemed to have a "major impact" only when it would spread oversnow vehicle ("OSV") noise across more than 20 percent of Yellowstone's more than two-million acres.  See FEIS at 304 (Table 4-48), 342 (Table 4-66).   This standard ignores the most basic consideration relevant to an assessment of a plan's noise impacts:  the location of the winter visitors who come to Yellowstone in search of sanctuary.  See id. at 138; AR 125262 (NPS Natural Sounds Program comments noting that the "total park" standard "miss[es] an important point" as "it is not the entire area of the park that is relevant, but the area of the park weighted by the amount of visitor use"); see also FEIS at 5 (noting the historic loss of the "solitude, quiet, and clear air that people expect to enjoy in the parks"); cf. U.S. Air Tour Ass'n v. FAA, 298 F.3d 997, 1017-18 (D.C. Cir. 2002) (rejecting a soundscape metric measuring park noise impacts based on an "annual average day," as "the use of an annual average does not correspond to the experience of the Park's actual visitors").  As the FEIS itself acknowledges, "[a]lthough sounds from OSVs are audible within a relatively small portion of the parks' total acreage, they are concentrated to a large degree around

---

[10] The FEIS further fails to address recommendations contained in the Park Service's own monitoring studies.  According to the most recent of the reports, "sound levels and audibility thresholds are being exceeded at developed areas and travel corridors" within Yellowstone despite "substantial improvements [that] have been made by the switch from 2-stroke to 4-stroke snowmobiles and by the guiding requirement[.]"  AR 125292 (2007 soundscape report), at 47.  The report therefore recommends that sound and audibility levels be reduced from those seen under the temporary plan—and notes that, among other measures, "[r]educing the total number and reducing single and small groups of OSVs operating on [Yellowstone's] roads would … minimize their impact to natural soundscapes[.]"  Id.; see also AR 125050 (2006 soundscape report), at 72 (same).  In adopting as "preferred" an alternative doubling recreational snowmobile use within Yellowstone, the FEIS neglected to address this recommendation, compromising the document's discussion of alternatives' comparative merits.  See 40 C.F.R. § 1502.14.

travel corridors and park attractions and affect the areas most accessible by the vast majority of park visitors."  Id. at 139; see also id. Figs. 4-5–4-17 ("audibility contour" maps illustrating concentration of OSV noise in areas generally accessible to winter visitors).  In relying on a soundscape metric indifferent to this fact, the FEIS wholly obscures the noise impacts of the various alternatives.[11]  Indeed, the FEIS's "total park" metric is so arbitrary as to classify impairing "historic conditions"—which, according to the FEIS, spread vehicle noise across 16.2 percent of Yellowstone—as only moderately adverse to the Park's natural quiet.  See id. at 304 (Table 4-48) (establishing a ">20" percent of the Park "major impact" threshold); id. at 307 (Table 4-49) (stating that historic use resulted in OSV audibility across 16.2 percent of Yellowstone).  As a result, the FEIS's noise analysis fails to satisfy the requirements of NEPA.[12]

---

[11] According to a Park Service scientist, the "total park" metric is also largely indifferent to the number of oversnow vehicles authorized under an alternative, as "'percent area affected' doesn't change very much from only one OSV to 5000 OSVs, if the one travels the same route as the many."  AR 125015.  By emphasizing the metric, therefore, the FEIS further obscured the significant differences among the considered alternatives.  Evidence in the record suggests that this obfuscation was deliberate.  In commenting on a draft of the EIS, one member of the Park Service's sound program noted that while the document's "acoustic analysis" could be improved in a manner "better protecting park resources, values, and visitor use[,]" not much time would be spent on this "[g]iven the political reality[.]"  AR 116985.

[12] The FEIS's soundscape analysis was further flawed by its differential treatment of road closures in modeling the various alternatives.  Common to all alternatives considered in the FEIS is the possibility that the road between Madison and Norris would be closed—after five years of study—in order to assess the impact of road grooming on bison movements within the Park.  See FEIS at 38-39.  In determining the likely soundscape impacts of the various alternatives, however, this road was modeled as "closed" only under one of the seven plans: Alternative 7, that ultimately selected by the administration.  See id. at 334 ("Note that the Madison-Norris road segment was modeled as closed to reflect management experiments investigating the bison-groomed road relationship."); see also id. at 335 (map reflecting modeled road closure).  As a result, the modeled soundscape impacts of Alternative 7 were arbitrarily reduced relative to the other considered alternatives, skewing the FEIS's analysis in favor of the administration's preferred plan.  See, e.g., id. at 311 ("Note that experimental closure of the Gibbon Canyon or other road segments for management experiment purposes … under this alternative would decrease the percent time audible on the affected road segment(s).").  (As noted above, supra n.3, the same difficulty arises under the FEIS's emissions analysis.)

See, e.g., 40 C.F.R. §§ 1502.2(d), 1502.14.

    **C.**    *In Assessing the Alternatives' Air Quality Impacts, the FEIS Improperly Relies Upon Inapposite Air Quality Standards and a Park-Wide Impact Metric*

The FEIS's assessment of the alternatives' air quality impacts is similarly flawed, having relied upon an impact definition and air quality standards inappropriate for measuring impairment or unacceptable impacts within the National Parks.

With respect to the document's air quality impact definitions, the FEIS distinguishes between "localized" air quality impacts and those deemed "substantial and highly noticeable park-wide." See FEIS at 222 (Table 4-31). According to the FEIS, only obvious, "park-wide" impacts are considered "major." See id. For the reasons outlined above, the FEIS's reliance on a "park-wide" standard renders it incapable of informing decisionmakers and the public as to whether any of the alternatives would unacceptably impact those areas where visitors congregate during Yellowstone's winter season. See 40 C.F.R. § 1502.2(d); see also U.S. Air Tour Ass'n, 298 F.3d at 1017-18; Sierra Club, 459 F. Supp. 2d at 101-02 (rejecting amorphous impact definitions that had "no principled basis").

With respect to the document's use of air quality standards, the FEIS's assessment of the alternatives' air quality impacts centers upon the alternatives' compliance with state and federal air quality standards promulgated under the Clean Air Act. See, e.g., FEIS at 215-16 (discussing standards), 221 (discussing Clean Air Act visibility provisions), 222-27 (assessing alternatives relative to air quality standards); 2007 ROD at 27; see also 2007 Rule, 72 Fed. Reg. at 70,791 (Cmt. 40). Indeed, in summarizing its conclusions regarding the alternatives' air quality impacts, the FEIS declares that "[u]nder all the alternatives, all measures of air quality pollutants, particulates and visibility are predicted to meet Federal, Montana, and Wyoming ambient air quality standards. No alternatives would see impairment of park air quality." Id. at 234. The

FEIS neglects to explain the connection between such standards—which articulate permissible amounts of air pollution—and the Park Service's independent duty to conserve the Parks by preserving the "best possible" air quality.  See NPS Policies § 4.7.1.  In failing to articulate how the various alternatives conform with Park Service's conservation mandate, the administration's FEIS violated NEPA.  See 40 C.F.R. §§ 1502.2(d), 1502.16(c); see also Sierra Club, 459 F. Supp. 2d at 106.

> **D.**    ***In Assessing the Alternatives' Wildlife Impacts, the FEIS Improperly Relies on a Population-Based Metric Indifferent to Impacts on Individual Animals and Disregards the Recommendations of Park Service Biologists***

The FEIS's wildlife impacts metric is likewise incapable of assessing the alternatives' conformity with Park Service mandates.  In the words of the administration's 2003 SEIS, "park policies, regulations, and EOs clearly state that disturbance to wildlife, regardless of population-level effects, is unacceptable in the national parks."  National Park Service, Winter Use Plans, Final SEIS, at 206 (Feb. 2003) (attached as Ex. D).  Under Park Service regulations, snowmobile use may be authorized within the Parks only when it "will not disturb wildlife[.]"  36 C.F.R. § 2.18(c).  Nonetheless, the FEIS no more than "acknowledges that adverse impacts to individual animals should be minimized[,]" see FEIS at 251, characterizing alternatives as having a "major" impact on wildlife only where they result in a "substantial and possibly permanent consequence to the population[,]" id. at 257; see also id. at 251 ("[T]he focus of this analysis is predominantly the impact on wildlife populations[.]").  Moreover, in recommending a doubling of recreational snowmobile use, the FEIS fails to address the recommendation of Park Service biologists that OSV traffic levels be maintained "at or below" those seen under the temporary plan in order to avoid adverse fitness effects on the Park's wildlife.  See AR 125701, at 1, 20.  In utilizing such a population-based metric and disregarding the Service's own wildlife study, the FEIS further

obscures the extent to which each of the alternatives would comply with the Park Service's

conservation mandate, contrary to the requirements of NEPA.  See 40 C.F.R. §§ 1502.2(d),

1502.16(c).

> **E.**     ***The FEIS Deprives Decisionmakers and the Public of an Understanding of the Alternatives' Environmental Impacts and the Extent to which They Conform with Park Service Mandates***

In combination, the FEIS's numerous deficiencies result in a document that leaves

decisionmakers and the public with little understanding of the alternatives' relative impacts and

the extent to which each conforms with Park Service mandates.  After assessing the alternatives'

often substantial adverse effects against the "backdrop" of deplorable "historic conditions" and

relying upon metrics indifferent to park resources and values, the FEIS declares that none of the

considered alternatives—even one providing for an expansion of snowmobile use over historic

levels—would impair or unacceptably impact park resources or values.  See, e.g., FEIS at 364-

74.  Missing from the FEIS is any meaningful explanation as to why—an explanation demanded

by NEPA, the Organic Act, and the prior Orders of this Court.  Having been designed to obscure

the substantial differences between the alternatives, rather than "sharply defin[e] the issues and

provid[e] a clear basis for choice among options by the decisionmaker and the public[,]" see 40

C.F.R. § 1502.14, the FEIS should be set aside.

## IV.     The Court Should Order the Park Service to Promulgate a Winter Use Plan Consistent with the Court's Orders

Because the administration acted arbitrarily and unlawfully in authorizing recreational

snowmobile use within Yellowstone, the challenged regulation, ROD, and FEIS should be

vacated and remanded, allowing the Park Service to develop a long-term winter use plan

consistent with the conservation mandate governing the National Parks.  In order to ensure

continued access to the Parks during the preparation of this plan, the Greater Yellowstone

Coalition plaintiffs further request that this Court order the Park Service to promulgate—no later than 30 days prior to the beginning of trail grooming activities for the 2008-2009 winter season—a short-term interim plan to bring winter access into compliance with the Orders of this Court.

## CONCLUSION

For the reasons set forth above, the Greater Yellowstone Coalition plaintiffs request that the Court grant their motion for summary judgment and the relief requested herein.

Respectfully submitted this 9th day of May, 2008.

<div align="right">

/s/     Sean M. Helle
Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
*Greater Yellowstone Coalition, et al.*

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| GREATER YELLOWSTONE ) | |
| COALITION, *et al*., ) | |
| ) | |
|       Plaintiffs, ) | Civ. No. 07-2111 (EGS) |
| ) | |
|     v. ) | [Hearing on Motion for Summary |
| ) |  Judgment on August 27, 2008] |
| DIRK KEMPTHORNE, *et al*., ) | |
| ) | |
|       Defendants. ) | |
| _____) | |
| ) | |
| NATIONAL PARKS CONSERVATION ) | |
| ASSOCIATION, ) | |
| ) | |
|       Plaintiff, ) | Civ. No. 07-2112 (EGS) |
| ) | |
|     v. ) | [Hearing on Motion for Summary |
| ) |  Judgment on August 27, 2008] |
| UNITED STATES DEPARTMENT ) | |
| OF THE INTERIOR, *et al*., ) | |
| ) | |
|       Defendants. ) | |
| _____) | |

**GREATER YELLOWSTONE COALITION PLAINTIFFS' STATEMENT OF
MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

      Pursuant to Local Civil Rules 7(h) and 56.1, the Greater Yellowstone Coalition plaintiffs

hereby set forth their statement of material facts as to which they contend there is no genuine

issue, including references to supporting portions of the record.  Plaintiffs note that judicial

review under the Administrative Procedure Act generally does not require the resolution of

factual issues, "the function of the district court [being] to determine whether or not as a matter

of law the evidence in the administrative record permitted the agency to make the decision it

did." <u>Baystate Med. Ctr. v. Leavitt</u>, -- F. Supp. 2d. --, 2008 WL 836012, *12 (D.D.C. 2008)

(internal quotations omitted).  Accordingly, "[c]ourts in this Circuit have repeatedly recognized

that summary judgment is an appropriate procedure when a court reviews an agency's

administrative record."  <u>Fund for Animals v. Norton</u>, 294 F. Supp. 2d 92, 104 (D.D.C. 2003).

      The following are undisputed facts in the Administrative Record:

1.      In recent winter seasons—with snowmobile use occurring at approximately half

the level authorized under the challenged winter use plan (250-300 snowmobiles per day, on

average), National Park Service, Winter Use Plans, Final Environmental Impact Statement (Sep.

2007) (AR 117160) ("FEIS"), at 153; National Park Service, Winter Use Plans, Record of

Decision (Nov. 20, 2007) (AR 126499) ("2007 ROD"), at 8, 20; Final Rule, 72 Fed. Reg. 70,781,

70,798 (Dec. 13, 2007)[1]—recreational snowmobiling has caused significant adverse impacts to

Yellowstone National Park's resources and values:

a.      With respect to Yellowstone's natural quiet, Park Service monitoring has

demonstrated that noise thresholds have been repeatedly exceeded in recent seasons in areas

where visitors are concentrated during the winter season.  FEIS at 143-46.  During the same

period, the Park Service's backcountry noise threshold has been repeatedly exceeded, 2007 ROD

at 21, leading to complaints from the Park Service's own staff, AR 124898-99.  Accordingly, the

National Park Service's own soundscape monitoring studies have consistently recommended that

oversnow vehicle noise be reduced from recent levels, and noted that "[r]educing the total

number and reducing single and small groups of OSVs operating on [Park] roads would …

---

[1] "AR" citations refer to the Administrative Record.  Record citations are to Bates numbers and,
where applicable, to page numbers within documents that have not been internally Bates
stamped.  Because the challenged FEIS (AR 117160) and ROD (AR 126499) are not internally
Bates stamped within the record, citations to those documents will be to page number only.  The
FEIS, ROD, and other record documents are available at http://www.nps.gov/yell/parkmgmt/

minimize their impact to natural soundscapes."  AR 125292 (Natural Soundscape Monitoring in

Yellowstone National Park December 2006–March 2007 (Sep. 20, 2007)), at 47; AR 125050

(Natural Soundscape Monitoring in Yellowstone National Park December 2005–March 2006

(Sep. 6, 2006)), at 72; see also AR 124776 (Natural Soundscape Monitoring in Yellowstone

National Park December 2004–March 2005 (Dec. 15, 2005)), at 71.

       b.      With respect to Yellowstone's wildlife, Park Service biologists recommended in a

2006 study that oversnow vehicle numbers be maintained "at or below" recent levels in order to

minimize disturbance of the Park's winter-stressed animals and thereby avoid adverse fitness

effects.  AR 125701 (P.J. White et al., Behavioral Responses of Wildlife to Snowmobiles and

Coaches in Yellowstone (Oct. 17, 2006)), at 1, 20.

       c.      With respect to Yellowstone's air quality, the Agency for Toxic Substances and

Disease Registry's "minimum risk level" for chronic exposure to benzene has been repeatedly

exceeded in recent seasons with only 180 to 220 four-stroke snowmobiles entering through the

Park's West Entrance.  FEIS at 99-100.  During the same period, the National Institute for

Occupational Safety and Health's "recommended exposure limit" for formaldehyde was

approached with only 180 snowmobiles entering through the Park's West Entrance.  Id. at 100.

"Clearly, reducing daily snowmobile numbers w[ould] better protect park air quality."  2007

ROD at 21.

       2.      In promulgating the challenged winter use plan, the administration authorized a

doubling of the recreational snowmobile use seen within Yellowstone National Park during

recent winter seasons.  FEIS at 153; 2007 ROD at 8, 20.  The administration's plan will

---

winterusetechnicaldocuments.htm.

accordingly result in a substantial increase in the adverse environmental impacts caused by snowmobile use within the Park:

a.      With respect to Yellowstone's natural quiet, the challenged winter use plan will triple the area in which oversnow vehicles are audible during half or more of the day.  FEIS at 307.  The administration's soundscape modeling, moreover, underestimated the sound impacts of oversnow vehicles.  E.g. id. at 302.

b.      With respect to Yellowstone's wildlife, "[t]he potential for vehicle collisions with individual [animals]" under the challenged plan "w[ill] be higher … relative to … current conditions, due to … increased OSV numbers[.]"  FEIS at 269.  By increasing traffic volume in the Park, the challenged plan will further "cause increases in … wildlife displacement, behavior- or physiology-related energy costs, and the potential for adverse demographic impacts."  Id. at 270.

c.      With respect to Yellowstone's air quality, the impact of the challenged winter use plan is "more adverse compared to current use levels."  FEIS at 236.  According to the administration's own figures, the new winter use plan will, at a minimum, increase carbon monoxide emissions by 18 percent, benzene emissions by 33 percent, hydrocarbon emissions by 50 percent, formaldehyde emissions by 60 percent, and particulate matter emissions by 100 percent over current levels.  Id. at 229, 231.  These figures assume that the Park's East Entrance and Gibbon Canyon roads will be closed, though the East Entrance is to remain open when "safe" and the Gibbon Canyon closure is only a possibility that will be considered by the Park Service in five years.  2007 ROD at 6, 15-16.  Moreover,  the administration's models have understated the air impacts of oversnow vehicle operation within Yellowstone.  FEIS at 220.

Accordingly, the challenged plan is likely to result in even greater emissions increases over current levels.

3.      While providing equal access to Yellowstone, FEIS at 346, snowcoaches have environmental impacts falling far short of those stemming from the challenged winter use plan and all other alternatives providing for continued recreational snowmobiling in the Park:

a.      With respect to Yellowstone's natural quiet, the snowcoach alternative has the lowest noise impacts of any winter use plan providing for extensive motorized access to the Park. E.g., FEIS at 317.

b.      With respect to Yellowstone's wildlife, the Park Service is "not aware of any snowcoach-wildlife collisions, suggesting that trained, experienced snowcoach drivers are more effective than visitors on snowmobiles at avoiding such collisions."  FEIS at 251.  Moreover, the snowcoach alternative "would reduce the risk of vehicle-caused mortality relative to historical conditions, current conditions, and all … alternatives except [for that eliminating grooming on most roads] because overall traffic volume in the parks would decrease under [the snowcoach] alternative."  Id. at 260.  By reducing vehicle traffic in Yellowstone, the snowcoach alternative also avoids the "increases in … wildlife displacement, behavior- or physiology-related energy costs, and the potential for adverse demographic impacts" that come with increased vehicle traffic in the Park.  Id. at 260-61.

c.      With respect to Yellowstone's air quality, modern snowcoaches are "substantially cleaner" than "four-stroke snowmobiles …, especially given that snowcoaches currently carry an average of 7 times more passengers than snowmobiles."  Final Rule, 72 Fed. Reg. at 70,785. According to the administration's own figures, the snowcoach alternative considered and rejected in the FEIS and ROD would result in approximately one-fourth of the carbon monoxide

and particulate matter, one-tenth of the benzene, one-twelfth of the hydrocarbons, and one-seventeenth of the formaldehyde produced by oversnow vehicles under the challenged winter use plan.  FEIS at 229, 231.  The snowcoach alternative's "impact on air quality … would be beneficial compared to all the other alternatives, as well as current and historic levels of use."  Id. at 234.

4.       In rejecting the snowcoach alternative in favor of a winter use plan authorizing a doubling of current recreational snowmobile use within the Park, the administration failed to select the least-impacting means of access to Yellowstone.  See supra.

Respectfully submitted this 9th day of May, 2008,

<div style="margin-left:40%">

_____/s/  Sean M. Helle_____
 Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
*Greater Yellowstone Coalition et al.*

</div>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————
                                          )
GREATER YELLOWSTONE                        )
COALITION, *et al*.,                       )
                                          )
              Plaintiffs,                  )        Civ. No. 07-2111 (EGS)
                                          )
       v.                                  )
                                          )
DIRK KEMPTHORNE, *et al*.,                 )
                                          )
              Defendants.                  )
———————————————————)
                                          )
NATIONAL PARKS CONSERVATION                )
ASSOCIATION,                               )
                                          )
              Plaintiff,                   )        Civ. No. 07-2112 (EGS)
                                          )
       v.                                  )
                                          )
UNITED STATES DEPARTMENT                    )
OF THE INTERIOR, *et al*.,                  )
                                          )
              Defendants.                   )
———————————————————)


### [PROPOSED] **ORDER**

Upon consideration of the Greater Yellowstone Coalition plaintiffs' Motion for Summary

Judgment, federal defendants' and defendant-intervenors' oppositions and cross-motions for

summary judgment, and the entire record in this case, it is hereby:

ORDERED that the Greater Yellowstone Coalition plaintiffs' Motion for Summary

Judgment is granted; and it is

FURTHER ORDERED that federal defendants' and defendant-intervenors' cross-

motions for summary judgment are denied; and it is

DECLARED that federal defendants' September 24, 2007 Final Environmental Impact Statement, November 20, 2007 Record of Decision, and December 13, 2007 Final Rule violate the National Park Service Organic Act, 16 U.S.C. §§ 1, et seq.; Yellowstone's enabling legislation, 16 U.S.C. §§ 22, et seq.; the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq.; the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.; Executive Orders 11,644 and 11,989; and 36 C.F.R. § 2.18(c); and it is

ORDERED that federal defendants' September 24, 2007 Final Environmental Impact Statement, November 20, 2007 Record of Decision, and December 13, 2007 Final Rule are vacated and remanded to the National Park Service for further proceedings consistent with the Court's Opinion; and it is

FURTHER ORDERED that the National Park Service shall, no later than 30 days prior to the beginning of trail grooming activities for the 2008-2009 winter season, promulgate a short-term interim winter use plan to bring winter access into compliance with the Orders of this Court; and it is

FURTHER ORDERED that federal defendants are enjoined from implementing their November 20, 2007 Record of Decision and December 13, 2007 Final Rule.

SO ORDERED this _____ day of _____, _____.


_____
EMMET G. SULLIVAN
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
GREATER YELLOWSTONE                       )
COALITION, *et al*.,                      )
                                          )
            Plaintiffs,                   )      Civ. No. 07-2111 (EGS)
                                          )
     v.                                   )      [Hearing on Motion for Summary
                                          )       Judgment on August 27, 2008]
DIRK KEMPTHORNE, *et al*.,                )
                                          )
            Defendants.                   )
_____)
                                          )
NATIONAL PARKS CONSERVATION               )
ASSOCIATION,                              )
                                          )
            Plaintiff,                    )      Civ. No. 07-2112 (EGS)
                                          )
     v.                                   )      [Hearing on Motion for Summary
                                          )       Judgment on August 27, 2008]
UNITED STATES DEPARTMENT                  )
OF THE INTERIOR, *et al*.,                )
                                          )
            Defendants.                   )
_____)


**DECLARATION OF SEAN M. HELLE IN SUPPORT OF THE
GREATER YELLOWSTONE COALITION PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**


I, Sean M. Helle, declare pursuant to 28 U.S.C. § 1746:

       1.     I am an attorney in good standing of the bar of the District of Columbia, and I am

employed as an associate attorney with Earthjustice.  I am one of the attorneys representing the

Greater Yellowstone Coalition plaintiffs in this action.  I have personal knowledge of the facts

stated in this declaration and, if called to testify, I would testify that the facts set forth here are true and correct.

2.    Attached as **Exhibit A** is a true and correct copy of the National Park Service's 2003 Winter Use Plans Record of Decision (Mar. 25, 2003), obtained at http://www.nps.gov/yell/parkmgmt/upload/finalrod.pdf.

3.    Attached as **Exhibit B** is a true and correct copy of Appendix B of the National Park Service's 2004 Temporary Winter Use Plans Environmental Assessment (Aug. 2004), obtained at http://www.nps.gov/yell/parkmgmt/upload/tempwinteruseea8-18.pdf.

4.    Attached as **Exhibit C** is a true and correct copy of National Park Service Director's Order No. 12, obtained at http://www.nps.gov/refdesk/DOrders/DOrder12.html.

5.    Attached as **Exhibit D** is a true and correct copy of an excerpt of the National Park Service's 2003 Winter Use Plans Final Supplemental Environmental Impact Statement (Feb. 2003), obtained from the Administrative Record in <u>The Fund for Animals v. Norton</u>, Civ. No. 02-2367 (EGS).

I declare under penalty of perjury that the foregoing is true and correct.  Executed May 9, 2008 in Bozeman, Montana.

    /s/   Sean M. Helle



**National Park Service**
**U.S. Department of the Interior**

**Yellowstone and Grand Teton National Parks**
**John D. Rockefeller, Jr. Memorial Parkway**
**Wyoming, Montana, Idaho**

# Winter Use Plans
# Record of Decision

Responsible Official:

*Karen Wade*

Karen Wade
Intermountain Regional Director
National Park Service

Effective on:

*March 25, 2003*          *12 Noon MST*
Date                      Time

# RECORD OF DECISION

**Winter Use Plans – Supplemental Environmental Impact Statement**
**for Yellowstone and Grand Teton National Parks**
**and the John D. Rockefeller Jr., Memorial Parkway**

## Table of Contents

| | Page |
|---|---|
| *Part I: The Decision* | 3 |
| *Planning History* | 4 |
| 1990 Winter Use Plan | 4 |
| Multi-Agency Winter Visitor Use Assessment | 4 |
| 1997 Court Settlement - Winter Use Plans Environmental Impact Statement | 4 |
| 2001 Rule | 5 |
| 2001 Court Settlement - Winter Use Plans Supplemental Environmental Impact Statement | 5 |
| Delaying Rule | 5 |
| Purpose and Need for Action | 6 |
| Alternatives | 7 |
| Environmentally Preferred Alternative | 7 |
| *Issues or Concerns Not Addressed in the Plans/SEIS* | 8 |
| *Definitions* | 8 |
| *Actions and Assumptions Common to All Units* | 8 |
| Implementation | 8 |
| Regulation/Enforcement/Administration | 8 |
| Resource Protection | 9 |
| Visitor Use and Access | 9 |
| *Actions Specific to Yellowstone National Park* | 10 |
| *Actions Specific to Grand Teton National Park and the Parkway* | 10 |
| *Initial Daily Snowmobile Entry Limits* | 11 |
| *Monitoring and Adaptive Management* | 12 |
| *Requirement for Best Available Technology* | 14 |
| *Use of NPS Permitted Guides for Recreational Travel* | 16 |
| | |
| *Part II: Rationale for the Decision* | 17 |
| *Legal Framework* | 17 |
| Law | 17 |
| Executive Orders | 18 |
| Regulation | 18 |
| Interpretation of Policy | 19 |
| *Findings: How Environmental Issues were Considered and Addressed* | 20 |

**Record of Decision – Winter Use FSEIS and Plans for YNP, GTNP, and the Parkway**

|  | <u>Page</u> |
|---|---|
| Park Resources and Values | 20 |
| Air Quality | 21 |
| Natural Soundscapes | 22 |
| Wildlife – Elk and Bison | 22 |
| Visitor Experience | 22 |
| *Findings: Factors Other Than Environmental Consequences* | |
| *Considered in Making the Decision* | 23 |
| Safety and Access | 23 |
| Economic Impacts on Local Communities | 23 |
| *Measures Taken to Avoid Environmental Harm* | 24 |
| *Conclusion* | 24 |
| *Public Involvement* | 25 |
| *Consultation* | 25 |
| Cooperating Agencies | 25 |
| American Indian Tribes | 26 |
| State Historic Preservation Offices | 26 |
| U.S. Fish and Wildlife Service | 26 |
| *Information Contacts* | 27 |
| | |
| *Attachment A – Monitoring and Adaptive Management Program* | A-1 |
| *Attachment B – Comparison of FSEIS Alternatives* | B-1 |
| *Attachment C – Summary of Public Comment* | C-1 |
| *Attachment D - Winter Use Plan* | D-1 |

**RECORD OF DECISION**

*Winter Use Plans – Supplemental Environmental Impact Statement
for Yellowstone and Grand Teton National Parks
and the John D. Rockefeller Jr., Memorial Parkway*

# PART I: THE DECISION

This decision is made as a result of the Winter Use Plans - Final Supplemental Environmental Impact Statement (FSEIS) for Yellowstone (YNP) and Grand Teton National Parks (GTNP) and the John D. Rockefeller Jr., Memorial Parkway (the Parkway) and will guide winter use management in the three park units.  The decision is to select alternative 4, as described and evaluated in the FSEIS, with minor modifications to that alternative explained herein. Elements of the decision are given in detail below as actions and assumptions common to all three units, actions specific to Yellowstone, actions specific to Grand Teton and the Parkway, mitigation, and monitoring. The maps for alternative 4 and the description of each management zone provided in the FSEIS, while not duplicated in this Record of Decision, are features of this decision.

In order to implement the decision, the National Park Service (NPS) will propose to amend its regulations at 36 CFR 7.13 (l), 7.21 (a), and 7.22 (g). Although this decision is final for the purposes of this planning project, I may recommend modifications during the rule making process.

The selected alternative emphasizes cleaner, quieter access to the parks using the technologies commercially available today and calls for improvements in the future.

This decision addresses the full range of issues identified in the SEIS regarding safety, natural resource impacts, and visitor experience and access.  It addresses the issues in a manner that will allow snowmobile users to access the parks under very strict limitations including, but not limited to, daily snowmobile entry limits, requirements that they utilize the best technology commercially available, and requirements that snowmobiles visit Yellowstone with a properly trained guide.

All components of the plan for winter use in Yellowstone, Grand Teton and the Parkway are contained in Attachment D.

3

*Planning History*
## 1990 Winter Use Plan

In 1990 a Winter Use Plan was completed for Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller, Jr., Memorial Parkway. In 1993 a winter operations evaluation was conducted which resulted in an agreement to evaluate winter use across the Greater Yellowstone area in conjunction with the U.S. Forest Service. This effort was in response to an earlier than expected increase in winter use. The 1990 Winter Use Plan projected 143,000 visitors for the year 2000. Winter visitors to YNP and GTNP in 1992-1993 exceeded this estimate.

## Multi-Agency Winter Visitor Use Assessment

In 1994 the Greater Yellowstone Coordinating Committee (GYCC), composed of National Park Superintendents and National Forest Supervisors within the Greater Yellowstone Area (GYA), recognized the trend toward increasing winter use and identified concerns relating to that use. The GYCC chartered an interagency study team to collect information relative to these concerns and perform an analysis of winter use in the GYA. The analysis, *Winter Visitor Use Management: A Multi-Agency Assessment,* was drafted in 1997 and approved by the GYCC for final publication in 1999. The assessment identifies desired conditions for the GYA, current areas of conflict, issues and concerns, and possible ways to address them. The final document considered and incorporated many comments from the general public, interest groups, and local and state governments surrounding public lands in the GYA.

## 1997 Court Settlement - Winter Use Plans Environmental Impact Statement

Considerations embodied in the legal mandates discussed here prompted the Fund for Animals, et al., to sue the NPS in 1997. Specifically, the suit alleged the failure of the NPS to: consult with USFWS on impacts of winter use on threatened or endangered species; prepare an EIS concerning winter use; and evaluate the effects of trail grooming on wildlife and other parks' resources. While denying the allegations, the suit was resolved by a settlement agreement approved by the court in October 1997. The agreement committed the NPS to: write an EIS and determine a new winter use plan for the three park units; request formal consultation with USFWS; and evaluate the possible closure of a road segment in Yellowstone. One outcome of the 1997 settlement agreement was that the NPS evaluated the possibility of closing a winter road in Yellowstone in an Environmental Assessment completed in early 1988. The NPS decided to monitor and research bison use of groomed roads, an effort that has continued over the past six winters. In compliance with the settlement agreement the NPS released a Draft EIS (DEIS) in July 1999 and a Final EIS (FEIS) in October 2000. A Record of Decision (ROD) was signed on November 22, 2000, that included Alternative G as presented in the FEIS with modifications. The ROD called for the phase-out of snowmobiles by the winter of 2002-2003 and motorized access in the future by an NPS-managed snowcoach transportation system.

## 2001 Rule

On January 22, 2001, a final rule was published in the Federal Register implementing the ROD of November 22, 2000. The effective date of the rule was delayed until April 22, 2001. The final rule, as published, delayed the commencement of the phase-out of snowmobiles provided for in the ROD by one year, with the phase-out to commence during the winter of 2002-2003 as a result of the restrictions on NPS imposed by Congress subsequent to the ROD.

## 2001 Court Settlement - Winter Use Plans Supplemental Environmental Impact Statement

The International Snowmobile Manufacturers Association (ISMA), et al., filed suit against the Secretary of the Interior, et al., in December 2000. The suit alleged that NPS violated the Administrative Procedure Act, the National Environmental Policy Act, the National Park Service Organic Act, and other laws. The State of Wyoming intervened on behalf of ISMA, and the Greater Yellowstone Coalition, et al., intervened on behalf of the Department of the Interior and NPS. While denying the allegations, Interior and NPS agreed in a settlement that a Supplemental EIS considering new information and technology would further the purposes of NEPA.

Subsequent to the settlement, all agencies who were cooperating agencies during the earlier EIS process agreed to be cooperating agencies for the Supplemental EIS. These agencies are: the U.S. Forest Service; the States of Montana, Idaho, and Wyoming; Fremont County in Idaho; Gallatin and Park Counties in Montana; and Park and Teton Counties in Wyoming. In addition, the Environmental Protection Agency (EPA) was requested by NPS to be an additional cooperating agency in this effort, and EPA agreed.

The purpose for preparing a Supplemental EIS, as published in the Federal Register Notice of Intent, is as follows: "The preparation of a supplemental EIS is deemed necessary to further the purposes of the National Environmental Policy Act. Soliciting more public comment on the earlier decision and alternatives to it would further the purposes of the National Environmental Policy Act (NEPA). Additional information from the International Snowmobile Manufacturers Association will be considered, as well as any other new or updated information not available at the time of the earlier decision."

## Delaying Rule

On March 29, 2002, the NPS published a proposed rule in the Federal Register to generally delay for one year the phase-out of snowmobiles in the parks under the January 2001 snowmobile regulations. The additional time was needed to complete the SEIS. The final rule was published on November 18, 2002, and went into effect on December 18, 2002, providing for the phase-out of snowmobiles to be in effect for the winter of 2004-2005.[1]

---

[1] A challenge to this one year delay in the phase out of recreational snowmobile use in the parks was filed in the U.S. District Court for the District of Columbia. *Fund for Animals, et al., v. Norton, et al.,* Civ. No. 02-2367 (EGS)(D.D.C.).

**Purpose and Need for Action**

The purpose and need for action as the basis for this SEIS, in accordance with CEQ regulations (40 CFR 1502.13), is the same as that for the FEIS. Some of the information in the FEIS purpose and need section was responsive to comments received on the draft SEIS. The fundamental purpose and need for action is framed by a set of desired conditions, compared to existing conditions. The desired conditions are distilled from the large body of laws, regulations, Executive Orders, and policies that guide management of the national park system. Alternatives are different ways of addressing existing conditions and moving toward the desired state.

These bulleted statements express desired conditions or objectives for winter use management, tying directly to laws, regulations, Executive Orders, and policies:

- Visitors have a range of appropriate winter recreation opportunities from primitive to developed. Winter recreation complements the unique characteristics of each landscape within the ecosystem.

- Recreational experiences are offered in an appropriate setting; they do not take place where they will irreparably impact air quality, wildlife, cultural areas, the experiences of other park visitors, or other park values and resources.

- High quality facilities are provided in parks to support the need for safety and enhanced visitor experiences.

- Conflicts among user groups are minimal.

- Visitors know how to participate safely in winter use activities without damaging resources.

- Oversnow vehicle sound and emission levels are reduced to protect employee and public health and safety, enhance visitor experience, and protect natural resources.

Those elements of the November 2000 decision and rule are being reevaluated as a function of the new information about snowmobile technology. That earlier decision is presented as alternative 1a, no action, in the SEIS. Alternative 1b is the same in all respects to alternative 1a as far as final implementation is concerned, but it would allow another year for phase-in. The basis for alternatives 2, 3, and 4 describes how different levels and locations of snowmobile use could be accommodated. In the previous EIS, recreational use considerations and supporting facilities were limited to those considered technically possible at the time, or feasible for development and implementation. Alternatives evaluated in the Draft EIS that proposed implementation of "clean and quiet" standards were criticized during the public comment period as impractical because technology was unavailable or because NPS was alleged to have no authority to impose such measures.[2] Because of the settlement agreement, the SEIS specifically evaluates improvements in snowmobile technology as to how they may change impacts on park

---

[2] The analysis and the alternatives in the FSEIS are not vastly different than those in the Final EIS. What appears to have changed is the snowmobiling public's perception regarding new technology, or its willingness to consider its use, and industry's willingness and ability to produce it. Also, based on public comment, it appears the snowmobiling public acknowledges NPS' authority to impose these kinds of restrictions, which was not the case in the response to alternatives in the Draft EIS.

Record of Decision – Winter Use FSEIS and Plans for YNP, GTNP, and the Parkway

resources and values, such as air quality, the natural soundscape, and visitor experience. Because use limits are imposed as features of the SEIS alternatives, social and economic impacts were also reevaluated.

The decision to be made based on the analysis in the Final SEIS must consider the conclusions in the Final EIS regarding adverse impacts from existing types and levels of use and the finding in the November 2000 ROD and the January 2001 final rule that these impacts (individually and collectively) constitute impairment of park resources and values.[3] NPS stated in the proposed rule implementing the ROD that, "it would be necessary to establish very strict limitations on that use (snowmobiles) to remain consistent with the NPS Organic, the relevant Executive Orders, the NPS general snowmobile regulations, and other applicable requirements."

Director's Order 12, which provides current direction on the preparation of environmental documents, requires an assessment of impairment for each resource impact topic.

## Alternatives

Five alternatives for winter visitor use in the three park units are evaluated in the FSEIS. Three of the alternatives (alternatives 2, 3, and 4) are limited specifically to actions that allow snowmobile recreation to continue in the parks. Alternative 1a was the selected alternative in the *Record of Decision for the Winter Use Plans and Final Environmental Impact Statement for Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway* (ROD*)* as modified by the final rule published in the Federal Register on January 22, 2001. This alternative serves as the no action alternative. Alternative 1b is the same as alternative 1a, but it defers implementation for one more year. The remaining alternatives for the SEIS were formulated in response to the concern that information on new snowmobile technologies and other connected issues was not included in the original Final EIS. Consequently, alternatives 2, 3, and 4 were formulated specifically to provide an additional basis for the choice of snowmobiles as a mode of winter transportation in the parks. Alternative 4, the preferred alternative, was not included in the Draft SEIS, but has been included and analyzed in the Final SEIS. Attachment B - Table S-1 from the FSEIS summarizes the features of all alternatives.

## Environmentally Preferred Alternative

Based on reduced impacts to human health and safety, air quality, visitor access, the natural soundscape, and wildlife the NPS has identified alternative 1b as the environmentally preferred alternative. The environmentally preferred alternative only takes into account primarily environmental impacts, whereas the NPS preferred alternative takes into account a broader set of factors, including laws, regulations, and policies; socioeconomic effects; public comments; an appropriate phase-in; as well as environmental concerns.  The NPS believes that through monitoring and adaptive

---

[3] This is a matter of record. The SEIS is a <u>supplement</u> to the Final EIS per the settlement, and the context in which it is being written is the acceptance of new data, not a conclusion that the Final EIS and ROD are incorrect as alleged in the ISMA litigation.

**Record of Decision – Winter Use FSEIS and Plans for YNP, GTNP, and the Parkway**

management, the resource conditions that would have been achieved under Alternative 1b can be reached with the selective alternative.

## Issues or Concerns Not Addressed in the Plans/SEIS

The scope of analysis determines the range of alternatives to be considered.  Pages 7-8 in the Final EIS describe the scope of analysis resulting in the seven alternatives evaluated in that document. The analysis in the FSEIS is more limited in scope than that in the FEIS, focusing primarily on the impact of snowmobile use that would continue under essentially four differing alternatives. Existing condition is described as the current decision. Because the settlement agreement was fundamentally predicated on "furthering the purposes of NEPA," and considering new information about snowmobile technology that was unavailable at the time of the Final EIS and ROD, only those alternative elements having to do with snowmobile and snowcoach use were evaluated.  All components of the Winter Use Plan for YNP, GTNP, and the Parkway are listed in Attachment D.

## Definitions

Refer to Glossary, Page 295 in the FSEIS

## Actions and Assumptions Common to All Units

**Implementation**

- Unless otherwise noted, the parks will implement all actions identified by alternative 4 of the Final SEIS the winter following the Record of Decision (ROD) for the winter use plans.  Actions requiring a change in regulations will be implemented once the new regulations are effective.

- In the development of various implementation details the NPS will coordinate and consult with gateway communities, concessioners, and winter permittees.

- NPS will coordinate with gateway communities, concessioners and winter permittees, and state tourism programs on a new marketing strategy designed to facilitate winter visitation.

- For the winters of 2003-2004 and 2004-2005, implement initial daily snowmobile entry limits. These daily entry limits will remain in effect in perpetuity unless changed by the superintendents.  Changes to the daily entry limits will be made with appropriate public notice in accordance with 36 CFR  1.7.

**Regulation/Enforcement/Administration**

- None of the actions preclude road or other closures for safety, resource protection, or other reasons as identified in 36 CFR 1.5 or 2.18.

- Require new oversnow vehicles purchased by the parks to conform to the best available technology requirements, and that other vehicles are retrofitted whenever

possible with new technologies designed to lower sound and emission levels. Given the need for pursuit and off-road search and rescue use, vehicles used for law enforcement or emergency purposes could be exempt from BAT requirements.

- Increase the field presence of park employees during the first two years under the new plan to monitor, anticipate, detect, and mitigate impacts to park resources and values and to increase visitor safety.

**Resource Protection**

- Implement a comprehensive monitoring program building on previous scientific studies and monitoring regarding winter visitor use and park resources.  Revise daily limits, modify best available technology (BAT) requirements, increase the percent of commercially-guided daily entries, close selected areas of the park, including sections of roads, to visitor use if monitoring indicates that human presence or activities have a detrimental effect on wildlife populations or other park resources or values that could not otherwise be mitigated.  The appropriate level of environmental assessment under NEPA will be completed for all actions as required by CEQ regulations (40 CFR parts 1500-1508).

- Notice will ordinarily be given by July 1 before any closure or new requirements are implemented for future winter seasons unless immediate action is deemed necessary to avoid impairment of park resources or to protect public safety.

**Visitor Use and Access**

- NPS will determine visitor use capacities based on studies that set indicators and thresholds for desired visitor experiences and resource conditions.  The NPS will monitor indicators to maintain the conditions for each management prescription.  If necessary, techniques such as reservations, permits, and differential fees will be implemented (see Final SEIS Zone Descriptions as presented in Table 8).

- Backcountry non-motorized use will continue to be allowed throughout the parks except where designated otherwise for resource protection purposes (shown as Area of Designated Trail Use or Zone 11 on Figures 8 and 14 in the Final EIS).

- Other means of oversnow travel not foreseen in this Record of Decision must be specifically approved by the park superintendents.

- Oversnow vehicles must comply with appropriate BAT requirements.

- Prohibit recreational motorized oversnow travel from 9 P.M. to 7 A.M. unless specifically authorized.  This was the nighttime closure that was implemented during the 2002-2003 winter season and was successful at improving visitor safety while reducing conflicts with wildlife.

- Continue with and improve the information program on snow and trail conditions, points of interest, and available recreational opportunities.  Through partnerships, establish park visitor contact opportunities in gateway communities and utilize state tourism programs.

- Implement a reservation system through a third party to manage the daily entries that are non-commercially guided. This reservation system would potentially allow for re-allocation from non-commercial to commercial allocations, if the non-commercial entries are not fully utilized on a given day.  However, unused commercially guided entries would not be reallocated for non-commercial use. The reservation system would be in place for the winter of 2003-2004, and all visitors to YNP wishing to snowmobile would need reservations.
- Complete the concession contracting process prior to the beginning of the 2003-2004 winter season for commercially-guided snowmobile entries.
- Develop a non-commercial guide training and certification program to be implemented the winter season of 2004-2005. Such training may be available as an option in 2003-2004, and would be mandatory in subsequent winters.

## Actions Specific to Yellowstone National Park

- Continue allowing personal non-recreational use of snowmobiles by employees and their families living in the interior of Yellowstone.  This use will not count against daily entry limits. Subject to available funding, provide administrative snowmobiles and snowcoaches for their use and encourage them to replace personally owned snowmobiles with ones that meet BAT requirements.

- Allow on a limited basis as administrative use, snowmobiles by concessioners to support their operation.  Require best available technologies (through permit and contracts) and encourage the use of snowcoaches.

- With one exception, those roads that were restricted to snowcoach-only motorized travel in the winter of 2002-2003 will remain as snowcoach-only unless modified by the superintendent in accordance with the adaptive management provisions of this decision. The Lake Butte Road would be open to snowmobiles beginning in the winter of 2003. I am permitting snowmobile travel along this side road only because its closure to snowmobiles does not achieve a spatial separation of snowcoach and snowmobile users.  There currently are no snowcoaches operating along the East Entrance-Fishing Bridge road segment or on the Lake Butte side road.  In addition, this side road differs from others because it is only approximately one mile long and provides access to one specific scenic point, as opposed to a "thru" route paralleling main roads.

## Actions Specific to Grand Teton National Park and the Parkway

- Snowplanes will continue to be prohibited in accordance with 36 CFR 7.22. For the purpose of winter fishing, limited snowmobile use on Jackson Lake's frozen surface will be permitted in accordance with the daily limits identified in Table 1 of this ROD. Only snowmobiles that meet the best available technology and other requirements will be permitted access.  Maximum speed will be limited to 25 miles per hour and access will be permitted from Colter Bay and Signal Mountain only. Those using the lake surface must have in their possession a valid Wyoming fishing license, fishing equipment, and may only travel directly to and from a fishing area.

Other recreational snowmobile use on Jackson Lake will be prohibited. Jackson Lake could have motorized and non-motorized zones to provide spatial separation of users. I am permitting snowmobile use on Jackson Lake with strict limitations to allow for a continuation of the long-standing practice of winter ice fishing in cooperation with the State of Wyoming Department of Game and Fish.

- Phase-in administrative snowmobile types that meet the best available technology requirements.  Administrative use of snowmobiles in Grand Teton is limited to law enforcement, utility and maintenance access, permitted scientific studies, search and rescue or other use as approved by the superintendent.[4]

- In GTNP and the Parkway, BAT requirements would apply to all snowmobiles on the Continental Divide Snowmobile Trail (CDST).  BAT requirements would also apply to all snowmobiles originating at Flagg Ranch and traveling west on the Grassy Lake Road.  Snowmobiles originating in the Targhee National Forest and traveling eastbound on the Grassy Lake Road would not be required to be BAT because it is not necessary due to the low volume of use and the fact that most use originates on the Targhee National Forest and the majority of that use does not travel beyond Flagg Ranch. Resulting impacts on park resources and values including wildlife and visitor experience are negligible. However, these snowmobiles may not travel further than Flagg Ranch.  These requirements would be effective beginning with the winter season of 2004-2005. I am not requiring eastbound snowmobile travel on the Grassy Lake Road to meet BAT requirements so as to allow snowmobile use that originates in the Targhee National Forest the opportunity to utilize the facilities at Flagg Ranch Resort for visitor safety and comfort.

*Initial Daily Snowmobile Entry Limits*

Implementation of these limits is to ensure that use is strictly limited and the level of impact associated with peak use is dramatically reduced. The limits will ensure use does not exceed the current average use through the West Entrance, but allow for modest increases at the other entrances and road segments, and the level of impact associated with it. Historically, use has fluctuated daily, increasing especially during certain holiday periods. Use limits should act to regulate such fluctuations and visitation and therefore lessen subsequent impacts. Use limits identified in Table 1 include the guide and their snowmobile; thus, both commercial and non-commercial guides are counted towards fulfilling the daily entry limits.  Based on the use of cleaner and quieter snowmobiles required by this ROD utilizing BAT and concerns for safety and wildlife impacts, during the winters of 2003-2004 and 2004-2005 limits will be as follows:

---

[4] EO 11644, sections (3) and (4)

Record of Decision – Winter Use FSEIS and Plans for YNP, GTNP, and the Parkway

**Table 1.  Initial daily limits on recreational snowmobile use for Yellowstone/Grand Teton/Parkway entrances and road segments**

| Entrance or Road Segment | Daily Limit for Commercially Guided Snowmobile Use | Daily Limit for Non-Commercially Guided Snowmobile Use | Total |
|---|---|---|---|
| North Entrance | 40 | 10 | 50 |
| East Entrance | 80 | 20 | 100 |
| West Entrance | 440 | 110 | 550 |
| South Entrance | 200 | 50 | 250 |
| Grassy Lake Road | N/A | N/A | 75* |
| Continental Divide Snowmobile Trail | N/A | N/A | 75* |
| Jackson Lake | N/A | N/A | 40* |

\* Given the unique aspects of travel on these road segments and Jackson Lake, the users are not required to be accompanied by a guide. Guiding is not required due to the low volume of use, the conditions for access to the lake for winter fishing, the through road characteristics of the CDST, as well as the inter-agency jurisdiction on the Grassy Lake Road.  With respect to the Grassy Lake Road and the CDST, impacts on park resources and values are negligible.

- Initially, visitors who enter Yellowstone through one entrance, exit the park at another entrance in order to spend that night out of the park, and then re-enter on the following day will not be counted towards the daily entry limits on the following day. Also, visitors spending the night in Yellowstone such as at Old Faithful or Canyon would only count towards the daily entry limit on the day they initially enter the park.

- Initially, snowmobiles rented at Old Faithful by an authorized concessioner will not count against daily entry limits. Both of these provisions may be modified through adaptive management.

## Monitoring and Adaptive Management

In order to assess the long-term effects of management actions on park resources and values, resource inventory, monitoring, and adaptive management are incorporated into this decision. The key resources and values potentially impacted by winter recreation use in the three park units are air quality, wildlife, sound, water resources, safety, and visitor experience.

An adaptive management plan is different from a monitoring plan in that it allows park managers to act when information exists about a specific resource but conclusive data is currently unavailable.  The first step in adaptive management is to develop and implement a management scenario based on the best available information.  The next step is to implement an evaluation program to assess the success of the management scenario relative to defined resource thresholds.  This evaluation is critical within the framework of adaptive management because of the uncertain results of the initial predictions.

Managers then review the results of the evaluation program and may adjust activities or use limits to mitigate unplanned or undesirable outcomes. For example, if the visitor limits set for a park entrance have a greater or lesser effect on resource thresholds than predicted, then the number of snowmobiles allowed to enter the parks could be raised or lowered accordingly. Further discussion on the adaptive management process may be found in Appendix I of the Final EIS.

Monitoring is also a component of this decision. General resource monitoring applies when adequate information exists to make informed management decisions based on discrete and accepted thresholds. It is the process of collecting information to evaluate whether or not the objectives of a management plan are being realized.

Attachment A outlines specific indicators, thresholds, and potential management actions for monitoring these resources and values. The indicators will be monitored to ensure protection of natural resources and park values and evaluate management success.

Monitoring programs will be coordinated between Yellowstone and Grand Teton National Parks. The programs will function and be coordinated through the resource management staffs of both parks. Annual plans and reports will be developed through the resource management staffs. Actual monitoring responsibilities for park personnel will be assigned through annual plans.

Monitoring programs will be conducted on a sampling basis for the purpose of effective use of funds and personnel. It is expected that initial monitoring will be intensive, both in geographic and temporal extent, so that correlations can be made and results can be extrapolated. It is also expected that monitoring over time will become less intensive and arrive at a low intensity, maintenance level. Sampling schedules may vary from year to year, focusing on different areas within the park units.  The parks will report the results of monitoring programs annually to the public.

If there is insufficient funding to fully implement monitoring and adaptive management programs, the management options identified in Attachment A are available to park managers to protect park resources.

If monitoring or adaptive management lead park managers to take management actions (such as changing the daily entry limits, altering the commercial:non-commercial guide ratio, revising BAT requirements, etc.), the superintendents will provide appropriate public notice in accordance with 36 CFR 1.7.  Implementation of these actions could require changes to the superintendent's compendium. To provide the public with sufficient notice, changes to the superintendent's compendium would ordinarily be made by July 1 and implemented in a future winter season.  Generally, the parks would not initiate formal rulemaking and publish in the Federal Register to effect changes in winter use management.

## *Requirement for Best Available Technology*

The NPS Organic Act (16 USC 1,3) authorizes the Secretary of the Interior to make such rules as are necessary to "conserve the scenery and the natural and historic objects and the wildlife" of national parks. The BAT approach is not a restriction on what manufacturers may produce but an end-use restriction on which commercially produced snowmobiles and snowcoaches may be used in the parks. This exercise of the NPS Organic Act authority is not an effort by the NPS to regulate manufacturers and is consistent with Sec. 310 of the Clean Air Act, which preserves the authority of other federal agencies.

In recent years, some snowmobile manufacturers have made significant improvements at reducing air and noise emissions in some snowmobile models. To date, the 2002 Arctic Cat 4-Stroke Touring and the 2002 Polaris Frontier four-stroke represent the cleanest and quietest production snowmobiles that have been tested. These snowmobiles are capable of reducing hydrocarbon emissions by 95-98% and carbon monoxide by 85%, as compared to a standard two-stroke snowmobile. In addition, four-stroke snowmobiles typically perform at sound levels below 73 dB as measured on the A-weighted scale, as compared to two-stroke snowmobiles which typically perform at 75-80 dB(A). Four-stroke snowmobiles also produce more even frequency spectra and are less audible over a distance, relative to two-stroke snowmobiles.

Therefore, to mitigate impacts to air quality and the natural soundscape, NPS is requiring that recreational snowmobiles entering the parks be Best Available Technology (BAT). Initially, BAT would be set as any snowmobile commercially available that can achieve a 90% reduction in hydrocarbons and a 70% reduction in carbon monoxide from EPA's baseline assumptions for uncontrolled snowmobiles as published in the Federal Register on November 8, 2002. Thus, any recreational snowmobile entering YNP must achieve emissions below 15 g/kW-hr for hydrocarbons and 120 g/kW-hr for carbon monoxide. Snowmobiles must be tested on a 5-mode engine dynamometer with all test data provided to the NPS for review.

Snowmobiles would also be required to operate at or below 73 dB(A), as measured at full throttle according to Society of Automotive Engineers (SAE) J192 test procedures. The SAE J192 test protocol is at full throttle but does not require the snowmobile being tested to be a specific speed. The equipment that measures sound levels is 50 feet from where the snowmobile passes by and has traveled down a 150 foot track. The initial BAT requirement for sound was established by reviewing individual machine results from side-by-side testing performed by the NPS' contractor, Harris Miller Miller & Hanson Inc. (HMMH) and the State of Wyoming's contractor, Jackson Hole Scientific Investigations, Inc (JHSI). These separate reports independently concluded that the six four-stroke snowmobiles tested between 69.6 and 77.0 dB(A) using the J192 protocol. On average, the HMMH and JHSI studies measured 4-strokes at 73.1 and 72.8 dB(A) at full throttle, respectively. When these tests were performed on the 4-stroke snowmobiles, they were moving past the test equipment at between 26 and 28 miles per hour (at full

Record of Decision – Winter Use FSEIS and Plans for YNP, GTNP, and the Parkway

throttle). The SAE J192 test also allows for a tolerance of 2 dB(A) over the sound limit to account for variations in weather, snow conditions, and other factors. It would be the responsibility of the snowmobile manufacturers and/or guides and outfitters to demonstrate snowmobiles which are compliant with BAT requirements.

For non-historic snowcoaches, BAT air emissions would be the same as those for snowmobiles: 15 g/kW-hr for hydrocarbons and 120 g/kW-hr for carbon monoxide by the winter of 2005-2006.  For sound emissions, snowcoaches would be required to operate at or below 75 dB by the winter of 2008-2009 as measured at 25 mph on the A-weighted scale at 50 feet. Historic snowcoaches (defined as a Bombardier snowcoach manufactured in 1983 or earlier) would initially be exempt from air and sound requirements; however, NPS would work with snowcoach owners to retrofit historic snowcoaches to meet BAT requirements. Because of the relatively few Bombardier snowcoaches currently operating (about 29), the NPS believes it is reasonable and prudent to work with outfitters and concessioners to determine how best to upgrade their equipment.

It is the goal of the NPS that these be considered initial thresholds. The NPS fully expects, and industry has stated that, technological improvements will continue and that snowmobiles entering the parks will be even cleaner and quieter than the machines evaluated for the SEIS.  NPS plans to work cooperatively with manufacturers and guides and outfitters in preparing and publishing annually a list of snowmobile makes, models, and year of manufacturer that meet BAT requirements. Each model of snowmobile would be certified for entry into the parks for six years after the time it was published on the list. Individual snowmobiles modified in such a way as to increase sound and air emissions of HC and CO would be denied entry to the parks. At this time, NPS has sufficient test data on the 2002 Arctic Cat 4-Stroke and the 2002 Polaris Frontier to determine that they meet BAT requirements established in this ROD.[5]  No other models of snowmobiles would be allowed into the parks unless they were subjected to the testing described above and met BAT requirements. It would be the responsibility of the end users (guides and outfitters, or private riders) to ensure that their snowmobiles met the BAT requirements.

All commercially guided snowmobiles entering YNP beginning with the winter season of 2003-2004 would be required to be BAT.  Beginning with the winter season of 2004-2005, all snowmobiles would be required to be BAT.

All commercially guided snowmobiles entering GTNP and the Parkway beginning with the winter season of 2003-2004 would be required to be BAT. Beginning with the winter season of 2004-2005, all snowmobiles would be required to be BAT.  Snowmobiles originating in the Targhee National Forest and travelling on the Grassy Lake Road into the Parkway would not be required to be BAT; however, these snowmobiles could not travel further than Flagg Ranch.

---

[5] At this time the NPS has not received test data on 2003 and 2004 snowmobiles. Once this information has been received a determination will be make with regard to BAT requirements.

Under the adaptive management framework, BAT requirements could be adjusted annually to protect park resources and values, including air quality, natural soundscapes, wildlife, visitor experience, and employee health and visitor safety.  Based on technology improvements in the past few years, the NPS expects that snowmobile technology will continue to improve, reducing sound and air emissions. In the future, other testing methods than those presented here, could be approved by NPS on a case-by-case basis. NPS would initially certify makes, models, and year of manufacture as opposed to individual machines for entry.

## *Use of NPS Permitted Guides for Recreational Travel*

To mitigate impacts to wildlife, visitors, employees, and safety, all recreational snowmobiles operated in Yellowstone National Park would be required to be accompanied by a trained guide.  Eighty percent of the daily limit on snowmobile entries through each entrance would be allocated for commercially guided tours under concessions contracts similar to those currently operating in the parks.  Commercial guides would be required to be educated in safety, interpretive skills, and appropriate actions for minimizing impacts to resources and other visitors.  The remaining 20 percent of snowmobile entries will be available for non-commercially guided trips that require a member of the group to be certified by NPS as qualified to lead a group of snowmobilers. Non-commercial guides would undergo a training program approved by NPS that would address park rules, safety considerations, and appropriate actions to minimize impacts to wildlife and other park resources.  Guided groups may contain from 2 to 11 snowmobiles, including the guide's machine.

Beginning with the winter season of 2003-2004, eighty percent of daily snowmobile entries through each Yellowstone entrance would be required to be accompanied by a commercial guide.  The remaining twenty-percent would be available for individuals with no guiding requirement for the 2003-2004 winter season only. Beginning with the winter season of 2004-2005, all of the daily snowmobile entries reserved for non-commercially guided parties would be required to be accompanied by a non-commercial guide who had completed the NPS-approved training program.  This delay in the implementation of the non-commercial guiding requirement for one season is to allow sufficient time for the NPS to work with states, counties, and other partners to develop a comprehensive non-commercial guide training program.

In the Parkway, all snowmobile parties traveling north of Flagg Ranch would be required to be accompanied by a guide, with the same ratio and phase in as described above for YNP. Our experience is that such snowmobilers do travel to YNP and this will avoid problems resulting from unguided parties arriving at the South Entrance of YNP. All other snowmobilers in Grand Teton and the Parkway would not be required to be accompanied by a guide.  Guiding is not required due to the low volume of use, the conditions for access to Jackson Lake for winter fishing, the through road characteristics of the CDST, as well as the inter-agency jurisdiction on the Grassy Lake Road.  With

respect to the Grassy Lake Road and the CDST, impacts on park resources and values are negligible.

Under the adaptive management framework, guiding requirements, including the commercial/non-commercial guide ratio and any training requirements for members of non-commercially guided parties could be adjusted annually to protect park resources and values, including air quality, natural soundscapes, wildlife, visitor experience, and employee health and visitor safety.

Non-commercial guides may not provide guiding services for a fee or compensation.

## PART II: RATIONALE FOR THE DECISION

This section provides the rationale for selecting Final SEIS alternative 4, as modified, as the decision and the basis for winter use plans in the three park units. In arriving at this decision, I have considered the detailed analysis of effects in the Final SEIS for a range of alternative plans that would govern winter use. I have considered how each alternative responds to the purpose and need for action to improve existing conditions in the parks and move them toward a desired condition that is implicit in NPS mandates. In doing so, I considered the impacts for each alternative program and considered them for their affirmative direction for protecting park resources and values, and their enjoyment by future generations, from adverse impacts or impairment. I also considered the degree to which each alternative would enhance the condition of resources or values and the enjoyment thereof. Other considerations include socioeconomic impacts, effects on lands adjacent to the three parks, the plans or desires articulated by local communities and nonfederal governments, and the full body of public comments on the draft SEIS. All these considerations are presented below as they contribute to the decision.

The fundamental basis for the decision is the direction provided in laws, regulations, executive orders, and policies that relate to human uses of the parks and their effect on park resources and values. This basis is overlain by the analysis of effects on park resources and values disclosed in the FSEIS. Then, conclusions or findings are made about the alternatives and their effects in relation to the key mandates regarding adverse impacts and impairment. Other considerations are incorporated into the discussion.

## *Legal Framework*

### Law

The fundamental purpose of the national park system established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve park resources and values. This mandate is independent of the separate prohibition on impairment and is always applicable, with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired.

Record of Decision – Winter Use FSEIS and Plans for YNP, GTNP, and the Parkway

NPS managers must always seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values. The laws give the NPS the discretion to allow some impacts to park resources and values when appropriate and necessary to fulfill the purposes of a park as long as that impact does not constitute impairment.

The Park Service mandate includes providing for the enjoyment of park resources and values by present and future generations. NPS policies acknowledge that providing opportunities for public enjoyment is a fundamental part of the NPS mission. While the policies permit recreation and other activities, including NPS management activities, they may be allowed only when they will not cause an impairment or derogation of a park's resources, values or purposes. Recognizing that the enjoyment of the national parks by future generations can be assured only if the quality of park resources and values is left unimpaired, Congress has provided that when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be the primary concern.[6]

## Executive Orders
Areas and trails for off-road vehicle use shall be located in areas of the National Park System only if the agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic and scenic values. Use will be controlled or directed to protect the resources, promote safety, and minimize conflicts among various users of those lands. Also, the agency head shall monitor the effects of such use that may be authorized, and upon that information they shall from time to time amend or rescind designations, or take other actions to eliminate adverse impacts.[7] If the agency determines that the use of off-road vehicles (including snowmobiles) will cause or is causing considerable adverse effects on the soil, vegetation, wildlife, and wildlife habitat, such areas shall immediately be closed to that use.[8]

## Regulation
NPS regulations implementing the foregoing Executive Orders specifically provide that snowmobiling may be allowed only where it is consistent with the park's natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources. NPS regulations generally limit snowmobile use to designated routes and water surfaces used by motor vehicles and motor boats during other seasons.[9] Specifically in YNP snowmobiles are confined to park roads open to automobiles and other vehicles during other times of the year. In GTNP and the Parkway snowmobiles are confined to road corridors and the frozen surface of Jackson Lake open to motorized use during other times of the year.

---

[6] The Redwood Act of March 27, 1978 (P.L. 95-250) serves as the basis for any judicial resolution of competing private and public values and interests in the national park system, and affirms the primary consideration of conserving, unimpaired, park resources and values.
[7] EO 11644, Use of Off-Road Vehicles on Public Lands, Federal Register, Vol 37, No. 27-Wed.February 9, 1972.
[8] EO 11989, Off Road Vehicles on Public Lands, Federal Register, Vol 42, No: 101-Wed.May 23, 1977.
[9] 36 CFR 2.18 Snowmobiles.

**Interpretation of Policy**

Impairment is an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Impairment may occur from visitor use or park management activities.[10]

NPS Management Policies 2001 define the terms "resources and values" as the park's scenery, natural and historic objects, and wildlife, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and that continue to act upon it; scenic features; natural visibility (both in daytime and at night); natural landscapes; natural soundscapes[11] and odors; water and air resources; soil; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals. The park's resources and values also include the opportunity for enjoyment of these resources, to the extent that can be done without impairing them. The term also includes the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park and any additional specific purposes for which a park was established. An impact is more likely to constitute an impairment to the extent that it affects a resource or value whose conservation is:

- necessary to fulfill specific purposes identified in the establishing legislation;
- key to the cultural or natural integrity of the park or opportunities to enjoy the park; or
- identified as a goal or critical resource in relevant NPS planning documents.

The 2001 NPS Management Policies state that the National Park Service will seek to perpetuate the best possible air quality in parks because clean air is critical to visitor enjoyment, human health, scenic vistas, and the preservation of natural systems and cultural resources. The policies also recognize that many natural resources, including water and wildlife, are sensitive to air pollution. Additionally, NPS must err on the side of protecting air quality and related values for future generations if there is doubt as to the impacts on park resources of existing or potential air pollution.[12] NPS also has recognized that it must preserve the natural quiet and the natural sounds associated with the physical and biological resources of the parks. Managers must monitor sounds and take actions to prevent or minimize unnatural sounds that adversely affect park resources or values and visitors' enjoyment of them.

---

[10] 2001 NPS Management Policies
[11] NPS Director's Order #47 articulates operational policies requiring the protection, maintenance or restoration of the natural soundscape resource in a condition unimpaired by inappropriate noise sources. Inappropriate noise is that generated by activities at a level described as excessive, which impacts the park's natural soundscapes and jeopardizes the natural resources or the purposes for which the park was created.
[12] 2001 NPS Management Policies, Chapter 4

The 2001 NPS Management Policies[13] also recognize that the NPS Organic Act directs the agency to provide for the public enjoyment of parks while leaving resources unimpaired for future generations.  The policies mandate that the use of parks will be resource-based and non-consumptive of resources. To the extent practicable, the NPS will encourage people to come to the parks and to pursue inspirational, educational, and recreational activities related to the resources found in the parks.  NPS must manage visitor use and, as necessary, regulate the amount and kind, and the time and place, of visitor activities.

Finally, the 2001 Management Policies[14] state that the NPS must encourage recreational activities that are consistent with applicable legislation, that promote visitor enjoyment of park resources through a direct association or relation to those resources so long as those uses are consistent with the protection of the resources and are compatible with other visitor uses. NPS must manage recreational use to protect park resources, provide for public enjoyment, promote public safety, and minimize conflicts with other visitor activities and park uses. Unless the activity is required by statute, NPS will not allow a recreational activity in a park if it would involve or result in:

- inconsistency with the park's enabling legislation or proclamation, or derogation of the values or purposes for which the park was established;
- unacceptable impacts on visitor enjoyment due to interference or conflict with other visitor use activities;
- consumptive use of park resources;
- unacceptable impacts on park resources or natural processes;
- unacceptable levels of danger to the welfare or safety of the public, including participants.

Public use of a park is an important reason for creating and sustaining the national park system.  In developing the Winter Use Plan and Environmental Impact Statement, the goal of the parks was to provide for a winter use experience to a wide range of people. Given the mandate of the Organic Act, to preserve and provide for public enjoyment, some level of adverse impact from visitor use during the winter is acceptable, if the parks mitigate the impacts to the greatest extent practicable.  Should future monitoring disclose that the impacts are too much for the resources to sustain, additional restrictions will be implemented.

## Findings: How Environmental Consequences Were Considered and Addressed

### Park Resources and Values

As determined in the November 22, 2000, ROD, the use of snowmobiles at past levels and older technology harmed the integrity of the resources and values of these three

---

[13] 2001 NPS Management Policies, Chapters 1 and 8
[14] 2001 NPS Management Policies, Chapter 8

parks, and so constituted an impairment of the resources and values, which was not permissible under the NPS Organic Act. In YNP, the impairment was the result of the impacts from snowmobile use on air quality, wildlife, the natural soundscape, and opportunities for enjoyment of the park by visitors. In GTNP, the impairment was the result of the impacts from snowmobile and snowplane use on the natural soundscape and opportunities for enjoyment of the park by visitors. In the Parkway, the impairment was the result of impacts from snowmobile use on air quality, the natural soundscape, and opportunities for enjoyment of the park.

Under the NPS Organic Act, the NPS may not allow the impairment of park resources and values, and when there is impairment, the NPS must eliminate it. The combination of actions provided for in this Record of Decision will eliminate any remaining impairment in YNP, GTNP, and the Parkway beginning the winter of 2003-2004. Impairment of the soundscape and visitor enjoyment in GTNP due to snowplanes was eliminated after the winter of 2001-2002 due to the prohibition of snowplanes on Jackson Lake and snowmobiles on the Teton Park Road after the winter of 2001-2002.

Snowmobile use for official administrative or emergency purposes in the three park units is specifically allowed under the regulations and executive orders cited herein. Incidental amounts of snowmobile use in GTNP for purposes of winter access to private lands within the park or to adjacent public lands is consistent with the access provisions of the park's establishing legislation.[15] These are not recreational uses, per se, and were not the subject of analysis in the FSEIS.

**Air Quality**
At the time of the Decision of November 22, 2000, there were no current means of mitigation that would assure the impacts to air quality resulting from unregulated recreational snowmobile use could be reduced, predictably and soon, to a level that would not generally impair these resources and values. Cleaner snowmobiles were not commercially available at that time, and mass production of such machines was not imminent. Today, this situation has changed dramatically. Four-stroke snowmobiles are substantially cleaner than standard two-stroke machines, being capable of reducing hydrocarbon emissions by 95% and carbon monoxide emissions by 85%. As the industry has promised, I expect snowmobile technology to continue to improve, which will further reduce adverse impacts to air quality. This decision generally requires that snowmobiles entering the parks for recreational use be best available technology, and it also sets daily entry limits on the number of recreational snowmobiles that may enter the parks. Given these requirements, the adverse impacts and impairment resulting from the current condition will be sufficiently remedied. The NPS will ensure that impairment and unacceptable impacts do not occur through the adaptive management and monitoring process identified in this decision. The preliminary air quality thresholds were established based on the least environmentally damaging environmental conditions achievable under any of the SEIS alternatives. Should these thresholds be exceeded, park managers will undertake mitigating management actions.

---

[15] EO 11644, sections (3) and (4), and 16 USC 406d-2(a).

**Natural Soundscapes**

Also at the time of the decision of November 22, 2000, there were no quieter snowmobiles commercially available.  Today, testing data indicates that the four-stroke snowmobiles developed by Arctic Cat and Polaris are quieter than standard two-stroke machines.  These snowmobiles were tested at  approximately 73 dB(A) whereas a two-stroke was tested at nearly 79 dB(A).  Because sound is measured on a logarithmic scale a difference between 79 dB(A) and 73 dB(A) is considered significant. Snowmobiles entering the parks will be required to be best available technology, and I expect snowmobile manufacturers to continuously improve technology, thereby further reducing the audibility of snowmobiles.  Additionally, the daily entry limits will substantially reduce the number of snowmobiles present in the park, especially on peak use days, consequently reducing impacts to the soundscape.  Together, these requirements will eliminate the impairment to the natural soundscape in the parks.  Through the adaptive management and monitoring provisions of this decision, NPS will monitor the soundscape to ensure that unacceptable impacts or impairment are not occurring, and take corrective actions if unacceptable conditions arise.

**Wildlife – Elk and Bison**

Winter is the most difficult time of year for most wildlife, including elk and bison.  The Final EIS and the Supplemental EIS have documented significant environmental impacts resulting from the previous use of snowmobiles in Yellowstone National Park.  Under current management, these impacts are impairing wildlife and are inconsistent with relevant laws, executive orders, and NPS' own regulations.  This decision sets strict limitations on snowmobiles which will eliminate impairment and mitigate impacts.  All snowmobilers in Yellowstone will be accompanied by a guide, who has been trained in appropriate techniques to minimize impacts to wildlife.  Eighty-percent of the daily entries will be with commercial-guides, who will in general have even more training, experience, and expertise in dealing with wildlife encounters along roadways, as compared to non-commercial guides.  In addition, this decision sets daily snowmobile entry limits, which will significantly reduce the number of overall snowmobile-wildlife encounters along roadways.  This decision requires that all snowmobilers travel in groups of 2-11 snowmobiles.  This action will further reduce the overall number of snowmobile-wildlife encounters.  Under the adaptive management and monitoring provisions of this decision, NPS will monitor wildlife populations and take corrective actions if unacceptable impacts occur.

**Visitor Experience**

Because of the requirements of this decision, including best available technology, daily entry limits, and guides, the opportunity to enjoy the resources and values of the parks will be restored.  In the past, the opportunity to enjoy park resources and values has been impaired for some visitors due to the impacts of essentially unmanaged snowmobile use.  In the future, if snowmobiles would have been eliminated, some visitors would be impacted because of the loss of the opportunity to visit the parks on a snowmobile.  Visitor experience in the parks will be monitored and adjustments made in the program

when necessary as part of adaptive management.  By allowing snowmobile use to continue in the parks, albeit through strict limitations, NPS is preserving the fundamental opportunity for snowmobilers to have a range of choices and experiences and enjoy the resources and values of these parks.

## Findings: Factors Other Than Environmental Consequences Considered in Making the Decision

### Safety and Access

Safety issues are related to access issues. Modes of access and volumes of traffic are primary factors in maintaining a safe experience for visitors. Potentially unsafe conditions can be improved, as proposed in several alternatives, by separating different uses and modes of transport, by eliminating wheeled vehicle use in places, and by eliminating large volumes of oversnow motorized use especially where ungulates use groomed surfaces. Safety would be most improved where a number of these measures are combined, as in all Final SEIS alternatives. All of the alternatives hypothesize impacts on the basis of motorized oversnow access at various use levels. However, there are different mixes of snowcoach and snowmobile use distributed differently through the range of alternatives. In some areas, snowmobiles operate on groomed trails in the same locale as non-motorized visitors, wheeled vehicles and large ungulates. Therefore, there is some risk that continued snowmobile use would continue to result in accidents.  The selected alternative eliminates the source of most safety concerns due to placing daily entry limits, requiring guides in YNP, and eliminating night-time travel.

### Economic Impacts on Local Communities

The impacts of any alternative on economies beyond the gateway communities are negligible. West Yellowstone is most affected through the range of alternatives because that community is most directly tied to access via snowmobile. Not coincidentally, the West Entrance to Old Faithful road segment is the most adversely impacted oversnow route in the three-unit area. Ranking economic impacts, alternatives 1a and 1b would have the greatest impact of those evaluated in the Final SEIS compared to the existing economic outputs in the 3-state region, the 5-county area, and on West Yellowstone, Montana.  None of the FSEIS alternatives would have more than negligible impacts on the other GYA gateway communities. This analysis indicates that these impacts are short term. Compared to current output levels for each of the economic analysis areas, all of the FSEIS alternatives produce less than a 1% decline in both jobs and dollars, except in West Yellowstone, where the percent change in output ranges from –2.3 to –8.5 percent, depending on the alternative.

Potentially affected states and counties were involved as cooperating agencies in the preparation of this SEIS (see pages 16-18 in the FEIS). Through the process, these entities identified no issues concerning conflicts with any land use plans, policies or controls that may exist. Any such impacts are inferred in the analysis (FSEIS pages 246-

251).  They are concerned that the decision would significantly impact local economies by drastically reducing snowmobile use and visitation to the area.

## *Measures Taken to Avoid Environmental Harm*

To prevent impairment to park resources and values, alternative 4, as modified, establishes strict limitations on snowmobiles and implements a comprehensive adaptive management and monitoring program. Therefore, the features of alternative 4, as modified, and the mitigation that applies with this decision constitute measures taken to avoid environmental harm. If future monitoring, as provided in this decision, indicates that impacts are too great to sustain additional use, or that impairment occurs, it will be appropriate to implement further management changes. Monitoring plans will describe thresholds of impact, and management actions that will be taken if thresholds are exceeded.

## *Conclusion*

Few issues facing the National Park Service today are as polarizing as whether to permit the recreational use of snowmobiles under the Winter Use Plan. This is reflected by both the substance and volume of comments submitted during the SEIS process. A single hard copy of all the comments would fill 40 four-drawer file cabinets.

The Winter Use Plans being adopted herein also reflect:

(1) The commitment to provide protection of park resources and values.

(2) The decision to allow appropriate levels of visitor use recognizing that winter in YNP, GTNP, and the Parkway is a unique experience not duplicated on other public lands. Such uses are in a manner that ensures protection of park resources and values.

(3) The Service's concern for working closely and cooperatively with gateway communities. Within the limits authorized by the Organic Act and other legal authorities applicable to winter use in these parks, for any park's programs to be truly successful, a strong collaborative relationship with our gateway community partners is essential. This relationship has been demonstrated in our planning process both by the role of these communities through the states and counties as cooperating agencies and the decision I make herein.

Finally, I am quite aware of the broad discretion afforded under the applicable laws and policies to the Service in the operation of these units. I am led to an inevitable conclusion that there is no single decision mandated by these laws and policies. This is reflected by my Record of Decision from November 2000 which would have phased out the recreational use of snowmobiles in these parks over several years, and the decision I make herein today to permit recreational snowmobile use in the future under strict numerical and technological limits with adaptive management to respond to future impacts from motorized winter use in these parks. The strict standards set forth in this

Record of Decision – Winter Use FSEIS and Plans for YNP, GTNP, and the Parkway

decision allow for a reasonable level of recreational snowmobile use to continue in a manner and form which protects, not impairs, park resources and values.

Therefore, for the reasons described in this decision, I have determined that the limited and restricted snowmobile and snowcoach use that will occur in YNP, GTNP, and the Parkway should not result in an impairment of park resources and values, and with adaptive management to address problems that may arise in the future, is consistent with the requirements of the NPS Organic Act, Executive Orders 11644 and 11989, the NPS's general snowmobile regulations implementing those Executive Orders, and other laws and policies.

## Public Involvement

The NPS received approximately 30 individual pieces of correspondence regarding the FSEIS. The majority of comments favored Alternative 1a or 1b as the preferred alternative. Other comments addressed a variety of aspects of managing for winter use such as the Best Available Technology requirements, guide training, interim limits, and allocation of the daily limits to commercial operators. I believe that these comments have been adequately addressed in the FSEIS and this ROD.

For a summary of the SEIS public comment process refer to Attachment C

## Consultation

**Cooperating Agencies**

The discussion of cooperating agencies is located in the Final EIS on pages 16-18. During the previous EIS process, state and county governments around the GYA requested and were granted cooperating agency status (40 CFR §1501.6) in December 1997 and January 1998. The NPS also requested that the USFS become a cooperating agency because of possible impacts on surrounding national forests from changes in the parks' winter use management; the USFS acceded. In addition to these agencies, the Environmental Protection Agency (EPA) was invited to participate as a cooperator for the SEIS. There are, therefore, 10 cooperating agencies in this effort. All agencies signed a cooperating agency agreement, an example of which is presented in Appendix B of the Draft SEIS. The designated representatives for all cooperating agencies are also presented in Appendix B of the Draft SEIS.

The cooperating agencies participating in the SEIS process submitted a variety of new studies and reports regarding the effect of winter use in the parks and on the local economies in the greater Yellowstone area and new snowmobile technologies. The new information submitted by the cooperating agencies is presented and discussed in detail in *Chapter III – Affected Environment* in the FSEIS.

**Record of Decision – Winter Use FSEIS and Plans for YNP, GTNP, and the Parkway**

## American Indian Tribes

The NPS is committed to recognizing the past and present existence of American Indians in the region, and the traces of their use as an important part of the cultural environment to be preserved and interpreted. NPS consulted during the SEIS process with the 26 contemporary American Indian tribes currently recognized by YNP and GTNP as traditionally affiliated with the GYA. These tribes are:

- Assiniboine and Sioux Tribes
- Blackfeet Tribe
- Cheyenne River Sioux Tribe
- Coeur d'Alene Tribe
- Comanche Tribe of Oklahoma
- Confederated Tribes of Colville Indian Reservation
- Confederated Tribes of the Umatilla Indian Reservation
- Confederated Salish and Kootenai Tribes

- Crow Creek Sioux Tribe
- Crow Tribe
- Eastern Shoshone Tribe
- Northern Arapaho Tribe
- Flandreau Santee Sioux Tribe
- Gros Ventre and Assiniboine Tribes
- Kiowa Tribe of Oklahoma
- Lower Brule Sioux Tribe
- Nez Perce Tribe
- Northern Cheyenne Tribe

- Oglala Sioux Tribe
- Rosebud Sioux Tribe
- Shoshone-Bannock Tribe
- Sisseton-Wahpeton Sioux Tribe
- Spirit Lake Sioux Tribe
- Standing Rock Sioux Tribe
- Turtle Mountain Band of the Chippewa Indians
- Yankton Sioux Tribe

## State Historic Preservation Offices

Consultation with State Historic Preservation Office (SHPO) in Wyoming, Montana, and Idaho during the earlier EIS process is described on page 20 of the Final EIS and page 31 of the ROD. None of the three offices provided substantive comments, and indicated there was no further need to consult as the Final EIS was being prepared for publication. No comments were received from these offices as part of the SEIS process.

## U.S. Fish and Wildlife Service

For this process, a Biological Assessment for this Final SEIS was submitted to the U.S. Fish and Wildlife Service (USFWS) on November 17, 2002. The USFWS responded with a biological opinion dated March 21, 2003. The USFWS concurred with the NPS conclusion as stated in the Biological Assessment that the preferred alternative in the Winter Use Plan will have "no effect" on the whooping crane and "may affect, but not likely to adversely affect" the bald eagle, grizzly bear, and the gray wolf. With respect to Canada lynx, it is the biological opinion of USFWS that the preferred alternative in the Winter Use Plan is not likely to jeopardize the continued existence of the Canada lynx.

**Record of Decision – Winter Use FSEIS and Plans for YNP, GTNP, and the Parkway**

*Information Contacts*

For more information on this decision, the Final SEIS or on the Final EIS, please contact the offices of:

KAREN WADE, DIRECTOR
NATIONAL PARK SERVICE - INTERMOUNTAIN REGION
12795 WEST ALAMEDA PARKWAY
LAKEWOOD, CO  80225

STEPHEN P. MARTIN, SUPERINTENDENT
GRAND TETON NATIONAL PARK
PO DRAWER 170
MOOSE, WY  80312

SUZANNE LEWIS, SUPERINTENDENT
YELLOWSTONE NATIONAL PARK
PO BOX 168
YELLOWSTONE, WY 82190

## ATTACHMENT A

## MONITORING AND ADAPTIVE MANAGEMENT

**Table 1. Monitoring and adaptive management indicators, thresholds, and methods.**

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Air Quality | Park employees and visitors exposure to CO, particulate matter, and volatile organic compounds | Zone 1 | 1-hr maximum CO (w/bkgd): 8 ppm<br>8-hr maximum CO (w/bkgd): 3 ppm<br>24-hr maximum $PM_{10}$ (w/bkgd): 23 $\mu g/m^3$<br>No observed employee health problems due to air quality<br>ATSDR (Agency for Toxic Substances and Disease Registry) Minimal Risk Levels | Fixed site monitoring or personal sampling for PM and CO<br>Personal samples, cartridges, or canisters for VOCs (air toxics) | High | • Require new technologies<br>• Adjust number of daily vehicle entries permitted<br>• Establish timed-entry requirements |
| | | Zone 2 | 1-hr maximum CO (w/bkgd): 1 ppm<br>8-hr maximum CO (w/bkgd): 1 ppm<br>24-hr maximum $PM_{10}$: 5 $\mu g/m^3$<br>No observed employee health problems due to air quality<br>ATSDR (Agency for Toxic Substances and Disease Registry) Minimal Risk Levels | Fixed site monitoring or personal sampling for PM and CO<br>Personal samples, cartridges, or canisters for VOCs (air toxics) | Low | |
| | | Zone 3 | 1-hr maximum CO (w/bkgd): 1 ppm<br>8-hr maximum CO (w/bkgd): 1 ppm<br>24-hr maximum $PM_{10}$ (w/bkgd): 6 $\mu g/m^3$<br>No observed employee health problems due to air quality<br>ATSDR (Agency for Toxic Substances and Disease Registry) Minimal Risk Levels | Fixed site monitoring or personal sampling for PM and CO<br>Personal samples, cartridges, or canisters for VOCs (air toxics) | Moderate | |
| | | Zones 4-5 | 1-hr maximum CO (w/bkgd): 1 ppm<br>8-hr maximum CO (w/bkgd): 1 ppm<br>24-hr maximum $PM_{10}$: 5 $\mu g/m^3$ | Fixed site monitoring or personal sampling for PM and CO | Low | |
| | Visibility | Zones 1-4 | No perceptible localized visibility impacts | Photo Survey and time laps video and nephelometer | High | |
| | | Zones 5-9 | No perceptible localized visibility impacts | | Low | |
| | Odor | Zones 1-3 | Area free of any noticeable odor resulting from motorized recreation at least 90% of the daytime hours of park operation (8 A.M. – 4 P.M.) | Park visitor survey<br>Scentometer | High | |
| | | Zones 4-5 | Area free of any noticeable odor resulting from motorized recreation at least 95% of the daytime hours of park operation (8 A.M. – 4 P.M.) | | Low | |
| | | Zones 6-9 | Area free of any noticeable odor resulting from motorized recreation | | Low | |

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Natural Soundscapes | Distance and time human-caused sound is audible | Zones 1-5 | During daytime hours of park operation (8 A.M. – 4 P.M.) and measured 100 feet from staging areas and roadways:<br>▪ Audibility: Not to exceed (NTE) 50%<br>▪ dB of human caused noise: NTE 70 dB(A)<br>▪ Leq (average sound level): NTE 45 dB(A)<br><br>Note: Audibility is the percent of time oversnow vehicles are audible to a person with normal hearing. A NTE 50% threshold means that oversnow vehicles will not be audible more than 50% of the time during daytime hours of park operation. | Audibility logging, digital recordings, and sound pressure level measurement | High | ▪ Require new technologies<br>▪ Adjust number of daily vehicle entries permitted<br>▪ Establish timed-entry requirements |
| | | Zone 6 | During daytime hours of park operation (8 A.M. – 4 P.M.) and measured 100 feet from staging areas and roadways:<br>▪ Audibility: Not to exceed (NTE) 25%<br>▪ dB of human caused noise: NTE 70 dB(A)<br>▪ Leq (average sound level): NTE 45 dB(A) | | High | |
| | | Zones 7-8 | During daytime hours of park operation (8 A.M. – 4 P.M.) and measured 100 feet from staging areas and roadways:<br>▪ Audibility: Not to exceed (NTE) 20%<br>▪ dB of human caused noise: NTE 6 dB(A) below natural ambient sound levels<br>▪ Leq (average sound level): NTE natural ambient sound levels<br><br>Note: Vehicle noise, even at 6 dB(A) less than natural ambient, is usually audible due to the lower frequencies of human-caused noise. Additionally, since natural and human-caused sounds tend to be in different frequencies, both can be audible at the same time, even at very low levels. | | Moderate | |
| Safety | Motor vehicle accidents | Zones 1-5 | Continual improvement of three-year sliding average | Incident descriptions and GIS mapping | High | ▪ Alter or implement commercial and non-commercial guiding requirements and/or ratio<br>▪ Increase signage and reduce speed limits in areas of recurring incidents<br>▪ Increase law enforcement and educational information<br>▪ Adjust number of daily vehicle entries permitted |

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| **Water/Snowpack** | Water quality: VOCs, pH, hydrogen, ammonium, calcium, sulfate, nitrate, and NOx | Zones 1-3 | Monitoring will occur until BAT requirements are full implemented and a longer-term threshold will be set then. In the interim, the following thresholds will be used:[†] ▪ Benzene: EPA maximum limit for drinking water 0.005 mg/L. OSHA permissible exposure in workplace (8 hour day, 40 hour weeks) 1 ppm ▪ Toluene: EPA maximum limit for drinking water 1 mg/L. OSHA permissible exposure in workplace 200 ppm ▪ Ethylbenzene: EPA maximum limit for drinking water .7 mg/L. OSHA permissible exposure in workplace 100 ppm ▪ Xylene: EPA maximum limit for drinking water 10 ppm. OSHA permissible exposure in workplace 100 ppm | Snowpack sampling, snowmelt runoff, stream runoff, snowmelt/rain event | Moderate | ▪ Require new technologies ▪ Determination and application of best management practices ▪ Adjust number of daily vehicle entries permitted |
| | | Zone 8 | ▪ Benzene: EPA maximum limit for drinking water 0.005 mg/L. OSHA permissible exposure in workplace (8 hour day, 40 hour weeks) 1 ppm ▪ Toluene: EPA maximum limit for drinking water 1 mg/L. OSHA permissible exposure in workplace 200 ppm ▪ Ethylbenzene: EPA maximum limit for drinking water .7 mg/L. OSHA permissible exposure in workplace 100 ppm ▪ Xylene: EPA maximum limit for drinking water 10 ppm. OSHA permissible exposure in workplace 100 ppm | Snowpack sampling, snowmelt runoff, stream runoff, snowmelt/rain event | Low | |
| **Geothermal Features** | Human-caused damage to geothermal areas | Zone 1 | No degradation of geothermal resources | Remote sensing and visual observation | High | ▪ Increase law enforcement and educational information ▪ Restrict travel |
| **Visitor Experience** | Smoothness of the groomed surface | Zone 3 | No worse than fair 20% of the daytime hours of park operation (8 A.M. – 4 P.M.) | Visual observation | High | ▪ Increase grooming ▪ Adjust vehicle numbers when threshold temperature and/or snow conditions are forecasted or reached |
| | | Zone 4 | No worse than fair 20% of the daytime hours of park operation (8 A.M. – 4 P.M.) | | Low | |
| | Visitor satisfaction levels with opportunities to experience and view wildlife, scenery, and clean air and solitude. | Zones 1-8 | Visitors are highly satisfied (+90%) with their park experience | | High | ▪ Establish carrying capacity/adjust visitor numbers ▪ Determine unsatisfactory conditions and rectify |
| | Visitor perception assessment of important park resources and values | Zones 1-8 | Visitors are able to see, smell, and hear the natural environment at roadside pullouts and interpretive trails 90% of each 24-hour period | Visitor survey Encounter rates Time lapse photos Travel simulation models Observations | High | ▪ Establish carrying capacity/adjust visitor numbers ▪ Require new technologies |

[†]Ingersoll (1999) compared his water quality findings for snowmelt runoff to drinking water standards.

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Wildlife | Bird and mammal habituation and effectiveness of garbage facilities | Zone 1 | Garbage unavailable to wildlife | Photo surveys and observations | High | ▪ Improve or redesign facilities<br>▪ Adjust number of daily vehicle entries permitted<br>▪ Alter or implement commercial guiding requirements and allocations |
| | Ungulate (e.g., bison and elk) movements on plowed roads | Zone 2 | No unacceptable adverse effects. Unacceptable effects are those considered greater than "adverse negligible." See Chapter IV, *Wildlife*, for definitions of effects. | Continue bison monitoring, flights, and photo surveys | High | ▪ Evaluate alternative transportation systems<br>▪ Close roads (by road segment or seasonally) |
| | Vehicle caused wildlife mortality | Zones 2-4 | No unacceptable adverse effects | Incident reports, roadside surveys, GIS, and visual observations | High | ▪ Alter or implement commercial guiding requirements and allocations<br>▪ Evaluate alternative transportation systems<br>▪ Increase law enforcement and educational information<br>▪ Reduce speed limits |
| | Wildlife harassment or displacement due to vehicle sounds or movements | Zone 2-5 | No unacceptable adverse effects | Incident reports, photo surveys, and visual observations | High | ▪ Increase law enforcement and educational information<br>▪ Require new technologies<br>▪ Adjust number of daily vehicle entries permitted<br>▪ Alter or implement commercial guiding requirements and allocations<br>▪ Establish additional no-stopping zones<br>▪ Adjust group size requirements<br>▪ Establish timed-entry requirements<br>▪ Close roads (by road segment or seasonally) |
| | Wildlife trapped by snow berms in road corridor | Zone 2 | No unacceptable adverse effects | Incident reports, roadside surveys, and visual observations | High | ▪ Increase number of exit berms and re-evaluate location of existing exits<br>▪ Evaluate alternative transportation systems |
| | Ungulate (e.g., bison and elk) use of groomed surfaces | Zones 3-4 | No unacceptable adverse effects | Visual observations, photo surveys, air surveys, and telemetry. Continue bison monitoring | High | ▪ Close roads or eliminate grooming operations (by road segment or seasonally)<br>▪ Adjust grooming intensity |
| | Carnivore (e.g., wolves and lynx) displacement and habitat effectiveness | Zones 3-9 | Insignificant, discountable, or beneficial effects only | Carnivore and snowshoe hare track surveys and air surveys | High | ▪ Mitigate effects or close area<br>▪ Increase law enforcement and educational information<br>▪ Require new technologies<br>▪ Adjust number of daily vehicle entries permitted<br>▪ Alter or implement commercial guiding requirements and allocations<br>▪ Establish additional no-stopping zones<br>▪ Adjust group size requirements<br>▪ Establish timed-entry requirements<br>▪ Consult with USFWS for appropriate mitigation strategies |
| | Wildlife harassment or displacement as a result of visitor activities | Zone 6-9 | No unacceptable adverse effects | Incident reports, photo surveys, and visual observations | High | ▪ Increase law enforcement and educational information<br>▪ Require use of designated trails only<br>▪ Close areas to use seasonally |
| | Human-bear conflicts during pre- and post-denning periods | Zones 2 and 7-9 | No unacceptable adverse effects | Mapping of denning areas and visitor use patterns and trends.<br>Incident Reports | Moderate | |

A-4

ATTACHMENT B

**Table S-1. Summary of alternative actions Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway winter use plan.**

| ALTERNATIVES 1a and 1b | ALTERNATIVE 2 |
|---|---|
| **Emissions Requirements** | |
| ▪ Snowcoach travel only managed by concessions permit and required to meet the best available environmental standards, (currently the Mattrack snowcoach).<br>▪ Phase in these requirements through the permitting process. | ▪ Rental snowmobiles: 200 g/kW-hr (149g/hp-hr) for CO and 75 g/kW -hr (56g/hp-hr) for HC (EPA emission rule for snowmobiles) beginning in 2003-2004.<br>▪ Public snowmobiles: allow any 4-stroke and any 2-stroke using bio-fuels and lubes.<br>▪ By 2006-2007 all snowmobiles must meet 2012 EPA standards.<br>▪ Snowcoaches: For the first five years, allow snowcoaches irrespective of emissions. After five years, only "new concept snowcoaches" will be allowed. |
| **Sound Requirements** | |
| ▪ Snowcoaches: 75 dB phasing to 70 dB(A).[†] | ▪ Rental snowmobiles: 75 dB(A).[‡]<br>▪ Public snowmobiles: 78 dB(A).[‡]<br>▪ Snowcoaches: For the first five years, 78 dB(A), after five years, 75 dB(A).[†] |
| **Interim Limits and Phase In Period** | |

| **Alternative 1a** | **Alternative 1b** | ALTERNATIVE 2 |
|---|---|---|
| ▪ 2003-2004 close Jackson Lake and Teton Park Road to motorized vehicles.<br>▪ 2003-2004 snowmobiles at a maximum of 50% of current average day at West and South Entrances; current use maintained at all other areas.<br>▪ 2004-2005 snowcoach only travel, snowmobile access maintained to inholdings and USFS areas in GTNP. | ▪ 2003-2004 close Jackson Lake and Teton Park Road to motorized vehicles.<br>▪ 2004-2005 snowmobiles at a maximum of 50% of current average day at West and South Entrances; current use maintained at all other areas.<br>▪ 2005-2006 snowcoach only travel, snowmobile access maintained to inholdings and USFS areas in GTNP. | ▪ Interim limit for monitoring and adaptive management program. As monitoring and carrying capacity studies indicate, use numbers may be adjusted.<br>▪ North Entrance limited to 25 snowmobiles per day.<br>▪ West Entrance limited to 825 snowmobiles in year 1.<br>▪ West Entrance limited to 725 snowmobiles in year 2.<br>▪ West Entrance limited to 600 in year 3. (Note: West Entrance limits in years 2 and 3 would only be effective if a commensurate number of seats on "new concept snowcoaches" become available each year at West Yellowstone to replace the visitors lost by the decrease in snowmobiles.)<br>▪ East Entrance limited to 100 snowmobiles per day.<br>▪ South Entrance limited to 225 snowmobiles per day.<br>▪ CDST 75 snowmobiles per day.<br>▪ Grassy Lake Road no snowmobile limit.<br>▪ Snowcoach travel no limit. |

[†]Snowcoach sound measured at 50 ft on the A-weighted scale at full throttle.

[‡]Snowmobile sound measured at 50 ft on the A-weighted scale at 40 mph.

| ALTERNATIVES 1a and 1b | ALTERNATIVE 2 |
|---|---|
| **Access** ||
| ▪ All oversnow routes open to snowcoaches.<br>▪ Snowmachine access eliminated on the Teton Park Road and on the frozen surface of Jackson Lake.<br>▪ Levels of snowcoach access would be unrestricted.<br>▪ In 2010, the road from Colter Bay to Flagg Ranch becomes an oversnow route.<br>▪ Increase both the size and number of warming huts. | ▪ All oversnow routes open except snowmachine access eliminated on the Teton Park Road and fishermen only the frozen surface of Jackson Lake.<br>▪ Levels of access are restricted to the average peak day numbers for the West Entrance and higher than peak day average for East, South and North Entrances.<br>▪ Snowcoach numbers unrestricted.<br>▪ Increase groomed nonmotorized trails.<br>▪ Increase both the size and number of warming huts. |
| **Wildlife** ||
| ▪ Nonmotorized uses in wildlife winter ranges and thermal areas limited to travel on designated routes or trails.<br>▪ Construct wildlife-proof garbage facilities.<br>▪ Manage adaptively-continue scientific studies and monitoring regarding winter visitor use and park resources. Close selected areas of the parks if scientific studies indicate that human presence or activities have a detrimental effect that could otherwise not be mitigated. | ▪ Nonmotorized uses in wildlife winter ranges and thermal areas limited to travel on designated routes or trails.<br>▪ Construct wildlife-proof garbage facilities.<br>▪ Employ additional law enforcement.<br>▪ Manage adaptively. |
| **Winter Season** ||
| ▪ Late November to mid-March. | ▪ Mid-November to mid-December access only by rubber track snowcoaches, snowshoes or skis.<br>▪ Mid-December to mid-March snowmobile and snowcoach travel. |
| **Interpretation and Orientation** ||
| ▪ Information program on snow and trail conditions, points of interest and available recreation opportunities.<br>▪ Increase interpretive opportunities on the unique aspects of the winter environment. Provide interpretive programs at destination areas and at warming huts. | ▪ Information program on snow and trail conditions, points of interest and available recreation opportunities.<br>▪ Increase interpretive opportunities on the unique aspects of the winter environment. Provide interpretive programs at destination areas and at warming huts.<br>▪ Develop educational video on trail etiquette, snowmobile safety, and proper behavior around wildlife. |

| ALTERNATIVE 3 | ALTERNATIVE 4 |
|---|---|
| **Emissions Requirements** | |
| ▪ Cleaner and quieter technologies managed by NPS permit and managed adaptively.<br>▪ Interim emission requirements are based on BAT and evaluated annually as emissions are reduced numbers could be increased.<br>▪ Snowmobile and snowcoach BAT is capable of reducing HC by 90% and CO emissions by 70% from EPA baseline snowmobile assumptions. Historic snowcoaches initially exempted. | ▪ Cleaner and quieter technologies managed by NPS permit and managed adaptively.<br>▪ Interim emission requirements are based on BAT and evaluated annually as emissions are reduced numbers could be increased.<br>▪ Snowmobile and snowcoach BAT is capable of reducing HC by 90% and CO emissions by 70% from EPA baseline snowmobile assumptions. Historic snowcoaches initially exempted. |
| **Sound Requirements** | |
| ▪ Interim sound emission requirements are based on BAT and evaluated annually (as sound emissions are reduced numbers could be increased).<br>▪ Snowmobiles: Any snowmobile 73 dB(A) or less.[†]<br>▪ Snowcoaches: Initially, 75 dB(A) by 2008.[‡] Historic snowcoaches exempted. | ▪ Interim sound emission requirements are based on BAT and evaluated annually (as sound emissions are reduced numbers could be increased).<br>▪ Snowmobiles: Any snowmobile 73 dB(A) or less.[†]<br>▪ Snowcoaches: Initially, 75 dB(A) by 2008.[‡] Historic snowcoaches exempted. |
| **Interim Limits and Phase In Period** | |
| ▪ Interim limits for monitoring and adaptive management program implemented in 2003-2004. As monitoring and carrying capacity studies indicate use numbers may be adjusted.<br>▪ North Entrance limited to 100 per day.<br>▪ West Entrance limited to 330 per day.<br>▪ East Entrance limited to 100 per day.<br>▪ South Entrance limited to 400 per day.<br>▪ CDST limited to 100 per day.<br>▪ Grassy Lake limited to 100 per day.<br>▪ Snowcoach travel no limit.<br>▪ Require BAT for all snowmobiles beginning in 2003-2004.<br>▪ Implement guided snowmobile requirements in 2003-2004. | ▪ Interim limit for monitoring and adaptive management program during the first two years. As monitoring and carrying capacity studies indicate, use numbers may be adjusted.<br>▪ North Entrance limited to 50 snowmobiles per day.<br>▪ West Entrance limited to 550 snowmobiles per day.<br>▪ East Entrance limited to 100 snowmobiles per day.<br>▪ South Entrance limited to 250 snowmobiles per day.<br>▪ CDST limited to 75 snowmobiles per day.<br>▪ Grassy Lake Road limited to 75 snowmobiles per day.<br>▪ Snowcoach travel no limit.<br>▪ Require BAT for commercially guided snowmobiles in 2003-2004; all other snowmobiles must be BAT in 2004-2005.<br>▪ Implement 80:20 commercial:non-commercial guided requirements in 2003-2004. |

[†]Snowmobile sound measured at full acceleration using SAE J192 test procedures.

[‡]Snowcoach sound measured at 50 ft on the A-weighted scale at 25 mph.

| ALTERNATIVE 3 | ALTERNATIVE 4 |
|---|---|
| **Access** ||
| ▪ All major oversnow routes open except snowmachine access eliminated on the Teton Park Road and on the frozen surface of Jackson Lake.<br>▪ In 2009, the road from Colter Bay to Flagg Ranch becomes an oversnow route.<br>▪ Increase groomed nonmotorized trails.<br>▪ Increase both the size and number of warming huts. | ▪ All major oversnow routes open except snowmachine access eliminated on the Teton Park Road and on the frozen surface of Jackson Lake.<br>▪ In 2009, the road from Colter Bay to Flagg Ranch becomes an oversnow route.<br>▪ Increase groomed nonmotorized trails.<br>▪ Increase both the size and number of warming huts. |
| **Wildlife** ||
| ▪ Nonmotorized uses in wildlife winter ranges and thermal areas limited to travel on designated routes or trails.<br>▪ Construct wildlife-proof garbage facilities.<br>▪ Manage adaptively; action items include signing, employing additional enforcement rangers, limiting access. | ▪ Nonmotorized uses in wildlife winter ranges and thermal areas limited to travel on designated routes or trails.<br>▪ Construct wildlife-proof garbage facilities.<br>▪ Employ additional law enforcement.<br>▪ Manage adaptively; action items include signing, employing additional enforcement rangers, limiting access. |
| **Winter Season** ||
| ▪ Late November to mid-March.<br>▪ Last week of February (after President's Day) to mid-March access by snowcoach, skis or snowshoes only. | ▪ Late November to mid-March. |
| **Interpretation and Orientation** ||
| ▪ Information program on snow and trail conditions, points of interest and available recreation opportunities.<br>▪ Increase interpretive opportunities on the unique aspects of the winter environment. Provide interpretive programs at destination areas and at warming huts.<br>▪ Develop educational video on trail etiquette, snowmobile safety, and proper behavior around wildlife. | ▪ Information program on snow and trail conditions, points of interest and available recreation opportunities.<br>▪ Increase interpretive opportunities on the unique aspects of the winter environment. Provide interpretive programs at destination areas and at warming huts.<br>▪ Develop educational video on trail etiquette, snowmobile safety, and proper behavior around wildlife. |

ATTACHMENT C

SUMMARY OF PUBLIC COMMENTS

**Federal Register Notices**

A notice of intent to prepare an SEIS was published in the Federal Register on July 27, 2001, officially beginning the process. A notice of availability for the Winter Use Plan and Draft Supplemental Environmental Impact Statement (DSEIS) for Yellowstone and Grand Teton National Parks and the John D. Rockefeller Jr., Memorial Parkway appeared in the Federal Register, March 29, 2002. The notice indicated that the public comment due date was May 29, 2002. The notice of availability for the Final SEIS was published on February 21, 2003.

**Environmental Impact Statement (EIS)**

The NPS initiated the winter visitor use planning process by publishing a Notice of Intent to Prepare an EIS on April 15, 1998. Public scoping comments were accepted from April 14 to July 18, 1998. Scoping brochures were distributed to about 6,000 interested parties and 12 public meetings were held throughout the greater Yellowstone area and in Idaho, Montana, and Wyoming. In addition to the local and regional area, the NPS hosted meetings in Salt Lake City, Denver, Minneapolis, and Washington D.C. Overall, 2,000 comments were received, 1,200 of these were form letters. From this body of comment, the NPS obtained about 15,000 discrete comments. Scoping respondents included businesses, private and nonprofit organizations, local, state and federal agencies, and the public at large.

Comments were accepted from August (according to the previous ROD) 1999 to December 15, 1999, on the *Winter Use Plans/Draft Environmental Impact Statement the Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway.* The NPS received comments from across the United States, Canada and as far away as Germany, Saudi Arabia and Japan. Most comments came from Rocky Mountain and Northwest States. The NPS received 46,500 documents commenting on the DEIS - 6,300 unique documents and 40,200 form documents. Commenters included businesses, private and non-profit organizations, local, state, tribal and federal government agencies and the public at large, which constituted 99% of the total commenters. In addition to written public comment, the NPS held 6 public hearings in the following areas, Idaho Falls, Idaho; Livingston and West Yellowstone, Montana; Jackson and Cody, Wyoming; and Denver Colorado. For reference, a thorough analysis of comments received on the previous draft EIS may be found in the FEIS, Volume III. The comment analysis is summarized on pages 9-11 of the FEIS.

The Winter Use Plans Final Environmental Impact Statement the Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway was published on October 10, 2000. Although not required by CEQ regulation the NPS invited the public to provide comment on the FEIS until October 31, 2001. During this comment period, the NPS received 10,880 documents. Of these 6,717 were form letters and 4,163 were unique documents.

Following the signing of the ROD, the NPS initiated a rulemaking process to implement actions associated with the phase-in schedule for snowmobiles and the change to snowcoach only travel in the parks. The rulemaking process received a total of 5,273 comment documents in the form of letters, postcards and emails.

## SEIS (Scoping)

The Notice of Intent to prepare a Winter Use Plans Supplemental Environmental Impact Statement for Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway was published in the Federal Register on July 27, 2001. The preparation of a SEIS was deemed necessary to further the purposes of NEPA. The purposes of NEPA would be furthered in this instance by, "soliciting more public comment on the earlier decision and alternatives to it, which will remain the protection of park resources. Additional information from the International Snowmobile Manufacturers Association will be considered as well as any other new or updated information not available at the time of the earlier decision."

The NPS received 8,443 separate documents commenting on the SEIS process. Approximately 7,100 of these were form documents or petitions and 1,343 were unique documents. The majority of the documents expressed either support for or against the SEIS process. Commenters expressed concern for the same issues as described in the DEIS and FEIS, including concern for socioeconomic effects on local communities, effects on visitor access and visitor experience, effects on air quality, the natural soundscape, and wildlife.

A number of comments were concerned with the SEIS process. Some commenters questioned the need for a SEIS because they believed the FEIS document was sufficient, citing ten years of study that have proven that snowmobiles damage park resources such as air quality, soundscapes and wildlife and are a risk to public safety. Other commenters disagreed, saying that the present winter use plan disregarded the socioeconomic effects on local communities, the needs of the disabled and the elderly, and does not conform with applicable law, either substantively or procedurally.

## Summary of Public Comments on the Draft SEIS

On March 29, 2002, the National Park Service released the SEIS to supplement the Final Environmental Impact Statement (FEIS) for the winter use plans issued in October 2000. The decision resulting from the FEIS would phase out snowmobiles in the three parks over three years and provide for over-snow access by snowcoach beginning the winter of 2003-04. The National Park Service undertook the supplemental NEPA process to provide for additional public comment and consider new information from snowmobile manufacturers on their new generation of "cleaner and quieter" snowmobiles.

About 307,592 individuals, organizations, and businesses chose to participate in the supplemental NEPA process by submitting comments.[1] This represents the largest amount of public comment letters received on any project in the National Park Service. The comments included form and non-form letters, both mailed and electronic mail, and petitions.

---

[1] This amount does not account for duplicates, e.g., those letters that were sent both via the Internet and the U.S. Postal System.

The comments were sorted to identify potential substantive comments, i.e., those that request the agency to modify alternatives; to develop and evaluate alternatives not previously given serious consideration by the agency; to supplement, improve, or modify its analyses; or to make factual corrections.  The NPS does not consider all of the information contained in the comment summaries as substantive.  Due to the tremendous volume of comments received, summaries of the comments tentatively identified as substantive were compiled, as allowed by regulation (40 CFR 1503.4).  The letters that are summarized and responded to in section 4, below, are best described as representative.  The content of this representative group of letters, with respect to substance in particular, encompasses the content of the entire body of comment.  In the summaries, the commenters own words were used or paraphrased in terms similar to the language contained in the letters.  The representative letters are duplicated in their entirety (Appendix A).

Following the identification of the comments initially identified as substantive, the remaining comments were sorted by general support for an alternative or action.  Each comment then was reviewed by at least one member of the NPS planning team.  Many of the non-form comments contained personal recollections of prior experiences in the parks.  The content of these letters was recorded using a coding system.  CEQ regulations require the agency to respond to all comments, as a minimum, by explaining why those comments do not warrant further agency response, citing the sources, authorities, or reasons that support the agency's position and, if appropriate, indicating those circumstances that would trigger agency reappraisal or further response.

For the most part, comments fell into two categories, those that supported the immediate phase-out of snowmobiles, i.e., the existing decision or alternative 1a, and those that want public snowmobile use to continue in the parks at a high level, i.e., alternative 2.  Those who commented primarily are from the United States, although NPS received comments from persons in other nations.

ATTACHMENT D

WINTER USE PLANS FOR YELLOWSTONE AND GRAND TETON NATIONAL PARKS AND THE JOHN D. ROCKEFELLER, JR. MEMORIAL PARKWAY

---

**The elements of this plan are a combination of the November 2000 Record of Decision, as modified by the March 2003 Record of Decision.**

**Actions and Assumptions Common to All Units**

- The intent of the winter use plans for Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway (All Units) is to provide opportunities for historical levels of visitation based on the average of the past ten years. Visitation and access to the parks would be available in a mix of snowmobiles and snowcoaches. Implementation of this plan will encourage continuous improvement in snowmobile technology available for use in the parks, as well as development, production, and use of a new generation of snowcoach. Both modes of access would meet a Best Availability Technology (BAT) requirement, whereupon snowcoach use and occupancy would be emphasized over individual access.

- New cleaner and quieter snowmachine technologies will generally be required for all recreational oversnow vehicles entering the parks. This requirement will be implemented primarily through the issuance of outfitter and guide permits by the NPS. Initially, emission and sound requirements would be based on current BAT and evaluated annually under an adaptive management framework. The requirement to meet BAT will remain ongoing. After two years an annual evaluation could result in an adjustment of snowmobile use limits if necessary for protection of air quality, wildlife, visitor experience, and natural soundscapes (as defined by NPS policy) as determined by monitoring.

- The NPS Organic Act authorizes the Secretary to make such rules as are necessary to "conserve the scenery and the natural and historic objects and the wildlife" of national parks. The BAT approach in this plan is not a restriction on what manufacturers may produce but an end-use restriction on which commercially produced snowmobiles may be used in the parks. This exercise of the NPS Organic Act authority is not an effort by the NPS to regulate manufacturers and is consistent with Sec. 310 of the Clean Air Act, which preserves the authority of other federal agencies.

- The Best Available Technology requirement (BAT) will ensure that the oversnow vehicles used in Yellowstone and Grand Teton National Parks are the cleanest and quietest commercially available under current technology, and will ensure that oversnow machines will continuously improve. The NPS encourages manufacturers to develop snowmobiles that reduce not only the NAAQS criteria pollutants, but other emissions of concern, such as air toxics.

Unwanted sound from snowmobiles (noise) will also be reduced under this plan. The NPS will annually publish a list of snowmobile makes, models, and year of manufacture that meet the BAT requirements. The program would rely on manufacturers' testing of the machines using approved Society of Automotive Engineers procedures specified by this decision. Each snowmobile model will be certified for entry into the parks for six years after the time it was published on the list.

- Currently, BAT would be set as any snowmobile that can achieve a 90% reduction in hydrocarbons and a 70% reduction in carbon monoxide from EPA's baseline assumptions. Thus, any recreational snowmobile entering YNP must achieve emissions below 15 g/kW-hr for hydrocarbons and 120 g/kW-hr for carbon monoxide.

- All commercially guided snowmobiles entering the three parks beginning in 2003-2004 must meet the reduction in snowmobile engine emissions equal to or better than the reductions given above. In the 2004-2005 season, all snowmobiles entering the parks will be required to meet BAT. Through a monitoring program, air quality parameters will be monitored and various aspects of snowmobile use will be adjusted accordingly (e.g., numbers per day, number per hour).

- The approach for the winter of 2003-2004 will be to set BAT as any snowmobile that is capable of an output of 73 dB(A) or less, as measured at full throttle according to the SAE J192 test procedures. All commercially guided snowmobiles entering the three park units beginning in 2003-2004 must meet the BAT sound requirements. In the 2004-2005 season, all snowmobiles entering the parks will be required to meet BAT. Through a monitoring program, the natural soundscape will be monitored and various aspects of snowmobile use will be adjusted accordingly (e.g., numbers per day, numbers per hour).

- NPS has sufficient test data on the 2002 Arctic Cat 4-Stroke and the 2002 Polaris Frontier to deem them as meeting BAT requirements. Generally, no other snowmobiles would be allowed into the parks unless they were subjected to the testing described above and met BAT requirements.

- Through continuous improvement the NPS expects that snowmobile manufacturers will conduct ongoing research to continually improve sound and emissions in a line of available production machines. Information on the full spectrum of pollutant criteria is critical information as this alternative is phased in to ensure that an inadvertent increase in some pollutants does not occur. Without continuous improvement, it is possible that the initial generation of machines will not meet adaptive management thresholds over time, and other measures such as reduced numbers will need to be imposed.

- Through a snowcoach BAT requirement, the NPS will encourage investment in snowcoach technology. Therefore, all historic snowcoaches (such as Bombardiers) would initially be exempt from BAT requirements. However NPS would work with snowcoach owners to retrofit historic snowcoaches to meet BAT. For non-historic snowcoaches, BAT emission requirements would

be the same as those for snowmobiles: 120 g/kW-hr for CO and 15 g/kW-hr for HC. The initial snowcoach sound target would be 75 dB by 2008. As new technology snowcoaches are developed (see discussion of "new generation snowcoach" in the Best Available Technology section of Chapter III), these requirements would be revisited.

- In 2003-2004, eighty percent of all recreational snowmobiles entering YNP would be through the use of trained guides by way of commercially guided tours similar to those currently operating in the parks. The remaining 20 percent of entries will be available for non-commercial entry. Guided groups may contain from 2 to 11 snowmobiles including the guide. Beginning the winter season of 2004-2005 20 percent of entries will be available for non-commercially guided trips that require a member of the group to be certified by the NPS to lead a group of snowmobilers. Commercial and non-commercial guided groups may contain from 2 to 11 snowmobiles including the guide. In Grand Teton and the Parkway, the Grassy Lake Road, the Continental Divide Snowmobile Trail, and Jackson Lake would be exempt from guiding requirements.

- The NPS will establish a winter visitor carrying capacity for all three park units. The carrying capacity will be determined by defining the desired future condition for park resources and visitor experiences, the indicators of a quality experience and resource conditions and the establishment of thresholds that describe at what point management must take action. The visitor carrying capacity study would include a public participation component and utilize the NPS approved VERP Framework and other appropriate methodologies. The study will be completed no later than May 2006, subject to available funding.

- Implement an intensive adaptive management and monitoring program to ensure that desired resource conditions and visitor experiences are met. The initial monitoring and adaptive management thresholds and indicators are described in Attachment A of this ROD.

- When monitoring identifies a violation of a threshold, a change in management will be addressed. A downward alteration in allowable numbers of snowmobiles could be implemented by closing areas or road segments or decreasing daily entrance limits, permanently, seasonally, or for periods of time within a given winter season. Any such action would occur only after two years of use and monitoring at the initial limits, except for immediate actions necessary under regulatory direction provided in 36 CFR 1.5 and 2.18. An upward alteration in numbers could be occasioned by effectively demonstrating through monitoring that there would be no further impact in doing so, especially if other mitigation is applied or if emissions and sound characteristics of snowmobiles are demonstrably improved.

- Develop a training program with the cooperation of operators, businesses and user groups to orient and educate potential non-commercial guides for certification by the NPS. The training is intended to be comprehensive. There would be a nominal fee and the certification would last for one season.

- In cooperation with gateway communities, businesses, counties, and state tourism organizations, develop a reservation system for the effective utilization of the 20% daily non-commercial entry limits. This reservation system would be in place for the winter of 2003-2004, and all visitors to YNP wishing to snowmobile would need reservations.

- Prohibit late night oversnow motorized recreation travel from about 9:00 P.M. to 7:00 A.M. Travel during this period of time may be approved by the park superintendent for administrative or emergency purposes, or by special permit for necessary travel.

- In the winters of 2003-2005, and subject to NPS approval, allow existing commercial snowcoach operators to increase their fleet size.

- In 2003-2004 and 2004-2005, implement initial snowmobile limits (see Table 1). These limits will be in effect in perpetuity unless changed by the superintendents.

- None of the actions in these plans preclude closures for safety, resource protection, or other reasons as identified in 36 CFR 1.5 or 2.18.

- These plans do not preclude the non-recreational, administrative use of snowmobiles, by park personnel, or by duly permitted parties under the provisions of 36 CFR 1.5 and 1.6. Permitted parties shall meet technological requirements for cleaner and quieter machines.

- For the purposes of this winter use plan, the following definitions are consistent throughout:

➤ Oversnow motor vehicles: self-propelled vehicles intended for travel on snow, driven by a track or tracks in contact with the snow that may be steered by skis or tracks in contact with the snow. This term includes both snowmobiles and snowcoaches.

➤ Snowmobiles: self-propelled vehicles intended for travel on snow, having a curb weight of not more than 1,000 pounds (450 kg), driven by a track or tracks in contact with the snow, which may be steered by a ski or skis in contact with the snow. Note: The EPA definition of snowmobile is: "A vehicle designed to operate outdoors only over snow covered ground, with a maximum width of 1.5 meters or less."

➤ Snowplanes: self-propelled vehicles intended for oversnow travel, having a weight of not more than 1,000 pounds (450 kg) mounted on skis in contact with the snow, and driven by a pusher-propeller.

➤ Snowcoaches: self-propelled, mass transit vehicles intended for travel on snow, having a curb weight of over 1,000 pounds (450 kg), driven by a track or tracks and steered by skis or tracks, having a capacity of at least 8 passengers.

- If the Environmental Protection Agency (EPA) adopts standards for any class of oversnow motor vehicle that is more stringent than the requirements

resulting from this NEPA process and decision, the EPA standards shall then become the NPS requirement for all oversnow vehicles entering the parks.[1]

- These plans call for the use of sand, or an equally environmentally neutral substance, for traction on all plowed winter roads. No salts will be used. Before spring opening, sand removal operations would continue on all plowed park roads.

- Investigate and implement options to reduce the palatability and accessibility to wildlife of the hydraulic fluid used in snow groomers.

- When snow depth warrants and at periodic intervals, routine plowing operations will include laying back roadside snowbanks that could be a barrier to wildlife exiting the road corridor.

- These plans will continue to implement transition and action plans for accessibility and support the philosophy of universal access in the parks. The NPS would make reasonable efforts to ensure accessibility to buildings, facilities, programs, and services. The NPS will develop strategies to ensure that new and renovated facilities, programs and services (including those provided by concessionaires) are designed, constructed, or offered in conformance with applicable policies, rules, regulations, and standards (including but not limited to the Architectural Barriers Act of 1968; the Americans with Disabilities Act of 1990 (ADA); the Uniform Federal Accessibility Standards of 1984 (UFAS); and the Guidelines for Outdoor Developed Areas of 1999). The NPS will evaluate existing buildings and existing and new programs, activities, and services (including telecommunications and media) to determine current accessibility and usability by disabled winter visitors. Action plans to remove barriers will be developed.

- Backcountry nonmotorized use will continue to be allowed throughout the parks except where designated otherwise.

- The phrase "gateway communities" refers to the towns of Jackson and Cody, Wyoming, and Gardiner and West Yellowstone, Montana, only.

- Require all new oversnow vehicles purchased by the parks to conform to the best environmental standards available, and that other vehicles are retrofitted whenever possible with new technologies designed to lower sound and emission levels, subject to available funding.

**Adaptive Management and Monitoring Common to All Units**

These plans include adaptive management provisions. An adaptive management plan is different from a monitoring plan in that it allows park managers to act when some information exists about a specific resource but conclusive data is currently unavailable. The first step in adaptive management is to develop and implement a management scenario based on the best available information. For example, this plan prescribes a

---

[1] See discussion of the EPA rule in FESIS Chapter III under Air Quality.

specific limit on the number of daily entries by snowmobile. The next step is to implement an evaluation program to assess the success of the management scenario relative to defined resource thresholds. This evaluation is critical within the framework of adaptive management because of the uncertain results of the initial predictions. Managers then review the results of the evaluation program and may adjust activities or use limits to mitigate unplanned or undesirable outcomes. For example, if the visitor limits set for a park entrance have a greater or lesser effect on resource thresholds than predicted, then the number of visitors allowed to enter the parks could be raised or lowered accordingly. Further discussion on the adaptive management process may be found in Appendix I of the Final EIS.

General resource monitoring applies when adequate information exists to make informed management decisions based on discrete and accepted thresholds. It is the process of collecting information to evaluate if the objectives of a management plan are being realized. General monitoring techniques will be used to assess impacts to public health and safety; geothermal features; water quality; threatened and endangered species; wildlife; and some aspects of visitor experience. A sample monitoring plan is provided in Appendix E of the Draft SEIS.

Attachment A describes monitoring and adaptive management indicators, locations/zones, preliminary thresholds, methods, and monitoring intensity. Attachment A also identifies possible management actions that will be implemented if thresholds are violated. Some non-emergency actions, such as permanent road closures to protect wildlife or the construction of a new facility, may require additional site-specific NEPA analysis, which includes public involvement. Other actions might be administrative in nature or could be implemented through application of a categorical exclusion under NEPA. The preliminary thresholds in Attachment A are based in part on the least environmentally damaging conditions that would have been achievable under any of the alternatives considered in the SEIS. Monitoring and adaptive management, and management action if these thresholds are violated, will ensure the parks' obligation to preserve park resources and values in an unimpaired condition is achieved, while allowing for winter use of the parks. Many of these thresholds were derived partly from the results of computational models, and they are preliminary in nature. Therefore, they could be adjusted depending on data resulting from monitoring and adaptive management programs.

**Mitigation Common to All Units**

### Water Resources
- Best management practices will be used during the construction, reconstruction, or winter plowing of trails and roads to prevent unnecessary vegetation removal, erosion, and sedimentation.
- Winter-motorized trails will be separated from drainages to mitigate the routing of snowpack contaminants into surface water.
- Any new or reconstructed winter use sanitary facilities will be constructed in locations and with advanced technologies that will protect water resources.

- A focused monitoring program will reduce the uncertainty of impacts from oversnow vehicles, and if necessary indicate best management practices that might be implemented.

**Wildlife, Including Federally Protected Species and Species of Special Concern**

- NPS personnel will patrol sensitive resources to ensure compliance with area closures.
- Monitoring of eagle populations to identify and protect nests will continue. The park will continue to support the objectives of the Greater Yellowstone Bald Eagle Management Plan.
- Monitoring of wolf populations will continue.
- Continue to conduct lynx surveys to document the presence/absence of lynx and their distribution and abundance. The information obtained will assist park managers in protecting important habitats and planning recreational activities that minimize disturbance to lynx. The presence of other carnivores will be documented. The parks will abide by the recommendations of the Lynx Conservation Assessment Strategy.
- Assessment of grizzly bear abundance, distribution, and habitat selection, including the location of dens, will continue. The information obtained will assist park managers in protecting important habitats and planning recreational activities that minimize disturbance to bears. Monitoring grizzly bear populations will continue in accordance with the Interagency Grizzly Bear Management Guidelines and the parks' bear management plans.
- Monitoring and protecting trumpeter swan habitats and nests will continue, including the closure of nest sites, when warranted, to public access from February 1 to September 15.
- Monitoring potential or known winter use conflicts will result in area closures if necessary to protect wildlife habitat.
- Snow track surveys for carnivores (including lynx) will be conducted on both groomed and ungroomed routes.
- Use of groomed, ungroomed, and plowed surfaces by bison and other ungulates will continue to be monitored.

**Cultural Resources**

- Should the discovery of human remains, funerary objects, sacred objects, or objects of cultural patrimony occur during construction, provisions outlined in the Native American Graves Protection and Repatriation Act of 1990 (25 USC 3001) will be followed.
- Trails and trailheads will be sited to avoid adversely impacting known cultural resources, including potential cultural landscapes. In addition, the use of natural materials and colors for all permanent signs erected will allow the signs to blend into their surroundings.

**Actions Specific to Yellowstone**

- In Yellowstone, the NPS will continue to plow the road from Mammoth to Tower and Tower to the Northeast Entrance (Cooke City) throughout the winter. The NPS would support the state of Montana's plowing of U.S. Highway 191 in Yellowstone.

- A designated route for "non-motorized recreation" is defined as a marked or otherwise indicated oversnow travel way.

- Grand Canyon of the Yellowstone and the McMinn Bench bighorn sheep area will continue to be closed to winter use.

- Restrict non-motorized uses in wildlife winter ranges and thermal areas to travel on designated routes or trails.

- Winter garbage storage facilities that are wildlife-proof will be constructed in the Old Faithful, Grant, Lake, and Canyon areas.

- Continue allowing personal non-recreational use of snowmobiles by employees and their families living in the interior of Yellowstone; however, subject to available funding, provide administrative snowcoaches for their use and encourage them to replace their current snowmobiles with cleaner and quieter machines utilizing the best available technology (BAT).

- Increase interpretive opportunities related to the unique aspects of the winter environment by providing interpretive programs at destination areas and warming huts. Provide guided interpretive programs for organized groups on snowcoaches. Provide interpretive ski and snowshoe tours and programs such as near Tower, Canyon, Mammoth, Old Faithful, West Thumb, Madison, and West Entrance.

- Provide adequate warming huts for all visitors at Old Faithful, Norris, Madison, Canyon, Fishing Bridge, Mammoth Terraces and other appropriate sites.

- Continue all existing major groomed motorized routes (zone 3).

- Implement the winter use season during the period from late November to mid-March.

- Allow early season travel by only rubber track vehicles until sufficient snow for snowmachines has accumulated.

- Reduce administrative snowmobile use and supplement with administrative snowcoaches, subject to available funding and authority. Phase-in administrative snowmobiles to a type that meet the BAT requirements.

- Allow on a limited basis as administrative use, snowmobiles by concessioners to support their operation. Require (through permit and contracts) BAT as they are developed and encourage the use of snowcoaches.

- Maintain the speed limit of 35 mph from the West Entrance to Madison to Old Faithful, and further reduce speed limit to 25 mph in specific, special areas along this segment.

- The side roads that were restricted to snowcoach-only motorized travel in the winter of 2002-2003 will remain as snowcoach-only at least through the winter of 2004-2005, with the exception of the Lake Butte Road, which will be opened to snowmobiles.

**Actions Specific to Grand Teton and the Parkway**

- In Grand Teton and the Parkway, the following roadways will continue to be plowed:

➢ Highway 26/89/287 from the south boundary of the park to Moran.

➢ Highway 89/287 from Moran to Colter Bay.

➢ Highway 26/287 from Moran to the eastern park boundary.

➢ Teton Park Road from Moose Junction to Taggart Lake Trailhead, and from Jackson Lake Junction to Signal Mountain Lodge; from Highway 89/287 along the Pacific Creek road to the park boundary; from Kelly to the eastern park boundary; from Gros Ventre Junction to Kelly to Mailbox Corner; and the road to the eastern park boundary at Ditch Creek.

- Current winter closures will remain in effect on the Snake River floodplain, the Buffalo Fork River floodplain, and the Uhl Hill area, Willow Flats, Kelly Hill, Static Peak (zone 9), Prospectors Mountain, and Mount Hunt.

- Continue to provide access to inholdings and adjacent public and private lands using motorized means. This access will be a combination of plowed roads for wheeled-vehicle access, and staging areas for snowmachines traveling to immediately adjacent lands.

- Reasonable and direct access to adjacent public and private lands, or to privately owned lands within the park with permitted or historical motorized access, will continue via paved and plowed routes or via oversnow routes from GTNP.

- Increase interpretive opportunities related to the unique aspects of the winter environment by providing interpretive programs at destination areas and warming huts. Provide guided interpretive programs for organized groups on snowcoaches. Provide interpretive ski and snowshoe tours and programs at locations such as Moose, Colter Bay, and Flagg Ranch.

- Phase in administrative snowmobile types that meet the best available emission and sound limits, subject to available funding. Administrative use of snowmobiles in Grand Teton is limited to law enforcement, utility and maintenance access, and search and rescue or other use as approved by the superintendent and consistent with NPS Management Policies 8.2.3.2.

- Continue destination and support facilities at Moose, Triangle X, Colter Bay, and Flagg Ranch, and add warming hut facilities along the Teton Park Road to provide visitor services and interpretive opportunities that focus on nonmotorized uses (zone 1).

- Continue access to Flagg Ranch by plowed road at least until the current concessions contract expires on December 31, 2009.

- Continue existing motorized routes (zone 3).

- Limit snowmobile use on Jackson Lake's frozen surface to the daily limits identified in Table 1 of this ROD, and only with machines that meet the BAT requirements, as well as other restrictions. Snowplanes will continue to be prohibited in accordance with 36 CFR 7.22. Maximum speed will be limited to 25 miles per hour and access will be permitted from Colter Bay and Signal Mountain only. Those using the lake surface must have in their possession a valid Wyoming fishing license, fishing equipment, and may only travel directly to and from a fishing area. Other recreational snowmobile use on Jackson Lake would be prohibited.

- BAT requirements would apply to all snowmobiles on the Continental Divide Snowmobile Trail (CDST). BAT requirements would also apply to all snowmobiles originating at Flagg Ranch and traveling west on the Grassy Lake Road. Snowmobiles originating in the Targhee National Forest and traveling eastbound on the Grassy Lake Road would not be required to be BAT; however, these snowmobiles could not travel further than Flagg Ranch. These requirements would be effective beginning with the winter season of 2004-2005.

**Table 1. Initial limits on recreational snowmobile use for Yellowstone/Grand Teton/Parkway entrance road segments**

| Entrance or Road Segment | Daily Limit for Commercially Guided Snowmobile Use | Daily Limit for Non-Commercially Guided Snowmobile Use | Total |
|---|---|---|---|
| North Entrance | 40 | 10 | 50 |
| East Entrance | 80 | 20 | 100 |
| West Entrance | 440 | 110 | 550 |
| South Entrance | 200 | 50 | 250 |
| Grassy Lake Road | N/A | N/A | 75* |
| Continental Divide Snowmobile Trail | N/A | N/A | 75* |
| Jackson Lake | N/A | N/A | 40* |

*The users are not required to be accompanied by a guide.

- Initially, visitors who enter Yellowstone through one entrance, exit the park at another entrance in order to spend that night out of the park, and then re-enter on the following day will not be counted towards the daily entry limits on following day. Also, visitors spending the night in Yellowstone at Old Faithful, Canyon, or in the backcountry would only count towards the daily entry limit on the day they initially enter the park.

- Initially, snowmobiles rented at Old Faithful by an authorized concessioner will not count against daily entry limits. Both of these provisions may be modified through adaptive management.

National Park Service
U.S. Department of the Interior

Grand Teton/Yellowstone National Parks
John D. Rockefeller, Jr., Memorial Parkway
Wyoming/Montana/Idaho



# Temporary Winter Use Plans Environmental Assessment

## August 2004

# APPENDIX B
# MONITORING AND ADAPTIVE MANAGEMENT

**Table 1. Monitoring and adaptive management indicators, thresholds, and methods.**

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Air Quality | Park employees and visitors exposure to CO, particulate matter, and volatile organic compounds | Zone 1 | 1- hr maximum CO (w/bkgd): 8 ppm<br><br>8- hr maximum CO (w/bkgd): 3 ppm<br><br>24- hr maximum $PM_{10}$ (w/bkgd): 23 g/m$^3$<br><br>No observed employee health problems due to air quality<br><br>ATSDR (Agency for Toxic Substances and Disease Registry) Minimal Risk Levels | Fixed site monitoring or personal sampling for PM and CO<br><br>Personal samples, cartridges, or canisters for VOCs (air toxics) | High | ▪ Require new technologies<br>▪ Adjust number of daily vehicle entries permitted<br>▪ Establish timed-entry requirements |
| | | Zone 2 | 1- hr maximum CO (w/bkgd): 1 ppm<br><br>8- hr maximum CO (w/bkgd): 1 ppm<br><br>24- hr maximum $PM_{10}$: 5 g/m$^3$<br><br>No observed employee health problems due to air quality<br><br>ATSDR (Agency for Toxic Substances and Disease Registry) Minimal Risk Levels | Fixed site monitoring or personal sampling for PM and CO<br><br>Personal samples, cartridges, or canisters for VOCs (air toxics) | Low | |
| | | Zone 3 | 1- hr maximum CO (w/bkgd): 1 ppm<br><br>8- hr maximum CO (w/bkgd): 1 ppm<br><br>24- hr maximum $PM_{10}$ (w/bkgd): 6 g/m$^3$<br><br>No observed employee health problems due to air quality<br><br>ATSDR (Agency for Toxic Substances and Disease Registry) Minimal Risk Levels | Fixed site monitoring or personal sampling for PM and CO<br><br>Personal samples, cartridges, or canisters for VOCs (air toxics) | Moderate | |

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| | | Zones 4–5 | 1- hr maximum CO (w/bkgd): 1 ppm<br>8- hr maximum CO (w/bkgd): 1 ppm<br>24- hr maximum $PM_{10}$: 5 g/m$^3$ | Fixed site monitoring or personal sampling for PM and CO | Low | |
| | Visibility | Zones 1–4 | No perceptible localized visibility impacts | Photo Survey and time laps video and nephelometer | High | |
| | | Zones 5–9 | No perceptible localized visibility impacts | | Low | |
| | Odor | Zones 1–3 | Area free of any noticeable odor resulting from motorized recreation at least 90% of the daytime hours of park operation (8 A.M.– 4 P.M.) | Park visitor survey<br>Scentometer | High | |
| | | Zones 4–5 | Area free of any noticeable odor resulting from motorized recreation at least 95% of the daytime hours of park operation (8 A.M.– 4 P.M.) | | Low | |
| | | Zones 6–9 | Area free of any noticeable odor resulting from motorized recreation | | Low | |

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Natural Soundscapes | Distance and time human-caused sound is audible | Zones 1–5 | During daytime hours of park operation (8 A.M.– 4 P.M.) and measured 100 feet from staging areas and roadways: <br> ▪ Audibility: Not to exceed (NTE) 50% <br> ▪ dB of human caused noise: NTE 70 dB(A) <br> ▪ Leq (average sound level): NTE 45 dB(A) <br><br> Note: Audibility is the percent of time oversnow vehicles are audible to a person with normal hearing. A NTE 50% threshold means that oversnow vehicles will not be audible more than 50% of the time during daytime hours of park operation. | Audibility logging, digital recordings, and sound pressure level measurement | High | ▪ Require new technologies <br> ▪ Adjust number of daily vehicle entries permitted <br> ▪ Establish timed-entry requirements |
| | | Zone 6 | During daytime hours of park operation (8 A.M.– 4 P.M.) and measured 100 feet from staging areas and roadways: <br> ▪ Audibility: Not to exceed (NTE) 25% <br> ▪ dB of human caused noise: NTE 70 dB(A) <br> ▪ Leq (average sound level): NTE 45 dB(A) | | High | |

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| | | Zones 7–8 | During daytime hours of park operation (8 A.M.– 4 P.M.) and measured 100 feet from staging areas and roadways:<br>• Audibility: Not to exceed (NTE) 20%<br>• dB of human caused noise: NTE 6 dB(A) below natural ambient sound levels<br>• Leq (average sound level): NTE natural ambient sound levels<br><br>Note: Vehicle noise, even at 6 dB(A) less than natural ambient, is usually audible due to the lower frequencies of human-caused noise. Additionally, since natural and human- caused sounds tend to be in different frequencies, both can be audible at the same time, even at very low levels. | | Moderate | |
| Safety | Motor vehicle accidents | Zones 1–5 | Continual improvement of three- year sliding average | Incident descriptions and GIS mapping | High | • Alter or implement commercial and non- commercial guiding requirements and/or ratio<br>• Increase signage and reduce speed limits in areas of recurring incidents<br>• Increase law enforcement and educational information<br>• Adjust number of daily vehicle entries permitted |

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Water/Snowpack | Water quality: VOCs, pH, hydrogen, ammonium, calcium, sulfate, nitrate, and NOx | Zones 1–3 | Monitoring will occur until BAT requirements are full implemented and a longer- term threshold will be set then. In the interim, the following thresholds will be used:[7] ▪ Benzene: EPA maximum limit for drinking water 0.005 mg/L. OSHA permissible exposure in workplace (8 hour day, 40 hour weeks) 1 ppm ▪ Toluene: EPA maximum limit for drinking water 1 mg/L. OSHA permissible exposure in workplace 200 ppm ▪ Ethylbenzene: EPA maximum limit for drinking water .7 mg/L. OSHA permissible exposure in workplace 100 ppm ▪ Xylene: EPA maximum limit for drinking water 10 ppm. OSHA permissible exposure in workplace 100 ppm | Snowpack sampling, snowmelt runoff, stream runoff, snowmelt/rain event | Moderate | ▪ Require new technologies ▪ Determination and application of best management practices ▪ Adjust number of daily vehicle entries permitted |
| | | Zone 8 | ▪ Benzene: EPA maximum limit for drinking water 0.005 mg/L. OSHA permissible exposure in workplace (8 hour day, 40 hour weeks) 1 ppm ▪ Toluene: EPA maximum limit for drinking water 1 mg/L. OSHA permissible exposure in workplace 200 ppm ▪ Ethylbenzene: EPA maximum limit for drinking water .7 mg/L. OSHA permissible exposure in workplace 100 ppm ▪ Xylene: EPA maximum limit for drinking water 10 ppm. OSHA permissible exposure in workplace 100 ppm | Snowpack sampling, snowmelt runoff, stream runoff, snowmelt/rain event | Low | |
| Geothermal Features | Human- caused damage to geothermal areas | Zone 1 | No degradation of geothermal resources | Remote sensing and visual observation | High | ▪ Increase law enforcement and educational information ▪ Restrict travel |

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Visitor Experience | Smoothness of the groomed surface | Zone 3 | No worse than fair 20% of the daytime hours of park operation (8 A.M.– 4 P.M.) | Visual observation | High | ▪ Increase grooming ▪ Adjust vehicle numbers when threshold temperature and/or snow conditions are forecasted or reached |
| | | Zone 4 | No worse than fair 20% of the daytime hours of park operation (8 A.M.– 4 P.M.) | | Low | |
| | Visitor satisfaction levels with opportunities to experience and view wildlife, scenery, and clean air and solitude. | Zones 1- 8 | Visitors are highly satisfied (+90%) with their park experience | | High | ▪ Establish carrying capacity/adjust visitor numbers ▪ Determine unsatisfactory conditions and rectify |
| | Visitor perception assessment of important park resources and values | Zones 1- 8 | Visitors are able to see, smell, and hear the natural environment at roadside pullouts and interpretive trails 90% of each 24- hour period | Visitor survey Encounter rates Time lapse photos Travel simulation models Observations | High | ▪ Establish carrying capacity/adjust visitor numbers ▪ Require new technologies |

[1]Ingersoll (1999) compared his water quality findings for snowmelt runoff to drinking water standards.

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| Wildlife | Bird and mammal habituation and effectiveness of garbage facilities | Zone 1 | Garbage unavailable to wildlife | Photo surveys and observations | High | ▪ Improve or redesign facilities<br>▪ Adjust number of daily vehicle entries permitted<br>▪ Alter or implement commercial guiding requirements and allocations |
| | Ungulate (e.g., bison and elk) movements on plowed roads | Zone 2 | No unacceptable adverse effects. Unacceptable effects are those considered greater than "adverse negligible." See Chapter IV, *Wildlife*, for definitions of effects. | Continue bison monitoring, flights, and photo surveys | High | ▪ Evaluate alternative transportation systems<br>▪ Close roads (by road segment or seasonally) |
| | Vehicle caused wildlife mortality | Zones 2- 4 | No unacceptable adverse effects | Incident reports, roadside surveys, GIS, and visual observations | High | ▪ Alter or implement commercial guiding requirements and allocations<br>▪ Evaluate alternative transportation systems<br>▪ Increase law enforcement and educational information<br>▪ Reduce speed limits |

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| | Wildlife harassment or displacement due to vehicle sounds or movements | Zone 2–5 | No unacceptable adverse effects | Incident reports, photo surveys, and visual observations | High | ▪ Increase law enforcement and educational information<br>▪ Require new technologies<br>▪ Adjust number of daily vehicle entries permitted<br>▪ Alter or implement commercial guiding requirements and allocations<br>▪ Establish additional no- stopping zones<br>▪ Adjust group size requirements<br>▪ Establish timed- entry requirements<br>▪ Close roads (by road segment or seasonally) |
| | Wildlife trapped by snow berms in road corridor | Zone 2 | No unacceptable adverse effects | Incident reports, roadside surveys, and visual observations | High | ▪ Increase number of exit berms and re- evaluate location of existing exits<br>▪ Evaluate alternative transportation systems |
| | Ungulate (e.g., bison and elk) use of groomed surfaces | Zones 3–4 | No unacceptable adverse effects | Visual observations, photo surveys, air surveys, and telemetry. Continue bison monitoring | High | ▪ Close roads or eliminate grooming operations (by road segment or seasonally)<br>▪ Adjust grooming intensity |

| Resource or Value | Indicator | Location/ Management Zone | Preliminary Threshold | Preliminary Method | Initial Monitoring Intensity* | Possible Management Options if Threshold is Violated |
|---|---|---|---|---|---|---|
| | Carnivore (e.g., wolves and lynx) displacement and habitat effectiveness | Zones 3–9 | Insignificant, discountable, or beneficial effects only | Carnivore and snowshoe hare track surveys and air surveys | High | ▪ Mitigate effects or close area<br>▪ Increase law enforcement and educational information<br>▪ Require new technologies<br>▪ Adjust number of daily vehicle entries permitted<br>▪ Alter or implement commercial guiding requirements and allocations<br>▪ Establish additional no-stopping zones<br>▪ Adjust group size requirements<br>▪ Establish timed-entry requirements<br>▪ Consult with USFWS for appropriate mitigation strategies |
| | Wildlife harassment or displacement as a result of visitor activities | Zone 6–9 | No unacceptable adverse effects | Incident reports, photo surveys, and visual observations | High | ▪ Increase law enforcement and educational information<br>▪ Require use of designated trails only<br>▪ Close areas to use seasonally |
| | Human-bear conflicts during pre- and post-denning periods | Zones 2 and 7–9 | No unacceptable adverse effects | Mapping of denning areas and visitor use patterns and trends.<br>Incident Reports | Moderate | |

**A5623(2310)**

**January 8, 2001**

**Memorandum**

**To: Directorate, Field Directorate and Park Superintendents**

**From: Director /s/ Robert Stanton**

**Subject: Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making**

I am pleased to send you Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making and its accompanying Handbook. Together, these documents set forth the policy and procedures by which the National Park Service carries out its responsibilities under the National Environmental Policy Act (NEPA). NEPA and the National Park Service Organic Act are recognized as the two pieces of "landmark" environmental legislation passed by Congress. The provisions of NEPA also supply the Service with a powerful tool we can use to accomplish our mission of protecting this country's parks for future generations.

Director's Order #12 and the Handbook lay the groundwork for a necessary evolution in the way we approach environmental analysis, public involvement, and making resource-based decisions. They set forth a new direction in using interdisciplinary teams, incorporating scientific and technical information, and establishing a solid administrative record for our actions.

Recent court challenges have stopped or redirected some of the Service's actions and decisions. Court decisions are generally based on the adequacy of environmental analysis under NEPA, and the accompanying administrative record. Common themes seen in the court decisions indicate defects in the NPS decision-making process. The courts have cited a lack of, or failure to incorporate, critical information in decisions. In some cases, there has been a basic disregard of laws, regulations, and policies designed to foster resource preservation and conservation. Because of this, I asked a subcommittee of the National Leadership Council to recommend actions to be taken to address these issues. These recommendations, as well as others, are incorporated in the Director's Order and Handbook. They include:

- Use of interdisciplinary approaches and principles in decision-making;
- Decisions based on technical and scientific information;
- Establishment of benchmarks demonstrating best management processes (such as resource councils and project review teams) in development, analysis, and review of projects;
- Use of alternative dispute resolution and other processes to resolve internal and external disputes;
- Peer review panels to address conflicts among resource specialists regarding validity and interpretation of data and resource information;
- Analysis of impairment to resources as part of the environmental impact analysis process; and
- Post-litigation review and analysis of decision-making for potential improvements to resource-based decisions.

To assist in the implementation of the Director's Order, I am directing the Associate Director, Natural Resource Stewardship and Science to re-direct resources and seek additional funding so that the Environmental Quality Division can provide increased technical assistance to parks and regions according to the general model adopted by other Natural Resource Program Center Divisions. Service-wide funding proposals should also be developed so that parks, system support offices and regions have adequate resources to implement them. Lastly, an advisory group made up of regional environmental coordinators, and others from parks, regions, and SSOs should also be established to provide recommendations on improvement of methods and processes used in

environmental impact analysis and policy implementation.

No amount of policy, guidance, or oversight will be successful unless we make a personal commitment to affirmatively fulfill these responsibilities. Our world and our jobs are more complicated now than in any time in history. With this and other issues we must achieve a level of excellence that others will emulate in exercising our resource stewardship responsibilities.

CFagan:1/3/01/208-7456I:/DIRORDER/12-NEPA/DIRECTORSMEMO



# National Park Service

## DIRECTOR'S ORDER #12: CONSERVATION PLANNING AND ENVIRONMENTAL IMPACT ANALYSIS, AND DECISION-MAKING

**Approved:** /s/ Robert Stanton
Director, National Park Service

**Effective Date:** January 8, 2001

**Sunset Date:** January 8, 2005

NPS-12, "NEPA Compliance," is superseded and replaced by this Director's Order and Handbook 12.

**Contents:**

   I.   Background
  II.  Purpose and Scope
 III.  Authority
 IV.  Instructions, Requirements, and Policies
      1.  Sources of NEPA Guidance
      2.  Director's Order and Handbook
      3.  Full and Open Evaluation
      4.  Technical and Scientific Analysis
      5.  Unknown or Uncertain Impacts
      6.  The Administrative Record
      7.  Prohibition on Impairment
      8.  Records of Decision
      9.  Peer Review
     10.  Alternative Dispute Resolution
     11.  Interdisciplinary Approach Required
     12.  Evaluating Proposals by Others
  V.  Responsibilities
      1.  Director
      2.  Associate Director for Natural Resources Stewardship and Science

3. Regional Directors
4. Park Superintendents
5. WASO Environmental Quality Division
6. Park Resource Specialists
7. Project Managers and Contracting Officers

## I. Background

The National Environmental Policy Act of 1969 (NEPA), as amended, is landmark environmen-tal protection legislation establishing as a goal for federal decision-making a balance between use and preservation of natural and cultural resources. NEPA requires all federal agencies to: (1) prepare in-depth studies of the impacts of and alternatives to proposed "major federal actions"; (2) use the information contained in such studies in deciding whether to proceed with the actions; and (3) diligently attempt to involve the interested and affected public before any decision affecting the environment is made. The 1916 National Park Service Organic Act directs the National Park Service to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." (16 USC 1)

Read together, the provisions of NEPA and the National Park Service Organic Act are consonant and jointly commit the Service to make informed decisions that perpetuate the conservation and protection of park resources unimpaired for the benefit and enjoyment of future generations. Planning, environmental evaluation and public involvement in management actions that may affect national park system resources are essential in carrying out the trust responsibilities of the National Park Service (NPS). Particularly in this era of heightened environmental concern, it is essential that NPS management decisions (1) be scientifically informed, and (2) insist on resource preservation as the highest of many worthy priorities.

## II. Purpose and Scope

The purpose of this Director's Order is to set forth the policy and procedures by which the NPS will comply with NEPA.

The Council on Environmental Quality (CEQ), part of the Executive Office of the President, is the "caretaker" of NEPA. The NPS will abide by all CEQ NEPA regulations (40 CFR 1500-1508) and any other procedures and requirements imposed by other higher authorities, such as the Department of the Interior (DOI). This Director's Order is not intended, however, to document all those procedures and requirements; for a comprehensive compilation, employees must refer to Handbook 12.

## III. Authority

Authority to issue this Director's Order is contained in the NPS Organic Act (16 U.S.C. 1 et seq.), and in delegations of authority found in Part 245 of the DOI Manual (DM). Other specific authorities and requirements governing NPS conservation planning and environmental impact analysis are found in NEPA (42 U.S.C. 4321 et seq.); 40 C.F.R. 1500-1508; Executive Order 11514 as amended by Executive Order 11991; and the National Parks Omnibus Management Act of 1998 (NPOMA) (16 U.S.C. 5901 et seq.).

## IV. Instructions, Requirements, and Policies

**4.1 Sources of NEPA Guidance.** The NPS will comply with the substantive and procedural requirements of NEPA, 40 CFR 1500-1508, 516 DM, and any additional NPS procedures or instructions regarding NEPA.

**4.2 Director's Order and Handbook.** References in NPS *Management Policies* to public involvement, alternative analysis, and environmental evaluation of NPS and other government actions

on resources administered by the NPS are supplemented by this Director's Order and Handbook 12. The Associate Director for Natural Resources Stewardship and Science will develop and issue Handbook 12, containing uniform Servicewide implementing procedures and such supplemental material as may be necessary to carry out NPS responsibilities under NEPA and related statutes. Where other directives and guidelines appear to differ from this Director's Order and Handbook in the areas of impact analysis and other responsibilities under the National Environmental Policy Act, this Director's Order and Handbook take precedence.

**4.3 Full and Open Evaluation.** The procedures contained in Handbook 12 will ensure that environmental costs and benefits of NPS proposed actions are fully and openly evaluated before actions are taken that may impact the human environment. This evaluation must include provisions for:

- Meaningful participation by the public and other stakeholders;
- Development and critical evaluation of alternative courses of action;
- Rigorous application of scientific and technical information in the planning, evaluation and decision-making processes;
- Use of NPS knowledge and expertise through interdisciplinary teams and processes; and
- Aggressive incorporation of mitigation measures, pollution prevention techniques and
- other principles of sustainable park management in all actions.

**4.4 Technical and Scientific Analysis.** Pursuant to the NPOMA and NEPA, NPS management decisions will be based on ample technical and scientific studies properly considered and appropriate to the decisions made. In making decisions, the NPS will articulate a reasoned connection between technical and scientific information and the final agency action. Technical and scientific analyses on potential impacts that are essential in making a well-reasoned decision will be obtained even though such information may not be readily available. If such information cannot be obtained due to excessive cost or technical impossibility, the proposed alternative for decision will be modified to eliminate the action causing the unknown or uncertain impact or other alternatives will be selected.

**4.5 Unknown or Uncertain Impacts.** When it is not possible to modify alternatives to eliminate an activity with unknown or uncertain potential impacts, and such information is essential to making a well-reasoned decision, the NPS will follow the provisions of the regulations of the Council on Environmental Quality (40 CFR 1502.22). The NPS will state in the environmental document that: (1) such information is incomplete or unavailable; (2) the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and (4) an evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. Reasonably foreseeable impacts -- including impacts that have catastrophic consequences -- will be included, even if their probability of occurrence is low, if such analysis (1) is supported by credible scientific evidence, (2) is not based on pure conjecture, and (3) is within the rule of reason. Scoping processes will be used to help determine data needs.

**4.6 The Administrative Record.** Where an action undertaken by the NPS may cause an adverse effect on park resources, an adequate and public administrative record must reflect the manner in which park unit resource studies have been considered, alternatives examined, mitigations incorporated, and final decisions reached.

**4.7 Prohibition on Impairment.** In managing units of the national park system, the Service may undertake actions that have both beneficial and adverse impacts on park resources and values. However, by the provisions of the laws governing the NPS, the Service is prohibited from taking or authorizing any action that would, or is likely to, impair park resources or values. In addition, under other environmental laws, adverse impacts may be prohibited as well. Impacts that may constitute an impairment of park resources or values will be evaluated and described in impact analysis contained within environmental documents produced by the Service.

**4.8 Records of Decision.** Decisions described in Findings of No Significant Impact and Records of Decision will record information as required by the Council on Environmental Quality and by NPS policies and practices described in the handbook accompanying this order. In addition, such documents will summarize impacts, and whether or not such impacts may constitute an impairment of park resources or values using any criteria established under NPS Management Policies and best professional judgment.

**4.9 Peer Review.** Peer review will be used to address conflicts among resource specialists regarding validity and interpretation of data and resource information. When conflicting information and opinions concerning resource impacts exists, managers must resolve such disputes. Peer review and similar mechanisms will be used as a primary method for resolution of such conflicts. These processes will be reflected in the administrative record.

**4.10 Alternative Dispute Resolution.** In order to reduce the potential for litigation, relationships with established alternative dispute resolution providers and scientific professional societies will be established and used within the NEPA process to provide a vehicle for resolution of internal and external disputes. In those instances where the NPS has been sued successfully under NEPA, or advised by the Department of Justice or the Office of the Solicitor to settle litigation, a review and evaluation of the process will be conducted so that corrections can be made to improve our project planning, evaluation and decision-making processes. *(See also Director's Order #93: Conflict Resolution.)*

**4.11 Interdisciplinary Approach Required.** Laws, regulations, and policies applicable to the NPS require interdisciplinary approaches to problem-solving and decision-making. NPS decisions need to reflect this approach as the standard for management within all units. Both present and new NPS managers must consistently apply the principles of interdisciplinary decision-making in order to achieve our goals as resource stewards and "environmental leaders." Benchmarks demonstrating best management processes in development, analysis, and review of projects (such as resource councils and project review teams) will be established for use by parks and regions.

**4.12 Evaluating Proposals by Others.** The NPS will participate in the early and candid evaluation of proposals by other governments or private entities to avoid adverse environmental impacts to NPS units or other park or recreation resources subject to the provisions of federal law. This is an essential element of effective NPS stewardship. When participating in the environmental impact analysis processes of other entities, the Associate Director for Natural Resources Stewardship and Science will ensure that the NPS's responsibilities for commenting are clearly defined and that the Service and its personnel work with federal, tribal, state and local governments in identifying and evaluating potential impacts to resources under NPS jurisdiction or within areas of NPS expertise. Examples include, but are not limited to:

- Consultation under provisions of Section 4(f) of the Department of Transportation Act;
- Evaluation of noise, visual, or other impacts to national park system resources resulting from external activities;
- Hydropower relicensing projects through FERC procedures
- Impacts of proposed projects on non-NPS areas that have benefited from NPS administered partnership programs (e.g. Land and Water Conservation Fund, Rivers and Trails, National Natural Landmarks, National Register Properties, etc.).
- Analysis of cumulative ecosystem or other impacts upon the integrity of NPS-administered resources; and
- The impacts of any federal activity on other park resources.

Further, other agencies or project proponents will receive responsive and professional evaluation of the potential impacts of their proposals and whether such impacts may result in the derogation of national park system resources or values, or the derogation of other park and recreation resources subject to the provisions of federal law. The purpose of these efforts will be to assist other agencies in avoiding or successfully mitigating impacts to resources and values of NPS units, or on NPS programs administered under other statutory or administrative authorities.

## V. Responsibilities

**5.1 The Director** is ultimately responsible for NEPA planning for all NPS activities. The Director retains signature and approval authority for programmatic environmental impact statements for proposals of nationwide application. While regional directors are delegated authority to approve other types of park-specific EISs, the Director may assume signature authority for any EIS that is unusually controversial or that involves major policy issues.

**5.2 The Associate Director for Natural Resources Stewardship and Science** will work cooperatively with other associate directors, regional directors, support offices, superintendents and field personnel to ensure that training, technical assistance, and other resources are available and fully used to implement the legal, regulatory, and policy requirements of this order.

**5.3 Regional directors** are responsible to the Director for integrating the NEPA process into all regional activities and for NEPA planning in their regions. Regional directors are delegated the authority to approve most park-specific EISs for public review, and are responsible for approval of environmental assessments for public review. Only regional directors may sign a Finding of No Significant Impact (FONSI) or Record of Decision (ROD). Regional directors also accept or reject requests for the NPS to be a cooperating or joint lead agency on another agency's environmental documents.

Regional directors should designate a regional environmental coordinator or similar position for their particular region. Subject to the direction of the regional director, regional environmental coordinators:

- Have functional oversight responsibility for all environmental compliance activities within a given region;
- Usually are the point of contact with the Washington Office, Department of Interior, Office of Environmental Policy and Compliance, and Solicitor's Office on significant environmental issues;
- Provide policy review for all NPS NEPA documents and coordinate external review for the region; and
- Serve as a resource to other NPS professionals for understanding the various environmental requirements under which the Service operates.

Regional directors should also designate an associate regional director to serve as a contact for the peer review and alternative dispute resolution processes described in paragraphs 4.9 and 4.10, above.

**5.4 Park superintendents** are responsible for day-to-day implementation of conservation planning and impact analysis activities related to parks under their administration. They must:

- Assure that within-park actions have been adequately analyzed, an adequate range of alternatives considered, and the public and other agencies appropriately involved;
- Assure that ample resource information appropriate to a decision is available, and the technical and scientific studies appropriate to analyze proposed actions are conducted;
- Assure that resource conflicts and allocations are adequately resolved before projects are implemented;
- Recommend Environmental Assessments, Environmental Impact Statements, RODs and FONSIs for approval by the regional director;
- Assure that all actions approved under a FONSI or ROD are implemented;
- Designate a park resource specialist to serve as coordinator for NEPA and related impact analysis activities;
- Assure that mitigation measures are included in projects once they are approved; and
- Approve actions that fall under established NPS Categorical Exclusions.

**5.5 The WASO Environmental Quality Division**, which is a part of the Natural Resource Program Center and reports to the Associate Director for Natural Resources Stewardship and Science, will:

- Serve as the focal point for all matters relating to NEPA planning and other related environmental mandates;
- Provide technical assistance to parks and regions;
- Provide project management and coordination on nationally significant environmental impact analysis issues and proposals;
- Coordinate NPS review of NEPA and other documents prepared by other agencies; and
- Provide policy review and clearance for NPS Environmental Impact Statements, as requested.

The Environmental Quality Division may provide policy review and clearance for NPS EISs on a case by case basis, depending on the level of controversy or policy issues involved in the proposed action. Information concerning NPS NEPA documents or the NEPA process can be obtained by contacting this office.

**5.6 Park resource specialists** are responsible for:

- Having knowledge of existing technical and scientific information on park resources and the quality of such information;
- Identifying additional resource information needs and technical and scientific studies necessary to ensure that ample resource information appropriate to analyze proposed actions is available;
- Serving as park NEPA coordinator to facilitate conservation planning and impact analysis;
- Having knowledge of impact analysis processes and procedures;
- Working with the park superintendent and other park staff to assure consideration of potential resource impacts in park proposals; and
- Working with contracting officers in parks, regions, and the Washington Office to ensure that mitigating measures identified in environmental documents are included in the subsequent contract documents implementing projects.

**5.7 Project Managers and Contracting Officers** are responsible for working with park staff to assure that mitigating measures and other items identified in environmental documents to provide for resource protection are included in the subsequent documents implementing projects.

----------------- end of Director's Order ---------------

## WINTER USE PLANS

### Final Supplemental Environmental Impact Statement

## ADMINISTRATIVE RECORD

Winter Use Plans
Yellowstone/Grand Teton National Parks

**Volume 1**

**Supplemental
Environmental Impact Statement
And
Record of Decision**

03/25/2003



**VOLUME  31**

**BATES START #  76513
BATES END #  76513**

**February 2003**

---

## YELLOWSTONE AND GRAND TETON NATIONAL PARKS
### AND THE JOHN D. ROCKEFELLER, JR., MEMORIAL PARKWAY

Effects related to traffic volumes including disturbance and harassment would be mitigated by the stipulation that permitted guides accompany all snowmobilers in YNP. The use of guides would serve to minimize impacts by controlling where and when stops are made, and would prevent snowmobiles from becoming dispersed along the roadway. In addition, when snow depth warrants and at periodic intervals, routine plowing operations would include laying back roadside snowbanks that could be a barrier to wildlife exiting the road corridor (an action common to all alternatives).

**Effects of groomed roads and trails for motorized use.** Packed trails may influence wildlife movements and distributions by facilitating travel into areas that would normally be inaccessible due to deep snow. Under the preferred alternative, YNP would groom all existing routes (184 miles). GTNP and the Parkway would groom 35 miles of motorized routes, including the Grassy Lake Road and the CDST. Adaptive management would be employed in all alternatives to evaluate the effects of winter recreation on wildlife and to formulate management alternatives if necessary. Preliminary thresholds for adaptive management under the preferred alternative are based on a determination of adverse effects that are considered "greater than negligible" as determined by NPS biologists.

Similar to alternative 3, the effects of groomed routes would increase slightly from alternatives 1a and 1b due to the addition of the CDST. However because the CDST does not pass through elk or bison winter range, effects related to these species would not change. As stated in alternative 1a, groomed routes may be important in stress-induced exploratory dispersal and range use/preference that has resulted in bison seeking habitat outside of the park boundaries; however, whether this confers adverse impacts upon ungulate distributions and population dynamics is speculative and remains under investigation.

### Conclusion

Overall for alternative 4, effects increase relative to alternatives 1a and 1b because snowmobiles are allowed in the parks on all major existing motorized routes except the Teton Park Road and Jackson Lake. Specifically, road kill mortality caused by oversnow vehicles would be greater (the occurrence is historically related to snowmobile use only), risks associated with harassment and displacement would increase, and physiological stress responses would rise due to higher traffic volumes. Although winter recreation within the park has not clearly demonstrated any long-term adverse consequences to populations, park policies, regulations, and EOs clearly state that disturbance to wildlife, regardless of population-level effects, is unacceptable in the national parks. Under the preferred alternative, alternative 4, potential impacts to wildlife would be mitigated by permitting snowmobile access only when accompanied by an NPS permitted guide, travel in groups, and prohibiting nighttime oversnow travel. These features decrease effects relative to alternative 2. Because of these mitigation actions, impacts to wildlife associated with alternative 4 would not be of sufficient magnitude to constitute impairment of park resources or values.

### Summary of Effects on Elk and Bison

Effects of motorized oversnow use of groomed and ungroomed roads and trails on:

- Mortality caused by collisions - adverse, negligible, and short term
- Harassment and displacement from preferred habitats - adverse, moderate, and short term
- FGC levels - unknown to what extent stress may be affecting populations in the long-term; Greater than alternative 1a
- Effects of groomed roads and trails on animal movements - unknown if and to what extent beneficial effects outweigh negative effects
- Animal movements - potentially important during stress-induced exploratory dispersal; potentially facilitating range use/preference; however unknown if and to what extent beneficial effects outweigh negative effects under normal conditions

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREATER YELLOWSTONE COALITION, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) Civ. No. 07-2111 (EGS) |
| v. | ) ) [Hearing on Motion for Summary ) Judgment on August 27, 2008] |
| DIRK KEMPTHORNE, *et al.*, | ) ) |
| Defendants. | ) ) |
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) ) |
| Plaintiff, | ) ) Civ. No. 07-2112 (EGS) |
| v. | ) ) [Hearing on Motion for Summary ) Judgment on August 27, 2008] |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) ) ) |
| Defendants. | ) ) |

**DECLARATION OF CHARLES CLUSEN**

I, Charles M. Clusen, declare:

1.     I am a Senior Policy Analyst and national parks project director for the

Natural Resources Defense Council ("NRDC"), in Washington D.C.  I am also a member

of NRDC.  NRDC uses law, science, and the support of more than 1.2-million members

and electronic activists nationwide to protect the planet's wildlife and wild places and to

ensure a safe and healthy environment for all living things.  NRDC's purpose is to

safeguard the Earth: its people, its plants and animals and the natural systems on which all life depends.

2.    I specialize in national parks policy and my responsibilities include operation of NRDC's National Parks Project.  The National Parks Project aims to protect a representative sample of diverse ecosystems naturally occurring in the United States and its possessions, to insure the preservation and non-impairment of park resources and, thereby, provide a high-quality visitor's experience in all national park units, to emphasize the preservation of the roadless lands and wildlife populations within individual national park units, to develop and implement a science program adequate to properly guide the protection of park resources, and to acquire adequate funding for all park service protection programs.  NRDC has designated Yellowstone National Park as a priority park to demonstrate methods of implementing these goals.

3.    NRDC believes that snowmobile use in the national parks adversely impacts wildlife and other natural resources, as well as the experience of park visitors. Accordingly, NRDC strongly opposes snowmobile use in Yellowstone National Park.

4.    NRDC has engaged in a wide array of efforts to protect Yellowstone National Park from the adverse impacts of snowmobiles:

    a.  For many years, NRDC has educated the National Park Service on the impacts that prolific use of snowmobiles has on air and water quality, wildlife and visitor experience;

    b.  NRDC has submitted formal comments at every stage of the various National Environmental Policy Act ("NEPA") and administrative rulemaking

processes addressing winter use in Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway (collectively "Yellowstone");

c.   NRDC has actively educated the media and the public about the threat snowmobiles pose to Yellowstone, Grand Teton and other National Parks;

d.   NRDC's members have written to the National Park Service to support a prohibition on snowmobile use in Yellowstone and Grand Teton National Parks, and to advocate similar proposals in other National Parks.  In addition, NRDC members have attended, and encouraged others to attend, meetings and hearings concerning the winter use activities in Parks;

e.   NRDC representatives have worked to educate Congress and Interior Department officials on the positive economic effects of phasing out snowmobiles and phasing in a snowcoach-based mass-transit winter transportation system in Yellowstone;

f.   NRDC has lobbied to educate lawmakers on the negative effects snowmobiles have on the National Park experience, and in particular, to garner support for measures such as the Yellowstone Protection Act, which would have mandated a snowmobile phase-out in Yellowstone;

g.   NRDC assisted in the preparation of a Citizens' Solution for Winter Access to Yellowstone, which supported a plan by which all over-snow access in Yellowstone would be provided by snowcoaches.  Together with fourteen other conservation groups, NRDC published The Citizen's Solution and submitted it to the Park;

h.  NRDC has previously participated in litigation to defend the Park

Service's original decision to phase-out snowmobiles in Yellowstone.

5.      I personally have experienced the adverse effects of snowmobile use on

the natural resources and visitor experience in Yellowstone National Park.  I have visited

Yellowstone National Park in the winter utilizing snowcoach transportation in order to

reach areas of the Park where I intended to ski.  My experience in the Park was impaired

by the nearly constant noise of snowmobiles and smell of snowmobile exhaust in the Old

Faithful area.  One reason I visited the Park was to observe its amazing wildlife, but this

experience too was marred by extensive snowmobile use, as I saw snowmobiles

harassing bison within Yellowstone National Park.

6.      I will return to Yellowstone National Park for winter recreation next

winter and have a plane ticket and reservations for February 16–19, 2009.  I am sure that

I will continue to visit after next February as well.  Allowing continued snowmobile use

in Yellowstone and Grand Teton National Parks would seriously undermine the quality of

the National Park experience for myself and my family.

I declare under penalty of perjury that the foregoing is true and correct.

Executed  on May 6, 2008, in Washington, D.C.

CHARLES M. CLUSEN

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| GREATER YELLOWSTONE COALITION, *et al.*, ) ) ) ) | |
| Plaintiffs, ) | Civ. No. 07-2111 (EGS) |
| ) | |
| v. ) ) | [Hearing on Motion for Summary Judgment on August 27, 2008] |
| DIRK KEMPTHORNE, *et al.*, ) ) | |
| Defendants. ) | |

_____

| | |
|---|---|
| ) | |
| NATIONAL PARKS CONSERVATION ASSOCIATION, ) ) ) | |
| ) | |
| Plaintiff, ) | Civ. No. 07-2112 (EGS) |
| ) | |
| v. ) ) | [Hearing on Motion for Summary Judgment on August 27, 2008] |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, ) ) ) | |
| ) | |
| Defendants. ) | |

_____

### DECLARATION OF ROBERT EKEY

I, Robert Ekey, declare:

1.      I am the Northern Rockies Regional Director for The Wilderness Society in Bozeman, Montana.  In addition to being the Regional Director, I am a member of The Wilderness Society.

2.      The Wilderness Society is a non-profit membership organization founded in 1935, with its headquarters in Washington, D.C., eight regional offices, and approximately 250,000 members.  The Society is dedicated to protecting wilderness and

inspiring Americans to care for our wild places. The Society works to ensure wise management and protection of America's public lands, including our National Parks, Forests, Wildlife Refuges, and lands administered by the Bureau of Land Management. The Society fulfills its mission through education, analysis, and advocacy.

3.    The Society has a long-standing interest in and close involvement with the administration of our National Parks by the National Park Service, including Yellowstone and Grand Teton National Parks. Many of the Society's members visit these National Parks each year to pursue various forms of recreation, to watch and learn about wildlife and wildlands, and to learn more about the natural world. Our National Parks provide society with some of our cleanest air and water, highest quality wildlife refugia, and an opportunity to experience lands untrammeled by humans.

4.    The Society has engaged in a broad range of activities to advance the protection of the ecological integrity of our National Parks. Utilizing administrative processes, lobbying, public education, and legal action, the Society and its members have historically been involved in protecting all National Parks, including Yellowstone and Grand Teton.

5.    In particular, the Society has undertaken a wide array of efforts to protect Yellowstone and Grand Teton National Parks from the adverse impacts of snowmobiles:

     a.    For many years, the Society has educated the National Park Service on the impacts that the prolific use of snowmobiles has on the air and water quality, wildlife, and visitor experience;

2

b.      The Society has submitted formal comments at every stage in the National Environmental Policy Act and administrative rulemaking processes addressing winter use in Yellowstone and Grand Teton National Parks;

c.      The Society has actively educated the media and the public about the threat snowmobiles pose to Yellowstone, Grand Teton and other National Parks;

d.      The Society's members have written repeatedly to the National Park Service and met with National Park Service officials to advocate for a snowmobile phase-out in Yellowstone and other National Parks. In addition, Society members have attended, and encouraged others to attend, meetings and hearings concerning winter use in the Parks;

e.      Representatives of the Society have traveled to Washington, D.C., with business representatives from West Yellowstone, Montana, to educate Congress and Interior Department officials on the positive economic effects of phasing out snowmobiles and phasing in a snowcoach-based mass-transit winter transportation system in Yellowstone;

f.      The Society has lobbied to educate lawmakers on the negative effects snowmobiles have on the National Park experience, and in particular, to garner support for measures such as the Yellowstone Protection Act, which would have mandated a snowmobile phase-out in Yellowstone; and,

g.      The Society assisted in the preparation of a Citizens' Solution for Winter Access to Yellowstone, which supported a plan by which all over-snow access in Yellowstone would be provided by snowcoaches. Together with

3

fourteen other conservation groups, the Society published The Citizen's Solution and submitted it to the Park.

h.      The Society has previously litigated to defend the Park Service's original decision to phase-out snowmobiles in Yellowstone.

6.      I regularly visit Yellowstone and Grand Teton National Parks in winter. I have skied in both the front country and back country of Yellowstone and Grand Teton. I have also camped in both Parks and spent time viewing their wintering wildlife. An integral part of my enjoyment of Yellowstone and Grand Teton is the opportunity to view the Parks' wildlife in a natural setting. The noise and wildlife conflicts caused by snowmobiles have negatively affected my experience in these National Parks.

7.      I intend to return to both Yellowstone and Grand Teton during the next winter season, and in later years. I and my family plan to again ride snowcoaches to Old Faithful; view Old Faithful and other geysers, hot springs, and geothermal features; and observe wintering wildlife. Allowing continued snowmobile use in Yellowstone and Grand Teton National Parks would seriously undermine the quality of the National Park experience for myself and my children.

8.      For more than 16 years, I have worked to protect the ecological integrity and sanctity of Yellowstone and Grand Teton National Parks. I have an interest in seeing a natural National Park experience preserved for this and future generations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 9th, 2008 in Bozeman, Montana.

_____
ROBERT EKEY

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREATER YELLOWSTONE COALITION, *et al.*, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DIRK KEMPTHORNE, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) ) ) |
| | ) |
| Defendants. | ) |

Civ. No. 07-2111 (EGS)

[Hearing on Motion for Summary Judgment on August 27, 2008]

Civ. No. 07-2112 (EGS)

[Hearing on Motion for Summary Judgment on August 27, 2008]

**DECLARATION OF AMY MCNAMARA**

I, Amy McNamara, declare as follows:

1.    I am a resident of Bozeman, Montana, and have been since 2004.

2.    I am a member of, and National Parks Program Director for, the Greater

Yellowstone Coalition ("GYC"), a plaintiff in the above-captioned cases.  GYC is a

conservation organization dedicated to protecting and restoring the Greater Yellowstone

Ecosystem and the unique quality of life it sustains, now and in the future.  Central to

GYC's mission is the integrity of Yellowstone and Grand Teton national parks, which

form the core of the Greater Yellowstone Ecosystem.   As National Parks Program

Director, it is my job to advocate for management decisions that ensure Yellowstone and

Grand Teton national parks are protected in a way that allows them to be enjoyed not just

by those who are here today, but also by generations that follow.  This can only be

assured if these special places are passed on to future generations in an unimpaired

condition.

3.      I regularly use and enjoy Yellowstone and Grand Teton national parks in

winter.  I have taken at least one snowcoach trip to Old Faithful during each of the past

four winter seasons and have skied on trails in Yellowstone's interior as well.  My winter

trips to Yellowstone have all occurred since the requirements for four-stroke, "best

available technology," and 100-percent commercially guided snowmobiles were put into

place.  Despite these measures, the noise and smell of snowmobiles continues to impair

my national park experience.  In particular, the subtle sounds of features like gurgling

mudpots and hissing steam vents are overpowered by snowmobile noise.  Also, the level

of traffic I have experienced in the park during the winter is unnecessarily high and has

distracted from my ability to enjoy the peace and tranquility of the park and to view the

park's wildlife.  During my snowcoach trips I have witnessed bison being pushed off the

road by snowmobiles and I have witnessed both bison and elk off the road being

noticeably disturbed by the presence of snowmobiles in the park.

4.      Twice I have traveled to Old Faithful on a snowcoach and stayed

overnight at the Snow Lodge, allowing me to ski extensively around the Old Faithful

Geyser Basin, at Biscuit Basin, and to Lone Star Geyser.  I enjoy the ability to experience

the park under my own power and to witness aspects of Yellowstone I would not

otherwise be afforded from the road. Every single one of these experiences has been marred by the sounds of snowmobiles—even when I was skiing on trails away from the road corridor. While skiing on the road between the Lone Star Geyser trailhead and Old Faithful, I was physically uncomfortable each time a line of snowmobiles passed me on my skis. Also, the exhaust from the snowmobiles detracted from my national park experience.

5.      Separate from these experiences in Yellowstone's interior, I have skied and/or snowshoed in the northern part of Yellowstone on the Blacktail Plateau, up Slough Creek, on the road to Tower Falls, and in the Lamar Valley. Also, I have skied on Teton Park Road, below the majestic Teton Range, and in the vicinity of Moose-Wilson Road— both in Grand Teton National Park. All of these human-powered experiences took place in Yellowstone and Grand Teton national parks, but at a significant distance from where snowmobiling occurs—and in areas generally inaccessible to many park visitors. These experiences taught me what a winter experience in a national park should be like and why it is so important to ensure that access to Yellowstone's interior is provided by mass-transit snowcoaches, not snowmobiles. Under such a system, all visitors to Old Faithful and other Yellowstone destinations would enjoy the peace and tranquility of the park, its resources and its wildlife.

6.      In 2007 and 2008, GYC invited members to join me and other organization representatives on day-long snowcoach trips from West Yellowstone to Old Faithful and back. Over two dozen individuals joined the trip in 2007, and over 60 people joined the trip in 2008. Individuals on the trip noted that the exhaust from four-stroke snowmobiles is too odorous for the park environment and that snowmobiles

3

remain too noisy. Individuals also noted that snowmobiles continue to disturb wildlife on the road. Participants were young and old and came from Cody, Bozeman, Idaho Falls, Driggs, Red Lodge, and other places in Idaho, Montana, and Wyoming. GYC intends to organize such a snowcoach trip again during the next winter season and in years to come. Should snowmobiling continue in Yellowstone, these member trips will continue to be negatively impacted by the presence of snowmobiles.

7.    I intend to visit Yellowstone in coming winters both on a snowcoach and traveling under my own power on skies and snowshoes. In February 2009, I will be returning to Yellowstone for another snowcoach tour with GYC members and representatives. Should snowmobile use continue, these experiences will again be impaired.

8.    I support the National Park Service's original decision to phase out snowmobile use in the Parks. I support the use of snowcoaches in Yellowstone and believe the snowcoach alternative should be fully implemented to protect park resources and values.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 8, 2008, in Bozeman, Montana.

AMY McNAMARA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREATER YELLOWSTONE COALITION, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) Civ. No. 07-2111 (EGS) |
| v. | ) ) [Hearing on Motion for Summary ) Judgment on August 27, 2008] |
| DIRK KEMPTHORNE, *et al.*, | ) ) |
| Defendants. | ) ) |
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) |
| Plaintiff, | ) ) Civ. No. 07-2112 (EGS) |
| v. | ) ) [Hearing on Motion for Summary ) Judgment on August 27, 2008] |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) ) |
| Defendants. | ) ) |

**DECLARATION OF MICHAEL SCOTT**

I, Michael Scott, declare as follows:

1.      I am a resident of Bozeman, Montana, and have lived in southwest Montana since 1985.

2.      I am a member of, and Executive Director of, the Greater Yellowstone Coalition ("GYC"), a plaintiff in the above-captioned cases.  GYC is a conservation organization dedicated to protecting and restoring the Greater Yellowstone Ecosystem and the unique quality of life it sustains, now and in the future.  Central to GYC's

mission is the integrity of Yellowstone and Grand Teton national parks which form the core of the Greater Yellowstone Ecosystem. The Greater Yellowstone Ecosystem is the most intact landscape in the lower forty-eight states and is internationally renowned. Formed in 1983, GYC has 16,000 members and activists who regularly use and enjoy the area, including Yellowstone and Grand Teton national parks.

3.    Yellowstone National Park is the world's first national park and has served as the inspiration for preserves throughout the world since 1872. No place on earth better represents the national park ideal. The park contains half of the world's hydrothermal features, including the world's largest concentration of geysers; is home to all of the large mammal species known to be present when Europeans first arrived; provides innumerable recreation opportunities and has been designated as a Biosphere Reserve and a World Heritage Site. Most of my work as Executive Director is focused on protecting the values and integrity of Yellowstone National Park and the lands that surround and support it.

4.    GYC has advocated strongly for protecting Yellowstone and Grand Teton national parks' natural resources by eliminating inappropriate snowmobile use from Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller Jr. Memorial Parkway (the "Parks") throughout each of the National Park Service's winter use planning processes:

a.    In 1999, GYC convened a coalition of 14 regional and national conservation organizations representing more than 2.7 million members to advocate for an environmentally sensitive response to the Parks' winter use problems. Together with these groups, GYC published The Citizens' Solution for

Winter Access to Yellowstone, which advocated that all over-snow transportation in Yellowstone be provided by snowcoaches that would provide winter access to the park for the same number of people but with 90 percent fewer vehicles. GYC conducted a broad campaign in support of the management proposal advocated in the Citizens' Solution.

b.      In the wake of the National Park Service's issuance of its first Winter Use Plan Final Environmental Impact Statement and Record of Decision, GYC continued to advocate for and support the agency's decision to phase out snowmobile use in the Parks. GYC was a member of a subcommittee organized by members of the public and the National Park Service to develop a plan for a transition from snowmobile use in the Parks to a snowcoach system.

c.      Representatives from GYC traveled to Washington D.C. with business owners from West Yellowstone, Montana to educate members of Congress and the Department of Interior as to why a transition from snowmobiles to snowcoaches would be valuable for local economies and better for the Parks and their visitors. In addition, GYC representatives lobbied members of Congress to seek their support for the Yellowstone Protection Act which would have phased out snowmobiling in the Parks and put a mass-transit snowcoach system in place.

d.      GYC educated its members, the general public, and the media about the impacts of snowmobiling on park resources. As part of this education, we shared the alternative solution of a mass-transit snowcoach system that would carry passengers into Yellowstone's interior in a manner that would best protect

3

the Parks.  GYC published articles about the issue of winter use in the Parks in its
newsletter, the *Greater Yellowstone Report*.

      e.      GYC representatives educated the National Park Service on the
impacts of snowmobiling on the Parks and their wildlife, natural soundscapes, air
quality and visitor experience.

      f.      GYC submitted formal comments during every stage of each
National Environmental Policy Act process related to winter use planning and
during every stage of each associated rule-making process.  GYC consistently has
supported a full transition to snowcoaches as the best means by which to protect
the Parks and their visitors.

      g.      Members of GYC wrote repeatedly to the National Park Service
throughout the winter use planning processes.  Individual GYC members attended
public meetings across the country to speak supportively on behalf of a transition
from snowmobiling to mass-transit snowcoaches.

      h.      GYC encourages members to enjoy Yellowstone in the winter on
snowcoaches—the over-snow transportation system identified by the National
Park Service and the Environmental Protection Agency as the most
environmentally friendly for the park and its visitors.  We do this through our
newsletter, website and mailings to regional members.

      i.      GYC has repeatedly litigated to defend the National Park Service's
original decision to phase-out snowmobiles in Yellowstone.

      5.      I regularly use and enjoy Yellowstone National Park in winter.  I have
taken snowcoach trips to every available destination in Yellowstone and have cross-

country skied on many of Yellowstone's trails. I have recreated within Yellowstone multiple times a season during almost every winter since 1986 and will return to the park in each of the coming winter seasons. I choose to recreate in Yellowstone in winter to experience its quiet, solitude and wildlife.

6.     I have a deep personal interest in how Yellowstone is managed in winter since it affects the quality of my experience. Over the years, my winter trips to Yellowstone have been impaired by the sound and smell of snowmobiles. I have heard the sound of snowmobiles several miles from roads, which has adversely affected my search for solitude. These sounds and smells have persisted even with the recent transition to four-stroke snowmobiles and the reduced snowmobile numbers seen under the 2004 temporary plan. Earlier this year, I skied on the road between Mammoth and Norris to recreate on Sheepeater Flats. During this ski, I was passed by snowcoaches but not snowmobiles and noted how much more pleasant it was to be in Yellowstone but not listening to the whine of snowmobiles or smelling their exhaust.

7.     While both skiing and riding in snowcoaches, I have witnessed snowmobiles running and pushing bison and elk off park roads. I travel in Yellowstone in winter to view wildlife acting naturally on its own terms. Seeing Yellowstone's wildlife running from snowmobiles impedes and impairs the experience I seek in the park.

8.     Should snowmobile use continue in Yellowstone, it would seriously impair the quality of the national park experience for myself and others. I believe strongly that national parks should be managed to protect park resources unimpaired for this generation and beyond. My experience in Yellowstone in the wintertime clearly

demonstrates to me that wildlife resources and visitor experience continue to be impaired by snowmobile use within the park.

9.      I support the original decision of the National Park Service to phase-out snowmobiles in Yellowstone National Park because it would keep park values from being impaired and would improve significantly my winter experience and that of GYC members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 6, 2008, in Bozeman, Montana.

_____
MICHAEL SCOTT

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREATER YELLOWSTONE ) COALITION, *et al.*, ) ) | |
| Plaintiffs, ) ) | Civ. No. 07-2111 (EGS) |
| v. ) ) | [Hearing on Motion for Summary Judgment on August 27, 2008] |
| DIRK KEMPTHORNE, *et al.*, ) ) | |
| Defendants. ) ) | |
| NATIONAL PARKS CONSERVATION ) ASSOCIATION, ) ) | |
| Plaintiff, ) ) | Civ. No. 07-2112 (EGS) |
| v. ) ) | [Hearing on Motion for Summary Judgment on August 27, 2008] |
| UNITED STATES DEPARTMENT ) OF THE INTERIOR, *et al.*, ) ) | |
| Defendants. ) ) | |

**DECLARATION OF STEVE THOMAS**

I, Steve Thomas, declare:

1.      I am a Regional Field Director for the Sierra Club, in Sheridan, Wyoming.
I am also a member of the Sierra Club.  The Sierra Club is a national nonprofit
organization of approximately 700,000 members dedicated to: exploring, enjoying, and
protecting the wild places of the earth; to practicing and promoting the responsible use of
the earth's ecosystems and resources; to educating and enlisting humanity to protect and
restore the quality of the natural and human environment; and to using all lawful means
to carry out these objectives.

2.    My responsibilities include staff management in offices in Wyoming, Montana, Nebraska, South Dakota, North Dakota, Texas, Oklahoma, and Kansas. Additionally, I am responsible for developing our program work for these states.

3.    Sierra Club believes that snowmobile use in the national parks adversely impacts air quality, natural quiet, wildlife, and other natural resources, as well as the experience of park visitors. Accordingly, the Sierra Club strongly opposes snowmobile use in Yellowstone National Park.

4.    Sierra Club has engaged in a wide array of efforts to protect Yellowstone National Park from the adverse impacts of snowmobiles:

a.    For many years, Sierra Club has educated the National Park Service on the impacts that prolific use of snowmobiles has on air and water quality, wildlife, and visitor experience;

b.    Sierra Club has submitted formal comments at every stage of the various National Environmental Policy Act ("NEPA") and administrative rulemaking processes addressing winter use in Yellowstone and Grand Teton national parks and the Rockefeller Parkway (collectively "Yellowstone");

c.    Sierra Club has actively educated the media and the public about the threat snowmobiles pose to Yellowstone, Grand Teton, and other national parks;

d.    Sierra Club's members have written to the National Park Service to support the elimination of recreational snowmobile use from Yellowstone and Grand Teton national parks, and to advocate similar proposals in other national parks. In addition, Sierra Club members have attended, and encouraged others to attend, meetings and hearings concerning the winter use activities in parks;

e.   Sierra Club representatives have worked to educate Congress and Interior Department officials on the positive economic effects of phasing out snowmobiles and phasing in a snowcoach-based mass-transit winter transportation system in Yellowstone;

f.   Sierra Club has lobbied to educate lawmakers on the negative effects snowmobiles have on the national park experience, and in particular, to garner support for measures such as the Yellowstone Protection Act, which would have mandated a snowmobile phase-out in Yellowstone;

g.   Sierra Club assisted in the preparation of a Citizens' Solution for Winter Access to Yellowstone, which supported a plan by which all over-snow access in Yellowstone would be provided by snowcoaches.  Together with fourteen other conservation groups, Sierra Club published The Citizen's Solution and submitted it to the Park Service;

h.   Sierra Club has previously participated in litigation to defend the Park Service's original decision to phase-out snowmobiles in Yellowstone.

5.   Having visited Yellowstone National Park and Grand Teton National Park many times in recent years to ski and view wildlife, I personally have experienced the adverse effects of snowmobile use on the natural resources and visitor experience in the parks.  My experience in the parks has been impaired by engine exhaust and the nearly constant noise of snowmobiles.

6.   As has been my practice, I intend to return to Yellowstone National Park and Grand Teton National Park for winter recreation with my family during the next winter season and those that follow.  In Yellowstone, we plan to ski again in the Old

Faithful area during the winter of 2008-2009. Allowing continued snowmobile use in Yellowstone National Park and Grand Teton National Park would seriously undermine the quality of the National Park experience for myself and my family.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May __9__, 2008, in Sheridan, Wyoming.

STEVE THOMAS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREATER YELLOWSTONE COALITION, *et al.*, ) | |
| Plaintiffs, ) | Civ. No. 07 2111 (EGS) |
| v. ) | [Hearing on Motion for Summary Judgment on August 27, 2008] |
| DIRK KEMPTHORNE, *et al.*, ) | |
| Defendants. ) | |
| NATIONAL PARKS CONSERVATION ASSOCIATION, ) | |
| Plaintiff, ) | Civ. No. 07-2112 (EGS) |
| v. ) | [Hearing on Motion for Summary Judgment on August 27, 2008] |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, ) | |
| Defendants. ) | |

## DECLARATION OF CHARLES WOODRUFF

I, Charles H Woodruff, declare:

1.      I am Development Director for Winter Wildlands Alliance ("WWA"), in Boise, Idaho.  I am also a member of WWA and the Greater Yellowstone Coalition. WWA is a national recreation group of individual members and grassroots groups working to protect and create quality human-powered snowsports experiences for skiers, snowshoers, and other snowsports enthusiasts on public lands.  WWA is the only national

recreation organization dedicated to non-motorized winter recreation opportunities on local, regional, and national levels.

2.    In my capacity as Development Director, my responsibilities include communicating federal land use planning and policies to our members, foundation supporters, corporate and small business partners, grassroots groups, and affiliate organizations and encouraging them to participate in planning processes on federal lands.

3.    WWA research and my personal communications have established that non-motorized winter recreation enthusiasts, including but not limited to backcountry skiers and snowshoers, face diminishing recreation opportunities in areas unaffected by the noise, emissions, and other impacts of motorized winter recreation, particularly snowmobiling. One of those areas is Yellowstone National Park.

4.    WWA employs a variety of laws, executive orders, management policies, agency regulations, and other legal measures to assert the rights of our members and other human-powered recreationists to enjoy these lands free from the impacts of motorized users. WWA and its member groups have been successful in multiple states in creating separate use areas, where appropriate, to minimize user conflicts.

5.    WWA is a non-profit organization based in Boise, Idaho. For the past seven years, a considerable percentage of its budget and staff time has been devoted to efforts to phase snowmobiles out of Yellowstone and Grand Teton National Parks. Its work products have included multiple mailings, production of a skier-oriented video documenting snowmobile impairment to park values and the visitor experience, and production of brochures, post cards and other literature representing the human-powered recreationists' viewpoint on the snowmobile issue.

6.      After extensive investigation, including multiple visits to Yellowstone

National Park during the winter use season, WWA has established that the recreation

experience for skiers, snowshoers, and other non-snowmobiling visitors has been

impaired by snowmobile use in Yellowstone and Grand Teton National Parks.  As a

result, WWA has undertaken a number of measures aimed at reinstating the original

winter use Record of Decision to phase out private and commercial snowmobile use in

Yellowstone.

        a.      WWA as an organization, and through its staff, board of directors,

        and members, has submitted public comments during the development of the

        winter use plans.

        b.      WWA has been actively engaged in media outreach on

        Yellowstone winter use issues.  It has also conducted widespread public

        involvement campaigns on behalf of skiers and snowshoers who object to

        continued snowmobile use in the Parks.

7.      During recent visits to Yellowstone in the winter, including one for the

Yellowstone Ski Festival in 2005, a trip to Old Faithful with my three year old son in

early 2007, and a personal trip through the park in late 2007, I have experienced first-

hand the impacts of snowmobile use in the Park.  On all occasions, my visit was severely

impaired by the number of snowmobiles around me inside the west entrance, on the

Riverside Trail loops, and on trails around Old Faithful.  My expectations of a quiet

skiing trip in the western area of Yellowstone and also of a quiet snowshoeing hike

around Old Faithful were equally impacted by the sound and by the emissions of

snowmobiles.  On recent visits, the machines entering the Park were four-stroke models

3

that were not appreciably less offensive to my experience than the older two-stroke machines.

8.    Winter Wildlands Alliance held a board meeting in West Yellowstone and the Old Faithful Snow Lodge in January 2007. We traveled to Old Faithful via snowcoach and found the experience enjoyable and our driver/guides very knowledgeable. However, it was of great concern to witness snowmobilers riding among bison and to see the bison moving off into deep snow to escape the snowmobiles.

9.    As has been my practice in past years, I intend to return to Yellowstone to ski and snowshoe in 2008-2009 and later winter seasons. I plan on taking my family to the Yellowstone Ski Festival again in November 2008 as well as to the Old Faithful Snow Lodge in February 2009. In addition I have been organizing a snow camping expedition along the Bechler River canyon that will likely take place in the winter of 2010. Should recreational snowmobile use continue within the Park, my experience during these trips will be severely impaired.

10.    As a strong advocate of skiing and snowshoeing in Yellowstone, I remain deeply concerned that if snowmobile use is allowed to continue, skiers, snowshoers and winter hikers will remain skeptical about visiting the Park in winter because of the negative impacts snowmobiles have on the quiet winter use experience.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 7, 2008 in Boise, Idaho.

CHARLES H WOODRUFF

4