IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
GREATER YELLOWSTONE COALITION,          )
et al.,                                 )
                                        )
                Plaintiffs,             )
                                        )        Case No. 07-cv-2111 (EGS)
        v.                              )
                                        )        [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                )        Judgment on August 27, 2008]
                                        )
                Defendants.             )
_____)


_____
                                        )
NATIONAL PARKS CONSERVATION             )
ASSOCIATION,                            )
                                        )
                Plaintiff,              )
                                        )        Case No. 07-cv-2112 (EGS)
        v.                              )
                                        )        [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE         )        Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE         )
                                        )
                Defendants.             )
_____)



**FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO NATIONAL PARKS CONSERVATION ASSOCIATION'S
MOTION FOR SUMMARY JUDGMENT, RE CASE NO. 07-CV-2112 (EGS)**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.    Prior Winter Use Litigation and Development of the Temporary
        Winter Use Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.   The 2007 Winter Use Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.   National Park Service Organic Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    III.  Yellowstone Enabling Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          A.    Standard of Review in a Motion for Summary Judgment . . . . . . . . . . . . 7

          B.    Standard of Review under the Administrative Procedure Act . . . . . . . . . 7

    II.   The FEIS Fully Complies with NEPA And Provides An Adequate Basis
        For The Park Service's Management Actions Under The Organic Act . . . . . . . 9

          A.    The Service's Thorough Analysis of Soundscape Impacts
               Satisfies NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

               1.    The "Park-Wide" Metric Is Only One Of Three Metrics
                    Used To Measure Impacts To Soundscapes . . . . . . . . . . . . . . . . . 13

               2.    The Soundscapes Analysis Appropriately Relied On Both
                    Monitoring and Modeling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

               3.    The Service's Findings Concerning the Preferred Alternative
                    Are Fully Supported by the Administrative Record and
                    the FEIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          B.    The Service's Thorough Analysis of Air Quality Impacts
                Satisfies NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

               1.    The Service's Comparison to "Historic Conditions" is Only
                    One of Three Metrics Used to Analyze Air Quality Impacts . . . 23

               2.    NPCA's Criticisms of the Service's Modeling System
                    Have No Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3.      NPCA Exaggerates the Emission Levels Expected Under
        the Winter Use Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.      The Service's Analysis of Potential Impacts to Wildlife
        Satisfies NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        1.      The Analysis of Impacts to Bison and Other Wildlife
                From OSV Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        2.      NPCA's Arguments Regarding the Analysis of Wildlife
                in the EIS are Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

                a.      The Service's Analysis is Consistent with the Findings
                        of the Relevant Studies Conducted by its Scientists . . . . 31

                b.      NPS Analyzed Impacts to Both Populations and
                        Individuals of Species . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

                c.      The Service's Findings are Supported by the Record . . . 32

D.      NPCA's Criticisms of the "Parameters" of the NEPA Analysis
        Have No Basis in Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III.    NPCA's Claims Under the Organic Act, Yellowstone Act, Executive
        Orders, and 36 C.F.R. §2.18 Have No Merit . . . . . . . . . . . . . . . . . . . . . . . . 34

        A.      The Winter Use Plan Does Not Violate The Organic Act . . . . . . . . . . . 34

                1.      No Impairment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                2.      The Conservation Mandate . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        B.      The Winter Use Plan Does Not Violate The Yellowstone
                Enabling Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        C.      The Winter Use Plan Does Not Violate Executive Order 11644 . . . . . . 41

        D.      The Winter Use Plan Does Not Violate 36 C.F.R. § 2.18(c) . . . . . . . . . 42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**INTRODUCTION**

Federal Defendants, the United States Department of the Interior and the National Park Service (collectively "Federal Defendants" or "Service"), respectfully submit the following memorandum of points and authorities in support of the Service's cross-motion for summary judgment and in opposition to plaintiff National Parks Conservation Association's ("NPCA") motion for summary judgment.

NPCA's arguments consist of two central allegations: (1) that the Winter Use Plan governing the use of recreational snowmobiles in Yellowstone National Park violates the National Park Service Organic Act and related authorities; and (2) that the Service prepared an inadequate environmental analysis under the National Environmental Policy Act ("NEPA"). As explained in detail below, neither of these arguments has any merit. The Winter Use Plan – a policy decision by which the competing uses of natural resources have been reconciled – fully complies with the substantive requirements of all relevant environmental statutes and regulations. In addition, the Plan is based on the thorough and painstaking environmental analysis summarized in the Service's Final Environmental Impact Statement ("FEIS"). That FEIS, together with the administrative record previously lodged with this Court, provides a rational basis for the Service's decision and more than satisfies the procedural requirements of NEPA. Accordingly, NPCA's motion for summary judgment should be denied, and the Service's motion for summary judgment should be granted.

**FACTUAL BACKGROUND**

**I.    Prior Winter Use Litigation and Development of The Temporary Winter Use Plans**

The existence and regulation of snowmobile use has a long history in Yellowstone National Park (hereinafter "the Park" or "Yellowstone"). Only three snowmobiles entered the Park during the entire winter of 1963, but that number grew rapidly to the point where as many as 1700 recreational snowmobiles would access Yellowstone and two contiguous units of the National Park System (Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway) on peak days. See Fund for Animals v. Norton, 294 F. Supp.2d 92, 98-99 (D.D.C. 2003).

This rapid rise in visitation created a variety of issues, including air quality, soundscape, visitor experience, and wildlife concerns. FEIS (AR 117160) at 5. These issues led to litigation and, ultimately a settlement agreement whereby the Service committed to prepare a new winter use plan and a corresponding environmental impact statement. Fund for Animals, 294 F. Supp.2d at 99. The environmental impact statement and record of decision were issued in 2000, and a Final Rule was published in 2001 that mandated a complete elimination of snowmobile use for the 2003-2004 winter season. Id. at 100. In support of its decision, the Service recognized that Yellowstone saw an average of more than 800 snowmobile entries per day. 65 Fed. Reg. 80,908, 80,913 (December 22, 2000). The Service explained that the adverse impacts to Yellowstone's air quality, natural soundscape, and wildlife resulting from that level of snowmobile use had resulted in the impairment of Park resources and values in violation of the Organic Act. Fund for Animals, 294 F. Supp.2d at 106; see also 65 Fed. Reg. at 917.

In December, 2003, however, the Service replaced the 2001 Rule with a new Final Rule, whereby it authorized up to 950 snowmobiles to enter the Park each day, subject to certain best available technology ("BAT") standards. Fund for Animals, 294 F. Supp.2d at 101. The 2003 Rule implemented a monitoring and adaptive management program, and required that 80% of all snowmobiles be accompanied by a commercial guide. Id.; see also 68 Fed. Reg. 69,268, 69,283-84 (Dec. 11, 2003). The remaining 20% was allowed to enter with non-commercial guides.

This Court ultimately vacated the 2003 Rule on grounds that it represented an unexplained departure from the Service's previous position, and reinstated the previous (2001) Rule in its place. Id. at 108. A subsequent ruling by the District Court for the District of Wyoming, however, prohibited the Service from implementing the 2001 Rule and, accordingly, the Service was left without an operative rule to govern winter use of the Park during the 2003-04 season. See Fund for Animals v. Norton, 323 F. Supp.2d 7, 10 (D.D.C. 2004). The Service, therefore, prepared temporary winter use plans in 2004. The temporary plans were intended to provide a framework for managing winter use in the three units of the National Park System for a period of three years while the Service

prepared an environmental impact statement and long-term winter use plan for the Parks that would

address the issues identified by the two district courts.  See Fund for Animals v. Norton, 390 F.

Supp.2d 12, 14 (D.D.C. 2005).

On November 10, 2004, the Service issued the Temporary Rule, which authorized up to 720

snowmobile entries per day in Yellowstone.  69 Fed. Reg. 65,348 (November 10, 2004).  As with

the 2003 Rule, the Temporary Rule required that all recreational snowmobiles meet BAT standards.

In addition, the Temporary Rule imposed a 100% commercial guiding requirement in Yellowstone

National Park.  This rule remained effective through the winter season of 2006–2007.

## II.    The 2007 Winter Use Plan

The Service conducted public scoping for the 2007 EIS from June 24 through September 1,

2005, published a Draft EIS on March 27, 2007, and accepted public comments until June 5, 2007.

The Service also held four public meetings during the comment period.  AR 126499 (ROD) at 36-38.

The 2007 Final EIS, which was released on September 24, 2007, considered all of the comments

submitted.  AR 117160 (EIS) at 383-94 & Appendix I; AR 121306 (Public Comment Report).  A

total of 122,190 letters were submitted, 116,910 of which were form letters.  AR 121306 at 20.

Among those comments was a letter from former directors of the National Park Service objecting

to the preferred alternative in the DEIS, which would have permitted 720 snowmobiles per day.  AR

120940.  Taking its analysis and the public comments into consideration, the Service lowered the

daily snowmobile limit in the final Winter Use Plan to 540, and released the Final EIS ("FEIS") on

September 24, 2007.  AR 117160 at 63.[1/]

_____

[1/]    NPCA references an October 29, 2007 letter from members of Congress, submitted after
the EIS was finalized, objecting to the proposed Winter Use Plan.  AR 116581; NPCA Br. at 9.
This letter, which was submitted at the eleventh hour and does not represent the will of
Congress, should be given little weight by the Court.  Cf. Sullivan v. Finkelstein, 496 U.S. 617,
632 (Scalia, J., concurring) ("Arguments based on subsequent legislative history, like arguments
based on antecedent futurity, should not be taken seriously, even in a footnote.").  Indeed, a
similar comment letter from members of Congress in Idaho, Montana and Wyoming, whose
constituents would be most directly affected by the rule, supports snowmobile use in the Parks
and describes it as "consistent with the goals of conservation and preservation."  AR 116578.

The Record of Decision ("ROD") for the 2007 FEIS was approved on November 20, 2007. The ROD calls for a daily limit of 540 snowmobiles and 83 snowcoaches per day in Yellowstone. With few exceptions, all recreational snowmobiles are immediately required to meet BAT standards, as are all snowcoaches beginning in 2011-12. In addition, all snowmobilers in Yellowstone must travel with a commercial guide. The ROD provides for an intensive adaptive management program. It also calls for temporal and spatial zoning on several side roads to facilitate a variety of uses. AR 126499.

The proposed rule was published on May 16, 2007. 72 Fed. Reg. 27,499. Comments were accepted until July 16, 2007. Id. The 2007 Final Rule, which implements those portions of the 2007 ROD for which a special regulation was necessary or appropriate, was published on December 13, 2007. 72 Fed. Reg. 70,781.

## LEGAL BACKGROUND

### I.    National Environmental Policy Act

NEPA serves the dual purpose of, first, informing agency decision-makers of the significant environmental effects of proposed major federal actions and, second, insuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

The Council on Environmental Quality's regulations implementing NEPA provide guidance as to the nature and content of an EIS. See 40 C.F.R. Part 1502 (addressing requirements for an EIS). Those regulations direct the preparer to include an analysis of alternatives to the proposed action in an EIS, see id. § 1502.14, and further instruct that the document should include discussions of direct, indirect, and cumulative impacts, id. §§ 1502.16 (a)-(b), 1508.7, 1508.8, as well as means to mitigate adverse environmental impacts from the proposed action. Id. § 1502.16(h). The

regulations, however, clarify that agencies must discuss impacts only in proportion to their significance. Id. § 1502.2.

In reviewing the sufficiency of an EIS, a court is charged only with ensuring that the agency has presented a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." California v. Block, 690 F.2d 753, 761 (9th Cir. 1982). Thus, "a reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies." Northern Plains Resource Council v. Lujan, 874 F.2d 661, 665 (9th Cir. 1989); Sierra Club v. Adams, 578 F.2d 389, 393 (D.C. Cir. 1978) ("We are not to 'fly speck' the statement."). While it "is . . . always possible to explore a subject more deeply and to discuss it more thoroughly," the "line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." Coal. on Sensible Transp. v. Dole, 826 F.2d 60, 66 (D.C. Cir. 1987).

In addition, a reviewing court may not force an agency to elevate environmental concerns over other appropriate considerations. Stryker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227 (1980). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 350, 351 (1989). "NEPA does not require that certain outcomes be reached as a result of the evaluation." Natural Res. Def. Council, Inc. v. EPA, 822 F.2d 104, 129 (D.C. Cir. 1987) (internal citation omitted). Rather, "[o]nce satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." Block, 690 F.2d at 761 (citing Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976)).

## II.    The National Park Service Organic Act

The National Park Service Organic Act provides that the Service is to "promote and regulate the use" of national parks in such a way as to conform to the "fundamental purpose" of the parks. This fundamental purpose is defined in the Act as follows:

> [T]o conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1 (emphasis added).[2/]  While the Organic Act directs the Service to regulate the parks pursuant to this broad "non-impairment" standard, it is silent as to the specifics of park management. See S. Utah Wilderness Alliance v. Dabney ("SUWA I"), 222 F.3d 819, 826 (10th Cir. 2000) ("It is unclear from the statute itself what constitutes impairment, and how both the duration and severity of the impairment are to be evaluated or weighed against the other value or public use of the park."). Thus, "the Park Service has broad discretion in determining which avenues best achieve the Organic Act's mandate."  Bicycle Trails Council of Marin v. Babbitt, 82 F.3d 1445, 1454 (9th Cir. 1996) (quotations omitted).  The Organic Act, therefore, provides the Service authority to make such regulations as it deems "necessary or proper for the use and management of the parks." 16 U.S.C. § 3.  Regulations promulgated under this authority are found in Title 36 of the Code of Federal Regulations.  In addition to these regulations, the Service has issued a Service-wide policy document entitled the "Management Policies," which informs and directs the management of park resources under the Organic Act. See Mgmt. Pol. (AR 120645) at 4-5; available at www.nps.gov/policy/ MP2006.pdf.  The most recent version of the Management Policies was issued in 2006, and the interpretations and policies articulated therein are entitled to substantial deference.  See Davis v. Latschar, 202 F.3d 359, 365 (D.C. Cir. 2000) ("Because the Organic Act is silent as to the specifics

---

[2/]     In addition to the "non-impairment" standard, the Organic Act prohibits the Service from authorizing activities that "derogate" park values.  The non-derogation mandate is set out in the Organic Act as follows:

> The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress.

16 U.S.C. § 1a-1 (emphasis added).  As is evident from the legislative history for the amendment that added the "derogation" standard to the Organic Act, however, the derogation and impairment terms "define a single standard for the management of the national park system – not two separate standards."  Mgmt. Pol. § 1.4.2 (emphasis added).

of park management, the Secretary has especially broad discretion on how to implement his statutory mandate.").

## III.    Yellowstone Enabling Act

The Yellowstone Enabling Act, 16 U.S.C. § 21 et seq., sets apart a vast expanse of land lying in Wyoming, Montana, and Idaho "as a public park or pleasuring ground for the benefit and enjoyment of the people" of the United States. Id. § 21. The Act requires the Secretary of the Interior to preserve "from injury or spoliation" the "wonders" of Yellowstone National Park and to ensure "their retention in their natural condition." Id. § 22. The Secretary is also required to "provide against the wanton destruction of the fish and game found within the park, and against their capture or destruction for the purposes of merchandise or profit." Id. Finally, the Act authorizes the Secretary to issue "such rules and regulations as he may deem necessary and proper for the management and care of the park . . . ." Id. § 26.

## ARGUMENT

## I.    Standards of Review

### A.    Standard of Review in a Motion for Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). In Administrative Procedure Act (APA) actions, the Court reviews the agency's administrative record, and may not "find" underlying facts. The only issues presented are issues of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272, 1282 (D.C. Cir. 2005) ("'[C]laims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues.'") (quoting Atl. States Legal Found. v. E.P.A., 325 F.3d 281, 284 (D.C. Cir. 2003)).

### B.    Standard of Review under the Administrative Procedure Act

Challenges to agency actions taken pursuant to NEPA and the Organic Act are subject to the review provisions of the Administrative Procedure Act. See Town of Stratford, Conn. v. F.A.A., 285 F.3d 84, 88 (D.C. Cir. 2002) (NEPA); Sierra Club v. Mainella, No. Civ.A. 04-2012 JDB, 2005

WL 3276264, at *8 n.6 (D.D.C. Sept. 1, 2005) (Organic Act).  The APA allows review of "agency action," dictating the type of agency action that is judicially reviewable, when agency action is judicially reviewable, the scope of review permitted, and the standard to be applied by a reviewing court.  5 U.S.C. §§ 701-706; Darby v. Cisneros, 509 U.S. 137, 146 (1993).  In evaluating the legal sufficiency of informal agency actions, the Court must apply the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A).  This standard is a narrow one whereby "[t]he court is not empowered to substitute its judgment for that of the agency."  Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  Rather, a court's role is to decide whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Id.; see also Marsh, 490 U.S. at 378; Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc., 462 U.S. 87, 97 (1983); see also H&F Enterprises, Ltd. v. United States, 973 F. Supp. 170, 173 (D.D.C. 1996) ("Court is expected to exercise restraint in deciding whether to set aside agency actions.").  Deference to an agency's decision is especially appropriate when courts review the agency's technical analysis and judgments involving the evaluation of complex scientific data within the agency's technical expertise.  See Marsh, 490 U.S. at 377.

The scope of a court's review under the APA is limited to the administrative record that was before the decision-maker.  See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985); Camp v. Pitts, 411 U.S. 138, 142 (1973).[3/]

---

[3/]    NPCA violates this fundamental tenet of administrative law by citing and appending various extra-record materials to its brief.  Those materials are: (1) excerpts from a draft version of the amendments to the 2001 Management Policies (Docket No. 48-4); (2) a letter submitted to the Service regarding the proposed revisions (Docket No. 48-5); and (3) excerpts from a transcript of a congressional hearing regarding the proposed revisions (Docket No. 48-6).  See NPCA Memo at 6-7 & Appendix, Tabs 1-3.  In addition, NPCA's arguments reference and rely on documents submitted to this Court during the briefing of Defendants' motion to transfer venue.  See NPCA Memo at 5 and n.2-4 (citing NPCA's Opposition to Transfer; Declaration of Tony Jewett and attachments (Docket No. 33-2); and Declaration of Robert D. Rosenbaum and attachments (Docket No. 33-21)).  The Service, however, has lodged and certified the complete administrative record (see Dkt. # 31-2), and that certification is entitled to a presumption of regularity.  See Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs, 448 F. Supp.2d 1, 5

## II.     The FEIS Fully Complies With NEPA And Provides An Adequate Basis For The Park Service's Management Actions Under the Organic Act

The FEIS in this case has been prepared as part of an ongoing process to assess the potential

impacts of the Winter Use Plan.  The FEIS describes the purpose and need for the proposed action

as "provid[ing] park visitors with a range of appropriate winter recreational opportunities, while

ensuring that these activities do not lead to unacceptable impacts or the impairment of park resources

and values."  AR 117160 at 4; see also 40 C.F.R. § 1502.13.  In furtherance of this purpose and

need, the FEIS examines seven alternatives in depth, including a no-action alternative.  40 C.F.R.

§ 1502.14; see AR 117160 at 40-65.  Of relevance here, the Service's preferred alternative

(Alternative 7) strikes a balance between snowmobile and snowcoach use while reducing the daily

number of snowmobiles (from that permitted by the Draft EIS preferred alternative) to better protect

park soundscapes and other resources.  Alternative 7 allows a maximum of 540 snowmobiles and

83 snowcoaches to enter Yellowstone Park each day.  AR 117160 at 60-65.

Through this NEPA process, the Service analyzed the impacts of the proposed action and its

alternatives on a variety of the Parks' various resources and values, including those of most interest

to the NPCA plaintiffs: air quality, wildlife, and natural soundscapes.  See AR 117160 at 215, 248,

301; 40 C.F.R. §§ 1502.16 (a)-(b), 1508.7, 1508.8.  In addition, the FEIS includes discussion of the

various means that would be used to mitigate the adverse environmental impacts resulting from the

proposed action.  See, e.g., AR 117160 at 35-37; 40 C.F.R. § 1502.16(h).  The results of this

_____

(D.D.C. 2006) ("Once an agency presents a certified copy of the complete administrative record
to the court, the court presumes that the record is properly designated.").  Because the above-
referenced documents do not form part of that administrative record, *this Court cannot consider
those materials in resolving the parties' motions for summary judgment, and should strike them
from the judicial record*.  See Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792
(D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it
neither more nor less information than did the agency when it made its decision."); Ammex, Inc.
v. United States, 62 F. Supp.2d 1148, 1156 (CIT 1999) ("In compiling an administrative record,
relevant materials that were neither directly nor indirectly considered by agency decisionmakers
should not be included.").

rigorous examination are presented in comparative form, thus complying with NEPA's requirement that a clear basis for choice among the alternatives be provided to the agency decision-maker and the public.  See AR 117160 at 170-363; 40 C.F.R. § 1502.14.  Finally, the FEIS and ROD describe a process by which the Service will continue to conduct intensive monitoring in order to assess the impacts of the preferred alternative on Park resources and values.  The results of this monitoring will alert the Service if and when an adjustment to winter use management or an emergency action to protect Park resources and values becomes necessary.  AR 117160 at 373; ROD (AR 126499) at 21.

In addition to complying with the requirements of NEPA, this thorough analysis provided the Service with a means of determining whether the proposed Winter Use Plans would result in an "impairment" of, or unacceptable impacts to, Park resources and values.[4]  As explained more fully below, the FEIS supported the conclusion that the proposed levels of oversnow vehicle ("OSV") use would not result in the impairment of Park resources because those levels would not severely affect a resource or value whose conservation is: (1) necessary to fulfill specific legislative purposes; (2) key to the natural or cultural integrity of the Parks or to opportunities for enjoyment of the Parks; or (3) identified as a goal in the Parks' general management plan or other relevant planning documents.  AR 117160 at 373.  Accordingly, NPCA's NEPA claims have no merit, and its allegation that the Service violated its duties under the Organic Act, Yellowstone Act, and corresponding regulations is belied by the administrative record.

---

[4]     The Management Policies 2006 provide the following guidance concerning the Service's use of NEPA documents in meeting its duties under the Organic Act: "In making a determination of whether there would be an impairment [or unacceptable impacts], an NPS decision-maker must use his or her professional judgment.  This means that the decision-maker must consider [inter alia] any environmental assessments or environmental impacts statements required by the National Environmental Policy Act of 1969 . . . ."  Mgmt. Pol. § 1.4.7.

-10-

**A.    The Service's Thorough Analysis of Soundscape Impacts Satisfied NEPA**

Recognizing that the natural soundscape is a key resource, as well as an expected element of the Park visitor experience, the Service thoroughly analyzed the impacts to the soundscape that could result from the implementation of each of the seven alternatives.  AR 117160 at 20, 301-342. As part of this analysis, the Service conducted soundscape monitoring during the past four winter seasons.  Id. at 137-138.  The data collected as a result of this effort – which constitutes "one of the most extensive national park acoustic datasets in existence," Id. at 139 – forms the basis for the Service's characterization of existing and historic soundscape conditions.  Id. at 138-141.

During the 2005-2006 winter season, this monitoring focused on five Yellowstone sites that were representative of the various developed areas and travel corridor management zones within the Park: Old Faithful Weather Station; Old Faithful Upper Basin; Spring Creek; West Thumb Geyser Basin; and a point 2.3 miles west of Madison Junction.  Id. at 143.  This monitoring showed that, on average, snowmobiles were audible for more time than snowcoaches, although snowcoaches in general produced higher sound levels, especially at higher speeds.  In addition, the monitoring revealed that the sound level and the percent of time in which OSVs were audible remained substantially lower than during the 2002-2003 winter use season, during which an average of 583 snowmobiles accessed Yellowstone Park each day, many of which had louder two-stroke engines. AR 126288.  The FEIS explains that the reduced sound and audibility levels were largely caused by a lower average number of OSVs during the 2005-2006 season (256 snowmobiles and 32 snowcoaches), the change from two-stroke to BAT four-stroke engine technology, and the requirements that snowmobiles travel in guided groups.  Id. at 143.

In addition to monitoring, the Service enlisted the U.S. Department of Transportation to conduct acoustical modeling using the Federal Aviation Administration's ("FAA") Integrated Noise Model ("INM"), as adapted for use with oversnow vehicles.  Id. at 301.  The INM was used to model various vehicle types consistent with the scenarios described in each of the seven examined alternatives, including two- and four- stroke snowmobiles, various models of snowcoaches, and

-11-

wheeled vehicles.  Id.  The development of this modeling tool was critical to the Service's analysis

because, unlike historical monitoring data, the INM allowed the Service to compare the potential

sound impacts corresponding to each of the seven alternatives.

Based on the information produced by the INM, the Service was able to predict for each

alternative (1) the total percentage of area within the Parks that would have any level of OSV

audibility, however slight;[5] (2) the percentage of time that OSVs would be audible, as measured

both Park-wide [6] and at representative points throughout the Parks;[7] and (3) the intensity (decibel

level) of the sound that would be caused by OSVs at various points within the Parks.[8]  Id. at 303,

305-08.  The modeled impacts were then compared to pre-determined thresholds, thereby allowing

the Service to determine whether the impact level of each alternative would be negligible, minor,

moderate, or major.  Id. at 304 (Table 4-48).  On this basis, the FEIS concludes with respect to

Alternative 7 (the preferred alternative) that the authorization of up to 540 snowmobiles and 83

snowcoaches in Yellowstone will cause a moderate, adverse, short-term, and direct impact with

respect to Park-wide audibility; a major impact with respect to percent time audible; and a minor,

adverse, and short term impact with respect to maximum sound levels.  Id. at 339.

---

[5]    See, e.g., AR 117160 at 306 (Figure 4-1) (indicating percentage of Yellowstone in which
recreational OSVs were audible for all alternatives).

[6]    See, e.g., AR 117160 at 307 (Tables 4-49, 4-50) (indicating the percentage of
Yellowstone and the number of square miles within Yellowstone, respectively, in which
recreational OSVs are audible under each examined alternative – where the rows represent the
percentage of the eight-hour day in which audibility was present); AR 117160 at 335 (Figure 4-
16) (map indicating "audibility contours" which illustrate the percent time audible along travel
corridors and transition areas).

[7]    See AR 117160 at 308 (describing analysis for "selected sites" as opposed to "park
wide").

[8]    With respect to "intensity," the model predicted the seconds out of each hour during
which OSV sounds would be within specified dBA intervals for each of the thirteen points
illustrated in the AR 117160 at 309.  The product of this modeling for recreational OSV traffic
from 9:00 A.M to 10:00 A.M. in Alternative 7 is illustrated in the AR 117160 at 337 (Table 4-
64).

Against this backdrop, NPCA urges that the soundscape analysis is inadequate because it allegedly (1) presents impacts using a deceptive metric; (2) relies on "hypothetical studies" rather than historical monitoring; and (3) presents findings that run "counter to the evidence before the agency" or that are "so implausible that they cannot be ascribed to a difference in view or the product of agency expertise." See NPCA Br. at 11-22, 44. These arguments have no merit.

### 1. The "Park-Wide" Metric Is Only One Of Three Metrics Used To Measure Impacts To Soundscapes

NPCA's primary argument is that the FEIS presented the results of its soundscape analysis using a deliberately misleading metric. NPCA Br. at 14-16, 19. This accusation, however, is belied by the analysis in the FEIS referenced by NPCA. AR 117160 at 304.

As explained above, the INM was used to predict information relating to the two essential features in a soundscapes analysis. The first, "percent time audible," reflects the percentage of time in which sound generated by recreational OSV use is perceptible to the human ear. See AR 117160 at 305. The second feature, "sound level," reflects what is best described in laymen terms as the absolute "loudness" of a sound, as measured in A-weighted decibels (dBA). Id. By combining these features with other elements, including different locations and management zones, the Service was able to devise metrics that facilitated the translation of modeled outputs into impact categories. Table 4-48 (AR 117160 at 304) illustrates how the Service plotted the three primary metrics used to measure impacts in the FEIS (columns 2, 4, and 5) against four separate impact categories (column 1).

NPCA contends that the first metric – referred to in the FEIS as "Percent of Total Park in Which OSV Sound is Audible" (AR 117160 at 304, Table 4-48, column 2) – was engineered to dilute the impacts of recreational snowmobiles and snowcoaches by highlighting the vast size of Yellowstone National Park. NPCA Br. at 15, 19. To support this theory, NPCA seizes upon a number of comments in the administrative record purporting to indicate that the use of this metric was a cause for concern among Park Service employees. See, e.g., NPCA Br. at 15-16 (quoting AR

-13-

125262 at 4) (comment by Kurt Fristrup noting that, while the Park-wide metric relates to resource protection, it "causes a substantial underestimation of the impact within visitor use zones"); id. at 16 (quoting AR 124927) (Gary Pollock commenting that "perhaps we . . . did not ask the right questions").

As an initial matter, NPCA's arguments in this context focus exclusively on the impacts of OSV noise on visitor experience. The Service, however, is charged both with protecting the enjoyment of the public, see 16 U.S.C. § 21, and conserving the Park's natural soundscape and ecosystems. Thus, while certain parts of the Park may not see high volumes of visitors, the Service's FEIS must nonetheless address and communicate the impacts of recreational OSV use on the entire Park. The Service accomplished this task by using the Park-wide metric. Contrary to NPCA's accusations, therefore, that metric was not a deliberate attempt to obfuscate the results of its analysis.

Second, NPCA fails to acknowledge that the comments it relies on from the administrative record formed part of the analytical process by which the INM model was adapted to the Service's needs. Those concerns were addressed in the final Volpe Report and FEIS. Thus, the Service did not simply end its analysis after predicting the Park-wide area in which recreational OSV use would be audible. Rather, the Service designed two additional metrics, each of which was used to determine the relative impact of the proposed action and its alternatives. An impact category was then assigned to each alternative based on the metric that produced the highest impact level. See AR 117160 at 304 ("[S]hould the assessed impact level (i.e., negligible, minor, moderate, or major) for one [metric] be higher than for another, the overall impact is judged to be at the higher level.") (emphasis added).

Thus, the fallacy of NPCA's argument becomes most evident through its own hypothetical worst-case scenarios. For example, in attacking the Service's "contrived" impact definitions, NPCA argues that, under the park-wide metric, "an impact would be considered 'minor,' regardless of how loud it is, if it would be audible in 10% or less of the total park area." NPCA at 14 (emphasis

-14-

added).  This argument, conveniently ignores that the "maximum sound level" metric results in a finding of "major impacts" if and when the sound levels exceed the thresholds established for that metric, the highest of which only needs to exceed 70dBA for developed areas and travel corridors to be considered a major impact.  See AR 117160 at 304 (Table 4-48, column 5).  NPCA also posits that a volume of 10,000 snowmobiles entering the park and causing a "constantly audible noise" would escape the Service's analysis with nothing more than "minor impact" rating, NPCA Br. at 15, but this argument is similarly wrong.  Even assuming such a large volume of recreational snowmobiles were only audible in 10% of the Park, the resulting "constantly audible noise" (100% time audible) would far exceed the thresholds established for the "percent time audible" metric, the highest of which only needs to exceed 40% for developed areas and travel corridors to be considered a major impact.  Thus, NPCA's attempts to use the "park-wide" metric as a straw man should not persuade this Court.[9]

### 2.    The Soundscapes Analysis Appropriately Relied On *Both* Monitoring *And* Modeling

NPCA next complains that the Service's analysis should have relied on the historical monitoring data compiled between 2002 and 2007 instead of the "hypothetical" INM model.  As an initial matter, however, the Supreme Court has cautioned that courts must generally be at their "most deferential" when reviewing technical analysis and judgments involving the evaluation of complex scientific data within the agency's expertise.  Balt. Gas and Elec. Co. v. Nat'l Res. Def. Council, Inc., 462 U.S. 87, 103 (1983).  Accordingly, an agency's expert choice of methodology is entitled to great deference.  See Sierra Club v. DOT, 753 F.2d 120, 128 (D.C. Cir. 1985) ("It is clearly within

---

[9]    It is also important to note in this context that the "audibility" metric is best understood when described as "audible at all," or "any audibility."  AR 117160 at 306.  Thus, even if 20% of the entire Park area is exposed to *some* level of audibility greater than zero, that that does not mean that the sound level in those areas would be considered disruptive.  See id. at 140, 313, Table 4-53 (indicating that, under alternative 1, recreational OSVs were audible at Mary Mountain trailhead and Mud Volcano 60% of the time during the hour modeled, but at a decibel range of only 0.1 to 30dBA – the equivalent of normal breathing, rustling leaves, a whisper, or the sound of the Snake River at a distance of 300 ft).

the expertise and discretion of the [agency] to determine proper [noise] testing methods."); City of Bridgeton v. FAA, 212 F.3d 448, 460 (8th Cir. 2000) ("[C]ourts have consistently upheld the FAA's discretion to choose its . . . noise impact methodology").  NPCA's misinterpretation of the INM illustrates precisely why such a high level of deference is necessary.

     As with its criticism of the "park-wide" metric, NPCA's "monitoring vs. modeling" argument is riddled with errors.  First, NPCA's assertion that the Service ignored the historical monitoring data is simply incorrect.  The FEIS uses the results of historical monitoring in many ways, including (1) as the input for the baseline ambient sound level and OSV sound source characteristics used in the INM, AR 117160 at 301-02; (2) as the basis for development of noise-speed-distance relationships for the INM, id.; (3) as a means of describing the affected environment, id. at 137-147, (4) and as context for the modeled results.  See id. at 147, 301-303 (explaining the statistical relationship between the two datasets).

     Second, while NPCA clings to the fact that modeling, as opposed to monitoring, formed the basis of the Service's "alternatives analysis," see id. at 311-339, the Service's primary reliance on modeling at this stage was made necessary by the *inherently* hypothetical nature of the analysis required by NEPA and its implementing regulations.  See 40 C.F.R. § 1501.2(c).  Whereas monitoring data reveals only information about the past, the INM model provided a tool with which to examine and compare the hypothetical management scenarios presented by each of the alternatives to the proposed action.  See AR 117160 at 302 ("Alternative modeling, unlike monitoring, allows comparison among the proposed alternatives relative to the volume and type of recreation use allowed.").  Accordingly, the Service's reliance on modeling was neither arbitrary nor capricious.

     Third, NPCA incorrectly argues that the modeling results are somehow deficient because they do not match the historical data generated by the Service's monitoring process.  The INM model was designed only to provide an objective mechanism for comparing the seven alternatives.  Accordingly, the model considered only those sounds expected to be produced by recreational

-16-

OSVs, to the exclusion of all other ambient sound sources.  Id. at 302, 305 ("The model did not include other ambient sounds, both natural and non-natural, while monitoring data does include these sounds.").  By focusing on noise emitted by recreational OSVs to the exclusion of all other sound sources, the Service was able to present an objective comparison of the soundscape impacts corresponding to each of the seven alternatives.  Moreover, while this narrow focus may have resulted in an "underestimation" of modeled vis-a-vis actual sound impacts, that discrepancy was addressed by a downward adjustment to the impact thresholds used for modeling in the AR 117160 at 304 (Table 4-48) vis-a-vis the thresholds used during the monitoring stage of the Service's analysis.[10]

Finally, while NPCA correctly points out that several commentators critiqued the INM at various stages of its development, those comments once again formed part of the Service's analytical process.  Contrary to NPCA's accusation that the Service ignored its experts, those comments either aided in the Service's development of the model or provided guidance for the presentation of the model in the FEIS.[11]  This form of analysis is precisely what NEPA encourages.

---

[10]     See AR 117160 at 303 ("The specific thresholds consider only visitor (recreation) sound impacts and not those of administrative travel; therefore, the thresholds are reduced accordingly.") (emphasis added); Compare AR 125050 at 12 (Burson Report 2006, Table 1, columns 3-4) (using the impact thresholds depicted in columns 3-4 to gauge the relative impact on soundscapes of all ambient sound sources, regardless or whether they relate to recreational OSV use) with AR 117160 at 304, Table 4-48, columns 4-5 (using much lower impact thresholds than in the Burson Report 2006, to control for the fact that ambient noise sources were not considered during the modeling process).

[11]     For example, the request for an "explicit recognition that the modeled values represent an underestimate" of actual impacts (NPCA Br. at 18, quoting AR at 125263), was followed by the insertion in the FEIS of the following sentence: "Overall, it appears that the model underestimated, sometimes substantially, the sound level and the percent time audible of OSVs in the parks as compared to data derived from field measurement."  AR 117160 at 302-303.  Similarly, a comment that "the model used . . . does not account for atmospheric temperature inversions . . . ," (NPCA Br. at 17, quoting AR 125248), resulted in the following addition to the FEIS: "Weather conditions, such as temperature inversions and wind, are common during the winter . . . and may cause sounds to travel much further than predicted by the INM sound propagation model."  Compare AR 116985 (Karen Trevino commenting on February 21, 2007 that "[w]e have some recommendations that would improve the analysis with a better and more

-17-

In sum, even NPCA concedes that "[t]he [Service] may of course properly utilize a well-constructed model to assist in assessing the impacts of various alternatives . . . ."  NPCA Br. at 16.  The Service did just that, and NPCA has failed to identify any putative defect in the model that is not clearly rebutted by record evidence.

### 3.    The Service's Findings Concerning the Preferred Alternative Are Fully Supported by the Administrative Record and the FEIS

Finally, while NPCA argues that the Service's findings are not supported by the record, it is actually NPCA's objections that are belied by record evidence.

Contrary to NPCA's assertions, the Service did not determine that each of the seven alternatives would cause "moderate, adverse, and short-term impacts" to the natural soundscape.  See NPCA Br. at 19.  While the Service made a similar determination with respect to the Park-wide metric (i.e., six out of seven alternatives would cause that level of impact), even a cursory review of the FEIS and ROD reveals that the Service's impacts analysis was much more complex than what NPCA describes, including a separate determination of impacts for each of the three metrics discussed in Section II.A supra.  See AR 117160 at S-13; AR 126499 at 33-34.

Also obvious from the record is the fact that a snowmobile meeting BAT requirements would reach 73 dBA only during testing while at full throttle.  See AR 126499 at 14.  Given that these machines are not generally operated at full throttle, NPCA's assertion that "snowmobiles operate at around" 73 dBA is exaggerated.  See NPCA Br. at 21 n.7.  This is especially true given that the Service has imposed a maximum 35 mph speed limit on the 30 mile route from the West Entrance

---

comprehensive toolbox aimed at better protecting park resources values and visitor use.  Given the political reality, however, we will not spending much time on this") with AR 125248 (Karen Trevino recognizing on August 26, 2007 that the "speech interference" methodology she had previously commented on was not included in the soundscape analysis because "it wasn't ready for prime time"); AR 116973, 76-83 (email from Trevino's office indicating that the metric intended to measure speech interference remained in draft form as of February 28, 2007); cf. Sierra Club v. U.S. Dep't of Transp., 753 F.2d 120, 128-129 (D.C. 1985) ("The [agency] is not, in any event, required to accept every possible method of collecting and analyzing data. . . .  The agency is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances.").

(where 300 of the 540 permitted daily entrances are allocated) to Old Faithful (the Park's most popular attraction).  See AR 117160 at 34, 140; see also id, at 8 (Figure 1-1).

A third error is NPCA's argument that BAT requirements for snowcoaches would not significantly reduce noise levels.  The ROD discloses that monitoring thresholds for the "maximum sound level" metric were exceeded more often than expected from 2003 to 2007, but explains that these exceedances were primarily caused by snowcoaches and road-grooming equipment rather than snowmobiles.  See AR 126499 at 21.  While NPCA accuses the Service of arbitrarily reaching this conclusion, the record provides ample evidence to support the Service's finding.  Compare NPCA Br. at 21 ("There is no support in the FEIS or, based on our search, elsewhere in the Administrative Record, for the claim that excess noise found by the monitoring reports was primarily attributable to snowcoaches and grooming equipment.") with AR 125292 at 31, Table 4 (indicating that 96% of the 445 exceedences measured from 8 a.m. to 4 p.m. during the 2006-2007 winter use season at Spring Creek and Madison Junction were caused by snowcoaches).

NPCA's arguments concerning the Service's reliance on the use of BAT snowmobiles to mitigate impacts fares no better.  NPCA's criticism – that the adverse impacts recorded during previous winter seasons were caused by snowmobiles already subject to BAT requirements – misses the mark, because it ignores the distinction between recreational and administrative OSVs.  See NPCA Br. at 21.  The 2004 Temporary Plan required that all recreational snowmobiles meet BAT standards, but it did not impose similar requirements for OSVs generally.  69 Fed. Reg. 65,348, 65,349, 361 (Nov. 10, 2004).  As a result, the sound levels recorded since that time reflect not only BAT recreational snowmobiles, but also administratively-used snowmobiles and non-BAT snowcoaches (including old model Bombardiers).  AR 126499 at 21.  The ROD explains that the non-BAT snowcoaches contributed disproportionately to both maximum sound levels and percent time audible.  See AR 126499 at 21.  Similarly, administrative snowmobiles contributed disproportionately to the recorded soundscape impacts because they were generally operated individually rather than in groups, and because many were non-BAT.  See AR 117160 at 143

-19-

("[A]lthough administrative vehicles operated by NPS, concession, and contractor employees comprise 12% of the individual snowmobiles, they are heard 29% of the time during an 8 a.m. to 4 p.m. period."). By requiring that both snowcoaches and administrative OSVs meet BAT requirements, the 2007 Winter Use Plan imposes a significant mitigation measure that was not present during the temporary plans that governed from 2003 to 2007. AR 117160 at 34, 38.

In sum, NPCA's criticisms of the Service's soundscape analysis find no support in the record and provide no grounds for challenging the adequacy of the FEIS.

### B.  The Service's Thorough Analysis of Air Quality Impacts Satisfies NEPA

NPCA next alleges that the Service failed to undertake a sufficient analysis of the Winter Use Plan's impacts on air quality. NPCA Br. at 26-30, 36. However, the record does not support NPCA's allegation. To the contrary, the record amply demonstrates that the Service undertook an extensive analysis of the potential air quality impacts associated with the various alternatives under consideration, and that it reached an informed decision that Alternative 7 would not exceed the air quality standards established by the Environmental Protection Agency ("EPA") or the more stringent standards established by the state of Montana. See AR 117160 at 20, 91-101, 215-248; see also AR 110001-111581 and AR 126499 (ROD) at 3-7, 12-15, 21, 27, 33-34, 39-42. This analysis fully satisfies the Service's responsibilities under NEPA, and supports the Service's determination that the Winter Use Plan will not unacceptably impact or impair air quality within the Park.

For the Service's air quality studies, the Service calculated maximum predicted ambient concentrations of pollutants using a modeling system approved by the EPA and widely used for evaluating air quality impacts throughout the country. AR 117160 at 216-17. These models are commonly referred to as EPA's CAL3QHC and Industrial Source Complex Short-term (ISCST3) and are used to predict concentrations of pollutants for a short-term basis at specific locations. Id.

As recommended by EPA, this modeling system employs a series of conservative assumptions for meteorology, traffic conditions, and existing background concentration levels that result in a conservative, yet realistic, estimate of expected pollutant concentrations from winter use

vehicle emissions.  Id.  For example, in determining the locations for modeling, the Service selected

four areas that were expected to generate the most elevated air quality impacts based on expected

vehicle traffic.  Id. at 217.  These locations were: Yellowstone's West Entrance, West Entrance to

Madison Junction, Old Faithful Staging Area, and the Flagg Ranch Staging Area.  Id.  At each site,

multiple receptors were modeled for CAL3QHC at spaced intervals, and the receptor with the

highest predicted concentration was used to represent each modeling site.  Id.  In addition, at each

site, dispersion modeling was conducted for the peak-hour periods (highest levels of vehicle traffic)

because those periods present the greatest potential for air quality impacts.  Id. at 219.  Conservative

meteorological conditions were also selected for modeling, consistent with EPA guidelines, in order

to produce the highest modeled ambient concentrations.  AR 111561 at 11-23; see, e.g., id. at 21-22

(modeling "worst-case" pollutant concentrations at each of the four modeling sites by assuming a

low wind speed and angle as part of the CAL3QHC pollutant computations and, accordingly, very

limited wind dispersion of pollutants).  Finally, background conditions were added to the modeling

results to obtain total pollutant concentrations at the modeling sites.[12]  AR 117160 at 220, 222.  The

FEIS demonstrates the reliability of the model by comparing monitored versus modeled

concentrations of pollutants.  Id. at 220-221(Tables 4-29 and 4-30).[13]

---

[12]    As with the Service's modeling of soundscape impacts, the air quality model is not
intended to predict the exact emissions corresponding to each of the seven alternatives.  Rather,
modeling allows the Service to objectively compare the hypothetical scenarios presented by the
broad range of alternatives under consideration.  Id. at 220.  Monitoring, by contrast, can only
provide information regarding past emissions.  However, unlike the modeling of soundscape
impacts, see Section II.A.2 supra, the Service was able to add background conditions to the
modeled results in order to predict total pollutant concentrations at the prediction sites.  AR
117160 at 217, 220.  In this respect, the modeled results provide reliable predictions of the actual
emissions for each alternative.

[13]    For both CO and particulate matter, modeled concentrations were relatively similar to
monitored values.  AR 117160 at 220.  For example, the 8-hour CO concentration levels at the
West Entrance were monitored at 1.0 ppm and modeled at 1.2 ppm.  Thus, the Service's
modeling system was effective in predicting emissions from OSV use in the Park.  While the
model underestimated CO emissions vis-a-vis monitored results at Old Faithful, and
underestimated $PM_{2.5}$ concentrations at both Old Faithful and the West Entrance,  see id. at 221

As the FEIS and Management Policies explain, the Clean Air Act gives the highest level of air quality protection to National Parks exceeding 6000 acres, which are deemed Class I areas.  AR 117160 at 92; Mgmt. Pol. § 4.7.1.  In addition, Montana has adopted air quality standards that are more stringent for carbon monoxide ("CO") than the applicable federal standard.  The results of the Service's air quality modeling analysis revealed that none of the alternatives were likely to exceed or even approach the National Ambient Air Quality Standards ("NAAQS") or the Montana or Wyoming ambient air quality standards for CO and particulate matter.  See id. at 223-227, 233 (Tables 4-32; 4-33; 4-36; 4-39).  Specifically with respect to Alternative 7, the Service determined that 1-hour concentrations of CO would reach a maximum of only 5.7 parts per million ("ppm") at the busiest entrance to the Park (West Entrance), well below the NAAQS of 35 ppm.  Id. at 223, Table 4-32.  The Service's determinations for maximum predicted 8-hour CO concentrations (1.9 ppm) and maximum predicted 24-hour PM2.5 concentrations (8.6 micrograms per cubic meter, or "$\mu g/m^3$") were equally favorable as compared to the corresponding NAAQS (9 ppm and 65 $\mu g/m^3$, respectively) when measured at the West Entrance under Alternative 7.  See AR 117160 at 223-226, Tables 4-32, 4-33, 4-36.  These comparisons were even more favorable when measured at all other modeled sites (West Entrance to Madison; Old Faithful Staging Area; Flagg Ranch Staging Area). Id.

Finally, the Service has identified threshold levels well below both federal and state air quality standards at which adaptive management action would be taken to ensure no impairment occurs under the proposed action.  Compare id. at 93, Table 3-8 (showing NAAQSs for maximum 1-hour and 8-hour concentrations of CO, maximum predicted 24-hour PM2.5 concentrations, and 24-hour PM10 PSD increment consumption) with AR 126499 at 41-42 (showing adaptive

---

(Tables 4-29; 4-30), the FEIS explains that: "[G]iven that the modeling approach must employ a series of assumptions and approximations of actual conditions, utilizing the best available emission factors and other input parameters, etc., compared with monitored concentrations, the modeling results are within a reasonable range of possibility . . . ."  Id. at 220.

management thresholds for each pollutant that are much lower than the corresponding NAAQSs and PSD limits). Under these circumstances, the Service's air quality analysis fully satisfied NEPA and permitted the agency to reach an informed decision that cannot be considered arbitrary and capricious.

### 1. The Service's Comparison to "Historic Conditions" is Only One of Three Metrics Used to Analyze Air Quality Impacts

NPCA first argues that the Service's analysis of air quality impacts is inadequate because it relied on an "inappropriate desired condition." NPCA Br. at 27-28. NPCA, however, does not explain why it believes this desired condition is inappropriate, nor could it. The Service's desired condition with respect to Park resources and values states as follows:

> Park resources and values are protected from impairment by preventing unacceptable impacts. Reduced oversnow vehicle sound and emission levels protect air quality, natural soundscapes, and other resources that are dependent on those qualities. Impacts to wildlife are mitigated, and effective wildlife habitat is protected.

AR 117160 at 5. As explained in Section III.A.2 infra, the Organic Act's non-impairment mandate requires that the Service prevent "impairment" to the Park's resources and values, and the Service implements its Organic Act responsibilities by identifying and preventing "unacceptable impacts," whether or not they rise to the level of impairment. The above statement of "desired conditions," therefore, is perfectly consistent with the Service's statutory obligations relating to Park management, and it is not rendered arbitrary merely because it was also juxtaposed with a statement of historic conditions.

It therefore appears that NPCA is once again attempting to erect a straw man. As with its criticism of the "Park-wide" metric in the soundscape section above, NPCA focuses exclusively on one type of analysis in the FEIS, neglecting other elements of the Service's thorough analysis. This line of argument fails for two reasons.

First, it was perfectly appropriate for the Service to compare the impacts of the Winter Use Plan to historic conditions, in light of this Court's opinion in Fund for Animals v. Norton, 294 F. Supp.2d 92 (D.D.C. 2003). There, this Court held that Service's adoption of the 2003 Final Rule,

-23-

which would have allowed up to 950 snowmobiles per day in Yellowstone, was an "unexplained departure" from the Service's prior finding that similar volumes of snowmobile use had caused the impairment of Park resources and values. See id. at 105-108. By comparing the Winter Use Plan's impacts to historical conditions, the Service provides the required explanation. In addition, the juxtaposition of historic conditions to desired conditions served to "illustrate the need for . . . a winter use plan," given that historic conditions were caused by the largely unregulated use of OSVs. See AR 117160 at 4.

Second, NPCA's narrow view of the FEIS does not mean that the Service simply ended its analysis after providing this explanation. To the contrary, the Service analyzed the results of its monitoring against three benchmarks: historic conditions, current conditions, and the relevant State and National Ambient Air Quality Standards. AR 117160 at 4-5 and 223-236. See e.g., id. at 223-236 (Tables 4-32 to 4-38, 4-40 to 4-41 and 4-43 to 4-44 and accompanying analysis of air quality impacts).[14] Thus, NPCA's argument that the Service failed to consider current conditions in its NEPA analysis is contradicted by the administrative record.

### 2.    NPCA's Criticisms of the Service's Modeling System Have No Merit

NPCA alleges that the modeling system employed by the Service underestimated emissions, but this argument is based on statements taken out of context. NPCA Br. at 29-30. As the FEIS reflects, the Service's modeling system may have slightly overestimated and underestimated emissions, but recent monitoring data confirms that the model was reasonably accurate. AR 111760 at 217-221. As the FEIS appropriately discloses, the snowmobile laboratory test data used in the impacts analysis may underestimate emissions to some extent because snowmobiles within the Park are typically operated at high altitude and low winter temperatures . See id. at 217. The Service's

---

[14]    For example, Table 4-33 shows predicted 8-hour CO levels for each alternative in comparison to both 1999 historic conditions and current conditions. AR 117160 at 224. In comparison to current conditions, which produced CO concentrations of 1.2 parts per million (ppm), the 8-hour CO level for the preferred alternative is 1.9 ppm, and well below EPA's NAAQS standard of 9.0 ppm. Id.

EPA-approved model, however, incorporated a series of conservative assumptions for meteorology, traffic conditions, background concentration levels, and other variables which, as the FEIS explains, ensured conservative yet realistic estimates of winter use vehicle emissions. AR 117160 at 217-18; see also id. at 222; AR 111561 at 23 (indicating that 24-hour PM2.5 values were determined from maximum predicted 1-hour modeling results, which do not reflect that winter vehicle use occurs primarily during only one third of the day). The FEIS confirms the conservative nature and relative accuracy of the model, showing that the model not only underestimated, but also overestimated emissions in several instances. AR 117160 at 220-221. Thus, in contrast to the one statement cited by NPCA, the record when viewed as a whole demonstrates that the Service reasonably calculated and disclosed the air quality impacts of the Winter Use Plan.

NPCA next argues that the modeling system incorrectly assumed that emissions from BAT-certified snowmobiles will meet the Service's emissions requirements. NPCA Br. at 29. In keeping with its practice of fly-specking the administrative record, NPCA relies on an email from 2005 stating that emissions from four-stroke snowmobiles "aren't as clean as they are supposed to be" (AR 110545) and a study from the University of Denver, Department of Chemistry and Biochemistry, indicating that two particular models of snowmobile, the Ski Doo Legend GT and Arctic Cat T660, produced higher CO emissions during accelerations (AR 111471). Id. at 29-30. A closer look at the documents cited by NPCA demonstrates the flaws in its arguments. First, the email, dated September 8, 2005, was a criticism by the Service's atmospheric chemist of the biased comments presented in a article by snowcoach proponents. AR 110545. In his email, Mr. Ray notes that the news article picked the least-used 4-stroke snowmobile as the basis for comparison, failed to explain that a more popular model exhibited a greater reduction in CO levels, and neglected to mention that four-stroke snowmobiles had reduced hydrocarbon emissions by 96%. Id. This email is hardly the indictment of four-stroke snowmobiles that NPCA would like the Court to assume.

Second, the study cited by Plaintiffs at AR 111471 cannot serve as support for the sweeping claim that snowmobiles produce more emissions than what was predicted by the Service's model.

The study reflects that only two snowmobiles were tested for a limited time. AR 111471 at 27. Moreover, the study acknowledges that some of the measurements were obtained from a single snowmobile, and that "there is no way of predicting how representative that single snowmobile is compared with all others that are used in the Park." Id. at 34. A much more representative study involving over 960 snowmobile measurements was conducted in 2006 by the same research group. AR 110761; AR 111471 at 1. This 2006 study revealed that four-stroke snowmobiles have reduced CO and hydrocarbon emissions at the West Entrance by 61% and 96% respectively. Id. Finally, and perhaps most damaging to NPCA's claim, the Service's model predicted emissions levels that were reasonably similar to actual emissions, and well below NAAQS and state ambient air quality standards. AR 117160 at 220-222 (Tables 4-29 and 4-30). NPCA's criticisms of the Service's model are therefore belied by the administrative record, and provide no support for their NEPA or Organic Act claims.

### 3.    NPCA Exaggerates the Emission Levels Expected Under the Winter Use Plan

NPCA concludes its attack on the Service's air quality analysis by claiming that carbon monoxide and particulate matter would increase significantly from current conditions and, therefore, adverse impacts are likely to occur. NPCA Br. at 28. NPCA cites to the percentage increase from current conditions rather than the actual figures in an attempt to exaggerate the size of the very limited increase in emissions from the proposed action. Id. For example, at the West Entrance, CO will increase from 1.2 ppm to 1.9 ppm while the NAAQS for CO is 9 ppm, and particulate matter will increase from 6.1 to 8.6 $\mu g/m^3$ while the NAAQS is 65 $\mu g/m^3$. AR 117160 at 224-225. At Flagg Ranch, the corresponding increases would be .9 to 1.8 ppm for CO and 3.1 to 4.1 $\mu g/m^3$ for particulate matter. Id. And, at Old Faithful, the corresponding increases would be .3 to .4 ppm for CO and 2.5 to 2.6 $\mu g/m^3$ for particulate matter. These are hardly significant increases, and the air quality at these locations would continue to be excellent and under NAAQS and Wyoming and Montana ambient air quality standards. Id. at 232-36. Moreover, these very small increases are

based on the conservative modeling assumption that every day of the winter season would see a full 540 snowmobile entries and 83 snowcoaches. These volumes are not expected and, accordingly, the assumption is highly conservative.[15] Therefore, NPCA's attempt to exaggerate the size of the slight increases in air emissions from the proposed action by referencing percentages rather than actual figures cannot serve to undermine the agency's thorough air quality analysis. When viewed with the appropriate level of deference to the Service's technical expertise, NPCA's challenge to the agency's air quality analysis cannot withstand judicial scrutiny. See Balt. Gas and Elec. Co., 462 U.S. at 103.

## C.     The Service's Analysis of Potential Impacts to Wildlife Satisfies NEPA

The FEIS presents a thorough analysis of the potential impacts to wildlife resulting from the Winter Use Plan. See AR 117160 at 111-136, 248-301. That analysis is focused especially on impacts to bison, as that issue has attracted a great deal of attention from the scientific community, the public, and this Court. See Fund for Animals, 294 F. Supp. 2d at 108-11 (D.D.C. 2003). Notwithstanding this, the FEIS also thoroughly determines and discloses the effects of the proposed Winter Use Plan on elk and other species of concern, including lynx, grizzly bears, gray wolves, bald eagles, coyotes, and ravens. AR 117160 at 111-36. The Service's analysis included a review of extensive data concerning interactions between OSVs and wildlife, See id. at 111-115 (Borkowski

---

[15]     While NPCA insists that snowmobile use will somehow "double" under the Winter Use Plan, it cites no support for the assertion that average daily volume will reach or even approach the 540 snowmobile cap – a number which is designed in part to accommodate the surge of visitors that occurs during the winter holidays but which is absent during the remainder of the winter season. See AR 120099 (showing that holidays saw substantially higher visitation rates than all other days during the 2006-2007 season); see also AR 120174 at 4 (indicating that the 540 limit under the Winter Use Plan corresponds to peak visitation number of 542 during the 2005-2006 winter season); AR 113572 at 25 (explaining that an average of only 290 snowmobiles accessed Yellowstone each day during the 2005-2006 season, despite a cap of 720).

2006 and White 2006), as well as a large body of research concerning bison travel, the use of groomed roads, bison energy use, and other related issues. Id. [16]

The FEIS discloses potential impacts to both individuals and populations of wildlife species in the Parks. The Service considered events that may cause direct mortality to individuals, such as vehicle collisions, as well as interactions that could lead to long term effects, such as habitat displacement or elevated energy expenditure. AR 117160 at 249. The Service's analysis also includes appropriate assumptions, based on the relevant scientific data, including: that the likelihood of wildlife response increases as the number of vehicles increases; that snowcoaches, because they are bigger than snowmobiles, are more likely to elicit an active response from individual animals; and that mandatory guiding reduces harmful interactions with wildlife. Id. at 250.

In order to analyze the impacts of each of the proposed alternatives in the EIS, the Service rated impacts to wildlife species using five criteria: 1) vehicle-caused mortality to individual animals, 2) displacement impacts, 3) behavioral responses of wildlife groups to OSVs and associated human activities, 4) physiological responses of wildlife to OSVs and associated human activities, and 5) demographic effects at the population level. Id. at 251. For each wildlife species of concern, the Service analyzed each of the alternatives based on the five factors defined above, and categorized impacts to species under each of those factors and provided a cumulative impact rating. Id. at 257-301. This level of analysis thoroughly satisfies the requirements of NEPA.

---

[16] The Gates Report, commissioned by the Service, and other recent studies, Bruggeman 2006, Coughenour 2005, Fuller 2007, and Wagner 2006, address the issue of whether road grooming adversely affect bison ecology and spatial dynamics. See EIS at 111-25. The issue of whether road grooming itself, not interactions with OSVs, adversely affects bison ecology and spatial dynamics, was raised by Fund for Animals in prior litigation dating back to 1997 and also was discussed in this Court's 2003 opinion. See Fund for Animals, 294 F. Supp. 2d at 108-11.

### 1.     The Analysis of Impacts to Bison and Other Wildlife From OSV Use

As the FEIS explains, the bison population in Yellowstone has risen steadily since the cessation of herd control in the late 1960s.  Id. at 116, 120.  Since 1980, the population has fluctuated between 2,500 and 4,900 animals, and the number in late summer 2006 was 3,900.  Id.  The rising population of bison has coincided with the increase in OSV recreation in Yellowstone. Id.  Between 1968 and 2004, the number of winter visitors increased from 5,000 to nearly 100,000 people.  Id.; see also AR 125625 at 1922 (Borkowski 2006, noting increase in OSV use corresponding with increase in bison population).  During that same time period, the bison population increased from approximately 400 to 3,400 animals.  AR 117160 at 127.  Much of the increased use of Yellowstone has been concentrated in the west-central area of Yellowstone, where bison are common.  Id.  The increased use of the Park, and the lack of a mandatory guiding requirement through the 1990's, resulted in frequent conflicts between wildlife and visitors that had to be resolved by Park Rangers.  Id.  Among the most common problems were snowmobilers attempting to pass through or around herds of bison.  Id. at 120-21.  The implementation of a mandatory guiding requirement in recent winters has substantially reduced these incidents.  Id. at 121; AR 119778 (Taber 2006 Report); see also AR 125625 at 1923-24 (Borkowski 2006, noting that winter visitors traveling on OSVs were confined to groomed roads and typically behaved properly around wildlife).

The Service considered these and other findings in the FEIS, see AR 117160 at 111-29, and acknowledged evidence showing that, under historic conditions (i.e., unregulated OSV use), some ungulates were displaced from roadways.  Id. at 126, 128.  However, the relevant studies also show that such displacement was temporary, was not likely to be injurious to individual animals, and was not likely to induce measurable stress reactions.  Id. at 125-26.  In addition, displacement has been localized and has not translated into large-scale patterns of habitat avoidance.  Id. at 129.  The weight of the scientific evidence also shows that human disturbance is not a primary motivator for ungulate distribution and movement within the park.  Id. at 126, 129.  Rather, the most recent

research by the Service's scientists concluded that factors other than human disturbance, such as snowpack, population density, and drought are the primary influences on herd distribution, movements, and foraging behavior in the winter.  Id.

Finally, the Service and Montana State University conducted two extensive studies in order to determine the nature of wildlife responses during interactions with OSVs.[17]  See AR 117160 at 154.  The first, Borkowski 2006, analyzed more than 6500 interactions between bison or elk and OSVs over a five year period (1999-2000, 2002-2004).  AR 117160 at 112; AR 125625 at 1911.  Each interaction was grouped into one of three categories: (1) no visible response – meaning no reaction whatsoever from the animal; (2) a vigilance response – meaning that the animal directs its attention toward the OSV, but does not move; and (3) an active response – meaning walking or running from or towards an OSV.  See AR 117160 at 115, Table 3-18.  The results of the study indicated that bison exhibit no response to OSVs 80% of the time, a vigilance response 12% of the time, and an active response only 7% of the time.  Id.  The percentage of instances in which elk exhibited no response or only a vigilance response was 93.3.  Id.   The same figure for trumpeter swans, bald eagles and coyotes was  89.5%, 89.8%, and 76%, respectively.  Id.  The second study, White 2006, analyzed over 5500 records of interaction during the 2003-2006 winter seasons, Id. at 114, and produced very similar results.  See id. at 115, Table 3-18.  Both White and Borkowski concluded that there was no evidence that snowmobile use over the past 35 years has adversely affected the demography or population dynamics of bald eagles, bison, elk, or trumpeter swans.  Id. at 115; AR 125701 at 20 (White); AR 125625 at 1924 (Borkowski).[18]

---

[17]     These studies span periods of both unmanaged use (1999-2003) and managed use (2004-2006) and both high and low average snowmobile entries (87,206 total entries in the 2001-2002 season, and 24,049 total entries in the 2004-2005 season).  See AR 117160 at 154, Table 3-20.

[18]     Each year, the Service also compiles its own monitoring data regarding wildlife responses to OSVs.  In 2007, the Service winter use crews conducted 208 surveys of road segments, covering 5,514 kilometers and observed 1,663 groups of wildlife, 983 interactions with OSVs, 111 wheeled vehicle interactions, and 16 pedestrian interactions.  AR 125741 at 9. Overall, the responses of wildlife observed were: 76 % no apparent response, 18 % look/resume,

2.    **NPCA's Arguments Regarding the Analysis of Wildlife in the EIS Are Without Merit**

NPCA argues that (1) the Service did not follow the recommendations of its own scientists regarding wildlife impacts in setting daily OSV entry levels; (2) the Service considered only impacts to populations, not individuals, and thereby improperly manipulated its analysis to minimize the predicted impacts; and (3) the Service's findings were arbitrary. NPCA Br. at 22-26, 39-43. As discussed below, none of these arguments has merit.

a.    **The Service's Analysis Is Consistent With the Findings of the Relevant Studies Conducted by Its Scientists**

NPCA argues that the Service's analysis of impacts is inconsistent with the findings of the scientists who participated in the research and drafting of the White 2006 study, because the authors of that study recommended that "park managers consider maintaining OSV traffic levels at or below those observed during our monitoring." NPCA Br. at 22-24, 43-44 (citing AR 125701 (White 2006) at 20); see also Borkowski 2006, AR 125625 at 1924 ("Thus, we recommend park managers consider maintaining OSV traffic levels at or below those observed during our study."). NPCA's argument, however, is predicated on a false factual assumption, i.e., that the level of OSV use during the White and Borkowski studies was 260 snowmobiles per day and 29 snowcoaches per day. Id. In fact, those numbers are found nowhere in the White and Borkowski studies and represent the average daily entries for the 2006 season only. AR 117160 at 76. Borkowski examined data from the winters of 1999-2000 and 2002-04, during which the daily average OSV levels at the West entrance alone were: 514, 486, 593, 320, and 178. AR 125625 at 1915. During those same years, the maximum daily numbers at the West Entrance were 1168, 1010, 1874, 573, and 330,

---

1 % attention/alarm, 4 % travel, and 1% flight. Id. at 9-10. In interactions with snowmobiles, the following bison reactions were observed: 90.2 % no response, 6.7 % look/resume, 1.5 % travel, 0.8 % alarm/attention, 0.8 % flight. Id. at 24. Bison reactions to snowcoaches were almost identical: 92.4 % no response, 6.9 % look/resume, 0.7 % flight. Id. at 26. Elk responded to snowmobiles as follows: 55.1 % no response, 44.9 % look/resume. Id. 24. Elk responses to snowcoaches were: 67.2% no response, 32.8% look/resume. Id. at 26.

respectively.  Id.  Given the cap of 300 entries at the West Entrance, the actual use numbers under the Winter Use Plan will likely be much lower than those observed during the Borkowski study.

With respect to the White study, White examined data for the years 2003-06, where the OSV entry figures for the West entrance were 320, 178, 156, and 181.  AR 125701 at 11.  By comparison, the Service's preferred alternative permits up to 300 snowmobiles and 37 snowcoaches daily from the West entrance.  AR 117160 at 63.  Given this cap on daily entries at the West Entrance under the Winter Use Plan, actual use levels will likely be similar to the OSV entry figures observed at the West Entrance during the last three years of the White study.  See AR 120099 (showing that the high visitation rates present during holiday weekends are not present during the remainder of the 2006-2007 season); AR 120174 at 4 (indicating that the 540 limit under the Winter Use Plan corresponds to peak visitation number of 542 during the 2005-2006 winter season).  NPCA's assertion that the Service has ignored the findings of its scientists is therefore false.

### b.    NPS Analyzed Impacts to Both Populations and Individuals of Species

Next, NPCA argues that the FEIS is inadequate because it analyzes only impacts to populations, not individuals, of wildlife species.  NPCA Br. at 24-26, 41-42.  This argument, however, is belied by record evidence.  The Service expressly acknowledges in the FEIS that "adverse impacts to individual animals should be minimized."  AR 117160 at 251.  Thus, in addition to analyzing population level effects, the Service specifically considered effects on individuals, including injury or death from collisions with vehicles, displacement from habitat, behavioral responses, and physiological responses.  AR 117160 at 251-256.  Indeed, the record discloses that during the period from 1989-98 – a decade of unmanaged and, therefore, relatively high snowmobile use – 10 bison, 3 elk, 2 coyotes, and 1 moose were killed by snowmobiles in Yellowstone (none were killed by snowcoaches).  AR 125701 at 17; see also FEIS 251, 269.  As this disclosure demonstrates, the study of effects on population-level demographics was but one component of the Service's analysis.  Id. at 255-56.

### c.       The Service's Findings Are Supported By The Record

NPCA criticizes the Service's finding that effects on wildlife would be "negligible to moderate, adverse, short-term, and direct," and argues that it can be justified only on the basis of "total-population-level-effects-analysis."  NPCA Br. at 26.  However, the conclusion that impacts to individuals are likely to be "negligible to moderate" is consistent with the scientific evidence, which shows, among other things, that interactions with wildlife are likely to result in only temporary disturbances to individual animals and, with the exception of collisions, are not likely to result in any type of injury or mortality to individual animals.  AR 125701; AR 125625.  Even with respect to collisions, moreover, the record shows that, in contrast to the few mortalities caused by snowmobiles described above, collisions with wheeled vehicles were more frequent during the same time period in the summer season.  AR 125701 at 17-18.  Accordingly, the Service's findings regarding the degree of impacts to ungulates and to other wildlife species are supported by the record.

As recognized in the White study, scientific findings "rarely persuade people to alter their value or beliefs (e.g., Meadow et al. 2005).  Thus, we suspect that varying interpretations of the behavioral and physiological response data will continue to exist because of the diverse values and beliefs of the many constituencies of Yellowstone."  AR 125701 at 20.  This conclusion has certainly proven to be prophetic.  NPCA apparently believes that any level of response by wildlife to an OSV is intolerable.  Thus, in its view, the Service's finding that bison would exhibit no response to OSVs 80% of the time, a vigilance response 12.5% of the time, and an active response 7% of the time is unacceptable.  See NPCA Br. at 26.  These impacts, however, were addressed in the ROD, AR 126499 at 22, and were discussed at length in the FEIS.  AR 117160 at 251-271.  As those documents explain, the Service's reasoned determination that a 7% active response rate has caused no measurable injury to individual animals and has resulted in no measurable fitness effects on bison is supported by ample scientific evidence.  AR 125701 at 20; see also AR 125625 at 1924.  NPCA, therefore, has offered no basis for doubting the adequacy of the Service's analysis.

-33-

**D.** **NPCA's Criticism of the "Parameters" of the NEPA Analysis Have No Basis in Law**

NPCA argues that the "purpose and need" statement in the FEIS is arbitrary and capricious because it allegedly ignores the restrictions and requirements set out by the Organic Act and the Yellowstone Enabling Act. NPCA Br. at 39-41. This is incorrect. Contrary to NPCA's assertions, the Service has not misinterpreted the Organic Act, nor has the Service taken the position that its duties end with the non-impairment mandate. Rather, as the FEIS indicates:

> The goal of the plan is to provide park visitors with a range of appropriate winter recreational opportunities, while ensuring that these activities do not lead to unacceptable impacts or the impairment of park resources and values.

AR 117160 at 4 (emphasis added). On the basis of this purpose and need statement, the Service designed a range of winter use management plans and examined their impacts in comparative form, thereby ensuring that the selected alternative would not result in a conflict between the conservation of Yellowstone's resources and values and providing for their enjoyment. See Mgmt. Pol § 1.4.3. Accordingly, the Service fully considered all applicable legal authorities in crafting the scope of its NEPA analysis.[19]

**III.** **NPCA's Claims Under The Organic Act, Yellowstone Act, Executive Orders, and 16 C.F.R. § 2.18 Have No Merit**

**A.** **The Winter Use Plan Does Not Violate The Organic Act**

The Organic Act imposes two independent mandates on the Service. The first is a duty to ensure that park resources and values are left "unimpaired" unless a particular law directly and specifically provides otherwise. 16 U.S.C. § 1; see also Mgmt. Pol. § 1.4.4.[20] This non-impairment

---

[19]     NPCA also argues that the purpose and need statement "failed to take into account the strong protections imposed by the Yellowstone Enabling Act." See NPCA Br. at 40. As discussed in Section III.B infra, however, this argument is based on a misinterpretation of the Yellowstone Act, and therefore fails.

[20]     This Circuit has established that the Management Policies are not enforceable against the Service. See The Wilderness Soc'y v. Norton, 434 F.3d 584, 596-597 (D.C. Cir. 2006). Thus, insofar as NPCA attempts to enforce any provision of the Management Policies, that attempt must fail because "the only agency action that can be compelled under the APA is action legally

-34-

mandate, which is described as "the cornerstone of the Organic Act, establishes the primary responsibility of the National Park Service." Id. The second mandate is a duty to "conserve" park resources and values. The Management Policies explain that this conservation duty "is independent of the separate prohibition on impairment," and that it "applies all the time with respect to all park resources and values, even when there is no risk that any particular park resources or values may be impaired." Id.

In this case, NPCA asserts that the Winter Use Plan violates both of these mandates because it adversely impacts some of Yellowstone National Park's resources and values. These claims lack merit, however, because the Service's exhaustive environmental analysis confirms that the impacts flowing from the Winter Use Plan are acceptable and well within the scope of the Service's management discretion under the Organic Act.

### 1.    No Impairment

NPCA argues that "[t]he studies conducted by the [Service] in the last several years" demonstrate that snowmobile use adversely impacts the Park's resources and values and, accordingly, prove that the Winter Used Plan causes "impairment." NPCA Br. at 31, 36. NPCA is wrong.

The mere existence of adverse impacts does not constitute impairment. See Mgmt. Pol. § 1.4.7.1 ("The impact threshold at which impairment occurs is not always readily apparent."). Rather, the Management Policies define the term "impairment" as "an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." Mgmt. Pol., § 1.4.5 (emphasis added). The Service uses the factors described

---

required." Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 63 (2004). Notwithstanding, Part 1.4 of the Management Policies presents the Service's interpretation of the various statutory authorities that Congress has charged it with implementing. That part of the Management Policies is therefore entitled to substantial deference.

in Section 1.4.5 of the Management Policies as a basis for determining whether this threshold is met. It is not enough, therefore, for NPCA to simply assert that adverse impacts have occurred. After exhaustively studying the likely impacts of the Winter Use Plan, including the impacts to air quality, wildlife, and the natural soundscape, the Service determined that the actions described in Alternative 7:

> do not severely affect a resource or value whose conservation is (1) necessary to fulfill specific legislative purposes; (2) key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park; or (3) identified as a goal in the parks' general management plan or other relevant NPS planning documents.

AR 117160 at 373; see also Mgmt. Pol.§ 1.4.5. On this basis, the Service concluded that the Winter Use Plan would not impair the Park's resources and values. AR 126499 at 39. This conclusion is entitled to substantial deference, and NPCA has provided no basis for this Court to overturn it.[21]

### 2.    Conservation Mandate

NPCA's claim that the Winter Use Plan violates the Service's "conservation" mandate also fails. NPCA places heavy reliance on Section 1.4.3 of the Management Policies, which interprets the Organic Act as assigning priority to the "conservation" of park resources and values whenever a "conflict" arises between providing for their enjoyment and ensuring their conservation. See NPCA Br. at 34-35. This provision, however, must be interpreted in harmony with the rest of the Management Policies. See United Savings Ass'n. of Tex. v. Timbers of Inwood Forest Assocs.,

---

[21] It appears from the brevity of NPCA's "impairment" argument that NPCA is simply attempting to leverage this Court's decision in Fund for Animals v. Norton, 294 F. Supp.2d 92 (D.D.C. 2003), where, under very different circumstances, this Court found that the Service had arbitrarily departed from its previous finding that snowmobile use at historical levels constituted impairment. This reliance on Fund for Animals is misplaced, however, because the FEIS and administrative record in this case clearly support the Service's decision. A more thorough discussion of the differences between the 2001 Phase-Out Rule, the 2003 Final Rule, and the current Winter Use Plan appears in Federal Defendants' response to the Greater Yellowstone Coalition's motion for summary judgment in the consolidated case, No. 07-cv-2111 (EGS), and is incorporated by reference herein. See Federal Defendants' Memorandum in Opposition to Greater Yellowstone Coalition's Motion for Summary Judgment, Re Case No. 07-cv-2111 (EGS), at 20-23.

Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor.") (citations omitted); Roberto v. Dep't of the Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006) ("The rules of statutory construction apply when interpreting an agency regulation."). As the Management Policies make clear, not every adverse impact constitutes a "conflict" with the Service's conservation mandate.

Indeed, the Management Policies recognize that "[v]irtually every form of human activity that takes place within a park has some degree of effect on park resources or values, but that does not mean the impact is unacceptable or that a particular use must be disallowed." Mgmt. Pol. § 1.4.7.1. Thus, forms of use that cause some adverse impacts can occur without necessarily creating the kind of "conflict" between conservation and enjoyment that is described in Section 1.4.3. In order to distinguish between those adverse impacts that conflict with the Organic Act's conservation mandate and those that do not, the Management Policies uses a graphic image, which is depicted at AR 120645 at 14. The bottom of the image represents impacts that flow from "appropriate" uses of the parks. Those impacts are still subject to the Service's overarching conservation mandate, and therefore must be avoided or minimized to the extent practicable, see Mgmt. Pol.§ 1.4.3, but they do not create the sort of conflict that would render a particular use inappropriate and require that it be disallowed. Rather, it is only when an impact rises to the level of "unacceptable impact" on this graphic image that a "conflict" arises, triggering the requirement that the Service prioritize the conservation of park resources and values over providing for their enjoyment. See Mgmt. Pol.§ 1.4.7.1 (describing factors to be considered in determining whether an action rises to the level of an "unacceptable impact").

Thus, while the statutory mandates described in the Organic Act impose two independent duties – i.e., non-impairment and conservation – the duties are nonetheless interrelated and complementary. As the Management Policies explain, "the impact threshold at which impairment occurs is not always readily apparent." Mgmt. Pol. § 1.4.7.1. Through the exercise of its conservation mandate, therefore, the Service employs a precautionary standard whereby it avoids

-37-

impacts that it deems "unacceptable" even if they do not rise to the level of impairment.  Id.; see also

Mgmt. Pol. § 1.5 (reiterating that "[w]hen proposed park uses and the protection of park resources

and values come into conflict, the protection of resources and values must be predominant," but

explaining in the very next sentence that "[a] new form of park use may be allowed within a park"

if "it will not result in unacceptable impacts.").  This is precisely the approach taken by the Service

in the instant case.  See AR 126499 at 30 (stating that the protection of park resources and values

"must be predominant" whenever it conflicts with a proposed park use, and explaining that this goal

is achieved by ensuring that a proposed park use "will not result in unacceptable impacts"); AR

117160 at 5 ("Appropriate winter recreation is that which does not cause unacceptable impacts on

unique characteristics of winter settings within the parks, while permitting their enjoyment and

protection").

Applying the above principles to the instant case, the Service found that no "unacceptable

impacts" would occur because the actions in alternative 7:

> would not (1) be inconsistent with [the] park's purposes and values; (2) impede the
> attainment of [the] park's desired future conditions for natural and cultural resources
> as identified through the parks' planning process; (3) create an unsafe or unhealthy
> environment for visitors or employees; (4) diminish opportunities for current or
> future generations to enjoy, learn about, or be inspired by park resources or values;
> or (5) unreasonably interfere with park programs or activities; an appropriate use of
> the parks; the atmosphere of peace and tranquility; or the natural soundscape
> maintained in wilderness and natural, historic, or commemorative locations within
> the parks.

AR 117160 at 373; see also Mgmt. Pol. § 1.4.7.1.  The Service concluded that, "[a]lthough adverse

impacts could occur under this alternative to wildlife, air quality, noise, and visitor experience,

impacts are at acceptable levels and may be mitigated through management actions."  Id.  As with

the Service's determination that the Winter Use Plan did not cause impairment (see Section III.A.1

supra), the conclusion that impacts resulting from the Winter Use Plan are "acceptable" is entitled

to substantial deference.  Accordingly, this Court should enter summary judgment for the Service

with respect to NPCA's Organic Act claims.

**B.    The Winter Use Plan Does Not Violate The Yellowstone Enabling Act**

NPCA's attempt to leverage the Yellowstone Enabling Act to impose its own preferred management practices cannot be sustained, because the Yellowstone Act provides no restrictions of relevance here that are not already imposed by the Park Service Organic Act.  In relevant part, Section 22 requires only that the Service issue regulations providing for the retention of Yellowstone's timber, mineral deposits, "natural curiosities," and "wonders" in their natural condition.  16 U.S.C. § 22.  Clearly, snowmobile use does not in any way affect the Park's timber or mineral deposits, nor does it adversely impact the various geothermal and geographic features that Congress described in Section 22 as "natural curiosities" and "wonders."  Given that none of these features have been altered from their "natural condition," NPCA's claim under the Yellowstone Act must be denied.

NPCA's theory ignores the fact that Congress chose to address wildlife specifically in the fourth sentence of Section 22, where it imposed a very different standard on wildlife management than the one advocated by NPCA.  Rather than using the more restrictive language that NPCA is attempting to leverage here (i.e., that "natural curiosities" and "wonders" be retained "in their natural condition"), Congress chose instead to prohibit only the "wanton destruction" of wildlife and/or its "capture or destruction for purposes of profit."  See 16 U.S.C. § 22.  NPCA's preferred interpretation of Section 22 would render the fourth sentence in that same Section superfluous, and therefore cannot be sustained.[22]  Nat'l Insulation Transp. Comm. v. I.C.C., 683 F.2d 533, 537 (D.C.

---

[22]    Any doubt as to whether Congress intended that wildlife also be retained "in [its] natural condition" is resolved by the Act's legislative history, which makes clear that Congress authorized Park visitors "to shoot game or catch fish for their own subsistence," though not for profit.  CONG. GLOBE, 42d Cong., 2d Sess., 697 (1872).  In response to concerns voiced during the Senate floor debate, that hunting of any kind might ultimately lead to "an entire destruction of all the game in [the] park," it was resolved that the management of hunting would be "entirely under the control of the Secretary of the Interior," who was authorized to "make the rules that shall govern the destruction and capture of game."  Id.

Cir. 1982) ("[A] court must, if possible, give effect to every phrase of a statute so that no part is rendered superfluous.").[23]

NPCA also misinterprets Section 26 of the Yellowstone Enabling Act. That section, which was enacted 22 years after Sections 21 and 22, states:

> The Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary and proper for the management and care of the park and for the protection of the property therein, especially for . . . the protection of the animals and birds in the park from capture or destruction, or to prevent their being frightened or driven from the park . . . .

16 U.S.C. § 26.  NPCA's interpretation of Section 26 as an absolute prohibition against any behavioral disturbance of wildlife would again render the prohibition against "wanton destruction" in Section 22 superfluous.  Perhaps for this reason, no other court has interpreted the language in Section 26 as expansively as NPCA attempts to do here.  To the contrary, in <u>United States v. Peterson</u>, 121 F. Supp.2d 1309 (D. Mont. 2000), the District Court for the District of Montana was charged with interpreting an identical provision in the enabling legislation for Glacier National Park, 16 U.S.C. § 170.  In interpreting that language, the court found that Congress had deemed it necessary to foreclose the possibility that wildlife would be driven from the park's boundaries so that it could be hunted.  <u>Id.</u> at 1319; <u>see also</u> S. Rep. No. 106 at 2 (1910), 61st Cong., 2d Sess., at 2 (Jan. 20, 1910) ("[I]t is believed that . . . game animals and birds will increase in numbers, if protected by law from interference, to such an extent as to furnish in the overflow from the park a tempting supply to sportsmen for all time to come . . . .").  The purpose of Section 26, therefore, is to prevent the <u>intentional</u> hazing or driving of wildlife across Yellowstone's borders, where they would no longer enjoy the prohibition against hunting described in 36 C.F.R. § 2.2.

------

[23]     Even if NPCA were correct that the terms "natural curiosities" and "wonders" could include wildlife, however, there is no basis for NPCA's bizarre interpretation of the phrase "retention in their natural condition."  NPCA interpretation of that phrase as imposing an absolute duty to prevent every single possible activity that could "create anxiety or unease" for wildlife is contrary to more than 100 years of wildlife management and visitor use and, if accepted, would require a closure of the Park to both visitors and Park staff.  Clearly, nothing in the statutory language provides support for such a reading.

Thus, despite NPCA's characterization of the Yellowstone Act as providing a "very specific and detailed preservation mandate," NPCA Br. at 33, the Act provides no support for NPCA's arguments that Congress intended the Service to retain wildlife in its natural condition or to prevent every single instance of unintentional "frightening" of a bird or animal.

### C.    The Winter Use Plan Does Not Violate Executive Order 11644

NPCA's reliance on Executive Order 11,644 (hereinafter "E.O. 11644") must also be rejected. See NPCA Br. at 37-38 (citing Exec. Order No. 11,644, 37 Fed. Reg. 2877 (Feb. 8, 1972)). The core provision of E.O. 11644 requires affected agencies to develop regulations to govern the "designation of specific areas and trails on public lands on which the use of off-road vehicles may be permitted . . . ." E.O. 11644 § 3 (emphasis added). This Order therefore addresses what was perceived in 1972 as a potential conflict between environmental values and the growing popularity of off-road vehicles ("ORVs"), by establishing standards that govern the Service's authorization of ORV use on "trails" and "areas" within the public lands. Id. § 3 & Preamble. Contrary to NPCA's assertions, however, E.O. 11644 does not directly prohibit (or even regulate) the general use of snowmobiles in the national parks. Rather, the Executive Order directs the Secretary of the Interior to "develop and issue regulations . . . to provide for the administrative designation of specific areas and trails" on which off-road vehicles may be permitted. Id. § 3(a).

The Service has implemented E.O. 11644 with respect to snowmobiles through the promulgation of 36 C.F.R. § 2.18(c), which prohibits snowmobile use on "trails" and "areas" within the meaning of the Order. Section § 2.18(c) provides in relevant part that snowmobile use may be authorized only on established roads that are used by motor vehicles during seasons other than the winter. Consistent with Section 2.18, the Winter Use Plan as implemented by the 2007 Final Rule provides with respect to Yellowstone that "snowmobiles and snowcoaches . . . continue[] to be[] restricted to designated routes that are the same as roads that are used by motor vehicles during other seasons of the year." 72 Fed. Reg. at 70,791 (Response to Comment 35). By prohibiting snowmobile use on "trails" or "areas" within the meaning of E.O. 11644, and by requiring instead

that snowmobile use be limited to the same established roads that are used by wheeled vehicles during other seasons, the Service has fully complied with E.O. 11644.

Even if NPCA could directly challenge the Winter Use Plan under the standards of E.O. 11644, however, the administrative record and the discussion throughout this brief concerning the Service's thorough environmental analysis demonstrate that, by designating only established roads for snowmobile use and by imposing significant other mitigation measures, the Service has "minimized harassment of wildlife," has "minimized damage to soil, watershed, vegetation, and other resources of the public lands," and has avoided the occurrence of unacceptable impacts to the Park's natural, aesthetic, and scenic values within the meaning of E.O. 11644 §§ 3(a)(1)-(2), 4.

### D.     The Winter Use Plan Does Not Violate 36 C.F.R. § 2.18(c)

NPCA argues that, by issuing the Final Rule authorizing the Winter Use Plan, the Service violated 36 C.F.R. § 2.18(c). NPCA Br. at 37. That regulation provides that:

> The use of snowmobiles is prohibited, except on designated routes and water surfaces that are used by motor vehicles or motorboats during other seasons. Routes and water surfaces designated for snowmobile use shall be promulgated as special regulations. Snowmobiles are prohibited except where designated and only when their use is consistent with the park's natural cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources.

36 C.F.R. § 2.18(c). NPCA does not dispute that the Winter Use Plan complies with the first part of the regulation. Nor can it because, as explained above, OSV use is only permitted on roads within Yellowstone that are used by other motor vehicles during the non-winter seasons, and only to the extent those roads have been specifically designated for OSV use. See 36 C.F.R. §§ 7.13(l)(7)(I) (2007); 7.21(a)(7)(I) (2007); 7.22(g)(7)(I) (2007). Rather, NPCA's argument is that because snowmobile use may "create anxiety or unease among wildlife," "agitate them," or "cause them to move . . . from a state of tranquility," the Winter Use Plan violates the requirement not to "disturb" wildlife. NPCA Br. at 38. This position is untenable.

NPCA's interpretation of Section 2.18(c) is inconsistent with the language and purpose of the regulation. The regulation plainly allows snowmobile use authorized by special regulation on

-42-

routes that are used by motor vehicles in other seasons, subject to certain limitations.  36 C.F.R. § 2.18(c)-(e).  NPCA's interpretation of the regulation as not allowing *any* level of wildlife "anxiety or unease" is an impossible standard and would turn the regulation into a de facto ban on snowmobiles in all park units.  This is clearly not what the Service intended.  See Gregory v. Mo. Pac. R.R. Co., 32 F.3d 160, 165 (5th Cir. 1994) ("It goes without saying that, in construing a . . . regulation, we seek to avoid imposing [absurd] results.").  NPCA's interpretation is also contrary to over 30 years of snowmobile use in Yellowstone and other park units while the regulation, or a similar regulation, has been in effect.

NPCA's argument that snowmobile use is inconsistent with the Park's "natural, cultural, scenic, and aesthetic values" (and therefore violates § 2.18) simply because it impacts the Park's soundscapes and air quality, is also without merit.  In support of this argument, NPCA creatively posits that "[t]here is no better place to look" for a definition of those values with respect to Yellowstone Park than 16 U.S.C. §§ 22, 26.  See NPCA Br. at 38.  These provisions, however, are best described as grants of regulatory authority, and not as statutory definitions of Yellowstone's values.  Indeed, the clearest statement of congressional intent with respect to Yellowstone lies not in Sections 22 and 26, but rather in 16 U.S.C. § 21, where Congress explicitly "dedicated and set apart" the lands that currently comprise Yellowstone National Park "as a public park or pleasuring ground for the benefit and enjoyment of the people."  Moreover, as demonstrated throughout this brief, the Winter Use Plan fully complies with both the Organic Act and the Yellowstone Act and, accordingly, is fully consistent with the Park's "natural, cultural, scenic, and aesthetic values."

At bottom, the Service's interpretation of Section 2.18, its own regulation, to permit snowmobiles in the Parks in accordance with the requirements of the Winter Use Plan, is entitled to deference from this Court.  Auer v. Robbins, 519 U.S. 452, 461 (1997) (an agency's interpretation of its own regulation is entitled to substantial deference and should only be overturned if is "plainly erroneous or inconsistent with the regulation") (citations omitted).  The FEIS and ROD demonstrate that the Winter Use Plan will not result in any unacceptable adverse impacts, and that determination

is entitled to substantial deference.  Moreover, NPCA's assertions to the contrary are grounded primarily in its misinterpretation or mischaracterization of the record evidence.  Accordingly, summary judgment should be granted for the Federal Defendants.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully submit that Defendants' motion for summary judgment should be granted, and NPCA's motion for summary judgment should be denied.

Respectfully submitted this 16th day of June, 2008.

RONALD J. TENPAS
Assistant Attorney General

 /s/ Guillermo A. Montero
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469
Fax: (202) 305-0274
Guillermo.Montero@usdoj.gov

OF COUNSEL:
JASON WAANDERS                                    Attorneys for the Defendants
U.S. Department of the Interior
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957

-44-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
GREATER YELLOWSTONE COALITION,          )
et al.,                                 )
                                        )
            Plaintiffs,                 )
                                        )        Case No. 07-cv-2111 (EGS)
      v.                                )
                                        )        [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                )        Judgment on August 27, 2008]
                                        )
            Defendants.                 )
_____)


_____
                                        )
NATIONAL PARKS CONSERVATION             )
ASSOCIATION,                            )
                                        )
            Plaintiff,                  )
                                        )        Case No. 07-cv-2112 (EGS)
      v.                                )
                                        )        [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE         )        Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE         )
                                        )
            Defendants.                 )
_____)


**[PROPOSED] ORDER GRANTING FEDERAL DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT, RE CASE NO. 07-CV-2112 (EGS)**

On consideration of the Federal Defendants' Motion for Summary Judgment, the opposition

thereto, and the entire Record, it is hereby ORDERED that the motion is GRANTED;

It is further ORDERED that the National Parks Conservation Association's Motion for

Summary Judgment is DENIED.



Dated:_____            _____
                                      United State District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————— )
                                              )
GREATER YELLOWSTONE COALITION,                )
et al.,                                       )
                                              )
            Plaintiffs,                       )
                                              )        Case No. 07-cv-2111 (EGS)
      v.                                      )
                                              )        [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                      )        Judgment on August 27, 2008]
                                              )
            Defendants.                       )
———————————————————— )


———————————————————— )
                                              )
NATIONAL PARKS CONSERVATION                   )
ASSOCIATION,                                  )
                                              )
            Plaintiff,                        )
                                              )        Case No. 07-cv-2112 (EGS)
      v.                                      )
                                              )        [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE               )        Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE               )
                                              )
            Defendants.                       )
———————————————————— )


## FEDERAL DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

The parties in this case are currently briefing cross-motions for summary judgment under

Federal Rule of Civil Procedure 56. Local Rules 7(h) and 56.1 require the submission of a statement

of material facts as to which the moving party contends that there is no genuine issue. For the

reasons explained below, however, a statement of facts is inappropriate in this case.

It is well established that, in cases such as this one – where Plaintiffs seek judicial review

under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 – the scope of that judicial review

is properly limited to the administrative record that was before the agencies at the time the decisions

were made.  See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985); Camp v. Pitts, 411 U.S. 138, 142 (1973).  "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."  Florida Power & Light Co., 470 U.S. at 743-44.

Accordingly, judicial review of final agency action on summary judgment is different in nature from the procedures used to resolve civil actions within the original jurisdiction of the federal district courts.  See Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 124 (D.D.C. 2001) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based on the administrative record . . . , even though the Court does not employ the standard of review set forth in Rule 56, Fed. R. Civ. P.").  In APA cases, the district court sits as an appellate tribunal.  University Medical Center of Southern Nevada v. Shalala, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (citing Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1225-26 (D.C.Cir.1993).  Thus, judicial review is confined to the administrative record already in existence, and does not contemplate a factual record developed *de novo* in federal district court.  Community for Creative Non-Violence v. Lujan, 908 F.2d 992, 998 (D.C. Cir. 1990).  "As all material facts are within the administrative record, no material facts are in dispute."  LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham, 215 F. Supp. 2d 73, 84 (D.D.C. 2002); see also National Ass'n of Home Builders v. U.S. Army Corps of Engineers, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (recognizing that the D.C. Circuit has repeatedly held that claims asserting "an agency's action is arbitrary and capricious or contrary to law present purely legal issues").

Because there are no material facts for the Court to resolve in the first instance here, a Statement of Material Facts as contemplated by Local Rules 7(h) and 56.1 is inapposite.  The Court should confine its review of the National Park Service's actions to the certified Administrative Record as Supplemented, lodged with the Court on April 22 and May 15, 20008 (referred to herein as "AR").  Nonetheless, to ensure strict compliance with the local rules, the Defendants submit the

following Statement of Material Facts As To Which There is No Genuine Issue in support of their Motion for Summary Judgment:

1.      This case involves the National Park Service's Winter Use Plan for Yellowstone National Park, Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway ("the Parks"). On March 27, 2007, the National Park Service issued a draft environmental impact statement for the Winter Use plan. AR 117061. Comments were accepted until June 5, 2007. NPS also held four public scoping meetings during the comment period. AR 126499 (Record of Decision) at 36-38.

2.      On May 16, 2007, the National Park Service issued a proposed rule regarding its Winter Use Plan. Special Regulations, Areas of the National Park Service, Proposed Rule, 72 Fed. Reg. 27,499 (May 16, 2007). Comments on the proposed rule were accepted until July 16, 2007. Id. at 27,500.

3.      On September 24, 2007, after considering the comments submitted by the public and other government entities, the National Park Service issued the final environmental impact statement for the Winter Use Plan. AR 117160.

4.      On November 20, 2007, the National Park Service issued a record of decision adopting Alternative 7 in the final environmental impact statement. AR 126499. The record of decision permits 540 snowmobiles and 83 snowcoaches to enter Yellowstone National Park per day, requires that nearly all recreational snowmobiles be equipped with the best available technology and requires that snowcoaches adopt best available technology by 2011, imposes a mandatory guiding requirement on all recreational snowmobile use, and adopts an adaptive management plan, among other conditions. See id. at 5-18.

5.      On December 13, 2007, the National Park Service issued a final rule implementing the Winter Use Plan set forth in the record of decision. Special regulations; Areas of the National Park System, Final Rule, 72 Fed. Reg. 70781 (December 13, 2007).

6.      All material facts in this action are contained in the AR.


Respectfully submitted this 16th day of June, 2008.

RONALD J. TENPAS
Assistant Attorney General

 /s/ Guillermo A. Montero
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469
Fax: (202) 305-0274
Guillermo.Montero@usdoj.gov

OF COUNSEL:
JASON WAANDERS                          Attorneys for the Defendants
U.S. Department of the Interior
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GREATER YELLOWSTONE COALITION, et al., ) ) ) ) Plaintiffs, ) ) v. ) ) DIRK KEMPTHORNE, et al., ) ) Defendants. ) | Case No. 07-cv-2111 (EGS) [Hearing on Motions for Summary Judgment on August 27, 2008] |
| NATIONAL PARKS CONSERVATION ASSOCIATION, ) ) ) ) Plaintiff, ) ) v. ) ) UNITED STATES DEPARTMENT OF THE ) INTERIOR; NATIONAL PARK SERVICE ) ) Defendants. ) | Case No. 07-cv-2112 (EGS) [Hearing on Motions for Summary Judgment on August 27, 2008] |

**FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFF NATIONAL PARKS
CONSERVATION ASSOCIATION'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

The parties in this case are currently briefing cross-motions for summary judgment under

Federal Rule of Civil Procedure 56.  Local Rules 7(h) and 56.1 require the submission of a response

to the statement of material facts submitted by an opposing party.  For the reasons explained below,

however, both a statement of facts and a response thereto are inappropriate in this case.

It is well established that, in cases such as this one – where Plaintiffs seek judicial review

under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 – the scope of that judicial review

is properly limited to the administrative record that was before the agencies at the time the decisions were made.  <u>See, e.g.</u>, <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743 (1985); <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973).  "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."  <u>Florida Power & Light Co.</u>, 470 U.S. at 743-44.

Accordingly, judicial review of final agency action on summary judgment is different in nature from the procedures used to resolve civil actions within the original jurisdiction of the federal district courts.  <u>See</u> <u>Defenders of Wildlife v. Babbitt</u>, 130 F. Supp. 2d 121, 124 (D.D.C. 2001) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based on the administrative record . . . , even though the Court does not employ the standard of review set forth in Rule 56, Fed. R. Civ. P.").  In APA cases, the district court sits as an appellate tribunal.  <u>University Medical Center of Southern Nevada v. Shalala</u>, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (citing <u>Marshall County Health Care Auth. v. Shalala</u>, 988 F.2d 1221, 1225-26 (D.C.Cir.1993).  Thus, judicial review is confined to the administrative record already in existence, and does not contemplate a factual record developed *de novo* in federal district court.  <u>Community for Creative Non-Violence v. Lujan</u>, 908 F.2d 992, 998 (D.C. Cir. 1990).  "As all material facts are within the administrative record, no material facts are in dispute."  <u>LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham</u>, 215 F. Supp. 2d 73, 84 (D.D.C. 2002); <u>see</u> <u>also</u> <u>National Ass'n of Home Builders v. U.S. Army Corps of Engineers</u>, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (recognizing that the D.C. Circuit has repeatedly held that claims asserting "an agency's action is arbitrary and capricious or contrary to law present purely legal issues").

Because there are no material facts for the Court to resolve in the first instance here, a statement of material facts and response thereto, as contemplated by Local Rules 7(h) and 56.1, are inapposite.  The Court should confine its review of the National Park Service's actions to the certified Administrative Record as Supplemented, lodged with the Court on April 22 and May 15, 20008 (referred to herein as "AR").  However, because the National Park Conservation Association

("NPCA") has submitted a Statement of Material Facts, and to ensure strict compliance with the local rules, Federal Defendants submit this response to Plaintiff National Park Conservation Association's Statement of Material Facts as to Which There Is No Genuine Issues ("NPCA's SOF").

With respect to the factual allegations in each numbered paragraph in NPCA's Statements, Federal Defendants respond that all material facts in this action are contained in the certified AR. The documents in the AR speak for themselves. The material facts should be identified by the parties through citations to the AR in the parties' summary judgment motions and responses. To the extent NPCA's Statement of Material Facts mischaracterizes documents in the AR, it should be disregarded by the Court. Likewise, to the extent NPCA's Statement of Material Facts refers to matters outside the AR, those statements also should be disregarded by the Court. For the reasons stated above, Federal Defendants do not here provide specific responses to the particular factual assertions contained in NPCA's Statement of Material Facts. In the event the Court determines that such responses are required in this case, Federal Defendants respectfully request an opportunity to file such a response within one week from the Court's order so providing.

Respectfully submitted this 16th day of June, 2008.

RONALD J. TENPAS
Assistant Attorney General

 /s/ Guillermo A. Montero
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469
Fax: (202) 305-0274
Guillermo.Montero@usdoj.gov

OF COUNSEL:
JASON WAANDERS
U.S. Department of the Interior          Attorneys for the Defendants
Office of the Solicitor

Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957