IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GREATER YELLOWSTONE COALITION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 07-cv-2111 (EGS) |
| v. | ) ) | [Hearing on Motions for Summary Judgment on August 27, 2008] |
| DIRK KEMPTHORNE, et al., | ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 07-cv-2112 (EGS) |
| v. | ) ) | [Hearing on Motions for Summary Judgment on August 27, 2008] |
| UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK SERVICE, | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF NATIONAL PARKS CONSERVATION ASSOCIATION'S
REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION TO THE GOVERNMENT'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

I.    STANDARD OF REVIEW .............................................................................. 4

II.   THE GOVERNMENT'S INTERPRETATIONS OF THE SUBSTANTIVE LEGAL
      REQUIREMENTS ARE SPURIOUS ................................................................ 5

      A.    The NPS's Snowmobile Regulation and the Executive Orders Which It
            Implements ............................................................................................. 6

            (1)   The NPS Is Entitled to No Deference for Its Purported
                  "Interpretation" of Its Snowmobile Regulation Because It Has Not
                  Interpreted That Regulation ........................................................ 6

            (2)   The NPCA's Interpretation of the Regulation Is Reasonable ..................... 7

      B.    The Yellowstone Enabling Act, 16 U.S.C. § 22 ........................................ 8

      C.    The Organic Act ...................................................................................... 10

            (1)   Section 1.4.7.1 Is Not an Interpretation of the Organic Act and Is
                  Not Entitled to Deference Because It Merely Provides Internal
                  Guidelines for Avoiding Impairment .......................................... 11

            (2)   Moreover, Section 1.4.7.1 Cannot Fairly Be Understood to Permit
                  the Type of Recreational Uses for Which the Government Argues .......... 13

            (3)   The Reference to "Enjoyment" in the Organic Act Does Not Give
                  the NPS License to Turn the National Parks into a Recreational
                  Playground ................................................................................ 18

            (4)   Although the NPS Has the Discretion to Determine How Best to
                  Implement the Organic Act, the Agency Has No Discretion to
                  Permit Activities That Violate It ................................................ 20

            (5)   The Government's Attempt to Eliminate from This Case the
                  History of the 2006 Management Policies Should Not Be Tolerated ........ 20

            (6)   The Winter Use Plan Constitutes Impairment ............................. 22

      D.    The Government Has Failed to Respond to the NPCA's Position That the
            Parameters Set for the NPS's Analysis Did Not Reflect the Applicable
            Legal Restraints ..................................................................................... 22

III.   THE NPS'S OWN STUDIES AND ADMISSIONS DEMONSTRATE THAT THE
       WINTER USE PLAN VIOLATES THE APPLICABLE SUBSTANTIVE LEGAL
       RESTRICTIONS, AND THE FEIS AND THE ROD DEMONSTRATE THAT THE
       NPS HAS MANIPULATED THE FACTS AND REACHED UNREASONABLE
       CONCLUSIONS AND DECISIONS IN ORDER TO AVOID THOSE LEGAL
       RESTRICTIONS ...................................................................................................23

       A.     The Winter Use Plan Must Be Evaluated Based on the Maximum Number
              of OSVs It Permits..................................................................................................23

       B.     The Government's Conclusions Concerning Natural Soundscape Impact
              Are Based on Arbitrary and Capricious Standards and Are Unsupported by
              the Administrative Record .......................................................................................24

              (1)    The Government's Claim That It Used the Highest Impact Level of
                     Any of Three Metrics Is Unsupported by the FEIS and the ROD .............24

              (2)    Reliance on the Percent-of-Total-Park-Area Test is Arbitrary and
                     Capricious ..................................................................................................26

              (3)    The Government's Secondary Reference to the Other Two Metrics
                     Does Not Save Its Conclusions Because the Modeled Results on
                     Which It Relied Were Clearly Inconsistent With the Known Facts .........27

              (4)    The Government's Attempts to Rebut NPCA's Reliance on the
                     Highly Critical Comments of the NPS's Own Soundscape Experts
                     Is Based on a Distortion of the Record ......................................................30

              (5)    The NPS's Claim that Excess Noise Was Primarily Attributable to
                     Snowcoaches and Road Grooming Equipment Is Without Record
                     Support........................................................................................................33

       C.     The Government's Arguments Attempting to Defend the NPS's Findings
              Concerning Wildlife Are Based on a Distortion of the NPS Scientists'
              Recommendation and an Attempt to Divert Attention from the Fact That
              the NPS Required Population Level Impacts Before Considering Impacts
              as Significant...........................................................................................................34

              (1)    The Government Distorts the Recommendations of Its Own
                     Scientists That OSV Use Levels Be Maintained At or Below Those
                     of the Recent Winter Seasons ....................................................................34

              (2)    The Fact That the NPS Analyzed Impacts to Both Populations and
                     Individuals Does Not Justify Its Relying on Impact Definitions
                     Which Disregard Impacts to Individuals ....................................................37

       D.     The Government Distorts the Record Concerning Impacts on Air Quality...........39

IV.    THE INTERVENORS' REMAINING POINTS FAIL TO JUSTIFY THE WINTER USE PLAN...................................................................................................41

    A.    Intervenors Should Not Be Permitted to Rely on the Winter Use Plan's Restrictions Before This Court While Attacking Them in the Wyoming Litigation.................................................................................................41

    B.    Intervenors' Attempt to Compare Snowmobiles to Automobile Traffic Is Off-Point.................................................................................................42

    C.    The Intervenors Exaggerate the Extent to Which Winter Visitors Are Comprised of Snowmobile Users ........................................................43

V.    CONCLUSION.................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134 (D.D.C. 2002)................................ 21

*Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461 (2004) ................................ 9

*Almay, Inc. v. Califano*, 569 F.2d 674 (D.C. Cir. 1977)................................................................ 28

*Appalachian Power Co. v. EPA*, 251 F.3d 1026 (D.C. Cir. 2001) ............................................... 28

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................................... 6

*Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87 (1983)........................................................................................................................... 27

*Burlington Truck Lines Inc. v. U.S.*, 371 U.S. 156 (1962).......................................... 4, 26, 29, 30

*Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006)..................................................... 4

*Chemical Manufacturers Ass'n v. EPA*, 28 F.3d 1259 (D.C. Cir. 1994)...................................... 28

*City of Carmel-by-the-Sea v. U.S. Dep't. of Transportation*, 123 F.3d 1142 (9th Cir. 1997) ...................................................................................................................... 22

*Communications & Control, Inc. v. FCC*, 374 F.3d 1329 (D.C. Cir. 2004)................................. 7

*Davis v. Michigan Dep't of Treasury*, 489 U.S. 803 (1989).......................................................... 9

*DeMarco v. Ginn*, 137 F.R.D. 214 (D.N.J. 1990).......................................................................... 7

*Edmonds Institute v. Babbitt*, 42 F. Supp. 2d 1 (D.D.C. 1999) ................................................... 16

*Electric Power Supply Ass'n v. FERC*, 391 F.3d 1255 (D.C. Cir. 2004) .................................... 17

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989)..................................................................... 14, 22

*Fund for Animals v. Norton*, 294 F. Supp. 2d 92 (D.D.C. 2003)............................................ 4, 10

*Fund for Animals v. Williams*, 391 F. Supp. 2d 191 (D.D.C. 2005)............................................ 21

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995).............................................................................. 9

*Internat'l Longshoremen's Ass'n v. Nat'l Mediation Board*, 870 F.2d 733 (D.C. Cir. 1989) ...................................................................................................................... 7

*National Treasury Employees Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) ...................... 17

*New York State Energy Research & Development Authority v. FERC*, 746 F.2d 64
    (D.C. Cir. 1984) ................................................................................................ 6

*Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004) ..................... 4, 26, 29, 30

*Pub. Citizen, Inc. v. U.S. Dep't. of Health and Human Services*, 332 F.3d 654
    (D.C. Cir. 2003) ............................................................................................... 13

*Seifert v. Winter*, __ F. Supp. 2d __, 2008 WL 879029 (D.D.C. Apr. 3, 2008) .......................... 14

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir.
    1983) ........................................................................................................... 28, 30

*Smith v. City of Jackson, Mississippi*, 544 U.S. 228 (2005) ........................................ 7

*Stone v. INS*, 514 U.S. 386 (1995) ............................................................................ 9

## Statutes

16 U.S.C. § 1 ............................................................................................................ 18

16 U.S.C. § 1a-1 ...................................................................................................... 16

16 U.S.C. § 21 .......................................................................................................... 19

16 U.S.C. § 22 ................................................................................................... passim

## Rules

Fed. R. Evid. 201(b) .............................................................................................. 14

## Regulations

36 C.F.R. § 2.18(c) ............................................................................................... 1, 6

## Other Authorities

39 Fed. Reg. 11882 (Apr. 1, 1974) ......................................................................... 8

Executive Order 11644 ............................................................................................ 7

Hearing Before the Subcommittee on National Parks of the Senate Committee on
    Energy and Natural Resources, "The National Park Service's Revised Draft
    Management Policies," June 20, 2006,  S. Hrg. 109-313, Pt. 2 ................................ 20

Senate Committee on Energy and Natural Resources, S. Rep. No. 95-528 (1977) ..................... 16

WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 535 (2d ed. 1983) ................................. 6

## INTRODUCTION

The problems with the NPS's Winter Use Plan and the Government's arguments in support of it can be grouped into three categories: (1) the Government's flawed treatment of the substantive legal restraints; (2) the NPS's disregard of studies demonstrating significant adverse impact on Yellowstone's resources and the reliance instead on impact definitions that sought to evade those conclusions, and (3) the Government's distortions of the record.

Most fundamentally, the Winter Use Plan is flawed because it is based on a profoundly incorrect analysis of the substantive legal restraints on the NPS. First, the NPS was required to comply with its own snowmobile regulation, which prohibits it from permitting snowmobiles where their use would disturb wildlife or damage park resources or be inconsistent with the park's natural, scenic or aesthetic values. 36 C.F.R. § 2.18(c). Attempting to justify the NPS's failure to apply that regulation, the Government objects to the NPCA's interpretation of "disturb wildlife" based on the commonly understood meaning of those words, arguing that the NPS is entitled to deference for its interpretation. But the NPS has not interpreted those words at all.

The NPS's failure to comply with its own regulation is alone sufficient to terminate the discussion with an order striking down the Winter Use Plan. But the Yellowstone Enabling Act also requires that result. That statute expressly precludes the NPS from adopting regulations inconsistent with the protection of the natural wonders of Yellowstone. But again, the Government brushes that restriction aside, claiming that the statutory language is wholly superfluous.

As if the NPS's failure to comply with these requirements were not enough, the Winter Use Plan reflects a fundamentally erroneous view of the requirements of the Organic Act governing the NPS and the whole National Park System. For 90 years, since that Act was

adopted, it has been widely understood that conservation is to be at the forefront of the NPS's mission. Conservation is the protection and preservation of the natural resources of the National Park System. Congress re-emphasized that requirement by an amendment to the Act in 1978. In 2005 and 2006, in its re-write of the NPS Management Policies, the Bush Administration attempted by frontal assault to strip that conservation mission out of its official interpretation of the Organic Act. The Administration's stated goal was to enhance the role of recreation in the National Park System, even at the expense of protecting its natural resources. When that effort ran into a buzz saw of opposition, the Administration abandoned that frontal assault and reaffirmed the NPS's predominant conservation mandate in the 2006 Management Policies.

But make no mistake about it — the Winter Use Plan represents the Administration's effort to achieve the same result it failed to achieve by frontal assault. This time, the Administration is using a more subtle approach. That approach is to "interpret" the NPS's conservation mandate out of the statute, arguing that it has been replaced with a concept called "unacceptable impacts." That concept is so fuzzy as to permit the NPS to argue, as it does here, that the Winter Use Plan's significant impacts on Yellowstone resources are "acceptable" in order to permit recreational snowmobiling. The Winter Use Plan must instead be tested against that statutory conservation mandate. And the conclusion is inescapable: the significant adverse impacts of this Winter Use Plan conflict with that mandate. The Plan is accordingly contrary to law and must be invalidated.

In an effort to evade that conclusion, the NPS employed modes of analysis that fail the test of reasonableness and are therefore arbitrary and capricious. With respect to natural soundscapes, the NPS primarily relied on an analysis of the percent-of-total-park-area in which soundscapes were impacted, a methodology the Government makes little or no attempt to defend

here. While the NPS also modeled two other soundscape metrics, as the Government now emphasizes, those modeled results were so far from the reality demonstrated by the NPS's monitoring studies that it was unreasonable for the NPS to rely on those modeled results. While the Government claims the NPS used the highest impact level finding from any of those three metrics, that is simply not true. With respect to wildlife impacts, the Government utilized a standard which required adverse impact on the total population of a species before an impact was considered significant, contrary to the NPS snowmobile regulation and the other substantive legal restraints and contrary to the view expressed in the NPS's 2003 Supplemental Environment Impact Statement ("SEIS") that adverse impacts to wildlife conflict with those rules, regardless of the population-level impact. With respect to air quality, the NPS relied on a model that was based on assumptions the NPS knew to be untrue.

And now, in an effort to defend the NPS's flawed analysis, the Government resorts to distortions of the administrative record. It is self-evident when that occurs that the party's position on the facts and/or the law are untenable. That is the case here. For example, the Government's brief distorts the views of its own experts, who were highly critical of the methodology being applied to assess natural soundscape impacts. The Government also mischaracterizes the recommendations of its own scientists that oversnow vehicle ("OSV") use levels should be maintained at or below those experienced in the recent low-use seasons; the Government argues that the Winter Use Plan complies with that recommendation by twisting it such that it appears to be different than it was in fact. The Government also claims that a 2007 emissions report was not "as representative" as a 2006 report, despite the fact that both were performed by the same scientists and despite the fact that the 2007 report explained that it was being performed because the 2006 report had employed a "crude" analysis.

-3-

The Winter Use Plan fails both the substantive legal restraints and the arbitrary and capricious standards under the Administrative Procedure Act.[1]

## I.    STANDARD OF REVIEW

The Government claims numerous forms of deference that the Court should supposedly give to the Executive Branch's decision to adopt the Winter Use Plan.  While the Government pays lip service to the existence of substantive and procedural restraints on the NPS, the power is claimed essentially to decide unilaterally what those restrictions mean and when they apply.  *See, e.g.*, Gov. Br. at 35 (stressing that "impairment" is what the NPS says it is).  But the Administrative Procedure Act was adopted for the very purpose of providing a check on the power of Executive Branch agencies.  The APA requires that the Court conduct a "thorough, probing, in-depth review" of agency actions to see if every step in the agency's process of reaching its decision was reasonable and that it took into account the factors imposed on the agency by the applicable statutes and regulations.  *See Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 104 (D.D.C. 2003).  *See also Burlington Truck Lines Inc. v. U.S.*, 371 U.S. 156, 166-68 (1962); *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251, 1289 (D.C. Cir. 2004).  Such a "thorough, probing, in-depth review" is called for here.

Moreover, while the standard of review of agency action is generally a deferential one, more exacting review is required when the presumption of regularity is rebutted.  *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006).  Here, no deference should be given to the Government's latest effort to change its position on Yellowstone snowmobiles, particularly

---

[1]    We will cite to the Government's Response to the NPCA's Motion for Summary Judgment and Cross-Motion for Summary Judgment [Doc. 59] as "Gov. Br."  We will cite to the Intervenors' Memorandum in Opposition to Plaintiffs' Motions for Summary Judgment [Doc. 56] as "Interv. Br."  We will cite to the NPCA's Opening Brief [Doc. 48] as "NPCA Br."

in light of the strong indications that the impetus for this latest decision, as in the case of earlier Bush Administration decisions on this issue, emanated from White House officials, not from the NPS professionals.

## II. THE GOVERNMENT'S INTERPRETATIONS OF THE SUBSTANTIVE LEGAL REQUIREMENTS ARE SPURIOUS

In its Opening Brief, the NPCA relied on three sources of substantive legal restrictions applicable to the NPS's adoption of the Winter Use Plan. In the order of their specificity, these are (i) the NPS's own regulation limiting its designation of locations within the National Park System where snowmobile use may be permitted, (ii) the Yellowstone Enabling Act, and (iii) the NPS Organic Act. Whether read alone or together, these three legal mandates impose significant restrictions on the NPS's authorization of snowmobiles in Yellowstone. The Government essentially brushes aside its snowmobile regulation and the Yellowstone Enabling Act and claims essentially unbridled discretion under the Organic Act to permit any uses it wishes to permit, subject only to the limitation of "impairment."

In this section, we will demonstrate that the Government's treatment of these legal restrictions is without merit. The NPS's snowmobile regulation imposes highly significant limitations on snowmobile authorization in the National Park System. The Yellowstone Enabling Act reinforces those restrictions in this case because Yellowstone occupies a very special place as one of the crown jewels of the National Park System, and indeed the very first National Park. And the Organic Act, while generally permitting the NPS broad discretion in managing the National Park System, does not permit the extent of adverse impacts which the Winter Use Plan would cause.

A.      **The NPS's Snowmobile Regulation and the Executive Orders Which It Implements**

The NPS's snowmobile regulation, 36 C.F.R. § 2.18(c), prohibits the NPS from designating areas for snowmobile use unless "their use is consistent with the park's natural, cultural, scenic and aesthetic values,… and will not disturb wildlife or damage park resources." Words used in such regulations, in the absence of definitions or other indicators of meaning, are interpreted based on their commonly understood meaning. The commonly understood meaning of "disturb" is "to stir; to move;… to excite from a state of rest or tranquility; to make uneasy or anxious; to agitate the mind of …." WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 535 (2d ed. 1983). *See* NPCA Br. at 37-38. The NPS is of course bound to apply its snowmobile regulation. *See, e.g., New York State Energy Research & Development Authority v. FERC*, 746 F.2d 64, 68-69 (D.C. Cir. 1984) (agency must comply with its own regulation).

(1)      **The NPS Is Entitled to No Deference for Its Purported "Interpretation" of Its Snowmobile Regulation Because It Has Not Interpreted That Regulation**

The Government argues that the NPS has "interpreted" the snowmobile regulation — presumably referring to the words "disturb wildlife" — to permit snowmobiles in accordance with the Winter Use Plan and that its interpretation is entitled to deference under *Auer v. Robbins*, 519 U.S. 452, 461 (1997). But what is that interpretation? Nowhere in the FEIS or in the ROD does the NPS set forth any interpretation of those words or of any other words in the regulation. The Government does not even proffer any alternative interpretation of the regulation in its brief.

The NPS is entitled to no deference concerning its purported "interpretation" of its snowmobile regulation because it has adopted no such interpretation. As many courts have found, "we cannot evaluate the reasonableness of an interpretation [the agency] did not set

forth." *Communications & Control, Inc. v. FCC*, 374 F.3d 1329, 1336-37 (D.C. Cir. 2004); *see also Internat'l Longshoremen's Ass'n v. Nat'l Mediation Board*, 870 F.2d 733, 736 (D.C. Cir. 1989) ("[W]e cannot defer to what we cannot perceive"); *DeMarco v. Ginn*, 137 F.R.D. 214, 215 (D.N.J. 1990) (refusing to defer to agency interpretation of regulations when "no such interpretation exists"). As Justice O'Connor stated, "[i]t makes little sense to attribute to the agency a construction of the relevant statutory text that the agency itself has not actually articulated so that we can then 'defer' to that reading." *Smith v. City of Jackson, Mississippi*, 544 U.S. 228, 266 (2005) (concurring).

Moreover, if the Government is claiming it has interpreted this regulation as applying only at the level of whole populations of a species, that argument flies in the face of the NPS's own 2003 explanation that its regulation prohibits disturbance of wildlife "regardless of population-level effects." *See* NPCA Br., First App., Tab 5 [Doc. 48-8] at 206 (2003 SEIS).

### (2)    The NPCA's Interpretation of the Regulation Is Reasonable

The Government also responds that the NPCA's interpretation of the regulation would impose an impossible standard for permitting snowmobiles in national parks. But that is simply not so.

The Executive Order pursuant to which this regulation was adopted expressly imposed on the NPS a requirement for permitting off-road vehicles in the National Park System that was more rigorous than that imposed on agencies administering federal lands generally. Specifically, the Executive Order prohibited the designation of areas and trails in the National Park System unless the agency head determined that off-road vehicle use in such locations "will not adversely affect their natural, aesthetic, or scenic values." Executive Order 11644, § 3(a)(4). The NPS adopted what is now 36 C.F.R. § 2.18 to comply with that order (*see* 39 FED. REG. 11882-83

(Apr. 1, 1974)).  Clearly, the very purpose of Section 2.18(c) was to impose a very high standard to be met by the NPS before permitting vehicles such as snowmobiles in the National Park System.

That does not mean that snowmobiles are banned from the National Park System.  That system consists of almost 400 separate units.  If there are locations where snowmobile use would not have the proscribed effects, the NPS is free to permit snowmobile use in those areas.  With respect to wildlife, such locations would presumably be the areas in which wildlife is not in abundance or is not generally found in the areas where snowmobile use is permitted, unlike at Yellowstone.  Apart from wildlife, it should not be overlooked that the regulation also prohibits snowmobile use where inconsistent with the particular park's natural, cultural, scenic or aesthetic values or where it would damage other park resources.  Yellowstone's natural, cultural, scenic and aesthetic values clearly include Yellowstone's natural soundscapes and its air quality, as well as its wildlife.

**B.     The Yellowstone Enabling Act, 16 U.S.C. § 22**

The NPCA demonstrated that the Winter Use Plan is contrary to the Yellowstone Enabling Act, 16 U.S.C. § 22, which provides that, "[i]n addition to the powers and duties enumerated in section 3 of this Title not inconsistent with this section," the NPS shall make regulations providing "for the preservation, from injury or spoliation, of all … natural curiosities, or wonders, within the park, and their retention in their natural condition."  The Government's response is without merit.

The Government claims that the Enabling Act provides <u>no restrictions</u> not already imposed by the Organic Act.  But that argument flies in the face of well-established principles of statutory construction.  If the Enabling Act imposed no requirements other than those set forth in

the Organic Act, the sentence on which the NPCA relies would be superfluous.  *See, e.g.*, *Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461, 489 n.13 (2004) (there is a "cardinal principle of statutory construction" that statutes must be construed so that no clause, sentence, or word shall be superfluous).  Moreover, Congress added the opening clause to that sentence by amendment, *see* NPCA Br. at 32-33, which makes the Government's reading particularly untenable.  *See, e.g.*, *Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").  If Section 22 were not intended to impose any further limitations on the NPS than those set forth in the Organic Act, it would not have been necessary for Congress to have added that opening clause, much less to retain Section 22 in Title 16.  *See, e.g.*, *Davis v. Michigan Dep't. of Treasury*, 489 U.S. 803, 809 (1989) (It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995) (A court should interpret a statute "as a symmetrical and coherent regulatory scheme.").

The Government also argues that this sentence's reference to "natural curiosities, or wonders" only applies to "geothermal and geographic features."  The Government offers no support for that interpretation.  The terms "natural curiosities, or wonders" are broad indeed, reflecting Congress' admiration in 1872 and ever since for all of the natural resources of Yellowstone and Congress' admonition that they should be preserved and protected.  The mere fact that Congress also addressed wildlife more specifically in following sentences does not provide any basis for interpreting those broad words more narrowly.  Indeed, the NPS itself, in its 2006 Management Policies, states that the similar but perhaps more modern term "natural resources" includes, among other things, "biological resources such as native plants, animals,

and communities." AR 120645 at 50.

But even if the Court were somehow to conclude that "natural curiosities, and wonders" does not include wildlife, the Government provides no explanation why "natural curiosities, and wonders" does not encompass the natural winter soundscapes and pristine winter air that once existed in Yellowstone. Indeed, the FEIS states that Yellowstone's "winter park landscapes … uniquely embody solitude, quiet, undisturbed wildlife, clean air vistas …." AR 117160 at 5 (Table 1.1). And the Management Policies includes in "natural resources," among other things, "natural soundscapes and clear skies." AR 120645 at 50.

Contrary to the Government's arguments, the Yellowstone Enabling Act is a significant factor in the Court's evaluation of the Winter Use Plan, independent of the more general Organic Act.

### C.    The Organic Act

This Court, as well as numerous others, have recognized that the NPS's overarching mandate under the Organic Act is one of preservation of the national wonders of the National Park System. *See, e.g., Fund for Animals v. Norton*, 294 F. Supp. 2d at 105, 114. As this Court there found, "NPS is bound by a conservation mandate, and that mandate trumps all other considerations." *Id.* at 105. *See also id.* at 114 (referring to the "NPS's clear charge to protect the wonders of the National Parks"). The NPS's conservation mandate does not permit the balancing of recreation and conservation reflected in the Winter Use Plan. *See* NPCA Br. at 34-35, 39-41.

The FEIS stated that "the decision [to be made] requires optimizing between recreation activities and protection of resources and values, in accordance with NPS policies." AR 117160 at 10. The FEIS also explains that the chosen alternative "achieves a balance of resources use

and sharing life's amenities." *Id.* at 67. Similarly, the ROD states that "I further find that this decision represents an appropriate balance of the various potential uses of the parks in the winter, and is in accord with the discretion provided to the National Park Service in managing the National Park System." AR 126499 at 39. *See also* Gov. Br. at 1 (arguing that the issue here is simply about "a policy decision by which the competing uses of natural resources have been reconciled).

When challenged on these statements, the Government concedes that the "Organic Act imposes two independent mandates on the Service" — (i) non-impairment and (ii) conservation of park resources and values. Gov. Br. at 34-35. However, the Government argues that the 2006 Management Policies interpret the Organic Act as finding no conflict between recreational activities and the conservation mandate so long as there are no "unacceptable impacts." The Government also argues that the "unacceptable impacts" section of those Management Policies, Section 1.4.7.1, is an official agency interpretation of the Organic Act, entitled to substantial deference. In order to permit any form of recreation in the National Parks, says the Government, all the NPS has to do is to make findings that none of the "unacceptable impacts" are likely to occur. *See* Gov. Br. at 36-38. This view of the Organic Act is fundamentally wrong.

> **(1)      Section 1.4.7.1 Is Not an Interpretation of the Organic Act and Is Not Entitled to Deference Because It Merely Provides Internal Guidelines for Avoiding Impairment**

Whatever may be the case with other sections of the Management Policies, the "unacceptable impacts" section, Section <u>1.4.7.1</u>, is not an interpretation of the Organic Ac and is entitled to <u>no</u> deference. Section 1.4.7.1 is instead a subsection providing internal policy guidance to NPS decision-makers that they should avoid impacts coming close to impairment. Section 1.4.7.1 is a subsection of Section 1.4.7, headed "Decision-Making Requirements to

Identify and Avoid Impairments." AR 120645 at 11. That section begins by stating that, "[b]efore approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values." *Id.* That section proceeds by discussing steps to be taken by the decision-maker. Section 1.4.7.1 follows and explains that "the Service will apply a standard that offers greater assurance that impairment will not occur. The Service will do this by avoiding impacts that it determines to be unacceptable." *Id.* at 14. The "unacceptable impacts" concept is therefore clearly not an interpretation of statutory requirements, but instead guidance for decision-makers about how to avoid impacts approaching impairment.

If indeed Section 1.4.7.1 were an official interpretation of the conservation mandate, one would expect to see a statement to that effect, similar to that found, for "impairment," in Section 1.4.5, "What Constitutes Impairment of Park Resources and Values," AR 120645 at 12. But there is no such statement that Section 1.4.7.1 describes, *e.g.*, "What Constitutes Conservation." There is no explanation in that section, moreover, of what that mandate requires and/or what level of impact on natural resources would conflict with that mandate. There is, notably for present purposes, a statement of avoidance of unreasonable interference with "the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness." *Id.* at 14. But there is otherwise no such material found in that section. There is no reference, for example, to avoidance of injury to wildlife. *Id.* There is no reference to avoidance of destruction of the flora. *Id.* There is no reference to avoidance of destruction of geological features. *Id.*

Furthermore, the explanation at the beginning of Section 1.4.7.1 of the purpose of the "unacceptable impacts" concept is inconsistent with the explanation of the conservation mandate

found in Section 1.4.3. Section 1.4.3 makes clear that the conservation mandate is independent

of any risk of impairment. Section 1.4.7.1 makes clear that it addresses reducing the risk of

impairment. Compare AR 120645 at 11 (Section 1.4.3) with 14 (Section 1.4.7.1).

Section 1.4.7.1 is therefore a statement of an internal policy. This type of internal policy

is not entitled to deference as a interpretation of the statute. *See Pub. Citizen, Inc. v. U.S. Dep't.

of Health and Human Services*, 332 F.3d 654, 660 (D.C. Cir. 2003) ("[t]he Supreme Court has

twice cited 'agency manuals' as an archetype of the kind of document that is not entitled to such

deference.").

### (2)    Moreover, Section 1.4.7.1 Cannot Fairly Be Understood to Permit the Type of Recreational Uses for Which the Government Argues

The Government argues that it has complied with the conservation mandate by finding

that the Winter Use Plan will cause no "unacceptable impacts," but the NPS's findings here, *see*

AR 126499 (ROD) at 32-34, make clear that the NPS's view of "unacceptable impacts" cannot

be squared with the requirements of the conservation mandate.

That proposition is made  plain by the history of the 2006 Management Policies. As we

discussed in our Opening Brief, the Bush Administration attempted to amend the NPS's

Management Policies in 2005 and 2006 to change the NPS's fundamental mission and its official

interpretation of the Organic Act. One of the stated purposes of the revision was to reflect "the

NPS's commitment to tourism and public enjoyment." AR 120651. The driving force behind

this effort was Paul Hoffman.

Mr. Hoffman had been a congressional aide to Vice President Cheney when he was a

member of Congress from Wyoming. Mr. Hoffman then became Executive Director of the

Chamber of Commerce of Cody, Wyoming, which lies just to the East of Yellowstone. *See*

AR 117160 at 82-83, 180 (FEIS analysis of impact of Winter Use Plan alternatives on economy

of Cody). In 2002, he was appointed to the position of Deputy Assistant Secretary for Fish and

Wildlife and Parks of the U.S. Department of the Interior. In December 2003, of course, this

Court vacated and remanded to the NPS the snowmobile rule which was adopted by the Bush

Administration earlier that year. In 2004, Vice President Cheney stated his strong opposition to

a prohibition on snowmobiles at Yellowstone, stating that "those of us who live in Wyoming …

for years, we have used snowmobiles in Yellowstone." *See* NPCA Br. at 5.[2]

 During the course of the NPS's work on what became the Winter Use Plan, Mr. Hoffman

began on a parallel track to revise the 2001 Management Policies on which this Court had relied

in its 2003 decision. *See* NPCA Br. at 5-7. Mr. Hoffman's proposed revision of the

Management Policies, among other things, would have made the following changes to the NPS's

official interpretation of the Organic Act as stated in Section 1.4.3:

_____

[2]  *See* NPCA Br. at 5. The Government objects to the support NPCA offered for these factual
statements. Accordingly, the NPCA does not rely on any of the materials described in footnote 2
of its Opening Brief. Instead, NPCA asks that the Court take judicial notice of these facts. *See*
FED. R. EVID. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in
that it is … capable of accurate and ready determination by resort to sources whose accuracy
cannot reasonably be questioned."). The speech of Vice President Cheney was obtained directly
from the White House website and is offered for the fact of the Vice President's statement, not
for the truth thereof. Another copy is submitted in a Second Appendix herewith. *See* Tab 1. *See
also* http://www.whitehouse.gov/news/releases/2004/09/20040929-7.html. Mr. Hoffman's
appointment at the Department of the Interior and his prior position with the Cody Chamber of
Commerce are substantiated by the Department of the Interior's announcement, "Secretary
Norton Appoints Paul Hoffman as Deputy Assistant Secretary for Fish and Wildlife and Parks,"
2002 WL 22193 (Jan. 4, 2002). A copy of that announcement is at Tab 2 of NPCA's Second
Appendix. Also submitted is the "1987-1988 Official Congressional Directory, 100th Cong." at
324 (GPO 1987), showing Mr. Hoffman as then-Congressman Cheney's Staff Director in
Casper, Wyoming. *See* Tab 3. These facts are not subject to reasonable dispute and are capable
of accurate and ready determination by resort to these sources, whose accuracy cannot
reasonably be questioned. *See also Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (court
may consider extra-record materials necessary clearly to frame the issues or that were at least
indirectly considered by the agency); *Seifert v. Winter*, __ F. Supp. 2d__, 2008 WL 879029, at *6
n. 5 (D.D.C. Apr. 3, 2008).

- Stripping out the statement that there is a separate conservation mandate, independent of the prohibition on impairment.

- Elevating "enjoyment" of parks to a level equal in importance with conservation and stating that "the Service must balance the sometimes competing obligations of conservation and enjoyment in managing the parks."

- Replacing the statement that "when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant" with a new statement that "when there are concerns as to whether an activity or action will cause an impairment, the Service will protect the resources while taking appropriate steps ... to resolve the concerns."

*See* NPCA Br., First App., Tab 1 [Doc. 48-4] (NPS's own redlined version of changes proposed), at 16-17. Moreover, Mr. Hoffman's rewrite proposed to add the concept of "unacceptable impacts," the purpose of which was stated to be protecting against impacts that came close to causing impairment. *Id.* at 18. In other words, the NPS was to balance conservation and enjoyment, but the conservation mandate was to be deleted and the only legal prohibition was that of impairment.

The implications of Mr. Hoffman's proposed changes were not lost on the public or on Congress. The proposal was essentially to open the National Parks to recreational activities previously considered impermissible in those national treasures. As long ago as 1918, for example, then-Secretary of the Interior Franklin K. Lane had instructed the first Director of the NPS, Stephen T. Mather, that "[e]very activity of the Service is subordinated to the duties imposed upon it to faithfully preserve the parks for posterity in their natural state." http://www.cr.nps.gov/history/online_books/anps_lj.htm. That mission and that mandate had been recognized in every version of the NPS's Management Policies published before Mr. Hoffman's proposed rewrite, including those adopted in 1988 during the Reagan Administration. Indeed, Congress had itself addressed and resolved the very issue of "uses" versus "preservation" in 1978, when it adopted the Redwood Amendments to the Organic Act.

According to the Senate Committee on Energy and Natural Resources, those amendments were

adopted because there had been a blurring of the responsibilities articulated by the 1916 Organic

Act.  The Committee had admonished that

> the Secretary is to afford <u>the highest standard of protection and
> care to the natural resources within</u> Redwood National Park and
> <u>the National Park System</u>.  No decision shall compromise these
> resource values except as Congress may have specifically
> provided.

S. Rep. No. 95-528 at 14 (1977) (emphasis added).  Those amendments added language to 16

U.S.C. § 1a-1, stating that "the authorization of activities shall be construed and the protection,

management and administration of these areas shall be conducted in light of the high public

value and integrity of the National Park System and shall not be exercised in derogation of the

values and purposes for which these various areas have been established...."  *See, e.g., Edmonds*

*Institute v. Babbitt*, 42 F. Supp. 2d 1, 16 (D.D.C. 1999) (citing line of decisions that found the

Redwood Amendments "to reflect a renewed insistence on the part of Congress that the national

parks be managed in accordance with the primary purpose of the [Organic Act], namely the

conservation of wildlife resources").

Accordingly, the Administration faced overwhelming opposition, in numerous

Congressional hearings, an enormous number of adverse comment letters and newspaper

editorials across the nation.  The Administration abandoned its proposed radical revision of the

mission of the NPS.  As adopted, Section 1.4.3 of the 2006 Management Policies instead

continued to affirm the NPS's separate conservation mandate, no longer purposed to elevate

"enjoyment" to a level equally important with conservation and reaffirmed that, "when there is a

conflict between conserving resources and values and providing for enjoyment of them,

conservation is to be predominant."  AR 120645 at 11.  Indeed, the 2006 Management Policies

stated that this principle was one of the "Underlying Principles" on the basis of which the 2006

Management Policies had been prepared. *Id.* at (iv). The Deputy Director of the NPS presented a prepared statement on behalf of the Department of the Interior and the NPS to its Senate oversight committee, at a hearing called for that purpose. That statement emphasized that what became the 2006 Management Policies "assure that conservation will be predominant when there is a conflict between protection of resources and their use." *See* NPCA Br. at 7.

This history, and the text, of the 2006 Management Policies makes clear that no provision in it may properly be interpreted as permitting the NPS to manage the National Park System in the same manner as Mr. Hoffman's proposed rewrite would have permitted. The Administration cannot now be heard to argue that all it must do in order to achieve the results proposed in the Hoffman rewrite is to tick off the considerations found in the description of "unacceptable impacts," a list of considerations which nowhere addresses all of the factors that would be required to be considered to determine whether a particular action violates the conservation mandate. Indeed, if Section 1.4.7.1 is considered an interpretation of the conservation mandate, it is an impermissible interpretation of that statutory demand. *See, e.g., Electric Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1265-66 (D.C. Cir. 2004) (rejecting regulation justified as striking a balance between competing needs in the face of a statutory requirement not permitting such a balancing). *National Treasury Employees Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) is instructive in this regard. There, the Court found that the Department of Homeland Security "was not free to treat [a statutory term] as an empty linguistic vessel" to be filled in any manner desired by the agency. 452 F.3d at 860. Similarly, the NPS is not free to drain its "conservation mandate" of meaning and substitute the NPS's "unacceptable impacts" standard, a standard devoid of the type of restrictions long considered part of that conservation mandate. As the Management Policies affirm, the conservation mandate requires that protection of resources

predominate when that purpose conflicts with their use.  *See* AR 120645 at (iv).

This does not mean that no impacts may be tolerated, as Intervenors mischaracterize our position.  The studies performed at Yellowstone, however, demonstrate that the impacts of the Winter Use Plan will not be insignificant.  Try as Defendants might to minimize those impacts, the NPS's own studies speak for themselves about the significant adverse impacts on natural soundscapes, wildlife and air quality likely to result from this regulation.

> **(3)     The Reference to "Enjoyment" in the Organic Act Does Not Give the NPS License to Turn the National Parks into a Recreational Playground**

The Intervenors argue that "enjoyment" is one of the purposes of the National Park System as stated in the Organic Act and that Chapter 8 of the Management Policies permits recreational uses of the parks.  Not only do they ignore the history of those Management Policies, as discussed above, but they take the materials on which they rely out of context.

The Organic Act does not authorize the NPS, as Intervenors would have it, to manage the National Park System in such a manner as to make it a recreational playground for the vehicle manufacturers and suppliers that are the lead Intervenors to sell even more products than they do now.  Instead, the word "enjoyment" appears in the clause stating that the "fundamental purpose" of the National Park System "is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1 (emphasis added).  The clause "to provide for the enjoyment of the same" does not refer to the enjoyment of the parks; instead, the statute refers to "enjoyment of the same" and "the same" refers back to the last prior nouns, which are "the scenery and the natural and historic objects and the wild life therein."  In other words, the enjoyment purpose found in the Organic Act is

enjoyment of the scenery and the natural and historic objects and the plant and animal life found in the parks.  This is far different from simply providing for visitors to have fun in the parks by means that could be equally enjoyed in numerous other places than in the National Park System.  The purpose of the National Parks is not to permit bungee jumping, paint ball games, jet skis or other similar forms of recreation.

This is why the Management Policies expressly state, in the same Chapter 8 on which the Intervenors rely, that "many forms of recreation enjoyed by the public do not require a national park setting and are more appropriate to other venues.  The Service will therefore … provide opportunities for forms of enjoyment that are <u>uniquely suited</u> and appropriate to the superlative natural and cultural resources found in the parks …."  2006 Management Policies § 8.2, AR 120645 at 157 (emphasis added).

Nor is the Yellowstone Enabling Act's reference to providing a "pleasuring ground" for the public an open invitation for all recreational activities.  *See* 16 U.S.C. § 21.  Those words were written in 1872, when the types of activities available for obtaining pleasure from Yellowstone did not include snowmobiles, jet skis or motor vehicles.

Recreational snowmobiling is not uniquely suited to the National Parks.  There are many other locations, including immediately adjacent to Yellowstone, where recreational snowmobiling is permitted.  Nor are snowmobiles necessary to provide access to the Park.  Access could be provided by snowcoaches alone.  The feature added by the use of snowmobiles is that of recreation.  Indeed, the NPS admits that permitting another form of recreation is the very purpose of its Winter Use Plan.  *See* AR 117160 at (i).

(4)    **Although the NPS Has the Discretion to Determine How Best to Implement the Organic Act, the Agency Has No Discretion to Permit Activities That Violate It**

Both the Government and the Intervenors repeatedly stress the fact that courts have recognized that the NPS has discretion to determine how best to implement the Organic Act. *See, e.g.*, Gov. Br. at 6. Defendants appear to believe that, because the NPS has discretion to implement its conservation mandate, that discretion also gives the NPS discretion to violate the conservation mandate if the NPS is serving the purpose of providing for "enjoyment" of the parks. No reading of any of the cases on which Defendants rely support that proposition. Nor do those cases give the NPS the unilateral power to determine whether such violations have or would occur, free from the restraints of judicial review under the Administrative Procedure Act.

(5)    **The Government's Attempt to Eliminate from This Case the History of the 2006 Management Policies Should Not Be Tolerated**

The Government attacks the NPCA's reliance of the legislative history of the 2006 Management Policies by arguing that the NPCA has appended "extra-record materials." Gov. Br. at 8 n.3. Among the documents in question are (i) excerpts from an NPS 2006 publication showing the changes it proposed to make from the 2001 Management Policies (*see* NPCA Br. at 6, First App. at Tab 1 [Doc. 48-4]); (ii) one example of the national outcry that ensued when the Administration proposed amending the Management Policies, namely, a letter from The Coalition of National Park Service Retirees signed by 25 former senior officials of the NPS, including three deputy directors and 16 regional directors (*see* NPCA Br. at 6-7, First App. at Tab 2 [Doc. 48-5]); and (iii) excerpts from the official record of the June 20, 2006 hearing before the Subcommittee on National Parks of the Senate Committee on Energy and Natural Resources, "The National Park Service's Revised Draft of Management Policies," S. Hrg. 109-313, Pt. 2 (*see* NPCA Br. at 7, First App. at Tab 3 [Doc. 48-6]). In other words, while the Government on

the one hand relies extensively on the 2006 Management Policies throughout its brief, the Government seeks to exclude from consideration the legislative history of that very document. This argument is simply untenable.

There can be no doubt that these documents are highly relevant to the legal issues before this Court. The parties dispute the proper interpretation of the Management Policies. What could be more relevant in understanding the meaning and purpose of the 2006 Management Policies than that publicly available history? The Government itself, on statutory interpretation issues, cites to legislative history such as Congressional committee hearings and other legislative materials that are not in the Administrative Record. So too is the NPCA permitted to cite historical materials relevant to interpreting the Management Policies, on which all parties rely for their legal positions. There is no requirement that the legislative history of the Management Policies be in the Administrative Record in order for that history to be considered in interpreting those Policies.

If the Court finds, however, that these materials must be included in the Administrative Record in order to be used by the NPCA, it respectfully requests that the Court direct the Government to include them in the Administrative Record. Because the Government included other materials relating to the proposed amendments to the Management Policies in the Administrative Record, *see, e.g.*, AR 120651-52 (notice of the availability of the draft revision to the Management Policies), it would be unfair to exclude the materials cited by the NPCA. As this Court has found, "the agency may not skew the record in its favor by excluding pertinent but unfavorable information." *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005). *See also Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 139, 142 (D.D.C. 2002) (granting motion to supplement the record with (i) transcript of workshop directly relating

to the issue decided, co-sponsored by the agency but adverse to its position and (ii) a GAO report addressing issues pertinent to the proposed rule, finding that "Publicly available reports, especially those relating to relevant issues and drafted as a result of an agency request, should be considered by the agency and therefore should be included in the administrative record."). *See also Esch v. Yeutter*, 876 F.2d at 991 (Courts should consider evidence outside of the administrative record when, *inter alia*, "a case is so complex that a court needs more evidence to enable it to understand the issues clearly.").[3]

**(6)    The Winter Use Plan Constitutes Impairment**

The NPCA also demonstrated the unreasonableness of the NPS's explanation of why the 2007 Winter Use Plan would not cause impairment. *See* NPCA Br. at 35-37. The Government provides no response, and the NPCA stands by its earlier position in this regard.

**D.    The Government Has Failed to Respond to the NPCA's Position That the Parameters Set for the NPS's Analysis Did Not Reflect the Applicable Legal Restraints**

The NPCA demonstrated in its Opening Brief that, in setting the parameters for its action, the NPS failed to take into account the applicable legal requirements, as discussed above. *See* NPCA Br. at 39-41; *City of Carmel-by-the-Sea v. U.S. Dep't. of Transportation*, 123 F.3d 1142, 1155 (9th Cir. 1997). The NPS's statement of "purpose and need," its statement of "desired conditions" and its definition of impact levels, we observed, all established an analytic process which essentially ignored the applicable restrictions and requirements, such as the snowmobile

---

[3]    The Government, in a meet-and-confer, advised NPCA's counsel that it would move to strike these documents if the NPCA did not do so voluntarily. In response, the NPCA stated that, if such a motion were filed, it would file a counter-motion seeking inclusion in this Administrative Record of the record relating to the adoption of the 2006 Management Policies. The Government then declined to file such a motion, instead merely objecting in a footnote in its brief.

regulation.  Other than to point out that it included avoiding "unacceptable impacts" or

impairment in one of the parameters we challenged, "purpose and need," the Government has

failed to respond.

**III.    THE NPS'S OWN STUDIES AND ADMISSIONS DEMONSTRATE THAT THE WINTER USE PLAN VIOLATES THE APPLICABLE SUBSTANTIVE LEGAL RESTRICTIONS, AND THE FEIS AND THE ROD DEMONSTRATE THAT THE NPS HAS MANIPULATED THE FACTS AND REACHED UNREASONABLE CONCLUSIONS AND DECISIONS IN ORDER TO AVOID THOSE LEGAL RESTRICTIONS**

The NPCA demonstrated in its Opening Brief that the NPS's own studies and admissions

demonstrate that the Winter Use Plan is irreconcilable with the NPS's snowmobile regulation,

with the requirements of 16 U.S.C. § 22, with the Organic Act's conservation mandate and with

its prohibition on impairment.  The Government's response makes clear the lengths to which it

has gone in an effort to evade those requirements.  The NPS manipulated the studies which it had

conducted, it manipulated the parameters established for its analysis and it reached conclusions

bearing no reasonable relationship to the underlying facts.  The Government continues that

pattern by distorting the Administrative Record and the recommendations contained in those

studies.  But the Government cannot avoid the conclusion that the Winter Use Plan violates the

applicable substantive legal restrictions.  The Government's response merely underscores that

the Winter Use Plan constitutes arbitrary and capricious agency action and an abuse of the

agency's discretion.

**A.    The Winter Use Plan Must Be Evaluated Based on the Maximum Number of OSVs It Permits**

The Government claims that its Winter Use Plan should not be evaluated based upon the

maximum number of OSVs it permits.  *See* Gov. Br. at 27 n.15.  It is easy to understand why the

Government now would like to defend a rule which was different than the one it adopted.  But it

is too late in the day for the Government to claim it only has to defend some lesser usage numbers than those permitted by its regulation. The entire process employed by the NPS of studying and evaluating this issue was based upon the maximum permitted usage under each Alternative. And the NPS itself changed its preferred Alternative from one permitting 720 snowmobiles per day to one permitting 540 per day. The NPS adopted the Winter Use Plan, and the Government now has to defend it as written.

### B. The Government's Conclusions Concerning Natural Soundscape Impact Are Based on Arbitrary and Capricious Standards and Are Unsupported by the Administrative Record

In its Opening Brief, the NPCA demonstrated the indefensibility of the Government's reliance, in assessing impacts on the natural soundscape, primarily on a metric which evaluates the percent of the total park area in which OSVs can be heard. *See* NPCA Br. at 14-21. In response, Intervenors accept that the NPS relied on that metric and attempt to defend it. Interv. Br. at 22-24. The Government's response, on the other hand, attempts to downplay the extent to which the NPS relied on the total-park-area test in reaching its conclusions. Gov. Br. at 13-15. Neither position can withstand analysis.

### (1) The Government's Claim That It Used the Highest Impact Level of Any of Three Metrics Is Unsupported by the FEIS and the ROD

The Government claims that the NPS only used the percent-of-total-park-area test as one of three metrics and that it relied on the impact level which was the <u>highest</u> of any one of those three metrics. See Gov. Br. at 14-15. As NPCA explained in its Opening Brief, the other two metrics are (i) the percent of time during daylight hours in which the noise could be heard and (ii) the maximum sound level of the noise. NPCA Br. at 14. The Government points to a statement in the FEIS to the effect that, "should the assessed impact level (*i.e.*, negligible, minor,

moderate, or major) for one [of the three metrics] be higher than for another, the overall impact is judged to be at the higher level." Gov. Br. at 14 (emphasis in original). According to the Government, "[a]n impact category was then assigned to each alternative based on the metric that produced the highest impact level." *Id.* (emphasis added). *See also id.* at 15 (applying that approach to a hypothetical). Under this approach, in other words, if the maximum sound level were found to create only a "minor" impact, although the percentage-of-time-audible had a "major" impact, the alternative under consideration, such as Alternative 7 which was adopted by the NPS as the Winter Use Plan, would itself be considered to have a "major" soundscape impact.

The flaw in the Government's argument is that, while the FEIS states that this highest-impact-among-the metrics approach would be used in evaluating each alternative, the NPS did not actually follow such an approach in the FEIS or the ROD. The NPS did not take the supposed step of assigning the highest of the three impact levels to an Alternative. If indeed the NPS had used the highest impact level of any of the metrics in assessing what became the Winter Use Plan, that plan would have been rated as having a "major" soundscape impact. That is so because the NPS conceded that "[i]mpacts due to percent time audible will be major in Yellowstone," AR 126499 (ROD) at 33-34, but then stated that the maximum sound level would be only minor, *id.* at 34. Instead of concluding that the Winter Use Plan would therefore have a major impact, the NPS found that the Winter Use Plan's impact on natural soundscapes would be only "moderate." *Id.* at 33.

Moreover, the NPS did not even rely on all three metrics to the same extent. One need only read the relevant portions of the FEIS and the ROD to conclude that the Government gave greater weight to the percent-of-total-park-area test. For example, the ROD claims: "This

decision will be beneficial in Yellowstone … compared to current use and beneficial … compared to the historical condition. Under current conditions, analysis indicates oversnow vehicles would be audible in about 14.4% of Yellowstone …. Under historical conditions, oversnow vehicles would be audible in 16.8% of Yellowstone …." AR 126499 at 34. On this basis, the ROD concludes that "impacts are at acceptable levels …." *Id.* at 32.

Furthermore, in the section of the FEIS stating overall "Conclusions" concerning impact on natural soundscapes, the <u>only</u> metric mentioned is the percent-of-total-park-area test. *See* AR 117160 at 339; *see also id.* at 339-42. That "Conclusions" section rates Alternative 7 as having a "moderate" adverse impact at Yellowstone, *id.* at 342 (Table 4-66). And, in ranking the preferred Alternative 7 against the other alternatives being considered, the "Conclusions" section relies on a table comparing <u>only</u> the percent of park area affected by each of the alternatives, along with current conditions and historical conditions. *Id.* at 339, referring to "Figure 4-1"; *id.* at 306 (Figure 4-1). *See also* AR 125352 at xxiii (Volpe Study, stating that "the modeling alternatives, as well as current and historical conditions, were rank ordered <u>based on park area</u> ….").

### (2)    Reliance on the Percent-of-Total-Park-Area Test is Arbitrary and Capricious

NPCA does not question that, as the Government argues, the percent-of-total-park-area test would have <u>some</u> utility in determining whether the Winter Use Plan is consistent with the Yellowstone Enabling Act and other legal requirements applicable here. But that test does not <u>alone</u> provide the required rational basis for the NPS's conclusions and decision that the plan is consistent with those legal requirements (to the extent the NPS acknowledged them at all) or provide a reasonable basis for those conclusions and decision. *See Burlington Truck Lines*, 371 U.S. at 166-68; *Nuclear Energy Institute*, 373 F.3d at 1289. *See generally* NPCA Br. at 14-21.

That test ignores intrusions into the natural soundscape of loud and continuous noise in the very area in which visitors and wildlife congregate.

The Government argues that the Volpe model "was designed <u>only</u> to provide an objective mechanism for comparing the seven alternatives." Gov. Br. at 16. But this is simply not true. The ROD relied on the Volpe model for the conclusions reached concerning the Winter Use Plan's impact on natural soundscapes. *See* AR 126499 at 33-34.

The Government argues that the NPS is entitled to substantial deference in its choice of methodology involving technical analysis and judgments and the evaluation of complex scientific data within the agency's expertise. Gov. Br. at 15. But the Volpe model does not warrant that standard of deference for several reasons. First, it is the Federal Aviation Administration that developed and applied the model, not the NPS. *See* Gov. Br. at 11. Second, measurement of sound impacts is not within the "area of special expertise" of the NPS. The Government relies on *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87 (1983), but that case emphasized that there the "Commission is making predictions, <u>within its area of special expertise</u>, at the frontiers of science." 462 U.S. at 103 (emphasis added). Third, while the NPS does in fact have its own soundscape experts, those experts were highly critical of the Volpe model and of the NPS's decision to rely on it. *See* NPCA Br. at 17-18 and discussion in subsection (4) below. Particularly under these circumstances, it is ironic indeed that the NPS seeks deference from the Court based on its supposed technical expertise in this area.

> **(3)      The Government's Secondary Reference to the Other Two Metrics Does Not Save Its Conclusions Because the Modeled Results on Which It Relied Were Clearly Inconsistent With the Known Facts**

It is true that the Volpe Study also modeled the other two metrics at 13 specific sites in

Yellowstone.  But the NPCA's position is not, as the Government mischaracterizes it, that the Government somehow should have used historical monitoring data as a predictive tool instead of a model.  The NPCA's position instead is that the Volpe modeling results are not a reasonable basis on which to judge the impact of the Winter Use Plan because those results are totally at odds with the known data derived from the monitoring studies.  *See* NPCA Br. at 19-20, 42-43.

The point is that there is something very wrong with this model of percent-time-audible and maximum sound levels as a predictor of the Winter Use Plan's impact on the natural soundscapes at Yellowstone.  A model must be rejected as arbitrary and capricious "if there is simply no rational relationship between the model and the known behavior of [the items] to which it is applied." *Chemical Manufacturers Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994). *See also Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 535 (D.C. Cir. 1983) (A court may strike down a model if the agency's conclusions based on it are unreasonable.); *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1035 (D.C. Cir. 2001) (rejecting rulemaking where agency relied on inferior methodology); *Almay, Inc. v. Califano*, 569 F.2d 674, 682-83 (D.C. Cir. 1977) (agency decision was arbitrary and capricious because it relied in part on a flawed survey).

The Government itself recognizes the validity of this point.  When addressing the <u>air quality</u> modeling, the Government compares the results reached with that modeling to the monitoring data; because the data was allegedly similar, the Government argues that "the Service's modeling system was effective." Gov. Br. at 21 n.13; *see also id.* at 24 ("recent modeling data confirms that the model was reasonably accurate").  But the Government has no answer for its reliance on the <u>soundscape</u> modeling that produced results so totally different than those found in monitoring studies.

-28-

Although the FEIS states that "impacts due to maximum sound levels would be minor" at the 13 sites at which Volpe monitored these two metrics, *see* NPCA Br. at 20, the NPS had in hand its own monitoring studies that had found consistently over several years that the maximum sound levels "exceeded 70dBa at Old Faithful, along the groomed traveled corridor between Madison Junction and the West Yellowstone Entrance and between West Thumb and Old Faithful." AR 125255 at 2. The monitoring studies define that level as "noisy" and the equivalent of hearing a "vacuum cleaner" in an indoor room. AR 125050 at 50. Even the FEIS calls that sound level "intrusive." AR 117160 at 140.

And the NPS had before it another critical fact — the number of oversnow vehicles during the time these monitoring studies were conducted would be <u>more than doubled</u> under the Winter Use Plan. Yet, rather than redesigning the modeling study, questioning its conclusions, giving their conclusions little weight or taking other appropriate action, the NPS relied on those conclusions as if they were a reasonable foundation on which to base findings concerning the likely adverse impacts of the Winter Use Plan. That was a highly unreasonable — indeed, untenable — conclusion. *See Burlington Truck Lines*, 371 U.S. at 166-68; *Nuclear Energy Institute*, 373 F.3d at 1289.

The Government also argues that it did not ignore the monitoring results but used them "in many ways." But the four examples provided by the Government totally miss the point. The issue is not, for example, whether the monitoring reports were used as input for "ambient sound level," Gov. Br. at 16, but whether the monitoring reports concerning OSV noise was used to evaluate the reasonableness of the conclusions reached by use of the model. And it is not sufficient for the FEIS to have <u>admitted</u> that the model underestimated impacts. While such disclosure was of course required, it cannot substitute for the required reasonable relationship

between the facts found and the conclusions drawn by the NPS from them. *See Burlington Truck Lines*, 371 U.S. at 166-68; *Nuclear Energy Institute*, 373 F.3d at 1289; *Chemical Mfrs. Ass'n*, 28 F.3d at 1265; *Small Refiner Lead Phase-Down Task Force*, 705 F.2d at 535.

> **(4)     The Government's Attempts to Rebut NPCA's Reliance on the Highly Critical Comments of the NPS's Own Soundscape Experts Is Based on a Distortion of the Record**

The NPCA pointed out that the Government's own professionals in the field of soundscape management were highly critical of the analytical process being used by the NPS. *See* NPCA Br. at 17-18. In response, the Government claims that those comments "formed part of the analytical process by which the INM Model [*i.e.*, Volpe] was adapted to the Services' needs. Those concerns were addressed in the final Volpe Report and FEIS." Gov. Br. at 14; *see also id.* at 17. But that simply is not true.

First, the Volpe Report did <u>not</u> reflect those comments, in part because they were made <u>after</u> the "final Volpe Report" was completed, with one exception. The "Final Report" on the Volpe Study was dated October 2006, *see* AR 125352, and an "Addendum" was dated June 8, 2007, AR 125237. The NPCA cited to an email dated July 26, 2007 from one of those experts, stating that "the model didn't realistically calculate OSV travel in the area, it just truncated all traffic at a point on the main road. This is why the <u>modeled results are so far from the reality</u>." AR 125317 (emphasis added), cited at NPCA Br. at 17. That email was written long after the Volpe Study had been concluded. Similarly, NPCA relied upon an email from Karen Trevino, another one of those experts. AR 125248. That email was also dated July 26, 2007, well after the Volpe modeling had been completed.

It was <u>after</u> the modeling had been completed that Ms. Trevino stated in her July 26, 2007 email that, "[w]hile the impact analysis is based only on modeling, I understand that the final

decision and therefore any management actions taken pursuant thereto, will consider the effects from both the modeling and the monitoring. … From a resource standpoint, I guess <u>we would just want to make sure the Decision really does factor in the monitoring results as much as the monitoring [sic: modeling] since the monitoring does indicate a larger noise footprint</u> from which to mitigate effects and we know the model has its limitations." AR 125248. *See also* AR 125262 at 3-4 (the fact that the modeling underestimated impacts "does strongly caution against a literal interpretation of any modeled outcome as representing the impacts that will obtain"); AR 125263 (confirming a September 2007 telephone conversation in which "[we] discussed on the phone the problem of treating modeled areas as literal").

NPCA also cited Karen Trevino's February 2007 comment that there was "a better and more comprehensive toolbox" not being used, NCPA Br. at 18. The Government claims that those other analytical methods from that toolbox were not used because they were not "ready for prime time." Gov. Br. at 17 n.11. But what the Government does not say is that those tool box items were <u>in fact being used "in our work with all other parks.</u>" AR 125248 (July 2007 Trevino email) (emphasis added). Apparently, the problem was not that the toolbox was not "ready for prime time," as Trevino sarcastically stated, but that the NPS for whatever reason had decided not to use it at Yellowstone, despite the fact that it was being used "with all other parks."

The Government's suggestion that one of those methodologies, "speech interference", was still in "draft form" in February 2007, is similarly misleading. The Government cites to AR 116973, 76-83, but that document does <u>not</u> say the <u>methodology</u> is in draft form. It instead states that the methodology is "well-established and peer-reviewed." AR 116974. The only thing in "draft form" is <u>a paper describing</u> the methodology. *See* AR 116976.

The Government's claim that language was added to the FEIS in response to these and

-31-

other comments misses the point, even if that were true.  The Government may not rely on an

unreasonable conclusion merely by adding a sentence or two to its FEIS explaining that the

conclusion is unreasonable.  It is not true, however, that the NPS added language to the FEIS

requested by its soundscape experts.  For example, NPCA cited to AR 124928, in which one of

the soundscape experts pointed out that the Volpe study contained apparently biased statements

and suggested adding: "Many visitors visit areas near travel routes of OSVs and thus are

exposed to very loud sound levels from OSVs."  NPCA Br. at 17.  No such statement was added

to the Volpe study, the FEIS or the ROD.  The Government claims that another comment in the

Trevino July 26, 2007 email on which NPCA relied led to the addition of a sentence in the FEIS.

Gov. Br. at 17 n.11.  But she was there commenting on the July 2007 internal review draft,

which <u>already contained</u> the sentence the Government claims was added in response to her

comment; it was merely edited slightly in the FEIS.  See AR 117120 at 293, last paragraph.[4]

Another NPS expert commented on the draft FEIS by suggesting that language be added to the

effect that "[t]here are areas in the parks where the total cumulative effect from OSV activities

and facilities (buildings, utilities, etc.) is such that it masks the natural soundscape from most of

a winter day."  AR 125317.  Nothing was added to the FEIS or the ROD to that effect.

Similarly, the Government claims that a sentence was added to the FEIS in response to

Kurt Fristrup's September 13, 2007 statement that there must be "explicit recognition that the

modeled values represent an underestimate" of actual impacts.  AR 125263.  *See* Gov. Br. at 17

n.11.  But the Government has the facts wrong again.  The sentence the Government claims was

inserted in response to this comment was already in the document long before that comment.

---

[4]    The draft was circulated with a cover note dated July 27, 2007, *see* AR 117120 at 1, but the document must have been circulated before that date in light of all the comments on it dated July 26, 2007.

*See* AR 117120 at 294 (July 2007 internal review draft of FEIS).

        **(5)**        **The NPS's Claim that Excess Noise Was Primarily Attributable to Snowcoaches and Road Grooming Equipment Is Without Record Support**

The ROD makes the statement that, while monitoring showed OSVs could be heard more than expected, that fact is primarily attributable to non-BAT snowcoaches and road grooming equipment. *See* AR 126499 at 20-21. The NPCA stated that there was no support in the FEIS or, based on our search, elsewhere in the Administrative Record for that claim. See NPCA Br. at 21. In response, the Government provides a single citation. *See* Gov. Br. at 19. That citation is to a table at page 31 of the 2006-2007 monitoring report, under the heading "Event Analysis." AR 125292 at 31. But that cite does not support the sweeping statement challenged by the NPCA.

First, while the study generally analyzes metrics at five sites, *see, e.g.,* AR 125292 at 15, the table on which the Government relies concerning the source of the sounds only addresses two sites. *See* AR 125292 at 31. Second, the study explains that "[i]t was increasingly difficult to identify sound sources as distances increased from the recording location to the sound source."). *Id.* at 10 (emphasis added). For example, the text preceding the table states that no measurements could be taken at the Old Faithful Weather Station site. *Id.* at 31. And the same study concludes that the reduced sound and audibility levels in recent seasons "were largely explained by fewer snowmobiles, the change from two to four-stroke engine technology, and the guided group requirements." *Id.* at 2 (emphasis added).

Accordingly, this single table does not provide a reasonable basis for the NPS's bold conclusion that the imposition of a BAT requirement on snowcoaches would result in a major reduction in natural soundscape impacts — particularly when the Winter Use Plan would more

than double the number of OSVs.  Even if the noise level produced by each snowcoach were

reduced, in other words, there is no support for the proposition that that effect would offset the

facts (i) that currently soundscapes are already significantly impacted, and (ii) that the number of

OSVs would more than double from current levels.

> **C.    The Government's Arguments Attempting to Defend the NPS's Findings Concerning Wildlife Are Based on a Distortion of the NPS Scientists' Recommendation and an Attempt to Divert Attention from the Fact That the NPS Required Population Level Impacts Before Considering Impacts as Significant**

The Government's attempt to explain its conclusions about the Winter Use Plan's impact

on wildlife has no more substance than its arguments relating to soundscapes.

> **(1)    The Government Distorts the Recommendations of Its Own Scientists That OSV Use Levels Be Maintained At or Below Those of the Recent Winter Seasons**

The NPCA pointed out that six scientists, four from the NPS and two from the University

of Montana, had completed a report in 2006 in which they linked the impact of OSVs on wildlife

to the level of OSV use.  *See* NPCA Br. at 24.  The scientists unanimously recommended that

OSV traffic levels be maintained at or below those observed during the three most recent

seasons, 2003-2004 to 2005-2006.  *Id.*; *see* AR 125701 at 20.  The NPCA also pointed out that

the NPS rejected that recommendation without any explanation or reasoning.  *See* NPCA Br. at

43 and cases there cited.  The Government's response is to manipulate the premise of that

recommendation and then to claim, incorrectly, that the NPS actually followed it.

The Government misleadingly suggests that the authors of that study only considered

OSVs entering through the West Entrance of Yellowstone.  Gov. Br. at 32.  The authors of that

study, however, stated unequivocally that "[w]e conducted our study along road segments

throughout the central portion of Yellowstone."  AR 125701 at 3 (emphasis added).  They went

on to say that they focused the study area in the upper Madison River drainage in the west-central portion of the park, and the corridor between Norris and Mammoth. *Id.* at 3. *See also id.* at 4 (nine road segments on which surveys were conducted, including those from the South Entrance, and segments ending at Mommoth, which is near the North Entrance). *See* AR 117160 at 8 (map). In other words, the study included OSVs entering not only from the West Entrance, but also from the South Entrance and from the North Entrance, near Mammoth. There is no basis for the Government's argument that the scientists' recommendations were based only on the number of snowmobiles entering through the West Entrance.

Indeed, the scientists themselves left no doubt about the use level they were recommending be maintained or reduced. Under "Recommendations," they stated that OSV traffic levels should be kept "at or below those observed during the last three years of our study (*i.e.,*<u><50,000 over-snow visitors</u>)." AR 125701 at 20 (emphasis added). The actual annual OSV visitation numbers were 45,535 in the first of those seasons; 41,291 in the second such season; and 48,689 in the third such season. *See* AR 117160 at 85. There is accordingly no doubt that the NPS scientists were addressing <u>total</u> OSV visitation, not merely those OSV users who entered through the West Entrance. And the ROD and FEIS make clear that the daily average number of snowmobiles during those seasons was approximately 250. *See, e.g.,* AR 117160 at 26.

Lest there be any misunderstanding in this regard, however, the scientists were not recommending that even that number of snowmobiles be permitted. Their recommendation was that the numbers should be kept "at or below" those of the recent seasons. And they made clear in a draft of their report that even during those recent seasons there was adverse impact on wildlife. While OSVs often elicited no <u>observable movement</u> responses, they found that

"recreational activities can also cause physiological responses such as elevated heart rate, blood pressure, breathing rate, and release of adrenaline," which decrease resistance to disease and produce an array of other fitness costs. *See* AR 125605 at 19.[5]  In Yellowstone's often severe winters, fitness costs are highly significant to the survivability of wildlife.  The 2003 SEIS explained that the winter at Yellowstone is "the season when animals are stressed by climate and food shortages.  Disturbance or harassment of wildlife during this sensitive time can have a negative effect on individual animals and, in some cases, populations as a whole."[6]  Accordingly, the scientists recommended in their 2006 report that "park managers must seeks ways to minimize, to the greatest degree practicable, adverse effects to park resources and values."  AR 125701 at 20.

Moreover, while the Government makes much of the percentages of wildlife showing various levels of reactions to OSVs, *see* Gov. Br. at 29-30, it is undisputed that a significant percentage of wildlife <u>do</u> exhibit an observable response.  For example, while the Government stresses that 80 percent of bison exhibited <u>no</u> observable response, that means that 20 percent of bison <u>did</u> so.  And those statistics do not account for non-observable responses, described above.  The fact that population levels have not been significantly affected squarely raises the question of whether the Government's reliance solely on population level effects on wildlife and not effects on individual animals is a viable analytical approach, to which we now turn.

_____

[5]     While that paragraph was deleted in the final report, compare AR 125701 at 19, the same point was retained in the FEIS.  *See* 117160 at 254-55.

[6]     *See* NPCA Br., First App., Tab 5 [Doc. 48-8], at 196.

      (2)      **The Fact That the NPS <u>Analyzed</u> Impacts to Both Populations and Individuals Does Not Justify Its <u>Relying</u> on Impact Definitions Which Disregard Impacts to Individuals**

The NPCA demonstrated that, despite studies which demonstrated that snowmobiles disturb wildlife, the NPS avoided the results of those studies by defining impacts based on population level effects, thereby permitting the conclusion that population-level impacts to wildlife were "acceptable" despite adverse impacts to individuals. *See* NPCA Br. at 22-26. The Government responds by stating that it "rated impacts to wildlife species using five criteria," of which one related to individual animals, and that the Government "analyzed" impacts to <u>both</u> populations and individuals. *See* Gov. Br. at 28, 32-33. The Government's argument is without merit.

The Government did not "rate" impacts using five criteria. The "ratings" were established in a table which imposed an overriding consideration of "consequence to the population" that had to be met under each of the impact levels defined. *See* AR 117160 at 257. Compare *id.* at 251 (<u>discussing</u> five concerns). The Government's obligations do not end merely by <u>discussing</u> impacts to individual animals. The Government must also establish parameters for its analysis that are consistent with the applicable legal requirements; the Government must articulate a rational basis for its conclusions and for its decision; and the Government in the end may not violate substantive restraints on its management of these parks. The NPS has long recognized, as stated in its 2003 SEIS, that "park policies, regulations, and EOs clearly state that disturbance to wildlife, regardless of population-level effects, is unacceptable in the national parks." *See* NPCA Br., First App., Tab 5 [Doc. 48-8] at 206. Here, all of the Government's impact definitions depend on the "consequence to the population." *See* AR 117160 at 257; 126499 at 32-33. *See also* NPCA Br. at 24-26. Based on those criteria, the NPS found "negligible to moderate" adverse impacts on wildlife. *See* AR 117160 at 270, 279, 288-89, 291,

300-01; 126499 at 32-33.  And the ROD concluded that "[m]onitoring shows that winter use did not contribute to wildlife effects at the population level under a wide range of snowmobile numbers (between 324 and 1,400 per day at the West Entrance)."  AR 126499 at 22.

These conclusions are irreconcilable with the scientific studies.  One of the NPS's scientists observed that "[a]lternatives which lower OSV traffic are believed to have wildlife impacts lesser than those alternatives with higher levels of traffic."  AR 125617.  *See* NPCA Br. at 25.  And both of the most recent studies on which the Government now relies recommended maintaining or reducing OSV use levels.  *See* 125625 at 1924 (Borkowski et al. 2005: "we recommend park managers consider maintaining OSV traffic levels at or below those observed during our study"); 125701 at 20 (White et al.:  recommendation that "OSV traffic levels at or below those observed during the last 3 years of our study (*i.e.*, <50,000 over-snow visitors)."  Instead, by defining impacts at the total population level, the Government attempts to justify more than doubling the aggregate number of OSVs from the level recommended by those scientists.

Far from supporting the Government's findings and conclusions, those studies demonstrate that the Government's conclusions are without record support, that the analysis fails the test of reasonableness, that the parameters for the analysis are inconsistent with the applicable legal requirements and that, in the end, the Winter Use Plan must be found to have violated the NPS's own snowmobile rule (which among other things precludes snowmobile designations that would "disturb wildlife"), the Yellowstone Enabling Act (which precludes regulations inconsistent with the preservation of the natural wonders of Yellowstone, of which its wildlife are surely a part) and the Organic Act (which mandates that preservation predominate over recreation).

**D.      The Government Distorts the Record Concerning Impacts on Air Quality**

In its Opening Brief, the NPCA demonstrated that the NPS relied on inappropriate

"desired conditions" in analyzing air quality impact, ignored the fact that carbon monoxide and

particulate matter would increase dramatically under the Winter Use Plan from current

conditions and made no attempt to explain the fact that its findings were inconsistent with a 2007

NPS study establishing that emissions are likely to be higher than those assumed for purposes of

its air quality modeling.  *See* NPCA Br. at 26-30.  Only two aspects of the Government's

response merit a reply — the Government's misleading discussion of the 2007 study and the

Government's similarly misleading discussion of statements by an NPS expert.

The NPCA pointed out that the NPS's air quality modeling was based on an assumption

that the emissions from BAT-certified snowmobiles would actually meet the NPS's emissions

requirements, but that an NPS 2007 study established that emissions are likely to be higher than

those assumed for purposes of that modeling (the "2007 Emissions Report").  *See* NPCA Br. at

29.  In response, the Government makes no attempt to demonstrate that the NPS actually

considered, or provided reasonable grounds for having ignored, the 2007 Emissions Report in its

FEIS and ROD.  The Government now states, however, that "a much more representative study"

was conducted in 2006.  Gov. Br. at 25.  The Government claims that that 2006 study involved

"over 960 snowmobile measurements," suggesting that the study involved 960 snowmobiles.

But in fact, the 960 number refers to the number of <u>measurements</u>, not the number of

<u>snowmobiles</u> used in the test.  AR 110761 at iv.  In the 2006 study, three brands of snowmobiles

were tested, compared with two brands tested in the 2007 study.  Compare AR 110761 at 2 with

AR 111471 at v.  But, the 2007 study states that there had been "a number of problems" with the

2006 report, causing the experts to revisit the subject in the 2007 study.  *See* AR 111471 at 27.

In the 2007 Emissions Report, the authors stated that their 2005 work, reported in the 2006 report

on which the Government relies, was a "crude attempt" at measurements taken under dubious

testing conditions.  *Id.*  For example, the earlier measurements had been taken over a 2.3 mile

drive, while the latter study involved measurements taken over a 32-mile drive.  If anything, the

Government merely demonstrates by its argument that the 2007 study was the more reliable and

representative study, and that the 2006 study should have been disregarded.

 The NPCA had also relied on the NPS's own atmospheric chemist's advice to the Winter

Use Plan team that "our emissions data don't seem to support that 4-stroke snowmobiles are as

clean as they are supposed to be.  Likewise, the ambient monitoring data that shows reductions in

CO and PM can mostly be accounted for by fewer numbers of snowmobiles."  AR 110545;

NPCA Br. at 29.  The Government brushes aside the chemist's advice, suggesting that, rather

than the chemist's own views, the quoted materials was merely a report on "biased comments

presented in an article by snowcoach proponents."  Gov. Br. at 25.  While the Government is

correct that the email contains a criticism of an article by snowcoach proponents, the language

quoted by the NPCA is <u>not</u> a report of the views expressed in the article.  The quote reflects the

chemist's own views.  Here is the full paragraph:

> Is the news item an accurate portrayal of study results?  Not
> exactly, it has a very definite bias.  But it didn't directly lie and
> distort the facts it quoted.  I didn't do a direct comparison to the
> BAT, but <u>our emissions data don't seem to support that the 4-
> stroke snowmobiles are as clean as they are supposed to be</u>.
> Likewise the ambient monitoring data that shows reductions in CO
> and PM can mostly be accounted for by fewer numbers of
> snowmobiles.  I'm still working at getting rough numbers for the
> percentage of pollution reduction due to fewer snowmobiles vs
> lower emissions.

AR 110545 (emphasis added).

## IV.  THE INTERVENORS' REMAINING POINTS FAIL TO JUSTIFY THE WINTER USE PLAN

The Intervenors provide no arguments in support of the Government's position not already addressed above that merit any response at all.  Nevertheless, there are a few points we wish to make.

### A.  Intervenors Should Not Be Permitted to Rely on the Winter Use Plan's Restrictions Before This Court While Attacking Them in the Wyoming Litigation

The arguments advanced here by Intervenors that the Winter Use Plan complies with the law should be given no weight in light of the fundamentally inconsistent position they have taken in the Wyoming litigation.

The Intervenors argue here that "NPS's decision to permit restricted snowmobile access is in accordance with relevant law, was conducted in full compliance with NEPA, and is adequately supported by the record."  Interv. Br. at 14.  And Intervenors stress the fact that the Winter Use Plan imposes numerical limits and a commercial guiding requirement.  But this position is directly contradicted by their assertions in the simultaneous litigation pending in Wyoming, *State of Wyoming v. The United States Department of the Interior,* Case Nos. 2:08-cv319, 004 (D. Wyo.) (the "Wyoming Action").  In the Wyoming Action, Intervenors have asked that court to strike down those provisions of the Winter Use Plan limiting snowmobile access to 540 machines per day and requiring use of commercial guides.  Petition for Review of Final Agency Action, NPCA Second App., Tab 4, at ¶¶ 14-19.  The Intervenors contend in the Wyoming Action that the 540 per day snowmobile limit is "arbitrary and capricious and contrary to law and exceeds the NPS's statutory authority" and that the commercial guiding requirement is invalid because it is "not supported by the record and the NPS has failed to provided a reasoned analysis for that decision."  *Id.* at ¶¶ 13, 17 (internal quotations omitted).

Intervenors should not be heard to rely here on the very aspects they challenge in Wyoming.

**B.      Intervenors' Attempt to Compare Snowmobiles to Automobile Traffic Is Off-Point**

The Intervenors attempt to draw a parallel between the use of snowmobiles in the winter season at Yellowstone and the presence of automobiles in the park during other seasons, but that parallel fails for a number of reasons.

First, the roads to which the Intervenors point were built before the NPS assumed control of Yellowstone pursuant to the 1916 Organic Act.

Second, the FEIS recognizes that winter park landscapes at Yellowstone "uniquely embody solitude, quiet, undisturbed wildlife, clean air vistas and the enjoyment of these resources by those engaged in non-motorized activities." AR 117160 at 5 (Table 1.1). Those qualities are unique to the winter in part because of the absence of substantial traffic.

Third, the NPS's snowmobile regulation only applies to snowmobiles. For that reason alone, a different analysis is required for the Winter Use Plan than would be required if the issue before the Court related to the use of automobiles in the summer.

Fourth, the FEIS expressly recognizes that snowmobiles can contribute more pollution than automobiles during the summer months. "A common misperception is that many more automobiles entering the park during summer months contribute more pollutants than do snowmobiles. Although the historic number of snowmobiles entering YNP during the winter (66,619) was, on average, a factor of 16 lower than the number of automobiles entering the park annually (1,075,295), snowmobile emissions equaled or exceeded total annual emissions for CO and HC from other mobile sources (*i.e.*, cars, RVs, buses and snowcoaches)." AR 117160 at 103. *See also id.* at 94 (discussing "an important driver of air quality" being meteorological

conditions).

**C.    The Intervenors Exaggerate the Extent to Which Winter Visitors Are Comprised of Snowmobile Users**

The Intervenors claim that most of the winter visitors to Yellowstone are there to use snowmobiles, and everyone else should be relegated to the largely inaccessible back-country. Perhaps the extreme noise and pollution caused by snowmobiles has indeed discouraged some non-snowmobile visitors in past years, but the Intervenors' arguments in this regard are in any event exaggerated, at least.

They argue that "most winter visitors to Yellowstone are there for the purpose of riding snowmobiles," Interv. Br. at 23, and that there are "few visitors" seeking wilderness, solitude and natural quiet in Yellowstone, *id.* at 3.  They state that 98.5 percent of winter visitors are comprised of snowmobile riders and snowcoach passengers.  *Id.* at 3 n.10.  But they then ignore the fact that snowcoach riders are part of that statistic.  And there is a big difference.  Many visitors use snowcoaches, for example, to enter Yellowstone and be driven to a point within the park from which they then cross-country ski or engage in other non-motorized vehicle activity. *See, e.g.*, AR 117160 at 153 ("While cross-country skiers are not separately counted in entrance statistics, about 20% of winter visitors (otherwise counted as visitors using either wheeled or oversnow transport) cross-country ski at some time during their stay in YNP.").

Furthermore, the number of visitors using snowcoaches has dramatically increased in recent years, as visitors experience the many advantages of snowcoach use over snowmobiling for observing the natural wonders of the park.  For example, not only are snowcoaches less intrusive on the natural resources of the park than snowmobiles, but snowcoaches permit visitors seeking to enjoy those resources rather than the recreational experience of using a snowmobile to observe the resources in a heated coach in which a guide can be heard explaining what they are

observing, unlike with snowmobiles.  It is therefore not surprising that the FEIS states that "the number of visitors touring YNP by snowcoach rose 72.0%" from the winter of 2001-2002 to the winter of 2006-2007.  AR 117160 at 154.  "For the winter of 2006-2007, 39 percent of OSV passengers in YNP traveled by snowcoach."  *Id.*  And snowmobiles adversely impact the experience of visitors using snowcoaches.

This is why NPCA supported the snowcoach only alternative as an appropriate Winter Use Plan.

The FEIS itself recognizes the fallacy of the Intervenors' claim that only "few visitors" come to Yellowstone in winter seeking wilderness, solitude and natural quiet.  The fact that snowmobile use in historic numbers was "inconsistent with winter park landscapes that uniquely embody solitude, quiet, undisturbed wildlife, clean air vistas and the enjoyment of these resources by those engaged in non-motorized activities" is cited as one of the very reasons for the entire Winter Use Plan exercise.  *See* AR 117160 at 5.

## V.    CONCLUSION

The NPCA accordingly requests that the Court enter summary judgment in favor of the

NPCA, finding that the Winter Use Plan is contrary to law and/or that the process followed by

the Federal Defendants in adopting that Plan was arbitrary, capricious and an abuse of discretion.

The Court should also deny the Government's cross-motion for summary judgment.

Respectfully submitted,

_____
Robert D. Rosenbaum (D.C. Bar No. 090498)
Ingo W. Sprie
Francis A. Franze-Nakamura (D.C. Bar No. 497985)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
Phone:    (202) 942-5862
Fax:        (202) 942-5999

Attorneys for Plaintiff National Parks Conservation
Association

Dated:  July 11, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GREATER YELLOWSTONE COALITION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 07-cv-2111 (EGS) |
| v. | ) ) ) | [Hearing on Motions for Summary Judgment on August 27, 2008] |
| DIRK KEMPTHORNE, et al., | ) ) | |
| Defendants. | ) ) ) | |

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 07-cv-2112 (EGS) |
| v. | ) ) ) | [Hearing on Motions for Summary Judgment on August 27, 2008] |
| UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK SERVICE, | ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF NATIONAL PARKS CONSERVATION ASSOCIATION'S RESPONSE TO
FEDERAL DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE**

Pursuant to Local Rules 7.1(h) and 56.1, Plaintiff National Parks Conservation Association ("NPCA") hereby submits the following response to the Federal Defendant's statement of material facts as to which there is no genuine issue.

1.    NPCA disputes this statement only to the extent it is inconsistent with NPCA's December 18, 2007 First Amended Petition for Review of Agency Action.

2.    NPCA does not dispute this statement.

3.     NPCA does not dispute this statement.

4.     NPCA does not dispute this statement.

5.     NPCA does not dispute this statement.

6.     NPCA disputes this statement on the grounds that it is well-accepted that the

Court may take judicial notice of publicly available documents outside of the administrative

record. *See, e.g.*, *Seifert v. Winter*, __ F. Supp. 2d__, 2008 WL 879029, at *6 n. 5 (D.D.C.

Apr. 3, 2008) (considering document available on the internet that was not part of the

administrative record).

Respectfully submitted,

_____
Robert D. Rosenbaum (D.C. Bar No. 090498)
Ingo W. Sprie
Francis A. Franze-Nakamura (D.C. Bar No. 497985)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
Phone:    (202) 942-5862
Fax:        (202) 942-5999

Attorneys for Plaintiff National Parks Conservation
Association

Dated:  July 11, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
GREATER YELLOWSTONE COALITION,      )
et al.,                                               )
                        Plaintiffs,              )
                                                    )   Case No. 07-cv-2111 (EGS)
            v.                                      )
                                                    )   [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                 )   Judgment on August 27, 2008]
                                                    )
                        Defendants.            )
_____)

_____
                                                    )
NATIONAL PARKS CONSERVATION        )
ASSOCIATION,                                  )
                                                    )
                        Plaintiff,               )
                                                    )   Case No. 07-cv-2112 (EGS)
            v.                                      )
                                                    )   [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE  )   Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE,  )
                                                    )
                        Defendants.            )
_____)


**SECOND APPENDIX TO
PLAINTIFF NATIONAL PARKS CONSERVATION ASSOCIATION'S
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

<u>Tab No.</u>

Press Release, White House, Vice President and Mrs. Cheney Remarks and Q&A
at Town Hall Meeting in Duluth, Minnesota (Sept. 29, 2004), as obtained from
the White House Website....................................................................................................1.

News Release, Department of the Interior, "Secretary Norton Appoints Paul
Hoffman as Deputy Assistant Secretary for Fish and Wildlife and Parks"
(Jan. 4, 2002), 2002 WL 22193 ........................................................................................2.

1987-1988 Official Congressional Directory, 100th Congress, page 324 .....................................3.

Petition for Review of Final Agency Action, Filed by Petitioner Intervenors The
International Snowmobile Manufacturer's Association, The American Council of
Snowmobile Associations, BlueRibbon Coalition, Inc. and Teri Manning, *State of
Wyoming v. U.S. Department of the Interior et al.*, 2:07-cv-00319-CAB, U.S.
District Court for the District of Wyoming (Feb. 26, 2008)..........................................................4.

Case 1:07-cv-02111-EGS   Document 61-4   Filed 07/11/2008   Page 1 of 10



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

 CLICK HERE TO PRINT

For Immediate Release
Office of the Vice President
September 29, 2004

## Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Duluth, Minnesota

Cirrus Design Corporation
Duluth, Minnesota

10:55 A.M. CDT

MRS. CHENEY: Well, thank you so much that great welcome. It is a beautiful day here in Duluth, and we are so happy to be here.

It has been a privilege for Dick and me to travel all across this wonderful country. And I can't tell you how many times when we're going through the many, many beautiful places that America has, we say to ourselves how lucky we are to be American. And when I try to make a list of all the things that I feel fortunate about, all the things that I feel proud about -- proud about, especially, -- right at the top of that list is our President, George W. Bush. (Applause.)

He has been a magnificent leader over these past four years. And if you don't mind my saying so, the Vice President is no slouch either. (Laughter and applause.)

Well, I get the job of introducing Dick because I have known him for so long. I have known him since he was 14 years old, and his job that summer, that school year when I first knew him, his job was sweeping out the Ben Franklin store in Casper, Wyoming, our hometown. And I have known him through many jobs since. I've known him since he was digging ditches at the Central Wyoming Fair and Rodeo Grounds, outside our hometown of Casper. And I've known him since he was loading bentonite --hundred-pound sacks of bentonite into railroad cars. And I've known him since he was building power line all across the West to help pay his way through school. And I mention all those things because I think that when you grow up working hard, you learn some really important lessons. And one of those lessons is how important it is for the hard working men and women of this country to get to keep as much of their paychecks as possible. (Applause.)

So it has been a great honor and privilege for us to be involved in this presidential campaign, a distinguishing mark of our civilization, our country is getting to choose our leaders. And it is a great source of pride and honor to me to get to introduce to you my husband, Dick Cheney, the Vice President of the United States. (Applause.)

THE VICE PRESIDENT: Thank you. Thank you all very much. And, Lynne, thank you for the fine introduction. She wouldn't go out with me until I was 17. (Laughter.)

But I often tell people we have a marriage that came about because Dwight Eisenhower got elected President of the United States. Because in 1952, when Eisenhower ran for President, I was a youngster living in Lincoln, Nebraska with my folks. Dad worked for the Soil Conservation Service. Eisenhower got elected, reorganized the government, Dad got transferred to Casper, Wyoming, which is where I met Lynn. And we grew up together, went to high school together, and a few weeks ago celebrated our 40th wedding anniversary. (Applause.) I explained to a group the other night that if it hadn't been for Eisenhower's election victory, Lynne would have married somebody else. (Laughter.) And she said, right, and now he'd be Vice President of the United States. (Laughter and applause.)

Well, we're delighted to be here today in Duluth. I want to thank the Klapmeiers for allowing us to come here and spend some time at Cirrus. This is a great company. They've got a great track record and have done some superb work building quality products. One of the great American success stories that you find as you travel all across the country. And we're delighted to be here today. And I want to thank all of you at Cirrus for allowing us to come by and for being part of the effort here this morning.

We're obviously embarked upon the final weeks of the campaign. And we're doing a number of these events across the country. Of course, the President is getting ready for his debate tomorrow night. And mine will be next Tuesday with my opponent, John Edwards.

Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Duluth, Minnesota

John, of course -- Senator Edwards -- I shouldn't call him John. I don't know him that well. But Senator Edwards, of course, it is alleged got his job because he's charming, sexy, good looking and has great hair. I said, how do you think I got the job? (Laughter.) Why do they laugh?

But this is an important campaign this year. And you need to have a sense of humor in this business, so we need to have a few laughs along the way. But it's also very serious business. The decision we're going to make on November 2nd is one of great significance for the nation, and may indeed be the most important election at least that I can recall in my lifetime in terms of the decisions we're going to make about absolutely vital issues and the course we're going to set for this nation in the years ahead.

And what I'd like to do this morning is take a few minutes, share some thoughts with you about a part of that decision that we're going to make on November 2nd, why I think it's so important. And then we'll throw it open to questions and allow you to ask questions or make comments, have a bit of an exchange or dialogue. These sessions are a lot better if you don't have to just listen to me ramble on endlessly, but rather get a chance for a good exchange. So we'll do that this morning.

But I want to begin, first of all, by talking about what I think is at the heart of the election, the significance of this election this year, and that's the basic fundamental question about what the national security strategy and policy will be for the United States in the years ahead. The most significant set of developments I think that the President had I have had to deal with since we were sworn in, that were not anticipated when we were elected four years ago, of course, are all of those events that began with 9/11 and all that that's entailed for the country. So that's what I really want to focus on this morning.

If you think about it, there have been times in our history when we come to sort of watershed moments. Something happens that constitutes a new threat to the United States, or a fundamentally altered international situation and we have to think new thoughts about our strategy, about how we conduct ourselves in the world, what kind of military forces we need, what the threats are, and I think we've gone through one of those periods.

I think back to the time right after World War II, for example, after we'd won the war against Germany and Japan, our troops came home. And then within a matter of a few years, all of a sudden we were faced with the Cold War, a Soviet Union that had occupied half of Europe, that was acquiring nuclear weapons, and we had to put together an entirely new national security strategy for the United States, a policy of deterrence to deter the Soviets from launching an attack against the U.S., of containment -- established NATO, a series of alliances around the world to protect us against the Soviet threat, created the Department of Defense, in 1947 -- the Central Intelligence Agency, reconfigured our military forces and so forth. Those policies we put in place then lasted for about the next 40 years, and were supported by Republican and Democratic administrations alike -- the basic, fundamental foundation of national security for the United States really until the Soviet Union collapsed and the Cold War ended in the 1989-90 time frame.

And I think we're again at one of those moments, in connection with the war on terror, the nature of the threat we face today, and what has emerged if you will for us since 9/11 that we now have to deal with

And of course, 9/11 was significant because it brought home, I think, to everybody the fact that there was, indeed, an organization out there -- in this case, we called them the al Qaeda -- that had designs on the United States, that had managed to organize an attack against us that killed 3,000 of our people in less than two hours on the morning of 9/11, more folks than we lost at Pearl Harbor, the worst attack ever on American soil by a foreign power.

And when that occurred, of course, we had to come to grips with that threat and to recognize that the biggest threat we face today would be a group of terrorists in the middle of one of our own cities with a weapon of mass destruction, with a biological or a chemical agent, or conceivably, even a nuclear weapon, and that that kind of threat, if it were to occur could conceivably result in the death of hundreds of thousands of Americans in a few hours, not just 3,000. And so the scale of the threat is very different than what we've dealt with before, and the nature of the defenses we need to mount against it, obviously, are fundamentally altered, too.

In response to 9/11, we did several things. The President, of course, insisted on doing everything we could to harden the target here at home, to make the U.S. a tougher target for our adversaries, created the Department of Homeland Security, passed the Patriot Act that gave law enforcement the tools they need to be able to prosecute terrorists, strengthened our intelligence agencies, got a better mechanism in place to coordinate between the CIA and the FBI, beefed up our Border Patrol, passed Project BioShield, which provides funds and authority to research and develop defenses against biological weapons and so forth.

All of that is very good. But the President also made a decision that I think is absolutely essential, and that is that there's no such thing as a perfect defense, that if we're successful 99 percent of the time against our adversaries, the 1 percent that gets through

given the nature of the threat could be devastating. So you cannot accept a situation where even a 1 percent possibility of success on the part of our adversaries. And therefore, it was essential that we also go on offense. And that has been the biggest departure, if you will, from the past in terms of what George Bush and those of us who work for him have done since 9/11. By go on offense, we mean that we would use our military force as well as our intelligence services and so forth to aggressively go after the terrorists wherever they reside, wherever they train, wherever we find them. And secondly, that we would confront those who support terror -- those states that sponsor terror, who've provided safe harbor and sanctuary for terrorists, who conceivably have provided financial assistance or arms, or could eventually share that deadly technology with the terrorists also become a target of our interest.

And based on that fundamental strategic decision, we then clearly went into Afghanistan, took down the Taliban regime, captured and killed hundreds of al Qaeda, closed the training camps in Afghanistan where the terrorists had trained to kill Americans on 9/11, and where some 20,000 terrorists were trained in the late 1990s. And in the aftermath of that, then, we also took one additional step, and that is to establish a democratically elected government in Afghanistan. It's not enough for us to go and simply kill terrorists, or to topple governments that have supported terror and thereby threaten the United States, you also have to put something in its place. You can't simply do the first two steps and walk away and leave a failed state behind where it will revert back to what it was before, a breeding ground for terror, or conceivably become a dictatorship of some kind.

And so what we've done in Afghanistan, we've stood up an interim government. They've written a constitution. They've registered 10 million voters, first time in history, over 40 percent of them, women. And on October 9th, there will be free elections in Afghanistan. And by the end of the year, there will be a democratically elected government in Afghanistan where they used to train terrorists. (Applause.)

On Iraq, slightly different situation -- but in Iraq, we had in Saddam Hussein a man who had started two wars, who had traditionally been a state sponsor of terror, always carried by our State Department as a sponsor of terror, the home to the Abu Nidal organization, the Palestinian Islamic Jihad, a man who paid $25,000 to the families of suicide bombers who would kill Israelis, had a relationship with al Qaeda, a man who had previously produced and used weapons of mass destruction against his own people and against the Iranians, and who had defied the international community for 12 years. We went in and took down the regime of Saddam Hussein. Today, he's in jail -- which is exactly where he belongs. (Applause.) And we're now actively and aggressively working to stand up a new democratic government in Iraq.

This is hard work. This is not an easy task. You're going to find people who say, oh, my gosh, you can't do it. It's too hard. There will be a civil war, et cetera, et cetera, et cetera. You can always find somebody who can argue against what needs to be done here. But it needs to be done. And having -- (Applause.) And having gone this far, it can be done. And again, think about where we are in Iraq. We've got an interim government stood up composed of Iraqis, headed up by a man named Ayad Allawi. He is the Prime Minister. He has now appointed a Cabinet. The Iraqis control all the government ministries now, have since the end of June. They've been in business 90 days -- probably a little soon to make a final judgment about how they're going to do. They're just getting started. We've got a lot of people out there who want say, oh, it's a failure. They don't have any idea whether it's a failure or not. These folks have just barely gotten started, gotten their feet on the ground and they're doing a good job.

Allawi is a very tough man. He fled Iraq many, many years ago during Saddam's rule, went to London and was living in London. And one night when he was in bed, in London, woke up to find assassins in his room sent by Saddam Hussein armed with axes. They tried to hack him to death -- he and his wife. He survived, but he spent nearly a year in the hospital recovering from his wounds. And his wife never really recovered psychologically from the event. She died a few years later. Very tough customer, Ayad Allawi -- he's willing to go back to Iraq, and knows he's the target of the terrorists and the former regime elements who'd like nothing better than to do him in. And he's back there putting his life on the line to create a democracy in Iraq and to give the people of Iraq a chance to live in freedom under a democratic form of government.

Now, it is in our interest that that happen. We don't want to see Iraq revert back to what it was before. And the Iraqis have got a good start. They've not -- we were told we couldn't stand up an interim government, that they couldn't. Well, they've done that. We were told, you'll never transfer power to them on June 30th. Well, we've done that. We were told, you can't hold a national assembly of Iraq. Well, they've done that. They will have elections in January. That group that is elected then will write a constitution, and by the end of next year, they'll have new elections under an Iraqi-drafted constitution, and you'll have a democratically elected government in place in Iraq. (Applause.)

Now, the challenge for us going forward here is to make certain we get it right. We have to continue to do whatever is necessary for as long as necessary to get these people back on their feet. And there are two major tasks they have to accomplish. They've got to take on responsibility for their own governance. And they've got to take on responsibility for their own security. So both in Afghanistan and Iraq, we're spending a lot of time and effort, standing up and training Afghan and Iraqi security forces that can take over basic fundamental responsibilities for their security. And that's a major task for us. We want to get it done just as quickly

Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Duluth, Minnesota          Page 4 of 10

as we can. We don't want to stay a day long than we have to, but we want to stay as long as necessary. You'll find some people -- I heard John Kerry this morning on Good Morning America for example, say his objective is to get the American troops home. We clearly want them home, but that's not the way to state the objective. The objective is to finish the mission, to get the job done, to do it right. (Applause.)

Now, the biggest cost of all, the burden for this situation, prosecuting the war on terror and doing what needs to be done in Afghanistan and Iraq falls first and foremost on the armed services, on the men and women who wear the uniform of the United States military, and on their families. And we all owe them an enormous debt of gratitude for what they've done for all of us. (Applause.)

The --, some have suggested that we need to pursue a different policy. I think, frankly, there are still a lot of folks out there that have not made the transition to the post-9/11 perspective, if you will. They still have what I call a pre-9/11 mind set. They still think it's an option for us to pull back, sort of retreat behind our oceans, that we can live comfortably here at home. We don't have to be engaged out there around the world. We don't have to be prosecuting the war on terror in the far corners of the globe. I think they're wrong. I think that mind set, that attitude is flawed because all it does is postpone the ultimate day of reckoning. The United States of America cannot fail to be engaged in the world. We're the world's leading trading nation, the most powerful nation on Earth. We do business all over the world. Our ideas, our culture, our beliefs, our economic products and services and so forth, we are the dominant power on the face of the Earth today. And you can't allow a bunch of terrorists to force the United States to retreat behind its oceans and sit here and act as though we're safe and maybe they'll hit us last.

The fact is what we're engaged in here is a global conflict. Remember, since 9/11, since they hit New York and Washington, they hit Madrid, and Casablanca, and Mombassa, and Riyadh, and Jakarta, and Istanbul, and Bali, and Baghdad, and Beslan -- most recently -- in Russia, where they killed approximately 350 people one morning, most of them school children. That's the nature of the enemy and the adversary we face. The kinds of people who will go on television and make a tape of themselves beheading an individual and then broadcast it because they want to -- through fear and intimidation -- they want force us to change our policies and withdraw, if you will, from the outside world and retreat, in effect, behind our own boundaries.

That won't work. And as I say, all it will do is increase the ultimate cost of coming to grips with this problem because sooner or later you do have to face it. And it's better for us to face it today and to deal with it today when we've got friends and allies all over the world out there who are willing to work with us on it than it would be to postpone action and to wait.

And the other thing, obviously, that's at stake here is to understand that if we don't take them on over there, we may well end up having to fight with them here in the streets of our own cities, as we did on 9/11. And that's not an acceptable outcome. Ultimately, of course, what is at risk here, what is at stake are the safety and security of our kids and grandkids for generations to come. And the United States can win this battle. There is no doubt in my mind. It's absolutely the right thing to do, and we're on the right course. And that's the course we need to stay on.

Now, when we make a decision on November 2nd, we'll be choosing between that policy and that strategy that I believe is working, that the President laid out for us in the aftermath of 9/11, or we're going to shift gears and pick somebody else as our Commander-in-Chief.

Now, I've looked carefully at John Kerry's record and let me say today, as I've said -- I said it in my speech at the convention in New York a few weeks ago -- that we respect John Kerry's military service, as we do for all of our veterans, appreciate very much his service in Vietnam. Nobody in connection with this campaign has ever challenged his patriotism or his service to the nation. What we challenge is his judgment and what he operated, did, votes he cast, how he functioned for the 20 years he was in the United States Senate, where he had an opportunity time after time to vote on issues that deal directly with national security -- on weapons systems, on strategy, on the commitment of forces, on when the United States ought to be aggressively involved and so forth. And if you look at that record, what it shows is during those years in the Senate, back in the '80s, most of the time, he opposed the major weapons systems and programs that Ronald Reagan recommended and put forth that were instrumental to our being able to succeed in the Cold War. Many of those systems that we're using today he opposed when we were starting up.

In 1991, when Saddam Hussein invaded Kuwait and the question before the Congress was whether or not we would use military force to liberate Kuwait and send Saddam packing, Desert Storm, John Kerry voted no. In the two years that he's been campaigning for President, I think everybody knows he's been all over the lot in terms of whether or not he's for or against what we've been doing in the war on terror. He voted to authorize the use of force, and then later on announced he was an anti-war candidate, and then voted against funding for the troops once we committed them to combat, and then when asked knowing everything he knows now, would he have voted the way he did then, and he said yes. And this morning, Diane Sawyer interviewed him on Good Morning America and asked him the same question, knowing everything you know now, would you have voted that way, and he said, no. (Laughter.) He's changed his mind on many occasion. I think what's required in a President is the

Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Duluth, Minnesota          Page 5 of 10

ability to make a decision, to take a position, and to convey to the American people and to the troops who are the ones who have to put their lives on the line to carry out the policy, and to our adversaries what the position of the United States is. That's exactly what we've got in George Bush, a man who means what he says and says what he means. (Applause.)

I don't see those same qualities in John Kerry. And I think when it comes time to pick a Commander-in-Chief for the next four years, who's going to basically set strategy and a policy that may, in fact, be the key to defending the nation for the next 30 or 40 or 50 years, that we've got a pretty clear choice on November 2nd. In my mind, given my priorities, what I worry about, that is an absolutely crucial part of the decision that we, as Americans, are going to make.

I think it's very, very important that we get it right. I think we will. I feel very good about the state of the race. I tell people that things look good. As Lynne and I travel the country -- we've been in some 48 states now, in this campaign -- and things look very good not only here in Minnesota, but even in Massachusetts. (Laughter and applause.)

There was this news account a few weeks ago, as the Democratic Convention ended in Boston, as the delegates were leaving the hall, they stopped a Boston policeman and asked for directions. And he said, "Leave here and go vote Republican." (Laughter and applause.) True story. (Applause.) So we're eager to have the support of that policeman, as well as Republicans, Democrats and independents from all across America.

But it is an important decision that we get to make. We're enormously privileged to be Americans, to live in the country we do and to have the opportunity and the responsibility to participate in this process. Don't let anybody tell you what a handful of people does doesn't matter -- remember the last election? Five hundred and thirty-seven votes in Florida determined the outcome of who was going to be President of the United States for the next four years. Every hour of volunteer time, every dollar contributed, every vote, everything matters. And it's our privilege to live in a country where we can exercise that responsibility. It's a gift from the generations that have gone before, and it's one we need to exercise and nurture if we're going to make certain that it's in as good of shape for our kids and grandkids as it's been for us.

So with that, let me stop and we'll go to a Q&A session. We've got proctors in the audience with microphones -- you'll note they're the people in the orange shirts.

MRS. CHENEY: Dick, what do those orange shirts remind you of? (Laughter.) I'll say it. (Laughter.) How about John Kerry's suntan? (Laughter and applause.)

THE VICE PRESIDENT: Oh, I may have to disassociate myself from -- (laughter.) We're trying to bring her along -- she's doing good, that was a good line; it was a good line.

But what we'll do, if you've got a question, I'm going to ask just grab the attention of a proctor and I'll call on you and we'll get a chance to do some questions. Yes.

Q Vice President Cheney and Mrs. Cheney, welcome to Duluth, God's country -- a fact, not an opinion. (Laughter.) Mrs. Cheney, what is the status of the women in Afghanistan now?

MRS. CHENEY: Well, as Dick mentioned, and it's just so thrilling to hear those numbers, that 40 percent of the 10 million people registered are women. And, you know, they've done this with great bravery. There was one incident where women were pulled off a bus and killed because they were trying to register to vote.

But the status of women in Afghanistan, what the United States and our allies have done has really transformed their lives. Little girls are going to school now. I mean, for years they weren't. Women under the Taliban were stopped on the street, they were whipped if their ankles were showing; there were accounts of their fingers being amputated if they were wearing nail polish. I mean, it is impossible to imagine the brutality and repression of life under the Taliban. And to see women re-entering their professions -- doctors, teachers, engineers -- to see those little girls going to school, I have to tell you, just makes my heart glad. We've done a very good thing there. (Applause.)

Q Mr. Vice President, the national news media is always concentrating on the less than productive relationships that we have with certain Arab and Muslim nations around the world. Would you comment on the positive relationship that we have with Arab and Muslim nations and just exactly what they're doing to help us fight the war on terror?

THE VICE PRESIDENT: Sure. I guess the way I would describe it is our relationships have improved significantly since 9/11.

Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Duluth, Minnesota   Page 6 of 10

When you look at the reality of what's happening in various places out there, that part of it was the exercise of firm leadership and the demonstration of the President's determination and the ability of the American military to do what we said we were going to do. And then let me give you a couple of examples.

If you think about Libya, for example. We went into Afghanistan and then we went into Iraq, took down those regimes. Moammar Ghadafi had for years invested millions in trying to acquire nuclear weapons capability. He had acquired the centrifuges to enrich uranium. He had the uranium feed stock. And he had a design for a weapon that he had acquired from a black market network that was providing these materials not only to him, but also to North Korea and Iran.

The day that we launched into Iraq, he contacted President Bush and Prime Minister Blair -- he didn't contact Kofi Annan and the United Nations -- and he basically said he wanted to enter into negotiations about ending his program. Then some nine months later -- we went into the negotiations, some nine months later, five days after Saddam was dug out of his hole in Northern Iraq, Colonel Ghadafi went public and said he was going to give up all of his WMD materials. He has. We've rounded all that up. And all that nuclear material that was being developed for weapons now resides under lock and key down at Oak Ridge, in Tennessee.

A classic example of how the behavior of a government in the region saw what the United States did, saw we meant business and fundamentally altered the course of action. And relationships are improving now between the U.S. and Libya.

Other examples. Pakistan, President Musharraf has been one of our key allies in this effort. We have captured and killed hundreds of al Qaeda -- a lot of them in Pakistan. We captured, in Pakistan, Khalid Shaykh Muhammad, the man who was the mastermind of the 9/11 attack. He's now in custody because of the help and cooperation we got from President Musharraf. Musharraf is -- now recognizes that he's on the target list for al Qaeda, too, there have been two or three assassination attempts on him in the last year.

Saudi Arabia, after they got hit in Riyadh, back in May of '03, they've been allies in the past, but they work very closely with us now, a coordinated effort because they, too, are targets for the al Qaeda organization.

So we have made progress. We've got a closer working relationship with many intelligence services and law enforcement agencies in that part of the globe. And many of the nations out there have provided basing, access and so forth for the United States, for our operation. So I would say overall the degree of cooperation we're getting from governments out there has, for the most part, improved over the course of the last three-plus years now, since 9/11.

Q Vice President and Mrs. Cheney, thank you for your service and welcome to Duluth. Being a military father -- I have two sons in the military -- I'd like to hear your comment about how we sustain perhaps four or five -- who knows how many years -- of the kind of pace that we're keeping currently with active duty military, without jeopardizing troop strength. And I'd also like to hear Mrs. Cheney comment -- for the benefit of my wife and the other moms -- what will this administration do to assure that we continue to support the troops that are going to be there for, undoubtedly, some period of time?

THE VICE PRESIDENT: Well, I -- without question, the level of activity has been pretty intense in the last three years, since 9/11. I've spent a fair amount of time with the troops; I've been out into the region and visited with various unites that are there; I've talked with folks back, who've been deployed; I've recently been at Camp Pendleton with Marines; a couple of weeks ago down at Fort Benning, Georgia, with the 3rd Battalion of the Ranger Regiment, the 75th Ranger Regiment, who've been deployed repeatedly over the course of that three year period of time; I meet with National Guard units, I got off the airplane yesterday in -- I guess it was in Minneapolis -- and visited the commanders of the Air Guard wing down there, they've been deployed regularly, too.

So the pace, the ops tempo has been higher than normal, without question. That places an extra burden on us, in terms of making sure that they've got all the support they need, that we take care of their families back here at home, that we provide as much information as quickly as possible about the kinds of demands that are placed on various units -- especially those that are Reserve and Guard units that are called up -- so

that they can plan their own lives and we can work around that.

There's also a major effort underway, especially, for example, in the Army, to restructure the entire Army, to create a lot more deployable force out of the total end strength that we have today. Pete Schoomaker, who is the Army Chief of Staff, has got a superb plan he's working on to take the same end strength and increase, I think it's from 33 brigades up to 48 brigades, to be deployable.

We're also in the midst of a major transformation of our forces worldwide. For example, we've had two heavy divisions deployed in Europe now, since the end of the Cold War. Now we'll be bringing them one and there will be only one brigade left in Europe to replace them. But that means we'll have more of our troops based here at home on a permanent basis; they'll deploy periodically overseas; it'll be a lighter, more mobile force; we'll be able to have more basing arrangements at various places around the world that we have to get into quickly, but it will be a different kind of force structure than we've had previously. We're doing the same thing in Korea, where we're cutting back a brigade there, as well, too.

So I think when you get through this whole period of time you'll see that on the one hand we're doing everything we can to support the troops that are deployed out there now; secondly, to restructure the entire force so we can better sustain these kinds of operations, recognizing that what we have to do in the global war on terror and the way we have to operate is fundamentally different than what we did during the Cold War, when the basic idea was to keep a lot of heavy divisions forward deployed overseas to be able to take on the Soviets, for example, in a conventional armored warfare, the kind of thing that you'd have if there had ever been a major conflict in Europe.

So all of that should help relieve the turmoil, if you will, and the turnover in the force. The Secretary -- also talking about longer assignments, instead of rotating somebody in and out of a unit every two years, that once you signed on for a unit, you'd stay for a longer period of time. That means fewer moves for the family, more consistency and stability over time.

We're very sensitive to the need to maintain the quality of life for the force, because it's an all-volunteer force, everybody who is wearing the uniform today voluntarily put it on. That places a special obligation on all of us to make certain that we manage that process in the best way possible, to take into account their needs, too. A lot of the soldiers today are married, they've got families, they need good schools for their kids, decent health care, housing, and so forth, and we have to tend to all of that at the same time.

I'm confident we can do it. I served as Secretary of Defense for four years, myself. I can't say enough things about the caliber of people we have serving today and about the value of the all-volunteer force, they do a superb job for us. And we're watching very carefully all those indicators to make certain that we do, in fact, do whatever is necessary to maintain that force as strong and as healthy and as vibrant as it is today.

MRS. CHENEY: I'll just add one thing, which is, you know, what Dick and I are doing traveling all across the country is sometimes you wake up in the morning and you feel like, oh, my gosh, this a is pretty exhausting thing we're doing. There is nothing that energizes either of us -- and I think it's probably -- I'm speaking for Dick, but I've done that before. Meeting with the young men and women who are serving, and meeting with military families, there is such strength there, such focus, such conviction, and it does seem to me that one of the things that we can do to repay that is to elect a Commander-in-Chief who has that same focus and strength and conviction, and who understands that the way you honor the men and women who are serving is by completing this mission. (Applause.)

Q Vice President Cheney and Mrs. Cheney, I have been hearing the opposition saying things like, if you're re-elected that we're going to be -- you're going to institute the draft. And I know it isn't true, but I want you to let other people know it, too.

THE VICE PRESIDENT: All right. This is an urban legend. (Laughter.) Or a nasty political rumor, I'm not sure which. Nobody has any intention -- nobody in a position of responsibility -- any intention of trying to reinstitute the draft. It makes no sense at all. As I say, and those of us who have been associated with the military in the past -- and as I say, I had the privilege of serving as Secretary of Defense for four years, from '89 to '93, through Desert Storm and Just Cause in Panama and so forth. The thing you come away from that with is just enormous respect for the caliber of people we have serving today.

The other thing that I would say, in addition to the fact that everybody is there because they want to be there, just affects their quality and caliber of the whole operation. But, also, it has forced the services to be much better than they used to be about how they tend to their people. You know, when you had an arrangement where manpower was basically a free good -- you didn't have to pay for it, you could compel people to serve, you got your monthly quota and put them through basic and trained them up and away we went -- it worked under certain circumstances and during World War II made sense.

But once we went to the all volunteer force after Vietnam, it forced the services to think about: Well, how do I attract good people? How do I retain them? What do I have to pay them? What kind of benefits do we provide? What kind of leadership? Do we give them enough responsibility so that they're willing to sign on and be proud of their service? Do we take care of their families? Is there adequate base housing? All of those things you have to do if you're running a business to be able to attract good people that want to work for you and to have a really first-class organization, the military has to do now. And it's changed -- I can't measure all the ways in which it's changed, the way the Army and the Navy and the Air Force and so forth, think about the kind of organization

they want to be and how they attract their folks.

And it has just -- it's paid enormous dividends. As I say, in all the years that I've been involved, one way or another -- as a member of Congress, SECDEF, the Vice President now -- I have yet to encounter anybody in the uniformed military or in a position of responsibility who thinks we ought to go back to the old days, where we operated based on a draft, instead of an all-volunteer force. It works. It works extraordinary well. It's the best military I think the world has ever seen. And I don't know anybody in their right mind who would want to go back and do that. And the notion that somebody is peddling out there, that there's a secret plan to reinstate the draft -- hogwash, not true. (Applause.)

MODERATOR: Excuse me, Mr. Vice President, we're out of time.

THE VICE PRESIDENT: Well, we do -- we've got time for a couple more questions here -- unless you guys all got to go back to work. (Laughter.) Yes, sir.

Q I just wanted to say to you that slightly chubby, balding hairline just like yours --

THE VICE PRESIDENT: I don't know anybody like that. (Laughter.)

Q (Inaudible.)

THE VICE PRESIDENT: All right.

Q I stand squarely behind you, 100 percent. It seems that perception right now in the political process is more important than reality. The reality that we have right now as a border state, it appears to me that with millions upon millions of illegal aliens in the United States, will it take another 9/11 before the Congress, which really has the power, if you will, will do something about our borders?

THE VICE PRESIDENT: Well, it's -- it is a continuing problem. It's one that Tom Ridge, who is the Secretary now of Homeland Security, spends a lot of time on. We've beefed-up our border patrol capabilities, completely reorganized that part of the government so you've got Customs and Border Patrol, and so forth, now all under one agency. We've hired a lot more people. We've deployed more technology to be able to monitor the borders.

But you've still got a situation both at the border with Canada and the border with Mexico are huge, thousands and thousands of miles; a tradition of good, friendly relations with our neighbors, so these are not hostile borders, by any means, with armed guards on them -- we probably haven't got enough people to put armed guards, you know, every step of the way. So we've got to find ways to work with them to help try to control the flow of people and to regularlize it and have knowledge over who's here, when they come, what they're doing when they're here, and when they leave. It's a problem, too, also, from our ports and air transportation coming in and so forth, but a special problem at the borders.

We're doing better. We're not doing good enough, yet. And it's an area that the President continues to emphasize. He's got good, strong understanding of because of his years as the governor of Texas, and trying to deal with the problem down there, which has been significant. And we just have to keep working at it. But we do need to find ways to make certain we know who's here and what they're doing, and to protect it.

Q We're behind you in that.

THE VICE PRESIDENT: All right. Thank you. (Applause.)

Q I have just a little different opinion on men with hair. (Laughter.) Just teasing you.

My name is Peter Wood, I'm a third generation logger from the Duluth area here, and my family has homesteaded where I live for the last, almost hundred years.

The forest industry is about the second industry in Minnesota. We employ roughly around 60,000 people. What is your own take on the President's healthy initiative on forests?

THE VICE PRESIDENT: Well, we think the Healthy Forest Initiative is very important, especially out our way -- I mean, we're from Wyoming. The problem we've had out there, with respect to wildfires, is that it's been devastating. We've had about a five year drought and we've lost vast stretches of forest. And the policies the President has put in place to allow us to control that, to go in and harvest some of that timber and put it to good use -- and partly as a preventive measure, to make it more easy for us to control and prevent fires in the far West is extraordinarily important. We've had to continue to fight to get it through. We've got environmental groups oftentimes on our case trying to block it, or stop it in various places. But I think it's absolutely the right thing to do. And as I say, my years in Wyoming, I used to serve on the public lands subcommittee and the interior committee for 10 years in the House where we wrestled with these kinds of issues. And I think the Healthy Forest Initiative is a very good, a very positive step forward. (Applause.)

Q (Inaudible.)

THE VICE PRESIDENT: Well, those are tough management decisions that you've got to make, and obviously, in part the federal government gets involved because a lot of those are federal resources. Again, in Wyoming, we've got a slightly different situation because we're a public land state. We came into the union under different circumstances. Half the surface of Wyoming is owned by the federal government. So we get into situations there where we get a real crunch between the federal interest, the fact that to do anything in Wyoming, whether it's resource development or farming and ranching, or recreation, you've got to have access to the public lands. And that immediately sets up a conflict between the various groups involved. So we're continually trying to manage that process. I'm not familiar with the details of the issues you've got around the Boundary Waters Area. I know it's a beautiful area, very important resource. Right now, the battle in Wyoming is over snowmobiles in Yellowstone. And those of us who live in Wyoming -- I've got to be careful how I say this now -- (laughter) -- when you're from a public land state, or a state like Wyoming, we love it. It's a fantastic place to live. And it is in great shape relative to, say, New York or San Francisco, in terms of the natural beauty of the place, but we get a lot of advice from New York and San Francisco about how to do our business. (Laughter and applause.) And for years, we've used snowmobiles in Yellowstone. And I'm sure you got snowmobilers here in northern Minnesota. And it's something we've done. We do it responsibly in the park. When you go in the park, you stay on the road. You don't go off-road at all. But there's been a battle raging now for several years, and the Clinton administration tried basically to shut down all snowmobiles in Yellowstone National Park. That doesn't make any sense at all. Reasonable regulations and requirements and so forth, sensitive to other uses -- so there is this battle, that the only way I know about it is to go into the normal process, the political process, participate and get actively involved, work with your members of Congress, work with the administration.

One of the things we inherited when we came in, in the closing days of the Clinton administration, shortly before he left office, Bill Clinton designated huge areas in the West as roadless, permanently roadless, off-limits. You couldn't do anything with them. Well, we've been through that process now. The courts basically threw that decision out. We've now gone to a situation where what we've said is we want to work with the governors, and the governor of each state can come in with recommendations for how the lands ought to be managed in that state, and we'll try to work with them to put together an intelligence, coherent plan that respects and reflects the views of the people that live there, and who've got to make a living as to how we ought to proceed. So as I say, these are age-old issues for those of us who live in places like Minnesota and Wyoming. I think we're doing a better job now than was true in the past, with respect to managing that. And you're always looking to balance out, if you will, the public interest in protecting and preserving a lot of those areas, as well as the need for folks that live in the area to be able to make a decent living and to use those resources, but use them intelligently and in a wise fashion.

So thank you. You bet. One last question.

Q Mr. Vice President, I think I'm going to have to throw one on the social side. A lot of people, especially the elderly that I've been around, they get really mad because Mr. Bush is going to -- President Bush is going to take away their Social Security. That's one of the issues. The other one --

THE VICE PRESIDENT: It's not an issue. It's not going to happen. (Laughter.)

Q Believe me it is when you're downtown waiting for a bus and they've read about it -- that he's taking away my Social Security. And the Medicare, and Medicaid -- these are things that I hear a lot about in the different groups I belong to, and the education -- like my daughter moving from one school to the other because they brought in -- everybody has to be educated, so we'll take them from a bad school and put them in a good school. And the good school turns bad because of the students. There's no doubt about it. These are social factors the average mom and dad coming home, and maybe they've got two hours before everybody has to get to bed, and at least my grandson knows the President is Mr. Bush. And the thing of it is, this is the argument -- what is the President going to do for me?

THE VICE PRESIDENT: Well, let me give you a quick response to a couple of those. Social Security -- the Social Security

program is safe. We have no intention on taking away anybody's Social Security benefits. Don't let anybody tell you otherwise. For those who are currently in the program, receiving benefits, the program is secure. For those who are about to retire, getting close to retirement age, they're going to be fine.

The problem we're going to have in Social Security is down the road 30 years or so, and today's younger worker in their 20s and 30s can look at it and legitimately say, well, is there going to be anything there when I'm ready to retire? And there are going to be long-term problems with the program if we don't find ways to keep it solvent and make it solvent. One of the things the President has talked about, I think and this applies to the younger generation. It would not apply to anybody who is already receiving benefits, or expecting soon to receive benefits, but it would a program that would allow the younger worker voluntarily -- they don't have to, but that they could take part of their payroll tax and invest it in a personal retirement account, earn a higher rate of return and be able to have greater confidence when they reached retirement age that they would, in fact, have the cushion they need for their retirement when that time comes. It's a concept. It's an idea. There are a lot of ideas floating around about exactly how you would do it. But those are some of the things we're looking at. But anybody -- tell anybody, any of your friends today, their Social Security check is going to continue to arrive just like clockwork. And I don't know anybody who isn't committed to that course of action.

With respect to Medicare, the President did something I think is very important -- it's the most important change in Medicare in my lifetime since the program was set up back in the '60s. This year, when we passed legislation -- this past year, he signed it last December, I guess, when we passed legislation to provide prescription drug benefits to Medicare recipients -- 40 million Americans. And the Medicare program, of course, when it was set up -- part B of the program would provide hospitalization coverage, but in effect, the way it was working was you could get -- if you were enrolled in Medicare, you could get covered for a heart bypass operation, but you couldn't get covered for the prescription drug that might keep you from needing a bypass operation because it didn't cover prescription drugs. And in the 40 years, or 50 years since -- 40 years, I guess, since Medicare was set up, medicine had changed a great deal, and a whole lot more is available now, possible now through prescription drugs. They're a much more important part of our continuing care for everybody, and so the President wanted to change that.

His opposition -- the Democrats, frankly, campaigned year after year after year on the basis that they were going to do this, and they never did. George Bush got elected, and we did it. We got it done. It's now the law of the land. (Applause.)

So there -- we have I think moved in the right direction with respect to Medicare. I think that's a major plus. A lot more work to do in the whole health care area. It's one of the single most important issues that we face. It affects everybody. It affects businesses, the cost of doing business, the care and quality of life of everybody. We've got a lot of folks out there that are not insured still at this point -- a lot of them working for small businesses. So the President has got a plan to address a lot of these issues. We've already started and it will be priority for us clearly in a second term.

Let me stop at that point. I've gone on long enough, and I've gone over my limit according to Joanne. So I'll simply want to thank you again for being here today. As I say, it's a enormous privilege for all of us to be able to participate in the presidential selection process. Lynne and I feel uniquely blessed to get to campaign all across this country and meet so many tremendous people in fantastic communities, and great companies, and organizations doing great work. And you really do come away from this experience just with this enormous enthusiasm and excitement and emotional feeling about the greatness of America. So we're proud to be here today. We hope all of you will take advantage of our citizenship, participate on November 2nd. And we hope you remember us.

Thank you very much. (Applause.)

END 11:53 A.M. CDT

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2004/09/20040929-7.html

CLICK HERE TO PRINT

2002 WL 22193 (D.O.I.)

Department of the Interior (D.O.I.)
Office of the Secretary

(NEWS RELEASE)

**\*1** SECRETARY NORTON APPOINTS PAUL HOFFMAN AS DEPUTY ASSISTANT SECRETARY FOR FISH
AND WILDLIFE AND PARKS

January 4, 2002

**(WASHINGTON)** - Interior Secretary Gale Norton today appointed Paul Hoffman, a life-
long outdoorsman, a skilled consensus-builder and the executive director of the
Cody Country Chamber of Commerce in Cody, Wyoming, to be deputy assistant secretary
of the Interior for fish and wildlife and parks. In this position, Hoffman will
help oversee two Interior agencies, the U.S. Fish and Wildlife Service and the
National Park Service

"Paul Hoffman has a long and impressive record as a Wyoming community leader and
conservationist," Norton said. "He is an avid outdoorsman who has worked to improve
the conservation and the recreational benefits of parks and other natural areas in
Wyoming."

Hoffman joined the Cody Country Chamber of Commerce in 1990 after working as state
director for then-U.S. Representative Dick Cheney from 1985 to 1989. During that
time, he helped initiate the bipartisan effort to designate Clarks Fork of the
Yellowstone River as Wyoming's first wild and scenic river.

In 1984, Hoffman co-founded the Park County Resouce Council, now known as the
Northwest Wyoming Resouce Council, a grassroots group dedicated to protecting the
environment of Northwest Wyoming, including Yellowstone National Park.

Hoffman lives in Cody with his wife, Lisa Ann, a daughter, Desiree, and a son,
Fritz. He recieved a bachelor degree in economics and biology at the University of
California at San Diego, Revelle College. He is an avid hunter, angler, horseman
and skier.

Craig Manson, a California Superior Court judge and former general counsel of the
California Department of Fish and Game, has been nominated to be assistant
secretary of fish and wildlife and parks and is awaiting Senate confirmation.
Hoffman will not require Senate confirmation.

CONTACT: Mark Pfeifle
202-208-6416

2002 WL 22193 (D.O.I.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. Prt. 100–31

# 1987–1988

## OFFICIAL

# Congressional Directory

## 100th Congress

Convened January 6, 1987

Closing date for compiling Directory material, April 15, 1987

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON



| Name, Home and Office Addresses, and Staff | Office Building | |
|---|---|---|
| | Room | Phone |

\*CHANDLER—Continued
  1025 South 320th, No. 101, Federal Way, WA 98003 ............................ (206) 941–2875
    Caseworker.—Randy J. Pepple
\*CHAPMAN, JIM (1st), Sulphur Springs, TX 75482 ................................ (206) 593–6371
    429 CHOB    5–3035
    Administrative Assistant.—William K. Moore
    Correspondence Manager.—Roxanne Smith
    Legislative Assistants: James R. Campbell; Richard Taylor; Karen
      Troutman
    Office Manager.—Dorothy F. Council
    Personal Secretary.—Mary Flowers
    Press Secretary.—Brian Detter
  Post Office Box 538, Sulphur Springs, TX 75482 .................................. (214) 885–8682
    District Administrator.—Don Howard
    District Director.—Nancy Rooks
    Special Assistants: Danita Graves; Delores Poskey; Joan Snow
  U.S. Federal Building, G-15, 100 East Houston, Marshall, TX 75671 ..... (214) 938–8386
    Special Assistants: Leta Kay; Robert McCain; Teddie McClendon
  210 U.S. Post Office and Federal Building, Paris, TX 75460 ................... (214) 785–0723
    Special Assistant.—Mary Leonard
  401 U.S. Post Office and Federal Building, Texarkana, TX 75504 .......... (214) 793–6728
    Special Assistant.—Nell King
\*CHAPPELL, BILL (4th), Ormond Beach, FL 32074 ............................ 2468 RHOB    5–4035
    Administrative Assistant.—Shephard W. Hill (5–8200)
    Associate Staff: Otto R. Berton; William P. Goehring (5–8200)
    Legislative Assistants: Kelly Fitzgerald; Charles F. Knapp; Michael
      K. May (5–8200)
    Legislative Director.—Robert F. DuPree, Jr. (5–8200)
    Personal Secretary.—Leslie L. Schindel
    Press Assistant.—Henry H. Hicks (5–1727)
    Receptionist.—Acquenetta J. Wilson
    Special Projects.—John H. Allen
  575 North Halifax Avenue, Daytona Beach, FL 32018 .......................... (904) 253–7632
    Field Representative.—David L. Davis
    District Director.—Georgia Russell Flynn
    Caseworkers: Rosemary B. Kinsey; Joan Bohan Roberson
  Suite 4, 8789 San Jose Boulevard, Jacksonville, FL 32217 .................... (904) 731–4236
    Caseworkers: Joyce M. Campbell; Evelyn W. Scott
    District Director.—Jo Ellen Fraser
\*CHENEY, DICK (At L.), Casper, WY 82601 ...................................... 104 CHOB    5–2311
    Administrative Assistant/Legislative Director.—Patricia J. Howe
    Correspondence Manager.—Cecelia A. Hall
    Executive Assistant.—Kathleen Embody
    Legislative Assistants: Susan L. Benzer; James E. Steen
    Press Secretary/Legislative Assistant.—Pete Williams
    Receptionist.—Teddi A. Norman
    Secretary.—Averill Holtz
  Federal Office Building, Casper, WY 82601 ........................................ (307) 261–5413
    Office Manager.—Carol Leffler
    State Staff Director.—Paul Hoffman
  Federal Office Building, Cheyenne, WY 82001 ................................... (307) 772–2451
    Office Manager.—Ruthann Norris
  P.O. Box 1357, Green River, WY 82935 .............................................. (307) 875–6969
    Field Representative.—Anthony Padilla
\*CLARKE, JAMES McCLURE (11th), Fairview, NC 28730 ................... 217 CHOB    5–6401
    Administrative Assistant.—Terrell T. Garren
    Assistant Administrative Assistant/Press Secretary.—Dennis B.
      Clark
    Computer Operator/Press Assistant.—Robin D. Cochran
    Executive Assistant.—Ann N. Owens

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

FEB 2 6 2008

Stephan Harris, Clerk
Cheyenne

Harriet M. Hageman (Wyo Bar No. 5-2656)
Hageman & Brighton, PC
222 E. 21st St.
Cheyenne, WY 82001
Telephone: (307) 635-4888
Facsimile: (307) 635-7581
hhageman@hblawoffice.com

William P. Horn (*pro hac vice* application pending)
David E. Lampp (*pro hac vice* application pending)
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave. NW, Suite 1200
Washington, DC 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
whorn@dc.bhb.com; dlampp@dc.bhb.com

*Attorneys for Petitioner-Intervenors International Snowmobile Manufacturer's Association, American Council of Snowmobile Associations, BlueRibbon Coaltion, Inc., and Teri Manning*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, )<br><br>Petitioner, )<br><br>and )<br><br>THE INTERNATIONAL SNOWMOBILE )<br>   MANUFACTURER'S )<br>   ASSOCIATION, INC., et al. )<br><br>Petitioner Intervenor-Applicants, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF )<br>   THE INTERIOR, et al., )<br><br>Respondents. )<br>_____ ) | Case No. 2:07-cv-00319-CAB<br><br>PETITION FOR REVIEW<br>OF FINAL AGENCY ACTION |

Petitioner Intervenors The International Snowmobile Manufacturer's Association, the American Council of Snowmobile Associations, BlueRibbon Coalition, Inc., and Teri Manning, by and through counsel, hereby petition this Court for review of final agency action by Respondents United States Department of the Interior ("DOI"), the National Park Service ("NPS"), Secretary of the Interior Dirk Kempthorne, NPS Director Mary Bomar, and NPS Intermountain Region Director Michael Snyder (collectively "Respondents" or "Federal Respondents"). Petitioner Intervenors intervene on the side of the State of Wyoming, which filed its Petition for Review on December 13, 2007. The final agency action for which the Petitioner Intervenors seek review consists of the Federal Respondents' promulgation of a final rule regarding winter use of Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Highway (collectively, the "Parks"). See 72 Fed. Reg. 70781 et seq. (the "2007 Final Rule"). The 2007 Final Rule is arbitrary and capricious, contrary to law, and exceeds the NPS's statutory authority to the extent that it limits snowmobile entries into Yellowstone National Park to 540 vehicles per day, reduced from the previous limit of 720 vehicles per day, and requires all recreational snowmobiles entering Yellowstone National Park to be accompanied by a commercial guide.

### Parties, Jurisdiction, and Venue

1.     The International Snowmobile Manufacturers' Association ("ISMA"), based in Michigan, is an organization of snowmobile manufacturers dedicated to, *inter alia*, promoting snowmobiling and snowmobile-friendly policies, preparing and disseminating information regarding snowmobiling opportunities, and fostering growth in the sport of snowmobiling.

2

ISMA members manufacture many of the snowmobiles and snowmobile parts that are used throughout the National Park System, including in Yellowstone National Park, Grand Teton National Park, and the Rockefeller Parkway. ISMA previously challenged, as a Petitioner in this Court, the NPS's promulgation of a 2001 winter use plan prohibiting all recreational snowmobiling in Yellowstone National Park. See Int'l Snowmobile Mfrs. Ass'n. v. Norton, 304 F. Supp. 2d 1278 (D. Wyo. 2004). In addition, ISMA was previously a Defendant Intervenor on the side of the NPS in a case in the U.S. District Court for the District of Columbia brought to challenge the NPS's 2004 temporary winter use plan regulating snowmobile usage in Yellowstone National Park. See Fund for Animals v. Norton, Civ. No. 04-1913 (EGS), 512 F. Supp. 2d 49 (D.D.C. 2007).

2.      The American Council of Snowmobile Associations ("ACSA"), based in Michigan, is an organization made up of snowmobilers and snowmobiling-related businesses and associations dedicated to providing a strong national voice to promote the interests of the snowmobiling community and the millions of snowmobilers throughout the United States. Among other things, ACSA promotes snowmobile access to public lands across the United States, including the Parks.

3.      The BlueRibbon Coalition, Inc. ("BRC"), based in Idaho, is an Idaho non-profit organization representing over 1,000 businesses and organizations with approximately 600,000 members nationwide. BRC is dedicated to promoting public access to federal lands like those at issue in this case for both motorized and non-motorized use, including for snowmobiling in the Parks. BRC has participated in past litigation and rulemaking proceedings in connection with its

mission of preserving motorized and non-motorized access to public lands for recreational

purposes. BRC previously challenged, as a Petitioner in this Court, the NPS's promulgation of a

2001 winter use plan prohibiting all recreational snowmobiling in Yellowstone National Park.

See Int'l Snowmobile Mfrs. Ass'n. v. Norton, 304 F. Supp. 2d 1278 (D. Wyo. 2004). In

addition, BRC was previously a Defendant Intervenor on the side of the NPS in a case in the

U.S. District Court for the District of Columbia brought to challenge the NPS's 2004 temporary

winter use plan regulating snowmobile usage in Yellowstone National Park. See Fund for

Animals v. Norton, Civ. No. 04-1913 (EGS), 512 F. Supp. 2d 49 (D.D.C. 2007).

4.     Teri Manning is an individual residing in Wyoming who has, for many years,

enjoyed snowmobiling in the Parks. Ms. Manning is a past president of the Wyoming State

Snowmobile Association and ACSA, and in those capacities has dedicated significant amounts

of time and effort to protecting and promoting the interests of snowmobilers, including access to

public lands specifically including the Parks at issue here.

5.     This action arises under the Administrative Procedure Act, codified 5 U.S.C. §§

551 et seq. ("APA"), the Yellowstone National Park Act, codified at 16 U.S.C. §§ 21 et seq., and

the National Park Service Organic Act, codified at 16 U.S.C. §§ 1 et seq.

6.     This Court has jurisdiction over Petitioner Intervenors' claims under 5 U.S.C. §§

701-706, 28 U.S.C. § 1331, and Local Civil Rule 83.7.2.

7.     Venue is proper in this Court under 28 U.S.C. § 1391(e). Respondents are all

federal agencies or federal officers acting in their official capacities, and a substantial part of the

events and omissions giving rise to the 2007 Final Rule, State Petitioners' challenge, and

4

Petitioner Intervenors' challenge occurred in this judicial district. In addition, State Petitioner resides in this judicial district for purposes of this litigation.

**Challenged Action**

8.      During the winter use seasons of 2004-2005, 2005-2006, and 2006-2007, recreational snowmobile use in the Parks was governed by an NPS Interim Rule that provided, *inter alia,* for 720 snowmobiles per day to enter Yellowstone National Park. See 69 Fed. Reg. 65348, 65349 (Nov. 10, 2004).

9.      The NPS Interim Rule also required all snowmobiles entering Yellowstone National Park for recreational purposes to be accompanied by a commercial guide. See id.

10.     On May 16, 2007, the NPS published a proposed permanent rule regarding winter use for the Parks. See 72 Fed. Reg. 27500 et seq. The proposed rule, like the Interim Rule previously in place, included a limit of 720 snowmobiles per day in Yellowstone National Park (aside from at Cave Falls, which, as an isolated area where snowmobile use is incidental to snowmobile use outside the Park, has its own independent daily limit). Id. at 27505. The proposed rule, like the Interim Rule, also required all recreational snowmobiles entering Yellowstone National Park to be accompanied by a commercial guide.

11.     The NPS published its 2007 Final Rule on a permanent winter use plan for the Parks in on December 13, 2007. See 72 Fed. Reg. 70781 et seq. The 2007 Final Rule includes a limit of 540 snowmobiles per day in Yellowstone National Park (aside from Cave Falls). See id. at 70798. The 2007 Final Rules also includes a requirement that all recreational snowmobiles entering Yellowstone National Park be accompanied by a commercial guide.

12.     The 2007 Final Rule was preceded by a draft environmental impact statement on

April 2, 2007, see 72 Fed. Reg. 15720 et seq. (Apr. 2, 2007), and a final environmental impact

statement ("FEIS") issued on September 25, 2007.  See 72 Fed. Reg. 54456 (Sept. 25, 2007).

13.     The NPS's limit in its 2007 Final Rule of 540 snowmobiles per day is arbitrary

and capricious and contrary to law and exceeds the NPS's statutory authorization.

### Petioner Intervenors' Claims

14.     The NPS's promulgation of the 2007 Final Rule is final agency action subject to

review in this Court.  See 5 U.S.C. § 704; Olenhouse v. Commodity Credit Corp., 42 F.3d 1560,

1580 (10th Cir. 1994); Int'l Snowmobile, 304 F. Supp. 2d at 1290 (2001 winter use rules

constituted "final agency action" for purposes of judicial review).

15.     The NPS's reduction in snowmobile entries into Yellowstone National Park from

720 to 540 snowmobiles per day and its requirement that all snowmobiles entering the Park for

recreational purposes be accompanied by commercial guides are not supported by the record, are

arbitrary and capricious and not in accordance with law in violation of the APA, and exceed the

NPS's statutory authority under the National Park Service Organic Act and the Yellowstone

National Park Act.

16.     The NPS acted arbitrarily and capriciously, in violation of the APA, 5 U.S.C. §

706(2)(A), by decreasing the daily snowmobile limit from 720 vehicles (the interim rule limit in

place for three winter use seasons, the preferred alternative in the draft EIS, and the proposed

limit in the May 2007 proposed rule) to 540 vehicles (the "revised preferred alternative" in the

final EIS and the limit in the 2007 Final Rule).  The decrease in snowmobile access is not

supported by the record and the NPS has failed to provide a "reasoned analysis" for that decision. <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 42 (1983).

17.    The NPS acted arbitrarily and capriciously, in violation of the APA, 5 U.S.C. § 706(2)(A), by requiring all recreational snowmobiles entering Yellowstone National Park to be accompanied by a commercial guide. This requirement is not supported by the record and the NPS has failed to provide a "reasoned analysis" for that decision. <u>Motor Vehicle</u>, 463 U.S. at 42.

18.    The NPS exceeded its statutory authority under the Yellowstone National Park Act, codified at 16 U.S.C. §§ 21 <u>et seq.</u>, and the National Park Service Organic Act, codified at 16 U.S.C. §§ 1 <u>et seq.</u> Because the daily snowmobile limit in the 2007 Final Rule violates these provisions of federal law, it is also contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(c).

19.    Accordingly, Petitioner Intervenors ask the Court to:

    a.    Set aside that portion of the 2007 Final Rule imposing a 540-snowmobile limit on daily snowmobile entries into Yellowstone National Park; and

    b.    Order that Federal Respondents impose a daily snowmobile limit that is not arbitrary and capricious, that is supported by the record, and that complies with federal law; and

    c.    Order that the previous 720-snowmobile limit remain in effect until such time as Federal Respondents promulgate a limit that complies in all respects with their legal obligations; and

    d.    Grant Petitioner Intervenors such further and additional relief as the Court may

deem proper.

Submitted this 26th day of February, 2008.

HAGEMAN & BRIGHTON, P.C.

Respectfully submitted,

Harriet M. Hageman (Wyo. Bar No. 5-2656)
HAGEMAN & BRIGHTON, PC
222 E. 21st St.
Cheyenne, WY 82001
Telephone: (307) 635-4888
Facsimile: (307) 635-7581
hhageman@hblawoffice.com

William P. Horn (pro hac vice application pending)
David E. Lampp (pro hac vice application pending)
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave. NW, Suite 1200
Washington, DC 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
whorn@dc.bhb.com; dlampp@dc.bhb.com

*Attorneys for Applicant Defendant Intervenors*
*International Snowmobile Manufacturers*
*Association, American Council of Snowmobile*
*Associations, Blue Ribbon Coalition, and Teri*
*Manning*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of February, 2008, I filed the foregoing Petition electronically through the CM/ECF system, which caused the following counsel to be served by electronic means. I further certify that I caused correct copies of the foregoing to be served by placing the same in the U.S. first class mail, postage prepaid, addressed as follows:

Bruce Salzburg, Attorney General
Jay Jerde, Deputy Attorney General
Teresa Nelson, Assistant Attorney General
123 Capitol Building
Cheyenne, WY 82002

Barry A. Weiner
Luther L. Hajek
Guillermo Montero
U.S. Department of Justice
Environmental & Natural Resources Division
601 D Street, NW, Room 3528
P.O. Box 663
Washington, DC 20044-0663

Nicholas Vassallo
U.S. Attorney's Office
P.O. Box 668
Cheyenne, WY 82003-0668