IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GREATER YELLOWSTONE COALITION, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 07-cv-2111 (EGS) |
| v. | ) ) | [Hearing on Motions for Summary |
| DIRK KEMPTHORNE, et al., | ) ) | Judgment on August 27, 2008] |
| Defendants. | ) ) ) | |

|  |  |  |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 07-cv-2112 (EGS) |
| v. | ) ) | [Hearing on Motions for Summary |
| UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK SERVICE | ) ) ) | Judgment on August 27, 2008] |
| Defendants. | ) ) | |

**FEDERAL DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO GREATER YELLOWSTONE COALITION'S MOTION FOR
<u>SUMMARY JUDGMENT, RE CASE NO. 07-CV-2111 (EGS)</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   The Organic Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.   The Winter Use Rule Complies with the Conservation Mandate . . . . . . . . . . . . 1

     B.   The Winter Use Rule Is Consistent with the Management Policies
          Section 1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     C.   The Winter Use Rule Will Not Result in Impairment . . . . . . . . . . . . . . . . . . . . 6

II.  The Executive Orders and NPS's Snowmobile Regulation . . . . . . . . . . . . . . . . . . . 7

III. NPS Has Fully Explained Its "Departure" from the 2001 Snowcoach Rule . . . . . . . . 10

IV.  NPS's Analysis of Impacts Under the Applicable Substantive Standards in the FEIS . 14

     A.   Comparison to Historical Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     B.   Noise Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     C.   Air Quality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     D.   Wildlife Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          1.   NPS Considered the Findings of Wildlife Scientists . . . . . . . . . . . . . . 21

          2.   NPS Did Not Disregard Impacts to Individual Animals . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## INTRODUCTION

Federal Defendants hereby reply to plaintiff Greater Yellowstone Coalition's ("GYC") Opposition to the Government's Cross-Motion for Summary Judgment ("GYC Opp.") (Docket No. 59). In its Opposition, GYC relies on a distorted view of the Organic Act, National Park Service ("NPS") regulations, and the Yellowstone Enabling Act to argue that any use of the national parks that causes any adverse impacts on the parks is prohibited. This is simply not the relevant standard. GYC also erroneously asserts in a number of places that the Winter Use Rule will permit "double" the amount of snowmobiles when compared to the current level, when in fact the number of snowmobiles permitted will be 25 percent lower. GYC's arguments regarding NPS's impact determinations with respect to soundscapes, air quality, and wildlife, inaccurately characterize NPS's analysis and are without basis. GYC fails to show that NPS's analysis or its conclusions were arbitrary or capricious.

## ARGUMENT

### I.    The Organic Act

GYC argues that the Winter Use Rule violates the Organic Act's conservation mandate and that NPS has not provided a reasoned basis for its decision. These arguments are without merit.

### A.    The Winter Use Rule Complies with the Conservation Mandate

GYC argues that, instead of using the conservation mandate standard established by NPS, this Court should hold NPS and the Winter Use Rule to a "least deleterious effect" standard. This is not the way the Organic Act's conservation mandate has been interpreted by NPS in its Management Policies and is based on an erroneous interpretation of D.C. Circuit law.

As a legal matter, it is irrelevant how GYC chooses to interpret the standards of the Organic Act. Congress delegated to NPS the authority to interpret the statute. 16 U.S.C. §§ 1, 3. NPS has interpreted the Organic Act's conservation mandate in the Management Policies § 1.4:

> The fundamental purpose of the national park system, established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve park resources and values. This mandate is independent of the separate

1

> prohibitions on impairment and applies all the time with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired. NPS managers must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values. However, the laws do give the Service the management discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of the park, so long as the impact does not constitute impairment of the affected resources and values. . . .

Mgmt. Pol. § 1.4.3.[1]  This interpretation of the conservation mandate, which recognizes the tension between avoiding adverse impacts while also fulfilling the purposes of the park, is entitled to substantial deference.  Davis v. Latschar, 202 F.3d 359, 364-65 (D.C. Cir. 2000) ("Because the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate.").

Choosing, for the moment, to ignore NPS's interpretation of the conservation mandate, GYC argues that the conservation mandate required that NPS choose a course of action that caused "the least deleterious effect on the environment."  GYC Opp. at 3 (quoting Daingerfield Island Protective Soc'y v. Babbit, 40 F.3d 442, 446 (D.C. Cir. 1995).  However, the language cited by GYC does not represent the court's interpretation of the conservation mandate.  The court merely explained that the approval of an interchange design that would have the "least deleterious effect on the environment" was not an abuse of NPS's "broad statutory discretion."  40 F.3d at 446.  Daingerfield also does not establish a standard whereby NPS must always choose an action that is "best calculated to protect Park resources."  GYC Opp. at 3 (quoting 40 F.3d at 446).  Rather, the Court merely reaffirmed NPS's "broad discretion" to interpret the provisions of the Organic Act.  This

---

[1]     The Management Policies provide guidance to park managers on the relevant legal authorities that govern decisions relating to management of park units.  While not all of the provisions of the Management Policies constitute interpretations of specific legal requirements embodied in a statute or regulation, Section 1.4 contains NPS's interpretation of the NPS Organic Act of 1916 and the NPS General Authorities Act of 1970.  See Mgmt. Pol. § 1.4.1 ("This section 1.4 of *Management Policies* represents the agency's interpretation of these key statutory provisions," referring to the Organic Act and the General Authorities Act.).

broad discretion was later affirmed in <u>Davis</u>, which GYC ignores.  Accordingly, GYC's argument

that <u>Daingerfield</u> established a "least deleterious" standards is without merit.[2]

Contrary to GYC's attempt to hold NPS to a "least deleterious" standard, the relevant

statutes grant the NPS broad discretion to balance the protection of park resources and values against

their use and enjoyment.  <u>See</u>, <u>e.g.</u>, <u>Sierra Club v. Babbitt</u>, 69 F. Supp. 2d 1202 (E.D. Cal. 1999)

("Section 1 [of the Organic Act] recognizes, both implicitly and explicitly the tension between

conservation and providing for public enjoyment.  Courts have consistently recognized the

discretion that the Organic Act accords NPS."); <u>Terbush v. United States</u>, 516 F.3d 1125, 1130 (9th

Cir. 2008) ("Much of the NPS's work is 'grounded' in the Organic Act's broad mandate to balance

conservation and access."); <u>Bicycle Trails Council of Marin v. Babbitt</u>, 82 F.3d 1445, 1454 (9th Cir.

1996) ("Courts have noted that the Organic Act is silent as to the specifics of park management and

that under such circumstances, the Park Service has broad discretion in determining which avenues

best achieve the Organic Act's mandate") (internal quotation marks omitted); <u>Miccosukee Tribe v.</u>

<u>United States</u>, 980 F. Supp. 448, 462 (S.D. Fla. 1997) ("The Interior Department has broad

discretion in determining how best to . . . weigh competing uses of federal property, and allocate

park resources"), <u>aff'd</u>, 163 F.3d 1359 (11th Cir. 1998), <u>cert. denied</u>, 528 U.S. 810 (1999);

<u>Organized Fishermen of Fla. v. Hodel</u>, 775 F.2d 1544, 1550 (11th Cir. 1985) ("The task of weighing

the competing uses of federal property has been delegated by Congress to the Secretary of Interior"),

<u>cert. denied</u>, 476 U.S. 1169 (1986); <u>S. Utah Wilderness Alliance v. Dabney</u>, 222 F.3d 819, 826 (10th

Cir. 2000) (reading the Organic Act "as permitting the NPS to balance the sometimes conflicting

---

[2]     GYC's reliance on <u>Sierra Club v. Andrus</u>, <u>see</u> GYC Opp. at 4 is similarly unavailing.  In
<u>Andrus</u>, the plaintiffs argued that the Organic Act imposed a mandatory duty on NPS to join in,
and assert federal reserved water right claims in, an ongoing general stream adjudication in state
court in order to protect water-dependent resources of several national parks.  487 F. Supp. 443,
445-46 (D.D.C. 1980), <u>aff'd sub nom</u>, <u>Sierra Club v. Watt</u>, 659 F.2d 203 (D.C. Cir. 1981).  The
court, however, rejected the plaintiffs' contention, and in doing so, expressly confirmed that the
Organic Act vests the Park Service with broad discretion on how best to protect park resources.
<u>Id.</u> at 448 ("The Court concludes that the [federal] defendants have broad discretion in
determining what actions are best calculated to protect Park resources . . . .").

policies of resource conservation and visitor enjoyment in determining what activities should be permitted or prohibited").[3/]  Accordingly, GYC's interpretation of the Organic Act's conservation mandate – as restricting NPS's discretion by allowing only the "least deleterious" means of providing for the enjoyment of the Park – finds no support in the case law and must be rejected.

**B.      The Winter Use Rule Is Consistent with the Management Policies Section 1.4.3**

GYC next argues that NPS has not complied with its own interpretation of the conservation mandate as set forth in the management policies.  GYC Opp. at 15-17.  NPS's interpretation of the Management Policies, however, is entitled to substantial deference and cannot be overturned unless it is "'plainly erroneous or inconsistent' with the terms of the policies."  Davis, 202 F.3d at 367. GYC has failed to demonstrate that NPS's interpretation of the Management Policies in promulgating the Winter Use Rule is plainly erroneous or inconsistent with the policies.

Selectively quoting from section 1.4.3, which is quoted more fully above, GYC argues that "NPS is absolutely charged with preserving the natural wonders of the Parks."  GYC Opp. at 15. Focusing on the language which requires that NPS managers "seek to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values," GYC argues that *any* adverse impacts are always to be avoided.  GYC at 15-16 (emphasis added).  However, the portion quoted by GYC is only one part of section 1.4.3.  Section 1.4.3 also explains that the Organic Act "*give[s] [NPS] management discretion to allow impacts to park resources and values* when necessary and appropriate to fulfill" the purposes of the parks, one of which is to "provid[e] for the

---

[3/]      Applying its erroneous conservation mandate standard, GYC argues that the Winter Use Rule violates that mandate because, GYC contends, NPS's temporary adaptive management standards for soundscapes were exceeded in the past few winters, federal standards for formaldehyde and benzene have been exceeded, NPS did not follow the recommendations of NPS scientists regarding harm to wildlife, and the emission of pollutants will dramatically increase.  GYC Opp. at 4-5.  Each of these arguments has been rebutted, see Fed. Def. Br. at 14-15 (soundscape adaptive management thresholds), 15 n.5 (benzene and formaldehyde), 32 (air quality) 39-40 (wildlife), and will be addressed further in Section IV, below.  GYC's argument that a rule permitting only snowcoaches *would* comply with the conservation mandate, GYC Opp. at 5-6, is discussed in Section III, below.

enjoyment of park resources and values by the people of the United States." Mgmt. Pol. § 1.4.3

(emphasis added). Further, Section 1.4.7.1 states that "[v]irtually every form of human activity that

takes place within a park has some degree of effect on park resources or values, but that does not

mean the impact is unacceptable or that a particular use must be disallowed." Mgmt. Pol. § 1.4.7.1.

Thus, a full reading of Section 1.4 does not support NPCA's absolutist interpretation of the

conservation mandate as one that requires the preservation of park resources in their natural state.

Having found that snowmobile use, when appropriately regulated, is an appropriate means of

providing for the enjoyment of park resources and values,[4] the NPS has devised a Winter Use Plan

that minimizes corresponding impacts to the greatest extent practicable. Neither the conservation

mandate nor its interpretation in Section 1.4.3 of the Management Policies requires anything more.[5]

Finally, GYC argues that NPS's interpretation of Mgmt. Pol. § 1.4.3 as permitting impacts

which do not cause unacceptable impacts is plainly erroneous because this interpretation would

relegate the conservation mandate to a secondary status. GYC Opp. at 17-19; see Fed. Def. Br. at

11-12. There is no basis for this assertion. As section 1.4.3 makes clear, "[t]he fundamental purpose

of all parks . . . includes providing for the enjoyment of park resources and values by the people of

the United States." Mgmt. Pol. § 1.4.3. For each proposed use of the parks, NPS must determine

whether it would cause unacceptable impacts and therefore be impermissible using the criteria set

_____

[4]     See Bicycle Trails Council of Marin, 82 F.3d at 1454 ("[T]he Park Service is empowered
with the authority to determine what uses of park resources are proper and what proportion of the
park's resources are available for each use."); National Wildlife Fed'n v. National Park Service,
669 F. Supp. 384, 390 (D. Wyo. 1987) (citations omitted) ("[T]he Park Service is empowered
with the authority to determine what uses of park resources are proper and what proportion of the
park's resources are available for each use."); Eiseman v. Andrus, 433 F. Supp. 1103, 1106 (D.C.
Ariz. 1977) (same).

[5]     As it did in its opening brief, GYC also cites Mgmt. Pol. §§ 4.7.1, 4.9, 8.2.3. GYC Opp.
at 16. As a legal matter, however, private parties cannot claim that NPS's Management policies
themselves contain enforceable rights or duties. Wilderness Soc'y v. Norton, 434 F.3d 584, 596-
97 (D.C. Cir. 2006). We have demonstrated that, unlike Mgmt. Pol. § 1.4, these sections do not
contain an interpretation of the Organic Act which may be enforced against NPS. See Fed. Def.
Br. at 14 & n.3.

forth in the Management Policies.  Mgmt. Pol. §§ 1.4.3, 1.4.7.1.  In authorizing such uses, NPS also

must "seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park

resources and values."  Mgmt. Pol. § 1.4.3.  Consistent with these Policies, NPS has determined that

the snowmobile use, as restricted by the conditions in the Winter Use Rule, is an appropriate use of

the park resources, and NPS has adopted measures that minimize impacts to the greatest extent

practicable.[6]  Furthermore, NPS has committed to an adaptive management program so that impacts

from winter use are constantly monitored, and use will be altered if unacceptable impacts result.  AR

126499 at 5-6, 34, 39-50.  NPS has determined that these actions fully comply with the Organic

Act's conservation mandate as described in Section 1.4 of the Management Policies, and  GYC has

failed to show that NPS's interpretation of that mandate is plainly erroneous or inconsistent with the

policies.  See Davis, 202 F.3d at 367.  Accordingly, GYC's Organic Act claims must be denied.

C.     The Winter Use Rule Will Not Result in Impairment

Finally, GYC argues that Federal Defendants have not shown that NPS made a reasoned

decision that the proposed activities in the Winter Use Rule will not result in unacceptable impacts.

GYC Opp. at 19-21.  To the contrary, Federal Defendants have fully described the NPS's decision

making process and the record support for NPS's finding that the Winter Use Rule will not cause

impairment.  See Fed. Def. Br. at 12-13, 23-40; AR 117160 at 373-74; AR 126499 at 33-34.  GYC's

argument that NPS has not offered a reasoned explanation for its decision is belied by the record.

NPS's conclusions are supported by extensive data gathered over many years regarding the impacts

of oversnow vehicle (OSV) use on soundscapes, air quality, and wildlife.  These data and NPS's

modeling of impacts under the seven proposed alternatives are analyzed at length in the FEIS.  AR

116170 at 215-36 (air quality); 248-301 (wildlife); 301-42 (soundscapes).   NPS has thoroughly

---

[6]     See Bicycle Trails Council of Marin, 82 F.3d at 1454 ("[T]he Park Service is empowered
with the authority to determine what uses of park resources are proper and what proportion of the
park's resources are available for each use."); Nat'l Wildlife Fed'n v. NPS, 669 F. Supp. 384,
390 (D. Wyo. 1987) (same); Eiseman v. Andrus, 433 F. Supp. 1103, 1106 (D. Ariz. 1977(same).

described the process that it used to evaluate impairment and unacceptable impact and analyzed all seven alternatives under those standards. AR 117160 at 167-70, 364-74. Accordingly, GYC's argument that NPS has not provided a rational basis for its decision is without merit.[7]

## II.     The Executive Orders and NPS's Snowmobile Regulation

GYC argues that NPS has not complied with Executive Orders 11644 and 11989 and its snowmobile regulation, 36 C.F.R. § 2.18. GYC Opp. at 6-10, 22-23. GYC misconstrues Federal Defendants' arguments regarding the applicability of the executive orders and ignores NPS's findings in the administrative record regarding compliance with Section 2.18. Accordingly, GYC's arguments fail.

Regarding the executive orders, GYC argues that Federal Defendants have argued that the executive orders "are inapplicable here because the challenged winter use plan merely authorizes the use of snowmobiles on roads." GYC Opp. at 9 (emphasis in original). That is not what Federal Defendants argued. Rather, Federal Defendants argued that Executive Order 11644 does not itself regulate off-road vehicle use in the parks. Rather it *directs* agencies, including NPS, to "*develop and issue regulations and administrative instructions* . . . for administrative designation of the specific areas and trails on public lands on which the use of off-road vehicles may be permitted . . ." Exec. Order 11644 § 3 (emphasis added). Accordingly, Executive Order 11644, as amended by Executive Order 11989, does not itself create a relevant enforceable standard. It is the regulation promulgated by NPS, 36 C.F.R. § 2.18, which contains the relevant standard. The promulgation of Section 2.18 complies with the mandates of the executive orders. See Fed. Def. Br. at 17. Accordingly, GYC has misconstrued Federal Defendants' argument.

GYC's further arguments that the Winter Use Rule does not comply with the mandates of the Executive Orders and Section 2.18 are misguided. As an initial matter, GYC is incorrect that

---

[7]     GYC's specific arguments regarding soundscapes, GYC Opp. at 20-21, are addressed in Section IV.B., below, and the arguments regarding benzene and formaldehyde already have been addressed. Fed. Def. Br. at 15 n.5.

NPS has not interpreted the standards in the Executive Orders and the Section 2.18. See GYC Opp. at 22-23. The Management Policies clearly recognize these standards and provide guidance to park managers regarding the application of those standards. Mgmt. Pol. § 8.2.3.1. Tracking the language of Executive Order 11989, the Management Policies state that off-road vehicle use may not be permitted "whenever the use will cause unacceptable impacts on the soil, vegetation, wildlife, wildlife habitat, or cultural and historic resources." Mgmt. Pol. § 8.2.3.1. Snowmobiling will only be permitted when NPS determines through the issuance of special regulations that it is an "appropriate use" and not result in "unacceptable impacts." Mgmt. Pol. § 8.2.3.2.

Applying this standard in the record of decision ("ROD"), NPS quoted its snowmobile policy, Mgmt. Pol. § 8.2.3.2, and stated:

> The decision to allow a limited number of snowmobiles and snowcoaches per day, when combined with other reasonable restrictions (BAT, 100% commercial guiding, nighttime use limits, and reduced speed limits) will not create unacceptable impacts to the parks' resources or values as supported by the analysis in the FEIS. Further, consistent with 36 C.F.R. § 2.18, all oversnow vehicle use would occur on snow-covered roads or, in the cases of Jackson Lake in Grand Teton National Park, on the frozen surface of a lake that is used by motorboats in the summer.

AR 126499 (ROD) at 28. NPS's analysis of whether the proposed snowmobile use would cause unacceptable impacts complies with the mandates of the Executive Orders and Section 2.18. NPS's interpretation of the regulation and its finding that the Winter Use Rule complies with Section 2.18 are entitled to substantial deference. Auer v. Robbins, 519 U.S. 452, 461 (1997).

Relying on the language that requires that snowmobile use be permitted "only when their use is consistent with the parks's natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources," 36 C.F.R. § 2.18(c), GYC concludes, without analysis, that Section 2.18 has been violated. GYC Opp. at 7-8.[9]

---

[9] The fact that the Yellowstone Enabling Act does not specifically authorize snowmobile use is not relevant to the Court's analysis. See GYC Opp. at 7-8 n.4. Nothing in Section 2.18 prohibits NPS from promulgating special regulations, as was done in this case, to permit snowmobiles in any particular park unit. 36 C.F.R. § 2.18(c).

GYC's claim fails because, as the record reflects, NPS has reached a reasoned determination that the Winter Use Rule will not result in unacceptable impacts. GYC suggests that Section 2.18 requires a different standard than "unacceptable impacts," although it does not state what that standard would be, much less justify it. GYC Opp. at 23. NPS's interpretation of Section 2.18 as barring unacceptable impacts finds ample support in the relevant statutory and legal framework. The "disturb wildlife" language is not unique to the snowmobile regulation. For example, NPS's regulations interpreting the broad requirements of the Organic Act contain a general requirement to "conserve scenery, natural and historic objects, and wildlife." 36 C.F.R. § 1.1(b). The regulations also contain multiple references to wildlife and adopt rigorous wildlife protection standards mandated by the Organic Act. The regulations prohibit "disturbing [wildlife] from its natural state." 36 C.F.R. § 2.1(a)(1); see also 36 C.F.R. § 2.2, Wildlife Protection. Indeed, the regulation governing bicycle use in the parks contains a nearly identically worded requirement that such use be "consistent with the protection of a park area's natural, scenic and aesthetic values, safety considerations and management objectives and will not disturb wildlife or park resources." 36 C.F.R. § 4.30. Thus, the requirement that recreational uses of the parks not "disturb wildlife" is not a separate higher standard that is applicable only to snowmobiles; rather, it is derived from the underlying mandate of the Organic Act and is similar to the regulatory requirements applicable to all users of the parks, not just snowmobile users.

The requirement that recreational uses not "disturb wildlife" does not, however, have the absolute prohibitive meaning that GYC implies. NPS's Management Policies interpret this requirement as requiring that NPS maintain wildlife by "minimizing human impacts on native plants, animals, populations, communities, and ecosystems, and the processes that sustain them." Mgmt. Pol. § 4.4.1. NPS has not interpreted the "disturb wildlife" standard to require no impact on wildlife whatsoever, and, of course, such an interpretation would generally render it impossible for NPS to meet its mandate to provide for visitor enjoyment of the parks. As discussed above, with respect to snowmobile use, NPS uses the "unacceptable impact" standard to determine whether snowmobile

use is appropriate in park areas. Mgmt. Pol. 8.2.3.1 - 8.2.3.2. Regarding the Winter Use Rule, NPS has complied with the mandates of the Organic Act and its own regulations by implementing a plan that will minimize impacts to wildlife and will avoid unacceptable impacts. See Final Rule, 72 Fed. Reg. 70781, 70782 (Dec. 13, 2007); AR 126499 (ROD) at 28.

## III.    NPS Has Fully Explained Its "Departure" from the 2001 Snowcoach Rule

As in its opening brief, GYC argues that the Winter Use Rule constitutes an unreasoned "departure" from the 2001 final rule, which authorized snowcoaches only, and that, therefore, the Winter Use Rule is not entitled to deference and should be invalidated. GYC Opp. at 23-39. As an initial matter, it is not at all clear that the baseline from which "departure" should be judged is the 2001 rule. As already demonstrated, following this Court's decision invalidating the 2003 winter use rule, Fund for Animals v. Norton, 294 F. Supp. 2d 92 (D.D.C. 2003), the U.S. District Court for District of Wyoming invalidated the 2001 rule on the basis that it constituted an unreasoned departure from NPS's prior practice of permitting unregulated use of snowmobiles in Yellowstone for almost 40 years. Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F. Supp. 2d 1249 (D. Wyo. 2004). Following that decision, NPS issued the 2004 temporary rule, which permitted 720 snowmobiles per day. AR 117160 at 3-4. Therefore, either unregulated use or a cap of 720 snowmobiles per day is a more appropriate benchmark for determining whether there was a "departure" from NPS's prior policy.

Regardless of what benchmark is used, GYC's argument fails because NPS's decision was not "unreasoned." Rather, it was fully supported by extensive analyses of all of the potential impacts of the rule, including soundscapes, air quality, and wildlife. See Fed. Def. Br. at 20-23. GYC cannot refute that extensive analysis has been conducted to support the Winter Use Rule or that NPS based its decision on that analysis. Therefore, to the extent that a "reasoned analysis" was required, it was provided. See Motor Vehicles Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57 (1983). GYC also is incorrect that the Winter Use Rule is not entitled to substantial

deference. GYC Opp. at 24-25. A new policy is equally entitled to the substantial deference owed
to agency decisions under the APA's arbitrary and capricious standard of review. See id. at 41.

GYC argues that the decision to permit 540 snowmobiles daily is unreasoned because it
amounts to a "doubling" of the snowmobile usage level and there is insufficient basis in the record
to support the number permitted. GYC Opp. at 24-26. The claim that snowmobile use will "double"
is an inaccurate characterization of the Winter Use Rule that persists throughout GYC's arguments.
See, e.g., id. at 1, 4, 8, 19, 24. As a matter of legal fact, the Winter Use Rule *lowers* the daily entry
limit 25% from 720 snowmobiles per day to 540, and the 540 cap also is roughly 43% *lower* than
the 950 cap invalidated by this Court in 2003. Fed. Def. Br. at 21; AR 117160 at 3. Further, GYC's
misapprehension that usage will increase because quotas are decreasing is unsupported and illogical.
By analogy, if Washington, D.C. decided to *reduce* the capacity of the new Nationals Park, which
seats roughly 42,000, by 25% to 31,500, no one would say that attendance would be expected to
*increase*. However, that is precisely the logic that GYC uses.

Furthermore, NPS has adequately explained the reasons for choosing a daily entry limit of
540. As Federal Defendants already have shown, the *lowering* of the daily entry limit from 720
snowmobiles per day to 540 per day was done with the intention of keeping OSV use at roughly the
same levels as the last three winters under the temporary rule. Fed. Def. Br. at 23; AR 120174 at
4; AR 126499 (ROD) at 20. The limit of 540 is based on the peak daily number of snowmobiles
entering the park during the three winters under the temporary rule, which was 542. AR 126499 at
20, AR 120174 at 4. Thus, using daily entry as a basis of comparison, snowmobile use under the
Winter Use Rule will *not exceed* the levels during the past few winters. GYC relies on the lower
*average* daily entry number, which for 2007 was 290. AR 126499 at 20. However, in doing so,
GYC assumes, without any factual basis, that usage levels will immediately surge to the maximum
permitted. GYC Opp. at 27. In fact, as Federal Defendants have demonstrated, usage under the
temporary rule peaked during certain times of the year, and that pattern can be expected to continue
with a lower daily cap. Fed. Def. Br. at 23.

11

Moreover, the daily cap of snowmobiles permitted is a more reasonable basis of comparison than the average daily entry levels, which for upcoming winters are somewhat speculative. As a general rule, the higher the level of use on any particular day, the greater the impacts to soundscapes, air quality, and wildlife can be expected to be. See AR 125292 at 16 (noise impacts generally will be higher with higher use); AR 117160 at 222-30 (comparing modeled emissions data for the seven alternatives analyzed in the FEIS); AR 117160 at 260 (the analysis in the FEIS assumes that "that increases in winter traffic levels and associated human recreational activity cause increases in [wildlife impacts]"). By lowering the daily cap, NPS lowers the potential for impacts to below the highest level observed (542) during the past few winters, thus minimizing impacts to soundscapes, air quality, and wildlife. AR 126499 at 20-22. Moreover, if usage levels are higher than expected and approach unacceptable levels, NPS's adaptive management protocol requires that it reevaluate impacts to soundscapes, air quality and wildlife, and alter usage levels as necessary to avoid such impacts. AR 126499 at 5-6, 34, 39-50. Thus, NPS has provided a reasoned basis for imposing a daily cap of 540 on snowmobile use. GYC's specific arguments relating to soundscapes and wildlife (GYC Opp. at 25-26) are addressed in Section IV below.

In addition, as already demonstrated, the cap of 540 is not the only aspect of the record for the Winter Use Rule that distinguishes it from the record for the 2003 rule. The Winter Use Rule also contains a 100% commercial guiding requirement and a BAT requirement for snowmobiles, both of which will further minimize the potential for impacts to park resources. Fed. Def. Br. at 22-23. GYC's responses to these points are insubstantial. GYC Opp. at 27-29. Relying on this Court's 2003 opinion, GYC argues that a guiding requirement is of little value because group sizes may still be small and the communication among larger groups may be difficult. GYC Opp. at 27-28. While in 2003 this Court did not have the advantage of being able to review information about the utility of a guiding requirement because it had never previously been applied, now it does. The guiding requirement has proven to be an overwhelming success, particularly in reducing impacts to wildlife. Fed. Def. Br. at 22. GYC's reliance on this Court's 2003 language is misplaced. Similarly, with

respect to snowmobile BAT requirements concerning noise and air quality, GYC's reliance on this Court's 2003 decision also is misplaced.  See GYC Opp. at 28-29.  In 2003, this Court did not have before it the extensive air quality and soundscapes analysis that supports the Winter Use Rule.  See Fed. Def. Br. at 22-23.  The Court should base its decision on the current record before it, not on the basis of the past record for the 2003 rule.

It is also worth noting that, while GYC repeatedly asserts that standards have been violated by snowmobiles, it has no problem accepting similar impacts when they are caused by snowcoaches. See GYC Opp. at 5 ("The snowcoach alternative rejected by the administration . . . would have minimized the adverse sound and wildlife impacts . . ."); 6 n.3 ("Under the rejected snowcoach alternative, Bombardiers [snowcoaches] would have been converted into 'best available technology' ('BAT') machines, addressing any such issues."); 15 ("[The] snowcoach alternative [] would afford equal access to the Park while avoiding the significant, adverse impacts that come with snowmobiles."); 29 ("the administration's decision to again reject a plan providing for access to the Park by cleaner, quieter snowcoaches").  While NPS agrees that snowcoaches have advantages and are appropriate for use in Yellowstone, NPS also recognizes that snowcoaches cause impacts to park resources, just as snowmobiles do.

Particularly with respect to impacts to soundscapes and wildlife, snowcoaches have impacts that are considerable.  In evaluating the noise monitoring data, NPS found that exceedances of noise thresholds were primarily attributable to either road grooming equipment or snowcoaches, which are noisier than snowmobiles, especially older model Bombardiers.  AR 126499 at 21; AR 116170 at 147; see also AR 125050 at 47.  With respect to wildlife impacts, NPS's monitoring data reveals that wildlife responds to snowcoaches and snowmobiles in virtually identical numbers.  AR 125741 at 24-26.  And, there is evidence to suggest that, because snowcoaches are larger, they elicit a greater percentage of responses than snowmobiles.  AR 117160 at 250; AR 125701 at 12 (White study) ("The odds of observing a movement response were 1.1 times greater for each additional snowmobile, 1.5 times greater for each additional snowcoach . . . .").  Moreover, the

13

recommendation in the White study that usage levels not exceed 50,000 oversnow visitors (discussed further in Section IV.D, below) did not differentiate between snowmobiles and snowcoaches, belying GYC's suggestion that the wildlife biologists recommended snowcoaches over snowmobiles.  AR 125701 at 20.  Snowcoaches generally are cleaner than snowmobiles, but they do emit pollutants.  See, e.g., AR 111471 at 37-38.  And, in comparing the relative environmental impacts of snowcoaches and snowmobiles, it is relevant to note that snowmobiles are more fuel efficient than snowcoaches, even on a per passenger basis.  AR 117160 at 79-80.  Accordingly, GYC's easy dismissal of impacts caused by snowcoaches is in marked contrast to its harsh condemnation of any and every impact caused by snowmobiles.

## IV.    NPS's Analysis of Impacts Under the Applicable Substantive Standards in the FEIS

Federal Defendants have demonstrated that NPS has thoroughly analyzed and considered the alternatives in the FEIS according to the relevant legal standards.  Fed. Def. Br. at 23-25; AR 117160 at 170-374.  GYC argues that NPS could not have properly evaluated the alternatives presented in the FEIS because NPS did not conclude that any of the alternatives would result in impairment. GYC Opp. at 29-30.  GYC is essentially complaining that NPS did not analyze in detail alternatives that would not meet the purpose and need "to provide park visitors with wide range of appropriate winter recreational opportunities, while ensuring that these activities do not lead to unacceptable impacts or the impairment of park resources and values."  AR 117160 at 4.  NPS was, of course, not required to evaluate alternatives that do not meet the purpose and need.  See, e.g., Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C. Cir. 1991) ("the proposed alternative is reasonable only if it will bring about the ends of the federal action").  GYC's argument that alternative 4 (expanded recreational use) would have resulted in impairment is irrelevant because NPS did not choose that alternative.  GYC Opp. at 29-30.  Contrary to GYC's assertions, the analysis in the FEIS did provide a clear basis for policy makers to decide whether the various alternatives analyzed would meet the applicable legal standards, 40 C.F.R. § 1502.2(d), rigorously explored the alternatives presented, 40 C.F.R. § 1502.14, and analyzed the environmental

consequences of each alternative.  40 C.F.R. § 1502.16; see Fed. Def. Br. at 23-25; AR 117160 at 170-374.

### A.    Comparison to Historical Conditions

GYC overstates the importance of the comparison to historical conditions in the FEIS.  As already demonstrated, the comparison was provided as background and to address to the Court's 2003 decision, which found that levels of snowmobile use similar to the historical conditions had caused impairment.  Fed. Def. Br. at 25.  However, the comparison to historical conditions did not serve, as GYC would have this Court believe, as the basis for comparison among the alternatives presented in the FEIS.  To the contrary, NPS analyzed the impacts of the alternatives presented against an objective set of impact criteria, and that analysis was based on the extensive monitoring and modeling of soundscapes, air quality, and wildlife that NPS has conducted, as well as all of the relevant scientific literature.  See, e.g., AR 117160 at 115 (analyzing data from wildlife studies); 222-30 (comparing air quality data), 342 (comparing soundscape data).  In addition, NPS's reliance upon applicable federal and state standards, as well as its own adaptive management standards, to evaluate the potential impacts under each alternative was perfectly appropriate.  See, e.g., AR 117160 at 92-93, 215-16 (comparison to federal and state air quality standards); AR 126499 at 41-50 (adaptive management standards).

### B.    Noise Impacts

With respect to soundscapes, GYC again attacks NPS's purported sole reliance on the "park-wide" metric as the basis for evaluating sound impacts.  GYC Opp. at 32-34.  GYC's arguments are without merit.

First, GYC argues that consideration of the total park area metric (which measures the total park area in which OSVs are audible and is one of the three metrics considered by NPS) was inappropriate because the purpose of the soundscape analysis was *not* to evaluate impacts to park resources, such as wildlife, but *only* to analyze impacts to park visitors.  GYC Opp. at 32.  It is hard to imagine GYC taking such a position except to opportunistically support its litigation position.

15

As stated in the FEIS and numerous places in the Management Policies, natural soundscapes are a park resource in their own right, which are to be protected from unacceptable impacts. AR 117160 at 137; Mgmt. Pol. §§ 1.4.7.1 (unacceptable impacts), 4.9 (natural soundscapes).

Second, GYC asserts in various places throughout its brief that, because preliminary adaptive management audibility thresholds in place during the temporary plan were exceeded, NPS's finding that the Winter Use Rule will not result in unacceptable impacts is arbitrary. GYC Opp. at 4, 20-21.[9] As explained in the ROD, the exceedance of adaptive management standards does not demonstrate that unacceptable impacts have occurred. AR 126499 at 40. The temporary standards were set based on a limited amount of data. Id. Based on additional data gathered in Yellowstone and other park units over the past four winters, NPS revised the percent audibility threshold for *developed areas only* from 50% to 75%. Id. at 40, 43. GYC's suggestion that this was improper is erroneous. As GYC acknowledges, NPS has fully disclosed exceedances of the 75% audibility thresholds in the FEIS. GYC Opp. at 20 (citing AR 117160 at 143-47). Thus, raising the audibility threshold did not result in a discounting of the impact. Indeed, NPS found that noise impacts in Yellowstone, as measured by the percent time audible metric, would be *major*. AR 126499 at 33. Accordingly, GYC's argument that NPS has "change[d] the goalposts" to discount noise impacts is without basis. GYC Opp. at 21.

Third, GYC argues that NPS's soundscapes analysis is flawed because, using the total park area metric, the historical measure (16.2%) is deemed to be a moderate impact. GYC Opp. at 32-33. GYC argues that this constitutes an "unreasoned conversion of soundcape impacts from impairment to 'moderate.'" Id. at 33. GYC again ignores the fact that modeling serves primarily as a point of

---

[9]    As already demonstrated, these exceedances of the adaptive management threshold do not demonstrate a flaw in NPS's analysis because the monitoring data includes noise for road grooming, administrative use of OSVs, and other natural and artificial noises, which are not included in the modeling. Fed. Def. Br. at 30 n.14. The thresholds used to analyze impacts were adjusted downwards to reflect the differences between the monitoring and the modeling. Id.; AR 117160 at 303.

comparison among alternatives and does not establish thresholds at which unacceptable impacts occur. In the FEIS all "moderate" impacts are analyzed to determine whether they constitute unacceptable impacts. AR 116170 at 169. As explained more fully below, NPS analyzed three metrics in determining whether noise impacts would result in unacceptable impacts. GYC's argument merely serves to underscore the fact that the total park area metric is not the only metric analyzed in the soundscapes analysis.[10]

Fourth, GYC is, in fact, wrong that the total park area metric was the only one relied upon by NPS in its soundscapes analysis. To begin with, NPS considered two other metrics in its noise analysis: (1) the percent time audible at certain locations within the park, and (2) the sound level at certain locations. Fed. Def. Br. at 28-29. GYC argues that these other metrics were not really considered in the conclusion section of the analysis. GYC Opp. at 33 (citing FEIS at 339-42). GYC's assertion is belied by the record. Indeed, NPS examined all three metrics in its analysis of the impacts of each alternative. For alternative 7, NPS found that impacts in Yellowstone were as follows: total park area – moderate, percent time audible – major, and sound level – minor. AR 117160 at 339. These same findings are stated in the ROD. AR 126499 at 33-34. Therefore, GYC's argument that only the total park area metric was considered is without basis.[11]

Because NPS considered all three metrics in determining the noise impacts of the Winter Use Rule, GYC's argument that NPS's reliance on only the total park area metric was arbitrary and capricious is without any factual basis. GYC Opp. at 33-34. The ROD explains that, even though the percent time audible metric indicates a major, adverse, short-term noise impact in Yellowstone,

---

[10]    GYC's argument that the winter use rule will result in a tripling of the area in which OSVs are audible is without merit. GYC Opp. at 5. The area in which OSVs are audible would decrease from 14.4% to 13.8% in Yellowstone. AR 126499 at 33-34.

[11]    In support of its argument that only the park wide metric was considered, GYC also references Table 4-66 in the FEIS. GYC Opp. at 33. However, as its title indicates, the table is a summary of the park wide metric only and does not purport to be a summary of all three sound metrics.

noise impacts generally will not constitute unacceptable impacts. Id. at 34. First, NPS finds based on the total park area metric that NPS's proposed use levels (which would result in 13.8% audibility) compare favorably to both current conditions (14.4% audibility) and historical conditions (16.8%). Id. Second, NPS finds that the implementation of BAT technology for snowcoaches will reduce noise impacts compared to current conditions. Id. And, third, based on NPS's professional judgment, as guided by the Management Policies, the noise impacts from Winter Use Rule will not harm the integrity of park resources and values. Id.; see also AR 117160 at 334-42. Based on these reasons, as supported by the thorough analysis in the FEIS, NPS's decision that noise impacts will not be cause unacceptable impacts was not arbitrary or capricious.

Finally, the fact that NPS modeled alternative 7 based on the potential closure of the Madison to Norris road segment does not render the soundscapes analysis arbitrary or capricious. NPS analyzed alternative 7 with the closure because that is an integral part of alternative 7, and the decision to conduct modeling with the closure was fully disclosed in the FEIS. AR 117160 at 334-35. NPS nevertheless characterized this impact as moderate. AR 117160 at 339. Accordingly, modeling alternative 7 in a realistic manner that did not minimize the impact of the proposed action complies with NEPA and provided the decisionmakers with means to judge the alternative's compliance with the relevant substantive requirements.

Accordingly, GYC's criticisms of NPS's soundscapes analysis are not supported by the record and do not demonstrate that NPS's analysis was arbitrary or capricious. Furthermore, GYC's reliance on U.S. Air Tour Ass'n v. FAA, 298 F.3d 997 (D.C. Cir. 2002) is misplaced. GYC Opp. at 34. At issue in that case was whether a rule promulgated by the Federal Aviation Administration ("FAA") imposing a limit on the number of air tours of Grand Canyon National Park complied with the requirement of the Overflights Act to effect "substantial restoration of the natural quiet." 298 F.3d at 1015. NPS already had interpreted that language as requiring that "50% of the Park experience natural quiet at least 75% of 'the day.'" Id. The court found that FAA's interpretation of "the day" to mean "an annual average day," instead of "any given day" was inconsistent with the

way that term had been defined by NPS. Id. at 1016-18. The distinction made by the court, between an "annual average day" and "any given day" has no relevance here because the Winter Use Rule did not use an "annual average day" or even an "average winter time day" in its analysis. GYC's citation to this case is ironic, given that the court makes clear that substantial deference is owed to NPS in applying the Integrated Noise Model ("INM"), the model used by Volpe to evaluate noise in Yellowstone and Grand Teton. Id. at 1008-09.

### C.    Air Quality

GYC argues that, under the Winter Use Rule, federal standards for formaldehyde and benzene will be exceeded, that the emission of certain pollutants will dramatically increase, that NPS has used a "park-wide" metric to obscure the air quality impacts, and that NPS's reliance on federal and state air quality standards was improper. GYC Opp. at 4-5, 21, 35-36.

GYC's argument that federal formaldehyde and benzene standards were exceeded is without merit. See Fed. Def. Br. at 15 n.5. As to benzene, two tests revealed levels that were above the intermediate-duration inhalation minimum risk level ("MRL") of .006 ppm, but were below the acute-duration inhalation MRL of .009 ppm. AR 117413 at 16. Thus, the applicable MRL was not exceeded. The authors concluded that: "Worker exposure to toxic contaminants were *below* established occupational standards and established recommended exposure limits." Id. at 37 (emphasis added). Measured formaldehyde levels also did not exceed the NIOSH REL of .016 ppm or the OSHA PEL 8-hour time-weighted average of .75 ppm. AR 117370 at 136-37; AR 117160 at 100. The authors concluded that: "All employee exposure to the above air contaminants and noise were well below established Occupational Safety and Health Administration (OSHA) Permissible Exposure Limits (PELs) and other established recommended exposure limits." AR 117370 at 4.

GYC also argues that, under the Winter Use Plan, benzene emissions will increase 33%, hydrocarbons will increase 50%, formaldehyde will increase 60%, and particulate matter will increase 100%. GYC Opp. at 5. GYC's assertions are misleading because GYC does not indicate the actual increases it references, which in real terms are very minor, or compare them to the

National Ambient Air Quality Standards ("NAAQS"). See Fed. Def. Br. at 32 n.17; AR 117160 at 223-31. For example, at the West Entrance, PM 2.5 emissions are modeled to increase from the current level of 6.1 $\mu g/m^3$ to 8.6 $\mu g/m^3$, still far below the NAAQS standard of 65 $\mu g/m^3$ and even further below the 193.9 $\mu g/m^3$ level under unregulated historical use. AR 117160 at 225. The modeled emissions do not represent significant increases, and the air quality under the Winter Use Plan would continue to be excellent and well within all relevant federal and state air quality standards. Fed. Def. Br. at 30-35.

GYC's assertion that NPS improperly relied on a "park-wide" is inaccurate. GYC Opp. at 35. As GYC concedes, NPS did analyze air emissions at four locations throughout the park. Id. (citing Fed. Def. Br. at 33-34). Nevertheless, GYC argues that, because the definition of "major" impact references impacts that will be "highly noticeable park-wide," that NPS did not consider more localized impacts. GYC Opp. at 35. This assertion is belied by the record, which clearly indicates that impacts were measured and analyzed at specific locations in the park, not just on a "park-wide" basis. AR 117160 at 223-27. The fact that the definition of "major" impact includes impacts that will be felt park-wide does not mean that impacts to specific areas were not considered and analyzed, which in fact they were. See id.

Finally, GYC's argument that NPS should not consider federal and state air quality standards is without merit. GYC Opp. at 35-36. GYC again suggests that NPS must comply with the "best possible air quality" language in the Management Policies, but that language does not set a specific standard and cannot be enforced against NPS. See Wilderness Soc'y, 434 F.3d at 596-97. This does not mean that NPS has "disavow[ed]" its Management Policies. GYC Opp. at 35. Rather, the Management Policies indicate that park managers should consider national and state air quality standards in managing the parks. See Mgmt. Pol. § 4.7.1. NPS does not take the position, as GYC wrongly claims, that air quality impacts will always be acceptable as long as national air quality standards are not exceeded. GYC Opp. at 36. Rather, NPS has used those levels as benchmarks, and, in this case, those levels far exceed the projected emissions levels under the Winter Use Rule.

20

Fed. Def. Br. at 32.  Moreover, NPS has established its own much lower adaptive management thresholds for use in determining whether monitored conditions are acceptable.  Id. at 32-33.

### D.     Wildlife Impacts

GYC argues, as it did in its opening brief, that NPS did not sufficiently consider the recommendations of NPS wildlife biologists and that that NPS considered only harm to wildlife populations, not individuals.  GYC Opp. at 4, 8, 26, 36-39.  GYC's arguments rely on a selective reading of the FEIS and relevant studies and are without merit.

### 1.     NPS Considered the Findings of Wildlife Scientists

GYC argues that NPS did not follow the specific recommendation of its wildlife scientists regarding the appropriate level of snowmobile use. GYC Opp. 37-38.  In making this argument, GYC narrowly focuses on just one of the scientists' recommendations and, in doing so, loses sight of the overall findings of the studies.  Those studies (the White and Borkowski studies) found that wildlife populations have been largely unaffected by OSV use over the past 35 years and that individual animals are most likely to demonstrate no observable response in the presence of OSVs. AR 125701 (White) at 20; AR 125625 (Borkowski) at 1924.  The scientists do not find that the wildlife reactions observed in their studies are harmful to wildlife.  Rather, the scientists recognized that the decision as to whether to allow over OSV uses in the parks, or other types of uses, is largely a value judgement and a policy choice that ultimately must be made by policymakers.  See AR 125701 at 1 (White) ("Regardless, differing interpretations of behavior and physiological response data will continue to exist because of the diverse values and beliefs of the many constituencies of Yellowstone."); AR 125625 at 1923 (Borkwoski) ("[S]cience cannot resolve issues where policy is advocated due to values judgments and perceptions about what is appropriate in national parks."). Furthermore, it is not just OSV use that may cause reactions in wildlife; rather *all* forms of use have the potential to cause some reaction. "[I]t is unrealistic to expect winter recreation or administrative travel by park staff to be totally benign, regardless of whether that activity is skiing, snowshoeing, snowmobiling, or driving an automobile."  AR 125625 at 1923.  NPS adequately considered the

findings of the White and Borkowski in its analysis in the FEIS. <u>See</u> AR 117160 (FEIS) at 112, 114-15, 128-29.

Despite the fact that NPS has thoroughly considered the data and findings of these studies in the FEIS, and the scientists themselves have not purported to make the types of policy judgments that must be made by NPS, GYC argues that NPS did not sufficiently follow the scientists' recommendations regarding the level of use. In fact, NPS *did* lower the daily entry limit for snowmobiles, in keeping with the recommendations of the White and Borkowski studies. The White study "recommend[ed] park managers consider maintaining OSV traffic levels at or below those observed during our monitoring," which, for the last three seasons of the study, were below 50,000 oversnow visitors. AR 125701 at 20. Federal Defendants already have demonstrated that the *lowering* of the daily entry limit from 720 snowmobiles per day to 540 per day was done with the intention of keeping OSV use at roughly the same levels as the last three winters under the temporary rule. Fed. Def. Br. at 23; AR 120174 at 4; AR 126499 (ROD) at 20. And, as already discussed, GYC's repeated assertion that the Winter Use Rule amounts to a "substantial expansion" of the number of snowmobiles permitted in Yellowstone is simply erroneous. <u>See</u> GYC Opp. at 38. Based on the *lowering* of the daily entry limit, in all likelihood, the number of over snow visitors (regardless of whether those visitors come by snowmobile or snowcoach) *will* be under 50,000, as in the last three seasons of the White study. If the levels are higher and unacceptable conditions result, NPS will adjust the daily limit downwards. AR 126499 (ROD) at 5-6, 34, 39-40, 48-50. As stated numerous times in the FEIS, NPS adhered to the recommendation of the scientists to lower the daily OSV entry limits in order to minimize impacts to wildlife. <u>See</u>, <u>e.g.</u>, AR 117160 at 260 ("The qualitative assumptions, grounded in the available literature on bison and elk, made in this analysis are that increases in winter traffic levels and associated human recreational activity cause increases in vehicle-caused mortality, wildlife displacement, behavior- or physiology-related energy costs, and the potential for adverse demographic impacts."); <u>see also</u> <u>id.</u> at 261, 263, 264, 266, 268

22

& 270.[12]  Thus, GYC is wrong when it says that the recommendation of the White study regarding usage levels was not considered.

However, even if this Court finds that NPS did not precisely follow the recommendation of the White study to keep visitation below 50,000 over snow visitors, that is not sufficient grounds to find that NPS's analysis of wildlife impacts was arbitrary and capricious.  That recommendation (which was offered for consideration by NPS) is not binding on NPS.  Cf. Citizens Against Burlington, 938 F.2d at 201 ("[U]nder the rule of reason, a lead agency does not have to follow the EPA's comments slavishly – it just has to take them seriously.").  In setting a daily use level, NPS had a number of other factors to consider, including that: (1) the daily entry numbers from the Borkowski study, which contained similar findings to White, were higher than in the White study, including years of 514, 486, and 593 *average* daily entry levels at the West entrance alone, AR 125625 at 1915; (2) decreased snowmobile use would likely mean increased snowcoach use, and snowcoaches, because they are bigger than snowmobiles, are more likely to elicit behavioral responses from wildlife, AR 117160 at 250; (3) NPS's own wildlife monitoring studies, which for the 2007 winter showed that 96.1 % of bison responses to OSVs and 98.2 % of elk responses were either no response or "look/resume," AR 125741 at 23, and (4) there is an increasing consensus among wildlife biologists that winter use is not affecting wildlife populations.  AR 117160 at 121-26.  NPS also considered that increasing OSV use may result in some unobserved and unquantifiable physiological effects, resulting on increased stress on wintering wildlife.  AR 117160 at 254-55.  Considering all of these factors and all of the record materials, NPS made a reasoned decision to permit a cap of 540 snowmobiles and 83 snowcoaches per day.  AR 126499 at 20; AR 120174 at 4.

---

[12]    GYC has misconstrued this language to argue that NPS has found that alternative 7 will *result* in "an increase in wildlife mortality, displacement, and energy expenditure."  GYC Opp. at 5 (citing AR 117160 at 270).  However, NPS's conclusion, based on the use of guiding and adaptive management, is that impacts "are predicted to be negligible to moderate, adverse, short-term, and direct."  AR 117160 at 270.

### 2.    NPS Did Not Disregard Impacts to Individual Animals

Although GYC argues that impacts to individual animals were not sufficiently considered in the analysis in the FEIS, it cannot seriously dispute that such impacts were considered. See GYC Opp. at 36-37. Indeed, as already demonstrated, the impact definitions include impacts to individuals. See, e.g., AR 117160 at 257. For example, the definition of major effects is "An action that will noticeably affect a population or *individuals* of a species . . . ."). GYC is wrong to suggest that, even though impacts to individuals are mentioned in the rating scale, that the only real consideration in NPS's assigning of a rating was impacts to populations. GYC Opp. at 36-37. While impacts to populations were an important consideration, if impacts to individuals were noticeable, then NPS could have found that such impacts were major based on the definitions in the FEIS. However, NPS did not make that finding because the record did not support that conclusion.

NPS's analysis does not brush aside concerns about effects on individual animals; rather, it fully considers them in the FEIS and ROD. At least two of the five factors used to rate impacts to wildlife – physiological effects and vehicle-caused mortality – relate specifically to impacts to individuals, not populations. AR 117160 at 251. As discussed above, the White and Borkowski studies both found that most individual animals had no observed response to OSVs. NPS also considered that increasing OSV use may result in unquantifiable physiological effects, such as increase in heart rate, blood pressure, breathing rate, and release of adrenaline. AR 117160 at 254-55. In response to those concerns, NPS has taken measures to minimize interaction between wildlife and OSVs, including reducing the daily entry limit, requiring commercial guides, and monitoring wildlife interactions to determine whether unacceptable impacts are occurring. AR 117160 at 258. If unacceptable impacts are found to be occurring, NPS will reduce OSV use or even close certain areas of the park to OSV use. Id.; AR 126499 (ROD) at 5-6.

GYC also claims that the insufficient attention to harm to individual animals in the FEIS "is not mended by the FEIS's discussion of individual animals' responses to oversnow vehicles and the record's disclosure of the number of animals killed by snowmobiles in Yellowstone." GYC Opp.

24

at 37. This arguments misses the point, which is that NPS's finding that the impact of vehicle mortality to bison and elk would be negligible is fully supported by the record. AR 117160 at 251, 269. Indeed, the White study reported that, during a 10 year period of unmanaged and, therefore, relatively high snowmobile use, only 10 bison, 3 elk, 2 coyotes, and 1 moose were killed by snowmobiles in Yellowstone. AR 125701 at 17. During that same period, 98 bison, 425 elk, 75 coyotes, 84 moose, and 406 other large animals (bears, bighorn sheep, deer, pronghorn, and wolves) were killed by wheeled vehicles. AR 125701 at 17. Accordingly, NPS's finding that impacts to individuals from vehicle mortality would be negligible was reasonable, particularly when compared to other uses in Yellowstone.

NPS evaluated the impacts to individual animals under the applicable standards and made a reasoned determination that the potential impacts to individuals and populations of wildlife were acceptable. AR 117160 (FEIS) at 248-301; AR 126499 (ROD) at 32-34. GYC just disagrees with the NPS's conclusion that the impacts are acceptable, largely because it misinterprets the Organic Act and NPS regulations to require absolutely no disturbance whatsoever of wildlife in the parks. See GYC Opp. at 37. As already demonstrated, this interpretation is inconsistent with any prior interpretation of the applicable standards and would prevent anyone from using and enjoying the parks. Accordingly, NPS has properly analyzed impacts to wildlife under the governing standards and reached a reasoned decision that is supported by the record.

## CONCLUSION

For the foregoing reasons and for the reasons stated in our opening brief, Federal Defendants respectfully submit that Federal Defendants' motion for summary judgment should be granted, and GYC's motion for summary judgment should be denied.

Respectfully submitted this 1st day of August, 2008.

RONALD J. TENPAS
Assistant Attorney General

/s/ *Luther L. Hajek*

25

GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469
Fax: (202) 305-0274
Guillermo.Montero@usdoj.gov

OF COUNSEL:
JASON WAANDERS
U.S. Department of the Interior
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957

Attorneys for the Defendants