IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
GREATER YELLOWSTONE COALITION,          )
et al.,                                 )
                                        )
                Plaintiffs,             )
                                        )        Case No. 07-cv-2111 (EGS)
        v.                              )
                                        )        [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                )        Judgment on August 27, 2008]
                                        )
                Defendants.             )
_____)


_____
                                        )
NATIONAL PARKS CONSERVATION             )
ASSOCIATION,                            )
                                        )
                Plaintiff,              )
                                        )        Case No. 07-cv-2112 (EGS)
        v.                              )
                                        )        [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE         )        Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE         )
                                        )
                Defendants.             )
_____)


**FEDERAL DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO NATIONAL PARKS CONSERVATION ASSOCIATION'S MOTION
FOR SUMMARY JUDGMENT, RE CASE NO. 07-CV-2112 (EGS)**

# TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   The Organic Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   NPS's Interpretation of the Organic Act, as Set Forth In Its Management
         Policies, is Entitled to Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   Permitting Snowmobiles in Yellowstone Is Consistent with the NPS's
         Interpretation of the Organic Act as Set Forth in the Management Policies . . . . 2

    C.   NPS Has the Discretion to Permit Uses of the Parks Which Cause
         Acceptable Adverse Impacts to Park Resources . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.   Federal Defendants Have Responded to NPCA's Arguments Regarding
         Impairment and the Applicable Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   The Executive Orders and NPS's Snowmobile Regulation . . . . . . . . . . . . . . . . . . . . . . . 7

III.   The Yellowstone Enabling Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.   NPS's Analysis of Impacts Under the Applicable Substantive Standards in the FEIS . 10

    A.   Noise Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.   NPS Evaluated All Three Sound Metrics in Determining
           Whether Unacceptable Impacts Would Result . . . . . . . . . . . . . . . . . . . 10

        2.   NPS Has Fully Explained How It Has Incorporated the Results of
           Noise Monitoring Data Into Its Analysis of Noise Impacts . . . . . . . . . 12

        3.   The Record Supports NPS's Finding that Noise Exceedances Were
           Primarily Attributable to Road Grooming Equipment or Snowcoaches . 14

        4.   The Comments of NPS's Scientific Staff Do Not Demonstrate that
           NPS's Noise Modeling Was Inadequate . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.   Wildlife Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1.   NPS Considered the Findings of Wildlife Scientists . . . . . . . . . . . . . . 18

        2.   NPS Did Not Disregard Impacts to Individual Animals . . . . . . . . . . . . 21

    C.   Air Quality Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## INTRODUCTION

Federal Defendants hereby reply to plaintiff National Parks Conservation Association's ("NPCA") Opposition to the Government's Cross-Motion for Summary Judgment ("NPCA Opp.") (Docket No. 61).  In its Opposition, NPCA relies on a distorted view of the Organic Act, National Park Service ("NPS") regulations, and the Yellowstone Enabling Act to argue that any use of the national parks that causes any adverse impacts on the parks is prohibited.  This is simply not the relevant standard.  NPCA also erroneously asserts in a number of places that the Winter Use Rule will "double" the amount of snowmobiles when compared to the current level, when in fact the number of snowmobiles permitted will be 25 percent lower.  Finally, in an attempt to show that the relevant standards will be violated by the level of oversnow vehicle ("OSV") use in the Winter Use Rule, NPCA selectively quotes and misconstrues portions of the administrative record.  NPCA fails to show that NPS's analysis or its conclusions were arbitrary or capricious.

## ARGUMENT

### I.    The Organic Act

NPCA argues that NPS's interpretation of the Organic Act, as embodied in the Management Policies, is not entitled to deference, that the types of winter uses in the Winter Use Rule are not permitted by the Management Policies, and that NPS has not sufficiently supported its finding that the Winter Use Rule will not cause impairment.  None of these arguments has merit.

### A.    NPS's Interpretation of the Organic Act, as Set Forth In Its Management Policies, is Entitled to Deference

NPCA argues that Section 1.4.7.1 regarding unacceptable impacts is not NPS's interpretation of the Organic Act and is therefore is not entitled to deference.  NPCA is simply incorrect.  Section 1.4.1 states:  "This section 1.4 of *Management Policies* represents the agency's interpretation of these key statutory provisions," referring to the Organic Act and the General Authorities Act.  As part of Section 1.4, Section 1.4.7.1 is obviously part of that interpretation.  More generally, the Management Policies, although they constitute policy guidance and not regulations, contain NPS's

-1-

interpretations of relevant legal standards, including the Organic Act. The policies provide guidance to park managers on the relevant legal authorities that govern decisions relating to management of park units. See Mgmt. Pol. (AR 120645) at 2. The introductory passage of the Management Policies makes that clear: "In carrying out their responsibilities under the 1916 Park Service Organic Act and other pertinent statutes, all NPS's officials and employees must be knowledgeable about the laws, regulations, and policies that pertain to their work. . . . In carrying out this function, the National Park Service, like other federal agencies, develops policy to *interpret the ambiguities of the law* and to fill in the details left unaddressed by Congress in the statutes." Id. (emphasis added).

The law is clear that NPS's interpretation of the Organic Act contained in the Management Policies is entitled to substantial deference. Davis v. Latschar, 202 F.3d 359, 364-65 (D.C. Cir. 2000). "Because the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate." Id. at 365; see also Bicycle Trails Council of Marin v. Babbitt, 82 F.3d 1445, 1454 (9th Cir. 1996) ("[T]he Park Service has broad discretion in determining which avenues best achieve the Organic Act's mandate.") (quotations omitted); S. Utah Wilderness Alliance v. Nat'l Park Serv., 387 F. Supp. 2d 1178, 1193 (D. Utah 2005). Thus, NPS's interpretation of the Organic Act is entitled to deference.

**B.     Permitting Snowmobiles in Yellowstone Is Consistent with the NPS's Interpretation of the Organic Act as Set Forth in the Management Policies**

Following its argument that Section 1.4.7.1 of the Management Policies is not entitled to deference, NPCA suddenly changes tack and tries to have it both ways, arguing that NPS has not complied with Section 1.4.7.1. NPCA Opp. at 13. As a legal matter, private parties cannot claim that NPS's Management Policies themselves contain enforceable rights or duties. Wilderness Soc'y v. Norton, 434 F.3d 584, 596-97 (D.C. Cir. 2006). NPS does, however, follow its own interpretation of the Organic Act as set forth in the Management Policies, and it did so here. NPS's interpretation of the Management Policies is entitled to substantial deference and cannot be overturned unless it

is "'plainly erroneous or inconsistent' with the plain terms of the policies." Davis, 202 F.3d at 367. NPCA has failed to demonstrate that permitting snowmobiles in Yellowstone is plainly erroneous or inconsistent with the Management Policies.

Indeed, the argument put forth by NPCA has little to do with whether snowmobile use is consistent with Section 1.4.7.1 of the Management Policies. Instead, arguing on the basis of materials not included in the administrative record, NPCA argues that the former Deputy Assistant Secretary for Fish and Wildlife and Parks, Paul Hoffman, who was formerly an aide to Vice President Cheney, suggested certain changes to the 2001 Management Policies during the revision process. NPCA Opp. at 13-14. The proposals were suspicious, in NPCA's view, because Vice President Cheney seemed to voice general support for snowmobile use in Yellowstone in a public statement in 2004 and because the proposed changes would have undermined the interpretation of the conservation mandate in the Management Policies and elevated enjoyment of the parks to a degree equal to conservation. Id. at 14-15. After a public process, the changes that Mr. Hoffman proposed were *rejected* by NPS in favor of the current version of the 2006 Management Policies. Id. at 16-17. Despite the fact that the proposed changes which NPCA found offensive were never adopted, NPCA nevertheless argues that the 2006 Management Policies are not a valid interpretation of the Organic Act. Id. at 17.

Aside from the dubious logic of these arguments, they do not warrant consideration because they are based on extra-record materials. See Federal Defendants' Summary Judgment Brief ("Fed. Def. Br.") (Docket No. 57) at 8-9 n.3. As a case brought pursuant to the Administrative Procedure Act ("APA"), this case is governed by the record review doctrine, and NPCA has not made a "strong showing" that the record should be supplemented with these materials. See, e.g., Fund for Animals v. Williams, 245 F. Supp. 2d 49, 58 (D.D.C. 2003), vacated on other grounds, 428 F.3d 1059 (D.C. Cir. 2005); Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 12 (D.D.C. 2001). Nor has NPCA demonstrated "bad faith or improper behavior on the part of the agency" or that "'the record is so bare that it precludes effective judicial review,'" in order to invoke an exception to

record review.  Fund for Animals v. Williams, 391 F. Supp. 2d 191, 198 (D.D.C. 2005) (quoting

Commercial Drapery Contractors v. United States, 133 F.3d 1, 7 (D.C. Cir. 1998)).

NPCA offers two rationales to support the Court's consideration of the submitted extra-

record materials.  First, as to certain press releases and other documents submitted with its brief in

opposition to Federal Defendants' Motion to Transfer and NPCA Appendix 2, Tabs 1-3, NPCA now

argues that the Court can take judicial notice of the facts in those documents based on Fed. R. Evid.

201(b).  See NPCA Opp. at 14 n.2; Fed. Def. Br. at 8-9 n.3 (listing documents referenced in NPCA's

summary judgment brief).  The concept of judicial notice is generally inapplicable in APA cases,

where the relevant inquiry is what information was before the agency, not what information is

available in the public domain.  See Rybachek v. EPA, 904 F.2d 1276, 1296 n.25 (9th Cir. 1990)

(construing motion to take judicial notice of extra-record documents as a motion to supplement the

record and denying the motion); Murakami v. United States, 46 Fed. Cl. 731, 739 (2000)

("[D]iscretion to take judicial notice must be exercised sparingly lest [Fed. R. Evid. P.] 201 be

wielded to create an exception that would envelop the established procedures for conducting

arbitrary and capricious review.").  NPCA is asking the Court to take judicial notice of a wide range

of factual statements, some of which could be contested, and the Court should refrain from doing

so.  Murakami, 46 Fed. Cl. at 739-40.

NPCA offers a second rationale for consideration of extra-record materials relating to the

revisions of the 2001 Management Policies.  See NPCA Opp. at 20-22.  This argument applies to

NPCA First App. Tabs 1-3.  Id.  NPCA argues that these documents constitute the "legislative

history" of the Management Policies and are relevant because "[t]he parties dispute the proper

interpretation of the Management Policies."  NPCA Opp. at 21.  NPCA likens these documents to

the legislative history of the Yellowstone Act cited by Federal Defendants in their brief.  Id.  The

Management Policies are not legislation and the process by which the Management Policies were

revised cannot accurately be called a legislative history.  Legislative history generally is composed

of public reports and transcripts of Congressional proceedings regarding drafts of *legislation* that

eventually become law.  It is used to clarify ambiguous terms or provisions contained in statutes and can be important in interpreting statutes, like the Yellowstone Act, which were enacted many years in the past.  The concept of legislative history has no meaning with respect to revisions to the Management Policies, which do not make any law and are themselves interpretation of the relevant statutory and regulatory provisions governing the management of the parks.  These documents cannot be considered legislative history.  Nor is the record skewed by the omission of these materials from the record.  See NPCA Opp. at 21-22.

But, even if the Court decides that it may consider some or all of the extra-record materials cited by NPCA, they are, nevertheless, entirely irrelevant to any issue before this Court.  Although NPCA claims that the revisions of the Management Policies are necessary for interpreting the 2006 Management Policies, it does not give one example of how any actual revisions to the policies should affect the Court's interpretation.  Instead, it discusses only proposed changes that were never made part of the 2006 Management Policies.  Such proposed changes can only serve to confuse the issues before this Court.  Indeed, the complete absence from the administrative record of the proposed drafts of the Management Policies offered by NPCA demonstrates that they were not considered by NPS during the rulemaking process and have no relevance in this case.[1/]  Thus, NPCA has failed to demonstrate that permitting snowmobiles in the park is inconsistent with the approved 2006 Management Policies, which were the policies applied by NPS during the rulemaking process.

C.    **NPS Has the Discretion to Permit Uses of the Parks Which Cause Acceptable Adverse Impacts to Park Resources**

NPCA argues that NPS does not have the discretion to *violate* the conservation mandate of the Organic Act on the basis that NPS is serving the dual purpose of providing for "enjoyment" of the parks.  NPCA Opp. at 20.  NPS has never taken the position that it may violate the conservation

---

[1/]    If NPCA is permitted to offer such extra-record materials, Federal Defendants would request that the Court also consider NPCA's own past statements.  See NPCA Press Release, "Final National Park Management Policies Preserve Parks' Mission," http://www.npca.org/media_center/press_releases/2006/page-28128124.html.

mandate of the Organic Act for any purpose, let alone to allow for enjoyment of the parks. To the contrary, the Management Policies provide that "when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant." Mgmt. Pol. § 1.4.3. However, "the laws do give [NPS] the discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values." Id. And, the Management Policies recognize that "[v]irtually every form of human activity that takes place within a park has some degree of effect on park resources or values, but that does not mean the impact is unacceptable or that a particular use must be disallowed." Mgmt. Pol. § 1.4.7.1. For each proposed use, NPS must determine whether it would cause unacceptable impacts and therefore be impermissible using the criteria set forth in the Management Policies. Mgmt. Pol. § 1.4.7.1. Accordingly, NPCA's characterization of Federal Defendants' position is mistaken.

### D. Federal Defendants Have Responded to NPCA's Arguments Regarding Impairment and the Applicable Legal Standards

Finally, NPCA argues that Federal Defendants have not responded to NPCA's arguments that the Winter Use Rule will cause impairment. NPCA Opp. at 22. To the contrary, Federal Defendants have fully described the record support for NPS's finding that the Winter Use Rule will not cause impairment. See Fed. Def. Br. at 9-38; see also id. at 36 n.21 (incorporating by reference the arguments made in opposition to Greater Yellowstone Coalition's impairment claim). Federal Defendants have fully rebutted NPCA's argument that NPS's analysis in the final environmental impact statement ("FEIS") did not take into consideration the relevant legal standards. NPCA Opp. at 22. Federal Defendants demonstrated that the entire NEPA and rulemaking process for the Winter Use Rule was guided by the relevant legal standards for governing the management of park resources, including the Organic Act and the Management Policies. Fed. Def. Br. at 34; see also AR 117160 (FEIS) at 4, 21. Indeed, NPS has thoroughly described the process that it used to evaluate impairment and unacceptable impact, and NPS analyzed all seven alternatives under those standards.

AR 117160 at 167-70, 364-74.  Accordingly, NPCA's argument that NPS has ignored the relevant

legal standards in its analysis in the FEIS is without merit.

## II.    The Executive Orders and NPS's Snowmobile Regulation

NPCA argues that NPS has not complied with Executive Orders 11644 and 11989 and its

snowmobile regulation, 36 C.F.R. § 2.18, because it has never properly interpreted the standards in

these documents.  NPCA Opp. at 6.  Relying solely on a dictionary definition, NPCA argues that the

Executive Orders and Section 2.18 operate to bar snowmobile use in Yellowstone.  See NPCA Reply

at 6-8.  NPCA's arguments are not grounded in the relevant statutory and regulatory framework or

the Management Policies and therefore fail.

NPCA is incorrect that NPS has not interpreted the standards in the Executive Orders and

the Section 2.18.  The Management Policies clearly recognize these standards and provide guidance

to park managers regarding the application of those standards.  Mgmt. Pol. § 8.2.3.1.  Using the

language of Executive Order 11989, the Management Policies state that off-road vehicle use may

not be permitted "whenever the use will cause unacceptable impacts on the soil, vegetation, wildlife,

wildlife habitat, or cultural and historic resources."  Mgmt. Pol. § 8.2.3.1.  Snowmobiling will only

be permitted when NPS determines through the issuance of special regulations that it is an

"appropriate use" and not result in "unacceptable impacts."  Mgmt. Pol. § 8.2.3.2.

Applying this standard in the record of decision ("ROD"), NPS quoted its snowmobile

policy, Mgmt. Pol. § 8.2.3.2, and stated:

> The decision to allow a limited number of snowmobiles and snowcoaches per day,
> when combined with other reasonable restrictions (BAT, 100% commercial guiding,
> nighttime use limits, and reduced speed limits) will not create unacceptable impacts
> to the parks' resources or values as supported by the analysis in the FEIS.  Further,
> consistent with 36 C.F.R. § 2.18, all oversnow vehicle use would occur on snow-
> covered roads or, in the cases of Jackson Lake in Grand Teton National Park, on the
> frozen surface of a lake that is used by motorboats in the summer.

AR 126499 (ROD) at 28.  NPS's analysis of whether the proposed snowmobile use would cause

unacceptable impacts complies with the mandates of the Executive Orders and Section 2.18.

The language that NPCA focuses on requires that snowmobile use be permitted "only when their use is consistent with the parks's natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources." 36 C.F.R. § 2.18(c).  NPCA interprets this language to mean that snowmobiling may only occur in park areas where "wildlife is not in abundance or is not generally found in the areas where snowmobile use is permitted." NPCA Opp. at 8.  NPCA's interpretation is, of course, entitled to no deference by the Court.  Moreover, NPCA's interpretation of Section 2.18 finds no support in the relevant statutory and regulatory framework.  NPCA ignores the fact that this language is not unique to the snowmobile regulation.  For example, NPS's regulations interpreting the broad requirements of the Organic Act contain a general requirement to "conserve scenery, natural and historic objects, and wildlife." 36 C.F.R. § 1.1(b).  The regulations also contain multiple references to wildlife and adopt rigorous wildlife protection standards mandated by the Organic Act.  The regulations prohibit "disturbing [wildlife] from its natural state." 36 C.F.R. § 2.1(a)(1); see also 36 C.F.R. § 2.2, Wildlife Protection.  Indeed, the regulation governing bicycle use in the parks contains a nearly identically worded requirement that such use be "consistent with the protection of a park area's natural, scenic and aesthetic values, safety considerations and management objectives and will not disturb wildlife or park resources." 36 C.F.R. § 4.30(a).  Thus, the requirement that recreational uses of the parks not "disturb wildlife" is not a separate higher standard that is applicable only to snowmobiles; rather, it is derived from the underlying mandate of the Organic Act and is similar to the regulatory requirements applicable to all users of the parks, not just snowmobile users.

NPCA's interpretation of the "disturb wildlife" language in NPS's regulations strains credulity.  It would not only ban snowmobiles, it would ban virtually all human uses of the parks. If a person walking through a park caused an animal to raise its head in response or accidentally stepped on an ant hill, NPCA's standard would be violated.  Fortunately, the requirement that recreational uses not "disturb wildlife" does not have the meaning the NPCA ascribes to it and has never been interpreted that way by NPS.  NPS's Management Policies interpret this requirement as

requiring that NPS maintain wildlife by "minimizing human impacts on native plants, animals, populations, communities, and ecosystems, and the processes that sustain them." Mgmt. Pol. § 4.4.1. NPS has not interpreted the "disturb wildlife" standard to require no impact on wildlife whatsoever, and, of course, such an interpretation would generally render it impossible to meet its mandate to provide for visitor enjoyment of the parks. As discussed above, with respect to snowmobile use, NPS uses the "unacceptable impact" standard to determine whether snowmobile use is appropriate in park areas. Mgmt. Pol. 8.2.3.1 - 8.2.3.2. Regarding the Winter Use Rule, NPS has complied with the mandates of the Organic Act and its own regulations, by implementing a plan that will minimize impacts to wildlife and will avoid unacceptable impacts. See Special Regulations, Areas of the National Park System, 72 Fed. Reg. 70781, 70782 (Dec. 13, 2007); AR 126499 (ROD) at 28.

## III.    The Yellowstone Enabling Act

NPCA argues that the Yellowstone Enabling Act contains a strict standard altogether prohibiting any disturbance of wildlife, which is violated by the Winter Use Rule. NPCA Opp. at 8-10. NPCA's standard is found nowhere in the statute. Rather, with respect to wildlife, the statute specifies that "hunting, or the killing, wounding, or capturing at any time of any bird or wild animal, except . . . when it is necessary to prevent them from destroying human life or inflicting an injury, is prohibited," and also gives the Secretary the authority "as he may deem necessary and proper" to publish regulations "for the protection of the animals and birds in the park, from capture or destruction or to prevent their being frightened or driven from the park." 16 U.S.C. § 26. Another section provides similar regulatory authority to "provide against the wanton destruction of the fish and game found within the park, and against their capture or destruction for the purposes of merchandise or profit." 16 U.S.C. § 22. NPCA's interpretation of that section and 16 U.S.C. § 26 as strictly prohibiting any disturbance of wildlife is contrary to the plain language of the statute.

Ignoring that plain specific language, NPCA instead argues that other general language in 16 U.S.C. § 22 regarding "natural curiosities, or wonders" applies to wildlife, and that therefore a

stricter standard applies. NPCA's broad interpretation of the terms "natural curiosities" and "wonders" finds no support in the Yellowstone Act or its legislative history. See Cong. Globe, 42d Cong., 2d Sess., 697 (1782); H.R. 26, 42d Cong. (1872). Moreover, as a matter of statutory construction, even if these broad terms could be read to include wildlife, the Court should still look to the specific statutory provisions about wildlife in order for the relevant standard and authorities for wildlife. Accordingly, the Yellowstone Enabling Act creates no specific requirements relevant to this case which NPS has not already complied with through its compliance with the Organic Act.[2/]

## IV.    NPS's Analysis of Impacts Under the Applicable Substantive Standards in the FEIS

### A.    Noise Impacts

NPCA's arguments regarding noise impacts misconstrue the materials in the administrative record and in no way undermine NPS's determination that the Winter Use Rule will not result in unacceptable noise impacts.

### 1.    NPS Evaluated All Three Sound Metrics in Determining Whether Unacceptable Impacts Would Result

NPCA argues that NPS only considered the total park area metric in rating the noise impacts from the various alternatives examined in the EIS and the ROD. NPCA Opp. at 24-26. NPCA's position is without basis. As already demonstrated, NPS considered two other metrics in its noise analysis: (1) the percent time audible at certain locations within the park, and (2) the sound level at certain locations. Fed. Def. Br. at 13. NPCA makes the point that, contrary to what is stated in the FEIS, NPS did not assign an overall noise rating for each alternative. NPCA Opp. at 25. However, NPCA's related assertion that NPS "did not even rely on all three metrics to the same extent" is inaccurate. Id. In fact, NPS examined all three metrics in its analysis of the impacts of each

---

[2/]    Contrary to NPCA's assertions, Federal Defendants do not argue that the Yellowstone Enabling Act provides no restrictions of its own. See NPCA Opp. at 8-9. Federal Defendants agree that the Yellowstone Enabling Act's provisions grant regulatory authority and impose certain restrictions that do not also flow from the Organic Act. However, none of these provisions have any relevance here or impose any additional "conservation" duty that is not satisfied through NPS's compliance with the Organic Act.

alternative.  For alternative 7, NPS found that impacts in Yellowstone were as follows: total park area – moderate,  percent time audible – major, and sound level – minor.  AR 117160 at 339.  These same findings are stated in the ROD.  AR 126499 at 33-34.  Therefore, NPCA's argument that only the total park area metric was considered is without basis.[3]

Because NPS considered all three metrics in determining the noise impacts of the Winter Use Rule, NPCA's argument that NPS's reliance on only the total park area metric was arbitrary and capricious is without any factual basis.  NPCA Opp. at 26-27.  In evaluating whether noise from oversnow vehicles will cause unacceptable impacts, the ROD states:

> As modeled for Yellowstone, in about 13.8% of the park over the average day, oversnow vehicles will be audible at some level.  From the *overall park perspective*, this will constitute a *moderate*, adverse, short-term, and direct impact. . . .  Impacts due to *percent time audible* will be *major* in Yellowstone to moderate in Grand Teton and the Parkway, adverse, and short-term impacts.  Impacts due to maximum *sound levels* will be *minor*, adverse, and short-term in the parks.

AR 126499 at 33-34 (emphasis added).  The ROD further explains why, even though the percent time audible metric indicates a major, adverse, short-term noise impact in Yellowstone, noise impact generally will not constitute unacceptable impacts.  Id. at 34.  First, NPS finds based on the total park area metric that NPS's proposed use levels (which would result in 13.8% audibility) compare favorably to both current conditions (14.4% audibility) and historical conditions (16.8%).  Id.  Second, NPS finds that the implementation of BAT technology for snowcoaches will reduce noise impacts compared to current conditions.  Id.  And, third, based on NPS's professional judgment, as guided by the Management Policies, NPS's finding that the noise impacts from Winter Use Rule will not harm the integrity of park resources and values.  Id.; see also AR 117160 at 334-42.  Based on these reasons, as supported by the thorough analysis in the FEIS, NPS's decision that noise impacts will not cause unacceptable impacts was not arbitrary or capricious.

---

[3]     In support of its argument that only the park wide metric was considered, NPCA also references Table 4-66 in the FEIS.  NPCA Opp. at 26 (citing AR 117160 at 342).  However, as its title indicates, the table is a summary of the park wide metric only and does not purport to be a summary of all three sound metrics.

NPCA's related argument that NPS's analysis of noise impacts is not entitled to deference also is without basis. <u>See</u> NPCA Opp. at 27. NPCA argues that NPS is entitled to no deference because evaluation of noise impacts is not within NPS's "area of special expertise" and because the model was developed by the Federal Aviation Administration ("FAA"). <u>Id.</u> NPCA is wrong. The D.C. Circuit has deferred to the technical expertise of NPS and FAA in applying the Integrated Noise Model ("INM"), the model used by Volpe to evaluate noise in Yellowstone and Grand Teton. <u>U.S. Air Tour Ass'n v. FAA</u>, 298 F.3d 997, 1008-09 (D.C. Cir. 2002). Finally, as explained below, the comments of NPS's own sound experts do not demonstrate any significant flaws in the INM model.

**2.    NPS Has Fully Explained How It Has Incorporated the Results of Noise Monitoring Data Into Its Analysis of Noise Impacts**

NPCA argues that, even if NPS considered all three noise metrics in its analysis (which NPS did), the noise model is arbitrary and capricious because the results of noise monitoring conducted by NPS do not precisely match the results of NPS's noise modeling. NPCA Opp. at 27-30. Federal Defendants already have demonstrated that it was necessary to use modeling as a predictive tool so that NPS could compare the noise impacts of the different alternatives analyzed in the FEIS. Fed. Def. Br. at 16. NPCA now concedes this point. NPCA Opp. at 28. Instead, NPCA argues that the results of NPS's modeling "are not a reasonable basis on which to judge the impact of the Winter Use Plan because those results are totally at odds with the known data derived from the monitoring studies." <u>Id.</u> NPCA's analysis ignores the fact that the monitoring data formed the very basis of NPS's modeling. Fed. Def. Br. at 11; AR 117160 at 137-47. As explained in the FEIS, the Volpe model relied on NPS's monitoring data for sound level inputs to the model: "The best available natural ambient sound levels were provided by the NPS and natural ambient sounds maps were generated for the parks." AR 117160 at 301; <u>see also</u> AR 125352 (Volpe study) at 2, 14. NPS's monitoring data was also used to calculate noise-speed-distance ("NSD") relationships for over snow vehicles. AR 117160 at 301; AR 125352 at 18. Accordingly, NPCA's position that the Volpe

model is "totally at odds with the known data" simply represents a misunderstanding of how the data were used to model noise impacts.

NPCA goes on to argue that "there is something very wrong" with the model because the monitoring data gathered by NPS are not the same as the results predicted by NPS's modeling. NPCA ignores the fact that NPS has fully recognized the differences between monitoring data and modeling data and explained why those differences exist. AR 117160 at 301-02. Modeling did not take into account noise from administrative vehicles or other ambient noise, both natural and non-natural. Id. at 302. In addition, monitoring conditions at any given time may differ from the conditions that were modeled, thus affecting perceived sound levels. Id. Modeling data also rely on average noise emissions from vehicles, whereas monitoring data will capture noises from vehicles that are both noisier and quieter than average. Id. Weather conditions, such as temperature inversions, and intermittent ambient noises, such as wind, thermal activity, flowing water, and aircraft, may mask OSV noise. Id.

Despite these and other factors which make comparison of monitoring data and modeling data difficult, NPS compared the two sets of data. NPS found that for 4 sites, the data were similar, but for 8 other sites, the data were not as similar and that the modeled data were lower than the monitoring data. Id. 302-03. These differences are explained by the factors described above. Choosing to ignore what is stated in the FEIS, NPCA implies that NPS did not consider these differences in setting noise impact thresholds. This insinuation is false. The FEIS states: "The specific thresholds consider only visitor (recreation) sound impacts and not those of administrative travel; therefore, the thresholds *are reduced accordingly*." Id. at 303. Thus, not only did NPS properly incorporate the monitoring data it its modeling, it also tested its modeled results against monitoring data and adjusted its impact thresholds accordingly.

NPCA's additional points lack merit. NPCA argues that noise readings at Old Faithful were higher than predicted by the model and analyzed in the FEIS. NPCA Opp. at 31. While it is true that the monitoring data at Old Faithful showed 31 exceedances of the 70 dBA threshold in the

winter of 2006, those exceedances were, except for one instance, not caused by snowmobiles.  AR 125050 at 47.  Rather, they were mainly caused by helicopters, snow groomers, and natural sounds. Id.  As already explained, the modeling data does not include noise from those other sound sources, but only for recreational OSV use.  Therefore, NPCA's overly simplistic comparison of the data does not show a flaw in the model.  NPCA also argues that the monitoring data themselves underestimate impacts because OSV use under the Winter Use Plan will be "more than doubled" as compared to current usage levels.  NPCA Opp. at 29.  NPCA has misread the Winter Use Rule.  The daily entry limits will not double.  Rather, as to snowmobiles, the daily entry limit will decrease from 720 under the temporary rule to 540 under the Winter Use Rule, a 25 % reduction from the current level and a roughly 43 % reduction from the 950 level in the 2003 rule.  The level of snowcoaches permitted will remain virtually the same – 78 versus 83.  As a general proposition, noise impacts can be expected to be greatest on days with the highest levels of use.  AR 125292 at 16.  During the three winters preceding adoption of the Winter Use Rule, the highest daily level of snowmobiles was 542.  AR 120174 at 4; AR 126499 at 20.  NPCA's argument that noise levels will be higher when fewer snowmobiles are permitted to enter the park on a daily basis and daily entries are capped at the highest level of use during the past three winters is nonsensical.

### 3.    The Record Supports NPS's Finding that Noise Exceedances Were Primarily Attributable to Road Grooming Equipment or Snowcoaches

In evaluating the monitoring data, NPS found that exceedances of noise thresholds were primarily attributable to either road grooming equipment or snowcoaches, which are noisier than snowmobiles, especially older model Bombardiers.  AR 126499 at 21; AR 116170 at 147.  Contrary to NPCA's assertion, NPCA Opp. at 33, the record fully supports this conclusion.  As described in the FEIS, monitoring data for the winter of 2006 showed that sound levels from OSVs occasionally exceeded the temporary plan threshold of 70 dBA at three of the five sites: the Old Faithful Weather Station, Madison Junction 2.3 (a site 2.3 miles west of Madison Junction), and Spring Creek.  AR 117160 at 147.  As shown in the monitoring report for the winter of 2006, at the other two sites, Old

-14-

Faithful Upper Basin and West Thumb Geyser Basin, there were few to no loud motorized events, and therefore those two sites were not included in the exceedance analysis. AR 125050 at 47. In the monitoring report, recordings of 70 dBA for 1 second or 60 dBA for 10 seconds were considered exceedances. Id. at 47 n.1. At Old Faithful Weather Station, there were such 31 exceedances, 1 of which was attributable to a snowmobile, 2 to snowcoaches, 5 to snow groomers, 1 to a propeller plane, 17 to helicopters, 1 to people, 3 to natural sounds, and 1 unknown. Id. At Spring Creek, there were 79 exceedances, 70 of which were attributed to snowcoaches and 9 to snow groomers. Id. At Madison Junction 2.3, there were 386 exceedances, 118 of which were attributable to snowmobiles, 124 to snowcoaches, 3 to oversnow vehicles, 127 to snow groomers, 1 to a propeller plane, and 5 to natural sounds. Id.[4]

For the winter of 2007, which NPCA specifically references, the results were similar. In the 2007 report, five sites were tested, although they were not all the same sites as 2006: Old Faithful Weather Station, Madison Junction 2.3, Spring Creek 2, Mud Volcano, and Fern Lake. AR 125292 at 6-9. The monitoring data indicated that few to no loud noises were recorded at Mud Volcano, Fern Lake, or Old Faithful Weather Station. Id. at 31. At the two sites where exceedances were recorded, at Spring Creek 2, there were 349 exceedances, 2 of which were attributed to snowmobiles, 346 to snowcoaches, and 1 to an unidentified oversnow vehicle. Id. At Madison Junction 2.3, there were 96 exceedances, 11 of which were attributed to snowmobiles, 81 to snowcoaches, 2 to snowgroomers, and 2 to natural causes. Id. Ignoring the data plainly presented in the study, NPCA misconstrues the text, arguing that it finds that "no measurements could be taken at the Old Faithful Weather Station site," NPCA Opp. at 33, when what it actually says is: "The distance and slow OSV speeds caused few loud events to be recorded [at Old Faithful Weather

---

[4]    The underlying data show that 70 dBA was only exceeded 129 times at Madison Junction 2.3, and of those instances, 100 were attributed to snowcoaches, 20 to snowmobiles, 2 to either a snowmobile or snowcoach, and 7 to a road groomer. AR 125126-29; AR 117160 at 147.

Station]." AR 125292 at 31.   Indeed, data from Old Faithful Weather Station were collected and analyzed. Id. at 18-21.

In addition, the statement in the 2007 monitoring study that "[i]t was increasingly difficult to identify sound sources as distances increased from the recording location to the sound source," does not apply to the exceedance analysis. Id. at 10.   Rather, the identification of sound sources referenced here is for the purpose of calculating a percent time audible figure for snowmobiles and snowcoaches. Id. at 10, 20-21, 26-27.   Finally, NPCA ignores the study's conclusion that: "Although on average snowmobiles were audible for more time than snowcoaches, snowcoaches in general had higher sound levels, especially at higher speeds." Id. at 2.   Accordingly, the record fully supports NPS's conclusion that exceedances were primarily caused by snowcoaches or snow groomers.   That finding, in turn, justifies NPS's decision to implement snowcoach BAT along with a 25% reduction in the number of snowmobiles permitted per day.   AR 126499 at 20-21.

### 4.    The Comments of NPS's Scientific Staff Do Not Demonstrate that NPS's Noise Modeling Was Inadequate

In an attempt to undermine NPS's noise analysis, NPCA quotes snippets of e-mails of NPS's scientific staff who worked on the development of the noise model and analysis of the modeling and monitoring data.   NPCA Opp. at 27, 30-33.   Far from demonstrating that the analysis in the FEIS is inadequate, these e-mails and relevant portions of the administrative record demonstrate that there was a healthy discussion among NPS's staff regarding the strengths and weaknesses of the noise analysis and the robustness of NPS's final analysis and the conclusions drawn therefrom.   The e-mails cited by NPCA demonstrate no flaw in the analysis that would render it arbitrary or capricious.

First, NPCA's suggestion that NPS staff questioned the use of the Volpe model is false.   See NPCA Opp. at 27.   Karen Trevino, whose e-mails NPCA cites, works with NPS's Natural Sounds Program and was involved in initial internal scoping meetings for the EIS in May 2005.   AR 119280. Ms. Trevino was involved in selecting the Volpe Center and the use of the INM model.   See AR 124700-13; see also AR 119321.   Kurt Fristrup, who works with Ms. Trevino in the Natural Sounds

Program, provided comments on an internal review draft of the EIS on October 5, 2006. AR 117002 Neither in these comments nor in any subsequent comments did any of NPS's sound experts question the use of the INM model. See id; AR 116973, AR 125248, AR 125262; AR 125274-75.

Second, NPCA argues that comments relating to the differences between the modeled data and the monitored data demonstrate a flaw in the model. NPCA Opp. at 30-31 (citing AR 125248), 32-33 (citing AR 125263). As already discussed, NPS has recognized and explained the differences between modeled and monitored data and adjusted its model accordingly. In addition, NPS has taken the monitoring data into account in its decision making process. The monitoring data are provided and discussed in the ROD. AR 126499 at 20-21. Moreover, through adaptive management, NPS will continue to use the monitoring data to evaluate impacts, and, if noise impacts become unacceptable, NPS will adjust the levels of OSV use. Id. at 5-6.

Third, NPCA's insistence that the noise analysis is inadequate because it did not use "speech interference" methodology is misguided. A draft speech interference paper was presented to the team by Frank Turina, who also works with Ms. Trevino, on September 25, 2006. A later draft paper discussing speech interference was distributed by Mr. Fristrup on February 13, 2007. AR 125164. However, these papers were not finalized during the EIS process. Fed. Def. Br. at 17-18 n.11. And the interest in including speech interference analysis was not uniform. One NPS scientist stated, "it will be a sad day in the NPS if speech interference measures, especially as described in this paper [distributed by Mr. Turina] take precedence over other procedures to assess noise impacts." AR 125057. Even Ms. Trevino acknowledged that speech interference analysis was not necessary: "I wouldn't go so far as to say that its absence detracts from the analysis." AR 125248. NPCA gives no explanation as to why using speech interference, which was only available in draft form at the time of NPS's analysis, is necessary.

Finally, NPCA's remaining arguments that comments relating to sound levels from OSVs and the cumulative effects of OSV noise were not considered are without merit. See NPCA Opp.

at 32. These topics are thoroughly addressed in the FEIS. AR 117160 at 301-42. Accordingly, NPCA has raised no criticisms that undermine the validity of the noise modeling or NPS's analysis.

### B.    Wildlife Impacts

NPCA's wildlife arguments rely almost entirely on its insistence that NPS has not sufficiently considered the results and recommendations of various studies that it commissioned regarding impact to wildlife. NPCA's selective reading of the relevant studies does not demonstrate that NPS's consideration of the scientific data was so inadequate as to render its decision arbitrary or capricious.

### 1.    NPS Considered the Findings of Wildlife Scientists

As it did in its opening brief, NPCA argues that NPS did not follow the specific recommendation of its wildlife scientists regarding the appropriate level of snowmobile use. See NPCA Opp. at 34-35. In making this argument, NPCA narrowly focuses on just one of the scientists' recommendations and, in doing so, loses sight of the overall findings of the studies. Those studies (the White and Borkowski studies) found that wildlife populations have been largely unaffected by over snow vehicle use over the past 35 years and that individual animals are most likely to demonstrate no observable response in the presence of OSVs. AR 125701 (White) at 20; AR 125625 (Borkowski) at 1924. The scientists do not find that the wildlife reactions observed in their studies are harmful to wildlife. Rather, the scientists recognized that the decision as to whether to allow over snow vehicle uses in the parks, or other types of uses, is largely a value judgement and a policy choice that ultimately must be made by policymakers. See AR 125701 at 1 (White) ("Regardless, differing interpretations of behavior and physiological response data will continue to exist because of the diverse values and beliefs of the many constituencies of Yellowstone."); AR 125625 at 1923 (Borkwoski) ("[S]cience cannot resolve issues where policy is advocated due to values judgments and perceptions about what is appropriate in national parks."). Furthermore, it is not just OSV use that may cause reactions in wildlife; rather *all* forms of use have the potential to cause some reaction. "[I]t is unrealistic to expect winter recreation or administrative travel by park

staff to be totally benign, regardless of whether that activity is skiing, snowshoeing, snowmobiling, or driving an automobile." AR 125625 at 1923. NPS adequately considered the findings of the White and Borkowski in its analysis in the FEIS. See AR 117160 (FEIS) at 112, 114-15, 128-29.

Despite the fact that NPS has thoroughly considered the data and findings of these studies in the FEIS, and the scientists themselves have not purported to make the types of policy judgments that must be made by NPS, NPCA argues that NPS did not sufficiently follow the scientists' recommendations regarding the level of use. First, NPCA misconstrues Federal Defendants' argument in its initial brief. See NPCA Opp. at 34. Federal Defendants never suggested that White only considered OSV data from the West Entrance. Rather, Federal Defendants cited data from the West Entrance because it is specifically listed in the White study. AR 125701 at 11. Second, abandoning its prior unsupported argument that the scientists recommended 260 snowmobiles and 29 snowcoaches per day, NPCA now argues that the scientists recommended that OSV levels be kept below 50,000 per season. NPCA Opp. at 35. The White study did, indeed, "recommend park managers consider maintaining OSV traffic levels at or below those observed during our monitoring," which were below 50,000 oversnow visitors. AR 125701 at 20. Federal Defendants already have demonstrated that the *lowering* of the daily entry limit from 720 snowmobiles per day to 540 per day was done with the intention of keeping OSV use at roughly the same levels as the last three winters under the temporary rule. Fed. Def. Br. at 32; AR 120174 at 4; AR 126499 (ROD) at 20.[5] NPCA's assertion that the Winter Use Rule amounts to a "doubling" of the number of snowmobiles permitted in Yellowstone is simply erroneous. See NPCA Br. at 38. Based on the *lowering* of the daily entry limit, in all likelihood, the number of over snow visitors *will* be under 50,000, and if it is not and unacceptable conditions result, NPS will adjust the daily limit

---

[5] NPCA's argument that NPS must expect that 540 snowmobiles will enter the park each day is without merit. See NPCA Opp. at 23-24. As Federal Defendants have demonstrated, usage under the temporary rule peaked during certain times of the year and that pattern can be expected to continue with a lower daily cap. Fed. Def. Br. at 27 n.15, 32.

downwards. AR 126499 (ROD) at 5-6, 34, 39-40, 48-50. As stated numerous times in the FEIS, NPS adhered to the recommendation of the scientists to lower the daily OSV entry limits in order to minimize impacts to wildlife. See, e.g., AR 117160 at 260 ("The qualitative assumptions, grounded in the available literature on bison and elk, made in this analysis are that increases in winter traffic levels and associated human recreational activity cause increases in vehicle-caused mortality, wildlife displacement, behavior- or physiology-related energy costs, and the potential for adverse demographic impacts."); see also id. at 261, 263, 264, 266, 268 & 270. Thus, NPCA is wrong when it says that the recommendation of the White study regarding usage levels was not considered.

However, even if this Court finds that NPS did not precisely follow the recommendation of the White study to keep visitation below 50,000 over snow visitors, that is not sufficient grounds to find that NPS's analysis of wildlife impacts was arbitrary and capricious. That recommendation (which was offered for consideration by NPS) is not binding on NPS. Cf. Citizens Against Burlington v. Busey, 938 F.2d 190, 201 (D.C. Cir. 1991) ("[U]nder the rule of reason, a lead agency does not have to follow the EPA's comments slavishly – it just has to take them seriously."). In setting a daily use level, NPS had a number of other factors to consider, including that: (1) the daily entry numbers from the Borkowski study, which contained similar findings to White, were higher than in the White study, including years of 514, 486, and 593 average daily entry levels at the West entrance alone, AR 125625 at 1915; (2) decreased snowmobile use would likely mean increased snowcoach use, and snowcoaches, because they are bigger than snowmobiles, are more likely to elicit behavioral responses from wildlife, AR 117160 at 250; (3) NPS's own wildlife monitoring studies, which for the 2007 winter showed that 96.1 % of bison responses to OSVs and 98.2 % of elk responses were either no response or "look/resume," AR 125741 at 23, and (4) there is an increasing consensus among wildlife biologists that winter use is not affecting wildlife populations. AR 117160 at 121-26. As NPCA recognizes, NPS also considered that increasing OSV use may result in some unobserved and unquantifiable physiological effects, resulting on increased stress on

-20-

wintering wildlife.  AR 117160 at 254-55.  Considering all of these factors and all of the record materials, NPS made a reasoned decision to permit a cap of 540 snowmobiles and 83 snowcoaches per day.  AR 126499 at 20; AR 120174 at 4.

### 2.      NPS Did Not Disregard Impacts to Individual Animals

Although NPCA argues that impacts to individual animals were not sufficiently considered in the analysis in the FEIS, it does not seriously dispute that such impacts were considered.  Indeed, as already demonstrated, the impact definitions include impacts to individuals.  See, e.g., AR 117160 at 257 (the definition of major effects, for example, is "An action that will noticeably affect a population or individuals of a species . . . .").  NPCA is wrong to suggest that, even though impacts to individual are mentioned in the rating scale, that the only real consideration in NPS's assigning of a rating was impacts to populations.  NPCA Opp. at 37.  While impacts to populations were an important consideration, if impacts to individuals were noticeable, then NPS could have found that such impacts were major based on the definitions in the FEIS.  However, NPS did not make that finding because the record does not support such a conclusion.

NPS's analysis does not brush aside concerns about effects on individual animals; rather, it fully considers them in the FEIS and ROD.  At least two of the five factors used to rate impacts to wildlife – physiological effects and vehicle-caused mortality – relate specifically to impacts to individuals, not populations.  AR 117160 at 251.  As discussed above, the White and Borkowski studies both found that most individual animals had no observed response to OSVs.  And, as NPCA acknowledges, NPS did consider that increasing OSV use may result in unquantifiable physiological effects, such as increase in heart rate, blood pressure, breathing rate, and release of adrenaline.  NPCA Opp. at 36 & n.5 (citing AR 117160 at 254-55).[9]  In response to those concerns,

---

[9]      NPCA's citation to a draft of the White study further discussing these physiological effects serves only to demonstrate that these effects are difficult to quantify.  NPCA Br. at 36 (citing AR 125605 at 19).  Attempts by researchers to link levels of glucocorticoids secreted by the adrenal cortex in elk with OSV use have been inconclusive.  AR 125605 at 19.

NPS has taken measures to minimize interaction between wildlife and OSVs, including reducing the daily entry limit, requiring commercial guides, and monitoring wildlife interactions to determine whether unacceptable impacts are occurring. AR 117160 at 258. If unacceptable impacts are found to be occurring, NPS will reduce OSV use or even close certain areas of the park to OSV use. Id.; AR 126499 (ROD) at 5-6.

In addition, NPS's finding that the impact of vehicle mortality to bison and elk would be negligible is fully supported by the record. AR 117160 at 251, 269. Indeed, the White study reported that, during a 10 year period of unmanaged and, therefore, relatively high snowmobile use, only 10 bison, 3 elk, 2 coyotes, and 1 moose were killed by snowmobiles in Yellowstone. AR 125701 at 17. During that same period, 98 bison, 425 elk, 75 coyotes, 84 moose, and 406 other large animals (bears, bighorn sheep, deer, pronghorn, and wolves) were killed by wheeled vehicles. AR 125701 at 17. Accordingly, NPS's finding that impacts to individuals from vehicle mortality would be negligible was reasonable, particularly when compared to other uses in Yellowstone.

Contrary to NPCA's assertions, NPS did evaluate the impacts to individual animals under the applicable standards and made a reasoned determination that the potential impacts to individuals and populations of wildlife were acceptable. AR 117160 (FEIS) at 248-301; AR 126499 (ROD) at 32-34. NPCA just disagrees with the NPS's conclusion that the impacts are acceptable, largely because it misinterprets the Organic Act, NPS regulations, and the Yellowstone Act to require absolutely no disturbance whatsoever of wildlife in the parks. See NPCA Opp. at 38. As already demonstrated, this interpretation is inconsistent with any prior interpretation of the applicable standards and would prevent anyone from using and enjoying the parks. Accordingly, NPS has properly analyzed impacts to wildlife under the governing standards and reached a reasoned decision that is supported by the record.

## C.    Air Quality Impacts

In their initial brief, Federal Defendants demonstrated that the FEIS contains a thorough analysis of potential air quality impacts from the Winter Use Rule, that NPS has verified the

accuracy of its model through monitoring, and that all predicted emissions will be well below all applicable legal standards and below NPS's stricter adaptive management standards. Fed. Def. Br. at 20-27. Indeed, NPCA recognizes in its noise arguments that NPS's air quality modeling data and monitoring data were similar, which supports NPS's argument that its air quality model is accurate. See NPCA Opp. at 28. In its reply, NPCA argues that the assumptions in NPS's air quality model regarding snowmobile carbon monoxide ("CO") and particular matter ("PM") emissions were inaccurate based upon a 2007 emissions study and an e-mail drafted by an NPS chemist. NPCA Opp. at 39-40. Federal Defendants already have demonstrated that these contentions are without merit. Fed. Def. Br. at 25-26. Further explanation is provided below.

NPCA's argument that NPS has ignored the findings of a 2007 emission study conducted by Dr. Gary Bishop at the University of Denver is utterly unfounded. Indeed, NPS fully considered the results of both the 2006 and 2007 emission studies conducted by Dr. Bishop in the FEIS. AR 117160 at 93, 219. As a preliminary matter, NPCA completely mischaracterizes the results of those two studies. The 2006 study contained 960 emissions measurements from 341 snowmobiles. AR 110761 at 8-9. The 2007 study analyzed emissions from two snowmobiles, using different techniques. AR 110761 at 27. NPCA's assertion that the studies are similar because the 2006 study tested three "brands" of snowmobiles and the 2007 study tested two "brands" is incorrect and irrelevant. See NPCA Opp. at 39. Indeed, the primary purpose of the 2007 study was to conduct additional emissions monitoring of *snowcoaches* using a portable emissions monitoring system ("PEMS"). AR 111471 at 1-2. "If time allowed," the researchers "were interested in trying to duplicate the PEMS measurements on one or two snowmobiles driven over the same route as the snowcoaches." Id. at 2. In fact, using this technique and measuring only two snowmobiles, the study found *lower* CO emissions than it did in the 2006 study (15 versus 21 g/mile/person for 4-stroke snowmobiles). Id. at vi.

Moreover, although the data in the Bishop studies were considered by NPS, the actual data used by NPS in the modeling for snowmobiles were not these data, but rather U.S. Environmental

Protection Agency ("EPA") certified modal emission testing results for BAT-approved snowmobile engines of three different manufacturers. AR 117160 at 218; AR 111561 at 18. As NPCA suggests, the authors themselves recognized that there were inherent problems with the PEMS data from the snowmobiles in the 2006 study. AR 111471 at 27. And, the 2007 study only analyzed PEMS data from two snowmobiles, a 2006 Arctic Cat and a 2004 Ski Doo (the latter of which experienced technical problems in its measurements). Id. at 27-30. Accordingly, the EPA certified data were considered to be the best available data for modeling snowmobile emissions. AR 117160 at 217-19. However, the emissions factors based on the EPA data and used in the modeling are comparable to the data from Dr. Bishop's 2007 study. Based on the EPA data, CO emissions were calculated to be 35.1 g/mile at 15 mph and 22.9 g/mile at 35 mph. AR 111561 at 18. Dr. Bishop's 2007 study resulted in a time weighted mean of 45 g/mile at low speed and 14 g/mile at cruising speed. AR 111471 at 31. These data were skewed by the low speed measurement for the older model Ski Doo, which, because of the way its engine operates, produces more CO at idle than the Arctic Cat. Id. at 31-33. Thus, NPCA's criticism that the Bishop data demonstrate false assumptions in the model is unfounded. Finally, the close correlation between the modeled data and actual monitoring data demonstrate the accuracy of the model. AR 117160 at 221.

NPCA's additional argument relying on a September 2005 e-mail from an NPS atmospheric chemist, John Ray, is equally without merit. As Federal Defendants have already pointed out, the e-mail is not a critique or comment about the accuracy of NPS's air quality model. AR 110545. Rather, it is a response to a newspaper article discussing two unidentified NPS studies and asserting that those studies show that "[s]now coaches may be a less harmful way to travel Yellowstone Park than noisy and polluting snow mobiles." Id. at 2. Dr. Ray begins his e-mail by stating: "Interesting how selective pieces of information can be used from a report. The key phrase is 'new snow coaches are cleaner . . . .' Our data supported that. However, back to the real world – the current fleet of not-so-new snow coaches actually came out has having greater emissions per passenger than the current snowmobiles entering the park." Id. at 1. Dr. Ray further states, "The news article below

-24-

also picked on the least used of the 4-stroke snowmobiles entering the park. The Arctic Cats [snowmobiles] had a greater reduction in CO. Left out of the news article is the 96% reduction in hydrocarbons by the 4-stroke snowmobiles." Id. Finally, in the portion of the e-mail cited by NPCA, Dr. Ray states that "our emissions data don't seem to support that the 4-stroke snowmobiles are as clean as they are suppose to be." Id. However, it is clear from the e-mail that Dr. Ray is discussing a preliminary analysis – "I'm still working at getting rough numbers for the percentage of pollution reduction due to fewer snowmobiles vs lower emissions." Id. And, as NPCA admits, the results of the air quality modeling are very close to the monitoring data, thus demonstrating the accuracy of the model. AR 117160 at 221.

## CONCLUSION

For the foregoing reasons and all of the reasons stated in their opening brief, Federal Defendants respectfully submit that Defendants' motion for summary judgment should be granted, and NPCA's motion for summary judgment should be denied.

Respectfully submitted this 1st day of August, 2008.

RONALD J. TENPAS
Assistant Attorney General

 /s/ *Luther L. Hajek*
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469
Fax: (202) 305-0274
Guillermo.Montero@usdoj.gov

OF COUNSEL:
JASON WAANDERS
U.S. Department of the Interior        Attorneys for the Defendants
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C. 20240
Tel: (202) 208-7957