IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                       )
GREATER YELLOWSTONE COALITION,         )
et al.,                                )
                                       )
            Plaintiffs,                )
                                       )        Case No. 07-cv-2111 (EGS)
       v.                              )
                                       )        [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,               )        Judgment on August 27, 2008]
                                       )
            Defendants.                )
_____)


_____
                                       )
NATIONAL PARKS CONSERVATION            )
ASSOCIATION,                           )
                                       )
            Plaintiff,                 )
                                       )        Case No. 07-cv-2112 (EGS)
       v.                              )
                                       )        [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE        )        Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE        )
                                       )
            Defendants.                )
_____)


**FEDERAL DEFENDANTS' SUPPLEMENTAL BRIEF
IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Federal Defendants respectfully submit the following supplemental memorandum in support of their cross-motion for summary judgment and in opposition to Plaintiffs' motions for summary judgment. This brief is submitted pursuant to the Court's instruction that the parties submit papers by August 29, 2008, 12:00 P.M. The following provides additional information in response to questions posed by the Court or challenges posed by the Plaintiffs during the motions hearing.

**1.      What was the basis for the 540 limit on snowmobiles?**

The Plaintiffs miss the point in criticizing the Service's selection of the 540 snowmobile cap in Alternative 7 as lacking sufficient basis. As Defendants have argued, there is no requirement under the Organic Act that the Service implement the least deleterious or least impacting means of providing access to the national parks, nor does the Organic Act or any other statute suggest that there is a formula that may be used to determine a "correct" number that is precise down to the last snowmobile. Rather, the Service must determine, on the record, that a proposed use or alternative uses will not cause unacceptable impacts or impairment. Absent impairment or unacceptable impacts, the Service has latitude to exercise its judgment and discretion in selecting the alternative that best promotes Park Service policies.[1] That is exactly what happened here. Having determined that the considered alternatives would not result in unacceptable impacts or impairment, the Service then exercised its judgment concerning what range of appropriate recreational opportunities would be best. See FEIS at 4 (purpose and need statement per 40 C.F.R. § 1502.13) ("The goal of the [Winter Use Plan] is to provide park visitors with a range of appropriate winter recreational

---

[1]      The Organic Act establishes the fundamental purposes of conservation and enjoyment, but is silent as to how those two purposes should be analyzed. The courts have consistently interpreted this silence as affording broad discretion to the Service in determining which avenues best achieve the Organic Act's mandate. See Sierra Club v. Babbitt, 69 F. Supp. 2d 1202 (E.D. Cal. 1999) ("Section 1 of the Organic Act recognizes, both implicitly and explicitly, the tension between conservation and providing for public enjoyment. Courts have consistently recognized the discretion that the Organic Act affords NPS."); Terbush v. United States, 516 F.3d 1125, 1130 (9th Cir. 2008) ("Much of the Service's work is 'grounded' in the Organic Act's broad mandate to balance conservation and access."). See also Bicycle Trails, 82 F.3d 1445, 1454 (9th Cir. 1996) (The courts have recognized that "the Park Service is empowered with the authority to determine what uses of park resources are proper and what proportion of the park's resources are available for each use.").

opportunities, while ensuring that these activities do not lead to unacceptable impacts or the impairment of park resources and values.").

Notwithstanding this, the Service's development of the seven considered alternatives through the NEPA process was well documented in the administrative record. It was based on the various considerations described in the FEIS at 25, including the instructions provided by this Court and the District Court for the District of Wyoming, the scoping comments received during the process described in 40 C.F.R. § 1501.7, comments received on the Draft EIS, and the information gleaned from past winter use planning processes including the monitoring and studies conducted during the Temporary Winter Use plans (2004-2007). See generally AR 114385, 116622, 116626, 11636, 11637, 123239 at 3-6 (record documents mapping the development of the alternatives). Plaintiffs' argument that the Service should have applied some sort of precise formula in calculating the correct snowmobile cap is without support in NEPA, which requires analysis of a range of possible alternatives, but does not prescribe rigid formulae.

The source of the 540 figure adopted in the revised preferred alternative in the FEIS is also documented in the record. AR 120174 at 4 ("This limit is similar to our peak day last year – 542 on 12/28/2006 – but would allow for some increase in use from last winter's average of 290 snowmobiles a day); AR 120099 (showing 542 figure for 12/28/06 and demonstrating that holidays saw substantially higher visitation rates than other days); ROD at 20. Finally, the reasons for favoring the revised-preferred alternative are fully explained. See AR at 113572 at 6, 15, 19-21, 23-24 (discussing motivations for adopting the 540 figure including resource protection, stability, consistency with the Management Policies, and avoidance of the disruptions to visitation and local businesses that occur as a result of litigation).

**2.     Whether the NPS adequately addressed the concerns expressed in the comments provided by members of Congress and seven former National Park Service Directors**

On March 26, 2007, seven former park directors submitted a comment letter criticizing the preferred alternative in the FEIS, which contemplated a cap of 720 snowmobiles. AR 120940. That letter observed that the relatively low average number of snowmobile entries observed under the 2004-2007 Temporary Winter Use Plans was "principally responsible for significantly improving

the health of the park for visitors, employees and wildlife." Id. By contrast, the letter opined that a proposal to adopt the then-preferred alternative (720 snowmobiles per day) would be "at odds" with several provisions in the Management Policies 2006. AR at 120940-41.

The Service specifically responded to the concerns expressed in the letter. See AR 116294. As the preamble to the Final Rule explains, these concerns were also addressed elsewhere in the record:

> The NPS addressed these concerns in a number of ways, including new modeling and analysis to more clearly show the environmental impacts of winter use, a revision of the preferred alternative from the DEIS to that in the Final EIS which reduced the number of snowmobiles allowed in Yellowstone from 720 per day to 540 per day, which is reflected in the ROD and Final Rule, and affirmance in both the ROD and this rule that implementation of the preferred alternative will not result in impairment of park resources or values, nor will it result in unacceptable impacts on the Park[].

72 Fed. Reg. 70,781, 70,782-83 (Dec. 13, 2007). The Service's careful consideration of this comment letter and others like it fully complies with the requirements of NEPA and the APA. See Public Citizen, Inc. v. F.A.A., 988 F.2d 186, 197 (D.C. Cir. 1993) ("[T]he agency's response to public comments need only enable [the court] to see what major issues of policy were ventilated ... and why the agency reacted to them as it did.") (internal quotation marks omitted); 40 C.F.R. § 1503.4 (describing an agency's duty to respond to comments submitted on a NEPA document).

A similar letter was submitted on behalf of 86 members of Congress on October 29, 2007. AR 116581. Unlike the March 26 letter, this letter recognized the Service's decision to adopt a revised preferred alternative which contemplated a more restrictive cap of 540 snowmobiles per day. The letter also purported to interpret provisions of the Management Policies and the various studies that the Service had conducted in the course of its rulemaking process.

That letter, however, was submitted on October 29, 2007 – nearly five months after the close of the NEPA comment period; over a month after the FEIS's issuance on September 24; and a mere 22 days before the issuance of the ROD on November 20. This Circuit has long recognized that an agency's obligation to consider public comments does not extend beyond the close of the comment period. Appalachian Power Co. v. E.P.A., 249 F.3d 1032, 1059 (D.C. Cir. 2001) ("An agency is not required to consider evidence in comments that are not timely filed."); Reytblatt v. U.S. Nuclear

Regulatory Com'n, 105 F.3d 715, 723 (D.C. Cir. 1997) (holding that agency was not required to address comments that had been submitted two months after the close of the comment period). The record did contain timely filed comments from other sources favoring the elimination of snowmobiles or the use of very low daily entry limits, and those comments were adequately considered.[7] See U.S. Satellite Broadcasting Co., Inc. v. F.C.C., 740 F.2d 1177, 1188 (D.C. Cir. 1984) ("The FCC may not have explicitly discussed each and every contention made by [the commenter] . . . , but in light of the fact that the opinion was centered on that issue, . . . we read the opinion as clear implicit rejection of [the commenter's] various specific comments on the subject").

Insofar as the plaintiffs look to the October 29, 2007 letter as support for their interpretation of the Organic Act, we have already explained that this letter does not represent the will of Congress and can have no bearing on the Court's task of construing that statute or the Service's corresponding statements of policy. See Defendants' Opening Br. at 3 n.1 (07-cv-2112).

**3.     Whether compliance with the National Ambient Air Quality Standards ("NAAQS") can be seen as evidence of compliance with the Organic Act's conservation mandate**

As is evident from the Record of Decision (ROD at 30) and Sections 1.4.3, 1.4.7.1, and 1.5 of the Management Policies, the Service uses an "unacceptable impacts" standard to determine whether a proposed use complies with the Organic Act's conservation mandate. If "unacceptable impacts" are found, the Service deems the proposed use of park resources to be in conflict with their conservation, and therefore prohibits the proposed use. Compare Mgmt. Pol. § 1.4.3 (eighth sentence) with § 1.5 (sixth and seventh sentences); ROD at 30 (second and third sentences). In this way, the Service ensures that "the superb quality of park resources and values is left unimpaired" for the enjoyment of future generations. Mgmt. Pol. § 1.4.3 (eighth sentence).

---

[7]     See, e.g., 72 Fed. Reg. at 70,778 (Response to Comment 7) (responding to comment that attributed the improvements in environmental conditions to the reduced snowmobile levels experienced from 2004 to 2007); id. at 70,791 (Response to Comment 33) (explaining that the numbers of snowmobiles allowed in the Parks under the Final Rule was modified in response to public comment, feedback from public meetings, and additional analysis and modeling completed since the publication of the DEIS); id. (Response to Comment 38) (responding to comment expressing preference with respect to the manner in which protection of park resources and use of the parks should be assessed).

However, a pre-determined numerical threshold for "unacceptable impacts" does not exist with respect to air quality; rather, these determinations involve a degree of professional judgment and expertise on behalf of the park manager. For this reason, strict compliance with state or federal emissions standards cannot be treated as a litmus test for the avoidance of unacceptable impacts in all situations. Indeed, it is possible that unacceptable impacts or impairment to air quality will occur despite compliance with applicable state and federal emission standards, as occurred in 2001 when the Service determined that historical levels of non-BAT snowmobiles had impaired the air quality in Yellowstone.[3] The NAAQS are nonetheless useful to the Service, and may be relied upon in support of a no-impairment determination because they are designed to protect the very same resources that are afforded protection by the Organic Act. As the FEIS explains, the Environmental Protection Agency ("EPA") has established primary and secondary NAAQS for carbon monoxide (CO) and particulate matter (PM). The primary NAAQS "protect public health, and represent levels at which there are no known major effects on human health." FEIS at 92. The secondary NAAQS "are intended to protect the Nation's welfare, and account for air pollutant effects on soil, water, visibility, materials, vegetation, and other aspects of the environment." Id. With respect to CO and PM, the EPA has established the same primary and secondary standards. Id.

In this case, assuming a full capacity of 540 snowmobiles per day and 83 snowcoaches, the Maximum Predicted 1-Hour CO Concentration levels for Alternative 7 amount to only 16%, 3%, 2%, and 11% of the NAAQS as modeled at the West Entrance, Madison, Old Faithful Staging Area (parking lot), and Flagg Ranch Staging Area, respectively. See FEIS at 223, Table 4-32. The Maximum Predicted 24-Hour PM2.5 Concentrations were modeled at 13%, 4%, 4%, and 6% of the NAAQS. FEIS at 225, Table 4-36. Thus, while mere compliance with the NAAQS alone may not be sufficient, the record here shows that the selected alternative offers results that are far better than

---

[3]    The air quality model indicates that 1999 unregulated historic use complied with the NAAQS for Maximum Predicted 1-Hour CO Concentrations (68% of NAAQS) and for Maximum Predicted 8-Hour CO Concentrations (82% of NAAQS). See FEIS at 223-224, Tables 4-32 & 4-33. However, Maximum Predicted 24-Hour PM2.5 Concentrations exceeded the NAAQS by a factor of nearly three (298% of NAAQS). See FEIS at 225, Table 4-36.

mere compliance as is appropriate for the Parks. Given these results, together with the emissions and health related data provided elsewhere in the FEIS, the Service determined that the proposed Winter Use Plan would not impair or cause unacceptable impacts to the Park's air quality, and this determination is entitled to deference. See Defendants' Opening Br. at 20-27 (07-cv-2112); see also AR 117160 at 20, 91-101, 215-248, AR 110001-111581, 126499 at 3-7, 12-15, 21, 27, 33-34, 39-42.

**4.  Whether the Service's use of an "unacceptable impacts" standard in complying with the "will not disturb wildlife" mandate of Section 2.18(c) is permissible**

As Defendants have argued, the Service applies an "unacceptable impacts" standard in determining whether the use of snowmobiles has "disturb[ed]" wildife within the meaning of 36 C.F.R. § 2.18(c). This argument finds support in the Service's Management Policies § 8.2.3.2, which instructs that

> "routes and areas may be designated for snowmobiles and oversnow vehicle use only by special regulation after it has first been determined through park planning to be an appropriate use that will meet the requirements of 36 CFR 2.18 and not otherwise result in unacceptable impacts."

Id. (emphasis added). NPCA's response to this argument is that Section 8.2.3.2 of the Policies simply creates two separate standards for the protection of wildlife from snowmobile use, both of which must be met: (1) the "disturb" standard and (2) the "unacceptable impacts" standard. NPCA is wrong. As an initial matter, the Management Policies themselves, which are internal guidance by the Park Service for the Park Service, create no judicially enforceable standard. Further, contrary to NPCA's assertion, Section 8.2.3.2 of the Policies is fully consistent with the Service's interpretation of 36 C.F.R. § 2.18(c).

The courts have held that the use of "otherwise" to connect two clauses in this way creates an association between the standards, not two separate standards. For example, in Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995), the court held that language providing that an abducted child need not be returned it if would "expose the child to physical harm or otherwise place the child in an intolerable situation" created a unitary standard: "[t]he use of the word 'otherwise' points inescapably to the conclusion that the physical or psychological harm contemplated by the first clause . . . is harm to a degree that also amounts to an intolerable situation."

Similarly, in <u>J.I. Case Credit Corp. v First Nat'l Bank of Madison County</u>, 991 F.2d 1272, 1275-76 (7th Cir. 1993), the court interpreted a standard that applied the law of fraudulent conveyances to "recovery of proceeds . . . from a transferee out of the ordinary course <u>or otherwise</u> in collusion with the debtor to defraud the secured party."  The court held that the use of the word "otherwise" suggested an association between "out of the ordinary course" and "collusion . . . to defraud."  <u>Id.</u> at 1277, 1279 ("If 'out of the ordinary course' was not meant to involve common elements with collusion and fraud, the more natural phrasing would have been 'out of the ordinary course <u>or</u> in collusion' . . . ") (emphasis in original).

Similarly here, if the Service had not interpreted Section 2.18 as being subject to an "unacceptable impacts" standard, the more natural phrasing of Section 8.2.3.2 would have been: "that will meet the requirements of 36 CFR 2.18 and not result in unacceptable impacts."  The Service's use of the word "otherwise" is dispositive of this issue, especially given the standard of review that applies to the Service's interpretation of its regulations and Policies.  <u>See</u> <u>Davis III v. Latschar</u>, 202 F.3d 359, 367 (D.C. Cir. 2000) ("While the language of the Management Policies could be interpreted either as plaintiffs read it or as the Park Service does, the interpretation of the Park Service is plausible; it certainly is not 'plainly erroneous or inconsistent' with the policies and therefore must prevail over plaintiffs' reading.").

Respectfully submitted this 29th day of August, 2008.

RONALD J. TENPAS
Assistant Attorney General

 */s/ Guillermo A. Montero*
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469
Fax: (202) 305-0274

OF COUNSEL:                              Guillermo.Montero@usdoj.gov
JASON WAANDERS
U.S. Department of the Interior          Attorneys for the Defendants
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957