```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


GREATER YELLOWSTONE           .
COALITION,                    .
                              .
          Plaintiff,          .  CA No. 07-2111 and 07-2112
                              .
     v.                       .
                              .  Washington, D.C.
DIRK KEMPTHORNE,              .  Wednesday, August 27, 2008
                              .  10:05 a.m.
          Defendant.          .
                              .
and

NATIONAL PARKS CONSERVATION
ASSOCIATION,

          Plaintiff,

     v.

UNITED STATES DEPARTMENT OF
THE INTERIOR,

          Defendant.
 . . . . . . . . . . . . . .
```

```
                    TRANSCRIPT OF MOTIONS HEARING
               BEFORE THE HONORABLE EMMET G. SULLIVAN
                    UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiff:              SEAN M. HELLE, ESQ.
Greater Yellowstone         DOUGLAS L. HONNOLD, ESQ.
Coalition                   Earthjustice
                            209 S. Willson Avenue
                            Bozeman, MT  51715
                            406-589-9699



APPEARANCES con't. on next page.
```

PDF created with pdfFactory trial version www.pdffactory.com

APPEARANCES, con't.


| | |
|---|---|
| For Plaintiff:<br>National Parks<br>Conservation<br>Association | ROBERT D. ROSENBAUM, ESQ.<br>MATTHEW ROESSING, ESQ.<br>Arnold & Porter LLP<br>555 12th Street, N.W.<br>Washington, D.C.  20004-1206<br>202-942-5000 |
| For Defendant:<br>Department of the<br>Interior | GUILLERMO A. MONTERO, ESQ.<br>United States Department of Justice<br>601 D Street, N.W.<br>Washington, D.C.  20530<br>202-305-0443 |
| | LUTHER L. HAJEK, ESQ.<br>United States Department of Justice<br>P.O. Box 663<br>Washington, D.C.  20004<br>202-305-0492 |
| | BARRY WEINER, ESQ.<br>United States Department of Justice<br>General Litigation Section<br>Ben Franklin Station<br>P.O. Box 663<br>Washington, D.C.  20044-0663<br>202-305-0469 |
| | JASON WONG, ESQ.<br>Department of the Interior |
| For the Defendant:<br>Intervenors | WILLIAM P. HORN, ESQ.<br>Birch, Horton, Bittner and Cherot<br>1155 Connecticut Avenue, N.W.<br>Washington, D.C.  20036<br>202-659-5800 |
| Court Reporter: | JACQUELINE M. SULLIVAN, RPR<br>Official Court Reporter<br>U.S. Courthouse, Room 6818<br>333 Constitution Avenue, NW<br>Washington, D.C. 20001<br>202-354-3187 |


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

PDF created with pdfFactory trial version www.pdffactory.com

```
1                        P R O C E E D I N G S

2              COURTROOM DEPUTY:  Civil Action 07-2111, Greater

3    Yellowstone Coalition, et al versus Dirk Kempthorne, et al, and

4    Civil Action 07-2112, National Parks Conservation Association

5    versus U.S. Department of the Interior.

6              I'm going to ask counsel to please come forward,

7    identify yourselves for the record, and also state who you are

8    representing.

9              MR. ROSENBAUM:  Good morning, your Honor.  I'm Robert

10   Rosenbaum representing plaintiff, National Parks Conservation

11   Association.

12             THE COURT:  All right.  Good morning.

13             MR. HELLE:  Good morning, your Honor.  I'm Sean Helle.

14   I'm joined at the counsel table by Doug Honnold.  We represent

15   the Greater Yellowstone Coalition.

16             THE COURT:  Good morning.

17             MR. MONTERO:  Guillermo Montero, Department of

18   Justice.  I represent the National Park Service.

19             THE COURT:  Good morning, counsel.

20             MR. HORN:  Good morning, your Honor.  My name is

21   William Horn, representing defendant intervenors, the

22   snowmobiler groups.

23             THE COURT:  Good morning.

24             It's always good to get the names of everyone else

25   who's at the table.  Do you want to introduce your colleagues,
```

PDF created with pdfFactory trial version www.pdffactory.com

1   or they can introduce themselves.

2          MR. MONTERO:  I apologize.  Barry Weiner and Luther

3   Hajek, also with the Department of Justice, and Jason Wong,

4   who's sitting at the corner, from the Department of the

5   Interior.

6          THE COURT:  Good morning, counsel.

7          MR. ROSENBAUM:  With me today is Matthew Roessing of

8   the firm Arnold & Porter, one of my colleagues working with me

9   on this case.

10          THE COURT:  All right.  Thanks.

11          A couple of thoughts I want to share with you,

12   counsel.  This is probably a case where the Court will probably

13   benefit from the transcript of this proceeding, so I'm going to

14   -- I don't want to impose a financial hardship on anyone.

15   Hopefully the parties can can share the cost of a transcript.

16   The court reporter is realtime.  I don't order a transcript in

17   every case, but this is probably a hearing that in all

18   likelihood the Court will derive some benefit from the

19   transcript.

20          Secondly, let me just thank the firm of Arnold &

21   Porter for its unsolicited assistance in providing two copies of

22   the appendix containing the record material in binders.  That

23   was extremely helpful.

24          I just want the record to reflect, you sent around a

25   letter to everyone dated August 15th.  We certainly appreciated

PDF created with pdfFactory trial version www.pdffactory.com

1     that.  In fact, in future scheduling orders we're going to

2     require that in major cases, but it was extremely helpful to

3     have the administrative record parsed out, segregated out.

4          Let me share a few thoughts in trying to set the tone

5     for what hopefully will be a fruitful hearing.  The Court's

6     analysis starts from the Winter Use Plan itself that allows 540

7     snowmobiles, 18 snow coaches, the best available technology

8     standards for the OSVs, a hundred percent commercial guiding,

9     and an adaptive management plan.

10         Now, the points that I want the parties to focus on,

11    points that the Court believes are indeed the most important

12    points in this litigation, are, the basis for the 540 limit.

13    I'm not sure how that 540 limit was arrived at.  There's no

14    indication as far as the Court can determine of the reason why

15    that number is appropriate or where that number came from.  The

16    Court recognizes that the Park Service argues the 540 is, in the

17    words of the Park Service, a reduction from the current limit of

18    720, and in any event, arguably unlikely to be reached based on

19    actual use numbers.

20         I query whether MPS should be allowed to defend the

21    limit that they arguably did not select or set an arbitrary

22    limit and then hope that it won't be reached.  It appears that

23    it's undisputed that when uses and conservation conflict, that

24    conservation in the Court's view must be predominant.  MPS

25    appears to argue that there's no conflict between adverse

PDF created with pdfFactory trial version www.pdffactory.com

1    impacts of the Winter Use Plan and the conservation of the park,

2    because in an interview of MPS the Service has determined that

3    the impacts of the plan are indeed, to use its terminology,

4    acceptable.  I query whether MPS has articulated clearly why the

5    admittedly adverse impacts do not create a conflict with

6    snowmobile use.

7            Focusing on that sound methodology, arguably the sound

8    methodology is unsound.  The modeling of the monitoring doesn't

9    appear to be consistent with each other.  The model appears to

10   have underestimated sound impacts and percent time audible 75

11   percent of the time, yet the decision appears to have been based

12   only on the model with minimum discussion of monitoring.  The

13   adaptive management thresholds appear to have been exceeded for

14   sound scape monitoring, but MPS argues that those thresholds are

15   preliminary in nature only and not evidence of an acceptable

16   impasse, but then it appears that MPS argues that the thresholds

17   will prevent unacceptable impacts from occurring but query

18   whether there are guarantees from MPS that it will respond when

19   indeed they exceed in the record of decision on page 34,

20   alternative seven, the alternative seven of the plan is deemed,

21   quote/unquote, beneficial to the park based on a decrease in

22   overall audibility compared to current conditions, but it

23   appears to the Court that the only decrease in audibility is for

24   areas of the park in which snowmobiles can be heard 0 to 9

25   percent of the time.  It also appears that in all audibility

PDF created with pdfFactory trial version www.pdffactory.com

1    categories above ten percent of the park in which snowmobiles

2    can be heard each increases under the WUPS as compared to

3    current conditions.

4           Now, with respect to wildlife, the Park Service argues

5    that it's set a limit on west entries at three hundred in order

6    to keep the usage at the levels recommended in the White report,

7    again arguing that the maximums will not likely be met.  I query

8    whether there's evidence that the maximums won't be met, and in

9    any case, that isn't the number supported by the record and

10   query whether it's arbitrary to select a higher number and then

11   hope it won't be reached.

12          With respect to air quality, the MAAQS, M-a-a-q-s,

13   were not exceeded even when the conditions in the park were not

14   officially, quote/unquote, impaired.  I query whether those

15   standards are evidence of conserving the park's air quality

16   resources, the adaptive management thresholds for air.  The same

17   problem as for sound.  Arguably they're only preliminary in

18   nature and not a guarantee of a response by the Park Service.

19          Now, those are some thoughts that the Court wanted to

20   at least share with the parties up front and ask that you leave

21   your responses to those thoughts in whatever representations you

22   wish to make to the Court today.

23          I do have other matters on my calendar today.  I want

24   to be fair and give the parties an opportunity to focus on their

25   principal arguments, and I'll do that, but I do have some other

PDF created with pdfFactory trial version www.pdffactory.com

 1   matters on my calendar today that I need to address also, not

 2   this morning, but shortly after the noon recess.

 3          Let me hear from plaintiffs' counsel first.  Have you

 4   given some thought as to how you wish to divide your time or

 5   not?  Because I really do not need to have repetitious

 6   argument --

 7          MR. ROSENBAUM:  Yes, your Honor.

 8          THE COURT:  -- by any side.

 9          MR. ROSENBAUM:  We've agreed that I would go first, my

10   emphasis would be on the substantive legal restraints, and Mr.

11   Helle would go second and would focus more on procedural issues.

12          THE COURT:  All right.

13          MR. ROSENBAUM:  I very much appreciate your giving us

14   your thoughts because it would help focus the arguments, but I

15   do want to address some of these substantive legal restraints

16   first, and also the issue of deference, which the National Park

17   Services relies heavily on.

18          THE COURT:  Right.  That's a significant issue.  I

19   mean, I query whether the Court should scrutinize at this level

20   recognizing that the agency is owed a significant amount of

21   deference with the respect to the FEIS.

22          MR. ROSENBAUM:  Yes, your Honor.  If I may just

23   address that issue, the government says that they are giving

24   substantial deference under the Administrative Procedure Act.

25          THE COURT:  The law says that as well.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROSENBAUM:  Yes, your Honor, but not in every

2     case, and they say they're entitled to deference concerning

3     their choice of models and methodology concerning their

4     interpretation of their own regulation, concerning their

5     interpretation of the statute, and concerning their

6     interpretation of their own management policies.  In other

7     words, your Honor, the government is saying there's a big sign

8     here, please no entry by federal judges, and I'd like to argue

9     first that there's no basis at all for any of those kinds of

10    deference.

11         THE COURT:  No entry to what, Yellowstone?

12         MR. ROSENBAUM:  No entry to their decision-making

13    process, your Honor.

14         First, with respect to the Administrative Procedure

15    Act, in your 2003 decision you recognized that deference is not

16    owed when the presumption of regularity has been rebutted.  The

17    courts say that that applies when the Court has reversed a

18    decision and the agency comes back with a decision that is not

19    materially different.

20         There are also cases that -- well, I'm sorry.

21         The other reason -- that's what we have here, your

22    Honor.

23         And the other reason that the presumption of

24    regularity is rebutted in this case is the indication that

25    decisions here were not made solely by the agency, the

PDF created with pdfFactory trial version www.pdffactory.com

1    professionals at the agency, that there was political

2    involvement in the decision, so under the Administrative

3    Procedure Act, your Honor, it is our position that more exacting

4    review is required here.  You have to look at whether the rule

5    complies with the substantive legal restraints, you have to look

6    obviously at whether it's arbitrary and capricious, whether

7    every stand in the analysis was reasoned and reasonable, and

8    whether the decision and the considerations that were taken into

9    account apply to relevant factors, and here we think that none

10   of that has been met.

11           In addition, on the issue of the government's

12   interpretation of its own regulation, namely Section 2.18(c),

13   there is no interpretation by the National Park Service, and I'd

14   like to come to that in a minute.

15           On the issue of the deference owed to the national

16   policies, we would say, yes, part of the national policies

17   represents the government's official interpretation of the

18   Organic Act, Section 1.4.3 and a few other sections that follow

19   it, and yes, that's owed deference, but we rely on that

20   provision of the management policies.

21           The other portions that are relied upon by the

22   government are not an interpretation of the statute, and I'll

23   come to that a moment and walk you through it in detail.

24           And finally, with respect to the choice of

25   methodology, your Honor, when an agency applies methodologies

PDF created with pdfFactory trial version www.pdffactory.com

1    that produce results that are contrary to known facts that the

2    Courts say no, we do not owe deference to the agency under those

3    circumstances, and all of that applies here, your Honor, so we

4    ask you to look carefully at this rule and when you do so we

5    believe that you will find that it does not comply with either

6    the substantive legal restraints or with the procedural

7    requirements of the Administrative Procedure Act, not to mention

8    NEPA.

9            THE COURT:  And if it doesn't, then what's the remedy?

10           MR. ROSENBAUM:  Your Honor, we believe that the remedy

11    is to validate the rule.  We would ask that you order a

12    temporary Rule B imposed that would phase out snowmobiles in

13    Yellowstone.  We're not asking for a cliff in which we go from

14    the current level to zero.  We do believe that under the

15    Administrative Procedure Act you've got the flexibility and

16    discretion to order a gradual phase-out in light of the fact

17    that now snowmobiles are being leased and used in that area.

18           THE COURT:  Why should the Court guide the hand of the

19    agency if the Court agrees with you that a basis exists to

20    vacate the rule and the Court vacates the rule, then why

21    shouldn't the Court just direct the agency to do whatever is

22    appropriate, considering the rationale behind the decision to

23    vacate as opposed to direct the agency to phase out snowmobiles?

24    I guess another way to that is, is that an impermissible

25    micromanagement of the agency?  The Court could do that.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. ROSENBAUM:  Well, your Honor, I think what you
 2    could do is direct the agency to go back and take whatever
 3    action is appropriate in light of your decision but make clear
 4    that if they so decide they could phase out the snowmobiles.  We
 5    are being accused of being the radical absolutists here, your
 6    Honor, and I just want to make clear that is not a fair
 7    characterization of our position.  We believe that this rule is
 8    wrong, is not supported by the record, is contrary to the law,
 9    and represents dangerous interpretations of the governing laws
10    such that it would change what we have always for a hundred
11    years, almost a hundred years, believed to be our national park
12    system into a recreation playground, but that doesn't mean that
13    your Honor doesn't have some flexibility in the order that you
14    enter.
15              THE COURT:  Suppose the Court were to agree with you
16    and vacate the ruling and not say anything more about what the
17    government should or should not do.  What's wrong with that
18    approach?
19              MR. ROSENBAUM:  From our point of view there's nothing
20    wrong with that approach.  I'm not suggesting that you --
21              THE COURT:  Would the plan revert to some other plan,
22    2001 plan, the temporary plan?  What would happen?
23              MR. ROSENBAUM:  Well, your Honor, I think there's an
24    issue with the 2001 plan only because it's been invalidated by
25    Judge Brimmer.  As to what decision the Park Service makes for
```

PDF created with pdfFactory trial version www.pdffactory.com

1    this coming season, we're not trying to suggest what they should

2    do.

3              THE COURT:   I thought you just said that.   You are

4    asking me to suggest, if I vacate, that they go ahead and

5    promulgate a rule that phases out snowmobiles.

6              MR. ROSENBAUM:   I'm sorry.   I'm trying to suggest that

7    from the point of view of the plaintiffs we believe that you

8    have flexibility.   If they don't have you to use that

9    flexibility we're not urging you to do that, but I'm just trying

10   to suggest that we believe you've got flexibility in the

11   crafting of the order.

12             THE COURT:   All right.   At the bare minimum it seems

13   to me that if the plan is vacated, and I'm not indicating that

14   it will be, but if for purposes of our discussion if it were to

15   be vacated, it would seem to me at the very least the government

16   should be directed to promulgate some sort of temporary plan for

17   winter usage, it seems to me.   Whether I said so or not they'd

18   have to.

19             MR. ROSENBAUM:   Yes.   We would not be against that,

20   your Honor.

21             Let me turn to the substantive legal restraints, and I

22   do want to address some of the questions that you've raised in

23   the context of this discussion.

24             The first is, I would like to point out that the whole

25   issue of conservation and what it means and how you balance it

PDF created with pdfFactory trial version www.pdffactory.com

1    against usage is a critical issue, but you have three possible

2    legal provisions that you rely on in finding this rule invalid.

3              THE COURT:  Is there a concern here that should guide

4    the Court in its decision-making, in its analysis, that is

5    paramount to any other concern?  Is it conservation, is it

6    preservation of the park?  Is there an overriding concern that

7    should guide the Court's analysis and focus the Court's

8    decision?

9              MR. ROSENBAUM:  I would say that there are two things,

10   your Honor.  One is that this rule will permit a continuation of

11   significant injury to this park.  This park in the winter is

12   primarily visited for its quietude, solitude, peacefulness,

13   which of course the American people increasingly seek, but --

14             THE COURT:  But it's fair to say that some people and

15   a significant number of people visit the park also to ride

16   snowmobiles?

17             MR. ROSENBAUM:  Yes, your Honor.  There are lots of

18   other places where they can do that.  In fact, immediately

19   adjacent to Yellowstone there are places where there are

20   permitted Yellowstone routes so they don't need Yellowstone, but

21   the people who go there for what it offers most in the winter,

22   which is the quiet and peacefulness, can't go to those other

23   places because they're jammed with snowmobiles, but I would say

24   there's a second answer to your question and there is a much

25   more far-reaching point, and that is that what we have here,

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    your Honor, is a government agency which is attempting to change

 2    the understanding of the fundamental laws that regulate that

 3    agency.  We went through this whole process after your decision

 4    in 2003.  You relied on provisions of the 2001 management

 5    policies.  The administration started a process in 2005 at the

 6    same time that it was working on the new snowmobile rule to

 7    change the management policies that under which the Park Service

 8    operates and we provided you with their own red-line markup of

 9    Section 1.4.3, and what they attempted to do there was to change

10    the almost-hundred-year understanding of what the Park Service

11    and park system was.  They eliminated, they struck out the

12    conservation mandate.  They elevated enjoyment to the same

13    level -- recreational enjoyment to the same level as

14    conservation instead of conservation being predominant.  They

15    would change the interpretation that they had of the governing

16    statute such that recreation would be equal with conservation,

17    and the Park Service bound them.  Now, this was a fundamental

18    change that produced a national outcry, 35 or 6 congressional

19    hearings, and in 2006 the Park Service abandoned that plan and

20    adopted what is now the 2006 management policies.  Now we

21    believe that's critical, and why it is is because now the Park

22    Service in its FEIS and in its ROD for this rule interpreted in

23    the briefs before your Honor in the same way that had been

24    proposed and rejected, and we believe that that -- that this

25    rule has taken on a greater importance than just the protection
```

PDF created with pdfFactory trial version www.pdffactory.com

1     of this park.  We believe that this rule represents an attempt

2     to, quietly perhaps, achieve the same result that had been

3     attempted in the proposed amendments to the 2006 management

4     policies.  Therefore, we believe that interpreting these

5     policies in the same way that it was rejected is fundamental

6     error, profound error, underlying this rule.

7             And let me go to that number and talk about what the

8     government argues here, and it's one of the questions that you

9     asked.  They say that the conservation mandate can be met by

10    finding that there are no unacceptable impacts.

11            THE COURT:  Where does that phraseology come from?

12            MR. ROSENBAUM:  It comes from the 2006 management

13    policies.  That's where it comes from.

14            THE COURT:  In the first instance?

15            MR. ROSENBAUM:  In the first instance, your Honor.

16            THE COURT:  So is that entitled to deference?

17            MR. ROSENBAUM:  No, your Honor, and the reason it's

18    not entitled to deference is because they have not interpreted,

19    the agency has not interpreted the conservation mandate to

20    prohibit unacceptable impacts.  Now they argue to you that they

21    have done so and they refer you to a section of the management

22    policies, and I would like to hand that up, if I may.

23            THE COURT:  I'm sure we have it.  There have been

24    plenty of paragraphs already, but pass it up.

25            MR. ROSENBAUM:  This is excerpts from record document

PDF created with pdfFactory trial version www.pdffactory.com

1   120645, the 2006 management policies.  Now, they say that

2   Section 1.4 of these policies is an official interpretation of

3   the Organic Act.  And the management policies do say that, but

4   your Honor, I would say that that is so only with respect to

5   some of what's in Section 1.4.  When you get to Section -- the

6   section that they rely on as an interpretation of the

7   conservation mandate, equally unacceptable impacts, and if you

8   look at what's numbered page thirteen of these excerpts you see

9   Section 1.4.7 under which the section on which they rely

10  appears, and that section is entitled Decision-Making

11  Requirements to Identifying and Avoiding Impairments.  Now we

12  know and the government agrees that the statute prohibits two

13  things:  impairments and conservation, and it requires

14  conservation.  This section deals with impairments, not

15  conservation.

16          Secondly, it's a decision-making section.  It's a

17  section that is an internal policy, your Honor, and when you

18  turn to the section which they rely on, which is 1.4.7.1, the

19  next page, it says that.  It says that.  It begins, We don't

20  know exactly where impairment -- when impairment occurs.

21  Therefore, we're going to apply a standard that offers greater

22  assurance that impairment will not occur.  The service will

23  apply a standard.  In other words, this is not an interpretation

24  of the statutory term.  This is a procedure that the service

25  says its managers should follow in order to avoid, not again

PDF created with pdfFactory trial version www.pdffactory.com

1   conservation, but impairment.  Then, if you look at what it is

2   that they say they're going to look at, if this were an

3   interpretation of conservation mandate in the statute you would

4   expect to find provisions here that talk about protecting

5   natural resources.  You don't find it here.  All you find on

6   that score is that for the purposes of these policies

7   unacceptable impacts are impacts that individually or

8   cumulatively would -- the second bullet -- impede the attainment

9   of the park's desired future conditions for natural and cultural

10   resources as identified in the park's planning process.  In

11   other words, they're saying we determine what we believe the

12   desired future conditions should be.  That's all it says.

13   There's nothing in here that could be fairly understood to be an

14   interpretation of a statutory term.  So we do not believe that

15   the National Park Service has in fact interpreted the

16   conservation mandate as being met by a finding that there are no

17   unacceptable impacts.

18          The government makes another argument, which is that

19   it has discretion to permit adverse impacts if necessary and

20   appropriate for the purpose of the pact, and that's in fact what

21   the management policy section says on which they rely, and we

22   accept that that's an interpretation of the statute.

23   Conservation mandate is different from impairment in the sense

24   that, yes, you can prevent impairments when necessary and

25   appropriate to carry out the purposes of the park.  You couldn't

PDF created with pdfFactory trial version www.pdffactory.com

1    do that with impairment, that's the difference.   The trouble is,

2    your Honor, that they then say, well, what is the purpose of the

3    park?   The purpose of the park includes recreation, so therefore

4    they're saying that to permit recreation we can permit

5    appearance.   In other words, there is no conservation mandate;

6    we can do whatever we want because the purpose of the park is

7    enjoyment.

8            Now, the statute requires conservation and providing

9    for enjoyment of what?   Well, they say it's enjoyment of the

10   park, so let's have fun any way we want.   Let's have fun.   Let's

11   have ATVs, let's have snowmobiles, hand gliders, whatever, but

12   that's not what the statute says.   The statute says enjoyment of

13   the same, and the last nouns that appear in the sentence prior

14   to the words "the same" are the scenery and the national

15   historic objects and the wildlife, so, your Honor, enjoyment is

16   not just having fun.   Enjoyment is enjoying those qualities that

17   are special to the national parks.   And that's what makes them

18   special places, that we don't have those kinds of machines.

19           Now I'd like to come to your question about the

20   numbers here, and I have a chart that I would like to hand up,

21   and I've shown this to the other parties and they've all told me

22   that they have no objection to it.   Is it permissible?

23           THE COURT:   You can use that Elmo if you want and then

24   everyone can see that.   We're in the age of technology now.

25           MR. ROSENBAUM:   I'm sure you are, but I'm not.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  All right.

 2              MR. ROSENBAUM:  Help me use it.  What do I do?

 3              THE COURT:  Don't worry about it.  I couldn't help you

 4    there.  I don't know.

 5              MR. ROSENBAUM:  Is it okay if I just hand it around?

 6              THE COURT:  You can, yes.

 7              MR. ROSENBAUM:  Okay.  Thank you.

 8              THE COURT:  Do you have copies for your opponents

 9    there?

10              MR. ROSENBAUM:  I do.

11              THE COURT:  All right.  Great.

12              MR. ROSENBAUM:  Your Honor, this demonstrative shows

13    the difference between two different numbers.  The first on the

14    left is the daily average number of snowmobiles that entered

15    Yellowstone in 2005 and 2006.  The red represents snowmobiles

16    and the blue represents snow coaches.  On the right is what this

17    plan would permit in terms of the number of snowmobiles in red

18    and the number of snow coaches in blue.  Why did we pick 2005/

19    2006, your Honor?  Well, the studies that have been prepared by

20    the Park Service were done during this time period and we

21    believe based on other numbers in the Park Service's documents

22    but not in this record -- I'll come back to that in a minute --

23    that this is representative in the whole period of which the

24    studies were prepared.

25              First is a sound monitoring, a sound scape monitoring.
```

PDF created with pdfFactory trial version www.pdffactory.com

1   That was performed during the period -- well, I believe it was

2   during the periods 2003 to date.  And during that time when the

3   monitoring was being performed the number of snowmobiles

4   entering the park was approximately the number reflected in this

5   chart, somewhere in the 200s, and snow coaches were somewhere in

6   the 30ish range.  And that study found that there were

7   significant sound scape impacts.

8           Secondly, six scientists published a study undertaken

9   by the National Park Service with, I believe it was University

10  of Montana, called the White study, and they evaluated the

11  impact on wildlife, and they represented that the number of

12  snowmobiles not -- and number of snowmobiles, both, snow

13  coaches, be maintained at or below the levels during the time

14  that they conducted their studies, and those studies were done

15  from 2003 to 2006.

16          Now, we looked in the record, your Honor, and we found

17  to our astonishment there are no numbers in the record that we

18  could find that state the average number for each winter season

19  during which these studies were being performed.  However, we

20  have found that number in a 2008 study, the last monitoring

21  study of the sound scape impact that was performed in June of

22  2008, and what it demonstrates is that these numbers are

23  representative, the 2005/2006 numbers are representative, and

24  I'm prepared to address that if your Honor would like.

25          THE COURT:  Sure.  Go right ahead.

PDF created with pdfFactory trial version www.pdffactory.com

 1              MR. ROSENBAUM:  Okay.  This is a document that appears

 2     after the record was closed in this case and it's entitled

 3     Natural Sound Scape Monitoring in Yellowstone National Park.

 4              THE COURT:  Then can I consider that document?

 5              MR. ROSENBAUM:  I would propose that you can because

 6     all I'm referring to here are the historical numbers that appear

 7     in this document, and certainly the Park Service must have taken

 8     that into account in making its decisions.

 9              I would ask if the government has any objection.

10              MR. MONTERO:  Your Honor, I'm not familiar with the

11     document.  If it's in the administrative record and if it was

12     considered then I have no objection.

13              MR. ROSENBAUM:  It's not.

14              THE COURT:  I don't think it is.

15              MR. MONTERO:  I would like to designate the

16     document -- I think it's in draft form.  Your Honor, I do object

17     to this.  What I could do is send -- Mr. Rosenbaum is looking

18     for numbers that might correspond to averages in the record.  I

19     can query my clients and see if those numbers exist.

20              THE COURT:  Let me do this:  I'll provisionally let

21     you make your argument.  I don't know.  I doubt if I can rely

22     upon that, but I'll give you a few minutes to make your

23     argument.  To the extent I rely on it, if there's a legal basis

24     for the Court to rely on it then I'll so inform the parties in

25     my decision.  I doubt very seriously that I can rely on that

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    document because it doesn't appear that they considered that

 2    since it was not part of the administration record, but I'll

 3    give you a few minutes to make your points.  And the reason why

 4    I'm doing that is because I don't want to not allow you to make

 5    your argument now and then determine later that maybe it was

 6    relevant and then we get back, so with the understanding that

 7    I've not ruled as a matter of law that I will consider this

 8    document, I'll let you make your argument, counsel.

 9            MR. ROSENBAUM:  So, your Honor, the document that I've

10    just handed up is the cover page and page 41 of the document,

11    and the only thing that I am referring to on page 41 is a table

12    that provides the number of snowmobiles and snow coaches and all

13    oversnow vehicles per day for the seasons beginning 2003/'04 and

14    ending 2007/'08, and as I indicated, the chart, the bar chart

15    that I'm relying on, uses 2005/'06, which shows here 267 --

16            THE COURT:  This is a government-generated report?

17            MR. ROSENBAUM:  Yes, it is.

18            THE COURT:  Presumably those figures are in the

19    record.  Presumably they are.

20            MR. ROSENBAUM:  Presumably.

21            THE COURT:  Best-case scenario, this document probably

22    just highlights numbers that are already in the administrative

23    record.

24            MR. ROSENBAUM:  I would expect so, your Honor.

25            But my point is, the numbers that we have used a fair
```

PDF created with pdfFactory trial version www.pdffactory.com

1    representation.   267 and 30 are actually the numbers that are

2    cited in the record.

3              THE COURT:  All right.

4              MR. ROSENBAUM:  In the FEIS, and I'm just showing you

5    that the other years were not significantly different.

6              Now going back to my bar chart, what we're saying

7    here, your Honor, is that the studies showed that there was

8    significant impact and that --

9              THE COURT:  Let me stop you for a second.  I'm going

10   to have this document marked.  I don't believe this is a part of

11   your submission, I don't believe.

12             MR. ROSENBAUM:  No, your Honor, it's just a

13   demonstrative.

14             THE COURT:  I will consider that as part of your

15   presentation.  This should be marked as an exhibit, and we call

16   this Plaintiffs' Supplemental Exhibit No. 1.

17             (Plaintiffs' Supplemental Exhibit No. 1 was marked for

18             identification at about 10:44 a.m.)

19             MR. ROSENBAUM:  Thank you, your Honor.

20             THE COURT:  Unless you've already referred to some

21   exhibits as supplemental exhibits.  I don't believe you did.

22             MR. ROSENBAUM:  No, your Honor.

23             THE COURT:  That's 1, and then for the document that

24   essentially probably just recaps figures already in the

25   government's administrative order over the years, we'll call

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    that Supplemental Exhibit No. 2.

 2              (Plaintiffs' Supplemental Exhibit No. 2 was marked

 3              for identifcation at about 10:45 a.m.)

 4         MR. ROSENBAUM:  Thank you, your Honor.

 5         THE COURT:  1 I'll admit into the record, unless

 6    there's some objection as to the bar chart.

 7              (Plaintiffs' Supplemental Exhibit No. 1 was

 8              admitted into evidence at about 10:45 a.m.)

 9         MR. MONTERO:  Your Honor, I can't actually vouch for

10    the accuracy of the numbers in this draft number, but I am

11    informed that the FEIS at page 154 does have total visitation

12    per winter season per vehicle type, and dividing that number by

13    the total number of days in the season will yield the average.

14         THE COURT:  Right.  I've seen these figures in various

15    briefs.  I think it's accurate, but with that proviso I would

16    admit it into the record.

17         MR. ROSENBAUM:  So what this bar graph demonstrates is

18    that the government is doubling the number that they themselves

19    through their own studies have found to have very significant

20    impacts.

21              Now, your question, the government argues that the

22    actual numbers are likely to be less --

23         THE COURT:  Right.

24         MR. ROSENBAUM:  -- than the numbers they are

25    permitting.  Well, your Honor, there is no analysis in the ROD,
```

PDF created with pdfFactory trial version www.pdffactory.com

1   there is no analysis in the FEIS, there is no statement in there

2   that concludes that the numbers are likely to be less.

3         THE COURT:  Have you been able to determine what the

4   basis is for the number 540?

5         MR. ROSENBAUM:  No, your Honor.  But my point is that

6   the courts will not accept rationalization in legal briefs that

7   the agency itself did not undertake.  In other words, if the

8   National Park Service had said we're adopting this rule but we

9   believe that in fact it's going to be a lot less, then at least

10  that could be considered.  We do not believe that a statement in

11  a legal brief can be considered, but, your Honor, even if the

12  Park Service had made such an analysis, and they did not, the

13  idea that they are going to set a limit and then they say, well,

14  gee, if in fact there are significant impacts we'll just reduce

15  the limit.  The rule in its final form actually says that, but

16  your Honor, that is not the way rules are made.  In other words,

17  we have an Administrative Procedure Act for a reason.  The

18  reason is, to require agencies to demonstrate that what they're

19  doing by adopting regulations is consistent with the statute and

20  is reasoned and based on appropriate considerations.  Agencies

21  don't adopt rules that say we're going to have one standard and

22  then with our discretion -- within our discretion we can change

23  it to a different standard later.  Think about what difficulty

24  the plaintiffs here or other objectors would have if there were

25  impacts and if the government failed to reduce the number.

PDF created with pdfFactory trial version www.pdffactory.com

1    Think about what difficulty it would have challenging that, the

2    failure to take such action.  We would be met with all sorts of

3    procedural objections, your Honor, so we do not believe that it

4    is an appropriate answer to the question how have you justified

5    the number of snowmobiles that you are permitting.  They adopted

6    a rule that says 540 snowmobiles and 83 snow coaches.  They have

7    to justify that, your Honor.  They can't say we'll figure it out

8    later.

9              Now I would like to come back to one point that I

10   believe is important that I skipped over, and that is, the

11   argument the government makes about Section 2.18(c) of its

12   regulations.  Now, that's a rule that says you cannot authorize

13   snowmobiles in the national parks if it will be inconsistent

14   with the natural and aesthetic values of the park, damage

15   resources, and disturb wildlife, and they say they've

16   interpreted that rule.  There's no analysis, by the way, of this

17   in the FEIS.  But they say they've interpreted that rule, and I

18   refer you back to the pages of the management policy that I

19   handed up.  Where do they say that interpretation is?  They say

20   it is in management policy, and they refer to Section 8.2.3.1,

21   which is at 165 of the excerpts, and 8.2.3.2.  Well, first 8231,

22   that is 8.2.3.1 for the record, has to do with off-road

23   vehicles.  And it doesn't mention 2.8.1 at all.  The next

24   section does deal with snowmobiles, but, your Honor, it doesn't

25   interpret Section 2.18.  Instead it states in about the middle

PDF created with pdfFactory trial version www.pdffactory.com

1    of the first paragraph, Outside Alaska routes and areas may be

2    designated for snowmobiles's or snow scale use only by

3    designation after it has been determined through park planning

4    to be an appropriate use that will meet the requirements of 36

5    CFR 2.18 and not otherwise result in unacceptable impacts.

6          This is not an interpretation that says you meet 2.18

7    if you find no unacceptable impacts.  Just the contrary.  It

8    says you've got to comply with the standards of 2.18 and not

9    commit any unacceptable impacts.  So the idea that there is an

10   interpretation of 2.18 in this section is just not true, your

11   Honor, and again, when the government does not provide an

12   interpretation, the interpretation argument by counsel is not

13   entitled to deference.  Now, sometimes the courts permit

14   deference to interpretation that reflects, that shows that it

15   reflects the agency's considered judgment, but there is no such

16   showing here.

17          I would now like to turn to the impacts.  I'm trying

18   to identify which of the items in your list of questions that I

19   had not planned to address, so bear with me just one second.

20         THE COURT:  What I'll do in all likelihood is leave

21   the record open for a couple of days in the event that a party

22   recognizes after appearing that a point was not made and did not

23   address a point raised by the Court.

24         MR. ROSENBAUM:  Thank you, your Honor.

25         THE COURT:  I'll give everyone a couple of days, but

PDF created with pdfFactory trial version www.pdffactory.com

1    it won't be long.  It will be a few days.

2            MR. ROSENBAUM:  Thank you.

3            Let me say this:  That the briefs that we filed do

4    cover, of course, a wide area of problems.

5            THE COURT:  Absolutely, absolutely.

6            MR. ROSENBAUM:  And the idea that the government can

7    rely on models, and we do talk about the model issue, and the

8    sound scape model you asked about.

9            THE COURT:  Let me just say one thing.  The points

10   that the Court raised also are gleaned from everything that's

11   been filed, so there's nothing new, I don't believe.

12           MR. ROSENBAUM:  Yes, your Honor.

13           THE COURT:  The Court has focused on points that the

14   Court believes are crucial to a fair consideration of the

15   issues.

16           MR. ROSENBAUM:  Let me address just a few points, your

17   Honor, and take advantage of your permission to supplement after

18   the hearing.  And I do want to address the whole issue of sound

19   scape.

20           The point that is made in the ROD that we have said is

21   not supported by the record is a critical point, and that is

22   this:  The government says there is an impact on the natural

23   sound scape, but it is mainly due to snow coaches and road-

24   grooming equipment.  Now, that's pretty important because

25   they're saying that if the problem is not the snowmobiles, then

PDF created with pdfFactory trial version www.pdffactory.com

1   our increasing the number of snowmobiles is not likely to have a

2   significant impact on the natural sound scape.

3           THE COURT:  That's absolutely correct.

4           MR. ROSENBAUM:  But your Honor, the support they offer

5   for that proposition does not support it.  What do they cite?

6   They cite provisions in two years of sound scape studies, the

7   monitoring studies, and they say that this shows that the loud

8   events recorded were snow coach events and not snowmobile

9   events.

10          THE COURT:  And road grooming as well?

11          MR. ROSENBAUM:  And road grooming.

12          But, your Honor, if you look at the pages they cite

13  to, a couple of things become very clear.  First of all, it

14  states right in the document on the page they cite that road

15  grooming takes place outside of the time frame in which the

16  Winter Use Plan applies, which is eight a.m. to four p.m.  Road

17  grooming takes place almost entirely outside of that time frame,

18  so that's not a cause of the sound scape impacts.  Then the

19  government relies upon numbers that include events that were

20  recorded by a machine monitoring at a place called Spring Creek

21  2.  Spring Creek 2 does in fact show a large number of snow

22  coach loud sound events, but what is Spring Creek 2?  Spring

23  Creek 2, according to the same reports on which the government

24  relies, is not representative of other locations in the park.

25  It is an isolated thoroughfare from the south entrance to Old

PDF created with pdfFactory trial version www.pdffactory.com

1    Faithful and it is a place where loud, Bomadeer snow coaches

2    cruise at maximum speed of 45 miles an hour because they are

3    taking visitors from the south entrance to Old Faithful.  The

4    vice record document, 117160 at 147, states this:  That Spring

5    Creek 2 is a place where, quote, loud Bomadeer snow coaches,

6    close quote, pass a, quote, maximum cruising speed.

7              I also cite to record 125292, which is the 2007

8    monitoring study at page 31, which is the page that they rely on

9    where it states that at Spring Creek 2 there's a 45-mile-an-hour

10   zone.  Now, what is significant about this, your Honor, is that

11   at Old Faithful, one of the most popular spots, you don't find

12   snow coaches to be producing the loud noise events.  In the

13   2000-2007 monitoring report they indicated that there were no

14   recordings of loud sounds at Old Faithful; therefore, they don't

15   even report the numbers.

16             In the 2005/2006 study, also relied upon by the

17   government, which is at record 1250/50, page 47, at Old Faithful

18   snowmobiles accounted for one -- these are whole season numbers,

19   your Honor -- one of the loud events, and snow coaches two of

20   the loud events.

21             Now, another place that is a busy location is Madison

22   Junction, which is 2.3 miles west of an intersection, and the

23   2005/2006 study says snowmobiles accounted for 118 loud events

24   season-wide and snow coaches for 124, 118 and 124, and there are

25   three others that were unidentified, so maybe it's 121 to 124.

PDF created with pdfFactory trial version www.pdffactory.com

1   My point, your Honor, is that the Spring Creek numbers are not

2   representative of the park as a whole.

3          Now, when you rely upon numbers of this sort for a

4   critical conclusion you have to have more record support than

5   this, I would submit, your Honor.  The same reports say that

6   OSVs were audible 68 percent of the day at Old Faithful and 59

7   percent of the day in Madison Junction with maximum sounds

8   exceeding 70 decibels at those locations, yet there's no need

9   for consistent figures showing snow coaches as the cause of that

10  event.

11         Now, the government also says that its model, the

12  sound scape model, has been upheld, and it cites in its reply

13  brief to U.S. Air Tour Association versus FAA at 298F3rd 997,

14  1008, just cite D.C. Circuit 2002, but there, your Honor, it was

15  an issue of applying this model to flights over the Grand

16  Canyon, and it was used -- it's a Department of Transportation

17  model.  It was used to assess noises from airplanes and other

18  aircraft, and the court says only that it's referring to the

19  agency in the use of this model in the area of aircraft noise.

20  Now, significantly the challenge there was not to their

21  reasonableness of the results found, which here we say is

22  unreasonable because they were contrary to the known facts found

23  in the monitoring, nor was the challenge to the application of

24  that model in a way that hadn't been used before.  The model

25  could very well be appropriate for assessing what flight paths

PDF created with pdfFactory trial version www.pdffactory.com

1   aircraft should be permitted to take based upon how far the

2   noise travels, but here the noise being made is at the very

3   location where the people are, so the idea that you're going to

4   use that model in this very different situation is not

5   reasonable.

6          Now with respect to the wildlife issue, and I believe

7   that this is the issue that you raised but I'm not certain about

8   it, though scientists in the White study recommended OSV use be

9   maintained at or below a level during the period of the study,

10  and the scientists themselves said that that level is fifty

11  thousand per season.  Now, that translates into the averages

12  that we have been talking about, your Honor, which is 254

13  snowmobiles in the first season, 206 in the second, and 267 in

14  the third.  The government says they followed that

15  recommendation but obviously they didn't.  They doubled the

16  numbers from those recommended in the study.  Now, we're not

17  saying that the government is required to follow that study, but

18  the government has to explain why it didn't follow that study,

19  which it didn't do here.

20          Your Honor, I would like to just close --

21          THE COURT:  The White and Borkowski studies?

22          MR. ROSENBAUM:  I'm sorry?

23          THE COURT:  The White and Borkowski studies analyzed

24  what, over 6,500 interactions between the OSVs and wildlife and

25  provided percentage of active and nonactive responses to OSVs

PDF created with pdfFactory trial version www.pdffactory.com

1    for five species, right?

2            MR. ROSENBAUM:  Yes, your Honor.

3            THE COURT:  Okay.  The government then determined that

4    those percentage were not acceptable?

5            MR. ROSENBAUM:  Yes, your Honor.

6            THE COURT:  That's the government's determination.  I

7    mean, what more could the government have done?  What else

8    should they have done?

9            MR. ROSENBAUM:  Your Honor, I think it's not a

10   question of what further studies they should have undertaken.  I

11   think it's a question of the conclusion they drew from those

12   studies, the conclusion in order to permit recreation, and

13   that's what the very beginning of the FEIS says.

14           THE COURT:  Right.

15           MR. ROSENBAUM:  That's what we're doing here.  We just

16   want to provide more recreation.  In order to provide more

17   recreation does the conservation mandate permit the government,

18   when there's this level of impact, permit them to say, well, we

19   need more recreation; therefore, we don't care about this

20   impact?  I mean, our view, your Honor, is that they should have

21   taken that study and said, no, we're not going to permit

22   snowmobiles at this level, at least at this level, but that's

23   not what they did.  They said, well, first they said we followed

24   their recommendations, which they didn't do, and then they said,

25   well, it's acceptable because after all it's only twenty percent

PDF created with pdfFactory trial version www.pdffactory.com

1    of FEIS that are affected.

2            THE COURT:  Right.

3            MR. ROSENBAUM:  But your Honor, the idea that you look

4    at the population as a whole and say we got lots of bison and we

5    don't need -- if a few of them die from starvation from the

6    winter stresses, that is okay with us.  That's not what the laws

7    require.  That's not what 2.18 requires.  That's not what the

8    conservation mandate requires.  I suppose you could imagine a

9    situation in which the government for other purposes might be

10   able to say it's necessary for us to take certain actions for

11   the protection of the park and therefore some bison and some

12   swans and some wolverines, etcetera, are going to have to

13   suffer, but simply in order to provide more recreation?  I just

14   don't think the statute permits that.

15           So, your Honor, in closing let me just say that this

16   has been going on a very long time.

17           THE COURT:  Thanks for reminding me.

18           MR. ROSENBAUM:  And we all know that.  And there are

19   so many things wrong with this process and this rule that it's

20   even hard to know where to start, but what we would urge your

21   Honor, my client would urge, is that you address the substantive

22   legal restraints here.  2.18, the Yellowstone and AV Act, the

23   Organic Act, it's not just a question of going back and doing

24   more studies.  It's a profoundly wrong view of the statute,

25   which is the problem here, and more studies are not going to

PDF created with pdfFactory trial version www.pdffactory.com

1   solve that problem.

2          And there's another issue here, your Honor, which may

3   be a little out of school here, but we have tremendous respect

4   for the professionals in the National Park Service, but we've

5   also come to see that political influence is endemic in the

6   management of the national parks.

7          THE COURT:  That's your argument here.  The decision

8   reached was indeed a political one without reliance upon the

9   record before the agency.

10         MR. ROSENBAUM:  Well, yes, your Honor, but I'm

11  addressing future, and I'm just saying that if your Honor

12  rejects the fundamental view of the statute that this rule is

13  based on, you provide the professionals and the Park Service

14  with greater ammunition to resist political pressure that seeks

15  to lead them in the wrong path, and that may not be a legal

16  argument but it is just a practical reality of life.

17         THE COURT:  What was the agency's response to the

18  complaints of the former National Park Service directors?  Seven

19  or eight of them challenged the decision.

20         MR. ROSENBAUM:  Eleven directors.

21         THE COURT:  Eleven?

22         MR. ROSENBAUM:  Eleven directors and 630 former

23  members, former employees, The Coalition of Retired National

24  Service Employees.

25         THE COURT:  Almost a hundred members of the Congress

PDF created with pdfFactory trial version www.pdffactory.com

1    also.

2              MR. ROSENBAUM:  And 86 members of the Congress and

3    EPA, and 120,000 --

4              THE COURT:  Were those views considered by the agency?

5              MR. ROSENBAUM:  Your Honor, I don't know whether they

6    were actually considered.

7              THE COURT:  Can I look at the record?  Can I look at

8    the administrative record for that answer?

9              MR. ROSENBAUM:  The only place that we --

10             THE COURT:  No one disputes that the eleven Park

11   Service directors and almost one hundred members of the Congress

12   challenged this plan and basically asked the government not to

13   implement it?

14             MR. ROSENBAUM:  Yes, your Honor.  120,000 members of

15   the public commented.

16             Your Honor, I don't know where the record of that

17   appears, and perhaps the government could answer that question.

18             THE COURT:  What's the significance of that?  If it

19   wasn't considered as part of the administrative record, can this

20   Court consider that?

21             MR. ROSENBAUM:  Oh, yes, your Honor.

22             THE COURT:  How so?  How do I factor that into the

23   decision-making?  The government made a decision based upon this

24   record that's been amassed and these outside commentaries that's

25   outside the administrative record, so what am I supposed to do

PDF created with pdfFactory trial version www.pdffactory.com

1    with that?

2             MR. ROSENBAUM:  Well, your Honor, it is in the record;

3    every one of the comments that I just mentioned is in the

4    record.

5             THE COURT:  Right.

6             MR. ROSENBAUM:  What I don't know is where in the

7    record it reflects what consideration was given to it, but I

8    don't see any reason why you could not rely on it.  I think the

9    massive outpouring of opposition here indicates that again this

10   is a radical rule and this is one that would again change the

11   whole way in which the National Park Service would manage this

12   system.

13            THE COURT:  Okay.

14            MR. ROSENBAUM:  Thank you, your Honor.

15            THE COURT:  Okay.  Thank you.

16            One of your colleagues is going to address the other

17   issues that the plaintiffs have; is that correct?

18            MR. HELLE:  Sean Helle.

19            THE COURT:  Good morning, counsel.

20            MR. HELLE:  I'm going to make every effort, your

21   Honor, not to duplicate every --

22            THE COURT:  No, no, please don't.  Everyone has done

23   an excellent job in providing us with significant briefs.  I

24   want you to highlight the principal points.  I want you, to the

25   extent you're able, to respond to the points that the Court

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    highlighted as significant in the Court's view when I took the
 2    bench.
 3              MR. HELLE:  I think I'll be able to do so.
 4              I would like to begin just by reminding the Court
 5    what's at issue, at stake in this case.  This case presents
 6    fundamental questions regarding the vitality of Yellowstone
 7    National Park and the National Park ID at Yellowstone.
 8              In 1872, spurred by a surreal and serene landscape
 9    unlike any other in the world --
10              THE COURT:  Counsel, I am quite familiar with the
11    history.  I don't want to take away your thunder here, but I'm
12    quite familiar of the history of this wonderful park, so I want
13    you to make your principal legal argument that you came to court
14    prepared to make.
15              MR. HELLE:  And I'm happy not to burden you with the
16    history.
17              THE COURT:  No, it's not a burden.  I wish we had more
18    time to talk about this wonderful park, but I'm quite familiar
19    with the history, but let's get on with the legal challenge,
20    though.
21              MR. HELLE:  With respect to the legal challenge, I
22    think one of the most pressing issues in the case is that the
23    national park idea is in fact in the balance here.
24              In 1872, as you know, Congress established Yellowstone
25    as a refuge, a sanctuary that exists no where else in the United
```

PDF created with pdfFactory trial version www.pdffactory.com

1    States, and the Park Service was subsequently established in

2    order to protect public lands that are the most cherished we

3    have, and so this national park ID is actually contained in the

4    requirements of the Organic Act which have been touched on

5    already this morning but I think it's good to return to them.

6           The Organic Act provides the Park Service with a

7    mandate to first conserve park resources.

8           THE COURT:  Conservation is paramount.  I recognize

9    that.

10          MR. HELLE:  And to provide for their enjoyment, and I

11   think what's critical, as this Court recognized in 2003, as the

12   Park Service has recognized in its own management policy, and as

13   the D.C. Circuit recognized in the endangered case and many

14   others, conservation is inevitably predominant in the parks

15   because what is to be enjoyed is in fact the resources these

16   places preserve, and so this is actually an extraordinary case.

17   First of all, there is no question on this record that snow

18   coaches afford the form of access that best protects the park.

19   The EIS states directly again and again and again that under the

20   snow coach alternative ultimately dismissed by the

21   administration the park would be left cleaner and quieter than

22   under any other alternative.  That's simply not disputed in this

23   case.  There are simply no question as well that snow coaches

24   provide identical access to the decision challenged in this

25   case, and so cleanly presented here is a situation in which

PDF created with pdfFactory trial version www.pdffactory.com

1    there is no tension whatsoever between conservation and

2    enjoyment.  Snow coaches provide for complete access to the

3    park's resources and leave them far better intact, and in that

4    situation the Park Service is simply without discretion to

5    disregard the conservation FA and elect to compromise park

6    resources and values in furtherance of snowmobiling.  This

7    interpretation of the conservation mandate, while contested by

8    the government in this case, is simply -- it's reflected in D.C.

9    Circuit precedent and the management policies.  In the

10   Dangerfield opinion, which I know we discussed at some length in

11   the briefing, the D.C. Circuit characterized the Park Service's

12   discretion as discretion to determine what actions will best

13   protect the parks.  That determination was actually made in this

14   case.  It's very clear again on this record that snow coaches

15   are the form of access that best protect the park, and the

16   administration's decision to disregard that, to disregard the

17   conservation mandate and simply declare that snowmobiling was

18   fine and continue to be allowed, cannot be reconciled with that

19   holding.  The government in its brief notably doesn't really

20   attempt to reconcile the decision with the holding in

21   Dangerfield.  They interpret Dangerfield as no more providing

22   the Park Service has discretion, and from what I can tell based

23   on the briefing in this case, the government's view is that the

24   Park Service has unfettered discretion to determine in an

25   unreviewable manner that activities are appropriate, that their

PDF created with pdfFactory trial version www.pdffactory.com

1   impacts will be acceptable, and therefore they will be allowed

2   within the park.   But Dangerfield doesn't simply say the

3   National Park Service has discretion.   Again it says the

4   National Park Service has discretion to determine how best to

5   protect this place, and they did so in this case and they

6   declined to take that action which is at odds with the

7   conservation mandate.

8          The government also talks quite a bit about Section

9   1.4.3 of the policies, which, as they stress, reflects the Park

10   Service's own interpretation of the conservation mandate.   As

11   1.4.3 notes, the conservation mandate is predominate.   It

12   applies all the time whether or not there's a risk, and it

13   requires the Park Service to avoid or minimize adverse impacts

14   to the park.   What the government stresses is not that language.

15   The government stresses subsequent language that says park

16   managers have the discretion to authorize adverse impacts to

17   parks when necessary and appropriate to fulfill the purposes of

18   the park.

19          While invited a number of times to explain why

20   snowmobile use is necessary within Yellowstone, the government

21   has failed to do so.   Again, the repeated declarations are we

22   think it's appropriate, we think the impacts are going to be

23   fine.   The problem with that is, necessity really is the

24   embodiment of this conservation idea and the record in this case

25   reflects that snow coaches provide full access to all of

PDF created with pdfFactory trial version www.pdffactory.com

1    Yellowstone's wonders and curiosities while leaving them better

2    intact, and so any suggestion in this case that there is some

3    question about the Park Service's discretion to balance use and

4    enjoyment is simply misplaced because it's the extraordinary

5    fact pattern where conservation can be obtained under an

6    alternative that provides for full enjoyment.  There is really

7    no issue of discretion.

8         With respect to impacts, I think it's important to

9    note again the Court opened by referencing the adaptive

10   management standards, and there's some effort in the

11   government's briefing to suggest that plaintiffs are simply

12   unhappy in this case with the level of impact that will result

13   of the challenged Winter Use Plan, and I think the important

14   point here is that with respect to every resource the threshold

15   at issue is in fact the administration's own.

16        To begin with noise, as has already been discussed

17   this morning, monitoring in recent seasons demonstrated that

18   oversnow vehicle noise was audible for far more than fifty

19   percent of the day in developed areas such as Old Faithful.

20   This exceeded the administration's own 2004 standard, a standard

21   geared to determine when the parks may be sliding toward

22   unacceptable impacts and impairment, if not into unacceptable

23   impacts and impairment, and it should be stressed here that

24   we're talking about Old Faithful, perhaps the most iconic place

25   in all of the National Park System.  What the administration

PDF created with pdfFactory trial version www.pdffactory.com

1    does in this decision, rather than responding to one of the

2    management actions that is supposed to be taken when an adaptive

3    management standard is breached, it simply changes the standard.

4    Without explanation it says, you know, you've determined based

5    on recent seasons which demonstrated only that their existing

6    standard didn't -- that Yellowstone in fact can withstand 75

7    percent -- noise 75 percent of the day, so under the

8    administration's new standard we're not to reconsider the number

9    of snowmobiles authorized within the park until it is determined

10   that snowmobiles and other oversnow vehicles are in fact audible

11   for more than 75 percent after a given date.  I mean, what's

12   being compromised here is the park, and what is on the record is

13   that this is in no way essential to access.  Again, there's been

14   some talk about the model problems and there are significant

15   problems with the modeling in this case, but I think one thing

16   that is clear is that the ROD itself states that in terms of

17   percentile mobility snow coaches have been determined to be

18   recently responsible for 22 percent of audibility within the

19   park and snowmobiles 72 percent.  By all indications that ratio

20   will only change in favor of snow coaches, as the plan provides

21   for a continued transition to ban snow coaches, whereas

22   snowmobiles that will be used in the park under the challenged

23   plan on the exact same ones, the same BATT standards that we

24   have seen in recent years, and so the decision is actually very

25   clear on the point that audibility is a problem relating to

PDF created with pdfFactory trial version www.pdffactory.com

1    snowmobiles, not snow coaches, so there is simply no reason to

2    expect that the doubling of snowmobile use authorized under the

3    administration's decision will at all reduce audibility problems

4    at Old Faithful, and there is every reason to understand on this

5    record that snow coaches would in fact address this issue.

6         I think with respect to noise, we've also talked about

7    the maximum sound level issue in this case.  Much attempt is

8    made in the record to suggest that snow coaches are in fact the

9    prime problem here because some modeling -- or some

10   monitoring -- I'm sorry -- is demonstrated.  They in fact

11   resulted in the lack of snow in the park or some of the snow

12   noises in the park.  Again, under alternative two that was

13   rejected by the administration, snow coaches would continue to

14   transition back to the BATT and under the BATT standards for

15   both snowmobiles and snow coaches.  There's a 73 decibel

16   maximum, so there is simply no reason on this record to think

17   that snow coaches will somehow contribute unevenly to noise

18   impacts within the park.  What's very clear is that the

19   audibility problems will persist, and the only way the

20   administration could deal with that was by changing the

21   threshold.

22        And so you've asked about what is the relevance of

23   these adaptive management thresholds in terms of the Park

24   Service determination.  Can we rely on the Park Service to

25   actually respond with management actions?  And I think there are

PDF created with pdfFactory trial version www.pdffactory.com

1    actually three critical problems with the adaptive management

2    standards here.

3         First of all, as we've discussed, they're arbitrary.

4    With respect to Old Faithful in particular the administration

5    has simply elected to weaken protections in the park's developed

6    areas without explaining why, without explaining how that

7    fulfills the stringent mandates contained in the Organic Act and

8    other Park Service laws.

9         Second, there's a conspicuous failure to take any

10   management action already when presented with exceedances.  The

11   government elected to change the standard and authorize an

12   expansion of the snowmobiles that were primarily responsible for

13   the issue in the first place, so there is no reason to take

14   seriously the notion that management actions will be taken even

15   if these thresholds are breached.

16        And finally, adaptive management is incapable of

17   addressing an existing problem within a park.  It's very clear

18   that the Park Service has an obligation to comply with its

19   mandates and to comply with them now and so promises of future

20   management actions in the face of significant impacts that

21   demonstrate that Yellowstone's protections are in fact being

22   disregarded in this case.  I simply can't save the

23   administration's decision.

24        With respect to benzene, I don't want to dwell too

25   long on this, but I think it portrays the same problem as with

PDF created with pdfFactory trial version www.pdffactory.com

1    noise.  First of all, the MRL addition, the Minimal Risk Levels,

2    at issue in this case, are established pursuant to circling, and

3    the point of these levels remarkably is to assess the health

4    threat posed by hazardous waste sites.  For benzene, three

5    levels have been established:  A clonic level that measures

6    risks from exposures of 365 days' duration more, an inter-

7    mediate, a standard that establishes risks for durations of 14

8    days or more, and an acute standard which is applicable to

9    exposures of just one day.  What's been demonstrated at the west

10    entrance in the park in the past three seasons is that the

11    clonic, the lowest benzene level for clonic exposures, has been

12    consistently exceeded.  There is a three-day study in 2006 over

13    Presidents' Day weekend at the west entrance.  Two of the three

14    days the people doing the study noted that the intermediate

15    threshold for benzene, the standard that measures health effects

16    from a 14-day exposure or more, had been exceeded, and in fact

17    one of those exceedances occurred on the day when there were

18    only 174 snowmobiles in the park and it fell just short of the

19    acute standard, the standard that applies to single-day

20    exceedances, single-day exposures to benzene.  This 174

21    snowmobile level was .0086.  The acute standard for benzene is

22    point .009.  Under the challenge plan in this case, three

23    hundred snowmobiles will be allowed to enter through the west

24    entrance, so approximately twice the number seen on the day when

25    the intermediate threshold was exceeded and the acute threshold

PDF created with pdfFactory trial version www.pdffactory.com

 1   approached.  The government simply does not address this issue

 2   in its decision in the EIS.  It dismisses the standards as

 3   irrelevant and offers promises of medical monitoring just to be

 4   certain that a doubling will somehow prove okay in the park, and

 5   this is remarkable in two senses, I think.

 6          First of all, these organic standards used to assess

 7   health threats at hazardous waste sites, for the administration

 8   to disregard them in Yellowstone I think is rather stunning, and

 9   second of all, the MRLs have been incorporated by the

10   administration as adaptive management thresholds, so again, this

11   is not a concern that plaintiffs are raising on our own.  This

12   is actually their own flag for assessing when conditions in the

13   park are strained far from where they ought to be, and so again,

14   the premise of adaptive management I think is elusory here, and

15   in fact, what the government's adaptive management standards

16   demonstrate is that the impact of recent seasons, much less the

17   impact of a doubling of snowmobile use, are ultimately

18   irreconcilable with Park Service mandates.  It is for this

19   reason I think that 540 is ultimately not the number defended in

20   the government's brief.

21          There are efforts --

22          THE COURT:  Have you been able to determine the

23   factual basis for that decision of 540?

24          MR. HELLE:  I don't think there is a factual basis,

25   and I think there is an important record point here.  The

PDF created with pdfFactory trial version www.pdffactory.com

1    government has cited in its reply two documents that it says

2    reflect an intention with the 540 cap to maintain snowmobile

3    levels at the numbers in recent seasons.  These documents,

4    however, don't reflect an intention.  They reflect a mere

5    correspondence between the 540 snowmobile cap and the 542 peak

6    day in 2006.  That correspondence is not an intention, and

7    what's very clear in this case is that if the administration had

8    desired to come up with a plan that would actually keep

9    snowmobile numbers at recent levels it could have done so and it

10   hasn't and so the administration's efforts in this case to avoid

11   defending the plan that the administration in fact promulgated

12   simply cannot be accepted.  The administration authorized 540

13   snowmobiles in the park each day.  The administration said that

14   that number was consistent with Park Service mandates.  The

15   question in this case is absolutely therefore whether that's

16   correct, and the reason I think the government conspicuously

17   backs away from the number is because it's indefensible.

18        With respect to the air and noise impacts, we've

19   already discussed a doubling of snowmobile use is certain only

20   to exacerbate the existing conditions within the park.

21        And with respect to the White study, again this has

22   been discussed and please cut me off if you're tired of hearing

23   about it, but with respect to the White study, the government

24   concedes, I think, ultimately, that the 540 cap is at odds with

25   the recommendation.  Over-snow vehicle numbers under the

PDF created with pdfFactory trial version www.pdffactory.com

1  administration's plan will more than double relative to those

2  observed or studied at least during the White study, so what the

3  administration has done is turn its back on its own scientists

4  in order to double use, and then in the briefing argue that, you

5  know, at the end of the day we'll probably just see recent

6  levels, and so that's fine.  We ultimately, though, we didn't

7  make a decision to cap snowmobile numbers, we effectively, we

8  expect, we hope, as you said, that snowmobile numbers will stay

9  where they were during the years of this study.

10        The problem with that, the government notes of course

11 that this study was not binding on the Park Service, and we

12 agree with this.  The Park Service also notes, however, citing

13 Citizens Against Burlington, that the Park Service had to take

14 the study seriously, and it didn't do so here.  The

15 recommendation is simply not reflected in the record, and so the

16 government's efforts to fill briefing -- fill the briefing in

17 this case with examples of other considerations that the Park

18 Service, the administration had before it, is simply it misses

19 the point, that we absolutely agree that the White study had to

20 be taken seriously and ultimately it cannot have been taken

21 seriously by simply casting it aside, making no mention.

22        I would like to talk briefly about the issue of

23 deference in this case.  Of course there are situations in which

24 the Park Service's decision would be entitled to deference.

25 This, however, is not one of them.  The problem here is that

PDF created with pdfFactory trial version www.pdffactory.com

1   there is simply no reasoned explanation for what the

2   administration did and there's no reasonable explanation that's

3   been offered by the administration, and the failure I think is

4   remarkable in that in 2003 and again in 2004 this Court directed

5   the administration's decision, determination that suddenly

6   snowmobile use could be allowed in the park despite what the

7   Park Service had determined in 2000 and 2001, that snowmobile

8   use was fine, that we're awaiting the explanation demanded by

9   this Court, and it's simply not offered in this record.  Again,

10  this is no small matter.

11          THE COURT:  If the rule is vacated then what's in

12  place?  There's no plan in place.  If the rule is vacated what

13  are you asking the Court to do, if anything?

14          MR. HELLE:  You're right.  This is 2003.  There's no

15  backup ruling in place, and I think, first of all --

16          THE COURT:  This Court has no desire to run the

17  National Park Service, so you asked that if the rule is vacated,

18  the Court were inclined to agree with you, that's the end of

19  what this Court has to do at that point?

20          MR. HELLE:  We've had two things.  First of all, of

21  course, that this plan be vacated or remanded to the Park

22  Service with a final plan consistent with the Court's order.

23          THE COURT:  Right, but the likelihood of that

24  happening between now and the commencement of the winter season

25  is remote.

PDF created with pdfFactory trial version www.pdffactory.com

```
1              MR. HELLE:  That's true, which is why we've also asked

2    for the Court to order the Park Service to promulgate an interim

3    rule that provides for continued access.

4              THE COURT:  Your colleague argued for a rule that will

5    phase out snowmobiling, but why would the Court want to put

6    itself in a position of telling the government what to

7    promulgate?

8              MR. HELLE:  I think ultimately when given the Court's

9    guidance, the Park Service will be able --

10             THE COURT:  I've given guidance before.

11             MR. HELLE:  I'm being optimistic, but I think that

12   with the Court's guidance the Park Service --

13             THE COURT:  So this time I mean it?

14             MR. HELLE:  I think that would be the best to suggest.

15   I think that the Park Service --

16             THE COURT:  It would be safer if I vacate the rule

17   just to say put in place an interim plan and keep trying?

18             MR. HELLE:  I think that's right, and, your Honor,

19   there is actually precedent here from the Park Service to rely

20   on.  In 2001 the Park Service figured out how to navigate from a

21   situation in which there was impairment to one in which

22   impairment was incrementally avoided.  I think that the Park

23   Service is capable here of promulgating a temporary ruling and

24   final ruling and should be allowed to do so, and I think that

25   simply your involvement would end at vacating or requiring
```

PDF created with pdfFactory trial version www.pdffactory.com

1    promulgation to a rule.

2              THE COURT:  All right.

3              MR. HELLE:  With respect to the problem of the failure

4    to offer an explanation, I think a couple of points here are

5    conspicuous.  First of all, with respect to the executive

6    orders, 11644, 11989, and also the Park Service's snowmobile

7    regulation, the government in its reply ultimately concedes that

8    these provisions were not independently assessed.  What they

9    say, however, and this comes back to the discussion of the

10   double impact standard, is by determining the various

11   alternatives, including that selected by the administration, in

12   determining that they would not result in unacceptable impacts,

13   the administration simultaneously determined that they would in

14   fact comply with Section 218(c) and the relevant executive

15   orders, and the government cites to its management policy in

16   chapter eight relating to offer of vehicle use, and also to its

17   subsequent policy addressing snowmobile use, and these

18   provisions actually reflect the opposite, that in its own

19   policies the Park Service has recognized that these executive

20   orders and this regulation impose separate requirements on the

21   Park Service, and thus any proposal to authorize either offer of

22   vehicle use or, in particular, snowmobile use, must be assessed

23   against both the requirements of these orders and the

24   requirements of Section 218(c).

25              With respect to 218(c) in particular, the policy here

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    is Section 8.2.3.2.  It says that snowmobile use may be allowed

 2    only when it is consistent with requirements of Section 218(c)

 3    and will not otherwise result in unacceptable impacts.  And this

 4    makes absolute sense because, as counsel for MPCA has already

 5    noted, the unacceptable impact standard simply has nothing to do

 6    with specific uses, such as offer of vehicles and snowmobiles.

 7    The unacceptable impact standard was designed since --

 8              THE COURT:  These arguments have been made.

 9              MR. HELLE:  Okay.

10          So I think this is a critical failure because it's an

11    acknowledgment by the government that it did not address these

12    provisions, and the APA fundamentally requires a reasoned

13    explanation.  Administrative decisions cannot be merely acts of

14    political will.  They have to be acts of reason, and we don't

15    have that here, and I think it's not surprising that we don't

16    have it here because I fail to understand how the administration

17    could offer a reasoned explanation for how the expanded

18    snowmobile impacts under the challenged plan would in fact prove

19    consistent with these standards.

20          With respect to the Organic Act, there has been no

21    effort ultimately by the government in this case to demonstrate

22    how in fact this case is different from that confronted by Judge

23    Bates.  In that case, as you know, Judge Bates noted that it's

24    not enough for the Park Service to catalog the impacts of an

25    action, to parrot the unacceptable impacts management standard
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1    and then simply declare by fiat the referenced impacts will not
2    exceed the standards articulated in management policies, and
3    actually what we have here is no different.  If you look at the
4    various sections, pages 364 to 374 in EIS, are very indicative
5    of this.  The government's nonimpairment analysis essentially
6    goes, first of all, here is how we've interpreted our nonimpact
7    mandate in the management policies, here's how we've set out our
8    unacceptable impact standard in the management policies, here is
9    how bad it was in the '90s.  And we don't believe that any of
10   these alternatives will result in impairment or unacceptable
11   impacts because there are impacts that will be less than we saw
12   in the past.  What's missing here, like what was missing in
13   Sierra versus Manello, is the natural connection, the
14   explanation as to why some reduction of deplorable historic
15   conditions is not impairment, is not unacceptable impacts, and
16   the government concedes ultimately that this historic conditions
17   metric is incapable of determining whether impairment or
18   unacceptable impacts will occur, and the government similarly
19   abandons its reliance on national air quality standards saying
20   that's right, that doesn't demonstrate whether we've secured the
21   best possible air quality in the park, whether we avoided the
22   impacts under Section 1.3.
23          The government withdraws again the various mandates
24   set forth in defense of its decision and what's left ultimately
25   is nothing.  What's left is political will, and I think it's
```

PDF created with pdfFactory trial version www.pdffactory.com

1  important, as this Court noted in 2003, the obligation of the

2  Park Service to explain itself stems both from fundamental

3  principles of an administrative ruling and also from the Park

4  Service's overriding conservation mandate.  These are sacred

5  places in a significant sense.  These are our most cherished

6  public lands, and what the government has offered,

7  decision-makers and the public here is simply a declaration that

8  we think reduced impacts relative to historic conditions will be

9  good enough, and the problem of course is that's simply not good

10 enough under the legal mandates, under the requirements of the

11 Administration Act.

12          THE COURT:  Thank you, counsel.

13          Let me hear from government counsel.  We lost the

14 government's counsel.

15          MR. HAJEK:  Your Honor, we just ask for a couple of

16 minutes.

17          THE COURT:  Has he conceded this case?

18          MR. HAJEK:  Absolutely not, your Honor.

19          THE COURT:  He hasn't?  He's going to come back?

20          Do you want two more minutes?

21          MR. HAJEK:  Yes, your Honor.

22          THE COURT:  I have a number of questions.  I need to

23 get some answers to some questions first and then I'll give you

24 a chance to respond to the argument made.

25          I want to focus on the FEIS for a second, page 307,

PDF created with pdfFactory trial version www.pdffactory.com

1    tables 4-49 and 4-50.

2              MR. MONTERO:  Your Honor, you said at 307?

3              THE COURT:  Yes, page 307, the charts.

4              MR. MONTERO:  Okay.  I'm at it.

5              THE COURT:  All right.  Now, those tables appear to

6    compare sound impacts for the current conditions to the various

7    alternatives.  As I read this, it's based on modeled data.

8              MR. MONTERO:  That's correct, your Honor.

9              THE COURT:  All right.  The first question is, is the

10   data for current conditions, that's in that next to last column,

11   the current conditions based on the number of snowmobiles

12   allowed under the Temporary Rule 720, are they average actual

13   use for the past three years, 260 to 290?

14             MR. MONTERO:  Your Honor, this is the historic

15   condition.  Actually the 800 average, the current condition, I'm

16   looking at the top one here that's 14.4.

17             THE COURT:  Right.

18             MR. MONTERO:  The number in there that would be the

19   actual observed conditions we will replicate, indicating the

20   actual observed conditions during the 2004 through 2007 seasons.

21             THE COURT:  All right.  But where is that gleaned from

22   the tables, though?  Where would I find that answer?

23             MR. MONTERO:  Well, I'm not sure the current condition

24   I'm sure is described throughout the FEIS.

25             THE COURT:  You have to tell me.  You have to point it

PDF created with pdfFactory trial version www.pdffactory.com

1    out in the record.  Where is it?  Because it's not clear from

2    any description of the tables at all just what that 14.4 figure

3    pertains to.

4              MR. MONTERO:  I think what I'll do, your Honor, is

5    I'll ask co-counsel to find that in the record and to pass me a

6    note.  Then as soon as I've obtained that I'll let your Honor

7    know.

8              THE COURT:  Because I made an assumption that the

9    current conditions means 260 snowmobiles and 29 snow coaches.

10             MR. MONTERO:  Well, that actually is the current

11   condition.

12             THE COURT:  That is?

13             MR. MONTERO:  Right.

14             What is somewhat confusing, your Honor, is current

15   conditions, what were the current conditions while the studies

16   were taking place.  Bear in mind this was a three-year process,

17   so now as one reads this labeling as Current Condition, the

18   current condition is actually the first year under the Winter

19   Use Plan.

20             THE COURT:  Winter Use Plan is alternate seven, right?

21             MR. MONTERO:  That's correct.

22             THE COURT:  Now, in that table, and for the record,

23   I'm referring again to Table 4-49, it appears that ninety

24   percent of the time audible numbers increase, that the

25   percentage of park area in which they can be heard for the most

PDF created with pdfFactory trial version www.pdffactory.com

1    part decreases; is that correct?

2              MR. MONTERO:  Decreases how, your Honor?

3              THE COURT:  Look at the table going down to that last

4    row of boxes in the table.

5              MR. MONTERO:  As one goes down?

6              THE COURT:  Yes.  Ninety percent of the time audible,

7    on your alternative seven, snowmobiles can be heard ninety

8    percent of the time in .9 percent of the park, while under

9    Current Conditions snowmobiles can be heard ninety percent of

10   the time in .2 percent of the park.

11             MR. MONTERO:  Okay.  Yes, your Honor.

12             THE COURT:  So what's the benefit there?

13             MR. MONTERO:  The benefit in terms of?  I'm not sure

14   that would not be beneficial.

15             THE COURT:  That would not be beneficial?

16             MR. MONTERO:  Correct.

17             THE COURT:  And it's also correct, though, under every

18   level audibility over zero to ten percent, the chosen

19   alternative is two to three times higher in terms of percent of

20   park area in which OSVs can be heard in current conditions.  I

21   mean, your own figures show that.  Everything has increased.

22             MR. MONTERO:  That's correct, your Honor, until one

23   gets to about twenty percent time audible.

24             THE COURT:  Right.  The only way in which the chosen

25   alternative represents a decrease in audibility is in the zero

PDF created with pdfFactory trial version www.pdffactory.com

1   to ten percent time audible category, but in every other percent

2   time the audible range in the Winter Use Plan presents a

3   significant increase.

4           MR. MONTERO:  Your Honor, I think I may understand

5   your concern here and you can stop me if I'm wrong.  The

6   question is, how does this table show that the current --

7           THE COURT:  Your figures don't help you.  Your figures

8   don't help your analysis.  That's the point that your own

9   figures show.

10          MR. MONTERO:  Your Honor, I disagree.  This is one of

11  the three metrics.  The three metrics were considered.  Actually

12  this is a combination of two metrics.  Park by Audibility is one

13  of them, and that's actually the highest, the zero -- the

14  highest row here which is --

15          THE COURT:  First of all, first of all, 4.49 are

16  figures that the government relies on for its argument that the

17  WUP presents a beneficial change in Yellowstone, because that's

18  what you say on page 34 of your decision, that there's --

19          MR. MONTERO:  Thirty-four?

20          THE COURT:  There's a beneficial change, right?

21          MR. MONTERO:  Thirty-four of the final --

22          THE COURT:  Of the ROD.

23          MR. MONTERO:  Your Honor, the ROD compares --

24          THE COURT:  The ROD at 34 states:  This decision will

25  be beneficial in Yellowstone and adverse in Grand T compared to

PDF created with pdfFactory trial version www.pdffactory.com

1    current use, and beneficial in both parks compared to the

2    historical condition.  Under Current Conditions:  Analysis

3    indicates oversnow vehicles would be audible in about 14.4

4    percent of Yellowstone.  While the comparison to Current

5    Conditions may seem counter-intuitive, the comparison is

6    accurate because the implementation of snow coach sound

7    requirements substantially reduces OSV audibility.

8           Now, if the Court's understanding of Table 4-49 is

9    correct, the benefit in audibility is only in terms of percent

10   time audible in the smallest range, zero to nine percent.

11          MR. MONTERO:  That's absolutely correct, your Honor.

12          THE COURT:  The question then, is, how is this

13   beneficial to the park overall?

14          MR. MONTERO:  It is only beneficial with respect to

15   park-wide audibility.  It is not beneficial to park time audible

16   as compared to current use conditions, or I'm sorry, but is as

17   compared to historical conditions, and with respect to maximum

18   intensity levels it is, I think it's a wash between the two,

19   between the two alternatives.

20          THE COURT:  I'm sorry, it's what?  Your voice is

21   trailing off.

22          MR. MONTERO:  I'm sorry, your Honor.  I don't believe

23   there's a difference between the two alternatives for the

24   purposes of maximum sound levels, but the statement here is

25   really directed at explaining why, when there's comparison

PDF created with pdfFactory trial version www.pdffactory.com

1    between current conditions, which are of course 2004-2007, and

2    the conditions that were modeled for the Winter Use Plan, why

3    the Winter Use Plan came up being positive with respect to park-

4    wide audibility.  That was not expected.

5              THE COURT:  You say "positive" meaning "greater than"?

6              MR. MONTERO:  Is it beneficial.  I'm sorry.

7    Beneficial with respect to as compared to the Current Use

8    scenario.  The reason it was beneficial as modeled was because

9    most of the -- the park-wide audibility metric is most affected

10   by very high sound levels which are produced by, for the most

11   part, the bomadeer snow coaches and the regular snow coaches,

12   which are not AT at the moment and will not be until 2011, so

13   that is what threw off, what resulted in an unexpected result

14   with respect to the counter-intuitive result with respect to the

15   comparison of alternative seven of Current Use.  This is not,

16   this language in the ROD does not purport to say that with

17   respect to current use sound impacts are now less impacting,

18   that they're somehow better.

19             Now, I think the ROD, the EIS and the ROD disclose

20   that there are going to be greater impacts.  It will be assuming

21   that the 540 cap is reached.  That was the number that was

22   modeled in the 83 snow coaches per day, so there is nothing in

23   here that bases a decision on a finding that there will be less

24   impacts as a result of the Winter Use Plan.

25             THE COURT:  So then how could it be beneficial then?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MONTERO:  It's beneficial with respect to park-

2     wide audibility.  It is not beneficial with respect to percent

3     time audible or maximum sound levels.

4          THE COURT:  Recognizing that MPS discussed both the

5     sound level and the per time audibility, the park-wide metric is

6     the metric used most frequently throughout the discussion.

7          MR. MONTERO:  Your Honor, I disagree with that, and

8     I'm actually -- I reviewed the sound scape impact section as a

9     result of the briefing and I was surprised to have seen that.

10    It certainly is in there and I thought first the objection from

11    the plaintiffs was it was in there at all.  Clearly it serves a

12    function, and I can explain that if your Honor wishes.

13         THE COURT:  Yes, please do.

14         MR. MONTERO:  In terms of predominating over the rest

15    of the analysis, I disagree with that, and I'm happy to walk the

16    Court through the section.

17         THE COURT:  Go right ahead.  Start walking.

18         MR. MONTERO:  Okay.  If you'll turn to -- maybe the

19    quickest way to do this, your Honor, is to turn to the

20    alternative seven in the FEIS.  All these alternatives are

21    compared or analyzed comparatively.  That's why it's more

22    useful.  These pages run from, let's see.  Okay.  The end page

23    would be 342.  I'll just find the start page in a moment.

24    Alternative seven, the start page is 334.

25         THE COURT:  All right.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MONTERO:  Now, if you look at these pages, and

2    I'll have to direct your Honor's attention to the beginning in a

3    moment, but if we look at these pages the only things that

4    really directly address only park-wide audibility is this table

5    on page 342.  The reason for that is that there's a conclusion

6    section beforehand that does not address park-wide audibile but

7    instead addresses per time audibility and maximum sound levels.

8          THE COURT:  All right.  I got it.  Go ahead.  I have

9    it.  342.

10         MR. MONTERO:  342.  If you'll flip back one page,

11   you'll see an example of --

12         THE COURT:  What page are you reading, on 340 or 341?

13         MR. MONTERO:  341.  340.  I'm sorry.  340 is again,

14   339, page 339 is the Yellowstone ranking.  It's the bottommost

15   paragraph.  This also addresses park-wide audibility and it

16   ranks the alternatives based on park-wide audibility.  Now, it's

17   not possible to rank the alternatives based on the other sound

18   scape metrics because they don't reduce themselves to a number.

19   Instead they are expressed in terms of sound contour, sound

20   contour maps, and those are the various maps with all the

21   squiggly lines that your Honor will see throughout the EIS.  If

22   we go to page 335, there's a map there and it has -- my version

23   is in color.  I'm assuming your Honor's version is not, but I'm

24   happy to offer up my own.  This map is in color and the legend

25   is on the bottom and what it will show is the per time at which

PDF created with pdfFactory trial version www.pdffactory.com

1    snowmobiles or snow scapes, oversnow vehicles were audible

2    within these different parts of the park, and for the most part

3    it is concentrated in the travel corridors, the transition

4    zones.  There is no sound in the back country.  And then it's

5    also concentrated in developed areas, and plaintiffs point out

6    their concern being that the sound scape impact analysis should

7    have focused on places where people tend to congregate.  That's

8    exactly what this does.  Focusing on where people tend to

9    congregate shows for each of these different changes in how it

10   shows how the percent time audible will shift, and that's what

11   the legend is about.  These tables, your Honor, for example,

12   let's see.  I'll direct your Honor to Decibel and Range, page

13   333, a use table that provides a number, and I don't know which.

14   I'm not sure which alternative I'm on, but it doesn't matter.

15   This table addressed --

16          THE COURT:  Which table?  There are two tables.

17          MR. MONTERO:  I'm sorry.  The uppermost one, although

18   either one is fine.

19          MR. ROSENBAUM:  I'm sorry, I missed what page you're

20   on.

21          MR. MONTERO:  I'm on 333.

22          And this is figure 4-62, what this does is takes

23   thirteen points in the park and conducts modeling there based on

24   these realistic conditions and then it predicts the amount of

25   time, and technically it would be something like seconds in a

PDF created with pdfFactory trial version www.pdffactory.com

1  minute or seconds in an hour or something like that, but it's a

2  percentage of time that the sound that's audible is within a

3  decibel range, so we're not talking about audibility at all any-

4  more, whether I can hear snowmobiles.  We're talking about how

5  loud, how intrusive is the sound, so these different shadings in

6  my copy, again, it's yellow, will show that for eleven percent

7  of an hour it will be within this decibel, a certain decibel

8  range, five to ten, ten to fifteen, fifteen to twenty, and it

9  will show that for each of the various decibel ranges what

10  percentage of the hour it will be in that decibel range, and

11  sometimes it will be zero and sometimes it will be quite a bit,

12  but again, these thirteen spots are meant to be representative

13  of the various management zones within the park.  It includes

14  developed areas and places where people congregate, so again,

15  this is directed specifically at determining impacts with

16  respect to -- on sound scapes with respect to how people --

17  their ability to find solitude and quiet, how that is affected.

18          And your Honor, if I may just address a point here,

19  and this sort of segues into Mr. Rosenbaum's presentation a

20  little earlier, and it's not a big point, but he said, and I'm

21  not quoting, I'm paraphrasing, that the primary reason for

22  visiting Yellowstone is to seek solitude and quiet in the winter

23  season.  That's not correct.  It is a very important reason, but

24  the primary reason is to view natural scenery and to view

25  wildlife, and that would be in the FEIS at page 164.  There's no

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    minimizing the importance of sound scapes, but I do want to

 2    correct that particular point.

 3          So I would like the Court, and maybe your Honor can

 4    tell me if the best use of our time is to do that now, but I

 5    would like the Court to review not only --

 6          THE COURT:  So we're talking about the ROD on page 337

 7    of the FEIS, you indicate that alternative seven would represent

 8    a beneficial impact on the natural sound scape for the eastern

 9    portion of the park.  But that's because Sylvan Park will be

10    closed, though, right?

11          MR. MONTERO:  I'm sorry, your Honor, because Sylvan

12    Pass?

13          THE COURT:  Sylvan Pass, right.

14          MR. MONTERO:  Are we on page 337?

15          THE COURT:  Right.

16          MR. MONTERO:  I guess what I can say, I'm not familiar

17    with that.  I will say this as to Sylvan Pass.  I'm not very

18    familiar with how that's being managed, but I do know that

19    average use of vehicles at Sylvan Pass is probably going to be

20    about three snowmobiles per day, maybe less, and again, my

21    colleagues can give me an accurate number with a case cite, I

22    will be happy to tell the Court, but it is a negligible amount

23    of snowmobile entries, but I'm not prepared on this particular

24    page.  I'm happy to read it and give your Honor my

25    interpretation.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    THE COURT:  All right.  I do have other matters on my

2    calendar.  I will give you some time to present your principal

3    arguments, though, but at some point I have to give the court

4    reporter a short recess.  Go ahead.

5    MR. MONTERO:  Yes, your Honor.  Thank you.

6    I tend to speed up on occasion.  You can just give me

7    the hand and I'll slow right down.

8    Well, your Honor, I think, I guess I could just

9    provide the Court with a very brief summary.

10   THE COURT:  How does the government arrive at 540, the

11   figure 540?  I don't see any rationalization in the record at

12   all for that number.

13   MR. MONTERO:  There were -- well, I guess --

14   THE COURT:  Point to me in the record how the

15   government arrived at 540.  What's the record support for this?

16   MR. MONTERO:  Anecdotically and --

17   THE COURT:  No.  I want the record.  I don't need

18   anecdotes.  I want you to point in the record what the basis is

19   for the government's decision of 540, because it is supported by

20   the record, right?

21   MR. MONTERO:  Absolutely, your Honor.

22   THE COURT:  All right.  Where?

23   MR. MONTERO:  The 540 number is a reflection or it is

24   consistent with the 542 maximum that occurred during --

25   THE COURT:  Show me in the record where the

PDF created with pdfFactory trial version www.pdffactory.com

1   rationalization is for 540.

2           MR. MONTERO:  I'll find that, your Honor.

3           But I think --

4           THE COURT:  I don't want you to think.  I want you to

5   tell me first.  Let one of your colleagues find it for you,

6   because I haven't seen it.

7           MR. MONTERO:  Your Honor, I'm going to provide you

8   that number, but I don't think it will resolve the Court's

9   concerns and I'd like to explain why.

10          The plaintiffs and this Court have been discussing

11  that there is no science pointing to the 540 number, there is no

12  impact's analysis pointing to the 540 number.  Science does not

13  determine a number.  This is a policy decision, so is there

14  something saying, is there a recommendation by biologists saying

15  540 snowmobiles, that would be a really good limitation?  No,

16  absolutely not, your Honor, but this is what the service did.

17  It examined seven alternatives, one of which would have

18  contemplated no oversnow vehicle use at all, one of which would

19  have contemplated 540 and 83 snow coaches --

20          THE COURT:  How is the figure 540 you selected,

21  though, as opposed to 530 or 548?  Someone said 540 for this

22  reason, and I'm just trying to figure out what the reason is.

23          MR. MONTERO:  During the three years under the

24  temporary use plans, what is labeled as Current Use under the

25  FEIS, the maximum amount on any single day of snowmobile access

PDF created with pdfFactory trial version www.pdffactory.com

1    was 542, so the idea being -- bear in mind this 540 number is

2    the cap, it's not an average -- the idea being you set the cap

3    at a number that will accommodate rush days, holidays, that sort

4    of thing, and then for the rest of the year the number that is

5    the average use actually ends up being quite a bit less.  Now,

6    that is not to say that the FEIS did not analyze 540.  It made a

7    conservative assumption which is supported by the case law in

8    this Circuit, they made an upper bounds determination, set a

9    number of 540 and a number of snowmobiles and a number of 83

10   snow coaches and it analyzed those impacts assuming they were

11   actually going to happen, and based on that analysis the Park

12   Service determined there would be no impairment or unacceptable

13   impacts, so it's not that the service said we're going to

14   analyze 540 but for impairment determination we're going to

15   assume 290.  That's not what happened.  It was based on the 540

16   figure, assuming that actually reflected reality.  We're just

17   saying for the Court's benefit that that does not actually

18   reflect reality.  I'm just letting the Court know during the

19   last year the number was 290, and that's reflected on this draft

20   piece of paper that Mr. Rosenbaum offered, but again, the

21   analysis is based on 540, and the source of that 540 number is a

22   542 cap.

23            THE COURT:  And all of this is reflected in the ROD

24   somewhere?

25            MR. MONTERO:  Yes, your Honor.  This is page twenty of

PDF created with pdfFactory trial version www.pdffactory.com

1    the ROD, and there's a spreadsheet I'll find for your Honor

2    which shows all the days during 2006/2007 and that has the 542

3    number, but this says, page twenty of the ROD, next to last

4    paragraph:  In order to prevent impairment and unacceptable

5    impacts of park resources and ensure that the experience of

6    visiting Yellowstone in the winter is of high quality, the

7    decision limits the number of snowmobiles to 540 per day in

8    comparison to the historical average of 795 per day.

9           As a point of comparison, the winter of 2006/2007 --

10   I'm sorry, your Honor.  And I'm just going to read the last

11   sentence here in the last paragraph, the second to last

12   paragraph.  As a point of comparison, in the winter of 2006 and

13   2007 saw an average of 290 snowmobiles per day and a single peak

14   of 542, slightly higher than each of the previous two winters.

15          So recognizing, your Honor, that there is a -- that

16   there are surge days, days when people are more likely to visit

17   the parks, the peak was established at a number that was similar

18   to the peak that had occurred in the previous three years.

19          THE COURT:  With respect to, for instance, the White

20   study, I mean, there is science supporting the figures in the

21   White study.  What's the science supporting this figure of 540?

22          MR. MONTERO:  Science does not point to a number, your

23   Honor.  The best the service can do, and this is the absolute

24   best the service can do, is to come up with a different, a

25   variety of numbers and to determine what the impacts are, and

PDF created with pdfFactory trial version www.pdffactory.com

1    the science does certainly support --

2         THE COURT:  What about the numbers supporting -- the

3    numbers referenced in the White study, though, that are

4    supported by science?  What about the government's consideration

5    of those numbers?

6         MR. MONTERO:  In the White study they were certainly

7    considered, and I just direct the Court's attention to pages 121

8    through 126 of the FEIS, the bulk of the science actually

9    disputes the fact that anything other than temporary

10   displacement or anything at any population level impacts occur.

11   Certainly there is temporary displacement.  Certainly there is

12   some anxiety, some physiological damage, but not to the extent

13   of population level damage.

14        But turning to the White recommendation, it was not

15   expressed as a recommendation.  If your Honor will turn to both

16   the abstract and the very last page of the White study, both in

17   the abstract on top of the last page right where it says

18   Recommendations and Caps at the top of the page, it will say we

19   recommend that the service consider limiting winter visitation

20   to fifty thousand, so it wasn't recommendations to adopt, it was

21   a recommendation to consider, and the service actually did that.

22   And just again, pointing to what happens under the first year of

23   the implementation of the Winter Use Plan, the numbers are

24   coming in right around 53,000 so it's very close to what the

25   White study contemplated.  But I will also say this with respect

PDF created with pdfFactory trial version www.pdffactory.com

1    to the White study:  It's a rather arbitrary recommendation

2    because busses -- under Alternative Six busses could get 200,000

3    people into the park per winter season and it would be less

4    impacting with respect to sound scapes and it would probably be

5    about as impacting with respect to air quality as the snow coach

6    alternative, so that, the five -- I don't understand and I have

7    no idea why the White study made a recommendation based on

8    number of visitors as opposed to number of vehicles and with

9    some weighting for the, you know, the different impacts from the

10   different vehicles, but the 50,000 number is a rather arbitrary

11   recommendation, and I'll just point out that as modeled the snow

12   coach alternative, the one that the plaintiffs prefer, will

13   result in 80,000 visitors per season, not to say that White

14   would be adverse to a snow coach alternative, but rather to say

15   the 50,000 number is not a very useful number, so that is why,

16   your Honor, that it doesn't need to be just adopted.

17         THE COURT:  With respect to the Adaptive Management

18   Program, the government argues that because certain thresholds

19   in that program have been exceeded, that those thresholds are

20   just indicators that, and I quote, the current conditions are

21   becoming less desirable and not an indication of impairment or

22   even unacceptable impacts, and that's your opposition to

23   plaintiffs' motion 15.  However, then the government argues with

24   certainty that the Winter Use Plan will not lead to impairment

25   because the Park Service will continue to use the adaptive

PDF created with pdfFactory trial version www.pdffactory.com

1    management program.  The Park Service's simultaneous reliance on

2    and downplay of the adaptive management program leads the Court

3    to wonder why the Adaptive Management Program should be any

4    assurance of future non-impairment when the exceedances in the

5    past are treated so casually.  Why should the public and the

6    Court expect the Adaptive Management Program to protect the park

7    in the future?

8             MR. MONTERO:  Your Honor, I do not see a conflict in

9    the Service's reliance on the Adaptive Management, and the -- I

10   guess what I should say is that I disagree that the Service

11   downplayed the role of the Adaptive Management Plan here.  What

12   it does is, and I know the record won't record hand motions, but

13   what it does is there's a --

14            THE COURT:  I'm sorry?

15            MR. MONTERO:  I'm trying to figure out how to express

16   this in a way that will be reflected in the record, so I'll just

17   do this verbally.

18            There's a high threshold set by impairment.  There's a

19   somewhat lower threshold set by unacceptable impacts which

20   correlates to a component in the conservation mandate, and then

21   with respect to the adaptive management thresholds they're quite

22   a bit lower still.  They're protected, they're conservative, so

23   the reason for doing this, your Honor, is that in order to

24   determine whether impairment or unacceptable impacts occurred, a

25   lot of variables have to be examined, and these are spelled out

PDF created with pdfFactory trial version www.pdffactory.com

1    in management policies, but it has a qualitative component to it

2    that can be reduced to a number of a predetermined thresholds,

3    so instead, in order to inform the public, the Park Service

4    says, look, we can't tell you pre-determined, what number, you

5    know, what threshold is going to result in impairment

6    determination or unacceptable impacts determination, but we're

7    going to do you one better.  Here are these adaptive management

8    thresholds which are lower, they're easier to trigger, and when

9    they're triggered there will be an investigation and an

10   appropriate adaptive management activity, adaptive management --

11   yes, action, and in doing so the Service isn't just ensuring the

12   unacceptable impacts and impairment will not occur, it's

13   actually resulting in far lower impacts, impacts that don't even

14   approach the thresholds for unacceptable impacts and impairment.

15          And an example of that, your Honor, is with respect to

16   the one adaptive management threshold, I think it's only one,

17   that has been triggered to date, and it is the one about percent

18   time audible.  This is again the contour maps I was showing the

19   Court a while ago with all the squiggle lines and color.  With

20   respect to percent time audible, I think the adaptive management

21   threshold was exceeded and as a result to the Park Service or

22   the Park Service examined this and determined we're going to see

23   what happens in 2011 when all snowmobiles or between now and

24   2007 because this is going to be a rolling process, but at that

25   point all snowmobiles, snow coaches, both normal, modern and

PDF created with pdfFactory trial version www.pdffactory.com

1    between, will be transitioned over to the AT technology and all

2    administrative snowmobiles which are currently two strokes, and

3    the numbers are significant, will also be turned over to four-

4    stroke technology, and at that point in 2011 the Park Service

5    will reassess, and if it hasn't fixed the problem then the Park

6    Service has to do something about the numbers, and this is the

7    process, your Honor, and the reason for the Adaptive Management

8    Plan generally as an administrative planning tool is that the

9    APA recognizes that there is no way to know everything on the

10   day of the decision and that FEIS is a very long process.  The

11   CEQ regs contemplate -- 1502.9 contemplate a supplemental

12   process because science continues to evolve and the knowledge

13   base of the Service continues to grow and as that happens, as

14   the Service continues to monitor or as it implements a plan that

15   it hasn't had any experience with yet to date, as it does that

16   it's going to learn more and it's going to have to implement,

17   going to have to take actions to preserve or to protect park

18   resources and values as it becomes apparent that they may be

19   threatened, so that is a value of the Adaptive Management Plan.

20            THE COURT:  All right.  Go ahead.  Any points you'd

21   like to make?

22            MR. MONTERO:  I'm sorry, your Honor?

23            THE COURT:  Are there any principle points you'd like

24   to make for the Court's benefit?

25            MR. MONTERO:  If I may, yes.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  And to the extent you can respond to the

2     Court's focus on the points the Court believes are paramount,

3     then you should do so.

4          MR. MONTERO:  I obviously have some points I would

5     like to make, but since we're doing this sort of piecemeal

6     answering of questions why don't we stay on that line and answer

7     the questions I heard your Honor ask at the beginning and then

8     I'll turn to my notes and just deliver my --

9          THE COURT:  If you'd like to focus on the points the

10    Court made at the beginning.  Go right ahead.

11         MR. MONTERO:  Yes.  Let's see.  I've already covered

12    the one about adaptive management thresholds, the 540 number.  I

13    think your Honor has actually asked me all the points.  If

14    there's anything missing --

15         THE COURT:  As I indicated, I'm going to keep the

16    record open for a day or two, probably not longer than that,

17    because I do have other matters on my calendar, but to the

18    extent that a party wants to, in a very brief manner, respond to

19    the points that the Court has deemed to be important for an

20    appropriate decision in this case, then that will be the

21    opportunity for a party to do so.  If there's some principal

22    points you'd like to make other than the responses to the

23    Court's principal points, go right ahead.

24         MR. MONTERO:  There are, and I've just found the last

25    question that your Honor asked and so I'll address that first.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    Why is it that the modeling for sound scapes is appropriate even
 2    though it was inconsistent with monitoring?  And in this case,
 3    your Honor, I just ask the Court to cross-reference from the
 4    FEIS page 304 with administrative record document 125292 at page
 5    12.  And so I'll wait for the Court to receive those documents,
 6    but these are -- I received -- this is the -- the impact
 7    thresholds for sound scape modeling as described in the FEIS
 8    that's on page 304, and then the other document is the
 9    monitoring report, the Shambers report that was prepared, I
10    think that was '07, either '07 or '06.  Your Honor, if your
11    Honor compares the impact thresholds in the monitoring report
12    with the Shambers report with the impact threshold --
13            THE COURT:  And that's at 12592?
14            MR. MONTERO:  12592, correct, your Honor, at page
15    twelve.
16            THE COURT:  All right.
17            MR. MONTERO:  And I don't have -- oh, I don't have it
18    with me.  So for some of -- the way the sound scape modeling
19    work is to make it more accurate, the purpose of it of course is
20    to provide an objective comparison to the various alternatives
21    all seven alternatives with respect to sound scapes, so in order
22    to do that the Vope model takes into account only recreational
23    sound sources, so recreational snowmobiles and recreational snow
24    coaches.  Well, actually there's no other kind of snow coaches.
25    This is to the exclusion of administrative snowmobiles and other
```

PDF created with pdfFactory trial version www.pdffactory.com

1    administration vehicles to the exclusion of, you know, heating

2    ducts, all other activity that would result in sound.  Why?

3    Again, to compare just the sounds caused by the recreational

4    oversnow vehicles that are being analyzed here.  Does that mean

5    that actual sounds, meaning recreational sounds in combination

6    with ambient sounds, were ignored?  No, your Honor, but the way

7    this was -- this was certainly disclosed with respect to

8    modeling.  This is just about the alternative analysis.  If your

9    Honor turns to chapter three there is plenty of information

10   there about the impacts that were observed during the monitoring

11   stage during what is labeled the current use part of the

12   planning process, which is 2004 to 2003.  What was I saying

13   here?  Oh, the thresholds are reduced, so if on page 304 -- 304

14   and page 12 of that other document are very similar, but if you

15   look at the column that sets thresholds and it says less than

16   this number, greater than that number, I think with the

17   exception only of park-wide audibility -- I may be wrong about

18   that -- well, with one set of exceptions, all of the thresholds

19   for the monitoring were reduced, and that makes perfect sense

20   because that accounts for the fact that you were taking these

21   ambient sounds, these employee snowmobile sounds, and you're

22   taking them out of the equation, so instead of requiring, for a

23   major impact instead of requiring that the modeling result in

24   seventy decibels it only resulted -- the impact categorization

25   decisions only requires that the modeling result at forty

PDF created with pdfFactory trial version www.pdffactory.com

1   thousand decibels for it to be a major impact, so that is how

2   the very well disclosed discrepancy between modeling and

3   monitoring was adopted for the impact analysis.  I just want to

4   point out this was different with air quality because in air

5   quality it is possible to add back in background air quality

6   data points, so with respect to air quality there will be a much

7   closer correlation to the actual monitoring.  There should be no

8   expectation finding a correlation with respect to sound scape,

9   modeling, and that was fully disclosed.  That wasn't the purpose

10  of it.

11          THE COURT:  All right.

12          MR. MONTERO:  Your Honor, I think the plaintiffs have

13  made their -- I'll start with -- let me do this:  I'll start

14  with the NEPA analysis first, the NEPA claims, and I'll move on

15  to the administrative procedure, and that's the claim where the

16  Service has reversed the prior decision without a reasonable

17  analysis.  I'll move on to the Organic Act and then I'll finish

18  up with the Yellowstone Act, which I think only NEPA stands and

19  the executive orders and the snowmobile information.  If your

20  Honor wants to hear anything out of order I'm happy to oblige.

21          One of the main categorive impacts for the plaintiffs

22  is that the FEIS in this case was actually designed to somehow

23  obscure impacts instead of disclosing them, which obviously is

24  the purpose of a NEPA document.  Part of this is the park-wide

25  audibility argument that while you really focus on park-wide

PDF created with pdfFactory trial version www.pdffactory.com

1   audibility, I hope I showed to the Courts's satisfaction that

2   that wasn't the case.  All three of these metrics were used and

3   relied on.  I should also say park-wide audibility metric does

4   not focus on people, where people congregate, but it does focus

5   on the Eco system, and if it weren't in litigation I think the

6   plaintiffs would agree that that is a very important

7   consideration and one that the Service should certainly put its

8   time and focus into.

9           Another argument that the park, that the FEIS obscures

10  impacts is that it's, compared to the impacts, these are

11  alternatives to restore conditions which were very bad and that

12  it somehow sought to dilute the impacts that they are comparing.

13  Here that comparison is useful because it provided a means.  It

14  provided this Court and the public with an explanation as to why

15  there was a decision in 2001 to ban snowmobiles.  There was a

16  decision now allowing snowmobiles.  What happened?  MPA requires

17  a reasonable analysis, and that comparison is part of that

18  analysis, but I should point out that wasn't the only

19  comparison.  The preferred alternative was also compared to the

20  other six alternatives.  It was compared to the impacts observed

21  from 2004 to 2007 and it was also compared where possible to

22  objective standards, and here I'm really referring to the Clean

23  Air Act and state-wide air emission standards.  Unfortunately,

24  with respect to sound scapes and wildlife there are no objective

25  standards, and so I ask it be more of a modeled analysis but

PDF created with pdfFactory trial version www.pdffactory.com

1    qualitative determination.

2         I'm just trying to see what was addressed and what

3    wasn't.  I'll just respond to what we've talked about today.

4         Mr. Rosenbaum suggested that the Service attributed

5    sound scape impacts primarily to snow coaches and snow groomers,

6    and there's no evidence in record to support that.  That is,

7    it's not true, your Honor, but I certainly don't blame Mr.

8    Rosenbaum because these are not, these documents are not always

9    as easy to read as they -- well, it's very complicated

10   information.  But I'm turning right now to AR125292 of the very

11   same document I asked the Court to look at a moment ago.  And

12   this is page 31 of that document.

13        You know, there is another document which I'll ask the

14   Court to look at.  It's AR125050.  And this would be page 47.

15   Your Honor, these documents are the, the reports on annual

16   reports on the modeling that was done by Mr. Shambers, one of

17   the Park Service employees, and it's a 2007 one and a 2006 one,

18   and I think properly, or I know, properly interpreted they show

19   that most of these maximum sound level exceedances were in fact

20   a result of snow groomers and snow coaches, both bomadeers and

21   the other more modern kind.

22        With respect to -- is that page 31?  I guess you're

23   looking at both of them.

24        THE COURT:  Counsel, make your argument.

25        MR. MONTERO:  I'm sorry.

PDF created with pdfFactory trial version www.pdffactory.com

1          For both Spring Creek and Madison Junction, looking at

2     Madison Junction with respect to snow coaches, there were 81

3     exceedances as compared to eleven for snowmobiles.  There are

4     only two for snow groomers and that seems odd because snow

5     groomers do tend to exceed the sound level thresholds more than

6     any other vehicle.  The problem is this monitoring was done

7     during the eight-hour day.

8          Now, if your Honor moves to the second document that I

9     explained -- oh, by the way, Madison Junction, while Spring

10    Creek is certainly not representative of all the points in the

11    park and no point in the park would be representative, Madison

12    Junction is a very busy thoroughfare and it's one of the points

13    on the way from the west entrance, the most popular entrance to

14    Old Faithful.

15         Turning to page 47 in the 2006 report, I'll just point

16    out again Madison Junction.  That's the rightmost column for

17    snowmobiles.  The number of exceedances is 118.  For snow

18    coaches the number of exceedances is 128.  For snow groomers the

19    number of exceedances is 127, so what happened here and why are

20    they so different?  The reason is the first sentence.  The first

21    full sentence on this page says:  This data includes all periods

22    of the day, including night.  Snow groomers come out at night at

23    four o'clock, and it's a big Zambony basically.  It prepares the

24    snow for the next day.  These snowmobiles were not for the most

25    part recreational snowmobiles.  They would be non-ATV

PDF created with pdfFactory trial version www.pdffactory.com

1   snowmobiles that the administrative people drive, and again,

2   this is not during the day for the most part, so that's why the

3   discrepancy is there.  But this record evidences, these two

4   sound monitoring reports show that in fact maximum sound level

5   was most affected by non-ATV administrative snowmobiles and snow

6   coaches and snow groomers.

7           With respect to the former two, those will be all

8   transferred over to BATT standards by 2011.

9           Your Honor, I think I'll just move on to the APA

10  argument.  Of course this Court is aware that the APA requires a

11  reasoned analysis when an agency reserves itself, and the Court

12  struck the 2003 rule on that basis.  Now the difference between

13  then and now is that the Park Service has had three years

14  implementing a limited oversnow vehicle plan.  During that time

15  and based on the information gathered during that time it was

16  able to calculate predicted ambient pollution models used an EPA

17  approved level and it was able to calculate using a model from

18  the Department of Transportation.

19          I don't know if the Court has questions as to the

20  level of deference.

21          THE COURT:  If I have questions I'll ask them.  Make

22  your argument.

23          MR. MONTERO:  Thank you, your Honor.

24          The Service was able to implement its proposed guiding

25  requirement also from 2004 to 2007.  It's proven to be

PDF created with pdfFactory trial version www.pdffactory.com

1   enormously successful.  It reduces maximum sound levels by

2   resulting in strict enforcement of speed limits.  It also

3   reduces per time audible by grouping the different snowmobiles

4   in smaller groups as opposed to having individual snowmobiles

5   rome the park.  It also reduces impact to wildlife in two ways.

6   It reduces total number of encounters because we're talking

7   about groups as opposed to multiple individual snowmobiles, and

8   it also reduces adverse encounters because these guides know

9   what they're doing and they're trained to manage the wildlife

10  encounters without resulting in adverse impact.

11          If I could just read one comment here, and this is

12  AR119777, and this is the cannon district ranger saying in 2006

13  that, In my twenty years as a ranger in this park I have seen no

14  other program that has been as effective in enhancing safety,

15  resource protection, and the visitor experience as the Winter

16  Guide requirement has been in the last two winters.

17          So we now have, the Service now has record support for

18  what it was saying before about how the guiding requirement

19  would be effective.

20          Finally, the 2001 decision was based on an average use

21  of eight hundred snowmobiles --

22          THE COURT:  What about the former seven directors of

23  the National Park Service who have been extremely critical of

24  this plan?  I'm sorry, eleven former directors.

25          MR. MONTERO:  I'm aware of that letter and I can

PDF created with pdfFactory trial version www.pdffactory.com

1    provide the case if asked that.

2         THE COURT:  What consideration did the government give

3    to the views of those former directors?

4         MR. MONTERO:  Well, I can't recall at what point that

5    letter came, whether it was part of the comment process or not,

6    and anyway, it was considered and that was back when the Service

7    was contemplating a cap of 720 snowmobiles per day.  That was

8    one of the several comments or many comments saying that 720

9    would be too high, and as a result of that comment and many

10   other comments the Service used a lower cap of 540, but again,

11   that letter contemplates an increase in the average of

12   snowmobiles to 720 and it's comparing that to an average use of

13   290, and the 540 number does not refer to averages, it refers to

14   a cap.  There is no way, again the limitations of science here,

15   there is no way of knowing what's going to happen with average

16   use.  It could increase, it could breach 540, and again I

17   mentioned that the Service analyzed that number and determined

18   that will not result in unacceptable impacts or impairment, but

19   there's also the Adaptive Management Plan.  Any growth, should

20   it occur, it didn't last year, but should it occur, is

21   considered to be slow.  It's expected to be slow, and that will

22   certainly provide the Service with ample time to monitor the

23   impacts, and to the extent the adaptive management threshold is

24   breached, to take the appropriate management action.

25         I would just mention, your Honor, that even assuming

PDF created with pdfFactory trial version www.pdffactory.com

1    the ceiling of 540 is reached, and that that happens on average,

2    we're still talking again about a comparison between eight

3    hundred average non-ATV snowmobiles and, worst case scenario,

4    540 BATT snowmobiles, which are quieter, produce ninety percent

5    less carbon monoxide and seventy percent less hydrocarbons.  So

6    that is the basis, that is the reasoned explanation for why in

7    2001 the decision went one way and we're here today in 2007 with

8    a decision allowing up to 540 snowmobiles per day.

9            With respect to impairment, your Honor, this is one

10   that flows from the Organic Act.  It's interpreted in Section

11   1.4.5 of the policies, and that section explains, and I'll quote

12   here.  The impairment that is prohibited by the Organic Act is

13   an impact that in the professional judgment and the responsible

14   MPS manager would harm the integrity of the park resources and

15   values.

16           And as I explained before, this impairment inquiry

17   involves a lot of factors, including the resources and values

18   being affected, the severity, duration, and timing of the

19   impact, the direct and indirect effects of the impact, and the

20   cumulative effects of the impact.  In this case the FEIS

21   provided the necessary information.  With respect to air

22   quality, it found that not only did -- not only did the

23   predicted emissions meet the national air quality --national

24   ambient air quality standards, it far exceeded them at a rate of

25   over 4.5 to 50 times lower than what is permitted under those

PDF created with pdfFactory trial version www.pdffactory.com

1    Acts, and bear in mind was modeled in four different parts of

2    the park that were picked as worst case scenario occasions based

3    on meteorological case and high levels of traffic as well.  One

4    of these places was the west entrance, which was modeled at

5    three hundred snowmobiles per day, so these are worst case

6    scenarios even though 4.5 to 50 times the maximum for carbon

7    monoxide and particulate matter.

8            I think I heard the plaintiffs argue that the Organic

9    Act requires something more than that compliance with the Clean

10   Air Act, doesn't meet the Organic Act's -- doesn't speak to the

11   Organic Act's interest in protecting resources and values.  I

12   respectfully disagree.  The primary acts under the Clean Air Act

13   and acts are divided into primary and secondary, the primary are

14   level of air quality which EPA judges are necessary to protect

15   public health.  The secondary act applies to particulates

16   defining the concentration levels to protect against any known

17   or participated adverse impacts of a pollutant with respect to

18   soil water visibility vegetation and other aspects of the

19   environment, and this is explained in the FEIS at 92 to 93, so

20   both of these Clean Air Act standards speak precisely to the

21   resources and values that apply to the act.  And again, the

22   modeling didn't just show that the standards were met, they were

23   far, far exceeded in one case by a factor of 50.

24           For wildlife, as your Honor recognized before, there

25   were these -- there were two different studies and a lot of data

PDF created with pdfFactory trial version www.pdffactory.com

1   showing that there would be a seven percent active response to

2   oversnow vehicles and the remainder of the percentage would have

3   little or no response at all.  The Service within its discretion

4   determined that that was acceptable.  There's also the science

5   supporting the fact that the belief that it's oversnow vehicles

6   harms populations, the weight of the science does not support

7   that, and that's laid out in pages 121 through 126.

8         And finally, your Honor, the Service's Adaptive

9   Management Plan, which I've already explained, and all those

10   things taken together form a reasonable basis and the basis for

11   the Service's determination of no impairment with respect to the

12   Winter Use Plan.

13         I'm going to turn now to the second -- pardon me, your

14   Honor.  I'm going to turn now to the second component of the

15   Organic Act, and that's the conservation mandate.

16         There is no dispute that these two mandates are

17   distinct.  But I want to start with something Mr. Rosenbaum

18   said, and this is not a quote.  Seeing these impacts to bison,

19   was the Service permitted to allow them merely to provide more

20   use and enjoyment.  And he said I don't think so.  The answer to

21   that is yes, absolutely, and I'm going to explain why.

22         The conservation mandate is grounded in the Organic

23   Act.

24         THE COURT:  Before you get into that, let me ask you

25   this question about the air quality:  Why are the NAC standards

PDF created with pdfFactory trial version www.pdffactory.com

1    appropriate for measuring unacceptable impacts or non-

2    impairment where the NACs were not exceeded under the historic

3    condition of the park's air quality was considered to have been

4    impaired?

5            MR. MONTERO:  The NACs are not the threshold for

6    impairment and the --

7            THE COURT:  What is the threshold for impairment?

8            MR. MONTERO:  Again, your Honor, this is one of those

9    situations where there is no numerical threshold because there

10   are a lot of qualitative considerations, but the adaptive

11   management thresholds in accomodation of that reality sets a

12   lower threshold, and I don't know those offhand, but it says

13   where I say the NAC -- maybe I do know one.

14           I think there is one part of the analysis which I

15   think at the west entrance there are 1.9 parts per billion of

16   carbon monoxide and these worst-case-scenarios again, and the

17   applicable NAC is something like nine, I think, and the adaptive

18   management threshold is set somewhere around five or lower.  I'm

19   not sure, but before air quality impacts even approach the NACs,

20   there will be the Park Service, the plan -- the management plan

21   will result in a flag being raised and the Service will take

22   heed and take whatever management action is necessary to reverse

23   the trend.

24           THE COURT:  What do you have to say to the plaintiffs'

25   focus on benzene and the points that the plaintiffs made?

PDF created with pdfFactory trial version www.pdffactory.com

 1          MR. MONTERO:  Your Honor, I have that written out, and

 2     this is unfortunately not an area I'm intimately familiar with,

 3     but the minimum risk level for benzene was exceeded in two of

 4     the thirteen samples taken by Spear, Hart & Stevenson in the AR

 5     at 117413.  Benzene was only sampled thirteen times and it did

 6     not exceed the MRL on eleven of the thirteen times.  Further,

 7     the two violating samples were short-term samples, not the

 8     long-term samples, meaning eight-hour samples that are needed to

 9     determine compliance with the MRLs.  The two benzene samples

10     also had concentrations of .007, two parts per million and .0086

11     parts per million above the exposure of .30306, but below the

12     acute duration and inhalation exposure of 00.9 parts per

13     million.  So although the authors took note of those samples,

14     they noted the mean concentration of all benzene was .03032

15     compared to a mean concentration of .011 during the 2005 survey.

16     Both mean concentrations are well below MRL for benzene, and

17     most significantly, worker exposure to toxic air contaminates

18     were well below standard occupational standard and exposed

19     limits.  Again, not something I'm intimately familiar with, but

20     that is the answer I've been given.

21          With respect to the conservation duty, the

22     conservation mandates ground in the Mandate Act and has two

23     components, and these are spelled out in Section 1.4.3 of the

24     management policies.  First it requires that the Service manage

25     and regulate each proposed use of the national park so as to

PDF created with pdfFactory trial version www.pdffactory.com

1   avoid or minimize the impacts that result from that use, and

2   second, it requires that the conservation being predominant

3   whenever it's found to be in conflict with the proposed use or

4   enjoyment of a park resource and value, and that's how the

5   Service has interpreted the mandate.

6          What I heard this morning is that the plaintiffs are

7   relying on this Dangerfield case out of this Circuit for the

8   notion that the compliance with this conservation standard is

9   held to a least deleterious alternative standard.  That's not

10  correct.  We explained in our briefs that the Dangerfield case

11  does not purport to prove this least deleterious alternative.

12  What it actually does is that it finds that the Service in fact

13  adopted the least deleterious alternative and that it had no

14  option not to because it was contractually-bound to implement, I

15  think it was an interchange proposal, and so in other words, the

16  D.C. Circuit did not establish a standard for compliance with

17  the conservation mandate.  What it does was said here's what you

18  did, Service, and I find that that certainly cannot be found to

19  be a violation of the Organic Act.  Contrary to the plaintiffs'

20  reading of the Dangerfield case, the Organic Act actually

21  establishes two fundamental purposes.  Those are conservation,

22  and the enjoyment of the parks.  The Act is silent as to how the

23  two purposes should be balanced.  The various courts that have

24  interpreted that silence have afforded broad discretion -- have

25  read that silence as affording broad discretion to the Act and

PDF created with pdfFactory trial version www.pdffactory.com

1    determining which avenue is best to achieve the Organic Act's

2    dual mandate.  By contrast, no court to my knowledge has ever

3    held that the Service has to implement the least impacting or

4    the least deleterious alternative.

5            So it is our position that Dangerfield does not

6    support the plaintiffs' argument, nor do the management

7    policies.  And again I'll focus here on Section 1.4.3.  GYC and

8    MPCA argue that the conservation mandate somehow requires the

9    implementation of the least impacting alternative, and why?

10   Because it says so in the third sentence of 143.

11           Before I go there I just want to remind the Court of

12   the standard of review here, and this was set out in Davis v

13   Lahser out of this Circuit.  While the language of the

14   management policies could be implemented either as plaintiffs'

15   read it or as the Park Service does, the interpretation of the

16   Park Service is plausible.  It certainly is not plainly

17   erroneous or inconsistent with the policies and therefore must

18   prevail over the plaintiffs' reading.  And that's the standard

19   that applies to the interpretation of the policies.

20           So the third sentence in 143 reads as follows:  Park

21   Service managers must always seek ways to avoid or minimize to

22   the greatest extent practicable adverse impacts of park

23   resources and values.  And the plaintiffs interpret that as

24   requiring that the Service always apply the least-impacting

25   alternative, and their scenario was snow coaches, snowmobiles,

PDF created with pdfFactory trial version www.pdffactory.com

1   they give you the same exact access.  Snow coaches are less

2   impacting.  You had to go with that one.  You didn't have

3   discretion to avoid going with that one.

4           Note, your Honor, that the Service uses the words

5   "must seek" in that sentence of the policy.  It does not use the

6   word "must" and under bedrock principles, statutory construction

7   and regulatory construction that indicates that the Service read

8   the Organic Act as imposing something less than a mandate to

9   avoid or minimize every single impact to the extent possible.

10  There are policy decisions to be made.  There is room for

11  discretion here, and in this context I invite the Court to -- I

12  invite the Court's attention to the following case out of the

13  First Circuit:  Kaneal v Secretary of Housing and Urban

14  Development.  That one is 840 F2d105, First Circuit 1988, and

15  the jump cite is 112 to 113.  And in that case the First Circuit

16  held that the use of the words "shall seek" instead of "shall"

17  in a statute could only be interpreted as requiring that the

18  secretary take reasonable affirmative steps towards the stated

19  policy goal; in other words, it was something less than a

20  mandate.  And consistent with the Kaneal case, there is nothing

21  in the third sentence of 143 that would require the Service to

22  adopt the least-impacting alternative, and that's especially

23  true, whereas here the Service has adopted -- has determined

24  that a certain use of the park is appropriate, and that would be

25  snowmobile use, and that where adopting the least-impacting

PDF created with pdfFactory trial version www.pdffactory.com

1    alternative would foreclose that use that the Service has

2    already deemed appropriate.

3         There is a second component to the Conservation Act,

4    and this is spelled out in the eighth sentence of Section 1.4.3.

5    It says:  When there is a conflict between conserving resources

6    and values and providing for enjoyment of them, the conservation

7    is to be predominant.  In other words, the best way to

8    characterize this is it's do-not-stop, go, that the previous

9    component of the conservation mandate is an affirmative duty to

10   take affirmative remedial action.  This is more of a limit on

11   the Service's discretion, so there are two very different

12   things.  This sentence does not support the plaintiffs' position

13   because not every impact to a park's resources and values

14   results in a conflict with conservation, "conflict" being the

15   term of art here.  The conflict only occurs when it is deemed

16   unacceptable, and this is the way the Service has applied this

17   throughout its decision-making documents.  That is evidence

18   from, let's see.  I'll have to provide a cite showing exactly

19   where the Service linked those two standards, but the

20   plaintiffs' complaint with this interpretation, the Service's

21   interpretation of its own regulation, of its own policy, is that

22   it somehow conflates the conservation and impairment mandates,

23   or that it merges the conservation mandate within the impairment

24   mandate, and the best I can do in response to that, your Honor,

25   is, yes, this second component of the conservation mandate does

PDF created with pdfFactory trial version www.pdffactory.com

1    in fact -- it complements the impairment determination, and that

2    is directly from the exact language in the management policies,

3    and I'll read that.  This is again the eighth sentence in 1.4.3.

4         And it says as follows, quote:  Congress, recognizing

5    that the enjoyment by future generations of the national parks

6    can be assured only if the superb quality of park resources and

7    values is left unimpaired, has provided that when there is a

8    conflict between conserving resources and values and providing

9    for the enjoyment of them, conservation is to be predominant.

10        In other words, the Service's reading of the Organic

11   Act as that Congress, as a means of assuring impairment,

12   required that conservation be predominant when it conflates

13   with -- when there's a conflict between that and the use of

14   resources and values, so it's Congress that envisioned this

15   portion of the conservation mandate as being complementary with

16   the impairment standard.  It's not an argument we made up, your

17   Honor.  It is how it is written in the management policies.

18        And finally, as to the necessary and appropriate

19   language, I didn't have prepared comments on this so I can't

20   recall what sentence it is, it might be sentence four in Section

21   1.4.3, that necessary and an appropriate language does not refer

22   to uses.  It's not that snowmobile use has to be necessary.

23   It's that the impacts associated with snowmobile use have to be

24   necessary, and by that I mean unavoidable, unavoidable and

25   appropriate.  And a good analogy here is on these battlefield

PDF created with pdfFactory trial version www.pdffactory.com

1    parks where a tree will block a vista and it's important to

2    restore that vista, that tree being a national resource, will

3    nonetheless be removed, and that is an unavoidable impact but it

4    is an appropriate impact.  That's what that fourth sentence is

5    about, so it doesn't limit the Park Service's discretion to

6    allow impacts in the way that the plaintiffs think it does.

7            Moving on to the Yellowstone Act.

8            THE COURT:  Wrap it up, counsel.  You made these

9    arguments in your pleading.  If you want to take a few minutes

10   to make any principal point you can, but I do have other matters

11   on my calendar, so I'll give you another five minutes.

12           MR. MONTERO:  Understood, your Honor.  Thank you.

13           With respect to the executive orders then, and we'll

14   rest on our briefs as to the Yellowstone Act, the executive

15   orders don't directly regulate the use of snowmobiles.  Instead

16   they direct the Service to issue regulations that will govern

17   the designation of specific areas and trails where snowmobiles

18   can be used.  The Park Service fully complied with that

19   executive order when it issued Section 2.18.

20           The plaintiffs I believe don't have a problem with

21   2.18 because they haven't challenged it, so really the focus of

22   our conversation today has to be on whether the Park Service has

23   complied with the snowmobile regulation, 2.18, and that

24   regulation states as follows:  The Park Service may designate

25   areas for snowmobile use to the extent that it is consistent

PDF created with pdfFactory trial version www.pdffactory.com

1    with the park's natural cultural scenic and aesthetic values and

2    will not disturb wildlife.

3              As to the first part of the regulation, It is the Park

4    Service that has been charged by Congress with determining what

5    is consistent with the park's aesthetic values and natural

6    values.  The Park Service has made that determination here.

7    It's based on a very broad-ranging environmental impact

8    statement, and they are entitled to substantial deference in

9    that determination.

10             As to the second part of the regulation, the

11   plaintiffs argue that the Winter Use Plan will disturb wildlife.

12   The term "disturb" is not defined in the regulation itself, but

13   it is used in Section 8.2.3.2 of the policies.  Those policies

14   obviously aren't enforceable or they aren't an interpretation of

15   the statutory language or anything of the sort, but it does show

16   that the Service applies Section 2.18, the threshold being

17   unacceptable impacts, and this makes a lot of sense.  If the

18   threshold were actually the dictionary definition of "disturb"

19   as the plaintiffs use it, and that one is:  To stir, to move, to

20   excite an animal from a state of rest or tranquility.  That

21   would be -- that would have broad-ranging impacts.

22             I know, for example, that the Greater Yellowstone

23   Coalition has done a lot of good work trying to establish

24   bicycle trails in Grand Teton National Park.  It so happens that

25   the bicycle regulation, and that's Section 4.30 of Title 36, is

PDF created with pdfFactory trial version www.pdffactory.com

1    nearly identical to a snowmobile regulation in terms of this use

2    of the term "disturbed," and if the dictionary definition of

3    "disturb" is applied:  Any movement from any animal to stir the

4    animal from a state of rest, that would abolish the use of

5    bicycles in any of the national parks because clearly it's a low

6    enough threshold that will be met by any use of the parks, so,

7    your Honor, we submit that based on the significant analysis

8    here and the finding of no unacceptable impacts, we submit that

9    the regulation was fully complied with, as was the Organic Act

10   and the conservation impairment components of the Organic Act

11   and NEPA.

12           And I'll just conclude, your Honor.  In conclusion,

13   there is no requirement that the Park Service select the means

14   of accessing the park that will cause the least amount of

15   impacts.  That is not required by the Organic Act, it's not

16   required by the Yellowstone Act, and it's not required by any

17   other relevant authority.  Rather, in evaluating the use of the

18   park, the Service has to do three things:  First, it has to make

19   a determination under the impairment standard that impairment

20   will not occur; second, it has to make a determination under the

21   second component of the conservation standard that unacceptable

22   impacts will not occur and therefore there will be no conflict

23   between the use of resources and their conservation; and third,

24   the Service has to take reasonable affirmative steps to avoid or

25   minimize adverse impacts whenever possible.  All those steps

PDF created with pdfFactory trial version www.pdffactory.com

1    were taken here, and what the plaintiffs are asking this Court

2    to do is to make a policy decision by imposing an even stricter

3    standard that finds no place in the Organic Act.  These

4    decisions, however, are reserved to the agencies, they're not

5    reserved to the courts, and so on that basis, your Honor, I

6    respectfully ask that the Court deny the motion for summary

7    judgment of the plaintiffs and enter summary judgment for the

8    Service.

9          And just in responding to the questions of remedy, I

10   would just submit there we would hope that supplemental briefing

11   would be provided with respect to remedy because it is a very

12   complex inquiry, but even if it is not, we would submit that

13   there are no, with current uses, matching the same -- with

14   current use under the Winter Use Plan matching the level of use

15   from 2004 to 2007.  There's no imminent harm here as a result of

16   this plan, and so we would submit that if this Court were to

17   find for the plaintiffs and if it were not to provide for

18   supplemental briefing on relief, then perhaps the appropriate

19   remedy is a remand without vacatur so that the Service could

20   develop is representation.

21         THE COURT:  I know I've not heard from the intervenors

22   and I may not have time to hear from the intervenors, but I'm

23   going to take a five-minute recess just now to talk to my staff

24   about the other matters on my calendar.  There are some criminal

25   matters involving some people who have been incarcerated for

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    quite some time, so I'm not going to continue those cases.  I'm
 2    going to consider maybe bringing you back at 1:30 and giving the
 3    intervenors some time and maybe give the plaintiffs -- have you
 4    thought about asking for any additional time to respond to what
 5    the government had to say, Mr. Rosenbaum, or your colleague?
 6              MR. ROSENBAUM:  Yes, your Honor.
 7              THE COURT:  We don't have a great deal of time.
 8              MR. ROSENBAUM:  Mine would be very small.
 9              THE COURT:  What about your colleague, just a small,
10    or not?
11              MR. HELLE:  A couple of minutes.
12              THE COURT:  Intervenors, how much time would you need
13    to sum up your arguments?  I've read your submissions.
14              MR. HORN:  Five to ten minutes, your Honor.
15              THE COURT:  I need to give the court reporter a five-
16    minute recess.  I do have some criminal matters, and I'm going
17    to consider a couple of alternatives.  One alternative would be
18    to bring you back at 1:30, and I probably would have a half-hour
19    before my 2:00 matter.  That probably would make more sense, but
20    let me throw this out:  Suppose the Court were to bring you back
21    at 1:30 or so, is that going to impose a hardship on anyone?
22              MR. ROSENBAUM:  No.
23              THE COURT:  I might want to do that and just proceed
24    with my criminal matter at one o'clock.  I'll take a five-minute
25    recess now.  There's no need to stand.  But don't go too far.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    It's not going to be any more than five minutes.

2              COURTROOM DEPUTY:  This Honorable Court stands in a

3    five-minute recess.

4              (Recess taken at about 12:52 p.m.)

5              COURTROOM DEPUTY:  Remain seated.  This Honorable

6    Court is again in session.

7              (Back on the record at about 1:02 p.m.)

8              THE COURT:  We're going to call that case in just a

9    second.

10             For the case that's in progress, I'm going to bring

11   the attorneys back at 1:45, and I won't keep you long, but I'll

12   bring you back at 1:45.  All right.

13             (Recess taken at about 1:02 p.m.)

14             COURTROOM DEPUTY:  Please remain seated.  This

15   Honorable Court is now in session.  Please come to order.

16             (Back on the record at about 2:00 p.m.)

17             THE COURT:  Counsel, if I give you a few minutes, the

18   intervenors, I promised you a couple of minutes.  Believe me,

19   I've read your pleadings, I've read your argument.  I don't want

20   to short-change you either.  You're here, it's a pleasure to

21   have you here.

22             MR. HORN:  William Horn for the snowmobilers.

23             I'd like to quickly address four issues.  Your Honor

24   expressed considerable interest in the snowmobile interest to

25   540.

PDF created with pdfFactory trial version www.pdffactory.com

1           THE COURT:  Whoever's phone is on, turn it off.

2           MR. HORN:  It's our considered judgment when you

3    review the factual record reviewed by the agency the factual

4    record supports the entry level 720 a day, which is a

5    continuation of the interim rule that was put into effect back

6    in the 2003-2004 season and clearly demonstrates in our opinion

7    that air, sound, and wildlife impacts will be fully acceptable

8    under that 720 threshold.  Nonetheless, the agency, out of what

9    we view as excessive caution, reduced that from 720 to 540 to

10   further limit any effects that might have been associated with

11   air, sound, and wildlife.  And that 540 number of course arose

12   from the peak use in the last couple of years so that the actual

13   historic use level was a contributing factor to selecting the

14   540, much the same way, for example, that alternative four --

15           THE COURT:  And the record just doesn't jump out at

16   you, though, does it?

17           MR. HORN:  It's a paragraph in the record of decision,

18   you know.  We've had our own particular problems because we

19   think that 720 was the appropriate decision as originally

20   proposed and that's sustained, but they, out of what we

21   attribute to be excessive caution, dropped it to 540, and that

22   number, like 720, these numbers have all arisen from a variety

23   of historic use numbers, just like alternative four in the EIS

24   was at 1025, which reflected the historic daily use numbers

25   during the 1990s, so that's where these numbers come from.

PDF created with pdfFactory trial version www.pdffactory.com

1   They're not literally pulled out of the air.  They have been

2   derived essentially from massaging and using the variety of use

3   data.

4        I would add that we think the 540 number will

5   ultimately pinch historic use during the '90s was clearly in the

6   thousand-a-day range, which of course precipitated some of this

7   controversy starting in 1997.  In the middle of this decade we

8   had a fairly precipitous drop arising from all the uncertainty

9   from the litigation from various efforts in Congress,

10  unsuccessful to close the park to snowmobiles, and that resulted

11  in these historic low numbers in the 2003/4 season.  Uses begun

12  to come back up, and in our opinion, unconstrained use would

13  return to the thousand level as in the past, and accordingly we

14  think the 540 is going to punch the using comment, and we've

15  objected on that basis alone.

16       The second issue I would like to just touch on is we

17  would respectfully, your Honor, urge the Court to sort of deny

18  plaintiffs' invitation, if you will, to get into the weeds and

19  some of the technical issues involving methodologies, metrics,

20  models and the variety of studies, and avoid getting into trying

21  to tell the agency which forms of methodology and which metrics

22  it can use or rely upon.  We note, for example, in the wildlife

23  area that's been debated fairly strenuously over eleven years

24  there's at least seven separate studies.  They're not all in one

25  hundred percent agreement and the agency has looked at all seven

PDF created with pdfFactory trial version www.pdffactory.com

1   of those to come up with what it considers to be reasoned

2   judgments.  One of the problems of getting into the weeds, if

3   you will, on the technical issues is that it's going to open

4   Pandora's box in a lot of potential regards.  We on behalf of

5   the snowmobile manufacturers have had a continuing technical

6   dispute with the Park Service over how you measure the decibel

7   levels to satisfy the best available technology requirements,

8   and the agency has adopted a model called J192 from the Society

9   of American Engineers.  It turns out there are two variations of

10  the J192 model, and we've been urging the agency to adopt one

11  version.  The agency has adopted the other and we have very

12  technical issues between us about testing at -- altitude testing

13  on snow, should you use a full throttle bypass or should you use

14  a constant speed bypass, and these are very highly technical

15  issues that can have some significant bearing.  And as much as

16  we may argue with the agency, we certainly believe that it's

17  within their discretion and authority to make these selections,

18  and we're going to work the political process and the public

19  process to effect those decisions to the degree that we can.

20          To the degree that reliance on modeling is an issue,

21  and that's obviously come up in the questions about sound scapes

22  and such, we would note that agencies, particularly land

23  management agencies, rely on modeling to a very great degree,

24  and a large number of high-profile Endangered Species Act

25  listings have proceeded on the basis of modelings, most notably

PDF created with pdfFactory trial version www.pdffactory.com

1    the recent decision to list the polar bear as a threatened

2    species, is based entirely on model projections of what the

3    status of those animals will be in fifty years, so to that

4    degree, the Park Service's reliance on its sound modelings is

5    consistent with the long history with the reliance on modeling

6    documents.

7            I'll briefly touch on the novel interpretations of the

8    1916 Park Organic Act and the 1872 Yellowstone Act advanced by

9    plaintiffs.  Using Mr. Rosenbaum's term of a "substantial legal

10   constraint," they're arguing that, you know, the statutes impose

11   on MPS this mandatory duty to ensure that there is no

12   disturbance of natural conditions or that the agency may only

13   allow those visitor activities that are least impacting.  We

14   would associate ourselves with the government's remarks in terms

15   of how to construe the ambiguous terms in those statutes, but I

16   think it's appropriate that the Court be cognizant of the

17   consequences, enormous far-reaching consequences on visitor use

18   policies not only in Yellowstone but elsewhere if there was a

19   decision to adopt the interpretation advanced by the plaintiffs.

20   We look at Yellowstone with its 350-mile road system.  It hosts

21   over a million-and-a-half automobiles and busses and trucks

22   every year.  It has extensive visitor infrastructure of hotels

23   and gas stations and parking lots.  All of those activities very

24   clearly have some adverse impact on natural conditions.  They

25   clearly disturb wildlife.  Nonetheless, for a hundred years the

PDF created with pdfFactory trial version www.pdffactory.com

 1    Park Service has determined that the effects associated with

 2    that intensive visitor activity are acceptable, they don't rise

 3    to the level of impairment, and if we were to suddenly change

 4    the long established interpretation of these statutes to say

 5    that no disturbance of natural conditions is allowed or only the

 6    least-impacting activities are allowed, I think that that's

 7    sound-biting, going to sound the death nail for a wide variety

 8    of other traditional activities.

 9            We wrap up quickly by noting that I was talking to

10    other co-counsel and I think I'm the only attorney in this case

11    who's been privy to every snowmobile case since 1997, and I

12    recall that when this case, this dispute commenced --

13            THE COURT:  With the exception of me.

14            MR. HORN:  Yes, sir.  When this --

15            THE COURT:  We're the lucky ones, right?

16            MR. HORN:  Absolutely.

17            When this dispute commenced, at that point there were

18    five basic objections.  One was procedural, that no NEPA

19    documentation had been prepared.  If the four substantive

20    objections had been there are too many snowmobiles being allowed

21    into the park, that the old two-stroke technology of that era

22    produced -- had machines that produced excessive emissions or

23    excessive sound, and then there was that unique argument that

24    grooming of the roads prompted bison out of migration which led

25    to their killing, because they do carry brucellosis, under other

PDF created with pdfFactory trial version www.pdffactory.com

1      cooperative management plans.

2              I think it's worth noting that in the intervening

3      eleven years with the multiple EISs, the supplemental EISs, the

4      dozens of studies, congressional action done, congressional

5      inaction, and almost incessant litigation, what's come out of

6      this is a park plan that they've done NEPA, they've limited the

7      number to 540.  They've required the best available technology

8      to redress the emissions and noise problems associated with the

9      older machines, and ten years of comprehensive studies have

10     pretty conclusively demonstrated no significant adverse effect

11     upon the wildlife populations in the park, and we think on that

12     basis that, you know, the agency decision and the rule-making in

13     this case ought to be affirmed.

14             THE COURT:  Thank you, counsel.

15             I'll give plaintiffs just a few minutes.  We have to

16     wrap it up.

17             MR. ROSENBAUM:  Thank you, your Honor.

18             The first thing I would like to address is one point

19     that was made by Mr. Montero, and that related to the numbers in

20     document 125050.  If you still have it before your Honor at page

21     47, and I pointed to the comparison of snowmobile and snow coach

22     loud sound events, and he said that the 118 number for snow-

23     mobiles, it was from administrative use of snowmobiles.  I would

24     just like to point out that that representation is not in the

25     record, your Honor.  There is no record support for that

PDF created with pdfFactory trial version www.pdffactory.com

 1    proposition.

 2           Secondly, Mr. Horn said about methodologies and

 3    modeling.  We do not say that the Park Service cannot choose an

 4    appropriate model.  And indeed in most instances, almost all

 5    instances, it's within the discretion of the agency to pick a

 6    model, a methodology, and we accept that.  The problem is that

 7    when a methodology or model produces results that are so far

 8    from the known facts, that's when that model is suspect and

 9    should not be given deference.

10           Finally, Mr. Horn said that our argument was that the

11    Park Service must choose the least impactful alternative.  And I

12    cannot speak for the other plaintiff groups, but our position is

13    instead that this rule clearly reflects a situation in which

14    substantial impacts are shown communitively on air sound scapes,

15    wildlife communitively significant impacts, and in that case you

16    may not adopt a rule merely to provide re-creation that has

17    those impacts.  That is where the conservation mandate and the

18    recreational usage conflicts.  That's where the conservation

19    mandate is to be predominant.  If it's not predominant in this

20    case there's no situation in which it's predominant, your Honor.

21           That's all I have.  Thank you very much.

22           THE COURT:  Thank you, counsel.

23           Yes, counsel, a couple of minutes.

24           MR. HELLE:  Your Honor, I think that the transcript

25    should reflect that that was my cell phone.  My deepest

PDF created with pdfFactory trial version www.pdffactory.com

1   apologies to everyone.

2           While the government has offered much in the way of

3   the data in this case of analysis, the government gives us

4   nothing.  While the government's own noise thresholds and

5   emissions thresholds have been exceeded in recent seasons, we're

6   told that impairment will not result.  Why that is we're not

7   told.  Even on the critical question of the administration's

8   decision to authorize a doubling of snowmobile use within

9   Yellowstone National Park, the government in this case can offer

10  nothing by way of an explanation.  The administration simply

11  declares that snowmobile use is appropriate and its uses will

12  not be unacceptable, or its impacts, I'm sorry, will not be

13  unacceptable, and we're asked simply to accept that.  This

14  extraordinary notion of unbridled Park Service discretion is

15  irreconcilable with the various substantive and procedural

16  mandates in this case.  If the government is correct, there

17  really is no line insulating America's most cherished public

18  lands from the will of changing political administrations, and

19  that cannot be sustained.  To ensure that Yellowstone and the

20  national park idea that it embodies are conserved and protected,

21  we ask that summary judgment be entered on behalf of the

22  plaintiffs.

23          THE COURT:  Thank you.  Thank you, counsel.

24          I'm going to take the case under advisement.  To the

25  extent that someone wants to respond further to the points that

PDF created with pdfFactory trial version www.pdffactory.com

1    the Court focused on at the commencement of this hearing, you

2    can do so, but you can do so by no later than Friday at noon,

3    and I want to be fair about that.  I was thinking five pages.  I

4    don't want to give each plaintiff group five pages and then tell

5    the government it has five pages, so the plaintiffs can split up

6    eight pages, and the government, what do you want?  Do you want

7    eight pages?  Do you need eight pages?

8              MR. MONTERO:  We would hope to, your Honor, we would

9    hope to keep it shorter.  If we could start with eight pages.

10             THE COURT:  I mean, I don't want to give them ten

11   pages.  I mean, we're down to counting pages now.  This case is

12   swimming with pages.  Why don't I just give each side five pages

13   and if for some reason the government needs more than five I'll

14   give you seven pages, all right?

15             MR. MONTERO:  Thank you, your Honor.

16             THE COURT:  That's it.  Noon, that's it.  No

17   responses.  I'm not going to extend the time, and no one is

18   required to submit anything.  If you believe that you've

19   adequately responded to those points that the Court believes are

20   truly important, then you may do so.  I'll take it under

21   advisement.  I have no other questions.  If for some reason

22   there is a question that I have a burning desire to get the

23   answer to I'll notify counsel, but I think that the record is

24   replete with everyone's arguments and rationale for their

25   arguments as to why everyone's position is correct.  And so I'll

PDF created with pdfFactory trial version www.pdffactory.com

1    take the case under advisement.  Thank you.  Good to see every-

2    one.  Thank you.

3              MR. ROSENBAUM:  Thank you.

4              MR. MONTERO:  Thank you.

5              THE COURT:  I'm going to be here for some other

6    matters so take your time.

7              (Proceedings concluded at about 2:15 p.m.)

8                           - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

```
1                        I N D E X

2

3    WITNESSES:

4

5         None.

6

7

8

9

10

11

12

13

14

15                     E X H I B I T S

16

17

18   Plaintiffs'
     Supplemental
19   Exhibit
     No.         Identification        Marked          Admitted
20
     No. 1        Bar Chart             24              25
21
     No. 2                              25
22

23

24

25
```

PDF created with pdfFactory trial version www.pdffactory.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, JACQUELINE M. SULLIVAN, Official Court Reporter,
certify that the foregoing pages are a correct transcript from
the record of proceedings in the above-entitled matter.

_____
JACQUELINE M. SULLIVAN

PDF created with pdfFactory trial version www.pdffactory.com

**'**

**'06** [1] - 78:10
**'07** [2] - 78:10
**'90s** [2] - 55:9, 104:5

**0**

**0** [1] - 6:24
**00.9** [1] - 91:12
**007** [1] - 91:10
**0086** [2] - 47:21, 91:10
**009** [1] - 47:22
**011** [1] - 91:15
**03032** [1] - 91:14
**07-2111** [2] - 1:5, 3:2
**07-2112** [2] - 1:5, 3:4

**1**

**1** [6] - 24:16, 24:17, 24:23, 25:5, 25:7, 113:20
**1.3** [1] - 55:22
**1.4** [2] - 17:2, 17:5
**1.4.3** [9] - 10:18, 15:9, 42:9, 42:11, 91:23, 93:7, 95:4, 96:3, 96:21
**1.4.5** [1] - 87:11
**1.4.7** [1] - 17:9
**1.4.7.1** [1] - 17:18
**1.9** [1] - 90:15
**1008** [1] - 32:14
**1025** [1] - 103:24
**10:05** [1] - 1:7
**10:44** [1] - 24:18
**10:45** [2] - 25:3, 25:8
**112** [1] - 94:15
**113** [1] - 94:15
**1155** [1] - 2:18
**11644** [1] - 53:6
**117160** [1] - 31:4
**117413** [1] - 91:5
**118** [4] - 31:23, 31:24, 83:17, 108:22
**11989** [1] - 53:6
**12** [2] - 78:5, 79:14
**120,000** [2] - 37:3, 37:14
**120645** [1] - 17:1
**121** [3] - 31:25, 72:7, 89:7
**124** [3] - 31:24, 31:25
**1250/50** [1] - 31:17
**125050** [1] - 108:20
**125292** [2] - 31:7, 78:4

**12592** [2] - 78:13, 78:14
**126** [2] - 72:8, 89:7
**127** [1] - 83:19
**128** [1] - 83:18
**12:52** [1] - 102:4
**12th** [1] - 2:4
**14** [1] - 47:7
**14-day** [1] - 47:16
**14.4** [3] - 57:16, 58:2, 61:3
**143** [1] - 93:10, 93:20, 94:21
**147** [1] - 31:4
**15** [1] - 73:23
**1502.9** [1] - 76:11
**154** [1] - 25:11
**15th** [1] - 4:25
**164** [1] - 66:25
**165** [1] - 27:21
**174** [2] - 47:18, 47:20
**18** [1] - 5:7
**1872** [3] - 39:8, 39:24, 106:8
**1916** [1] - 106:8
**1988** [1] - 94:14
**1990s** [1] - 103:25
**1997** [2] - 104:7, 107:11
**1:02** [2] - 102:7, 102:13
**1:30** [3] - 101:2, 101:18, 101:21
**1:45** [2] - 102:11, 102:12

**2**

**2** [10] - 25:1, 25:2, 30:21, 30:22, 30:23, 31:5, 31:9, 59:10, 113:21
**2.18** [11] - 27:25, 28:5, 28:6, 28:8, 28:10, 35:7, 35:22, 97:19, 97:21, 97:23, 98:16
**2.18(c** [2] - 10:12, 27:11
**2.3** [1] - 31:22
**2.8.1** [1] - 27:23
**200,000** [1] - 73:2
**2000** [1] - 51:7
**2000-2007** [1] - 31:13
**20001** [1] - 2:23
**20004** [1] - 2:10
**20004-1206** [1] - 2:4
**2001** [8] - 12:22, 12:24, 15:4, 51:7, 52:20, 81:15, 85:20,

87:7
**2002** [1] - 32:14
**2003** [10] - 9:15, 15:4, 21:2, 21:15, 40:11, 51:4, 51:14, 56:1, 79:12, 84:12
**2003-2004** [1] - 103:6
**2003/'04** [1] - 23:13
**2003/4** [1] - 104:11
**20036** [1] - 2:19
**2004** [7] - 43:20, 51:4, 57:20, 79:12, 81:21, 84:25, 100:15
**2004-2007** [1] - 62:1
**20044-0663** [1] - 2:14
**2005** [4] - 15:5, 20:15, 20:18, 91:15
**2005/'06** [1] - 23:15
**2005/2006** [3] - 21:23, 31:16, 31:23
**2006** [14] - 15:19, 15:20, 16:3, 16:12, 17:1, 20:15, 20:19, 21:15, 47:12, 49:6, 71:12, 82:17, 83:15, 85:12
**2006/2007** [2] - 71:2, 71:9
**2007** [9] - 31:7, 57:20, 71:13, 75:24, 81:21, 82:17, 84:25, 87:7, 100:15
**2007/'08** [1] - 23:14
**2008** [3] - 1:7, 21:20, 21:22
**200s** [1] - 21:5
**2011** [4] - 62:12, 75:23, 76:4, 84:8
**202-305-0443** [1] - 2:8
**202-305-0469** [1] - 2:15
**202-305-0492** [1] - 2:11
**202-354-3187** [1] - 2:23
**202-659-5800** [1] - 2:19
**202-942-5000** [1] - 2:5
**20530** [1] - 2:7
**206** [1] - 33:13
**209** [1] - 1:22
**218(c** [3] - 53:14, 53:25, 54:2
**218(c)** [1] - 53:24
**22** [1] - 44:18
**220** [1] - 113:20, 113:21
**254** [1] - 33:12
**260** [2] - 57:13, 58:9
**267** [3] - 23:15, 24:1,

33:13
**27** [1] - 1:7
**29** [1] - 58:9
**290** [5] - 57:13, 70:15, 70:19, 71:13, 86:13
**298F3rd** [1] - 32:13
**2:00** [2] - 101:19, 102:16
**2:15** [1] - 112:7

**3**

**30** [1] - 24:1
**30306** [1] - 91:11
**304** [4] - 78:4, 78:8, 79:13
**307** [3] - 56:25, 57:2, 57:3
**30ish** [1] - 21:6
**31** [3] - 31:8, 82:12, 82:22
**333** [2] - 2:22, 65:13, 65:21
**334** [1] - 63:24
**335** [1] - 64:22
**337** [2] - 67:6, 67:14
**339** [2] - 64:14
**34** [3] - 6:19, 60:18, 60:24
**340** [3] - 64:12, 64:13
**341** [2] - 64:12, 64:13
**342** [4] - 63:23, 64:5, 64:9, 64:10
**35** [1] - 15:18
**350-mile** [1] - 106:20
**36** [2] - 28:4, 98:25
**364** [1] - 55:4
**365** [1] - 47:6
**374** [1] - 55:4

**4**

**4-49** [3] - 57:1, 58:23, 81:8
**4-50** [1] - 57:1
**4-62** [1] - 65:22
**4.30** [1] - 98:25
**4.49** [1] - 60:15
**4.5** [2] - 87:25, 88:6
**406-589-9699** [1] - 1:23
**41** [2] - 23:10, 23:11
**45** [1] - 31:2
**45-mile-an-hour** [1] - 31:9
**47** [4] - 31:17, 82:14, 83:15, 108:21

**5**

**50** [3] - 87:25, 88:6, 88:23
**50,000** [2] - 73:10, 73:15
**51715** [1] - 1:22
**53,000** [1] - 72:24
**530** [1] - 69:21
**540** [49] - 5:6, 5:12, 5:13, 5:16, 26:4, 27:6, 48:19, 48:23, 49:2, 49:5, 49:12, 49:24, 62:21, 68:10, 68:11, 68:15, 68:19, 68:23, 69:1, 69:11, 69:12, 69:15, 69:19, 69:20, 69:21, 70:1, 70:6, 70:9, 70:14, 70:15, 70:21, 71:7, 71:21, 77:12, 86:10, 86:13, 86:16, 87:1, 87:4, 87:8, 102:25, 103:9, 103:11, 103:14, 103:21, 104:4, 104:14, 108:7
**542** [6] - 49:5, 68:24, 70:1, 70:22, 71:2, 71:14
**548** [1] - 69:21
**555** [1] - 2:4
**59** [1] - 32:6

**6**

**6** [1] - 15:18
**6,500** [1] - 33:24
**601** [1] - 2:7
**630** [1] - 36:22
**663** [2] - 2:10, 2:14
**68** [1] - 32:6
**6818** [1] - 2:22

**7**

**70** [1] - 32:8
**72** [1] - 44:19
**720** [10] - 5:18, 57:12, 86:7, 86:8, 86:12, 103:4, 103:8, 103:9, 103:19, 103:22
**73** [1] - 45:15
**75** [4] - 6:10, 44:6, 44:7, 44:11
**795** [1] - 71:8

PDF created with pdfFactory trial version www.pdffactory.com

## 8

**8.2.3.1** [2] - 27:20, 27:22
**8.2.3.2** [3] - 27:21, 54:1, 98:13
**80,000** [1] - 73:13
**800** [1] - 57:15
**81** [1] - 83:2
**8231** [1] - 27:21
**83** [4] - 27:6, 62:22, 69:19, 70:9
**840** [1] - 94:14
**86** [1] - 37:2

## 9

**9** [2] - 6:24, 59:8
**92** [1] - 88:19
**93** [1] - 88:19
**997** [1] - 32:13

## A

**a.m** [5] - 1:7, 24:18, 25:3, 25:8, 30:16
**abandoned** [1] - 15:19
**abandons** [1] - 55:19
**ability** [1] - 66:17
**able** [9] - 26:3, 35:10, 38:25, 39:3, 48:22, 52:9, 84:16, 84:17, 84:24
**abolish** [1] - 99:4
**above-entitled** [1] - 114:4
**absolute** [2] - 54:4, 71:23
**Absolutely** [4] - 29:5, 56:18, 68:21, 107:16
**absolutely** [7] - 29:5, 30:3, 49:15, 50:19, 61:11, 69:16, 89:21
**absolutists** [1] - 12:5
**abstract** [2] - 72:16, 72:17
**accept** [4] - 18:22, 26:6, 109:6, 110:13
**acceptable** [8] - 6:4, 6:15, 34:4, 34:25, 42:1, 89:4, 103:7, 107:2
**accepted** [1] - 49:12
**access** [9] - 40:18, 40:24, 41:2, 41:15, 42:25, 44:13, 52:3, 69:25, 94:1

**accessing** [1] - 99:14
**accommodate** [1] - 70:3
**accomodation** [1] - 90:11
**according** [1] - 30:23
**accordingly** [1] - 104:13
**account** [3] - 10:9, 22:8, 78:22
**accounted** [2] - 31:18, 31:23
**accounts** [1] - 79:20
**accuracy** [1] - 25:10
**accurate** [4] - 25:15, 61:6, 67:21, 78:19
**accused** [1] - 12:5
**achieve** [2] - 16:2, 93:1
**acknowledgment** [1] - 54:11
**Act** [44] - 8:24, 9:15, 10:3, 10:18, 11:7, 11:15, 17:3, 26:17, 35:22, 35:23, 40:4, 40:6, 46:7, 54:20, 56:11, 80:17, 80:18, 81:23, 87:10, 87:12, 88:9, 88:10, 88:12, 88:20, 89:15, 89:23, 91:22, 92:19, 92:20, 92:22, 92:25, 94:8, 95:3, 96:11, 97:7, 97:14, 99:9, 99:10, 99:15, 99:16, 100:3, 105:24, 106:8
**act** [2] - 88:15, 88:21
**Act's** [3] - 88:10, 88:11, 93:1
**action** [10] - 12:3, 27:2, 42:6, 46:10, 54:25, 75:11, 86:24, 90:22, 95:10, 108:4
**Action** [2] - 3:2, 3:4
**actions** [7] - 35:10, 41:12, 44:2, 45:25, 46:14, 46:20, 76:17
**active** [2] - 33:25, 89:1
**activities** [5] - 41:25, 106:13, 106:23, 107:6, 107:8
**activity** [3] - 75:10, 79:2, 107:2
**acts** [4] - 54:13, 54:14, 88:12, 88:13
**Acts** [1] - 88:1
**actual** [8] - 5:19, 25:22, 57:12, 57:19, 57:20, 79:5, 80:7, 103:12

**acute** [5] - 47:8, 47:19, 47:21, 47:25, 91:12
**Adaptive** [9] - 73:17, 74:3, 74:6, 74:9, 74:11, 76:7, 76:19, 86:19, 89:8
**adaptive** [23] - 5:9, 6:13, 7:16, 43:9, 44:2, 45:23, 46:1, 46:16, 48:10, 48:14, 48:15, 73:25, 74:2, 74:21, 75:7, 75:10, 75:16, 75:20, 77:12, 86:23, 90:10, 90:17
**add** [2] - 80:5, 104:4
**addition** [2] - 10:11, 47:1
**additional** [1] - 101:4
**address** [20] - 8:1, 8:15, 8:23, 13:22, 21:24, 28:19, 28:23, 29:16, 29:18, 35:21, 38:16, 45:5, 48:1, 54:11, 64:4, 64:6, 66:18, 77:25, 102:23, 108:18
**addressed** [2] - 65:15, 82:2
**addresses** [2] - 64:7, 64:15
**addressing** [3] - 36:11, 46:17, 53:17
**adequately** [1] - 111:19
**adjacent** [1] - 14:19
**Administration** [1] - 56:11
**administration** [22] - 15:5, 23:2, 40:21, 43:25, 45:13, 45:20, 46:4, 48:7, 48:10, 49:7, 49:11, 49:12, 49:13, 50:3, 50:18, 51:2, 51:3, 53:11, 53:13, 54:16, 79:1, 110:10
**administration's** [10] - 41:16, 43:15, 43:20, 44:8, 45:3, 46:23, 49:10, 50:1, 51:5, 110:7
**administrations** [1] - 110:18
**Administrative** [7] - 8:24, 9:14, 10:2, 11:7, 11:15, 26:17, 54:13
**administrative** [16] - 5:3, 22:11, 23:22, 24:25, 37:8, 37:19,

37:25, 56:3, 76:2, 76:8, 78:4, 78:25, 80:15, 84:1, 84:5, 108:23
**admit** [2] - 25:5, 25:16
**Admitted** [1] - 113:19
**admitted** [1] - 25:8
**admittedly** [1] - 6:5
**adopt** [6] - 26:21, 72:20, 94:22, 105:10, 106:19, 109:16
**adopted** [8] - 15:20, 27:5, 73:16, 80:3, 92:13, 94:23, 105:8, 105:11
**adopting** [3] - 26:8, 26:19, 94:25
**advanced** [2] - 106:8, 106:19
**advantage** [1] - 29:17
**adverse** [14] - 5:25, 6:5, 18:19, 42:13, 42:16, 60:25, 73:14, 85:8, 85:10, 88:17, 93:22, 99:25, 106:24, 108:10
**advisement** [3] - 110:24, 111:21, 112:1
**aesthetic** [3] - 27:14, 98:1, 98:5
**affected** [3] - 35:1, 62:9, 66:17, 84:5, 87:18
**affirmed** [1] - 108:13
**afford** [1] - 40:18
**afforded** [1] - 92:24
**affording** [1] - 92:25
**age** [1] - 19:24
**agencies** [4] - 26:18, 100:4, 105:22, 105:23
**Agencies** [1] - 26:20
**agency** [30] - 8:20, 9:18, 9:25, 10:1, 10:25, 11:2, 11:19, 11:21, 11:23, 11:25, 12:2, 15:1, 15:3, 16:19, 26:7, 32:19, 36:9, 37:4, 84:11, 103:3, 103:8, 104:21, 104:25, 105:8, 105:10, 105:11, 105:16, 106:12, 108:12, 109:5
**agency's** [2] - 28:15, 36:17
**ago** [2] - 75:19, 82:11

**agree** [5] - 12:15, 50:12, 50:19, 51:18, 81:6
**agreed** [1] - 8:9
**agreement** [1] - 104:25
**agrees** [2] - 11:19, 17:12
**ahead** [8] - 13:4, 21:25, 63:17, 64:8, 68:4, 76:20, 77:10, 77:23
**aided** [1] - 2:25
**Air** [5] - 32:13, 81:23, 88:10, 88:12, 88:20
**air** [24] - 7:12, 7:19, 7:16, 49:18, 55:19, 55:21, 73:5, 80:4, 80:5, 80:6, 81:23, 87:21, 87:23, 87:24, 88:14, 89:25, 90:3, 90:19, 91:17, 103:7, 103:11, 104:1, 109:14
**aircraft** [3] - 32:18, 32:19, 33:1
**airplanes** [1] - 32:17
**al** [2] - 3:3
**Alaska** [1] - 28:1
**allow** [4] - 23:4, 89:19, 97:6, 106:13
**allowed** [11] - 5:20, 41:18, 42:1, 47:23, 51:6, 52:24, 54:1, 57:12, 107:5, 107:6, 107:20
**allowing** [2] - 81:16, 87:8
**allows** [1] - 5:6
**Almost** [1] - 36:25
**almost** [6] - 12:11, 15:10, 30:17, 37:11, 108:5, 109:4
**almost-hundred-year** [1] - 15:10
**alone** [1] - 104:15
**alternate** [1] - 58:20
**Alternative** [2] - 63:24, 73:2
**alternative** [30] - 6:20, 40:20, 40:22, 43:6, 45:12, 59:7, 59:19, 59:25, 62:15, 63:20, 65:14, 67:7, 73:6, 73:12, 73:14, 79:8, 81:19, 92:9, 92:11, 92:13, 93:4, 93:9, 93:25, 94:22, 95:1, 101:17, 103:14, 103:23, 109:11

PDF created with pdfFactory trial version www.pdffactory.com

**alternatives** [14] - 53:11, 55:10, 57:7, 61:19, 61:23, 63:20, 64:16, 64:17, 69:17, 78:20, 78:21, 81:11, 81:20, 101:17
**altitude** [1] - 105:12
**amassed** [1] - 37:24
**ambient** [4] - 79:6, 79:21, 84:16, 87:24
**ambiguous** [1] - 106:15
**amendments** [1] - 16:3
**America's** [1] - 110:17
**American** [2] - 14:13, 105:9
**ammunition** [1] - 36:14
**amount** [5] - 8:20, 65:24, 67:22, 69:25, 99:14
**ample** [1] - 86:22
**analogy** [1] - 96:25
**analysis** [26] - 5:6, 10:7, 14:4, 14:7, 25:25, 26:1, 26:12, 27:16, 55:5, 60:8, 63:15, 65:6, 69:12, 70:11, 70:21, 79:8, 80:3, 80:14, 80:17, 81:17, 81:18, 81:25, 84:11, 90:14, 99:7, 110:3
**Analysis** [1] - 61:2
**analyze** [2] - 70:6, 70:14
**analyzed** [5] - 33:23, 63:21, 70:10, 79:4, 86:17
**anecdotes** [1] - 68:18
**Anecdotally** [1] - 68:16
**animal** [3] - 98:20, 99:3, 99:4
**animals** [1] - 106:3
**annual** [1] - 82:15
**answer** [9] - 14:24, 27:4, 37:8, 37:17, 57:22, 77:6, 89:20, 91:20, 111:23
**answering** [1] - 77:6
**answers** [1] - 56:23
**anxiety** [1] - 72:12
**anyway** [1] - 86:6
**APA** [4] - 54:12, 76:9, 84:9, 84:10
**apologies** [1] - 110:1
**apologize** [1] - 4:2
**apparent** [1] - 76:18

**appear** [6] - 6:9, 6:13, 19:13, 22:6, 23:1, 57:5
**appearance** [1] - 19:5
**APPEARANCES** [3] - 1:19, 1:25, 2:1
**appearing** [1] - 28:22
**appendix** [1] - 4:22
**applicable** [2] - 47:8, 90:17
**application** - 32:23
**applied** [2] - 95:16, 99:3
**applies** [9] - 9:17, 10:25, 11:3, 30:16, 42:12, 47:19, 88:15, 93:19, 98:16
**apply** [5] - 10:9, 17:21, 17:23, 88:21, 93:24
**applying** [1] - 32:15
**appreciate** [1] - 8:13
**appreciated** [1] - 4:25
**approach** [4] - 12:18, 12:20, 75:14, 90:19
**approached** [1] - 48:1
**appropriate** [28] - 5:15, 11:22, 12:3, 18:20, 18:25, 26:20, 27:4, 28:4, 32:25, 41:25, 42:17, 42:22, 75:10, 77:20, 78:1, 86:24, 90:1, 94:24, 95:2, 96:18, 96:21, 96:25, 97:4, 100:18, 103:19, 106:16, 109:4, 110:11
**approved** [1] - 84:17
**AR** [1] - 91:4
**AR119777** [1] - 85:12
**AR125050** [1] - 82:14
**AR125292** [1] - 82:10
**arbitrary** [6] - 5:21, 7:10, 10:6, 46:3, 73:1, 73:10
**area** [7] - 11:17, 29:4, 32:19, 58:25, 59:20, 91:2, 104:23
**areas** [8] - 6:24, 28:1, 43:19, 46:6, 65:5, 66:14, 97:17, 97:25
**Arguably** [1] - 7:17
**arguably** [3] - 5:18, 5:21, 6:7
**argue** [5] - 5:25, 9:8, 16:20, 50:4, 88:8, 93:8, 98:11, 105:16
**argued** [1] - 52:4
**argues** [8] - 5:16, 6:14, 6:16, 7:4, 16:8, 25:21, 73:18, 73:23

**arguing** [2] - 7:7, 106:10
**argument** [23] - 8:6, 18:18, 22:21, 22:23, 23:5, 23:8, 27:11, 28:12, 36:7, 36:16, 39:13, 56:24, 60:16, 80:25, 81:9, 82:24, 84:10, 84:22, 93:6, 96:16, 102:19, 107:23, 109:10
**arguments** [8] - 7:25, 8:14, 54:8, 68:3, 97:9, 101:13, 111:24, 111:25
**arisen** [1] - 103:22
**arising** [1] - 104:8
**Arnold** [3] - 2:3, 4:8, 4:20
**arose** [1] - 103:11
**arrive** [1] - 68:10
**arrived** [2] - 5:13, 68:15
**art** [1] - 95:15
**articulated** [2] - 6:4, 55:2
**aside** [1] - 50:21
**aspects** [1] - 88:18
**assess** [3] - 32:17, 47:3, 48:6
**assessed** [2] - 53:8, 53:22
**assessing** [2] - 32:25, 48:12
**assistance** [1] - 4:21
**associate** [1] - 106:14
**associated** [4] - 96:23, 103:10, 107:1, 108:8
**ASSOCIATION** [1] - 1:10
**Association** [4] - 2:4, 3:4, 3:11, 32:13
**assume** [1] - 70:15
**assuming** [5] - 62:20, 64:23, 70:10, 70:16, 86:25
**assumption** [2] - 58:8, 70:7
**assurance** [2] - 17:22, 74:4
**assured** [1] - 96:6
**assuring** [1] - 96:11
**astonishment** [1] - 21:17
**AT** [2] - 62:12, 76:1
**attainment** [1] - 18:8
**attempt** [3] - 16:1, 41:20, 45:7
**attempted** [2] - 15:9,

16:3
**attempting** [1] - 15:1
**attention** [3] - 64:2, 72:7, 94:12
**attorney** [1] - 107:10
**attorneys** [1] - 102:11
**attribute** [1] - 103:21
**attributed** [1] - 82:4
**ATV** [3] - 83:25, 84:5, 87:3
**ATVs** [1] - 19:11
**audibile** [1] - 64:6
**audibility** [25] - 6:22, 6:23, 6:25, 44:18, 44:25, 45:3, 45:19, 59:18, 59:25, 61:7, 61:9, 61:15, 62:4, 62:9, 63:2, 63:5, 64:4, 64:7, 64:15, 64:16, 66:3, 79:17, 80:25, 81:1, 81:3
**Audibility** [1] - 60:12
**audible** [19] - 6:10, 32:6, 43:18, 44:10, 58:24, 59:6, 59:23, 60:1, 60:2, 61:3, 61:10, 61:15, 63:3, 65:1, 65:10, 66:2, 75:18, 75:20, 85:3
**August** [2] - 1:7, 4:25
**authority** [2] - 99:17, 105:17
**authorize** [5] - 27:12, 42:16, 46:11, 53:21, 110:8
**authorized** [3] - 44:9, 45:2, 49:12
**authors** [1] - 91:13
**automobiles** [1] - 106:21
**AV** [1] - 35:22
**available** [3] - 5:7, 105:7, 108:7
**Avenue** [3] - 1:22, 2:18, 2:22
**avenue** [1] - 93:1
**average** [16] - 20:14, 21:18, 25:13, 57:12, 57:15, 67:19, 70:2, 70:5, 71:8, 71:13, 85:20, 86:11, 86:12, 86:15, 87:1, 87:3
**averages** [2] - 22:18, 33:11, 86:13
**avoid** [9] - 17:25, 42:13, 49:10, 92:1, 93:21, 94:3, 94:9, 99:24, 104:20
**avoided** [2] - 52:22, 55:21

**Avoiding** [1] - 17:11
**awaiting** [1] - 51:8
**aware** [2] - 84:10, 85:25

**B**

**background** [1] - 80:5
**backs** [1] - 49:17
**backup** [1] - 51:15
**bad** [2] - 55:9, 81:11
**balance** [3] - 13:25, 39:23, 43:3
**balanced** [1] - 92:23
**ban** [2] - 44:21, 81:15
**bar** [4] - 23:14, 24:6, 25:6, 25:17
**Bar** [1] - 113:20
**bare** [1] - 13:12
**Barry** [1] - 4:2
**BARRY** [1] - 2:12
**base** [1] - 76:13
**based** [25] - 5:18, 6:11, 6:21, 20:21, 26:20, 33:1, 36:13, 37:23, 41:22, 44:4, 57:7, 57:11, 64:16, 64:17, 65:23, 70:11, 70:15, 70:21, 73:7, 84:15, 85:20, 88:2, 98:7, 99:7, 106:2
**bases** [1] - 62:23
**basic** [1] - 107:18
**basis** [16] - 5:12, 9:9, 11:19, 22:23, 26:4, 48:23, 48:24, 68:18, 84:12, 87:6, 89:10, 100:5, 104:15, 105:25, 108:12
**Bates** [1] - 54:23
**BATT** [5] - 44:23, 45:14, 84:8, 87:4
**battlefield** [1] - 96:25
**bear** [4] - 28:19, 70:1, 88:1, 106:1
**Bear** [1] - 58:16
**bearing** [1] - 105:15
**become** [1] - 30:13
**becomes** [1] - 76:18
**becoming** [1] - 73:21
**bedrock** [1] - 94:6
**BEFORE** [1] - 1:17
**beforehand** [1] - 64:6
**begin** [2] - 39:4, 43:16
**beginning** [5] - 23:13, 34:13, 64:2, 77:7, 77:10
**begins** [1] - 17:19
**begun** [1] - 104:11

PDF created with pdfFactory trial version [www.pdffactory.com](www.pdffactory.com)

behalf [2] - 105:4, 110:21
behind [1] - 11:22
belief [1] - 89:5
believes [4] - 5:11, 29:14, 77:2, 111:19
below [5] - 21:13, 33:9, 91:11, 91:16, 91:18
Ben [1] - 2:13
bench [1] - 39:2
Beneficial [1] - 62:7
beneficial [16] - 6:21, 59:14, 59:15, 60:17, 60:20, 60:25, 61:1, 61:13, 61:14, 61:15, 62:6, 62:8, 62:25, 63:1, 63:2, 67:8
benefit [7] - 4:13, 4:18, 59:12, 59:13, 61:9, 70:17, 76:24
benzene [11] - 46:24, 47:4, 47:11, 47:15, 47:20, 47:21, 90:25, 91:3, 91:9, 91:14, 91:16
Benzene [1] - 91:5
Best [1] - 23:21
best [15] - 5:7, 40:18, 41:12, 41:15, 42:4, 52:14, 55:21, 67:4, 71:23, 71:24, 93:1, 95:7, 95:24, 105:7, 108:7
Best-case [1] - 23:21
better [4] - 41:3, 43:1, 62:18, 75:7
between [20] - 5:25, 20:13, 33:24, 41:1, 49:5, 51:24, 61:18, 61:19, 61:23, 62:1, 75:23, 76:1, 80:2, 84:12, 87:2, 95:5, 96:8, 96:13, 99:23, 105:12
bicycle [2] - 98:24, 98:25
bicycles [1] - 99:5
big [3] - 9:7, 66:20, 83:23
billion [1] - 90:15
binders [1] - 4:22
binding [1] - 50:11
biologists [1] - 69:14
Birch [1] - 2:18
bison [4] - 35:4, 35:11, 89:18, 107:24
bit [4] - 42:8, 66:11, 70:5, 74:22
biting [1] - 107:7

Bittner [1] - 2:18
blame [1] - 82:7
block [1] - 97:1
blue [2] - 20:16, 20:18
Bomadeer [2] - 31:1, 31:5
bomadeer [1] - 62:11
bomadeers [1] - 82:20
Borkowski [2] - 33:21, 33:23
bottom [1] - 64:25
bottommost [1] - 64:14
bound [2] - 15:17, 92:14
bounds [1] - 70:8
box [1] - 105:4
Box [2] - 2:10, 2:14
boxes [1] - 59:4
Bozeman [1] - 1:22
breach [1] - 86:16
breached [3] - 44:3, 46:15, 86:24
brief [6] - 26:11, 32:13, 41:19, 48:20, 68:9, 77:18
briefing [9] - 41:11, 41:23, 43:11, 50:4, 50:16, 63:9, 100:10, 100:18
briefly [2] - 50:22, 106:7
briefs [7] - 15:23, 25:15, 26:6, 29:3, 38:23, 92:10, 97:14
Brimmer [1] - 12:25
bring [4] - 101:18, 101:20, 102:10, 102:12
bringing [1] - 101:2
broad [4] - 92:24, 92:25, 98:7, 98:21
broad-ranging [2] - 98:7, 98:21
brucellosis [1] - 107:25
bulk [1] - 72:8
bullet [1] - 18:8
burden [2] - 39:15, 39:17
Burlington [1] - 50:13
burning [1] - 111:22
busses [3] - 73:2, 106:21
busy [2] - 31:21, 83:12
bypass [2] - 105:13, 105:14

**C**

CA [1] - 1:5
calculate [2] - 84:16, 84:17
calendar [6] - 7:23, 8:1, 68:2, 77:17, 97:11, 100:24
cannon [1] - 85:12
cannot [9] - 27:12, 41:18, 49:12, 50:20, 54:13, 92:18, 109:3, 109:12, 110:19
Canyon [1] - 32:16
cap [11] - 49:2, 49:5, 49:24, 50:7, 62:21, 70:2, 70:22, 86:7, 86:10, 86:14
capable [1] - 52:23
capricious [1] - 10:6
Caps [1] - 72:18
carbon [3] - 87:5, 88:6, 90:16
care [1] - 34:19
carefully [1] - 11:4
carry [2] - 18:25, 107:25
case [70] - 4:9, 4:12, 4:17, 7:9, 9:2, 9:24, 22:2, 23:21, 39:5, 39:22, 40:13, 40:16, 40:23, 40:25, 41:8, 41:14, 41:23, 42:5, 42:24, 43:2, 43:12, 44:15, 45:7, 46:22, 47:2, 47:22, 49:7, 49:10, 49:15, 50:17, 50:23, 54:21, 54:22, 54:23, 56:17, 67:21, 70:7, 77:20, 78:2, 80:22, 81:2, 86:1, 87:3, 87:20, 88:2, 88:3, 88:5, 88:23, 90:16, 92:7, 92:10, 92:20, 94:12, 94:15, 94:20, 102:8, 102:10, 107:10, 107:11, 107:12, 108:13, 109:15, 109:20, 110:3, 110:9, 110:16, 110:24, 111:11, 112:1
cases [3] - 5:2, 9:20, 101:1
casting [1] - 50:21
casually [1] - 74:5
catalog [1] - 54:24
categories [1] - 7:1

categorive [1] - 80:21
categorization [1] - 79:24
category [1] - 60:1
caused [1] - 79:3
caution [2] - 103:9, 103:21
ceiling [1] - 87:1
cell [1] - 109:25
CEQ [1] - 76:11
certain [7] - 33:7, 35:10, 48:4, 49:19, 66:7, 73:18, 94:24
Certainly [2] - 72:11
certainly [13] - 4:25, 22:7, 63:10, 72:1, 72:6, 79:7, 81:7, 82:7, 83:10, 86:22, 92:18, 93:16, 105:16
certainty [1] - 73:24
CERTIFICATE [1] - 114:1
certify [1] - 114:3
CFR [1] - 28:5
challenge [5] - 32:20, 32:23, 39:19, 39:21, 47:22
challenged [7] - 36:19, 37:12, 40:24, 43:13, 44:22, 54:18, 97:21
challenging [1] - 27:1
chance [1] - 56:24
change [14] - 12:10, 15:1, 15:7, 15:9, 15:15, 15:18, 26:22, 38:10, 44:20, 46:11, 60:17, 60:20, 102:20, 107:3
changes [2] - 44:3, 65:9
changing [2] - 45:20, 110:18
chapter [2] - 53:16, 79:9
characterization [1] - 12:7
characterize [1] - 95:8
characterized [1] - 41:11
charged [1] - 98:4
Chart [1] - 113:20
chart [6] - 19:20, 21:5, 23:14, 24:6, 25:6
charts [1] - 57:3
cherished [4] - 40:2, 56:5, 110:17
Cherot [1] - 2:18
choice [2] - 9:3, 10:24
choose [2] - 109:3,

109:11
chosen [2] - 59:18, 59:24
circling [1] - 47:2
Circuit [11] - 32:14, 40:13, 41:9, 41:11, 70:8, 92:7, 92:16, 93:13, 94:13, 94:14, 94:15
circumstances [1] - 11:3
cite [9] - 30:5, 30:6, 30:12, 30:14, 31:7, 32:14, 67:21, 94:15, 95:18
cited [2] - 24:2, 49:1
cites [2] - 32:12, 53:15
citing [1] - 50:12
Citizens [1] - 50:13
Civil [2] - 3:2, 3:4
claim [1] - 35:21
claims [1] - 80:14
Clean [4] - 81:22, 88:9, 88:12, 88:20
cleaner [1] - 40:21
cleanly [1] - 40:25
clear [10] - 12:3, 12:6, 30:13, 41:14, 44:16, 44:25, 45:18, 46:17, 49:7, 58:1
clearly [7] - 6:4, 99:5, 103:6, 104:5, 106:24, 106:25, 109:13
Clearly [1] - 63:11
client [1] - 35:21
clients [1] - 22:19
cliff [1] - 11:13
clonic [3] - 47:5, 47:11
close [4] - 31:6, 33:20, 72:24, 104:10
closed [2] - 22:2, 67:10
closer [1] - 80:7
closing [1] - 35:15
co [2] - 58:5, 107:10
co-counsel [2] - 58:5, 107:10
coach [8] - 30:8, 30:22, 40:20, 61:6, 73:5, 73:12, 73:14, 108:21
coaches [44] - 5:7, 20:16, 20:18, 21:5, 21:13, 23:12, 27:6, 29:23, 31:1, 31:5, 31:12, 31:19, 31:24, 32:9, 40:18, 40:23, 41:2, 41:14, 42:25, 44:17, 44:20, 44:21,

PDF created with pdfFactory trial version www.pdffactory.com

45:1, 45:5, 45:8, 45:13, 45:15, 45:17, 58:9, 62:11, 62:22, 69:19, 70:10, 75:25, 78:24, 82:5, 82:20, 83:2, 83:18, 84:6, 93:25, 94:1
**COALITION** [1] - 1:4
**Coalition** [5] - 1:21, 3:3, 3:15, 36:23, 98:23
**cognizant** [1] - 106:16
**colleague** [3] - 52:4, 101:5, 101:9
**colleagues** [5] - 3:25, 4:8, 38:16, 67:21, 69:5
**color** [3] - 64:23, 64:24, 75:19
**COLUMBIA** [1] - 1:1
**column** [3] - 57:10, 79:15, 83:16
**combination** [2] - 60:12, 79:5
**coming** [2] - 13:1, 72:24
**commenced** [2] - 107:12, 107:17
**commencement** [2] - 51:24, 111:1
**comment** [4] - 85:11, 86:5, 86:9, 104:14
**commentaries** [1] - 37:24
**commented** [1] - 37:15
**comments** [5] - 38:3, 86:8, 86:10, 96:19
**commercial** [1] - 5:8
**commit** [1] - 28:9
**communitively** [2] - 109:14, 109:15
**comparatively** [1] - 63:21
**compare** [2] - 57:6, 79:3
**compared** [14] - 6:22, 7:2, 60:25, 61:1, 61:16, 61:17, 62:7, 63:21, 81:10, 81:19, 81:20, 81:21, 83:3, 91:15
**compares** [2] - 60:23, 78:11
**comparing** [2] - 81:12, 86:12
**comparison** [13] - 61:4, 61:5, 61:25, 62:15, 71:8, 71:9, 71:12, 78:20, 81:13,

81:17, 81:19, 87:2, 108:21
**complaint** [1] - 95:20
**complaints** [1] - 36:18
**complementary** [1] - 96:15
**complements** [1] - 96:1
**complete** [1] - 41:2
**complex** [1] - 100:12
**compliance** [4] - 88:9, 91:9, 92:8, 92:16
**complicated** [1] - 82:9
**complied** [3] - 97:18, 97:23, 99:9
**complies** [1] - 10:5
**comply** [5] - 11:5, 28:8, 46:18, 46:19, 53:14
**component** [7] - 74:20, 75:1, 89:14, 95:3, 95:9, 95:25, 99:21
**components** [2] - 91:23, 99:10
**comprehensive** [1] - 108:9
**compromise** [1] - 41:5
**compromised** [1] - 44:12
**computer** [1] - 2:25
**computer-aided** [1] - 2:25
**con't** [2] - 1:25, 2:1
**conceded** [1] - 56:17
**concedes** [3] - 49:24, 53:7, 55:16
**concentrated** [2] - 65:3, 65:5
**concentration** [3] - 88:16, 91:14, 91:15
**concentrations** [2] - 91:10, 91:16
**concern** [6] - 14:3, 14:5, 14:6, 48:11, 60:5, 65:6
**concerning** [4] - 9:2, 9:3, 9:4, 9:5
**concerns** [1] - 69:9
**conclude** [1] - 99:12
**concluded** [1] - 112:7
**concludes** [1] - 26:2
**conclusion** [5] - 32:4, 34:11, 34:12, 64:5, 99:12
**conclusively** [1] - 108:10
**condition** [7] - 57:15, 57:23, 58:11, 58:18, 61:2, 90:3

**Condition** [1] - 58:17
**conditions** [29] - 6:22, 7:3, 7:13, 18:9, 18:12, 48:12, 49:20, 55:15, 55:16, 56:8, 57:6, 57:10, 57:11, 57:19, 57:20, 58:9, 58:15, 59:20, 61:16, 61:17, 62:1, 62:2, 65:24, 73:20, 81:11, 106:12, 106:24, 107:5
**Conditions** [3] - 59:9, 61:2, 61:5
**conducted** [1] - 21:14
**conducts** [1] - 65:23
**conflates** [2] - 95:22, 96:12
**conflict** [12] - 5:23, 5:25, 6:5, 74:8, 92:3, 95:5, 95:14, 95:15, 96:8, 96:13, 99:22
**conflicts** [1] - 109:18
**confronted** [1] - 54:22
**confusing** [1] - 58:14
**congregate** [4] - 65:7, 65:9, 66:14, 81:4
**Congress** [9] - 36:25, 37:2, 37:11, 39:24, 96:4, 96:11, 96:14, 98:4, 104:9
**congressional** [3] - 15:18, 108:4
**Connecticut** [2] - 2:18
**connection** [1] - 55:13
**consequences** [2] - 106:17
**conservation** [57] - 5:23, 5:24, 6:1, 13:25, 14:5, 15:12, 15:14, 15:16, 16:9, 16:19, 17:7, 17:13, 17:14, 17:15, 18:1, 18:3, 18:16, 19:5, 19:8, 34:17, 35:8, 40:14, 41:1, 41:5, 41:7, 41:17, 42:7, 42:10, 42:11, 42:24, 43:5, 56:4, 74:20, 89:15, 89:22, 91:21, 91:22, 92:2, 92:8, 92:17, 92:21, 93:8, 95:6, 95:9, 95:14, 95:22, 95:23, 95:25, 96:9, 96:12, 96:15, 99:10, 99:21, 99:23, 109:17, 109:18
**CONSERVATION** [1] - 1:10
**Conservation** [6] -

2:3, 3:4, 3:10, 18:23, 40:8, 95:3
**conservative** [2] - 70:7, 74:22
**conserve** [1] - 40:7
**conserved** [1] - 110:20
**conserving** [3] - 7:15, 95:5, 96:8
**consider** [8] - 22:4, 23:7, 24:14, 37:20, 72:19, 72:21, 101:2, 101:17
**considerable** [1] - 102:24
**consideration** [5] - 29:14, 38:7, 72:4, 81:7, 86:2
**considerations** [4] - 10:8, 26:20, 50:17, 90:10
**considered** [14] - 22:12, 23:1, 26:10, 26:11, 28:15, 37:4, 37:6, 37:19, 60:11, 72:7, 86:6, 86:21, 90:3, 103:2
**considering** [1] - 11:22
**considers** [1] - 105:1
**consistent** [12] - 6:9, 26:19, 32:9, 49:14, 51:22, 54:2, 54:19, 68:24, 94:20, 97:25, 98:5, 106:5
**consistently** [1] - 47:12
**conspicuous** [2] - 46:9, 53:5
**conspicuously** [1] - 49:16
**constant** [1] - 105:14
**Constitution** [1] - 2:22
**constraint** [1] - 106:10
**construction** [2] - 94:6, 94:7
**construe** [1] - 106:15
**contained** [2] - 40:3, 46:7
**containing** [1] - 4:22
**contaminates** [1] - 91:17
**contemplate** [2] - 76:11
**contemplated** [3] - 69:18, 69:19, 72:25
**contemplates** [1] - 86:11
**contemplating** [1] - 86:7

**contested** [1] - 41:7
**context** [2] - 13:23, 94:11
**continuation** [2] - 14:10, 103:5
**continue** [4] - 41:18, 45:13, 73:25, 101:1
**continued** [2] - 44:21, 52:3
**continues** [3] - 76:12, 76:13, 76:14
**continuing** [1] - 105:5
**contour** [3] - 64:19, 64:20, 75:18
**contractually** [1] - 92:14
**contractually-bound** [1] - 92:14
**contrary** [4] - 11:1, 12:8, 28:7, 32:22
**Contrary** [1] - 92:19
**contrast** [1] - 93:2
**contribute** [1] - 45:17
**contributing** [1] - 103:13
**controversy** [1] - 104:7
**conversation** [1] - 97:22
**cooperative** [1] - 108:1
**copies** [2] - 4:21, 20:8
**copy** [1] - 66:6
**corner** [1] - 4:4
**Correct** [1] - 59:16
**correct** [17] - 30:3, 38:17, 49:16, 57:8, 58:21, 59:1, 59:17, 59:22, 61:9, 61:11, 66:23, 67:2, 78:14, 92:10, 110:16, 111:25, 114:3
**correlates** [1] - 74:20
**correlation** [2] - 80:7, 80:8
**correspond** [1] - 22:18
**correspondence** [2] - 49:5, 49:6
**corridors** [1] - 65:3
**cost** [1] - 4:15
**counsel** [21] - 3:6, 3:14, 3:19, 4:6, 4:12, 8:3, 23:8, 28:12, 38:19, 54:4, 56:12, 56:13, 56:14, 58:5, 97:8, 107:10, 108:14, 109:22, 109:23, 110:23, 111:23

PDF created with pdfFactory trial version [www.pdffactory.com](www.pdffactory.com)

**Counsel** [3] - 39:10, 82:24, 102:17
**counter** [2] - 61:5, 62:14
**counter-intuitive** [2] - 61:5, 62:14
**counting** [1] - 111:11
**country** [1] - 65:4
**couple** [4] - 4:11, 28:21, 28:25, 30:13, 53:4, 56:15, 101:11, 101:17, 102:18, 103:12, 109:23
**course** [11] - 14:13, 29:4, 50:10, 50:23, 51:21, 56:9, 62:1, 78:19, 84:10, 103:11, 104:6
**Court** [73] - 2:21, 2:21, 4:12, 4:18, 5:11, 5:14, 5:16, 6:23, 7:19, 7:22, 8:19, 9:17, 11:18, 11:19, 11:20, 11:21, 11:25, 12:15, 14:4, 22:24, 28:23, 29:10, 29:13, 29:14, 37:20, 38:25, 39:4, 40:11, 43:9, 51:4, 51:9, 51:13, 51:16, 51:18, 51:19, 52:2, 52:5, 56:1, 63:16, 67:3, 67:5, 67:22, 68:9, 69:10, 70:18, 74:2, 74:6, 75:19, 77:2, 77:10, 77:19, 78:3, 78:5, 81:14, 82:11, 82:14, 84:10, 84:11, 84:19, 93:11, 94:11, 100:1, 100:6, 100:16, 101:20, 102:2, 102:6, 102:15, 104:17, 106:16, 111:1, 111:19, 114:2
**COURT** [173] - 1:1, 3:12, 3:16, 3:19, 3:23, 4:6, 4:10, 8:8, 8:12, 8:18, 8:25, 9:11, 11:9, 11:18, 12:15, 12:21, 13:3, 13:12, 14:3, 14:14, 16:11, 16:14, 16:16, 16:23, 19:23, 20:1, 20:3, 20:6, 20:8, 20:11, 21:25, 22:4, 22:14, 22:20, 23:16, 23:18, 23:21, 24:3, 24:9, 24:14, 24:20, 24:23, 25:5, 25:14, 25:23, 26:3, 28:20,

28:25, 29:5, 29:9, 29:13, 30:3, 30:10, 33:21, 33:23, 34:3, 34:6, 34:14, 35:2, 35:17, 36:7, 36:17, 36:21, 36:25, 37:4, 37:7, 37:10, 37:18, 37:22, 38:5, 38:13, 38:15, 38:19, 38:22, 39:10, 39:17, 40:8, 48:22, 51:11, 51:16, 51:23, 52:4, 52:10, 52:13, 52:16, 53:2, 54:8, 56:12, 56:17, 56:19, 56:22, 57:3, 57:5, 57:9, 57:17, 57:21, 57:25, 58:8, 58:12, 58:20, 58:22, 59:3, 59:6, 59:12, 59:15, 59:17, 59:24, 60:7, 60:15, 60:20, 60:22, 60:24, 61:12, 61:20, 62:5, 62:25, 63:4, 63:13, 63:17, 63:25, 64:8, 64:12, 65:16, 67:6, 67:13, 67:15, 68:1, 68:10, 68:14, 68:17, 68:22, 68:25, 69:4, 69:20, 70:23, 71:19, 72:2, 73:17, 74:14, 76:20, 76:23, 77:1, 77:9, 77:15, 78:13, 78:16, 80:11, 82:24, 84:21, 85:22, 86:2, 89:24, 90:7, 90:24, 97:8, 100:21, 101:7, 101:9, 101:12, 101:15, 101:23, 102:8, 102:17, 103:1, 103:15, 107:13, 107:15, 108:14, 109:22, 110:23, 111:10, 111:16, 112:5
**court** [6] - 4:16, 32:18, 39:13, 68:3, 93:2, 101:15
**Court's** [16] - 5:5, 5:24, 14:7, 39:1, 51:22, 52:8, 52:12, 61:8, 69:8, 70:17, 72:7, 76:24, 77:2, 77:23, 94:12
**Courthouse** [1] - 2:22
**COURTROOM** [4] - 3:2, 102:2, 102:5, 102:14
**courts** [5] - 9:17, 26:6, 28:13, 92:23, 100:5

**Courts** [1] - 11:2
**Courts's** [1] - 81:1
**cover** [2] - 23:10, 29:4
**covered** [1] - 77:11
**crafting** [1] - 13:11
**create** [1] - 6:5
**creation** [1] - 109:16
**Creek** [9] - 30:20, 30:21, 30:22, 30:23, 31:5, 31:9, 32:1, 83:1, 83:10
**criminal** [3] - 100:24, 101:16, 101:24
**critical** [9] - 14:1, 15:21, 29:21, 32:4, 40:11, 46:1, 54:10, 85:23, 110:7
**cross** [1] - 78:3
**cross-reference** [1] - 78:3
**crucial** [1] - 29:14
**cruise** [1] - 31:2
**cruising** [1] - 31:6
**cultural** [2] - 18:9, 98:1
**cumulative** [1] - 87:20
**cumulatively** [1] - 18:8
**curiosities** [1] - 43:1
**Current** [7] - 58:17, 59:9, 61:2, 61:4, 62:7, 62:15, 69:24
**current** [24] - 5:17, 6:22, 7:3, 11:14, 57:6, 57:10, 57:11, 57:15, 57:23, 58:9, 58:10, 58:14, 58:15, 58:18, 59:20, 60:6, 61:1, 61:16, 62:1, 62:17, 73:20, 79:11, 100:13, 100:14
**cut** [1] - 49:22

## D

**D.C** [12] - 1:6, 2:4, 2:7, 2:10, 2:14, 2:19, 2:23, 32:14, 40:13, 41:8, 41:11, 92:16
**daily** [2] - 20:14, 103:24
**damage** [3] - 27:14, 72:12, 72:13
**Dangerfield** [8] - 41:10, 41:21, 42:2, 92:7, 92:10, 92:20, 93:5
**dangerous** [1] - 12:9
**data** [7] - 57:7, 57:10,

80:6, 83:21, 88:25, 104:3, 110:3
**date** [4] - 21:2, 44:11, 75:17, 76:15
**dated** [1] - 4:25
**Davis** [1] - 93:12
**days** [10] - 25:13, 28:21, 28:25, 29:1, 47:8, 47:14, 70:3, 71:2, 71:16
**days'** [1] - 47:6
**deal** [3] - 27:24, 45:20, 101:7
**deals** [1] - 17:14
**death** [1] - 107:7
**debated** [1] - 104:23
**decade** [1] - 104:7
**Decibel** [1] - 65:12
**decibel** [4] - 45:15, 66:3, 66:7, 66:9, 66:10, 105:6
**decibels** [2] - 32:8, 79:24, 80:1
**decide** [1] - 12:4
**Decision** [1] - 17:10
**decision** [56] - 6:11, 6:19, 9:12, 9:15, 9:18, 10:2, 10:8, 11:22, 12:3, 12:25, 14:4, 14:8, 15:3, 17:16, 22:25, 36:7, 36:19, 37:23, 40:24, 41:16, 41:20, 44:1, 44:24, 45:3, 46:23, 48:2, 48:23, 50:7, 50:24, 51:5, 55:24, 56:7, 60:18, 60:24, 62:23, 68:19, 69:13, 71:7, 76:10, 77:20, 80:16, 81:15, 81:16, 85:20, 87:7, 87:8, 95:17, 100:2, 103:17, 103:19, 106:1, 106:19, 108:12, 110:8
**decision-makers** [1] - 56:7
**Decision-Making** [1] - 17:10
**decision-making** [5] - 9:12, 14:4, 17:16, 37:23, 95:17
**decisions** [7] - 9:25, 22:8, 54:13, 79:25, 94:10, 100:4, 105:19
**declaration** [1] - 56:7
**declarations** [1] - 42:21
**declare** [2] - 41:17, 55:1

**declares** [1] - 110:11
**declined** [1] - 42:6
**decrease** [3] - 6:21, 6:23, 59:25
**decreases** [1] - 59:1
**Decreases** [1] - 59:2
**deemed** [4] - 6:20, 77:19, 95:2, 95:15
**deepest** [1] - 109:25
**defend** [1] - 5:20
**Defendant** [4] - 1:8, 1:15, 2:6, 2:17
**defendant** [1] - 3:21
**defended** [1] - 48:19
**defending** [1] - 49:11
**defense** [1] - 55:24
**deference** [18] - 8:16, 8:21, 8:24, 9:2, 9:10, 9:15, 10:15, 10:19, 11:2, 16:16, 16:18, 28:13, 28:14, 50:23, 50:24, 84:20, 98:8, 109:9
**defined** [1] - 98:12
**defining** [1] - 88:16
**definition** [2] - 98:18, 99:2
**degree** [4] - 105:19, 105:20, 105:23, 106:4
**deleterious** [4] - 92:9, 92:11, 92:13, 93:4
**deliver** [1] - 77:8
**demanded** [1] - 51:8
**demonstrate** [5] - 26:18, 46:21, 48:16, 54:21, 55:20
**demonstrated** [5] - 43:17, 44:5, 45:10, 47:9, 108:10
**demonstrates** [3] - 21:22, 25:17, 103:6
**demonstrative** [2] - 20:12, 24:13
**deny** [2] - 100:6, 104:17
**Department** [11] - 2:6, 2:9, 2:12, 2:16, 3:5, 3:17, 4:3, 4:4, 32:16, 84:18
**DEPARTMENT** [1] - 1:13
**deplorable** [1] - 55:14
**DEPUTY** [4] - 3:2, 102:2, 102:5, 102:14
**derive** [1] - 4:18
**derived** [1] - 104:2
**described** [2] - 57:24, 78:7
**description** [1] - 58:2

PDF created with pdfFactory trial version www.pdffactory.com

**designate** [2] - 22:15, 97:24
**designated** [1] - 28:2
**designation** [2] - 28:3, 97:17
**designed** [2] - 54:7, 80:22
**desirable** [1] - 73:21
**desire** [2] - 51:16, 111:22
**desired** [3] - 18:9, 18:12, 49:8
**despite** [1] - 51:6
**detail** [1] - 10:23
**determination** [15] - 34:6, 41:13, 45:24, 51:5, 70:8, 70:14, 75:6, 82:1, 89:11, 96:1, 98:6, 98:9, 99:19, 99:20
**determine** [13] - 5:14, 18:11, 23:5, 26:3, 41:12, 41:24, 42:4, 43:21, 48:22, 69:13, 71:25, 74:24, 91:9
**determined** [15] - 6:2, 28:3, 34:3, 44:4, 44:9, 44:17, 51:7, 53:13, 70:12, 75:4, 75:22, 86:17, 89:4, 94:23, 107:1
**determining** [6] - 53:10, 53:12, 55:17, 66:15, 93:1, 98:4
**develop** [1] - 100:20
**developed** [4] - 43:19, 46:5, 65:5, 66:14
**Development** [1] - 94:14
**dictionary** [2] - 98:18, 99:2
**die** [1] - 35:5
**difference** [4] - 19:1, 20:13, 61:23, 84:12
**different** [20] - 9:19, 18:23, 20:13, 24:5, 26:23, 33:4, 54:22, 55:3, 65:2, 65:9, 66:5, 71:24, 73:9, 73:10, 80:4, 83:20, 85:3, 88:1, 88:25, 95:11
**difficulty** [2] - 26:23, 27:1
**dilute** [1] - 81:12
**direct** [8] - 11:21, 11:23, 12:2, 64:2, 65:12, 72:7, 87:19, 97:16
**directed** [4] - 13:16,

51:4, 61:25, 66:15
**directly** [4] - 40:19, 64:4, 96:2, 97:15
**director** [7] - 36:18, 36:20, 36:22, 37:11, 85:22, 85:24, 86:3
**Dirk** [1] - 3:3
**DIRK** [1] - 1:7
**disagree** [5] - 60:10, 63:7, 63:15, 74:10, 88:12
**disclose** [1] - 62:19
**disclosed** [3] - 79:7, 80:2, 80:9
**disclosing** [1] - 80:23
**discrepancy** [2] - 80:2, 84:3
**discretion** [24] - 11:16, 18:19, 26:22, 41:4, 41:12, 41:22, 41:24, 42:3, 42:4, 42:16, 43:3, 43:7, 89:3, 92:24, 92:25, 94:3, 94:11, 95:11, 97:5, 105:17, 109:5, 110:14
**discussed** [6] - 41:10, 43:16, 46:3, 49:19, 49:22, 63:4
**discussing** [1] - 69:10
**discussion** [5] - 6:12, 13:14, 13:23, 53:9, 63:6
**dismissed** [1] - 40:20
**dismisses** [1] - 48:2
**displacement** [2] - 72:10, 72:11
**dispute** [4] - 89:16, 105:6, 107:12, 107:17
**disputed** [1] - 40:22
**disputes** [2] - 37:10, 72:9
**disregard** [4] - 41:5, 41:16, 48:8
**disregarded** [1] - 46:22
**distinct** [1] - 89:17
**DISTRICT** [3] - 1:1, 1:1, 1:18
**district** [1] - 85:12
**disturb** [7] - 27:15, 98:2, 98:11, 98:12, 98:18, 99:3, 106:25
**disturbance** [2] - 106:12, 107:5
**disturbed** [1] - 99:2
**divide** [1] - 8:4
**divided** [1] - 88:13
**dividing** [1] - 25:12

**do-not-stop** [1] - 95:8
**document** [24] - 16:25, 22:1, 22:4, 22:7, 22:11, 22:16, 23:1, 23:8, 23:9, 23:10, 23:21, 24:10, 24:23, 30:14, 31:4, 78:4, 78:8, 79:14, 80:24, 82:11, 82:12, 82:13, 83:8, 108:20
**documentation** [1] - 107:19
**documents** [8] - 20:21, 49:1, 49:3, 78:5, 82:8, 82:15, 95:17, 106:16
**done** [13] - 16:21, 20:20, 21:14, 34:7, 34:8, 38:22, 49:9, 50:3, 82:16, 83:6, 98:23, 108:4, 108:6
**double** [3] - 50:1, 50:4, 53:10
**doubled** [1] - 33:15
**doubling** [6] - 25:18, 45:2, 48:4, 48:17, 49:19, 110:8
**doubt** [2] - 22:21, 22:25
**Doug** [1] - 3:14
**DOUGLAS** [1] - 1:21
**down** [4] - 59:3, 59:5, 68:7, 111:11
**downplay** [1] - 74:2
**downplayed** [1] - 74:11
**dozens** [1] - 108:4
**draft** [3] - 22:16, 25:10, 70:19
**drew** [1] - 34:11
**drive** [1] - 84:1
**drop** [1] - 104:8
**dropped** [1] - 103:21
**dual** [1] - 93:2
**ducts** [1] - 79:2
**due** [1] - 29:23
**duplicate** [1] - 38:21
**duration** [3] - 47:6, 87:18, 91:12
**durations** [1] - 47:7
**during** [21] - 20:20, 21:1, 21:2, 21:13, 21:19, 33:9, 50:2, 50:9, 57:20, 68:24, 70:18, 71:2, 79:10, 79:11, 83:7, 84:2, 84:15, 91:15, 103:25, 104:5
**During** [2] - 69:23, 84:14

**duty** [3] - 91:21, 95:9, 106:11
**dwell** [1] - 46:24

## E

**Earthjustice** [1] - 1:21
**easier** [1] - 75:8
**eastern** [1] - 67:8
**easy** [1] - 82:9
**Eco** [1] - 81:5
**effect** [3] - 103:5, 105:19, 108:10
**effective** [2] - 85:14, 85:19
**effectively** [1] - 50:7
**effects** [5] - 47:15, 87:19, 87:20, 103:10, 107:1
**effort** [3] - 38:20, 43:10, 54:21
**efforts** [4] - 48:21, 49:10, 50:16, 104:9
**eight** [11] - 30:16, 36:19, 53:16, 83:7, 85:21, 87:2, 91:8, 111:6, 111:7, 111:9
**eight-hour** [2] - 83:7, 91:8
**eighth** [2] - 95:4, 96:3
**EIS** [6] - 40:19, 48:2, 55:4, 62:19, 64:21, 103:23
**EISs** [2] - 108:3
**either** [6] - 11:5, 53:21, 65:18, 78:10, 93:14, 102:20
**elect** [1] - 41:5
**elected** [2] - 46:5, 46:11
**elevated** [1] - 15:12
**Eleven** [3] - 36:20, 36:21, 36:22
**eleven** [7] - 37:10, 66:6, 83:3, 85:24, 91:6, 104:23, 108:3
**eliminated** [1] - 15:11
**Elmo** [1] - 19:23
**elsewhere** [1] - 106:18
**elusory** [1] - 48:14
**embodies** [1] - 110:20
**embodiment** [1] - 42:24
**emission** [1] - 81:23
**emissions** [4] - 87:23, 107:22, 108:8, 110:5
**EMMET** [1] - 1:17
**emphasis** [1] - 8:10
**employee** [1] - 79:21

**employees** [2] - 36:23, 82:17
**Employees** [1] - 36:24
**encounters** [3] - 85:6, 85:8, 85:10
**end** [4] - 50:5, 51:18, 52:25, 63:22
**Endangered** [1] - 105:24
**endangered** [1] - 40:13
**endemic** [1] - 36:5
**ending** [1] - 23:14
**ends** [1] - 70:5
**enforceable** [1] - 98:14
**enforcement** [1] - 85:2
**Engineers** [1] - 105:9
**enhancing** [1] - 85:14
**enjoyed** [1] - 40:15
**enjoying** [1] - 19:16
**enjoyment** [17] - 15:12, 15:13, 19:7, 19:9, 19:12, 19:15, 40:10, 41:2, 43:4, 43:6, 89:20, 92:4, 92:22, 95:6, 96:5, 96:9
**Enjoyment** [1] - 19:16
**enormous** [1] - 106:17
**enormously** [1] - 85:1
**ensure** [3] - 71:5, 106:11, 110:19
**ensuring** [1] - 75:11
**enter** [3] - 12:14, 47:23, 100:7
**entered** [2] - 20:14, 110:21
**entering** [1] - 21:4
**entirely** [2] - 30:17, 106:2
**entitled** [9] - 9:2, 16:16, 16:18, 17:10, 22:2, 28:13, 50:24, 98:8, 114:4
**entrance** [9] - 30:25, 31:3, 47:10, 47:13, 47:24, 83:13, 88:4, 90:15
**entries** [2] - 7:5, 67:23
**entry** [4] - 9:8, 9:11, 9:12, 103:4
**environment** [1] - 88:19
**environmental** [1] - 98:7
**envisioned** [1] - 96:14
**EPA** [3] - 37:3, 84:16, 88:14
**equal** [1] - 15:16

PDF created with pdfFactory trial version www.pdffactory.com

**equally** [1] - 17:7
**equation** [1] - 79:22
**equipment** [1] - 29:24
**era** [1] - 107:21
**erroneous** [1] - 93:17
**error** [2] - 16:6
**especially** [1] - 94:22
**ESQ** [9] - 1:20, 1:21, 2:2, 2:3, 2:6, 2:9, 2:12, 2:16, 2:17
**essential** [1] - 44:13
**essentially** [3] - 24:24, 55:5, 104:2
**establish** [2] - 92:16, 98:23
**established** [6] - 39:24, 40:1, 47:2, 47:5, 71:17, 107:4
**establishes** [2] - 47:7, 92:21
**et** [2] - 3:3
**etcetera** [1] - 35:12
**evaluated** [1] - 21:10
**evaluating** [1] - 99:17
**event** [3] - 5:18, 28:21, 32:10
**events** [10] - 30:8, 30:9, 30:19, 30:22, 31:12, 31:19, 31:20, 31:23, 108:22
**evidence** [6] - 6:15, 7:8, 7:15, 25:8, 82:6, 95:17
**evidences** [1] - 84:3
**evolve** [1] - 76:12
**exacerbate** [1] - 49:20
**exact** [3] - 44:23, 94:1, 96:2
**exacting** [1] - 10:3
**exactly** [3] - 17:20, 65:8, 95:18
**examined** [3] - 69:17, 74:25, 75:22
**example** [6] - 64:11, 65:11, 75:15, 98:22, 103:14, 104:22
**examples** [1] - 50:17
**exceed** [4] - 6:19, 55:2, 83:5, 91:6
**exceedances** [9] - 46:10, 47:17, 47:20, 74:4, 82:19, 83:3, 83:17, 83:18, 83:19
**exceeded** [13] - 6:13, 7:13, 43:20, 47:12, 47:16, 47:25, 73:19, 75:21, 87:24, 88:23, 90:2, 91:3, 110:5
**exceeding** [1] - 32:8
**excellent** [1] - 38:23

**exception** [2] - 79:17, 107:13
**exceptions** [1] - 79:18
**excerpts** [3] - 16:25, 17:8, 27:21
**excessive** [4] - 103:9, 103:21, 107:22, 107:23
**excite** [1] - 98:20
**exclusion** [2] - 78:25, 79:1
**executive** [7] - 53:5, 53:14, 53:19, 80:19, 97:13, 97:14, 97:19
**exhibit** [1] - 24:15
**Exhibit** [6] - 24:16, 24:17, 25:1, 25:2, 25:7, 113:19
**exhibits** [1] - 24:21
**exist** [1] - 22:19
**existing** [3] - 44:5, 46:17, 49:20
**exists** [2] - 11:19, 39:25
**expanded** [1] - 54:17
**expansion** [1] - 46:12
**expect** [5] - 18:4, 23:24, 45:2, 50:8, 74:6
**expectation** [1] - 80:8
**expected** [2] - 62:4, 86:21
**experience** [3] - 71:5, 76:15, 85:15
**explain** [6] - 33:18, 42:19, 56:2, 63:12, 69:9, 89:21
**explained** [5] - 83:9, 87:16, 88:19, 89:9, 92:10
**explaining** [3] - 46:6, 61:25
**explains** [1] - 87:11
**explanation** [11] - 44:4, 51:1, 51:2, 51:8, 53:4, 54:13, 54:17, 55:14, 81:14, 87:6, 110:10
**exposed** [1] - 91:18
**exposure** [4] - 47:16, 91:11, 91:12, 91:17
**exposures** [4] - 47:6, 47:9, 47:11, 47:20
**express** [1] - 74:15
**expressed** [3] - 64:19, 72:15, 102:24
**extend** [1] - 111:17
**extensive** [1] - 106:22
**extent** [10] - 22:23, 38:25, 72:12, 77:1,

77:18, 86:23, 93:22, 94:9, 97:25, 110:25
**extraordinary** [3] - 40:16, 43:4, 110:14
**extremely** [3] - 4:23, 5:2, 85:23

## F

**F2d105** [1] - 94:14
**FA** [1] - 41:5
**FAA** [1] - 32:13
**face** [1] - 46:20
**fact** [31] - 5:1, 11:16, 14:18, 18:15, 18:20, 26:9, 26:14, 30:21, 39:23, 40:15, 43:5, 43:15, 44:6, 44:10, 45:5, 45:8, 45:10, 46:21, 47:16, 48:15, 49:11, 53:14, 54:18, 54:22, 72:9, 79:20, 82:19, 84:4, 89:5, 92:12, 96:1
**factor** [3] - 37:22, 88:23, 103:13
**factors** [2] - 10:9, 87:17
**facts** [3] - 11:1, 32:22, 109:8
**factual** [4] - 48:23, 48:24, 103:3
**fail** [1] - 54:16
**failed** [2] - 26:25, 42:21
**failure** [5] - 27:2, 46:9, 51:3, 53:3, 54:10
**fair** [6] - 7:24, 12:6, 14:14, 23:25, 29:14, 111:3
**fairly** [3] - 18:13, 10:4:8, 104:23
**Faithful** [11] - 31:1, 31:3, 31:11, 31:14, 31:17, 32:6, 43:19, 43:24, 45:4, 46:4, 83:14
**familiar** [8] - 22:10, 39:10, 39:12, 39:18, 67:16, 67:18, 91:2, 91:19
**far** [13] - 5:14, 14:25, 33:1, 41:3, 43:18, 48:13, 75:13, 87:24, 88:23, 101:25, 106:17, 109:7
**far-reaching** [2] - 14:25, 106:17
**favor** [1] - 44:20

**federal** [1] - 9:8
**FEIS** [23] - 8:21, 15:22, 24:4, 25:11, 26:1, 27:17, 34:13, 35:1, 56:25, 57:24, 63:20, 66:25, 67:7, 69:25, 70:6, 72:8, 76:10, 78:4, 78:7, 80:22, 81:9, 87:20, 88:19
**fell** [1] - 47:18
**few** [10] - 5:4, 10:18, 22:22, 23:3, 29:1, 29:16, 35:5, 97:9, 102:17, 108:15
**fiat** [1] - 55:1
**fifteen** [2] - 66:8
**fifty** [4] - 33:10, 43:18, 72:20, 106:3
**figure** [9] - 27:7, 58:2, 65:22, 68:11, 69:20, 69:22, 70:16, 71:21, 74:15
**figured** [1] - 52:20
**figures** [10] - 23:18, 24:24, 25:14, 32:9, 59:21, 60:7, 60:9, 60:16, 71:20
**filed** [2] - 29:3, 29:11
**fill** [2] - 50:16
**final** [4] - 26:15, 51:22, 52:24, 60:21
**finally** [4] - 10:24, 46:16, 89:8, 96:18
**Finally** [2] - 85:20, 109:10
**financial** [1] - 4:14
**fine** [5] - 41:18, 42:23, 50:6, 51:8, 65:18
**finish** [1] - 80:17
**firm** [2] - 4:8, 4:20
**First** [15] - 9:14, 20:25, 30:13, 40:17, 46:3, 47:1, 48:6, 51:20, 53:5, 60:15, 91:24, 94:13, 94:14, 94:15, 99:18
**first** [29] - 8:3, 8:9, 8:16, 9:9, 13:24, 16:14, 16:15, 20:13, 27:21, 28:1, 33:13, 34:23, 40:7, 46:13, 51:15, 55:6, 56:23, 57:9, 58:18, 60:15, 63:10, 69:5, 72:22, 77:25, 80:14, 83:20, 98:3, 108:18
**Five** [1] - 101:14
**five** [16] - 34:1, 66:8, 73:6, 90:18, 97:11, 100:23, 101:15,

101:24, 102:1, 102:3, 107:18, 111:3, 111:4, 111:5, 111:12, 111:13
**five-minute** [3] - 100:23, 101:24, 102:3
**fixed** [1] - 76:5
**flag** [2] - 48:12, 90:21
**flexibility** [5] - 11:15, 12:13, 13:8, 13:9, 13:10
**flight** [1] - 32:25
**flights** [1] - 32:15
**flip** [1] - 64:10
**flows** [1] - 87:10
**focus** [15] - 5:10, 7:24, 8:11, 8:14, 14:7, 56:25, 77:2, 77:9, 80:25, 81:4, 81:8, 90:25, 93:7, 97:21
**focused** [3] - 29:13, 65:7, 111:1
**Focusing** [2] - 6:7, 65:8
**follow** [4] - 10:18, 17:25, 33:17, 33:18
**followed** [2] - 33:14, 34:23
**following** [1] - 94:12
**follows** [3] - 93:20, 96:4, 97:24
**FOR** [1] - 1:1
**foreclose** [1] - 95:1
**foregoing** [1] - 114:3
**form** [5] - 22:16, 26:15, 40:18, 41:15, 89:10
**former** [7] - 36:18, 36:22, 36:23, 84:7, 85:22, 85:24, 86:3
**forms** [1] - 104:21
**forth** [1] - 55:24
**forty** [1] - 79:25
**forward** [1] - 3:6
**four** [11] - 30:16, 60:19, 60:21, 76:3, 83:23, 88:1, 96:20, 102:23, 103:14, 103:23, 107:19
**fourth** [1] - 97:4
**frame** [2] - 30:15, 30:17
**Franklin** [1] - 2:13
**frequently** [1] - 63:6
**Friday** [1] - 111:2
**front** [1] - 7:20
**fruitful** [1] - 5:5
**fulfill** [1] - 42:17
**fulfills** [1] - 46:7

PDF created with pdfFactory trial version www.pdffactory.com

**full** [4] - 42:25, 43:6, 83:21, 105:13
**fully** [4] - 80:9, 97:18, 99:9, 103:7
**fun** [3] - 19:10, 19:16
**function** [1] - 63:12
**fundamental** [7] - 15:2, 15:17, 16:5, 36:12, 39:6, 56:2, 92:21
**fundamentally** [1] - 54:12
**furtherance** [1] - 41:6
**future** [8] - 5:1, 18:9, 18:12, 36:11, 46:19, 74:4, 74:7, 96:5

**G**

**gas** [1] - 106:23
**gathered** [1] - 84:15
**geared** [1] - 43:13
**gee** [1] - 26:14
**General** [1] - 2:13
**generally** [1] - 76:8
**generated** [1] - 23:16
**generations** [1] - 96:5
**given** [7] - 8:4, 38:7, 44:11, 52:8, 52:10, 91:20, 109:9
**gleaned** [2] - 29:10, 57:21
**gliders** [1] - 19:11
**goal** [1] - 94:19
**govern** [1] - 97:16
**governing** [2] - 12:9, 15:15
**government** [68] - 8:23, 9:7, 10:22, 12:17, 13:15, 15:1, 16:8, 17:12, 18:18, 22:9, 23:16, 25:18, 25:21, 26:25, 27:11, 28:11, 29:6, 29:22, 30:19, 30:23, 31:17, 32:11, 33:14, 33:17, 33:18, 34:3, 34:7, 34:17, 35:9, 37:12, 37:17, 37:23, 41:8, 41:19, 42:8, 42:14, 42:15, 42:20, 46:11, 48:1, 49:1, 49:16, 49:23, 50:10, 52:6, 53:7, 53:15, 54:11, 54:21, 55:16, 55:18, 55:23, 56:6, 56:13, 60:16, 68:10, 68:15, 73:18, 73:23, 86:2, 101:5, 110:2, 110:3,

110:9, 110:16, 111:5, 111:6, 111:13
**government's** [15] - 10:11, 10:17, 24:25, 34:6, 41:23, 43:11, 48:15, 48:20, 50:16, 55:5, 56:14, 68:19, 72:4, 106:14, 110:4
**government-generated** [1] - 23:16
**gradual** [1] - 11:16
**Grand** [3] - 32:15, 60:25, 98:24
**graph** [1] - 25:17
**great** [2] - 101:7, 105:23
**Great** [1] - 20:11
**GREATER** [1] - 1:3
**greater** [6] - 15:25, 17:21, 36:14, 62:5, 62:20, 79:16
**Greater** [4] - 1:21, 3:2, 3:15, 98:22
**greatest** [1] - 93:22
**groomers** [7] - 82:5, 82:20, 83:4, 83:5, 83:18, 83:22, 84:6
**grooming** [6] - 29:24, 30:10, 30:11, 30:15, 30:17, 107:24
**ground** [1] - 91:22
**grounded** [1] - 89:22
**group** [1] - 111:4
**grouping** [1] - 85:3
**groups** [4] - 3:22, 85:4, 85:7, 109:12
**grow** [1] - 76:13
**growth** [1] - 86:19
**guarantee** [1] - 7:18
**guarantees** [1] - 6:18
**guess** [6] - 11:24, 67:16, 68:8, 68:13, 74:10, 82:22
**guidance** [1] - 52:9, 52:10, 52:12
**Guide** [1] - 85:16
**guide** [3] - 11:18, 14:3, 14:7
**guides** [1] - 85:8
**guiding** [3] - 5:8, 84:24, 85:18
**GUILLERMO** [1] - 2:6
**Guillermo** [1] - 3:17
**GYC** [1] - 93:7

**H**

**HAJEK** [4] - 2:9, 56:15, 56:18, 56:21

**Hajek** [1] - 4:3
**half** [2] - 101:18, 106:21
**half-hour** [1] - 101:18
**hand** [7] - 11:18, 16:22, 19:11, 19:20, 20:5, 68:7, 74:12
**handed** [2] - 23:10, 27:19
**happy** [6] - 39:15, 63:15, 64:24, 67:22, 67:24, 80:20
**hard** [1] - 35:20
**hardship** [4] - 4:14, 101:21
**harm** [2] - 87:14, 100:15
**harms** [1] - 89:6
**Hart** [1] - 91:4
**hazardous** [2] - 47:4, 48:7
**health** [4] - 47:3, 47:15, 48:7, 88:15
**hear** [5] - 8:3, 56:13, 66:4, 80:20, 100:22
**heard** [10] - 6:24, 7:2, 58:25, 59:7, 59:9, 59:20, 77:7, 88:8, 92:6, 100:21
**HEARING** [1] - 1:17
**hearing** [5] - 4:17, 5:5, 29:18, 49:22, 111:1
**hearings** [1] - 15:19
**heating** [1] - 79:1
**heavily** [1] - 8:17
**heed** [1] - 90:22
**held** [3] - 92:9, 93:3, 94:16
**Helle** [3] - 3:13, 8:11, 38:18
**HELLE** [20] - 1:20, 3:13, 38:18, 38:20, 39:3, 39:15, 39:21, 40:10, 48:24, 51:14, 51:20, 52:1, 52:8, 52:11, 52:14, 52:18, 53:3, 54:9, 101:11, 109:24
**Help** [1] - 20:2
**help** [4] - 8:14, 20:3, 60:7, 60:8
**helpful** [2] - 4:23, 5:2
**high** [6] - 62:10, 71:6, 74:18, 86:9, 88:3, 105:24
**high-profile** [1] - 105:24
**higher** [2] - 7:10, 59:19, 71:14
**highest** [2] - 60:13,

60:14
**highlight** [1] - 38:24
**highlighted** [1] - 39:1
**highlights** [1] - 23:22
**highly** [1] - 105:14
**historic** [11] - 55:14, 55:16, 56:8, 57:14, 90:2, 103:13, 103:23, 103:24, 104:5, 104:11
**historical** [4] - 22:6, 61:2, 61:17, 71:8
**history** [5] - 39:11, 39:12, 39:16, 39:19, 106:5
**holding** [2] - 41:19, 41:20
**holidays** [1] - 70:3
**HONNOLD** [1] - 1:21
**Honnold** [1] - 3:14
**Honor** [166] - 3:9, 3:13, 3:20, 8:7, 8:22, 9:1, 9:7, 9:13, 9:22, 10:3, 10:25, 11:3, 11:10, 12:1, 12:6, 12:13, 12:23, 13:20, 14:10, 14:17, 15:1, 15:23, 16:15, 16:17, 17:4, 17:17, 19:2, 19:15, 20:12, 20:19, 21:16, 21:24, 22:10, 22:16, 23:9, 23:24, 24:7, 24:12, 24:19, 24:22, 25:4, 25:9, 25:25, 26:5, 26:11, 26:16, 27:3, 27:7, 27:24, 28:11, 28:24, 29:12, 29:17, 30:4, 30:12, 31:10, 31:19, 32:1, 32:5, 32:14, 33:12, 33:20, 34:2, 34:5, 34:9, 34:20, 35:3, 35:15, 35:21, 36:2, 36:10, 36:11, 37:5, 37:14, 37:16, 37:21, 38:2, 38:14, 38:21, 52:18, 56:15, 56:18, 56:21, 57:2, 57:8, 57:14, 58:4, 58:6, 58:14, 59:2, 59:11, 59:22, 60:4, 60:10, 60:23, 61:11, 61:22, 63:7, 63:12, 63:19, 64:21, 65:11, 65:12, 66:18, 67:3, 67:11, 67:24, 68:5, 68:8, 68:21, 69:2, 69:7, 69:16, 70:25, 71:1, 71:10, 71:15, 71:23, 72:15, 73:16,

74:8, 74:23, 75:15, 76:7, 76:22, 77:7, 77:13, 77:25, 78:3, 78:10, 78:11, 78:14, 79:6, 79:9, 80:12, 80:20, 82:7, 82:15, 83:8, 84:9, 84:23, 86:25, 87:9, 88:24, 89:8, 89:14, 90:8, 91:1, 94:4, 95:24, 96:17, 97:12, 99:7, 99:12, 100:5, 101:6, 101:14, 102:23, 104:17, 108:17, 108:20, 108:25, 109:20, 109:24, 111:8, 111:15
**Honor's** [2] - 64:2, 64:23
**Honorable** [3] - 102:2, 102:5, 102:15
**HONORABLE** [1] - 1:17
**hope** [7] - 5:22, 7:11, 50:8, 81:1, 100:10, 111:8, 111:9
**Hopefully** [1] - 4:15
**hopefully** [1] - 5:5
**HORN** [8] - 2:17, 3:20, 101:14, 102:22, 103:2, 103:17, 107:14, 107:16
**Horn** [4] - 3:21, 102:22, 109:2, 109:10
**Horton** [1] - 2:18
**hosts** [1] - 106:20
**hotels** [1] - 106:22
**hour** [7] - 31:2, 66:1, 66:7, 66:10, 83:7, 91:8, 101:18
**Housing** [1] - 94:13
**hundred** [13] - 5:8, 7:5, 12:10, 12:11, 15:10, 36:25, 37:11, 47:23, 85:21, 87:3, 88:5, 104:25, 106:25
**hydrocarbons** [1] - 87:5

**I**

**iconic** [1] - 43:24
**ID** [2] - 39:7, 40:3
**idea** [11] - 26:13, 28:9, 29:6, 33:3, 35:3, 39:23, 42:24, 70:1, 70:2, 73:7, 110:20
**identical** [2] - 40:24,

PDF created with pdfFactory trial version www.pdffactory.com

99:1
**identifcation** [1] - 25:3
**Identification** [1] - 113:19
**identification** [1] - 24:18
**identified** [1] - 18:10
**identify** [2] - 3:7, 28:18
**Identifying** [1] - 17:11
**ignored** [1] - 79:6
**imagine** [1] - 35:8
**immediately** [1] - 14:18
**imminent** [1] - 100:15
**impact** [36] - 21:11, 21:21, 24:8, 29:22, 30:2, 34:18, 34:20, 43:12, 48:16, 48:17, 53:10, 54:5, 54:7, 55:8, 63:8, 65:6, 67:8, 78:6, 78:11, 78:12, 79:23, 79:24, 80:1, 80:3, 85:5, 85:10, 87:13, 87:19, 87:20, 94:9, 95:13, 97:3, 97:4, 98:7, 106:24
**impact's** [1] - 69:12
**impactful** [1] - 109:11
**impacting** [11] - 62:17, 73:4, 73:5, 93:3, 93:9, 93:24, 94:2, 94:22, 94:25, 106:13, 107:6
**impacts** [91] - 6:1, 6:3, 6:5, 6:10, 6:17, 16:10, 16:20, 17:7, 18:7, 18:17, 18:19, 21:7, 25:20, 26:14, 26:25, 28:5, 28:7, 28:9, 28:17, 30:18, 42:1, 42:13, 42:16, 42:22, 43:8, 43:22, 42:23, 45:18, 46:20, 49:18, 53:12, 54:3, 54:18, 54:24, 54:25, 55:1, 55:11, 55:15, 55:18, 55:22, 56:8, 57:6, 62:17, 62:20, 62:24, 66:15, 70:10, 70:13, 71:5, 71:25, 72:10, 73:9, 73:22, 74:19, 74:24, 75:6, 75:12, 75:13, 75:14, 79:10, 80:21, 80:23, 81:10, 81:12, 81:20, 82:5, 86:18, 86:23, 88:17, 89:18, 90:1, 90:19, 92:1, 93:22,

96:23, 97:6, 98:17, 98:21, 99:8, 99:15, 99:22, 99:25, 103:7, 109:14, 109:15, 109:17, 110:12
**impaired** [2] - 7:14, 90:4
**impairment** [42] - 17:20, 17:22, 18:1, 18:23, 19:1, 43:22, 43:23, 52:21, 52:22, 55:10, 55:15, 55:17, 70:12, 70:14, 71:4, 73:21, 73:24, 74:4, 74:18, 74:24, 75:5, 75:12, 75:14, 86:18, 87:9, 87:12, 87:16, 89:11, 90:2, 90:6, 90:7, 95:22, 95:23, 96:1, 96:11, 96:16, 99:10, 99:19, 107:3, 110:6
**Impairments** [1] - 17:11
**impairments** [3] - 17:13, 17:14, 18:24
**impasse** [1] - 6:16
**impede** [1] - 18:8
**impermissible** [1] - 11:24
**implement** [5] - 37:13, 76:16, 84:24, 92:14, 92:3
**implementation** [3] - 61:6, 72:23, 93:9
**implemented** [1] - 93:14
**implementing** [1] - 84:14
**implements** [1] - 76:14
**importance** [2] - 15:25, 67:1
**important** [12] - 5:11, 27:10, 29:24, 43:8, 43:13, 48:25, 56:1, 66:23, 77:19, 81:6, 97:1, 111:20
**impose** [4] - 4:14, 53:20, 101:21, 106:10
**imposed** [1] - 11:12
**imposing** [2] - 94:8, 100:2
**inaction** [1] - 108:5
**incapable** [2] - 46:16, 55:17
**incarcerated** [1] - 100:25
**incessant** [1] - 108:5

**inclined** [1] - 51:18
**include** [1] - 30:19
**includes** [3] - 19:3, 66:13, 83:21
**including** [3] - 53:11, 83:22, 87:17
**inconsistent** [3] - 27:13, 78:2, 93:17
**incorporated** [1] - 48:9
**increase** [4] - 58:24, 60:3, 86:11, 86:16
**increased** [1] - 59:21
**increases** [1] - 7:2
**increasing** [1] - 30:1
**increasingly** [1] - 14:13
**incrementally** [1] - 52:22
**indeed** [5] - 5:11, 6:3, 6:19, 36:8, 109:4
**indefensible** [1] - 49:17
**independently** [1] - 53:8
**indicate** [1] - 67:7
**indicated** [3] - 23:14, 31:13, 77:15
**indicates** [3] - 38:9, 61:3, 94:7
**indicating** [2] - 13:13, 57:19
**indication** [3] - 5:14, 9:24, 73:21
**indications** [1] - 44:19
**indicative** [1] - 55:4
**indicators** [1] - 73:20
**indirect** [1] - 87:19
**individual** [2] - 85:4, 85:7
**individually** [1] - 18:7
**inevitably** [1] - 40:14
**influence** [1] - 36:5
**inform** [2] - 22:24, 75:3
**information** [5] - 79:9, 80:19, 82:10, 84:15, 87:21
**informed** [1] - 25:11
**infrastructure** [1] - 106:22
**inhalation** [1] - 91:12
**injury** [1] - 14:11
**inquiry** [1] - 87:16, 100:12
**instance** [3] - 16:14, 16:15, 71:19
**instances** [2] - 109:4, 109:5
**instead** [8] - 15:14,

64:7, 75:3, 79:22, 79:23, 80:23, 94:16, 109:13
**Instead** [3] - 27:25, 64:19, 97:15
**insulating** [1] - 110:17
**intact** [2] - 41:3, 43:2
**integrity** [1] - 87:14
**intensity** [1] - 61:18
**intensive** [1] - 107:2
**intention** [3] - 49:2, 49:4, 49:6
**inter** [1] - 47:6
**interactions** [1] - 33:24
**interchange** [1] - 92:15
**interest** [3] - 88:11, 102:24
**interim** [3] - 52:2, 52:17, 103:5
**INTERIOR** [1] - 1:14
**Interior** [4] - 2:7, 2:16, 3:5, 4:5
**intermediate** [2] - 47:14, 47:25
**internal** [1] - 17:17
**interpret** [3] - 27:25, 41:21, 93:23
**interpretation** [30] - 9:4, 9:5, 9:6, 10:12, 10:13, 10:17, 10:22, 15:15, 17:2, 17:6, 17:23, 18:3, 18:14, 18:22, 27:19, 28:6, 28:10, 28:12, 28:14, 41:7, 42:10, 67:25, 93:15, 93:19, 95:20, 95:21, 98:14, 106:19, 107:4
**interpretations** [2] - 12:9, 106:7
**interpreted** [12] - 15:22, 16:18, 16:19, 18:15, 27:16, 27:17, 55:6, 82:18, 87:10, 92:5, 92:24, 94:17
**interpreting** [1] - 16:4
**intersection** [1] - 31:22
**intervening** [1] - 108:2
**Intervenors** [2] - 2:18, 101:12
**intervenors** [5] - 3:21, 100:21, 100:22, 101:3, 102:18
**interview** [1] - 6:2
**intimately** [2] - 91:2, 91:19
**introduce** [2] - 3:25,

4:1
**intrusive** [1] - 66:5
**intuitive** [2] - 61:5, 62:14
**invalid** [1] - 14:2
**invalidated** [1] - 12:24
**investigation** [1] - 75:9
**invitation** [1] - 104:18
**invite** [2] - 94:11, 94:12
**invited** [1] - 42:19
**involvement** [2] - 10:2, 52:25
**involves** [1] - 87:17
**involving** [2] - 100:25, 104:19
**irreconcilable** [2] - 48:18, 110:15
**irrelevant** [1] - 48:3
**isolated** [1] - 30:25
**issue** [26] - 8:16, 8:18, 8:23, 10:11, 10:15, 12:24, 13:25, 14:1, 29:7, 29:18, 32:15, 33:6, 33:7, 36:2, 39:5, 43:7, 43:15, 45:5, 45:7, 46:13, 47:2, 48:1, 50:22, 97:16, 104:16, 105:20
**issued** [1] - 97:19
**issues** [9] - 8:11, 29:15, 38:17, 39:22, 102:23, 104:19, 105:3, 105:12, 105:15
**items** [1] - 28:18
**itself** [7] - 5:6, 26:7, 44:16, 52:6, 56:2, 84:11, 98:12

# J

**J192** [2] - 105:8, 105:10
**JACQUELINE** [3] - 2:21, 114:2, 114:5
**jammed** [1] - 14:23
**Jason** [1] - 4:3
**JASON** [1] - 2:16
**job** [1] - 38:23
**joined** [1] - 3:14
**Judge** [3] - 12:25, 54:22, 54:23
**JUDGE** [1] - 1:18
**judges** [2] - 9:8, 88:14
**judgment** [6] - 28:15, 87:13, 100:7, 103:2,

PDF created with pdfFactory trial version www.pdffactory.com

110:21
**judgments** [1] - 105:2
**jump** [2] - 94:15, 103:15
**Junction** [7] - 31:22, 32:7, 83:1, 83:2, 83:9, 83:12, 83:16
**June** [1] - 21:21
**Justice** [5] - 2:6, 2:9, 2:12, 3:18, 4:3
**justified** [1] - 27:4
**justify** [1] - 27:7

## K

**Kaneal** [2] - 94:13, 94:20
**keep** [6] - 7:6, 49:8, 52:17, 77:15, 102:11, 111:9
**KEMPTHORNE** [1] - 1:7
**Kempthorne** [1] - 3:3
**killing** [1] - 107:25
**kind** [2] - 78:24, 82:21
**kinds** [2] - 9:9, 19:18
**knowing** [1] - 86:15
**knowledge** [2] - 76:12, 93:2
**known** [4] - 11:1, 32:22, 88:16, 109:8

## L

**labeled** [2] - 69:24, 79:11
**labeling** [1] - 58:17
**lack** [1] - 45:11
**Lahser** [1] - 93:13
**laid** [1] - 89:7
**land** [1] - 105:22
**lands** [3] - 40:2, 56:6, 110:18
**landscape** [1] - 39:8
**language** [8] - 42:14, 42:15, 62:16, 93:13, 96:2, 96:19, 96:21, 98:15
**large** [2] - 30:21, 105:24
**last** [15] - 19:13, 21:20, 57:10, 59:3, 70:19, 71:3, 71:10, 71:11, 72:16, 72:17, 77:24, 85:16, 86:20, 103:12
**law** [4] - 8:25, 12:8, 23:7, 70:7

**laws** [4] - 12:9, 15:2, 35:6, 46:8
**lead** [2] - 36:15, 73:24
**leads** [1] - 74:2
**learn** [1] - 76:16
**leased** [1] - 11:17
**least** [19] - 7:20, 13:15, 26:9, 34:22, 50:2, 92:9, 92:11, 92:13, 93:3, 93:4, 93:9, 93:24, 94:22, 94:25, 99:14, 104:24, 106:13, 107:6, 109:11
**least-impacting** [4] - 93:24, 94:22, 94:25, 107:6
**leave** [3] - 7:20, 28:20, 41:3
**leaving** [1] - 43:1
**led** [1] - 107:24
**left** [6] - 20:14, 40:21, 55:24, 55:25, 61:10, 96:7
**legal** [16] - 8:10, 8:15, 10:5, 11:6, 13:21, 14:2, 22:23, 26:6, 26:11, 35:22, 36:15, 39:13, 39:19, 39:21, 56:10, 106:9
**legend** [2] - 64:24, 65:11
**length** [1] - 41:10
**less** [17] - 25:22, 26:2, 26:9, 48:16, 55:11, 62:17, 62:23, 67:20, 70:5, 73:3, 73:21, 79:15, 87:5, 94:1, 94:8, 94:19
**letter** [4] - 4:25, 85:25, 86:5, 86:11
**letting** [1] - 70:18
**level** [30] - 8:19, 11:14, 15:13, 33:9, 33:10, 34:18, 34:22, 43:12, 45:7, 47:5, 47:11, 47:21, 59:18, 63:5, 72:10, 72:13, 82:19, 83:5, 84:4, 84:17, 84:20, 88:14, 91:3, 100:14, 103:4, 103:13, 104:13, 107:3
**Levels** [1] - 47:1
**levels** [16] - 7:6, 21:13, 47:3, 47:5, 49:3, 49:9, 50:6, 61:18, 61:24, 62:10, 63:3, 64:7, 85:1, 88:3, 88:16, 105:7

**life** [1] - 36:16
**light** [2] - 11:16, 12:3
**likelihood** [3] - 4:18, 28:20, 51:23
**likely** [5] - 7:7, 25:22, 26:2, 30:1, 71:16
**limit** [11] - 5:12, 5:13, 5:17, 5:21, 5:22, 7:5, 26:13, 26:15, 95:10, 97:5, 103:10
**limitation** [1] - 69:15
**limitations** [1] - 86:14
**limited** [1] - 84:14, 108:6
**limiting** [1] - 72:19
**limits** [3] - 71:7, 85:2, 91:19
**line** [3] - 15:8, 77:6, 110:17
**lines** [2] - 64:21, 75:19
**linked** [1] - 95:19
**list** [2] - 28:18, 106:1
**listings** [1] - 105:25
**literally** [1] - 104:1
**Litigation** [1] - 2:13
**litigation** [4] - 5:12, 81:5, 104:9, 108:5
**LLP** [1] - 2:3
**location** [2] - 31:21, 33:3
**locations** [1] - 30:24, 32:8
**long-term** [1] - 91:8
**look** [18] - 10:4, 10:5, 11:4, 17:8, 18:1, 18:2, 30:12, 35:3, 37:7, 55:3, 64:1, 64:3, 75:4, 79:15, 82:11, 82:14, 106:20
**Look** [1] - 59:3
**looked** [2] - 21:16, 104:25
**looking** [4] - 22:17, 57:16, 82:23, 83:1
**lost** [1] - 56:13
**loud** [11] - 30:7, 30:22, 31:1, 31:5, 31:12, 31:14, 31:19, 31:20, 31:23, 66:5, 108:22
**low** [2] - 99:5, 104:11
**lower** [8] - 74:19, 74:22, 75:8, 75:13, 86:10, 87:25, 90:12, 90:18
**lowest** [1] - 47:11
**lucky** [1] - 107:15
**Luther** [1] - 4:2
**LUTHER** [1] - 2:9

## M

**MAAQS** [1] - 7:12
**machine** [2] - 2:25, 30:20
**machines** [3] - 19:18, 107:22, 108:9
**Madison** [7] - 31:21, 32:7, 83:1, 83:2, 83:9, 83:11, 83:16
**main** [1] - 80:21
**maintain** [1] - 49:2
**maintained** [2] - 21:13, 33:9
**major** [3] - 5:2, 79:23, 80:1
**makers** [1] - 56:7
**manage** [3] - 38:11, 85:9, 91:24
**managed** [1] - 67:18
**management** [61] - 5:9, 6:13, 7:16, 9:6, 10:20, 15:4, 15:7, 15:20, 16:3, 16:12, 16:21, 17:1, 17:3, 18:21, 27:18, 27:20, 36:6, 40:12, 41:9, 43:10, 44:2, 44:3, 45:23, 45:25, 46:1, 46:10, 46:14, 46:16, 46:20, 48:10, 48:14, 48:15, 53:15, 54:25, 55:2, 55:7, 55:8, 66:13, 74:1, 74:2, 74:21, 75:1, 75:7, 75:10, 75:16, 75:20, 77:12, 86:23, 86:24, 90:11, 90:18, 90:20, 90:22, 91:24, 93:6, 93:14, 96:2, 96:17, 105:23, 108:1
**Management** [9] - 73:17, 74:3, 74:6, 74:9, 74:11, 76:7, 76:19, 86:19, 89:9
**manager** [1] - 87:14
**managers** [3] - 17:25, 42:16, 93:21
**mandate** [34] - 15:12, 16:9, 16:19, 17:7, 18:3, 18:16, 18:23, 19:5, 34:17, 35:8, 40:7, 41:7, 41:17, 42:7, 42:10, 42:11, 55:7, 56:4, 74:20, 89:15, 89:22, 92:5, 92:17, 93:2, 93:8, 94:8, 94:20, 95:9, 95:23, 95:24, 95:25,

96:15, 109:17, 109:19
**Mandate** [1] - 91:22
**mandates** [10] - 46:7, 46:19, 48:18, 49:14, 55:23, 56:10, 89:16, 91:22, 95:22, 110:16
**mandatory** [1] - 106:11
**Manello** [1] - 55:13
**manner** [2] - 41:25, 77:18
**manufacturers** [1] - 105:5
**map** [2] - 64:22, 64:24
**maps** [3] - 64:20, 75:18
**marked** [4] - 24:10, 24:15, 24:17, 25:2
**Marked** [1] - 113:19
**markup** [1] - 15:8
**massaging** [1] - 104:2
**massive** [1] - 38:9
**matching** [2] - 100:13, 100:14
**material** [1] - 4:22
**materially** [1] - 9:19
**matter** [7] - 23:7, 51:10, 65:14, 88:7, 101:19, 101:24, 114:4
**matters** [9] - 7:23, 8:1, 68:1, 77:17, 97:10, 100:24, 100:25, 101:16, 112:6
**MATTHEW** [1] - 2:3
**Matthew** [1] - 4:7
**maximum** [15] - 31:2, 31:6, 32:7, 45:7, 45:16, 61:17, 61:24, 63:3, 64:7, 68:24, 69:25, 82:19, 84:4, 85:1, 88:6
**maximums** [2] - 7:7, 7:8
**mean** [15] - 8:19, 12:12, 34:7, 34:20, 44:11, 52:13, 59:21, 71:20, 79:4, 91:14, 91:15, 91:16, 96:24, 111:10, 111:11
**meaning** [3] - 62:5, 79:5, 91:8
**means** [5] - 13:25, 58:9, 81:13, 96:11, 99:13
**meant** [1] - 66:12
**measure** [1] - 105:6
**measures** [2] - 47:5, 47:15

PDF created with pdfFactory trial version www.pdffactory.com

measuring [1] - 90:1
mediate [1] - 47:7
medical [1] - 48:3
meet [4] - 28:4, 28:6, 87:23, 88:10
members [5] - 36:23, 36:25, 37:2, 37:11, 37:14
mention [4] - 11:7, 27:23, 50:21, 86:25
mentioned [2] - 38:3, 86:17
mere [1] - 49:4
merely [3] - 54:13, 89:19, 109:16
merges [1] - 95:23
met [8] - 7:7, 7:8, 10:10, 16:9, 18:16, 27:2, 88:22, 99:6
meteorological [1] - 88:3
methodologies [3] - 10:25, 104:19, 109:2
methodology [7] - 6:7, 6:8, 9:3, 10:25, 104:21, 109:6, 109:7
metric [5] - 55:17, 62:9, 63:5, 63:6, 81:3
metrics [7] - 60:11, 60:12, 64:18, 81:2, 104:19, 104:21
micromanagement [1] - 11:25
middle [2] - 27:25, 104:7
might [5] - 22:18, 35:9, 96:20, 101:23, 103:10
migration [1] - 107:24
miles [2] - 31:2, 31:22
million [4] - 91:10, 91:11, 91:13, 106:21
million-and-a-half [1] - 106:21
mind [3] - 58:16, 70:1, 88:1
Mine [1] - 101:8
Minimal [1] - 47:1
minimize [5] - 42:13, 92:1, 93:21, 94:9, 99:25
minimizing [1] - 67:1
minimum [3] - 6:12, 13:12, 91:3
minute [7] - 10:14, 20:22, 66:1, 100:23, 101:16, 101:24, 102:3
minutes [13] - 22:22,

23:3, 56:16, 56:20, 97:9, 97:11, 101:11, 101:14, 102:1, 102:17, 102:18, 108:15, 109:23
misplaced [1] - 43:4
missed [1] - 65:19
misses [1] - 50:18
missing [3] - 55:12, 77:14
mobiles [1] - 108:23
mobility [1] - 44:17
model [22] - 6:9, 6:12, 29:7, 29:8, 32:11, 32:12, 32:15, 32:17, 32:19, 32:24, 33:4, 44:14, 78:22, 84:17, 105:8, 105:10, 106:2, 109:4, 109:6, 109:7, 109:8
modeled [8] - 57:7, 62:2, 62:8, 62:22, 73:11, 81:25, 88:1, 88:4
modeling [18] - 6:8, 44:15, 45:9, 65:23, 78:1, 78:7, 78:18, 79:8, 79:23, 79:25, 80:2, 80:9, 82:16, 88:22, 105:20, 105:23, 106:5, 109:3
modelings [2] - 105:25, 106:4
models [4] - 9:3, 29:7, 84:16, 104:20
modern [2] - 75:25, 82:21
moment [5] - 10:23, 62:12, 63:23, 64:3, 82:11
monitor [2] - 76:14, 86:22
monitoring [24] - 6:8, 6:12, 6:14, 20:25, 21:3, 21:20, 30:7, 30:20, 31:8, 31:13, 32:23, 43:17, 45:10, 48:3, 78:2, 78:9, 78:11, 79:10, 79:19, 80:3, 80:7, 83:6, 84:4
Monitoring [1] - 22:3
monoxide [3] - 87:5, 88:7, 90:16
Montana [1] - 21:10
Montero [2] - 3:17, 108:19
MONTERO [75] - 2:6, 3:17, 4:2, 22:10, 22:15, 25:9, 57:2,

57:4, 57:8, 57:14, 57:18, 57:23, 58:4, 58:10, 58:13, 58:21, 59:2, 59:5, 59:11, 59:13, 59:16, 59:22, 60:4, 60:10, 60:19, 60:21, 60:23, 61:11, 61:14, 61:22, 62:6, 63:1, 63:7, 63:14, 63:18, 64:1, 64:10, 64:13, 65:17, 65:21, 67:11, 67:14, 67:16, 68:5, 68:13, 68:16, 68:21, 68:23, 69:2, 69:7, 69:23, 70:25, 71:22, 72:6, 74:8, 74:15, 76:22, 76:25, 77:4, 77:11, 77:24, 78:14, 78:17, 80:12, 82:25, 84:23, 85:25, 86:4, 90:5, 90:8, 91:1, 97:12, 111:8, 111:15, 112:4
morning [13] - 3:9, 3:12, 3:13, 3:16, 3:19, 3:20, 3:23, 4:6, 8:2, 38:19, 40:5, 43:17, 92:6
most [22] - 5:11, 14:21, 31:11, 39:22, 40:2, 43:24, 56:5, 58:25, 62:9, 62:10, 63:6, 65:2, 82:19, 83:13, 83:24, 84:2, 84:5, 91:17, 105:25, 109:4, 110:17
motion [2] - 73:23, 10:6
MOTIONS [1] - 1:17
motions [1] - 74:12
move [4] - 80:14, 80:17, 84:9, 98:19
movement [1] - 99:3
moves [1] - 83:8
Moving [1] - 97:7
MPA [1] - 81:16
MPCA [2] - 54:4, 93:8
MPS [10] - 5:20, 5:24, 6:2, 6:4, 6:14, 6:16, 6:18, 63:4, 87:14, 106:11
MR [175] - 3:9, 3:13, 3:17, 3:20, 4:2, 4:7, 8:7, 8:9, 8:13, 8:22, 9:1, 9:12, 11:10, 12:1, 12:19, 12:23, 13:6, 13:19, 14:9, 14:17, 16:12, 16:15, 16:17, 16:25, 19:25, 20:2, 20:5, 20:7,

20:10, 20:12, 22:1, 22:5, 22:10, 22:13, 22:15, 23:9, 23:17, 23:20, 23:24, 24:4, 24:12, 24:19, 24:22, 25:4, 25:9, 25:17, 25:24, 26:5, 28:24, 29:2, 29:6, 29:12, 29:16, 30:4, 30:11, 33:22, 34:2, 34:5, 34:9, 34:15, 35:3, 35:18, 36:10, 36:20, 36:22, 37:2, 37:5, 37:9, 37:14, 37:21, 38:2, 38:6, 38:14, 38:18, 38:20, 39:3, 39:15, 39:21, 40:10, 48:24, 51:14, 51:20, 52:1, 52:8, 52:11, 52:14, 52:18, 53:3, 54:9, 56:15, 56:18, 56:21, 57:2, 57:4, 57:8, 57:14, 57:18, 57:23, 58:4, 58:10, 58:13, 58:21, 59:2, 59:5, 59:11, 59:13, 59:16, 59:22, 60:4, 60:10, 60:19, 60:21, 60:23, 61:11, 61:14, 61:22, 62:6, 63:1, 63:7, 63:14, 63:18, 64:1, 64:10, 64:13, 65:17, 65:19, 65:21, 67:11, 67:14, 67:16, 68:5, 68:13, 68:16, 68:21, 68:23, 69:2, 69:7, 69:23, 70:25, 71:22, 72:6, 74:8, 74:15, 76:22, 76:25, 77:4, 77:11, 77:24, 78:14, 78:17, 80:12, 82:25, 84:23, 85:25, 86:4, 90:5, 90:8, 91:1, 97:12, 101:6, 101:8, 101:11, 101:14, 101:22, 102:22, 103:2, 103:17, 107:14, 107:16, 108:17, 109:24, 111:8, 111:15, 112:3, 112:4
MRL [3] - 47:1, 91:6, 91:16
MRLs [2] - 48:9, 91:9
MT [1] - 1:22
multiple [2] - 85:7, 108:3
must [8] - 5:24, 22:7, 53:22, 93:17, 93:21, 94:5, 94:6, 109:11

N

N.W [3] - 2:4, 2:7, 2:18
NAC [3] - 89:25, 90:13, 90:17
NACs [3] - 90:2, 90:5, 90:19
nail [1] - 107:7
name [1] - 3:20
namely [1] - 10:12
names [1] - 3:24
national [18] - 10:15, 10:16, 12:11, 15:18, 19:14, 19:17, 27:13, 36:6, 39:23, 40:3, 55:19, 87:23, 91:25, 96:5, 97:2, 99:5, 110:20
NATIONAL [1] - 1:10
National [23] - 2:3, 3:4, 3:10, 3:18, 8:16, 10:13, 18:15, 21:9, 22:3, 26:8, 36:4, 36:18, 36:23, 38:11, 39:7, 42:3, 42:4, 43:25, 51:17, 85:23, 98:24, 110:9
natural [13] - 18:5, 18:9, 27:14, 29:22, 30:2, 55:13, 66:24, 67:8, 98:1, 98:5, 106:12, 106:24, 107:5
Natural [1] - 22:3
nature [2] - 6:15, 7:18
navigate [1] - 52:20
nearly [1] - 99:1
necessary [12] - 18:19, 18:24, 35:10, 42:17, 42:20, 87:21, 88:14, 90:22, 96:18, 96:21, 96:22, 96:24
necessity [1] - 42:23
need [13] - 8:1, 8:5, 14:20, 32:8, 34:19, 35:5, 56:22, 68:17, 73:16, 101:12, 101:15, 101:25, 111:7
needed [1] - 91:8
needs [1] - 111:13
negligible [1] - 67:22
NEPA [8] - 11:8, 80:14, 80:18, 80:24, 99:11, 107:18, 108:6
new [3] - 15:6, 29:11, 44:8
next [6] - 1:25, 17:19, 27:23, 57:10, 71:3,

PDF created with pdfFactory trial version www.pdffactory.com

83:24
**night** [2] - 83:22
**nine** [1] - 90:17
**ninety** [5] - 58:23, 59:7, 59:9, 61:10, 87:4
**Ninety** [1] - 59:6
**noise** [13] - 31:12, 32:19, 33:2, 43:16, 43:18, 44:7, 45:6, 45:17, 47:1, 49:18, 108:8, 110:4
**noises** [2] - 32:17, 45:12
**non** [5] - 74:4, 83:25, 84:5, 87:3, 90:1
**non-ATV** [3] - 83:25, 84:5, 87:3
**non-impairment** [1] - 74:4
**nonactive** [1] - 33:25
**None** [1] - 113:5
**none** [1] - 10:9
**Nonetheless** [2] - 103:8, 106:25
**nonetheless** [1] - 97:3
**nonimpact** [1] - 55:6
**nonimpairment** [1] - 55:5
**noon** [2] - 8:2, 111:2
**Noon** [1] - 111:16
**normal** [1] - 75:25
**notably** [2] - 41:19, 105:25
**Note** [1] - 94:4
**note** [5] - 43:9, 58:6, 91:13, 104:22, 105:22
**noted** [5] - 47:14, 54:5, 54:23, 56:1, 91:14
**notes** [4] - 42:11, 50:10, 50:12, 77:8
**nothing** [9] - 12:19, 18:13, 29:11, 54:5, 55:25, 62:22, 94:20, 110:4, 110:10
**notify** [1] - 111:23
**noting** [2] - 107:9, 108:2
**notion** [3] - 46:14, 92:8, 110:14
**nouns** [1] - 19:13
**novel** [1] - 106:7
**number** [78] - 5:15, 7:9, 7:10, 14:15, 16:7, 20:14, 20:17, 20:18, 21:3, 21:4, 21:11, 21:12, 21:18, 21:20, 23:12, 25:10,

25:12, 25:13, 25:18, 26:4, 26:25, 27:5, 30:1, 30:21, 42:19, 44:8, 47:24, 48:19, 49:14, 49:17, 56:22, 57:11, 57:18, 62:21, 64:18, 65:13, 67:21, 68:12, 68:23, 69:8, 69:11, 69:12, 69:13, 70:1, 70:3, 70:4, 70:9, 70:19, 70:21, 71:3, 71:7, 71:17, 71:22, 73:8, 73:10, 73:15, 75:2, 75:4, 77:12, 79:16, 83:17, 83:18, 83:19, 85:6, 86:13, 86:17, 103:11, 103:22, 104:4, 105:24, 108:7, 108:22
**numbered** [1] - 17:8
**numbers** [42] - 5:19, 19:20, 20:13, 20:21, 21:17, 21:22, 21:23, 22:6, 22:18, 22:19, 23:22, 23:25, 24:1, 25:10, 25:22, 25:24, 26:2, 30:19, 31:15, 31:18, 32:1, 32:3, 36:14, 49:3, 49:9, 49:25, 50:7, 50:8, 58:24, 71:25, 72:2, 72:3, 72:5, 72:23, 76:3, 76:6, 103:22, 103:23, 103:24, 103:25, 104:11, 108:19
**numerical** [1] - 90:9
**NW** [1] - 2:22

## O

**o'clock** [2] - 83:23, 101:24
**object** [1] - 22:16
**objected** [1] - 104:15
**objection** [5] - 19:22, 22:9, 22:12, 25:6, 63:10
**objections** [3] - 27:3, 107:18, 107:20
**objective** [3] - 78:20, 81:22, 81:24
**objectors** [1] - 26:24
**objects** [1] - 19:15
**obligation** [2] - 46:18, 56:1
**oblige** [1] - 80:20
**obscure** [1] - 80:23

obscures [1] - 81:9
**observed** [5] - 50:2, 57:19, 57:20, 79:10, 81:20
**obtained** [2] - 43:5, 58:6
**obviously** [6] - 10:6, 33:15, 77:4, 80:23, 98:14, 105:21
**occasion** [1] - 68:6
**occasions** [1] - 88:2
**occupational** [1] - 91:18
**occur** [8] - 17:22, 55:18, 72:10, 75:12, 86:20, 99:20, 99:22
**occurred** [4] - 47:17, 68:24, 71:18, 74:24
**occurring** [1] - 6:17
**occurs** [2] - 17:20, 95:15
**odd** [1] - 83:4
**odds** [2] - 42:6, 49:24
**OF** [3] - 1:1, 1:13, 1:17
**off-road** [1] - 27:22
**offer** [8] - 30:4, 53:4, 53:16, 53:21, 54:6, 54:17, 64:24, 110:9
**offered** [5] - 51:3, 51:9, 56:6, 70:20, 110:2
**offers** [3] - 14:21, 17:21, 48:3
**offhand** [1] - 90:12
**official** [2] - 10:17, 17:2
**Official** [2] - 2:21, 114:2
**officially** [1] - 7:14
**old** [1] - 107:21
**Old** [11] - 30:25, 31:3, 31:11, 31:14, 31:17, 32:6, 43:19, 43:24, 45:4, 46:4, 83:14
**older** [1] - 108:9
**One** [7] - 14:10, 38:16, 80:21, 88:3, 101:17, 105:2, 107:18
**one** [63] - 4:8, 16:8, 26:21, 27:9, 28:19, 29:9, 31:11, 31:18, 31:19, 36:8, 37:10, 37:11, 38:3, 38:10, 39:22, 44:1, 44:15, 47:9, 47:17, 50:25, 52:21, 57:16, 58:17, 59:5, 59:22, 60:10, 60:12, 64:10, 65:17, 65:18, 69:5, 69:17, 69:18, 73:12, 75:7,

75:16, 75:17, 77:12, 79:18, 81:7, 82:16, 82:17, 83:12, 85:11, 86:8, 87:7, 87:9, 88:23, 90:8, 90:13, 90:14, 94:2, 94:3, 94:14, 98:19, 101:24, 104:24, 105:10, 108:18, 111:17, 112:2
**ones** [2] - 44:23, 107:15
**open** [3] - 28:21, 77:16, 105:3
**opened** [1] - 43:9
**operates** [1] - 15:8
**opinion** [3] - 41:10, 103:6, 104:12
**opponents** [1] - 20:8
**opportunity** [2] - 7:24, 77:21
**opposed** [5] - 11:23, 69:21, 73:8, 85:4, 85:7
**opposite** [1] - 53:18
**opposition** [2] - 38:9, 73:22
**optimistic** [1] - 52:11
**option** [1] - 92:14
**order** [22] - 4:16, 7:5, 11:11, 11:16, 12:13, 13:11, 17:25, 24:25, 34:12, 34:16, 35:13, 40:2, 50:4, 51:22, 52:2, 71:4, 74:23, 75:3, 78:21, 80:20, 97:19, 102:15
**orders** [8] - 5:1, 53:6, 53:15, 53:20, 53:23, 80:19, 97:13, 97:15
**organic** [1] - 48:6
**Organic** [25] - 10:18, 17:3, 35:23, 40:4, 40:6, 46:7, 54:20, 80:17, 87:10, 87:12, 88:8, 88:10, 88:11, 89:15, 89:22, 92:19, 92:20, 93:1, 94:8, 96:10, 99:9, 99:10, 99:15, 100:3, 106:8
**originally** [1] - 103:19
**OSV** [2] - 33:8, 61:7
**OSVs** [5] - 5:8, 32:6, 33:24, 33:25, 59:20
**otherwise** [2] - 28:5, 54:3
**ought** [2] - 48:13, 108:13
**ourselves** [1] - 106:14
**outcry** [1] - 15:18

**outpouring** [1] - 38:9
**Outside** [1] - 28:1
**outside** [4] - 30:15, 30:17, 37:24, 37:25
**Over-snow** [1] - 49:25
**overall** [2] - 6:22, 61:13
**overriding** [2] - 14:6, 56:4
**oversnow** [10] - 23:13, 43:18, 44:10, 61:3, 65:1, 69:18, 79:4, 84:14, 89:2, 89:5
**owe** [1] - 11:2
**owed** [4] - 8:20, 9:16, 10:15, 10:19
**own** [20] - 9:4, 9:6, 10:12, 15:8, 25:19, 40:12, 42:10, 43:15, 43:20, 48:11, 48:12, 50:3, 53:18, 59:21, 60:8, 64:24, 95:21, 103:18, 110:4

## P

**p.m** [6] - 30:16, 102:4, 102:7, 102:13, 102:16, 112:7
**P.O** [2] - 2:10, 2:14
**pact** [1] - 18:20
**page** [46] - 1:25, 6:19, 17:8, 17:19, 23:10, 23:11, 25:11, 30:14, 31:8, 31:17, 56:25, 57:3, 60:18, 63:22, 63:23, 63:24, 64:5, 64:10, 64:12, 64:14, 64:22, 65:12, 65:19, 66:25, 67:6, 67:14, 67:24, 70:25, 71:3, 72:16, 72:17, 72:18, 78:4, 78:8, 78:14, 79:13, 79:14, 82:12, 82:14, 82:22, 83:15, 83:21, 108:20
**pages** [21] - 27:18, 30:12, 55:4, 63:22, 64:3, 64:3, 72:7, 89:7, 111:3, 111:4, 111:5, 111:6, 111:7, 111:9, 111:11, 111:12, 111:14, 114:3
**Pandora's** [1] - 105:4
**paper** [1] - 70:20
**paragraph** [6] - 28:1, 64:15, 71:4, 71:11, 71:12, 103:17

PDF created with pdfFactory trial version www.pdffactory.com

paragraphs [1] - 16:24
paramount [3] - 14:5, 40:8, 77:2
paraphrasing [1] - 66:21
pardon [1] - 89:13
park [98] - 6:1, 6:21, 6:24, 7:1, 7:13, 12:11, 14:6, 14:11, 14:15, 15:11, 16:1, 18:25, 19:3, 19:6, 19:10, 21:4, 27:14, 28:3, 30:24, 32:2, 35:11, 39:12, 39:18, 39:23, 40:3, 40:7, 40:18, 40:21, 41:5, 41:15, 42:2, 42:14, 42:15, 42:18, 44:9, 44:12, 44:19, 44:22, 45:11, 45:12, 45:18, 46:17, 47:10, 47:18, 48:4, 48:13, 49:13, 49:20, 51:6, 55:21, 58:25, 59:8, 59:10, 59:20, 61:13, 61:15, 62:3, 62:9, 63:1, 63:5, 64:4, 64:6, 64:15, 64:16, 65:2, 65:23, 66:13, 67:9, 71:5, 73:3, 74:6, 76:17, 79:17, 80:24, 80:25, 81:3, 81:9, 83:11, 85:5, 85:13, 87:14, 88:2, 91:25, 92:4, 93:22, 94:24, 96:6, 99:14, 99:18, 104:10, 107:21, 108:6, 108:11, 110:20
Park [101] - 3:18, 5:16, 5:17, 7:4, 7:18, 8:16, 10:13, 12:25, 15:7, 15:10, 15:17, 15:19, 15:21, 18:15, 20:20, 20:21, 21:9, 22:3, 22:7, 26:8, 26:12, 36:4, 36:13, 36:18, 37:10, 38:11, 39:7, 40:1, 40:6, 40:12, 41:4, 41:11, 41:22, 41:24, 42:3, 42:4, 42:9, 42:13, 43:3, 43:25, 45:23, 45:24, 46:8, 46:18, 48:18, 49:14, 50:11, 50:12, 50:13, 50:17, 50:24, 51:7, 51:17, 51:21, 52:2, 52:9, 52:12, 52:15, 52:19, 52:20, 52:22, 53:6, 53:19,

53:21, 54:24, 56:2, 56:3, 60:12, 67:9, 70:11, 73:25, 74:1, 75:3, 75:21, 75:22, 76:4, 76:5, 82:17, 84:13, 85:23, 90:20, 93:15, 93:16, 93:20, 97:5, 97:18, 97:22, 97:24, 98:3, 98:6, 98:24, 99:13, 105:6, 106:4, 106:8, 107:1, 109:3, 109:11, 110:9, 110:14
park's [9] - 7:15, 18:9, 18:10, 41:3, 46:5, 90:3, 95:13, 98:1, 98:5
park-wide [11] - 61:15, 62:9, 63:5, 64:4, 64:6, 64:15, 64:16, 79:17, 80:24, 80:25, 81:3
parking [1] - 106:23
parks [14] - 19:17, 27:13, 36:6, 40:14, 41:13, 42:17, 43:21, 61:1, 71:17, 92:22, 96:5, 97:1, 99:5, 99:6
PARKS [1] - 1:10
Parks [3] - 2:3, 3:4, 3:10
parrot [1] - 54:25
parsed [1] - 5:3
part [16] - 10:16, 23:2, 24:10, 24:14, 37:19, 59:1, 62:11, 65:2, 71:9, 81:17, 83:25, 84:2, 86:5, 90:14, 98:3, 98:10
Part [1] - 80:24
participated [1] - 88:17
particular [6] - 46:4, 53:22, 53:25, 67:2, 67:23, 103:18
particularly [1] - 105:22
particulate [1] - 88:7
particulates [1] - 88:15
parties [6] - 4:15, 5:10, 7:20, 7:24, 19:21, 22:24
parts [6] - 65:2, 88:1, 90:15, 91:10, 91:11, 91:12
party [3] - 28:21, 77:18, 77:21
pass [3] - 16:24, 31:6,

58:5
Pass [4] - 67:12, 67:13, 67:17, 67:19
past [5] - 47:10, 55:12, 57:13, 74:5, 104:13
path [1] - 36:15
paths [1] - 32:25
pattern [1] - 43:5
peacefulness [2] - 14:12, 14:22
peak [5] - 49:5, 71:13, 71:17, 71:18, 103:12
people [16] - 14:13, 14:14, 14:15, 14:21, 33:3, 47:14, 65:7, 65:8, 66:14, 66:16, 71:16, 73:3, 81:4, 84:1, 100:25
per [22] - 23:13, 25:12, 33:11, 62:22, 63:5, 64:7, 64:25, 67:20, 71:7, 71:8, 71:13, 73:3, 73:13, 85:3, 86:7, 87:8, 88:5, 90:15, 91:10, 91:11, 91:12
percent [37] - 5:8, 6:10, 6:11, 6:25, 7:1, 32:6, 32:7, 34:25, 43:19, 44:7, 44:11, 44:18, 44:19, 58:24, 59:6, 59:8, 59:9, 59:10, 59:18, 59:19, 59:23, 60:1, 61:4, 61:9, 61:10, 63:2, 65:10, 66:6, 75:17, 75:20, 87:4, 87:5, 89:1, 104:25
percentage [6] - 33:25, 34:4, 58:25, 66:2, 66:10, 89:2
percentile [1] - 44:17
perfect [1] - 79:19
performed [4] - 21:1, 21:3, 21:19, 21:21
perhaps [4] - 16:2, 37:17, 43:24, 100:18
period [4] - 20:20, 20:23, 21:1, 33:9
periods [2] - 21:2, 83:21
permissible [1] - 19:22
permission [1] - 29:17
permit [10] - 14:10, 18:19, 19:4, 20:17, 28:13, 34:12, 34:17, 34:18, 34:21
permits [1] - 35:14
permitted [4] - 14:20,

33:1, 87:25, 89:19
permitting [2] - 25:25, 27:5
persist [1] - 45:19
pertains [1] - 58:3
phase [3] - 11:12, 11:16, 11:23, 12:4, 52:5
phase-out [1] - 11:16
phases [1] - 13:5
phone [2] - 103:1, 109:25
phraseology [1] - 16:11
physiological [1] - 72:12
pick [2] - 20:18, 109:5
picked [1] - 88:2
piece [1] - 70:20
piecemeal [1] - 77:5
pinch [1] - 104:5
place [16] - 30:15, 30:17, 30:20, 31:1, 31:5, 31:21, 37:9, 42:5, 43:24, 46:13, 51:12, 51:15, 52:17, 58:16, 100:3
places [9] - 14:18, 14:19, 14:23, 19:18, 40:16, 56:5, 65:7, 66:14, 88:4
plainly [1] - 93:16
Plaintiff [4] - 1:5, 1:11, 1:20, 2:2
plaintiff [3] - 3:10, 109:12, 111:4
plaintiffs [29] - 13:7, 26:24, 38:17, 43:11, 48:11, 63:11, 65:5, 69:10, 73:12, 80:12, 80:21, 81:6, 88:8, 90:25, 92:6, 93:23, 97:6, 97:20, 98:11, 98:19, 100:1, 100:7, 100:17, 101:3, 106:9, 106:19, 108:15, 110:22, 111:5
plaintiffs' [10] - 8:3, 73:23, 90:24, 92:19, 93:6, 93:14, 93:18, 95:12, 95:20, 104:18
Plaintiffs' [5] - 24:16, 24:17, 25:2, 25:7, 113:18
Plan [20] - 5:6, 6:1, 30:16, 43:13, 58:19, 58:20, 60:2, 62:2, 62:3, 62:24, 72:23, 73:24, 74:11, 76:8,

76:19, 86:19, 89:9, 89:12, 98:11, 100:14
plan [31] - 5:9, 6:3, 6:20, 12:21, 12:22, 12:24, 13:13, 13:16, 15:19, 20:17, 37:12, 44:20, 44:23, 47:22, 49:8, 49:11, 50:1, 51:12, 51:21, 51:22, 52:17, 54:18, 76:14, 84:14, 85:24, 90:20, 100:16, 108:6
planned [1] - 28:19
planning [4] - 18:10, 28:3, 76:8, 79:12
plans [2] - 69:24, 108:1
plausible [1] - 93:16
playground [1] - 12:12
pleading [1] - 97:9
pleadings [1] - 102:19
pleasure [1] - 100:20
plenty [2] - 16:24, 79:9
point [42] - 12:19, 13:7, 13:24, 14:25, 23:25, 26:5, 27:9, 28:22, 28:23, 29:20, 29:21, 32:1, 43:14, 44:25, 47:3, 47:22, 48:25, 50:19, 51:19, 57:25, 60:8, 65:5, 66:18, 66:20, 67:2, 68:3, 68:18, 71:9, 71:12, 71:22, 73:11, 75:25, 76:4, 80:4, 81:18, 83:11, 83:15, 86:4, 97:10, 107:17, 108:18, 108:24
Point [1] - 68:14
pointed [1] - 108:21
pointing [3] - 69:11, 69:12, 72:22
points [26] - 5:10, 5:11, 5:12, 23:3, 29:9, 29:13, 29:16, 38:24, 38:25, 53:4, 65:23, 76:20, 76:23, 77:2, 77:4, 77:9, 77:13, 77:19, 77:22, 77:23, 80:6, 83:10, 83:12, 90:25, 110:25, 111:19
polar [1] - 106:1
policies [33] - 9:6, 10:16, 10:20, 15:5, 15:7, 15:20, 16:4, 16:5, 16:13, 16:22, 17:1, 17:2, 17:3, 18:6, 41:9, 42:9,

PDF created with pdfFactory trial version www.pdffactory.com

53:19, 55:2, 55:7, 55:8, 75:1, 87:11, 91:24, 93:7, 93:14, 93:17, 93:19, 96:2, 96:17, 98:13, 106:18
**policy** [14] - 17:17, 18:21, 27:18, 27:20, 40:12, 53:15, 53:17, 53:25, 69:13, 94:5, 94:10, 94:19, 95:21, 100:2
**political** [8] - 10:1, 36:5, 36:8, 36:14, 54:14, 55:25, 105:18, 110:18
**pollutant** [1] - 88:17
**pollution** [1] - 84:16
**popular** [2] - 31:11, 83:13
**population** [3] - 35:4, 72:10, 72:13
**populations** [2] - 89:6, 108:11
**Porter** [3] - 2:3, 4:8, 4:21
**portion** [2] - 67:9, 96:15
**portions** [1] - 10:21
**portrays** [1] - 46:25
**posed** [1] - 47:4
**position** [7] - 10:3, 12:7, 52:6, 93:5, 95:12, 109:12, 111:25
**positive** [2] - 62:3, 62:5
**possible** [7] - 14:1, 55:21, 64:17, 80:5, 81:21, 94:9, 99:25
**potential** [1] - 105:4
**practicable** [1] - 93:22
**practical** [1] - 36:16
**pre** [1] - 75:4
**pre-determined** [1] - 75:4
**precedent** [2] - 41:9, 52:19
**precipitated** [1] - 104:6
**precipitous** [1] - 104:8
**precisely** [1] - 88:20
**predetermined** [1] - 75:2
**predicted** [2] - 84:16, 87:23
**predicts** [1] - 65:24
**predominant** [10] - 5:24, 15:14, 40:14, 92:2, 95:7, 96:9, 96:12, 109:19,

109:20
**predominate** [1] - 42:11
**predominating** [1] - 63:14
**prefer** [1] - 73:12
**preferred** [1] - 81:19
**preliminary** [2] - 6:15, 7:17
**premise** [1] - 48:14
**prepared** [8] - 20:19, 20:24, 21:24, 39:14, 67:23, 78:9, 96:19, 107:19
**prepares** [1] - 83:23
**present** [1] - 68:2
**presentation** [2] - 24:15, 66:19
**presented** [2] - 40:25, 46:10
**presents** [3] - 39:5, 60:2, 60:17
**preservation** [1] - 14:6
**preserve** [2] - 40:16, 76:17
**Presidents'** [1] - 47:13
**pressing** [1] - 39:22
**pressure** [1] - 36:14
**Presumably** [2] - 23:18, 23:19, 23:20
**presumption** [2] - 9:16, 9:23
**pretty** [1] - 29:24, 108:10
**prevail** [1] - 93:18
**prevent** [3] - 6:17, 18:24, 71:4
**previous** [3] - 71:14, 71:18, 95:8
**primarily** [3] - 14:12, 46:12, 82:5
**primary** [1] - 66:21, 66:24, 88:12, 88:13
**prime** [1] - 45:9
**principal** [7] - 7:25, 38:24, 39:13, 68:2, 77:21, 77:23, 97:10
**principle** [1] - 76:23
**principles** [2] - 56:3, 94:6
**privy** [1] - 107:11
**problem** [17] - 7:17, 29:25, 35:25, 36:1, 42:23, 44:25, 45:9, 46:17, 46:25, 50:10, 50:25, 53:3, 56:9, 76:5, 83:6, 97:20, 109:6
**problems** [9] - 29:4, 44:14, 44:15, 45:3,

45:19, 46:1, 103:18, 105:2, 108:8
**procedural** [5] - 8:11, 11:6, 27:3, 107:18, 110:15
**procedure** [2] - 17:24, 80:15
**Procedure** [6] - 8:24, 9:14, 10:3, 11:7, 11:15, 26:17
**proceed** [1] - 101:23
**proceeded** [1] - 105:25
**proceeding** [1] - 4:13
**proceedings** [1] - 114:4
**Proceedings** [2] - 2:25, 112:7
**process** [4] - 9:13, 15:3, 15:5, 18:10, 35:19, 58:16, 75:24, 76:7, 76:10, 76:12, 79:12, 86:5, 105:18, 105:19
**produce** [2] - 11:1, 87:4
**produced** [2] - 2:25, 15:18, 62:10, 107:22
**produces** [1] - 109:7
**producing** [1] - 31:12
**professional** [1] - 87:13
**professionals** [3] - 10:1, 36:4, 36:13
**profile** [1] - 105:24
**profound** [1] - 16:6
**profoundly** [1] - 35:24
**Program** [3] - 73:18, 74:3, 74:6
**program** [4] - 73:19, 74:1, 74:2, 85:14
**progress** [1] - 102:10
**prohibit** [1] - 16:20
**prohibited** [1] - 87:12
**prohibits** [1] - 17:12
**projections** [1] - 106:2
**promised** [1] - 102:18
**promises** [2] - 46:19, 48:3
**prompted** [1] - 107:24
**promulgate** [4] - 13:5, 13:16, 52:2, 52:7
**promulgated** [1] - 49:11
**promulgating** [1] - 52:23
**promulgation** [1] - 53:1
**properly** [1] - 82:18
**proposal** [2] - 53:21,

92:15
**propose** [1] - 22:5
**proposed** [6] - 15:24, 16:3, 84:24, 91:25, 92:3, 103:20
**proposition** [2] - 30:5, 109:1
**protect** [8] - 40:2, 41:13, 41:15, 42:5, 74:6, 76:17, 88:14, 88:16
**protected** [2] - 74:22, 110:20
**protecting** [2] - 18:4, 88:11
**protection** [3] - 15:25, 35:11, 85:15
**protections** [2] - 46:5, 46:21
**protects** [1] - 40:18
**prove** [3] - 48:4, 54:18, 92:11
**proven** [1] - 84:25
**provide** [18] - 28:11, 34:16, 35:13, 36:13, 40:10, 40:24, 41:2, 42:25, 68:9, 69:7, 78:20, 86:1, 86:22, 89:19, 95:18, 100:17, 109:16
**provided** [5] - 15:8, 33:25, 81:13, 81:14, 87:21, 96:7, 100:11
**provides** [6] - 23:12, 40:6, 43:6, 44:20, 52:3, 65:13
**providing** [6] - 4:21, 19:8, 38:23, 41:21, 95:6, 96:8
**provision** [1] - 10:20
**provisionally** [1] - 22:20
**provisions** [7] - 14:2, 15:4, 18:4, 30:6, 53:8, 53:18, 54:12
**proviso** [1] - 25:15
**public** [10] - 37:15, 40:2, 56:6, 56:7, 74:5, 75:3, 81:14, 88:15, 105:18, 110:17
**published** [1] - 21:8
**pulled** [1] - 104:1
**punch** [1] - 104:14
**purport** [2] - 62:16, 92:11
**purpose** [7] - 18:20, 19:2, 19:3, 19:6, 78:19, 80:9, 80:24
**purposes** [8] - 13:14,

18:6, 18:25, 35:9, 42:17, 61:24, 92:21, 92:23
**pursuant** [1] - 47:2
**put** [4] - 52:5, 52:17, 81:7, 103:5

**Q**

**qualitative** [3] - 75:1, 82:1, 90:10
**qualities** [1] - 19:16
**quality** [18] - 7:12, 7:15, 55:19, 55:21, 71:6, 73:5, 80:4, 80:5, 80:6, 87:22, 87:23, 87:24, 88:14, 89:25, 90:3, 90:19, 96:6
**query** [8] - 5:20, 6:4, 6:17, 7:7, 7:10, 7:14, 8:19, 22:19
**questions** [13] - 13:22, 16:8, 28:18, 39:6, 56:22, 56:23, 77:6, 77:7, 84:19, 84:21, 100:9, 105:21, 111:21
**quickest** [1] - 63:19
**quickly** [2] - 102:23, 107:9
**quiet** [3] - 14:22, 66:17, 66:22
**quieter** [2] - 40:21, 87:4
**quietly** [1] - 16:2
**quietude** [1] - 14:12
**quite** [8] - 39:10, 39:12, 39:18, 42:8, 66:11, 70:5, 74:21, 101:1
**quote** [7] - 31:5, 31:6, 73:20, 87:11, 89:18, 96:4
**quote/unquote** [2] - 6:21, 7:14
**quoting** [1] - 66:21

**R**

**radical** [2] - 12:5, 38:10
**raised** [5] - 13:22, 28:23, 29:10, 33:7, 90:21
**raising** [1] - 48:11
**Range** [1] - 65:12
**range** [7] - 21:6, 60:2,

PDF created with pdfFactory trial version www.pdffactory.com

61:10, 66:3, 66:8, 66:10, 104:6
**ranger** [2] - 85:12, 85:13
**ranges** [1] - 66:9
**ranging** [2] - 98:7, 98:21
**rank** [1] - 64:17
**ranking** [1] - 64:14
**ranks** [1] - 64:16
**rate** [1] - 87:24
**Rather** [1] - 99:17
**rather** [5] - 44:1, 48:8, 73:1, 73:10, 73:14
**ratio** [1] - 44:19
**rationale** [2] - 11:22, 111:24
**rationalization** [3] - 26:6, 68:11, 69:1
**re** [1] - 109:16
**re-creation** [1] - 109:16
**reached** [6] - 5:18, 5:22, 7:11, 36:8, 62:21, 87:1
**reaching** [2] - 14:25, 106:17
**read** [12] - 57:7, 67:24, 71:10, 82:9, 85:11, 92:25, 93:15, 94:7, 96:3, 101:13, 102:19
**reading** [4] - 64:12, 92:20, 93:18, 96:10
**reads** [2] - 58:17, 93:20
**realistic** [1] - 65:24
**reality** [4] - 36:16, 70:16, 70:18, 90:11
**really** [11] - 8:5, 41:19, 42:23, 43:6, 61:25, 64:4, 69:15, 80:25, 81:22, 97:21, 110:17
**realtime** [1] - 4:16
**reason** [27] - 5:14, 9:21, 9:23, 16:17, 23:3, 26:17, 26:18, 38:8, 45:1, 45:4, 45:16, 46:13, 48:19, 49:16, 54:14, 62:8, 64:5, 66:21, 66:23, 66:24, 69:22, 74:23, 76:7, 83:20, 111:13, 111:21
**reasonable** [8] - 10:7, 33:5, 51:2, 80:16, 81:17, 89:10, 94:18, 99:24
**reasonableness** [1] - 32:21
**reasoned** [8] - 10:7,

26:20, 51:1, 54:12, 54:17, 84:11, 87:6, 105:1
**reassess** [1] - 76:5
**rebutted** [2] - 9:16, 9:24
**recaps** [1] - 24:24
**receive** [1] - 78:5
**received** [1] - 78:6
**recent** [9] - 43:17, 44:5, 44:24, 48:16, 49:3, 49:9, 50:5, 106:1, 110:5
**recently** [1] - 44:18
**recess** [6] - 8:2, 68:4, 100:23, 101:16, 101:25, 102:3
**Recess** [2] - 102:4, 102:13
**recognize** [1] - 40:8
**recognized** [6] - 9:15, 40:11, 40:12, 40:13, 53:19, 88:24
**recognizes** [3] - 5:16, 28:22, 76:9
**Recognizing** [1] - 63:4
**recognizing** [3] - 8:20, 71:15, 96:4
**recommend** [1] - 72:19
**recommendation** [10] - 33:15, 49:25, 50:15, 69:14, 72:14, 72:15, 72:21, 73:1, 73:7, 73:11
**Recommendations** [1] - 72:18
**recommendations** [2] - 34:24, 72:20
**recommended** [3] - 7:6, 33:8, 33:16
**reconcile** [1] - 41:20
**reconciled** [1] - 41:18
**reconsider** [1] - 44:8
**record** [75] - 3:7, 4:22, 4:24, 5:3, 6:19, 7:9, 12:8, 16:25, 20:22, 21:16, 21:17, 22:2, 22:11, 22:18, 23:2, 23:19, 23:23, 24:2, 25:5, 25:16, 27:22, 28:21, 29:21, 31:4, 31:7, 31:17, 32:4, 36:9, 37:7, 37:8, 37:16, 37:19, 37:24, 37:25, 38:2, 38:4, 38:7, 40:17, 41:14, 42:24, 44:12, 45:5, 45:8, 45:16, 48:25, 50:15, 51:9, 58:1,

58:5, 58:22, 68:11, 68:14, 68:15, 68:17, 68:18, 68:20, 68:25, 74:12, 74:16, 77:16, 78:4, 82:6, 84:3, 85:17, 102:7, 102:16, 103:3, 103:4, 103:15, 103:17, 108:25, 111:23, 114:4
**recorded** [2] - 30:8, 30:20
**recordings** [1] - 31:14
**recreation** [9] - 12:12, 15:16, 19:3, 19:4, 34:12, 34:16, 34:17, 34:19, 35:13
**recreational** [8] - 15:13, 78:22, 78:23, 79:3, 79:5, 83:25, 109:18
**red** [3] - 15:8, 20:15, 20:17
**red-line** [1] - 15:8
**redress** [1] - 108:8
**reduce** [4] - 26:14, 26:25, 45:3, 64:18
**reduced** [5] - 56:8, 75:2, 79:13, 79:19, 103:9
**reduces** [6] - 61:7, 85:1, 85:3, 85:5, 85:6, 85:8
**reduction** [2] - 5:17, 55:14
**refer** [5] - 16:21, 27:18, 27:20, 86:13, 96:21
**reference** [1] - 78:3
**referenced** [2] - 55:1, 72:3
**referencing** [1] - 43:9
**referred** [1] - 24:20
**referring** [5] - 22:6, 23:11, 32:18, 58:23, 81:22
**refers** [1] - 86:13
**reflect** [7] - 4:24, 49:2, 49:4, 53:18, 70:18, 109:25
**reflected** [8] - 21:4, 41:8, 50:15, 70:16, 70:19, 70:23, 74:16, 103:24
**reflection** [1] - 68:23
**reflects** [6] - 28:14, 28:15, 38:7, 42:9, 42:25, 109:13
**refuge** [1] - 39:25
**regarding** [1] - 39:6

**regards** [1] - 105:4
**regs** [1] - 76:11
**regular** [1] - 62:11
**regularity** [2] - 9:16, 9:24
**regulate** [2] - 15:2, 91:25, 97:15
**regulation** [13] - 9:4, 10:12, 53:7, 53:20, 95:21, 97:23, 97:24, 98:3, 98:10, 98:12, 98:25, 99:1, 99:9
**regulations** [3] - 26:19, 27:12, 97:16
**regulatory** [1] - 94:7
**rejected** [3] - 15:24, 16:5, 45:13
**rejects** [1] - 36:12
**related** [1] - 108:19
**relating** [4] - 44:25, 53:16
**relative** [2] - 50:1, 56:8
**relevance** [1] - 45:22
**relevant** [4] - 10:9, 23:6, 53:14, 99:17
**reliance** [7] - 36:8, 55:19, 74:1, 74:9, 105:20, 106:4, 106:5
**relied** [4] - 10:21, 15:4, 31:16, 81:3
**relief** [1] - 100:18
**relies** [4] - 8:17, 30:19, 30:24, 60:16
**rely** [18] - 10:19, 14:2, 17:6, 17:9, 17:18, 18:21, 22:21, 22:23, 22:24, 22:25, 29:7, 31:8, 32:3, 38:8, 45:24, 52:19, 104:22, 105:23
**relying** [2] - 23:15, 92:7
**Remain** [1] - 102:5
**remain** [1] - 102:14
**remainder** [1] - 89:2
**remand** [1] - 100:19
**remanded** [1] - 51:21
**remarkable** [2] - 48:5, 51:4
**remarkably** [1] - 47:3
**remarks** [1] - 106:14
**remedial** [1] - 95:10
**remedy** [5] - 11:9, 11:10, 100:9, 100:11, 100:19
**remind** [1] - 93:11
**reminding** [2] - 35:17, 39:4
**remote** [1] - 51:25
**removed** [1] - 97:3

**repeated** [1] - 42:21
**repetitious** [1] - 8:5
**replete** [1] - 111:24
**replicate** [1] - 57:19
**reply** [3] - 32:12, 49:1, 53:7
**report** [9] - 7:6, 23:16, 31:13, 31:15, 78:9, 78:11, 78:12, 83:15
**reported** [1] - 2:25
**reporter** [4] - 4:16, 68:4, 101:15
**Reporter** [3] - 2:21, 2:21, 114:2
**reports** [5] - 30:23, 32:5, 82:15, 82:16, 84:4
**represent** [3] - 3:14, 3:18, 67:7
**representation** [3] - 24:1, 100:20, 108:24
**representations** [1] - 7:21
**representative** [8] - 20:23, 21:23, 30:24, 32:2, 66:12, 83:10, 83:11
**represented** [1] - 21:11
**representing** [3] - 3:8, 3:10, 3:21
**represents** [6] - 10:17, 12:9, 16:1, 20:15, 20:16, 59:25
**require** [4] - 5:2, 26:18, 35:7, 94:21
**required** [8] - 10:4, 33:17, 96:12, 99:15, 99:16, 108:7, 111:18
**requirement** [4] - 84:25, 85:16, 85:18, 99:13
**Requirements** [1] - 17:11
**requirements** [10] - 11:7, 28:4, 40:4, 53:20, 53:23, 53:24, 54:2, 56:10, 61:7, 105:7
**requires** [13] - 17:13, 19:8, 35:7, 35:8, 42:13, 54:12, 79:25, 81:16, 84:10, 88:9, 91:24, 92:2, 93:8
**requiring** [5] - 52:25, 59:22, 79:23, 93:24, 94:17
**reserved** [2] - 100:4, 100:5
**reserves** [1] - 84:11

PDF created with pdfFactory trial version www.pdffactory.com

resist [1] - 36:14
resolve [1] - 69:8
resource [4] - 43:14, 85:15, 92:4, 97:2
resources [21] - 7:16, 18:5, 18:10, 27:15, 40:7, 40:15, 41:3, 41:6, 71:5, 76:18, 87:14, 87:17, 88:11, 88:21, 93:23, 95:5, 95:13, 96:6, 96:8, 96:14, 99:23
respect [55] - 7:4, 7:12, 8:21, 9:14, 10:24, 17:4, 33:6, 36:3, 39:21, 43:8, 43:14, 45:6, 46:4, 46:24, 49:18, 49:21, 49:23, 53:3, 53:5, 53:25, 54:20, 61:14, 61:17, 62:3, 62:7, 62:14, 62:17, 63:1, 63:2, 66:16, 71:19, 72:25, 73:4, 73:5, 73:17, 74:21, 75:15, 75:20, 78:21, 79:7, 80:6, 80:8, 81:24, 82:22, 83:2, 84:7, 87:9, 87:21, 88:17, 89:11, 91:21, 97:13, 100:11
respectfully [3] - 88:12, 100:6, 104:17
respond [9] - 6:18, 38:25, 45:25, 56:24, 77:1, 77:18, 82:3, 101:4, 110:25
responded [1] - 111:19
responding [2] - 44:1, 100:9
response [5] - 7:18, 36:17, 89:1, 89:3, 95:24
responses [4] - 7:21, 33:25, 77:22, 111:17
responsible [3] - 44:18, 46:12, 87:13
rest [5] - 63:14, 70:4, 97:14, 98:20, 99:4
restore [2] - 81:11, 97:2
restraints [6] - 8:10, 8:15, 10:5, 11:6, 13:21, 35:22
result [23] - 16:2, 28:5, 43:12, 53:12, 54:3, 55:10, 62:13, 62:14, 62:24, 63:9, 73:13, 75:5, 75:21, 79:2,

79:23, 79:25, 82:20, 86:9, 86:18, 90:21, 92:1, 100:15, 110:6
resulted [4] - 45:11, 62:13, 79:24, 104:10
resulting [3] - 75:13, 85:2, 85:10
results [4] - 11:1, 32:21, 95:14, 109:7
Retired [1] - 36:23
return [2] - 40:5, 104:13
reverse [1] - 90:22
reversed [2] - 9:17, 80:16
revert [1] - 12:21
review [4] - 10:4, 67:5, 93:12, 103:3
reviewed [2] - 63:8, 103:3
ride [1] - 14:15
rightmost [1] - 83:16
rise [1] - 107:2
risk [2] - 42:12, 91:3
Risk [1] - 47:1
risks [2] - 47:6, 47:7
road [6] - 27:22, 29:23, 30:10, 30:11, 30:14, 106:20
Road [1] - 30:16
roads [1] - 107:24
Robert [1] - 3:9
ROBERT [1] - 2:2
ROD [14] - 15:22, 25:25, 29:20, 44:16, 60:22, 60:23, 60:24, 62:16, 62:19, 67:6, 70:23, 71:1, 71:3
ROESSING [1] - 2:3
Roessing [1] - 4:7
role [1] - 74:11
rolling [1] - 75:24
rome [1] - 85:5
Room [1] - 2:22
room [1] - 94:10
Rosenbaum [7] - 3:10, 22:17, 70:20, 82:4, 82:8, 89:17, 101:5
ROSENBAUM [73] - 2:2, 3:9, 4:7, 8:7, 8:9, 8:13, 8:22, 9:1, 9:12, 11:10, 12:1, 12:19, 12:23, 13:6, 13:19, 14:9, 14:17, 16:12, 16:15, 16:17, 16:25, 19:25, 20:2, 20:5, 20:7, 20:10, 20:12, 22:1, 22:5, 22:13, 23:9, 23:17,

23:20, 23:24, 24:4, 24:12, 24:19, 24:22, 25:4, 25:17, 25:24, 26:5, 28:24, 29:2, 29:6, 29:12, 29:16, 30:4, 30:11, 33:22, 34:2, 34:5, 34:9, 34:15, 35:3, 35:18, 36:10, 36:20, 36:22, 37:2, 37:5, 37:9, 37:14, 37:21, 38:2, 38:6, 38:14, 65:19, 101:6, 101:8, 101:22, 108:17, 112:3
Rosenbaum's [2] - 66:19, 106:9
routes [2] - 14:20, 28:1
row [2] - 59:4, 60:14
RPR [1] - 2:21
rule [35] - 10:4, 11:4, 11:11, 11:20, 12:7, 13:5, 14:2, 14:10, 15:6, 15:22, 15:25, 16:1, 16:6, 26:8, 26:15, 27:6, 27:12, 27:16, 27:17, 35:19, 36:12, 38:10, 51:11, 51:12, 51:17, 52:3, 52:4, 52:16, 53:1, 84:12, 103:5, 108:12, 109:13, 109:16
Rule [2] - 11:12, 57:12
rule-making [1] - 108:12
ruled [1] - 23:7
rules [2] - 26:16, 26:21
ruling [5] - 12:16, 51:15, 52:23, 52:24, 56:3
run [2] - 51:16, 63:22
rush [1] - 70:3

## S

sacred [1] - 56:4
safer [1] - 52:16
safety [1] - 85:14
sampled [1] - 91:5
samples [7] - 91:4, 91:7, 91:8, 91:9, 91:13
sanctuary [1] - 39:25
satisfaction [1] - 81:1
satisfy [1] - 105:7
save [1] - 46:22

saw [2] - 55:11, 71:13
scale [1] - 28:2
Scape [1] - 22:3
scape [19] - 6:14, 20:25, 21:7, 21:21, 29:8, 29:19, 29:23, 30:2, 30:6, 30:18, 32:12, 63:8, 64:18, 65:6, 67:8, 78:7, 78:18, 80:8, 82:5
scapes [5] - 65:1, 66:16, 67:1, 73:4, 78:1, 78:21, 81:24, 105:21, 109:14
scenario [5] - 23:21, 62:8, 87:3, 88:2, 93:25
scenarios [2] - 88:6, 90:16
scenery [2] - 19:14, 66:24
scenic [1] - 98:1
scheduling [1] - 5:1
school [1] - 36:3
science [10] - 69:11, 71:20, 71:21, 72:1, 72:4, 72:8, 76:12, 86:14, 89:4, 89:6
Science [2] - 69:12, 71:22
scientists [4] - 21:8, 33:8, 33:10, 50:3
score [1] - 18:6
scrutinize [1] - 8:19
SEAN [1] - 1:20
Sean [2] - 3:13, 38:18
season [14] - 13:1, 21:18, 25:12, 25:13, 31:18, 31:24, 33:11, 33:13, 51:24, 66:23, 73:3, 73:13, 103:6, 104:11
season-wide [1] - 31:24
seasons [8] - 23:13, 43:17, 44:5, 47:10, 48:16, 49:3, 57:20, 110:5
seated [2] - 102:5, 102:14
second [20] - 8:11, 14:24, 18:8, 24:9, 28:19, 33:13, 48:9, 56:25, 71:11, 83:8, 89:13, 89:14, 92:2, 95:3, 95:25, 98:10, 99:20, 99:21, 102:9, 104:16
Second [2] - 46:9
secondary [2] - 88:13,

88:15
Secondly [4] - 4:20, 17:16, 21:8, 109:2
seconds [2] - 65:25, 66:1
Secretary [1] - 94:13
secretary [1] - 94:18
section [15] - 16:21, 17:6, 17:9, 17:10, 17:14, 17:16, 17:17, 17:18, 18:21, 27:24, 28:10, 63:8, 63:16, 64:6, 87:11
Section [26] - 2:13, 10:12, 10:18, 15:9, 17:2, 17:5, 17:9, 27:11, 27:20, 27:25, 42:8, 53:14, 53:24, 54:1, 54:2, 55:22, 87:10, 91:23, 93:7, 95:4, 96:20, 97:19, 98:13, 98:16, 98:25
sections [2] - 10:18, 55:4
secured [1] - 55:20
see [17] - 17:8, 19:24, 22:19, 36:5, 38:8, 50:5, 63:22, 64:11, 64:21, 65:12, 68:11, 74:8, 75:22, 77:11, 82:2, 95:18, 112:1
Seeing [1] - 89:18
seek [4] - 14:13, 66:22, 93:21, 94:5, 94:16
seeks [1] - 36:14
seem [2] - 13:15, 61:5
segregated [1] - 5:3
segues [1] - 66:19
select [3] - 5:21, 7:10, 99:13
selected [2] - 53:11, 69:20
selecting [1] - 103:13
selections [1] - 105:17
send [1] - 22:17
sense [6] - 18:23, 54:4, 56:5, 79:19, 98:17, 101:19
senses [1] - 48:5
sent [1] - 4:24
sentence [14] - 19:13, 71:11, 83:20, 83:21, 93:10, 93:20, 94:5, 94:21, 95:4, 95:12, 96:3, 96:20, 97:4
separate [2] - 53:20, 104:24
serene [1] - 39:8

PDF created with pdfFactory trial version www.pdffactory.com

**seriously** [5] - 22:25, 46:14, 50:14, 50:20, 50:21
**serves** [1] - 63:11
**Service** [118] - 3:18, 5:16, 5:17, 6:2, 7:4, 7:18, 10:13, 12:25, 15:7, 15:10, 15:17, 15:19, 15:22, 18:15, 20:20, 21:9, 22:7, 26:8, 26:12, 36:4, 36:13, 36:18, 36:24, 37:11, 38:11, 40:1, 40:6, 40:12, 41:4, 41:22, 41:24, 42:3, 42:4, 42:13, 45:24, 46:8, 46:18, 48:18, 49:14, 50:11, 50:12, 50:13, 50:18, 51:7, 51:17, 51:22, 52:2, 52:9, 52:12, 52:15, 52:19, 52:20, 52:23, 53:19, 53:21, 54:24, 56:2, 70:12, 73:25, 74:10, 75:3, 75:11, 75:21, 75:22, 76:4, 76:6, 76:13, 76:14, 80:16, 81:7, 82:4, 82:17, 84:13, 84:24, 85:17, 85:23, 86:6, 86:10, 86:17, 86:22, 89:3, 89:19, 90:20, 90:21, 91:24, 92:5, 92:12, 92:18, 93:3, 93:15, 93:16, 93:21, 93:24, 94:4, 94:7, 94:21, 94:23, 95:1, 95:16, 95:19, 97:16, 97:18, 97:22, 97:24, 98:4, 98:6, 98:16, 99:13, 99:18, 99:24, 100:8, 100:19, 105:6, 107:1, 109:3, 109:11, 110:14
**service** [8] - 17:22, 17:24, 69:16, 70:13, 71:23, 71:24, 72:19, 72:21
**Service's** [16] - 20:21, 41:11, 42:10, 43:3, 50:24, 53:6, 56:4, 74:1, 74:9, 89:8, 89:11, 95:11, 95:20, 96:10, 97:5, 106:4
**Services** [1] - 8:17
**session** [2] - 102:6, 102:15
**set** [13] - 5:4, 5:21, 7:5, 26:13, 55:7, 55:24, 70:2, 70:8,

74:18, 74:19, 79:18, 90:18, 93:12
**sets** [2] - 79:15, 90:11
**Seven** [1] - 36:18
**seven** [15] - 6:20, 58:20, 59:7, 62:15, 63:20, 63:24, 67:7, 69:17, 78:21, 85:22, 89:1, 104:24, 104:25, 111:14
**seventy** [2] - 79:24, 87:5
**several** [1] - 86:8
**severity** [1] - 87:18
**shadings** [1] - 66:5
**shall** [2] - 94:16
**Shambers** [3] - 78:9, 78:12, 82:16
**share** [4] - 4:11, 4:15, 5:4, 7:20
**shift** [1] - 65:10
**short** [4] - 47:18, 68:4, 91:7, 102:20
**short-change** [1] - 102:20
**short-term** [1] - 91:7
**shorter** [1] - 111:9
**shorthand** [1] - 2:25
**shortly** [1] - 8:2
**Show** [1] - 68:25
**show** [11] - 30:21, 59:21, 60:6, 60:9, 64:25, 66:6, 66:9, 82:18, 84:4, 88:22, 98:15
**showed** [2] - 24:7, 81:1
**showing** [6] - 24:4, 28:16, 32:9, 75:18, 89:1, 95:18
**shown** [2] - 19:21, 109:14
**shows** [7] - 20:12, 23:15, 28:14, 30:7, 65:9, 65:10, 71:2
**side** [2] - 8:8, 111:12
**Sierra** [1] - 55:13
**sign** [1] - 9:7
**significance** [1] - 37:18
**significant** [21] - 8:18, 8:20, 14:11, 14:15, 21:7, 24:8, 25:19, 26:14, 30:2, 31:10, 38:23, 39:1, 44:14, 46:20, 56:5, 60:3, 76:3, 99:7, 105:15, 108:10, 109:15
**significantly** [3] - 24:5, 32:20, 91:17

**silence** [2] - 92:24, 92:25
**silent** [1] - 92:22
**similar** [2] - 71:17, 79:14
**similarly** [1] - 55:18
**simply** [28] - 35:13, 40:22, 40:23, 41:4, 41:8, 41:17, 42:2, 43:4, 43:11, 44:3, 45:1, 45:16, 46:5, 46:22, 48:1, 49:12, 50:15, 50:18, 50:21, 51:1, 51:9, 52:25, 54:5, 55:1, 56:7, 56:9, 110:10, 110:13
**simultaneous** [1] - 74:1
**simultaneously** [1] - 53:13
**single** [5] - 47:19, 47:20, 69:25, 71:13, 94:9
**single-day** [2] - 47:19, 47:20
**sites** [2] - 47:4, 48:7
**sitting** [1] - 4:4
**situation** [7] - 33:4, 35:9, 40:25, 41:4, 52:21, 109:13, 109:20
**situations** [2] - 50:23, 90:9
**six** [2] - 21:8, 81:20
**Six** [1] - 73:2
**skipped** [1] - 27:10
**sliding** [1] - 43:21
**slightly** [1] - 71:14
**slow** [3] - 68:7, 86:21
**small** [4] - 51:10, 61:10, 101:8, 101:9
**smaller** [1] - 85:4
**Snow** [3] - 41:2, 83:22, 94:1
**snow** [64] - 5:7, 20:16, 20:18, 21:5, 21:12, 23:12, 27:6, 28:2, 29:23, 30:8, 30:21, 31:1, 31:5, 31:12, 31:19, 31:24, 32:9, 40:17, 40:20, 40:23, 41:14, 42:25, 44:17, 44:20, 44:21, 45:1, 45:5, 45:8, 45:11, 45:13, 45:15, 45:17, 49:25, 58:9, 61:6, 62:11, 62:22, 65:1, 69:19, 70:10, 73:5, 73:11, 73:14, 75:25, 78:23, 78:24, 82:5,

82:20, 83:2, 83:4, 83:17, 83:18, 83:24, 84:5, 84:6, 93:25, 105:13, 108:21, 108:22
**snowmobile** [36] - 6:6, 15:6, 30:8, 42:20, 45:2, 47:21, 48:17, 49:2, 49:5, 49:9, 49:19, 50:7, 50:8, 51:6, 51:7, 53:6, 53:17, 53:22, 54:1, 54:18, 67:23, 69:25, 79:21, 80:19, 94:25, 96:22, 96:23, 97:23, 97:25, 99:1, 102:24, 105:5, 107:11, 108:21, 110:8, 110:11
**snowmobiler** [1] - 3:22
**snowmobilers** [1] - 102:22
**snowmobiles** [79] - 5:7, 6:24, 7:1, 11:12, 11:17, 11:23, 12:4, 13:5, 14:16, 14:23, 19:11, 20:14, 20:15, 20:17, 21:3, 21:12, 23:12, 27:5, 27:6, 27:13, 27:24, 29:25, 30:1, 31:18, 31:23, 33:13, 34:22, 44:9, 44:10, 44:19, 44:22, 45:1, 45:15, 46:12, 47:18, 47:23, 49:13, 54:6, 57:11, 58:9, 59:7, 59:9, 65:1, 66:4, 67:20, 69:15, 70:9, 71:7, 71:13, 75:23, 75:25, 76:2, 78:23, 78:25, 81:15, 81:16, 83:3, 83:17, 83:24, 83:25, 84:1, 84:5, 85:3, 85:4, 85:7, 85:21, 86:7, 86:12, 87:3, 87:4, 87:8, 88:5, 93:25, 97:15, 97:17, 104:10, 107:20, 108:23
**snowmobiles's** [1] - 28:2
**snowmobiling** [3] - 41:6, 41:17, 52:5
**Society** [1] - 105:8
**soil** [1] - 88:18
**solely** [1] - 9:25
**solitude** [3] - 14:12, 66:17, 66:22

**solve** [1] - 36:1
**someone** [1] - 110:25
**Someone** [1] - 69:21
**sometimes** [3] - 28:13, 66:11
**somewhat** [2] - 58:14, 74:19
**somewhere** [4] - 21:5, 70:24, 90:18
**soon** [1] - 58:6
**sorry** [18] - 9:20, 13:6, 33:22, 45:10, 61:16, 61:20, 61:22, 62:6, 64:13, 65:17, 65:19, 67:11, 71:10, 74:14, 76:22, 82:25, 85:24, 110:12
**sort** [7] - 13:16, 32:3, 66:19, 70:3, 77:5, 98:15, 104:17
**sorts** [1] - 27:2
**sought** [1] - 81:12
**sound** [61] - 6:7, 6:10, 6:14, 7:17, 20:25, 21:7, 21:21, 29:8, 29:18, 29:23, 30:2, 30:6, 30:18, 30:22, 32:12, 45:7, 57:6, 61:6, 61:24, 62:10, 62:17, 63:3, 63:5, 63:8, 64:7, 64:17, 64:19, 65:4, 65:6, 66:2, 66:5, 66:16, 67:1, 67:8, 73:4, 78:1, 78:7, 78:18, 78:21, 78:23, 79:2, 80:8, 81:24, 82:5, 82:19, 83:5, 84:4, 85:1, 103:7, 103:11, 105:21, 106:4, 107:7, 107:23, 108:22, 109:14
**Sound** [1] - 22:3
**sound-biting** [1] - 107:7
**sounds** [8] - 31:14, 32:7, 79:3, 79:5, 79:6, 79:21
**source** [1] - 70:21
**sources** [1] - 78:23
**south** [2] - 30:25, 31:3
**Spear** [1] - 91:4
**special** [2] - 19:17, 19:18
**species** [2] - 34:1, 106:2
**Species** [1] - 105:24
**specific** [2] - 54:6, 97:17
**specifically** [1] - 66:15

PDF created with pdfFactory trial version www.pdffactory.com

**speed** [5] - 31:2, 31:6, 68:6, 85:2, 105:14
**spelled** [3] - 74:25, 91:23, 95:4
**split** [1] - 111:5
**spots** [2] - 31:11, 66:12
**spreadsheet** [1] - 71:1
**Spring** [9] - 30:20, 30:21, 30:22, 31:4, 31:9, 32:1, 83:1, 83:9
**spurred** [1] - 39:8
**squiggle** [1] - 75:19
**squiggly** [1] - 64:21
**staff** [1] - 100:23
**stage** [1] - 79:11
**stake** [1] - 39:5
**stand** [2] - 10:7, 101:25
**standard** [33] - 17:21, 17:23, 26:21, 26:23, 43:20, 44:3, 44:6, 44:8, 46:11, 47:7, 47:8, 47:15, 47:19, 47:21, 53:10, 54:5, 54:7, 54:25, 55:8, 91:18, 92:8, 92:9, 92:16, 93:12, 93:18, 96:16, 99:19, 99:21, 100:3
**standards** [22] - 5:8, 7:15, 28:8, 43:10, 44:23, 45:14, 46:2, 48:2, 48:6, 48:15, 54:19, 55:2, 55:19, 81:22, 81:23, 81:25, 84:8, 87:24, 88:20, 88:22, 89:25, 95:19
**stands** [2] - 80:18, 102:2
**Start** [1] - 63:17
**start** [7] - 35:20, 63:23, 63:24, 80:13, 89:17, 111:9
**started** [1] - 15:5
**starting** [1] - 104:7
**starts** [1] - 5:6
**starvation** [1] - 35:5
**state** [5] - 3:7, 21:18, 81:23, 98:20, 99:4
**state-wide** [1] - 81:23
**statement** [4] - 26:1, 26:10, 61:24, 98:8
**States** [4] - 2:6, 2:9, 2:12, 40:1
**states** [8] - 27:25, 30:14, 31:4, 31:9, 40:19, 44:16, 60:24, 97:24

**STATES** [3] - 1:1, 1:13, 1:18
**Station** [1] - 2:13
**stations** [1] - 106:23
**status** [1] - 106:3
**statute** [14] - 9:5, 10:22, 15:16, 17:12, 18:3, 18:22, 19:8, 19:12, 26:19, 35:14, 35:24, 36:12, 94:17
**statutes** [3] - 106:10, 106:15, 107:4
**statutory** [4] - 17:24, 18:14, 94:6, 98:15
**stay** [2] - 50:8, 77:6
**stems** [1] - 56:2
**steps** [3] - 94:18, 99:24, 99:25
**Stevenson** [1] - 91:4
**still** [3] - 74:22, 87:2, 108:20
**stir** [2] - 98:19, 99:3
**stop** [3] - 24:9, 60:5, 95:8
**strained** [1] - 48:13
**Street** [2] - 2:4, 2:7
**strenuously** [1] - 104:23
**stress** [1] - 42:9
**stressed** [1] - 43:23
**stresses** [3] - 35:6, 42:14, 42:15
**strict** [1] - 85:2
**stricter** [1] - 100:2
**stringent** [1] - 46:7
**stroke** [2] - 76:4, 107:21
**strokes** [1] - 76:2
**struck** [2] - 15:11, 84:12
**studied** [1] - 50:2
**studies** [21] - 20:19, 20:24, 21:14, 21:19, 24:7, 25:19, 30:6, 30:7, 33:21, 33:23, 34:10, 34:12, 35:24, 35:25, 58:15, 88:25, 104:20, 104:24, 108:4, 108:9
**study** [31] - 21:6, 21:8, 21:10, 21:20, 21:21, 31:8, 31:16, 31:23, 33:8, 33:9, 33:16, 33:17, 33:18, 34:21, 47:12, 47:14, 49:21, 49:23, 50:2, 50:9, 50:11, 50:14, 50:19, 71:20, 71:21, 72:3, 72:6, 72:16, 72:25, 73:1, 73:7

**stunning** [1] - 48:8
**submission** [1] - 24:11
**submissions** [1] - 101:13
**submit** [7] - 32:5, 99:7, 99:8, 100:10, 100:12, 100:16, 111:18
**subsequent** [2] - 42:15, 53:17
**subsequently** [1] - 40:1
**substantial** [4] - 8:24, 98:8, 106:9, 109:14
**substantially** [1] - 61:7
**substantive** [8] - 8:10, 8:15, 10:5, 11:6, 13:21, 35:21, 107:19, 110:15
**successful** [1] - 85:1
**suddenly** [1] - 51:5, 107:3
**suffer** [1] - 35:13
**suggest** [7] - 13:1, 13:4, 13:6, 13:10, 43:11, 45:8, 52:14
**suggested** [1] - 82:4
**suggesting** [1] - 12:20
**suggestion** [1] - 43:2
**SULLIVAN** [4] - 1:17, 2:21, 114:2, 114:5
**sum** [1] - 101:13
**summary** [4] - 68:9, 100:6, 100:7, 110:21
**superb** [1] - 96:6
**supplement** [1] - 29:17
**Supplemental** [6] - 24:16, 24:17, 25:1, 25:2, 25:7, 113:18
**supplemental** [5] - 24:21, 76:11, 100:10, 100:18, 108:3
**support** [11] - 30:4, 30:5, 32:4, 68:15, 72:1, 82:6, 85:17, 89:6, 93:6, 95:12, 108:25
**supported** [6] - 7:9, 12:8, 29:21, 68:19, 70:7, 72:4
**supporting** [4] - 71:20, 71:21, 72:2, 89:5
**supports** [1] - 103:4
**suppose** [1] - 35:8
**Suppose** [2] - 12:15,

101:20
**supposed** [2] - 37:25, 44:2
**surge** [1] - 71:16
**surprised** [1] - 63:9
**surprising** [1] - 54:15
**surreal** [1] - 39:8
**survey** [1] - 91:15
**suspect** [1] - 109:8
**sustained** [2] - 103:20, 110:19
**swans** [1] - 35:12
**swimming** [1] - 111:12
**Sylvan** [5] - 67:9, 67:11, 67:13, 67:17, 67:19
**System** [1] - 43:25
**system** [5] - 12:12, 15:11, 38:12, 81:5, 106:20

# T

**table** [11] - 3:14, 3:25, 23:11, 58:22, 59:3, 59:4, 60:6, 64:4, 65:13, 65:15, 65:16
**Table** [2] - 58:23, 61:8
**tables** [6] - 57:1, 57:5, 57:22, 58:2, 65:11, 65:16
**talks** [1] - 42:8
**technical** [5] - 104:19, 105:3, 105:5, 105:12, 105:14
**technically** [1] - 65:25
**technology** [7] - 5:7, 19:24, 76:1, 76:4, 105:7, 107:21, 108:7
**temporary** [7] - 11:12, 12:22, 13:16, 52:23, 69:24, 72:9, 72:11
**Temporary** [1] - 57:12
**ten** [8] - 7:1, 59:18, 60:1, 66:8, 101:14, 108:9, 111:10
**tend** [4] - 65:7, 65:8, 68:6, 83:5
**tension** [1] - 41:1
**term** [8] - 17:24, 18:14, 91:7, 91:8, 95:15, 98:12, 99:2, 106:9
**terminology** [1] - 6:3
**terms** [11] - 20:17, 44:16, 45:23, 59:13, 59:19, 61:9, 63:14, 64:19, 99:1, 106:14,

106:15
**testing** [2] - 105:12
**Teton** [1] - 98:24
**THE** [175] - 1:1, 1:14, 1:17, 3:12, 3:16, 3:19, 3:23, 4:6, 4:10, 8:8, 8:12, 8:18, 8:25, 9:11, 11:9, 11:18, 12:15, 12:21, 13:3, 13:12, 14:3, 14:14, 16:11, 16:14, 16:16, 16:23, 19:23, 20:1, 20:3, 20:6, 20:8, 20:11, 21:25, 22:4, 22:14, 22:20, 23:16, 23:18, 23:21, 24:3, 24:9, 24:14, 24:20, 24:23, 25:5, 25:14, 25:23, 26:3, 28:20, 28:25, 29:5, 29:9, 29:13, 30:3, 30:10, 33:21, 33:23, 34:3, 34:6, 34:14, 35:2, 35:17, 36:7, 36:17, 36:21, 36:25, 37:4, 37:7, 37:10, 37:18, 37:22, 38:5, 38:13, 38:15, 38:19, 38:22, 39:10, 39:17, 40:8, 48:22, 51:11, 51:16, 51:23, 52:4, 52:10, 52:13, 52:16, 53:2, 54:8, 56:12, 56:17, 56:19, 56:22, 57:3, 57:5, 57:9, 57:17, 57:21, 57:25, 58:8, 58:12, 58:20, 58:22, 59:3, 59:6, 59:12, 59:15, 59:17, 59:24, 60:7, 60:15, 60:20, 60:22, 60:24, 61:12, 61:20, 62:5, 62:25, 63:4, 63:13, 63:17, 63:25, 64:8, 64:12, 65:16, 67:6, 67:13, 67:15, 68:1, 68:10, 68:14, 68:17, 68:22, 68:25, 69:4, 69:20, 70:23, 71:19, 72:2, 73:17, 74:14, 76:20, 76:23, 77:1, 77:9, 77:15, 78:13, 78:16, 80:11, 82:24, 84:21, 85:22, 86:2, 89:24, 90:7, 90:24, 97:8, 100:21, 101:7, 101:9, 101:12, 101:15, 101:23, 102:8, 102:17, 103:1, 103:15, 107:13, 107:15,

PDF created with pdfFactory trial version www.pdffactory.com

108:14, 109:22,
110:23, 111:10,
111:16, 112:5
**themselves** [4] - 4:1,
25:18, 33:10, 64:18
**Therefore** [2] - 16:4,
17:21
**therefore** [8] - 19:3,
31:14, 34:19, 35:11,
42:1, 49:15, 93:17,
99:22
**They've** [1] - 108:7
**they've** [5] - 19:21,
27:15, 27:17, 108:6
**thinking** [1] - 111:3
**third** [5] - 33:14,
93:10, 93:20, 94:21,
99:23
**thirteen** [6] - 17:8,
65:23, 66:12, 91:4,
91:5, 91:6
**Thirty** [2] - 60:19,
60:21
**Thirty-four** [2] - 60:19,
60:21
**thoroughfare** [2] -
30:25, 83:12
**thoughts** [5] - 4:11,
5:4, 7:19, 7:21, 8:14
**thousand** [5] - 33:11,
72:20, 80:1, 104:6,
104:13
**thousand-a-day** [1] -
104:6
**threat** [1] - 47:4
**threatened** [2] - 76:19,
106:1
**threats** [1] - 48:7
**three** [22] - 7:5, 14:1,
31:25, 46:1, 47:4,
47:10, 47:12, 47:13,
47:22, 57:13, 58:16,
59:19, 60:11, 67:20,
69:23, 71:18, 79:9,
81:2, 84:13, 88:5,
99:18
**three-day** [1] - 47:12
**three-year** [1] - 58:16
**threshold** [21] - 43:14,
45:21, 47:15, 47:25,
74:18, 74:19, 75:5,
75:16, 75:21, 78:12,
86:23, 90:5, 90:7,
90:9, 90:12, 90:18,
98:16, 98:18, 99:6,
103:8
**thresholds** [23] - 6:13,
6:14, 6:16, 7:16,
45:23, 46:15, 48:10,
73:18, 73:19, 74:21,

75:2, 75:8, 75:14,
77:12, 78:7, 78:11,
79:13, 79:15, 79:18,
83:5, 90:11, 110:4,
110:5
**threw** [1] - 62:13
**throttle** [1] - 105:13
**throughout** [4] -
57:24, 63:6, 64:21,
95:17
**throw** [1] - 101:20
**thunder** [1] - 39:11
**timing** [1] - 87:18
**tired** [1] - 49:22
**Title** [1] - 98:25
**today** [7] - 4:7, 7:22,
7:23, 8:1, 82:3, 87:7,
97:22
**together** [1] - 89:10
**tone** [1] - 5:4
**took** [2] - 39:1, 91:13
**tool** [1] - 76:8
**top** [3] - 57:16, 72:17,
72:18
**total** [3] - 25:11,
25:13, 85:6
**touch** [2] - 104:16,
106:7
**touched** [1] - 40:4
**Tour** [1] - 32:13
**toward** [1] - 43:21
**towards** [1] - 94:18
**toxic** [1] - 91:17
**traditional** [1] - 107:8
**traffic** [1] - 88:3
**trailing** [1] - 61:21
**trails** [2] - 97:17,
98:24
**trained** [1] - 85:9
**tranquility** [1] - 98:20
**TRANSCRIPT** [1] -
1:17
**transcript** [7] - 2:25,
4:13, 4:15, 4:16,
4:19, 109:24, 114:3
**transcription** [1] -
2:25
**transferred** [1] - 84:8
**transition** [3] - 44:21,
45:14, 65:3
**transitioned** [1] - 76:1
**translates** [1] - 33:11
**Transportation** [2] -
32:16, 84:18
**travel** [1] - 65:3
**travels** [1] - 33:2
**treated** [1] - 74:5
**tree** [2] - 97:1, 97:2
**tremendous** [1] - 36:3

**trend** [1] - 90:23
**trigger** [1] - 75:8
**triggered** [2] - 75:9,
75:17
**trouble** [1] - 19:1
**trucks** [1] - 106:21
**true** [4] - 28:10, 52:1,
82:7, 94:23
**truly** [1] - 111:20
**trying** [11] - 5:4, 13:1,
13:6, 13:9, 28:17,
52:17, 69:22, 74:15,
82:2, 98:23, 104:20
**turn** [11] - 13:21,
17:18, 28:17, 50:3,
63:18, 63:19, 72:15,
77:8, 89:13, 89:14,
103:1
**turned** [1] - 76:3
**Turning** [1] - 83:15
**turning** [2] - 72:14,
82:10
**turns** [2] - 79:9, 105:9
**twelve** [1] - 78:15
**twenty** [6] - 34:25,
59:23, 66:8, 70:25,
71:3, 85:13
**twice** [1] - 47:24
**two** [38] - 4:21, 14:9,
17:12, 20:13, 30:6,
31:19, 45:12, 48:5,
49:1, 51:20, 56:20,
59:19, 60:12, 61:18,
61:19, 61:23, 65:16,
71:14, 76:2, 77:16,
83:4, 84:3, 84:7,
85:5, 85:16, 88:25,
89:16, 91:3, 91:7,
91:9, 91:10, 91:22,
92:21, 92:23, 95:11,
95:19, 105:9, 107:21
**Two** [1] - 47:13
**two-stroke** [1] -
107:21
**type** [1] - 25:12


## U

**U.S** [3] - 2:22, 3:5,
32:13
**ultimately** [12] - 40:20,
48:17, 48:19, 49:24,
50:6, 50:20, 52:8,
53:7, 54:21, 55:16,
55:24, 104:5
**unacceptable** [36] -
6:17, 16:10, 16:20,
17:7, 18:7, 18:17,
28:5, 28:7, 28:9,

43:22, 53:12, 54:3,
54:5, 54:7, 54:25,
55:8, 55:10, 55:15,
55:18, 70:12, 71:4,
73:22, 74:19, 74:24,
75:6, 75:12, 75:14,
86:18, 90:1, 95:16,
98:17, 99:8, 99:21,
110:12, 110:13
**unavoidable** [3] -
96:24, 97:3
**unbridled** [1] - 110:14
**uncertainty** [1] - 104:8
**unconstrained** [1] -
104:12
**under** [40] - 7:2, 8:24,
10:2, 11:2, 11:14,
15:7, 17:9, 40:19,
40:22, 43:5, 44:7,
44:22, 45:2, 45:12,
45:14, 49:25, 54:18,
55:22, 56:10, 57:12,
58:18, 59:8, 59:17,
69:23, 69:24, 72:22,
73:2, 87:25, 88:12,
90:2, 94:6, 99:19,
99:20, 100:14,
103:8, 107:25,
110:24, 111:20,
112:1
**Under** [2] - 47:22, 61:2
**underestimated** [1] -
6:10
**underlying** [1] - 16:6
**understood** [1] -
18:13
**Understood** [1] -
97:12
**undertake** [1] - 26:7
**undertaken** [2] - 21:8,
34:10
**undisputed** [1] - 5:23
**unevenly** [1] - 45:17
**unexpected** [1] -
62:13
**unfettered** [1] - 41:24
**unfortunately** [1] -
91:2
**Unfortunately** [1] -
81:23
**unhappy** [1] - 43:12
**unidentified** [1] -
31:25
**unimpaired** [1] - 96:7
**unique** [1] - 107:23
**UNITED** [3] - 1:1, 1:13,
1:18
**United** [4] - 2:6, 2:9,
2:12, 39:25
**University** [1] - 21:9

**Unless** [1] - 24:20
**unless** [1] - 25:5
**unlike** [1] - 39:9
**unlikely** [1] - 5:18
**unreasonable** [1] -
32:22
**unreviewable** [1] -
41:25
**unsolicited** [1] - 4:21
**unsound** [1] - 6:8
**unsuccessful** [1] -
104:10
**up** [23] - 7:20, 16:22,
16:24, 19:20, 23:10,
27:19, 49:8, 62:3,
64:24, 68:6, 70:5,
71:24, 80:18, 87:8,
96:16, 97:8, 101:13,
104:12, 105:1,
105:21, 107:9,
108:16, 111:5
**upheld** [1] - 32:12
**upper** [1] - 70:8
**uppermost** [1] - 65:17
**Urban** [1] - 94:13
**urge** [3] - 35:20,
35:21, 104:17
**urging** [2] - 13:9,
105:10
**usage** [4] - 7:6, 13:17,
14:1, 109:18
**useful** [3] - 63:22,
73:15, 81:13
**Uses** [1] - 104:11
**uses** [7] - 5:23, 23:15,
54:6, 94:4, 96:22,
100:13, 110:11


## V

**vacate** [5] - 11:20,
11:23, 12:16, 13:4,
52:16
**vacated** [6] - 13:13,
13:15, 51:11, 51:12,
51:17, 51:21
**vacates** [1] - 11:20
**vacating** [1] - 52:25
**vacatur** [1] - 100:19
**validate** [1] - 11:11
**value** [2] - 76:19, 92:4
**values** [16] - 27:14,
41:6, 76:18, 87:15,
87:17, 88:11, 88:21,
93:23, 95:6, 95:13,
96:7, 96:8, 96:14,
98:1, 98:5, 98:6
**variables** [1] - 74:25
**variations** [1] - 105:9

PDF created with pdfFactory trial version www.pdffactory.com

**variety** [5] - 71:25, 103:22, 104:2, 104:20, 107:7
**various** [12] - 25:14, 53:10, 55:4, 55:23, 57:6, 64:20, 66:9, 66:13, 78:20, 92:23, 104:9, 110:15
**vegetation** [1] - 88:18
**vehicle** [8] - 25:12, 43:18, 49:25, 53:16, 53:22, 69:18, 83:6, 84:14
**vehicles** [13] - 23:13, 27:23, 44:10, 54:6, 61:3, 65:1, 67:19, 73:8, 73:10, 79:1, 79:4, 89:2, 89:5
**verbally** [1] - 74:17
**version** [3] - 64:22, 64:23, 105:11
**versus** [4] - 3:3, 3:5, 32:13, 55:13
**vice** [1] - 31:4
**view** [11] - 5:24, 12:19, 13:7, 34:20, 35:24, 36:12, 39:1, 41:23, 66:24, 103:9
**views** [2] - 37:4, 86:3
**violating** [1] - 91:7
**violation** [1] - 92:19
**visibility** [1] - 88:18
**visit** [2] - 14:15, 71:16
**visitation** [2] - 25:11, 72:19
**visited** [1] - 14:12
**visiting** [2] - 66:22, 71:6
**visitor** [5] - 85:15, 106:13, 106:17, 106:22, 107:2
**visitors** [3] - 31:3, 73:8, 73:13
**vista** [2] - 97:1, 97:2
**vitality** [1] - 39:6
**voice** [1] - 61:20
**Vope** [1] - 78:22
**vouch** [1] - 25:9

## W

**wait** [1] - 78:5
**walk** [2] - 10:23, 63:15
**walking** [1] - 63:17
**wants** [3] - 77:18, 80:20, 110:25
**wash** [1] - 61:18
**Washington** [7] - 1:6, 2:4, 2:7, 2:10, 2:14,

2:19, 2:23
**waste** [2] - 47:4, 48:7
**water** [1] - 88:18
**ways** [2] - 85:5, 93:21
**weaken** [1] - 46:5
**Wednesday** [1] - 1:7
**weeds** [2] - 104:18, 105:2
**weekend** [1] - 47:13
**weight** [1] - 89:6
**weighting** [1] - 73:9
**Weiner** [1] - 4:2
**WEINER** [1] - 2:12
**west** [8] - 7:5, 31:22, 47:9, 47:13, 47:23, 83:13, 88:4, 90:15
**whatsoever** [1] - 41:1
**whereas** [2] - 44:21, 94:23
**White** [19] - 7:6, 21:10, 33:8, 33:21, 33:23, 49:21, 49:23, 50:2, 50:19, 71:19, 71:21, 72:3, 72:6, 72:14, 72:16, 72:25, 73:1, 73:7, 73:13
**Whoever's** [1] - 103:1
**whole** [8] - 13:24, 15:3, 20:23, 29:18, 31:18, 32:2, 35:4, 38:11
**wide** [17] - 29:4, 31:24, 61:15, 62:4, 62:9, 63:2, 63:5, 64:4, 64:6, 64:15, 64:16, 79:17, 80:24, 80:25, 81:3, 81:23, 107:7
**wildlife** [19] - 7:4, 19:15, 21:11, 27:15, 33:6, 33:24, 66:25, 81:24, 85:5, 85:9, 88:24, 98:2, 98:11, 103:7, 103:11, 104:22, 106:25, 108:11, 109:15
**WILLIAM** [1] - 2:17
**William** [2] - 3:21, 102:22
**Willson** [1] - 1:22
**winter** [13] - 13:17, 14:11, 14:21, 21:18, 25:12, 35:6, 51:24, 66:22, 71:6, 71:9, 71:12, 72:19, 73:3
**Winter** [16] - 5:6, 6:1, 30:16, 43:13, 58:18, 58:20, 60:2, 62:2, 62:3, 62:24, 72:23, 73:24, 85:15, 89:12,

98:11, 100:14
**winters** [2] - 71:14, 85:16
**wish** [3] - 7:22, 8:4, 39:17
**wishes** [1] - 63:12
**withdraws** [1] - 55:23
**withstand** [1] - 44:6
**WITNESSES** [1] - 113:3
**wolverines** [1] - 35:12
**wonder** [1] - 74:3
**wonderful** [2] - 39:12, 39:18
**wonders** [1] - 43:1
**Wong** [1] - 4:3
**WONG** [1] - 2:16
**word** [1] - 94:6
**words** [14] - 5:17, 9:7, 17:23, 18:11, 19:5, 19:14, 26:7, 26:16, 92:15, 94:4, 94:16, 94:19, 95:7, 96:10
**worker** [1] - 91:17
**world** [1] - 39:9
**worry** [1] - 20:3
**worst** [4] - 87:3, 88:2, 88:5, 90:16
**worst-case-scenarios** [1] - 90:16
**worth** [1] - 108:2
**Wrap** [1] - 97:8
**wrap** [2] - 107:9, 108:16
**written** [2] - 91:1, 96:17
**WUP** [1] - 60:17
**WUPS** [1] - 7:2

## Y

**year** [8] - 15:10, 58:16, 58:18, 70:4, 70:19, 72:22, 86:20, 106:22
**years** [18] - 12:11, 24:5, 24:25, 30:6, 44:24, 50:9, 57:13, 69:23, 71:18, 84:13, 85:13, 103:12, 104:23, 106:3, 106:25, 108:3, 108:9
**yellow** [1] - 66:6
**YELLOWSTONE** [1] - 1:3
**Yellowstone** [33] - 1:21, 3:3, 3:15, 9:11, 11:13, 14:19, 14:20, 20:15, 22:3, 35:22, 39:6, 39:7, 39:24,

42:20, 44:6, 48:8, 60:17, 60:25, 61:4, 64:14, 66:22, 71:6, 80:18, 97:7, 97:14, 98:22, 99:16, 106:8, 106:18, 106:20, 110:9, 110:19
**Yellowstone's** [2] - 43:1, 46:21
**yield** [1] - 25:13
**yourselves** [1] - 3:7

## Z

**Zambony** [1] - 83:23
**zero** [6] - 11:14, 59:18, 59:25, 60:13, 61:10, 66:11
**zone** [1] - 31:10
**zones** [2] - 65:4, 66:13

PDF created with pdfFactory trial version www.pdffactory.com